

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| JACKSONVILLE POLICE AND FIRE PENSION FUND, on behalf of itself and all others similarly situated, | |
| | Civil Action No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Jacksonville Police and Fire Pension Fund ("Plaintiff"), by its undersigned counsel, brings this action on behalf of itself and all other similarly situated persons or entities (the "Class"), other than Defendants and their affiliates (as described herein), who purchased or otherwise acquired securities issued by American International Group, Inc. ("AIG" or the "Company"), from May 11, 2007 through May 9, 2008 (the "Class Period"), for violations of the federal securities laws. Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The allegations of this Complaint are based on Plaintiff's personal knowledge as to itself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## SUMMARY OF THE ACTION

1.     This class action involves allegations that AIG, the world's largest insurer and one of the 30 companies making up the Dow Jones Industrial Average, and certain of its officers and directors issued a series of false and misleading statements relating to the Company's finances that artificially inflated the price of AIG securities.  Throughout the Class Period, defendants repeatedly reassured investors that AIG's superior risk management and diversification had successfully insulated the Company from the turmoil that had roiled the credit markets through 2007.  In truth, AIG hid or recklessly ignored facts regarding the mounting losses on the Company' assets and insurance products tied to the residential mortgage market, even as its top management continued to claim that AIG's actual exposure was "close to zero."

2.     Indeed, since the inception of the Class Period, AIG made repeated statements touting the Company's sophisticated and conservative risk management strategies and policies.  In particular, AIG consistently assured investors of the security of its "super senior" credit default swap ("CDS") portfolio, representing to investors the material fact that it was "highly unlikely" to suffer any actual losses as a result of the mortgage meltdown.  CDSs are credit derivatives that, in practice, work much like traditional insurance:  a buyer of a CDS obtains credit protection by paying a fee to transfer the risk of default on a fixed income security to the seller of the swap (in this case, AIG).

3.     For example, in an August 2007 investor conference call, the (now) former head of AIG's derivative unit, Defendant Joseph Cassano, touted the level of protection built into the Company's CDS portfolio, stating that "*it is hard for us with,*

2

*and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions."*

4.     Repeating this sentiment at an investor meeting on December 5, 2007, Defendant AIG Chief Executive Officer Martin Sullivan claimed that AIG had "little to no exposure" to asset-backed commercial paper, structured investment vehicles or collateralized debt instruments tied to residential mortgage-backed securities. According to Sullivan, the likelihood the CDS portfolio would sustain actual losses was "close to zero." Moreover, Sullivan stated, AIG was "confident" in its valuation methods and that, given the Company's "size, financial strength and global diversification," its exposure to the U.S. residential housing market was "manageable." These assurances provided great comfort to investors and ensured that AIG securities traded at artificially inflated levels during the Class Period.

5.     The truth about the losses faced by AIG as a result of the deterioration in its CDS portfolio began to emerge on February 11, 2008, when AIG revealed to investors that the Company's independent auditor, PricewaterhouseCoopers LLC ("PWC"), discovered material weaknesses in the Company's financial reporting and oversight and had insisted that the Company drastically modify its method of accounting in its CDS portfolio. According to the Company, by applying the proper valuation method, AIG's actual losses on its CDS portfolio more than quadrupled to be between $4.5 and $6.0 billion as of November 30, 2007, from the $1.4 billion to $1.5 billion loss valuation first reported by the Company at the December 5 investor meeting. AIG further disclosed that PWC had uncovered a "material weakness in its internal control" over financial reporting and oversight relating specifically to its accounting for these derivative securities.

3

6.     Following the February 11 disclosures, AIG stock plunged 12%, from $50.86 per share to $44.74 per share, wiping out $15 billion in shareholder value.  Two weeks later, on February 28, 2008, the Company again revised the valuation on this same CDS portfolio, reporting in its Form 10-K filed with the Securities and Exchange Commission ("SEC") an upward modification of cumulative losses of $11.5 billion as of December 30, 2007.  In short, over the course of just three short months, AIG's losses on its CDS portfolio appeared to jump from $1.4 to $1.5 billion in December, to $4.5 to $6.5 billion in mid-February, to $11.5 billion on February 28.

7.     Furthermore, AIG disclosed, *for the first time*, that it had notional exposure of over $6.5 billion in liquidity puts that it had written on CDOs linked to U.S. residential subprime mortgages.  According to AIG's 2007 10-K, unbeknownst to investors, the Company had been forced to repurchase over $754 million in CDO securities at par value in 2007 pursuant to the terms of the liquidity puts, and that AIG had provided $3 billion in liquidity facilities in case the Company was required by counterparties to repurchase additional CDOs over the next three years.  These disclosures in the 2007 10-K revealed that AIG officials were well aware at the December 5 investor meeting that AIG was facing substantial exposure to the subprime mortgage market, as indeed, the Company had already been forced to repurchase hundreds of millions of dollars worth of mortgage-related CDOs in 2007.

8.     Then, on May 8, 2008, AIG reported a massive $7.8 billion loss in the first quarter of 2008 – the worst-performing quarter in the Company's 40-year history – which the Company largely attributed to an astonishing $9.1 billion additional decline in valuation of its CDS portfolio.  Furthermore, AIG recanted its earlier statements that the

valuation fluctuations in the CDS portfolio did not reflect any actual economic impact; that any deterioration in the portfolio was only temporary; and that it was "highly unlikely" that there would be any actual losses.  In an about-face, AIG admitted that actual losses in its CDS portfolio were now estimated to be $2.4 billion.  Further undermining the credibility of even this most recent valuation, an unidentified outside evaluator hired by the Company pegged actual losses in this CDS portfolio at closer to $9 to $11 billion.

