**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ )<br>)<br>JACKSONVILLE POLICE AND FIRE )<br>PENSION FUND, on behalf of itself and )<br>all others similarly situated, )<br>)<br>      Plaintiff, )<br>)<br>  v. )<br>)<br>AMERICAN INTERNATIONAL GROUP, )<br>INC., MARTIN SULLIVAN, STEVEN )<br>BENSINGER, JOSEPH CASSANO and )<br>ROBERT LEWIS, )<br>)<br>      Defendants. )<br>_____ ) | 08-CV-4772 (RJS)<br> ECF Case<br><br><br>**ELECTRONICALLY FILED** |

(captions continued on following pages)

**DECLARATION OF WILLIAM H. NARWOLD IN SUPPORT OF THE AIG**
**INSTITUTIONAL INVESTOR GROUP'S MOTION FOR**
**CONSOLIDATION, APPOINTMENT AS**
**LEAD PLAINTIFF, AND APPROVAL OF ITS SELECTION OF COUNSEL**

|  |  |  |
|---|---|---|
| JAMES CONNOLLY, individually and on behalf of all others similarly situated, | ) ) ) |  |
| Plaintiff, | ) ) | 08-CV-5072 (RJS) ECF Case |
| v. | ) ) |  |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN J. SULLIVAN, STEVEN J. BENSINGER, JOSEPH J. CASSANO, ROBERT E. LEWIS and DAVID L. HERZOG, | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |
| MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) ) |  |
| Plaintiff, | ) ) | 08-CV-5464 (RJS) ECF Case |
| v. | ) ) |  |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | ) ) ) ) |  |
| Defendants. | ) ) |  |

ONTARIO TEACHERS' PENSION PLAN
BOARD, on behalf of itself and all others
similarly situated,

                              Plaintiff,

                v.

AMERICAN INTERNATIONAL GROUP,
INC., MARTIN SULLIVAN, STEVEN
BENSINGER, JOSEPH CASSANO and
ROBERT LEWIS,

                          Defendants.

08-CV-5560 (RJS)

ECF Case

William H. Narwold declares under penalty of perjury this 21st day of July, 2008:

1.      I am a member of the law firm of Motley Rice LLC.  I submit this Declaration in support of the Motion of the AIG Institutional Investor Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Its Selection of Counsel.

2.      Attached hereto as Exhibits A-1 through A-3 are true and correct copies of the signed certifications of the members of the AIG Institutional Investor Group, pursuant to the requirements of the Private Securities Litigation Reform Act ("PSLRA") of 1995.  15 U.S.C. § 78u-4(a)(2).

3.      Attached hereto as Exhibit B is a true and correct copy of the notice to class members concerning the action that was published on May 22, 2008 on MarketWire advising the public of the pendency of a class action filed on behalf of shareholders of American International Group, Inc. ("AIG").

4.      Attached hereto as Exhibit C is the AIG Institutional Investor Group's loss charts showing its financial interest in the relief sought.

5.      Attached hereto as Exhibit D is a true and correct copy of the firm biography of Motley Rice LLC, proposed Co-Lead Counsel.

6.      Attached hereto as Exhibit E is the Lead Plaintiff Order in In re NPS Pharm., Inc. Sec. Litig., No. 2:06-cv-00570-PGC-PMW (D. Utah Nov. 17, 2006).

7.      Attached hereto as Exhibits F-1 through F-6 is a compendium of cases in which other courts have appointed foreign investors lead plaintiff in securities class actions, cited in the AIG Institutional Investor Group's Memorandum of Law, footnote 7.

8.      Attached hereto as Exhibit G is a true and correct copy of the firm resume of Kirby McInerney LLP.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 21, 2008.

/s/ William H. Narwold
William H. Narwold (WN-1713)

# EXHIBIT A-1

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Toon Termote and Erwin Schoeters, on behalf of KBC Asset Management NV ("KBC"), for account of the funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      We have reviewed a complaint against the American International Group, Inc. ("AIG") and designate Motley Rice LLC as proposed lead counsel for KBC in this action for all purposes.

2.      We are duly authorized to institute legal action on KBC's and the Funds' behalf, including litigation against AIG and the other defendants.  KBC controls and manages and is attorney-in-fact for the Funds.

3.      KBC did not acquire AIG securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.      KBC is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  KBC also understands that, if appointed lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings by the Court, including rulings regarding any judgments.

5.      KBC will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6.      Within the past three years, KBC has not sought to serve as a representative party for a class in an action under the federal securities laws.

7.      Within the past three years, KBC has not served as a representative party for a class in an action under the federal securities laws.

8.      KBC understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

9.      Attached hereto as Schedule A is a complete listing of all transactions KBC made on behalf of the Funds during the Class Period in the security that is the subject of the complaint. KBC will provide records of those transactions upon request.

10.     KBC is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.**

Executed this 18 day of July, 2008

KBC Asset Management NV


By: _____          By: _____
    Erwin Schoeters                         Toon Termote
    Managing Director                        President

## SCHEDULE A

### American International Group (NYSE: AIG)
### Class Period: 11/10/2006-06/06/2008

| KBC | | DATE | SHARES | PRICE |
|---|---|---|---|---|
| **Boon-Falleur Beatrice** | | | | |
| | Purchases: | 05/20/08 | **600** | 37.9000 |
| **Mahieu Pierre** | | | | |
| | Purchases: | 05/20/08 | **400** | 37.9000 |
| **FIVEST - US** | | | | |
| | Purchases: | 04/18/08 | **3,143** | 48.2300 |
| **PLATO INST.I.F. NORTH AMERICAN EQ.** | | | | |
| | Purchases: | 11/13/06 | **2,430** | 70.6500 |
| | | 11/27/06 | **661** | 70.2500 |
| | | 12/08/06 | **1,300** | 70.3500 |
| | | 12/19/06 | **400** | 72.2300 |
| | | 12/21/06 | **709** | 71.9500 |
| | | 01/12/07 | **1,093** | 71.0700 |
| | | 02/15/07 | **600** | 69.1200 |
| | | 03/15/07 | **768** | 67.0500 |
| | | 03/22/07 | **395** | 68.2100 |
| | | 05/16/07 | **10,469** | 72.4600 |
| | | 06/26/07 | **2,463** | 70.9400 |
| | | 06/29/07 | **19** | 70.0300 |
| | | 06/29/07 | **11,705** | 70.0300 |
| | | 09/27/07 | **1,449** | 67.4700 |
| | | 09/27/07 | **1,226** | 67.4700 |
| | | 10/01/07 | **1,731** | 68.5900 |
| | | 10/09/07 | **354** | 70.1100 |
| | | 10/12/07 | **700** | 68.0900 |
| | | 10/26/07 | **383** | 62.1500 |
| | | 12/14/07 | **2,400** | 55.6500 |
| | | 02/15/08 | **1,500** | 46.1100 |
| | | 03/17/08 | **2,500** | 39.8000 |
| | Sales: | 01/22/07 | 700 | 70.4600 |
| | | 04/23/07 | 1,176 | 69.5500 |
| | | 04/30/07 | 583 | 69.9100 |
| | | 08/16/07 | 1,301 | 63.9500 |
| | | 11/30/07 | 2,400 | 58.1300 |
| | | 05/05/08 | 3,900 | 47.3900 |

**KBC EQUITY FUND - TOP 30**

|  |  | Date | Shares | Price |
|---|---|---|---|---|
| | Purchases: | 11/21/07 | **30,428** | 51.7415 |
| | | 12/03/07 | **4,802** | 56.9000 |
| | | 02/04/08 | **5,201** | 55.5425 |
| | | 02/22/08 | **10,272** | 48.0700 |
| | | 03/14/08 | **1,311** | 41.2480 |
| | | 04/02/08 | **2,074** | 46.7400 |
| | | 04/18/08 | **20,213** | 48.1701 |
| | | 05/06/08 | **7,956** | 48.4966 |
| | | 05/08/08 | **2,755** | 44.0654 |
| | Sales: | 11/23/07 | 527 | 53.0300 |
| | | 11/23/07 | 426 | 52.8475 |
| | | 12/19/07 | 7,753 | 57.1205 |
| | | 01/14/08 | 1,795 | 59.3200 |
| | | 01/16/08 | 3,071 | 57.9600 |
| | | 01/22/08 | 472 | 52.4100 |
| | | 01/25/08 | 894 | 53.2200 |
| | | 02/11/08 | 1,040 | 44.7400 |
| | | 03/03/08 | 2,652 | 46.6900 |
| | | 03/07/08 | 2,034 | 42.8800 |
| | | 03/17/06 | 3,039 | 39.8806 |
| | | 03/19/08 | 5,988 | 42.6202 |
| | | 03/25/08 | 1,647 | 45.8100 |
| | | 05/30/08 | 632 | 36.0000 |
| | | 05/30/08 | 22,961 | 36.0000 |
| | | 06/06/08 | 740 | 34.1284 |

**KBC EQUITY FUND - FINANCE**

|  |  | Date | Shares | Price |
|---|---|---|---|---|
| | Purchases: | 05/24/07 | **157** | 71.8500 |
| | | 11/14/07 | **39,424** | 59.5462 |
| | | 11/14/07 | **117,733** | 59.4300 |
| | | 12/03/07 | **14,384** | 56.7391 |
| | | 02/04/08 | **22,401** | 55.5425 |
| | | 04/02/08 | **8,030** | 46.7400 |
| | | 05/06/08 | **13,282** | 48.4966 |
| | Sales: | 02/23/07 | 20,924 | 68.8173 |
| | | 04/20/07 | 3,750 | 69.4878 |
| | | 06/27/07 | 3,000 | 70.2038 |
| | | 08/23/07 | 8,000 | 66.7528 |
| | | 10/19/07 | 3,000 | 63.5634 |
| | | 11/20/07 | 11,625 | 54.4400 |
| | | 11/23/07 | 465 | 53.0300 |
| | | 11/23/07 | 10,155 | 52.8475 |
| | | 01/14/08 | 11,964 | 59.1625 |
| | | 01/14/08 | 9,228 | 59.1625 |

|  |  | 01/16/08 | 20,027 | 58.1927 |
|  |  | 01/22/08 | 8,518 | 52.4100 |
|  |  | 03/10/08 | 15,949 | 42.2400 |
|  |  | 03/18/08 | 6,952 | 41.3820 |
|  |  | 03/19/08 | 16,303 | 42.6202 |

**CENTEA FD-WORLD SELECT**

|  | Purchases: | 11/21/07 | **9,348** | 51.7415 |
|  |  | 11/23/07 | **465** | 53.0300 |
|  |  | 02/22/08 | **3,095** | 48.0700 |
|  |  | 04/18/08 | **6,186** | 48.1701 |
|  | Sales: | 12/19/07 | 777 | 57.0145 |
|  |  | 01/22/08 | 1,016 | 52.4100 |
|  |  | 01/25/08 | 453 | 53.2200 |
|  |  | 03/19/08 | 3,149 | 42.6202 |
|  |  | 03/25/08 | 673 | 45.8100 |
|  |  | 05/30/08 | 5,560 | 36.0000 |

# EXHIBIT A-2

## PLAINTIFF'S CERTIFICATION
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned, Dr. Joachim von Cornberg and Stefan D`Oleire, on behalf of Union Asset Management Holding AG ("Union"), for account of the funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     We have reviewed a complaint against the American International Group, Inc. ("AIG") and designate Motley Rice LLC as proposed lead counsel for Union in this action for all purposes.

2.     We are duly authorized to institute legal action on Union's and the Funds' behalf, including litigation against AIG and the other defendants.  Union controls and manages and is attorney-in-fact for the Funds.

3.     Union did not acquire AIG securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.     Union is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  Union also understands that, if appointed lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings by the Court, including rulings regarding any judgments.

5.     Union will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6.     Within the past three years, Union has sought to serve as a representative party for a class in an action under the federal securities laws in the following cases:

*Merck & Co., Inc., Sec., Derivative & "ERISA" Litig.*, No. 05-CV-1151 (D.N.J. 2005);
*In re Dell, Inc. Securities Litigation*, No. 06-CV-00726 (W.D. Tex. 2006);
*In re UBS AG Securities Litigation*, No. 07-CV-11225 (S.D.N.Y. 2008).

7.     Within the past three years, Union has served as a representative party for a class in an action under the federal securities laws in the following cases:

*In re Dell, Inc. Securities Litigation*, No. 06-CV-00726 (W.D. Tex. 2006);
*In re UBS AG Securities Litigation*, No. 07-CV-11225 (S.D.N.Y. 2008).

8.     Union understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

9.    Attached hereto as Schedule A is a complete listing of all transactions Union made on behalf of the Funds during the Class Period in the security that is the subject of the complaint. Union will provide records of those transactions upon request.

10.    Union is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.**

Executed this 21 of July, 2008

Union Asset Management Holding AG

By: _____          By: _____
    Dr. Joachim von Cornberg                 Stefan D`Oleire
    General Counsel                          General Counsel

**American International Group (NYSE: AIG)**
Class Period: 11/10/2006-06/06/2008

**Schedule A**

| Union | | DATE | SHARES | PRICE |
|---|---|---|---|---|
| **BayernLB Balanced Stocks 60 Plus Fonds** | | | | |
| | Purchases: | 10/31/07 | **3,600** | 63.0833 |
| | Sales: | 11/15/07 | 550 | 58.7731 |
| | | 01/31/08 | 3,050 | 53.0515 |
| **DEVIF-Fonds Nr. 450** | | | | |
| | Purchases: | 05/30/07 | **3,000** | 71.6609 |
| **Invest Global** | | | | |
| | Purchases: | 05/15/07 | **6,000** | 72.4042 |
| | | 12/19/07 | **7,369** | 57.3276 |
| | Sales: | 08/06/07 | 4,900 | 63.0894 |
| | | 11/20/07 | 2,000 | 53.9911 |
| | | 02/11/08 | 3,100 | 45.1223 |
| | | 02/11/08 | 1,400 | 45.1223 |
| **IPC- W.P. Vermögensfonds** | | | | |
| | Purchases: | 09/18/07 | **1,250** | 65.3000 |
| **UGS-Union** | | | | |
| | Purchases: | 02/01/07 | **14,000** | 68.6774 |
| | Sales: | 02/28/07 | 8,600 | 66.5961 |
| | | 08/15/07 | 5,400 | 63.8049 |
| **UniRak** | | | | |
| | Purchases: | 02/22/07 | **10,000** | 69.5889 |
| | | 02/26/07 | **10,000** | 68.8875 |
| | | 04/03/07 | **10,000** | 67.6550 |
| | | 04/10/07 | **10,000** | 67.1040 |
| | | 05/21/07 | **10,000** | 72.2160 |
| | | 06/21/07 | **10,000** | 71.5800 |
| | | 07/05/07 | **10,000** | 70.1103 |
| | | 08/08/07 | **10,000** | 66.1526 |
| | | 01/23/08 | **20,000** | 51.2889 |
| | | 05/07/08 | **10,000** | 47.3445 |
| | | 05/09/08 | **10,000** | 42.0420 |

# EXHIBIT A-3

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Walter Stampor, Executive Secretary of the General Retirement System of the City of Detroit ("Detroit General"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Secretary of Detroit General. I have reviewed a complaint filed in this matter. Detroit General has authorized Kirby McInerney LLP to file a motion for appointment as lead plaintiff on its behalf.

2. Detroit General did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Detroit General is willing to serve as lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Detroit General fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Detroit General's transactions in the American International Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Detroit General has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Dot Hill Systems Corp. Securities Litigation*, Case No. 06-cv-228 (S.D.Cal.)
*In re International Rectifier Corp. Securities Litigation*, Case No. 07-cv-2544 (C.D. Cal.)
*In re Medtronic Inc. Securities Litigation*, Case No. 07-cv-4564 (D. Minn.)
*Genessee County Employees' Retirement Sys. v. Merck & Co.*, No. 08cv2177 (D.N.J.)

6.    Detroit General has sought to serve as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions as lead plaintiff or was not appointed lead plaintiff:

*Maiden, et al. v. Merge Technologies Inc., et al.*, Case No. 06-cv-349 (E.D. Wis.)
*In re Amgen, Inc. Securities Litigation*, Case No. 07-cv-2536 (C.D. Cal.)
*In re Aetna Inc. Securities Litigation*, Case No. 07-cv-4451 (E.D. Pa.)
*In re UBS AG Securities Litigation*, Case No. 07-cv-11225 (S.D.N.Y.)
*Rubin v. MF Global, Ltd. et al.*, Case No. 08-cv-2233 (S.D.N.Y.)

7.    Detroit General will not accept any payment for serving as a representative party on behalf of the Class beyond Detroit General's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _18_ day of July, 2008.

Walter Stampor
Executive Secretary
*General Retirement System of the City of Detroit*

2

## SCHEDULE A

Detroit General's transactions in American International Group, Inc. securities during the class period.

**Purchases of the Common Stock:**

| Date | Purchases | Price |
|------|-----------|-------|
| November 10, 2006 | 1,700 | $69.25 |
| December 6, 2006 | 4,400 | $70.167 |
| January 3, 2007 | 26,800 | $72.138 |
| February 15, 2007 | 4,700 | $69.054 |
| March 2, 2007 | 8,000 | $69,783 |
| March 20, 2007 | 5,925 | $68.184 |
| March 23, 2007 | 3,300 | $68.229 |
| April 11, 2007 | 3,800 | $66.811 |
| April 12, 2007 | 1,900 | $66.366 |
| April 16, 2007 | 400 | $67.599 |
| April 24, 2007 | 600 | $69.428 |
| May 2, 2007 | 500 | $70.519 |
| May 18, 2007 | 800 | $72.179 |
| May 29, 2007 | 700 | $71.705 |
| June 6, 2007 | 900 | $72.254 |
| June 22, 2007 | 700 | $71.585 |
| July 5, 2007 | 800 | $70.254 |
| July 5, 2007 | 400 | $70.1 |
| August 3, 2007 | 7,700 | $61.795 |

| | | |
|---|---|---|
| August 8, 2007 | 1,100 | $66.568 |
| August 9, 21007 | 1,900 | $64,777 |
| August 10, 2007 | 1,900 | $64.246 |
| August 21, 2007 | 1,000 | $66.099 |
| September 5, 2007 | 2,400 | $65.751 |
| September 7, 2007 | 1,200 | $64.016 |
| September 7, 2007 | 2,600 | $64.205 |
| October 22, 2007 | 3,900 | $63.283 |
| October 22, 2007 | 1,000 | $63,232 |
| October 22,2 007 | 600 | $63.231 |
| October 31, 2007 | 1,100 | $63.01 |
| October 31, 2007 | 500 | $63.075 |
| November 6, 2007 | 4,000 | $61.336 |
| November 8, 2007 | 3,000 | $54.723 |
| January 7, 2008 | 300 | $56.164 |
| January 8, 2008 | 400 | $56.326 |
| January 8, 2008 | 700 | $56.357 |
| January 8, 2008 | 2,200 | $56.42 |
| January 9, 2008 | 1,800 | $55.124 |
| January 10, 2008 | 1,800 | $57.83 |
| January 10, 2008 | 1,800 | $56.284 |
| January 14, 2008 | 1,700 | $58.957 |
| January 16, 2008 | 2,900 | $57.799 |

| January 16, 2008 | 2,400 | $57.774 |
| January 18, 2008 | 2,900 | $51.653 |
| January 18, 2008 | 4,100 | $51.696 |
| January 18, 2008 | 7,100 | $52.536 |
| January 23, 2008 | 3,900 | $52.142 |
| February 20, 2008 | 2,800 | $47.659 |
| February 20, 2008 | 1,200 | $47.842 |
| February 20, 2008 | 600 | $47.801 |
| February 21, 2008 | 1,500 | $48.471 |
| February 21, 2008 | 400 | $48.515 |
| February 22, 2008 | 1,700 | $47.368 |
| March 24, 2008 | 2,100 | $46,242 |
| May 12, 2008 | 4,100 | $38.00 |

**Sales of the Common Stock:**

| Date | Purchases | Price |
| --- | --- | --- |
| November 13, 2006 | 600 | $70.161 |
| November 16, 2006 | 1,000 | $72.48 |
| November 17, 2006 | 2,500 | $72.25 |
| November 21, 2006 | 1,000 | $71.803 |
| December 7, 2006 | 200 | $70.602 |
| December 7, 2006 | 1,900 | $70.68 |
| December 11, 2006 | 300 | $71.43 |
| December 19, 2006 | 300 | $72.292 |

| | | |
|---|---|---|
| February 13, 2007 | 500 | $69.163 |
| March 2, 2007 | 500 | $69.66 |
| March 20, 2007 | 200 | $68.349 |
| July 12, 2007 | 700 | $69.031 |
| July 17, 2007 | 4,925 | $69.71 |
| July 29, 2007 | 600 | $69.296 |
| July 30, 2007 | 400 | $64.911 |
| August 7, 2007 | 1,300 | $65.74 |
| August 15, 2007 | 400 | $63.888 |
| August 23, 2007 | 700 | $66.528 |
| August 29, 2007 | 3,950 | $65.002 |
| August 31, 2007 | 400 | $65.924 |
| September 7, 2007 | 8,300 | $63.885 |
| September 11, 2007 | 800 | $64.63 |
| September 19, 2007 | 500 | $67.709 |
| September 27, 2007 | 500 | $67.38 |
| October 16, 2007 | 6,425 | $66.09 |
| October 23, 2007 | 1,900 | $64.335 |
| October 25, 2007 | 8.700 | $59.407 |
| November 16, 2007 | 1,500 | $56.978 |
| November 16, 2007 | 1,500 | $56.568 |
| November 16, 2007 | 600 | $56.913 |
| November 16, 2007 | 700 | $56.914 |

| | | |
|---|---|---|
| November 16, 2007 | 7,400 | $56.541 |
| November 16, 2007 | 4,500 | $56.259 |
| November 16, 2007 | 1,100 | $56.385 |
| November 19, 2007 | 7,400 | $55.175 |
| November 19, 2007 | 7.300 | $55.496 |
| November 20, 2007 | 1,200 | $54.994 |
| November 20, 2007 | 1,000 | $54.99 |
| November 20, 2007 | 900 | $55.005 |
| November 20, 2007 | 4,200 | $54.945 |
| November 28,2 007 | 300 | $57.348 |
| December 13, 2007 | 5,900 | $56.672 |
| December 14, 2007 | 15,100 | $56.797 |
| December 14, 2007 | 4,100 | $55.65 |
| December 14, 2007 | 790 | $56.827 |
| January 7, 2008 | 2,600 | $56.004 |
| January 18, 2008 | 25,300 | $51.653 |
| April 23, 2008 | 1,400 | $43.86 |

# EXHIBIT B

Yahoo! My Yahoo! Mail    Make Y! your home page    Search: [_____]    **Web Search**

**YAHOO!** FINANCE    **Sign In**    Finance Home    marketwire
New User? Sign Up    -
Help

Welcome [Sign In]                                    To track stocks & more, Register

**Financial News**

Enter symbol(s) [_____] | Basic ▼ | Get | Symbol Lookup

**Press Release**                    Source: Bernstein Litowitz Berger & Grossmann LLP

# Bernstein Litowitz Berger & Grossmann LLP Announces Filing of Class Action Suit Against AIG and Certain of Its Senior Officers and Directors

Thursday May 22, 12:42 pm ET

NEW YORK, NY--(MARKET WIRE)--May 22, 2008 -- Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") today announced that it filed a class action lawsuit in the United States District Court for the Southern District of New York on behalf of its client Jacksonville Police and Fire Pension Fund ("Jacksonville Police & Fire") and purchasers of the securities of American International Group, Inc. ("AIG" or the "Company") (NYSE:AIG - News) during the period from May 11, 2007 through May 9, 2008 (the "Class Period"). The case is captioned Jacksonville Police and Fire Pension Fund v. American International Group, Inc., et al., Case No., 08-CV-4772.

The Complaint alleges that during the Class Period, AIG and the individual defendants, Chief Executive Officer Martin J. Sullivan, Executive Vice President and Chief Financial Officer Steven J. Bensinger, Senior Vice President and Chief Risk Officer Robert Lewis and Joseph Cassano, the former head of AIG subsidiary American International Group Financial Products ("AIGFP"), violated the federal securities laws by issuing false and misleading press releases, financial statements, filings with the SEC and statements during investor conference calls. The Complaint alleges that, throughout the Class Period, Defendants repeatedly reassured investors that AIG had successfully insulated itself from the recent turmoil in the housing and credit markets due to its superior risk management. In particular, defendants touted the security of AIGFP's "super senior" credit default swap ("CDS") portfolio, making numerous statements that this portfolio was secure and that AIG's method for accounting for the valuations of this portfolio accurately reflected its value.

Investors began to learn the truth regarding AIG's financial condition and the Company's exposure to the mortgage market when, on February 11, 2008, the Company disclosed that its outside auditor had determined that there was "material weakness in its internal control" over the financial reporting and oversight relating specifically to its accounting for the CDS portfolio, and that the Company was revising the loss valuations it previously reported. Under the new valuations, losses on the CDS portfolio more than quadrupled -- from the $1.4 billion reported on the CDS portfolio just weeks before to over $4.5 billion. Two weeks later, on February 28, 2008, AIG disclosed that the market valuations on the CDS portfolio would increase to $11.5 billion and revealed for the first time that the Company had notional exposure of $6.5 billion in liquidity puts written on collateralized debt obligations ("CDOs") linked to the sub-prime mortgage market. Finally, on May 8, 2008, the Company disclosed that market valuation losses on the CDS portfolio for the quarter climbed an additional $9.1 billion, for a cumulative loss of $20.6 billion, and that the Company was expecting actual losses on the portfolio to be about $2.4 billion. As a result of these disclosures, the price of

AIG stock plunged from a Class Period high of $75.24 per share on June 5, 2008, to $38.37 per share on May 12, 2008, wiping out tens of billions of dollars in shareholder value and causing damage to the class.

The Complaint alleges that the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and that Defendants Sullivan and Bensinger violated Section 20(a) of the Exchange Act.

If you wish to serve as lead plaintiff, you must move the Court no later than 60 days from May 22, 2008. Accordingly, the deadline for filing a motion for appointment as lead plaintiff is July 21, 2008. If you wish to discuss this action or have any questions concerning this notice or your rights or interests, please contact Plaintiff's counsel, Gerald H. Silk or Salvatore J. Graziano of BLB&G at 212-554-1400, or via e-mail at jerry@blbglaw.com or sgraziano@blbglaw.com, respectively. You can view a copy of the Complaint as filed online at http://www.blbglaw.com. Any member of the class may move the Court to serve as lead plaintiff through counsel of their choice, or may choose to do nothing and remain a member of the proposed class.

Plaintiff Jacksonville Police & Fire is represented by BLB&G, a firm of 50 attorneys with offices in New York, California, Louisiana and New Jersey, which has extensive expertise in prosecuting investor class actions involving financial fraud. Since its founding in 1983, BLB&G has built an international reputation for excellence and integrity. Specializing in securities fraud, corporate governance, shareholders' rights, employment discrimination and civil rights litigation, among other practice areas, BLB&G prosecutes class and private actions on behalf of institutional and individual clients worldwide. Unique among its peers, BLB&G has obtained six of the ten largest and most significant securities recoveries in history, recovering nearly $20 billion on behalf of defrauded investors.

The AIG action has been investigated and is being prosecuted by BLB&G's subprime litigation group, which is also representing investors in class and derivative subprime related actions against Washington Mutual, Inc., American Home Mortgage Investment Corp., New Century Financial Corporation, Countrywide Financial Corporation and State Street, among others. More information about Bernstein Litowitz Berger & Grossmann LLP can be found online at www.blbglaw.com.

*Contact:*

```
CONTACT:
Bernstein Litowitz Berger & Grossmann LLP, New York, N.Y.

Gerald H. Silk
212-554-1400

Salvatore J. Graziano
212-554-1400
```

Source: Bernstein Litowitz Berger & Grossmann LLP

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Send

# EXHIBIT C

Class Period: 11/10/06 - 06/06/08    **American International Group (NYSE: AIG)**    Hold price:    $28.5093

FIFO LOSSES

| KBC | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | SHARES HELD | ESTIMATED VALUE (2) | ESTIMATED LOSSES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | |
| Boon-Falleur Beatrice | 05/20/08 | 600 | 37.9000 | 22,740.00 | | | | | | | |
| **Boon-Falleur Beatrice Total** | | **600** | | **22,740.00** | | **0** | | **0.00** | **600** | **17,105.59** | **(5,634.41)** |
| Mahieu Pierre | 05/20/08 | 400 | 37.9000 | 15,160.00 | | | | | | | |
| **Mahieu Pierre Total** | | **400** | | **15,160.00** | | **0** | | **0.00** | **400** | **11,403.72** | **(3,756.28)** |
| FIVEST - US | Pre-Class Holdings | 1,761 | | | | | | | | | |
| | 04/18/08 | 3,143 | 48.2300 | 151,586.89 | | | | | | | |
| **FIVEST - US Total** | | **3,143** | | **151,586.89** | | **0** | | **0.00** | **3,143** | **89,604.76** | **(61,982.13)** |
| PLATO INST.I.F. NORTH AMERICA | Pre-Class Holdings | 34,856 | | | 01/22/07 | 700 | 70.4600 | | | | |
| | | | | | 04/23/07 | 1,176 | 69.5500 | | | | |
| | | | | | 04/30/07 | 583 | 69.9100 | | | | |
| | | | | | 08/16/07 | 1,301 | 63.9500 | | | | |
| | | | | | 11/30/07 | 2,400 | 58.1300 | | | | |
| | | | | | 05/05/08 | 3,900 | 47.3900 | | | | |
| | | | | | **Total** | **10,060** | | | | | |
| | 11/13/06 | 2,430 | 70.6500 | 171,679.50 | | | | | | | |
| | 11/27/06 | 661 | 70.2500 | 46,435.25 | | | | | | | |
| | 12/08/06 | 1,300 | 70.3500 | 91,455.00 | | | | | | | |
| | 12/19/06 | 400 | 72.2300 | 28,892.00 | | | | | | | |
| | 12/21/06 | 709 | 71.9500 | 51,012.55 | | | | | | | |
| | 01/12/07 | 1,093 | 71.0700 | 77,679.51 | | | | | | | |
| | 02/15/07 | 600 | 69.1200 | 41,472.00 | | | | | | | |
| | 03/15/07 | 768 | 67.0500 | 51,494.40 | | | | | | | |
| | 03/22/07 | 395 | 68.2100 | 26,942.95 | | | | | | | |
| | 05/16/07 | 10,469 | 72.4600 | 758,583.74 | | | | | | | |
| | 06/26/07 | 2,463 | 70.9400 | 174,725.22 | | | | | | | |
| | 06/29/07 | 19 | 70.0300 | 1,330.57 | | | | | | | |
| | 06/29/07 | 11,705 | 70.0300 | 819,701.15 | | | | | | | |
| | 09/27/07 | 1,449 | 67.4700 | 97,764.03 | | | | | | | |
| | 09/27/07 | 1,226 | 67.4700 | 82,718.22 | | | | | | | |
| | 10/01/07 | 1,731 | 68.5900 | 118,729.29 | | | | | | | |
| | 10/09/07 | 354 | 70.1100 | 24,818.94 | | | | | | | |
| | 10/12/07 | 700 | 68.0900 | 47,663.00 | | | | | | | |
| | 10/26/07 | 383 | 62.1500 | 23,803.45 | | | | | | | |
| | 12/14/07 | 2,400 | 55.6500 | 133,560.00 | | | | | | | |
| | 02/15/08 | 1,500 | 46.1100 | 69,165.00 | | | | | | | |
| | 03/17/08 | 2,500 | 39.8000 | 99,500.00 | | | | | | | |

Class Period: 11/10/06 - 06/06/08                    **American International Group (NYSE: AIG)**                    Hold price:        $28.5093

| FIFO LOSSES | | PURCHASE TRANSACTIONS | | | SALES TRANSACTIONS (1) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | SHARE | PURCHASE | | | SHARE | | SHARES | ESTIMATED | **ESTIMATED** |
| KBC | DATE | SHARES | COST | AMOUNT | DATE | SHARES | PRICE (3) | SALES AMOUNT | HELD | VALUE (2) | **LOSSES** |
| **PLATO INST.I.F. NORTH AMERICAN EQ. Total** | | **45,255** | | **3,039,125.77** | | **0** | | **0.00** | **45,255** | **1,290,188.84** | **(1,748,936.93)** |
| | | | | | | | | | | | |
| KBC EQUITY FUND - TOP 30 | 11/21/07 | **30,428** | 51.7415 | 1,574,390.36 | 11/23/07 | 527 | 53.0300 | 27,946.81 | | | |
| | 12/03/07 | **4,802** | 56.9000 | 273,233.80 | 11/23/07 | 426 | 52.8475 | 22,513.04 | | | |
| | 02/04/08 | **5,201** | 55.5425 | 288,876.54 | 12/19/07 | 7,753 | 57.1205 | 442,855.24 | | | |
| | 02/22/08 | **10,272** | 48.0700 | 493,775.04 | 01/14/08 | 1,795 | 59.3200 | 106,479.40 | | | |
| | 03/14/08 | **1,311** | 41.2480 | 54,076.13 | 01/16/08 | 3,071 | 57.9600 | 177,995.16 | | | |
| | 04/02/08 | **2,074** | 46.7400 | 96,938.76 | 01/22/08 | 472 | 52.4100 | 24,737.52 | | | |
| | 04/18/08 | **20,213** | 48.1701 | 973,662.23 | 01/25/08 | 894 | 53.2200 | 47,578.68 | | | |
| | 05/06/08 | **7,956** | 48.4966 | 385,838.95 | 02/11/08 | 1,040 | 44.7400 | 46,529.60 | | | |
| | 05/08/08 | **2,755** | 44.0654 | 121,400.18 | 03/03/08 | 2,652 | 46.6900 | 123,821.88 | | | |
| | | | | | 03/07/08 | 2,034 | 42.8800 | 87,217.92 | | | |
| | | | | | 03/17/06 | 3,039 | 39.8806 | 121,197.14 | | | |
| | | | | | 03/19/08 | 5,988 | 42.6202 | 255,209.76 | | | |
| | | | | | 03/25/08 | 1,647 | 45.8100 | 75,449.07 | | | |
| | | | | | 05/30/08 | 632 | 36.0000 | 22,752.00 | | | |
| | | | | | 05/30/08 | 22,961 | 36.0000 | 826,596.00 | | | |
| | | | | | 06/06/08 | 740 | 34.1284 | 25,255.02 | | | |
| | | | | | | | | | | | |
| **KBC EQUITY FUND - TOP 30 Total** | | **85,012** | | **4,262,191.99** | | **55,671** | | **2,434,134.23** | **29,341** | **836,491.67** | **(991,566.09)** |
| | | | | | | | | | | | |
| KBC EQUITY FUND - FINANCE | Pre-Class | **72,883** | | | 02/23/07 | 20,924 | 68.8173 | | | | |
| | Holdings | | | | 04/20/07 | 3,750 | 69.4878 | | | | |
| | | | | | 06/27/07 | 3,000 | 70.2038 | | | | |
| | | | | | 08/23/07 | 8,000 | 66.7528 | | | | |
| | | | | | 10/19/07 | 3,000 | 63.5634 | | | | |
| | | | | | 11/20/07 | 11,625 | 54.4400 | | | | |
| | | | | | 11/23/07 | 465 | 53.0300 | | | | |
| | | | | | 11/23/07 | 10,155 | 52.8475 | | | | |
| | | | | | 01/14/08 | 11,964 | 59.1625 | | | | |
| | | | | | | | | | | | |
| | | | | | **Total** | **72,883** | | | | | |
| | | | | | | | | | | | |
| | 05/24/07 | **157** | 71.8500 | 11,280.45 | 01/14/08 | 9,228 | 59.1625 | 545,951.55 | | | |
| | 11/14/07 | **39,424** | 59.5462 | 2,347,549.39 | 01/16/08 | 20,027 | 58.1927 | 1,165,425.20 | | | |
| | 11/14/07 | **117,733** | 59.4300 | 6,996,872.19 | 01/22/08 | 8,518 | 52.4100 | 446,428.38 | | | |
| | 12/03/07 | **14,384** | 56.7391 | 816,135.21 | 03/10/08 | 15,994 | 42.2400 | 673,685.76 | | | |
| | 02/04/08 | **22,401** | 55.5425 | 1,244,207.54 | 03/18/08 | 6,952 | 41.3820 | 287,687.66 | | | |
| | 04/02/08 | **8,030** | 46.7400 | 375,322.20 | 03/19/08 | 16,303 | 42.6202 | 694,837.12 | | | |
| | 05/06/08 | **13,282** | 48.4966 | 644,131.84 | | | | | | | |
| | | | | | | | | | | | |
| **KBC EQUITY FUND - FINANCE Total** | | **215,411** | | **12,435,498.83** | | **76,977** | | **2,434,134.23** | **138,434** | **3,946,657.87** | **(6,054,706.73)** |
| | | | | | | | | | | | |
| CENTEA FD-WORLD SELECT | 11/21/07 | **9,348** | 51.7415 | 483,679.54 | 12/19/07 | 777 | 57.0145 | 44,300.27 | | | |
| | 11/23/07 | **465** | 53.0300 | 24,658.95 | 01/22/08 | 1,016 | 52.4100 | 53,248.56 | | | |
| | 02/22/08 | **3,095** | 48.0700 | 148,776.65 | 01/25/08 | 453 | 53.2200 | 24,108.66 | | | |

Class Period: 11/10/06 - 06/06/08 | **American International Group (NYSE: AIG)** | Hold price: | $28.5093

| FIFO LOSSES | | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | SHARES | ESTIMATED | **ESTIMATED** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KBC | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | HELD | VALUE (2) | **LOSSES** |
| | 04/18/08 | **6,186** | 48.1701 | 297,980.24 | 03/19/08 | 3,149 | 42.6202 | 134,211.01 | | | |
| | | | | | 03/25/08 | 673 | 45.8100 | 30,830.13 | | | |
| | | | | | 05/30/08 | 5,560 | 36.0000 | 200,160.00 | | | |
| **CENTEA FD-WORLD SELECT Total** | | **19,094** | | **955,095.38** | | **11,628** | | **486,858.63** | **7,466** | **212,850.51** | **(255,386.24)** |
| **KBC GRAND TOTAL** | | **368,915** | | **20,881,398.86** | | **144,276** | | **5,355,127.08** | **224,639** | **6,404,302.97** | **(9,121,968.81)** |

(1) Sales have been applied on a FIFO basis.
(2) Held shares have been valued using the average closing price of $28.5093 per share.
(3) Shares sold during the 90-day lookback period have been valued at the higher value between the actual sales price and the average closing price from the class period end to the date of the actual sale.

Class Period: 11/10/06 - 06/06/08    **American International Group (NYSE: AIG)**    Hold price:    $28.5093

| FIFO LOSSES | | PURCHASE TRANSACTIONS | | | SALES TRANSACTIONS (1) | | | | SHARES | ESTIMATED | **ESTIMATED** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UNION | DATE | **SHARES** | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | HELD | VALUE (2) | **LOSSES** |
| BayernLB Balanced Stocks 60 Plus Fonds | 10/31/07 | 3,600 | 63.0833 | 227,099.92 | 11/15/07 | 550 | 58.7731 | 32,325.19 | | | |
| | | | | | 01/31/08 | 3,050 | 53.0515 | 161,807.06 | | | |
| **BayernLB Balanced Stocks 60 Plus Fonds Total** | | **3,600** | | **227,099.92** | | **3,600** | | **194,132.25** | **0** | **0.00** | **(32,967.67)** |
| DEVIF-Fonds Nr. 450 | Pre-Class Holdings | 4,500 | | | | | | | | | |
| | 05/30/07 | 3,000 | 71.6609 | 214,982.73 | | | | | | | |
| **DEVIF-Fonds Nr. 450 Total** | | **3,000** | | **214,982.73** | | **0** | | **0.00** | **3,000** | **85,527.93** | **(129,454.80)** |
| Invest Global | Pre-Class Holdings | 10,000 | | | 08/06/07 | 4,900 | 63.0894 | | | | |
| | | | | | 11/20/07 | 2,000 | 53.9911 | | | | |
| | | | | | 02/11/08 | 3,100 | 45.1223 | | | | |
| | | | | | **Total** | **10,000** | | | | | |
| | 05/15/07 | 6,000 | 72.4042 | 434,425.21 | 02/11/08 | 1,400 | 45.1223 | 63,171.16 | | | |
| | 12/19/07 | 7,369 | 57.3276 | 422,447.24 | | | | | | | |
| **Invest Global Total** | | **13,369** | | **856,872.45** | | **1,400** | | **63,171.16** | **11,969** | **341,227.94** | **(452,473.35)** |
| IPC- W.P. Vermögensfonds | 09/18/07 | 1,250 | 65.3000 | 81,625.00 | | | | | | | |
| **IPC- W.P. Vermögensfonds Total** | | **1,250** | | **81,625.00** | | **0** | | **0.00** | **1,250** | **35,636.64** | **(45,988.36)** |
| UGS-Union | 02/01/07 | 14,000 | 68.6774 | 961,483.04 | 02/28/07 | 8,600 | 66.5961 | 572,726.74 | | | |
| | | | | | 08/15/07 | 5,400 | 63.8049 | 344,546.24 | | | |
| **UGS-Union Total** | | **14,000** | | **961,483.04** | | **14,000** | | **917,272.98** | **0** | **0.00** | **(44,210.06)** |
| UniRak | Pre-Class Holdings | 100,000 | | | | | | | | | |
| | 02/22/07 | 10,000 | 69.5889 | 695,889.00 | | | | | | | |
| | 02/26/07 | 10,000 | 68.8875 | 688,875.00 | | | | | | | |
| | 04/03/07 | 10,000 | 67.6550 | 676,550.14 | | | | | | | |
| | 04/10/07 | 10,000 | 67.1040 | 671,040.20 | | | | | | | |
| | 05/21/07 | 10,000 | 72.2160 | 722,160.00 | | | | | | | |
| | 06/21/07 | 10,000 | 71.5800 | 715,799.62 | | | | | | | |
| | 07/05/07 | 10,000 | 70.1103 | 701,102.93 | | | | | | | |
| | 08/08/07 | 10,000 | 66.1526 | 661,526.02 | | | | | | | |
| | 01/23/08 | 20,000 | 51.2889 | 1,025,777.00 | | | | | | | |
| | 05/07/08 | 10,000 | 47.3445 | 473,445.00 | | | | | | | |

Class Period: 11/10/06 - 06/06/08 — **American International Group (NYSE: AIG)** — Hold price: $28.5093

| FIFO LOSSES | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | | SHARES | ESTIMATED | **ESTIMATED** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UNION | DATE | **SHARES** | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | HELD | VALUE (2) | **LOSSES** |
|  | 05/09/08 | 10,000 | 42.0420 | 420,420.00 |  |  |  |  |  |  |  |
| **UniRak Total** |  | **120,000** |  | **7,452,584.91** |  | **0** |  | **0.00** | **120,000** | **3,421,117.24** | **(4,031,467.67)** |
| **UNION GRAND TOTAL** |  | **155,219** |  | **9,794,648.05** |  | **19,000** |  | **1,174,576.40** | **136,219** | **3,883,509.75** | **(4,736,561.91)** |

(1) Sales have been applied on a FIFO basis.
(2) Held shares have been valued using the average closing price of $28.5093 per share.
(3) Shares sold during the 90-day lookback period have been valued at the higher value between the actual sales price and the average closing price from the class period end to the date of the actual sale.

Class Period: 11/10/06 - 06/06/08

American International Group (NYSE: AIG)

Hold price:    $28.5093

| FIFO LOSSES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | | |
| PLAINTIFF | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | SHARES HELD | ESTIMATED VALUE (2) | **ESTIMATED LOSSES** |
| General Retirement System of City of Detroit | Pre-Class Holdings | 157,440 | | | 11/13/06 | 600 | 70.1610 | | | | |
| | | | | | 11/16/06 | 1,000 | 72.4800 | | | | |
| | | | | | 11/17/06 | 2,500 | 72.2500 | | | | |
| | | | | | 11/21/06 | 1,000 | 71.8030 | | | | |
| | | | | | 12/07/06 | 200 | 70.6020 | | | | |
| | | | | | 12/07/06 | 1,900 | 70.6800 | | | | |
| | | | | | 12/11/06 | 300 | 71.4300 | | | | |
| | | | | | 12/19/06 | 300 | 72.2920 | | | | |
| | | | | | 02/13/07 | 500 | 69.1630 | | | | |
| | | | | | 03/02/07 | 500 | 69.6600 | | | | |
| | | | | | 03/20/07 | 200 | 68.3490 | | | | |
| | | | | | 07/12/07 | 700 | 69.0310 | | | | |
| | | | | | 07/17/07 | 4,925 | 69.7100 | | | | |
| | | | | | 07/20/07 | 600 | 69.2960 | | | | |
| | | | | | 07/30/07 | 400 | 64.9110 | | | | |
| | | | | | 08/07/07 | 1,300 | 65.7400 | | | | |
| | | | | | 08/15/07 | 400 | 63.8880 | | | | |
| | | | | | 08/23/07 | 700 | 66.5280 | | | | |
| | | | | | 08/29/07 | 3,950 | 65.0020 | | | | |
| | | | | | 08/31/07 | 400 | 65.9240 | | | | |
| | | | | | 09/07/07 | 8,300 | 63.8850 | | | | |
| | | | | | 09/11/07 | 800 | 64.6300 | | | | |
| | | | | | 09/19/07 | 500 | 67.7090 | | | | |
| | | | | | 09/27/07 | 500 | 67.3800 | | | | |
| | | | | | 10/16/07 | 6,425 | 66.0900 | | | | |
| | | | | | 10/23/07 | 1,900 | 64.3350 | | | | |
| | | | | | 10/25/07 | 8,700 | 59.4070 | | | | |
| | | | | | 11/16/07 | 1,500 | 56.9780 | | | | |
| | | | | | 11/16/07 | 1,500 | 56.5680 | | | | |
| | | | | | 11/16/07 | 600 | 56.9130 | | | | |
| | | | | | 11/16/07 | 700 | 56.9140 | | | | |
| | | | | | 11/16/07 | 7,400 | 56.5410 | | | | |
| | | | | | 11/16/07 | 4,500 | 56.2590 | | | | |
| | | | | | 11/16/07 | 1,100 | 56.3850 | | | | |
| | | | | | 11/19/07 | 7,400 | 55.1750 | | | | |
| | | | | | 11/19/07 | 7,300 | 55.4960 | | | | |
| | | | | | 11/20/07 | 1,200 | 54.9940 | | | | |
| | | | | | 11/20/07 | 1,000 | 54.9900 | | | | |
| | | | | | 11/20/07 | 900 | 55.0050 | | | | |
| | | | | | 11/20/07 | 4,200 | 54.9450 | | | | |
| | | | | | 11/28/07 | 300 | 57.3480 | | | | |
| | | | | | 12/13/07 | 5,900 | 56.6720 | | | | |
| | | | | | 12/14/07 | 15,100 | 56.7970 | | | | |
| | | | | | 12/14/07 | 4,100 | 55.6500 | | | | |
| | | | | | 12/14/07 | 790 | 56.8270 | | | | |
| | | | | | 01/07/08 | 2,600 | 56.0040 | | | | |
| | | | | | 01/18/08 | 25,300 | 51.6530 | | | | |
| | | | | | 04/23/08 | 1,400 | 43.8600 | | | | |
| | | | | | 06/23/08 | 2,000 | 30.5660 | | | | |
| | | | | | 06/23/08 | 5,000 | 30.6400 | | | | |
| | | | | | 06/23/08 | 2,100 | 30.5660 | | | | |

Class Period: 11/10/06 - 06/06/08

**American International Group (NYSE: AIG)**

Hold price:    $28.5093

| PLAINTIFF | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE (3) | SALES AMOUNT | SHARES HELD | ESTIMATED VALUE (2) | **ESTIMATED LOSSES** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FIFO LOSSES | | | | | | | | | | | |
| | | | | | 06/23/08 | 1,600 | 30.7690 | | | | |
| | | | | | 06/23/08 | 700 | 30.7280 | | | | |
| | | | | | 06/24/08 | 1,200 | 29.8400 | | | | |
| | | | | | 06/24/08 | 550 | 30.3030 | | | | |
| | | | | | **Total** | **157,440** | | | | | |
| | 11/10/06 | 1,700 | 69.2500 | 117,725.00 | 06/24/08 | 2,750 | 30.3030 | 83,333.25 | | | |
| | 12/06/06 | 4,400 | 70.1670 | 308,734.80 | 06/24/08 | 4,000 | 30.2400 | 120,960.00 | | | |
| | 01/03/07 | 26,800 | 72.1380 | 1,933,298.40 | 06/24/08 | 2,300 | 29.8210 | 68,588.30 | | | |
| | 02/15/07 | 4,700 | 69.0540 | 324,553.80 | 06/24/08 | 800 | 30.3330 | 24,266.40 | | | |
| | 03/02/07 | 8,000 | 69.7830 | 558,264.00 | 06/24/08 | 2,000 | 30.2450 | 60,490.00 | | | |
| | 03/20/07 | 5,925 | 68.1840 | 403,990.20 | 06/24/08 | 1,100 | 30.3150 | 33,346.50 | | | |
| | 03/23/07 | 3,300 | 68.2290 | 225,155.70 | | | | | | | |
| | 04/11/07 | 3,800 | 66.8110 | 253,881.80 | | | | | | | |
| | 04/12/07 | 1,900 | 66.3660 | 126,095.40 | | | | | | | |
| | 04/16/07 | 400 | 67.5990 | 27,039.60 | | | | | | | |
| | 04/24/07 | 600 | 69.4280 | 41,656.80 | | | | | | | |
| | 05/02/07 | 500 | 70.5190 | 35,259.50 | | | | | | | |
| | 05/18/07 | 800 | 72.1790 | 57,743.20 | | | | | | | |
| | 05/29/07 | 700 | 71.7050 | 50,193.50 | | | | | | | |
| | 06/06/07 | 900 | 72.2540 | 65,028.60 | | | | | | | |
| | 06/22/07 | 700 | 71.5850 | 50,109.50 | | | | | | | |
| | 07/05/07 | 800 | 70.2540 | 56,203.20 | | | | | | | |
| | 07/05/07 | 400 | 70.1000 | 28,040.00 | | | | | | | |
| | 08/03/07 | 7,700 | 61.7950 | 475,821.50 | | | | | | | |
| | 08/08/07 | 1,100 | 66.5680 | 73,224.80 | | | | | | | |
| | 08/09/07 | 1,900 | 64.7770 | 123,076.30 | | | | | | | |
| | 08/10/07 | 1,900 | 64.2460 | 122,067.40 | | | | | | | |
| | 08/21/07 | 1,000 | 66.0990 | 66,099.00 | | | | | | | |
| | 09/05/07 | 2,400 | 65.7510 | 157,802.40 | | | | | | | |
| | 09/07/07 | 1,200 | 64.0160 | 76,819.20 | | | | | | | |
| | 09/07/07 | 2,600 | 64.2050 | 166,933.00 | | | | | | | |
| | 10/22/07 | 3,900 | 63.2830 | 246,803.70 | | | | | | | |
| | 10/22/07 | 1,000 | 63.2320 | 63,232.00 | | | | | | | |
| | 10/22/07 | 600 | 63.2310 | 37,938.60 | | | | | | | |
| | 10/31/07 | 1,100 | 63.0100 | 69,311.00 | | | | | | | |
| | 10/31/07 | 500 | 63.0750 | 31,537.50 | | | | | | | |
| | 11/06/07 | 4,000 | 61.3360 | 245,344.00 | | | | | | | |
| | 11/08/07 | 3,000 | 54.7230 | 164,169.00 | | | | | | | |
| | 01/07/08 | 300 | 56.1640 | 16,849.20 | | | | | | | |
| | 01/08/08 | 400 | 56.3260 | 22,530.40 | | | | | | | |
| | 01/08/08 | 700 | 56.3570 | 39,449.90 | | | | | | | |
| | 01/08/08 | 2,200 | 56.4200 | 124,124.00 | | | | | | | |
| | 01/09/08 | 1,800 | 55.1240 | 99,223.20 | | | | | | | |
| | 01/10/08 | 1,800 | 57.8300 | 104,094.00 | | | | | | | |
| | 01/10/08 | 1,800 | 56.2840 | 101,311.20 | | | | | | | |
| | 01/14/08 | 1,700 | 58.9570 | 100,226.90 | | | | | | | |
| | 01/16/08 | 2,900 | 57.7990 | 167,617.10 | | | | | | | |
| | 01/16/08 | 2,400 | 57.7740 | 138,657.60 | | | | | | | |
| | 01/18/08 | 2,900 | 51.6530 | 149,793.70 | | | | | | | |
| | 01/18/08 | 4,100 | 51.6960 | 211,953.60 | | | | | | | |

Class Period: 11/10/06 - 06/06/08     Case 1:08-cv-04772-LAP     Document 20-6     Filed 07/21/2008     Page 9 of 9     Hold price:    $28.5093

American International Group (NYSE: AIG)

| FIFO LOSSES | | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | | | ESTIMATED |
| | | | SHARE | PURCHASE | | | | SHARE | SALES | SHARES | ESTIMATED | **ESTIMATED** |
| PLAINTIFF | DATE | SHARES | COST | AMOUNT | DATE | SHARES | PRICE (3) | AMOUNT | HELD | VALUE (2) | **LOSSES** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 01/18/08 | **7,100** | 52.5360 | 373,005.60 | | | | | | | |
| | 01/23/08 | **3,900** | 52.1420 | 203,353.80 | | | | | | | |
| | 02/20/08 | **2,800** | 47.6590 | 133,445.20 | | | | | | | |
| | 02/20/08 | **1,200** | 47.8420 | 57,410.40 | | | | | | | |
| | 02/20/08 | **600** | 47.8010 | 28,680.60 | | | | | | | |
| | 02/21/08 | **1,500** | 48.4710 | 72,706.50 | | | | | | | |
| | 02/21/08 | **400** | 48.5150 | 19,406.00 | | | | | | | |
| | 02/22/08 | **1,700** | 47.3680 | 80,525.60 | | | | | | | |
| | 03/24/08 | **2,100** | 46.2420 | 97,108.20 | | | | | | | |
| | 05/12/08 | **4,100** | 38.0000 | 155,800.00 | | | | | | | |
| **General Retirement System of City of Detroit Total** | | **148,625** | | **9,280,425.10** | | **12,950** | | **390,984.45** | **135,675** | **3,868,000.68** | **(5,021,439.97)** |

(1) Sales have been applied on a FIFO basis.
(2) Held shares have been valued using the average closing price of $28.5093 per share.
(3) Shares sold during the 90-day lookback period have been valued at the higher value between the actual sales price and the average closing price from the class period end to the date of the actual sale.

# EXHIBIT  D

# SHAREHOLDER AND
# SECURITIES FRAUD RESUME

## 2008

*Securities and Consumer Fraud*
*Practice Group*













# TABLE OF CONTENTS

Firm Overview                                    2

Multiple Party Litigation                        2

     Securities Litigation

     Other Litigation

Civil Litigation                                 4

Bankruptcies                                     4

Accolades                                        5

Team Biographies                                 6

     The Firm's Members

     Additional Securities Litigators

     Securities Litigation Forensic Staff

Securities News Coverage                         17

## FIRM OVERVIEW

Founded on April 28, 2003, by Ronald Motley, Joseph Rice and nearly 50 other lawyers, Motley Rice LLC is one of the nation's largest plaintiffs' law firms. Our attorneys, assisted by over 300 support personnel, are litigators with extensive courtroom experience.

The firm's lawyers are known for their pioneering work representing asbestos victims, States' Attorneys General in their landmark litigation against Big Tobacco, and the 9/11 families and survivors in their ground breaking lawsuit against terrorist financiers.

Motley Rice lawyers initially gained widespread national recognition for conducting some of the first successful representations of injured persons against the asbestos industry. In the last decade, Motley Rice lawyers were selected by 26 States' Attorneys General to represent them against the tobacco industry in recovering medical costs associated with smoking under novel legal and equitable theories that Motley Rice lawyers spearheaded — resulting in a $246 billion settlement agreement, the largest financial resolution of civil litigation in the history of U.S. jurisprudence.

The firm represents individuals and institutions, including large institutional investors, in complex litigation involving civil racketeering (RICO), securities fraud, shareholder litigation, insurance fraud, tire and vehicle defects, defective drugs, class actions, toxic torts, workplace exposures, nursing home negligence, and the September 11, 2001 acts of terrorism.

The firm has offices in Mt. Pleasant, South Carolina; Providence, Rhode Island; and Hartford, Connecticut. Motley Rice lawyers have dealt with clients and cases throughout the world, including in Latin America, Canada, Europe and the Caribbean.

## MULTIPLE PARTY LITIGATION

The lawyers of Motley Rice LLC have substantial experience in multiple party litigation, including in numerous leadership roles in the class and consolidated actions listed below.

## SECURITIES LITIGATION

Motley Rice has been appointed as lead counsel or co-lead counsel in the following securities derivative and shareholder cases:

*In re Dell, Inc., Sec. Litig.*, No. A-06-CA726-SS (W.D. Tex.).

*Helaba Invest Kapitalanlagegesellschaft mbH v. Fialkow,* No. 2683-VCL (Del. Ch.) (regarding National Home Health Care Corp.).

*In re Lear Corp Sec. Litig.*, No. 2728-N (Del. Ch.).

*Sheet Metal Workers' Nat'l Pension Fund, Inc. v. Deaton*, No. 4:07-CV-01517 (S.D. Tex.) (regarding Baker Hughes Inc.).

*Manville Personal Injury Trust v. Blankenship,* No. 07-C-1333 (W. Va.) (regarding Massey Energy Co.).

*Schultze Asset Management, LLC v. Washington Group Int'l, Inc.,* No. 3261-VCN (Del. Ch.).

*In re Bioenvision, Inc. S'holders Litig.*, No. 3008-VCP (Del. Ch.).

*In re Molson Coors Brewing Co. Sec. Litig.*, No. 1:05-294-KAJ (D. Del.).

*West End Capital Mgmt., LLC v. Lee*, No. 06-CV-3141 (S.D.N.Y.) (regarding Pixelplus Co., Ltd.).

*In re Witness Systems Inc. Sec. Litig.*, No. 1:06-CV-1894 (N.D. Ga.).

*South Ferry LP #2 v. Killinger*, No. C04-1599C (W.D. Wash.) (regarding Washington Mutual, Inc.).

*In re NPS Pharm., Inc. Sec. Litig.*, No. 2:06-CV-00570 -PGC-PMW (D. Utah).

*Marsden v. Select Med. Corp.,* No. 04-CV-4020 (E.D. Pa.).

*Baker v. MBNA Corp.,* No. 05-272 (D. Del.).

*Abrams v. Micrus Endovascular Corp.*, No. 07-22601 (S.D. Fla.).

*In re UBS AG Sec. Litig.*, No. 1:07-cv-11225-RJS (S.D.N.Y.).

Motley Rice lawyers have served in key roles in the prosecution of the following securities litigation:

*In re Par Pharm. Sec. Litig.,* No. 06-CV-03226 (D.N.J.) (Lead Plaintiffs' Executive Committee).

*In re Clear Channel Commc'ns, Inc. S'holders Litig.*, No. 2006-CI-17492 (Tex.).

*Sheet Metal Workers' Nat'l Pension Fund v. Hill,* No. 1:07-CV-02269 (D.N.J.) (regarding Commerce Bancorp, Inc.).

## OTHER LITIGATION

Lead counsel in *Burnett v. Al Baraka Investment & Development Corp.*, No. 02-1616 (D.D.C.), consolidated actions against terrorist financing organizations in the United States District Court for the District of Columbia, representing over 6,500 families with victims of the 9/11 attacks.

Plaintiffs' steering and coordinating counsel, *Linscomb v. Pittsburgh Corning Corp.*, No. 1:90cv05000 (E.D. Tex.), a national class action on behalf of asbestos victims nationwide in the



United States District Court for the Eastern District of Texas, Beaumont Division.

Executive committee member in *In re Asbestos School Litigation*, No. 94-1494 (E.D. Pa.), a national school asbestos class action in the United States District Court for the Eastern District of Pennsylvania.

Lead plaintiffs' counsel in *Central Wesleyan College v. W.R. Grace & Co.*, No. 2:87-1860-8 (D.S.C.), a national asbestos property damage class action in the United States District Court for the District of South Carolina, Charleston Division.

Lead plaintiffs' counsel in *In re Raymark Asbestos Exposure Cases*, No. 87-1016-K (D. Kan.), a national asbestos personal injury class action filed in United States District Court of Kansas, Wichita Division, in which 19,684 claims were resolved.

Counsel for class representative in *Raytech Corp. v. White*, No. 89-05129 (D. Conn.), an asbestos bankruptcy related class action in the United States District Court of Connecticut.

Co-lead counsel for plaintiffs in *Cimino v. Pittsburgh Corning Corp.*, No. 1:85-CV-00676 (E.D. Tex.), an asbestos personal injury class action on behalf of 2,300 plaintiffs in the United States District Court for the District of Texas, Beaumont Division.

Co-lead plaintiffs' counsel in *Chatham v. AC&S, et al.*, a consolidated asbestos personal injury action involving 300 plaintiffs in the Circuit Court of Harris County, Texas.

Co-lead plaintiffs' counsel in *Abrams v. GAF Corp.*, No. 88-5422(1) (Jackson Cty., Miss.), a consolidated asbestos personal action involving more than 6,000 plaintiffs.

Co-liaison plaintiffs' counsel in 3,000 asbestos personal injury cases in the Third Judicial Circuit of Illinois, Madison County, Illinois.

Co-lead counsel in a consolidated asbestos personal injury action involving 540 plaintiffs pending in the Superior Court of Alameda County, California.

Co-lead counsel for plaintiffs in *In re Asbestos Products Liability Litigation*, MDL 875 (E.D. Pa.).

Counsel in numerous consolidated asbestos trials including 87 consolidated cases in Danville, Illinois; 300 consolidated cases in the United States District Court, Western District of New York, Rochester, New York; 42 consolidated cases in State Court in Mississippi; and 315 consolidated cases in the Circuit Court of Kanawha County, West Virginia.

Plaintiffs' steering committee and plaintiffs' liaison counsel in *In re Showa Denko K.K. L-Tryptophan Products Liability Litigation (No. II)*, MDL 865 (D.S.C.).

Member Interim Plaintiffs' steering committee and Multiple Plaintiffs' Counsel in *In re San Juan DuPont Plaza Hotel Fire Litigation*, MDL 721 (D.P.R.).

Plaintiffs' lead counsel in *In re Kansas Asbestos Cases* in the United States District Court for the District of Kansas, *In re Madison County Illinois Asbestos Litigation*, and *In re Wayne County Michigan Asbestos Cases*.

Class counsel in *Whitfield v. Sangamo Weston*, No. 6:84-3184 (D.S.C.), a PCB personal injury and property damage class action settled while pending before the United States District Court for the District of South Carolina, Greenville Division.

Lead counsel in *Bates v. Tenco Services Inc.*, 132 F.R.D. 160 (D.S.C. 1990), a jet fuel pollution case involving the consolidated property damage and personal injury claims of multiple plaintiffs in the Gold Cup Springs subdivision, in the United States District Court for the District of South Carolina, Charleston Division.

Member by appointment of a three (3) person steering committee on the Food Lion Multidistrict Litigation Panel.

Plaintiffs' lead counsel in a case involving ten (10) persons injured in a crane disaster in Florence County, South Carolina.

Plaintiffs' steering committee and plaintiffs' liaison counsel in *In re Policy Management Systems Corp.*, No. 3:93-0807-17 (D.S.C. 1993), a securities case filed in the United States District Court for the District of South Carolina, Columbia Division.

## CIVIL LITIGATION

Motley Rice lawyers and their extensive support staff have experience in a wide variety of civil litigation. The firm's lawyers routinely litigate complex cases involving multiple parties in state and federal jurisdictions throughout the United States, either as sole counsel for the plaintiffs or in association with local counsel and other firms.

Additionally, the firm's lawyers maximize the use of alternative dispute resolution where appropriate, such as negotiation, mediation and arbitration, making it possible to avoid protracted litigation in some cases. Motley Rice LLC employs state-of-the-art technology by using video conferencing, extranet access to institutional clients, and a computer-based document management system that enables the firm to process and enter into the database thousands of articles, liability documents and all other information and documents utilized in litigation proceedings.

3

## BANKRUPTCIES

Motley Rice lawyers serve on several committees in national bankruptcies including:

Class Counsel in *In re Trebol Motors Corporation* and *In re Trebol Motors Distributors Corp.*, actively defending a $143,000,000 class action judgment claim on behalf of a class of defrauded purchasers of Volvo automobiles.

Select counsel to the asbestos Claimants' Committee in the Johns-Manville bankruptcy pending in the United States Bankruptcy Court for the Southern District of New York.

Claimants' Committee in *In re A.H. Robins*, a Chapter 11 Reorganization involving Dalkon Shield victims nationwide and H.K. Porter, National Gypsum, Raytech, Rock Wool and M.H. Detrick asbestos related bankruptcies.

## ACCOLADES

Motley Rice lawyers have received many accolades from the courts, as well as in the press. Some of these include:

*Roberts v. AP Green Industries, Inc.,* No. 49D02-9601-MI-0001-687 (Marion Cty., Ind.) — The judge stated, "That was some of the best final arguments I think I've ever heard. That was a treat. Congratulations to you all. I expected the best, and you delivered the best, and I appreciate it."

*Marsden v. Select Med. Corp.*, No. 04-CV-4020 (E.D. Pa., Order entered Oct. 5, 2006) — "Motley Rice LLC possess[es] the requisite knowledge and skill in securities litigation to ably prosecute this matter on behalf of the class."

*In re NPS Pharm., Inc. Sec. Litig.*, No. 2:06-CV-00570-PGC-PMW (D. Utah, Order entered Nov. 17, 2006) — "As demonstrated by their submissions to the court, [Motley Rice has] expertise and experience in the prosecution of shareholder and securities class actions and, as a result, [is] adequate to represent the interests of the class."

Motley Rice was named to "The Plaintiff's Hot List" by *The National Law Journal* in October 2006.

Motley Rice was listed in the 2007 Litigation edition of *The Legal 500*.

"[Ron Motley is] one of the most influential lawyers in America." — *The National Law Journal*

"[Joe Rice is] one of the five most respected (and feared) plaintiffs' attorneys." — *Corporate Legal Times*

The American Association for Justice honored Ron Motley in 2007 with the David S. Shrager President's Award for his outstanding contributions to the safety and protection of American consumers and the civil justice system.

*Lawyers USA* recognized Member Jack McConnell as a 2006 Lawyer of the Year, citing the Rhode Island lead case.

Motley Rice Member Fidelma Fitzpatrick was named a Lawyer of the Year by *Rhode Island Lawyers Weekly*.



## TEAM BIOGRAPHIES

### THE FIRM'S MEMBERS

### RONALD MOTLEY

Ron Motley is an internationally recognized trial lawyer. Over a career spanning more than three decades, he has brought to justice two once-invincible giant industries whose malfeasance took the lives of millions of Americans — asbestos and tobacco.

Today, Motley is once again advancing cutting-edge litigation as lead counsel for more than 6,500 family members and survivors of the September 11, 2001, terrorist attacks seeking justice against al Qaeda's financiers.

In addition, he currently leads Motley Rice's litigation efforts against several human tissue processing firms in New York funeral home on behalf of the victims of an alleged body harvesting scheme. The firm is currently handling over 500 cases. Motley also serves as co-lead counsel on the tainted tissue MDL.

Motley has won widespread recognition for his legal skills. The American Association for Justice honored Motley in 2007 with the David S. Shrager President's Award for his outstanding contributions to the safety and protection of American consumers and the civil justice system. In 1998, he was named Harry M. Philo Trial Lawyer of the Year by the 50,000-member Association of Trial Lawyers of America and received the President's Award of the National Association of Attorneys General. *Business Week* magazine characterized Motley's courtroom skills as "dazzling." *American Lawyer* dubbed him "The man who took on Manville," and *The National Law Journal* has ranked him, "One of the most influential lawyers in America."

His combination of legal and trial skills, personal charisma and nose-to-the-grindstone hard work has enabled Motley, a 1971 graduate of the University of South Carolina School of Law, to build Motley Rice LLC into one of the world's largest plaintiffs' law firms. He is licensed in South Carolina and admitted to practice before the U.S. Supreme Court and the U.S. Court of Appeals for the Third, Fourth, Fifth and Eleventh Circuits.

### JOSEPH RICE

Motley Rice LLC co-founding Member Joe Rice is a recognized complex litigation settlement negotiator. Rice is known for his central role in working with asbestos victims as related to the Federal Employers Liability Act and in crafting the historic settlement with the tobacco industry. In the Big Tobacco litigation, Rice served as lead counsel for the States Attorneys General, negotiating the breakthrough settlement in which the tobacco industry agreed to reimburse states for smoking-related health costs, resulting in the largest civil settlement in history.

Rice continues to work as an integral negotiator for a multitude of the firm's practice areas, including occupational disease and toxic torts, aviation and other transportation disasters, securities and consumer fraud, and 9/11 and anti-terrorism. Most recently, he executed strategic settlement talks on behalf of families of the victims of the 9/11 attacks in aviation liability and damages cases against multiple defendants.

Rice was named one of the nation's "Five Most Respected Plaintiff Attorneys" in a poll of defense counsel and legal scholars conducted by *Corporate Legal Times*. The article notes, "For all his talents as a shrewd negotiator . . . Rice has earned most of his respect from playing fair and remaining humble." In 2006, Rice was described by *The American Lawyer* as "one of the shrewdest business men practicing law."

In 1998, Rice received the President's Award of the National Association of Attorneys General. In 1999 and 2000, Rice served on the faculty at Duke University School of Law as a Senior Lecturing Fellow. Rice earned Bachelor of Science and J.D. degrees from the University of South Carolina and has also taught classes at the USC and Duke Law Schools on the art of negotiating. He is licensed in South Carolina and admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the Third, Fourth and Eleventh Circuits, and the U.S. District Court for the District of Nebraska.

### FRED BAKER

Fred Baker divides his time between the Motley Rice Environmental and Securities and Consumer Fraud practice groups. Baker earned a J.D. and LL.M from Duke University School of Law in 1993. He began working with Motley Rice attorneys in 1994. Baker is licensed in New York and South Carolina and admitted to practice before U.S. Court of Appeals for the First, Third and Fourth Circuits, and the U.S. District Court for the District of South Carolina and the Southern District of New York.

### KEVIN DEAN

For over 15 years, Kevin Dean has litigated in the areas of personal injury, wrongful death, professional malpractice, products liability, lender liability and commercial/consumer fraud cases. Dean joined Motley Rice LLC as an Associate in 2004 in the firm's Transportation, Medical and Catastrophic Injury practice groups. He was quickly appointed vehicle defect subgroup leader. In late 2005, Dean was asked to serve as team leader on the firm's newest medical litigation. The litigation, led by Ron Motley, involves the prosecution of cases involving body snatching and recipients of potentially diseased human tissue. Dean was named a Member of Motley Rice LLC in 2006.

Prior to joining Motley Rice, Dean was a partner with the Law Offices of J. Edward Bell III, LLC, in Georgetown, South Carolina. Before moving to South Carolina in 2001, he was a member of the William S. Stone, P.C. law firm in Blakely, Georgia, after beginning

his career as an associate with the Bennett Law Firm of Valdosta, Georgia. Dean also served as a County Commissioner on the Early County Georgia Board of Commissioners.

Dean earned an Associate's Degree in Criminal Justice and a Bachelor's Degree in Political Science from Valdosta State University. He received a J.D. degree in 1991 from the Cumberland School of Law at Samford University, where he was selected to serve on one the school's nationally published law reviews, the *American Journal of Trial Advocacy*. Dean co-authored an article titled "Dangerous Doors and Loose Latches," appearing in the November 2004 issue of *Trial Magazine* of the Association of Trial Lawyers of America. He is licensed in Georgia and South Carolina and admitted to practice before the U.S. Court of Appeals for the Fourth and Eleventh Circuits and the U.S. District Court for the Middle District of Georgia, Northern District of Georgia, Southern District of Georgia, Central District of Illinois and District of South Carolina.

## MICHAEL ELSNER

In the groundbreaking anti-terrorism litigation, Mike Elsner leads the investigatory team that is currently scouring the globe gathering liability evidence for 9/11 families' civil action against al Qaeda's financiers and 9/11 aviation litigation.

To date, Elsner and the 9/11 and Anti-Terrorism practice group have acquired more than one million pages of documents in 13 languages about the activities of al Qaeda and the role that its alleged financiers played in providing material support for terrorism.

After graduating from John Carroll University and receiving a law degree from the University of Memphis in 1997, Elsner began work for the Manville Personal Injury Trust. He then teamed with Ron Motley and other lawyers on litigation against Big Tobacco. In 2001, Elsner joined the firm of Weitz & Luxenberg, where he worked on asbestos and toxic tort litigation. Through these positions, Elsner gained complex civil litigation experience in the areas of toxic tort, aviation, security, personal injury, bankruptcy, medical malpractice and whistleblower protections. He officially joined Motley Rice lawyers to work on the 9/11 litigation in 2002 and, in 2006, he became a Motley Rice Member.

Elsner has appeared on CNN, ABC, NBC, Fox, MSNBC, National Public Radio, the BBC and the Canadian Broadcasting Company to discuss terrorism litigation and he frequently lectures on the subject. Elsner is licensed in New York, South Carolina and Virginia and admitted to practice before the U.S. District Court for the Eastern District of New York and the Southern District of New York.

## FIDELMA FITZPATRICK

Fidelma Fitzpatrick helped break new legal ground by holding the lead pigment industry accountable for the childhood lead poisoning crisis. In February 2006, she was trial counsel in the landmark litigation against the lead pigment industry on behalf of the state of Rhode Island, which ended in an unprecedented verdict for the State.

Fitzpatrick also represents hundreds of lead poisoned children in Wisconsin in legal battles against the lead pigment industry. As a result, the Wisconsin State Supreme Court became the first to recognize the rights of poisoned children to sue the lead pigment manufacturers. She is also working intensively on similar litigation filed by the City of New York, the City and County of San Francisco and several New Jersey municipalities. In 2005, she served as co-counsel in a case resulting in a New Jersey Appellate Court ruling allowing 26 cities and counties to prosecute claims against the lead pigment industry.

Fitzpatrick graduated from Canisius College and received a law degree from the American University in 1994. In 1997, she joined Motley Rice lawyers in the Providence, R.I., office, working first on the Massachusetts, New York and Rhode Island lawsuits against Big Tobacco. Since 1999, she has worked on lead paint and other environmental litigation and for her efforts, she was named a Lawyer of the Year for 2006 by *Rhode Island Lawyer's Weekly*. Fitzpatrick became a Motley Rice LLC Member in 2006. She is licensed in Massachusetts, New York, Rhode Island and Washington, D.C., and admitted to practice before the U.S. Court of Appeals for the First Circuit and the U.S. District Court, District of Massachusetts and District of Rhode Island.

## JODI FLOWERS

Jodi Flowers is a Motley Rice LLC Member committed to the notion that trial lawyers can positively effectuate public justice and social change. Because of her reputation for developing, researching and managing complex litigation and class actions, Flowers was the first associate hired for Ron Motley's team against Big Tobacco. She prepared the case on child targeting by the tobacco industry that led to the restrictions on cartoon ads and the retiring of Joe Camel, as well as and developed expert and whistleblower testimony, synthesizing millions of pages of documents and preparing the tobacco cases for trial.

Flowers is currently the practice group leader for Motley Rice's 9/11 and Anti-Terrorism practice group, representing more than 6,500 family members and survivors in a pioneering civil action against al Qaeda's funders designed to bankrupt terrorism. She also performs pro bono work on a wide variety of cases and heads Motley Rice's charitable contribution committee.

Flowers earned a Bachelor of Arts degree *magna cum laude* from the College of Charleston in 1989 and received a J.D. from the University of South Carolina School of Law in 1993. She began practicing with Motley Rice upon graduation and is a Motley Rice LLC Member. She is licensed in South Carolina and admitted to practice before the U.S. Court of Appeals for the Fourth Circuit and the U.S. District Court for the District of South Carolina.



## JOHN HERRICK

John Herrick was persuaded to work with Ron Motley, Joe Rice and many other current colleagues some 16 years ago, encouraged and motivated by their high standards. He now approaches his work with the same ambition as a leader of the asbestos team at Motley Rice LLC. Herrick has worked for clients across the country in Alabama, Illinois, Maryland, Tennessee, Texas, Virginia, Wisconsin and others. He currently serves on the Claimants Committee of the C.E. Thurston, Inc., Bankruptcy.

Herrick received a Bachelor of Arts in 1983 and graduated with a J.D. in 1988 from the University of South Carolina. The combination of his innate affection for arguing and his desire to lend a voice to people who might otherwise not be heard drew him to the law and, more specifically, to the plaintiffs' bar. He became a Motley Rice Member in 2003. He is licensed in South Carolina and admitted to practice before the U.S. District Court for the Central District of Illinois, District of South Carolina, Eastern District of Wisconsin, Western District of Wisconsin as well as the Supreme Court of South Carolina.

## ANNE KEARSE

With a background in consumer affairs and asbestos litigation, Anne Kearse approaches every case with two objectives in mind: to be passionate about the clients she represents and to provide top-notch legal counsel. She has represented victims of asbestos exposure in numerous jurisdictions in both individual and mass tort settings. In addition to her asbestos-related work, Kearse represents individuals and families suffering from injuries resulting from defective products and catastrophic accidents.

Beginning her career as a trial paralegal and investigator for Motley Rice lawyers in 1984, she quickly learned the ins and outs of discovery while working on asbestos cases for individual plaintiffs and school districts. Kearse was later encouraged to obtain a law degree so that she could take her commitment and knowledge about plaintiffs' needs and the culpability of defendants to a new level.

In 1998, Kearse graduated *cum laude* from the University of South Carolina School of Law and was admitted to the South Carolina Bar. She became a Member of Motley Rice LLC in 2003 and now leads the asbestos liability team and Catastrophic Injury practice group. She handles toxic and mass tort, premises liability and general civil litigation. Kearse has written and been published on major legal issues, including *forum non conveniens* and defective products abroad, corporate conduct, medico legal aspects of asbestos litigation and mass tort litigation. She is licensed in South Carolina.

## ROBERT MCCONNELL

Bob McConnell joined Motley Rice as a Member in 2003 and has most recently devoted his attention to childhood lead poisoning cases, representing both injured children in lawsuits against negligent property owners and government agencies in public nuisance lawsuits against the lead pigment industry. He has presented to the Rhode Island Bar Association, the Northeast Conference of Attorneys General and various community groups throughout Rhode Island on lead poisoning litigation.

McConnell began his career representing individual asbestos victims and assisting in large consolidated asbestos trials in Maryland, Mississippi and West Virginia. After graduating from Brown University in 1979 and teaching for several years, McConnell earned his law degree in 1987 from Suffolk University.

McConnell then clerked for one year for Rhode Island Supreme Court Justice Donald F. Shea before joining Motley Rice. Hoping to better the state of Rhode Island, McConnell serves on the board of Help Lead Safe Center, whose purpose is to prevent childhood lead poisoning and provide services for children already affected. He is licensed in Massachusetts and Rhode Island and admitted to practice before the U.S. District Court for the District of Massachusetts and the District of Rhode Island as well as the Supreme Court of Rhode Island.

## JOHN MCCONNELL, JR.

Throughout his career, attorney Jack McConnell has fought for justice, taking on Big Tobacco, the asbestos industry, and now, the manufacturers of lead paint, on behalf of many individuals, groups of people, municipalities, counties and states.

McConnell's legal and trial achievements have earned him a host of honors. In 2006, *Lawyers USA* recognized McConnell as a Lawyer of the Year, citing the Rhode Island lead case. He is the recipient of the National Association of Attorneys General's President's Award, the Childhood Lead Action Project's Above and Beyond the Call of Duty Award, the Rhode Island Bar Association's Dorothy Lohman Award, CWRU's Martin Luther King, Jr. Award and the Rhode Island ARC's Silver Bullet Award. He is an Advocate in The National College of Advocacy.

A 1980 Brown University graduate, McConnell earned his law degree from Case Western Reserve University School of Law in 1983. After clerking for the R.I. Supreme Court, he practiced law at the firm of Mandell, Goodman, Famiglietti & Schwartz for two years before beginning work with Motley Rice lawyers in 1986. He became a Motley Rice LLC Member in 2003, serves as one of the six members of the firm's executive committee and manages the firm's Rhode Island office. McConnell is active in his community as well as the state and national Democratic Party. He is licensed in Massachusetts, Ohio, Rhode Island, South Carolina and Washington, D.C., and admitted to practice before the U.S. Court of Appeals for the First and Third Circuits, and the U.S. District Court for the District of Columbia, District of Massachusetts and District of Rhode Island.

## DONALD MIGLIORI

Donald A. Migliori's career has been built handling multi-million dollar asbestos cases, litigating on behalf of the 9/11 families and victims of aviation disasters and helping the States Attorneys General stop Big Tobacco.

Migliori is a frequent speaker on legal issues relating to terrorist financing, aviation security, class-action litigation, premises liability in asbestos litigation and tobacco company liability. He has also appeared on Court TV, Fox News, and The CBS Early Show and is an adjunct professor at Roger William School of Law, teaching mass torts.

After graduating from Brown University, Migliori earned a master's degree from Syracuse University's Maxwell School of Public Citizenry and a J.D. from Syracuse's College of Law. In 1997, he began his work with Motley Rice attorneys. Since becoming a Member of Motley Rice LLC in 2003, Migliori heads the firm's aviation team along with Member Mary Schiavo and tries occupational health, environmental, medical malpractice and other cases before juries. He is licensed in Massachusetts, Minnesota and Rhode Island, and admitted to practice before the U.S. Court of Appeals for the Fourth Circuit and the U.S. District Court for the District of Rhode Island.

## WILLIAM NARWOLD

Bill Narwold directs the Securities and Consumer Fraud practice group, building further on the firm's role in consumer fraud, defective products, whistleblower, antitrust and securities litigation matters throughout the United States.

Narwold joined Motley Rice LLC as a senior Member in January 2004 after spending 25 years at Cummings & Lockwood in Hartford, Connecticut, including a decade as managing partner. He was drawn to the firm by its energy, excitement and creativity and the opportunity to work on litigation that affects people's lives, policy and social change. Narwold plays an active management role as a member of Motley Rice's Executive Committee and heads the firm's appellate practice group. In addition to leading the firm's Securities and Consumer Fraud litigation matters, Narwold frequently acts as an arbitrator and mediator, both through the American Arbitration Association and privately.

A 1974 graduate of Colby College, Narwold earned a law degree *cum laude* from the University of Connecticut School of Law in 1979, where he was Managing Editor of the *Connecticut Law Review*. He is licensed in Connecticut, South Carolina and Washington, D.C., and admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh Circuits, and the U.S. District Court for the District of Connecticut, District of Colorado, Eastern District of New York and Southern District of New York.

## ANN RITTER

Possessing over two decades of courtroom experience in complex class action litigation involving matters as varied as products liability, toxic tort, shareholders' rights and consumer protection, Ann Ritter has worked to confront corporate wrongdoers and hold them accountable for negligence and misconduct.

Ritter is a founding attorney of Motley Rice LLC and serves on the Firm's Executive Committee. Additionally she serves in a managing role in Motley Rice's Occupational Disease, Transportation and Securities and Consumer Fraud practice groups.

Currently she serves as Lead Counsel in *In re Dell Inc., Sec. Litig.*, (United States District Court for the Western District of Texas); Co-Lead Counsel in *In re Lear Corp. Shareholders Litig.*, (Del. Ch.), Co-Lead Counsel in *Sheet Metal Workers' National Pension Fund, et al.*, derivatively on behalf of nominal defendant *Baker Hughes Incorporated v. Chad C. Deaton; et al.* (United States District Court for the Southern District of Texas), and has played a key role in the National Home freeze out case (*National Home Co. Sec. Litig.*, (Del. Ch.)).

Ritter earned a Bachelor of Science degree from Florida State University. Ritter was employed in the commercial banking area and also worked in the banking regulatory field as a bank examiner with the State of Florida Office of the Comptroller. She then pursued a law degree from the University of Tennessee. Ritter is co-author of "Asbestos in Schools," published by the National School Boards Association. She serves on the Executive Advisory Council of the International Pleural Mesothelioma Program at Brigham and Women's Hospital at Harvard Medical School, the Advisory Committee for the Tobacco Deposition and Trial Testimony Archives (DATTA) Project. She is licensed in South Carolina, Tennessee, and admitted to practice before the U.S. Court of Appeals for the Third and Eleventh Circuits.

## MARY SCHIAVO

Throughout her career in law and public service, Mary Schiavo has held corporations, institutions and the government accountable for their obligation to protect the public welfare. She continues that mission at Motley Rice LLC as a Member, leader of the aviation team and as a member of the firm's complex litigation team.

Schiavo has held numerous government appointments with the U.S. government. She is a former Assistant U.S. Attorney and served as an assistant to the U.S. Attorney General. As a prosecutor on the Organized Crime and Racketeering Strike Force, she prosecuted high profile criminal cases involving securities, mail and wire fraud. Appointed to Assistant U.S. Secretary of Labor, she investigated union, election and financial irregularities. From 1990 to 1996, Schiavo served as the Inspector General for the U.S. Department of Transportation. Under her direction, Schiavo and her staff secured more than 1,000 criminal convictions and uncovered billions of dollars of fraud, waste and abuse of taxpayers' money at the U.S.D.O.T. Additionally, Schiavo instructed in trial tactics and prosecution of



white collar investigations at the Federal Law Enforcement Training Academy, the Federal Bureau of Investigation Academy and the Attorney General's Advocacy Institute.

Since leaving the Transportation Department, Schiavo has worked on complex litigation matters to obtain accountability from corporations and wrongdoers for breach of fiduciary duty. She has represented passenger and crew families in complex litigation involving major U.S. aviation disasters as well as private planes. At Motley Rice, she represents clients in major aviation-related litigation, including family members of the passengers and crew aboard the four planes hijacked on September 11, 2001.

Experienced in corporate regulation, Schiavo worked for 10 years on corporate audit committee issues, including helping direct a NYSE corporation through the implementation of Sarbanes-Oxley compliance. Additionally, Schiavo served for 10 years on the Board of Directors of a NYSE-listed corporation and served on the Board of Directors for a Canadian-based corporation.

Schiavo is a *cum laude* graduate of Harvard University and earned a master's degree in public administration from The Ohio State University, where she was a University Fellow. Schiavo earned a J.D. from New York University and was a Root-Tilden Law Scholar. She has also made appearances on behalf of clients in many other U.S. states and several foreign countries.

Schiavo has served as a legal consultant for NBC and ABC news and frequently appears on Fox, CNN, CBS, History and Discovery Channels and the BBC. She is a licensed pilot and has taught aviation and public administration as a professor at The Ohio State University. She is licensed in Maryland, Missouri, South Carolina, Washington, D.C., and admitted to practice before the U.S. Supreme Court, U.S. District Court for the Western District of Missouri, and U.S. Court of Appeals for the Eleventh Circuit.

## FRED THOMPSON

Fred Thompson has over 25 years of trial experience in commercial, personal injury and toxic tort law. Thompson has represented a cross-section of clients in securities litigation, including customers of public brokerage houses, classes of bondholders in defaulted bond issues and purchasers of securities — including limited partnership units, stocks and other forms of securities against the issuing entities, advisers, accountants, brokers, bankers, underwriters, syndicators and other associated professionals in federal, state and bankruptcy forums, as well as in alternative dispute such as arbitration. Thompson currently leads Motley Rice's medical practice group, managing all cases related to defective medical devices, medical malpractice, nursing home abuse and harmful pharmaceutical drugs. He is a frequent speaker on medical litigation topics, and was recently appointed co-chairman of the American Association for Justice Kugel Mesh Litigation Group.

After earning a Bachelor of Arts degree *cum laude* from Yale University in 1973, Thompson served his country in the U.S. Navy. He then attended Duke University School of Law, where he earned his J.D. with distinction in 1979. Thompson has tried cases in every forum in South Carolina from the magistrate's court to the court of appeals. He is licensed in South Carolina and admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the Fourth Circuit and the U.S. District Court for the District of South Carolina.

9

## ADDITIONAL SECURITIES LITIGATORS

### WILLIAM APPLEGATE

Originally a small business owner, William Applegate chose to bring his business management background to the firm in 2003.

In his legal career, Applegate has represented individuals and small businesses in civil disputes around the country in both state and federal courts. He litigates securities and consumer fraud class actions and individual commercial torts, including securities fraud litigation and deal cases involving Dell, Witness Systems and MBNA. Additionally, Applegate is familiar with the strategies and casework in admiralty law, the Jones Act and environmental pollution law. He has litigated cases involving the Federal Employer's Liability Act (FELA), assisting in the representation of Motley Rice's 9,000 plaintiffs from across the country who were injured while working for different railroad companies.

Applegate earned Bachelor of Arts degrees in both English and Spanish from the College of Charleston. He received his law degree from the University of South Carolina in 2002. He speaks Spanish fluently. Applegate is licensed in South Carolina and admitted to practice before the U.S. District Court for the District of South Carolina.

### JOHN DUANE

Former federal prosecutor John Duane applies several years of experience litigating criminal matters to his work representing clients with Motley Rice LLC's aviation and securities fraud teams. As an Assistant U.S. Attorney for the District of South Carolina, Duane prosecuted a variety of cases, including white collar and violent crimes. In this role, he also served as the primary trial attorney on several jury trials and trained new prosecutors in caseload management, procedures and trial technique. In 2004, Duane received the Assistant United States Attorney of the Year award for the Charleston Division.

Prior to his role with the U.S. Attorney's Office, Duane served as a law clerk to Senior United States District Judge C. Weston Houck, assisting with all phases of both civil and criminal trials, including pre- and post-trial motions, evidentiary rulings, and research in class actions, products liability cases, medical malpractice and whistleblower actions.

Duane received a Bachelor of Arts in political science from the College of Charleston in 1994 and a Juris Doctor degree from the University of South Carolina in 1998. He is licensed in South Carolina and admitted to practice before the U.S. District Court, District of South Carolina and the U.S. Court of Appeals for the Fourth Circuit.

### JAMES HUGHES, PH.D.

Jim Hughes began his career as a professor, teaching philosophy at the University of Kentucky, Ohio State University, Vassar College and the University of South Carolina. As one who enjoyed the trials of teaching, Hughes decided that joining the legal profession might

inspire and further challenge him. He joined Motley Rice attorneys in 1993 and was named Senior Counsel in 2007.

Hughes primarily works with Motley Rice's Securities and Consumer Fraud practice group, writing pleadings and filings prior to lead plaintiff appointment, as well as during the litigation stage.

A Minnesota native, Hughes earned a Bachelor of Arts degree from the University of Minnesota followed by a Master of Arts and Ph.D. in philosophy from the University of Illinois at Chicago. He has spoken at several national conferences on silica topics, such as "Emerging Issues in Silica Litigation," "The Current State of Silica Litigation," "Silica Litigation: The Killing Dust" and "Is Silica the Next Asbestos? The Plaintiff's Perspective." Hughes's law review article, "Informing South Carolina Capital Juries About Parole," was cited in 2000 by Justice John Paul Stevens of the United States Supreme Court in his dissenting opinion in *Ramdass v. Angelone*. He is licensed in South Carolina and admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the Fourth Circuit, and the U.S. District Court for the District of South Carolina.

### BADGE HUMPHRIES

Since early in his legal career, Badge Humphries has experienced complex litigation in courtroom environments—first, as law clerk to U.S. District Court Judge Thad Heartfield and, then, as an Associate working with the Motley Rice Occupational Disease and Toxic Tort practice group on asbestos litigation. In 2004, Humphries began devoting a large amount of time to consumer fraud. His responsibilities at Motley Rice have included handling large dockets of asbestos cases and managing complex securities class actions against officers and directors who have breached their fiduciary duties to shareholders. Through his work at the firm, Humphries has experience prosecuting every stage of the litigation process, from filing through appeal.

Humphries graduated *summa cum laude* from Tulane University in 1996 with a B.A. in Latin American Studies. After college, Humphries worked for a non-profit human-rights organization in Austin, Texas, before enrolling at The University of Texas School of Law, where he served as a member of the *Texas Law Review* and earned a J.D. with honors in May 2001. He is licensed in South Carolina and Texas and admitted to practice before the U.S. District Court for the District of South Carolina and the Eastern District of Texas.

### FREDERICK JEKEL

Fritz Jekel has been involved in litigation related to securities fraud, asbestos, groundwater contamination, RICO, personal injury and product liability throughout his career. Most recently, Jekel participated in the discovery in the Clear Channel shareholder litigation (*In re Clear Channel Communications, Inc. Shareholders Litigation*, 408th Judicial District Court of Bexar County, Texas). He also tried lead poisoning personal injury cases in Illinois, Missouri, North Carolina, Ohio and South Carolina.

MotleyRice

Jekel also handles toxic mold exposure cases, effectively dealing with the unique challenges of causation and liability. He represented students at Stratford High School in a civil rights class action lawsuit in which the students alleged that their constitutional rights were violated when police handcuffed and held them at gunpoint during a drug raid. Jekel earned a Bachelor of Arts degree, M.P.A. and J.D. from the University of South Carolina. He is licensed in South Carolina and admitted to practice before the U.S. Court of Appeals for the Fourth Circuit, the U.S. District Court for the District of South Carolina as well as the Supreme Court of South Carolina.

## MARLON KIMPSON

Marlon Kimpson combines his knowledge of law and the banking industry to work aggressively for Motley Rice clients. Kimpson was actively involved in the firm's case on behalf of seven professional football players against the National Football League and National Football League Players Association alleging that they acted negligently in their endorsement and recommendation of a financial advisory firm that is currently under federal indictment for allegedly embezzling $185 million from a hedge-fund. He has also been actively involved in litigation with the firm's occupational disease, aviation and catastrophic injury teams.

Kimpson earned a Bachelor of Arts degree from Morehouse College. He worked in commercial banking for five years before receiving his law degree from the University of South Carolina. He is an active community participant, and currently is a member of the Carolina Youth Development Center Board of Directors and the University of South Carolina Board of Visitors. He served as Chairman of the South Carolina Election Commission from 2001-2003. Kimpson is licensed in South Carolina.

## GREGG LEVIN

With nearly 20 years of legal experience, attorney Gregg Levin litigates corporate governance, misconduct and securities fraud matters. Prior to joining Motley Rice in 2007, Levin was an associate at Grant & Eisenhofer in Wilmington, Delaware. There, he represented institutional investors in securities fraud class actions and shareholder derivative actions in federal and state courts across the country, including the WorldCom, Telxon and Global Crossing cases.

Levin is the author of significant portions of the treatise *Shareholder Activism Handbook* (Aspen Publishers; November 2005). He has written and published multiple articles addressing securities fraud litigation. Levin is also the former Vice President and Corporate Counsel for a Delaware Valley-based retail corporation, where he directed the corporation's legal affairs, led internal investigations and maintained corporate compliance in all internal and external policies, procedures and contracts.

Levin earned a Bachelor of Arts in Political Science from the University of Rochester in 1984 and a J.D. from Vanderbilt University

School of Law in 1987. He is licensed in Massachusetts and the District of Columbia and admitted to practice before the U.S. Court of Appeals for the Third and Eleventh Circuits.

## JOSH LITTLEJOHN

Josh Littlejohn began his legal career at Motley Rice in 2002 as a paralegal working on asbestos and prescription drug litigation. He later enrolled in law school while continuing to work at Motley Rice and, in 2007, joined the firm as an attorney with the medical and securities fraud teams.

With five years of experience at Motley Rice, Littlejohn has a background in discovery tactics, motion practice and liability document review. He played a role in prescription drug cases, dealing specifically with marketing practices and privilege log issues. Littlejohn has experience drafting complaints and assisting with securities cases including derivative suits and deal cases. He has also been actively involved with client relations and client intake.

Littlejohn earned a B.A. from the University of North Carolina at Asheville in 1999 and a J.D. from the Charleston School of Law in 2007. He is licensed in South Carolina and admitted to practice before the U.S. Court of Appeals for the Third Circuit.

## INGRID MOLL

After working for two large defense firms, Ingrid Moll made a significant career move in 2004 when she chose to join Motley Rice LLC, attracted by its energy, creativity and role in tobacco and asbestos litigation.

Moll's areas of experience include unfair competition and trade practices, intellectual property, tax and appellate practice. She has partaken in the preparation, briefing and argument for dozens of appeals in various state and federal courts. Moll works primarily in Motley Rice's Securities and Consumer Fraud practice group.

After graduating from Wheaton College with a Bachelor of Arts in Political Science and French, Moll earned a J.D. with honors from the University of Connecticut School of Law, where she was Editor-in-Chief of the *Connecticut Law Review*. Following her graduation from law school, Moll served as a law clerk to the Honorable David M. Borden, Connecticut Supreme Court.

Moll's experience includes serving on the litigation team of cases in unfair trade practices, intellectual property, constitutional law, tax and other areas in Colorado, Connecticut, Georgia, Massachusetts, Minnesota, New York, Ohio and Oklahoma and playing an active role in appeals before the U.S. Court of Appeals for the First and Second Circuit and the state courts of Connecticut, Georgia and Maryland. Moll has also taught moot court class at the University of Connecticut School of Law as an adjunct professor. She is licensed in Connecticut, the District of Columbia and South Carolina and admitted to practice before the U.S. Court of Appeals for

the Fourth Circuit and the U.S. District Court for the District of Connecticut, District of Colorado, Eastern District of New York and the Southern District of New York.

## BILL NORTON

Bill Norton counsels individual and institutional investors in securities class actions, derivative and deal cases as part of Motley Rice LLC's securities litigation team. Prior to joining Motley Rice, Norton was an associate in the New York office of an international law firm, where his experience included representing clients in complex securities litigation in federal court, including several class actions and SEC investigations. Norton handles pre-trial research, pleadings, motions and depositions and is practiced in electronic discovery.

As a law student, Norton worked in the U.S. Attorney's Office for the District of Massachusetts, addressing issues of civil asset forfeiture and money laundering. He has also been involved with multiple legal outreach and community programs.

Norton earned a Bachelor of Arts and Science from the University of South Carolina in 2001 and a Juris Doctor from Boston University School of Law in 2004, where he served as a member of the Boston University Law Review and was a G. Joseph Tauro Distinguished Scholar. He is licensed in New York and Massachusetts and is admitted to practice before the U.S. District Court for the Southern District of New York.

## LANCE OLIVER

With a background in complex and commercial litigation, Lance Oliver litigates securities fraud and shareholder derivative cases as part of the Motley Rice Securities and Consumer Fraud practice group.

Prior to joining Motley Rice, Oliver was an associate in the Washington, D.C., office of a national law firm. Oliver's experience includes complex litigation at both the trial and appellate levels, handling insurance coverage matters and working with The Freedom of Information Act.

Oliver received a B.A. from Samford University in 2001 and a J.D. from Duke University School of Law in 2004. After graduation, Oliver served as a law clerk to the Honorable James Hughes Hancock of the U.S. District Court, Northern District of Alabama. He is licensed in Alabama and the District of Columbia and admitted to practice before the U.S. Court of Appeals for the D.C. and Eleventh Circuits and the U.S. District Court for the District of Columbia.

## MEGHAN OLIVER

After three years as a business litigation and antitrust associate in Washington, D.C., Meghan Oliver joined Motley Rice in 2007. Oliver litigates securities fraud cases for the firm.

Oliver has participated in federal antitrust litigation, including the trial of a multi-district litigation antitrust case, as well as general commercial litigation. Additionally, she has assisted in multiple corporate internal investigations.

Prior to attending law school, Oliver lobbied Congress on behalf of several public health organizations. Oliver received a B.A. in 2000 and a J.D. in 2004 from the University of Virginia. She is licensed to practice in the District of Columbia and Virginia.

## VINCENT PARRETT

Vince Parrett earned a Bachelor of Arts Degree, *cum laude*, in Economics from Yale College, where he authored dual senior theses: "A Tract on the International Currency Swap Market" and "A History of the Securities & Exchange Commission. Sed quis custodiet ipsos Custodes?" He studied European Union Law and Economics in German, at the Goethe Institute in Mannheim, Germany. In 1998 Parrett graduated from New York University School of Law.

He began his legal career in Boston, Massachusetts, in the area of securities, representing clients involved in federal securities litigation and SEC investigations. He was involved in research, document analysis, drafting briefs and interviews with key witnesses involved in securities fraud litigation. Parrett has also served as a Naval Officer in the United States Navy Judge Advocate General's Corps (JAG).

From 2003 through the present, Parrett has represented victims of the September 11th attacks, first with a New York firm and thereafter with Motley Rice. He has represented clients in this multidistrict litigation against financial sponsors of al Qaeda, and against the airlines and security companies who allegedly failed to implement basic security measures and enabled the terrorists to launch the attacks.

Since joining Motley Rice, he has participated in corporate class action litigation representing the direct financial interests of shareholders against under-priced or coercive transactions and shareholders asserting claims against management and directors for violating their fiduciary duties in connection with corporate transactions, such as 'going-private' deals. He also engages in federal class action securities fraud litigation, representing investors injured because of wrongful conduct, including the dissemination of fraudulent statements to the investing public.

Parrett has co-authored several articles and presentations. He is licensed in California, Massachusetts, New York and South Carolina and admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the First, Second and Ninth Circuits and several districts of the U.S. District Court.

## MARTHA RHODES

With a background in corporate, business and insurance litigation, attorney Martha Rhodes has represented companies both small and large in civil litigation. She has taken more than 200 depositions relating to construction litigation and insurance defense and has taken several cases to trial.



Prior to joining Motley Rice, Rhodes was an associate at Buist Moore Smythe McGee P.A. in Charleston, South Carolina. She completed a clerkship with Judge Jackson V. Gregory of the Fourteenth Judicial Circuit of South Carolina and served as a law clerk for the Neighborhood Legal Assistance Program, Inc., in the Charleston community.

Rhodes joined Motley Rice in 2007 as an Associate in the Securities and Consumer Fraud practice group. She is a 1997 graduate of the University of the South, where she earned a Bachelor of Arts in English. She earned her J.D. in 2001 from the University of South Carolina School of Law and served as an Associate Justice of the University of South Carolina Moot Court Bar. She is licensed in South Carolina and admitted to practice before the U.S. District Court for the District of South Carolina.

### DANIEL ROME

Throughout the past 12 years, Dan Rome has served in a variety of roles within the securities industry, ranging from selling securities to working in a client services capacity. Most recently, Rome focused his career on securities compliance and risk management for banking and trading/brokerage service entities.

Rome brings a fundamental understanding of complex securities compliance issues and corporate governance to his work with the Motley Rice LLC securities litigation team. He is a member of the AML Strategic Leadership Group, an organization composed of anti-money laundering professionals from the financial sector and the government, and has crossed the nation conducting audits and training as related to securities compliance, internal controls and investor protection.

Rome expanded on his industry experience while working full-time, earning a Juris Doctor in 2001 from Widener University School of Law. He received a Bachelor of Arts in psychology from West Chester University of Pennsylvania in 1994 and is licensed to practice in Pennsylvania.

## SECURITIES LITIGATION FORENSIC STAFF

### DAVID ABEL

Director of Shareholder Services and Business Analysts David Abel identifies an organization's needs, develops solutions and has a passion for technology. He works with monitored clients and practice group attorneys to monitor clients' financial holdings.

Abel is responsible for communicating with institutional investors interested in Motley Rice's portfolio monitoring service, monitoring portfolios by correlating investment portfolio with current litigation, and analyzing institutional losses for potential/current actions impacting portfolios. He also oversees all client interaction as it relates to settlement recovery, document preparation and calculating recognizable loss.

Prior to joining Motley Rice in 2006, Abel gained valuable professional experiences as Vice President of Operations for a mid-size tour company, as Editor and General Manager for a political e-journal with over 40,000 subscribers and as Marketing Assistant at a full service marketing and public relations agency.

Abel earned a Master of Business Administration from The Citadel. He was a double major at Clemson University, earning Bachelor of Arts degrees in Speech and Communication and Spanish. He currently attends the Charleston School of Law.

### MICHELLE BEYEL

Michelle Beyel joined Motley Rice LLC in February 2008 as a Data Analyst in the Securities and Consumer Fraud practice group. Prior to joining Motley Rice, Beyel gained valuable experience while working as a legal secretary for 4 years during her summers at college. She was also a client administrator in the Corporate Funds Division at The Bank of New York Mellon for two and a half years. Beyel feels that her background in law and banking has given her the experience needed to make a positive contribution to Motley Rice. Beyel graduated *magna cum laude* and earned a B.S. in finance from The Syracuse University Whitman School of Management in May of 2005. She is currently a CFA Candidate.

### ADAM FOULKE

Adam Foulke joined Motley Rice LLC in December 2006 as a Business Analyst for the securities litigation team. Foulke has over 15 years of business experience including post-SOX experience in corporate governance consulting and market regulation compliance analysis.

Foulke was drawn to the securities fraud team at Motley Rice because of his passion for good corporate governance and his belief that in order for the United States capital markets to remain competitive, the market and its participants must act with integrity and individual firms must be accountable for the trust bestowed upon them by the investing public.

13

Before joining Motley Rice, Foulke served as a Principal in two maritime start-up businesses, a port services and transportation business and a technology venture seeking to market IED detection devices to domestic and international container terminal operators. He also served as a proxy analysis and corporate governance consultant for financial advisory firm, Institutional Shareholder Services (ISS). While working as an analyst at ISS, several of Foulke's articles on corporate governance issues were published in the firm's weekly publication circulated to pension fund investment advisors, money managers and other equities analysts.

Foulke later was a senior analyst in the Listing Qualifications Department at the Nasdaq Stock Market. Foulke earned a B.A. from Roanoke College and a Master of Business Administration from Johns Hopkins University.

## YVONNE GODFREY

Yvonne Godfrey joined Motley Rice in 2004 as a Research Assistant in the firm's Central Research department, supporting the firm's practice groups and active litigation with research and reference services.  She was quickly promoted to Supervisor of the department.

Godfrey currently works with the securities litigation team at Motley Rice, specifically on securities-related research and support. She earned a B.A. in English literature from Rhodes College in 2004.

## ELLIE KIMMEL

Business Analyst Ellie Kimmel began working with Motley Rice attorneys in 2000. Prior to her work with the securities litigation team, she was a founding member of the firm's Central Research Unit and also supervised the firm's file management. She currently completes securities research and client portfolio analysis for the firm's securities cases.

Kimmel has a diverse background that includes experience in education as well as the banking industry. She began her career in banking operations, where she served as an operations manager and business analyst in corporate banking support for 14 years. She then spent seven years teaching high school economics, Latin and history before joining Motley Rice.

Kimmel earned degrees in Latin, history and education from the University of South Florida.

## STEFFEN MOERTIZ

As Director of European Investors Relations, Steffen works closely with Motley Rice's Securities and Consumer Fraud practice group to identify, research and communicate the status of securities fraud litigation to European clients. He is responsible for managing the Portfolio Monitoring Service offered by Motley Rice to European clients, monitoring their investment portfolios to determine losses and potential recoveries. Additionally, Moeritz manages the preparation and filing of settlement claims.

Moeritz earned a law degree from Martin Luther University in Germany with an emphasis in economics. After spending several years as a legal consultant and business manager in Germany, Moeritz began working with American securities lawyers and European investors as the Foreign Outreach Manager at a New York-based securities firm. He is fluent in German and English. He joined Motley Rice in 2006.

## SAM WANKEL

Sam serves Motley Rice as a Business Analyst with more than 17 years of experience in complex securities litigation support and consulting. He provides litigation support relating to the economic issues that arise in complex securities fraud litigation.

Wankel's litigation consulting work includes calculating damages in actions brought under federal and state securities laws. In addition, he provides financial and economic analysis of publicly traded securities, financial statements, historical price performance and "peer group" comparisons as well as research on various individual company and/or industry specific issues relating to publicly traded securities.

From 1994 through 1995, he researched and prepared statistical information presented to the United States Congress and the Senate Banking and Finance Committee with respect to public offerings, stock trading and securities class actions and the Private Securities Litigation and Reform Act (PSLRA).

Wankel earned a Bachelor of Arts from Colorado State University and has taken various post graduate courses in finance, accounting, statistics, and investment analysis and portfolio management.

14

MotleyRice

# SECURITIES NEWS COVERAGE

*As featured in the* San Diego Union-Tribune Online *on August 27, 2007*

## Nigeria a legal trouble spot for oil service firms

By Anna Driver
REUTERS

HOUSTON – Operating in oil-rich Nigeria has always been a challenge for energy-service companies, but new bribery probes by U.S. authorities are raising legal and financial risks that may force them to leave the country.

GlobalSantaFe Corp, Transocean Inc and Pride International Inc have all said in regulatory filings that they received requests for information from the U.S. Department of Justice (DOJ), which is probing whether the oil service companies violated the U.S. Foreign Corrupt Practices Act (FCPA) by bribing customs officials in Nigeria.

The act outlaws bribes paid by U.S. companies or their agents to win business abroad. The U.S. Securities and Exchange Commission (SEC) is also probing a number of companies.

Booming oil prices in recent years have pushed up demand for offshore drilling rigs in West Africa, but lawyers say doing business there inevitably involves taking risks.

"In Nigeria, there are a lot of people who are demanding those services and they are basically going into the Wild West," said Brad Richards of Houston law firm Haynes and Boone." They are going into a market where the way of doing business is to pay bribes."

Transparency International, a global nonprofit group that battles corruption, found in a 2006 poll that bribe paying is the norm in a number of African countries, including Nigeria.

Richards, who advises companies doing business in Nigeria, said the number of FCPA probes grew after the Sarbanes-Oxley governance reforms of 2002 which, among other things, require companies to report more detailed financial information.

"It's going to be a growing problem for companies in that the DOJ and the SEC have it in their bulls-eye," he said.

A Houston-based spokeswoman for the DOJ would not comment.

Other oil service companies facing scrutiny from U.S. authorities or conducting their own probes into possible FCPA violations include Tidewater Inc and Noble Corp. Global Industries Ltd announced in June an internal bribery probe of its West African operations. Nabors Industries Inc. said in a regulatory filing the DOJ was probing one of its customs vendors.

And Swiss logistics and transport group Panalpina said in July it had started an inquiry because U.S. authorities requested documents related to a bribery probe.

The companies have said they are cooperating with the government. But several warned that if they do not get permits to operate in Nigeria, they will have to cancel contracts.

Noble said it had not been able to obtain or renew permits for five of its seven rigs operating in Nigeria due to its probe. If those permits cannot be obtained, "we may need to terminate the drilling contract," it said in an SEC filing.

UNSEALED

So far, U.S. authorities have nabbed two oil services companies, Baker Hughes Inc and Vetco International Ltd, for FCPA violations. Baker Hughes reached a $44.1 million settlement in April with the DOJ and SEC related to a bribery probe of its operations in Nigeria, Angola and Kazakhstan.

Baker Hughes pleaded guilty to FCPA violations and agreed to hire an outside monitor to oversee its compliance.

Two shareholder groups have sued Baker Hughes' officers and directors over the violations. In a federal complaint filed in Houston, shareholders allege the company has failed to comply with the FCPA for more than a decade.

"Companies have a lot of opportunities to do the right thing," Ann Ritter, an attorney with South Carolina based firm Motley Rice, who represents the Sheet Metal Workers' National Pension Fund. "And activist shareholders have a chance to use their voice to try and help them move in the right direction."

A spokesman for Baker Hughes was not available to comment on the lawsuits.

In February, three Vetco subsidiaries pleaded guilty to violating anti-bribery provisions of the FCPA and agreed to a $26 million fine. According to court documents, the wholly owned subsidiaries admitted they violated and conspired to violate the law in connection with the payment of about $2.1 million to Nigerian government officials.

"It's a tough problem for companies," said Cherie Taylor, a law professor at the South Texas College of Law in Houston. "But on the other hand, we've got no hope of getting those countries to get in line if we don't lead by example."



*As featured in* Business Week *on July 12, 2007*

# Saying No to an LBO

## *Shareholders are fighting "lowball" buyout bids—and finding an ally in the courts*

by Christopher Palmeri

Not long ago, billionaire investor Carl C. Icahn's bid for Lear Corp. (LEA) would have been a slam dunk. The $36-a-share offer, disclosed on Feb. 5, was 80% higher than the stock price a few months earlier. And both the board and Chief Executive Robert E. Rossiter had given their blessing.

But within days, Classic Fund Management, a big investor, sued to block the deal, arguing Rossiter had personal motives for pushing it. The court sided with the plaintiffs. As part of the ruling, Lear had to reveal to shareholders that Rossiter had asked the board to cash out his $11.6 million retirement plan; he later decided not to move forward after consultants said it would alarm investors. The Icahn deal would trigger that payout and allow Rossiter to keep his job. In an opinion on June 15, Delaware State Court Vice-Chancellor Leo E. Strine Jr., who stopped short of blocking the deal outright, noted that Rossiter didn't act improperly but said the deal "presented him with a viable route for accomplishing important personal objectives." Says Lear's general counsel: "We weren't trying to hide anything." Icahn has since upped his bid to $37.25, and the vote is set for July 16. "We think we're paying full price," says Icahn.

Battles like the one at Lear are playing out across the private equity landscape. In recent months shareholders have become increasingly hostile toward managements and boards for accepting what they perceive to be lowball bids, and they have been aggressively filing suits to block deals. Such tactics are nothing new. The difference now is that investors are starting to win. "You're seeing real skepticism," says Kenton J. King, an attorney at Skadden, Arps, Slate, Meagher & Flom. "Judges are asking if there isn't something else going on, other than getting the most value for shareholders."

With the buyout boom turning into a frenzy, private equity firms are feeling pressure from all sides. Politicos are bashing the group's big pay packages and beneficial tax treatments. Trade unions are complaining about the layoffs that often follow deals. Now judges are scolding CEOs who seem to be teaming up with private equity players at the expense of shareholders. The growing backlash comes at a time when borrowing costs are rising and firms are fretting that the bargains are gone. With investors and judges also pushing private equity to boost bids, it raises the likelihood that the current wave of deals will deliver meager returns, if not losses.

The Delaware courts took a bat to the buyout plans of Topps Co. (TOPP). In March, Michael D. Eisner, former CEO OF Walt Disney Co. (DIS), and Chicago private equity firm Madison Dearborn Partners signed a deal to acquire bubble gum and trading-card maker Topps for $9.75-a-share, or $385 million. Three weeks later rival Upper Deck Co. submitted a $10.75 bid to the board. But Topps' board said in a statement that such a merger might raise antitrust concerns and argued that Upper Deck hadn't proved it had enough financing to fund the deal. The company scheduled a vote for Eisner's offer.

The courts, though, decided investors needed more details about potential conflicts. Strine, the same judge in the Lear suit, ruled in mid-June that Topps needed to disclose two previous bids by Upper Deck. He also said management should tell investors that Eisner planned to keep Topps' management in place. CEO Arthur T. Shorin would stay on as a consultant, while Scott Silverstein, his son-in-law and the company's current president, and others would have a spot at the company—assurances Upper Deck didn't make. "Shorin has known that time is running out for him," Strine wrote in his recent opinion. "He was motivated to find a buyer that would guarantee that Shorin and his son-in-law would continue to play leading roles at Topps."

*As featured in the* Wall Street Journal *on July 12, 2007*

# Court Faults Buyouts

## *Delaware Rulings Raise Disclosure Questions in Topps, Lear Deals*

by Peter Lattman and Dana Cimilluca

The private-equity buyout boom has found critics in Congress and among some investors recently. Now the country's most important court for corporate law has raised questions about some deals.

In recent back-to-back opinions, the Delaware Court of Chancery criticized two publicly listed companies that have agreed to sell themselves to private investors.

The rulings expressed concern that Topps Co. and Lear Corp. hadn't disclosed enough information to shareholders about possible incentives the companies' managements may have to agree to the deals. That information is important for shareholders, who must vote to approve them, the court ruled. The rulings require both companies to disclose additional information.

The decisions could slow the pace of some transactions, said Robert Thompson, a corporate law professor at Vanderbilt University. "If you give incomplete information to shareholders, the court will hold up your deal, or worse, make you go back to the drawing board and redo it."

Because the majority of large public companies are incorporated in Delaware, the five-judge Court of Chancery is an influential forum for litigating corporate-governance issues and takeover disputes. There are no juries in the cases.

The author of both opinions, 43-year-old Vice Chancellor Leo E. Strine Jr., is a colorful figure who has emerged as something of a public face of the court. He has also been an important advocate for shareholder rights on the court. "His opinions carry a lot of weight," says Francis Pileggi, a partner at Fox Rothschild LLP in Wilmington, who has known Mr. Strine since 1992, when Mr. Pileggi was running for state representative in Delaware.

In the case of Lear, an auto-parts maker that billionaire financier Carl Icahn is seeking to buy for $2.9 billion, Mr. Strine faulted the company's board for letting Chief Executive Robert E. Rossiter negotiate the deal with Mr. Icahn on his own.

He also said shareholders should have been told more about an issue involving Mr. Rossiter's pension that could give him an incentive that other stockholders didn't share to favor the deal. In the case of Topps, Mr. Strine ruled that the trading-card company should have been more forthcoming about an agreement with the suitor to retain Topps's management.

In another ruling in March aimed at protecting shareholders in private-equity transactions, Mr. Strine criticized Netsmart Technologies Inc. for agreeing to an acquisition by two private-equity firms without canvassing possible corporate buyers. He ordered the company to disclose additional information about the transaction, which closed in April.

Mr. Strine declined to comment for this article.

The Delaware court's increased scrutiny of possible conflicts comes amid rising complaints, and more lawsuits, criticizing buyout deals for allegedly enriching corporate executives at the expense of the shareholders.

The leverage-buyout boom has run into other head winds recently. Congress is threatening to raise taxes on private-equity firms and their executives. Meanwhile, credit investors, until recently eager to finance buyout activity, are also tightening their purse strings.

Some recent shareholder protests have succeeded in forcing companies to go back and secure higher prices from private-equity firms that agreed to buy them. Clear Channel Communications Inc., for example, agreed to a leveraged-buyout deal with the family that runs it and two private-equity firms. Amid several lawsuits and a shareholder outcry claiming the deal shortchanged the public shareholders, the buyers had to



raise their offer by about $800 million, to more than $19 billion, to win support from key shareholders. At Biomet Inc. and OSI Restaurant Partners Inc., shareholders also fought for and won richer buyout offers.

Some boards appear to have been altering their behavior even before the rulings. The board of Cablevision Systems Inc. waited more than a year before accepting the third offer made by the Dolan family for the New York media company this year. Some shareholders still criticize the $10.6 billion proposal as too low.

In recent weeks, several major law firms have alerted their corporate clients to the Delaware rulings, saying that boards need to be more attuned to the enhanced scrutiny of private-equity deals.

Wilson Sonsini Goodrich & Rosati LLP reminded boards to be candid with their shareholders. "Sometimes more than the literal truth may be required to be disclosed," the firm wrote in a so-called client alert. Quoting the court's opinion, the firm told the boards they need to "avoid making materially misleading disclosures, which tell a distorted rendition of events or obscure material facts."

The issues raised by Mr. Strine differ from the legal concerns that emerged with the buyout boom of the 1980s. That era was marked by so-called corporate raiders. They offered shareholders rich premiums for their companies and vowed to remove existing management and boards. In those deals, Delaware courts examined shareholder allegations that company management and boards had rejected rich, hostile bids to keep their jobs.

In the current buyout craze, many buyout firms retain the management by offering rich pay packages and a stake in the newly private entity. These deals are being challenged in the courts by shareholders who allege that they are getting a meager payout for the company. They say boards are accepting deals based on factors other than the best-available price. In addition, shareholders are accusing boards of running into the friendly arms of private-equity buyers to escape activist hedge funds, who are trying to oust them through proxy battles.

In the case of Topps, the New York producer of trading cards, collectibles and candy, shareholders have accused the board of breaching its duties to get the highest price for the company when it agreed to a deal with a private-equity consortium led by Michael Eisner, the former Walt Disney Co. chief executive. The lawsuit alleges that the board, under pressure from an activist hedge fund, viewed Mr. Eisner as a friendly suitor who had pledged to retain management. While the court found no fault in the board's decision to negotiate exclusively with Mr. Eisner, it criticized Topps for the way in which it prevented a rival, the Upper Deck Co., from launching a tender offer for the company.

The court issued an order postponing the shareholder vote on the deal until Topps discloses the additional information to shareholders. This week, Topps said that its shareholders should reject a tender offer Upper Deck ended up making, but that it would continue talking with its rival to reach agreement on a higher price.

"When directors bias the process against one bidder and toward another not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty," Mr. Strine warned in his Topps opinion.

19

*As featured in the* Charleston Gazette *on July 06, 2007*

## Shareholder sues Massey, alleging mismanagement

By Ken Ward Jr., Staff writer

A shareholder who alleges mismanagement at Richmond, Va.-based Massey Energy is suing the coal giant's executives and board members.

The suit was filed earlier this week in Kanawha Circuit Court by a trust that funds asbestos settlements with former Johns Manville Corp. workers.

Massey President Don Blankenship and 13 current corporate board members, executives and former board members were named as defendants.

The case is a shareholder derivative suit. Technically, such suits are filed on behalf of the company by shareholders against corporate managers because of alleged mismanagement of the company.

The suit alleges a "conscious failure" by Massey management "to comply with applicable environmental and worker-safety laws and regulations." It says failure has "caused and will continue to cause severe injury to the company by consciously ignoring Massey Energy's legal obligations to comply with federal and state law, thereby exposing the company to a substantial threat of monetary liability for violations."

Among other things, the suit cites a recent federal lawsuit over repeated water pollution violations, hefty fines for the deaths of two miners in the Aracoma Mine fire, and a nearly $2 million verdict against Massey for firing a worker who complained about safety problems.

The Manville Personal Injury Trust owns about 1,000 shares of Massey stock, according to the lawsuit.

The trust was created in 1986 as part of the bankruptcy reorganization of the Johns Manville Corp.

The trust was formed to compensate workers injured by exposure to asbestos or asbestos-containing products made or sold by Manville. The trust invests its financial holdings in the stock market to fund worker compensation.

The suit was filed on the trust's behalf by former Kanawha Circuit Judge Andrew MacQueen.

The trust is also represented by the South Carolina firm of Motley Rice, whose founder, Ronald L. Motley, was among the first lawyers to take on the asbestos industry, and by the Delaware firm Rigrodsky & Long, which specializes in shareholder lawsuits.

In December 2005, Massey management settled a previous shareholder derivative case filed in Boone Circuit Court. Among other things, the settlement increased the number of board members governing Massey.

Last month, Massey cut two seats from its board, after two hedge fund officials who opposed Blankenship's leadership resigned in frustration.

20





*Motley Rice LLC*
*Attorneys at Law*
*www.motleyrice.com*
*1.800.768.4026*









28 Bridgeside Blvd., Mt. Pleasant, SC 29464
**o.** 843.216.9000    **f.** 843.216.9450

321 South Main St., Providence, RI 02940
**o.** 401.457.7700    **f.** 401.457.7708

20 Church St., 17th Floor, Hartford, CT 06103
**o.** 860.882.1681    **f.** 860.882.1682

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IN RE NPS PHARMACEUTICALS, INC. SECURITIES LITIGATION | MEMORANDUM DECISION AND ORDER APPOINTING LEAD PLAINTIFF AND APPROVING LEAD PLAINTIFF'S SELECTION OF COUNSEL<br><br>Case No. 2:06-cv-00570-PGC-PMW<br><br>District Judge Paul G. Cassell<br><br>Magistrate Judge Paul M. Warner |

This matter was referred to Magistrate Judge Paul M. Warner by District Judge Paul G.

Cassell pursuant to 28 U.S.C. § 636(b)(1)(A).[1]  Before the court are three competing motions for

appointment as lead plaintiff and for approval of selection of counsel.[2]  One motion was brought

by Dr. Audie Leventhal, who is represented by the law firms Lerach Coughlin Stoia Geller

Rudman & Robbins LLP and Anderson & Karrenberg.[3]  Another motion was brought by

PHARMA/wHEALTH Management Company S.A. ("PHARMA"), which is represented by the

---

[1]  In an order dated September 14, 2006, Judge Cassell consolidated several previously filed actions under the instant case name and case number. *See* docket no. 30.

[2]  In addition to these three motions, two other motions for appointment as lead plaintiff and for approval of selection of counsel were filed, but both were subsequently withdrawn. *See* docket nos. 34, 37, 45, 48.

[3]  Dr. Leventhal filed the same motion in three separate docket entries. *See* Docket nos. 17, 18, 32.  The court's disposition of Dr. Leventhal's motion applies to all three of these entries.

law firms Motley Rice LLC and Burbidge & Mitchell.[4]  The final motion was brought by John

Williams and Robert Rains (collectively, "Williams & Rains"), who are represented by the law

firms Schiffrin & Barroway, LLP and Pate Pierce & Baird, PC.[5]

The court has carefully reviewed the written submissions of the parties.  Pursuant to local

rule 7-1(f), the court has determined that oral argument would not be helpful or necessary and

will rule on the motions on the basis of the written submissions.  *See* DUCivR 7-1(f).

## BACKGROUND

This case was brought as a securities class action on behalf of all purchasers of the

publicly traded securities of NPS Pharmaceuticals, Inc. ("NPS") during a certain period of time

(the "Class Period").  The suit claims that owners of NPS stock during the Class Period suffered

losses based on the omissions and misrepresentations of NPS and its officers.

## ANALYSIS

### I.  Rebuttable Presumption for Determining Lead Plaintiff

When considering motions for appointment as lead plaintiff pursuant to the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), the court is required to adopt a rebuttable

presumption

> that the most adequate plaintiff . . . is the person or group of
> persons that--

---

[4]  Docket no. 21.

[5]  Docket no. 31.

(aa) has either filed the complaint or made a motion in
response to a notice . . . ;

(bb) in the determination of the court, has the largest
financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of [r]ule 23 of the
Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)-(cc).  These requirements, as applied to each movant, are
addressed below.

## A.  Complaint or Motion

All three movants satisfy the first requirement to obtain the rebuttable presumption–i.e.,
all three either filed a complaint or made a motion in response to a published notice.

## B.  Largest Financial Interest

Concerning the parties' claimed losses, PHARMA asserts that it lost approximately
$3,000,000; Dr. Leventhal asserts that he lost approximately $400,000; and Williams & Rains
claim that they lost approximately $200,000.

Although PHARMA clearly has the largest claimed financial interest in this case, Dr.
Leventhal and Williams & Rains dispute PHARMA's loss figure, arguing that PHARMA
actually made a profit during the Class Period.  They also present arguments concerning the
merits of the methods employed by the parties in measuring their respective losses–i.e., first in,
first out ("FIFO") vs. last in, last out ("LIFO").

These arguments are without merit.  In arguing that PHARMA actually made a profit
during the Class Period, Dr. Leventhal and Williams & Rains focus exclusively on the stock

3

purchased and sold by PHARMA during the Class Period, without recognizing the stock

PHARMA held prior to the commencement of the Class Period. Dr. Leventhal and Williams &

Rains show that PHARMA sold more shares than it purchased during the Class Period, and they

treat the excess number of shares sold as pure gain to PHARMA. This ignores the economic

reality of a stock sale, which requires that the sales price for a share of stock be matched with that

share's cost basis, in order to calculate a profit or loss on the sale of that share. As demonstrated

by PHARMA's submissions to the court, when this reality is recognized, Dr. Leventhal and

Williams & Rains's argument is baseless. In addition, the arguments concerning the use of FIFO

versus the use of LIFO are irrelevant because under the proper application of either method,

PHARMA's loss is greater than that of either Dr. Leventhal or Williams & Rains.

For these reasons, PHARMA has the greatest financial interest in the relief sought by the

class, thereby satisfying the second requirement to obtain the rebuttable presumption.

### C. Requirements of Rule 23

Rule 23, which governs class actions, provides that a class action may be maintained

> only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the
> class, (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a)(1)-(4). Of these four requirements, only subsection (3) ("typicality") and

subsection (4) ("adequacy") are relevant to the consideration of motions for appointment as lead

plaintiff. *See Meyer v. Paradigm Med. Indus.*, 225 F.R.D. 678, 680 (D. Utah 2004) ("For the

purposes of a motion for appointment of lead plaintiff under [r]ule 23, it is proper to limit a

court's inquiry into the final two prongs of [r]ule 23(a), typicality and adequacy. After the

selected lead plaintiff moves for class certification, then a court is to engage in a more thorough

analysis of the other requirements for class certification." (citations omitted)).

### 1. Typicality

The typicality requirement is satisfied when

> the "injury and the conduct are sufficiently similar." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988). Furthermore, a difference in the factual situations of class members per se, does not defeat typicality under [r]ule 23(a)(3). *See id.* This is true as long as the claims of class representatives and other class members are based on the same legal or remedial theory. *See id.*

*Meyer*, 225 F.R.D. at 680-81. All of the movants in this case satisfy the typicality requirement

because, like the other class members, (1) they purchased NPS stock during the Class Period, (2)

they allege the purchase price of the stock was inflated due to the omissions and

misrepresentations of NPS and its officers, and (3) they all allegedly suffered damages. *See id.* at

681 (citing *In re Ribozyme Pharm. Sec. Litig.*, 192 F.R.D. 656, 658 (D. Colo. 2000)). "The

claims made by the competing [movants] are typical of those in the rest of the class." *Id.* For

these reasons, all of the movants satisfy the typicality requirement of rule 23(a)(3).

### 2. Adequacy

When analyzing the adequacy requirement, "'[t]he PSLRA directs courts to limit [their]

inquiry regarding adequacy to the existence of any conflicts between the interests of the proposed

5

lead plaintiffs and the members of the class.'" *Id.* (quoting *In re Ribozyme*, 192 F.R.D. at 659).

The adequacy standard

> is met by fulfilling two requirements. First, there must be an
> absence of potential conflict between the named plaintiffs and
> other class members. *See* [*In re Ribozyme*, 192 F.R.D. at 659].
> Second, the counsel chosen by the representative party must be
> "qualified, experienced and able to vigorously conduct the
> proposed litigation." *Id.*

*Meyer*, 225 F.R.D. at 681. There is no evidence of a conflict between the named plaintiffs, the

competing movants, and the other class members. In addition, the parties' written submissions

demonstrate that each movant has retained qualified and experienced counsel who will be "'able

to vigorously conduct the proposed litigation.'" *Id.* (quoting *In re Ribozyme*, 192 F.R.D. at 659).

Therefore, all movants satisfy the adequacy requirement of rule 23(a)(4).

Based upon the foregoing, PHARMA is the only movant who has satisfied all of the

requirements for obtaining the rebuttable presumption as the most adequate plaintiff under the

PSLRA. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)-(cc). This notwithstanding, the PSLRA

provides the other movants with the ability to rebut this presumption in favor of PHARMA. *See*

*id.* § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb). Dr. Leventhal has presented arguments to this effect, which

will be addressed below.

## II. Rebutting the Presumption

Once the rebuttable presumption described in the PSLRA is established, it

> may be rebutted only upon proof by a member of the purported
> plaintiff class that the presumptively most adequate plaintiff--
>
> (aa) will not fairly and adequately protect the interests of

6

the class; or

(bb) is subject to unique defenses that render such plaintiff
incapable of adequately representing the class.

*Id.* § 78u-4(3)(B)(iii)(II)(aa)-(bb).

Dr. Leventhal does not argue that PHARMA will not fairly and adequately protect the

interests of the class.  However, Dr. Leventhal does argue that PHARMA is incapable of

adequately representing the class because its status as a foreign investment entity subjects it to

unique defenses.  Relying on cases from other jurisdictions, *see Blechner v. Daimler-Benz AG*,

410 F. Supp. 2d 366 (D. Del. 2006); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d

509 (D. N.J. 2005); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343 (D. Md. 2003)

(mem.), Dr. Leventhal asserts that PHARMA's status as a foreign investment entity could serve

as the basis for an attack from the defendants concerning a lack of subject matter jurisdiction.

Dr. Leventhal also claims that the res judicata effect of any judgment in favor of PHARMA is

uncertain because of its status as a foreign investment entity.  As noted by PHARMA in its reply

memorandum, these arguments are without merit.

In response to these arguments, PHARMA correctly notes that the cases relied upon by

Dr. Leventhal involved facts not present in this case.  Those cases involved foreign defendants

and stock traded on foreign markets.  *See Blechner*, 410 F. Supp. 2d at 371; *In re Royal*

*Dutch/Shell*, 380 F. Supp. 2d at 539-40; *In re Royal Ahold*, 219 F.R.D. at 351.  In this case, NPS

is a United States company, and PHARMA purchased its shares on an exchange based in the

United States.  Consequently, the concerns over subject matter jurisdiction and res judicata raised

in the cases cited by Dr. Leventhal are not present in this case. Even the authority cited by Dr. Leventhal makes it clear that the court has subject matter jurisdiction over claims of foreign investors for losses sustained on United States exchanges. *See In re Royal Ahold*, 219 F.R.D. at 351. In addition, it is clear that any potential judgment rendered by the court in favor of PHARMA would be enforceable in the United States against NPS, a United States company.

Based upon the failure of these arguments, the presumption in favor of PHARMA as the most adequate plaintiff has not been rebutted. Therefore, PHARMA's motion for appointment as lead plaintiff is granted.

### III.  Selection of Counsel

Pursuant to the PSLRA, the party selected to serve as lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v).  PHARMA has selected Motley Rice LLC to serve as lead counsel and Burbidge & Mitchell to serve as liaison counsel.  As demonstrated by their submissions to the court, both firms have expertise and experience in the prosecution of shareholder and securities class actions and, as a result, are adequate to represent the interests of the class. *See id.*; *Meyer*, 225 F.R.D. at 684.

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED**:

1.    PHARMA's motion for appointment as lead plaintiff and for approval of selection

of counsel[6] is **GRANTED**.  PHARMA is appointed as lead plaintiff, Motley Rice LLC is

appointed as lead counsel, and Burbidge & Mitchell is appointed as liaison counsel.

2.    Dr. Leventhal's motion for appointment as lead plaintiff and for approval of

selection of counsel[7] is **DENIED**.

3.    Williams & Rains's motion for appointment as lead plaintiff and for approval of

selection of counsel[8] is **DENIED**.

4.    Pursuant to previous orders of the court,[9] all portions of any pending motions

relating to consolidation of cases[10] are moot.

DATED this 17th day of November, 2006.

BY THE COURT:

_____

PAUL M. WARNER
United States Magistrate Judge

---

[6]  Docket no. 21.

[7]  Docket nos. 17, 18, 32.

[8]  Docket no. 31.

[9]  Docket nos. 30, 40.

[10]  Docket nos. 18, 31, 32.

9

# EXHIBIT F-1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

APR 9 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

*In re*

**DELL INC., SECURITIES LITIGATION**

Case No. A-06-CA-726-SS

---

# O R D E R

BE IT REMEMBERED on the _9th_ day of April 2007 the Court reviewed the file in the above-styled cause, specifically the motions for appointment as lead plaintiff filed by the Institutional Investor Group [#20, #137], the Pension Fund Group [#25], the Boca Raton Police and Firefighters' Retirement System [#26], Union Asset Management Holding AG [#39], and I.U.O.E Local 68 Pension and Annuity Funds [consolidated complaint] . Having considered these motions, the memoranda filed in support and opposition thereto, the applicable law, and the consolidated case file as a whole, the Court now enters the following opinion and order.

## Background

This case consolidates four class actions alleging violations under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, and Rule 10b-5 promulgated thereunder. Plaintiff Marc Abrams filed this action on September 13, 2006, individually and on behalf of all those who purchased common stock of Dell, Inc. ("Dell") between February of 2003 and September of 2006. Abrams claims Dell, during this period, disseminated materially false and misleading statements regarding its earnings and expected growth and reported incorrect financial data in its required SEC filings.

As required by the PSLRA, counsel for Abrams published notice of the pending class action in a "widely circulated national business-oriented publication or wire service" on September 13, 2006. 15 U.S.C. §78u-4(a)(3)(A)(i).  On November 13, 2006, several parties moved to be appointed lead plaintiff in this case pursuant to the PSLRA.[1]  Abrams moved to appoint the Institutional Investor Group (made up of plaintiffs Wolverhampton City Council and Amalgamated Bank) as Lead Plaintiff with Joe Kendall of Provost & Umphrey LLP and Patrick Coughlin of Lerach Coughlin Stoia Gellar Rudman & Robbins LLP as Co-Lead Counsel. The Pension Fund Group (made up of Plaintiffs Mississippi Public Employees' Retirement System, Sjunde AP-Fonden, Stichting Pensioenfunds ABP, and Pensionskassernes Administration A/S) also moved for appointment as Lead Plaintiff, with counsel from the law firms of Grant & Eisenhofer P.A. and Schiffrin and Barroway, LLP as Lead Counsel. Plaintiff Union Asset Management Holding AG ("Union") moved for appointment as Lead Plaintiff with counsel from the firms of Motley Rice LLC and Byrd, Davis, Furman, LLP as Lead Counsel.[2]  The City of Boca Raton Police and Firefighters' Retirement System filed its motion to be appointed Lead Plaintiff, with counsel from the firm of Lieff, Cabraser, Heimann and Bernstein, LLP as Lead Counsel.  Plaintiff I.U.O.E Local 68 Pension and Annuity Funds ("I.U.O.E.") filed a parallel complaint on November 13, 2006.

On November 16, 2006, the Court held a hearing regarding consolidation of the Abrams and I.U.O.E. complaints and related ERISA and derivative actions against Dell.  The Court issued an

---

[1] On November 13, 2006, the Policemen's Annuity and Benefit Fund of Chicago moved for appointment as Lead Plaintiff , but later withdrew the motion. The DeKalb County Pension Fund likewise moved for appointment as Lead Plaintiff on November 13, 2006, but later withdrew the motion.

[2] Union's motion is marked "filed" on November 16, 2006, but the motion itself is dated November 13, 2006.

Order directing "each group seeking to be lead counsel and represent the named representative plaintiff" in a consolidated action to "file an amended complaint on or before January 31, 2007, specifically alleging the class or classes to be established and the reasons why it should be selected as lead counsel and its client the named representative plaintiff." Order of Nov. 16, 2006. In response, the Pension Fund Group filed a parallel lawsuit on January 31, 2007. The Institutional Investor Group also filed a parallel suit on January 31, 2007. Union Asset Management filed an amended complaint in the *Abrams* action on January 31, 2007.

The Court also requested that all named plaintiffs file affidavits (in addition to the certifications required by the PSLRA, 15 U.S.C. §78u-4(a)(2)(A)) "confirming that the client solicited the attorney or firm to represent him . . . and the client made the first contact with the attorney." Order of Nov. 16, 2006. It appears that Abrams, the Pension Fund Group, and Union have filed such affidavits, but no representative of I.U.O.E. Local 68 Pension and Annuity Funds has done so. The additional filings requested by the Court are intended to aid the Court in determining which movant is the most adequate Lead Plaintiff, but the Court will consider each motion filed in accordance with the PSLRA regardless of whether the movant has filed the affidavits and amended complaint requested in the November 16, 2006 Order. *See* 15 U.S.C. §78u-4(a)(3)(B)(i) (the Court "*shall* consider any motion made by a purported class member in response to the notice") (emphasis added). The Court consolidated the related securities class action complaints on February 28, 2007, and now considers the motions for appointment as Lead Plaintiff.

**Analysis**

Where a court has pending before it one or more class actions arising under the Securities Exchange Act of 1934, the PSLRA directs that a Lead Plaintiff be selected early in the case, and that

the Lead Plaintiff is to select and retain lead counsel, subject to court approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). One of the main goals of the PSLRA is "to have the plaintiff class, represented by a member with a substantial financial interest in the recovery as incentive, monitor the litigation to prevent its being lawyer-driven." *See In re Waste Management, Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 411-12 (S.D. Tex. 2000).

## I. The Most Adequate Plaintiff

The PSLRA provides that the Court shall consider all timely-filed motions made by purported class members seeking to be appointed Lead Plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(1). The Court shall appoint as Lead Plaintiff the member or members of the purported plaintiff class that the court considers most capable of adequately representing the interests of the class members. *Id.* This Lead Plaintiff is termed the "most adequate plaintiff." *Id.*

The PSLRA directs the Court to adopt a presumption that the most adequate plaintiff is the person or group of persons that (1) filed a complaint or a timely motion to be appointed lead plaintiff, (2) "has the largest financial interest in the relief sought by the class," and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The PSLRA does not delineate a procedure for determining the "largest financial interest" among the proposed class members. Both the approximate loss claimed and the total number of shares purchased are, however, significant factors in determining the largest financial interest in the litigation. *See, e.g. In re Waste Management, Inc.*, 128 F. Supp. 2d 401, 414 (S.D. Tex. 2000) ("The term 'largest financial interest' . . . should be read broadly in terms of (1) the number of shares purchased, (2) the number of net shares purchased, (3) the total net funds expended by the plaintiff(s) during the class period, and (4) the approximate losses suffered by the

plaintiff(s).") (citation omitted). Accordingly, the Court considers the number of shares purchased and the total loss claimed by each movant in determining which proposed Lead Plaintiff has the largest financial interest in this litigation.

The Court has five motions for appointment as Lead Plaintiff to consider:

| Proposed Lead Plaintiff | Proposed Lead Counsel | Claimed Losses | Shares Purchased |
|---|---|---|---|
| Pension Fund Group | Grant & Eisenhofer P.A.; Schiffrin Barroway Topaz & Kessler, LLP | $87.93 million | 18.84 million |
| Union Asset Management Holding AG | Motley Rice LLC | $20.25 million | 3.23 million |
| Institutional Investors' Group | Lerach Coughlin Stoia Geller Rudman & Robbins LLP | $5.86 million | 629,412 |
| I.U.O.E. Local 68 Annuity & Pension Fund | Seeger Weiss LLP | $1.32 million | 59,522 |
| City of Boca Raton Police & Firefighters Retirement System | Lieff Cabraser Heiman & Bernstein LLP | $235,483.98 | 41,300 |

## II. Aggregation of Financial Interests

Several of the proposed Lead Plaintiffs are actually small groups of investors. In particular, the Pension Fund Group ("PFG") is made up of four separate entities: Stichting Pensioenfonds ABP ("ABP"), Mississippi PERS ("Mississippi"), Sjunde AP-Fonden ("AP7"), and Pensionskassernes Administration A/S ("PKA"). The Institutional Investors' Group ("IIG") is made up of two separate entities: Amalgamated Bank and the Wolverhampton City Council. Finally, Union Asset Management Holding AG ("Union") is a fund manager that manages seven different funds ("the

Union funds"). Each of these groups has claimed losses based on aggregating the total losses suffered by each member. Courts are divided over whether multiple plaintiffs may be aggregated to satisfy the "largest financial interest" requirement. *See Yousefi v. Lockheed Martin Corp.*, 70 F. Supp. 2d 1061, 1067 (C.D. Cal. 1999) (collecting cases). The majority of courts addressing this issue, however, have permitted the aggregation of claims. *See, e.g., In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 353 (S.D. Cal. 1998) (allowing the aggregation of six plaintiffs); *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 45-48 (S.D. N.Y. 1998) (appointing three plaintiffs as lead plaintiffs); *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 409 (D. Minn. 1998) (aggregating six plaintiffs). Courts have arrived at this result because the Act expressly permits a court to appoint more than one lead plaintiff. The court "shall appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added).

Courts within this Circuit, however, tend to adopt a "strict" view of aggregation, reasoning that although there is "no textual statutory obstacle to considering the [grouped] plaintiffs' financial interests together," *Bell v. Ascendant Solutions, Inc.*, No. 3:01-CV-0166-P, 2002 U.S. Dist. LEXIS 6850 (N.D. Tex. April 17, 2002), the express purpose of the PSLRA is to ensure that securities litigation is overseen by competent interested parties rather than driven by lawyers. *Id.* To ensure the type of proactive representation by plaintiffs envisioned by the PSLRA, a strict definition of appropriate "group" plaintiffs should be adopted, "requiring at maximum a small group with the largest financial interest in the outcome of the litigation and a pre-litigation relationship based on more than their losing investment." *In re Waste Management*, 128 F. Supp. 2d at 413. Under this

"strict" aggregation approach, "[t]he burden is on those seeking to aggregate to demonstrate the cohesiveness of their purported 'group' and . . . failure to provide significant information about the identity of the members other than a conclusory statement of names, transactions for purchase of securities, and largest financial interest should result in denial of their application for appointment as Lead Plaintiff." *Id.* (citing *Switzenbaum v. Orbital Sciences Corp.* ("Orbital I"), 187 F.R.D. 246, 250 (E.D. Va. 1999)).

The Institutional Investors' Group argues the Court should not consider the Pension Fund Group's aggregate loss because this group is "lawyer-driven," cobbled together for the purpose of achieving the greatest aggregated financial interest in the case.  This is an interesting argument from a group whose own filings show no evidence whatsoever of any relationship between the entities beyond this litigation, and whose counsel initially represented a totally different named plaintiff (Abrams) whose losses were much smaller.  Nevertheless, the Institutional Investors' Group makes a good point.  Neither PFG nor IIG has shown any non-litigation relationship between the members of the proposed Lead Plaintiff groups.

PFG argues its members are not an unrelated group because two of its members, ABP and Mississippi, are currently serving together as lead plaintiffs in *In re Delphi Corporation Sec. Litig.*, No. 06-10026 (E.D. Mich.); and AP7 and PKA previously filed a joint lead plaintiff motion in *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-cv-1691-JMR-FLN (D. Minn. May 5, 2006). This argument, however, does little to counter the argument that the Pension Fund Group's relationship is "lawyer-driven" and arises out of litigation alone.  The Court also notes that PFG member Mississippi is presumptively disqualified from serving as a lead plaintiff, because it has participated

as lead plaintiff in more than five securities class actions in the last 3 years.  15 U.S.C. §784-4(a)(3)(B)(5).

Though some courts have adopted group Lead Plaintiffs on the theory that diversity among plaintiffs helps ensure that all class members' interests are represented, *see, e.g. In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998), there is no such diversity in either of the groups proposed by PFG or IIG.  All of the members of these proposed groups are institutional investors. With respect to the Lead Plaintiff groups proposed by PFG and IIG, the Court finds no "advantages that outweigh the disservice to the PSLRA's interest in creating a small number of lead plaintiffs to counterbalance the influence of lawyers." *Bell*, 2002 U.S. Dist. LEXIS 6850.

In contrast, Union Asset Management, AG ("Union") is a single fund management company that oversees several different funds.  The Court in *In re Waste Management* recognized that "[a]n institutional investor that invests the monies pooled into it from numerous, interrelated funds, . . . under the direction of a single individual" functions as a  single investor under the PSLRA.  *In re Waste Mgmt.*, 128 F. Supp. 2d at 432.  Even if Union is considered as a group of separate investors, aggregation of their losses is appropriate because the funds have "a pre-litigation relationship based on more than their losing investment." *Id.* at 413.

## III. ABP is the Presumptively Most Adequate Plaintiff

Even when considered in the aggregate, however, Union has the second-largest claimed loss in this litigation.  The PFG's largest member, Stichting Pensioenfonds ABP ("ABP") purchased 18,484,148 shares of Dell stock during the class period and claims a loss of $68 million.  The PFG has requested that ABP be considered as an alternate Lead Plaintiff movant if the Court rejects its

group motion. Accordingly, the Court considers whether ABP, the movant with the largest financial interest in this litigation, is the most adequate plaintiff under the PSLRA.

"The rebuttable presumption created by the PSLRA, which favors the plaintiff with the largest financial interest, was not intended to obviate the principle of providing the class with the most adequate representation and in general the Act must be viewed against established principles regarding Rule 23 class actions." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. at 49. *See* Although the inquiry at this stage of the litigation in determining the Lead Plaintiff is not as searching as the one triggered by a subsequent motion for class certification, the proposed Lead Plaintiff must make at least a preliminary showing that it has claims that are typical of those of the putative class and the capacity to provide adequate representation for those class members. *In re Waste Management, Inc.*, 128 F. Supp. 2d at 411. Only the typicality and adequacy requirements of Rule 23 are directly relevant to the choice of the Lead Plaintiff in securities fraud cases. *Id.*

The proposed Lead Plaintiff's claims are typical of the class if there are "no differences among the class members that would substantially alter the proof required for one member's claims versus another's." *Bell*, 2002 U.S. Dist. LEXIS 6850 (citing *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997)). It is not necessary that a proposed Lead Plaintiff's claims be identical to the claims of other class members. *Id.* ABP, as a member of the PFG, has submitted a complaint alleging it, like other members of the proposed class, purchased Dell securities and lost money as a result of Dell's material misstatements and omissions. Though the class period differs slightly from the period alleged in the other complaints, and ABP is not pursuing some of the defendants and claims at issue in the related cases, there is no significant difference in the proof required to prove

ABP's claims and the claims asserted by other named plaintiffs in these related cases.  Therefore, ABP's claims are typical of the proposed class.

"[T]he adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees[.]" *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citation omitted). There is no question that APB's chosen counsel is competent and zealous; the detailed complaint and the thorough pleadings filed in connection with ABP/PFG's Lead Plaintiff Motion are ample proof of that.  ABP's affidavit, filed in response to this Court's Order of November 16, 2006, establishes that ABP is prepared to take an active role in the litigation.

Because ABP filed a timely motion (as part of the Pension Fund Group) to be appointed Lead Plaintiff, has the largest financial interest in this litigation, and satisfies the typicality and adequacy requirements of Rule 23, ABP is presumptively the "most adequate plaintiff" under the PSLRA. This presumption may be rebutted only by proof by another member of the purported plaintiff class that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II).

## IV.  Rebutting the Presumption

Union Asset Management and the Institutional Investors' Group present several challenges to ABP's ability to fairly and adequately represent the class and allege ABP is subject to multiple unique defenses.

### a. PriceWaterhouse Coopers

The Pension Fund Group is the only proposed Lead Plaintiff whose complaint does not name

Dell's auditor, PriceWaterhouseCoopers , as a defendant. Union and IIG argue this is because the

Pension Fund Group's largest member, ABP, uses the auditing services of a European affiliate of

PriceWaterhouseCoopers. In response, ABP points out that the Fifth Circuit rejected a similar

conflict of interest challenge in *Feder v. Electronic Data Sys. Corp.*, 429 F. 3d 125, 133–34 (5th Cir.

2005). In *Feder*, a defendant argued that the lead plaintiff, the state of New Jersey, was not an

adequate class representative because KPMG, a potential defendant, was New Jersey's auditor.

Specifically, defendants argued "that New Jersey's failure to name KPMG as a defendant in this

case, coupled with the fact that KPMG is New Jersey's auditor, demonstrates a conflict of interest

with the class that should disqualify New Jersey from serving as class representative." *Id.* at 134. The

Fifth Circuit Court of Appeals flatly rejected this argument and affirmed the District Court's decision

finding New Jersey to be an adequate class representative, holding:

> New Jersey is only a client of KPMG-not vice versa-so it has no self-interest in
> appeasing KPMG .... New Jersey would not necessarily benefit financially by
> maintaining a good relationship with KPMG. Thus, the Court does not believe
> there are unique circumstances here that threaten adequacy.

*Id.* at 135 (quoting *In re Electronic Data Sys. Corp. Sec. Litig*, 226 F.R.D. 559, 570 (E.D. Tex.

2005)). However, the *Feder* Court based its decision on the facts of the case: plaintiffs alleged the

defendant had "concealed its fraud from the market and from [the auditor]." *Id.* In contrast, the

complaints filed by IIG and by Union in this case both allege PriceWaterhouseCoopers was complicit

and actively participated in Dell's alleged fraudulent scheme. In particular, many of the securities

fraud allegations against Dell rest on its use of non-GAAP accounting procedures in SEC filings;

-11-

PriceWaterhouseCoopers approved Dell's accounting methods and signed off on these filings. In these circumstances, it is somewhat troubling that ABP has not named PriceWaterhouseCoopers as a defendant. Although "generally, failure to join all defendants is a strategy choice, and . . . is probably not grounds for finding inadequacy," *id.* at 135 (quoting *Paper Systems, Incorporated v. Mitsubishi Corporation*, 193 F.R.D. 601 (E.D. Wis. 2000), it is also true that "[t]he omission to sue a potential defendant cannot but prejudice the class." *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990). In these circumstances, "plaintiff is obligated to supply a persuasive reason for the non-joinder." *Id.*

ABP asserts that it is merely following the Court's directive to "be careful whom you sue" and further argues that, if selected as lead plaintiff, it "may well name PwC as a defendant if the circumstances warrant." Reply at 7. ABP points out that in a case pending in the United States District Court for the District of New Jersey, ABP named as a defendant PricewaterhouseCoopers U.K, LLP, a European subsidiary of PriceWaterhouseCoopers. *See Stichting Pensioenfonds ABP V. Royal Dutch Shell plc*, Civil Action No. 06-095. Nevertheless, in light of ABP's relationship with PriceWaterhouseCoopers and the detailed allegations against this auditing firm filed by other proposed Lead Plaintiffs, the Court is troubled by ABP's failure to join PriceWaterhouseCoopers as defendants in their Amended Complaint. The Court need not determine whether this potential conflict of interest is fatal, however, because ABP is also subject to unique defenses that disqualify it as an appropriate Lead Plaintiff.

### b. Short selling

Union Asset Management asserts that ABP is not the most adequate plaintiff because it adopts both long and short selling strategies and would therefore be subject to unique defenses.

-12-

Several courts have rejected short-sellers as potential lead plaintiffs in securities class actions, even where those plaintiffs also took "long" market positions, reasoning that short sales are inconsistent with the fraud-on-the-market theory on which most securities fraud claims are based. *In re Critical Path*, 156 F. Supp. 2d 1102, 1109-1110 (D. Cal. 2001); see also *In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780 (N.D. Ill. 2000). "Short sales raise the question of whether the seller was actually relying on the market price, and the class is not served by its representative coming under such scrutiny." *In re Critical Path*, 156 F. Supp. at 1109. Each of the complaints filed in the related Dell Securities Class Actions relies on the fraud-on-the-market theory. Therefore, ABP's position as a short-seller may well undermine the claims of the other class members.

## V. Union is Entitled to the Presumption

Union, the proposed Lead Plaintiff with the next largest financial interest in this case, has not taken any short positions on Dell stock and its fraud-on-the-market claims would not be subject to this defense. Nor has any other movant identified a potential conflict of interest between Union and the proposed class. Union satisfies the adequacy and typicality requirements of Rule 23. The detailed complaint and affidavit Union filed in response to this Court's Order of November 16, 2006 establish that Union has claims for securities fraud similar to those of the other class members and is prepared to take an active role in the litigation.

The Institutional Investors' Group objects that Union is a foreign entity. IIG argues that foreign entities should be "appointed alongside qualified and experienced American investors" in order to avoid unique defenses and mitigate the inconvenience of long-distance litigation. IIG, however, fails to identify any particular defense or inconvenience that would disqualify Union Asset Management. "There is, of course, a marked difference between affirmatively demonstrating that

[the presumptive Lead Plaintiff] is not an adequate representative or is subject to unique defenses and simply claiming that [Plaintiff] might be subject to such arguments in the future." *Gluck*, 976 F. Supp. at 547. There is neither a bar nor a presumption against appointing foreign entities to serve as lead plaintiff, particularly where, as here, the defendant is a U.S. company and the foreign entities bought their shares in the United States. *See In Re NPS Pharms., Inc. Sec. Litig.*, No. 2:06-00570, 2006 U.S. Dist. LEXIS 87231, at *13 (D. Ut. Nov. 17, 2006) (rejecting challenge to foreign lead plaintiff movant as inadequate or subject to unique defense, holding "concerns over subject matter jurisdiction and res judicata . . . are not present" where the foreign plaintiffs purchased stock in a United States company via a United States stock exchange). *See also In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 153 (D. Del. 2005) (court appointed German investment manager lead plaintiff, calling "res judicata argument a red herring"); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No 5:03-2166, 2004 U.S. Dist Lexis 27043 (N.D. Ohio May 12, 2004) (appointing Austrian institution as lead plaintiff, holding "[t]he...attempt to discredit Capital Invest on the ground that it is a non-domestic (Austrian) investment firm...is insupportable."); *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 505 (S.D. Fla. 2002)("In light of today's travel and communication methods, the geographical location of the [foreign lead plaintiff movants] is irrelevant").

Because ABP, the Plaintiff with the largest financial interest in this litigation, is subject to unique defenses, it is not the most adequate plaintiff. Union Asset Management Holding AG has the next largest financial interest in the case, satisfies the typicality and adequacy requirements of Rule 23, and has timely filed a motion to be appointed Lead Plaintiff. Union is therefore presumptively the most adequate plaintiff. No other movant has shown that Union would be subject to unique defenses or would be unable to adequately represent the class. Furthermore, Union's

relationship with its chosen counsel is exactly the type of relationship the PSLRA seeks to sponsor: Union is an institutional investor "dedicated to the strengthening of corporate governance to protect investors." Affid. Gaebel & Von Cornberg, Mot. for Appt. as Lead Pl. Ex. D. After evaluating the merits of the case and the extent of its losses, Union decided to move for appointment as lead plaintiff and selected the firm of Motely Rice as proposed Lead Counsel. *Id.* Union worked with Motley Rice to select Byrd Davis Furman L.L.P. as liason counsel. *Id.* It seems clear from the affidavit of Union's in-house counsel that Union is firmly in the drivers' seat with regard to this litigation. Appointing this institutional investor as Lead Plaintiff and approving its choice of Lead Counsel will serve the PSLRA's goal of encouraging shareholders to protect their interests via securities class actions while discouraging "lawyer-driven" litigation.

### Conclusion

Accordingly,

IT IS ORDERED that the Motion for Appointment of Lead Plaintiff of Union Asset Management Holding AG [#39] is GRANTED.

IT IS FURTHER ORDERED that Union's choice of Lead Counsel and Liason Counsel is APPROVED. The firm of Motley Rice appears to have extensive experience in securities class action litigation, and the local firm of Byrd Davis Furman is amply qualified to assist as liason counsel in this matter. Ronald Motley, Joseph Rice, Lauren S. Antonino, James M. Hughes, and Ann Kimmel Ritter of Motley Rice LLC are appointed Lead Counsel in this case, and Don L. Davis of Byrd Davis Furman is appointed Liason Counsel.

IT IS FINALLY ORDERED that the miscellaneous motions to file supplemental briefing and pleadings over the page limit regarding the Motions for Appointment as Lead Plaintiff [Documents

#21, #137, #144] are GRANTED.  The Court gave full consideration to all arguments on this

important threshold issue in the consolidated securities class action.


     SIGNED this the _____ day of April 2007.


                      _____

                      SAM SPARKS

                      UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MASSACHUSETTS LABORERS' | § | |
| ANNUITY FUND, *et al.*, | § | |
|         Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3022 |
| | § | |
| ENCYSIVE PHARMACEUTICALS | § | |
| INC., *et al.*, | § | |
|         Defendants. | § | |

## MEMORANDUM AND ORDER

This is a consolidated action brought under the Securities Exchange Act of 1934 by investors who purchased publicly traded securities of Encysive Pharmaceuticals Inc. ("Encysive"). The case is now before the Court on Motions to be Appointed Lead Plaintiff filed by The Graham Group [Doc. # 14] and Oppenheim Pramerica Asset Management S.á.r.l. ("OPAM") [Doc. # 19].[1] Each of these parties seeks appointment as lead plaintiff in this case pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

---

[1]     Fernando Dow, the Massachusetts Laborers' Pension and Annuity Fund, and the Scott Group have withdrawn their requests to be appointed lead plaintiff, leaving the Graham Group and OPAM as the only parties currently requesting appointment as lead plaintiff.

OPAM responded to the Graham Group's Motion [Doc. # 38], and the Graham Group responded to OPAM's Motion [Doc. # 42]. The Graham Group filed a reply [Doc. # 54], as did OPAM [Doc. # 55]. Following a hearing on January 18, 2007, the parties supplemented their briefing. OPAM filed a supplement to its original Motion [Doc. # 60], to which both Encysive[2] [Doc. # 61] and the Graham Group [Doc. # 62] responded. The Graham Group filed a Reply to Encysive's response [Doc. # 63], OPAM filed a "Supplemental Reply Brief" [Doc. # 64], and the Graham Group filed its own "Supplemental Reply Brief" [Doc. # 73].

Having reviewed the parties' submissions, all matters of record, and the relevant legal authorities, the Court **appoints** OPAM as lead plaintiff in this matter. The Court **appoints** Motley Rice LLC as lead counsel and Zummo & Midkiff, L.L.P. as liaison counsel.

## I.      **BACKGROUND**

Encysive, a pharmaceutical firm based in Houston, Texas, developed Thelin, a drug intended to treat pulmonary arterial hypertension. Encysive allegedly claimed that Thelin had reached an advanced stage in the review process at the Food and Drug Administration ("FDA"). Plaintiffs allege that expectations for the profitability of this

---

[2]      Encysive, the defendant in this matter, takes no position regarding whether OPAM or the Graham Group should be appointed lead plaintiff. *See* Statement of Defendants Regarding Lead Plaintiff Motions [Doc. # 55].

new drug caused the value of Encysive's shares to increase, allowing the company to complete two successful public offerings.

In March 2006, however, the FDA asked Encysive to provide more information and advised Encysive it might be required to conduct further studies to ensure that Thelin was safe and effective. The FDA announced that it would withhold approval of the drug pending its review of the new data. The price of Encysive's stock fell 49% on the news, dropping from $9.08 to $4.60 per share. When Encysive acknowledged in July that the FDA still had concerns, the shares' value dropped an additional 40%.

Plaintiffs allege that Encysive and its officers made misleading statements regarding Thelin's anticipated commercial value and its prospects for FDA approval, and failed to disclose adverse material facts. Plaintiffs also allege that Encysive's officers engaged in insider trading to capture profits from the company's artificially high valuation. Massachusetts Laborers' Annuity Fund and others filed suit against Encysive in the fall 2006. All of the lawsuits have been consolidated into this case.

## II. THE PSLRA

The PSLRA requires plaintiffs in a securites fraud case to publish a notice to members of the prospective class, informing them of "the pendency of the action, the claims asserted therein, and the purported class period." 15 U.S.C. § 78u-4(a)(3)(A)(i)(I). Within 60 days of the notice, any prospective class member may file

3

a motion to serve as lead plaintiff for the class. *Id*. The court is then required to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id*. § 78u-4(a)(3)(B)(i).

The court's selection of a lead plaintiff is guided by a rebuttable presumption that the party that responded to the initial notice, has the largest financial interest in the case, and meets the requirements of Federal Rule of Civil Procedure 23 is the "the most adequate plaintiff." *Id*. § 78u-4(a)(3)(B)(iii)(I). The presumption may be rebutted with evidence that the prospective lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id*. § 78u-4(a)(3)(B)(iii)(II).

The Fifth Circuit has stated that "Congress enacted the 'lead plaintiff' provisions of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B), to direct courts to appoint, as lead plaintiff, the most sophisticated investor available and willing so to serve in a putative securities class action. Insofar as possible following the procedure prescribed by § 78u-4(a)(3)(B), the lead plaintiff should be an investor capable of understanding and controlling the litigation." *Berger v. Compaq Computer Corp.*, 279 F.3d 313 (5th Cir. 2002).

III.  **ANALYSIS**

A.  **Initial Presumption**

Each candidate filed its Motion within the requisite time period.  Therefore, in order to apply the statutory rebuttable presumption that one candidate is more fit to serve as lead plaintiff, the Court looks to the candidates' comparative losses and considers whether the candidates satisfy the typicality and adequacy requirements of Rule 23.

The Graham Group consists of a husband, his wife, and a family testamentary trust for which the husband is the trustee.  It claims to be a cohesive group, able to make joint decisions based on their marital relationship.  The Graham Group asserts, as does OPAM, that its claims are typical of the claims of members of the proposed Class.  It represents that it is "prepared to direct the course of this Action and to fulfill their responsibilities as class representative."  *See* Memorandum of Law in Support of the Motion of the Graham Group ("Graham Group Memorandum") [Doc. # 15], at 6. The Graham Group alleges a loss of $384,371.40.

OPAM is a large "fund company that launches and manages investment funds under Luxembourgian law."  Memorandum of Law in Support of the Motion of OPAM ("OPAM Memorandum") [Doc. # 23], at 6.  Its institutional status weighs in its favor in the Court's analysis, as "Congress has unequivocally expressed its preference for

securities fraud litigation to be directed by large institutional investors."[3] *Gluck v. Cellstar Corp.*, 976 F. Supp. 542, 548 (N.D. Tex. 1997). OPAM's fund lost over $1.67 million, approximately four times the Graham Group's losses.

The Court finds that OPAM's claims are typical because they "arise from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *See Longden v. Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988). OPAM has established the "adequacy" requirement of Rule 23 by showing that it does not have a conflict with the class,[4] that it is willing and able to take an active role in the litigation and protect the class members' interests, and that it has chosen qualified, experienced counsel. *See, e.g., Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

In its Response, the Graham Group contends that OPAM has not actually incurred any losses because it is a fund manager, not an investor in its own right. In *In re Molson Coors Brewing Co. Securities Litigation*, 233 F.R.D. 147 (D. Del. 2005),

---

[3]     The Graham Group argues that Congress's preference is for pension funds, not mutual funds, but cites no authority prohibiting mutual funds from serving as lead plaintiff.

[4]     The Graham Group argued that OPAM has a potential conflict of interest based on its fiduciary duties to its own investors. When the Graham Group initially presented this argument, some of OPAM's investors still owned Encysive shares. Because that is no longer the case, this argument has become moot. Additionally, contrary to the Graham Group's suspicions, the Court finds nothing nefarious in OPAM's decision to sell the remaining Encysive shares.

the Delaware district court agreed to attribute a fund's losses to the fund manager

where the manager presented evidence through an affidavit that it was an "attorney in

fact for the investors in the identified funds, has authority to make decisions and act on

their behalf, and is able to recover moneys for them." *Id.* at 152. In this case, OPAM

has presented the joint affidavit of Max von Frantzius and Andreas Jockel, OPAM's

chief legal counsel and managing director, respectively, attesting that "OPAM controls

and manages and is attorney-in-fact for the fund." OPAM Memorandum, Exhibit A,

¶ 2. It is OPAM, not the individuals investing in the various funds managed by OPAM,

who makes investment decisions on behalf of those individual investors. The Court

agrees with the Delaware Court that this sworn evidence is sufficient to attribute the

fund's losses to OPAM for purposes of this securities fraud litigation. Given the

magnitude of those losses, OPAM is entitled to the statutory presumption that it is the

most appropriate lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

**B.    Rebuttal Evidence**

The PSLRA allows contenders for the role of lead plaintiff to rebut the statutory

presumption by submitting proof that the party benefitting from the presumption is

subject to unique defenses not applicable to the overall class or that it "will not fairly

and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The Graham Group presents several arguments in an attempt to rebut the statutory

7

presumption in OPAM's favor.  For the reasons discussed below, the Court finds none of the arguments persuasive.

The Graham Group challenges OPAM's standing to bring this lawsuit because it is merely a fund manager with an investment advisor, Medical Strategy GmbH ("Medical Strategy").  The evidence does not support the Graham Group's argument. OPAM has submitted sworn testimony from its corporate officers which satisfies the Court that OPAM is authorized to undertake this litigation on behalf of the fund.[5] OPAM has also shown that it makes the investment decisions for its funds and that its investment advisor is simply that – an independent advisor whose suggestions OPAM can accept or reject.  Based on the current record, OPAM appears to have standing to pursue this securities fraud litigation.

The Graham Group also asserts that OPAM cannot adequately represent the interests of the class because it is jointly owned by Sal Oppenheim International, S.A. and Pramerica International, a trade name of Prudential.  According to the Graham Group, Prudential was an underwriter for Encysive's public offerings at issue in this suit.  The Graham Group argues that Prudential will be "an important fact witness" in this case, and alleges that Prudential may have "contributed in some actionable form

---

[5]     A similar affidavit was found to be sufficient in *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003).

to the misinformation in the market concerning Encysive and its prospects." *See* Graham Group Response [Doc. # 42], at 9. The Graham Group, however, fails to present sufficient evidence to support its argument and thereby rebut the presumption in OPAM's favor. In OPAM's supplementary declaration, Von Frantzius and OPAM senior associate Johann Will state that OPAM has "never discussed its purchase of Encysive stock with Prudential" and that Prudential "has not underwritten any stock for Encysive since 2000." *See* Von Frantzius/Will Declaration, Exh. B to OPAM's Reply Memorandum [Doc. # 54], ¶ 5. According to OPAM, Encysive conducted several public offerings after 2000, none of which were underwritten by Prudential. Consequently, Prudential's role in Encysive's public offerings predates by six years the drop in share prices on which this suit is predicated, and is not a barrier to OPAM's appointment as lead plaintiff.

The Graham Group also contends that OPAM's complex corporate structure and foreign ownership preclude its service as lead plaintiff. The argument is unpersuasive. Courts have appointed foreign corporations as lead plaintiff in similar securities litigation. *See, e.g., In re Molson*, 233 F.R.D. at 151-52. OPAM has clearly indicated its willingness, if appointed lead plaintiff, to send its representatives to the United States to carry out its fiduciary duty to the class. As discussed above, large institutional

investors—which routinely have complex corporate structures—are preferred as lead plaintiffs. *See Gluck*, 976 F. Supp. at 548.

The Graham Group also argues that OPAM, as a foreign entity, may not be bound by *res judicata* in this case. Accordingly, it contends, OPAM would have a reduced incentive to represent the class, because it could later pursue a second round of litigation in a European court. OPAM has, however, affirmed that it and its funds will be bound by any judgment or other order in this case. In reaching its decision to appoint OPAM as lead plaintiff, the Court relies on OPAM's assertion in this regard, and OPAM will not be allowed to take a different position in the future.

The Graham Group challenges OPAM's ability to serve as lead plaintiff by questioning OPAM's liability for potential sanctions and costs. As an initial matter, the Court anticipates that all parties and their counsel will prosecute and defend this case in a professional manner and that, as a result, sanctions will not become an issue. Moreover, OPAM has affirmatively committed to pay any sanctions or costs which may be imposed and the Court will, if necessary, hold OPAM to its commitment.

The Graham Group argues also that OPAM made "off-market" trades that will prevent it from relying on the "fraud on the market" argument on the reliance issue.[6]

---

[6]     Contrary to the Graham Group's contention in its "Supplemental Reply Brief," OPAM has presented clear sworn testimony that all shares of Encysive stock were purchased on the NASDAQ stock exchange. *See* Von Frantzius/Will Declaration, ¶ 6.

In support of this argument, the Graham Group points to trades that are not within the high and low NASDAQ prices for the day indicated. OPAM has shown, however, that the dates listed for its trades are the settlement dates, not the transaction dates as assumed by the Graham Group. As a result, the factual basis for the Graham Group's argument has been refuted.

The Graham Group argues that OPAM will also face a unique challenge to its reliance on the "fraud on the market" argument because the fund's annual report included a statement that its investment strategy was to take advantage of market inefficiency. The Graham Group's reliance on this statement, which is taken out of context, is unpersuasive. The statement is within a section of the 2004 Annual Report [Exh. C to Doc. # 64] describing the large institutional investors' focus on companies with a high market capitalization, leaving companies with smaller capitalization "out of the picture." OPAM describes the result of this lack of institutional investors' research as "an inefficient market for these second-line stocks." OPAM then states that Medical Strategy, its investment advisor, can "exploit this market inefficiency" by conducting its own "carefully targeted analysis" of these "as yet unknown companies." Neither OPAM nor Medical Strategy indicate in the 2004 Annual Report that Encysive is considered an "as yet unknown" company that has been "out of the picture." Indeed, the evidence in the record is to the contrary. Moreover, Medical Strategy has, through

its declaration, stated under oath that it "relied on the integrity of the market for Encysive shares in making its investment recommendation to OPAM . . .." *See* Declaration of Medical Strategy (signed by Michael Fischer, its Chief Executive Officer), Exh. A to Supplemental Reply Brief [Doc. # 64], ¶ 6. The comments in the 2004 Annual Report, when read in context and in light of the record as a whole, do not raise a unique defense against OPAM.

The Graham Group contends that OPAM is a "professional plaintiff," and that Congress's intent in crafting the PSLRA was to prevent investors from taking lead roles in multiple securities cases. The PSLRA specifically prohibits any party from being a lead plaintiff in more than five securities class actions during a three-year period. *See* 15 U.S.C. § 78u-4(a)(3)(B)(vi). Although OPAM has *sought* to become a lead plaintiff in five different securities class actions in 2006, the Graham Group concedes that OPAM has been appointed as a lead plaintiff only once.

## III.   **CONCLUSION AND ORDER**

OPAM has demonstrated that its losses were significantly greater than any other investor in the proposed class, and more than three times larger than the Graham Group's losses. It satisfies the typicality and adequacy requirements of Rule 23 of the Federal Rules of Civil Procedure. Consequently, OPAM is presumed to be the better

candidate for lead plaintiff. The Graham Group has not refuted this presumption in OPAM's favor. Accordingly, it is

**ORDERED** that Oppenheim Pramerica Asset Management S.á.r.l.'s Motion for Appointment as Lead Plaintiff and Approval of Its Selection of Counsel [Doc. # 19] is **GRANTED**. OPAM is hereby **APPOINTED** lead plaintiff. The law firm of Motley Rice LLC is **APPOINTED** lead counsel, and Zummo & Midkiff, L.L.P. is **APPOINTED** liaison counsel. It is further

**ORDERED** that the Graham Group's Motion to be Appointed Lead Plaintiff [Doc. # 14] is **DENIED**.

The Clerk of Court is directed to change the style of this case to reflect that "Oppenheim Pramerica Asset Management S.á.r.l., on behalf of itself and others similarly situated" is the lead plaintiff in this case.

**SIGNED** at Houston, Texas, this **20th** day of **March**, **2007**.

Nancy F. Atlas
United States District Judge

# EXHIBIT F-2



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE WELMON, Individually and on Behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH,<br><br>                Defendants. | Case No. 06-CV-01283 (JES)<br><br>CLASS ACTION |
| RICHARD J. O'BRIEN, Individually and on Behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH,<br><br>                Defendants. | Case No. 06-CV-01532 (JES)<br><br>CLASS ACTION |

**(Additional Captions Set Forth Below)**

## [PROPOSED] ORDER CONSOLIDATING ACTIONS, APPOINTING LEAD PLAINTIFF AND APPROVING LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

| | | |
|---|---|---|
| MARC SABELLA, Individually and on Behalf of all others similarly situated, | : X : : | Case No. 06-CV-01542 (JES) |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : : | |
| CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH, | : : : : | |
| Defendants. | : X | |
| DONALD CHJERT, On Behalf of himself and all others similarly situated, | : : : | Case No. 06-CV-01677 (JES) |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : | |
| CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH, | : : : | |
| Defendants. | : X | |
| ROBERT FRIEDMAN, Individually and on Behalf of all others similarly situated, | : : : | Case No. 06-CV-01835 (JES) |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : | |
| CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH, | : : : | |
| Defendants. | : X | |

HAROON I. RASHEED, Individually and on
Behalf of all others similarly situated,

                    Plaintiff,

       vs.

CHICAGO BRIDGE & IRON CO. N.V.,
GERALD M. GLENN, ROBERT B. JORDAN,
and RICHARD E. GOODRICH,

                    Defendants.

Case No. 06-CV-01879 (JES)

CLASS ACTION

---

CHARLES K. DETENBER, Individually and on
Behalf of all others similarly situated,

                    Plaintiff,

       vs.

CHICAGO BRIDGE & IRON CO. N.V.,
GERALD M. GLENN, ROBERT B. JORDAN,
and RICHARD E. GOODRICH,

                    Defendants.

Case No. 06-CV-01957 (JES)

CLASS ACTION

---

TIM TADDEI, Individually and on Behalf of all
others similarly situated,

                    Plaintiff,

       vs.

CHICAGO BRIDGE & IRON CO. N.V.,
GERALD M. GLENN, ROBERT B. JORDAN,
and RICHARD E. GOODRICH,

                    Defendants.

Case No. 06-CV-01959 (JES)

CLASS ACTION

|  |  |
|---|---|
| X | |
| STEVEN STEIN, Individually and on Behalf of all others similarly situated, : | Case No. 06-CV-01976 (JES) |
| : | <u>CLASS ACTION</u> |
| Plaintiff, : | |
| : | |
| vs. : | |
| : | |
| CHICAGO BRIDGE & IRON CO. N.V., : GERALD M. GLENN, ROBERT B. JORDAN, : and RICHARD E. GOODRICH, : | |
| : | |
| Defendants. : | |
| X | |
| JEFFREY GOLDSTEIN, Individually and on Behalf of all others similarly situated, : | Case No. 06-CV-02563 (UA) |
| : | CLASS ACTION |
| Plaintiff, : | |
| : | |
| vs. : | |
| : | |
| CHICAGO BRIDGE & IRON CO. N.V., : GERALD M. GLENN, ROBERT B. JORDAN, : and RICHARD E. GOODRICH, : | |
| : | |
| Defendants. : | |
| X | |
| X | |
| ROBERT WEIS, Individually and on Behalf of all others similarly situated, : | Case No. 06-CV-02671 (UA) |
| : | CLASS ACTION |
| Plaintiff, : | |
| : | |
| vs. : | |
| : | |
| CHICAGO BRIDGE & IRON CO. N.V., : GERALD M. GLENN, ROBERT B. JORDAN, : and RICHARD E. GOODRICH, : | |
| : | |
| Defendants. : | |
| X | |

Upon consideration of the motions and supporting papers filed by the various movants for lead plaintiff in the above-captioned action and for good cause shown,

IT IS HEREBY ORDERED THAT:

1.    The Motion of Metzler Investment GmbH and Fortis Investment Management N.V./S.A. is GRANTED;

2.    The above-captioned actions are CONSOLIDATED pursuant to Fed. R. Civ. P. 42(a);

3.    Class members Metzler Investment GmbH and Fortis Investment Management N.V./S.A. are hereby APPOINTED to serve as Lead Plaintiff in the consolidated action, pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995.

4.    The law firm of Milberg Weiss Bershad & Schulman LLP is hereby APPOINTED to serve as Lead Counsel for the Class, pursuant to Section 21D(a)(3)(B) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995, in the above-captioned action.

SO ORDERED.

DATED: _____, 2006          _____

UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|  | : |  |
|---|---|---|
| IN RE ABLE LABORATORIES SECURITIES LITIGATION | : : : | Civil Action No. 05-2681 (JAG) **ORDER** |
|  | : |  |

---

**GREENAWAY, JR., U.S.D.J.**

     This matter comes before this Court on the motions of the Denver Employees Retirement Plan ("DERP") (Docket Entry No. 14) , Deka International (Ireland) Limited ("Deka") (Docket Entry No. 13), Richard Upham ("Upham") (Docket Entry No. 17), Floyd Webster, Kent Webster, Keith Webster and Helen Darrah (the "Webster Family") (Docket Entry No. 7), the Communications Workers of America Plan for Employees' Pensions and Death Benefits ("CWA") with Daniel Levy (Docket Entry No. 11), Genesee County Employees Retirement System with Julian M. Warren ("Genesee and Warren") (Docket Entry No. 6), Edward Howlette (Docket Entry No. 12), and Charles M. Gillis (Docket Entry No. 16) for appointment as lead plaintiff and appointment of their respective attorney as lead counsel.  Following the filing of the individual motions seeking appointment as lead plaintiff, Deka and DERP proposed combining to form the Institutional Investor Group ("IIG"), and the court having reviewed the submissions of the parties, as well a the oral arguments presented on January 23, 2006; and for the reasons set forth in the Court's opinion,

     IT IS on this  17th  day of March, 2006,

     ORDERED that the motions of Deka and DERP are GRANTED, and Deka and DERP

shall combine to form the Institutional Investor Group; and

IT IS FURTHER ORDERED that the Institutional Investor Group is appointed as the lead plaintiff; and

IT IS FURTHER ORDERED that Grant & Eisenhofer P.A. and Murray, Frank and Sailer LLP are appointed as co-lead counsel; and

IT IS FURTHER ORDERED that the motion of the Webster Family is withdrawn; and

IT IS FURTHER ORDERED that all other motions for appointment as lead plaintiff are DENIED; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Master File Civil Action No. 1:06CV00201

| | | |
|---|---|---|
| MIRCO INVESTORS, LLC, on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:05CV00118 |
| INSPIRE PHARMACEUTICALS, INC. CHRISTY L. SHAFFER, and THOMAS R. STAAB, II, | ) ) ) ) | |
| Defendants. | ) | |
| RICHARD & SUSAN GIORGINO, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:05CV00120 |
| INSPIRE PHARMACEUTICALS, INC. CHRISTY L. SHAFFER, and THOMAS R. STAAB, II, | ) ) ) ) | |
| Defendants. | ) | |

[Captions continued on next page]

ORDER CONSOLIDATING ACTIONS,
APPOINTING LEAD PLAINTIFFS AND APPROVING LEAD
PLAINTIFFS' SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL

| | |
|---|---|
| KIAH SAI TAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSPIRE PHARMACEUTICALS, INC. CHRISTY L. SHAFFER, and THOMAS R. STAAB, II,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:05CV00195<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| RONALD P. HORLICK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSPIRE PHARMACEUTICALS, INC. CHRISTY L. SHAFFER, and THOMAS R. STAAB, II,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:05CV00227<br>)<br>)<br>)<br>)<br>)<br>) |
| RANDALL SIMON and ROBERT KEMP, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSPIRE PHARMACEUTICALS, INC. CHRISTY L. SHAFFER, and THOMAS R. STAAB, II,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:05CV00248<br>)<br>)<br>)<br>)<br>)<br>) |

-2-

Having considered the motion of David and Stephanie Cozzarelli, Robert and Carole Swoboda and the FRANKFURT-TRUST Investment-Gesellschaft mbH (collectively, the "Inspire Investors Group") to consolidate actions, to be appointed Lead Plaintiffs and for approval of Lead Plaintiffs' selection of Lead Counsel and Liaison Counsel, and after a hearing before this Court on January 25, 2006,

IT IS HEREBY ORDERED THAT:

I.    **Order of Consolidation**

1.    The Inspire Investors Group's motion is granted.

2.    The above-captioned actions (the "Actions") and any other cases filed against any of the Defendants arising out of the same nucleus of operative facts as those alleged in these Actions are hereby consolidated into one action (the "Consolidated Action") for all purposes, pursuant to Federal Rules of Civil Procedure 42. This Order (the "Order") shall apply to the Consolidated Action and to each case that relates to the same subject matter that is subsequently filed in this Court or is transferred to this Court and is consolidated with the Consolidated Action.

3.    A Master File is established for this proceeding. The Master File shall be Civil Action No. 1:06CV00201. The Clerk shall file all pleadings in the Master File and note such filings on the Master Docket.

4.    An original of this Order shall be filed by the Clerk in the Master File.

5.    The Clerk shall mail a copy of this Order to counsel of record in the Consolidated Action.

6.    Every pleading in the Consolidated Action shall have the following caption:

| IN RE INSPIRE PHARMACEUTICALS, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. <u>1:06CV00201</u> |

7.    When a pleading is intended to be applicable to all actions to which this order is applicable, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption set out above.  When a pleading is intended to be applicable only to some, but not all, of such actions, the Court's docket number for each individual action to which the paper is intended to be applicable and the last name of the plaintiff in said action shall appear after the words "This Document Relates To:" in the caption set out above.

8.    The Court requests the assistance of counsel in calling to the attention of the Clerk of this Court the filing or transfer of any case that might properly be consolidated as part of the Consolidated Action.

9.    When a case that arises out of the same subject matter of the Consolidated Action is hereinafter filed in this Court or transferred from another Court, the Clerk of this Court shall:

   a.    File a copy of this Order in the separate file for such action;

   b.    Mail a copy of this Order to the attorneys for the plaintiff(s) in the newly-filed or transferred case and to any new defendant(s) in the newly-filed case; and

   c.    Make the appropriate entry in the Master Docket for the Consolidated Action.

10.    Each new case that arises out of the subject matter of the Consolidated Action, which is filed in this Court or transferred to this Court, shall be consolidated with the Consolidated Action and this Order shall apply thereto, unless a party objects to consolidation,

as provided for herein, or any provision of this Order, within ten (10) days after the date upon

which a copy of this Order is served on counsel for such party, by filing an application for relief

and this Court deems it appropriate to grant such application. Nothing in the forgoing shall be

construed as a waiver of Defendants' right to object to consolidation of any subsequently-filed or

transferred related action.

  11. This Order is entered without prejudice to the rights of any party to apply for

severance of any claim or action, for good cause shown.

  12. This Order is entered without prejudice to the rights of any party to challenge

personal jurisdiction or venue.

  13. Defendants are not required to respond to the complaint in any action

consolidated into this action, other than the Consolidated Action or a complaint designated as the

operative complaint.

**II.** **Appointment of Lead Plaintiffs and Lead Counsel**

  14. Class members David and Stephanie Cozzarelli, Robert and Carole Swoboda, and

FRANKFURT-TRUST Investment-Gesellschaft mbH (collectively, the "Inspire Investors

Group") are appointed to serve as Lead Plaintiffs in the above-captioned Consolidated Action

pursuant to 15 U.S.C. §78u-4(a)(3)(B).

  15. Robin Winchester of the law firm of Schiffrin & Barroway, LLP and Christopher

S. Polaszek of the law firm of Milberg Weiss Bershad & Schulman LLP are hereby approved as

Co-Lead Counsel for the Class. Co-Lead Counsel shall have the authority to speak for all

Plaintiffs and class members in all matters regarding the litigation including, but not limited to,

pre-trial proceedings, motion practice, trial and settlement, and shall make all work assignments

in such a manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.  Additionally, Lead Counsel shall have the following responsibilities:

        a.     to brief and argue motions;

        b.     to initiate and conduct discovery, including, without limitation, coordination of discovery with Defendants' counsel, the preparation of written interrogatories, requests for admissions, and requests for production of documents;

        c.     to direct and coordinate the examination of witnesses in depositions;

        d.     to act as spokesperson at pretrial conferences;

        e.     to call and chair meetings of Plaintiffs' counsel as appropriate or necessary from time to time;

        f.     to initiate and conduct any settlement negotiations with counsel for Defendants;

        g.     to provide general coordination of the activities of Plaintiffs' counsel and to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplication or unproductive effort;

        h.     to consult with and employ experts;

        i.     to receive and review periodic time reports of all attorneys on behalf of Plaintiffs, to determine if the time is being spent appropriately and for the benefit of Plaintiffs, and to determine and distribute Plaintiffs' attorneys' fees; and

   j.  to perform such other duties as may be expressly authorized by further order of this Court.

   16.  No pleadings or other papers shall be filed or discovery propounded, conducted or otherwise undertaken by any Plaintiff except as directed or undertaken by Lead Counsel.

   17.  J. Anthony Penry of the law firm of Taylor Penry Rash & Riemann, PLLC is hereby approved as Liaison Counsel for the Class.

   **IT IS SO ORDERED.**

DATED:  March 1, 2006        _Russell A. Eliason_
                 Honorable Russell A. Eliason, U.S.M.J.

cc: All counsel of record

-7-

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

RAYMOND KADAGIAN, On Behalf of
Himself and All others Similarly Situated,

        Plaintiff,

    v.                         Case No. 05-C-0547

HARLEY-DAVIDSON, INC.,
JEFFREY L. BLEUSTEIN,
JAMES L. ZIEMER,

        Defendants.

ALBERT VILLAR,
Individually and On Behalf of
All Others Similarly Situated,

        Plaintiff,

    v.                         Case No. 05-C-0554

HARLEY-DAVIDSON, INC.,
JEFFREY BLEUSTEIN,
JAMES ZIEMER,
JAMES BROSTOWITZ,

        Defendants.

## ORDER CONSOLIDATING THE RELATED ACTIONS, APPOINTING LEAD PLAINTIFF AND LEAD PLAINTIFF'S SELECTION OF LEAD AND LIAISON COUNSEL

[Caption continued on following pages]

FRANKLIN HIMES,

        Plaintiff,

        v.                                  Case No. 05-C-0579(LA)

HARLEY-DAVIDSON INC.,
JEFFREY L. BLEUSTEIN,
JAMES M. BROSTOWITZ,
R. JON FLICKINGER,
JOHN A. HEVEY,
RONALD M. HUTCHINSON,
GAIL A. LIONE,
JAMES A. MCCASLIN,
KENNETH SUTTON, JR.,
DONNA F. ZARCONE,
JAMES L. ZIEMER,

        Defendants.

---

PHILIP KATZ, Individually and On Behalf
of All Others Similarly Situated,

        Plaintiff,

        v.                                  Case No. 05-C-0609

HARLEY-DAVIDSON, INC.,
JEFFREY BLEUSTEIN,
JAMES ZIEMER,
JAMES M. BROSTOWITZ,

        Defendants.

---

JAMES A. ZIOLKOWSKI, On Behalf of
Himself and All Others Similarly Situated,

        Plaintiff,

        v.                                  Case No. 05-C-0629

2

HARLEY-DAVIDSON, INC.,
JEFFREY L. BLEUSTEIN,
JAMES M. BROSTOWITZ,
KARL M. EBERLE,
JON R. FLICKINGER,
JOHN A. HEVEY,
RONALD M. HUTCHINSON,
GAIL A. LIONE,
JAMES A MCCASLIN,
W. KENNETH SUTTON, JR.,
DONNA F. ZARCONE,
JAMES L. ZIEMER,

                    Defendants.

---

CHARLES R. BOURRET,
On Behalf of Himself and
All Others Similarly Situated,

                    Plaintiff,

              v.                  Case No. 05-C-0696

HARLEY-DAVIDSON, INC.,
JEFFREY L. BLEUSTEIN,
JAMES M. BROSTOWITZ,
R. JON FLICKINGER,
JOHN A. HEVEY,
RONALD M. HUTCHINSON,
GAIL A. LIONE,
JAMES A. McCASLIN,
W. KENNETH SUTTON, JR.,
DONNA F. ZARCONE,
JAMES L. ZIEMER,

                    Defendants.

---

Having considered the Plaintiffs' Joint Stipulation to Consolidate the Actions, Appoint Lead Plaintiff, and to Approve Lead Plaintiff's Selection of Co-Lead Counsel, and good cause appearing therefore, IT IS HEREBY ORDERED that:

1.    The stipulation is approved in part.

2.    Construction Laborers Pension Trust of Greater St. Louis, the Iron Workers Local No. 25 Pension Fund, the City of Sterling Heights Police & Fire Retirement System, and Deka International S.A. Luxembourg are hereby appointed Lead Plaintiffs for the Class, pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §78u-4(a)(3)(B).

3.    Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Murray, Frank & Sailer LLP are approved as Co-Lead Counsel for the Class, pursuant to §21D(a)(3)(B)(v) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B)(v), and Hale & Wagner, S.C. is approved as Liaison Counsel.

4.    Each of the above-entitled cases is found to be related and is consolidated for all purposes (the Consolidated Action) pursuant to Fed. R. Civ. P. 42(a). This order applies to the above-entitled cases and to each case related to the claims at issue in this Consolidated Action that is pending in this district, transferred to this district or consolidated with the above-entitled cases on or after this date, in accordance with this order.

5.    Every pleading filed in this action shall have the following caption:

| | |
|---|---|
| IN RE HARLEY-DAVIDSON, INC. )<br>SECURITIES LITIGATION ) | Case No. 05-C-00547-CNC |

6.    When a pleading is intended to apply to all actions governed by this order, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption set out above. When a pleading is intended to apply only to some, but not all of the Consolidated Actions, this court's docket number for each individual action

4

to which the paper is intended to be applicable and the last name of the first-named plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption described above (e.g., "No. 2:04-C-00547," (Kadagian)).

Dated at Milwaukee, Wisconsin, this 14th day of February, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge

5

# EXHIBIT F-3

MEMO ENDORSED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re GENERAL MOTORS CORP. SECURITIES LITIGATION | Master File No. 05-CV-8088 (RMB) THIS DOCUMENT RELATES TO: ALL ACTIONS |

~~[PROPOSED]~~ ORDER APPOINTING LEAD PLAINTIFF AND APPROVING LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL *

*RMB*

and 6 Her Briefs

Upon consideration of the motions and supporting papers for appointment of Lead

Plaintiff and approval of Lead Plaintiff's selection of Lead Counsel in the above-captioned

action and for good cause shown,

**IT IS HEREBY ORDERED THAT:**

1.  The Motion of Deka Investment GmbH and Deka International S.A., Luxembourg

("Deka") is **GRANTED**;

2.  Deka is hereby **APPOINTED** serve as Lead Plaintiff.

3.  The law firm of Murray, Frank & Sailer LLP is hereby **APPOINTED** to serve as

Lead Counsel.

**SO ORDERED**

DATED: **2/6** , 2006
     **2:20 P.M.**

*RMB*
_____
United States District Judge

_____

* No further briefing would be
necessary, appropriate or helpful

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE CONAGRA FOODS, INC. SECURITIES LITIGATION ) | |
| ) | |
| DAVID P. BERLIEN, on behalf ) of himself and all others ) similarly situated, ) | |
| ) | |
| Plaintiff, ) | 8:05CV292 |
| ) | |
| v. ) | |
| ) | |
| CONAGRA FOODS, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| JOSEPH CALVACCA, individually ) and on behalf of all others ) similarly situated, ) | |
| ) | |
| Plaintiff, ) | 8:05CV318 |
| ) | |
| v. ) | |
| ) | |
| CONAGRA FOODS, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| JAMES M. WOODS, on behalf ) of himself and all others ) similarly situated, ) | |
| ) | |
| Plaintiff, ) | 8:05CV493 |
| ) | |
| v. ) | |
| ) | |
| CONAGRA FOODS, INC., et al., ) | ORDER |
| ) | |
| Defendants. ) | |

This matter is before the Court on the motions of

International Fund Management S.A., Luxembourg (International

Fund"), National Elevator Industry Pension Fund ("National
Elevator"), and the Sumas Group ("Sumas") for consolidation,
appointment as lead plaintiff and approval of selection of lead
counsel.  All three motions were filed on August 22, 2005.  This
Court has previously ordered the consolidation of these actions
(Filing No. 54 in 8:05CV292; Filing No. 33 in 8:05CV318; Filing
No. 51 in 8:05CV493).  Now the Court will address the issues of
appointing a lead plaintiff and approving the selection of lead
counsel.

**Selection of Lead Plaintiff**

In selecting the co-lead plaintiff, Fed. R. Civ. P. 23
provides typicality and adequacy requirements that must be met
for a party to be considered for appointment as lead plaintiff.
In addition, the Private Securities Litigation Reform Act
("PSLRA") establishes a rebuttable presumption that "the person
or group of persons" which otherwise meets the requirements of
Rule 23 that "has the largest financial interest in the relief
sought by the class" shall be appointed lead plaintiff.  This
presumption may be overcome only upon proof that the
presumptively most adequate plaintiff will not fairly and
adequately represent the class or is subject to unique defenses.
15 U.S.C. § 78u-4(a)(3)(B)(iii).

Three parties have sought to be named as lead
plaintiff:  International Fund, National Elevator and Sumas.  Now

-2-

International Fund and National Elevator, (collectively the
"Institutional Investor Group"), have elected to jointly
prosecute this action against ConAgra and ask the Court to name
them collectively as the co-lead plaintiff. Thus, the Court must
choose between the Institutional Investor Group and Sumas for the
position of lead plaintiff.

The PSLRA instructs courts to appoint as lead plaintiff
the investor with the largest financial interest in the relief
sought by the class. In this instance, the Institutional
Investor Group clearly has a larger financial interest in the
relief sought than does Sumas. The Institutional Investor Group
bought 555,897 shares between September 18, 2003, and June 7,
2005 (the "Class Period"), and thereby claims losses totaling
$2,399,802.16. In comparison, Sumas bought 4,300 shares during
the Class Period and claims losses of $12,300.76. Thus, the
Institutional Investors Group clearly have the largest financial
stake in this litigation. Therefore, a rebuttable presumption
exists that the Institutional Investors Group shall be appointed
as co-lead plaintiff.

Sumas can rebut this presumption only by proof that the
Institutional Investor Group will not fairly and adequately
represent the class or is subject to unique defenses. In an
effort to rebut this presumption, Sumas asserts that appointment
of the Institutional Investors Group as co-lead plaintiff would

-3-

expose "the class to logistical issues that would not arise if the lead plaintiff is not foreign." This bare assertion is ineffectual. Sumas fails to detail any logistical issues which could arise because one of the members of the Institutional Investors Group is foreign. This objection is found to be without merit.

Next, Sumas asserts that one of the members of Institutional Investors Group failed to clearly set forth all of the information necessary in a sworn, signed certification. It is unclear whether a putative lead plaintiff, such as National Elevator, which did not file a complaint, is subject to this requirement. The plain language of the statute states that the sworn, signed certification is to be "filed with the complaint." 15 U.S.C. § 78u-4 (a)(2)(A); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 407, 2004 U.S. Dist. LEXIS 9571, at *36, n.18 (S.D.N.Y. 2004). Here, National Elevator has provided sufficient information to allow the Court to analyze its claimed financial interest. This objection is insufficient to overcome the Institutional Investor Group's rebuttable presumption as co-lead plaintiff as the party with the largest financial interest in the class.

Typicality and Adequacy

Institutional Investors Group fulfills the typicality and adequacy requirements of Rule 23(a). Typicality exists where

the plaintiff's claims arise from the same series of events and are based upon the same legal theories as the claims of all the class members.  It is the generalized nature of the claims asserted which determines whether the class representatives are typical.  The typicality requirement does not require that the claims be identical.

The Institutional Investors Group satisfies the typicality requirement because, like all other class members, it: (1) purchased ConAgra securities during the Class Period at allegedly artificially inflated prices; and (2) suffered damages thereby.  Thus, its claims are typical of those of other class members because its claims arise out of the same course of events.

Adequacy is evaluated by determining that (1) potential conflict between the proposed co-lead plaintiff and the class members is absent, and (2) the class representative has chosen counsel who is qualified, experienced and able to vigorously conduct the proposed litigation.  Here, Institutional Investors Group is an adequate class representative because its interests are clearly aligned with the other class members in vigorously pursuing the claims against the defendants because of the defendants' alleged false statements to the market.  There also is no evidence of any antagonism between Institutional Investors Group and other class members.  Finally, its proposed counsel is

highly qualified, experienced and capable of conducting this complex litigation in a professional manner.  Thus, Institutional Investors Group fulfills both the typicality and adequacy requirements of Rule 23(a).  Therefore, Institutional Investors Group will be appointed as co-lead plaintiff in this action.

**Counsel**

Having appointed Institutional Investors Group as co-lead plaintiff, the Court also will approve its selection of counsel.  The statute states that the lead plaintiff shall, subject to court approval, select and retain counsel to represent the class it seeks to represent.  15 U.S.C. § 78u-4(a)(3)(B)(v).  The lead plaintiff has selected Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") and Murray, Frank & Sailer LLP to serve as co-lead counsel for the class and Abrahams, Kaslow & Cassman LLP, as liaison counsel.  Lerach Coughlin has experience serving in the role of lead counsel, having been appointed as lead or co-lead counsel in several class actions including *In re Enron Corp., Sec. Litig.*, 206 F.R.D. 427 (S.D. Tex. 2002).  Likewise, Murray, Frank & Sailer LLP also is experienced in class action litigation.  The Court approves the selections by the lead plaintiff for lead and liaison counsel. Accordingly,

IT IS ORDERED:

1)  National Elevator and International Fund are appointed co-lead plaintiff for the class;

2)  Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Murray, Frank & Sailer LLP are appointed to serve as co-lead counsel for the class;

3)  Abrahams, Kaslow & Cassman LLP is appointed as liaison counsel.

DATED this 2nd day of December, 2005.

BY THE COURT:

/s/ Lyle E. Strom

LYLE E. STROM, Senior Judge
United States District Court

-7-





ENTERED
CLERK, U.S. DISTRICT COURT

NOV - 9 2005

CENTRAL DISTRICT OF CALIFORNIA
BY    MG    DEPUTY

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV  8 2005

CENTRAL DISTRICT OF CALIFORNIA
BY    DEPUTY

Priority
Send
Clsd
Enter
JS-5/JS-6
JS-2/JS-3

1

2

3

4   **THIS CONSTITUTES NOTICE OF ENTRY**

5   **AS REQUIRED BY FRCP, RULE 77(d).**

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  In re DREAMWORKS ANIMATION SKG,        )   Master File No. CV 05-03966
    INC., SECURITIES LITIGATION            )   MRP (VBKx)
11                                          )
    This Document Relates To:              )   (Consolidated Cases)
12  All Actions                            )
                                           )   ORDER APPOINTING NEXTRA
13                                          )   INVESTMENT MANAGEMENT S.G.R.
                                           )   S.p.A. AS LEAD PLAINTIFF AND
14                                          )   APPOINTING LEAD COUNSEL
                                           )
15                                          )
                                           )
16                                          )
                                           )
17                                          )
                                           )
18  ─────────────────────────────────────

19

20        Putative class member Nextra Investment Management S.G.R. S.p.A.

21  ("Nextra"), on behalf of NIS International Equities Fund, the Nextra

22  Blue Chips Internazionali Fund, the Nextra Bilanciato Internazionale

23  Fund, the Nextra Equilibrio Fund, and the Nextra Azioni Internazionali

24  Fund, has moved, pursuant to Section 27(a)(3) of the Securities Act of

25  1933 and Section 21D(a)(3) of the Securities Exchange Act of 1934, for

26  (1) appointment as Lead Plaintiff for the class of plaintiffs in this

27  case (the "Class"), (2) the approval of Schiffrin & Barroway, LLP as

28  Lead Counsel for Lead Plaintiff and the Class, and (3) the approval of

    Lim, Ruger & Kim, LLP as Liaison Counsel for Lead Plaintiff and the

1  Class.

2      The Court has read and considered the following documents: (1) the

3  Notice of Motion and Motion to Appoint Nextra as Lead Plaintiff Pursuant

4  to Section 27(a)(3)(B) of the Securities Act of 1933 and Section

5  21D(a)(3)(B) of the Securities Exchange Act of 1934 and to Approve Lead

6  Plaintiff's Choice of Counsel, filed by Nextra on August 9, 2005 (the

7  "Motion"); (2) the Memorandum in Opposition to Nextra Investment

8  Management S.G.R. S.P.A.'s Motion to be Appointed Lead Plaintiff and for

9  Approval of its Choice of Counsel, filed by plaintiffs Edward Forstein,

10  Joe Karim, Pamela Kasza and the Carpenters Pension Fund of Baltimore

11  (collectively, the "Dreamworks Group") on September 12, 2005; (3) the

12  Memorandum of Law in Further Support of Nextra Investment Management

13  S.G.R. S.p.A.'s Motion for Appointment as Lead Plaintiff and for

14  Approval of Lead Counsel and Opposition to all Competing Motions Seeking

15  Appointment of Lead Plaintiff, filed by Nextra on September 12, 2005;

16  (4) the Reply Memorandum of Law in Further Support of Nextra Investment

17  Management S.G.R. S.p.A.'s Motion for Appointment as Lead Plaintiff and

18  Approval of Selection of Lead Counsel, filed by Nextra on September 19,

19  2005; (5) the Reply Memorandum in Further Support of the Dreamworks

20  Group's Joint Stipulation for Appointment as Lead Plaintiff and for

21  Approval of its Choice of Counsel, filed by the Dreamworks Group on

22  September 19, 2005; (6) Nextra Investment Management S.G.R. S.p.A.'s

23  Submission Pursuant to this Court's October 19, 2005 Order, filed by

24  Nextra on November 2, 2005; and (7) all Declarations and Memoranda of

25  Points and Authority relating to the Motion.  In addition, the Court

26  heard oral argument on the Motion on September 26, 2005.

27      Accordingly, IT IS HEREBY ORDERED as follows:

28

2

1       1. Nextra, having the largest financial interest in this litigation

2 and otherwise satisfying the typicality and adequacy requirements of

3 Rule 23 of the Federal Rules of Civil Procedure, is the most adequate

4 plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) and Section

5 27(a)(3)(B)(iii)(I) of the Securities Act, and no other movant has

6 offered the proof necessary pursuant to 15 U.S.C. § 78u-

7 4(a)(3)(B)(iii)(II) and Section 27(a)(3)(B)(iii)(II) of the Securities

8 Act to rebut the statutory presumption in favor of Nextra. Therefore,

9 Nextra is hereby appointed Lead Plaintiff for the Class in this action

10 and any subsequently consolidated or related actions.

11       2. Pursuant to 15 U.S.C. § 77z-1(a)(3)(B)(v), 15 U.S.C. § 78u-

12 4(a)(3)(B)(v) and Section 27(a)(3)(B)(v) of the Securities Act, Lead

13 Plaintiff's selection of lead counsel and liaison counsel is hereby

14 approved. The law firm of Schiffrin & Barroway, LLP is appointed as

15 Lead Counsel and the law firm of Lim, Ruger & Kim, LLP is appointed as

16 Liaison Counsel.

17       3. Lead Counsel shall have the authority to speak for all

18 plaintiffs and Class members in all matters regarding the litigation

19 including, but not limited to, pre-trial proceedings, motion practice,

20 discovery, and trial and settlement, and shall make all work assignments

21 in such a manner as to facilitate the orderly and efficient prosecution

22 of this litigation and to avoid duplicative or unproductive effort. In

23 connection with the foregoing, Lead Counsel shall have the following

24 responsibilities:

       a. to brief and argue motions;

1      b. to initiate and conduct discovery, including, without

2  limitation, coordination of discovery with defendants' counsel the

3  preparation of written interrogatories, requests for admissions and

4  requests for production of documents;

5      c. to direct and coordinate the examination of witnesses in

6  depositions;

7      d. to act as spokesperson at pretrial conferences;

8      e. to call and chair meetings of plaintiffs' counsel as

9  appropriate or necessary from time to time;

10      f. to initiate and conduct any settlement negotiations with

11  defendants' counsel;

12      g. to provide general coordination of the activities of

13  plaintiffs' counsel and to delegate work responsibilities to selected

14  counsel as may be required in such a manner as to lead to the orderly

15  and efficient prosecution of this litigation and to avoid duplication or

16  unproductive effort;

17      h. to consult with and employ experts;

18      i. to receive and review periodic time reports of all

19  attorneys on behalf of all plaintiffs to determine if the time is being

20  spent appropriately and for the benefit of plaintiffs; and

21      j. to perform such other duties as may be expressly authorized

22  by further order of this Court.

23

24      4. Lead Counsel shall be responsible for coordinating all

25  activities and appearances on behalf of the Class and for disseminating

26  notices and orders of this Court.

27

28      5. No motion, application or request for discovery shall be

1  served or filed, or other pre-trial proceedings initiated, on behalf of

2  Lead Plaintiff, except through Lead Counsel.

3

4      6.  All  notices,  proposed  orders,  pleadings,  motions,

5  discovery, and memoranda requiring a response in less than 30 days shall

6  be served upon Lead Counsel and defense counsel in electronic format and

7  emailed the day of filing with exhibits to follow by overnight mail

8  service, telecopy, or hand delivery.  All other service shall take place

9  by regular mail.

10

11     7. In accordance with the Court's personal procedures, counsel

12 shall submit two (2) courtesy copies of all filings to Chambers.

13

14     8. Defendants' counsel may rely upon all agreements made with

15 Lead  Counsel,  or  other  duly  authorized  representatives  of  Lead

16 Plaintiff.

17

18     9. This Order shall apply to each case subsequently filed in

19 this Court or transferred to this Court, unless a party objecting to the

20 consolidation of such case or to any other provision of this Order files

21 within ten (10) days after the date upon which a copy of this Order is

22 mailed to counsel for such party, an application for relief from this

23 Order or any provision herein and this Court grants such application.

24

25     IT IS SO ORDERED.

26     DATED: *November 7, 2005*          *Mariana R. Pfaelzer*

27                                    Honorable Mariana R. Pfaelzer

28                                    United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TOBY OLSEN, individually and on behalf of
all others similarly situated,

                         Plaintiff,

         -against-

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, and MICHAEL P.
PUORRO,

               Defendants.

**MEMORANDUM OF DECISION
AND ORDER**

04-CV-4165 (DRH)(JO)

MORDEKAI SHAPIRO, individually and on
behalf of all others similarly situated,

               Plaintiff,

         -against-

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, and MICHAEL P.
PUORRO,

               Defendants.

04-CV-4282 (DRH)(JO)

ZACHARY ALAN STARR, on behalf of himself
and all others similarly situated,

               Plaintiff,

         -against-

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, and MICHAEL P.
PUORRO,

               Defendants.

04-CV-4375 (DRH)(JO)

---

JOSEPH R. RUSSO, individually and on
behalf of all others similarly situated,

      Plaintiff,

   -against-          04-CV-4464 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, and MICHAEL P.
PUORRO,

       Defendants.

---

ELI BOTKNECHT, individually and on
behalf of all others similarly situated,

      Plaintiff,

   -against-          04-CV-4490 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, JOSEPH L. MANCINO,
MICHAEL MANZULLI, MICHAEL P. PUORRO,
and ROBERT WANN

       Defendants.

---

RAMIN SARRAF, individually and on
behalf of all others similarly situated,

      Plaintiff,

   -against-          04-CV-4577 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, JOSEPH L. MANCINO,
MICHAEL MANZULLI, MICHAEL P. PUORRO,
and ROBERT WANN,

       Defendants.

---

2

---

HARLIN BROWN, on behalf of himself
and all others similarly situated,

                    Plaintiff,

          -against-                                04-CV-4845 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.
JOSEPH R. FICALORA, and MICHAEL P.
PUORRO,

                    Defendants.

---

PETER BRANDEL, individually and on
behalf of all others similarly situated,

                    Plaintiff,

          -against-                                04-CV-5047 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, JOSEPH L. MANCINO,
MICHAEL MANZULLI, MICHAEL P. PUORRO,
and ROBERT WANN,

                    Defendants.

---

ROBERT LOWINGER, on behalf of himself and
all others similarly situated,

                    Plaintiff,

          -against-                                04-CV-5065 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, ROBERT WANN,
MICHAEL F. MANZULLI, DONALD M. BLAKE,
ANTHONY E. BURKE, DOMINICK CIAMPA,
ROBERT S. FARRELL, WILLIAM C.
FREDERICK, MAX L. KUPFERBERG,
HOWARD C. MILLER, JAMES J. DONOVAN,
and JOHN A. PILESKI,

                    Defendants.

---

3

---

RICHARD A. STRAUSS, individually and on
behalf of all others similarly situated,

Plaintiff,

-against-                                    04-CV-5101 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, and MICHAEL P. PUORRO,

Defendants.

---

AL TAWIL and ESTATE OF FARAH MAHLAB,

Plaintiffs,

-against-                                    04-CV-5128 (DRH)(JO)

NEW YORK COMMUNITY BANCORP, INC.,
JOSEPH R. FICALORA, ROBERT WANN,
MICHAEL F. MANZULLI, DONALD M. BLAKE,
ANTHONY E. BURKE, DOMINICK CIAMPA,
ROBERT S. FARRELL, WILLIAM C.
FREDERICK, MAX L. KUPFERBERG,
HOWARD C. MILLER, JAMES J. DONOVAN,
and JOHN A. PILESKI,

Defendants.

---

**HURLEY, District Judge:**

      Presently before the Court are the motions by: (1) Metzler Investment GmbH, for

account of its funds MI-Fonds 208 and MI-Fonds 705 ("Metzler Investment") and Bernard

Drucker (collectively, the "NYCB Group"); (2) Carlos J. Burbano, Anna C. Burbano, Henry E.

Dubuy, Anthony J. Izzo, Hans Kalb, Dong K. Lee, Joseph Tobin, and Anthony Whitehead

(collectively, the "Lee Group"); (3) Dr. Max Schnapp ("Dr. Schnapp"); (4) James T. Stevens and

John W. Feil (collectively, the "Stevens Group"); (5) Vera Dalia, PhD, Anthony Curcio, and

Genevieve DeCarlo (collectively, the "Dalia Group"); and (6) Philip A. Stewart, Joyce Stewart,

and International Brotherhood of Electrical Workers Local 98 (the "Stewart Group") for an

Order consolidating the above-referenced actions,[1] appointing lead plaintiff, and approving the

selection of lead counsel.  For the reasons stated below, the motion of the NYCB Group is

granted in its entirety and the remaining motions are granted in part and denied in part.

## BACKGROUND

The above-captioned actions were commenced as purported securities class

actions on behalf of investors who purchased or acquired stock of New York Community

Bancorp, Inc. ("NYCB") between June 27, 2003 and May 9, 2004 (the "Class Period").  The

actions seek to recover damages suffered by members of the class as a result of Defendants'

alleged violations of federal securities law.  (Compl. ¶ 1.)[2]  Specifically, the Complaint alleges

that on the first day of the class period, NYCB announced that it had signed a definitive

agreement with Roslyn Bancorp, Inc. ("Roslyn"), valued at $1.579 billion, whereby Roslyn

would merge into NYCB and Roslyn shareholders would receive 0.75 shares of NYCB stock in

exchange for each share of Roslyn stock.  (*Id.* ¶ 24.)  The Complaint further alleges that in

connection with the merger, Defendants failed to disclose and misrepresented material adverse

---

[1] At the time of the filing of the parties' motions, there were eight related cases pending before the Court.  Since that time, three additional related cases have been filed, to wit, *Lowinger v. New York Community Bancorp, Inc.*, 04 CV 5065, *Strauss v. New York Community Bancorp, Inc.*, 04 CV 5101, and *Tawil v. New York Community Bancorp, Inc.*, 04 CV 5128.  These three related cases will be considered in the Court's decision.

[2] All citations to Complaint refer to the Complaint filed in *Olsen v. New York Community Bancorp, Inc.*, 04 CV 4165, the first action filed in this Court.

facts, which were known to Defendants or recklessly disregarded by them, which caused NYCB's stock to be artificially inflated. (*See id.* ¶¶ 25-57.)

The first action, *Olsen v. New York Community Bancorp, Inc.*, 04 CV 4165, was filed on September 24, 2004. That same day, plaintiffs' counsel published notice of the pendency of the action over the *PR News Wire*. The notice advised members of the proposed class of their right to move before this Court to serve as lead plaintiff(s) on or before November 23, 2004. (*See, e.g.*, Decl. of Aaron Brody, dated Nov. 23, 2004, Ex. A.)

Presently pending in the Eastern District of New York are eleven separate related securities fraud class actions. Plaintiffs in six of these actions have filed motions to consolidate and for appointment as lead plaintiff. Defendants take no position with regard to the respective motions.

## DISCUSSION

### I.    *The Motions to Consolidate are Granted*

Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the Court must decide any motion to consolidate prior to deciding a motion for appointment of lead plaintiff in a proposed securities class action. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii). Rule 42 of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; [and] it may order all the actions consolidated." Fed. R. Civ. P. 42(a).

Here, the factual allegations in each of the above-referenced actions are virtually identical and, as a result, the same discovery will be relevant to all of the actions. Several of the

6

actions, however, have alleged slightly different class periods and name different individual

defendants.  Moreover, some of the actions assert claims by former Roslyn shareholders pursuant

to the Securities Act of 1933 (the "Securities Act"), some assert claims by persons who

purchased NYCB stock on the open market pursuant to the Securities Exchange Act of 1934 (the

"Exchange Act"), and some assert claims pursuant to both statutes.  None of these minor

differences, however, which can be resolved when the appointed lead plaintiff files a

consolidated complaint, detracts from the overwhelming factual and legal similarities among the

cases.  *See, e.g., Dolan v. Axis Capital Holdings Ltd.,* Nos. 04 Civ. 8564, 04 Civ. 8810, 2005 WL

883008, at * 2 (S.D.N.Y. Apr. 13, 2005) (consolidating cases where one case asserted claims

against additional defendant and claims "overlapp[ed]"); *In re Olsten Corp. Sec. Litig.,* 3 F.

Supp. 2d 286, 292-93 (E.D.N.Y. 1998) (consolidating cases alleging different class periods and

slightly different facts; "the facts and legal issues need not be identical to warrant

consolidation"), *opinion adhered to on reconsideration,* 181 F.R.D. 218 (E.D.N.Y. 1998).

Moreover, it is apparent that no party will suffer prejudice from consolidation, a fact confirmed

by the complete absence of any opposition thereto.  Finally, it is equally apparent that

consolidation would significantly enhance judicial economy.  There is, in short, nothing to be

gained by requiring this matter to proceed as eleven separate cases.  Accordingly, the actions

involve "common issues of law and fact" and are hereby consolidated pursuant to Rule 42(a).

## II.  *Motions for Appointment of Lead Plaintiff*

### A.  *Procedure under the PSLRA*

The PSLRA sets forth the procedure governing the appointment of a lead plaintiff

in securities class actions.  As an initial matter, the plaintiff who files the first action must

publish notice to the class within twenty (20) days of filing the action, informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(I). Here, notice of the first action was published on September 24, 2004.

Next, the PSLRA provides that within ninety (90) days after publication of notice, the Court shall consider any motion made by a purported class member and shall appoint as lead plaintiff the "member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id.* § 78u-4(a)(3)(B). There is a rebuttable presumption that the "most adequate plaintiff" is

the person or group of persons that –

> (aa) has either filed the complaint or made a motion in response to [the statutorily mandated] notice . . .;
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u-4(a)(3)(B)(iii)(I). This presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff-(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II).

**B.    *Application to the Present Cases***

Plaintiffs in six of the above-referenced cases filed competing motions for appointment as lead plaintiff.   Upon review of the competing motions, the Stevens Group subsequently withdrew its application. The Dalia and Stewart Groups failed to file any opposition papers in response to the other applicants' motions and, thus, have presumably

8

withdrawn their applications as well.[3] Thus, the only three groups under consideration are the

NYCB Group, the Lee Group, and Dr. Schnapp.

All three groups have satisfied the first criterion necessary for a finding that it is

the most adequate plaintiff in that each has timely filed a motion in response to the notice of the

first filed action. *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa). The Court must then determine which group

holds the largest financial interest in the relief sought. *Id.* § 78u-4(a)(3)(B)(iii)(I)(bb).

All three groups have submitted affidavits along with their papers in support of

their respective claims of financial losses. The NYCB Group purchased or otherwise acquired

106,000 shares of NYCB stock, incurring an estimated loss of $905,647.65. (*See* Decl. of Peter

E. Seidman, dated Nov. 23, 2004, Exs. C and D.) The Lee Group purchased 57,116 shares of

NYCB stock during the class period and suffered estimated losses of $451,547. (*See* Decl. of

Aaron L. Brody, dated Nov. 23, 2004, Exs. B and C.) Finally, Dr. Schnapp acquired 59,432

shares of NYCB through the merger of NYCB and Roslyn and 780 shares through dividend

reinvestment for a total estimated loss of $605,520.[4] (*See* Decl. of William Berbarduci, dated

Nov. 23, 2004, Ex. B; Dr. Schnapp Reply Mem. at 2 n.3.) Thus, at first glance, the NYCB

Group appears to have sustained the largest financial loss. Both Dr. Schnapp and the Lee Group

advance several arguments, however, as to why the NYCB Group should be disqualified from

---

[3] The Dalia Group claimed a financial loss of $357,715.40 and the Stewart Group estimated its loss at $450,971.13. As will be discussed *infra*, because the Court finds that the NYCB Group, with an estimated loss of $905,647.65, has the largest financial interest in the relief sought, and satisfies the other requirements under the PSLRA, the Court finds that the NYCB Group is the most adequate plaintiff.

[4] Dr. Schnapp initially asserted a loss of $365,129, but later changed his loss based upon a revised calculation to allegedly reflect the methods used by the other movants. (Dr. Schnapp Mem. in Further Supp. at 1 n.1.)

lead plaintiff contention. The Court will address each one in turn.

### 1.  The Validity of the NYCB Group

Dr. Schnapp argues that the NYCB Group used an improper calculation in arriving at its estimated loss. Dr. Schnapp's argument, however, is based on his assertion that the NYCB Group is improperly comprised of two movants and that viewing each movant's loss separately, Dr. Schnapp's loss is greater than each individual movant. At this juncture, the Court need not resolve whether the approach used by the NYCB Group in estimating its financial loss is appropriate because as discussed below, the Court finds that the NYCB Group's inclusion of two distinct members is proper. Thus, under either method for calculating loss, the NYCB's loss, taken in the aggregate, is substantially greater than that of Dr. Schnapp.[5]

Dr. Schnapp argues that the NYCB Group is "nothing more than an amalgamation of unaffiliated and unrelated class members thrown together to try to artificially create the movant with the 'largest financial interest.'" (Dr. Schnapp Reply Mem. at 5.) The NYCB Group is comprised of an institutional movant, to wit, Metzler Investment, and an individual movant, to wit, Bernard Drucker.

The PSLRA states that the court "must appoint as lead plaintiff the *member or members* of the purported plaintiff class that the court determines to be most capable of

---

[5] The NYCB Group asserts its financial loss as totaling $905,647.65, based upon the "mean trading price" of its stock during the 90-day period beginning on the date on which the information correcting the misstatement or omission was disseminated to the market. 15 U.S.C. § 78u-4(e)(1). Dr. Schnapp contends that the NYCB Group erroneously performed this calculation based upon 90 *calendar* days, as opposed to 90 *trading* days, the latter of which excludes weekends and legal holidays. Thus, under Dr. Schnapp's method, the NYCB Group's loss, viewed in the aggregate, would actually be higher, at $1,010,580. (*See* Dr. Schnapp's Mem. in Further Supp. at 4.)

adequately representing the interests of class members," 15 U.S.C. § 78u-4(a)(3)(B) (emphasis

added), but does not specify whether the members must be related in some fashion in order to

qualify as an appropriate lead plaintiff group.  As recently articulated by Judge Scheindlin:

> Courts are divided on the issue. Two cases in the Southern District
> of New York forcefully assert that unrelated investors may not
> band together for the purpose of achieving lead plaintiff status,
> reasoning that investors with no prior relationship will not be as
> effective at controlling class counsel as would a single institutional
> entity. Other cases, comprising the majority view, hold that
> unrelated investors may aggregate under certain circumstances.
> One court even goes so far as to argue that "a greater number of
> plaintiffs allows them, as a group, to wield more control over
> counsel." For the most part, in the absence of explicit limits the
> lead plaintiff decision must be made on a case-by-case basis,
> taking account of the unique circumstances of each case.
> Generally, a lead plaintiff group should be held to a reasonable
> number, so that the group does not become too unwieldy. This
> logic eschews a hard-and-fast rule, instead adopting a rule of
> reason along with the general presumption that unrelated groups
> with more than five members are too large to work effectively.

*In re eSpeed, Inc. Sec. Litig.*, No. 05 Civ 2091, 2005 WL 1653933, at *2 (S.D.N.Y. July 13,

2005) (citations omitted).

Many courts have interpreted the PSLRA to favor institutional investors serving

as lead plaintiff. *See id.* ("An institutional investor with substantial losses functioning as lead

plaintiff is less likely to cause a flurry of otherwise pointless activity in the form of disputes

within the lead plaintiff group.") (citation and internal quotation marks omitted) (collecting

cases); *Dolan*, 2005 WL 883008, at *3 (stating that PSLRA was designed to encourage

institutional investors which have "significant holdings in issuers [and] whose interest are more

strongly aligned with the class of shareholders"). Here, given the PSLRA's preference for

institutional investors, and given that the NYCB Group consists of a manageable number of

11

members, the Court finds that the two member NYCB Group is a valid group under the PSLRA. *See In re Star Gas Sec. Litig.*, No. 04 Civ. 1766, 2005 WL 818617, at *5 (D. Conn. Apr. 8, 2005) ("The majority of courts considering the issue have taken an intermediate position, allowing a group of unrelated investors to serve as lead plaintiffs when it would be most beneficial to the class under the circumstances of a given case."); *Pirelli Armstrong Tire Corp. v. LaBranche & Co.*, No. 03 Civ. 8264, 2004 WL 1179311, at *22 (S.D.N.Y. May 27, 2004) (noting that a co-lead plaintiff structure will help to ensure that adequate resources and experience are available to the prospective class in the prosecution of the class action); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, No. 00 Civ. 152, 2000 WL 486956, at *3 (D. N.J. Apr. 24, 2000) (appointing three separate movants as co-lead plaintiffs and anticipating that each party would bring a unique perspective to the litigation); *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 45-46 (S.D.N.Y. 1998) (naming group of three unrelated individual investors as co-lead plaintiff with an institutional investor). Thus, viewing the NYCB Group's loss in the aggregate, it has the largest financial interest.

### 2.    The NYCB Group has Standing to Sue

Dr. Schnapp and the Lee Group contend that Metzler Investment, the institutional member of the NYCB Group, lacks standing to assert violations of the Exchange Act because it is merely an investment manager which did not purchase any NYCB stock for its own account but rather managed the investments of its clients' assets. "Generally, a client's grant of authority to an investment manager to purchase stock on his or her behalf does not also confer authority to commence suit on his or her behalf." *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003) (citing *Smith v. Suprema Specialties*, 206 F. Supp. 2d 627,

12

634-35 (D. N.J. 2002)). "However, when the investment advisor is also the attorney-in-fact for

its clients with unrestricted decision making authority, the investment advisor is considered the

'purchaser' under the federal securities laws with standing to sue in its own name." *Id.*; *see also*

*In re eSpeed, Inc. Sec. Litig.*, 2005 WL 1653933, at *1 ("In order for an investment advisor to

attain standing on behalf of investors[,] the transactions in question must have been executed as

if by a single person. Moreover, the advisor must be the attorney in fact for his clients, and he

must be granted both unrestricted decision-making authority and the specific right to recover on

behalf of his clients.") (citations omitted).

   Here, Metzler Investment has proffered the signed declaration of Marlies Pauly,

an authorized signatory of Metzler Investment, stating that Metzler Investment is a fund

management company that controls, manages, and is attorney-in-fact for each of its funds.

(Third Decl. of Peter E. Seidman, dated Dec. 15, 2004, Ex. B. ¶ 2.) The declaration further avers

that:

> Metzler [Investment] is also contractually authorized to undertake
> and act on behalf of these funds in any legal action on their behalf,
> including serving as lead plaintiff in this action. These funds'
> respective shareholders have each entered into a contract with
> Metzler [Investment] explicitly authorizing Metzler [Investment]
> to control all investments and to commence litigation on behalf of
> the funds. Accordingly, Metzler [Investment] has full and
> complete authority and discretion to purchase and sell securities
> for each of these funds, and to institute legal action on their behalf,
> including serving as lead plaintiff in this action.

(*Id.* ¶ 4.) Metzler Investment also submits a portion of the contracts it entered into with each of

the shareholders of the funds, which provides that Metzler Investment "is authorized to purchase

assets with the money invested by the shareholders, to sell those assets and to otherwise invest

the proceeds; it is further authorized to take all legal actions that arise from the management of

the assets." (*Id.* Ex. D and attachments thereto.)  Based on this proffer, the Court finds that

Metzler Investment has demonstrated that it has complete investment authority over its trades

and is agent and attorney-in-fact with full power and authority to act in connection with its

investments.  Thus, the Court finds that Metzler Investment does have standing to prosecute its

Exchange Act claims asserted here.

### 3.    *Applying the Requirements of Rule 23*

Having established that the NYCB Group has the greatest financial loss, and is

not otherwise disqualified from serving as lead plaintiff, the next question is whether the NYCB

Group "otherwise meets the requirements of Rule 23(a)."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

Rule 23(a) sets forth four prerequisites to be considered in evaluating the propriety of class

certification, to wit, numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

Only the typicality and adequacy criterions are relevant to the selection of lead plaintiff. *See*

*Dolan*, 2005 WL 883008, at *4; *In re eSpeed, Inc. Sec. Litig.*, 2005 WL 1653933, at *5.

Typicality is satisfied where the claims arise from the same course of events and

each class member makes similar legal arguments to prove the defendant's liability. *See, e.g.,*

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).  The NYCB

Group easily meets this requirement because the NYCB Group, like the other purported class

members in this action, alleges that it purchased or otherwise acquired NYCB stock during the

class period and was injured by false and misleading representations made by defendants in

violation of both the Exchange Act *and* the Securities Act.  Because the NYCB Group consists

of both a movant who acquired his shares of NYCB stock through NYCB's merger with Roslyn

*and* a movant who acquired its shares through the open market, all available legal theories are

14

represented. Although the Stevens Group suggests that the Court appoint two separate lead plaintiffs with separate counsel – one for the claims arising out of the Securities Act and one for the claims arising out of the Exchange Act[6]– the Court declines to do so. This argument is based on the premise that the two movants who make up the NYCB Group do not *individually* possess the greatest financial loss. As discussed previously, however, the Court has already found the NYCB Group to be a valid group which may be viewed in the aggregate. Moreover, as the parties concede, there is no precedent under which the Court is required to appoint separate lead plaintiffs for different claims, *cf. Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) (stating that the PSLRA does not require district to choose lead plaintiff with standing to sue on every available cause of action), and there has been no showing that the NYCB Group, the presumptive lead plaintiff, cannot vigorously pursue both claims. The NYCB Group therefore meets the Rule 23 typicality requirement for purposes of the lead plaintiff inquiry.

The NYCB Group also meets the Rule 23 requirement that the lead plaintiff have the capacity to adequately represent the class. The adequacy requirement is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 2005 WL 1653933, at *5 (citing *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 121 (S.D.N.Y. 2002) (considering adequacy in the lead plaintiff appointment context)). The NYCB Group's counsel, Milberg Weiss Bershad & Schulman LLP, has extensive experience litigating securities class actions and, therefore, has the ability to conduct the litigation effectively.

---

[6]  (*See* Stevens and Feil Response at 2-4; Dr. Schnapp Reply at 6-8.)

15

Moreover, there is no evidence to suggest that the members of the NYCB Group have interests that are antagonistic to each other or to other members of the putative class. Finally, the NYCB Group has already displayed a willingness to vigorously pursue its claims and has enough of an interest in the outcome of the litigation to ensure that it will continue to do so. Thus, the NYCB Group is an adequate class representative.

Thus, because the NYCB Group has satisfied the three prong test of the PSLRA, to wit, the NYCB Group has submitted a timely motion requesting to be named lead plaintiff, it is the entity with the greatest financial interest in the relief sought by the class, and otherwise meets the requirements of Rule 23(a), the NYCB Group is presumptively the most adequate plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). To rebut this presumption, as noted previously, the other movants must offer proof that the NYCB plaintiffs "will not fairly and adequately protect the interests of the class; or [are] subject to unique defenses that render [them] incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II). They have failed to do so. Accordingly, the Court appoints the NYCB Group as lead plaintiff.

### III.    *Motions for Selection of Lead Counsel*

The NYCB Group further moves to designate Milberg Weiss Bershad & Schulman LLP as lead counsel. The PSLRA provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel." 15 U.S.C. § 78u-4(a)(3)(B)(v). Resumes submitted by the firm indicate that it has successfully prosecuted numerous securities fraud class actions and is otherwise well qualified and free of conflicts. Accordingly, the Court appoints Milberg Weiss Bershad & Schulman LLP as lead counsel.

## CONCLUSION

For the foregoing reasons, the motion by the NYCB Group is granted in its entirety. The Court appoints the NYCB Group as lead plaintiff and Milberg Weiss Bershad & Schulman LLP as lead counsel. The other applicants' motions are granted to the extent they seek consolidation but are otherwise denied. The NYCB Group shall serve and file a consolidated complaint within thirty (30) days of this Order.

The actions are hereby consolidated under the caption "In re New York Community Bancorp, Inc. Securities Litigation." All relevant documents and submissions shall be maintained as one file under case number 04 CV 4165. The Clerk of the Court is hereby directed to close the other ten actions.

**SO ORDERED.**

Central Islip, N.Y.
August 9, 2005

/s_____
Denis R. Hurley,
United States District Judge

17

# EXHIBIT F-4A

BUCHWALD S.

USDC SDNY
DOCUMENT
ELECTRONIC ...
DOC #: _____
DATE FILED: 6/27/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHNNY COX, on behalf of himself and          )
all others similarly situated,                )
                                              )
                          Plaintiff,          )
                                              )
            v.                                )    Civil Action No. 1:05-CV-2637 (NRB)
                                              )
DELPHI CORPORATION (F/K/A DELPHI              )
AUTOMOTIVE SYSTEMS), J.T.                     )
BATTENBERG, III, ALAN S. DAWES,               )
PAUL R. FREE, and JOHN SHEEHAN,               )
                                              )
                          Defendants.         )

THOMAS MORRISON, on behalf of                 )
himself and all others similarly situated,    )
                                              )
                          Plaintiff,          )
                                              )
            v.                                )    Civil Action No. 1:05-CV-2656 (NRB)
                                              )
DELPHI CORPORATION, J.T.                       )
BATTENBERG, III, RODNEY O=NEAL,               )
ALAN S. DAWES, and JOHN G.                    )
BLAHNIK,                                       )
                                              )
                          Defendants.         )

[Captions continued on next page]


STIPULATION AND [~~PROPOSED~~] ORDER REGARDING APPOINTMENT OF LEAD
PLAINTIFFS AND APPROVAL OF LEAD PLAINTIFFS' SELECTION OF LEAD
COUNSEL

ROBERT HILLMAN, on behalf of himself )
and all others similarly situated, )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )     Civil Action No. 1:05-CV-2732 (NRB)
                                    )
DELPHI CORPORATION, J.T.            )
BATTENBERG, III, ALAN S. DAWES,     )
PAUL R. FREE, and JOHN D. SHEEHAN,  )
                                    )
                    Defendants.     )
                                    )

CORINNE C. OREM, on behalf of herself )
and all others similarly situated,  )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )     Civil Action No. 1:05-CV-2854 (NRB)
                                    )
DELPHI CORPORATION, J.T.            )
BATTENBERG, III, RODNEY O=NEAL,     )
ALAN S. DAWES, and JOHN G.          )
BLAHNIK,                            )
                                    )
                    Defendants.     )

VANESSA JONES, individually and on  )
behalf of all others similarly situated, )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )     Civil Action No. 1:05-CV-3323 (BSJ)
                                    )
DELPHI CORPORATION, J.T.            )
BATTENBERG, III, RODNEY O=NEAL,     )
ALAN S. DAWES, and JOHN G.          )
BLAHNIK,                            )
                                    )
                    Defendants.     )

[Captions continued on next page]

IRA GAINES, on behalf of himself and all ) others similarly situated, )
                                   )
                Plaintiff, )
                                   )
         v. )       Civil Action No. 1:05-CV-3439 (BSJ)
                                   )
DELPHI CORPORATION, J.T. )
BATTENBERG, III, ALAN S. DAWES, )
PAUL R. FREE, and JOHN D. SHEEHAN, )
                                   )
             Defendants. )
                                   )

POLICEMEN'S ANNUITY & BENEFIT )
FUND OF CHICAGO, on behalf of itself )
and all others similarly situated, )
                                   )
                Plaintiff, )      Civil Action No. 1:05-CV-4476 (UA)
         v. )
                                     )
DELPHI CORPORATION, JOHN D. )
SHEEHAN, J.T. BATTENBERG, III, )
ALAN S. DAWES, and PAUL R. FREE, )
                                   )
             Defendants. )

WHEREAS, on March 7, 2005, the first captioned class action complaint (*Cox v. Delphi Corp. (f/k/a Delphi Automotive Systems, LLC), et al.*, No. 1:05-CV-2637 (NRB)) alleging violations of federal securities laws was filed in the United States District Court for the Southern District of New York;

WHEREAS, twelve related complaints were subsequently filed. Six of those complaints were filed in the United States District Court for the Southern District of New York (*Morrison v. Delphi Corp., et al.*, No. 1:05-CV-2656 (NRB); *Hillman v. Delphi Corp., et al.* No. 1:05-CV-2732 (NRB); *Orem v. Delphi Corp., et al.*, No. 1:05-2854 (NRB); *Jones v. Delphi Corp., et al.*, No. 1:05-CV-3323 (BSJ); *Gaines v. Delphi Corp., et al.*, No. 1:05-CV-3439 (BSJ); and *Policemen's Annuity & Benefit Fund of Chicago v. Delphi Corp., et al.*, No. 1:05-CV-4476 (UA)) and six of those complaints were filed in the United States District Court for the Eastern District of Michigan (*Priest v. Delphi Corp., et al.*, No. 05-CV-70907-DPH-VMM; *City of Delray Beach Police and Firefighters Ret. Sys. v. Delphi Corp., et al.*, No. 05-CV-70945-DPH-VMM; *Karlin v. Delphi Corp., et al.*, No. 05-CV-70952-DPH-VMM; *Bennett v. Delphi Corp. (f/k/a Delphi Automotive Systems), et al.*, No. 05-CV-71157-VAR-MKM; *Raphael v. Delphi Corp., et al.*, No. 05-CV-71238-DPH-VMM; and *Police and Fire Ret. Sys. of the City of Detroit v. Delphi Corp., et al.*, No. 05-CV-60102-JCO-WC.) (All thirteen of the above actions shall be referred to collectively as the "Actions");

WHEREAS, on March 7, 2005, pursuant to Section 21D(a)(3)(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(A), notice was published which informed class members of their right to seek appointment as lead plaintiff;

WHEREAS, on May 6, 2005, putative class members Teachers' Retirement System of Oklahoma ("OTRS"), Oklahoma Law Enforcement Retirement System ("OLERS"), Public

Employees' Retirement System of Mississippi ("Mississippi PERS"), and San Diego City Employees' Retirement System ("SDCERS") (collectively, the "Public Pension Fund Group") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Bernstein Litowitz Berger & Grossmann LLP and Nix, Patterson & Roach, L.L.P. as lead counsel;

WHEREAS, on May 6, 2005, putative class members Nextra Investment Management S.G.R. S.p.A. on behalf of the NIS US Equities Fund, the Nextra Azioni Beni Di Consumo Fund, the Nextra Azioni Nord America Fund, the Primavera Trading Azioni Nord America Fund, and the Nextra Azioni Nord America Dinamico Fund (collectively, "Nextra") and Raiffeisen Kapitalanlage-Gesellschaft m.b.H. ("Raiffeisen") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Schiffrin & Barroway, LLP as lead counsel;

WHEREAS, on May 6, 2005, putative class member Stichting Pensioenfonds ABP ("ABP") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Grant & Eisenhofer, P.A. as lead counsel;

WHEREAS, on May 6, 2005, putative class member Secure Trading Group, Inc. ("STG") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Entwistle & Cappucci, LLP as lead counsel;

WHEREAS, on May 6, 2005, putative class members Illinois State Board of Investment ("ISBI") and State Universities Retirement System of Illinois ("SURS") (collectively, the "Illinois Funds") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Berman DeValerio Pease Tabacco Burt &

Pucillo as lead counsel;[1]

WHEREAS, on May 6, 2005, putative class members International Union of Painters and Allied Trades Industry Pension Fund, National Roofing Industry Pension Fund, and California Ironworkers Field Trust Funds (collectively, the "Institutional Funds") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP as lead counsel;

WHEREAS, on May 6, 2005, putative class members Metzler GmbH, Activest Investmentgesellschaft mbH, and Amalgamated Bank as Trustee of the Longview Collective Investment, Longview Quantitative FD-Prude and Longview VEBA 500 Funds (collectively, the "Institutional Investor Group") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Milberg Weiss Bershad & Schulman, LLP as lead counsel;

WHEREAS, on May 6, 2005, putative class member Police and Fire Retirement System of the City of Detroit ("Detroit") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Kirby McInerney & Squire, LLP as lead counsel;[2]

WHEREAS, on May 6, 2005, putative class member Government Employees' Retirement System of the Virgin Islands timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Barrack Rodos & Bacine as lead counsel;

WHEREAS, on May 6, 2005, putative class member Policemen's Annuity & Benefit

---

[1]  Subsequently, on May 17, 2005, SURS withdrew its application for appointment as lead plaintiff.

[2]  Subsequently, on May 23, 2005, Detroit withdrew its application for appointment as lead plaintiff.

Fund of Chicago timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Much Shelist Freed Denenberg Ament & Rubenstein, P.C. as lead counsel;

WHEREAS, on May 6, 2005, putative class members Louisiana District Attorneys' Retirement System ("LADARS"), Richard Cameron ("Cameron"), Bruce Chernofsky and Samuel & Harriet Chernofsky (the "Chernofsky Family") timely moved this Court, pursuant to Section 21(D)(a)(3) of the Exchange Act, for appointment as lead plaintiff and for approval of Pomerantz Haudek Block Grossman & Gross, LLP as lead counsel;

WHEREAS, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Court is to presume that the "most adequate plaintiff" is the person or group of persons who, "in the determination of the court has the largest financial interest in the relief sought by the class;"

WHEREAS, pursuant to the PSLRA, the lead plaintiff is vested with authority to select and retain lead counsel, subject to Court approval;

WHEREAS, OTRS, Mississippi PERS, ABP and Raiffeisen independently determined that it would be in the best interests of the Class to prosecute the Actions jointly as Lead Plaintiffs, with their respective law firms, Nix, Patterson & Roach, L.L.P., Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer, P.A., and Schiffrin & Barroway, LLP, serving as Lead Counsel for the Class;

WHEREAS, OTRS, Mississippi PERS, ABP and Raiffeisen, whether taken independently of one another or together, have the largest loss of all other persons who filed motions seeking appointment as lead plaintiff;

WHEREAS, counsel for STG, the Police and Fire Retirement System of the City of Detroit, the Government Employees' Retirement System of the Virgin Islands, the Policemen's Annuity & Benefit Fund of Chicago, LADARS, Cameron and the Chernofsky Family have represented to counsel for OTRS, Mississippi PERS, ABP and Raiffeisen that they either support or do not oppose the appointment of OTRS, Mississippi PERS, ABP and Raiffeisen as Lead Plaintiffs for the Class and their choice of Lead Counsel for the Class; and

WHEREAS, counsel for the ISBI have represented to counsel for OTRS, Mississippi PERS, ABP and Raiffeisen that ISBI does not take any position on this matter.

IT IS HEREBY STIPULATED AND AGREED, by OTRS, Mississippi PERS, ABP and Raiffeisen through their undersigned counsel as follows:

1.      OTRS, Mississippi PERS, ABP and Raiffeisen shall, subject to the approval of the Court, be appointed Lead Plaintiffs pursuant to Section 21(D)(a)(3) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B) in the Actions and all related actions consolidated herewith; and

2.      Lead Plaintiffs' selection of the law firms of Nix, Patterson & Roach, L.L.P., Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer, P.A., and Schiffrin & Barroway, LLP shall, subject to the approval of the Court, be approved as Lead Counsel for the Class pursuant to Section 21(D)(a)(3)(B)(v) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B)(v).

Respectfully submitted,

NIX, PATTERSON & ROACH, L.L.P.

Dated: May 23, 2005                   By:  *Bradley Beckworth/JKC*

Bradley E. Beckworth
Jeffrey J. Angelovich
Susan Whatley
205 Linda Drive
Daingerfield, TX 75638
Telephone:    (903) 645-7333
Facsimile:    (903) 645-4415

*Counsel for OTRS and Proposed Lead Counsel*

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

Dated: May 23, 2005                   By:  *Gerald Silk/JKC*

Douglas M. McKeige
Gerald H. Silk
Jai K. Chandrasekhar
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400
Facsimile:    (212) 554-1444

*Counsel for Mississippi PERS and
Proposed Lead Counsel*

GRANT & EISENHOFER, P.A.

Dated: May 23, 2005                   By:  *Jay Eisenhofer/JKC*

Jay W. Eisenhofer
Sidney S. Liebesman
James L. Sabella
45 Rockefeller Center
650 Fifth Avenue
New York, NY 10111
Telephone:    (212) 755-6501
Facsimile:    (212) 755-6503

- and -

Geoffrey C. Jarvis
Sharan Nirmul
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:   (302) 622-7000
Facsimile:    (302) 622-7100

*Counsel for ABP and Proposed Lead Counsel*

**SCHIFFRIN & BARROWAY, LLP**

Dated: May 23, 2005          By: _Stuart Berman / QKC_
Richard S. Schiffrin
Stuart L. Berman
Darren J. Cheek
Sean M. Handler
Robin Winchester
280 King of Prussia Road
Radnor, PA 19087
Telephone:   (610) 667-7056
Facsimile:    (610) 667-7706

*Counsel for Raiffeisen and*
*Proposed Lead Counsel*

**IT IS SO ORDERED:**

Dated: _June 27, 2005_          _[signature]_
The Honorable Naomi Reice Buchwald, U.S.D.J.

1
2
3
4
5
6              IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10   IN RE SIPEX CORPORATION                No. C 05-00392 WHA
     SECURITIES LITIGATION
11                                          ORDER APPOINTING LEAD
                                    /       PLAINTIFFS GLOBIS CAPITAL
12                                          PARTNERS LP AND SHAYE
     AND CONSOLIDATED CASES                 HIRSCH
13                                  /
14
15                          INTRODUCTION

16          Pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA),

17   Pub. L. No. 104–67, 109 Stat. 737 (codified as additions and amendments to 15 U.S.C. 77–78

18   and 18 U.S.C. 1964), this order appoints Globis Capital Partners LP and Shaye Hirsch as the

19   lead plaintiffs for two cases previously consolidated as the above-named action.  The

20   consolidated actions involve securities fraud.  This order sets forth the criteria for selection and

21   approval of lead plaintiff and also sets forth the procedure that will be used for the selection and

22   approval of class counsel.

23                              FACTS

24          These consolidated class actions arise from the alleged financial misrepresentation by

25   Sipex Corporation.  Sipex designs, manufactures and markets semiconductors that are used by

26   original equipment manufacturers in the computing, consumer electronics, communications and

27   networking infrastructure markets (Jacobson Compl. ¶ 2).  During the alleged class period,

28   Sipex reported positive results in its SEC filings (*id.* ¶ 3).[1]  In publically disseminated press

_____

[1]  The alleged class period is April 10, 2003, through and including January 20, 2005.

United States District Court
For the Northern District of California

1   releases, the company attributed the results to increased semiconductor sales and cost savings

2   resulting from restructuring its operations (*ibid*). On January 20, 2005, after the market closed,

3   Sipex issued a press release announcing that it might need to restate its reported financial

4   statements for fiscal year 2003 and for the first three quarters of fiscal year 2004 due to possible

5   "improper recognition of revenue" and that the company's audit committee and board of

6   directors had commenced an internal investigation of the matter (*id.* ¶ 4). As a result of the

7   investigation, Sipex stated that it would not be able to file its 2004 annual report with the SEC

8   on time (*ibid.*). In reaction to this news, the price of Sipex common stock dropped 23% from its

9   previous trading day's closing price (*ibid*).

10      Four class actions were filed.[2] Plaintiffs named Sipex corporation and its officers,

11   Douglas M. McBurnie, Walid Maghribi, Phillip Kagel and Clyde Ray Wallin as defendants.

12   The complaints alleged that defendants violated Section 10(b) and 20(a) of the Securities

13   Exchange Act of 1934 and Rule 10b-5, promulgated thereunder, by making allegedly false and

14   misleading statements, causing plaintiffs to purchase Sipex securities at artificially inflated

15   prices.

16      Initially, there were several competing movants for the position of lead plaintiff:

17   Walter Bednarszyk and James T. Collier, Roy and Margaret Gentles, the "Young Group" that

18   included six individuals and the "Globis Group" that included Globis Capital Partner LP and

19   Shaye Hirsch. Before the hearing on the appointment of lead plaintiff, the Court requested each

20   lead plaintiff to complete a questionnaire. The Court's questionnaire alerted movants that it

21   would evaluate the qualifications of single investors, not groups, as lead plaintiffs. The Court's

22   questions focused on the qualifications of the lead plaintiff, their experience in managing

23   litigation, potential conflicts and transactions related to the instant securities case. The Court

24   received back two questionnaires, one from Paul Packer, on behalf of Globis Capital Partners

25

26

27      [2] Initially the following five related actions were filed: *Barbara Keller v. Sipex*, C05-00331 WHA,
     *Coil Partners, LLC v. Sipex*, C05-00392 WHA, *Levy v. Sipex*, C05-00505 WHA and *Alfred H. Jacobson v.*

28   *Sipex*, C05-00712 WHA. Eventually, all the actions voluntarily dismissed except for *Coil Partners, LLC v.
     Sipex* and *Alfred H. Jacobson v. Sipex*. They were consolidated into this action.

2

United States District Court
For the Northern District of California

1   LP, and one from Shaye Hirsch. None of the other movants returned questionnaires.

2   Subsequently, the Gentiles moved for withdrawal of appointment as lead plaintiff.

3       The Court held a hearing on the appointment of lead plaintiff on May 12, 2005. The

4   only candidates present were Mr. Packer, on behalf of Globis, and Mr. Hirsch. The Court

5   questioned both plaintiffs on their qualifications, experience and financial loss.

6       Mr. Packer is the managing member of Globis Capital Partners LP, a hedge fund that

7   deals with small and mid-cap-value companies. He has previous experience as a lead-plaintiff.

8   Before the alleged class period he held 520,570 shares of Sipex stock. During the alleged class

9   period he purchased 1,110,086 shares of stock and sold 1,201,229 shares of stock. Despite

10  being a net seller during the alleged class period, Globis' alleged estimated loss is $725,857, a

11  point discussed below. Mr. Hirsch is an individual investor. During the alleged class period he

12  bought $7,000 shares. He estimates his total loss to be between $20,000 and $25,000. Globis

13  and Mr. Hirsch asked the Court to appoint them as joint lead-plaintiffs. Mr. Packer and Mr.

14  Hirsch are friends and their families have known each other for many years. Each had seen the

15  published notice of the class action and had contacted the law firm of Bernstein Liebhard &

16  Lipshitz LLP. The firm represents Mr. Packer in other matters and Mr. Hirsch had a personal

17  relationship with a partner at the firm.

18      At the hearing, the Court noted that Globis appears to have been a net seller and asked

19  counsel to provide the Court with supplemental briefing as to whether defendants would assert

20  at class certification that Globis is not an appropriate class representative. The defendants and

21  Globis provided the Court with supplemental briefing. Defendants' position is that Globis,

22  being a net seller, profited from the alleged stock price inflation and therefore is not

23  representative of a typical and adequate plaintiff in this class action. Globis' position is that it

24  is an adequate and typical lead plaintiff in this class action if one calculates financial loss using

25  a "first-in/first-out" (FIFO) method of accounting. This issue is addressed in depth below.

26      After the hearing, three of the fives cases were voluntarily dismissed and the Court

27  issued an order consolidating the remaining two actions. The following two actions were

28

United States District Court
For the Northern District of California

3

1  consolidated into the present case: *Coil Partners, LLC v. Sipex*, C05-00392 WHA and *Alfred*

2  *H. Jacobson v. Sipex*, C05-00712 WHA.

3                                              ANALYSIS

4          The PSLRA seeks to place a real investor, not a lawyer, in charge of the litigation on

5  behalf of the class. This statutory responsibility now resides in what the PSLRA calls the "lead

6  plaintiff." This representative acts as a fiduciary for all members of the proposed class and

7  must provide fair and adequate representation and management to obtain the largest recovery

8  for the proposed class consistent with good faith and meritorious advocacy.

9          The PSLRA provides that the Court "shall appoint as lead plaintiff the member or

10  members of the purported plaintiff class that the court determines to be the most capable of

11  adequately representing the interests of the class members in accordance with this

12  subparagraph." 15 U.S.C. § 78u-4(a)(3)(B)(I). The Act creates a rebuttable presumption that

13  the most adequate plaintiff should be the plaintiff who: (1) has brought the motion for

14  appointment of lead counsel in response to the publication of notice; (2) has the "largest

15  financial interest" in the relief sought by the class; and (3) otherwise satisfies the requirements

16  of FRCP 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc). The above presumption may be

17  rebutted only upon proof that the presumptive lead plaintiff (1) will not fairly and adequately

18  protect the interests of the class or (2) is subject to "unique defenses" that render such plaintiff

19  incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)–(bb).

20          The PSLRA does not provide any guidance concerning the method of calculating which

21  plaintiff has the "largest financial interest." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Courts

22  in this district have equated "largest financial interest" with the amount of potential recovery.

23  *See In Re Critical Path, Inc. Sec Litig.*, 156 F. Supp. 2d 1102, 1107–08 (N.D. Cal 2001); *In Re*

24  *Network Assocs., Inc. Sec. Litig.*, 76 F. Supp.2d 1017, 1030 (N. D. Cal. 1999); *Weisz v. Calpine*

25  *Corp.*, 2002 WL 32818827, *5 (N.D. Cal 2002). In determining which lead plaintiff has

26  suffered the greatest loss under the PSLRA, the law regulating securities losses must be

27  reviewed in part, a discussion that will presently include the issue of the "first-in/first-out"

28  (FIFO) and "last-in/first-out" (LIFO) methods.

United States District Court
For the Northern District of California

4

1    Under the purchaser-seller rule, only purchasers who actually buy or sellers who

2   actually sell in reliance on fraud may sue. Those who simply refrain from buying or selling,

3   even if in reliance on fraud, may not sue. *Blue Chip Stamps et al. v. Manor Drug Stores*, 421

4   U.S. 723, 731–755 (1975). The class period begins when the market was first defrauded. It

5   ends on the date when the truth was fully revealed or when the misinformation became too stale

6   to matter. Those defrauded in between can sue. Once the full truth comes out, an investor

7   electing to keep the stock and gamble on the future events cannot sue for future losses.

8   Otherwise, securities manipulators would become guarantors of a floor market price — even

9   after their manipulations had run their course. *See, e.g., SEC v. Shapiro*, 494 F.2d 1301, 1309

10  (2nd Cir. 1979).

11    The rule of loss causation, in the typical case, requires that the purchaser prove that

12  when the truth came out, the stock price dropped and did so by reason of the exposure of the

13  fraud rather than by reason of industry-wide down trends or other negative factors.

14  *Dura Pharmaceuticals, Inc., v. Michael Brudo*, ___ U. S. ___, 125 S. Ct. 1627, 1631 (2005).

15  Put another way, it is not enough to show that at the time of the purchase, the misrepresentation

16  had created a so-called "fraud premium," *i.e.*, that had the truth been known at the time of

17  purchase, the market price would have been lower. Rather than focusing on the time of the

18  *purchase*, we must, for damages purposes, focus on the time of the *sale* and determine the

19  extent to which revelation of fraud depressed the price as of the sale date. To be more precise,

20  the key inquiry is to isolate the extent of misrepresentations (originally inducing the purchase)

21  that became known during the time the shares were held and then to determine the contributory

22  and cumulative effect of those revelations on the price as of the date of sale, the date of sale

23  being the date of an actual sale within the class period or, constructively, the end of the class

24  period for all shares held to the end.

25    Suppose a share is purchased for $100 in reliance on an actionable misrepresentation.

26  The entire truth then suddenly comes out. The share price immediately drops $60. The only

27  reason for the plunge is the revelation. The entire $60 is recoverable.

28

United States District Court

For the Northern District of California

5

United States District Court

For the Northern District of California

1        What happens, however, if the defrauded investor sells before the end of the class

2    period? In the case of a purchaser (within the class period) who sells *before any* of the truth is

3    revealed, of course, recovery might be doubtful. This is because the market has absorbed the

4    misinformation and imposed a fraud premium on both the purchase and sale. Often the fraud

5    premium will be the same in each case, thus cancelling the loss. In the case of a purchaser

6    (within the class period) who sells immediately after a partial revelation of the truth with a

7    resultant plunge in the stock price, the critical inquiry, again, is the extent to which the partial

8    revelation has depressed the price as of the date of the sale. Again, the focus is not on the fraud

9    premium on the day of purchase. The focus must be on the day of sale and on the contribution

10    to the loss due to the partial revelation of fraud.

11        Turning now to a scenario closer to our immediate case, what happens when an investor

12    already owns some shares going into the class period and/or trades actively within the class

13    period? When an investor already owns shares at the outset of the class period and sells them

14    during the class period, the investor actually profits from the fraud by recovering a fraud

15    premium over and above the true value of the shares. When the same investor already holds

16    shares at the outset of the class period but, in addition, buys and sells shares during the class

17    period, the gains received must be used to reduce the losses incurred. Otherwise, the investor

18    would reap a windfall.

19        Over the course of the class period, there are two items needed for this calculus. One

20    may be called the "loss-causation contribution." This is the contribution made to the overall

21    loss by revelation of fraud between the dates of the purchase and sale. This item is relevant to

22    recoverable damages as set forth by the Supreme Court. *See Dura Pharm. Inc.,* 125 S. Ct. at

23    1631–2. The other is the "fraud premium," *i.e.,* the extent to which the price remains inflated

24    due to unrevealed fraud. The second item is relevant to the offsetting of windfall for shares sold

25    during the class period.

26        The LIFO/FIFO issue arises, among other scenarios, when a trader has an inventory of

27    the shares in question going into the class period and trades during the class period, as here.

28    Suppose one share is owned going into the class period, another share is then bought in reliance

<div style="writing-mode: vertical">United States District Court<br>For the Northern District of California</div>

1  on the fraud, one share is then sold midway through the class period and, finally, one share is

2  sold at the end of the class period. Recovery is allowable, of course, only for the share

3  purchased during the class period. But which share was sold when? Under FIFO, the

4  previously-held (non-actionable) share would be the first sold share. The fraud-induced

5  (actionable) share would be the last. Under LIFO, it would be the opposite. In doing the math

6  for the recoverable loss and the offsetting windfall, it would be necessary to determine the fraud

7  premium and loss-causation contribution. Depending on which of the two sales is deemed to be

8  actionable, these calculations will vary.[3]

9       The FIFO method would dictate that the actionable purchase was sold later. That loss

10  would be offset by a windfall of any fraud premium received on the first sale. The LIFO

11  method would dictate that the actionable purchase was sold first. There would be no windfall

12  on the later sale since, by definition, any fraud premium will always completely be eliminated

13  by the end of the class period. This, plus the fact that the recoverable loss will often be less

14  during the mid-range of the class period explains why defendants prefer the LIFO method and

15  plaintiffs prefer the FIFO, although this preference can be reversed in particular cases.

16       In the Court's view, LIFO is closer to the economic realities of market investing and the

17  purposes of the securities acts. If a trader buys and sells the same number of shares of the same

18  issue, on the same day, the economic reality of the basic investment decision is a net of one

19  against the other, *i.e.*, no change in position, at least as of the end of the day. Put differently, if

20  a trader buys and sells shares of the same issue over a brief period, the trader is relying on the

21  same basic market analysis and same market information. If a fraudulent misrepresentation has

22  affected the market, it has affected *both* sides of the equation. The LIFO method better tracks

23  the impact of investment decisions and how market fraud impacts them. This is at the core of

24  the securities acts. So, this Court will follow a LIFO convention for investors who both buy and

25  sell within the class period.

26

27  _____

28      [3] This Court expresses no opinion on the scenario in which the stock price goes up during the class
period in the presence of fraud but where the stock price would have gone up even in absence of the fraud. *See*
*Dura Pharm., Inc.*, 125 S. Ct. at 1632.

<div align="center">7</div>

1    This conclusion is in accordance with the weight of authority. *See, e.g., In re McKesson*

2    *HBOC, Inc. Sec. Litig.,* 97 F. Supp. 2d 993, 996 fn.2 (N. D. Cal. 1999); *In re Network Assoc.*

3    *Inc. Sec. Litig.,* 76 Supp. 2d 1017, 1027 (N.D. Cal. 1999); *Weisz v. Calpine Corp.,* 2002 WL

4    32818827, \*7 (N.D. Cal 2002); *In re Clearly Canadian Sec. Litig.,* 1999 U.S. Dist. LEXIS

5    14273, \*12–14 (N.D. Cal. 1999); *In re Comdisco Sec. Litig.,* 150 F. Supp. 2d 943, 945 (N.D. Ill.

6    2001).

7    At the May 12, 2005 hearing, counsel for Globis relied on an unpublished decision,

8    *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,* 2004 U.S. Dist. LEXIS

9    27008 (N.D. Cal. 2004), that cites *Broudo v. Dura Pharmaceuticals Inc.,* 339 F.3d 933, 938

10   (9th Cir. 2003), for the proposition that damages may be proved by simply showing that

11   plaintiffs purchased stock at an inflated price. As discussed, *Broudo* has been subsequently

12   overturned by *Dura Pharmaceuticals, Inc. v. Michael Broudo,* 125 S. Ct. 1627, 1631 (2005). In

13   its supplemental briefing, Globis cited published cases that used FIFO as an accounting

14   methodology for determining financial losses and several unpublished cases. *See e.g. Chill v.*

15   *Green Tree Financial Corp.,* 181 F.R.D. 398, 411 (D. Minn 1998); *Vansguard v. Ariba, Inc.,*

16   C-03-00277 JF, slip op. (N.D. Cal. 2003). These cites, however, are not helpful. While the

17   courts accepted the calculation of damages based on FIFO, they did not arrive at the application

18   of FIFO after a reasoned discussion of the merits. It was merely a background fact.

19   Since Globis, an active trader, was a net *seller* throughout the class period, there is a

20   plausible chance that Globis will have no net recovery. This is not yet certain, however,

21   because the necessary calculations are unknowable at this early stage. Only with the benefit of

22   expert evidence could the necessary items be determined and then netted. For the time being,

23   Globis has a sufficient stake to be appointed as one of two lead plaintiffs. Because the net loss

24   is speculative for Globis at this point and because Globis may eventually be shown to have no

25   net loss, Mr. Hirsch will be made a co-lead plaintiff. This ruling is without prejudice to defense

26   arguments to be made later, on the class certification motion. The same is true for the other

27   Rule 23 issues raised by the defense. (No other competing lead plaintiff is challenging the Rule

28   23 qualifications of the pending candidates).

8

### RESPONSIBILITIES OF LEAD PLAINTIFF

1      The lead plaintiffs must take affirmative steps to keep themselves informed at all times
2 of the progress and status of the case, the strengths and weaknesses of the case, the prospects for
3 settlement, and the resources invested in the suit or proposed to be invested.  With respect to
4 each major litigation event, such as important motions, settlement discussions, trial, and trial
5 preparation, the lead plaintiffs must actively inform themselves in advance and shall have the
6 authority and responsibility to direct counsel, after, of course, receiving the advice of counsel.
7 The lead plaintiffs must consult with counsel in advance to determine whether major tasks
8 proposed by counsel are likely to add more value to the case than would be incurred in time and
9 expense.  The lead plaintiffs shall meet in person with lead trial counsel at least quarterly to
10 review the progress and status of the case, shall attend all major hearings and mediation
11 sessions and shall, at a minimum, attend all sessions of the trial where the jury is present.  And,
12 of course, the lead plaintiff must give testimony.  No settlement will be approved by the Court
13 without the lead plaintiffs' careful recommendation in favor of it.  Reasonable travel, telephone
14 and business expenses incurred as a result of the lead plaintiff duties, if detailed and itemized,
15 may be reimbursed as expenses from any recovery.
16      Appended to this order are two forms of certification which Mr. Hirsch and Mr. Packer,
17 on behalf of Globis Partners LLP, individually, must sign, file and serve on or before
18 JUNE 1, 2005, in order to complete the appointment, obligating themselves to carry out the
19 responsibilities as lead counsel and the procedure for selecting and approving class counsel, a
20 procedure to which this order now turns.

### PROCEDURE FOR SELECTING AND APPROVING CLASS COUNSEL

21      Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the
22 court, select and retain counsel to represent the class." 15 U.S.C. 78u-4(a)(3)(B)(v).  Selection
23 and approval of class counsel are important responsibilities for the lead plaintiff and the court.
24 The selection and approval require an assessment of the strengths, weaknesses and experience
25 of counsel as well as the financial burden — in terms of fees and costs — on the class.

United States District Court
For the Northern District of California

1  *Wenderhold v. Cylink Corp.*, 191 F.R.D. 600, 602–03 (N.D. Cal. 2000); *Network Assocs.*,

2  76 F. Supp. 2d at 1033–34.

3      Any important decision made by a fiduciary should be preceded by due diligence. A

4  lead plaintiff is a fiduciary for the investor class. No decision by the lead plaintiff is more

5  important than the selection of class counsel. Consequently, the lead plaintiff should precede

6  his or her choice with due diligence. The extent of such due diligence is a matter of judgment

7  and reasonableness based on the facts and circumstances.

8      The lead plaintiffs should immediately proceed to perform their due diligence and,

9  through counsel, move for the appointment and approval of their selected counsel no later than

10  JUNE 17. The motion should be accompanied by declarations from each lead plaintiff

11  explaining the due diligence undertaken by each with respect to the selection of class counsel.

12  The declarations should also explain why the counsel selected was favored over other potential

13  candidates. The declarations should be filed under seal and not served on defendants. The

14  motion for approval of lead plaintiffs' choice of counsel, however, should be served on defense

15  counsel. No hearing will be held on the motion unless the Court determines that it would be

16  beneficial. Once class counsel is approved, the first order of business will be to file a

17  consolidated complaint. The Court expects this to be done by JULY 14 and any motion to

18  dismiss to be filed by AUGUST 11.

19

20      **IT IS SO ORDERED.**

21

22  Dated: May 24, 2005.

23                  WILLIAM ALSUP
                UNITED STATES DISTRICT JUDGE

24

25

26

27

28

10

United States District Court
For the Northern District of California

1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9

| | |
|---|---|
| IN RE SIPEX CORPORATION SECURITIES LITIGATION | No. C 05-00392 WHA |
| _____/ | CERTIFICATION OF LEAD PLAINTIFF SHAYE HIRSCH |
| AND CONSOLIDATED CASES | |
| _____/ | |

10
11
12
13

14          I have read and understand the Court's Order Appointing Lead Plaintiffs Globis Capital

15   Partners LP and Shaye Hirsch, including the duties of lead plaintiff and the procedure for

16   selecting and approving class counsel.  I agree and promise to faithfully execute those provisions

17   and to abide by the order.  Once class counsel are selected and approved, I will work and

18   cooperate fully with such counsel for the benefit of the investor class.

19
20   Dated:
21                                                 Mr. Shaye Hirsch

22
23                                                 Address: _____

24                                                 _____
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SIPEX CORPORATION SECURITIES LITIGATION | No. C 05-00392 WHA |
| _____/ | **CERTIFICATION OF LEAD PLAINTIFF GLOBIS CAPITAL** |
| AND CONSOLIDATED CASES | **PARTNERS LP** |
| _____/ | |

I have read and understand the Court's Order Appointing Lead Plaintiffs Globis Capital Partners LP and Shaye Hirsch, including the duties of lead plaintiff and the procedure for selecting and approving class counsel. I agree and promise to faithfully execute those provisions and to abide by the order. Once class counsel are selected and approved, I will work and cooperate fully with such counsel for the benefit of the investor class.

Dated:

_____

Mr. Paul Packer on behalf of Globis Partners LP

Address: _____

_____

# EXHIBIT  F-4B



The Honorable John C. Coughenour

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

SOUTH FERRY LP #2, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

KERRY K. KILLINGER, THOMAS W. CASEY,
DEANNA W. OPPENHEIMER, WILLIAM W.
LONGBRAKE, CRAIG J. CHAPMAN, JAMES
G. VANASEK, MICHELLE MCCARTHY, and
WASHINGTON MUTUAL INC.,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Master File No. CV04-1599C

[PROPOSED] ORDER APPOINTING
LEAD PLAINTIFFS AND
APPROVING LEAD PLAINTIFFS'
SELECTION OF COUNSEL

04-CV-01599-ORD

Milberg Weiss Bershad & Schulman LLP
1001 Fourth Avenue, Suite 2550
Seattle, WA 98154
Telephone: 206/839-0730 • Fax: 206/839-0728

1    Having considered The WAMU Investors Lead Plaintiff Group's Motion for

2    Appointment of Lead Plaintiff and Approval of Selection of Plaintiffs' Lead Counsel (the

3    "Motion"), and good cause appearing therefor, it is hereby ORDERED that:

4        1.    The Motion is GRANTED.

5        2.    The Court, having considered the provision of § 21D(a)(3)(B), as amended by the

6    PSLRA, hereby determines that The WAMU Investors Lead Plaintiff Group, consisting of

7    Metzler Investment GmbH, South Ferry LP #2, and The Walden Management Co. Pension Plan,

8    is appointed as Lead Plaintiff in this action.

9        3.    Lead Plaintiffs' selection of Lead Counsel is approved.  Pursuant to 15 U.S.C.

10    § 78u-4(a)(3)(B)(v), the law firm of Milberg Weiss Bershad & Schulman LLP is appointed as

11    Lead Counsel in this consolidated action.

12        4.    Lead Counsel for the class shall have the following responsibilities and duties, to

13    be carried out either personally or through counsel whom Lead Counsel shall designate:

14        a.    To coordinate the briefing and argument of motions;

15        b.    To coordinate the conduct of discovery proceedings;

16        c.    To coordinate the examination of witnesses in depositions;

17        d.    To coordinate the selection of counsel to act as spokesperson at pretrial

18    conferences;

19        e.    To call meetings of counsel as they deem necessary and appropriate from

20    time to time;

21        f.    To coordinate all settlement negotiations with counsel for defendants;

22        g.    To coordinate and direct the pretrial discovery proceedings and the

23    preparation for trial and the trial of this matter, and to delegate work responsibilities to selected

24    counsel as may be required; and

25        h.    To supervise any other matters concerning the prosecution or resolution of

26    the related and/or consolidated actions.

[PROPOSED] ORDER APPOINTING LEAD PLAINTIFFS AND
APPROVING LEAD PLAINTIFFS' SELECTION OF COUNSEL
(Master File No. CV04-1599C)
DOCS\26008V1

Milberg Weiss Bershad & Schulman LLP
1001 Fourth Avenue, Suite 2550
Seattle, WA 98154
Telephone: 206/839-0730 • Fax: 206/839-0728

- 1 -

1      5.    No motion, request for discovery, or other pretrial proceedings shall be initiated

2 or filed by any plaintiff in this action without the approval of Lead Counsel, so as to prevent

3 duplicative pleadings or discovery by plaintiffs in this action. No settlement negotiations shall be

4 conducted in this action without the approval of Lead Counsel.

5      6.    Defendants' counsel may rely upon agreements made with Lead Counsel.  Such

6 agreements shall be binding on plaintiffs.

7      7.    Any counsel of record for a party in this action who is not a member of the Bar of

8 this District is hereby admitted to practice *pro hac vice* in this action.

9      Dated this 3 0 day of N o v , 2004.

10

11

12                     HONORABLE JOHN C. COUGHENOUR
                           UNITED STATES DISTRICT JUDGE

13 Presented by:

14 **MILBERG WEISS BERSHAD
& SCHULMAN LLP**

15 LORI G. FELDMAN, WSBA #29096
DOUGLAS C. McDERMOTT, WSBA #31500

16

17 LORI G. FELDMAN
1001 Fourth Avenue, Suite 2550

18 Seattle, WA 98154
Telephone: (206) 839-0730

19 Facsimile: (206) 839-0728

20          -and-

21 **MILBERG WEISS BERSHAD
& SCHULMAN LLP**

22 MELVYN I. WEISS
SALVATORE J. GRAZIANO

23 PETER E. SEIDMAN
SHARON M. LEE

24 1 Pennsylvania Plaza
New York, NY 10119

25 Telephone: (212) 868-1229
Facsimile: (212) 594-5300

26 [Proposed] Lead Counsel for Plaintiffs

[PROPOSED] ORDER APPOINTING LEAD PLAINTIFFS AND
APPROVING LEAD PLAINTIFFS' SELECTION OF COUNSEL
(Master File No. CV04-1599C)
DOC5\226008V1              - 2 -

Milberg Weiss Bershad & Schulman LLP
1001 Fourth Avenue, Suite 2550
Seattle, WA 98154
Telephone: 206/839-0730 • Fax: 206/839-0728

1 | **LAW OFFICES OF**
   **MICHAEL A. SWICK, LLP**
2 | MICHAEL A. SWICK
One William Street, Suite 900
3 | New York, New York 10005
Telephone: (212) 584-0770
4 | Facsimile: (212) 584-0799

5

6 | **BULL & LIFSHITZ, LLP**
PETER D. BULL
7 | JOSHUA M. LIFSHITZ
18 East 41st Street, 11th Floor
New York, New York 10017
8 | Telephone: (212) 213-6222
Facsimile: (212) 213-9405

9

10 | **Plaintiff's Counsel**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED] ORDER APPOINTING LEAD PLAINTIFFS AND
APPROVING LEAD PLAINTIFFS' SELECTION OF COUNSEL
(Master File No. CV04-1599C)
DOCS\226008V1

- 3 -

Milberg Weiss Bershad & Schulman LLP
1001 Fourth Avenue, Suite 2550
Seattle, WA 98154
Telephone: 206/839-0730 • Fax: 206/839-0728



1 | MILBERG WEISS BERSHAD
   |   & SCHULMAN LLP
2 | JEFF S. WESTERMAN (94559)
   | 355 S. Grand Ave., Suite 4170
3 | Los Angeles, CA 90071-3172
   | Telephone: (213) 617-1200
4 | (213) 617-1975 (fax)

5 | MILBERG WEISS BERSHAD
   |   & SCHULMAN LLP
6 | STEVEN G. SCHULMAN
   | PETER E. SEIDMAN
7 | One Pennsylvania Plaza
   | New York, NY 10119
8 | Telephone: (212) 594-5300
   | (212) 868-1229 (fax)

9 | Proposed Lead Counsel

10

11 | [Additional Counsel on Signature Page]

12 |

13 | UNITED STATES DISTRICT COURT

14 | CENTRAL DISTRICT OF CALIFORNIA

   | WESTERN DIVISION

15 | CONWAY INVESTMENT CLUB,          ) Case No. 2:04-cv-05025
16 | Individually and On Behalf of All )
   | Others Similarly Situated,         ) [PROPOSED] ORDER
17 |                                    ) CONSOLIDATING THE ACTIONS,
   |                      Plaintiff,     ) APPOINTING LEAD PLAINTIFF,
18 |                                    ) AND APPROVING SELECTION OF
   |      vs.                           ) LEAD COUNSEL
19 | CORINTHIAN COLLEGES, INC.,        )
   | DAVID MOORE, ANTHONY              ) Date:       October 4, 2004
20 | DIGIOVANNI and DENNIS BEAL,       ) Time:       10:00 a.m.
   |                                    ) Courtroom: Honorable Manuel L.
21 |                      Defendant.     )             Real
   |                                    )
22 |                                    ) Date Action Filed: July 8, 2004
23 | (Additional Captions Set Forth Below)

24

25

26

27

28

| | | |
|---|---|---|
| 1 | BARBARA KAUFMAN, On Behalf of Herself and All Others Similarly Situated, | Case No. 2:04-cv-05091 |
| 2 | | Judge: Honorable Manuel L. Real |
| 3 | Plaintiff, | Courtroom: 8 |
| | | Date Action Filed: July 8, 2004 |
| 4 | vs. | |
| 5 | CORINTHIAN COLLEGES, INC., DAVID G. MOORE, DENNIS N. | |
| 6 | BEAL, AND ANTHONY F. DIGIOVANNI, | |
| 7 | | |
| | Defendant. | |
| 8 | | |
| 9 | MICHAEL ORLANDO, Individually | Case No. 2:04-cv-05754 |
| 10 | and On Behalf of All Others Similarly Situated, | |
| 11 | | |
| 12 | Plaintiff, | Judge: Honorable Manuel L. Real |
| | | Date Action Filed: July 16, 2004 |
| 13 | vs. | |
| 14 | CORINTHIAN COLLEGES, INC., DAVID MOORE, ANTHONY | |
| 15 | DIGIOVANNI and DENNIS BEAL, | |
| | Defendant. | |
| 16 | | |
| 17 | PAULENA PARTNERS, LLC, | Case No. 2:04-cv-06057 |
| 18 | Individually and On Behalf of All Others Similarly Situated, | |
| 19 | | Judge: Honorable Dale S. Fischer |
| | Plaintiff, | Date Action Filed: July 23, 2004 |
| 20 | vs. | |
| 21 | CORINTHIAN COLLEGES, INC., DAVID MOORE, ANTHONY | |
| 22 | DIGIOVANNI and DENNIS BEAL, | |
| 23 | Defendant. | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 1 | JAMES DOLAN, On Behalf of Himself | Case No. 2:04-cv-06076 |
| 2 | and All Others Similarly Situated, | |
| 3 | Plaintiff, | Judge: Honorable Manuel L. Real<br>Date Action Filed: July 23, 2004 |
| 4 | vs. | |
| 5 | CORINTHIAN COLLEGES, INC., | |
| 6 | DAVID MOORE, PAUL ST. PIERRE,<br>DENNIS BEAL, and ANTHONY | |
| 7 | DIGIOVANNI, | |
| 8 | Defendant. | |
| 9 | KWOK YAU TONG, Individually and | Case No. 2:04-cv-06993 |
| 10 | On Behalf of All Others Similarly | |
| 11 | Situated, | |
| | Plaintiff, | Judge: Honorable Manuel L. Real<br>Date Action Filed: August 20, 2004 |
| 12 | vs. | |
| 13 | CORINTHIAN COLLEGES, INC., | |
| 14 | DAVID MOORE, ANTHONY | |
| 15 | DIGIOVANNI and DENNIS BEAL, | |
| 16 | Defendant. | |
| 17 | DOUGLAS ROSE, On Behalf of | Case No. 2:04-cv-06994 |
| 18 | Himself and All Others Similarly | |
| | Situated, | |
| 19 | Plaintiff, | Judge: Honorable Manuel L. Real<br>Date Action Filed: August 20, 2004 |
| 20 | vs. | |
| 21 | CORINTHIAN COLLEGES, INC., | |
| 22 | DAVID MOORE, PAUL ST. PIERRE,<br>DENNIS BEAL and ANTHONY | |
| 23 | DIGIOVANNI, | |
| 24 | Defendant. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

SCANNED

| | | |
|---|---|---|
| 1 | IVAN MENESES, Individually and on Behalf of All Others Similarly Situated, | Case No. 8:04-cv-923 |
| 2 | | 2:04-8773 T |
| 3 | Plaintiff, | Judge: Honorable David O. Carter |
| 4 | vs. | Date Action Filed: August 4, 2004 |
| 5 | CORINTHIAN COLLEGES, INC., ANTHONY DIGIOVANNI, DAVID MOORE and DENNIS BEAL, | |
| 6 | | 04-6994 |
| 7 | Defendant. | |
| 8 | DOUGLAS ROSE, On Behalf of Himself and All Others Similarly | Case No. 8:04-cv-926 |
| 9 | Situated, | Judge: Honorable David O. Carter |
| 10 | Plaintiff, | Date Action Filed: August 5, 2004 |
| 11 | vs. | |
| 12 | CORINTHIAN COLLEGES, INC., DAVID MOORE, PAUL ST. PIERRE, | |
| 13 | DENNIS BEAL and ANTHONY DIGIOVANNI, | |
| 14 | | |
| 15 | Defendant. | |
| 16 | KOK YEOH, On Behalf of Himself and All Others Similarly Situated, | Case No. 8:04-cv-959 |
| 17 | | 04-8393 |
| 18 | Plaintiff, | Judge: Honorable Gary L. Taylor |
| 19 | vs. | Date Action Filed: August 9, 2004 |
| 20 | CORINTHIAN COLLEGES, INC., DAVID MOORE, PAUL ST. PIERRE, | |
| 21 | DENNIS BEAL and ANTHONY DIGIOVANNI, | |
| 22 | Defendant. | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

SCANNED



| | |
|---|---|
| 1  JAMES STELLATO, On Behalf of<br>   Himself and All Others Similarly<br>2  Situated, | Case No. 8:04-cv-997- |
| 3              Plaintiff, | Judge: Honorable David O. Carter<br>Date Action Filed: August 16, 2004 |
| 4      vs. | |
| 5  CORINTHIAN COLLEGES, INC.,<br>   DAVID MOORE, PAUL ST. PIERRE,<br>6  DENNIS BEAL and ANTHONY<br>   DIGIOVANNI, | |
| 7              Defendant. | |
| 8 | |

1    Having considered the motion of Metzler Investment GmbH ("Metzler

2    Investment"), and good cause appearing therefore, the Court orders as follows:

3

4        1.    The Motion is GRANTED;

5        2.    The above-captioned actions are consolidated pursuant to Fed. R. Civ. P.

6    42(a);

7

8        3.    Metzler Investment is the "most adequate plaintiff" and accordingly, is

9    appointed Lead Plaintiff pursuant to 15 U.S.C. 78u-4(a)(3)(B)(iii);

10

11       4.    Milberg Weiss Bershad & Schulman LLP is appointed Lead Counsel,

12   pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

13   IT IS SO ORDERED.

14   DATED: **Nov. 1**, 2004

15                                           _____
                                             Honorable Manuel L. Real
16   Submitted by:                           United States District Court Judge

     Dated: September 7, 2004
17
     MILBERG WEISS BERSHAD
18     & SCHULMAN LLP
     Jeff S. Westerman
19

20   _____
           JEFF S. WESTERMAN
21
     355 S. Grand Ave., Suite 4170
22   Los Angeles, CA 90071-3172
     Telephone: (213) 617-1200
23   Facsimile: (213) 617-1975

24   MILBERG WEISS BERSHAD
       & SCHULMAN LLP
25   Steven G. Schulman
     Peter E. Seidman
26   One Pennsylvania Plaza
     New York, NY 10119
27   Telephone: (212) 594-5300
     Facsimile: (212) 868-1229

28   Proposed Lead Counsel

1   THE BRUALDI LAW FIRM
     Richard B. Brualdi
2   29 Broadway
     Suite 2400
3   New York, New York  10006
     Telephone:  (212) 952-0602
4   Facsimile:  (212) 952-0608

5   Plaintiff's Counsel

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a resident of the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 355 South Grand Avenue, Suite 4170, Los Angeles, California 90071.

2.      That on September 7, 2004, declarant served the [PROPOSED] ORDER CONSOLIDATING THE ACTIONS, APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF LEAD COUNSEL by depositing a true copy thereof in a United States mailbox at Los Angeles, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7TH day of September, 2004, at Los Angeles, California.

_____
CYNTHIA DORSEY

## CORINTHIAN COLLEGES

### Service List

| Counsel for Plaintiffs | |
|---|---|
| Christopher Kim<br>Lisa J. Yang<br>**LIM RUGER & KIM**<br>1055 West 7th Street, Suite 2800<br>Los Angeles, CA 90017<br>Tel.: (213) 955-9500<br><br>Eric J. Belfi<br>**RABIN MURRAY AND FRANK**<br>275 Madison Avenue, Suite 801<br>New York, NY 10016<br>Tel.: (212) 682-1818<br><br>Marc A. Topaz<br>Richard A. Maniskas<br>**SCHIFFRIN & BARROWAY**<br>3 Bala Plaza East, Suite 400<br>Bala Cynwyd, PA 19004<br>Tel.: (610) 667-7706<br><br>*Attorneys for Conway Investment Club* | Kevin J. Yourman<br>Jennifer R. Williams<br>Vahn Alexander<br>**WEISS & YOURMAN**<br>10940 Wilshire Blvd, 24th Fl.<br>Los Angeles, CA 90024<br>Tel.: (310) 208-2800<br>Email: service@wyca.com<br><br>Timothy J. Burke<br>**STULL STULL & BRODY**<br>10940 Wilshire Boulevard, Suite 2300<br>Los Angeles, CA 90024<br>Tel.: (310) 209-2468<br>Email: service@ssbla.com<br><br>*Attorneys for Barbara Kaufman* |
| Robert I. Harwood<br>Joshua D. Glatter<br>**WECHSLER HARWOOD**<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022<br>Tel.: (212) 935-7400<br><br>Lionel Z. Glancy<br>**GLANCY BINKOW & GOLDBERG**<br>1801 Avenue of the Stars, Suite 311<br>Los Angeles, CA 90067<br>Tel.: (310) 201-9150<br><br>*Attorneys for Kwok Yau Tong* | Peter Arthur Binkow<br>**GLANCY BINKOW & GOLDBERG**<br>1801 Avenue of the Stars, Ste 311<br>Los Angeles, CA 90067<br>Tel.: (310) 201-9150<br>Email: info@glancylaw.com<br><br><br><br>*Attorneys for Michael Orlando* |
| Jonathan M. Stein<br>**JONATHAN M. STEIN LAW OFFICES**<br>197 S Federal Highway, Suite 200<br>Boca Raton, FL 33432 | Betsy C. Manifold<br>Francis A. Bottini, Jr.<br>Francis M. Gregorek<br>Rachele R. Rickert |

DOCS\223239v1

-4-

| | |
|---|---|
| 561-750-3000<br><br>*Attorneys for James Dolan* | WOLF HALDENSTEIN ADLER FREEMAN &<br>HERZ<br>Symphony Twr<br>750 B St, Ste 2770<br>San Diego, CA 92101<br>Tel.: (619) 239-4599<br>Fax: (619) 234-4599<br><br>*Attorneys for Ivan Meneses* |
| William S. Lerach<br>Darren J. Robbins<br>LERACH COUGHLIN STOIA GELLER RUDMAN<br>AND ROBBINS<br>401 B Street, Suite 1700<br>San Diego, CA 92101-4297<br>Tel.: (619) 231-1058<br>Email: denisey@lcsr.com<br><br>*Attorneys for Douglas Rose* | Evan J. Smith<br>Marc L. Ackerman<br>BRODSKY AND SMITH<br>333 East City Avenue, Suite 602<br>Bala Cynwyd, PA 19004<br>Tel.: (610) 667-6200<br><br>*Attorneys for Kok Yeoh* |
| Deborah R. Gross<br>BERNARD M. GROSS LAW OFFICES<br>1515 Locust St, 2nd Fl.<br>Philadelphia, PA 19102<br>Tel.: (215) 561-3600<br><br>*Attorneys for James Stellato* | Robert I, Harwood<br>Joshua D, Glatter<br>WECHSLER HARWOOD<br>488 Madison Avenue<br>8th Floor<br>New York, NY 10022<br>Tel.: (212) 935-7400<br><br>*Attorneys for Kwok Yau Tong* |
| *Defendants* | |
| Robert Dell Angelo<br>Munger Tolles & Olson Llp<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, CA 90071<br>Tel: (213) 683-9100<br>(213) 687-3702 (fax) | |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RICHARD CURTIS, on behalf of himself and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>BEA SYSTEMS, INC., ALFRED S. CHUANG, CHARLES L. ILL, III, and THOMAS M. ASHBURN,<br><br>    Defendants. | No. C 04-2275 SI<br><br>**CLASS ACTION**<br><br>**ORDER CONSOLIDATING ACTIONS AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL** |

On September 24, 2004, the Court heard argument on motions to consolidate various related securities class actions and competing motions to appoint lead plaintiff and lead counsel. Having considered the papers filed and the argument of counsel, the Court GRANTS the motion to consolidate these actions, appoints ARCA S.p.A. lead plaintiff and appoints its counsel, Green & Jigarjian and Schiffrin & Barroway, lead counsel.

**BACKGROUND**

Plaintiffs Tareq Zuaiter, John E. Kalil, and Roland Pardun ("the Zuaiter Group") and ARCA S.G.R. S.p.A. ("ARCA") are members of a class bringing a securities class action against defendant BEA Systems, Inc. ("BEA Systems" or the "Company") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

BEA Systems is a provider of application infrastructure software and related services. Compl. ¶ 2. Specifically, a product called the "BEA WebLogic Enterprise Platform" provides application infrastructure "for building and deploying distributed, integrated information technology environments, allowing customers to

United States District Court
For the Northern District of California

integrate private client/server networks, the Internet, intranets, extranets, virtual private networks, and mainframe and legacy systems as system components." Id. The Company's executive offices are in San Jose, where its day-to-day operations occur. Id. at ¶ 7(b). Plaintiffs allege that the Company and certain of its officers and directors artificially inflated the Company's stock price during the class period, November 13, 2003 through May 13, 2004, by issuing materially false and misleading statements regarding BEA's business and prospects. Id. at ¶ 3.

On May 13, 2004, BEA reported disappointing first quarter results and attributed these results to "the difficult selling environment" and "sales execution issues." Id. at ¶ 3. Company shares fell 30% to $8 per share. Id. at ¶ 3. Plaintiffs allege that defendants knew and concealed the real reasons for the first quarter results: (1) the Company was experiencing sales execution problems in its licensing division, which would result in license reserve being down; (2) a reorganization of the Company's sales' personnel disrupted sales during the preceding quarter; (3) the Company's WebLogic 8.1 Platform product was not selling as well as defendants claimed, and was not "revolutionary"; (4) the Company's North American reserves were disrupted by a transfer of medium and small businesses to the General Accounts Team; and (5) the Company was experiencing weakness in its telecom vertical business. Id. at ¶¶ 4(a)-(d); 23(a)-(e).

Because of defendants' false statements, the Company's stock price traded at inflated prices, as high as $14 per share. Id. at ¶ 5. The Company's officers and directors sold more than $13 million worth when the stock traded at its allegedly artificially inflated price. Id. Plaintiff and other class members allegedly suffered injury when they purchased the Company's stock at artificially inflated prices. Id. at ¶ 27-28.

The first of seven related securities class actions was filed against BEA Systems on June 9, 2004. ARCA Mot. for Appointment as Lead Plaintiff ("ARCA Mot.") at 3:12. Between June 9, 2004 and July 17, 2004, six more suits were filed in this District. Id. at 1:15-16. As required by § 21 D(a)(3)(A)(l) of the Exchange Act, a notice was published over Business Wire on June 9, 2004, advising class members of the existence and nature of the litigation. Decl. of Patrice L. Bishop ("Bishop Decl."), Ex. A; Decl. of Darren J. Check ("Check Decl."), Ex. B. The notice set a 60 day window for class members to appear and move for appointment as lead plaintiff, by August 9, 2004. Id. Three motions were filed within the time limit, two of

1  which are now before the Court, one by the Zuaiter Group, and one by ARCA.[1]  In addition, both movants

2  have moved to have all the actions consolidated.

3       The Zuaiter Group is comprised of three individuals who collectively purchased 48,380 shares of BEA

4  systems stock during the Class Period.  Zuaiter Group's Mot. for Appointment as Lead Plaintiff ("Zuaiter

5  Group Mot.") at 5:9-10.  ARCA is a mutual fund manager based in Milan, Italy.  ARCA Mot. at 2:4; Decl.

6  of John W. Pillette ("Pillette Decl."), Ex. A (Decl. of Dr. Attilio Ferrari) ¶ 2.

7       Now before the Court are the two competing motions for appointment of lead plaintiff and approval

8  of counsel, one by the Zuaiter Group, represented by Stull, Stull & Brody, LLP; and one by ARCA,

9  represented by Schiffrin & Barroway, LLP and Green and Jigarjian, LLP.

10

11  <div align="center">**LEGAL STANDARD**</div>

12  **A.**    **Motion to consolidate**

13      Under Rule 42(a) of the Federal Rules of Civil Procedure:

14      When actions involving a common question of law or fact are pending before the court, it may order
    a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions

15      consolidated; and it may make such orders concerning proceedings therein as may tend to avoid
    unnecessary costs or delay.

16

17  Courts have recognized that securities class actions are particularly suited to consolidation to help expedite

18  pretrial proceedings, reduce case duplication, avoid the involvement of parties and witnesses in multiple

19  proceedings, and minimize the expenditure of time and money by everyone involved.  See In re Equity Funding

20  of Amer. Sec. Litig., 416 F. Supp. 161, 176 (C.D. Cal. 1976) (citation omitted).  A court must rule on a

21  motion to consolidate before it can rule on a motion to appoint a lead plaintiff.  Securities Exchange Act, §

22  21D(a)(3)(B)(ii), 15 U.S.C. § 78u-4(a)(3)(B)(ii).

23

24

25  **B.**    **Motion to appoint lead plaintiff**

26      It has been long recognized that private securities litigation provides "'a most effective weapon in the

27

28      [1] Cement Masons and Plasterers Retirement Trust, Brian A. Metz and Mustapha Bahij also filed a
motion for appointment of lead plaintiff and counsel, but withdrew that motion on August 27, 2004.

<div align="center">United States District Court<br>For the Northern District of California</div>

<div align="center">3</div>

United States District Court
For the Northern District of California

1  enforcement' of the securities laws and [is] 'a necessary supplement to [administrative] action.'" Bateman

2  Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310, 105 S. Ct. 2622 (1985).  Although Congress

3  affirmed that such litigation "is an indispensable tool with which defrauded investors can recover losses," it

4  enacted the Private Securities Litigation Reform Act of 1995 (PSLRA) in response to a widespread perception

5  of abuse in securities class actions. Joint Explanatory Statement of the Committee of Conf., Conference Report

6  on Sec. Litig. Reform, H.R. Conf. Rep. No. 104-39 at 31 (1995).  Section 21D of the PSLRA provides

7  well-defined standards and procedures for selecting lead plaintiffs in a securities class action and is "intended

8  to encourage the most capable representatives of the plaintiff class to participate in class action litigation and

9  to exercise supervision and control of the lawyers for the class."  H.R. 104-39 at 32.  See generally In re

10 Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 432-436 (E.D. Va. 2000).

11      Under the procedures set out in the PSLRA, all proposed lead plaintiffs must have submitted a sworn

12 certification setting forth certain facts designed to assure the court that the plaintiff (i) has suffered more than

13 a nominal loss, (ii) is not a professional litigant, and (iii) is otherwise interested and able to serve as a class

14 representative.  15 U.S.C. § 78u-4(a)(2)(A).  The plaintiff in the first lawsuit to be filed must additionally

15 publish notice of the complaint in a widely circulated business publication within twenty days of filing the

16 complaint.  Id. at  § 78u-4(a)(3)(A)(l).  The notice must include a description of the claim and notify

17 prospective class members that they may move within 60 days of the notice to be named lead plaintiff.

18      Once applications for lead plaintiff status are closed, the district court must determine who among the

19 movants for lead plaintiff status is the "most adequate plaintiff." Id. at § 78u-4(a)(3)(B)(l).  The PSLRA directs

20 courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court

21 determines to be most capable of adequately representing the interests of class members . . . ." Id.  Toward

22 this end, the court must consider three factors: "the court shall adopt a presumption that the most adequate

23 plaintiff . . . is the person or group of persons that - (aa) has either filed the complaint or made a motion in

24 response to a notice . . .; (bb) in the determination of the court, has the largest financial interest in the relief

25 sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil

26 Procedure." Id. at § 78u-4(a)(3)(B)(iii)(l).  The presumption of most adequate plaintiff may be rebutted by

27 evidence that the designated plaintiff  "will not fairly and adequately protect the interests of the class" or "is

28

<p style="text-align:center">4</p>

1  subject to unique defenses that render such plaintiff incapable of adequately representing the class." Id. at §

2  78u-4(a)(3)(B)(iii)(II).

3    In the Ninth Circuit, In re Cavanaugh, 306 F.3d 726, 729-30 (9th Cir. 2002), governs lead plaintiff

4  selection and establishes a three-step process. First, as discussed above, timely and complete notice of the

5  action must be published. Id. at 729. Second, the district court considers the losses suffered by potential lead

6  plaintiffs and selects "the one who 'has the largest financial interest in the relief sought by the class' and

7  'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" Id. at 730, citing 15

8  U.S.C. § 78u-4(a)(3)(B)(iii)(I). Thus the court must determine which plaintiff "has the most to gain from the

9  lawsuit." Cavanaugh, 306 F.3d at 730. Finally, the court focuses on that plaintiff to ensure that the proposed

10  lead plaintiff "satisfies the requirements of [Fed. R. Civ. Pro.] 23 (a), in particular those of 'typicality' and

11  'adequacy.'" Id.

12    A plaintiff who satisfies the first two steps becomes the "presumptively most adequate plaintiff." Id.

13  In step three, other plaintiffs have the opportunity to rebut the presumptive lead plaintiff's showing of typicality

14  and adequacy. Id. at 730, citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

15    Once the court has designated a lead plaintiff, the lead plaintiff "shall, subject to the approval of the

16  court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). A court generally

17  should accept the lead plaintiff's choice of counsel unless it appears necessary to appoint different counsel to

18  "protect the interests of the class." Id. at § 78u-4(a)(3)(B)(iii)(II)(aa). In the Ninth Circuit, Cavanaugh

19  establishes the standard for approval of lead counsel. "[T]he district court does not select class counsel at all,"

20  id. at 732; instead, the district court generally approves the lead plaintiff's selection of counsel.

21

22

23

24  ///

25

26

27

28

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

## DISCUSSION

**A.    Motion to consolidate**

Both proposed lead plaintiffs have filed motions to consolidate the seven related cases pending in the Northern District of California against BEA Systems, Inc., and both motions are unopposed. The Court GRANTS the motions to consolidate.

**B.    Competing motions to appoint lead plaintiff and approve lead counsel**

The notice of this action was posted on Business Wire, a widely circulated national business-oriented publication. See Bishop Decl., Ex. A; Check Decl., Ex. B. The Zuaiter Group and ARCA have both filed timely motions for appointment as lead plaintiff and submitted acceptable sworn certifications. See Bishop Decl., Ex. B; Check Decl., Ex. A. The only task that remains is to determine which movant is the most adequate plaintiff.

**1.    Financial interest in the litigation**

The Court must first determine which movant has "the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). The Zuaiter Group asserts that its financial interest in the litigation is $242,625, distributed as follows: Zuaiter – $138,221; Kalil – $55,804; and Pardun – $48,600. Zuaiter Group's Mot. at 2:20; Bishop Decl., Exs. B,C. ARCA asserts that it has the largest financial interest in the case, with losses of $255,042. ARCA's Mot. at 2:1-2; Check Decl., Ex. C.

ARCA claims that the Zuaiter Group's loss figures are inflated because group member John Kalil's sales figures for May 13, 2004, do not match the Bloomberg trading data for that date. Specifically, Kalil states that he sold 3,800 shares at $9.22 per share and 10,200 shares at $9.10 per share for a loss of $55,804, but ARCA states that BEA Systems stock traded at a low of $10.49 per share that day. See ARCA Opp'n, Ex. A. Applying these figures, ARCA calculates the Zuaiter Group's total loss at $223,621. ARCA's Opp'n at 3:13. The Zuaiter Group counters that, while BEA stock did close on May 13, 2004 at $10.78, the stock price dropped on after-hours trading and opened at $9.04 on May 14, 2004. Zuaiter Group's Surreply at 1:8-11; Exs. 1-2.

6

1    Regardless of which figures are used to calculate the Zuaiter Group's losses, the Court finds that

2    ARCA has the largest financial interest in the litigation, and is thus entitled to the presumption of most adequate

3    plaintiff, if it meets the requirements of typicality and adequacy.

4

5    **2.    Typicality and adequacy**

6    While the Zuaiter Group does not dispute ARCA's higher loss figures, it argues that ARCA should not

7    serve as lead plaintiff because ARCA is an atypical member of the class. Specifically, the Zuaiter Group alleges

8    that ARCA "engaged in a suspicious pattern of trading which included short selling BEA stock" during the Class

9    Period. Zuaiter Group's Opp'n at 2:21-24. As an alleged short-seller and possible "hedge fund," the Zuaiter

10   Group contends, ARCA intended to drive down the price of stock so that it could buy more at a lower price,

11   and therefore its interests are not aligned with those of other class members.[2]  In addition, the Zuaiter Group

12   questions whether ARCA's clients have authorized ARCA to litigate on their behalf, and points out that there

13   is a pending case before the Ninth Circuit regarding whether an "investment advisor" may be appointed as lead

14   plaintiff. Id. at 3:22-25; see id., Ex. 1 (In re Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund

15   v. Anchor Capital Advisors, No. 04-73146). It contends that ARCA has not provided specific information

16   about its structure, clients, whether it has notified its clients of its motion for appointment as lead plaintiff, or

17   what "sophistication and resources" it has to "effectively manage this litigation." Zuaiter Group Opp'n at 1:7-

18   14.

19   ARCA responds that Zuaiter Group has not shown that ARCA engaged in short selling or established

20   why ARCA "appears" to be a hedge fund or asset manager. ARCA states that it is a mutual fund manager that

21   invested in BEA Systems on behalf of its own mutual funds, not on behalf of individual clients who control those

22   funds or receive investment advice from ARCA, and attaches a declaration from its Managing Director in

23   support of these claims. ARCA Reply at 4:10-14; see Pillette Decl., Ex. A (Decl. of Dr. Attilio Ferrari) ¶ 2,

24

25   ――――――――――――――――

      [2] The Zuaiter Group bases its claim that ARCA engaged in short-selling by pointing to the fact that

26   ARCA purchased 254,388 shares of BEA Systems stock for $12.2776 on November 19, 2003; it sold them
     for a profit of $0.2206 per share, a total of $56,118 one week later; just over three weeks later, it purchased

27   353,715 more shares for $12.3378 and sold these over the next two months for profits ranging from $1.7957
     per share to $0.6074 per share, totaling $371,269. It then had 88,430 shares left, and it bought 88,430 more,

28   of which it sold 36,397 two weeks before the May 13, 2004 announcement. See Zuaiter Group Opp'n at 3:7-
     16. Without more, the Court is unpersuaded that this reflects short-selling.

7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   4. Therefore, ARCA has full authority to bring suit, and Dr. Ferrari will actively monitor the litigation. Id. at

2   ¶ 4-5. ARCA also argues that, as a large investor, it is precisely the kind of prototypical "institutional investor"

3   that Congress intended to serve as lead plaintiff under the PSLRA. ARCA Mot. at 8:12-25.

4       By contrast, ARCA argues, the Zuaiter group does not survive the "rule of reason," under which the

5   proposed group of plaintiffs must "actively represent the class." This Court applies this rule of reason on a

6   case-by-case basis to determine whether an asserted group "has demonstrated the ability to represent the class

7   and direct the litigation without undue influence from counsel." In re Versata, Inc. Sec. Litig., 2001 U.S. Dist.

8   LEXIS 24270, at *21 (N.D. Cal. Aug. 20, 2001). Because the Court lacks any specific information about

9   the three individuals in the Zuaiter Group, ARCA argues that it cannot ensure that this group of plaintiffs has

10   the sophistication and business knowledge to adequately represent the class and direct the litigation without

11   undue influence from counsel. In re Versata, at *18-*22.[3]

12       The Court finds that ARCA meets the typicality and adequacy requirements. To meet the typicality

13   requirement, the claims of a lead plaintiff and class members need not be identical. In re Enron Corp.Sec.

14   Litig., 206 F.R.D. 427, 445 (S.D. Tex. 2002), citing In re Lucent Techs., Inc. Sec. Litig., 194 F.R.D. 137,

15   150 (D.N.J. 2000) ("the typicality requirement is satisfied when the plaintiff's claim arises from the same event

16   or course of conduct that gives rise to the claims of other members and is based on the same legal theory.").

17   In fact, "the test for typicality is not demanding . . . . [T]he critical inquiry is whether the class representative's

18   claims have the same essential characteristics of the putative class." In re Enron, at 445, n.10, citing Stirman

19   v. Exxon Corp., 280 F.3d 554, 562-63 (5th Cir. 2002). As the court explained in Deutschman v. Beneficial

20   Corp., 132 F.R.D. 359, 373 (D. Del., 1990), "the focus of the typicality inquiry is not on plaintiff's behavior,

21   but defendants'." If defendants' course of conduct gave rise to all class members' claims and if "defendants

22   have not taken any action unique to the named plaintiff, then the representative's claim is typical." Id. (citations

23   omitted). Here, the claims of all plaintiffs, including ARCA, are based on whether BEA Systems' alleged

24   misrepresentations injured its stockholders by artificially inflating its stock price. Moreover, the Court is

25

26

27       [3] The Court does not agree with ARCA that specific information from proposed lead plaintiffs is always required. In Versata, the Court relied on declarations submitted by the putative plaintiffs to establish their business sophistication, but did not expressly require them, like the district court in In re Network Associates,

28   Inc. Sec. Litig., 76 F.Supp.2d 1017 (N.D. Cal. 1999).

1   satisfied that ARCA is neither a hedge fund engaged in short selling nor an investment advisor acting without

2   the authorization of its clients.

3         The representative must have sufficient interest in the case's outcome to ensure vigorous advocacy.

4   The Court finds no evidence of any antagonism between the interests of ARCA and the class.  ARCA has

5   certified its willingness to serve as representative plaintiff and has retained counsel experienced in litigation

6   securities class actions.  No challenge has been made to ARCA's selection of counsel.

7         The Court finds that ARCA, as the plaintiff with the largest financial stake in the litigation, also satisfies

8   the typicality and adequacy tests necessary to serve as lead plaintiff in this litigation.

9

10                                    **CONCLUSION**

11         For the foregoing reasons and for good cause shown, the Court hereby GRANTS the motions to

12  consolidate all related actions.  The Court GRANTS ARCA's motion for appointment as lead plaintiffs along

13  with Schiffrin & Barroway LLP as lead counsel and Green & Jigarjian LLP as liaison counsel.  The motion by

14  the Zuaiter Group is DENIED.

15        Counsel for ARCA is ordered to prepare, circulate for approval as to form and submit to the Court

16  an order of consolidation and an Amended Consolidated Complaint, **all to be filed on or before October**

17  **15, 2004.**

18

19        **IT IS SO ORDERED.**

20

21  Dated: September 24, 2004                              S/Susan Illston

22                                                         _____

                                                          SUSAN ILLSTON
                                                          United States District Judge

23

24

25

26

27

28

9

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Ohio, Eastern
Division.
In re: THE GOODYEAR TIRE & RUBBER
COMPANY SECURITIES LITIGATION
No. 5:03 CV 2166.

May 12, 2004.

Jack Landskroner, Cleveland, OH, for Plaintiff.
Jack Morrison, Jr., Thomas R. Houlihan, Akron, OH,
Jacob B. Radcliff, Jerome S. Hirsch, Jonathan Lerner,
Lauren Aguiar, New York, NY, John T. Billick,
Cleveland, OH, for Defendants.

MEMORANDUM OPINION & ORDER

[Resolving Docs. 13, 16, 17 in case # 5:03CV2166
and Doc. 12 in case # 5:03CV2210]

I. Introduction

ADAMS, J.
*1 The above-captioned case is an action for
securities fraud brought on behalf of shareholders of
The Goodyear Tire & Rubber Company (the
"Shareholders") against Defendants The Goodyear
Tire & Rubber Company (Goodyear), Robert J.
Keegan, Robert W. Tieken, Samir G. Gibara,
Stephanie W. Bergeron, John W. Richardson, and
Richard J. Kramer, (collectively referred to as
"Defendants"). The Shareholders base their claims on
violations of Section 10(b) of the Securities and
Exchange Act of 1934, Section 20(a) of the Securities
Exchange Act of 1934, and Rule 10b-5, which was
promulgated thereunder. The action was filed as a
class action, excluding from the class Defendants,
directors and officers of Goodyear, their families and
affiliates.

On December 31, 2003, this Court entered an order
consolidating all individual actions related to this
matter. Shortly thereafter certain individual movants
filed motions requesting appointment as lead plaintiff
in the consolidated action. The first group of movants
consists of the Alaska Electrical Pension Fund and
the Central States, Southeast and Southwest Areas

Pension Fund (the "Institutional Funds").[FN1] The
second group of movants consist of funds A57, C16
and NK1, which are part of the fund family managed
by Capital Invest, die Kapitalanlagegesellschaft der
Bank Austria Creditanstalt Gruppe GmbH, a fund
management company located in Vienna, Austria
(Capital Invest).[FN2] The last movant is Flamina
Holdings, AG (Flamina Holdings.).[FN3] Flamina
Holdings is a holding entity for two individual
investors, Mr. Michael May and Ms. Christina May.


    FN1. ECF Doc. 16.

    FN2. ECF Doc. 17.

    FN3. Flamina's motion was filed as ECF
    Doc. 12 in case 5:03CV2210.

On February 10, 2004, the Court held a hearing at
which time counsel for each of the proposed lead
plaintiffs had an opportunity to present their
arguments. Counsel for the Institutional Funds,
Capital Invest and Flamina were present at the
hearing.[FN4] The Court has reviewed the parties'
motions, responses, and replies thereto. It has also
fully considered the arguments presented at the
hearing.


    FN4. The Court notes that a motion filed by
    movant Richard Berman is still pending on
    its docket. Mr. Berman was not represented
    by counsel at the hearing. Therefore, the
    Court deems his motion withdrawn. Even if
    the Court seriously considered Mr. Berman's
    motion, however, it would not appoint him
    as lead plaintiff in this action. By Mr.
    Berman's own admission, he has lost only
    $54,730, which is much less than the losses
    the other movants allegedly suffered.
    (Berman, Mot. for Lead Plf. at 9).

II. The Alleged Losses

The Institutional Funds request appointment as lead
plaintiff based on their alleged loss of more than $3.7
million in connection with the purchase of over
188,000 shares of Goodyear securities between the
time of October 13, 1998 and October 22, 2003 (the
"Class Period"). The Institutional Funds also request

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Page 2

approval of their selection of lead counsel, William S. Lerach and Tor Gronborg of Milberg, Weiss, Bershad, Hynes & Lerach LLP and Landskroner-Grieco, Ltd. as liaison counsel.

Likewise, Capital Invest requests appointment as lead plaintiff based on its loss of approximately $1.2 million in connection with its acquisition of 83,100 shares of Goodyear common stock during the class period. Capital Invest also requests approval of its selection of lead counsel the law firm of Bernstein, Litowitz, Berger & Grossman, LLP (Bernstein Litowitz) and the law firm Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., LPA (Climaco Lefkowitz) as liaison counsel.

*2 Flamina Holdings requests appointment as lead plaintiff based on its alleged loss of $2 million in connection with its acquisition of common stock and options. Flamina Holdings also requests approval of its selection of lead counsel the law firm of Scott & Scott and the law firm Tzangas, Plakas, Mannos, & Recupero as liaison counsel. However, Flamina Holdings' stated losses are based on its losses plus the losses of Goodyear Tireworkers Independent Unity of the USWA Local 307 Topeka (GTWIU), who no longer seeks appointment as lead plaintiff. GTWIU was originally a co-movant with Flamina Holdings. However, it subsequently withdrew from the motion.<u>FN5</u> At the hearing on this matter, Flamina Holdings represented that its loss alone was only $885,000.

FN5. ECF Doc. 32, filed in case 5:03CV2166.

III. Capital Invest is Appointed as Lead Plaintiff

The Private Securities Litigation Reform Act (PSLRA) sets forth the procedure that governs appointment of the lead plaintiff in actions arising under the Securities and Exchange Act of 1934 when such an action is brought as a class action under the Federal Rules of Civil Procedure. *See generally* 15 U.S.C. § 78u-4(a)(1) and (a)(3)(B)(i). This procedure first requires that the plaintiff who files the initial action, within 20 days of filing, publish a notice to the class informing the class members of their right to file a motion for appointment as lead plaintiff. *Id.* at § 78u-4(a)(3)(A)(I).<u>FN6</u>

FN6. Here, the first notice of pendency was published over *The Business Wire* on

October 23, 2003. Consistent with the PSLRA, the notice advised potential class members of the pendency of the action, the claims asserted therein, the purported class period, and that any member may, within 60 days from the date of the notice, move the Court to serve as lead plaintiff in the action. *Id.* at § 78u-4(a)(3)(A)(I).

The PSLRA also provides that within 90 days after publication of notice, the district court shall consider the class members' motions and shall appoint as lead plaintiff the member or members of the class that the Court determines most capable of adequately representing the interests of the class members.<u>FN7</u> *Id.* at § 78u-4(3)(B)(I). When making the determination of "most adequate plaintiff," the PSLRA states that:

FN7. The Court acknowledges that this Order designating lead Plaintiff was not issued within 90 days after publication of notice. However, the Court was not able to comply with the 90-day provision in this case. Based on the Court's trial schedule it was not able to hold the hearing before expiration of the 90-day period. Accordingly, the Court did not have the requisite information on which to base its decision. *In re PRI Automation, Inc. Securities Litigation,* 145 F.Supp.2d 138, 144-45 (D.Mass.2001) (noting that compliance with the 90-day provision in some cases would require a district judge to make an uninformed decision and finding the 90-day provision to be an unconstitutional intrusion on judicial functions). Moreover, the Court needed time after the hearing to appropriately consider the parties' motions and focus on selecting the lead plaintiff and lead counsel best suited to adequately and fairly represent the interests of the plaintiff class in this case. *See id.*

[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under [the PSLRA] is the person or group of persons that -
(aa) has either filed the complaint or made a motion in response to a notice ...;
(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

*Id.* § 78u-4 (3)(B)(iii)(I)(aa)-(cc). The above presumption may only be rebutted by proof that the presumptive lead plaintiff (1) will not fairly and adequately protect the interests of the class, or (2) is subject to "unique defenses" that render such plaintiff incapable of adequately representing to the class. *Id.* § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb). The lead plaintiff selected by the Court has the discretion to retain counsel of its choice to represent the class, subject to court approval. *Id.* § 78u-4(a)(3)(B)(v).

Here, all movants have timely filed their motions to be appointed lead plaintiff in this action. Accordingly, the Court now turns to its determination of the movants' relative financial interests in the relief sought by the class.

### IV. Largest Financial Interest

*3 The PSLRA does not provide any guidance concerning the method of calculating which plaintiff has the "largest financial interest." *See id.* 78(u)(a)(3)(B)(iii)(I)(bb). This Court will calculate financial interest employing a four-factor inquiry recognized by a host of other district courts. *See, e.g., In re Olsten Corp. Sec. Litig.,* 3 F.Supp.2d 286, 295 (E.D.N.Y.1998); *In re Nice Sec. Litig.,* 188 F.R.D. 206, 217 (D.N.J.1999); *In re Cable & Wireless, PLC, Sec. Litig.,* 217 F.R.D. 372, 375 n. 4 (E.D.Va.2003); *In re Comedisco Sec. Litig.,* 150 F.Supp.2d 943, 945 (N.D.Ill.2001). The four factors relevant to the calculation are: (1) the number of stock shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered during the class period. The Court separately addresses each movant's financial interest in light of these factors, subject to the caveat that this discussion is limited to resolving the lead plaintiff motions, and is not an ultimate determination of liability and damages.

### A. Flamina Holdings

Under the foregoing analysis, Flamina Holdings has not demonstrated the most significant financial interest in this litigation. Flamina Holdings purchased and sold 65,000 shares of Goodyear stock during the Class Period, for a net purchase of zero shares. The company expended $1,550,000 and received $665,400, incurring a total loss of $884,600. The

record thus indicates that, of the three movants for lead plaintiff, Flamina Holdings expended the least amount of funds and purchased the fewest (total) shares of Goodyear stock during the Class Period. As the Court discusses below, Flamina Holdings' $884,600 loss is not the greatest loss incurred by the movants. Accordingly, Flamina Holdings is not the best candidate for lead plaintiff.

Flamina Holdings' motion is denied on the additional ground that the movant is a holding company for two individual investors and thus is not an "institutional investor." The legislative history of the PSLRA reflects a preference for institutional investors in the lead plaintiff role. *See In re Telxon Corp. Sec. Litig.,* 67 F.Supp.2d 803, 821 (N.D.Ohio 1999).

Flamina Holdings' alternative request for appointment as a co-lead plaintiff also is denied. A co-lead plaintiff appointment is not warranted under the circumstances present in this case and likely would result in increased costs and duplication of efforts.

### B. The Institutional Funds

The Institutional Funds' motion also is denied on the ground that the Institutional Funds do not have the most significant financial interest in this litigation based on damages incurred from purchases and sales of Goodyear securities during the Class Period. Although the movants' respective representations of loss seem to indicate that the Institutional Funds suffered the greatest damages by a considerable margin, the Institutional Funds' claimed $3.7 million loss is illusory.

*4 The Institutional Funds have calculated their purported $3.7 million loss based solely on a first-in-first-out (FIFO) methodology, ignoring the four-pronged inquiry set forth above. In this situation, FIFO grossly inflates the Institutional Funds' damages because the Institutional Funds are a "net seller" of Goodyear stock. The Institutional Funds sold 202,714 more Goodyear shares during the Class Period than they purchased, and received profits from the sale of Goodyear stock during the Class Period than losses on the purchase of Goodyear securities.

Application of the four-factor test reveals FIFO's inaccuracy under the circumstances present here. The Institutional Funds purchased 188,675 shares of Goodyear stock during the Class Period and sold

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

391,389 shares for a net *sale* of 202,714 shares. A determination of net expenditures, or total monies received from sales ($12,910,959.72) of Goodyear stock less total funds expended on purchases ($5,299,423.81), verifies that the Institutional Funds received a total of $7,611,535.91 in net *proceeds* as a result of their high-volume Goodyear stock sales during the Class Period. The Institutional Funds may have benefitted from the alleged fraud in view of the fact that they earned millions of dollars on net sales of Goodyear stock during the Class Period. Accordingly, the Institutional Funds cannot establish the largest financial interest in the relief sought by the class.

Similarly, Central States and Alaska both are net sellers. Central States profited in the amount of $8,460,217.87 from its sales of Goodyear Stock during the Class Period. Although Alaska expended $848,681.96 more than it received, its loss is not even half as great as that claimed by Capital Invest. As such, the Court rejects the Institutional Funds' contention that they have incurred a greater financial interest in this litigation than any other lead plaintiff applicant. *See Weisz v. Calpine Corp.,* No. C 02-1200 SBA, Slip. Op. At 12 (N.D.Cal. Aug. 19, 2002) (rejecting motion of lead plaintiff movant who was a net seller and, as a result, "may have actually profited, not suffered losses as a result of the allegedly artificially inflated stock price"); *Comdisco,* 150 F.Supp. at 945-46 (same). *See also In re McKesson HBOC Sec. Litig.,* 97 F.Supp.2d 993, 996-97 (N.D.Cal.1999) ("[a] net purchaser will, presumably, have a greater interest in the litigation, because he or she was induced by the fraud to purchase shares, and has been left 'holding the bag' when the fraudulent inflation is revealed.")

Even if the Court ignores the flaws inherent in the Institutional Funds' FIFO methodology, the Institutional Funds are not an acceptable lead plaintiff as they may be subject to unique defenses. Alaska sold all of its shares of Goodyear stock prior to the disclosure of the alleged fraud. Likewise, it appears that Central States sold the significant majority of its shares prior to the disclosure. Thus, both Alaska and Central States undoubtedly will face motions to dismiss and/or for judgment as a matter of law on the ground that certain losses suffered by them were not caused by the alleged fraud. *See In re Cable & Wireless,* 217 F.R.D. at 379 (stating that the lead plaintiff movant who sold its shares "before the fraud ... was revealed to the public ... could not have suffered any loss as result of the Defendants' alleged fraud"); *In re MicroStrategy Inc. Sec. Litig.,* 110

F.Supp.2d 427, 437 n. 23 (E.D.Va.2000) (holding that a lead plaintiff movant who sold shares in the subject company prior to the disclosure of the fraud also may be subject to "unique defenses based on the timing of its loss"); *Arduini/Messina P'ship v. Nat'l Med. Fin. Servs. Corp.,* 74 F.Supp.2d 352, 361-62 (S.D.N.Y.1999) (granting the defendants' motion to dismiss the plaintiff's claims where plaintiff sold all of his shares in the subject company prior to disclosure of the fraud and could not demonstrate that his damages were caused by the defendants' fraudulent statements).

**\*5** Moreover, the Institutional Funds' motion is denied in light of this Court's previous ruling that lead plaintiff movants must have a pre-existing relationship and basis for acting as a collective unit to qualify under the PSLRA as a viable lead plaintiff group. *In re Telxon,* 67 F.Supp.2d at 823 (O'Malley, J.). At the February 10, 2004 hearing, counsel for the Institutional Funds admitted that Central States and Alaska have no relationship pre-dating this litigation and were joined solely for the purpose of prosecuting this case. As such, the Institutional Funds have improperly aggregated their losses for the purpose of their lead plaintiff motion.

#### C. Capital Invest

Having denied the competing lead plaintiff applications, the Court now turns to Capital Invest's motion. Capital Invest has the most significant financial interest in this litigation. It purchased the most shares of Goodyear Stock during the Class Period and sold no shares, for a net purchase of 83,100 shares, a net expenditure of $1,779,900.36, and a claimed loss of approximately $1,200,000. Thus, Capital Invest is the presumptive lead plaintiff subject to the requirements of Rule 23 (discussed *infra.*)

Capital Invest's qualifications for lead plaintiff status are not susceptible to the Institutional Funds' challenges. The Court briefly examines said challenges below.

Contrary to the Institutional Funds' contention, Capital Invest possesses standing to assert securities fraud claims on behalf of the clients for whom it purchases and sells securities. A number of district courts have held that an investment manager has standing to bring securities claims on its clients' behalf if it is the clients' attorney-in-fact and has specific authority to recover its clients' investment

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

losses. *See, e.g., Weinberg v. Atlas Air Worldwide Holdings, Inc., 216 F.R.D. 248, 255 (S.D.N.Y.2003)* (stating that "when the investment advisor is also the attorney-in-fact for its clients with unrestricted decision making authority, the investment advisor is considered the 'purchaser' under the federal securities laws with standing to sue in its own name"); *In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 299 (D.Del.2003)* (same); *In re Rent-Way Sec. Litig., 218 F.R.D. 101, 106-09 (W.D.Pa.2003)* (same); *EZRA Charitable Trust v. Rent-Way, Inc., 136 F.Supp.2d 435 (W.D.Pa.2001)* (same). Capital Invest's Declaration provides, "Capital Invest controls and manages the Funds and acts as attorney-in-fact for them. Capital Invest has full and complete authority to purchase and sell securities for each of the funds, and to institute legal action on their behalf." Based on the Declaration, the other evidence of record, and the caselaw cited above, Capital Invest has standing to bring suit and serve as lead plaintiff in this litigation.

The Institutional Funds' attempt to discredit Capital Invest on the ground that it is a non-domestic (Austrian) investment firm, and therefore an uncommitted and uncontrollable candidate for lead plaintiff, is insupportable. Capital Invest has testified in its Declaration and through its attorneys at the February 10, 2004 hearing that it has vast resources, that it is committed to working to obtain the best possible recovery for the plaintiff class, and that its representatives will be available in person to the Court. Further, the Institutional Funds' comment that Capital Invest is located almost 4500 miles from the Court lacks a measure of ingenuousness given that Alaska itself is located over 4000 miles away and has not provided the Court with any proof that it is willing to make its representatives available to the Court as necessary. Further, Austrians are, by treaty, expressly entitled to the same rights and privileges before United States courts as United States citizens. *See* Treaty between the United States of America and Austria of Friendship, Commerce and Consular Rights, June 19, 1928, U.S.-Aus., art. IX, 47 Stat. 1876, *1931 WL 29977 (U.S. Treaty).* Even in the absence of a treaty, to exclude a foreign investor from lead plaintiff status on nationality grounds would defy the realities and complexities of today's increasingly global economy.

*6 For all of the foregoing reasons, Capital Invest has the greatest financial interest in this case and is the presumptive lead plaintiff subject to the strictures and requirements of Rule 23. The Court now turns to its Rule 23 analysis.

## V. Adequacy & Typicality Under Rule 23(a)

Having determined that Capital Invest is the largest stakeholder does not end this Court's analysis. The PSLRA requires that the lead plaintiff also satisfy the requirements of Federal Rule 23.[FN8] Here, the Court must find that Capital Invest would satisfy Rule 23's typicality and adequacy requirements before it can appoint Capital Invest as lead plaintiff.[FN9] *See In re Century Business Services Sec. Litig., 202 F.R.D. 532, 539 (N.D.Ohio 2001)* (analyzing the typicality and adequacy requirements of Rule 23 in a securities class action governed by the PSLRA); *See also In re Telxon, 67 F.Supp.2d at 807 n. 10* (noting that class action analysis under Rule 23 in securities actions hinges on the typicality and adequacy requirements of the rule). Based on the evidence before it, this Court finds that Capital Invest would satisfy the typicality and adequacy requirements of Rule 23.

FN8. Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).

FN9. Upon motion to certify this action as a class action, the Court will undertake the "rigorous analysis" necessary for a determination of whether the complete prerequisites of Rule 23 are met. *In re American Medical Systems, Inc., 75 F.3d 1069, 1079 (6th Cir.1996)* (citing *General Tel. Co. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).* As the Sixth Circuit has noted, "[a] class is not maintainable as a class action by virtue of its designation as such in the pleadings." *Id.* Because, in this case, a consolidated complaint has not been filed, the Court will reserve the issue of whether a class will be certified for a later date.

Typicality is governed by Rule 23(a)(3), which requires that the claims or defenses of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

representative party be typical to the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). In other words, a sufficient relationship must exist between the injury to the named representative and the conduct affecting the class. In re American Medical Sys. Inc., 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3-13, at 3-76 (3d ed.1992)). "Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." Id.

Capital Invest satisfies the typicality requirement. It seeks to represent a class of purchasers of Goodyear securities who have non-competing and non-conflicting interests. All class members purchased or acquired Goodyear stock during the Class Period and allegedly suffered a loss as the result of Defendants' conduct in connection therewith. As Capital Invest aptly notes, its claims deal with the same issues that pertain to the claims of the other class members. Namely, these issues are (1) whether Goodyear issued false and misleading statements during the Class period, (2) whether Defendants acted knowingly and/or with deliberate recklessness in issuing these allegedly false and misleading statements, (3) whether the market price of Goodyear stock was artificially inflated during the Class Period because of Defendants' allegedly wrongful conduct, and (4) whether the members of the class have sustained damages, and the amount of such damages. Because Capital Invest's claims deal with the same issues that pertain to the other class members, its interests are clearly aligned with those of the class. Id.

*7 Adequacy is governed by Rule 23(a)(4), which allows certification of a class only if the class representative will fairly and adequately protect the interest of the class. Fed. R. Civ. P. 23(a)(4). The Sixth Circuit has set forth two criteria for determining adequacy. First, the class representative must have common interests with those unnamed class members. In re American Medical Systems, Inc., 75 F.3d 1069, 1082 (6th Cir.1996) (citation omitted). Second, it must appear that the class representative will vigorously prosecute the action with the assistance of qualified counsel. Id. According to the circuit, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class

members." Id.

Here, Capital Invest has common interests with the unnamed members of the class. Both Capital Invest and the other class members seek to recover their losses in connection with Defendants' alleged conduct. There is nothing to indicate that Capital Invest, as the class representative, would not vigorously prosecute the interests of the class. Clearly, Capital Invest has the need seek to recovery for its own losses. As such, there is no reason for this Court to find that Capital Invest would not just as vigorously prosecute and protect the interests of the class. As Capital Invest notes, there is no evidence before the Court of any antagonism between the interests of Capital Invest and the interests of the class members. Therefore, the Court sees no reason why Capital Invest cannot or would not vigorously prosecute the class members' claims.

There is also no evidence that the proposed lead counsel, Bernstein Litowitz, is not qualified counsel. In making this determination, the Court must consider whether the proposed counsel are qualified, experienced, and generally able to conduct the litigation. See Stout v. J.D. Byrider, 228 F.3d 709, 717 (6th Cir.2000). Having reviewed the resume of Bernstein Litowitz, proposed lead counsel in this action, the Court notes that the firm's litigation practice concentrates in the area of securities class actions. The firm also markets itself as "the nation's leading firm in representing institutional investors in securities fraud class action litigation." FN10

FN10. See Capital Invest, Mot. to Consolidate at Exh. D.

A review of the firm's resume reveals that it is qualified in securities class action lawsuits. Other courts have found this as well. See, e.g. Piven v. Sykes Enterprises, Inc., 137 F.Supp.2d 1295, 1306 (M.D.Fla.2000) (finding Bernstein Litowitz experienced in litigating class action lawsuits); Osher v. Guess?, Inc., No. CV01-00871LGB, 2001 WL 861694 at *4 (C.D.Cal.2001) (unreported) (finding Bernstein Litowitz experienced in litigating complex securities actions after reviewing the firm's resume); Armour v. Network Assoc., Inc., 171 F.Supp.2d 1044, 1052 (noting that "[t]he firm resume of Bernstein Litowitz reveals its competence to provide class representation in a securities class action."). In fact, the firm's literature boasts numerous statements from various district court judges across the country who have commented on the outstanding performance of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Bernstein Litowitz in various actions where excellent results have been achieved for plaintiff class members. On the whole, there is nothing that would indicate to this Court that Bernstein Litowitz is anything but qualified, experienced, and generally able to conduct the litigation in this case.

VI. Conclusion

*8 For the reasons stated above, Capital Invest's motion for appointment as lead plaintiff is granted. In keeping, its request appoint the law firm of Bernstein Litowitz as lead counsel and the law firm of Climaco Lefkowitz as liaison counsel is granted. All other pending motions are hereby denied.

IT IS SO ORDERED.

N.D.Ohio,2004.
In re Goodyear Tire & Rubber Co. Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3147605 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dec. 30, 2004) Original Image of this Document (PDF)
• 2004 WL 3145073 (Trial Motion, Memorandum and Affidavit) Motion to Fix Defendants' Reply Deadline at January 21, 2005. (Dec. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 3145065 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint (Nov. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 3144420 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of the Motion of Capital Invest to be Appointed Lead Plaintiff Pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, for Approval of its Choice of Lead Counsel for the Class and in Opposit ion to the Motions of the Central States Group and Flamina (Feb. 9, 2004) Original Image of this Document (PDF)
• 2004 WL 3152998 (Trial Motion, Memorandum and Affidavit) The Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Consolidated Reply in Further Support of their Motion for Appointment as Lead

Plaintiff and for Approval of their Selection of Lead Counsel (Feb. 9, 2004) Original Image of this Document (PDF)
• 2004 WL 3152997 (Trial Motion, Memorandum and Affidavit) Movant Flamina's Reply in Support of its Motion for Appointment as Lead Plaintiff and Approval of its Selection of Lead Counsel (Feb. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 3146524 (Trial Motion, Memorandum and Affidavit) The Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Consolidated Opposition to the Competing Motions for Appointment as Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counse (Jan. 29, 2004) Original Image of this Document (PDF)
• 2004 WL 3152996 (Trial Motion, Memorandum and Affidavit) Movant Flamina's Response to the Motions for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel Filed by the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund and by Capital Inves t GmbH (Jan. 29, 2004) Original Image of this Document (PDF)
• 2004 WL 3146787 (Trial Motion, Memorandum and Affidavit) Plaintiff Richard Berman's Response to Motions for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Co-Lead Counsel (Jan. 12, 2004) Original Image of this Document (PDF)
• 2003 WL 23998043 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants' Motion to Adopt Defendants' Case Management Proposal (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23998206 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants' Motion to Adopt Defendants' Case Management Proposal (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23999273 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants' Motion to Adopt Defendants' Case Management Proposal (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23999846 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants'

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

Motion to Adopt Defendants' Case Management Proposal (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 24001167 (Trial Motion, Memorandum and Affidavit) Class Action (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 24002678 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants' Motion to Adopt Defendants' Case Management Proposal (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23998228 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of Capital Invest for Consolidation; to be Appointed Lead Plaintiff Pursuant to Section 21d(a)(3)(B) of the Securities Exchange Act of 1934; and to Approve Proposed Lead Plaintiff's Choice of Counsel for the Class (Dec. 23, 2003) Original Image of this Document (PDF)
• 2003 WL 23998026 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southeast Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998035 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998040 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998092 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998253 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and

Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998353 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Richard Berman for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23998849 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23999134 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23999263 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23999268 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23999333 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)
• 2003 WL 23999343 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (Dec. 22, 2003) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 9
Not Reported in F.Supp.2d, 2004 WL 3314943 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

• 2003 WL 23999748 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 23999957 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 24000014 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of Capital Invest for Consolidation; to be Appointed Lead Plaintiff Pursuant to Section 21d(a)(3)(B) of the Securities Exchange Act of 1934; and to Approve Proposed Lead Plaintiff's Choice of Counsel for the Class (Dec. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 24001165 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 24001174 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion to Consolidate Related Actions (Dec. 22, 2003) Original Image of this Document (PDF)

• 2003 WL 23999790 (Trial Motion, Memorandum and Affidavit) Plaintiffs Alaska Electrical Pension Fund's and Central States, Southeast and Southwest Areas Pension Fund's Opposition to Defendants' Motion to Adopt Defendants' Case Management Proposal (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 23998348 (Trial Pleading) Complant for Violation of the Federal Securities Laws (Oct. 23, 2003) Original Image of this Document (PDF)

• 5:03cv02166 (Docket) (Oct. 23, 2003)

• 2003 WL 24002679 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of the Motion of Capital Invest to be Appointed Lead Plaintiff Pursuant to Section 21d(a)(3)(B) of the Securities Exchange Act of 1934, for Approval of its Choice of Lead Counsel for the Class and in Opposition to all other Competing Motions (Jan. 29, 2003) Original Image of this

Document (PDF)

• 2003 WL 23998875 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (2003) Original Image of this Document (PDF)

• 2003 WL 24001166 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of the Alaska Electrical Pension Fund and Central States, Southeast and Southwest Areas Pension Fund's Motion for Appointment of Lead Plaintiff and Approval of their Selection of Lead Counsel (2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F-5

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re NORTEL NETWORKS CORP. SECURITIES
LITIGATION
No. 01 Civ. 1855(RMB).

Sept. 8, 2003.

Investor, on behalf of putative class, brought securities fraud action against corporation and its officers. Investor moved for class certification. The District Court, Berman, J., held that: (1) investor satisfied prerequisites to class certification; (2) common questions of law or fact predominated; (3) class action was superior method of adjudicating controversy; and (4) court had subject matter jurisdiction over foreign investors for purposes of class certification.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Investor seeking class certification in securities fraud action satisfied numerosity prerequisite, inasmuch as class likely numbered in the hundreds or thousands. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[2] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Securities fraud case satisfied commonality prerequisite to class certification, given existence of such common legal and factual issues as whether defendants violated federal securities laws through acts and conduct alleged and whether corporation issued false and misleading statements during class period. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule

23(a)(2), 28 U.S.C.A.

**[3] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Investor seeking class certification in securities fraud action satisfied typicality prerequisite to certification, despite contention that investor's use of indexed trading strategy did not involve reliance on integrity of market and would give rise to atypical defenses, given that reliance was clearly alleged and jury could conclude that pursuing index strategy entailed reliance. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[4] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Investor satisfied prerequisite to class certification addressing adequacy of representation in securities fraud action, in that investor's claims appeared to be in harmony with those of other members of proposed class, investor took several significant "hands on" steps to prosecute case, and its counsel was qualified to pursue securities fraud litigation. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[5] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Common questions of law or fact predominated in securities fraud action, supporting investor's motion for class certification, notwithstanding defendants' contention that investor was not entitled to rely on fraud-on-the-market theory of reliance because market was not efficiently driven by fundamental value. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[6] Federal Civil Procedure** ☜⟶187
170Ak187 Most Cited Cases
Class action was superior method of resolving securities fraud litigation, supporting class certification, given that claims likely would be numerous but would, in many instances, be too small to pursue individually, and that multiple lawsuits would be inefficient. Securities Exchange Act of 1934, §§ 10(b), 20(a), as amended, 15 U.S.C.A. §§

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

Page 2

78j(b), 78t(a); 17 C.F.R. § 240.10b-5; Fed.Rules
Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[7] Federal Civil Procedure** ☜═187
170Ak187 Most Cited Cases
For purposes of class certification in securities fraud
action, district court had subject matter jurisdiction
over claims of foreign buyers who acquired
corporation's stock on foreign exchange, given
allegations that, during class period, corporation and
its officers extended vendor financing to United
States customers which they knew to be
uncreditworthy so as to artificially inflate
corporation's revenues, and thus engaged in
substantial fraudulent activity in United States
directly causing losses to foreign investors, and given
court's ability to shape class more precisely to fit
issues of case as they emerged during litigation.
Securities Exchange Act of 1934, § § 10(b), 20(a), as
amended, 15 U.S.C.A. § § 78j(b), 78t(a); 17 C.F.R. §
240.10b-5; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

DECISION AND ORDER ON CLASS
CERTIFICATION

BERMAN, J.

*1 THIS DOCUMENT RELATES TO: ALL
CLASS ACTIONS

I. Background

In this action filed on March 2, 2001, the Trustees of
the Ontario Public Employees' Union Pension Trust
Fund ("OPTrust"), on behalf of a putative class,
allege that Nortel Networks Corporation ("Nortel"),
John Andrew Roth, Nortel's Chief Executive Officer
and President during the Class Period, Clarence
Chandran, Nortel's Chief Operating Officer during
the Class Period, and Frank Dunn, Nortel's Chief
Financial Officer during the Class Period
(collectively, "Defendants") violated Section 10(b) of
the Securities Exchange Act of 1934 ("Exchange
Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a)
of the Exchange Act, 15 U.S.C. § 78t(a) by, among
other things, "knowingly or recklessly issu[ing] a
stream of materially false and misleading
representations to the investing public." (Second
Consolidated and Amended Class Action Complaint
("Complaint") ¶ 3, at 2.) [FN1]

> FN1. For a more detailed recitation of the
> facts, see this Court's Order resolving
> Defendants' motion to dismiss the

Complaint against Nortel, reported at 238
F.Supp.2d 613 (S.D.N.Y.2003).

OPTrust moves to certify a class "consisting of all
persons and entities who, during the period October
24, 2000 and continuing through and including
February 15, 2001, purchased Nortel common stock
or call options or sold Nortel put options, and who
suffered damages thereby, including, but not limited
to, those persons who traded in Nortel Securities on
the New York Stock Exchange and/or the Toronto
Stock Exchange." (Mem. of Law in Supp. of Lead
Pl.'s Motion for Class Certification ("Pl.Br.") at 7.)
OPTrust argues that "this action meets all of the
requirements of Rule 23 of the Federal Rules of Civil
Procedure for the maintenance of a class action" (Pl.
Br. at 2) and, among other things, that all members of
the class relied upon Defendants' allegedly "deceptive
and materially false and misleading statements to the
investing public." (Compl. ¶ 198, at 84; see id. ¶
203, at 86 ("Lead Plaintiff and the other members of
the Class, relying on the materially false and
misleading statements described herein, which the
defendants made, issued or caused to be
disseminated, or relying upon the integrity of the
market, traded in Nortel Securities at prices
artificially inflated or distorted by defendants'
wrongful conduct.") Defendants oppose class
certification, arguing that (1) OPTrust is atypical
because it is subject to unique defenses; (2) OPTrust
is an inadequate representative because it has ceded
control of the litigation to its lawyers; (3) common
questions of law or fact do not predominate "because
plaintiffs cannot rely upon the fraud-on-the-market
theory of reliance." (Def. Mem. of Law in Opp'n to
Lead Pl.'s Motion for Class Certification ("Def.Br.")
at 1-12); and (4) the Court does not have subject
matter jurisdiction over foreign purchasers of Nortel
Securities. For the reasons set forth below, the Court
grants Plaintiff's motion for class certification and
appoints OPTrust as Class representative.

II. Standard of Review

*2 To succeed on a motion to certify a class,
plaintiffs first must satisfy the prerequisites listed in
Rule 23(a) of the Federal Rules of Civil Procedure:
"(1) the class is so numerous that joinder of all
members is impracticable, (2) there are questions of
law or fact common to the class, (3) the claims or
defenses of the representative parties are typical of
the claims or defenses of the class, and (4) the
representative parties will fairly and adequately
protect the interests of the class." Fed.R.Civ.P. 23(a);
In re AMF Bowling Sec. Litig., 99 Civ. 3023, 2002

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

WL 461513, at *3 (S.D.N.Y. Mar.26, 2002).
"Second, plaintiffs must show that the putative class
falls within one of the three categories set forth in
Rule 23(b)." Id. [FN2]

> FN2. Plaintiffs seek certification under Rule
> 23(b)(3), which requires that the Court find
> "that questions of law or fact common to the
> members of the class predominate over any
> questions affecting only individual
> members, and that a class action is superior
> to other available methods for the fair and
> efficient adjudication of the controversy."
> Fed.R.Civ.P. 23(b)(3).

"[T]he Second Circuit has directed district courts to
apply Rule 23 according to a liberal rather than a
restrictive interpretation and has explicitly noted its
preference for class certification in securities cases."
Maywalt v. Parker & Parsley Petroleum Co., 147
F.R.D. 51, 54 (S.D.N.Y.1993); see In re Blech Sec.
Litig., 187 F.R.D. 97, 102 (S.D.N.Y.1999) ("Class
action treatment of related claims is particularly
appropriate when plaintiffs seek redress for violations
of the securities laws....").

"Although a court must conduct a rigorous inquiry in
determining whether the requirements of Rule 23
have been satisfied, it must accept plaintiffs'
allegations as true and refrain from conducting an
examination on the merits when determining the
propriety of class certification." In re AMF, 2002 WL
461513, at *3 (citations omitted); see Caridad v.
Metro-North Commuter R.R., 191 F.3d 283, 291 (2d
Cir.1999); Shelter Realty Corp. v. Allied
Maintenance Corp., 574 F.2d 656, 661 n. 15 (2d
Cir.1978).

III. Analysis

The Court has reviewed, among other things, Pl. Br.,
dated March 21, 2003; Def. Br., dated May 30, 2003,
which attaches the (expert) reports of Professor Paul
A. Gompers and Professor Christopher M. James;
"Lead Plaintiff's Reply Memorandum of Law in
Further Support of its Motion for Class
Certification," dated August 1, 2003 ("Pl.Reply"),
which attaches the (expert) reports of Professor
Anthony Saunders, Blaine F. Nye, Ph.D., and
Professor Sanjai Bhagat; and the Complaint, dated
January 18, 2002. The Court heard oral argument on
September 3, 2003.

A. Fed.R.Civ.P. 23(a)(1)--Numerosity

[1] According to OPTrust, approximately
3,006,967,918 shares of Nortel were outstanding
during the class period. (Pl. Br. at 7; see Compl. ¶
39, at 15.) OPTrust estimates that "there are, at a
minimum, thousands of members of the Class who
purchased Nortel common stock during the Class
Period." (Compl. ¶ 39, at 15.) Defendants do not
dispute that the proposed class is sufficiently
numerous and that joinder would be impractical.
(Accord Def. Br.) Indeed, the class likely will number
in the hundreds or thousands. See Maywalt, 147
F.R.D. at 55; see also In re Frontier Ins. Group, Inc.
Sec. Litig., 172 F.R.D. 31, 40 (E.D.N.Y.1997) (" 'In
securities fraud actions brought against publicly
owned and nationally listed corporations, the
numerosity requirement may be satisfied by a
showing that a large number of shares were
outstanding and traded during the relevant period." '
(citation omitted); Dietrich v. Bauer, 192 F.R.D.
119, 123 (S.D.N.Y.2000).

B. Fed.R.Civ.P. 23(a)(2)--Commonality

*3 [2] OPTrust asserts that common legal and factual
issues here include, among others, "whether
defendants violated the federal securities laws by the
acts and conduct alleged" and "whether Nortel issued
false and misleading statements during the Class
Period." (Pl. Br. at 10.) Defendants do not dispute
commonality. (Accord Def. Br.) "The commonality
requirement is met if plaintiffs' grievances share a
common question of law or fact." Robinson v.
Metro-North Commuter R.R., 267 F.3d 147, 155 (2d
Cir.2001) (citation omitted). "The commonality
requirement of Rule 23(a)(2) has been applied
permissively by courts in the context of securities
fraud litigation." In re Blech, 187 F.R.D. at 104; see
also In re Frontier, 172 F.R.D. at 40.

C. Fed.R.Civ.P. 23(a)(3)--Typicality

[3] OPTrust's claims, as well as those of the other
members of the proposed class, arise out of alleged
misrepresentations by Defendants concerning Nortel.
(See Pl. Br. at 10-11.) OPTrust argues, among other
things, that its "use of an indexed trading strategy
[does not] give[ ] rise to atypical defenses" because
"indexed trading typifies its reliance on the integrity
of the market." (Pl. Reply at 5.) Moreover, OPTrust
alleges specifically that it relied on Defendants'
alleged misrepresentations. (See, e.g., Compl. ¶ 203,
at 86 ("Lead Plaintiff ... relying on the materially
false and misleading statements described herein, ...
traded in Nortel Securities ...." (emphasis added)));
see also In re Avon Sec. Litig., 91 Civ. 2287, 1998

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

WL 834366, at *5 (S.D.N.Y. Nov.30, 1998) ("Decisions regarding class certification are to be based on the allegations set forth in the complaint, which are accepted as true."). [FN3]

> FN3. In addition, OPTrust argues that "[c]ourts have repeatedly held that additional purchases after the price of the security drops as a result of corrective disclosure do *not* give rise to atypical defenses." (Pl. Reply at 5-6 (citing cases)); *see, e.g., In re Frontier, 172 F.R.D. at 42* (concluding that a plaintiff's purchase of defendant's stock after the disclosure of alleged misrepresentations "has no bearing on whether or not she relied on the integrity of the market during the class period" and did not defeat typicality).

Defendants dispute OPTrust's claim that it satisfies the typicality requirement because " 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation .' " (Def. Br. at 12-13 (citing, among other opinions, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)).) Defendants argue that, unlike the putative class described in the Complaint, OPTrust "did not rely on the 'integrity' of Nortel's stock price" when OPTrust purchased Nortel stock. (Def. Br. at 13 ("[OPTrust's] trading strategy ran directly counter to market sentiment because its investment advisors concluded that the stock was highly 'overvalued' and indeed saw the emergence of a 'bubble' far earlier than the rest of the market. Yet, OPTrust bought Nortel stock largely because it was tracking an index, not because it was lulled into believing that Nortel was trading at 'a fair market price.' ").) [FN4]

> FN4. Defendants also argue that OPTrust's purchase of Nortel stock "well after the alleged 'fraud' was 'exposed' " militates against typicality. (*Id.* at 16.)

"[T]he claims of the class representatives [must] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." ' *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (per curiam). Because, among other things, "reliance" is clearly alleged, (*see, e.g.,* Compl. ¶ 203, at 86), and because a jury may conclude that pursuing an index strategy entails reliance (*see* Pl.

Reply at 5 ("Indexed trading is the ultimate acknowledgment that the market is efficient because it cannot be beat.")), OPTrust satisfies the typicality requirement. *See In re Blech,* 187 F.R.D. at 106 ("[T]he typicality requirement is satisfied because, as set forth in the Complaint, the Plaintiffs' claims of fraud arise from the same course of conduct.").

*4 Moreover, "[t]he rule barring certification of plaintiffs subject to unique defenses is not 'rigidly applied in this Circuit." *In re Frontier,* 172 F.R.D. at 41; *see also In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62, 72 (S.D.N.Y.1999) ("Because a person is ineligible to represent a class of securities purchasers only if he 'clearly did not rely upon either the misleading financials *or* on the integrity of the market price or information, [Plaintiff] remains qualified to serve as a class representative." (citation omitted)); *see also In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 481 (S.D.N.Y.2002) (While the extent of any non-reliance on [plaintiff's] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

### D. *Fed.R.Civ.P. 23(a)(4)--Adequate Representative*

[4] Defendants argue that OPTrust is "a wholly inadequate class representative, for it is a reluctant party that has ceded control over the litigation to lawyers." (Def. Br. at 17.) OPTrust responds that its "interests are not antagonistic to those of the Class" and that the "interests of the Class will be protected and advanced by OPTrust because its claims and interests are coextensive with those of the absent Class members." (Pl. Br. at 12.) In addition, OPTrust asserts that it has been "zealously representing the interests of the proposed Class by, among other things, retaining experienced counsel and devoting substantial time and effort to the prosecution of this case." (*Id.*) "Representatives of OPTrust met with senior attorneys from Milberg Weiss on three separate occasions to discuss the substantive allegations, the procedural posture of the litigation, the responsibilities of a class representative and OPTrust's potential interest in stepping into a lead role." (Pl. Reply at 7.) "Independent from the lawyers, OPTrust's Board of Trustees formed a Nortel Class Action Subcommittee ... to 'monitor developments, develop overall strategic direction and report to the Board in respect to the class action lawsuit" and "[a]t a Special Board of Trustees meeting on December 18, 2001--with the advice and assistance of an independent consultant--the Board

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

passed a resolution confirming its desire to seek the role of Lead Plaintiff." (*Id.; see also id.* at 8 n. 14 ("[W]e have a number of responsibilities, one of them being to manage the litigation ... [and] we have set up a subcommittee to do that." (quoting the deposition testimony of OPTrust's Chief Investment Officer, Morgan Eastman)).)

Under Fed.R.Civ.P. 23(a)(4), "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000). OPTrust satisfies the adequacy requirement. Its claims appear to be in harmony with those of the other members of the proposed class; it has taken several significant "hands on" steps to prosecute this case; and its counsel, Milberg Weiss Bershad Hynes & Lerach LLP, is clearly qualified to pursue this sort of litigation. *See also id.* at 61.

E. Fed.R.Civ.P. 23(b)(3)

*Predominance of Common Questions of Law or Fact*

*5 [5] Defendants argue in their brief that "because plaintiffs cannot rely upon the fraud-on-the-market theory of reliance" common questions of law or fact do not predominate over individual questions. (Def. Br. at 1; *see also Crommer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 130 n. 21 (S.D.N.Y.2001) (citing *In re Towers Fin. Corp. Noteholders Litig.*, 93 Civ. 0810, 1995 WL 571888, at *21 (S.D.N.Y. Sept.20, 1995), which states: "The [fraud-on-the-market theory] 'presumes that the market is a 'transmission belt which efficiently translates all information concerning a security into a price. In other words, it presumes the operation of an efficient market.' ")). Defendants argue that "[t]he market was not efficiently driven by fundamental value, and that is the death knell to application of the fraud-on-the-market theory." (Def. Br. at 12; *see id.* at 2 ("Without resort to the presumption, a class cannot be certified since individual claims of reliance would have to be proven and would overwhelm the common issues.").) Defendants urge the Court, preliminarily and by a separate proceeding, to "determine whether the plaintiffs are entitled to rely on the [fraud-on-the-market] presumption for purposes of class certification," (*id.* at 4 & n. 3 ("The availability of the fraud-on-the-market presumption is a legal issue that must be resolved by the Court for purposes of deciding class certification.")) citing several cases

(from other Circuits) for this proposition. *Cammer v. Bloom*, 711 F.Supp. 1264, 1290 (D.N.J.1989), *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir.2001), and *O'Neil v. Appel*, 165 F.R.D. 479, 496-505 (W.D.Mich.1996). [FN5]

FN5. Defendants submitted a letter to the Court, dated August 12, 2003, seeking to postpone a decision on OPTrust's motion for class certification so that the parties may conduct more "[e]xpert discovery followed by a possible hearing" on these issues. OPTrust responded with a letter to the Court, dated August 19, 2003, arguing "[t]he Court can and should decide the motion on the basis of the admittedly 'substantial' record already before it." The Court agrees with OPTrust on this issue. That is, the parties' thoughtful and comprehensive briefs on the motion to certify the class, which included submission of expert reports from Defendants and OPTrust, and helpful oral argument, have afforded the parties a full opportunity to address all salient points and authorities. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Baffa*, 222 F.3d at 58 ("[A] motion for class certification is not an occasion for examination of the merits of the case.... 'Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (citations omitted)). And, Defendants themselves have acknowledged that the existing class certification record is substantial as recently as July 29, 2003. (July 29, 2003 Tr. at 2 ("We have submitted a detailed brief, two expert reports, and I anticipate the plaintiffs will be doing the same. It's a pretty substantial record.").)

OPTrust contends that "it enjoys the benefit of the fraud on the market evidentiary rule, pursuant to which, in a Rule 10b-5 action against a public company such as Nortel, whose shares are traded in an open, well-developed market, it is presumed that (a) the alleged misrepresentations, so long as they are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

material, will inflate the value of the Company's shares and (b) plaintiff and all members of the Class relied upon the integrity of the market for those shares" and that "reliance is a common issue in this action." (Pl. Br. at 14.) OPTrust also argues " '[w]hether or not a market for a stock is open and efficient is a question of fact' that must wait for resolution at trial." (Pl. Reply at 1 (quoting *RMED Int'l Inc. v. Sloan's Supermarkets*, 94 Civ. 5587, 2002 WL 31780188 (S.D.N.Y. Dec.11, 2002))); *see also In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 490 (S.D.N.Y.1989) ("Whether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial."), *aff'd*, 969 F.2d 15 (2d Cir.1992). OPTrust argues that "Defendants' attempt to transform class certification into a complicated battle of the experts is precisely what the Supreme Court sought to preclude by barring 'preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (Pl. Reply at 1 (quoting *Eisen*, 417 U.S. at 177).)

*6 The parties have been afforded "substantial" opportunity to present their respective points of view. [FN6] *See In re Frontier*, 172 F.R.D. at 42 ("For the purposes of this motion [for class certification], the court assumes the market for Frontier stock is an efficient one incorporating all public information about the company."); *Crommer*, 205 F.R.D. at 133 ("While [defendant] has identified evidence and arguments it may use at trial to rebut the presumption, it remains true that it is logical and fair to presume reliance here."); *see also Baffa*, 222 F.3d at 58 ("[A] motion for class certification is not an occasion for examination of the merits of the case.... 'Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." ' (citations omitted)); *In re Frontier*, 172 F.R.D. at 39 ("In evaluating a motion for class certification, the court accepts as true the substantive allegations in the complaint and does not conduct even a preliminary inquiry into the merits of the case." (citing *Eisen*, 417 U.S. at 177-78); *In re Blech*, 187 F.R.D. at 107 ("[W]hen determining whether common questions predominate courts focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions." (citation omitted)).

FN6. *See also supra* note 5.

*Superiority of Class Action*

[6] The Court considers the following factors in making the determination of superiority: "(A) the interest of members of the class in individually controlling the prosecution or defenses of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3).

Here, a class action is superior to other alternatives. The claims likely will be numerous but, in many instances, too small to pursue individually and, even if individual plaintiffs chose to pursue the action, multiple lawsuits would be inefficient. *See In re Blech*, 187 F.R.D. at 107 ("In general, securities suits such as this easily satisfy the superiority requirement of Rule 23. Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims.").

*F. Subject Matter Jurisdiction over Foreign Purchasers*

*7 [7] Defendants argue that, even if the Court certifies a class in this action, the Court "should exclude foreign purchasers of Nortel stock." (Def. Br. at 20.) Citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985-90 (2d Cir.1975), Defendants argue that "[w]hen foreign purchasers on a foreign exchange seek to rely upon the Exchange Act, the Second Circuit has held that our securities laws should not be exported to foreign countries that are perfectly capable of policing the companies that reside within them." (Def. Br. at 21.) Defendants emphasize Nortel's connection to Canada. (*Id.* at 22 ("The essence of the fraud alleged here is that Nortel's senior management --- all based in Canada -- - made a series of representations, which materially overstated the Company's earnings."; "All of the allegedly fraudulent statements were disseminated from Nortel's headquarters in Ontario. Moreover, all challenged accounting decisions likewise were made in Canada." (footnote omitted).) Defendants also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

argue that "as a matter of international comity, accepting jurisdiction over Canadian purchasers would overlap and supplant at least three pending Canadian class actions brought on behalf of such purchasers in the courts of Canada. Moreover, issues of judicial administration would be a nightmare...." (*Id.* at 24-25.) [FN7]

> FN7. Relatedly, the Court received a letter, dated August 25, 2003 from counsel for plaintiffs in a Canada-wide class action entitled *Law, et al. v. Nortel Networks Corp., et al.,* 02-CL-4605 (Ontario Superior Court of Justice), which notes that "the other two cases are, to the best of our knowledge, limited to the Provinces of British Columbia and Quebec" and that "the Canadian courts are the proper place for determining the claims of Canadian citizens who purchased Nortel shares on the Toronto Stock Exchange." (Letter to the Court from Joel P. Rochon, dated Aug. 25, 2003 at 2-3.) The Court received a letter in response, dated September 2, 2003 from counsel for OPTrust, which argues, among other things, that "there is nothing in the applicable case law, or any proposition of international law identified by defendants, that would bar the extraterritorial application of the federal securities laws in this case ... provided that the applicable Second Circuit standards are met, which they are." (Letter to the Court from Steven G. Schulman, dated Sept. 2, 2003 at 2.)

OPTrust counters that "defendants' substantial activities in the United States are much more than merely preparatory to the fraud and thus favor a finding of subject-matter jurisdiction." (Pl. Reply at 8-9.) "The vast preponderance of customers and potential customers with whom Nortel did business during the Class Period were fiber-optic cable networks and internet service providers overwhelmingly located in the U.S." and "Nortel used its artificially inflated stock to fund an aggressive growth-by-acquisition strategy, then misled investors by failing to write down the goodwill associated with its numerous U.S. acquisitions despite substantial declines in their value.... Many of these acquisitions involved properties in the U.S." (*Id.* at 9.) In addition, OPTrust argues that the mere existence of Canadian lawsuits should not persuade the Court to deny certification. (*Id.* at 9 n. 15. ("Defendants offer no information about the nature or status of these actions, and fail to

mention important differences between U.S. and Canadian securities law—most notably the unavailability of the fraud-on-the-market-theory to Canadian plaintiffs. This Court should not grant defendants' request to avoid application of the securities laws to persons executing trades in Canada, given that Second Circuit standards for extending those laws to foreign investors in this case are satisfied.").)

"Since the Securities Exchange Act is silent as to its extraterritorial application, courts have developed two tests for determining the subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.,* 148 F.R.D. 105, 108 (S.D.N.Y.1993). "Under the 'conduct' test, a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. A federal court also has jurisdiction under the 'effects' test where illegal activity abroad causes a 'substantial effect' within the United States." *Id.* (quoting *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991).

*8 Defendants activities in the United States satisfy the test for subject matter jurisdiction. Among other things, OPTrust alleges that "defendants were consummating risky vendor financing deals in an effort to boost reported 'revenues' throughout the Class Period." (Compl. ¶ 64, at 26.) According to OPTrust, Defendants were extending vendor financing to "numerous U.S. customers that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." (Pl. Reply at 9); *see In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62, 73-75 (S.D.N.Y.1999) ("Subject matter jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme, allegedly straddled both sides of the border, and the degree of economic activity connecting [defendant] to the United States."). The Court also notes, in finding subject matter jurisdiction, that "it is well established that a court can certify a class while reserving the right to shape the class more precisely to fit the issues of the case as those emerge during the litigation." *Langner v. Brown,* 95 Civ.1981, 1996 WL 709757, at *4 (S.D.N.Y. Dec.10, 1996).

IV. Conclusion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)
(Cite as: 2003 WL 22077464 (S.D.N.Y.))

For the reasons stated herein, the Court grants OPTrust's motion to certify the class.

Not Reported in F.Supp.2d, 2003 WL 22077464 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 2004 WL 2973931 (Trial Motion, Memorandum and Affidavit) Nortel's Memorandum of Law in Opposition to Class Plaintiffs' Application for an Order to Show Cause (Jan. 15, 2004)

• 2003 WL 23671561 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification (May. 30, 2003)

• 2003 WL 23671559 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification (Mar. 21, 2003)

• 2002 WL 32595571 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and Jds Uniphase Shareholder Complaints (Sep. 30, 2002)

• 2002 WL 32595569 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Sep. 17, 2002)

• 2002 WL 32595570 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Aug. 16, 2002)

• 2002 WL 32595566 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Jul. 05, 2002)

• 2002 WL 32595557 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint (Jun. 03, 2002)

• 2002 WL 32595564 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of

Defendants' Motion to Dismiss the Nortel Shareholder and JDS Uniphase Shareholder Complaints (Apr. 01, 2002)

• 2002 WL 32768665 (Trial Pleading) Motion and Incorporated Memorandum for Withdrawal as Attorney of Record (Mar. 18, 2002)

• 2002 WL 32595550 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Fiducie Desjardins Inc.'s Motion for Appointment of Lead Plaintiff and Lead Counsel Pursuant to Section 21D of the Securities and Exchange Act of 1934 and for Consolidation of the Actions Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure (Feb. 14, 2002)

• 2001 WL 34611498 (Trial Motion, Memorandum and Affidavit) The JDSU Investors Group's Memorandum of Law in Opposition to the Nortel Investors Group'S Motion for Appointment of Lead Plaintiffs and Lead Counsel (May. 04, 2001)

• 2001 WL 34611496 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the Nortel Investors Group for Appointment of Lead Plaintiff and Approval of the Proposed Lead Plaintiff's Selection of Lead Counsel (Apr. 17, 2001)

• 1:01cv01855 (Docket) (Mar. 02, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F-6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:                                    )    Case Nos. 02-CV-72-H(M)
                                          )              Lead Case
WILLIAMS SECURITIES                       )
LITIGATION                                )
                                          )
                                          )    **F I L E D**
                                          )
                                          )    JUL  8 2002
                                          )
                                          )    Phil Lombardi, Clerk
                                               U.S. DISTRICT COURT

## ORDER

This matter comes before the Court on the motions to appoint lead plaintiff and lead counsel, filed on April 1, 2002 (Docket Nos. 16, 17, 19, 20, 25, 26, 34, 35, 38, 39). The Court issued an order on June 21, 2002 (Docket No. 123) consolidating the four remaining related cases with Case No. 02-CV-72-H(M) and bifurcating the action into the following subclasses: purchasers of Williams Communications Group, Inc. ("WCG") securities and purchasers of Williams Companies, Inc. ("WMB") securities. As contemplated by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii) and 15 U.S.C. § 77z-1(a)(3)(B)(ii), which requires the Court to appoint the most adequate plaintiff as the lead plaintiff for the consolidated action "as soon as practicable" after the decision on the motions to consolidate is rendered, the Court will now address the motions for appointment of lead plaintiff and lead counsel.

The Court has carefully reviewed the briefs submitted by the five lead plaintiff movants, and, for the reasons set forth below, hereby orders the appointment of Alex Meruelo as the lead plaintiff for the subclass of purchasers of WCG securities and HGK Asset Management ("HGK")

1

as lead plaintiff for the subclass of purchasers of WMB securities. The Court further orders the appointment of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Weiss & Yourman, and Morrel West Saffa Craige & Hicks Inc ("Morrel West") as counsel for the subclass of purchasers of WCG securities and Schoengold & Sporn and the Seymour Law Firm as counsel for the subclass of purchasers of WMB securities.

<center>I</center>

The PSLRA sets forth detailed procedures for the appointment of lead plaintiff(s) in a private class action arising under the securities laws. 15 U.S.C. § 78u-4(a).[1] Among those procedures is the requirement that the named plaintiff in the action must file notice within twenty days of filing suit to inform potential class members of their right to move to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Such notice must be published "in a widely circulated national business-oriented publication or wire service." Id. Not later than sixty days after the date on which this notice is published, any member of the putative class may move the court to be appointed lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

The PSLRA then requires the Court to appoint a lead plaintiff for the class after determining which applicant is "most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B). In determining which applicant should be named lead plaintiff, the Court must accept the presumption that the most adequate plaintiff in any private action is the person(s) who: (1) has either filed the complaint or made a motion in response to a

---

[1] The PSLRA amended both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by adding identical sections to both acts, Section 27 to the Securities Act and Section 21D to the Exchange Act. See 15 U.S.C. § 77z-1(a)(3) and 15 U.S.C. § 78u-4(a)(3). For convenience, the Court will cite only to the Exchange Act when referring to the PSLRA.

<center>2</center>

notice; (2) in the determination of the Court, has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Under the PSLRA, the Court's determination of the "most adequate plaintiff" may be rebutted only upon proof that the presumptive lead plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## II

### A. Appointment of Lead Plaintiff for the WCG Subclass

On January 29, 2002, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(A)(i)(I), the first notice of the pendency of this class action was published in a national business-oriented wire service. See Press Release, Milberg Weiss Bershad Hynes & Lerach LLP, Milberg Weiss Announces Class Action Suit Against Williams Companies, Inc. and Williams Communications Group, Inc. (Jan. 29, 2002) (Seymour Decl. Ex. A). Within sixty days following the date of that publication, on April 1, 2002, lead plaintiff applications were submitted by the following individuals or groups, now seeking to be appointed lead plaintiff for the subclass of purchasers of WCG securities ("WCG Subclass"): Mr. Meruelo;[2] Blaine Watkins, Bruce and Kathleen Smith and Bruce Russell ("the Watkins Group"); and Market Street Securities, Inc. ("Market Street").[3]

---

[2] The lead plaintiff application of Mr. Meruelo was originally submitted on behalf of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronayn ("the Meruelo Group"). In its June 6, 2002 memorandum, however, the Meruelo Group stated that, in light of the bifurcation of the action into subclasses of WMB and WCG securities purchasers, the group sought to put forward only Alex Meruelo as the proposed lead plaintiff.

[3] Douglas E. Miller and Carol Moore, purchasers of WMB and WCG securities, jointly filed a motion seeking to be appointed lead plaintiff on April 1, 2002 (Docket Nos. 22 and 23). Mr. Miller and Ms. Moore have not submitted the additional briefing ordered by the Court to

Because all three lead plaintiff motions were submitted within the time period established by the

PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), all applicants have satisfied the first requirement of

the statutory test for determining the presumptive "most adequate plaintiff."

The Court must next determine the person or group of persons who "has the largest

financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The

PSLRA, however, does not specify the procedure for the Court to follow in making this

determination. See In re Enron Sec. Litig., 2002 WL 530588, at *7 (S.D. Tex. 2002); see also In

re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1999). Several courts addressing this

question have applied the four-factor test articulated by the district court in Lax v. First Merchs.

Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). See, e.g., Enron, 2002 WL

530588, at *7; In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); Nice Sys.,

188 F.R.D. 206, 217 (D.N.J. 1999). The four Lax factors used to determine the largest financial

interest are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the

total net funds expended by the plaintiffs during the class period; and (4) the approximate losses

suffered by the plaintiffs. Lax, 1997 WL 461036, at *5. "These factors are useful because they

look to relatively objective indicators, such as the number of shares purchased or sold, rather

than to the ultimate question of damages." Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d

1146 (N.D. Cal. 1999). Notably, one of the WCG Subclass movants in this case, despite the

Court's request at the April 12, 2002 hearing for clear and specific information regarding loss

calculations, failed to provide information stated in these terms. Accordingly, the Court has

---

support their motion, and, accordingly, the Court deems the motion to have been withdrawn.
Westmonte Plaza Inc. (Docket No. 28) and Darryl Abramowitz (Docket Nos. 30 and 31) also
filed lead plaintiff applications on behalf of WCG securities purchasers. Both applications,
however, were formally withdrawn and, therefore, will not be addressed here.

4

focused its analysis on the movants' claimed losses, the only common denominator addressed by each of the WCG Subclass movants.[4]

On the basis of the losses claimed by the lead plaintiff movants, Mr. Meruelo appears to be the lead plaintiff applicant with the largest financial interest in the outcome of the litigation. The losses claimed by the respective movants are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| Alex Meruelo | $3,905,136.80[5] |
| Market Street | $2,300,000.00 |
| The Watkins Group | $  224,000.00 |

Market Street argues, however, that Mr. Meruelo's losses are overstated and that instead Market Street is the movant with the largest financial interest. Market Street attacks Mr. Meruelo's loss calculation on several grounds, claiming it is overstated because: (1) Mr. Meruelo made errors in his certifications and loss calculations; (2) Mr. Meruelo improperly

---

[4] The Court recognizes its obligation under the PSLRA to "determine" the plaintiff with the "largest financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (requiring that the "most adequate plaintiff" be the person or persons that, "in the determination of the court, has the largest financial interest in the relief sought by the class") (emphasis added); see also Aronson, 79 F. Supp. 2d at 1157. The Court further recognizes, however, that the statutory scheme for the speedy resolution of the lead plaintiff question makes it undesirable for courts to prejudge damages through an extensive fact-finding process. See Aronson, 79 F. Supp. 2d at 1157. The Court has reviewed the numerous motions and supporting memoranda addressing the lead plaintiff question and generally accepts the representations of the movants as true. Based on these representations and the unnecessary delay that would be occasioned by further proceedings, Market Street's motion for oral argument (Docket No. 119) on these issues is hereby denied.

[5] See Notice of Submission of Corrected Loss Calculation and Trading Data by Alex Meruelo; Declaration of Behram V. Parekh, filed June 6, 2002, ("Corrected Loss Calculation").

included purchases after the disclosure of fraud; and (3) Mr. Meruelo improperly calculated his losses by using the average trading price of WCG during the 90-day period following the close of the class period. The Court will address each of Market Street's criticisms in turn below.[6]

First, Market Street criticizes Mr. Meruelo's certification and therefore his loss calculation, arguing that the certification listed "numerous trades in the common stock of WCG at prices outside the range at which WCG traded on those dates." Market Street then calculates the amount by which Mr. Meruelo's losses would be reduced if the Court rejected all trades listed on the certification at prices outside the range at which the stock traded on those dates, arguing that Mr. Meruelo's claimed losses should be reduced by $1,128,665.00.

On June 6, 2002, however, Mr. Meruelo submitted a Corrected Loss Calculation and actual trading data supporting his motion for appointment as lead plaintiff. The revised loss calculation was submitted to correct the following discrepancies: (1) the trading data attached to Mr. Meruelo's certification reflected settlement dates rather than trading dates for the stock; and (2) the trading data attached to Mr. Meruelo's certification included the commission charge as part of the price of the securities, rather than reflecting just the trade price of the securities. After correcting for these errors, Mr. Meruelo's losses amount to $3,905,136.80; a total more than the

---

[6] In its June 6, 2002 Response Memorandum, Market Street also argued that Mr. Meruelo's losses were overstated because the Meruelo Group and Mr. Meruelo: (1) failed to assign value to Mr. Paronyan's shares; and (2) improperly aggregated the claims of the individuals in the Meruelo Group. Because the other individual lead plaintiff applicants in the former "Meruelo Group" have withdrawn their applications in support of Mr. Meruelo, the Court need not address these arguments.

6

amount stated in Mr. Meruelo's original submission.[7] The Court has reviewed the revised loss calculations and supporting trading data and finds that the errors identified by Market Street (and certain other lead plaintiff movants) have been sufficiently addressed. Accordingly, the Court finds unnecessary any reduction of Mr. Meruelo's loss calculation on the basis that the trade prices stated on the certification are in error.[8]

Market Street next claims that Mr. Meruelo's losses are overstated because his certification includes purchases of WCG securities effected after the disclosure of the fraud. Market Street argues that Mr. Meruelo's purchases of 171,700 shares of WCG stock on January 29, 2002 should be excluded from his loss calculation because the WMB press release describing the contingent guarantee of WCG debt was issued at 7:31 a.m. on January 29, 2002, before the market opened for trading.

Mr. Meruelo contends, however, that the January 29 purchases were appropriately included in his loss calculation because the class period alleged in the complaints filed in this action end on and include January 29, 2002. See, e.g., Cali, et al. v. Williams Cos. Inc., et al., Compl. at ¶ 18 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

---

[7] Mr. Meruelo's Corrected Loss Calculation explains that the increase in the amount of loss is due to the inadvertent exclusion from his original submission of purchases that were "settled" after the end of the class period but "transacted" within the class period.

[8] The Court finds that the corrected errors in Mr. Meruelo's certification and loss calculation do not provide a sufficient basis for denying his motion to be appointed lead plaintiff. Cf. Amended Memo. Of Law in Opp'n to the Competing Lead Plaintiff Motions and in Further Support of the Motion of Norman H. Kirkendoll, Michael Ewing, Alex Meruelo and Melis Paronyan for Consolidation, Appointment as Lead Plaintiff and For Approval and Selection of Lead and Liaison Counsel (4/19/02) ("The fact that none of the three certifications that were filed by Market Street Securities was accurate, in and of itself, provides additional grounds for denying its motion.").

otherwise acquired the securities of WMB and/or WCG between July 24, 2000 and January 29, 2002 inclusive (the 'Class Period') and who were damaged thereby") (emphasis added). Mr. Meruelo further contends that, in addition to the press release purportedly issued at 7:31 a.m., WCG issued its own press release on January 29, which may have contradicted WMB's prior statements. Mr. Meruelo argues that these conflicting press releases created confusion in the market regarding WMB and WCG's securities.

The Court finds that a determination regarding whether the shares purchased by Mr. Meruelo on January 29, 2002 occurred after the market became aware of the alleged fraud requires an extended inquiry and factual determination as to the exact moment investors were on notice of the negative information. The Court finds that such an inquiry is inappropriate and unnecessary at this stage of the litigation and, accordingly, declines to exclude Mr. Meruelo's January 29, 2002 purchases of WCG stock from Mr. Meruelo's loss calculation on that basis.

Finally, in addition to the criticisms of the trading prices stated in Mr. Meruelo's certification, Market Street also attacks the method by which Mr. Meruelo calculates his losses. Market Street argues that Mr. Meruelo's loss calculation, based on the PSLRA'S 90-day average trading price, 15 U.S.C. § 78u-4(e), is an inappropriate measure of loss at the lead plaintiff appointment stage.[9] Instead, Market Street argues that the appropriate measure of loss would be one based on the closing price for WCG common stock on January 29, 2002, the day the alleged fraud was disclosed. Market Street further argues that Mr. Meruelo's use of the 90-day average

---

[9] The PSLRA provides a limit on the amount of damages that can be recovered in a private action where the plaintiff seeks to establish damages by reference to the market price of a security. 15 U.S.C. § 78u-4(e)(1). That limit is calculated by determining "the mean trading price of [the] security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Id.

8

trading price is an attempt to claim "more than $1,700,000 worth of losses that occurred well after the disclosure of the fraud and the end of the class period."

Market Street cites the district court's decision in In re Ribozyme Pharms., Inc. Sec. Litig., 192 F.R.D. 656, 661 (D. Colo. 2000), to support its position that the 90-day average trading price should not be used to determine the lead plaintiff with the largest financial interest in the litigation. In Ribozyme, the court found that the loss calculation for the so-called "retention" plaintiffs was the value to which the stock price fell at the end of the class period; the court also explicitly rejected the use of the 90-day average trading price as a method for calculating damages:

> The "Lead Plaintiffs" Group argues against this novel valuation method and states that it is error to read the PSLRA's "90-day bounce back" provision regarding the calculation of damages into the lead plaintiff provision regarding the largest financial interest. I agree that the determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term "damages" but instead, "largest financial interest."

192 F.R.D. at 661.

The Court does not consider Ribozyme's analysis persuasive in light of the number of district courts relying upon the 90-day average trading price in comparing claimed losses. See, e.g., In re Microstrategy Inc. Sec. Litig., 110 F. Supp. 2d 427 (E.D. Va. 2000) (using 90-day period after the close of the class period to determine largest financial interest); Steiner v. Nat'l Auto Credit, 1998 U.S. Dist. LEXIS 21804, at *12 (N.D. Ohio July 16, 1998) (using the "mean trading price," or the average of the daily trading price of the security "during the 90 day period," to determine the largest financial interest in the case).[10] In fact, the Court is unaware of any other

---

[10] The Ribozyme court stated that it relied on several non-published opinions in its district that have employed the "retention value" method for determining the largest financial interest pursuant to the PSLRA. See Ribozyme, 192 F.R.D. at 660 (citing In re New Era Networks, Inc. Sec. Litig., Civil Action No. 99-WM-473 (Colo. 1999); In re Samsonite Corp. Sec. Litig., Civil Action No. 98-K-1878 (Colo. 1998); In re Boston Chicken Sec. Litig., Civil

opinion holding that the "retention value" method is the only appropriate method of calculating damages.[11]

Moreover, the Court finds that Market Street failed to follow the directive at the April 12, 2002 hearing to articulate with clarity and specificity the bases and methods for calculating its own losses. Market Street's original certification and loss calculation, unlike those of other lead plaintiff movants, failed to provide sufficient information for the Court to analyze the basis for its claimed financial interest. Furthermore, despite its sharp criticism of other lead plaintiff movants' calculations, Market Street has not provided any additional information to supplement its original submission in the four rounds of briefing following its April 1, 2002 motion.

In accordance with the PSLRA, the Court finds that Mr. Meruelo is the WCG Subclass lead plaintiff movant with the "largest financial interest" in the outcome of the litigation. The Court's determination is based on the following findings: (1) Mr. Meruelo's loss calculations have survived scrutiny and are permissibly calculated using the 90-day average trading price under the PSLRA; (2) the Watkins Group's claimed losses are significantly less than those of Mr. Meruelo; and (3) the claimed losses of Market Street are also significantly less than those of Mr. Meruelo.

---

Action No. 97-WM-1308 (Colo. 1997); In re New Era of Networks, Inc. Sec. Litig., Civil Action No. 99-WM-1274 (Colo. 1999)). The Court finds that each of these four opinions is inapposite because none of them endorses the "retention value" method or even mentions how the largest financial interest was determined. See id. Furthermore, two of the cases, New Era, Civil Action No. 99-WM-473; and Samsonite, Civil Action No. 98-K-1878, involved unopposed motions for the appointment of lead plaintiff, thereby explaining the absence of any discussion regarding the appropriate method for determining which movant had the "largest financial interest."

[11] The Court finds Market Street's attacks on Mr. Meruelo's use of the 90-day average trading price notable given Market Street's failure to make the argument before final briefs were submitted on June 6, 2002. This failure is particularly perplexing in light of the number of lead plaintiff movants calculating "losses" and financial interest using that method.

Having determined that Mr. Meruelo has the largest financial interest in the outcome of the litigation, the Court turns to whether Mr. Meruelo satisfies the requirements of Fed. R. of Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Many courts agree, however, that a "wide-ranging analysis under Rule 23 is not appropriate and should be left for consideration of a motion for class certification. This inquiry, therefore, focuses on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4)." Lax, 1997 WL 461036, at *6 (internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d 427; Aronson, 79 F. Supp. 2d at 1158 (citations omitted) (holding that, at the lead plaintiff appointment stage, "all that is required is a 'preliminary showing' that the lead plaintiff's claims are typical and adequate.").

Market Street claims Mr. Meruelo's losses are not typical of those of the WCG Subclass under Rule 23(a) because Mr. Meruelo is subject to unique defenses as a result of his purchases of securities after the alleged disclosure of the fraud on January 29, 2002. In support of this position, Market Street quotes a brief purportedly filed by Mr. Meruelo's counsel, Milberg Weiss, on behalf of another client in an unrelated case. Market Street argues that Mr. Meruelo's purchases of WCG securities on January 29, 2002 are similar to the purchases of the lead plaintiff movant in Enron where the court determined the movant was subject to unique defenses and therefore was atypical because it purchased millions of shares of Enron stock after the disclosure of the fraud. Enron, 2002 WL 530588, at *22; see also Berweeky v. Bear, Stearns & Co., Inc., 197 F.R.D. 65 (S.D.N.Y. 2000) (holding that a person who increases his holding after

11

revelation of the fraud is subject to unique defenses that preclude him from serving as class representative); Kreindler v. Sambo's Rest., Inc., 1985 U.S. Dist. Lexis 23388 (S.D.N.Y. 1985) (same).

Mr. Meruelo contends that his purchases of WCG securities on January 29, 2002, the last day of the class period, can be distinguished from those of the lead plaintiff movant in Enron, the Florida State Board of Administration ("FSBA"). Mr. Meruelo explains that the FSBA's purchases of Enron securities were made on its behalf by its investment advisor, Alliance Capital Management Holding, well after the first Enron shareholder suits were filed against Enron and after the announcement of the SEC investigation into Enron.

Under Fed. R. Civ. P. 23(a)(3), the claims of the representative parties must be typical of those of the putative class. Typicality is achieved where the named plaintiff's claims arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Enron, 2002 WL 530588, at *8 (citations omitted). Even though the typicality requirement is not satisfied when the "plaintiff's factual or legal stance is not characteristic of that of other members," id., at *13 (citations omitted), the existence of minor distinctions will not preclude the typicality requirement from being met, Olsten, 3 F. Supp. 2d at 296; see also Nice Sys., 188 F.R.D. at 217; Enron, 2002 WL 530588, at *13.

The Court finds that Mr. Meruelo's purchases of WCG stock on January 29, 2002, the first day the alleged fraud was disclosed, may be distinguished from the purchases of FSBA because the purchases of FSBA occurred "after the initial public disclosure regarding [its] overstatement of its assets and partnership liabilities, after the first suits in this consolidated action were filed, and after the SEC announced that it was investigating [the company]." Enron, 2002 WL 530588, at *22. In this case, the purchases upon which Market Street seeks to disqualify Mr. Meruelo occurred on January 29, 2002, the date the plaintiffs claim the first WMB

or WCG press release regarding the alleged fraud was issued. In Enron, the court found that FSBA's claims were atypical because, unlike this case, FSBA's purchases occurred so long after the first disclosure of the fraud that FSBA, unlike other investors, did not buy the stock relying upon either the market or statements by Enron or its agents.[12] The Court finds that Mr. Meruelo's purchases were not atypical so as to disqualify him from serving as lead plaintiff.

The Watkins Group, seeking to be appointed lead plaintiff on behalf of WCG bondholders, argues that its interests will not be adequately protected by Mr. Meruelo, or any other equity holder lead plaintiff. The Watkins Group objects on the following grounds: (1) WCG shareholders do not have standing to pursue claims on behalf of WCG bondholders; and (2) because the interests of WCG shareholders and WCG bondholders are divergent, the WCG bondholders will not be adequately represented by a shareholder lead plaintiff.

To the extent the Watkins Group's first argument relates to the typicality of Mr. Meruelo's claims, the Court finds that Mr. Meruelo's claims are typical because the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6 (N.D. Ill. 1997); see also Enron, 2002 WL 530588, at *13 ("When plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times.") (internal quotations omitted). Moreover, the Court finds that, insofar as the appointment of Mr. Meruelo

---

[12] The lead plaintiff movants, here, dispute whether the market, and Mr. Meruelo, had notice of the alleged fraud when the securities were purchased. As the Court explained above, an extended inquiry and factual determination into the exact moment investors were on notice is inappropriate and unnecessary at this stage of the litigation and will not be taken up here.

. 13

as WCG Subclass lead plaintiff presents standing issues, those issues can be resolved by the filing of an amended complaint.

The Watkins Group's second attack goes to the adequacy of Mr. Meruelo, or any shareholder lead plaintiff movant, to represent the interests of WCG bondholders. The Watkins Group, stressing the significance of the WCG bankruptcy, claims that it should also be appointed lead plaintiff in order to "ensure that the interests of bond purchasers are adequately represented and protected during any settlement negotiations, and particularly during any allocation of funds in the event of recovery." Watkins Group Reply Mem. (Jun. 6, 2002), at 4.

Under Fed. R. Civ. P. 23(a)(4), class representatives must adequately represent the interests of the putative class. This requirement is satisfied where: "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members do not have interests that are antagonistic to one another; and (3) the class has sufficient interest in the outcome of the case to ensure vigorous adequacy." Olsten, 3 F. Supp. 2d at 296 (citations and internal quotations omitted); see also Microstrategy, 110 F. Supp. 2d at 435-36. In other words, "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." Nice Sys., 188 F.R.D. at 219.

The Court finds that Mr. Meruelo's representation meets the Rule 23(a)(4) standard for adequacy. First, the Court finds Milberg Weiss, Weiss & Yourman, and Morrel West, the counsel selected by Mr. Meruelo, to be qualified and experienced lawyers who are unquestionably capable of conducting the litigation on behalf of the WCG Subclass. Second, the Court finds that any problems due to alleged conflicts of interest between WCG's debt and equity holders amounts to mere speculation at the present time. At this stage of the litigation, the

14

holders of both types of securities have the common goal of establishing the omissions and misrepresentations allegedly made to the market. See generally Enron, 2002 WL 530588, at *13. The Court further finds that the inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in an unnecessary and undesirable weakening of the bargaining power of the WCG Subclass. See Nice Sys., 188 F.R.D. at 220 ("Representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation.") (internal quotations omitted). Finally, the Watkins Group's contention that Mr. Meruelo, or another shareholder lead plaintiff, will not vigorously pursue the claims of the bondholder class members is unsubstantiated. The Court finds that Mr. Meruelo's own financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action on all fronts. See generally Nice Sys., 188 F.R.D. at 219.

The final issue with respect to the appointment of Mr. Meruelo as lead plaintiff is whether any lead plaintiff movant has successfully rebutted the presumption that Mr. Meruelo is the "most adequate plaintiff." Under the PSLRA, the presumptive lead plaintiff may only be rebutted upon proof that the plaintiff either: (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Both Market Street's and the Watkins Group's arguments for the disqualification of Mr. Meruelo on the grounds that his claims are atypical or inadequate under Rule 23(a) may be construed as rebuttal challenges under the PSLRA. See id. The Court addressed and rejected these arguments above. Therefore, the Court finds that the presumption that Mr. Meruelo is the "most adequate plaintiff" for the subclass has not been rebutted. Accordingly, the Court hereby appoints Mr. Meruelo as the lead plaintiff for the WCG subclass.

### B. Appointment of Counsel for the WCG Subclass

The Court now turns to the approval of lead counsel for the WCG Subclass. As noted above, the Court finds that Mr. Meruelo's selections, Milberg Weiss, Weiss & Yourman, and Morrel West, are qualified, experienced counsel who will adequately represent the interests of the class. Accordingly, the Court approves Mr. Meruelo's selection of Milberg Weiss and Weiss & Yourman as co-lead counsel, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7 (noting the use of co-lead counsel should not result in increased attorneys' fees and expenses). The Court also approves Mr. Meruelo's selection of Tulsa law firm Morrel West as local counsel for the WCG Subclass.

### III

### A. Appointment of Lead Plaintiff for the WMB Subclass

On April 1, 2002, motions seeking lead plaintiff status were filed by HGK and Teamsters Local 710 Pension Fund and Health & Welfare Fund ("Local 710"); both movants now seek to be appointed lead plaintiff for the subclass of purchasers of WMB securities ("WMB Subclass"). HGK and Local 710 submitted motions, as required by the PSLRA, within sixty days from the January 29, 2002 publication of the notice of the pendency of this class action. See 15 U.S.C. § 78u-4(a)(A)(i)(II). The potential lead plaintiffs for the WMB Subclass, therefore, both satisfy the first requirement for becoming the presumptive "most adequate plaintiff."

The Court must next determine which movant "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The financial interest claimed by the two lead plaintiff movants for the WMB Subclass are as follows:

| Lead Plaintiff Movant | Claimed Losses |
|---|---|
| HGK | $3,774,142.00 |
| Local 710 | $  146,166.00[13] |

As previously discussed, determining which lead plaintiff movant has the largest financial interest in the litigation is, generally, the most significant inquiry for the Court in appointing a lead plaintiff. See, e.g., Aronson, 79 F. Supp. 2d at 1157. In the case of the WMB Subclass, however, HGK's alleged losses dwarf those of Local 710, and Local 710 has failed to demonstrate that HGK's claimed WMB holdings or losses are erroneously calculated or otherwise overstated. Accordingly, the Court finds that HGK has the "largest financial interest in the outcome of the litigation." See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Local 710 argues that it should be appointed a separate lead plaintiff for a subclass of WMB bondholders.[14] Asserting similar justifications as those argued by the Watkins Group, Local 710 contends that no shareholder lead plaintiff movant has the standing required to pursue claims on behalf of the bondholders, and that Local 710's interests will not be adequately represented by a shareholder lead plaintiff.[15]

---

[13] HGK's losses were suffered in connection with its purchase of shares of WMB common stock and were determined after deducting gains from the sale of its WCG shares received as dividends; Local 710's losses were suffered in connection of its purchases of WMB notes.

[14] In its memoranda addressing the appointment of lead plaintiff, Local 710 urges the Court to appoint it lead plaintiff of a separate subclass of purchasers of WMB notes. The Court denied Local 710's request for the creation of a separate subclass in its June 21, 2002 order (Docket No. 123), and will not address that issue again here.

[15] It is unclear whether Local 710's attack is based on the grounds of typicality and adequacy under Rule 23 or an attack on HGK as the presumptive lead plaintiff.

17

As noted above, in determining the most adequate plaintiff, the Court must address Rule 23(a)'s typicality and adequacy requirements. The Court finds that HGK's representation meets the Rule 23(a) standards for typicality and adequacy. First, the Court finds that HGK's claims are typical of the WMB bondholders because the claims asserted by HGK on behalf of the shareholder plaintiffs "arise from the same event or practice or course of conduct that gives rise to the claims of other class members." See Lax, 1997 WL 461036, at *6. As discussed above, the Court finds that, to the extent the appointment of HGK as WMB Subclass lead plaintiff presents standing issues, those issues can also be resolved at the appropriate time by the filing of an amended complaint. Second, the Court finds that HGK's representation of the class is adequate for the reasons identified previously with respect to appointment of a lead plaintiff for the WCG Subclass because HGK: (1) has selected qualified and experienced counsel; (2) does not have any present conflicts of interest with the WMB bondholders; and (3) will vigorously prosecute the action.

Accordingly, because HGK (1) filed its lead plaintiff application within 60 days of the notice of the pendency of the action; (2) has been determined by the Court to have the largest financial interest in the litigation's outcome; and (3) satisfies the requirements of Rule 23, HGK is presumed to be the "most adequate" plaintiff. The Court finds that Local 710 has not successfully rebutted this presumption or otherwise shown that HGK cannot or will not adequately represent the class. Accordingly, the Court hereby appoints HGK as the lead plaintiff for the WMB Subclass.

### B. Appointment of Counsel for the WMB Subclass

The Court now turns to the approval of lead counsel for the WMB Subclass. The Court finds that HGK's selections, Schoengold & Sporn and the Seymour Law Firm, are qualified,

18

experienced counsel who will adequately represent the interests of the class. Accordingly, the Court hereby approves HGK's selection of Schoengold & Sporn and the Tulsa law firm, the Seymour Law Firm, as co-lead counsel for the subclass of purchasers of WMB securities, provided there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorney fees and expenses. See Lax, 1997 WL 461036, at *7.

IV

On March 15, 2002, the parties filed a Joint Stipulation and Proposed Scheduling Order to govern the timing of submissions following the entry of the Court's order appointing lead plaintiff and lead counsel. Pursuant to this Order, and in accordance with that Joint Stipulation, the Court hereby orders the following:

1.  Lead Plaintiffs for the WCG and WMB Subclasses shall file consolidated amended complaints on behalf of their respective subclasses incorporating all causes of action on behalf of all putative subclass members no later than 45 days from this order;

2.  Defendants shall have 45 days from service of the consolidated amended complaints to file responsive pleadings;

3.  Lead Plaintiffs shall have 45 days to file any oppositions to the responsive pleadings; and

4.  Defendants shall have 15 days to reply to Plaintiffs' opposition.

IT IS SO ORDERED.

This 8th day of July, 2002.

_____
Sven Erik Holmes
United States District Judge

19

# EXHIBIT  G



**At Kirby McInerney LLP,** we bring experience, intelligence, creativity and dedication to bear in defending our clients' interests against losses in cases of corporate malfeasance. Unfortunately, on the heels of the exposure of colossal corporate frauds – Enron, Worldcom and others – public and private investors, consumers, payors and employees today participate in an uncertain marketplace, and they need protection. We utilize cutting-edge strategies that bring high – and have even brought unprecedented – recoveries for our clients: governmental entities, Taft-Hartley funds, hedge funds, and other aggrieved institutions and individuals. We have achieved and are pursuing landmark results in the fields of securities fraud, corporate governance, consumer, antitrust, health care and ERISA litigation, representing our clients in class actions or, if appropriate, individual litigation.

We make our clients' interests our own, and are constantly looking for ways in which to help them manage the now amplified risks associated with their participation in the marketplace. As part of our focus on risk management, our *Institutional Monitoring Program* monitors our clients' investment history in order to ensure crucial, immediate awareness of possible fraud. When evidence of fraud surfaces, we partner with our clients to identify and execute a legal strategy that best defends their interests in light of their losses. Our *Institutional Monitoring Program* is cost and commitment free.

We offer our litigation services on a contingency basis, and are paid only if successful in recovering losses in the event of a fraud. This policy allows our clients to access legal rights and remedies that might otherwise be uneconomical. We carefully review the merits of all litigation proceedings, weighing our clients' losses against their chance for recovery, before moving forward with litigation.

We pride ourselves on our proven ability to protect our clients using the entire range of tools for recourse offered by the legal system, whether it be through settlement or, if needed, trial. Throughout the history of our firm we have recovered billions of dollars for our clients, and the average recoveries that we procure in each individual case are among the very best in the field:

> **In 2007, Institutional Shareholder Services, a top industry publication, lauded KM for procuring, on average, the third largest recoveries for shareholders of all plaintiffs' firms in the United States.**

**KIRBY McINERNEY LLP**

# CURRICULA VITAE

**Roger W. Kirby** is managing partner of the firm. He has written several articles on litigation, the Federal Rules of Civil Procedure and Federal Rules of Evidence that have been published by various reporters and journals, and has been on the board of editors of Class Action Reports. He has also lectured on aspects of securities litigation to various professional organizations in the United States and abroad.

Mr. Kirby has enjoyed considerable success as a trial attorney, and cases for which he has had primary responsibility have produced landmark decisions in the fields of securities law, corporate governance, and deceptive advertising.

Recent activities include:

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Kirby and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Kirby and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action that resulted in a multimillion dollar recovery jury verdict that was upheld on appeal; and

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. Mr. Kirby was instrumental in securing an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

Mr. Kirby is admitted to the New York State Bar, the United States District Courts for the Southern, Northern and Eastern Districts of New York, the United States Courts of Appeals for the Second, Third, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits and the United States Supreme Court. He attended Stanford University & Columbia College (B.A., 1969) and Columbia University School of Law (J.D., 1972) where he was an International Fellow. He also attended The Hague Academy of International Law (Cert. D'Att.). Thereafter, he was law clerk to the late Honorable Hugh H. Bownes, United States District Court for New Hampshire, and the United States Court of Appeals for the First Circuit.

 **Alice McInerney** is a partner in our New York office focusing on antitrust and consumer matters, and who also handles securities class actions. Ms. McInerney joined the firm in 1995 and has over 30 years of experience as an attorney.

Prior to joining KM, Ms. McInerney was Chief of the Investor Protection Bureau and Deputy Chief of the Antitrust Bureau of the New York Attorney General's office. While there, she chaired the Enforcement Section of the North American Securities Administrators Association and also chaired the Multi-State Task Force on Investigations for the National Association of Attorneys General.

Some of Ms. McInerney's relevant work includes:

- Representation, as lead and co-lead counsel, of consumer classes in antitrust cases against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota;

- Representation of a class of retailers in *In re Visa Check/Master Money Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class;

- Representation of public entities in connection with ongoing Medicaid fraud and false claims act litigations arising from health expenditures of these state and local governmental entities; and

- Representation of California homeowners in litigation arising from mortgage repayment irregularities. Litigation resulted in settlements that afforded millions of California homeowners clear title to their property. The cases resulted in the notable decision *Bartold v. Glendale Federal Bank*.

Ms. McInerney is admitted to the New York State Bar, all United States District Courts for the State of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. She graduated from Smith College (B.A. 1970) and Hofstra School of Law (J.D. 1976).



**Randall K. Berger** is a partner in our New York office focusing on antitrust, whistleblower and unclaimed property litigation. Mr. Berger joined the firm in 1994 and leads the firm's whistleblower practice. In whistleblower cases, fraud against Federal and State governments is exposed by persons having unique knowledge of the circumstances surrounding the fraud. These cases are generally litigated under seal.

Mr. Berger is a certified arbitrator for the National Association of Securities Dealers. The arbitration panels where Mr. Berger serves are used to resolve disputes between NASD member firms and customers, and to resolve intra-industry conflicts.

Some of Mr. Berger's relevant work includes:

- Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

- Representation of State Treasurers in litigation against the Federal government to recover unclaimed U.S. savings bond proceeds;

- Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States. Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

Mr. Berger is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern and Northern Districts of New York and the District of Colorado. He has been a member of the New York City Bar Association since 1995. He graduated from Iowa State University (B.S., 1985) and from the University of Chicago (J.D., 1992).

Prior to attending law school and joining KM, Mr. Berger utilized his undergraduate (engineering) degree working for four years with the management information consulting division of Arthur Anderson & Co.

 **Joanne Cicala** is a partner in our Texas office who specializes in health care fraud and consumer litigation. Ms. Cicala has been with the firm since 1997 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and forty two New York County governments in connection with ongoing Medicaid fraud litigations and other matters arising out of the health expenditures of these state and local governmental entities. Ms. Cicala also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Ms. Cicala is a member of the National Association of Public Pension Fund Attorneys and the County Attorneys Association of the State of New York.

Some of Ms. Cicala's recent, relevant experience includes:

- Representation of the City of New York in federal antitrust proceedings against GlaxoSmithKline for defrauding the U.S. Patent and Trademark Office in order to unlawfully extend patents for certain drugs;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the U.S. Northern District Court for the District of Illinois. Ms. Cicala and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Ms. Cicala and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Representation, as lead and co-lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, Tennessee, West Virginia and Minnesota; and

- Representation, as lead counsel, of a class of investors in *Gerber v. Computer Associates International, Inc.*, a securities class action which succeeded in trial and resulted in a multimillion dollar recovery for the class.

Ms. Cicala is admitted to practice in the states of New York, New Jersey and Texas. She is also admitted to the all U.S. District Courts in New York, the Western District of Texas and the United States Court of Appeals for the Second, Seventh and Eighth Circuits. She graduated from Georgetown University (B.S.F.S., 1987) and Fordham University Law School (J.D., 1994).

Prior to joining KM, Ms. Cicala was a litigator with Lane & Mittendorf LLP (now Windels Marx Lane & Mittendorf, LLP). Prior to attending law school, she worked for a US-AID funded organization in Washington, DC on legislative development projects in Central America. Ms Cicala also has extensive experience managing municipal welfare reform activities.

**Daniel Hume** is a partner in our New York office focusing on antitrust and securities litigation. Mr. Hume joined the firm in 1995 and currently leads our antitrust litigation practice. He has advised clients in connection with significant antitrust litigation and has helped to recover billions of dollars for corporate consumers, individual consumers, and institutional investors throughout the course of his career.

Mr. Hume has rendered compliance advice to broker-dealers and has contributed to The Compliance Reporter's securities question and answer column. He has also authored articles on securities and class action matters.

Some of Mr. Hume's relevant work includes:

- Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class; and

- Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Hume is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit and the United States Supreme Court. He graduated from the State University of New York at Albany *magna cum laude* (B.A., 1988) and from Columbia Law School, where he served as Notes Editor for the Columbia Journal of Environmental Law (J.D., 1991).

Prior to joining KM, Mr. Hume practiced at Tenzer Greenblatt (now Blank Rome Tenzer Greenblatt) and Herzog Calimari & Gleason where he focused on securities and securities regulatory litigation.



**Peter S. Linden** is a partner in our New York office focusing on securities and commercial fraud litigation. Mr. Linden joined the firm in 1990 and focuses on providing advisory services to government pension funds and other institutional investors as well as to corporate and individual consumers. He has been appointed a Special Assistant Attorney General for the State of Michigan and is a member of the National Association of Public Pension Plan Attorneys.

Mr. Linden has obtained numerous outstanding recoveries for investors and consumers during his career. His advocacy has also resulted in many notable decisions, including *In re Matsushita Securities Litigation*, which granted partial summary judgment under § 14(d)(7) of the Securities Exchange Act and, more recently, *In re Ebay Inc. Shareholder's Litigation*, which found that corporate insiders' acceptance of IPO allocations through "spinning" states a claim for breach of a fiduciary duty and that investment banking advisors could be held liable for aiding and abetting such a breach. Mr. Linden has been quoted or featured in articles in *The New York Times* and *The American Lawyer*.

Some of Mr. Linden's relevant experience includes:

- Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in *In re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class;

- Serving as Chairman of the Plaintiffs' Steering Committee in *In re MCI Non-Subscriber Litigation*, a consumer class action which resulted in an approximately $90 million recovery for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Mr. Linden and KM successfully persuaded the U.S. Court of Appeals for the Seventh Circuit and ultimately the district court to overturn the settlement in question, and were then appointed co-lead counsel to the class. Mr. Linden and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

- Current representation in class actions on behalf of investors includes *Dot Hill Systems Corporation* and, on behalf of retirement plan participants, in *In re JPMorgan Cash Balance Litigation*.

Mr. Linden is admitted to the New York State Bar, the United States Courts of Appeals for the Third, Sixth, Eighth, and Eleventh Circuits, and the United States District Courts for the Eastern and Southern Districts of New York, the Eastern District of Michigan and the District of Colorado. He graduated from the State University of New York at Stony Brook (B.A., 1980) and from Boston University School of Law (J.D., 1984). Prior to joining KM, Mr. Linden worked as an assistant district attorney in the Kings County District Attorney's Office from 1984 through October, 1990 where he served as a supervising attorney of the Office's Economic Crimes Bureau.



**Ira M. Press** is a partner in our New York office focusing in securities and consumer litigation.  Mr. Press joined the firm in 1993, and currently leads the firm's *Institutional Monitoring Program*.  In this capacity, he has provided advisory services to numerous government pension funds and other institutional investors. He has authored articles on securities law topics and has lectured to audiences of attorneys, experts and institutional investor fiduciaries.

Mr. Press' advocacy has resulted in several landmark appellate decisions including, *Rothman v. Gregor,* the first ever appellate reversal of a lower court's dismissal of a securities class action suit pursuant to the 1995 private securities litigation reform act, and more recently, *Pinker v. Roche Holdings.*

Some of Mr. Press' relevant experience includes:

- Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses.  During the class period, the company's stock fell from approximately $30 to less than $16.

- Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

- Representation of a public pension fund as lead plaintiff in *Stanley Kurzweil et al. vs. Medtronic, Inc. et al.*, a securities class action in which classwide losses are estimated to be approximately $2 billion;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in recovery of $150 million for the class;

- Representation of numerous institutional investors who have opted out of securities class actions to pursue individual claims.

Mr. Press is admitted to the New York State Bar, the United States Court of Appeals for the Second, Third and Eleventh Circuits, and the United States District Courts for the Eastern, Northern and Southern Districts of New York. He graduated from Yeshiva University *magna cum laude* (B.A., 1986) and from New York University Law School (J.D., 1989).

Prior to joining KM, Mr. Press practiced at Warshaw Burstein Cohen Schlesinger & Kuh, LLP, where he focused on commercial litigation.



**Mark Strauss** is a partner in our New York office focusing in securities class actions and class action cases involving defrauded investors and consumers. Mr. Strauss joined the firm in 1999. He has broad experience litigating auditor liability and Ponzi scheme cases. He also litigates claims on behalf of shareholders in mergers and acquisitions.

Some of Mr. Strauss' relevant work includes significant roles in the following litigations:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re: Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as co-lead counsel, of a class of hedge fund investors in *Cromer Finance v. Berger, et al.*, a securities class action which resulted in a total recovery of US$65 million, and one of the largest ever recoveries against a non-auditor third party service provider;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re: Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action alleging a Ponzi scheme. This litigation is ongoing;

- Representation, as lead counsel, of a class of investors in a hedge fund, Lipper Convertibles, L.P., which fraudulently overstated its investment performance, in *In re: Serino v. Lipper, et al.* This litigation is ongoing; and

- Representation, as lead counsel, of a class of bond investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

Mr. Strauss is admitted to the New York State Bar, the United States District Courts for the Eastern and Southern Districts of New York, the State of California and the Northern, Southern and Central Districts of California. He graduated from Cornell University (B.A., 1987) and from Fordham University School of Law, where he was Associate Editor of the Law Review (J.D., 1993).

Prior to joining KM, Mr. Strauss practiced at Christy & Viener, LLP and Cahill Gordon & Reindel LLP where he focused on commercial litigation and class action defense.

**Publications:**
**Are Class Actions Against Broker/Dealers Dead?**
*Securities Regulation and Law Report*, Vol. 36, No. 2, 01/12/2004, pp. 68-72.

Note, **Public Employees Freedom of Association—Should Connick's Free-Speech Based Public-Concern Rule Apply?**
*61 Fordham L. Rev. 473* (1992)



**David Bishop** is of counsel to the firm and practices out of our New York office. Mr. Bishop joined the firm in 2006 following a distinguished career in local government. Mr. Bishop was elected to the Suffolk County Legislature in 1993 while still attending Fordham Law School. There he served in several leadership capacities, including Democratic Party Leader, Chairman of Public Safety and Chairman of Environment. His legislative record earned him recognition from the Nature Conservancy, the Child Care Council and the Long Island Federation of Labor.

As an attorney in private practice, Mr. Bishop has litigated numerous NASD arbitrations on behalf of claimants. In addition to his work in connection with securities matters, Mr. Bishop helps to coordinate the firm's client relations activities.

Recent cases in which Mr. Bishop has been involved include:

• Representation of a union pension fund as lead plaintiff in *Nach v. Huber* in securities class action arising from Moody's misrepresentation about and in the course of its rating of mortgage-related securities. Classwide losses are estimated to be in the billions;

• Representation, as co-lead counsel, of an investor class led by an individual investor in *Lapin v. Goldman Sachs*, a securities class action against Goldman Sachs; and

• Representation, as lead counsel, of a class of investors led by a hedge fund against Herley Industries in *In re Herley Industries Inc. Securities Litigation.*

Mr. Bishop is admitted to the New York State Bar and the United States District Court for the Eastern District of New York. He is a member of the Public Investors Arbitration Bar Association and of the New York City Bar Association. He graduated from American University (B.A., 1987) and from Fordham University (J.D., 1993).Fiske Stone Scholar and Editor of the Columbia Law Review.



**Richard L. Stone** is of counsel to the firm and focuses on securities and consumer fraud litigation. Mr. Stone joined the firm in 1997.  In addition to his robust legal practice, Mr. Stone currently teaches as an Adjunct Professor of Financial Services Law at Florida State University.

Some of Mr. Stone's relevant experience includes:

- Representation, as co-lead counsel, of investors in Ponzi scheme instruments issued by the now-bankrupt Bennett Funding Group in a class action which resulted in a recovery of $169.5 million for the class;

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as lead counsel, of a class of investors in Amazon.com in *Argent Classic Convertible Arbitrage Fund v. Amazon.com*, a securities class action which resulted in a total recovery of $20 million for the class;

- Representation, as lead counsel, of two major insurance companies and a class of bondholders in *In re Laidlaw Bondholder Litigation*, a securities class action which resulted in a $42.275 million recovery for the class; and

- Representation, as co-lead counsel, of a class of institutional investors in Manhattan Investment Fund (a Bermuda hedge fund) in *Cromer Finance v. Berger et al.*, a securities class action which resulted in a total recovery of US$65 million for the class. The case involved complex jurisdictional and choice-of-law issues because of the offshore nature of the fund, and represents one of the largest ever recoveries against a non-auditor third party service provider in a securities class action.

Mr. Stone is admitted to the New York State Bar as well as United States District Courts for the Eastern and Southern Districts of New York. He graduated from Colgate University *magna cum laude* and Phi Beta Kappa (B.A., 1981), and from Columbia University School of Law (J.D., 1983), where he was a Harlan Fiske Stone Scholar and Editor of the Columbia Law Review.

Prior to joining KM, Mr. Stone was a Partner at Cadwalader, Wickersham & Taft in their Market Regulation and Financial Institutions Practice Groups.  Immediately after law school, Mr. Stone clerked for the Honorable Charles P. Sifton, United States District Judge in the Eastern District of New York.



**Henry Telias** is of-counsel to the firm and practices out of our New York office, focusing in accountants' liability and securities litigation.  Mr. Telias joined the firm in 1997.

In addition to his legal work, Mr. Telias is also the firm's chief forensic accountant. He received his CPA license from New York State in 1982.  Prior to practicing as an attorney, he practiced exclusively as a certified public accountant from 1982 to 1989, including 3 years in the audit and tax departments of Deloitte Haskins & Sells' New York office.

Mr. Telias is a member of the American Institute of Certified Public Accountants, the Association of Certified Fraud Examiners, and the American Finance Association.

Some of Mr. Telias' relevant experience includes:

- Representation, as co-lead counsel, of a multinational bank as lead plaintiff in *In re Adelphia Communications Corp. Securities & Deriv. Litig.*, a securities class action which resulted in a total recovery of $455 million for the class;

- Representation, as lead counsel, of a certified class of purchasers of PRIDES securities in connection with the Cendant Corporation accounting fraud in *In re Cendant Corporation PRIDES Litigation*. This litigation resulted in an approximate $350 million settlement for the certified class – an unprecedented 100 percent recovery.

- Representation, as co-lead counsel, of a class of investors in *In re Waste Management, Inc. Securities Litigation,* a securities class action which resulted in a recovery of $220 million for the class;

- Representation, as co-lead counsel, of an investor class and an institutional plaintiff in I*n re BISYS Securities Litigation*, a class action arising out of alleged accounting improprieties and which resulted in a $65 million recovery for the class; and

- Representation, as co-lead counsel, of an international bond fund as lead plaintiff in *Muzinich & Co., Inc. v. Raytheon Corp.*, a securities class action which resulted in a recovery of $39 million for the class;

Mr. Telias is admitted to the New York State Bar and the United States District Court for the Southern District of New York.  He graduated from Brooklyn College cum laude (B.S., 1980) and from Hofstra University School of Law (J.D., 1989).



**Kenneth G. Walsh** is of counsel to the firm and practices out of our New York office. Mr. Walsh joined the firm in 2007 and concentrates primarily on antitrust litigation, representing direct purchasers of medical devices and pharmaceuticals in federal courts. In addition, he has significant involvement in a number of state law antitrust and consumer protection actions. Mr. Walsh is currently serving as counsel to direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri.

Prior to joining KM, Mr. Walsh served as national counsel in significant federal and state antitrust actions while with Boies, Schiller, Flexner, LLP and Straus & Boies, LLP.

During his time at Boies, Schiller & Flexner, LLP, Mr. Walsh served as co-lead national counsel for approximately 3,700 independent retail pharmacies who are plaintiffs in a federal antitrust case pending against major drug manufacturers. He also defended AT&T/Southwestern Bell Telephone against monopolization claims brought in Texas state courts and in federal court in Oklahoma. Mr. Walsh also had significant involvement in a trademark infringement action that the firm brought and successfully settled on behalf of a prominent fashion designer. During his time at Straus & Boies, LLP, Mr. Walsh represented nationwide classes of indirect purchasers of computer chips and Vitamin C.

Mr. Walsh is admitted to the New York State Bar and the United States District Courts for the Eastern and Southern Districts of New York. He graduated from Catholic University (B.A., 1987) and from New York Law School (J.D., 1992).



**James P. Carroll, Jr.** is an associate based in our Texas office focusing on antitrust, securities and consumer fraud litigation. Mr. Carroll joined the firm in 1995.

Recent cases in which Mr. Carroll has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation as co-lead counsel of a class of consumers in connection with *Gordon v. Microsoft Inc.*, a Minnesota State civil antitrust case which settled for $175 million after nearly two months of trial; and

- Representation, as one of the firms with primary responsibility for the case, of a class of retailers in *In re Visa Check/MasterMoney Antitrust Litigation*, an antitrust case which resulted in a settlement of over $3 billion for the class.

Mr. Carroll is admitted to the New York State Bar, the Texas State Bar, the Colorado State Bar, the United States District Court for Colorado, the United States District Courts for the Eastern and Southern Districts of New York, the United States Tax Court and the United States Courts of Appeals for the Ninth and Tenth Circuits. He graduated from Duke University (B.A., 1988) and University of Denver (J.D.,1994).

Prior to joining KM, Mr. Carroll served as General Counsel & Director of U.S. Operations for Emerging Technologies, ET AB, a venture capital firm based in Stockholm, Sweden, and for Twobyfour Software AB, an application management software company where he served as General Counsel, Head of Business Development & Director of U.S. Operations.



**Aaron Hovan** is an associate in our New York office who specializes in health care fraud litigation. Mr. Hovan joined the firm in 2003 and serves as Special Assistant Attorney General to the States of Michigan and Iowa, and counsel to the City of New York and forty two New York County governments in connection with ongoing Medicaid fraud and false claims act litigations and other matters arising out of the health related expenditures of these state and local governmental entities.

Mr. Hovan also represents and advises numerous public employee health benefit funds and Taft Hartley funds on an array of issues related to their health care expenditures and relationships with Pharmacy Benefit Managers.

Recent cases in which Mr. Hovan has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing; and

- Advising County Health Benefit Plans and Taft Hartley Funds on the services rendered by those with whom they contract for health care services, including pharmacy benefit managers.

Mr. Hovan is admitted to the New York State Bar and the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York. He graduated from Colgate University *cum laude* (B.A., 1996) and Columbia University School of Law (J.D., 2002).

Before attending law school, Mr. Hovan worked for the Petroleum Finance Company as an upstream oil & gas industry analyst. Prior to joining KM, Mr. Hovan practiced at Baker Botts, LLP.



**David E. Kovel** is an associate based in our New York office focusing on antitrust, commodities and various corporate governance matters. Mr. Kovel joined the firm in 2004.

Recent cases in which Mr. Kovel has been involved include:

- Representation, as lead counsel, of the States of Michigan and Iowa as well as the City of New York and 42 New York counties in connection with individual Medicaid fraud actions in federal court. This litigation is ongoing;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline.

- Representation of consumers of propane who were harmed by BP America's manipulation of the propane market; and

- Representation of whistleblowers who claim that their companies have defrauded the United States Government.

Mr. Kovel is admitted to the New York State Bar, the United States District Courts for the Southern, Eastern, Western and Northern Districts of New York, the First Circuit and the Connecticut State Bar. He graduated from Yale University (B.A., 1993), Columbia University School of Law (J.D., 2002) and Columbia University School of Business Administration (M.B.A., 2003).

Mr. Kovel traded commodities for several years before attending law school. Prior to joining KM, Mr. Kovel practiced at Simpson Thacher & Bartlett, LLP.



**Sarah G. Lopez** is an associate in our New York office focusing on securities litigation. Ms. Lopez joined the firm in 2006.

Recent cases in which Ms. Lopez has been involved include:

- Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors.  This litigation is ongoing;

- Representation of institutional investors who have opted out of a securities class action filed against Tenet Healthcare Corp. and KPMG LLP to pursue their individual claims.  This litigation is ongoing;

- Representation, as lead counsel, of a class of limited partners of hedge fund Lipper Convertibles, L.P. in *In re Serino v. Lipper et al.*, a securities class action filed against Lipper, certain of its officers and PriceWaterhouseCoopers, its auditor, in connection with alleged accounting fraud. This litigation is ongoing;

- Representation, as lead counsel, of brokerage customers of Refco Capital Markets in *In re: Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, an action pertaining to an alleged ponzi scheme executed by Refco which resulted in billions in brokerage customer losses. This litigation is ongoing.

Prior to joining KM, Ms. Lopez practiced at Wilson, Elser, Moskowitz, Edelman & Dicker, LLP where her practice primarily focused on professional liability defense with a specialty in defending accountants and experience in defending directors and officers in shareholder derivative suits.  Ms. Lopez's specialty in accountants liability encompassed defending accounting firms against claims of negligence and fraud in connection with audit services provided to both profit and not-for profit entities as well as consulting services and tax preparations services provided to individuals and commercial entities.

During her time at Wilson Elser, Ms. Lopez also advised clients in connection with responding to subpoena requests issued in various investigations by government agencies such as the U.S. Attorney, SEC and NYS Attorney General.  Ms. Lopez also has experience with ERISA matters and has experience representing Plaintiffs asserting commercial claims for breach of contract and various business torts.  Finally, Ms. Lopez has extensive experience litigating matters at every phase of an action from commencement through the appellate process, in both New York State and Federal Court as well as before various arbitration tribunals.

Ms. Lopez is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, and the New Jersey State Bar.  She graduated from Colgate University (B.A., 1998) and from St. John's University (J.D., 2003).

**Karina Shostakovsky** is an associate based in our New York office focusing on antitrust litigation. Ms. Shostakovsky joined the firm in 2005.

Recent cases in which Ms. Shostakovsky has been involved include:

- Representation, as a lead counsel, of direct purchasers of urological catheters in a federal antitrust case pending in the Eastern District of Missouri. The case alleges that C.R. Bard and co-conspirators devised anticompetitive schemes to eliminate or lessen competition in order to acquire and maintain monopoly;

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antirust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as a lead counsel, of consumer classes in connection with antitrust proceedings against Microsoft. These litigations resulted in settlements totaling nearly a billion dollars for consumers in Florida, New York, Tennessee, West Virginia and Minnesota, where the litigation proceeded to trial.

Ms. Shostakovsky is admitted to the New York State Bar and the New Jersey State Bar. She graduated from Boston University (B.A., 2000) and from New York Law School (J.D., 2007).



**Christopher S. Studebaker** is an associate in the New York office focusing on antitrust and securities litigation.  Mr. Studebaker joined the firm in 2007.

Prior to joining KM, Mr. Studebaker worked at Straus & Boies, LLP, primarily litigating private antitrust cases involving the medical device, food supplements, electronics, and semiconductor industries.  Some of his notable antitrust experience includes the representation of a hospital against a pulse oximetry manufacturer, a distributor against a hypodermic syringe manufacturer, and consumers against manufacturers of Vitamin C.

Mr. Studebaker's previous experience also includes his work at the U.S. Department of Commerce, where he advised senior administration officials, multinational companies and trade associations on international trade policy and agreements; litigation of disputes before the World Trade Organization (WTO); and Customs matters.  He also represented the United States in a WTO dispute settlement proceeding and in trade agreement negotiations.  Before his legal career, Mr. Studebaker spent several years working and studying in Japan.  He is fluent in Japanese.

Mr. Studebaker is admitted to the New York State Bar and the Washington State Bar.  He graduated from Georgetown University *cum laude* (B.S.F.S., 1997), Waseda University (M.A., 2001), and University of Kansas (J.D., 2004), where he was the Managing Editor of the Kansas Journal of Law and Public Policy. He is an active member of the Asian American Bar Association of New York.



**Beverly Tse** is an associate based in our New York office focusing on antitrust and securities litigation. Ms. Tse joined the firm in 2004.

Recent cases in which Ms. Tse has been involved include:

- Representation, as lead counsel, of a class of consumers in connection with *In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation and Related Actions*. This case involves Unocal's manipulation of the standard-setting process for low-emissions reformulated gasoline in California, which increased retail prices of reformulated gasoline. This litigation is ongoing;

- Representation, as one of the firms with primary responsibility for the case, of a class of purchasers of computers containing Intel's microprocessor chips in *Coordination Proceedings Special Title, Intel x86 Microprocessor Cases*. This litigation is ongoing;

- Representation, as lead counsel, of the investor class in *In re AT&T Wireless Tracking Stock Securities Litigation*, a securities class action which resulted in a recovery of $150 million for the class;

- Representation of an objector to the settlement in *Reynolds v. Beneficial National Bank* in the United States Northern District Court for the District of Illinois. Ms. Tse and KM were lauded by the presiding judge for their "intelligence and hard work," and for obtaining "an excellent result for the class."

Ms. Tse is admitted to the California State Bar and the United States District Courts for the Northern and Central Districts of California. She graduated from California State University of Los Angeles *magna cum laude* (B.S., 2000) and from California Western School of Law (J.D., 2004).

 **Edward M. Varga, III** is an associate based in our New York office. focusing on securities and antitrust litigation.  Mr. Varga joined the firm in 2006.

Recent cases in which Mr. Varga has been involved include:

- Representation, as lead counsel, in the securities class action *In Re Herley Industries Inc. Securities Litigation* on behalf of investors.  This litigation is ongoing;

- Representation of companies that offered IPO securities in antitrust litigation against the 27 largest investment banks in the United States.  Plaintiffs allege that the banks conspired to price fix underwriting fees in the mid-sized IPO market.

- Representation of the NY State Common Retirement Fund as lead plaintiff in *Robert Casey, et al. v. National City Corporation*, et al, a securities class action arising from National City's issue of alleged materially false and misleading statements regarding the Company's business, including the extent of its exposure to subprime mortgage related losses.  During the class period, the company's stock fell from approximately $30 to less than $16.

Mr. Varga is admitted to the New York State bar.  He graduated from Cornell University  (B.S., 2000) and from New York University Law School (J.D., 2006).

## Client & Adversary Recognition

*"The case has been in front of the Supreme Court of the United States once, and in front of the Ninth Circuit no fewer than three times. Throughout, [KM] has . . . brought a considerable degree of success . . . and thwarted attempts by other counsel who sought to settle . . . and destroy a potential billion dollars of class rights."*

**Plaintiff / client, Epstein v. MCA, Inc.**

*"[The KM firm] proved to be a highly able and articulate advocate. Single-handedly, [KM] was able to demonstrate not only that [KM's] client had a good case but that many of the suspicions and objections held by the Nigerian Government were ill-founded."*

**English adversary in The Nigerian Cement Scandal**

*"[KM] represented us diligently and successfully. Throughout [KM's] representation of our firm, [KM's] commitment and attention to client concerns were unimpeachable."*

**European institutional defendant /client**
**involved in a multi-million dollar NASD arbitration**

*"Against long odds, [KM] was able to obtain a jury verdict against one of the larger, more prestigious New York law firms."*

**Plaintiff / client,**
**Vladimir v. U.S. Banknote Corporation**

*"[KM] represented our investors with probity, skill, and diligence. There is too much money involved in these situations to leave selection of class counsel to strangers or even to other institutions whose interests may not coincide."*

**Plaintiff / institutional client,**
**In re Cendant Corporation PRIDES Litigation**

## Notables

The firm has repeatedly demonstrated its expertise in the field of class litigation and its expertise has been repeatedly recognized.  For example:

- *In re Bisys Securities Litigation,* C.A. No. 04-CV-3840 (S.D.N.Y. 2007).  Co-lead counsel, $66 million settlement.

- *In re AT&T Corp. Securities Litigation*, C.A. No. 00-CV-8754 (S.D.N.Y. 2006).  Sole counsel, $150 million settlement.

  > "Nonetheless, in this Court's experience, relatively few cases have involved as high level of risk, as extensive discovery, and, most importantly, as positive a final result for the class members as that obtained in this case."

- *In re Adelphia Communications, Inc. Securities Litigation*, No. 04 CV 05759 (S.D.N.Y. 2006).  Co-lead counsel,  $455 million settlement.

  > "[T]hat the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."

- *Carnegie v. Household International Inc., et al.,* 98 C 2178 (EEB)(N.D.Ill. 2006).  Co-lead counsel, $39 million settlement:

  > "Since counsel took over the representation of this case . . ., they have pursued this case, conducting discovery, hiring experts, preparing for trial, filing motions where necessary, opposing many motions, and representing the class with intelligence and hard work. They have obtained an excellent result for the class."

- *Argent Convertible Classic Arbitrage Fund, L.P. v. Amazon.com, Inc. et al.,* CV No. 01-0640L (W.D. Wash. Oct. 20, 2005).  Lead counsel for class of convertible euro-demoninated bond purchase.  $20 million settlement.

- *Muzinich & Co., Inc. et al. v. Raytheon Company et al. ,* No. C-01-0284-S-BLW  (D. Idaho 2005).   Co lead counsel.  $39 million settlement.

- *Gordon v. Microsoft Corporation*, Civil No. 00-5994 (Minn. Dist. Ct., Henn. Co. 2004).  Co-lead counsel; $175 million settlement following two months of trial.

- *In re Visa Check/MasterMoney Antitrust Litigation*, 96-CV-5238 (E.D.N.Y. 2003)  $3 billion monetary settlement; injunctive relief.

- *In re Florida Microsoft Antitrust Litig.*, Case No. 99-27340 CA 11 (Fl. Cir. Ct. 11th Cir., Miami/ Dade Co. 2003). Co-lead counsel.  $200 million settlement of antitrust claims.

- *In re Churchill Securities, Inc.* (SIPA Proceeding), Case No. 99 B 5346A (Bankr.  S.D.N.Y. 2003: Sole Counsel; recovered over $9 million for 500+ victims of pyramid scheme perpetrated by defunct brokerage firm.

- *In re Laidlaw Bondholder Securities Litigation,* 00 cv 2518-17 (D. S.C. 2002).  Lead counsel; $42.8 million settlement.

- *Cromer Finance v. Berger et al.* (*In re Manhattan Fund Securities Litigatio*n), 00 cv 2284 (S.D.N.Y. 2002).  Co-lead counsel; $32 million settlement.

- *In re Boeing Securities Litigation,* 97 cv 715 (W.D. Wash. 2001).  $92.5 million settlement.

- *In re MCI Non-Subscriber Telephone Rates Litigation,* MDL No. 1275 (S.D. Ill. 2001).  Chairman of steering committee; $88 million settlement.

- *In re General Instrument Corp. Securities Litigation*, 01 cv 1351 (E.D. Pa. 2001). Co- lead counsel; $48 million settlement.

- *In re Bergen Brunswig/Bergen Capital Trust Securities Litigation,* 99 cv 1305 and  99 cv 1462 (C.D. Cal. 2001).  Co-lead counsel; $42 million settlement.

- *Steiner v. Aurora Foods,* 00 cv 602 (N.D. Cal. 2000).  Co-lead counsel; $36 million settlement.

- *Gerber v. Computer Associates International, Inc.*, No. 91 C 3610 (E.D.N.Y. 2000).  Multi-million dollar jury verdict in securities class action.

- *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000). Principal counsel of record in appeal that resulted in first ever appellate reversal of the dismissal of a securities fraud class action under the Securities Reform Act of 1995.

- *Bartold v. Glendale Federal Bank,* (2000) 81 Cal.App.4th 816. Ruling on behalf of hundreds of thousands of California homeowners establishing banks' duties regarding title reconveyance; substantial damages still to be calculated in this and related cases against other banks for failures to have discharged these duties.

- *In re Cendant Corporation PRIDES Litigation,* 51 F. Supp. 2d 537, 542 (D. N.J. 1999). Lead counsel, $340 million settlement.  The court said:

  "[R]esolution of this matter was greatly accelerated by the creative dynamism of counsel."  * * *  "We have seen the gifted execution of responsibilities by a lead counsel."

- *In re Waste Management, Inc. Securities Litigation*, No. 97C 7709 (N.D. Ill. 1999). Co-lead counsel, $220 million settlement.

  "...[Y]ou have acted the way lawyers at their best ought to act.  And I have had a lot of cases... in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here... I would say this has been the best representation that I have seen."

- *In re Bennett Funding Group Securities Litigation*, No. 96 Civ. 2583 (1999). Co-lead counsel; $140 million in settlements to date ($125 million recovered from Generali U.S. Branch, insurer of Ponzi scheme instruments issued by Bennett Funding Group; $14 million settlement with Mahoney Cohen, Bennett's auditor).  Case continuing against other defendants.

- *In re MedPartners Securities Litigation*, CV-98-06364 (Ala. June 1999). Co-lead counsel; $56 million settlement.

- *In re MTC Electronic Technologies Shareholder Litigation,*  No. CV-93-0876 (E.D.N.Y. October 20, 1998). Co-lead counsel; settlement in excess of $70 million.

- *Skouras v. Creditanstalt International Advisers, Inc., et al.,* NASD Arb., No. 96-05847 (1998).  Following an approximately one month hearing, successfully defeated multi-million dollar claim against major European institution.

- *In re Woolworth Corp. Securities Class Action Litigation,* 94 Civ. 2217 (RO) (S.D.N.Y. Sept. 29, 1997). Co-lead counsel; $20 million settlement.

KIRBY McINERNEY LLP - 26

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997).  Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997).  Multi-million dollar jury verdict in § 10(b) action.

- *In re Archer Daniels Midland Inc. Securities Litigation,* C.A. No. 95-2877 (C. D. Ill. April 11, 1997).  Co-lead counsel; $30 million settlement.

- *Vladimir v. U.S. Banknote Corp.,* No. 94 Civ. 0255 (S.D.N.Y. 1997).  Multi-million dollar jury verdict in § 10(b) action.

- *Epstein et al. v. MCA, Inc., et al*., No. 92-55675, 50 F.3d 644 (9th Cir. 1995) *rev'd and remanded on other grounds, Matsushita Electric Industrial Co., Ltd. et al. v. Epstein et al.,* No. 94-1809, 116  S. Ct. 873 (February 27, 1996). Sole counsel.  Appeal resulted in landmark decision concerning liability of tender offeror under section 14(d)(7) of the Williams Act, SEC rule 14d-10 and preclusive effect of a release in a state court proceeding.  In its decision granting partial summary judgment to plaintiffs, the court of appeals for the Ninth Circuit stated:

  > "The record shows that the performance of the Epstein plaintiffs  and their counsel in pursuing this litigation has been exemplary."

- *In re Abbott Laboratories Shareholder Litigation,* No. 92-C-3869 MEA, Fed. Sec. L. Rep. ¶ 98,973  (N.D. Ill. 1995). Co-lead counsel; $32.5 million settlement:

  > "The record here amply demonstrates the superior quality of plaintiffs' counsel's preparation, work product, and general ability before the court."

- *In re Morrison Knudsen Securities Litigation,* No. CV 94-334-S-EJL (D. Id. 1995). Co-lead counsel; approximately $68 million settlement.

- *In re T2 Medical Inc. Securities Litigation,* No. 1:94-CV-744-RLV (N.D. Ga. 1995). Co-lead counsel; approximately $50 million settlement.

- *Gelb v. AT&T*, 90 Civ. 7212 (LMM) (S.D.N.Y. 1994). Landmark decision regarding filed rate doctrine leading to injunctive relief.

- *In re International Technology Corporation Securities Litigation*, CV 88-40-WPG, (C.D. Cal. 1993). Co-lead counsel; $13 million settlement.

**KIRBY McINERNEY LLP - 27**

- *Colaprico v. Sun Microsystems,* No. C-90-20710 (SW) (N.D. Cal. 1993). Co-lead counsel; $5 million settlement.

- *Steinfink v. Pitney Bowes, Inc.*, No. B90-340 (JAC) (D. Conn. 1993). Lead counsel; $4 million settlement.

- *In re Jackpot Securities Enterprises, Inc. Securities Litigation*, CV-S-89-05-LDG (RJJ) (D. Nev. 1993). Lead counsel; $3 million settlement.

- *In re Nordstrom Inc. Securities Litigation,* No. C90-295C (W.D. Wa. 1991). Co-lead counsel; $7.5 million settlement.

- *United Artists Litigation*, No. CA 980 (Sup. Ct., L.A., Cal.). Trial counsel; $35 million settlement.

- *In re A.L. Williams Corp. Shareholders Litigation*, Consolidated, C.A. No. 10881 (Delaware. Ch. 1990). Lead counsel; benefits in excess of $11 million.

- *In re Triangle Inds., Inc., Shareholders' Litigation*, C.A. No. 10466 (Delaware. Ch. 1990). Co-lead counsel; recovery in excess of $70 million.

- *Schneider v. Lazard Freres*, (N.Y. Sup. 1990). Co-lead counsel. Landmark decision concerning liability of investment bankers in corporate buyouts; $55 million settlement.

- *Rothenberg v. A.L. Williams,* C.A. No. 10060 (Delaware. Ch. 1989). Sole counsel; benefits of at least $25 million to the class.

- *Kantor v. Zondervan Corporation*, C.A. No. 88 C5425 (W.D. Mich. S.D. 1989). Sole counsel; recovery of $3.75 million.

- *King v. Advanced Systems, Inc.*, C.A. No. 84 C10917 (N.D. Ill. E.D. 1988). Lead counsel; recovery of $3.9 million (representing 90% of damages).

- *Straetz v. Cordis*, 85-343 Civ. (SMA) (S.D. Fla. 1988). Lead counsel:

  > "I want to commend counsel and each one of you for the diligence with which you've pursued the case and for the results that have been produced on both sides. I think that you have displayed the absolute optimum in the method and manner by which you have represented your respective clients, and you are indeed a credit to the legal profession, and I'm very proud to have had the opportunity to have you appear before the Court in this matter."

**KIRBY McINERNEY LLP - 28**

- *In re Flexi-Van Corporation, Inc. Shareholders Litigation,* C.A. No. 9672 (Delaware. Ch. 1988). Co-lead counsel; $18.4 million settlement.

- *Entezed, Inc. v. Republic of Nigeria,* I.C.C. Arb. (London 1987). Multi-million dollar award for client.

- *In re Carnation Company Securities Litigation,* No. CV84-6913 (FW) (C.D. Cal. 1987). Co-lead counsel; $13 million settlement.

- *In re Data Switch Securities Litigation,* B84 585 (RCZ) (D. Conn. 1985). Co-lead counsel; $7.5 million settlement.

- *Stern v. Steans,* 80 Civ 3903 (GLG). The court characterized the result for the class obtained during trial to jury as "unusually successful" and "incredible" (Jun 1, 1984).

- *In re Datapoint Securities Litigation,* SA 82 CA 338 (W.D. Tex.). Lead Counsel for a Sub-Class; $22.5 million aggregate settlement.

- *Malchman, et al. v. Davis, et al.*, 77 Civ. 5151 (S.D.N.Y., June 8, 1984) (TPG):

    "It is difficult to overstate the far-reaching results of this litigation and the settlement. Few class actions have ever succeeded in altering commercial relationships of such magnitude. Few class action settlements have even approached the results achieved herein.... In the present case, the attorneys representing the class have acted with outstanding vigor and dedication . . . Although the lawyers in this litigation have appeared considerably more in the state courts than in the federal court, they have appeared in the federal court sufficiently for me to attest as to the high professional character of their work. Every issue which has come to this court has been presented by both sides with a thoroughness and zeal which is outstanding .... In sum, plaintiffs and their attorneys undertook a very large and difficult litigation in both the state and federal courts, where the stakes were enormous. This litigation was hard fought over a period of four years. Plaintiffs achieved a settlement which altered commercial relationships involving literally hundreds of millions of dollars."

* * *