# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JACKSONVILLE POLICE AND FIRE PENSION FUND, *on behalf of itself and all others similarly situated,* | 08 Civ. 4772 (RJS) |
| Plaintiff, | |
| v. | CLASS ACTION |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | |
| Defendants. | |
| JAMES CONNOLLY, | 08 Civ. 5072 (RJS) |
| Plaintiff, | |
| v. | CLASS ACTION |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO, ROBERT LEWIS, and DAVID L. HERZOG, | |
| Defendants | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE STATE TREASURER OF THE STATE OF MICHIGAN FOR CONSOLIDATION OF THE RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF ITS SELECTION OF COUNSEL, AND IN FURTHER OPPOSITION TO COMPETING MOTIONS

18204v1

| | |
|---|---|
| MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM, *on behalf of itself and all others similarly situated*, | 08 Civ. 5464 (RJS) |
| Plaintiff, | |
| v. | CLASS ACTION |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | |
| Defendants. | |
| ONTARIO TEACHERS' PENSION PLAN BOARD, *on behalf of itself and others similarly situated*, | 08 Civ. 5560 (RJS) |
| Plaintiff, | |
| v. | CLASS ACTION |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | |
| Defendants. | |

18149v1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 4

I.    SMRS USED A VALID METHODOLOGY TO MEASURE ITS LOSSES .................... 4

II.    ONTARIO/PGGM IGNORE THE *OLSTEN* FACTORS ..................................................... 7

III.    SMRS ALSO PREVAILS – WHETHER BY ACCOUNT OR IN THE
AGGREGATE – WHEN "IN-AND-OUT" LOSSES ARE REMOVED .......................... 8

IV.    ONTARIO SUFFERS FROM A CONFLICT OF INTEREST ....................................... 10

CONCLUSION ..................................................................................................................... 10

18149v1

# TABLE OF AUTHORITIES

## CASES

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
  315 F. Supp. 2d 666 (E.D. Pa. 2000) .................................................................5

*Borochoff v. Glaxosmithkline PLC*,
  246 F.R.D. 201 (S.D.N.Y. 2007) ......................................................................6

*Boyd v. NovaStar Fin., Inc.*,
  2007 WL 2026130 (W.D. Mo. July 9, 2007)......................................................9

*Bristol County Retirement System v. Wachovia Corp., et al.*,
  (N.D. Ca. 3:08-cv-02844-SC)............................................................................5

*In re Cable & Wireless, PLC Sec. Litig.*,
  217 F.R.D. 372 (E.D. Va. 2003) .......................................................................7

*In re Cendant Corp. Litig.*,
  182 F.R.D. 476 (D.N.J. 1998)..........................................................................10

*In re Cigna Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) ................................................................5

*In re Comverse Tech., Inc. Sec. Litig.*,
  2007 WL 680779 (E.D.N.Y. Mar. 2, 2007).....................................................8, 9

*Constance Sczesny Trust v. KPMG LLP*,
  223 F.R.D. 319 (S.D.N.Y. 2004) ....................................................................10

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................1, 2, 8, 9

*Durgin v. TOUSA*,
  2008 WL 2761301 (S.D. Fla. July 1, 2008).......................................................9

*In re Fuwei Films Sec. Litig.*,
  247 F.R.D. 432, 437 (S.D.N.Y. 2008) ...............................................................7

*Glaser v. Enzo Biochem, Inc.*,
  464 F.3d 474 (4th Cir. 2006), *cert. denied*,
  127 S. Ct. 1876 (2007)......................................................................................9

ii

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)..................................................................................10

*Kops v. NVE Corp.*,
   2006 WL 2035508 (D. Minn. July 19, 2006) ...........................................................9

*Lax v. First Merch. Acceptance Corp.*,
   1997 WL 461036 (N.D. Ill. Aug. 11, 1997) ............................................................3

*In re Olsten Corp. Sec. Litig.*,
   3 F. Supp. 2d 286 (E.D.N.Y. 1998) .....................................................................3, 7

*Naiditch v. Applied Micro Circuits Corp., et al.*,
   (D.N.J., Civ. 01-649) ..........................................................................................5

*Rutland v. Infosonics Corp.*,
   2006 WL 3746716 (S.D. Cal. Oct. 23, 2006) ..........................................................9

*Saltzman v. Citigroup, Inc.*,
   No. 07-9901-SHS (S.D.N.Y.) ...............................................................................3

*In re Veeco Instruments, Inc.*,
   232 F.R.D. 330 (S.D.N.Y. 2005) ..........................................................................9


## STATUTES

15 U.S.C. § 78u-4 ...................................................................................................1

Fed. R. Civ. P. 23(a) ............................................................................................10

The State Treasurer of the State of Michigan, as custodian of the Michigan Public School Employees Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System ("SMRS"), submits this reply memorandum in further support of its motion for consolidation, appointment as lead plaintiff and approval of its counsel as co-lead counsel for the putative class, and in further opposition to the competing motions pending before this Court.

## PRELIMINARY STATEMENT

Ontario/PGGM has failed to rebut SMRS's presumptive lead plaintiff status.[1] SMRS's measuring of losses account-by-account rather than in the aggregate is valid and, indeed, *more* accurate than lumping all accounts into one pot. *See* accompanying expert declaration of Kenneth Kotz ("Kotz Decl.") at ¶4. The Kotz Declaration, in addition to analyzing the financial interest of SMRS and Ontario/PGGM, describes why the by-account method comports more closely with economic reality – particularly where, as here, there were different account managers working for SMRS. *See id.* The by-account method is also consistent with the express language of the Private Securities Litigation Reform Act ("PSLRA") which requires a court to appoint as lead plaintiff the investor with the largest financial interest "in the relief sought by the class." 15 U.S.C. § 78u-4. Indeed, SMRS's method of computing its losses will be the same method employed by the class in computing damages at trial.

Moreover, even if SMRS's losses *are* measured in the aggregate, as Ontario/PGGM urge, SMRS *still* has the largest financial interest in the relief sought in this litigation. Under the Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), investors who sell stock *before* any corrective disclosure generally cannot recover under Section

---

[1] "Ontario" is Ontario Teachers' Pension Plan Board and "PGGM" is Ontario's proposed co-lead plaintiff, Stichting Pensioenfonds Zorgen Welzijn, represented by PGGM. Only Ontario/PGGM challenge SMRS's motion.

10(b) of the Securities Exchange Act of 1934 because they suffered no compensable harm. As a result, after *Dura*, many courts analyzing lead plaintiff motions have excluded such "in-and-out" losses from financial interest calculations. *See infra* at 8-9; *see also* Opp. at 9 n.7. When Ontario's and PGGM's "in-and-out" losses are backed out of their loss figures, their resulting financial interests are $29.1 million and $43.7, respectively, for a total of $72.9 million. When SMRS's "in-and-out" losses are backed out, its loss is $117 million on an account-by-account basis and $73.4 million on an aggregate basis. *See* Kotz Decl. Ex. 12.[2]

In other words, after the *Dura* analysis – which is critical – SMRS has the largest LIFO financial interest *no matter how you slice it. See id.* at ¶¶5, 23.

Moreover, as previously shown, analysis of the impact on the competing movants of the corrective disclosures alleged in Ontario's complaint provides even further support for the conclusion that the financial interest of SMRS in this litigation is greater than Ontario and PGGM, individually or together. *See* Opp. at 8-9.

The fact that most lead plaintiff motions have been decided in the past on submissions computed in the aggregate (rather than account-by-account) is meaningless. If the measure of a methodology was simply past practice then LIFO would not have replaced FIFO as this Court's methodology of choice. That only happened because this Court – and others – slowly became convinced that LIFO was, all things considered, a more accurate method. Further, other proposed lead plaintiffs have computed their losses on a by-account basis. *See infra* at 5 n.8. Thus, it seems such a method is not as unprecedented as Ontario/PGGM claim.

---

[2]  These numbers differ from the numbers in SMRS's opposition brief because one transfer between SMRS accounts was inadvertently miscalculated and the numbers provided there were without the benefit of expert review. Regardless, as argued in the opposition brief, after the *Dura* analysis, SMRS has the largest financial interest whether losses are measured by account or in the aggregate.

Ontario/PGGM also ignore three of the four seminal *Olsten* factors.[3]  SMRS prevails on all four factors when viewed against Ontario and PGGM individually and on three of the four when viewed against Ontario and PGGM collectively. *See infra* at 7-8.

Finally, co-counsel for Ontario/PGGM are currently in a heated fight *with each other* in *Saltzman v. Citigroup, Inc.*, No. 07-9901-SHS (S.D.N.Y.), complete with charges of ethical violations, betraying clients' confidential information, and manipulating class periods to increase losses. *See* Exs. A at 6 and B at 3 (memoranda in *Citigroup* attached hereto).  In light of, *inter alia*, this ongoing dispute, it is unclear how these same firms can work effectively together on the class' behalf.[4]

In sum, in contrast to SMRS's status as a strong, single, unconflicted, domestic institutional investor lead plaintiff that has the largest financial interest whether measured by-account or in the aggregate, Ontario and PGGM are a group whose "pre-existing relationship" is limited – and precarious – and Ontario suffers from Rule 23 impediments due to its ongoing business relationship with AIG. *See* Opp. at 14-17.  Accordingly, SMRS should be appointed as lead plaintiff and its choice of counsel approved.[5]

---

[3]  The four factors were first promulgated in *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997), and later in *In re Olsten Corp. Securities Litigation*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998).

[4]  In addition, Ontario and PGGM's financial interest is still unclear because there are significant discrepancies between Ontario's reported figures and the figures that would be derived from its publicly-filed Forms 13-F during and just prior to the class period. *See* Opp. at 12-14.  This is the type of lack of coordination that has caused some courts to favor a single investor over a group of investors to act as lead plaintiff. *See, e.g., In re OCA Inc. Sec. & Deriv. Litig.*, No. 05-2165, slip op. at 16-20 (E.D. La. 2005) (attached as Ex. C).  Such lack of coordination can only be exacerbated by the ongoing court dispute between the firms.

[5]  Separately, Oakland County's attempt to carve out a position as co-lead plaintiff for bondholders is unnecessary and contrary to settled Second Circuit law. *See infra* at 10 n. 17.

## ARGUMENT

### I.    SMRS USED A VALID METHODOLOGY TO MEASURE ITS LOSSES

Ontario/PGGM's attack on the account-by-account method utilized by SMRS to calculate loss in its lead plaintiff motion is devoid of merit and is contrary to the best interests of the class. In fact, the account-by-account methodology utilized by SMRS presents a *more* accurate method for measuring a plaintiff's LIFO loss because it provides a more precise linking of the sale side of each transaction with a purchase. *See* Kotz Decl. ¶4. In contrast to the methodology advocated by Ontario/PGGM, which artificially links purchases and sales of stock from different accounts on a strictly chronological basis – even though stock purchased in one account was not and could not have been sold through an immediately following sale of stock from a different account – the methodology utilized in the SMRS motion more precisely matches sales of stock. This methodology is consistent with the LIFO approach that is now clearly favored in this District. This is particularly true here because SMRS has different investment managers managing its various accounts, and to link up buys and sales from different managers that happened to take place chronologically near one another would be arbitrary.[6] Further, to "match" sales with buys across accounts on a purely chronological basis would clearly not serve the goal of more accurately assessing a lead plaintiff applicant's financial interest in the "relief sought by the class" in this litigation – as required by the PSLRA. Accordingly, SMRS's account-by-account measurement provides a more accurate estimate of the financial interest of each applicant and should be accepted by this Court.[7]

---

[6]  The various accounts identified in the loss chart attached to SMRS's motion papers were managed by Centre Asset Management, JS Asset Management, Oakbrook Investments, Seizert Capital and Lombardia, and also included several internally managed and index-based accounts.

[7]  It is telling that Ontario and PGGM did not present their data in this form, even after this methodology was raised and described in SMRS's opening papers. Ontario/PGGM thereby deprived SMRS and this Court of the ability to compare each applicant's loss on an account-by-

Moreover, contrary to Ontario/PGGM's argument, an account-by-account or transaction-based method of assessing a plaintiff's loss is an accepted method of calculating a plaintiff's damages. Indeed, proposed lead plaintiffs in other cases have measured their losses on a by-account basis. *See* Exs. D and E.[8]

Further, the by-account method has been accepted as appropriate for presentation to a jury at trial. In *In re Cigna Corp. Securities Litigation*, 459 F. Supp. 2d 338, 354 (E.D. Pa. 2006), citing expert opinion and other precedent, the court approved for submission to the jury just this type of transaction-based methodology. As the court found, this method is an appropriate method of calculating economic loss and damages. If this methodology is appropriate under a higher standard for admissibility at trial then it certainly should be appropriate to use at the lead plaintiff stage.[9] It is similarly noteworthy that when institutional and other investors submit claims information for a distribution from a settlement fund, they often do so on an account-by-account basis, and when that is done, claims administrators calculate the value of each claim on that basis.

---

account basis. This failure can only be seen as an admission that Ontario's and PGGM's financial interest, when calculated based on an account-by-account methodology, would be less than the financial interest of SMRS.

[8] Attached as Exhibits D and E are the certification and order appointing the Florida State Board of Administration in *Naiditch v. Applied Micro Circuits Corp., et al.* (D.N.J., Civ. 01-649), as well as the certifications and loss charts of the New York Funds in *Bristol County Retirement System v. Wachovia Corp., et al.* (N.D. Ca. 3:08-cv-02844-SC).

[9] As the court stated in *Cigna*, "there is a significant amount of authority which would allow a jury to apply a transaction-based methodology, if based on adequate evidence, to calculate economic loss and damages, *rather than requiring the jury to apply a cumulative approach that aggregates transactions and off-sets gains and losses stemming from different transactions*." *Id.* at 354 (emphasis added). *See also Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 680 (E.D. Pa. 2000) ("The language of Section 10(b) and Rule 10b-5 is more consistent with a transaction-based methodology than a cumulative one . . . . By using the singular nouns 'purchase' and 'sale', Congress and the SEC focus on each transaction individually. Neither the statute nor the Rule authorize any sort of aggregation of purchases or sales that could sanction the cumulative approach.")

In their zeal to argue against SMRS's accepted method of calculating a plaintiff's loss, Ontario/PGGM do a disservice to the putative class in this and other cases. Not only are they arguing against a methodology that would, in certain instances, allow plaintiffs, on behalf of a class, to present a more accurate damage figure to a jury, but they are also seeking to stop dead in its tracks the progress being made in terms of presenting lead plaintiff motions. The fact that this methodology has not been widely utilized by claimants seeking lead plaintiff status in the past is of no import because it has not been rejected by any court and it yields a more accurate picture of financial interest. This is the very same reason why this Court, and others, adopted a LIFO analysis over FIFO. The account-by-account method is the logical next step in the evolution of measuring financial interests of potential lead plaintiffs.[10]

Indeed, while Ontario/PGGM's counsel criticize SMRS for "manipulating" its loss calculation (albeit using a methodology that SMRS openly described in its opening papers), under the class period pled in the first three of these related cases by Jacksonville Police and Fire Pension Fund (represented by Ontario's counsel), Connolly (represented by PGGM's counsel) and Maine Public Employees Retirement System (represented by one of SMRS's counsel), Ontario would be a "net seller" of shares and a "net gainer" of proceeds, which many courts have ruled disqualifies an applicant from being appointed as a lead plaintiff. *See, e.g., Borochoff v. Glaxosmithkline PLC*, 246 F.R.D. 201, 205 (S.D.N.Y. 2007) (refusing to appoint shareholder

---

[10] The other points Ontario/PGGM raises against the use of SMRS's loss calculation approach are without merit. For instance, the fact that SMRS presents its holdings on its Form 13-F's in accordance with SEC requirements (which appears to be what Ontario failed to do), and votes its proxies on an aggregate basis, are entirely beside the point. Similarly beside the point is the manner in which SMRS describes its funds and its aggregate asset allocations, holdings and market values. SMRS is not seeking to present its accounts "as if each were a separate investor," as Ontario/PGGM contends (Response at 12). Rather, it is presenting its loss calculation in accordance with how the buys and sells really occurred and LIFO, the more widely adopted loss calculation method by this Court, based on a methodology that makes SMRS's $117 million loss calculation more precise than if it had been presented in a cumulative manner across all of its investment accounts.

that was a net seller as lead plaintiff because it could not adequately represent proposed class of shareholders); *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378 (E.D. Va. 2003) (rejecting application of net seller to be lead plaintiff).[11]  It was only by expanding the class period and counting on the precedent in this District that a broader alleged class period is generally utilized as the basis for judging lead plaintiff applications that Ontario would qualify at all for a lead plaintiff position.  Indeed, as SMRS previously showed, Ontario remains a "net seller" even over the course of the expanded class period through the dates of its own claimed partial disclosures of February 11 and February 28, 2008.[12]

## II.    ONTARIO/PGGM IGNORE THE *OLSTEN* FACTORS

Tellingly, Ontario/PGGM have no discussion of *Olsten*, and ignore three of the four *Olsten* factors, which this Court invariably uses in determining financial interest on lead plaintiff motions.  *See* Opp. at 5-8.  As discussed in SMRS' opposition, under the *Olsten* factors, courts determine a plaintiff's financial interest by considering the following factors:  (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period.  *See, e.g.*, *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 437 (S.D.N.Y. 2008).

---

[11]  During the shorter class period (May 11, 2007 through May 9, 2008, inclusive) pled in the first three complaints, Ontario purchased 1,903,990 shares for $100,834,127 and sold 2,432,049 shares for $134,485,144, thereby making it a "net seller" and a "net gainer" over that time period.

[12]  *See* Opp. at 8.  Further, a problem with the figures contained in the Ontario/PGGM application remains even after Ontario/PGGM had an opportunity to correct them in their responding brief. Thus, while they corrected the number of pre-class shares listed in PGGM's LIFO loss chart and the number of shares sold on July 17, 2007 in Ontario's FIFO and LIFO charts, *see* Ontario/PGGM Response at 2 n.3, Ontario still has not explained the discrepancies between the holding figures presented in its Forms 13-F and in the Ontario-PGGM lead motion papers.  *See* Opp. at 13-14.

SMRS has the largest amounts in each of these four categories when viewed against each of Ontario and PGGM, whether on an account-by-account or cumulative LIFO basis, and also has the largest amounts – even when measured against Ontario/PGGM as a group – under factors two (net shares bought), three (net funds expended), and four (when SMRS's estimated loss is calculated on an account-by-account method) or, as discussed below, when measured by Ontario/PGGM's own preferred aggregation method after "in-and-out" losses are properly backed out. *See* Kotz Decl. ¶¶5, 23.[13]

## III.    SMRS ALSO PREVAILS – WHETHER BY ACCOUNT OR IN THE AGGREGATE – WHEN "IN-AND-OUT" LOSSES ARE REMOVED

As discussed in SMRS's opposition brief (Opp. at 9 n.7), when taking into account the allegations in Ontario's complaint and loss causation principles enunciated in *Dura*, SMRS has a greater compensable loss than Ontario and PGGM, both individually and collectively, whether measured on an account-by–account basis *or* on a cumulative basis.

Since the Supreme Court's holding in *Dura*, courts have scrutinized lead plaintiff movants' trading and removed losses suffered *prior* to a corrective disclosure. In the recent case of *In re Comverse Technology, Inc. Securities Litigation*, No. 06-cv-1825 NGG RER, 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007), a court in this Circuit, reversing a ruling of the Magistrate Judge, decided this very issue:

> In short, it is clear that under *Dura* and its progeny, any losses that P & P may have incurred before Comverse's misconduct was ever disclosed to the public are not recoverable, because those losses cannot be proximately linked to the misconduct at issue in this litigation. While the *Dura* Court decided a motion to dismiss, and not a lead plaintiff motion, the logical outgrowth of that

---

[13] SMRS also hereby incorporates arguments in its opposition concerning Ontario/PGGM's purported "group" stature. In a situation like this, with a single, strong pension fund ready, willing and able, there is simply no need to allow a group to serve as lead plaintiff – particularly where the group's relationship is limited and their counsel are currently embroiled in a legal dispute.

> holding is that any such losses must not be considered in the *recoverable* losses calculation that courts engage in when selecting a lead plaintiff . . . .
>
> Applying the *Dura* principle to the instant motion, it is clear that Judge Reyes failed to limit his calculation of P & P's losses to *recoverable* losses- *i.e.,* losses it sustained from selling Comverse shares at reduced prices after March 14, 2006, the earliest corrective disclosures alleged in the complaint.

*Id.* at *4, *7. Similarly, in *In re Veeco Instruments, Inc.*, 232 F.R.D. 330, 334 (S.D.N.Y. 2005), Judge McMahon agreed with this reasoning, disqualifying the Decatur Plan, a proposed lead plaintiff who sold its stock a month *before* the corrective disclosure. *Id.*[14]

Here, when Ontario's and PGGM's "in-and-out" losses are backed out of their figures, their losses are $29.1 million and $43.7 million, respectively, for a group total of $72.9 million, while SMRS's loss figure is $117 million on an account-by-account basis and $73.4 million on an aggregate basis. *See* Kotz Decl. Ex. 12. Accordingly, even collectively, Ontario/PGGM's financial interest is less than that of SMRS when factoring in the impact of *Dura* and the curative disclosures alleged in Ontario's complaint. *See id.* at ¶¶4-5, 23 and Ex. 12.[15]

---

[14] *See also Durgin v. TOUSA, Inc.*, No. 06-61844-CIV, 2008 WL 2761301, at *2 (S.D. Fla. July 1, 2008) ("courts routinely analyze the loss calculation in lead plaintiff applications in terms of trading and removed losses suffered prior to a corrected disclosure"); *Boyd v. NovaStar Fin., Inc.*, No. 07-0139-CV-W-ODS, 2007 WL 2026130, at *3 (W.D. Mo. July 9, 2007) (holding that the analysis of financial interest on a lead plaintiff motion "should be modified to reflect the Supreme Court's decision in *Dura*" and finding that "if an investor buys *and* sells the stock after the fraud occurs and before the truth is revealed, any fluctuation in the stock price cannot be attributed to the fraud"); *Rutland v. Infosonics Corp.*, No. 06CV1231, 2006 WL 3746716, at *5 (S.D. Cal. Oct. 23, 2006) ("Here, there does not appear to be any allegation that the truth began to leak out before June 12, 2006 . . . . Therefore, the Court will not consider any losses suffered by Ordway as a result of transactions prior to that date"); *see also Kops v. NVE Corp.*, No. CIV. 06-574 (MJD/JJG), 2006 WL 2035508, at *5 (D. Minn. July 19, 2006); *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 478-79 (4th Cir. 2006) (holding, on review of a motion to dismiss, that price fluctuations prior to corrective disclosures do not constitute damages under 10(b)), *cert. denied*, 127 S.Ct. 1876 (2007).

[15] Further, as argued in its opposition brief, SMRS also has the greatest loss when all the currently alleged disclosure points are analyzed. *See* Opp. at 8. This analysis, therefore, serves to reinforce that SMRS has the largest financial interest of any lead plaintiff applicant.

## IV.    ONTARIO SUFFERS FROM A CONFLICT OF INTEREST

Ontario also has other problems.[16] As SMRS argued in its opposition brief, Ontario has a pre-existing and ongoing business relationship with AIG, which creates an inherent conflict of interest, thereby preventing it from fulfilling the adequacy requirement of Fed. R. Civ. P. 23(a) and precluding Ontario from serving as lead plaintiff in these actions. *See* Opp. at 14-17.[17]

## CONCLUSION

For the foregoing reasons and the reasons stated in its opening and opposition memoranda, SMRS respectfully requests that this Court: (1) consolidate the captioned, and all subsequently-filed, related actions; (2) appoint SMRS as lead plaintiff in the related actions; and (3) approve SMRS's selection of Barrack Rodos and Bernstein Liebhard as co-lead counsel.

---

[16] Also, as noted above, counsel for Ontario/PGGM are currently in a heated fight *with each other* in *Citigroup*. In light of, *inter alia*, this ongoing dispute, it is unclear how these firms can coordinate effectively together on the class' behalf.

[17] Separately, Oakland's arguments in favor of appointing a bondholder co-lead plaintiff should be rejected since the Second Circuit Court of Appeals has spoken on the issue: "[T]he Underwriters propose that we adopt a *per se* rule that a class may not be certified where a lead plaintiff does not have standing to bring every available claim and none of the named plaintiffs who have standing to bring the additional claims has been vetted under the PSLRA. This *per se* rule has little to recommend it. Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). *See also Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325 (S.D.N.Y. 2004) (where the claims of both shareholders and option holders were predicated on the same misstatements, the interests of option investors and shareholders were held not to be sufficiently differentiated so as to require the appointment of a "niche" lead plaintiff); *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 480 (D.N.J. 1998) (emphasizing that "what matters . . . is that the claims of every member or constituent group . . . arise from the same [statements]" and, therefore, refusing to appoint separate lead plaintiffs and counsel for separate groups of investors).

Dated: August 18, 2008

Respectfully submitted,

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

/s/
_____

Sandy A. Liebhard (liebhard@bernlieb.com)
Francis P. Karam (karam@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**BARRACK, RODOS & BACINE**
Regina M. Calcaterra (rcalcaterra@barrack.com)
1350 Broadway, Suite 1001
New York, NY 10018
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

-    and –

Leonard Barrack
Jeffrey W. Golan
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

**Attorneys for the State Treasurer of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges Retirement System and [Proposed] Co-Lead Counsel for Plaintiffs and the Class**

E. Powell Miller
Marc L. Newman
The Miller Law Firm P.C.
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307

18204v1

Telephone: (248) 841-2200
Facsimile: (248) 652-2852

**Liaison Counsel for the State Treasurer of
Michigan, Custodian of the Michigan Public
School Employees Retirement System, State
Employees' Retirement System, Michigan State
Police Retirement System, and Michigan Judges
Retirement System**

18204v1

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached was served upon the following counsel of record in the actions filed in this Court, First Class Mail prepaid, this 18th day of August 2008

*Attorneys for Plaintiffs:*

David Robertson Hassel
Gerald H. Silk
Noam Noah Mandel
**Bernstein Litowitz Berger & Grossmann LLP**

Jonathan Scott Shapiro
Robert Jason Shapiro
**The Shapiro Law Firm, LLP**
500 Fifth Avenue, 14th Floor
New York, NY 10110

Jeffrey Charles Zwerling
**Zwerling, Schachter & Zwerling**
41 Madison Avenue
New York, NY 10010

Christopher L. Nelson
Darren J. Check
Sean M. Handler
Stuart Berman

**Schiffrin Barroway Topaz & Kessler, LLP**
280 King of Prussia Road
Radnor, PA 19087

*Attorneys for Defendants:*

Joseph S. Allerhand
Robert F. Carangelo
**Weil Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153

/s/
_____
JOSEPH R. SEIDMAN, JR.

EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, ) ) ) | **CIVIL ACTION NO. 07-9901-SHS** |
| ) | **ECF Filed** |
| Plaintiff, ) ) | |
| ) | |
| vs. ) ) | |
| ) | |
| ) | |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, ) ) ) ) | |
| ) | |
| Defendants. ) | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, ) ) ) | **CIVIL ACTION NO. 07-10258-SHS** |
| ) | |
| Plaintiff, ) ) | |
| ) | |
| vs. ) | |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, GARY CRITTENDEN, ) ) ) | |
| ) | |
| Defendants. ) | |

## THE U.S. PUBLIC FUND GROUP'S REPLY MEMORANDUM
## OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR
## APPOINTMENT AS LEAD PLAINTIFF

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT ................................................................................................................................... 3

I.      The U.S. Public Fund Group Is The Most Adequate Plaintiff ............................................ 3

II.     The Global Pension Funds Should Not Be Appointed Lead Plaintiffs ............................... 5

        A.      The Global Pension Funds Were Joined Together By
                Their Lawyers To Aggregate Their Losses ............................................... 5

        B.      The Global Pension Funds Lack Cohesion ................................................ 8

        C.      ColPERA and TCRS Are Subject To Unique Defenses
                Not Applicable To the U.S. Public Fund Group ........................................ 9

CONCLUSION ............................................................................................................................. 11

## PRELIMINARY STATEMENT

Of the three competing groups seeking appointment as Lead Plaintiff, the U.S. Public Fund Group is the most adequate plaintiff and should be appointed as the Lead Plaintiff.[1]  The extensive record before the Court establishes that the U.S. Public Fund Group is the only institutional movant that is subject to no unique defenses threatening to derail the litigation to the detriment of the Class. In contrast to other movants, the U.S. Public Fund Group is also the only movant that has provided the Court with a factual basis for concluding that it has and will continue to appropriately monitor and supervise its counsel's conduct of the litigation. Accordingly, with losses exceeding $50 million from its trading in Citigroup shares, the U.S. Public Fund Group has the largest financial interest of any appropriate movant and should be appointed as Lead Plaintiff under the PSLRA.

The application of the "Global Pension Funds" presents a very different story—one that is entirely inconsistent with the PSLRA. The twelve disparate entities from two continents that seek appointment as the Global Pensions Funds have provided no evidence that they are a proper group whose losses can be aggregated for purposes of calculating financial interest under the PSLRA. The evidence that the Global Pension Funds have submitted establishes that they are far from the Lead Plaintiffs envisioned by the PSLRA:  an unwieldy aggregation of investors brought together by their lawyers within hours of the Lead Plaintiff deadline in order to surmount the U.S. Public Fund Group's motion. To lend the Court's sanction to such lawyer-driven litigation by appointing the Global Pension Funds as Lead Plaintiffs would undermine the very purpose of the PLSRA. *See, e.g., In re Tarragon Corp. Sec. Litig.*, No. 07-CV-7972, 2007 U.S. Dist. LEXIS 91418, at *4 (S.D.N.Y. Dec. 6, 2007) ("To allow an aggregation of unrelated

---

[1]  The U.S. Public Fund Group is comprised of the State Teachers Retirement System of Ohio ("Ohio STRS") and the State Universities Retirement System of Illinois ("SURS").

plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation.") (*quoting In re Donkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997)). The Global Pension Funds are likewise tainted by their failure to properly monitor their counsel who, as the record before the Court demonstrates, brought the Global Pension Funds together based on improperly obtained information concerning the financial interest and identity of the members of the U.S. Public Fund Group. Moreover, the Global Pension Funds have failed to oversee their counsel, as one of their counsel had been actively seeking to represent a different class of parties injured by Citigroup's conduct—the ERISA plaintiffs—while simultaneously pursuing appointment as Lead Counsel in this securities action. It was not until after the Lead Plaintiff filings were made in the securities action that this counsel abandoned the ERISA case in favor of the securities case—demonstrating that counsel, and not the clients, are controlling the litigation.

Furthermore, the members of the Global Pension Funds are, taken individually, inadequate to serve as Lead Plaintiffs. The ten foreign members of that group (from Sweden and Denmark) will likely be challenged based on the questionable effect a judgment of this Court will have in their home jurisdictions. Additionally, the eight Danish members of the group have failed to submit the required Certifications, instead trying to skirt that requirement by having an "administrator" appear on their behalf. Finally, the two U.S. funds (from Colorado and Tennessee) are subject to unique defenses as they both profited from their trading in Citigroup shares during the class period alleged in their very own complaint.[2]

---

[2] The many deficiencies of another movant, the ATD Group – which acquired Citigroup unregistered shares through a merger transaction and whose members are still affiliated with Citigroup and have made statements adverse to the Class – similarly preclude its appointment.

## ARGUMENT

### I.    The U.S. Public Fund Group Is The Most Adequate Plaintiff

The U.S. Public Fund Group is the paradigmatic "most adequate plaintiff" under the PSLRA. 15 U.S.C. § 78u-4(a)(3)(B). The U.S. Public Fund Group consists of two sophisticated public institutional investors of the precise sort contemplated by Congress as Lead Plaintiffs under the PSLRA. *See, e.g.,* H.R. Conf. Rep. No. 104-369, at 34, 104th Cong. 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730.

The U.S. Public Fund Group has also placed before the Court a detailed factual record—including several declarations from public officials, such as the Ohio Attorney General, who will be directly involved in supervising class counsel—reflecting that the U.S. Public Fund Group is entirely client-directed rather than "lawyer-driven." The U.S. Public Fund Group thus satisfies the PSLRA.[3]    As shown by the U.S. Public Fund Group's submissions, unlike the Global Pension Funds, the members of the U.S. Public Fund Group came together on their own initiative without the prodding of counsel; its members had numerous direct communications with each other (and without the participation of outside counsel) and determined that they could work jointly *prior* to making the lead plaintiff filing; they submitted a single declaration with their moving papers, reflecting their cohesiveness; and have a strong track record and are highly motivated to prosecute this case.[4]

---

[3] *See, e.g., Smith v. Suprema Specialities, Inc.*, 206 F. Supp. 2d 627, 635 (D.N.J. 2002) ("[T]o sustain a group of proposed lead plaintiffs, courts have established protocols to insure that the group will be effective. Such protocols include requiring declarations or affidavits to demonstrate that the proposed lead plaintiffs can work effectively as a group."); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) ("If the court determines that the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff, the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class.").

[4] *See* Joint Declaration of the Honorable Marc Dann, William J. Neville, John Michael Vazquez, William G. Clark, and Dan Slack in Support of the Motion of the U.S. Public Fund Group for Appointment as Lead Plaintiff, attached as Exhibit H to the Declaration of Gerald H. Silk in Support of the Motion of U.S. Public Fund Group for Appointment as Lead Plaintiff, Approval of Its Selection of Counsel as Lead Counsel and Consolidation of All Related Actions, at ¶¶5-14 (Dkt. # 24).

In contrast, the Global Pension Funds assert that their "group" is entitled to the PSLRA's statutory presumption as the "most adequate plaintiff" because their asserted financial interest is a facially larger number. The argument misapprehends the law. The PSLRA's presumption is not triggered by the assertion of an aggregated financial interest where the group asserting that interest has not provided any factual basis supporting the aggregation—*i.e.*, where the supposed "group" has "not proven its own existence." *In re Tarragon Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 91418, at *3-4 (declining to consider asserted aggregated financial interest of movant "group" where there was "no showing that the members of either 'group' have, in fact, functioned as a group. Neither 'group' is therefore in a position to direct and control counsel.").[5]

Indeed, as members of the Global Pension Funds well know from their experiences in other cases, they themselves bear the burden of establishing that they are a cohesive group that was not cobbled together by their lawyers. *See, e.g.*, Lead Plaintiff Order in *In re Dell Inc., Sec. Litig.*, No. 06-Civ-726 (W.D. Tex.), dated April 9, 2007, at 7 (declining to appoint a group consisting of several movants herein (the Danish movants and AP7) with other U.S. and European funds because they were "lawyer-driven" and had not demonstrated the "cohesiveness" of their group.).[6] The Global Pension Funds have plainly failed to meet that burden in this case as well. Rather, as discussed below, in contrast to the extensive factual showing provided by the U.S. Public Fund Group, the Global Pension Funds' submissions raise more questions than they answer and, ultimately, support the conclusion that the U.S. Public Fund Group is the only movant that can adequately lead this securities class action.

---

[5] *See also Constance Sczezny Trust v. KPMG LLP*, 223 F.R.D. 319, 323 (S.D.N.Y. 2004) (Stein, J.) (declining to consider an asserted aggregated financial interest where the movant "has not proffered sufficient evidence that the support of the other shareholders he points to is adequate to support aggregation of the financial interests of that putative group of shareholders for purposes of determining which moving party has the largest financial interest.").
[6] Attached as Exhibit J to the Affidavit of Roger W. Kirby Supplying Exhibits in Support of the Memorandum of the ATD Group and in Opposition to The Competing Motions for Lead Plaintiff Appointment (Dkt. # 32).

## II.    The Global Pension Funds Should Not Be Appointed Lead Plaintiffs

### A.    The Global Pension Funds Were Joined Together By Their Lawyers To Aggregate Their Losses

The Global Pension Funds group is a product of the very type of lawyer-driven litigation Congress sought to dispel through the enactment of the PSLRA.  The Global Pension Funds now acknowledge (through their belated declarations) that their group was formed by lawyers; it was Schiffrin Barroway Topaz & Kessler, LLP ("Schiffrin Barroway") that went to the Swedish and Danish movants and suggested that they move together.  AP4 Decl. ¶¶4, 9; AP7 Decl. ¶¶8, 9; PKA Decl. ¶¶7, 8.[7]  Separately, the law firm of Entwistle & Cappucci LLP ("Entwistle") advised TCRS that it could join together with ColPERA.  TCRS Decl. ¶¶6, 7.  Notably absent from these declarations is any clear statement of how, when, or why the Schiffrin Barroway group of foreign entities came together with the Entwistle group of U.S. pension funds.[8]  Of course, had the "how, when, or why" been consistent with the PSLRA, it is likely that those facts would have been stated unequivocally.

Further, while the declarations state that the Global Pension Funds have spoken "since" deciding to seek appointment as Lead Plaintiffs (AP4 Decl. ¶17; AP7 Decl. ¶17; PKA Decl. ¶16; ColPERA Decl. ¶17; TCRS Decl. ¶16), they are tellingly devoid of *any* evidence that the members of the Global Pension Funds group had direct contact with the others *before* their lawyers spliced them together, stating only that they "determined" that the other funds "shared similar goals and objectives."  AP4 Decl. ¶¶4, 9; AP7 Decl. ¶¶8, 9; PKA Decl. ¶¶7, 8; *see also*

---

[7] Notably, the eight Danish funds that actually purchased the Citigroup shares at issue have not submitted declarations or given any indication as to how they will work together with the two Swedish and two U.S. funds with which they have been proffered as Lead Plaintiffs.

[8] Interestingly, the foreign funds claim familiarity with Enwistle based on that firm's representation of ColPERA in *In re Royal Ahold N.V. Sec. & "ERISA" Litig.*, 1:03-MDL-01539 (N.D. Md.).  In that case, ColPERA and Entwistle argued that foreign entities should not serve as Lead Plaintiffs.  Reply Memorandum in Further Support of the Motion of the Public Employees' Retirement Association of Colorado and Generic Trading of Philadelphia, LLC, at 5, *In re Royal Ahold N.V. Sec. & "ERISA" Litig.*, 1:03-MDL-01539 (N.D. Md. filed July 18, 2003), attached as Exhibit D to the Supp. Silk Decl.

TCRS Decl. ¶¶10, 11 (including similar language); ColPERA Decl. ¶¶11, 12 (same). No explanation is provided as to how that determination was made or what those shared goals and objectives might be.

The declarations submitted by the U.S. Public Fund Group confirm that the Global Pension Funds had not been formed as of January 4, 2008.[9] Indeed, as of late that day, Schiffrin Barroway was still endeavoring to hitch its European clients to Ohio STRS, and had given no indication that the European funds intended to partner with any other funds. Thus, it was only after Ohio STRS rejected the attempt to couple its foreign clients with Ohio STRS that Schiffrin Barroway's group and Entwistle's group could have come together. How these twelve disparate funds spread across two continents came together over the weekend between January 4 and January 7 without speaking remains a mystery. The reasons they did so are undeniable.

First, through its attorney-client relationship with Ohio STRS in *Life Enrichment Foundation v. Merrill Lynch*, No. 07-CV-9633 (LBS) (S.D.N.Y.) ("*Merrill Lynch*"), Schiffrin Barroway obtained confidential information concerning Ohio STRS financial interest as well as the identity of it co-movants. After learning from the Attorney General of Ohio that Ohio STRS was unwilling to allow Schiffrin Barroway's European funds to join with Ohio STRS, Schiffrin Barroway determined to group its clients with other funds it knew (by virtue of the confidences gleaned from Ohio) would create a facially larger financial interest in order to defeat Ohio STRS and its co-movants.

Second, by tying themselves to Entwistle's U.S. funds, Schiffrin Barroway's ten foreign funds sought to deflect the anticipated argument that they are subject to the unique defense that

---

[9] *See, e.g.,* Declaration of the Honorable Marc Dann and William J. Neville in Further Support of the U.S. Public Fund Group's Motion for Appointment as Lead Plaintiff, attached as Exhibit B to the Supplemental Declaration of Gerald H. Silk in Further Support of the Motion of the U.S. Public Fund Group for Appointment as Lead Plaintiff and in Opposition to All Competing Motions, at ¶5 (Dkt. # 37).

this Court's judgments will not be recognized in their home jurisdictions. Indeed, Schiffrin Barroway's foreign clients stress in their respective declarations that they specifically sought to move jointly with U.S. investors. AP4 Decl. ¶¶6, 10 (AP4 had a "stated preference to work with U.S. public pension funds"); AP7 Decl. ¶¶7, 10 (same); PKA Decl. ¶¶8 (same). They do not explain why, however. The obvious answer is that these funds recognized that courts in this District and elsewhere have rejected foreign Lead Plaintiffs because of the unique defenses they face, and sought to inoculate themselves from that challenge by partnering with domestic funds.[10] The Global Pension Funds provide no other explanation for why these twelve funds came together.

Thus, despite submitting five separate declarations, the Global Pension Funds have failed to address the most critical question in determining whether the losses of several movants can properly be aggregated to claim a larger financial interest: "why its members combined into [a] group in the first place." *Schriver v. Impac Mortgage Holdings, Inc.*, No. SACV-06-31, 2006 U.S. Dist. LEXIS 40607, at *27 (C.D. Cal. May 1, 2006). This failure confirms that the "purpose of the combination was to secure lead plaintiff status for the group and appointment of lead counsel status for their attorneys." *Id.*; *accord In re Cendant Corp. Litig.*, 264 F.3d at 265-66 (cited *supra).*[11]

---

[10] *See, e.g., Borochoff v. GlaxoSmithKline, PLC,* 246 F.R.D. 201, 203-05 (S.D.N.Y. 2007); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 352 (D. Md. 2003). The ten Swedish and Danish funds that comprise the Global Pension Funds cannot remedy their shortcomings by partnering with two U.S. institutions. Defendants are likely to challenge these foreign funds on the basis that they cannot serve as representative parties when it is unknown whether the Court's judgments will be recognized in their home courts. This challenge will occur and distract them from the litigation regardless of whether they have U.S. funds as co-movants. Finally, any effort by these investors to submit expert affidavits concerning this issue would be a concession demonstrating that this issue will be a distraction to these investors and the Class.

[11] The Global Pension Funds' suggestion that their filing of a complaint and discovery motion is somehow relevant to their adequacy to serve as Lead Plaintiffs is specious. The determination of the Lead Plaintiff is based on the relative financial interest of the movants *that satisfy Rule 23*, which the Global Pension Funds do not. Any benefit they claim to have conferred on the Class through their complaint is irrelevant (and, in any event, they concede they

- 7 -

**B.**    **The Global Pension Funds Lack Cohesion**

The Global Pension Funds' declarations also fail to establish how these twelve entities will work together to manage this complex litigation. The dizzying leadership structure this group proposes – twelve entities overseen by twelve independent boards of directors, eight of which operate in connection with a separate administrator, two of which are represented by in-house counsel, and which will be represented by two law firms – requires an established protocol to ensure that significant decision making does not fall to outside counsel by default. A chart of the Global Pension Funds' proposed leadership structure reveals that having these twelve entities manage this complex litigation is unteneble. *See* Chart of Global Pension Funds Decision-Making Apparatus, attached hereto as Exhibit A. Here, the Global Pension Funds have refused to disclose how they will work together, claiming that the information is confidential. Since it is clearly their burden to establish adequacy, the decision to withhold this critical information is fatal to the Global Pension Funds' application.

Understanding how these twelve funds will oversee their U.S. counsel is particularly important given their failure to exercise that oversight thus far in this litigation. Specifically, the Global Pension Funds' counsel, Schiffrin Barroway, was actively representing employees of Citigroup and seeking to be appointed Lead Counsel in an ERISA class action against Citigroup *at the same time* that it was filing papers seeking appointment as Lead Counsel in this litigation on behalf of the Global Pension Funds.

In fact, on January 4, 2008, knowing full well that it was intending to submit a Lead Plaintiff motion in the securities case, Schiffrin Barroway filed a memorandum in further support of its bid for appointment as Lead Counsel in the ERISA action. Not until reply briefs were due

---

will amend if they are appointed (*See* Global Pension Funds' Memorandum of Law in Further Support, at 7 (Dkt. #36)). *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 268 (3d Cir. 2001).

in the ERISA action on January 10, 2008—which presumably provided Schiffrin Barroway enough time to survey the landscape and identify the case in which it preferred to be appointed Lead Counsel—did it withdraw its application to be Lead Counsel in the ERISA action. *See* Plaintiffs Shaun Rose's and Mark Geroulo's Reply, at 1, *Gray v. Citigroup, Inc., et al.*, 07 Civ. 9790 (SHS) (S.D.N.Y. filed Jan. 10, 2008) (Dkt. # 48). Schiffrin Barroway is also concurrently representing Ohio STRS – which is adverse to the Global Pension Funds in this litigation – as proposed Lead Counsel in *Merrill Lynch*. Schiffrin Barroway ultimately abandoned its Citigroup ERISA clients and has since abandoned Ohio STRS in *Merrill Lynch* to pursue its preferred opportunities in this action.

### C.    ColPERA and TCRS Are Subject To Unique Defenses Not Applicable To The U.S. Public Fund Group

ColPERA and TCRS are subject to the unique defense that they derived a net benefit from the sale of their Citigroup stock at artificially inflated prices. "Courts have consistently rejected applications for lead plaintiff status made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices." *In re Bausch & Lomb, Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007) (citing cases).[12]

Indeed, during the Class Period set forth in their own complaint (January 1, 2004 through November 21, 2007), ColPERA sold 718,082 more shares than it purchased and received *$35 million* more than it spent to buy Citigroup shares, while TCRS sold 210,204 more shares than it purchased during this period and received *$11 million* more than it spent. Thus, based on their own allegations, ColPERA and TCRS could be the subject of challenge by the defendants on the

---

[12] *See also, GlaxoSmithKline*, 246 F.R.D. at 205 (holding that Lead Plaintiff applicant did not adequately represent the proposed class because it was a "net seller"); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D.N.Y. 2005) ("courts usually reject these so-called net gainers as lead plaintiffs, opting for net losers that will have less trouble proving damages").

grounds that they have zero financial interest in this litigation and have actually benefited during the period of the misconduct set forth in their very own complaint.

The same cannot be said of the U.S. Public Fund Group. SURS is *not* a net seller or net gainer in any class period alleged.[13] SURS *is the only domestic lead plaintiff applicant that does not suffer from any infirmity or challenge to its adequacy or typicality*. Ohio STRS is *not* a net seller or net gainer in the first filed and noticed Class Period (April 17, 2006 to November 2, 2007), which is alleged in half of the complaints filed to date, but does have net sales and gains during the longer Class Period alleges in two of the filed complaints.[14] Ohio STRS and SURS will, once appointed, conduct a full investigation and determine the appropriate Class Period. The participation of SURS – which is not a net seller under any Class Period – ensures that there will be no question that the Class Period alleged is based *only* on the facts uncovered in the investigation. In contrast, ColPERA and TCRS have already filed their complaint, and it will be difficult for them to abandon their allegation that the Class Period begins in 2004, as opposed to the two shorter class periods beginning in 2006, without facing accusations by defendants that the decision was made to suit the needs of their own trading pattern.

---

[13]  The four complaints filed in this litigation allege three different Class Periods. The first filed and noticed action, *Saltzman v. Citigroup, Inc.*, No. 07-9901, alleges a Class Period of April 17, 2006 to November 2, 2007. *Hammerschlag v. Citigroup, Inc.*, No. 07-10258, alleges a Class Period of January 1, 2004 to November 5, 2007. The Global Pension Funds' complaint, for which the PSLRA-required notice was not published, alleges a Class Period of January 1, 2004 to November 21, 2007. *Fisher v. Citigroup, Inc.*, No. 08-0136, alleges the same class period set forth in *Saltzman*. It will fall to the Court-appointed Lead Plaintiff to determine the Class Period alleged in the operative complaint. The Global Pension Funds implicitly concede that, at the Lead Plaintiff stage, the Court may consider the different Class Periods that have been alleged, as their brief discussed their claim losses under two different Class Periods. *See* Global Pension Funds' Memorandum of Law in Further Support, at 8-9 (Dkt. #36).
[14]  ColPERA and TCRA are similarly net gainers in both of the longer Class Periods that have been alleged. Utilizing the *Hammerschlag* class period, which ends the class period on November 5, 2007, ColPERA had net gains of *$36 million* and TCRS had net gains of *$12 million*.

- 10 -

**CONCLUSION**

For all the above reasons, the U.S. Public Fund Group respectfully requests that the Court

appoint the U.S. Public Fund Group as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the

PSLRA.

Dated:  February 7, 2008                          Respectfully submitted,

                                                  /s/ Gerald H. Silk
                                                  **BERNSTEIN LITOWITZ BERGER**
                                                  **& GROSSMANN LLP**
                                                  Gerald H. Silk (GS-4565)
                                                  John P. Coffey (JC-3832)
                                                  Avi Josefson (AJ-3532)
                                                  Noam Mandel (NM-0203)
                                                  1285 Avenue of the Americas, 38th Floor
                                                  New York, New York 10019
                                                  Telephone: 212-554-1400
                                                  Facsimile:  212-554-1444

                                                  **BERMAN DEVALERIO PEASE TABACCO**
                                                  **BURT & PUCILLO**
                                                  Jeffrey C. Block (JB-0387)
                                                  Kathleen M. Donovan-Maher
                                                  Leslie R. Stern
                                                  One Liberty Square
                                                  Boston, Massachusetts 02109
                                                  Telephone: 617-542-8300
                                                  Facsimile: 617-542-1194

                                                  Michael J. Pucillo
                                                  Anne O'Berry
                                                  Esperante Building
                                                  222 Lakeview Avenue, Suite 900
                                                  West Palm Beach, FL 33401
                                                  Telephone: 561-835-9400
                                                  Facsimile: 561-835-0322

                                                  *Counsel to the U.S. Public Fund Group and*
                                                  *Proposed Lead Counsel for the Class*

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, ) | **CIVIL ACTION NO. 07-9901-SHS** |
| ) | **ECF Filed** |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, ) | |
| ) | |
| Defendants. ) | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, ) | **CIVIL ACTION NO. 07-10258-SHS** |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, GARY CRITTENDEN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO STRIKE THE DECLARATION OF BRUCE A. GREEN AND THE DECLARATIONS OF ATTORNEY GENERAL MARC DANN AND WILLIAM J. NEVILLE**

## I.    INTRODUCTION

The Attorney General of Ohio and the Ohio State Teachers' Retirement System ("Ohio STRS") respectfully submit this memorandum of law in opposition to two motions of the "Global Pension Funds" to strike the Declaration of Bruce A. Green and two Declarations of Honorable Marc Dann and William J. Neville (the "Motions to Strike").[1]  For the reasons set forth below, the Motions to Strike should be denied.

## II.    THE MOTION TO STRIKE PROFESSOR GREEN'S DECLARATION SHOULD BE DENIED

It is well established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence. *Boucher v. U.S. Suzuki Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Here, the court should exercise its discretion to admit the Green Declaration because Professor Green's opinion analyzes the facts of the case without attempting to "provide legal opinions, legal conclusions, or interpret legal terms" that fall within the province of the court. *Rondout Valley Cent. School Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004).

Movants incorrectly characterize the Green Declaration as including solely "conclusions of law."  Contrary to movants' suggestion, there is nothing improper about the Court's consideration of the opinions offered by Professor Green.[2]  Notably, movants do not challenge the qualifications of Professor Green or offer the opinion of any expert who disagrees with his conclusions.  Instead, movants appear to argue that judges can never consider the opinions of experts concerning legal ethics.  In doing so, movants ignore numerous cases that have carefully

---

[1]  The first motion to strike was submitted on January 31, 2008, with a request to be filed under seal and has not been docketed.  The second motion to strike was filed on February 5, 2008 (Dkt. #41).

[2]  Rule 702 of the Federal Rules of Evidence expressly permits admission of expert testimony where, as here, "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...."  F.R.E. 702.  While an expert may not state a legal conclusion, Rule 702 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  F.R.E. 704.

considered such opinions – including those from Professor Green himself – and disregard the substantial assistance such expert testimony can provide on the issues presented here involving the unique interplay of ethical rules in the securities class action context.