9.    These disclosures sent shares tumbling 13% over the next two trading days, from $44.15 to $38.37 per share, eliminating $14.4 billion in AIG's market capitalization.

10.    Defendants' knowing or reckless statements and inadequate disclosure of the massive losses inflicted on the Company's CDS portfolio artificially inflated the price of AIG stock throughout the Class Period, which reached as high as $72.54 per share on June 5, 2007.  When the truth about AIG's financial condition finally reached the market, culminating with the Company's stunning disclosure on May 8, 2008 reporting billions in losses on complex investments tied to residential mortgage-backed securities, the price of AIG stock sunk to $38.37 per share, wiping out tens of billions of dollars in shareholder value and causing substantial damage to the Class.

11.    This is an action to recover the losses suffered by those investors.

## PARTIES

12.    Plaintiff Jacksonville Police and Fire Pension Fund, a public pension fund with over $1 billion in assets based in Jacksonville, Florida, purchased shares of AIG during the Class Period as set forth in the attached certification and was injured thereby.

13.     Defendant American International Group, Inc. ("AIG" or "the Company") is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  AIG, through its subsidiaries, describes itself as a world leader in insurance and financial services with operations in more than 130 countries. AIG trades on the New York Stock Exchange under the ticker symbol AIG and, as of April 30, 2008, had 2,492,061,043 common shares of AIG stock outstanding.

14.     Defendant Martin J. Sullivan ("Sullivan") served as the President and Chief Executive Officer of AIG at all times relevant to the Class Period.

15.     Defendant Steven J. Bensinger ("Bensinger") served as the Executive Vice President and Chief Financial Officer of AIG at all times relevant to the Class Period.

16.     Defendant Joseph Cassano ("Cassano") served as head of AIG's Financial Products division ("AIGFP") at all times relevant to the Class Period.

17.     Defendant Robert Lewis ("Lewis"), AIG's Senior Vice President and Chief Risk Officer at all times relevant to the Class Period.

18.     Sullivan, Bensinger, Cassano and Lewis are referred to collectively herein as the "Individual Defendants," and, together with AIG, are referred to as the "Defendants."

## JURISDICTION AND VENUE

19.     The claims asserted herein on behalf of the Class arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

20.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

22.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

### FACTUAL ALLEGATIONS

**A.     AIG AND THE SUB-PRIME MORTGAGE MARKET**

23.     Sub-prime mortgages consist of residential home loans extended to borrowers who, pursuant to certain underwriting guidelines, do not qualify for "first tier" interest rates.   These underwriting guidelines typically include a variety of factors, including the borrower's credit history, income, assets, and amount of equity in the residential property.   Sub-prime mortgages carry higher interest rates because of their increased risk and higher rate of default.   Other non-prime mortgage products, sometimes referred to as "Alt-A" loans, are offered to borrowers with purportedly prime credit, but for various reasons do not meet the underwriting standards to qualify as prime loans that are sellable to Freddie Mac and Fannie Mae in the secondary mortgage market.

24.     AIG engages in the residential mortgage market in at least four significant ways. First, AIG acts as a mortgage originator through its subsidiary American General Finance, Inc., which originates mortgages, including first-lien and second-lien residential sub-prime mortgages.   Second, AIG's insurance and financial subsidiaries invest in collateralized debt obligations ("CDOs") and mortgage-backed securities which utilize residential mortgage loans as collateral.   Third, AIG acts as a securitizer of sub-prime

mortgages, which it packages into various securities, including CDOs, that it markets to investors. Fourth, AIG, through its subsidiaries, acts as an insurer for investors looking to hedge risk on debt instruments tied to the residential mortgage market.

25. AIG Financial Products ("AIGFP"), a subsidiary of AIG, issues credit protection through "credit default swaps" on select senior CDOs. These "credit default swaps" or "CDSs" are used by investors to hedge risk exposure on CDOs and other debt securities. CDSs are derivative instruments in which one party agrees, for a periodic fee, to assume the risk of non-payment on an underlying asset. In the event of a default on the underlying asset, the seller of the CDS is obligated to compensate the purchaser of the credit protection for the defaulted amounts.

26. The value of a CDS is derived from the quality of the underlying asset. The price of a swap is set by the expected likelihood of a default and the probable amount of the loss, or the "loss severity." The "value" of the swap, is therefore the amount of payments due to the seller over the life of the swap, less the likely default payments the seller will owe the purchaser. As the amount of the default payments increases, the value of the swap decreases.

27. Stated another way, because AIG is the seller of credit protection through CDSs, AIG's CDS portfolio consists of "derivative liabilities." As the value of the underlying CDO or other source of payments goes up, the potential liability of the CDS seller goes down. The lower potential liability means more of the premium AIG received in selling the credit protection is available as earnings. However, the inverse is also true. As the underlying credit goes down, more of AIG's premiums will be used to pay for losses, and the Company's earnings will diminish as a result.

28.     As investors would eventually discover, AIG, through AIGFP, was the counterparty on credit default swaps hedging the risk of failure to pay or other credit condition for at least $527 billion in debt, including over $78 billion in CDOs as of December 31, 2007.