In fact, courts routinely allow experts to opine on issues of legal ethics, especially on motions to disqualify counsel, because those issues inherently involve mixed questions of law and fact. *See, e.g., Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 453 n.7 (S.D.N.Y. 2001) (Professor Green's ethics opinion advised court on issue of breach of fiduciary duty); *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 453 (S.D.N.Y. 2000) (ethics expert opinion considered in motion to disqualify counsel).[3]   Courts accept expert opinions on mixed questions of law and fact where the testimony is "focused on helping the jury or judge understand particular facts in issue and [does] not opine on the ultimate legal conclusion." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 65 (S.D.N.Y. 2001) ("*In re IPO*") (citing *In re Air Disaster at Lockerbie, Scotland*, 37 F.3d 804, 826-27 (2d Cir. 1994)).[4] Moreover, the special policy concerns related to the prohibition on expert legal testimony are not

---

[3] This approach is followed by courts throughout the country. *See., e.g., Univ. of Rochester v. G.D. Searle & Co., Inc.*, No. 00-cv-6161LB, 2000 WL 1922271, *10 (W.D.N.Y. Dec. 11, 2000) (court accepted ethics expert's opinion with respect to conflict waivers); *Blanchard v. Edgemark Fin. Corp.*, No. 94 C 1890, 1998 WL 988958, *15 (N.D. Ill. Sept. 11, 1998) (ethics experts' opinions on whether rules of professional conduct were violated were part of the record reviewed by the court); *Terrebonne, Ltd. v. Murray*, 1 F. Supp. 2d 1050, 1058 n.5 (E.D. Cal. 1998) (expert testimony "relevant and helpful in determining conflict issues" in attorney disqualification case); *In re Southeast Banking Corp.*, 147 B.R. 267, 272 (S.D. Fla. Bankr. 1992) (expert opinion on conflict of interests considered by court on motion to disqualify counsel); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2001 WL 243494, *3 (D.Me. Mar. 12, 2001) (expert's assessment of conflicts of interest considered on motion to disqualify).

[4] The movants' reliance on *In re IPO* is misplaced. In that case, Judge Scheindlin found that the expert's opinion was an impermissible legal conclusion because the decision of whether to recuse was governed only by interpretation of the recusal statute, 28 U.S.C. § 45, and "this decision involves nothing more than interpreting the statute given certain undisputed facts; it is solely a question of law." 174 F. Supp. 2d at 65. In contrast, here, the key disputed issue is whether Schiffrin Barroway has taken a position adverse to that of Ohio – a mixed question of law and fact. Similarly, in *In re Intel Corp. Microprocessor Antitrust Litig.*, 2007 WL 4323007 (D. Del Dec. 6, 2007), the Court found that the expert reports at issue contained impermissible interpretations of Rule 23 and the legal effect of the 2003 amendments on that Rule. *Id.* at *2, *4. Here, Professor Green does not simply interpret a statute but, rather analyzes the salient facts under a broad body of law and opinion governing attorney conduct in a manner that would be helpful to the court in "interpreting and analyzing factual evidence." *Id.* at *4.

2

applicable where, as here, the factual issues are to be decided by the Court. Indeed, "[a] trial judge is quite capable to discern the relevant evidence, weigh the probative value or its prejudicial effect, and readily reject an improper inference or intrusion upon its role." *Rondout Valley Cent. School Dist.,* 321 F. Supp. 2d at 480.

Accordingly, the Motion to Strike the Green Declaration should be denied because the declaration contains only Professor Green's expert analysis of the facts contained in the Dann Declaration, *see* Green Declaration, at ¶6, and his related factual and legal conclusions. The vast majority of Professor Green's opinion concerns the issue of whether Schiffrin Barroway is, as a mixed question of fact and law, directly adverse to a current client. *See* Green Declaration, at ¶¶ 9-13. The opinion also addresses whether the conflict and its effects upon Ohio and the *Citigroup* litigation would dissipate under certain hypothetical circumstances, such as if Schiffrin Barroway withdrew from representing Ohio STRS in the *Merrill Lynch* litigation. *See* Green Declaration at ¶¶14-15. The declaration also contains Professor Green's opinion as to whether it is likely that Ohio's confidential information was conveyed from Schiffrin Barroway to Entwistle. *Id.* at ¶ 17. These are all mixed issues of fact and law, and are appropriate areas for expert testimony.

## III. THE MOTION TO STRIKE THE DECLARATION OF MARC DANN AND WILLIAM J. NEVILLE SHOULD BE DENIED

The Global Pension Funds' sole basis for striking the declarations of Attorney General Marc Dann and William J. Neville is that those declarations do not include an affirmation that the statements contained therein were made "under penalty of perjury" and "are true and correct" as required by 28 U.S.C. § 1746. That omission reflects the error of counsel to Ohio STRS and the Ohio Attorney General, who prepared the final versions of those declarations for execution by Attorney General Dann and Mr. Neville. *See* Declaration of Gerald H. Silk ("Silk Decl.")

3

¶2.[5]  Both Attorney General Dann and Mr. Neville believed the statements in their declarations to be true and correct when they signed them, as evidenced by the fact that Attorney General Dann and Mr. Neville have now both affirmed, under penalty of perjury, that the facts contained in those declarations are true and correct. *See* Silk Decl. Ex. A ¶16 and Ex. B ¶2.

This affirmation as to the truth of the declarations at issue satisfies the purpose of 28 U.S.C. § 1746: "To ensure the trustworthiness of a declaration, federal law requires a declarant subscribe his statement subject to the risk of criminal penalty." *Mugno v. Societe Intern. de Telecom. Aeronautiques*, No. 05-CV-2037, 2007 WL 316573, at *9 (E.D.N.Y. Jan. 30, 2007).  In accordance with this rationale, corrected declarations that contain the statutorily required language concerning "the penalty of perjury" (and thus subject the declarant to penalties for knowing falsehoods) are accepted by courts. *See, e.g., Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027 (M.D. Fla. 2000); *see also U.S. v. Gritz Bros. P'ship*, 155 F.R.D. 639, 644 (E.D. Wis. 1994) (denying motion to strike unsworn declaration not in compliance with 28 U.S.C. § 1746 where declarant submitted a corrected declaration).  Because Attorney General Dann and Mr. Neville have provided the statutorily required affirmation of their declarations, and because the Global Pension Funds have not been prejudiced by the error of counsel that gave rise to their motion, the Motions to Strike the declarations of Attorney General Dann and Mr. Neville should be denied.

---

[5] The Silk Declaration was submitted in support of the U.S. Public Fund Group's Reply Memorandum in Further Support of the Motion of Ohio State Teachers Retirement System and the Attorney General of Ohio in Support of Its Motion to Disqualify Counsel, and a courtesy copy was provided to the Court on February 6, 2008 with a request that it be filed under seal.

## CONCLUSION

For all the above reasons, Ohio respectfully requests that the Court deny the Motions to Strike in their entirety.

Dated:  February 7, 2008

Respectfully submitted,

**MARC DANN**
**ATTORNEY GENERAL OF OHIO**
Christopher R. Geidner,
Counsel to the Attorney General
Andrea L. Seidt,
Deputy Chief Counsel
30 E. Broad St., 17th Floor
Columbus, Ohio 43215
Telephone: 614-466-4320
Facsimile: 614-466-5087

*Counsel to the Ohio State Teachers'*
*Retirement System*

 /s/ Gerald H. Silk
**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
Max W. Berger (MB-5010)
Gerald H. Silk (GS-4565)
Avi Josefson (AJ-3532)
Noam Mandel (NM-0203)
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile:  212-554-1444

*Counsel to the Office of the Ohio Attorney*
*General and the Ohio State Teachers'*
*Retirement System*

EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

No. 05-2165

IN RE OCA, INC. SECURITIES
AND DERIVATIVE LITIGATION          SECTION: R(3)

JUDGE VANCE

**THIS DOCUMENT RELATES
TO: ALL CASES**

<u>**ORDER AND REASONS**</u>

Before the Court are motions for appointment as lead
plaintiff in the securities cases and in the derivative cases
that have been consolidated in this proceeding.  For the reasons
stated below, the Court conditionally appoints Samuel Boodman as
the lead plaintiff in the securities actions, and it approves his
selection of Kaplan Fox & Kilsheimer LLP as lead counsel and
Neblett, Beard & Arsenault as liaison counsel.  The Court
appoints Eric Nagel as lead plaintiff in the derivative actions,
and it approves his selection of Federman & Sherwood and Brodsky
& Smith, LLC as co-lead counsel and Barasso Usdin Kupperman
Freeman & Sarver, L.L.C. as liaison counsel.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Defendant OCA, Inc. is a Louisiana-based company that provides business services to orthodontic and pediatric dental practices throughout the United States.  Specifically, OCA provides affiliated practices with information systems and a range of operational, purchasing, financial, marketing, administrative and other business services.  It generally provides its services to affiliated practices under long-term service, consulting, or management service agreements with terms that typically range from 20 to 25 years. As of December 31, 2004, OCA had approximately 565 affiliated centers in the United States and abroad, and the company had customers in 46 states and in international locations.

On May 18, 2004, OCA announced that it would adopt Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"), which requires a company to consolidate the financial results of variable interest entities under certain circumstances when the company has an interest in the entities.  OCA stated that its adoption of FIN 46R would require it to make a number of changes to its financial statements effective January 1, 2004.  Those changes included changes to the way OCA recorded patient revenue and patient receivables.  OCA's chief executive officer, Bart F. Palmisano, Sr., stated in OCA's May 18, 2004 press release that

2

the accounting changes would make OCA's accounting simpler and more transparent and would lead to financial reporting that was more consistent with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the early part of 2005, defendants made a series of false statements concerning OCA's quarterly financial results and its future prospects.  According to plaintiffs, those statements were materially false or misleading and had the effect of artificially inflating OCA's stock price.

On March 17, 2005, OCA announced that it would delay the filing of its Form 10-K for the fiscal year ended December 31, 2004 because it had identified certain accounting errors relating to 2004 and earlier years.  OCA stated that it would continue to review its accounting and that it had not made a decision about whether the errors were material or would require it to restate earlier financial results.  On June 7, 2005, OCA announced a further delay the filing of its 2004 Form 10-K and reported that it had identified material errors in its calculation of patient receivables reported during the first three quarters of 2004.  It revealed that its audit committee required it to restate its financial results for those periods.  OCA also announced that it had organized a special committee of the board of directors to review the origins of certain journal entries in the company's

3

general ledger and their impact on OCA's financial statements.
OCA's chief operating officer, Bart. F. Palmisano, Jr., went on
administrative leave pending the outcome of the company's
internal investigation.  On the heels of OCA's June 7
announcement, shares of OCA stock fell $1.55, or 38%, to close at
$2.48 per share.

    Shortly after OCA's June 7, 2005 announcement, a number of
plaintiffs filed securities class actions and shareholder
derivative actions in this district against OCA and certain of
its officers and directors.  The complaints allege generally that
defendants engaged in improper accounting practices that
materially overstated OCA's patient receivables reported during
2004.  The complaints further allege that defendants made
improper journal entries in the company's general ledger, altered
information that they provided to OCA's independent accounting
firm, and failed to maintain adequate internal controls to ensure
accurate financial reporting.  The securities plaintiffs assert
claims against defendants under sections 10(b) and 20(a) of the
Securities Exchange Act of 1934.  The derivative plaintiffs
assert claims for breach of fiduciary duty, abuse of control,
mismanagement, waste of corporate assets, unjust enrichment and
disgorgement under the Sarbanes-Oxley Act of 2002.

    To date, 14 shareholder class actions and 7 shareholder

4

derivative actions have been filed in this district and
consolidated before this Court.  On August 2, 2005, the Court
held a preliminary conference and determined that separate lead
plaintiffs should be appointed for the consolidated securities
actions and the consolidated derivative actions.  The Court
directed the parties to file motions for appointment as lead
plaintiff in the securities actions and in the derivative actions
no later than August 12, 2005.  Six plaintiffs or groups of
plaintiffs timely moved for appointment as lead plaintiff in the
securities actions, and two candidates timely moved for
appointment as lead plaintiff in the derivative actions.  The
Court gave the plaintiffs the opportunity to respond to the
respective motions by August 19, 2005.  In the meantime,
Hurricane Katrina struck, which delayed the resolution of these
issues.

## II.  THE SECURITIES CASES

### A.  Applicable Law

The appointment of a lead plaintiff in a federal securities
class action is governed by the Private Securities Litigation
Reform Act of 1995.  *See* 15 U.S.C. § 78u-4.  The history and
purposes of the PSLRA have been extensively discussed in the case
law, and the Court will not repeat that discussion here.  *See
generally, e.g., Newby v. Enron Corp. (In re Enron Corp. Sec.*

5

*Litig.)*, 206 F.R.D. 427, 441-42 (S.D. Tex. 2002); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, app. at 1046-50 (N.D. Cal. 1999) (Amicus Brief of Securities and Exchange Commission); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813-15 (N.D. Ohio 1999). Suffice it to say, the PSLRA was enacted to curb perceived abuses in federal securities class actions and to ensure that securities plaintiffs, not lawyers, exercise control over federal securities class actions.

To that end, the statute sets out a detailed procedure for determining the appropriate lead plaintiff. Under the PSLRA, the first plaintiff to file a complaint must publish notice in a widely circulated business publication or wire service notifying putative class members that, no later than 60 days after publication of the notice, any putative class member can move to be appointed as the lead plaintiff for the purported class of plaintiffs. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). The district court must consider any timely motion for appointment as lead plaintiff, and it must appoint the "most adequate plaintiff" as the lead plaintiff. The "most adequate plaintiff" is the class member who is most capable of adequately representing the interests of class members. *Id.* § 78u-4(a)(3)(B)(i).

The PSLRA creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons" that (i)

6

has moved for appointment as the lead plaintiff in response to
the notice described above; (ii) has "the largest financial
interest in the relief sought by the class;" and (iii) "otherwise
satisfies the requirements of Rule 23 of the Federal Rules of
Civil Procedure." *Id.* § 78u-4(a)(3)(B)(iii)(I). Of Rule 23's
requirements for the maintenance of a class action, only two,
typicality and adequacy of representation, are relevant in the
lead plaintiff context. *See Newby*, 206 F.R.D. at 441; *Tarica v.
McDermott Int'l, Inc.*, No. Civ.A.99-3831, 2000 WL 377817, at *4
(E.D. La. Apr. 13, 2000).

Once the Court has determined the presumptive most adequate
plaintiff, the statutory presumption can be rebutted only by
proof that the presumptive plaintiff "will not fairly and
adequately protect the interests of the class[,] or . . . is
subject to unique defenses that render such plaintiff incapable
of adequately representing the class." 15 U.S.C. § 78u-
4(a)(3)(B)(iii)(II).

### B.    The Most Adequate Plaintiff

In this case, six parties timely moved for appointment as
lead plaintiff in the securities cases. These parties and their
interests are described below.

(1) Cannell Capital, LLC, an institutional investment
advisor, asserts a loss of $2,649,791.25 from its investments in

OCA securities. Cannell Capital originally asserted a loss of $3,016,046. (*See* Cannell Cap. Mem. at 6). It later submitted a declaration stating that one of its clients had not given it permission to pursue this action. Accordingly, Cannell Capital revised its purchases and sales to exclude transactions on behalf of that client, and it now asserts a loss of $2,649,791.25. (*See* Cannell Decl. Ex. A, at 7).

(2) The "OCA Investors Group" consists of Louisiana School Employees' Retirement System; Lawford Overseas Management, Inc.; B.V. Brooks, acting on behalf of himself, his wife (over whose account he holds a power of attorney) and a family trust the activities of which he directs as trustee; Brooks Torrey & Scott, Inc.; B.V. Brooks & Colin Gunn TTEE; Westbrook, Inc.; and Bryan Cardinal. (*See* OCA Inv. Group Mem. at 1 & n.1). It asserts a loss of $482,625.68. The OCA Investors Group initially asserted a loss of $468,376.18. (*See id.* at 10). In its responsive memorandum, however, it states that it has identified additional class period transactions in OCA securities, resulting in a total loss of $482,625.68. (*See* OCA Inv. Group Resp. Mem. at 6 n.3).

(3) Douglas Levine and Samuel Boodman, two individual investors who seek appointment as co-lead plaintiffs, assert a loss of $417,134. (*See* Levine & Boodman Mem. at 1).

(4) Robotti & Company Advisors LLC, an investment management

firm, asserts a loss of $318,399. (*See* Robotti & Co. Mem. at 5-6). In its responsive memorandum, Robotti & Company asserts a loss of $373,480, a figure that includes the individual losses of Robert E. Robotti. (*See* Robotti & Co. Resp. Mem. at 11-12). Because only Robotti & Company, not Robotti personally, timely moved for appointment as lead plaintiff, the Court will not consider Robotti's personal loss in determining Robotti & Company's financial interest in this action.

(5) The "MEL Capital Group," which consists of MEL Capital; Penmont Securities, LP; Richard Feinberg; Scott Goebel; and Greg Konny, asserts a loss of $214,400. (*See* MEL Cap. Group Mem. at 1, 5).

(6) Dr. Martin DeSomma, an individual investor, asserts as loss of $108,430. (*See* DeSomma Mem. at 2).

By filing their motions, each of the applicants has complied with the first of the statute's three criteria for becoming the most adequate plaintiff. The Court must next determine which of the movants has "the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The PSLRA does not define the term "largest financial interest." *See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 302 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *3 (N.D.

Ohio May 12, 2004).  A number of courts have held that four
factors are relevant to determining which proposed lead plaintiff
has the greatest financial interest.  They consider (i) the total
number of shares purchased during the class period; (ii) the
total net shares purchased during the class period; (iii) the
total net funds expended during the class period; and (iv) the
approximate amount of loss suffered.  *See, e.g., In re eSpeed,
Inc. Sec. Litig.*, No. 05 Civ.2091(SAS), 2005 WL 1653933, at *3
(S.D.N.Y. July 13, 2005); *Cardinal Health*, 226 F.R.D. at 303-04;
*Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *3.  Other courts
have eschewed the four-factor inquiry and held that the inquiry
should be based solely on each plaintiff's approximate loss.  *See
In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2005 U.S.
Dist. LEXIS 6243, at *14-15 (N.D. Ill. Mar. 15, 2005) ("We
believe that the best yardstick by which to judge 'largest
financial interest' is the amount of loss, period.").  Because
the parties focus primarily on approximate loss in their
submissions, the Court will employ only that measure to determine
which plaintiff has the largest financial interest here.

     1.    *Cannell Capital*

On the face of the lead plaintiff motions, Cannell Capital's
purported loss of $2,649,791 is almost $2.2 million larger than
the next-largest purported loss, which would give it by far the

greatest loss of any proposed lead plaintiff.

Several parties argue that Cannell Capital is an inadequate
lead plaintiff regardless of the size of its purported loss
because it may not be able to establish that any such loss was
caused by the defendants' fraud.  Those parties point out that
Cannell Capital sold all of its OCA shares by April 15, 2005,
nearly two months before OCA's June 7, 2005 announcement that it
would restate its financial results for the first three quarters
of 2004.  As a result, they argue, Cannell Capital's claims might
be subject to a defense for lack of loss causation.  *See* 15
U.S.C. § 78u-4(b)(4) (plaintiff in section 10(b) action must
prove that defendant's misrepresentations "caused the loss for
which the plaintiff seeks to recover"); *Dura Pharms., Inc. v.
Broudo*, 125 S.Ct. 1627, 1631-34 (2005) (plaintiff must allege and
prove a causal connection between defendant's misrepresentations
and the alleged loss).  Cannell Capital responds that it will be
able to allege and prove loss causation because OCA's March 17,
2005 press release announcing that the company would delay the
filing of its 2004 Form 10-K was a partial disclosure of
defendants' alleged fraud and led to a decline in the market
price of OCA stock.  Cannell Capital asserts that it still held
OCA shares at the time of the March 17, 2005 partial disclosure,
and that it will therefore be able to establish loss causation.

11

Notwithstanding this argument, the fact remains that Cannell
Capital faces issues concerning loss causation that the other
lead plaintiff candidates do not.  Those issues are substantial
enough to render Cannell Capital inadequate to serve as the lead
plaintiff in this action.  *See* 15 U.S.C. § 78u-
4(a)(3)(B)(iii)(II) (presumption that party is most adequate
plaintiff may be rebutted by showing that plaintiff is "subject
to unique defenses that render such plaintiff incapable of
adequately representing the class").  It is a safe bet that, if
Cannell Capital were appointed lead plaintiff, defendants would
challenge its claims on loss causation grounds.  Regardless of
whether such a challenge would be successful, Cannell Capital
would be required to devote substantial time and resources to
establishing that the defendants' alleged fraud caused its loss,
an issue that is not relevant to a significant number of class
members.  That alone makes Cannell Capital inadequate to serve as
lead plaintiff.  *See, e.g., Bally Total Fitness*, 2005 U.S. Dist.
LEXIS 6243, at *19 (plaintiff inadequate when "the time and
attention [it] would be required to devote to the loss causation
issue . . . would distract it from the claims of the rest of the
class"); *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *4 (lead
plaintiff candidates inadequate when they would likely face
motion to dismiss for lack of loss causation); *In re Carreker*

12

*Corp. Sec. Litig.*, No. 3:03-CV-0250-M, 2003 U.S. Dist. LEXIS
25988, at *8-9 (N.D. Tex. Aug. 14, 2003) (same).

In addition, Cannell Capital's interests in this litigation
are potentially divergent from the interests of other putative
class members.  Because Cannell Capital sold all of its OCA
shares before the June 7, 2005 disclosure that marks the end of
the class period, its overarching interests in this case are to
establish that OCA's March 17, 2005 press release was a
disclosure of the alleged fraud and to maximize the significance
of that disclosure.  Cannell Capital's incentive to effectively
front-load the disclosure of the alleged fraud might, however,
cause it to make arguments or take legal positions that are
adverse to the interests of those class members who purchased OCA
shares after March 17, 2005.  Indeed, it has already done so on
this motion.  In its responsive memorandum, Cannell Capital
argues that plaintiffs who purchased OCA stock after March 17 are
inadequate to serve as lead plaintiff because they purchased OCA
stock "with knowledge of the company's accounting problems."
(Cannell Cap. Resp. Mem. at 8).  The existence of this potential
conflict creates significant concerns about whether Cannell
Capital could be a typical or adequate representative of the
entire class, and it is an additional reason for finding that

Cannell Capital is not the most adequate plaintiff in this case.[1]

      2.   *OCA Investors Group*

    The OCA Investors Group purports to have the next-greatest financial interest in this case, as its members assert a combined loss of $482,625.68. The OCA Investors Group cannot be the most adequate plaintiff, however, because the Court finds that it is not an appropriate "group of persons" to serve as a lead plaintiff in this action.

    Courts are divided on whether a previous relationship among investors, independent of the lawsuit, is required for a group of investors to be appointed as lead plaintiff. *Compare, e.g., Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *8 ("'Where the members of the group do not share business or other relationships independent of the lawsuit . . . appointment of such an artificial group of persons as lead plaintiffs should be rare under the PSLRA.'" (quoting *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 847 (S.D. Ind. 1999))), *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *5 ("[L]ead plaintiff movants must have a pre-existing relationship and basis for acting as a

---

[1]Levine and Boodman also argue that Cannell Capital is an inadequate lead plaintiff because it is an investment advisor and it has not shown that it has standing to bring this action in its own name on behalf of its clients. As the Court has found that Cannell Capital is not the most adequate plaintiff, the Court need not address this additional argument.

collective unit to qualify under the PSLRA as a viable lead
plaintiff group."), *and In re Donnkenny Inc. Sec. Litig.*, 171
F.R.D. 156, 157 (S.D.N.Y. 1997) ("To allow an aggregation of
unrelated plaintiffs to serve as lead plaintiffs defeats the
purpose of choosing a lead plaintiff."), *with In re Cendant Corp.
Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) ("We disagree with those
courts that have held that the statute invariably precludes a
group of 'unrelated persons' from serving as a lead plaintiff
under the PSLRA."), *and In re Am. Bus. Fin. Servs., Inc. Sec.
Litig.*, No. 04-0265, 2004 U.S. Dist. LEXIS 10200, at *12 (E.D.
Pa. June 3, 2004) (PSLRA does not mandate that members of a group
have a preexisting relationship).  The PSLRA does not, by its
express terms, prohibit groups of unrelated plaintiffs from
banding together to move for appointment as lead plaintiff, and
this Court has permitted a group of investors to serve as co-lead
plaintiffs in other litigation.  *See Tarica,* 2000 WL 377817, at
*5.  Nevertheless, it is equally apparent that the practice of
aggregating unrelated plaintiffs into groups in order to seek
appointment as lead plaintiff, if permitted without scrutiny,
could undermine the PSLRA's goal of fostering plaintiff-driven
securities class action litigation.  *See, e.g., Sakhrani*, 78 F.
Supp. 2d at 847 ("[I]n most situations the appointment of an
artificial group as lead plaintiffs will tend to undermine the

15

goals of the PSLRA.").

Like a number of other courts, this Court will not take a categorical approach on the issue. It will permit an unrelated group of investors to serve as lead plaintiff if the group shows that its assemblage "is not a manipulated effort to aggregate larger losses than other proposed Lead Plaintiffs." *Newby*, 206 F.R.D. at 455; *In re Microstrategy, Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (refusing to appoint group of unrelated plaintiffs when evidence suggested that group "was merely a diverse collection of plaintiffs assembled . . . for the purpose of winning the lead plaintiff role"). Thus, to be eligible to serve as lead plaintiff, a group of unrelated investors must show that it is a cohesive group that will operate efficiently and that the group's appointment as lead plaintiff will provide some benefit to the class that would not be achieved by the appointment of a single lead plaintiff. *See In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 413 (S.D. Tex. 1999) ("The burden is on those seeking to aggregate to demonstrate the cohesiveness of their purported 'group' . . . ."); *see also Carreker Corp.*, 2003 U.S. Dist. LEXIS 25988, at *10-11 (stating that court will consider "whether an appointment of previously unrelated persons best serves the interest of the class and whether a sufficient governance structure is in

16

place"). Moreover, any group of plaintiffs must be small enough in size to assure the Court that it can manage the litigation effectively. For that reason, the Securities and Exchange Commission has stated that groups should generally contain no more than three to five members. *See Network Assocs.*, 76 F. Supp. 2d at app. at 1041 (Amicus Brief of Securities and Exchange Commission).

The OCA Investors Group consists of nine different plaintiffs, six of which are related and grouped under the moniker the "Brooks Family."[2] The OCA Investors Group asserts that it is a "small, cohesive and diverse group" that will provide the class "with benefits of joint decision-making and funding" and will allow the class to "wield more control" over counsel. (OCA Inv. Group Resp. Mem. at 7). The members of the OCA Investors Group have also signed a joint declaration stating that they "have agreed to communicate to discuss material developments and strategy and to establish a method of reporting by Lead Counsel" and have "exchanged contact information so that [they] may discuss issues outside the presence of counsel, if

---

[2]The "Brooks Family" consists of B.V. Brooks, his wife (over whose account he holds a power of attorney), a family trust whose activities he directs as trustee, and several companies he controls – Brooks Torrey & Scott, Inc., B.V. Brooks & Colin Gunn TTEE and Westbrook, Inc. (*See* OCA Inv. Group. Mem. at 1 & n.1).

17

[they] feel it necessary to do so." (*Id.* Ex. C, at 2).