29.     Accounting for derivative instruments, including CDSs, is governed by Statement of Financial Accounting Standard ("FAS") 133.  FAS 133 requires that derivative instruments such as credit default swaps be "marked to market" at the end of each reporting period.  This means that the derivative is valued on a company's books at its current market value, with any gains or losses from the prior period increasing or decreasing current earnings.

30.     FAS 107, as amended by FAS 133, requires a company to "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."  Quoted market prices are the best evidence of fair value.

31.     Where there are no quoted market prices, as was usually the case with AIG's CDSs, AIG would "mark-to-model."  The Company would estimate the fair value of its CDSs based on inputs and assumptions taken from current market indicators or comparable investments.  This mark-to-model approach was allowed so long as the fair value estimate is "practicable."

32.     According to AIG's Form 10-K for 2006, AIG performed the required market value assessment on its derivative instruments under the following stated policy:

*Fair Value Determinations of Certain Assets And Liabilities (Financial Services):*

•     Valuation models: utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.

• Market price data: AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such data is not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable recent prices.

33. AIG repeatedly touted the quality of its CDS portfolio. For example, in its 2006 Form 10-K, signed by Sullivan and Bensinger, the Company represented:

> AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses." *The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.* (emphasis added.)

## B. AIG FRAUDULENTLY REPORTS ITS FIRST QUARTER 2007 FINANCIAL RESULTS

34. On May 10, 2007, after the market closed, AIG announced its financial results for the first quarter of 2007 and filed its Form 10-Q with the SEC (the "2007 First Quarter Form 10-Q"). The Company reported net income of $4.13 billion or $1.58 per diluted share, compared to $3.20 billion or $1.22 per diluted share in the first quarter of 2006. AIG shares edged up on the news to $72.58 per share from their previous close of $72.20.

35. In addition to reporting net income, the Company also reported adjusted net income, which purported to exclude the effects of FAS 133 losses of $205 million. These losses were attributed to the "effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its

10

Capital Markets operations." Thus, the loss was attributed to fluctuations in the value of its own economic hedges, rather than derivative securities portfolios held by AIG.

36.     Both Sullivan and Bensinger certified the results reported in the 2007 First Quarter Form 10-Q, representing, *inter alia*, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

37.     These certifications, along with the disclosures in AIG's press release and 2007 First Quarter Form 10-Q were materially false and misleading. Nowhere did the Company disclose losses to its CDS portfolio, the amount of CDS exposure related to residential mortgages and sub-prime mortgages in particular, or the fact that AIG lacked the internal controls to determine the actual market value of its CDS instruments required for accurate reporting. The absence of any mention regarding these facts, while reporting only a *de minimus* amount of mark-to-market adjustments attributed to other derivative activity, continued to assure investors that any exposure to the growing housing crisis was immaterial.

## C.   AIG CONTINUES TO MISLEAD THE MARKET AND FRAUDULENTLY REPORT ITS SECOND QUARTER 2007 FINANCIAL RESULTS

38.     Following the end of the second quarter ended June 30, 2007 and into the third quarter of 2007, the number of companies disclosing significant losses from exposure to residential mortgages—especially sub-prime mortgages—rose at an alarming rate. Because these announced losses concerned "structured investments" and credit

insurance (*e.g.*, default swaps) on these investments, AIG shareholders became concerned that the Company was also susceptible to these losses.

39.     For example, on August 1, 2007, MarketWatch reported that "AIG shares dropped more than 8% in July as investors worried the giant insurer could be hit by losses from declines in the value of subprime mortgages." Paul Newsome, an analyst at A.G. Edwards, observed that "AIG's shares have fallen significantly in past days.  Why we don't exactly know, but investors are telling us that it has something to do with the potential for AIG to suffer significant losses from subprime mortgages."

40.     On August 8, 2007, after the close of the market, in an effort to calm investor concerns over AIG's subprime related exposure, AIG issued its second quarter 2007 earnings release and Form 10-Q for the quarter ended June 30, 2007 ("2007 Second Quarter Form 10-Q").  In the press release accompanying the Company's earnings, CEO Sullivan assured investors that "[AIG] continue[s] to be very comfortable with our exposure to the U.S. residential mortgage market, ***both in our operations and our investment activities.***  However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call." (emphasis added.)

41.     On August 9, 2008, during the earnings conference call, AIG and senior AIG officials, including Individual Defendants Martin Sullivan, Joseph Cassano, and Robert Lewis, led investors through a PowerPoint presentation titled "Residential Mortgage Presentation."[1]   The call and presentation only further misled investors regarding AIG's "super senior" credit default swap portfolios.

---

[1] This presentation was made available to investors prior to the call.  The presentation remains available at http://ir.aigcorporate.com/phoenix.zhtml?c=76115&p=irol-residential (visited May 15, 2008).

42.     During the conference call, AIG departed from its usual earnings presentation specifically to allow time to address investor concerns over the Company's exposure to the U.S. residential mortgage market.  AIG again used the opportunity to calm investor concerns by deliberately or recklessly misrepresenting not only that there had been no losses on AIG's credit default swaps, but that any losses in the future were inconceivable.   In walking investors through the presentation, Robert Lewis, AIG's Senior Vice President and Chief Risk Officer, represented to investors that:

> AIGFP's exposure to the market is derived through two sources.  First, they write ***extremely risk-remote super senior or AAA-plus credit protection on highly-diversified pools of assets,*** some of which include residential mortgages.  Second, they are cash investors in highly-rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages.  While both of these activities involve significant notional exposure, ***the risk actually undertaken is very modest and remote,*** and has been structured and managed effectively.  AIGFP has been running a successful business of writing super senior credit default swaps, or CDS protection, since 1998.  As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion.  The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality.  ***Before AIGFP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses*** that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.