Although the size of the OCA Investors Group exceeds that typically found acceptable, the Brooks Family would effectively function as a single investor by virtue of the relationships among its members. For practical purposes, then, the OCA Investors Group consists of only four members, and its size alone does not prevent it from serving as lead plaintiff.

The Court nevertheless finds that the OCA Investors Group is not an adequate lead plaintiff because it has not met its burden of showing that it is anything but a diverse collection of plaintiffs with no reason for being other than the aggregation of losses. The OCA Investors Group provides little or no information on matters relevant to its cohesiveness and ability to function efficiently. A proposed group should provide the Court with a description of how and why the group was formed, the specific benefits that each group member will bring to the prosecution of the litigation, other than the size of its loss, and the specific manner in which the group proposes to make decisions. *See Network Assocs.*, 76 F. Supp. 2d at 1026 (group should provide "descriptions of its members, including any pre-existing relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed

18

lead counsel have established to communicate with one another about the litigation." (quoting Amicus Brief of Securities and Exchange Commission at 12, 15, *Parnes v. Digital Lightwave, Inc.*, No. 99-11293 (11th Cir. Aug. 2, 1999))); *Newby*, 206 F.R.D. at 455 (denying group's motion for appointment as lead plaintiff when there was "no clear or persuasive reason why FSBA and NYC Funds have joined together to apply for Lead Plaintiff in this litigation other than an effort to amalgamate their losses to be greater than their competitors'").

Here, the OCA Investors Group provides no real explanation as to how or why it was formed, other than its generic statements about the benefits of joint decision-making and generalizations about a group's ability to control counsel more effectively than a single plaintiff. Even if those statements were accurate, they would apply to virtually any group of investors put together by counsel to move for appointment as lead plaintiff. Moreover, the OCA Investors Group has failed to provide an adequate description of how the group would function to manage this litigation. The group's joint declaration merely states that it will "discuss material developments and strategy" and that it intends to "establish a method of reporting." (*See* OCA Inv. Group. Resp. Mem. Ex. C, at 2). General statements like these are inadequate. *See Carreker Corp.*, 2003 U.S. Dist. LEXIS 25988, at *9-11

19

(counsel's declaration that group "'implemented procedures,' [had] a 'regular schedule' and [would] make decisions . . . on a majority vote" insufficient to show that group would effectively manage litigation).

The failure to provide any specifics about how the group will function is particularly problematic in a case such as this when the group consists of an unlikely conglomeration of very diverse parties.  The OCA Investors Group consists of a public pension fund, an investment advisor based in Mexico, a commercial fisherman, and an individual businessman who invested on behalf of his family and several family-owned companies.  With such a motley assortment of members, it is vital that such a group establish communication and decision-making structures to ensure that it is able to operate effectively.  Thus, despite the OCA Investors Group's assertion that it is a "cohesive" group, without some detail as to why the group was formed or how it will function, the Court cannot find that it is an appropriate lead plaintiff.[3]

---

[3]Levine and Boodman also challenge the OCA Investors Group on additional grounds, including that Lawford Overseas Management does not have standing to pursue this action on behalf of its clients and that Louisiana School Employees' Retirement System cannot serve as a lead plaintiff in this action because it would violate the PSLRA's restriction on "professional plaintiffs." See 15 U.S.C. § 78u-4(a)(3)(B)(vi).  As the Court has found that the OCA Investors Group is not an appropriate group of plaintiffs

Although the OCA Investors Group is not itself an appropriate plaintiff, the Court can consider whether any of its individual members is the most adequate plaintiff. *See Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *12 (considering individual group members as independent lead plaintiff candidates); *Cardinal Health*, 226 F.R.D. at 308 ("A group vying for lead plaintiff does not necessarily rise and fall as a group."). None of the individual members of the OCA Investors Group independently has the largest financial interest of the remaining candidates; thus, none of them can qualify as the most adequate plaintiff. Nor does the "Brooks Family," which itself is an acceptable "group" of investors, have a sufficiently large financial interest to serve as lead plaintiff.

3.    *Douglas Levine and Samuel Boodman*

Levine and Boodman purport to have the next-largest financial interest in this action, with $417,134 in asserted losses. Like the OCA Investors Group, however, Levine and Boodman are a group of unrelated investors, and they have also failed to provide the Court with sufficient reason to justify their serving as co-lead plaintiffs.

On his own, however, Samuel Boodman asserts a loss of

---

under the PSLRA, it will not consider the additional challenges raised by Levine and Boodman.

$318,501.50, which is greater than the asserted loss of any other single investor. Moreover, Boodman also satisfies the typicality and adequacy requirements of Rule 23. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Typicality under Rule 23 requires that the claims or defenses of the representative party be typical of the claims or defenses of the putative class of plaintiffs. *See* Fed. R. Civ. P. 23(a)(3). Here, Boodman and the class of plaintiffs both claim that the market price for OCA securities was artificially inflated during the class period as a result of defendants' false or misleading public statements, that they purchased OCA securities during the class period without knowledge of defendants' alleged fraud and in reliance upon the integrity of the market price for OCA securities, and that they suffered damages as a result. Nor does it appear likely that Boodman will be subject to any unique defenses that would render him an atypical class representative. Boodman purchased OCA shares between January 3, 2005 and February 3, 2005, while the market for OCA shares was allegedly inflated and before the March 17, 2005 "partial disclosure." Moreover, Boodman retained those shares through the end of the class period and the disclosure of the alleged fraud. The Court therefore finds that Boodman's claims are typical of the claims of the putative class members.

To satisfy Rule 23's adequacy requirement, the

22

representative party's interests must not be antagonistic to
those of the class members, and the class representative's
selected counsel must be qualified, experienced, and able to
vigorously prosecute the action on behalf of the class.  *See*
*Tarica*, 2000 WL 377817, at *5.  Here, Boodman's interests appear
to be fully aligned with the interests of the other putative
class members, and as discussed below, Boodman has retained
experienced counsel who will prosecute this action vigorously.
The Court therefore finds that Boodman satisfies the requirements
of Rule 23.

      The OCA Investors Group challenges Boodman's application on
the ground that his certification of transactions in OCA
securities during the class period is limited to his transactions
in OCA common stock and does not include options traded during
the class period.  The OCA Investors Group asserts that without
such information, it is impossible to determine whether Boodman
actually has the largest financial interest of any of the
proposed lead plaintiffs.  (*See* OCA Inv. Group Resp. Mem. at 17).

      The Court notes that although the majority of the securities
complaints purport to represent only purchasers and sellers of
OCA common stock during the class period, several of the
complaints define the class more broadly to include purchasers of
all "publicly traded securities" of OCA, or OCA "common stock and

sold put options." *See Thomas v. OCA Inc.*, No. 05-2220 (E.D. La.
filed June 10, 2005); *Klein v. OCA, Inc.*, No. 05-2433 (E.D. La.
filed June 15, 2005). The Court further notes that a plaintiff
who purchased only OCA common stock can serve as lead plaintiff
for purchasers of stock and options, unless or until a conflict
arises between stock purchasers and options purchasers. *See
Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325
(S.D.N.Y. 2004) (declining to appoint separate lead plaintiff for
sub-class of options purchasers); *Waste Mgmt.*, 128 F. Supp. 2d at
432 (same). Thus, that Boodman did not buy or sell any OCA
options during the class period would not affect his eligibility
to serve as lead plaintiff.

The OCA Investors Group's attack does not go to Boodman's
ability to represent the class, however, but to whether he has
the largest financial interest in the litigation. The OCA
Investors Group asserts that Boodman's failure to state whether
or not he bought or sold any OCA options during the class period
renders it impossible to determine his financial interest in this
litigation because undisclosed options trades could alter
Boodman's asserted loss materially. Since Boodman's
certification identifies only stock transactions, the Court
orders Boodman to file a supplemental certification within five
days of the date of this order stating whether he had any

transactions in OCA stock options during the class period and revising his estimated loss to reflect any such transactions. In the interim, the Court provisionally finds that Boodman is the most adequate plaintiff for the purposes of this motion.

Aside from this issue, the other lead plaintiff applicants have not come forward with any evidence to rebut the statutory presumption that Boodman is the most adequate plaintiff. Specifically, no party has shown that Boodman would not fairly or adequately represent the interests of the class members or that he is subject to any unique defense that renders him incapable of adequately representing the class. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Accordingly, the Court conditionally appoints Samuel Boodman as the lead plaintiff in the securities actions.

### C.    Approval of Lead Counsel

The PSLRA directs that, subject to the court's approval, the most adequate plaintiff shall select and retain counsel for the class. *See id.* § 78u-4(a)(3)(B)(v). Boodman has selected Kaplan Fox & Kilsheimer LLP as his proposed lead counsel and Neblett, Beard & Arsenault as proposed liaison counsel. The Court has reviewed the firm résumés of Boodman's proposed lead and liaison counsel, and it is satisfied that Boodman has retained competent and experienced counsel to represent the class in this matter.

25

Kaplan Fox & Kilsheimer has extensive experience representing

plaintiffs in securities litigation over the past 20 years, and

it has played a role in many cases that have generated

substantial recoveries for shareholders.  (*See* Levine & Boodman

Mem. Ex. D, at 1-3).  Mr. Arsenault of Neblett, Beard & Arsenault

has many years of experience in complex litigation and has

previously served as liaison counsel in complex actions before

this Court.  The Court is satisfied that Boodman's chosen counsel

will adequately represent the class in this litigation.  The

Court therefore conditionally approves Boodman's selection of

lead and liaison counsel.

## III. THE DERIVATIVE CASES

Two parties move for appointment as lead derivative

plaintiff.  A group titled the "Derivative Plaintiffs,"

consisting of Eric Nagel, Kevin Koch, Lemon Bay Partners, L.L.P.,

Daniel Taub and Xiafang Barr (hereinafter "Nagel"), moves for the

appointment of Eric Nagel as lead plaintiff.  Plaintiffs Aleksy

Shkuratkov and Ryan Bulmer jointly move to appoint themselves as

co-lead plaintiffs.

### A.    Appropriate Legal Standard

Although the PSLRA provides a detailed process for

appointing a lead plaintiff in securities class actions, no

similar statutory scheme governs the appointment of a lead

plaintiff in shareholder derivative actions.  Further, relatively few cases have discussed the appointment process for a lead derivative plaintiff.  In the absence of a clearly defined standard to apply, the Court directed the parties to brief the issue of the criteria the Court should consider in appointing a lead derivative plaintiff in this case.

The parties urge the Court to consider a variety of factors in determining the adequacy of shareholder derivative plaintiffs. Nagel relies primarily on cases that consider factors extrapolated from Federal Rule of Civil Procedure 23.1, which requires, among other things, that a derivative plaintiff fairly and adequately represent the interests of similarly situated shareholders.  See Larson v. Dumke, 900 F.2d 1363, 1367 (9th Cir. 1990) (considering eight relevant factors to determine whether plaintiff was adequate under Rule 23.1); Rothenberg v. Sec. Mgmt. Co., 667 F.2d 958, 961 (11th Cir. 1982) (five-factor inquiry into adequacy under Rule 23.1); Horn v. Raines, 227 F.R.D. 1, 3 (D.D.C. 2005) (considering three factors to determine whether proposed lead plaintiffs satisfied Rule 23.1).  Nagel additionally cites to cases that consider the size of each plaintiff's relative financial stake as a factor in appointing a lead derivative plaintiff.  See TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc., No. 18336, 2000 WL 1654504, at *4

27

(Del. Ch. Oct. 17, 2000).

Shkuratkov and Bulmer, on the other hand, argue that the appointment of a lead plaintiff and lead counsel should be made based on a consideration of (i) the quality of the pleadings filed by each party; (ii) the vigor with which each plaintiff has prosecuted the suit; and (iii) whether each plaintiff is represented by competent counsel. *See, e.g., Dollens v. Zionts*, No. 01 C 5931, 2001 WL 1543524, at *5-6 (N.D. Ill. Dec. 4, 2001); *see also Horn*, 227 F.R.D. at 3; *Millman v. Brinkley*, No. 1:03-CV-3831-WSD, 2004 WL 2284505, at *3 (N.D. Ga. Oct. 1, 2004). Although Shkuratkov and Bulmer assert that these three factors should be given controlling weight, some of the cases they cite considered additional factors, including the relative size of each plaintiff's economic stake in the outcome of the litigation. *See Dollens*, 2001 WL 1543524, at *5-6.

The key difference between the approach advocated by Nagel and that favored by Shkuratkov and Bulmer is that Nagel focuses on factors that measure the adequacy of the plaintiffs themselves, while Shkuratkov and Bulmer look to a greater degree to the quality of each plaintiff's counsel. Although the Court finds that the factors relied on by both movants are relevant, it concludes that it should accord more weight to factors that reflect the adequacy of the plaintiff than to factors that depend

upon the quality of the plaintiff's counsel.  Congress, through
the lead plaintiff provisions of the PSLRA, has mandated that
private securities litigation should, to the extent possible, be
driven and controlled by plaintiffs rather than by their lawyers.
Although those provisions apply only to class actions, the
policies underlying them are relevant to shareholder derivative
actions, and the Court finds it appropriate to take those
policies into account when it appoints a lead derivative
plaintiff.  *See id.* at *5 (PSLRA factors relevant to appointment
of lead derivative plaintiff); *In re Conseco, Inc. Sec. Litig.*,
120 F. Supp. 2d 729, 734 (N.D. Ind. 2000) (applying PSLRA
factors, though noting "unique circumstances" of case).
Accordingly, to determine which movant to appoint as lead
plaintiff, the Court will consider (i) which plaintiff best
satisfies the requirements of Rule 23.1; (ii) each movant's
relative economic stake in the outcome of the litigation; (iii)
the quality of the pleadings filed by each party; (iv) the vigor
with which each plaintiff has prosecuted this litigation; and (v)
whether each movant is represented by competent counsel.  The
Court will give more weight to the first two factors than the
last three.

29

**B.    Analysis**

    1.    *Federal Rule of Civil Procedure 23.1*

Rule 23.1 provides a number of requirements for the maintenance of a shareholder derivative action in federal court. Under Rule 23.1, a shareholder derivative complaint filed in federal court must be verified and must allege both that the plaintiff was a shareholder at the time of the actions complained of and that the suit is not a collusive attempt to confer jurisdiction upon a federal court that it would not otherwise have.    Fed. R. Civ. P. 23.1.    The complaint must also allege with particularity the plaintiff's efforts, if any, to obtain the desired action through the board of directors, or the reasons why no such efforts were made.    *Id.*    Finally, Rule 23.1 provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . . similarly situated in enforcing the right of the corporation."    *Id.*

Each proposed lead plaintiff filed a derivative complaint in this litigation,[4] and each of those complaints facially complies with the requirements of Rule 23.1.    Each of the complaints is

---

[4]*See Bulmer v. Palmisano*, No. 05-2421 (E.D. La. filed June 15, 2005); *Shkuratkov v. Palmisano*, No. 05-2223 (E.D. La. filed June 10, 2005); *Nagel v. Palmisano*, No. 05-2222 (E.D. La. filed June 10, 2005).

verified, each plaintiff alleges that he held OCA shares during
the relevant time period, each alleges that there has been no
collusion to create federal jurisdiction, and each alleges that
it would be futile to demand action by OCA's board of directors.[5]

Nagel challenges the sufficiency of Shkuratkov's
verification on the ground that the verification that he
initially submitted with his complaint was signed by Shkuratkov's
attorney, rather than by Shkuratkov himself.  The Court need not
decide this issue, however, because even were Shkuratkov's
initial verification defective, such a defect is curable, and
Shkuratkov has since filed a verification that he personally
executed.  *See Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177,
180 (N.D. Ill. 1987).

Each of the lead plaintiff candidates also at least
preliminarily satisfies Rule 23.1's requirement that a derivative
plaintiff fairly and adequately represent the interests of
similarly situated shareholders in enforcing the rights of the
corporation.  Whether a party is adequate under Rule 23.1 is an
issue that is firmly committed to the discretion of the district

---

[5]The Court emphasizes that its findings concerning
compliance with the requirements of Rule 23.1 are merely
preliminary findings of facial compliance with Rule 23.1 and are
made only for purposes of this motion.  The Court does not
consider whether, for example, plaintiffs' allegations of demand
futility are legally sufficient.

court. *See Smith v. Ayres*, 977 F.2d 946, 948 (5th Cir. 1992).
Courts that have considered Rule 23.1's adequacy requirement have
established a laundry list of factors that can bear on this
inquiry. In *Larson*, for example, the court found it appropriate
to consider (i) whether the plaintiff is the real party in
interest; (ii) the plaintiff's familiarity with the litigation;
(iii) the degree of control exercised by the plaintiff's
attorneys; (iv) the degree of support the plaintiff received from
other shareholders; (v) the plaintiff's personal commitment to
the litigation; (vi) the remedy sought in the derivative action;
(vii) the relative magnitude of the plaintiff's personal
interests as compared to his interest in the action itself; and
(viii) whether the plaintiff is vindictive toward the
defendants.[6]  *Larson*, 900 F.2d at 1367.  The Court will consider
these factors to the extent they are relevant here.

Nagel argues that Shkuratkov and Bulmer are inadequate under
Rule 23.1 because they are phantom plaintiffs who are unwilling
to participate in this litigation.  Nagel charges that Shkuratkov
and Bulmer are plaintiffs in name only and that their counsel is

---

[6]*See also Rothenberg*, 667 F.2d at 961 (considering (i)
indications that plaintiff is not real party in interest; (ii)
plaintiff's unfamiliarity with the action; (iii) degree of
control exercised by counsel; (iv) degree of support received by
other shareholders; and (v) plaintiff's lack of personal
commitment to the action).

actually driving the litigation. Disqualification on this ground requires a substantial showing that the plaintiff lacks knowledge of, or interest in, the pursuit of the claims and that the litigation is completely controlled by the plaintiff's attorney. In *Rothenberg*, upon which Nagel relies, for example, the Court found the plaintiff inadequate because she had "an almost total lack of knowledge about the facts of the case," was essentially unable to comprehend the nature of the derivative action, and sought primarily to recover her personal losses, not losses to the corporation. *Rothenberg*, 667 F.2d at 963. The plaintiff in that case also admitted at a deposition that she did not believe that she could fairly and adequately represent the interests of the corporation. *Id.* at 962 n.11; *Mills v. Esmark, Inc.*, 573 F. Supp. 169, 176 (N.D. Ill. 1983) (deposition showed that plaintiff had "little, if any comprehension of the litigation" and that lawyers had "total control" of litigation).

Nagel has not shown that Shkuratkov and Bulmer completely lack knowledge about this action or that their counsel exercises total control over the case. Nagel points out that Shkuratkov's initial verification of his complaint was executed by counsel. He also notes that when Shkuratkov gave his personal verification later, he incorrectly referred to his complaint as an amended complaint, and he based it "on discussions with and reliance

33

upon" counsel.  This showing falls short of establishing the kind
of ignorance that courts have found sufficient to render a
plaintiff inadequate.  Moreover, Nagel fails even to point to any
similar flaws that would disqualify Bulmer.  The Court therefore
finds that Shkuratkov and Bulmer preliminarily satisfy the
requirements of Rule 23.1 for purposes of this motion.

        Shkuratkov and Bulmer do not argue that Nagel fails to
satisfy Rule 23.1's adequacy requirement, and the Court finds
nothing in the record before it that would call his adequacy into
question.  Moreover, on the record before the Court, Nagel
appears to be a more adequate derivative plaintiff than
Shkuratkov and Bulmer.  First, Nagel's educational and
professional background suggests that he would be a more adequate
lead plaintiff than Shkuratkov and Bulmer.  Nagel has a degree in
accounting, he worked at a major accounting firm for a year, he
has worked on Wall Street since 1997, and he is currently an
institutional bond broker.  This background is relevant in this
case because the allegations of the complaints center on
accounting and financial reporting errors at a publicly traded
company.  Nagel's experience with accounting and securities makes
it likely that he will understand the facts and issues in the
case and be able to take an active role in this litigation.
Shkuratkov and Bulmer have not provided the Court with any

                                34

similar background information.

It is also relevant that the verification Nagel submitted with his complaint is based on his own knowledge, information and belief, while Shkuratkov's verification expressly relies upon counsel.  Although, as stated *supra*, that Shkuratkov's verification was made in reliance upon counsel does not render him an inadequate plaintiff, it does indicate that he has less personal knowledge of the case than Nagel and that his personal involvement in the case may be more limited.

The Court further notes that five of the seven plaintiffs who filed derivative complaints support Nagel's appointment as lead plaintiff. As OCA shareholders, those plaintiffs have an economic interest in seeing this litigation prosecuted successfully on behalf of OCA.  That those plaintiffs agree that Nagel should be the lead derivative plaintiff suggests that they also believe that Nagel will most adequately represent OCA's interests in this action.

On the basis of these considerations, the Court concludes that Nagel appears to be most able to represent the interests of similarly situated shareholders adequately in enforcing the rights of OCA.  Accordingly, this factor weighs in favor of Nagel.

2.   *Relative Economic Stake*

The movants do not dispute that Nagel has a greater economic
stake in the outcome of this litigation than Shkuratkov and
Bulmer combined.  Nagel has been an OCA shareholder since 2001,
and he currently holds 16,000 shares of OCA stock.  (*See* Nagel
Mem. at 1).  Shkuratkov and Bulmer hold a combined total of 350
OCA shares.  (*See* Shkuratkov & Bulmer Resp. Mem. at 13 n.11).
The parties' dispute instead focuses on the weight that this
factor should be given in this case.  Shkuratkov and Bulmer argue
that when, as here, neither movant holds a significant portion of
the corporation's outstanding shares, the economic stake of the
plaintiffs should be given little weight.  *See Wiehl v. Eon Labs*,
No. Civ.A. 1116-N, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005)
(economic stakes of competing plaintiffs not given great weight
when largest stake represented only 0.065 percent of
corporation's outstanding shares).

It is true that, since any recovery in the shareholder
derivative actions would go to the corporation, the plaintiffs'
economic interests in the outcome of this action are only
indirect interests in any event.  Nevertheless, the Court is not
convinced by Shkuratkov's and Bulmer's argument that economic
interest should be given little weight in this case.  First, the
analogous provision of the PSLRA, which creates a presumption

36

that the plaintiff with the largest financial interest is the most adequate plaintiff, applies even when no party's asserted loss is significant in relation to the size of the company or its total number of outstanding shares. Moreover, the size of the competing plaintiffs' stake in the company relative to each another provides a measure of their relative incentives to litigate vigorously, particularly when there is a large disparity in the size of their holdings. Shkuratkov's and Bulmer's approach would rob this consideration of significance in cases like this one.

Although economic interest alone is not dispositive, the Court finds that it should be given substantial weight. Here, for example, Nagel's 16,000 shares is over 45 times greater than the combined holdings of Shkuratkov and Bulmer. Nagel thus has a substantially greater incentive to make every effort to secure an outcome favorable to OCA. This factor therefore weighs in favor of Nagel.

### 3. Quality of the Pleadings

Shkuratkov and Bulmer assert that the quality of their complaints compared to Nagel's strongly favors appointing them as lead plaintiffs. Shkuratkov and Bulmer argue that Nagel's complaint is inferior because Nagel failed to invoke this Court's jurisdiction properly and failed to include certain causes of

action.  The Court considers each of these contentions in turn.

Nagel identifies two possible bases for this Court's subject-matter jurisdiction.  He first alleges that jurisdiction exists on the basis of diversity of citizenship.  He then asserts that the Court has federal question jurisdiction over his claim for contribution under the Securities Exchange Act of 1934, which allows the Court to exercise supplemental jurisdiction over his state law claims.  Shkuratkov and Bulmer argue that Nagel's jurisdictional allegations are deficient because he has failed to plead the citizenship of each of the parties and because his contribution claim is not yet ripe.

Shkuratkov and Bulmer are correct that Nagel's complaint does not properly plead jurisdiction on the basis of diversity of citizenship.  Because the burden of establishing diversity of citizenship rests with the plaintiff, the plaintiff must affirmatively plead the citizenship of the parties.  *See Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 804-05 (5th Cir. 1991). Nagel's complaint alleges generally that Nagel is diverse from each of the defendants, but it fails to allege the citizenship of any of the individual defendants.  Such a pleading defect is curable, *see Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889-90 (5th Cir. 1984), and there are no facts before the Court to suggest that Nagel cannot establish that he is diverse from each

38

of the defendants.  Nevertheless, this defect negatively impacts
Nagel's application.

Shkuratkov and Bulmer are also correct that a contribution
claim under federal law is not yet ripe and, accordingly, cannot
provide the basis for the Court's jurisdiction.  *See Vulcan
Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385 (5th Cir.
2001) (noting that federal court cannot exercise supplemental
jurisdiction over state law claims when plaintiff's sole federal
claim is unripe (citing *Samaad v. City of Dallas*, 940 F.2d 925,
934 (5th Cir. 1991))).  The right to contribution under the
Securities Exchange Act arises only once a defendant has incurred
an obligation to pay a judgment.  *See* 15 U.S.C. § 78u-4(f)(8)
(providing right of contribution to one who "becomes jointly and
severally liable for damages in any private action"); *id.* § 78u-
4(f)(9) (statute of limitations for contribution claim calculated
from date of final, nonappealable judgment); *see also In re
Cendant Corp. Derivative Action Litig.*, 96 F. Supp. 2d 394, 397
(D.N.J. 2000) (contribution claim under section 11 of Securities
Act of 1933 not ripe when settlement had not been approved by
court).  Thus, if diversity jurisdiction does not exist, the
Court could not at this point exercise supplemental jurisdiction
over Nagel's state law claims.

Of less significance is Shkuratkov's and Bulmer's assertion

that their complaints are superior because they include a cause
of action for disgorgement under section 304 of the Sarbanes-
Oxley Act of 2002. *See* 15 U.S.C. § 7243. Whether derivative
plaintiffs can maintain claims under section 304 may be an open
one, but one court has squarely held that they cannot. *See Neer
v. Pelino*, No. Civ.A. 04-4791, 2005 WL 2434685, at *3-8 (E.D. Pa.
Sept. 27, 2005) (holding that section 304 does not provide a
private right of action). Thus, the Court does not find that the
inclusion of such a claim makes Shkuratkov's and Bulmer's
complaints superior to Nagel's complaint in any significant way.

Shkuratkov and Bulmer also point to their claim for breach
of fiduciary duty for insider selling, which is based on an OCA
director's sale of 4,800 shares of OCA stock while he was
allegedly in possession of material, non-public information.
Nagel's complaint also refers to insider stock sales in its claim
for breach of fiduciary duty, but it makes only a passing,
unspecific reference to such sales, and it does not include
specific facts concerning any particular defendant or any
particular sale of stock. In this respect, Shkuratkov's and
Bulmer's complaints are at least moderately more detailed than
Nagel's complaint.