43.     Investors did not need to be concerned, according to the Company, because AIGFP was superior to other companies in its credit judgment.   Defendant Cassano, then-head of AIGFP, thus assured AIG investors that:

> It is hard to get this message across but these [credit default swaps] are very much handpicked.  We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points.  People have been willing to work with us in order to do that, to create the value that they do in these underlying.  So the combination of the underlying credit quality, and then the stresses that we put it through to make sure that we can hit these marks ***it is hard for us with, and without being flippant, to even see a scenario within any kind***

*of realm of reason that would see us losing $1 in any of those transactions.*

We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. But we see no issues at all emerging. We see no dollar of loss associated with any of that [credit default swap] business. *Any reasonable scenario that anyone can draw, and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.* (emphasis added.)

44.     Also during the call, Defendant Sullivan commented that:

AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoy [sic] significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to manage these risks carefully.

Temporary market disruptions may have some noneconomic effect on AIG through unrealized losses. However, the sound credit quality of the portfolios should result in collection of substantially all principal and interest under any reasonable scenario.

45.     The call and presentation had its desired effect. For example, on August 13, 2007, the *Wall Street Journal* reported on the call as follows:

Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers. But not at American International Group Inc. – or so its executives say. The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets. Although AIG sees mortgage delinquencies rising executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk. *The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include some subprime debt.* AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring. *No likely losses means no reason to worry, the company reasoned... Stock analysts seem satisfied by the Company's response that there isn't a problem.* (emphasis added.)

14

46.     On August 8, 2007, AIG filed its 2007 Second Quarter Form 10-Q.  As they did with the 2007 First Quarter Form 10-Q, both Sullivan and Bensinger certified the results reported in the 2007 Second Quarter Form 10-Q, representing, *inter alia*, that (1) the report was free from untrue statements of material facts or material omissions and (2) that each had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

47.     The statements made by the Defendants on the August 9, 2007 earnings conference call, and in the earnings press release and 2007 Second Quarter Form 10-Q, were materially false and misleading.  In reality, as Defendants would first begin to admit in February 2008, AIG was not marking these investments to market based on the actual market value of the derivatives as required by GAAP and, in fact, lacked the basic internal controls required to do so.  Furthermore, by the time of these statements, Defendants knew or recklessly disregarded that since the beginning of the Class Period, there had been even greater losses to AIG's CDS portfolio directly attributable to the housing credit crisis.

48.     Specifically, Defendants knew or should have known that the deterioration of the credit quality of the assets underlying their CDS portfolio had declined to a point where significant defaults were a near certainty, and that the market value of the portfolio itself had declined substantially.  Defendants also knew or should have known that it was unreasonable to expect no losses from these investments.  Any legitimate procedure for

evaluating the expected losses would have demonstrated probable and estimable losses that should have been taken in the first and second quarters, as well as when the statements were made.

**D.  AIG CONTINUES TO MISREPRESENT ITS FINANCIAL RESULTS AND CDS EXPOSURE IN ITS NOVEMBER 2007 PUBLIC DISCLOSURES**

49.     On November 7, 2007, the Company filed its third quarter Form 10-Q ("2007 Third Quarter Form 10-Q") after the close of the market.  In the 2007 Third Quarter Form 10-Q, which was signed by Sullivan and Bensinger, AIG admitted the credit and mortgage crises had resulted in a small third quarter loss in its credit default swap portfolio ($352 million) and projected only slightly higher losses during the fourth quarter ($550 million).   Investors considered these losses minimal compared to the approximately $500 billion in total exposure.  Downplaying even these small losses, the 2007 Third Quarter Form 10-Q stated that "AIG continues to believe that it is highly unlikely" that AIGFP would ever actually have to make payments under its portfolio of credit default swaps.

50.     The following morning, AIG executives dismissed any material impact of credit default swap losses during its earnings conference call, with AIG Senior Vice President and Chief Risk Officer Robert Lewis stating that the "ultimate credit risk actually undertaken is remote and has been structured and managed effectively." Defendant Sullivan further trivialized the already understated losses, stating:

> The loss taken this quarter reflects a change in the fair value of these derivatives due to the significant widening of credit spreads on the underlying collateral.  However it does not reflect a change in our view. *AIG does not expect to pay any losses on this carefully structured and well-managed portfolio.*  All Super Senior transactions are written to a zero loss standard; underlying collateral assets analyze the model to determine appropriate risk attachment points to that all transactions have

significant subordination below AIG-FP's attachment point. (emphasis added.)

51.     The earnings call again featured a PowerPoint "Residential Mortgage Presentation."[2]  The slide presentation furthered AIG's efforts to mislead investors regarding its "super senior" credit default swap portfolios, stating that "AIG does not expect to be required to make any payments from this exposure."  Once again, the 2007 Third Quarter Form 10-Q indicated only minor mark-to-market losses on the credit default swap portfolio.