On the whole, each plaintiff has filed a detailed and
professional complaint. For the reasons stated above, however,

the Court finds that Shkuratkov's and Bulmer's complaints are somewhat more thorough and carefully drafted.  Accordingly, this factor weighs in favor of Shkuratkov and Bulmer.

### 4.    *Vigorous Prosecution*

Each movant and his counsel has been active in the prosecution of the early stages of this litigation, and the Court is confident that each movant would continue to prosecute this action vigorously if selected as lead plaintiff.  Although the movants argue over which party has been more vigorous to date, the Court finds that this factor favors neither Nagel nor Shkuratkov and Bulmer.

### 5.    *Competence of Counsel*

Likewise, each movant is represented in this action by able lawyers who are experienced in the field of shareholder derivative litigation.  The Court has reviewed the parties' submissions on this issue and the attached firm résumés, and it is comfortable that each party's proposed leadership structure would capably prosecute this action.

Nagel's proposed leadership structure consists of Federman & Sherwood and Brodsky & Smith, LLC as proposed co-lead counsel, with Barasso Usdin Kupperman Freeman & Sarver, L.L.C. as proposed liaison counsel.  Nagel's co-lead counsel have served and currently serve as lead counsel in a large number of shareholder

41

derivative actions in state and federal courts around the United States. (*See* Nagel Mem. at 6-9 & Exs. E-F; Nagel Resp. Mem. at 2-4). Federman & Sherwood has successfully represented the interests of derivative plaintiffs in a number of actions. (*See* Nagel Mem. at 8-9). Nagel's proposed liaison counsel, Barasso Usdin Kupperman Freeman & Sarver, L.L.C., are reputable attorneys with a great deal of experience in complex litigation, including shareholder derivative litigation, and Mr. Kupperman of that firm has served as liaison counsel in complex litigation in this district. (*See id.* at 9-10).

Shkuratkov and Bulmer propose the appointment of Barrett, Johnston & Parsley and Robbins Umeda & Fink, LLP as co-lead counsel, with Smith & Fawer, LLC as liaison counsel. Barrett, Johnston & Parsley have successfully represented plaintiffs in a number of complex securities litigations, and currently serve as co-lead counsel in at least two shareholder derivative actions pending in federal courts. (*See* Shkuratkov & Bulmer Mem. at 12-13). Robbins Umeda & Fink has also successfully represented plaintiffs in a number of securities class actions and shareholder derivative actions. (*See id.* at 14-15). Moreover, Smith & Fawer are also well qualified to serve as liaison counsel. Mr. Smith of that firm has long practiced before the courts of this district and has ample experience in complex

42

litigation.  (*See id.* at 16).

Shkuratkov and Bulmer, however, seek to break the tie on this issue by asserting that Nagel's lawyers have committed ethics violations or have a disabling conflict of interest.  They rely on June 8, 2005 press releases issued by Brodsky & Smith and Federman & Sherwood that announce the filing of a class action lawsuit against OCA.  The press releases in question are generally similar and state that a securities class action was filed against OCA in this Court on June 7, 2005, that members of the putative class might have certain rights and that putative class members could contact the firms if they have questions about their legal rights.  (*See* Shkuratkov & Bulmer Resp. Mem. Ex. A).  Shkuratkov and Bulmer argue that, since neither Brodsky & Smith nor Federman & Sherwood filed securities actions in this Court, the press releases violate Louisiana Rule of Professional Conduct 7.1(a), which prohibits a lawyer from, *inter alia*, making false, misleading or deceptive communications about his services.  They argue alternatively that if either of those firms does, in fact, represent clients suing OCA for securities fraud, then the firm has a conflict of interest that prevents it from serving as counsel to plaintiffs suing derivatively on behalf of OCA.

This Court is not persuaded by these arguments.  First, neither Brodsky & Smith nor Federman & Sherwood filed a complaint

43

or has otherwise appeared before this Court as attorneys for any
securities plaintiff. Nor is there any evidence that they ever
formed an attorney-client relationship with, or received
confidential information from, any securities plaintiff. There
is therefore no basis to find that they have a conflict of
interest in representing plaintiffs in the derivative actions.
Second, the press releases themselves do not actually assert that
either of those firms filed a class action complaint. They state
only that a class action had been filed in this Court, which, of
course, is true. There is nothing inherently false, misleading
or deceptive about the press releases that would lead this Court
to conclude that counsel violated Louisiana Rule of Professional
Conduct 7.1(a).

Thus, each plaintiff's proposed leadership structure for
counsel is competent and adequate to pursue this action, and the
Court finds that this factor does not favor either Nagel or
Shkuratkov and Bulmer.

## C.    Lead Derivative Plaintiff

Based on the foregoing analysis, the Court appoints Nagel as
the lead derivative plaintiff. The Court bases this decision on
its findings that Nagel is the most adequate of the proposed lead
derivative plaintiffs under Rule 23.1 and that he has by far the
largest economic stake in the outcome of the litigation. The

Court is also satisfied that Nagel has vigorously prosecuted this action and that he is represented by competent and experienced counsel. Although Shkuratkov and Bulmer have filed somewhat better pleadings to date, as stated *supra*, the Court finds that the lead plaintiff inquiry should give primary consideration to the relative adequacy of the plaintiffs themselves. Here, that factor favors Nagel. Accordingly, the court appoints Eric Nagel as lead derivative plaintiff. The Court also approves his selection of Brodsky & Smith and Federman & Sherwood as co-lead counsel and Barasso Usdin Kupperman Freeman & Sarver as liaison counsel.

## IV.   CONCLUSION

For the reasons stated above, the Court conditionally appoints Samuel Boodman as lead plaintiff in the securities actions. The Court conditionally approves his selection of Kaplan Fox & Kilsheimer as lead counsel and Neblett, Beard & Arsenault as liaison counsel. The Court appoints Eric Nagel as lead derivative plaintiff and approves his selection of Brodsky &

Smith and Federman & Sherwood as co-lead counsel and Barasso

Usdin Kupperman Freeman & Sarver as liaison counsel.


New Orleans, Louisiana, this __18th__ day of November, 2005.


_____Sarah Vance_____
                    SARAH S. VANCE
              UNITED STATES DISTRICT JUDGE

EXHIBIT D



1 | BARRACK, RODOS & BACINE
LEONARD BARRACK
2 | GERALD J. RODOS
3300 Two Commerce Square
3 | 2001 Market Street
Philadelphia, PA 19103
4 | Telephone: (215) 963-0600
Facsimile: (215) 963-0838
5 |
BARRACK, RODOS & BACINE
6 | STEPHEN R. BASSER (121590)
402 West Broadway, Suite 850
7 | San Diego, CA 92101
Telephone: (619) 230-0800
8 | Facsimile: (619) 230-1874

9 | Attorneys for the Florida State Board of Administration
and [Proposed] Lead Counsel for Plaintiffs and the Class

10 |

11 | UNITED STATES DISTRICT COURT

12 | SOUTHERN DISTRICT OF CALIFORNIA

13 |

14 | BARRY S. NAIDITCH, On Behalf of    ) Case No.: 01-cv-0649-K (AJB)
Himself and All Others Similarly Situated,  )

15 | Plaintiff,    ) CLASS ACTION
    )
16 | vs.    )
    )
17 | APPLIED MICRO CIRCUITS    )
CORPORATION, DAVID M. RICKEY,    )
18 | VINCENT DEMAIORIBUS, BRENT E.    )
LITTLE, STEPHEN M. SMITH, ROGER    )
19 | A. SMULLEN, SR., WILLIAM E.    )
BENDUSH, FRANKLIN P. JOHNSON,    )
20 | GREG WINNER, RAM SUDIREDDY,    )
THOMAS L. TULLIE and CANDACE    )
21 | KILBURN,    ) DATE: August 6, 2001
    ) TIME: 11:00 a.m.
22 | Defendants.    ) CTRM: 16, 5th Floor
    ) JUDGE: Hon. Judith N. Keep

23 |

24 |

25 | DECLARATION OF STEPHEN R. BASSER IN SUPPORT OF FLORIDA STATE
BOARD OF ADMINISTRATION'S MOTION FOR APPOINTMENT AS LEAD
26 | PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S CHOICE OF COUNSEL

27 |

28 |

DECL OF STEPHEN R. BASSER IN SUPP OF MOTION
Case No.: 01-cv-0649-K (AJB)

1    I, STEPHEN R. BASSER declare as follows:

2    1.    I am a partner with Barrack, Rodos and Bacine, counsel for movants, the Florida

3    State Board of Administration ("FSBA"). I submit this declaration in support of the motion for

4    appointment as lead plaintiff in this and other similar related actions against Applied Micro

5    Circuits Corporation and for approval of lead plaintiff's choice of counsel.

6    2.    Attached as Exhibit 1 is a true and correct copy of the certification of Horace

7    Schow, II, General Counsel, Florida State Board of Administration, including the attached chart

8    entitled "Florida State Board of Administration Losses."

9    3.    Attached as Exhibit 2 is a true and correct copy of the notice published by

10   plaintiff in the *Naiditch* action over the *Business Wire*, a national business-oriented newswire

11   service, on April 12, 2001.

12   4.    Attached as Exhibit 3 is a true and correct copy of the firm resume of Barrack,

13   Rodos & Bacine.

14   I declare under penalty of perjury under the laws of the State of California that the

15   foregoing is true and correct. Executed this 9ᵗʰ day of June, 2001, San Diego, California.

16

17   DATED: June 9ᵗʰ, 2001

18                                              STEPHEN R. BASSER

19

20

21

22

23

24

25

26

27

28

1    DECL OF STEPHEN R. BASSER IN SUPP OF MOTION
     Case No.: 01-CV-0649-K (AJB)

EXHIBIT 1

**BARRACK, RODOS & BACINE**

Attorneys at Law

## SWORN CERTIFICATION

I, HORACE SCHOW, II, hereby certify and swear as follows:

1.    This Certification is provided on behalf of the State Board of Administration of Florida (hereinafter "SBA");

2.    The SBA has reviewed a complaint against Applied Micro Circuits Corp. (hereinafter "AMCC") alleging violations of the securities laws;

3.    The SBA is willing to serve as a representative on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

4.    Within the 3 year period preceding the date hereof, the SBA served as a lead plaintiff class representative in the following actions brought under the federal securities laws: Daimler Chrysler, Vesta Insurance Group, Northrop Grumman, Sykes Enterprises, Inc., Pediatrix Medical Group, Parametric Technology Corp., UCAR International, Inc., and the Samsonite securities litigation. The UCAR International and Samsonite securities class actions have been successfully concluded.  The Northrup Grumman case has been dismissed and is on appeal.  The Parametric case has been dismissed and is not being appealed.  The SBA continues to serve as a lead plaintiff in the remaining four pending actions. The SBA sought leadership in the McKesson, Telxon, Alcatel, and Rent-Way securities actions in which other parties were selected as lead plaintiff.  The SBA sought leadership in the Broadcom securities litigation, but withdrew its motion in view of another institution's motion.  The SBA is currently seeking appointment as lead plaintiff in the Schering-Plough securities litigation.

EXHIBIT 1

**BARRACK, RODOS & BACINE**

Attorneys at Law

    5.    The SBA's transactions in the securities of AMCC during the class period specified in the complaint are described in the chart attached.

    6.    The SBA did not purchase shares of AMCC at the direction of SBA's counsel or in order to participate in any private action under the federal securities laws;

    7.    The SBA will not accept any payment for serving as a representative party on behalf of a class beyond the SBA's pro rata share of any recovery, except as ordered or approved by the Court.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: **08 JUNE**, 2001

HORACE SCHOW, II

General Counsel

STATE BOARD OF ADMINISTRATION

    OF FLORIDA

EXHIBIT 1

3

## FLORIDA STATE BOARD OF ADMINISTRATION    APPLIED MICRO CIRCUITS CORP

Class Period: November 7, 2000 to February 5, 2001

| NUMBER | ACCOUNT NAME | BOUGHT DATE | SHARES | PRICE/SH | AMOUNT | SOLD DATE | SHARES | PRICE/SH | AMOUNT | PROFIT/LOSS |
|---|---|---|---|---|---|---|---|---|---|---|
| SM01 | ACTIVE CORE SBA | 01/02/01 | 65,000 | 73.6164 | 4,785,001.00 | RETAINED | 65,000 | 27.410 | 1,781,715.00 | 3,003,286.00 |
| | | 01/29/01 | 1,700 | 77.0331 | 130,955.27 | RETAINED | 1,700 | 27.410 | 46,598.70 | 84,357.57 |
| | | | 66,700 | | 4,915,957.27 | | 66,700 | | 1,828,313.70 | 3,087,643.57 |
| SM05 | PIVOT EQUITY SBA | 11/15/00 | 7,500 | 71.0563 | 532,922.25 | RETAINED | 7,500 | 27.410 | 205,582.50 | 327,339.75 |
| | | 11/15/00 | 5,613 | 71.0000 | 398,523.00 | RETAINED | 5,613 | 27.410 | 153,857.94 | 244,665.06 |
| | | 11/16/00 | 17,487 | 64.2280 | 1,123,155.04 | RETAINED | 17,487 | 27.410 | 479,339.16 | 643,815.88 |
| | | 11/28/00 | 4,100 | 53.6875 | 220,118.75 | RETAINED | 4,100 | 27.410 | 112,381.00 | 107,733.65 |
| | | 12/01/00 | 5,500 | 53.7477 | 295,612.35 | RETAINED | 5,500 | 27.410 | 150,760.50 | 144,851.85 |
| | | 12/12/00 | 38,400 | 75.0163 | 2,880,625.92 | RETAINED | 38,400 | 27.410 | 1,052,582.40 | 1,828,043.52 |
| | | 12/29/00 | 24,900 | 78.0994 | 1,944,675.06 | RETAINED | 24,900 | 27.410 | 682,533.90 | 1,262,141.16 |
| | | 01/26/01 | 6,000 | 72.1962 | 433,177.20 | RETAINED | 6,000 | 27.410 | 164,460.00 | 268,711.20 |
| | | | 109,500 | | 7,828,809.57 | | 109,500 | | 3,001,504.50 | 4,827,305.07 |
| SM11 | FLORIDA SBA | 12/18/00 | 28,000 | TRANS FR | SM65 | RETAINED | 28,000 | 72.0625 | 2,017,750.00 | |
| | | 12/18/00 | 14,100 | TRANS FR | SM65 | RETAINED | 14,100 | 82.9064 | 1,168,980.24 | |
| | | 01/16/01 | 44,100 | TRANS FR | SM65 | RETAINED | 44,100 | 82.9064 | 3,656,172.24 | |
| | | | 86,200 | | | | 86,200 | | 6,842,902.48 | |
| SM20 | ALLIANCE CAPITAL MGMT | 11/20/00 | 45,200 | 54.0224 | 2,441,812.48 | 12/11/00 | 45,200 | 71.8566 | 3,247,918.32 | (806,105.84) |
| | | 11/22/00 | 30,800 | 53.0000 | 1,632,400.00 | 12/11/00 | 30,800 | 71.8566 | 2,213,183.28 | (580,783.28) |
| | | 11/22/00 | 19,200 | 53.0000 | 1,017,600.00 | 12/12/00 | 19,200 | 73.1299 | 1,404,094.08 | (386,494.08) |
| | | 11/28/00 | 100,000 | 49.4549 | 4,945,490.00 | 12/12/00 | 100,000 | 73.1299 | 7,312,990.00 | (2,367,500.00) |
| | | 11/29/00 | 50,000 | 48.2500 | 2,412,500.00 | 12/12/00 | 50,000 | 73.1299 | 3,656,495.00 | (1,243,995.00) |
| | | | 245,200 | | 12,449,802.48 | | 245,200 | | 17,834,680.68 | (5,384,878.20) |
| SM41 | ENHANCED INVESTMENT | 01/22/01 | 23,100 | 81.7500 | 1,888,425.00 | 01/02/01 | 23,100 | 27.410 | 633,194.10 | 1,255,230.90 |
| | | 01/29/01 | 6,500 | 76.1337 | 494,869.05 | 01/23/01 | 6,500 | 27.410 | 178,171.50 | 316,697.55 |
| | | | 29,600 | | 2,383,294.05 | | 29,600 | | 811,365.60 | 1,571,928.45 |
| SM45 | GLOBAL T INC | BEG. BAL. | 6,000 | | | 01/02/01 | 6,000 | 71.2500 | 427,500.00 | |
| | | 12/05/00 | 3,600 | 57.5625 | 207,225.00 | 01/02/01 | 3,600 | 71.2500 | 256,500.00 | (49,275.00) |
| | | 12/05/00 | 2,500 | 57.5625 | 143,906.25 | RETAINED | 2,500 | 27.410 | 68,527.50 | 75,378.75 |
| | | 12/28/00 | 9,300 | 64.8750 | 603,337.50 | RETAINED | 9,300 | 27.410 | 254,922.30 | 348,415.20 |

EXHIBIT 1
4

# FLORIDA STATE BOARD OF ADMINISTRATION    APPLIED MICRO CIRCUITS CORP

Class Period: November 7, 2000 to February 5, 2001

| NUMBER | NAME | DATE | SHARES | PRICE/SH | AMOUNT | DATE | SHARES | PRICE/SH | AMOUNT | LOSS |
|---|---|---|---|---|---|---|---|---|---|---|
| | | BEG. BAL. | 15,400 | | 954,468.75 | | 15,400 | | 579,949.80 | 374,518.95 |
| | | | | | | | | | | 374,518.95 |
| SM65 | WILSHIRE | BEG. BAL | 42,100 | | | 12/18/00 | 42,100 | TRANS TO | SM11 | |
| | | BEG. BAL | 44,100 | | | 01/16/01 | 44,100 | TRANS TO | SM11 | |
| | | | 86,200 | | | | 86,200 | | | |
| | | 12/20/00 | 8,200 | 56.1000 | 460,020.00 | RETAINED | 8,200 | 27.4110 | 224,770.20 | 235,249.80 |
| | | 01/26/01 | 100 | 76.0625 | 7,606.25 | RETAINED | 100 | 27.4110 | 2,741.10 | 4,865.15 |
| | | | 8,300 | | 467,626.25 | | 8,300 | | 227,511.30 | 240,114.95 |
| | | | | | | | | | | 240,114.95 |
| SM74 | WALL STREET ASSOCIATE | 11/14/00 | 7,200 | 66.7048 | 480,274.56 | RETAINED | 7,200 | 27.4110 | 197,359.20 | 282,915.36 |
| | | 11/27/00 | 10,600 | 56.3888 | 597,721.28 | RETAINED | 10,600 | 27.4110 | 290,556.60 | 307,164.68 |
| | | | 17,800 | | 1,077,995.84 | | 17,800 | | 487,915.80 | 590,080.04 |
| | | | | | | | | | | 590,080.04 |
| | | | | | | | | GRAND | TOTAL | 5,306,712.83 |

EXHIBIT 1

5

01 NOV -5 AM 10: 56

DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BARRY S. NAIDITCH, on behalf of himself and all others similarly situated, | ) ) ) | Civil No. 01-CV-0649 K (AJB) |
| | ) ) | ORDER: |
| Plaintiffs, | ) ) | (i) APPOINTING LEAD PLAINTIFF [28-1, 30-1]; |
| v. | ) ) | (ii) APPOINTING LEAD COUNSEL [28-2, 30-2]; |
| APPLIED MICRO CIRCUITS CORP., et al., | ) ) | (iii) CONSOLIDATING RELATED |
| Defendants. | ) ) | CASES [23, 25, 32]. |

This is a securities fraud class-action suit brought pursuant to the Securities Exchange Act of 1934, Rule 10-b5 promulgated thereunder, and the Private Securities Litigation Reform Act of 1995 ("Reform Act"). Now before the Court are competing motions for appointment as lead plaintiff and for approval of lead counsel. On one side are proposed lead plaintiffs Walter Ritsert and Gary Beavers ("Ritsert & Beavers"), individual investors represented by the firm of Finkelstein & Krinsk. On the other side is proposed lead plaintiff Florida State Board of Administration ("FSBA"), an institutional investor of the pension funds of the State of Florida, represented by the firm of Barrack, Rodos & Bacine.

49

1

01cv0649

## I. BACKGROUND

The Background is taken from the Complaint and other papers of the parties and does not constitute findings of fact by this court.

Applied Micro Circuits Corp. ("AMCC") produces switching equipment for voice and data fiber optic networks. AMCC saw soaring sales, and an even higher flying stock price, in the late 1990s, selling to such telecom companies as Nortel, Cisco, Lucent, and JDSU as they quickly built fiber optic networks. Defendants, who include several senior officers of AMCC, had extensive holdings and much of their personal wealth was tied up in their company's stock. In the fall of 2000, AMCC and the public received warnings from their customers that demand was falling rapidly for fiber optic products. By the end of October 2000, the entire telecom industry was in the doldrums, and AMCC's shares were down over 50%.

It is then that the actionable conduct is alleged to have occurred. Essentially, Plaintiffs allege that Defendants intentionally issued false and misleading statements to prop up AMCC's stock price, while simultaneously and secretly unloading their inside shares. Defendants knew that substantial amounts of AMCC's customer contracts were being canceled or delayed, and the company's customers were warning that future prospects were quite poor. Meanwhile, it is alleged that AMCC publicly proclaimed that its sales were continuing to grow and it did not face the same threat to earnings that the rest of the industry faced. Over a two month period, the stock price of AMCC doubled back to its highs, while the insider Defendants sold nearly $100 million of their own holdings. Again, it is claimed that less than one day after the last of these insider sales, AMCC suddenly reversed course in its public pronouncements and the stock rapidly declined by over 50%, causing massive losses to the misled Plaintiffs.

## II. DISCUSSION

### A. Motion For Appointment of Lead Plaintiff

The essential legal issue in this case is the tension between the Presumptively Most Adequate Plaintiff provision of the Reform Act (15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)), which favors FSBA, and

01cv0649

1  the provision presumptively barring a Professional Plaintiff (15 U.S.C. § 78u-4(a)(3)(B)(vi)), which

2  favors Ritsert & Beavers.

3            **1. Presumptively Most Adequate Plaintiff Provision**

4            In selecting the group of class members who are the most capable of adequately representing the

5  class--i.e., the most adequate plaintiff--the Reform Act directs the court to presume that the plaintiff that

6  has "the largest financial interest in the relief sought" is the most adequate plaintiff. 15 U.S.C. § 78u-

7  4(a)(3)(B)(iii)(I)(bb).

8            Ritsert & Beavers collectively have suffered losses of approximately $980,000 as a result of their

9  purchases of AMCC's publicly traded securities during the November 30, 2000 to February 5, 2001 class

10 period. FSBA, on the other hand, has losses in excess of $5.3 million, over *five times* the loss of Ritsert

11 & Beaver. Thus FSBA is the presumptively most adequate plaintiff.

12

13           **2. Professional Plaintiff Provision**

14           The court's application of the Professional Plaintiff provision is the deciding issue in this case.

15 The Reform Act provides that

16           *Except as the court may otherwise permit, **consistent with the purposes of this***
             ***section**, a person may be a lead plaintiff . . . in no more than 5 securities class*
17           *actions . . . during any 3-year period.*

18 15 U.S.C. § 78u-4(a)(3)(B)(vi) (emphasis added). FSBA is subject to this provision, having been

19 appointed lead plaintiff in eleven cases over the past three years. Ritsert & Beavers contend that the

20 court should strictly apply this provision to bar the appointment of FSBA; FSBA argues that it is

21 precisely the sort of institutional investor envisioned by the Reform Act, and should be exempted from

22 this professional plaintiff restriction because such exemption would be "consistent with the purposes of

23 this section".

24           The court agrees with FSBA. FSBA is precisely the sort of lead plaintiff envisioned by the Act.

25 By implementing the Presumptively Most Adequate Plaintiff provision, Congress sought to curtail the

26 influence of plaintiff's lawyers and to "empower investors, so that they, not their lawyers, control private

27 securities litigation," by transferring "primary control of private securities litigation from lawyers to

28 investors." See Senate Rep. No. 104-98, 104th Cong., 1st Sess., 1995 U.S.C.C.A.N. 679, 683, 685.

01cv0649

1 Appointing lead plaintiffs on the basis of financial interest was intended to insure that large institutional

2 plaintiffs with expertise in the securities market would control the litigation, rather than the lawyers. See

3 H.R. Conf. Rep No. 104-369, at 31-35, 1995 U.S.C.C.A.N. 679, 730, 730-34; see also In re Network

4 Associates, Inc. Securities Litigation, 76 F.Supp.2d 1017, 1023 (N.D.Cal. 1999) (quoting In re

5 Donnkenny Inc. Securities Litigation, 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997)). Appointing FSBA as

6 lead plaintiff would be entirely "consistent with the purposes of this section." FSBA is an experienced

7 institutional investor, managing over $105 billion in assets, with fiduciary obligations to safeguard the

8 interests of its public funds. As such, it is particularly well-situated to control the litigation.

9     Legislative history is particularly helpful when a court exercises its discretion. The Conference

10 Report for the Reform Act is quite explicit that the preference for large institutional investors should not

11 be overridden by the professional plaintiff restriction:

12     The Conference Report seeks to restrict professional plaintiffs from serving as lead
    plaintiff by limiting a person from serving in that capacity more than five times in
13     three years. Institutional investors seeking to serve as lead plaintiff may need to
    exceed this limitation and do not represent the type of professional plaintiff this
14     legislation seeks to restrict. As a result, the Conference Committee grants courts
    discretion to avoid the unintended consequence of disqualifying institutional
15     investors from serving more than five times in three years. *The conference
    committee does not intend for this provision to operate at cross-purposes with the*
16     *"most adequate plaintiff" provision.*

17 H.R. Conf. Rep. No. 104-369, at 35 (emphasis added).

18     Ritsert & Beavers have suffered far smaller losses than FSBA, and thus have less at stake. As

19 individuals, they have to take time out from their personal lives to oversee a securities class action that

20 will likely be complex, lengthy, and time-consuming. Their experience in the securities markets, and

21 particularly in securities litigation, appears to be limited, as there were no declarations indicating any

22 securities expertise or securities litigation experience on the part of these two individuals. On the other

23 hand, prosecuting securities litigation is part of what FSBA does to fulfill its fiduciary duties to look

24 after the public money in its care. FSBA has a general counsel and corporate counsel department which

25 can oversee and control the litigation. For such a large institutional investor, 11 appointments as lead

26 plaintiff is quite understandable, and in fact could evince a laudatory zeal to fulfill its fiduciary duties.