52.     The truth, which Defendants either knew or recklessly disregarded at the time of the filing of AIG's 2007 Third Quarter Form 10-Q and the earnings conference call, but would continue to conceal from the market until at least February 2008, included, among other things, the following:

> (1)  The relatively modest losses for September and October 2007 reported by AIG in its portfolio of credit default swaps were calculated using an inadequate valuation model.  This model was inadequate under GAAP because it was based on generic credit spreads on asset-backed securities, rather than any actual market data;

> (2)  AIG's reported losses in its portfolio of credit default swaps would have been substantially higher had AIG utilized the more appropriate market-based valuation model instead of relying on "generic" credit spreads; and

> (3)  AIG should have used, at a minimum, an appropriate valuation model based on actual cash bond prices provided by the managers of the underlying collateral pools or prices derived from a price matrix based on available cash bond prices.  Further, AIG should have disclosed that its credit default swap positions were illiquid because the market for these derivatives had effectively disappeared.

53.     Nonetheless, Defendants Bensinger and Sullivan certified that AIG's 2007 Third Quarter Form 10-Q:  (i) "[did] not contain any untrue statement of a material fact

---

[2] These slides were posted for viewing on AIG's website prior to the conference call and can be located at http://ir.aigcorporate.com/phoenix.zhtml?c=76115&p=irol-residential (viewed May 15, 2008).

or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented."

54.     In addition, Defendants Bensinger and Sullivan each certified in the 2007 Third Quarter Form 10-Q that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

**E.     AIG MISREPRESENTS ITS FINANCIAL RESULTS IN ITS DECEMBER 2007 DISCLOSURES**

55.     On December 5, 2007, AIG held an investor meeting for the purpose of discussing the Company's exposure to the residential mortgage market.   During this meeting, AIG disclosed, for the first time, that the value of its super senior credit default swap portfolio had declined between $1.05 and $1.15 billion since September 30, 2007. Taking the disclosures of these losses together with the prior disclosures of losses in the third quarter Form 10-Q, AIG led shareholders to believe that the total disclosed decline in value of AIG's "super senior" credit default swap portfolio for 2007 through November was between $1.4 and $1.5 billion.  AIG later confirmed this disclosure in its Form 8-K/A filed with the SEC on December 7, 2007.

56.     During this investor meeting, Defendant Sullivan told shareholders that the possibility that the swaps would sustain a loss was "close to zero" and that AIG is

"confident in [its] marks and the reasonableness of [its] valuation methods."   Mr. Sullivan also told investors that AIG had "a high degree of certainty in" the losses that AIG had "booked to date" and that the Company's U.S. residential housing market exposure levels "are manageable given AIG's size, financial strength and global diversification."   With respect to the valuation models, Mr. Sullivan claimed AIGFP's models "have proven to be very reliable" and "provide AIG with a very high level of comfort."   Mr. Sullivan concluded that "AIG has accurately identified all areas of exposure to the U.S. residential housing market."

57.      These misleading statements made on December 5, 2007 to shareholders had a positive effect on AIG's stock.  As the *Wall Street Journal*'s blog *MarketBeat* reported that same day:

> AIG's stock was the leading Dow component out of the gate, opening at $58 a share, up $2.55, or 4.6%, from Tuesday's $55.45 close.  The rally was bolstered by statements from company executives during today's session that its exposure to housing is 'manageable,' *and that it has no exposure to structured investment vehicles,* which hold a big load of the odorous mass known as collateralized debt obligations... Of course, the markets have heard this sort of thing before − losses expected to be contained weren't; exposures that looked healthy were less so − but *saying one has no exposure, that's a bit more definitive.* (emphasis added.)

58.      The truth, which AIG and the Individual Defendants either knew or recklessly disregarded prior to and at the time of the investment meeting held on December 5, 2007 ("December 5 Investor Meeting") and the filing of AIG's Form 8-K on December 7, 2007 ("December 7 Form 8-K") included, among other things, the following:

> (1)  Losses to AIG's super senior credit default swap portfolio in October and November 2007 were in excess of $4 billion greater than what AIG disclosed to investors at the December 5 Investor Meeting and in the December 7 Form 8-K;

(2)  AIG hid its true losses in its super senior credit default swap portfolio in October and November 2007 by netting against those losses $4.36 billion in offsets from supposed "cash flow diversion features" and "negative basis adjustment," which netting was never disclosed to investors at the December 5 Investor Meeting or in the December 7 Form 8-K;

(3)  All of $3.6 billion-plus in "negative basis adjustments" that AIG utilized to hide actual super senior credit default swap portfolio losses in October and November 2007 were improper;

(4)  More than 50% of the cash flow diversion features that AIG utilized to hide actual super senior credit default swap portfolio losses in October and November 2007 were improper; and

(5)  AIG had a "material weakness" in its internal controls over financial reporting related to the fair value of its super senior credit default swap portfolio at the same time AIG disclosed losses for this swap portfolio at the December 5 Investor Meeting and in the December 7 Form 8-K.

## F.  THE TRUTH CONCERNING AIG'S REAL CDS EXPOSURE, LOSSES AND ACCOUNTING BEGINS TO EMERGE

59.  On February 11, 2008, in its Form 8-K ("February 11, 2007 Form 8-K"), AIG admitted that its credit swap portfolio losses were understated and that material information previously supplied to the market required correcting.

60.  As reported in the February 11, 2007 Form 8-K, AIG's gross cumulative decline in valuation for its credit swap portfolio through November 30, 2007 was actually $5.96 billion, more than $4 billion greater than the net figure reported to shareholders in December 2007.