27 Such experience will well equip FSBA to oversee this litigation. ***The court therefore appoints FSBA as***

28 ***lead plaintiff.***

4

### 3. Other Requirements

The Reform Act sets out two other requirements for the appointment of lead plaintiff: (a) the notice provision; (b) preliminary showing as to Rule 23(a). As there is no credible dispute that both parties satisfy these provisions, the court will only briefly address them. First, both parties have complied with the notice requirements of 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) by filing the instant motions for appointment as lead plaintiff within 60 days of publication of notice of the pendency of this action.

For the purposes of a motion for appointment as lead plaintiff, a proposed lead plaintiff must make only a preliminary showing that he or she satisfies the requirements of Rule 23(a). See, e.g., Gluck v. Cellstar Corp., 976 F. Supp. 542, 546 (N.D. Tex. 1997). For the limited purpose of analyzing the motions for appointment of lead plaintiff, both FSBA and Ritsert & Beavers have met the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).

First, the numerosity requirement is presumptively met at this stage, prior to discovery. AMCC was a publicly traded and widely held security, and the potential plaintiff class is accordingly quite large.

Second, both groups allege that defendants 1) violated the 1934 Act; 2) omitted and/or misrepresented material facts; and 3) knew or recklessly disregarded that their statements were false, all of which affected the value of AMCC's stock. Common questions of law and fact therefore exist.

Third, each competing lead plaintiff alleges damages based upon these common questions of law and fact, and each therefore appears to have claims typical of the unnamed putative class members.

Fourth, both FSBA and Ritsert & Beaver appear to be able to adequately represent the interests of the class. Neither has interests antagonistic to the class; both have retained capable and experienced law firms.

### B. Motion for Approval of Lead Counsel

The Reform Act states that, once the court has designated the most adequate, or lead plaintiff, the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). FSBA has selected the firm of Barrack, Rodos & Bacine. The court is impressed with the papers filed by the firm so far (as well as by the papers submitted by Finkelstein & Krinsk). The court notes that Barrack, Rodos has extensive experience litigating securities class actions,

01cv0649

1   having been appointed lead counsel in over 30 such cases since the Reform Act passed in 1995. *The*

2   *court therefore approves the choice and appoints Barrack, Rodos as lead counsel.*

3

4   **C. Motion to Consolidate All Related Cases**

5   The motion to consolidate all related cases is joined by Defendants. The court hereby orders the

6   following cases consolidated as <u>In re Applied Micro Circuits Corp. Securities Litigation</u>, 01-CV-0649-K

7   (AJB):

8   <u>Naiditch v. AMCC</u>   01-CV-0649-K (AJB)

9   <u>Congregation Givath Shoul v. AMCC</u>   01-CV-0675-K (AJB)

10   <u>Harris v. AMCC</u>   01-CV-0678-K (AJB)

11   <u>Shapiro v. AMCC</u>   01-CV-0743-K (AJB)

12   <u>Kucera v. AMCC</u>   01-CV-0772-K (JAH)

13   <u>Fairland Management Corp. Pension Plan v. AMCC</u>   01-CV-0798-K (AJB)

    <u>Hsu v. AMCC</u>   01-CV-0799-K (AJB)

14   <u>Scofield v. AMCC</u>   01-CV-0804-K (AJB)

15   <u>Reed v. AMCC</u>   01-CV-0808-K (AJB)

16   <u>Kregal v. AMCC</u>   01-CV-1034-K (AJB)

17

18

19

20

21

22

23

24

25

26

27

28

6

**III. CONCLUSION**

   For the foregoing reasons, the court APPOINTS AS LEAD PLAINTIFF the Florida State Board of Administration, APPOINTS AS LEAD COUNSEL the law firm of Barracks, Rodos and Bacine, and CONSOLIDATES the aforementioned cases as In re Applied Micro Circuits Corp. Securities Litigation, 01-CV-0649-K (AJB).

**IT IS SO ORDERED.**

_11/02/01_
Date

Judge Judith N. Keep
United States District Court
Southern District of California

CC:    ALL PARTIES
       MAGISTRATE JUDGE ANTHONY J. BATTAGLIA

7

01cv0649

# United States District Court

## Southern District Of California
### Office Of The Clerk
880 Front Street
Room 4290
San Diego, California 92101-8900

Roberta Westdal
Clerk Of The Court

Phone:
(619) 557-5600
Fax: 557-6684

November 7, 2001

Attention counsel and pro se litigants:

RE: Naiditch vs. Applied Micro

You are hereby notified that as of *11/05/01*, cases 01cv675K(AJB), 01cv678K(AJB), 01cv743K(AJB), 01cv772K(JAH), 01cv798K(AJB), 01cv799K(AJB), 01cv804K(AJB), 01cv808K(AJB), and 01cv1034K(AJB) were consolidated with the lead case 01cv649K(AJB). ALL FURTHER DOCKETING WILL BE DONE IN THE LEAD CASE. Please include the lead case number on all further filings.

ROBERTA WESTDAL, CLERK

By: _____
Aracely Campbell, Deputy Clerk

cc: Clerk
Appropriate Courtroom Clerk
Chambers

EXHIBIT E

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Teachers' Retirement System ("NYC TRS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC TRS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC TRS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC TRS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC TRS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC TRS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC TRS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYC TRS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day

of August, 2008.

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC TRS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337478 | 1,167,077 shares | 5/19/2006 | Buy | 6,022 | 53.14 |
| | | 10/4/2006** | Buy | 198,523 | 56.72 |
| | | 11/17/2006 | Buy | 1,850 | 55.01 |
| | | 11/17/2006 | Buy | 1,587 | 55.01 |
| | | 12/1/2006 | Buy | 5,685 | 54.10 |
| | | 1/29/2007 | Buy | 4,115 | 56.03 |
| | | 2/5/2007 | Buy | 766 | 57.06 |
| | | 2/9/2007 | Buy | 3,799 | 57.12 |
| | | 2/15/2007 | Buy | 1,262 | 57.89 |
| | | 2/28/2007 | Buy | 4,110 | 55.37 |
| | | 3/1/2007 | Buy | 592 | 55.38 |
| | | 3/19/2007 | Buy | 4,588 | 55.70 |
| | | 3/19/2007 | Buy | 63 | 55.70 |
| | | 3/28/2007 | Buy | 3,087 | 55.08 |
| | | 3/28/2007 | Buy | 2,435 | 55.08 |
| | | 4/20/2007 | Buy | 7,709 | 55.85 |
| | | 5/31/2007 | Buy | 3,995 | 54.19 |
| | | 6/7/2007 | Buy | 11,290 | 52.85 |
| | | 6/22/2007 | Sell | 25,202 | 51.87 |
| | | 6/22/2007 | Sell | 12,202 | 51.84 |
| | | 6/27/2007 | Sell | 13,932 | 52.06 |
| | | 6/27/2007 | Sell | 27 | 52.06 |
| | | 8/31/2007 | Buy | 1,558 | 48.79 |
| | | 8/31/2007 | Buy | 3,858 | 48.98 |
| | | 9/24/2007 | Buy | 4,344 | 50.39 |
| | | 9/26/2007 | Buy | 3,648 | 50.64 |
| | | 10/3/2007** | Buy | 56,254 | 51.37 |
| | | 10/9/2007 | Buy | 3,974 | 51.42 |
| | | 10/24/2007 | Buy | 369 | 45.40 |
| | | 10/24/2007 | Buy | 7,283 | 45.40 |
| | | 10/26/2007 | Buy | 3,295 | 46.54 |
| | | 10/30/2007 | Sell | 10,172 | 45.97 |
| | | 12/12/2007 | Buy | 2,766 | 40.54 |
| | | 12/19/2007 | Buy | 3,569 | 38.99 |
| | | 1/31/2008 | Buy | 2,421 | 35.47 |
| | | 2/5/2008 | Buy | 29,755 | 34.03 |
| | | 2/26/2008 | Sell | 7,091 | 34.81 |
| | | 2/26/2008 | Sell | 3,963 | 34.80 |
| | | 3/27/2008 | Buy | 1,071 | 27.07 |
| | | 3/31/2008 | Buy | 4,360 | 27.00 |
| | | 3/31/2008 | Buy | 711 | 27.00 |
| | | 4/30/2008 | Buy | 129,495 | 29.14 |
| | | 4/30/2008 | Buy | 340 | 29.15 |
| 337479 | 392,399 shares | 5/15/2006 | Buy | 2,500 | 54.71 |
| | | 6/8/2006 | Buy | 1,750 | 54.44 |
| | | 6/30/2006 | Sell | 1,400 | 54.08 |

|  |  | 6/30/2006 | Sell | 3,570 | 54.08 |
|  |  | 10/4/2006** | Buy | 67,403 | 56.72 |
|  |  | 10/26/2006 | Buy | 1,200 | 55.62 |
|  |  | 10/31/2006 | Buy | 3,100 | 55.50 |
|  |  | 11/27/2006 | Buy | 3,510 | 53.91 |
|  |  | 12/27/2006 | Sell | 3,740 | 57.46 |
|  |  | 2/1/2007 | Buy | 2,480 | 56.50 |
|  |  | 2/28/2007 | Buy | 1,900 | 55.37 |
|  |  | 3/21/2007 | Buy | 2,155 | 55.74 |
|  |  | 5/15/2007 | Buy | 2,542 | 56.58 |
|  |  | 5/25/2007 | Sell | 7,200 | 55.08 |
|  |  | 6/7/2007 | Buy | 4,560 | 53.16 |
|  |  | 6/22/2007 | Sell | 6,700 | 51.84 |
|  |  | 6/27/2007 | Sell | 3,360 | 51.74 |
|  |  | 8/30/2007 | Buy | 3,431 | 47.94 |
|  |  | 10/2/2007 | Buy | 2,000 | 50.83 |
|  |  | 10/3/2007** | Buy | 18,631 | 51.37 |
|  |  | 10/12/2007 | Buy | 2,640 | 51.00 |
|  |  | 10/30/2007 | Sell | 5,648 | 45.97 |
|  |  | 11/15/2007 | Buy | 3,231 | 41.20 |
|  |  | 12/14/2007 | Buy | 2,900 | 39.03 |
|  |  | 2/26/2008 | Buy | 3,588 | 34.46 |
|  |  | 4/30/2008 | Buy | 33,265 | 29.15 |
|  |  | 5/5/2008 | Buy | 13,901 | 29.60 |
| 337480 | 60,612 shares | 10/4/2006** | Buy | 10,405 | 56.72 |
|  |  | 10/4/2006 | Buy | 39,100 | 56.38 |
|  |  | 11/7/2006 | Sell | 7,400 | 55.68 |
|  |  | 12/5/2006 | Sell | 27,700 | 54.98 |
|  |  | 1/9/2007 | Buy | 200 | 56.51 |
|  |  | 2/13/2007 | Buy | 300 | 57.70 |
|  |  | 3/20/2007 | Buy | 14,700 | 55.97 |
|  |  | 6/12/2007 | Buy | 4,200 | 53.59 |
|  |  | 7/10/2007 | Buy | 24,100 | 50.42 |
|  |  | 8/9/2007 | Sell | 18,400 | 47.46 |
|  |  | 10/9/2007 | Buy | 13,600 | 51.21 |
|  |  | 10/25/2007 | Buy | 500 | 45.85 |
|  |  | 4/24/2008 | Sell | 19,300 | 27.44 |
| 337481 | 49,500 shares | 8/3/2006 | Buy | 15,900 | 54.20 |
|  |  | 10/4/2006** | Buy | 9,669 | 56.72 |
|  |  | 11/3/2006 | Sell | 4,500 | 54.39 |
|  |  | 1/4/2007 | Sell | 24,000 | 57.17 |
|  |  | 8/3/2007 | Sell | 29,600 | 46.28 |
|  |  | 4/3/2008 | Sell | 16,969 | 28.23 |
| 337485 | 0 shares | 10/1/2007 | Sell | 22,247 | 50.38 |
|  |  | 10/3/2007** | Buy | 22,247 | 51.37 |
| 363220 | 0 shares | 11/20/2007 | Buy | 710 | 38.11 |
| 363221 | 0 shares | 11/20/2007 | Buy | 116 | 38.34 |

| | | 3/14/2008 | Sell | 116 | 26.63 |
|---|---|---|---|---|---|
| 363242 | 0 shares | 11/26/2007 | Buy | 500 | 40.24 |
| | | 3/4/2008 | Sell | 100 | 28.92 |
| | | 3/25/2008 | Sell | 100 | 29.95 |
| | | 5/28/2008 | Sell | 100 | 23.46 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Marc Katz, Deputy Director of Investment Administration for the Teachers' Retirement System of the City of New York, provide the following certification on behalf of the New York City Teachers' Retirement System Variable Annuity Program ("Teachers' Variable A"), and hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of Teachers' Variable A. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2. Teachers' Variable A did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. Teachers' Variable A understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. Teachers' Variable A maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4. Teachers' Variable A's transactions in the securities of Wachovia, as prepared by the NYC Teachers' Retirement System accounting staff, are reflected in Exhibit A, attached hereto.

5. Teachers' Variable A has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)

6. Beyond its pro rata share of any recovery, Teachers' Variable A will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of

such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury on this _7_ day of August, 2008 that the foregoing

is true and correct to the best of my knowledge.

MARC KATZ
Deputy Director of Investment Administration
for the Teachers' Retirement System of the City of
New York

2

Exhibit A
NYC Teachers' Variable A Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|-----------------|------------|-------|----------|-------|
| Enhanced | 109,933 shares | 05/12/06 | Sell | 6601 | 54.94 |
| | | 07/17/06 | Sell | 1803 | 53.01 |
| | | 09/05/06 | Buy | 6900 | 55.27 |
| | | 10/2/2006 | Buy | 11036 | 55.80 |
| | | 11/17/06 | Sell | 2999 | 55.01 |
| | | 11/30/06 | Buy | 9500 | 53.71 |
| | | 02/12/07 | Sell | 15201 | 57.48 |
| | | 02/13/07 | Sell | 1298 | 57.49 |
| | | 05/01/07 | Sell | 11199 | 55.20 |
| | | 05/16/07 | Sell | 1199 | 56.11 |
| | | 08/22/07 | Sell | 10100 | 49.50 |
| | | 11/07/07 | Buy | 4900 | 41.37 |
| | | 12/14/07 | Sell | 1803 | 40.19 |
| | | 01/22/08 | Buy | 8800 | 30.38 |
| | | 01/30/08 | Sell | 18198 | 37.51 |
| | | 02/14/08 | Sell | 1500 | 33.66 |
| | | 03/05/08 | Buy | 15000 | 30.00 |
| | | 04/17/08 | Buy | 14100 | 25.70 |
| Wellington | 0 shares | 10/02/06 | Buy | 20390 | 55.80 |
| | | 01/23/07 | Sell | 900 | 56.38 |
| | | 01/24/07 | Sell | 700 | 56.47 |
| | | 01/26/07 | Sell | 900 | 56.05 |
| | | 03/02/07 | Sell | 5400 | 55.01 |
| | | 03/14/07 | Sell | 900 | 53.92 |
| | | 03/16/07 | Sell | 1100 | 55.02 |
| | | 04/05/07 | Sell | 1100 | 54.49 |
| | | 04/10/07 | Sell | 2800 | 54.13 |
| | | 04/11/07 | Sell | 900 | 53.70 |
| | | 04/12/07 | Sell | 1200 | 53.58 |
| | | 04/16/07 | Sell | 1300 | 55.13 |
| | | 05/29/07 | Sell | 3190 | 54.57 |
| MCM | 0 shares | 11/13/06 | Buy | 401164 | 55.49 |
| | | 11/17/06 | Sell | 9400 | 55.01 |
| | | 12/18/06 | Sell | 3800 | 57.49 |
| | | 12/19/06 | Buy | 474430 | 57.30 |
| | | 01/19/07 | Sell | 4650 | 56.70 |
| | | 02/13/07 | Sell | 7410 | 57.48 |
| | | 06/18/07 | Sell | 7700 | 54.05 |
| | | 06/22/07 | Sell | 11700 | 51.84 |
| | | 06/27/07 | Sell | 4030 | 51.74 |
| | | 09/17/07 | Sell | 3400 | 49.91 |
| | | 10/01/07 | Buy | 32374 | 49.42 |
| | | 10/18/07 | Sell | 1 | 48.91 |
| | | 02/15/08 | Sell | 6201 | 33.66 |
| | | 04/30/08 | Buy | 54759 | 29.15 |

|         |          | 05/05/08 | Buy  | 22845  | 29.60 |
|         |          | 05/16/08 | Sell | 6700   | 27.60 |
|         |          |          |      |        |       |
| Goldman | 0 shares | 06/13/07 | Buy  | 39700  | 53.16 |
|         |          | 09/24/07 | Buy  | 55400  | 50.68 |
|         |          | 10/09/07 | Buy  | 5100   | 51.17 |
|         |          | 12/03/07 | Sell | 100200 | 42.47 |
|         |          | 02/25/08 | Buy  | 6700   | 34.15 |
|         |          | 03/05/08 | Buy  | 14595  | 29.28 |
|         |          | 03/07/08 | Buy  | 305    | 27.48 |
|         |          | 03/13/08 | Buy  | 12800  | 26.98 |
|         |          | 03/24/08 | Buy  | 100400 | 31.35 |
|         |          | 04/01/08 | Buy  | 36200  | 28.66 |
|         |          | 04/18/08 | Sell | 131700 | 27.27 |
|         |          | 04/23/08 | Sell | 39300  | 26.14 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 and A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Employees' Retirement System ("NYCERS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYCERS.  I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYCERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYCERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary.  NYCERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYCERS's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYCERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*Vogel v. Jobs*, No. C-06-05208-JF (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYCERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day of August, 2008.

_Lewis Fin_

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYCERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337545 | 20,117 shares | 5/24/2006 | Buy | 3,300 | 53.36 |
| | | 5/25/2006 | Buy | 2,500 | 53.41 |
| | | 8/18/2006 | Buy | 2,290 | 55.58 |
| | | 10/4/2006** | Buy | 630 | 56.72 |
| | | 12/26/2006 | Buy | 100 | 57.18 |
| | | 3/27/2007 | Sell | 1,200 | 55.83 |
| | | 4/5/2007 | Sell | 4,553 | 54.24 |
| | | 5/3/2007 | Buy | 200 | 55.61 |
| | | 5/16/2007 | Sell | 1,500 | 56.63 |
| | | 6/25/2007 | Buy | 300 | 52.25 |
| | | 9/24/2007 | Sell | 1,930 | 50.86 |
| | | 9/24/2007 | Sell | 2,800 | 50.86 |
| | | 10/3/2007** | Buy | 98 | 51.37 |
| | | 10/22/2007 | Sell | 2,340 | 46.2 |
| | | 10/23/2007 | Sell | 1,595 | 45.84 |
| | | 11/26/2007 | Sell | 12,317 | 39.98 |
| | | 11/27/2007 | Sell | 200 | 39.67 |
| | | 12/27/2007 | Sell | 100 | 38.48 |
| | | 3/4/2008 | Sell | 200 | 28.92 |
| | | 3/25/2008 | Sell | 300 | 29.95 |
| | | 5/28/2008 | Sell | 200 | 23.46 |
| 337548 | 882,333 shares | 5/19/2006 | Buy | 3,911 | 53.14 |
| | | 6/27/2006 | Sell | 7,009 | 52.84 |
| | | 6/30/2006 | Sell | 3,434 | 54.08 |
| | | 6/30/2006 | Sell | 8,457 | 54.08 |
| | | 8/29/2006 | Buy | 1,256 | 55.23 |
| | | 9/25/2006 | Sell | 19,755 | 55.5 |
| | | 10/4/2006** | Buy | 150,804 | 56.72 |
| | | 10/31/2006 | Buy | 167 | 55.5 |
| | | 10/31/2006 | Buy | 407 | 55.5 |
| | | 12/1/2006 | Buy | 3,342 | 54.1 |
| | | 12/27/2006 | Sell | 97 | 57.46 |
| | | 12/27/2006 | Sell | 6,000 | 57.46 |
| | | 2/15/2007 | Buy | 566 | 57.89 |
| | | 2/28/2007 | Buy | 2,899 | 55.37 |
| | | 2/28/2007 | Buy | 417 | 55.38 |
| | | 3/19/2007 | Buy | 49 | 55.7 |
| | | 3/19/2007 | Buy | 3,591 | 55.7 |
| | | 3/28/2007 | Buy | 1,650 | 55.08 |
| | | 3/28/2007 | Buy | 1,301 | 55.08 |
| | | 4/20/2007 | Buy | 3,984 | 55.85 |
| | | 4/30/2007 | Buy | 5,945 | 55.54 |
| | | 4/30/2007 | Buy | 427 | 55.54 |
| | | 6/27/2007 | Sell | 38,493 | 52.06 |
| | | 6/27/2007 | Sell | 74 | 52.05 |
| | | 7/12/2007 | Sell | 2,908 | 52.28 |

| | | Date | Type | Shares | Price |
|---|---|---|---|---|---|
| | | 9/24/2007 | Buy | 4,756 | 50.39 |
| | | 10/3/2007** | Buy | 38,142 | 51.37 |
| | | 10/9/2007 | Buy | 3,976 | 51.42 |
| | | 10/24/2007 | Buy | 263 | 45.4 |
| | | 10/24/2007 | Buy | 5,187 | 45.4 |
| | | 11/27/2007 | Sell | 7,604 | 40.12 |
| | | 11/27/2007 | Sell | 10,920 | 40.12 |
| | | 12/19/2007 | Buy | 2,910 | 38.99 |
| | | 12/26/2007 | Sell | 4,937 | 39.07 |
| | | 2/8/2008 | Buy | 5,043 | 34.04 |
| | | 2/26/2008 | Sell | 1,913 | 34.8 |
| | | 2/26/2008 | Sell | 1,070 | 34.8 |
| | | 3/7/2008 | Buy | 1,858 | 27.22 |
| | | 3/27/2008 | Buy | 2,704 | 27.07 |
| | | 3/31/2008 | Buy | 2,341 | 27 |
| | | 3/31/2008 | Buy | 382 | 27 |
| | | 4/25/2008 | Sell | 6,495 | 28.81 |
| | | 4/25/2008 | Sell | 2,366 | 28.81 |
| | | 4/30/2008 | Buy | 219 | 29.15 |
| | | 4/30/2008 | Buy | 83,392 | 29.14 |
| 337549 | 894,871 shares | 6/7/2006 | Buy | 22,300 | 54.76 |
| | | 6/7/2006 | Buy | 3,600 | 54.47 |
| | | 6/16/2006 | Buy | 1,500 | 52.82 |
| | | 6/21/2006 | Buy | 4,400 | 53.33 |
| | | 6/22/2006 | Buy | 7,500 | 53.08 |
| | | 6/30/2006 | Sell | 31,200 | 54.15 |
| | | 6/30/2006 | Sell | 6,400 | 54.08 |
| | | 7/25/2006 | Sell | 10,000 | 53.46 |
| | | 8/3/2006 | Buy | 4,000 | 54.2 |
| | | 9/6/2006 | Buy | 1,100 | 55.44 |
| | | 9/6/2006 | Buy | 300 | 55.19 |
| | | 9/26/2006 | Sell | 26,300 | 55.5 |
| | | 9/26/2006 | Sell | 14,800 | 55.14 |
| | | 9/26/2006 | Sell | 400 | 55.5 |
| | | 10/2/2006 | Buy | 900 | 55.67 |
| | | 10/4/2006** | Buy | 140,315 | 56.72 |
| | | 10/4/2006** | Buy | 6,831 | 56.72 |
| | | 10/4/2006** | Buy | 2,312 | 56.72 |
| | | 10/13/2006 | Sell | 15,400 | 56.49 |
| | | 10/13/2006 | Sell | 76 | 56.49 |
| | | 10/13/2006 | Buy | 23,900 | 56.45 |
| | | 11/3/2006 | Buy | 3,600 | 54.62 |
| | | 1/25/2007 | Sell | 1,000 | 55.76 |
| | | 4/12/2007 | Buy | 10,100 | 53.34 |
| | | 5/31/2007 | Buy | 7,500 | 54.22 |
| | | 6/22/2007 | Sell | 45,300 | 51.86 |
| | | 6/22/2007 | Sell | 3,900 | 51.84 |
| | | 6/26/2007 | Sell | 11,700 | 51.98 |
| | | 9/12/2007 | Buy | 44,900 | 48.84 |
| | | 9/26/2007 | Sell | 15,100 | 50.64 |
| | | 10/3/2007** | Buy | 38,293 | 51.37 |

|  |  | 10/18/2007 | Buy | 2,400 | 47.81 |
|---|---|---|---|---|---|
|  |  | 11/26/2007 | Sell | 31,900 | 40.25 |
|  |  | 12/6/2007 | Buy | 5,300 | 43.18 |
|  |  | 12/21/2007 | Sell | 8,900 | 38.65 |
|  |  | 1/9/2008 | Buy | 14,700 | 35.07 |
|  |  | 2/25/2008 | Sell | 13,100 | 33.62 |
|  |  | 3/6/2008 | Buy | 14,400 | 28.35 |
|  |  | 3/31/2008 | Buy | 7,500 | 27 |
|  |  | 4/30/2008 | Buy | 89,200 | 29.15 |
|  |  | 5/27/2008 | Sell | 22,600 | 24.61 |
| 337568 | 0 shares | 10/1/2007 | Sell | 5,020 | 50.38 |
|  |  | 10/3/2007** | Buy | 5,020 | 51.37 |
| 337570 | 0 shares | 10/3/2007** | Buy | 3,839 | 51.37 |
|  |  | 10/11/2007 | Sell | 300 | 51.14 |
|  |  | 10/22/2007 | Sell | 3,539 | 46.26 |
| 337816 | 34,800 shares | 11/30/07 | Sell | 34,800 | 43.26 |
| 337818 | 14,090 shares | 5/8/2006 | Buy | 2,480 | 55.43 |
|  |  | 12/1/2006 | Sell | 5,250 | 53.95 |
|  |  | 6/26/2007 | Sell | 11,320 | 51.86 |
| 349445 | 0 shares | 11/20/2007 | Buy | 990 | 38.11 |
| 349446 | 0 shares | 11/20/2007 | Buy | 161 | 38.34 |
|  |  | 3/14/2008 | Sell | 161 | 26.63 |
| 349466 | 0 shares | 11/30/2007 | Buy | 14,526 | 43 |
|  |  | 11/30/2007 | Sell | 14,526 | 43.27 |
| 337551 | 196,619 shares | 6/15/2006 | Buy | 100 | 52.39 |
|  |  | 6/16/2006 | Sell | 900 | 52.76 |
|  |  | 6/27/2006 | Buy | 100 | 52.79 |
|  |  | 6/28/2006 | Buy | 80 | 53 |
|  |  | 6/29/2006 | Buy | 105 | 53.86 |
|  |  | 6/30/2006 | Buy | 53 | 54.44 |
|  |  | 7/5/2006 | Buy | 137 | 53.56 |
|  |  | 7/6/2006 | Buy | 25 | 53.77 |
|  |  | 8/23/2006 | Buy | 75 | 55.85 |
|  |  | 8/24/2006 | Buy | 45 | 56.32 |
|  |  | 8/25/2006 | Buy | 81 | 56.22 |
|  |  | 8/29/2006 | Buy | 49 | 55.08 |
|  |  | 8/31/2006 | Buy | 50 | 54.67 |
|  |  | 9/15/2006 | Sell | 1,200 | 55.12 |
|  |  | 9/22/2006 | Buy | 63 | 54.68 |
|  |  | 9/25/2006 | Buy | 414 | 55.17 |
|  |  | 9/29/2006 | Buy | 5,900 | 55.78 |
|  |  | 10/4/2006** | Buy | 34,431 | 56.72 |
|  |  | 12/18/2006 | Buy | 43 | 57.32 |
|  |  | 12/19/2006 | Buy | 31 | 57.49 |