61.  As reported in the February 11, 2007 Form 8-K, utilization of the "cash flow diversion feature" and "negative basis adjustment" in AIG's December disclosures reduced the $5.964 billion dollars in "gross" losses down to approximately $1.4 to $1.5 billion in losses, which AIG disclosed in its December 7 Form 8-K.  This was the first time AIG utilized these two techniques in this manner, according to the February 11

Form 8-K.  In fact, AIG had previously informed the market that prior to the December disclosures, the Company believed it could not reliably estimate the value of the "cash flow diversion features" and thus did not utilize either feature in calculating the value of its credit swap portfolio as of September 30, 2007 and as of October 31, 2007, when it reported losses in the CDS portfolio at those intervals in its 2007 Third Quarter Form 10-Q.  However, faced with enormous gross losses, AIG quickly reversed this position at the time of the December 5 investor meeting and reported that, for the first time, AIG was able to utilize these features on a net basis to reduce reported losses by $732 million. AIG also admitted that the December 2007 disclosures represented the first time AIG began to net its losses in its credit swap portfolio against $3.63 billion by utilizing "negative basis adjustments."  These negative basis adjustments, which the Company claimed were intended to reflect the spread differential between the spreads implied from cash CDO prices and credit spreads implied from the pricing of CDS on the CDOs, had the effect of making the Company's CDS losses appear much less substantial – in the order of several billion dollars – than they actually were.

62.     Significantly, AIG's 2007 Third Quarter Form 10-Q fails to discuss the use of "negative basis adjustments" by AIG in calculating the value of its credit swap portfolio at that time.  As reported in the February 11, 2007 Form 8-K, AIG admitted that it did not have grounds to utilize the $3.63 billion "negative basis adjustment" (which AIG used in its December disclosures to significantly reduce reported credit swap portfolio losses) going forward in AIG's upcoming Form 10-K for year-end 2007.

63.     As reported in the February 11, 2007 Form 8-K, the super senior credit default swap portfolio losses reported in AIG's third quarter 2007 Form 10-Q were

calculated using a modified Binomial Expansion Technique ("BET") that incorporated "generic" valuation inputs, as opposed to observed market-based inputs that AIG later adopted to calculate its losses, including "cash bond prices provided by the managers of the underlying CDO collateral pools, or, where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided." AIG further admitted in this report that the type of generic valuation methodology that was the basis of its loss disclosures in the Company's 2007 Third Quarter Form 10-Q resulted in dramatically lower loss calculations as compared to market-based valuation that AIG later implemented. Significantly, the February 11, 2007 8-K indicates that AIG's reported gross loss through November 30, 2007 would have been 57 percent less if AIG had relied on the generic valuation methodology.

64.     Finally, as reported in the February 11, 2007 Form 8-K, AIG was advised by its auditors, PricewaterhouseCoopers LLC ("PWC"), that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the super senior credit default swap portfolio."

65.     On February 12, 2008, the *Wall Street Journal* reported:

The finding by AIG's auditors PricewaterhouseCoopers LLP forced the big insurer to lower the value of insurance contracts it holds by an estimated $4.88 billion, before tax. Late last year, AIG went to great lengths to tell investors about the Company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller just above $1 billion for October and November.

Investors sold AIG's shares aggressively, sending them down $5.94, or 12%, to $44.74, a five-year low, and below its nadir during its accounting scandal. The decline wiped out $15 billion in stock market value and was the biggest percentage drop for AIG's shares since the 1987 stock-market crash. AIG's shares have lost a third of their value in the past year and are

down 23% this year.  Bond-rating firm Fitch Ratings announced yesterday
that it is putting AIG's issuer default rating on "negative" watch.

66.     Unknown to investors, but not to Defendants, the February 11 disclosures
revealed only the tip of the iceberg.  In reality, the losses AIG had already sustained, but
continued to conceal, were much higher.  Over the next several months, investors would
slowly learn the staggering amount of losses that were fraudulently withheld from the
investing public.

67.     On February 28, 2008, AIG filed its Form 10-K for year-end 2007 ("2007
Form 10-K"), which included additional disclosures demonstrating that the Company's
prior statements regarding losses on its credit swap portfolio had been false and
misleading.  As reported in the 2007 Form 10-K, just weeks after Defendants' prior
statements, AIG announced that the cumulative value of its credit default swap portfolio
dropped $11.5 billion and, as a result, AIG reported its largest quarterly loss ever of $5.3
billion.  In addition, AIG reported that its investment portfolio lost $3 billion in value due
to losses from the Company's portfolio of residential mortgage debt.

68.     In connection with the filing of the 2007 Form 10-K, Defendant Sullivan
reported to the market that Defendant Cassano, head of AIGFP, the entity responsible for
the Company's Credit swap portfolio, had agreed to leave AIG.

69.     AIG effectively conceded in its 2007 Form 10-K and fourth quarter 2007
earnings call on February 29, 2008, that the offsets it had previously used to reduce the
Company's reported losses were improper.   Accordingly, AIG reduced or eliminated
these offsets from its loss calculations.  Specifically, AIG conceded in the 2007 Form 10-
K that it did not have a basis to apply the $3.63 billion in "negative basis adjustments"
previously used in its December 2007 disclosures to reduce reported loss in value of the

credit default swap portfolio.   On the February 29, 2008 conference call, Defendant Bensinger admitted that, despite using the negative basis adjustments to report the CDS portfolio's third quarter losses, "AIG concluded that recording a negative basis adjustment at this time is not consistent with GAAP fair value requirements."