| Date | Type | Quantity | Price |
|---|---|---|---|
| 12/20/2006 | Buy | 25 | 57.2 |
| 12/21/2006 | Buy | 33 | 57.21 |
| 12/22/2006 | Buy | 68 | 57.03 |
| 2/1/2007 | Buy | 20 | 56.45 |
| 2/2/2007 | Buy | 45 | 56.42 |
| 2/6/2007 | Buy | 135 | 57.26 |
| 2/12/2007 | Buy | 245 | 57.52 |
| 2/13/2007 | Buy | 91 | 57.7 |
| 2/14/2007 | Buy | 72 | 57.94 |
| 2/15/2007 | Buy | 73 | 57.97 |
| 2/16/2007 | Buy | 87 | 58.24 |
| 2/20/2007 | Buy | 26 | 58.07 |
| 2/22/2007 | Buy | 31 | 58.69 |
| 2/23/2007 | Sell | 17,800 | 57.74 |
| 3/16/2007 | Buy | 900 | 55.14 |
| 4/5/2007 | Buy | 150 | 54.28 |
| 4/9/2007 | Buy | 22 | 54.03 |
| 4/11/2007 | Buy | 128 | 53.68 |
| 4/19/2007 | Buy | 200 | 55.34 |
| 4/26/2007 | Buy | 50 | 55.66 |
| 4/27/2007 | Buy | 50 | 55.65 |
| 5/4/2007 | Buy | 20 | 55.91 |
| 5/8/2007 | Buy | 80 | 56.37 |
| 5/25/2007 | Sell | 7,100 | 55.08 |
| 6/11/2007 | Buy | 120 | 53.65 |
| 6/13/2007 | Buy | 211 | 53.12 |
| 6/15/2007 | Buy | 2,500 | 54.04 |
| 7/10/2007 | Buy | 100 | 50.74 |
| 8/28/2007 | Buy | 125 | 49.16 |
| 8/30/2007 | Buy | 243 | 47.76 |
| 8/31/2007 | Buy | 79 | 48.95 |
| 9/4/2007 | Buy | 53 | 49.16 |
| 9/11/2007 | Buy | 50 | 48.14 |
| 9/12/2007 | Buy | 36 | 48.89 |
| 9/13/2007 | Buy | 14 | 49.98 |
| 9/21/2007 | Buy | 100 | 51.36 |
| 10/2/2007 | Buy | 60 | 51.28 |
| 10/3/2007 | Buy | 125 | 51.36 |
| 10/4/2007 | Buy | 129 | 51.45 |
| 10/8/2007 | Buy | 86 | 51.49 |
| 10/10/2007 | Buy | 210 | 50.88 |
| 10/11/2007 | Buy | 320 | 50.98 |
| 10/16/2007 | Buy | 80 | 49.25 |
| 11/5/2007 | Buy | 132 | 41.93 |
| 11/7/2007 | Buy | 174 | 41.81 |
| 11/8/2007 | Buy | 94 | 39.5 |
| 12/5/2007 | Buy | 50 | 42.47 |
| 12/6/2007 | Buy | 90 | 44.1 |
| 12/7/2007 | Buy | 138 | 43.63 |
| 12/10/2007 | Buy | 122 | 44.45 |
| 12/11/2007 | Buy | 100 | 44.47 |
| 12/21/2007 | Buy | 9,700 | 39.5 |

| | | | |
|---|---|---|---|
| 1/7/2008 | Buy | 66 | 35.27 |
| 1/8/2008 | Buy | 76 | 35.1 |
| 1/9/2008 | Buy | 46 | 33.52 |
| 1/10/2008 | Buy | 12 | 34.7 |
| 1/16/2008 | Buy | 200 | 34.85 |
| 1/23/2008 | Buy | 55 | 33.85 |
| 1/24/2008 | Buy | 45 | 35.97 |
| 1/29/2008 | Buy | 224 | 37.53 |
| 1/30/2008 | Buy | 76 | 37.47 |
| 3/11/2008 | Buy | 120 | 28.89 |
| 3/12/2008 | Buy | 54 | 28.66 |
| 3/13/2008 | Buy | 63 | 26.55 |
| 3/14/2008 | Buy | 63 | 26.93 |
| 3/20/2008 | Buy | 2,300 | 30.72 |
| 4/2/2008 | Buy | 120 | 29.14 |
| 4/3/2008 | Buy | 92 | 28.02 |
| 4/7/2008 | Buy | 75 | 27.71 |
| 4/8/2008 | Buy | 11 | 27.59 |
| 4/9/2008 | Buy | 55 | 26.88 |
| 4/10/2008 | Buy | 23 | 26.68 |
| 4/11/2008 | Buy | 114 | 27.81 |
| 4/14/2008 | Buy | 17,100 | 25.54 |
| 4/14/2008 | Buy | 43 | 24.96 |
| 5/6/2008 | Buy | 66 | 29.75 |
| 5/7/2008 | Buy | 120 | 29.56 |
| 5/8/2008 | Buy | 14 | 27.85 |
| 5/13/2008 | Sell | 200 | 27.79 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Pension Fund ("NYC Police"), and hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of NYC Police. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2. NYC Police did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. NYC Police understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Police maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4. NYC Police's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5. NYC Police has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

> *In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
> *In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
> *In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
> *In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
> (W.D. Wash.) (*Motion withdrawn*)

6. Beyond its pro rata share of any recovery, NYC Police will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this ___7ᵗʰ___ day of August, 2008.

_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC Police Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337627 | 15,400 shares | 1/8/2007 | Sell | 15,400 | 56.34 |
| | | | | | |
| 337629 | 334,040 shares | 6/7/2006 | Buy | 15,100 | 54.74 |
| | | 6/7/2006 | Buy | 2,400 | 54.47 |
| | | 6/30/2006 | Sell | 8,800 | 54.15 |
| | | 6/30/2006 | Sell | 1,800 | 54.08 |
| | | 10/4/2006** | Buy | 58,438 | 56.72 |
| | | 12/11/2006 | Buy | 2,300 | 56.28 |
| | | 1/25/2007 | Buy | 800 | 55.76 |
| | | 4/12/2007 | Buy | 4,900 | 53.33 |
| | | 5/31/2007 | Buy | 15,500 | 54.23 |
| | | 6/22/2007 | Sell | 1,700 | 51.84 |
| | | 6/22/2007 | Sell | 18,600 | 51.86 |
| | | 6/26/2007 | Sell | 11,600 | 51.98 |
| | | 9/12/2007 | Buy | 18,200 | 48.84 |
| | | 10/3/2007** | Buy | 16,845 | 51.37 |
| | | 12/6/2007 | Sell | 3,200 | 43.17 |
| | | 3/12/2008 | Buy | 300 | 29.69 |
| | | 3/31/2008 | Buy | 7,000 | 27 |
| | | 4/30/2008 | Buy | 37,300 | 29.15 |
| | | | | | |
| 337635 | 0 shares | 10/1/2007 | Sell | 23,527 | 50.38 |
| | | 10/3/2007** | Buy | 23,527 | 51.37 |
| | | | | | |
| 337642 | 71,500 shares | 4/22/2008 | Sell | 26,900 | 26.14 |
| | | 4/23/2008 | Sell | 24,400 | 26.15 |
| | | 4/24/2008 | Sell | 20,200 | 27.06 |
| | | | | | |
| 337643 | 0 shares | 8/29/2007 | Buy | 1,670 | 48.1 |
| | | 8/29/2007 | Buy | 76,090 | 48.15 |
| | | 8/31/2007 | Buy | 12,610 | 48.45 |
| | | 9/7/2007 | Buy | 6,330 | 48.12 |
| | | 9/12/2007 | Buy | 30,360 | 48.95 |
| | | 9/19/2007 | Buy | 12,240 | 52.64 |
| | | 9/26/2007 | Sell | 36,920 | 50.51 |
| | | 10/1/2007 | Sell | 15,920 | 50.88 |
| | | 10/18/2007 | Sell | 42,990 | 48 |
| | | 10/18/2007 | Sell | 43,470 | 47.96 |
| | | 2/1/2008 | Buy | 76,160 | 38.48 |
| | | 2/25/2008 | Buy | 9,920 | 33.91 |
| | | 3/3/2008 | Sell | 86,080 | 29.99 |
| | | | | | |
| 337821 | 323,519 shares | 5/31/2006 | Buy | 12,500 | 53.41 |
| | | 7/3/2006 | Buy | 4,900 | 54.14 |
| | | 8/4/2006 | Buy | 5,500 | 55.82 |
| | | 10/4/2006** | Buy | 56,546 | 56.72 |
| | | 5/16/2007 | Buy | 3,100 | 56.64 |
| | | 6/7/2007 | Buy | 15,400 | 53.09 |

|  |  | 6/22/2007 | Sell | 30,000 | 51.87 |
|  |  | 8/23/2007 | Buy | 13,100 | 49.56 |
|  |  | 10/3/2007** | Buy | 15,763 | 51.37 |
|  |  | 4/30/2008 | Buy | 41,600 | 29.15 |
| 363057 | 0 shares | 11/20/2007 | Buy | 630 | 38.11 |
| 363058 | 0 shares | 11/20/2007 | Buy | 103 | 38.34 |
|  |  | 3/14/2008 | Sell | 103 | 26.63 |
| 363081 | 0 shares | 11/26/2007 | Buy | 200 | 40.24 |
|  |  | 3/4/2008 | Sell | 50 | 28.92 |
|  |  | 3/25/2008 | Sell | 50 | 29.95 |
|  |  | 5/28/2008 | Sell | 50 | 23.46 |
| 337644 | 0 shares | 6/9/2006 | Buy | 7,900 | 54.47 |
|  |  | 10/10/2006 | Buy | 100 | 55.87 |
|  |  | 11/6/2006 | Sell | 8,000 | 54.49 |
|  |  | 1/9/2007 | Buy | 800 | 56.12 |
|  |  | 1/9/2007 | Buy | 2,100 | 55.98 |
|  |  | 3/21/2007 | Buy | 2,200 | 57.1 |
|  |  | 3/21/2007 | Buy | 1,300 | 57.21 |
|  |  | 3/22/2007 | Buy | 3,000 | 57.02 |
|  |  | 3/23/2007 | Buy | 1,000 | 56.92 |
|  |  | 3/23/2007 | Buy | 1,100 | 56.74 |
|  |  | 3/23/2007 | Buy | 500 | 56.92 |
|  |  | 3/27/2007 | Buy | 10,100 | 55.88 |
|  |  | 3/27/2007 | Buy | 10,200 | 55.8 |
|  |  | 5/23/2007 | Sell | 32,300 | 56.08 |
|  |  | 11/21/2007 | Buy | 9,200 | 37.99 |
|  |  | 12/12/2007 | Sell | 9,200 | 40.87 |
|  |  | 1/9/2008 | Buy | 52,200 | 33.58 |
|  |  | 1/16/2008 | Buy | 13,000 | 35.48 |
|  |  | 1/22/2008 | Buy | 5,700 | 30.21 |
|  |  | 1/25/2008 | Sell | 8,400 | 37.9 |
|  |  | 1/25/2008 | Sell | 3,100 | 36.56 |
|  |  | 1/25/2008 | Sell | 59,400 | 37.87 |
|  |  | 2/11/2008 | Buy | 12,300 | 33.69 |
|  |  | 2/14/2008 | Buy | 52,100 | 33.64 |
|  |  | 3/3/2008 | Buy | 1,600 | 30.04 |
|  |  | 3/27/2008 | Buy | 6,400 | 27.85 |
|  |  | 3/27/2008 | Buy | 14,800 | 27.56 |
|  |  | 3/27/2008 | Buy | 2,700 | 27.94 |
|  |  | 4/10/2008 | Sell | 5,900 | 27.46 |
|  |  | 4/14/2008 | Buy | 118,500 | 24 |
|  |  | 4/18/2008 | Sell | 9,600 | 27.31 |
|  |  | 4/30/2008 | Sell | 17,500 | 29.38 |
|  |  | 6/2/2008 | Buy | 15,400 | 23.39 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Department Pension Fund ("NYC Fire"), and hereby certify as follows:

1.  I am fully authorized to enter into and execute this Certification on behalf of NYC Fire. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.  NYC Fire did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.  NYC Fire understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC Fire maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.  NYC Fire's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.  NYC Fire has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Take-Two Interactive Securities Litig.*, No. 1:06-cv-00803-SWK (S.D.N.Y.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.  Beyond its pro rata share of any recovery, NYC Fire will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this _7th_ day

of August, 2008.

_Lewis Finkelman_
LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC Fire Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|---|
| 337665 | 5,600 shares | 1/8/2007 | Sell | 5,600 | 56.34 |
| 337673 | 83,090 shares | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/7/2006 | Buy | 2,300 | 54.72 |
| | | 6/30/2006 | Sell | 2,200 | 54.15 |
| | | 6/30/2006 | Sell | 400 | 54.08 |
| | | 8/17/2006 | Buy | 300 | 55.67 |
| | | 10/4/2006** | Buy | 14,504 | 56.72 |
| | | 11/3/2006 | Buy | 2,400 | 54.62 |
| | | 5/31/2007 | Buy | 1,900 | 54.25 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,500 | 51.86 |
| | | 6/26/2007 | Sell | 2,900 | 51.99 |
| | | 9/12/2007 | Buy | 4,500 | 48.84 |
| | | 10/3/2007** | Buy | 4,619 | 51.37 |
| | | 11/21/2007 | Sell | 200 | 38.22 |
| | | 12/6/2007 | Sell | 900 | 43.17 |
| | | 2/8/2008 | Buy | 1,800 | 34.03 |
| | | 2/29/2008 | Buy | 2,200 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,600 | 29.15 |
| 337675 | 26,400 shares | 8/3/2006 | Buy | 6,200 | 54.2 |
| | | 9/6/2006 | Buy | 1,700 | 55.44 |
| | | 9/6/2006 | Buy | 800 | 55.19 |
| | | 10/4/2006** | Buy | 4,414 | 56.72 |
| | | 1/4/2007 | Sell | 13,700 | 57.17 |
| | | 5/4/2007 | Sell | 25,814 | 55.9 |
| | | 2/5/2008 | Buy | 20,000 | 34.43 |
| 337678 | 0 shares | 10/1/2007 | Sell | 5,512 | 50.38 |
| | | 10/3/2007** | Buy | 5,512 | 51.37 |
| 337681 | 0 shares | 10/3/2007** | Buy | 4,331 | 51.37 |
| | | 10/11/2007 | Sell | 400 | 51.14 |
| | | 10/22/2007 | Sell | 3,931 | 46.26 |
| 337687 | 9,100 shares | 5/8/2006 | Buy | 1,700 | 56.21 |
| | | 10/16/2006 | Buy | 1,200 | 54.82 |
| | | 11/13/2007 | Sell | 12,000 | 43.42 |
| 337688 | 0 shares | 8/29/2007 | Buy | 620 | 48.1 |
| | | 8/29/2007 | Buy | 28,110 | 48.15 |
| | | 8/31/2007 | Buy | 4,660 | 48.45 |
| | | 9/7/2007 | Buy | 2,340 | 48.12 |
| | | 9/12/2007 | Buy | 11,220 | 48.95 |
| | | 9/19/2007 | Buy | 4,520 | 52.64 |

| | | | | | |
|---|---|---|---|---|---|
| | | 9/26/2007 | Sell | 13,635 | 50.51 |
| | | 10/1/2007 | Sell | 5,880 | 50.88 |
| | | 10/18/2007 | Sell | 16,065 | 47.96 |
| | | 10/18/2007 | Sell | 15,890 | 48 |
| | | 2/1/2008 | Buy | 28,140 | 38.48 |
| | | 2/25/2008 | Buy | 3,680 | 33.91 |
| | | 3/3/2008 | Sell | 31,820 | 29.99 |
| 337690 | 0 shares | 6/9/2006 | Buy | 1,900 | 54.47 |
| | | 11/6/2006 | Sell | 1,900 | 54.49 |
| | | 1/9/2007 | Buy | 200 | 56.12 |
| | | 1/9/2007 | Buy | 500 | 55.98 |
| | | 3/21/2007 | Buy | 500 | 57.1 |
| | | 3/21/2007 | Buy | 300 | 57.21 |
| | | 3/22/2007 | Buy | 800 | 57.02 |
| | | 3/23/2007 | Buy | 200 | 56.92 |
| | | 3/23/2007 | Buy | 300 | 56.74 |
| | | 3/23/2007 | Buy | 100 | 56.92 |
| | | 3/27/2007 | Buy | 2,500 | 55.88 |
| | | 3/27/2007 | Buy | 2,400 | 55.8 |
| | | 5/23/2007 | Sell | 7,800 | 56.08 |
| | | 11/21/2007 | Buy | 2,200 | 37.99 |
| | | 12/12/2007 | Sell | 2,200 | 40.87 |
| | | 1/9/2008 | Buy | 12,700 | 33.58 |
| | | 1/16/2008 | Buy | 3,100 | 35.48 |
| | | 1/22/2008 | Buy | 1,400 | 30.21 |
| | | 1/25/2008 | Sell | 2,000 | 37.9 |
| | | 1/25/2008 | Sell | 800 | 36.56 |
| | | 1/25/2008 | Sell | 14,400 | 37.87 |
| | | 2/11/2008 | Buy | 3,000 | 33.69 |
| | | 2/14/2008 | Buy | 12,600 | 33.64 |
| | | 3/3/2008 | Buy | 400 | 30.04 |
| | | 3/27/2008 | Buy | 1,600 | 27.85 |
| | | 3/27/2008 | Buy | 3,600 | 27.56 |
| | | 3/27/2008 | Buy | 600 | 27.94 |
| | | 4/10/2008 | Sell | 1,400 | 27.46 |
| | | 4/14/2008 | Buy | 28,700 | 24 |
| | | 4/18/2008 | Sell | 2,400 | 27.31 |
| | | 4/30/2008 | Sell | 4,200 | 29.38 |
| | | 6/2/2008 | Buy | 3,700 | 23.39 |
| 337806 | 6,200 shares | 11/30/2007 | Sell | 6,200 | 44.49 |
| 337807 | 2,520 shares | 5/8/2006 | Buy | 440 | 55.43 |
| | | 12/1/2006 | Sell | 940 | 53.95 |
| | | 6/26/2007 | Sell | 2,020 | 51.86 |
| 337849 | 84,781 shares | 5/31/2006 | Buy | 1,000 | 53.5 |
| | | 6/30/2006 | Sell | 3,500 | 54.12 |
| | | 10/4/2006** | Buy | 13,663 | 56.72 |
| | | 10/17/2006 | Buy | 4,200 | 55.02 |
| | | 2/7/2007 | Buy | 900 | 57.36 |

|        |               | 3/2/2007    | Buy  | 900   | 54.99 |
|--------|---------------|-------------|------|-------|-------|
|        |               | 5/31/2007   | Buy  | 1,400 | 54.18 |
|        |               | 6/22/2007   | Sell | 2,700 | 51.87 |
|        |               | 6/27/2007   | Sell | 3,400 | 52.06 |
|        |               | 10/1/2007   | Buy  | 3,700 | 50.98 |
|        |               | 10/3/2007** | Buy  | 3,833 | 51.37 |
|        |               | 1/7/2008    | Buy  | 3,200 | 35.84 |
|        |               | 2/26/2008   | Sell | 5,200 | 34.8  |
|        |               | 4/4/2008    | Buy  | 1,900 | 27.88 |
|        |               | 4/30/2008   | Buy  | 8,200 | 29.15 |
| 348872 | 0 shares      | 11/20/2007  | Buy  | 510   | 38.11 |
| 348873 | 0 shares      | 11/20/2007  | Buy  | 84    | 38.34 |
|        |               | 3/14/2008   | Sell | 84    | 26.63 |
| 362868 | 0 shares      | 11/30/2007  | Buy  | 1,614 | 43.27 |
|        |               | 11/30/2007  | Sell | 1,614 | 43.27 |
| 337689 | 19,800 shares | 4/22/2008   | Sell | 7,500 | 26.14 |
|        |               | 4/23/2008   | Sell | 6,700 | 26.15 |
|        |               | 4/24/2008   | Sell | 5,600 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Board of Education Retirement System ("NYC BERS"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of NYC BERS. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    NYC BERS did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    NYC BERS understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. NYC BERS maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    NYC BERS' transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    NYC BERS has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Countrywide Financial Corp. Securities Litigation*, 07 cv 5295 (C.D. Cal.) (*Appointed*)

6.    Beyond its pro rata share of any recovery, NYC BERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such

reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this **7th** day of August, 2008.

_Lewis F_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC BERS Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Account | Opening Position | Trade Date | Trans | Quantity | Price |
|---------|------------------|------------|-------|----------|-------|
| 337500 | 2,300 shares | 1/8/2007 | Sell | 2,300 | 56.34 |
| 337504 | 78,222 shares | 6/7/2006 | Buy | 2,100 | 54.72 |
| | | 6/7/2006 | Buy | 2,000 | 54.47 |
| | | 6/30/2006 | Sell | 1,900 | 54.15 |
| | | 6/30/2006 | Sell | 600 | 54.08 |
| | | 10/4/2006** | Buy | 13,663 | 56.72 |
| | | 12/11/2006 | Buy | 600 | 56.28 |
| | | 1/25/2007 | Buy | 100 | 55.76 |
| | | 4/12/2007 | Buy | 3,000 | 53.35 |
| | | 5/31/2007 | Buy | 700 | 54.29 |
| | | 6/22/2007 | Sell | 300 | 51.84 |
| | | 6/22/2007 | Sell | 3,300 | 51.86 |
| | | 9/12/2007 | Buy | 2,300 | 48.84 |
| | | 10/3/2007** | Buy | 4,102 | 51.37 |
| | | 10/18/2007 | Buy | 900 | 47.81 |
| | | 12/27/2007 | Buy | 600 | 38.52 |
| | | 2/29/2008 | Buy | 900 | 30.62 |
| | | 3/31/2008 | Buy | 900 | 27 |
| | | 4/30/2008 | Buy | 9,000 | 29.15 |
| 337801 | 8,800 shares | 11/30/2007 | Sell | 8,800 | 44.54 |
| 337802 | 3,600 shares | 5/8/2006 | Buy | 630 | 55.43 |
| | | 12/1/2006 | Sell | 1,340 | 53.95 |
| | | 6/26/2007 | Sell | 2,890 | 51.86 |
| 348618 | 30,700 shares | 9/6/2006 | Sell | 900 | 55.14 |
| | | 9/6/2006 | Sell | 8,700 | 55.21 |
| | | 4/22/2008 | Sell | 7,900 | 26.14 |
| | | 4/23/2008 | Sell | 7,200 | 26.15 |
| | | 4/24/2008 | Sell | 6,000 | 27.06 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Firefighters' Variable Supplements Fund ("FFVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of FFVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    FFVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    FFVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FFVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    FFVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    FFVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, FFVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs

and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

_____
LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

Exhibit A
NYC FFVSF Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 29,682 shares | 5/31/2006 | Buy | 1,100 | 53.5 |
| | 6/30/2006 | Sell | 1,100 | 54.12 |
| | 8/24/2006 | Buy | 200 | 56.63 |
| | 10/4/2006** | Buy | 5,360 | 56.72 |
| | 11/13/2006 | Buy | 400 | 55.65 |
| | 11/21/2006 | Buy | 600 | 54.67 |
| | 2/7/2007 | Buy | 400 | 57.23 |
| | 6/22/2007 | Sell | 500 | 51.87 |
| | 8/10/2007 | Buy | 600 | 46.79 |
| | 10/3/2007** | Buy | 1,328 | 51.37 |
| | 10/3/2007 | Buy | 1,800 | 51.26 |
| | 12/11/2007 | Sell | 4,000 | 41.95 |
| | 12/12/2007 | Sell | 100 | 40.81 |
| | 4/2/2008 | Buy | 900 | 28.82 |
| | 4/30/2008 | Buy | 2,800 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of FOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.      FOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      FOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. FOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.      FOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.      FOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919
(W.D. Wash.) (*Motion withdrawn*)

6.      Beyond its pro rata share of any recovery, FOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this $7^{h}$ day

of August, 2008.

_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
**NYC FOVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 21,414 shares | 9/15/2006 | Buy | 200 | 55.1 |
| | 9/29/2006 | Buy | 459 | 55.78 |
| | 10/4/2006** | Buy | 3,542 | 56.72 |
| | 10/6/2006 | Buy | 500 | 56.43 |
| | 10/6/2006 | Buy | 500 | 56.54 |
| | 10/6/2006 | Sell | 500 | 56.34 |
| | 1/26/2007 | Sell | 100 | 56.26 |
| | 6/15/2007 | Buy | 500 | 54.04 |
| | 12/21/2007 | Buy | 1,300 | 39.5 |
| | 1/28/2008 | Sell | 2,700 | 37.6 |
| | 3/20/2008 | Buy | 800 | 30.72 |
| | 4/14/2008 | Buy | 100 | 25.01 |
| | 4/14/2008 | Buy | 1,300 | 25.54 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Officers' Variable Supplements Fund ("POVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of POVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    POVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    POVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. POVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    POVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    POVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, POVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

    I declare under penalty of perjury that the foregoing is true and correct this 7th day

of August, 2008.