70.   On February 29, 2008, AIG also conceded in its fourth quarter earnings call that the "cash flow diversion features" used in its December 7, 2007 and February 11, 2008 disclosures to reduce reported loss in value of its credit default swap portfolio were improper.   Materials posted on AIG's website in support of the call make clear that AIG reduced this offsetting amount to only $310 million – a 58% reduction from the offset for such features that AIG used in its December 7 and February 11 Form 8-Ks.[3]

71.   The 2007 Form 10-K also reports, for the first time, that AIG's credit default swap portfolio included $6.5 billion in liquidity puts written on CDOs linked to the sub-prime mortgage market.   These put agreements required AIGFP to purchase certain CDOs at par, provided the securities did not suffer a default.

72.   These put agreements represented substantial near-term liabilities. Owners of these puts would not likely be exercised until it was apparent that a default on the underlying collateral was imminent or at least likely.   AIG would then have to take back the underlying assets in exchange for only the CDS price it had received when the credit quality of the assets was considered much higher.   In other words, the puts allowed purchasers of the sub-prime CDOs to force AIG to buy them back at the original price, despite the fact they had declined in value.

---

[3] These materials are available on AIG's website at
http://ir.aigcorporate.com/phoenix.zhtml?c=76115&p=irol-residential (visited May 15, 2008).

73.     Beyond disclosing the mere existence of the liquidity puts, the 2007 Form 10-K also reported for the first time that AIG had actually repurchased $754 million of these securities in 2007, and that the Company had provided third-parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years.   These liquidity puts further demonstrate that Defendants knew or recklessly disregarded AIG's exposure to the sub-prime mortgage market during 2007, as the liquidity puts are telling evidence that AIG was aware during the Class Period that the market for structured finance products such as CDOs had become significantly less liquid.

74.     The 2007 Form 10-K also includes a letter from AIG's audit firm, PWC, confirming that AIG's internal controls, relating to the AIGFP super senior credit default swap portfolio valuation process, had a material weakness and were ineffective:

> Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.   A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.
>
> *   *   *
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable

assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principle, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention of timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

75.     The 2007 Form 10-K further states that AIG agreed with its auditors' assessment that the Company's disclosure controls and procedures were ineffective as of December 31, 2007.  The report states AIG's controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements."

76.     The 2007 Form 10-K reports specifically on AIG's material weakness:

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified.  As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective.

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting.  AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of AIG's financial statements for external purposes in accordance with GAAP

\* \* \*

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not

effective. AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual, or interim consolidated financial statements that would not be prevented or detected on a timely basis.

77.    On May 8, 2008, after the market close, AIG announced its results for the quarter ended March 31, 2008, admitting that the true amount of the losses AIG had not previously been disclosed.

78.    The Company's net loss for the quarter was $7.8 billion. According to the press release, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio."

79.    The Company also disclosed that it had sustained "capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges...result[ing] primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary."

80.     Even as investors were just beginning to learn the extent of the Company's subprime exposure outside experts continued to question AIG's valuations, with some believing actual losses on the CDS portfolio to be closer to $9 to $11 billion.  For example, as disclosed in a draft prospectus issued pursuant to an offering of AIG common stock also filed with the SEC on May 8, the Company stated:

> AIG's credit-based analyses estimate potential realized credit impairment pre-tax losses at approximately $1.2 billion to approximately $2.4 billion. Other types of analyses or models could result in materially different estimates. AIG is aware that other market participants have used different assumptions and methodologies to estimate the potential realized credit impairment losses on AIGFP's super senior credit default swap portfolio, resulting in a significantly higher estimate than that resulting from AIG's credit-based analysis. *For example, a third-party analysis provided to AIG that AIG understands uses credit and market value inputs estimates the potential realized pre-tax losses on AIGFP's super senior credit default swap portfolio at between approximately $9 billion and approximately $11 billion. (AIG expresses no view as to the reasonableness of this third-party estimate and does not intend to seek an update of this estimate.)*

81.     These massive losses prompted AIG's simultaneous announcement that it would need to raise $12.5 billion in new capital.  *TheStreet.com*'s Nat Worden called these announcements "befuddling."

82.     In response to the news, Standard & Poor's immediately downgraded AIG's credit raiding.

83.     As a result of these announcements, shares of AIG stock plummeted on heavy trading to $40.28 per share from the previous close of $44.15, representing an 8.8% loss.

84.     AIG's actions have spoken louder than its words.  On May 20, 2008, the Company raised over $20 billion in new capital to fortify itself from future losses related to its residential mortgage exposure (a substantial increase from its initial plan announced

on May 8, 2008 to raise $12.5 billion), further underlining the Company's desperate financial condition.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

85.    At all relevant times, the market for AIG's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Through the Class Period:

(a)    AIG's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    AIG met the requirements of a seasoned issuer to file registration statements under Form S-3; in addition, as a regulated issuer, AIG filed periodic public reports with the SEC and the NYSE;

(c)    AIG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; Securities analysts and the business press followed and published research reports regarding AIG that were publicly available to investors;

(d)    The market price of AIG securities reacted promptly to the dissemination of public information regarding the Company;

(e)    The average daily trading volume for AIG stock during the Class Period was approximately 16.8 million shares traded; and

(f)    The Company's market capitalization was approximately $188.3 billion on May 11, 2007 (when AIG announced its financial results for the first quarter of 2007),

and $100.3 billion on May 9, 2008 (when AIG announced additional losses for the first quarter of 2008).