                    _____

                    LEWIS FINKELMAN
                    Deputy Comptroller for Legal Affairs and General
                    Counsel for the Office of the New York City
                    Comptroller

**Exhibit A**
**NYC POVSF Transactions in Wachovia Corp. common stock**
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 54,734 shares | 6/7/2006 | Buy | 1,600 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/20/2006 | Buy | 9,354 | 55.11 |
| | 12/11/2006 | Sell | 300 | 56.28 |
| | 5/31/2007 | Buy | 2,600 | 54.23 |
| | 6/22/2007 | Sell | 2,800 | 51.86 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 9/12/2007 | Buy | 1,800 | 48.9 |
| | 10/3/2007** | Buy | 2,461 | 51.37 |
| | 10/5/2007 | Buy | 300 | 51.94 |
| | 10/18/2007 | Buy | 400 | 47.81 |
| | 11/6/2007 | Buy | 400 | 42.68 |
| | 12/10/2007 | Sell | 7,600 | 44.46 |
| | 12/27/2007 | Buy | 300 | 38.52 |
| | 1/15/2008 | Buy | 200 | 35.03 |
| | 1/31/2008 | Buy | 100 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 600 | 27 |
| | 4/30/2008 | Buy | 5,400 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

# CERTIFICATION

I, Lewis Finkelman, Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, provide the following certification on behalf of the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), and hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of PSOVSF. I have reviewed a complaint prepared against Wachovia Corporation ("Wachovia") alleging violations of the federal securities laws.

2.    PSOVSF did not purchase securities of Wachovia at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    PSOVSF understands the responsibilities of serving as a lead plaintiff and class representative in this action and is willing to undertake these responsibilities, including providing testimony at a deposition and trial, if necessary. PSOVSF maintains regular communication with its attorneys, and will work with them to achieve the best possible recovery on behalf of the class of shareholders it now seeks to represent.

4.    PSOVSF's transactions in the securities of Wachovia are reflected in Exhibit A, attached hereto.

5.    PSOVSF has not sought to serve as a lead plaintiff in a class action under the federal securities laws filed during the last three years, except for the following:

*In re Juniper Securities Litigation*, No. C-06-4327-JW (N.D. Cal.) (*Appointed*)
*In re Washington Mutual Inc. Securities, Derivative, & "ERISA" Litigation*, 2:08-md-01919 (W.D. Wash.) (*Motion withdrawn*)

6.    Beyond its pro rata share of any recovery, PSOVSF will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 7th day of August, 2008.

_____

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General
Counsel for the Office of the New York City
Comptroller

2

**Exhibit A**
NYC PSOVSF Transactions in Wachovia Corp. common stock
Class Period: 5/8/06 to 6/6/08

| Opening Position | Trade Date | Trans | Quantity | Price |
|---|---|---|---|---|
| 56,177 shares | 6/7/2006 | Buy | 1,500 | 54.47 |
| | 6/30/2006 | Sell | 2,100 | 54.15 |
| | 6/30/2006 | Sell | 400 | 54.08 |
| | 9/26/2006 | Buy | 200 | 55.5 |
| | 10/4/2006** | Buy | 9,564 | 56.72 |
| | 11/3/2006 | Buy | 1,800 | 54.62 |
| | 12/11/2006 | Sell | 700 | 56.11 |
| | 12/11/2006 | Sell | 2,600 | 56.28 |
| | 1/25/2007 | Buy | 100 | 55.76 |
| | 5/31/2007 | Buy | 3,300 | 54.23 |
| | 6/22/2007 | Sell | 300 | 51.84 |
| | 6/22/2007 | Sell | 2,900 | 51.86 |
| | 9/12/2007 | Buy | 2,900 | 48.84 |
| | 10/3/2007** | Buy | 2,534 | 51.37 |
| | 12/10/2007 | Sell | 10,900 | 44.46 |
| | 12/27/2007 | Buy | 400 | 38.52 |
| | 1/15/2008 | Buy | 100 | 35.03 |
| | 1/31/2008 | Buy | 200 | 38.93 |
| | 2/29/2008 | Buy | 700 | 30.62 |
| | 3/31/2008 | Buy | 500 | 27 |
| | 4/30/2008 | Buy | 5,200 | 29.15 |

**Shares received pursuant to the acquisition by Wachovia Corp. of Golden West Financial on 10/4/06 or A.G. Edwards on 10/3/07. The share price shown is the closing price on the day of the acquisition.

## NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | LIFO Recognized Sales** | LIFO Recognized Proceeds** | Shares Retained (LIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NYC Board of Education Retirement System | Fidelity Management - LCG | 337500 | 41,495 | $1,974,536 | 52,130 | $2,152,824 | 6,730 | $356,012 | 34,765 | $548,154 | $(1,070,370) |
| | Blackrock Russell 3000 | 337504 | 0 | | 2,300 | $129,582 | 0 | | 0 | | |
| | PIM Denali | 337801 | 40,865 | $1,939,615 | 6,100 | $322,023 | 6,100 | $322,023 | 34,765 | $548,154 | $(1,069,438) |
| | PIM Piedmont | 337802 | 0 | | 8,800 | $391,952 | 0 | | 0 | | |
| | Aronson Johnson | 346618 | 630 | $34,921 | 4,230 | $222,168 | 630 | $33,989 | 0 | | $(932) |
| NYC Employees' Retirement System | PIM Affinity | 337816 | 905,983 | $42,754,434 | 510,962 | $23,763,880 | 363,165 | $16,141,798 | 542,818 | $8,558,829 | $(18,053,808) |
| | Blackrock Russell 3000 | 337549 | 0 | | 34,800 | $1,305,448 | 0 | | 0 | | |
| | FIS - Transition | 337545 | 456,851 | $21,672,189 | 258,077 | $12,346,495 | 213,676 | $9,035,059 | 243,175 | $3,834,237 | $(8,802,873) |
| | BGI Russell 3000 | 337548 | 9,418 | $510,174 | 29,235 | $523,677 | 9,418 | $508,551 | 0 | | $(1,623) |
| | Amalgamated Bank | 337551 | 331,890 | $15,575,572 | 121,533 | $5,915,150 | 88,045 | $3,925,810 | 243,846 | $3,844,817 | $(7,805,940) |
| | Chicago Equity | 337568 | 80,807 | $3,734,424 | 27,200 | $1,538,026 | 26,000 | $1,473,790 | 54,807 | $864,164 | $(1,396,470) |
| | CP Twin | 349445 | 5,020 | $257,900 | 5,020 | $252,908 | 5,020 | $252,908 | 0 | | $(4,992) |
| | CP Ten | 349466 | 990 | $37,729 | 161 | $4,287 | 161 | $4,287 | 990 | $15,610 | $(22,119) |
| | Altucks Transition | 337570 | 161 | $6,173 | 161 | $4,287 | 161 | $4,287 | 0 | | $(1,885) |
| | Franklin Port | | 14,526 | $624,618 | 14,526 | $628,540 | 14,526 | $628,540 | 0 | | $3,922 |
| | | | 3,839 | $197,209 | 3,839 | $179,056 | 3,839 | $179,056 | 0 | | $(18,153) |
| | PIM-Piedmont | 337818 | 2,480 | $137,466 | 16,570 | $870,293 | 2,480 | $133,796 | 0 | | $(3,670) |
| NYC Fire Dept Pension Fund | Northern Trust | 337849 | 305,015 | $12,817,815 | 243,206 | $10,776,460 | 171,086 | $7,522,668 | 133,929 | $2,111,712 | $(3,183,135) |
| | | 337665 | 42,896 | $2,028,734 | 14,600 | $687,433 | 12,300 | $552,133 | 30,596 | $482,419 | $(994,182) |
| | | 348872 | 510 | $19,436 | 5,600 | $315,504 | 0 | | 510 | $8,041 | $(11,395) |
| | | 337807 | 440 | $24,389 | 2,960 | $155,470 | 440 | $23,738 | 0 | | $(651) |
| | PIM Affinity | 337873 | 47,023 | $2,198,143 | 10,400 | $535,092 | 10,400 | $535,092 | 36,623 | $577,449 | $(1,085,602) |
| | PIM Atlanta Life | 337690 | 83,300 | $2,676,913 | 37,100 | $1,508,629 | 37,100 | $1,508,629 | 46,200 | $728,454 | $(439,630) |
| | Blackrock Russell 3000 | 337675 | 33,114 | $1,413,402 | 39,514 | $2,226,232 | 13,114 | $749,727 | 20,000 | $315,348 | $(348,327) |
| | Lord Abbett | 337678 | 5,513 | $283,151 | 5,513 | $277,695 | 5,513 | $277,695 | 0 | | $(5,456) |
| | WestPeak | 337681 | 4,331 | $222,483 | 4,331 | $202,304 | 4,331 | $202,304 | 0 | | $(20,179) |
| | | 337687 | 2,900 | $161,341 | 12,000 | $521,040 | 2,900 | $125,918 | 0 | | $(35,423) |
| | | 348873 | 84 | $3,221 | 84 | $2,237 | 84 | $2,237 | 0 | | $(984) |
| | | 363866 | 0 | | 1,614 | $69,838 | 0 | | 0 | | |
| | Indlian Asset Mgmt | 337688 | 1,614 | $69,838 | 1,614 | $69,838 | 1,614 | $69,838 | 0 | | |
| | Aronson Johnson | 337689 | 83,290 | $3,716,464 | 83,290 | $3,475,357 | 83,290 | $3,475,357 | 0 | | $(241,107) |
| | PIM Rasara Strategies | 337806 | 0 | | 6,200 | $275,838 | 0 | | 0 | | |
| NYC Police Pension Fund | Northern Trust | 337821 | 941,532 | $39,066,357 | 565,160 | $23,518,965 | 478,260 | $20,763,491 | 463,272 | $7,304,595 | $(11,000,271) |
| | | 337627 | 168,409 | $8,112,001 | 30,000 | $1,556,100 | 30,000 | $1,556,100 | 138,409 | $2,182,350 | $(4,373,551) |
| | Blackrock Russell 3000 | 337629 | 0 | | 15,400 | $867,636 | 0 | | 0 | | |
| | | 337635 | 179,083 | $8,587,257 | 45,700 | $2,367,700 | 45,700 | $2,367,700 | 133,383 | $2,103,103 | $(4,116,454) |
| | Aronson Johnson | 337642 | 23,527 | $1,208,582 | 23,527 | $1,185,290 | 23,527 | $1,185,290 | 0 | | $(23,292) |

**NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- LIFO**

| Fund | Account | Shares | Value | Shares | Value | Shares | Value | Shares | Value | Damages |
|---|---|---|---|---|---|---|---|---|---|---|
| | 363057 | 630 | $ 24,009 | 0 | $ - | 0 | $ - | 630 | $ 9,933 | $ (14,076) |
| | 363058 | 103 | $ 3,949 | 103 | $ 2,743 | 103 | $ 2,743 | 0 | $ - | $ (1,206) |
| | 363081 | 200 | $ 8,048 | 150 | $ 4,117 | 150 | $ 4,117 | 50 | $ 788 | $ (3,143) |
| Indian Asset Mgmt | 337643 | 225,380 | $ 10,057,074 | 225,380 | $ 9,404,719 | 225,380 | $ 9,404,719 | 0 | $ - | $ (652,355) |
| Lord Abbett | 337644 | 344,200 | $ 11,067,437 | 153,400 | $ 6,242,822 | 153,400 | $ 6,242,822 | 190,800 | $ 3,008,420 | $ (1,816,195) |
| **NYC Teachers Retirement System** | | | | | | | | | | |
| BGI | 337478 | 853,483 | $ 41,024,998 | 274,739 | $ 13,115,627 | 224,519 | $ 11,060,201 | 628,964 | $ 9,917,127 | $ (20,047,670) |
| Mellon Russell 3000 | 337479 | 520,549 | $ 24,270,969 | 72,589 | $ 3,518,842 | 72,589 | $ 3,518,842 | 447,960 | $ 7,063,165 | $ (13,688,962) |
| ING (Immy AELTUS) | 337480 | 176,687 | $ 8,343,788 | 31,618 | $ 1,661,067 | 30,898 | $ 1,622,129 | 145,789 | $ 2,298,713 | $ (4,422,946) |
| | 337485 | 107,105 | $ 5,805,582 | 72,800 | $ 3,337,834 | 72,800 | $ 3,337,834 | 34,305 | $ 540,901 | $ (1,926,847) |
| | 363220 | 22,247 | $ 1,142,828 | 22,247 | $ 1,120,804 | 22,247 | $ 1,120,804 | 0 | $ - | $ (22,024) |
| | 363221 | 710 | $ 27,058 | 0 | $ - | 0 | $ - | 710 | $ 11,195 | $ (15,863) |
| | 363242 | 116 | $ 4,447 | 116 | $ 3,089 | 116 | $ 3,089 | 0 | $ - | $ (1,358) |
| | 337481 | 500 | $ 20,120 | 300 | $ 8,233 | 300 | $ 8,233 | 200 | $ 3,153 | $ (8,734) |
| Westpeak | | 25,569 | $ 1,410,206 | 75,069 | $ 3,465,758 | 25,569 | $ 1,449,270 | 0 | $ - | $ (39,064) |
| **NYC TRS Variable Annuity** | | 1,347,398 | $ 67,619,390 | 428,483 | $ 16,773,260 | 397,718 | $ 15,280,950 | 949,680 | $ 14,973,984 | $ (37,364,456) |
| Enhanced VAR A | | 70,236 | $ 2,789,844 | 71,901 | $ 3,562,557 | 41,136 | $ 2,070,247 | 29,100 | $ 458,831 | $ (260,766) |
| Goldman | | 271,200 | $ 10,373,995 | 271,200 | $ 8,874,255 | 271,200 | $ 8,874,255 | 0 | $ - | $ (1,499,740) |
| Wellington | | 20,390 | $ 1,137,762 | 20,390 | $ 1,116,696 | 20,390 | $ 1,116,696 | 0 | $ - | $ (21,066) |
| MCM | | 985,572 | $ 53,317,789 | 64,992 | $ 3,219,752 | 64,992 | $ 3,219,752 | 920,580 | $ 14,515,153 | $ (35,582,884) |
| NYC FOVSF (Northern Trust) | 337852 | 9,201 | $ 432,662 | 3,300 | $ 135,316 | 3,300 | $ 135,316 | 5,901 | $ 93,043 | $ (204,303) |
| NYC FFVSF (Northern Trust) | 337846 | 15,488 | $ 748,269 | 5,700 | $ 257,348 | 5,700 | $ 257,348 | 9,788 | $ 154,331 | $ (336,590) |
| NYC POVSF (Blackrock Russell 3000) | 337860 | 26,415 | $ 1,238,487 | 13,500 | $ 650,887 | 12,600 | $ 602,180 | 13,815 | $ 217,827 | $ (418,480) |
| NYC PSOVSF (Blackrock Russell 3000) | 337835 | 28,998 | $ 1,403,145 | 19,900 | $ 971,512 | 18,900 | $ 917,390 | 10,098 | $ 159,219 | $ (326,536) |
| **TOTAL NYC FUNDS** | | 4,475,008 | $ 209,081,793 | 2,117,080 | $ 92,115,079 | 1,681,978 | $ 73,037,354 | 2,793,030 | $ 44,038,821 | $ (92,005,618) |

* Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 = $15.7674.

**NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO**

| Fund | Manager | Acct. # | Shares Purchased, Class Period | Expenditure | Shares Sold, Class Period | Proceeds | FIFO Recognized Sales** | FIFO Recognized Proceeds** | Shares Retained (FIFO)** | Valuation | (Damages) / Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NYC Board of Education Retirement System | Fidelity Management - LCG | 337500 | 41,495 | $1,974,536 | 52,130 | $2,152,824 | 630 | $32,672 | 40,865 | $644,335 | (1,297,529) |
| | Blackrock Russell 3000 | 337504 | 40,865 | 1,939,615 | 2,300 | 129,582 | 0 | 0 | 40,865 | 644,335 | (1,295,280) |
| | PIM Denali | 337801 | 0 | - | 8,800 | 322,023 | 0 | 0 | 0 | - | - |
| | PIM Piedmont | 337802 | 0 | - | 4,230 | 391,952 | 0 | 0 | 0 | - | - |
| | Aronson Johnson | 348618 | 630 | 34,921 | 30,700 | 1,087,099 | 630 | 32,672 | 0 | - | (2,249) |
| NYC Employees' Retirement System | PIM Affinity | 337816 | 905,983 | $42,754,434 | 510,962 | $23,763,880 | 35,146 | $1,549,266 | 870,837 | $13,730,835 | (27,474,343) |
| | Blackrock Russell 3000 | 337549 | 456,851 | 21,672,169 | 34,000 | 1,505,448 | 0 | 0 | 456,851 | 7,203,362 | (14,468,817) |
| | FIS - Transition | 337545 | 9,418 | 510,174 | 258,077 | 12,346,495 | 9,119 | 355,851 | 299 | 4,714 | (149,609) |
| | BGI Russell 3000 | 337548 | 331,890 | 15,576,677 | 29,235 | 523,677 | 0 | 0 | 331,890 | 5,233,042 | (10,343,530) |
| | Amalgated Bank | 337551 | 80,807 | 3,734,424 | 27,200 | 1,538,026 | 0 | 0 | 80,807 | 1,274,116 | (2,460,308) |
| | Chicago Equity | 337568 | 5,020 | 257,900 | 5,020 | 252,908 | 5,020 | 252,908 | 0 | - | (4,992) |
| | CP Twin | 349445 | 990 | 37,729 | 990 | 15,610 | 990 | 15,610 | 0 | - | (22,119) |
| | CP Ten | 349446 | 161 | 6,173 | 161 | 4,287 | 161 | 4,287 | 0 | - | (1,885) |
| | Attucks Transition | 349466 | 14,526 | 624,618 | 14,526 | 628,540 | 14,526 | 628,540 | 0 | - | 3,922 |
| | Franklin Port | 337570 | 3,839 | 197,209 | 3,839 | 179,056 | 3,839 | 179,056 | 0 | - | (18,153) |
| | PIM-Piedmont | 337818 | 2,480 | 137,466 | 16,570 | 870,293 | 2,480 | 128,613 | 0 | - | (8,853) |
| NYC Fire Dep't Pension Fund | Northern Trust | 337849 | 305,015 | $12,817,515 | 243,206 | $10,775,460 | 148,386 | $6,417,869 | 156,629 | $2,469,632 | (3,930,014) |
| | | 337865 | 42,896 | 2,028,734 | 14,800 | 687,433 | 0 | 0 | 42,896 | 676,358 | (1,352,376) |
| | | 348872 | 0 | - | 5,600 | 315,504 | 0 | 0 | 0 | - | - |
| | PIM Affinity | 337807 | 510 | 19,436 | - | - | 0 | 0 | 510 | 8,041 | (11,395) |
| | PIM Atlanta Life | 337873 | 440 | 24,389 | 2,960 | 155,470 | 440 | 22,818 | 0 | - | (1,571) |
| | Blackrock Russell 3000 | 337690 | 47,023 | 2,198,143 | 10,400 | 535,092 | 0 | 0 | 47,023 | 741,430 | (1,456,713) |
| | Lord Abbett | 337675 | 83,300 | 2,676,951 | 37,100 | 1,508,629 | 37,100 | 1,508,629 | 46,200 | 728,454 | (439,830) |
| | Westpeak | 337678 | 33,114 | 1,413,402 | 39,514 | 2,226,232 | 13,114 | 733,073 | 20,000 | 315,348 | (364,981) |
| | | 337681 | 5,513 | 283,151 | 5,513 | 277,695 | 5,513 | 277,695 | 0 | - | (5,456) |
| | | 337687 | 4,331 | 222,483 | 4,331 | 202,304 | 4,331 | 202,304 | 0 | - | (20,179) |
| | | 348873 | 2,900 | 161,341 | 2,900 | 521,040 | 2,900 | 125,918 | 0 | - | (35,423) |
| | Irian Asset Mgmt | 363668 | 84 | 3,221 | 84 | 2,237 | 84 | 2,237 | 0 | - | (984) |
| | Aronson Johnson | 337688 | 1,614 | 69,838 | 1,614 | 69,838 | 1,614 | 69,838 | 0 | - | - |
| | PIM Rasara Strategies | 337689 | 83,290 | 3,716,464 | 83,290 | 3,475,357 | 83,290 | 3,475,357 | 0 | - | (241,107) |
| | | 337806 | 0 | - | 6,200 | 275,838 | 0 | - | 0 | - | - |
| NYC Police Pension Fund | Northern Trust | 337821 | 941,532 | $39,068,357 | 565,160 | $23,518,965 | 402,560 | $16,839,691 | 538,972 | $8,498,187 | (13,730,479) |
| | | 337627 | 168,409 | 8,112,001 | 30,000 | 1,556,100 | 0 | 0 | 168,409 | 2,655,372 | (5,456,629) |
| | | | 0 | - | 15,000 | 867,636 | 0 | - | 0 | - | - |
| | Blackrock Russell 3000 | 337629 | 179,083 | 8,587,257 | 45,700 | 2,367,700 | 0 | 0 | 179,083 | 2,823,673 | (5,763,584) |
| | | 337635 | 23,527 | 1,208,582 | 23,527 | 1,185,290 | 23,527 | 1,185,290 | 0 | - | (23,292) |

## NYC Funds Damages Summary -- Wachovia Corp. Securities Litigation -- Class Period: May 8, 2006 to June 6, 2008 -- FIFO

| Fund / Account | | | | | | | | | Gain/(Loss) |
|---|---|---|---|---|---|---|---|---|---|
| **Aronson Johnson** | | | | | | | | | |
| 337642 | 0 $ | - | 71,500 $ | 1,887,838 | 0 $ | 0 | 0 $ | - | $ (14,076) |
| 363057 | 630 $ | 24,009 | 0 $ | - | 0 $ | 0 | 630 $ | 9,933 | $ (1,206) |
| 363058 | 103 $ | 3,949 | 103 $ | 2,743 | 103 $ | 2,743 | 0 $ | - | $ (3,143) |
| 360081 | 200 $ | 8,048 | 150 $ | 4,117 | 150 $ | 4,117 | 50 $ | 788 | $ (652,355) |
| Iridian Asset Mgmt 337643 | 225,380 $ | 10,057,074 | 225,380 $ | 9,404,719 | 225,380 $ | 9,404,719 | 0 $ | - | $ (1,816,195) |
| Lord Abbett 337644 | 344,200 $ | 11,067,437 | 153,400 $ | 6,242,822 | 153,400 $ | 6,242,822 | 190,800 $ | 3,008,420 | |
| **NYC Teachers Retirement System** 337478 | 853,483 $ | 41,024,998 | 274,739 $ | 13,115,627 | 60,420 $ | 2,343,608 | 793,063 $ | 12,504,542 | $ (26,176,848) |
| BGI 520,549 | $ | 24,270,969 | 72,589 $ | 3,518,842 | 0 $ | - | 520,549 $ | 8,207,704 | $ (16,063,265) |
| Mellon Russell 3000 176,687 | $ | 8,343,788 | 31,618 $ | 1,661,067 | 0 $ | - | 176,687 $ | 2,785,895 | $ (5,557,893) |
| ING (fmrly AELTUS) 107,105 | $ | 5,805,582 | 72,800 $ | 3,337,834 | 12,188 $ | 334,439 | 94,917 $ | 1,496,594 | $ (3,974,549) |
| 22,247 | $ | 1,142,828 | 22,247 $ | 1,120,804 | 22,247 $ | 1,120,804 | 0 $ | - | $ (22,024) |
| 710 | $ | 27,058 | 116 $ | 3,089 | 710 $ | - | 710 $ | 11,195 | $ (15,883) |
| 116 | $ | 4,447 | 116 $ | 3,089 | 116 $ | 3,089 | 0 $ | - | $ (1,356) |
| 4,447 | $ | 20,120 | 300 $ | 8,233 | 300 $ | 8,233 | 200 $ | 3,153 | $ (8,734) |
| Westpeak 337481 | 25,569 $ | 1,410,206 | 75,069 $ | 3,465,758 | 25,569 $ | 877,043 | 0 $ | - | $ (533,163) |
| **NYC TRS Variable Annuity** | 1,347,398 $ | 67,619,390 | 428,483 $ | 16,773,260 | 356,582 $ | 13,210,703 | 990,816 $ | 15,622,592 | $ (38,786,095) |
| Enhanced VAR A | 70,236 $ | 2,789,844 | 71,901 $ | 3,562,557 | 0 $ | - | 70,236 $ | 1,107,439 | $ (1,682,405) |
| Goldman | 271,200 $ | 10,373,895 | 271,200 $ | 8,874,255 | 271,200 $ | 8,874,255 | 0 $ | - | $ (1,499,740) |
| Wellington | 20,390 $ | 1,137,762 | 20,390 $ | 1,116,696 | 20,390 $ | 1,116,696 | 0 $ | - | $ (21,066) |
| MCM | 985,572 $ | 53,317,789 | 64,992 $ | 3,219,752 | 64,992 $ | 3,219,752 | 920,580 $ | 14,515,153 | $ (35,582,884) |
| **NYC FGVSF (Northern Trust)** 337852 | 9,201 $ | 432,662 | 3,300 $ | 135,316 | 0 $ | - | 9,201 $ | 145,076 | $ (287,586) |
| **NYC FFVSF (Northern Trust)** 337846 | 15,488 $ | 748,289 | 5,700 $ | 257,348 | 0 $ | - | 15,488 $ | 244,205 | $ (504,064) |
| **NYC PGVSF (Blackrock Russell 3000)** 337860 | 26,415 $ | 1,238,487 | 13,500 $ | 650,887 | 0 $ | - | 26,415 $ | 416,496 | $ (821,991) |
| **NYC PSQVSF (Blackrock Russell 3000)** 337835 | 28,998 $ | 1,403,145 | 19,900 $ | 971,512 | 0 $ | - | 28,998 $ | 457,223 | $ (945,922) |
| **TOTAL NYC FUNDS** | 4,475,008 $ | 209,081,793 | 2,117,000 $ | 92,115,079 | 1,003,724 $ | 40,393,799 | 3,471,284 $ | 54,733,123 | $ (113,954,871) |

* Pursuant to the PSLRA, shares held at the end of the Class Period were valued at their average closing price during the 90 days following the close of the class period. As 90 days have not yet passed, the shares were valued at the average closing price between 6/7/08 and 8/1/08 -- $15.7674

** Pursuant to FIFO methodology, proceeds from class period sales of shares that were purchased pre-class period are disregarded in the calculation. Only when all pre-class period positions have been closed by subsequent sales do we begin to match sales against class period purchases and offset the proceeds of the sales against the class period expenditures.