86.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for AIG securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

87.     Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of AIG securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

88.     Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased AIG securities at inflated prices.

89.     Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants failed to disclose material facts concerning the composition of AIG's credit default swap portfolio, which information Plaintiff would have wanted to have known and which would have caused investors to not have purchased shares of AIG at the prices at which they traded during the Class Period.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired AIG securities during the

period from May 11, 2007 through and including May 9, 2008 ("the Class Period") and suffered damages as a result.

91.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of AIG during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

92.     The members of the Class, purchasers of AIG securities, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher.  As of April 30, 2008, AIG reported that it had 2.49 billion shares of common stock issued and outstanding.

93.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual

Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

96.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)   whether the market price of AIG stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

(d)   with respect to Plaintiff's claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(e)   with respect to Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

(f)      whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

97.      Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

98.      The names and addresses of the record owners of AIG shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

### (Against All Defendants)

99.      Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

100.      This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

101.      Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class

members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

102.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and the other members of the Class to purchase AIG's securities at inflated prices.

103.    By failing to inform the market of the true risk of loss from AIG's credit default swap portfolio as a result of the rapidly rising rate of defaults on subprime mortgages and issues in the credit default swap market, and making other false statements and material omissions, these Defendants presented a misleading picture of AIG's finances and prospects.  This caused and maintained artificial inflation in the trading prices of AIG's publicly traded securities throughout the Class Period and until the truth came out.

104.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

105.    During the Class Period, the Individual Defendants occupied executive-level positions at AIG and were privy to non-public information concerning the

Company.   Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

106.   As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased AIG securities during the Class Period.   Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.   There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

107.   Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

108.   In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for AIG securities, Plaintiff and the other members of the Class purchased AIG securities at artificially inflated prices during the Class Period.   But for the fraud, they would not have purchased the securities at artificially inflated prices.

109.   The market price for AIG securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

110.   Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of AIG securities at artificially inflated

prices and the subsequent decline in the price of those securities when the truth was disclosed.

111.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

112.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

<u>**COUNT II**</u>

<u>**Violation of Section 20(a) of the Exchange Act**</u>

**(Against Defendants Sullivan and Bensinger)**

113.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Claim is brought pursuant to Section 20(a) of the Exchange Act against the individual defendants on behalf of Plaintiff and all members of the Class who purchased AIG securities during the Class Period.

114.    As alleged herein, AIG is liable to Plaintiff and the members of the Class who purchased AIG securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

115.    Throughout the Class Period, the Section 20(a) Defendants were controlling persons of AIG within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the AIG fraud, as detailed herein.

116.    Each of the Section 20(a) Defendants exercised control over AIG during the Class Period by virtue of, among other things, their executive positions with the

Company, the key roles they played in the Company's management, and their direct involvement in its day to day operations, including its financial reporting and accounting functions.

117.   In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over AIG during the Class Period.

118.   Given their individual and collective responsibilities for managing AIG throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for AIG's day-to-day business and operations, as well as the Company's strategic direction.  These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company. No one else at AIG exercised that degree of responsibility for, or control over, the Company's activities and public statements.

119.   As a result of the false and misleading statements and omissions alleged herein, the market price of AIG securities was artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing AIG securities at artificially inflated prices.

120.   This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

121.    By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of AIG's underlying violations.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class compensatory damages;

C.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated: May 21, 2008

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

Gerald H. Silk (GS-4565)
Salvatore J. Graziano (SG-6854)
David R. Hassel (DH-0113)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Attorneys for Plaintiff Jacksonville
Police and Fire Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, John Keane, on behalf of Jacksonville Police & Fire Pension Fund ("Jacksonville"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director - Administrator of Jacksonville. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. Jacksonville did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Jacksonville is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Jacksonville's transactions in the American International Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Jacksonville has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

   *In re American Italian Pasta Company Securities Litigation*, Case No. 05-cv-725 (W.D. Mo.)
   *Middlesex County Retirement System et al v. Semtech Corp. et al*, Case No. 07-cv-7114 (C.D. Cal.)

6. Jacksonville will not accept any payment for serving as a representative party on behalf of the Class beyond Jacksonville's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 day of May, 2008.

John Keane

John Keane
Executive Director - Administrator
*Jacksonville Police & Fire Pension Fund*

Jacksonville Police & Fire Pension Fund
Transactions in American International Group (AIG)

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchases | 6/7/2007 | 4,600 | $71.7050 |
| Purchases | 6/15/2007 | 4,800 | $72.5234 |
| Purchases | 10/31/2007 | 10,600 | $63.1600 |
| Purchases | 12/19/2007 | 4,100 | $57.7893 |
| Sales | 6/27/2007 | 7,500 | $70.1035 |
| Sales | 7/13/2007 | 4,800 | $69.6686 |
| Sales | 7/19/2007 | 3,000 | $69.6020 |
| Sales | 7/19/2007 | 11,400 | $69.6583 |
| Sales | 11/19/2007 | 5,600 | $55.4405 |
| Sales | 11/20/2007 | 1,300 | $54.3021 |
| Sales | 12/4/2007 | 3,300 | $55.5990 |
| Sales | 12/13/2007 | 15,500 | $56.2311 |
| Sales | 1/16/2008 | 2,818 | $58.2612 |
| Sales | 2/11/2008 | 14,100 | $45.2389 |
| Sales | 2/13/2008 | 3,382 | $45.5931 |
| Sales | 2/22/2008 | 9,500 | $47.4197 |