# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JACKSONVILLE POLICE AND FIRE PENSION FUND, on behalf of itself and all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO. 08-CV-4772-LAP** |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO, and ROBERT LEWIS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| JAMES CONNOLLY, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | **CIVIL ACTION NO. 08-CV-5072-LAP** |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| AMERICAN INTERNATIONAL GROUP, MARTIN J. SULLIVAN, STEVEN J. BENSINGER, JOSEPH J. CASSANO, ROBERT E. LEWIS, and DAVID L. HERZOG, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**(Captions continued on subsequent page)**

## PLAINTIFFS' MEMORANDUM OF LAW IN
## <u>SUPPORT OF THEIR MOTION FOR DISQUALIFICATION</u>

| | |
|---|---|
| MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO, and ROBERT LEWIS, <br><br> Defendants. | **CIVIL ACTION NO. 08-CV-5464-LAP** |
| ONTARIO TEACHERS' PENSION PLAN BOARD, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO, and ROBERT LEWIS, <br><br> Defendants. | **CIVIL ACTION NO. 08-CV-5560-LAP** |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................. 3

III. PROCEDURAL HISTORY............................................................................... 4

IV. MR. KAVALER'S AND CAHILL'S REPRESENTATION OF AIG .................... 6

V. ARGUMENT ..................................................................................................... 9

   A. Legal Standard ......................................................................................... 9

   B. Mr. Kavaler's Relationship With AIG as Outside Counsel Requires
      Disqualification Under Both Sections 455(a) & 455(b) .......................... 13

     1. Disqualification Under Section 455(a) ........................................... 13

     2. Disqualification Under the Code of Conduct and Compendium ..... 17

     3. Disqualification Under Section 455(b) ........................................... 19

     4. Judge Preska Should Exercise Her Discretion to Recuse ............... 21

VI. CONCLUSION.................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

CASES

*In re Basciano*,
    542 F.3d 950 (2d Cir. 2008)...................................................................................9

*Canino v. Barclays Bank, PLC*,
    1998 WL 7219 (S.D.N.Y. 1998).............................................................................22

*Canino v. Barclays Bank, PLC*,
    No. 94-CV-6314,1998 WL 7219 (S.D.N.Y. Jan. 7,1998) ...............................15, 22

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
    343 F.3d 120 (2d Cir. 2003)...........................................................................13, 14

*Davis v. Jones*,
    506 F.3d 1325 (11th Cir. 2007) ..............................................................................9

*In re Digital Music Antitrust Litig.*,
    No. 06 MDL No. 1780, 2007 WL 632762 (S.D.N.Y. Feb. 27, 2007) ....................16

*Diversifoods, Inc. v. Diversifoods, Inc.*,
    595 F. Supp. 133 (N.D. Ill. 1984) .........................................................................18

*Draper v. Reynolds*,
    369 F.3d 1270 (11th Cir. 2004) .............................................................................17

*In re Drexel Burnham Lambert Inc.*,
    861 F.2d 1307 (2d Cir. 1988)...........................................................................10, 14

*Hoke v. Charlotte-Mecklenburg Hosp. Auth., Inc.*,
    550 F. Supp. 1276 (W.D.N.C. 1982) .....................................................................19

*Liljeburg v. Health Services Acquisition Corp.*,
    486 U.S. 847 (1988).................................................................................9, 10, 17

*Liteky v. Unites States*,
    510 U.S. 540 (1994)...............................................................................................9

*In re Literary Works in Elec. Databases Copyright Litig.*,
    509 F.3d 136 (2d Cir. 2007).................................................................................10

*LoCascio v. United States*,
    473 F.3d 493 (2d Cir. 2007)...........................................................................10, 14

*Martingano v. Am. Int'l Group, Inc. et al.*,
06-CV-1625 (E.D.N.Y. Sept. 25, 2007), *appeal docketed*, No. 07-CV-4727
(2d Cir. Oct. 26, 2007) ................................................................................................7

*In re Mason*,
916 F.2d 384 (7th Cir. 1990) .....................................................................................11

*Matter of Billedeaux*,
972 F.2d 104 (5th Cir. 1992) ......................................................................................15

*Matter of Hatcher*,
150 F.3d 631 (7th Cir. 1998) ......................................................................................13

*Matter of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
839 F.2d 1226 (7th Cir. 1988) ....................................................................................12

*Mead Johnson Co. v. Abbott Labs.*,
No. EV-98-131-C H/H, 1999 WL 778592 (S.D. Ind. Feb. 22, 1999) ......................17

*Microsoft Corp. v. United States*,
530 U.S. 1301 (2000)..................................................................................................23

*Potashnick v. Port City Const. Co.*,
609 F.2d 1101 (5th Cir.1980) .................................................................................9, 10

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
No. 97 Civ. 5499, 2003 WL 282187 (S.D.N.Y. Feb. 7, 2003) ...........................15, 16

*Union Carbide Corp. v. U.S. Cutting Serv., Inc.*,
782 F.2d 710 (7th Cir. 1986) ......................................................................................17

*United States v. Amico*,
486 F.3d 764 (2d Cir. 2007)....................................................................................9, 10

*United States v. Damron*,
No. CRIM-C3-95-103, 1998 WL 1780621 (D.N.D. Aug. 24, 1998) ........................19

*United States v. DeTemple*,
162 F.3d 279 (4th Cir. 1998) ......................................................................................11

*United States v. Jordan*,
49 F.3d 152 (5th Cir. 1995) .........................................................................................11

*United States v. Miell*,
No. 07-CR-101-LRR, 2008 WL 974843 (N.D. Iowa Apr. 8, 2008).........................19

*United States v. Snyder,*
   235 F.3d 42 (1st Cir. 2000) ........................................................................9

*United States v. Vazquez-Botet,*
   532 F.3d 37 (1st Cir. 2008) ......................................................................15

*In re Virginia Elec. & Power Co.,*
   539 F.2d 357 (4th Cir. 1976) ....................................................................20

**STATUTES**

28 U.S.C. § 455 .......................................................................... passim

28 U.S.C. § 455(a) ...................................................................... passim

28 U.S.C. § 455(b)(4) .................................................................. passim

28 U.S.C. § 455(b)(5)(iii) ......................................................2, 12, 20

28 U.S.C. § 455(d)(4) ....................................................................12

C.C.A.N. 6351, 6355 .......................................................................9

**OTHER AUTHORITIES**

H.R.Rep. No. 93-1453 (1974) ...........................................................9

H.R.Rep. No. 93-1453, *reprinted in* 1974 U.S.C.C.A.N. 6351 ...................................10

The State of Michigan Retirement Systems ("Michigan"), Ontario Teachers'

Pension Plan Board ("OTPP") and Stichting Pensioenfonds Zorgen Welzijn, as duly

represented by PGGM Vermogensbeheer B.V. ("PGGM" and, collectively with Michigan

and OTPP, "Plaintiffs"), each of which has filed motions seeking appointment as Lead

Plaintiff in this action against American International Group, Inc. ("AIG" or the

"Company"), respectfully submit this memorandum of law in support of their joint

motion for disqualification under 28 U.S.C. § 455.

## I. PRELIMINARY STATEMENT

Should a federal district judge continue to preside over a case where, as here, the

judge's spouse has an attorney-client relationship with and currently represents the

principal defendant in a separate ongoing litigation; serves on the management committee

of a law firm that regularly represents that defendant and has in recent years received

████████████fees from that significant client; has, as a senior equity partner of

his firm████████████████ for each year since at least 2002 brought

into the household he shares with the judge████████████████████

████████████████that is directly traceable to fees paid by that client; and

could well experience a significant reduction of this valuable income stream if the client

is adversely affected by the multi-billion dollar litigation pending before his wife?

As a matter of common sense, fairness, and the appearance of judicial propriety,

the question answers itself.  Of course recusal is required.  And, as explained further

below, the law of judicial disqualification commands that proper result.  The Honorable

Loretta A. Preska should recuse herself and this high-profile action should be transferred

to one of the many other qualified jurists in the Southern District of New York who are free from the debilitating circumstances discussed below.

These circumstances unquestionably satisfy the standard for judicial disqualification.  The relevant statute, 28 U.S.C. § 455, requires that a federal judge "**shall** disqualify [her]self in any proceeding in which [her] impartiality **might** reasonably be questioned."  28 U.S.C. § 455(a) (emphasis added).  Obviously, a reasonable lay observer aware of the facts at hand **might** reasonably question this particular judge's impartiality.  To conclude otherwise is to blink at reality. The statute also requires a judge to disqualify herself where she "knows that . . . [her] spouse . . . has a financial interest in the subject in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).  Along similar lines, a separate provision of the statute requires that a judge "shall also disqualify [her]self" where she or her spouse "[is] known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii).

Given the risk that this lawsuit could pose to Cahill's AIG-related income stream, and the appearance that would be created were this Court to preside over this matter, the plain meaning and obvious intent of these provisions clearly require recusal in this case. Indeed, as the Committee on the Codes of Conduct of the Judicial Conference of the United States explained with respect to a substantially similar scenario, "[w]here parties before the judge are, in other matters, clients of the judge's spouse, and the spouse (or the

spouse's law firm) regularly represents the clients in other matters, the judge should either recuse or use the remittal process."[1]

For these reasons, and those discussed below, we respectfully submit that, in accordance with 28 U.S.C. § 455 and in the interests of continued public faith in the integrity and incorruptibility of our judicial system, Judge Preska should recuse herself from this matter.

## II.  FACTUAL BACKGROUND

This securities fraud class action seeks to recover billions of dollars on behalf of investors deceived by defendant AIG's concealment of massive liabilities arising from the Company's portfolio of credit default swaps ("CDS").  As alleged in the complaints on file, throughout the class period,[2] the Company overstated AIG's earnings and financial position, repeatedly reassuring investors that its CDS portfolio was secure and that AIG's method for accounting for the valuations of this portfolio was proper.  AIG's stock price plummeted—down from a class period high of $72.81 per share to its current per share price below $2.00—as the Company made multiple corrective disclosures during 2008, revealing that the value of AIG's CDS portfolio had been greatly exaggerated in public disclosures and that the Company's financial health was significantly overstated.

---

[1] 2 Guide to Judicial Policies and Procedures, Code of Conduct for United States Judges, Compendium § 3.2-2(d)(d-2) (2007).

[2] The class period referred to herein is November 10, 2006 through June 6, 2008, which is the longest class period asserted in any of the filed complaints.  In accordance with the normal practice in this District and elsewhere, the investor(s) ultimately appointed as Lead Plaintiff will determine the controlling class period allegation in an amended pleading.

As widely reported, by early September, the continuing troubles stemming from AIG's CDS exposure appeared to be pushing the Company toward bankruptcy. Fearing that the collapse of the world's largest insurer could send ripple effects through the global economy, on September 24, 2008, the U.S. Federal Reserve extended AIG an unprecedented $85 billion emergency loan in exchange for a 79.9 percent stake in the Company. Following the government bailout, a congressional oversight committee initiated an investigation into the practices at AIG and called on senior executives of the Company to testify before Congress to account for, among other things, their actions and public statements concerning the CDS portfolio—the very conduct at the heart of the claims in this action.

### III. PROCEDURAL HISTORY

In the wake of the disclosures revealing the wrongdoing at AIG, investors filed four securities class actions seeking to recover the billions in losses the investing public suffered as a result of the fraud. Each of the cases was initially assigned to the Honorable Richard J. Sullivan of this District. On May 23, 2008, after the first of these four cases was filed, AIG requested transfer to Judge Preska on the basis that she was then presiding over an earlier-filed shareholder derivative action involving the Company. On May 30, 2008, Judge Preska filed a notice on the securities case docket before Judge Sullivan stating that Cahill Gordon & Reindel LLP ("Cahill" or the "Firm"), the law firm in which

her husband, Mr. Thomas J. Kavaler is a partner, "from time to time represents [AIG] and/or its affiliates" and that Mr. Kavaler "works on some of those matters." Ex. A.[3]

Following the filing of the second case on June 3, 2008, AIG again requested that the securities class action be transferred to Judge Preska. The plaintiff in the second action, James Connolly, wrote to Judge Sullivan on June 9th and objected to the proposed transfer because, among other things and as set forth in Judge Preska's May 30th filing, Judge Preska's husband is a partner at Cahill and worked on AIG matters. Ex. B. AIG responded with another letter on June 10th reiterating its request for a transfer to Judge Preska. Ex.C. On June 16th, the plaintiff in the first action, Jacksonville Police & Fire Pension Fund, wrote to Judge Sullivan and objected to the transfer because Judge Preska's husband currently represents AIG in a securities class action brought in the Eastern District of New York and pending on appeal before the Second Circuit. Ex. D. On June 26th, Judge Sullivan convened a conference in which all four securities action plaintiffs opposed AIG's requested transfer.

On July 21st, OTPP and PGGM, on one hand, and Michigan, on the other, filed competing motions seeking lead plaintiff status under the Private Securities Litigation Reform Act ("PSLRA"). After briefing of those motions was complete, but before Judge Sullivan had rendered a decision on the lead plaintiff applications, AIG again wrote to the Court requesting that the securities actions be reassigned to Judge Preska. Ex. E. Plaintiffs again objected to the requested transfer, citing the conflict presented by Judge Preska's husband's concurrent representation of AIG. Ex. F.

---

[3] Reference throughout this memorandum of law to "Ex. __" is to the Declaration of Gerald H. Silk in Support of Plaintiffs' Motion for Disqualification, submitted herewith.

On August 21, 2008, an order was entered by the Clerk of the Court reassigning all four cases to Judge Preska. Ex. G. On September 10, 2008, in their first submission to the Court following the transfer, Plaintiffs jointly requested a pre-motion conference to address recusal. Ex. H.

On September 16, 2008 the Court granted Plaintiffs' request to seek limited discovery on the recusal issue, and in response to the subsequent request, Cahill produced the Declaration of Edward Krugman, a Cahill partner. Ex. I (the "Krugman Decl."). In addition to the publicly-available information illustrating the substantial relationship between AIG and Mr. Kavaler's firm, including Mr. Kavaler's concurrent representation of AIG in a separate securities class action pending on appeal in the Second Circuit, the facts disclosed in the Krugman Decl. confirm that the substantial and ongoing relationship between the principal defendant in this action and Judge Preska's husband and his law firm requires recusal.

## IV.  MR. KAVALER'S AND CAHILL'S REPRESENTATION OF AIG

For years, AIG and its related companies have regularly and repeatedly called on Cahill to represent their interests and, in so doing, have contributed█████████████ ███████the Firm's revenues and, as a result,███████████personally to Mr. Kavaler and the Kavaler household. Cahill's website touts its representation of AIG in litigation, in raising capital to finance acquisitions, and in reinsurance and insurance matters.[4] Legal news media have repeatedly recognized AIG as one of Cahill's most important clients. For example, over the past decade, the *National Law Journal* has

---

[4] *See* http://www.cahill.com/practices/050.

frequently described Cahill as one of AIG's "most-used outside counsel" for litigation, corporate and/or corporate governance matters.  Ex. J.  An article in *Legal Week* has described Cahill as a "regular advisor" to AIG.  Ex. K.

Significantly, AIG's retention of Cahill and Mr. Kavaler has generated almost █████ ████████ in revenues for the firm over the last seven years alone.  During this time, fees paid by AIG represent ██████████████████ of Cahill's total gross revenues.  Cahill currently represents AIG in seven ongoing litigations, has previously represented AIG in seventeen concluded cases, and has █████████████████ through advising AIG and related companies in reinsurance, tax, transactional, investigatory and other matters.

Mr. Kavaler has played a significant role in building and maintaining this critical retention for the firm.  Currently, Mr. Kavaler personally represents AIG in a securities class action pending on appeal before the Second Circuit.  *Martingano v. American Int'l Group, Inc. et al.*, 06-CV-1625 (JG) (E.D.N.Y. Sept. 25, 2007), *appeal docketed*, No. 07-CV-4727 (2d Cir. Oct. 26, 2007).  As the lead counsel on the case, Mr. Kavaler personally argued the successful motion to dismiss in the district court and is scheduled to argue the appeal.  The legal positions successfully advanced by Mr. Kavaler in the Eastern District and which he will no doubt pursue on behalf of AIG in the Second Circuit—including, for example, the plaintiffs' burdens in satisfying the pleading standards of the PSLRA—will likewise be vigorously advocated by Mr. Kavaler's client in this action.

As one of Cahill's senior partners and top litigators, Mr. Kavaler and his household enjoy a substantial stake in the profits of the firm.  Mr. Kavaler has been a

Cahill partner since 1980 and currently serves as one of only six members of the 260-attorney law firm's executive management committee. Based on his senior leadership position at the Firm and percentage participation in Cahill's annual profits, under a conservative estimate, Mr. Kavaler and his household have received almost ███████ in income directly traceable to fees paid by AIG over those seven years. As shown in the chart below, Plaintiffs estimate that between ███████████ per year of Mr. Kavaler's annual take-home pay is directly attributable to the business he and his law firm derive from their representation of the principal defendant in this action.

| Year | Percent of Cahill Revenue Derived from AIG | Cahill Net Income | Estimate of Cahill Net Income Attributable to AIG Fees | Estimate of Mr. Kavaler's Take-Home Income Traceable to AIG Fees[5] |
|---|---|---|---|---|
| 2007 | ███ | ███ | ███ | ███ |
| 2006 | ███ | ███ | ███ | ███ |
| 2005 | ███ | ███ | ███ | ███ |
| 2004 | ███ | ███ | ███ | ███ |
| 2003 | ███ | ███ | ███ | ███ |
| 2002 | ███ | ███ | ███ | ███ |
| Total | ███ | ███ | ███ | ███ |

---

[5] The figures in this chart were either provided in or have been derived from data set forth in the Krugman Decl. The percentage figures in the column labeled "Percent of Cahill Revenue Derived From AIG" were calculated by dividing the figures labeled "Cahill Revenue from AIG Companies" by those labeled "Cahill Gross Revenue, All Clients" in the Krugman Decl. *See* Krugman Decl. at ¶ 5. The figures in the column labeled "Cahill Net Income" were provided in the Krugman Decl. *See* Krugman Decl. at ¶ 6. The figures in the column labeled "Estimate of Cahill Net Income Attributable to AIG Fees" were calculated by multiplying the percentage of Cahill's annual revenue attributable to AIG by Cahill's net income for each particular year (that is, the figures in the second column are multiplied by the figures in the third column). For example, as Cahill's gross and net incomes were provided in the aggregate, for the year 2007 Plaintiffs have assumed that the fees paid by AIG were used to pay ███████████ of the net income. The figures in the column labeled "Estimate of Mr. Kavaler's Take-Home Income Attributable to AIG Fees" were calculated by applying Mr. Kavaler's equity stake in Cahill's profits, for each year in question, as set forth in the Krugman Decl., to the figures set forth in the column for "Estimate of Cahill Net Income Attributable to AIG Fees." *See* Krugman Decl. at ¶ 10.

Thus, Mr. Kavaler and his Firm's representation of AIG have had, and in all likelihood will continue to have, a direct and substantial impact on the financial position of the Kavaler household.

Given the extent of Mr. Kavaler's take-home pay attributable to fees from AIG, it cannot be doubted that a fair-minded observer might reasonably question the Court's impartiality, particularly where, as here, it is conceivable that decisions in this case— which has already become one of the central narratives in the current economic crisis— could affect the viability of AIG and thus its future need for the services of, and its ability to pay, outside counsel such as Cahill.

## V. ARGUMENT

### A. Legal Standard

The disqualification of federal judges is governed by 28 U.S.C. § 455. Section 455(a) requires a judge to disqualify herself from any proceeding in which her impartiality might reasonably be questioned. *Liteky v. Unites States*, 510 U.S. 540, 548 (1994); *Liljeburg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988).[6] Section 455(a) "deals exclusively with appearances," *In re Basciano*, 542 F.3d 950, 956 (2d Cir. 2008), and "'stems from the recognized need for an unimpeachable judicial system in which the public has unwavering confidence,'" *Davis v. Jones*, 506 F.3d 1325,

---

[6] When Congress amended 28 U.S.C. § 455 in 1974 so as to eliminate a judge's "duty to sit" in very close cases by adding the "might reasonably be questioned" standard of § 455(a), it did so out of concern that a judge who presides with complete impartiality may nonetheless undermine public confidence in the judiciary when there is an appearance of a conflict of interest. *U.S. v. Amico*, 486 F.3d 764, 775 n.3 (2d Cir. 2007) (*citing* H.R.Rep. No. 93-1453 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6351, 6355 ("[The new] general standard [of § 455(a) ] . . . has the effect of removing the so-called 'duty to sit' which has become a gloss on the existing statute."); *see also United States v. Snyder*, 235 F.3d 42, 46 n. 1 (1st Cir. 2000); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111-12 (5th Cir.1980)).

1332 (11th Cir. 2007) (*quoting Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980)).  The statute is designed to "promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2d Cir. 2007) (*citing* H.R.Rep. No. 93-1453, *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355).  Thus, if the circumstances might "raise any doubt in the mind of a reasonable person as to [the Court's] ability to decide the present case fairly," then the judge must recuse herself. *LoCascio v. United States*, 473 F.3d 493, 496 (2d Cir. 2007); *see also In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1309 (2d Cir. 1988) ("It is axiomatic that a judge may not preside over a case when his impartiality might reasonably be questioned.")

This standard is objective.  *Liljeburg*, 486 U.S. at 848.  It does not matter if the judge is in fact impartial, or if the judge does not know the disqualifying facts, or even if the judge is "pure in heart and incorruptible." *Liljeburg*, 486 U.S. at 860.  "[W]hat matters is not the reality of bias or prejudice but its *appearance*." *Literary Works*, 509 F.3d at 140 (emphasis in original).

Since recusal under Section 455(a) is based on appearance, a judge's representations concerning why recusal is not needed are insufficient to avoid recusal under Section 455(a) if the judge's participation in an action might create a question as to the judge's impartiality.  *See United States. v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) ("While we credit the judge's explanation of what transpired with regard to his mortgage

application, this test deals exclusively with appearances. Its purpose is the protection of

the public's confidence in the impartiality of the judiciary").

Courts have observed that the objective recusal standard "requires a nuanced

approach." *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998).

> On the one hand, we must keep in mind that the hypothetical reasonable
> observer is not the judge himself or a judicial colleague but a person
> outside the judicial system. Judges, accustomed to the process of
> dispassionate decision making and keenly aware of their Constitutional
> and ethical obligations to decide matters solely on the merits, may regard
> asserted conflicts to be more innocuous than an outsider would. On the
> other hand, a reasonable outside observer is not a person unduly
> suspicious or concerned about a trivial risk that a judge may be biased.

*Id*. Thus, judges must take care to imagine how a reasonable, well-informed outside

observer of the judicial system would react. *In re Mason*, 916 F.2d 384, 386 (7th Cir.

1990). As Judge Easterbrook observed:

> [D]rawing all inferences favorable to the honesty and care of the judge
> whose conduct has been questioned could collapse the appearance of
> impropriety standard under § 455(a) into a demand for proof of actual
> impropriety. So although the court tries to make an external reference to
> the reasonable person, it is essential to hold in mind that these outside
> observers are less inclined to credit judges' impartiality and mental
> discipline than the judiciary itself will be.

*Id*.; *see also DeTemple*, 162 F.3d at 287. *United States v. Jordan*, 49 F.3d 152, 156-57

(5th Cir. 1995).

In addition to the requirements of Section 455(a), Section 455(b) lists several

specific instances in which disqualification is mandated. As relevant here, Section

455(b)(4) requires the judge to disqualify herself from any case in which she knows her

spouse has a financial interest in a party to the proceeding. 28 U.S.C. § 455(b)(4). A

"financial interest" means "ownership of a legal or equitable interest, however small, or a

relationship as director, adviser, or other active participant in the affairs of a party." 28 U.S.C. § 455(d)(4).  Moreover, beyond a judge's spouse's financial interest in a party, Section 455(b)(4) requires recusal where the judge or the judge's spouse has "*any* other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4) (emphasis added).  Likewise, Section 455(b)(5)(iii) requires recusal where a judge or her spouse  "[is] known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii). Thus, even absent a "financial interest" as the term is defined by Section 455(b)(4), the broad language of Section 455(b)(4) requires recusal where "any other interest" is implicated.

To the extent a given set of circumstances is held not to satisfy the technical requirements of Section 455(b), courts must nevertheless consider and analogize to the situations outlined in Section 455(b) in defining the scope of section 455(a), because "affiliations that pose risks similar to those identified in § 455(b) may call for disqualification under § 455(a)."  *Matter of  National Union Fire Ins. Co. of Pittsburgh, Pa.,* 839 F.2d 1226, 1229 (7th Cir. 1988); *see also* Wright, *et al*., 13A Federal Practice and Procedure: Jurisdiction 2d § 3549, at 613-14 ("Because of [the] general provision of § 455(a), an overly-nice reading is not required of the specific instances of disqualification spelled out in § 455(b).").  "Even if analogies to the § 455(b) categories do not exhaust the possibilities for a § 455(a) recusal, the analogous situations must be evaluated with great care by judges."  *Matter of Hatcher,* 150 F.3d 631, 637 (7th Cir. 1998).

**B.    Mr. Kavaler's Relationship With AIG as Outside Counsel Requires Disqualification Under Both Sections 455(a) & 455(b)**

**1.    Disqualification Under Section 455(a)**

Mr. Kavaler currently represents AIG in a securities fraud class action pending before the Second Circuit, and represented AIG in the district court as well.  Mr. Kavaler's law firm regularly represents AIG in other matters, including at least seven pending litigations and multiple other litigations in the last six years.[7] As a percentage partner at Cahill, Mr. Kavaler derives a substantial income from AIG both in real dollars and as a percentage of overall income.  Since 2002, AIG has paid more than ▮▮▮▮▮▮ in fees to Cahill—at least ▮▮▮ of Cahill's overall income—and Mr. Kavaler was entitled to at least ▮▮▮ of Cahill's profits, resulting in nearly ▮▮▮▮▮ in fees paid to Mr. Kavaler.  Since 2004, Mr. Kavaler has personally billed on behalf of Cahill (on average) ▮▮▮▮▮ per year to AIG companies.  Moreover, as a partner of Cahill, Mr. Kavaler directly benefits from hours billed by other Cahill partners and associates regardless of the hours he has actually billed to AIG.

The crux of the test for recusal under Section 455(a) is not that the conflict *will* cause a judge to rule in a particular manner but how the public views the conflict and whether the judge's impartiality *might* reasonably be questioned.  In *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003), the Second Circuit held that recusal was warranted because the judge presiding over that case had a joint investment of $300,000, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7] These figures do not include non-litigation matters, which account for roughly a quarter of Cahill's fees from AIG.  *See* Krugman Decl ¶ 6.

██████████████████████████ in a party before him.  The Second Circuit

rejected the notion that recusal was not warranted because there was "no possibility . . .

that the judge ruled for the banks in order to enrich himself;" rather, the Second Circuit

explained:

> We are fully confident of our observation that the judge had no real
> financial stake in the outcome.  However, we are equally confident that
> Congress was right in apprehending that a headline (accurately) stating
> that the judge had entered a $92 million judgment to be shared by a
> corporation in which he owned $250,000 of stock would damage public
> confidence in the judiciary.

*Id.* at 128-29.  Here, Cahill's representation of AIG contributed ████████████

to Judge Preska's household since 2002.  Mr. Kavaler is currently representing

AIG and is presently earning fees from his and Cahill's ongoing representation of

AIG.  Moreover, all things being equal, Mr. Kavaler will most likely continue

earning fees from Cahill's representation of AIG – whether or not Mr. Kavaler

personally bills any time to AIG related matters – on a scale similar to that which

he has enjoyed since 2002.  The weight of all these factors would indisputably

cause a reasonable, disinterested yet well-informed layperson to question the

impartiality of the judge.  Accordingly, recusal is warranted.  *LoCascio*, 473 F.3d

at 496; *Drexel Burnham*, 861 F.2d at 1309.

Even in those cases where the judge was not required to disqualify herself, the

factors considered by the courts are instructive.  Indeed, in each of the following cases in

which recusal was not required, the reasoning was based on the absence of factors that

are present in this case:

- *Canino v. Barclays Bank, PLC*, No. 94-CV-6314,1998 WL 7219 (S.D.N.Y. Jan. 7,1998) — Judge Scheindlin held that Judge Cedarbaum was not required to recuse under either sections 455(a) or 455(b) on the sole ground that her husband's law firm regularly represented a party appearing before her. Judge Scheindlin was persuaded that absent any evidence that Judge Cedarbaum's husband handled any matters for or derived a significant source of income from the party, recusal was merely discretionary. *Id.* at *3. ***In this case, Judge Preska's husband currently represents AIG in a pending appeal and he earns significant income from AIG***;

- *U.S. v. Vazquez-Botet*, 532 F.3d 37 (1st Cir. 2008) — the First Circuit held that the district judge was not required under 455(a) to disqualify himself because his lawyer-wife's involvement with the party both in that case and in other matters "tangentially implicating" the party had ended some two years prior to the district judge's assignment to the case. ***In contrast, Judge Preska's husband currently represents AIG in a pending matter***;

- *Matter of Billedeaux*, 972 F.2d 104 (5th Cir. 1992) — the Fifth Circuit held that the district judge was not required to recuse under section 455(a) because, although the judge's husband was a partner of a firm that represented a party before the court on other matters, there was no claim that the judge's husband himself had ever represented or handled any matters for the party. ***Again, in contrast to this case, Judge Preska's husband currently represents AIG in a pending case***;

- *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt Corp.*, No. 97 Civ. 5499, 2003 WL 282187 (S.D.N.Y. Feb. 7, 2003) — this Court declined to recuse under section 455(a), in part because the party before the Court and the party represented by the Court's husband were not identical. Rather, distinct entities within the same corporate family were at issue. Further, there was no evidence in *Six West* that the defendant or its parent company provided a material part of the annual income of the Court's husband or his law firm. Also, the Court viewed the recusal movants' application with suspicion because the Court had already issued unfavorable rulings. *Id.* at *7. ***Here, by contrast, Kavaler and Cahill currently represent AIG, the same party as that appearing before the Court, and Cahill regularly represents AIG and is responsible for a material part of the annual income of both Cahill and Mr. Kavaler. Further, in this case, there have been no rulings, unfavorable or otherwise***; and

- *In re Digital Music Antitrust Litig.*, No. 06 MDL No. 1780, 2007 WL 632762 (S.D.N.Y. Feb. 27, 2007) — this Court declined to recuse under section 455(a) on the ground that her husband worked in a limited role for

15

some of the parties before the Court in prior, assertedly related litigation. *Id.* at \*12. **But there was no evidence that, as here, the Court's husband or his firm concurrently represented the party in other litigation, or that the party was a material client of her husband's law firm.** *Id.* at \*12 n.17.[8]

None of the cases declining to recuse involved a situation where a material client of the judge's spouse █████████████████████████████████████ to the judge's household), and where the judge's spouse was actively representing that client in another matter, was also a defendant in a case before the judge. Under these circumstances, regardless of the Court's ability to remain neutral, the *appearance* of partiality requires recusal under Section 455(a).

In this regard, it bears mentioning that Judge Preska has herself recognized that recusal is appropriate with respect to cases in which the parties are also significant clients of Mr. Kavaler. In her written submission to the Senate Judiciary Committee in connection with her confirmation as a federal judge, Judge Preska stated: "I also expect to recuse myself with respect to . . . clients for whom my husband does a significant amount of work." Ex. L. While defendants may quibble over whether Mr. Kavaler's work for AIG is a "significant amount," Plaintiffs respectfully submit that recusal in these circumstances is more consistent with Judge Preska's assurances to the Judiciary Committee. And, as explained in the next section, this is especially so with regard to

---

[8] It bears noting that the circumstances in *Digital Music* and *Six West,* unlike those here, fall outside the situation addressed by the Advisory Committee in the Compendium, in which the judge's spouse currently represents in an unrelated matter a party before the Court and the judge's spouse's law firm regularly represents the client in other matters.

Judge Preska's pledge to "follow the Code of Judicial Conduct with respect to recusal."
*Id.*

### 2.   Disqualification Under the Code of Conduct and Compendium

Canon 3C of the Code of Conduct for United States Judges is more-or-less
identical to Section 455; like the statute, it provides that "[a] judge shall disqualify
himself or herself in a proceeding in which the judge's impartiality might reasonably be
questioned, including but not limited to instances in which:  . . .  (c) the judge knows that
the  . . . judge's spouse . . . has a financial interest in the subject matter in controversy or
in a party to the proceeding, or any other interest that could be affected substantially by
the outcome of the proceeding."[9]

The Committee on the Codes of Conduct of the Judicial Conference of the United
States ("Advisory Committee") publishes advice to federal judges on ethics questions
posed by the Code.  Though not controlling as a matter of law, judges are "bound to give
some weight to the view of the committee," *Draper v. Reynolds*, 369 F.3d 1270, 1280
n.16 (11th Cir. 2004), and routinely do so, *see, e.g.*, *Union Carbide Corp. v. U.S. Cutting
Service, Inc.*, 782 F.2d 710, 715 (7th Cir. 1986); *Mead Johnson Co. v. Abbott Labs.*, No.
EV-98-131-C H/H, 1999 WL 778592, at *3 (S.D. Ind. Feb. 22, 1999) ("The
Compendium [of selected opinions] . . . is the product of a thoughtful process and
deserves respectful consideration.").  When it considered a question substantially similar
to that presented by this motion, the Advisory Committee opined that "[w]here parties

---

[9] In fact, section 455 was amended in 1974 to "conform with the recently adopted" Code of Conduct. *See
Liljeberg v. Health Services. Acquisition Corp.*, 486 U.S. 847, 858 n. 7 (1988).

before the judge are, in other matters, clients of the judge's spouse, and the spouse (or the spouse's law firm) regularly represents the clients in other matters, the judge should either recuse or use the remittal process; judge need not recuse if representation is only in isolated circumstances and spouse's interest in the pending litigation is minimal." 2 Guide to Judicial Policies and Procedures, Code of Conduct for United States Judges, Compendium § 3.2-2(d)(d-2) (2007).

The Advisory Committee's view is entitled to serious consideration and, moreover, *evidences* that the reasonable and well-informed group of observers (in this case, a body of federal judges) believe that the general outline of facts present here creates enough of an appearance of judicial partiality to require disqualification or remittal. Moreover, this is not a situation where representation is "isolated" *and* "the spouse's interest in the pending litigation is minimal." Cahill's representation of AIG is not isolated, but rather regular, substantial, and ongoing. And, Mr. Kavaler's interest in avoiding an adverse outcome for AIG in this lawsuit is by no means minimal. Therefore, recusal is warranted.

Courts have heeded the Advisory Committee's advice in a number of cases that raise issues similar to those presented here:

- *Diversifoods, Inc. v. Diversifoods, Inc.*, 595 F. Supp. 133, 138 n.4 (N.D. Ill. 1984) — the court noted that Judge Getzendanner of the Northern District of Illinois routinely recused herself in cases involving her husband's firm's clients where the client was a material client of the husband's firm. Married to a Mayer Brown & Platt partner, Judge Getzenberger recused herself from all matters involving the Continental Illinois National Bank and Trust Company of Chicago, regardless of whether Mayer Brown was acting as an attorney in the proceeding, because her husband had an attorney-client relationship with the bank and the bank was a material client of Mayer Brown. Likewise here, Kavaler

has an attorney-client relationship with AIG and, contributing more than
███████ in fees to Cahill from 2002, AIG is a material client of Cahill,
both in terms of dollar amount and percentage of overall business;

- *United States v. Miell*, No. 07-CR-101-LRR, 2008 WL 974843 (N.D. Iowa
  Apr. 8, 2008) — the court recused under section 455(a) on the ground that
  the judge's husband's law firm, where he was a partner, represented a
  client with an interest in a potentially related proceeding;

- *United States v. Damron*, No. CRIM-C3-95-103, 1998 WL 1780621
  (D.N.D. Aug. 24, 1998) — the district judge recused under section 455(a)
  because his son, as an assistant state attorney, had represented the state in
  a proceeding against a party appearing before the judge; and

- *Hoke v. Charlotte-Mecklenburg Hosp. Auth., Inc.*, 550 F. Supp. 1276,
  1277-78 (W.D.N.C. 1982) — the district judge elected to recuse himself
  from a case pursuant to Section 455(a) upon learning that his son had
  represented the plaintiff in a separate action in another federal district.
  Notwithstanding the fact that no actual conflict was shown to have
  resulted from the judge's participation in the litigation, the judge recused
  himself for the sake of the appearance of propriety. *Id.* at 1178 ("The
  integrity of the court as a public institution, as seen even through the
  anxious eyes of litigants, is far more important that any opinion of
  mine.").

Like the courts in the above-described instances, Judge Preska should abide by

the guidance of Canon 3C of the Code of Conduct for United States Judges and recuse

herself.

### 3.    Disqualification Under Section 455(b)

Section 455(b)(4) requires recusal where the judge or the judge's spouse has a

"financial interest in the subject matter in controversy or in a party to the proceeding, *or*

any other interest that could be substantially affected by the outcome of the proceeding."

28 U.S.C. § 455(b)(4) (emphasis added).  Whether or not a lawyer has a "financial

interest" as the term is defined in Section 455(b)(4) is not determinative of the need to

recuse under Section 455(b) in this case.  As courts have noted, the last part of Section 455(b)(4) is intentionally vague to capture more situations than cases involving "financial interest."  *Cf. In re Virginia Elec. & Power Co.*, 539 F.2d 357, 367-68 (4th Cir. 1976) ("Unlike 'financial interest,' the term 'any other interest' is not defined in terms of ownership or in any other manner. It is not easy to conclude what the term means.  But it must have been the congressional intent to make an interest of lesser degree than ownership disqualify.").  Similarly, Section 455(b)(5)(iii) requires that a judge "shall also disqualify [her]self" where she or her spouse "[is] known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii).

Here, Cahill's representation of AIG covers a wide spectrum of legal services, including seven ongoing litigations, seventeen concluded cases, and service/advice relating to reinsurance, tax, transactional, investigatory and other matters.  Moreover, favorable rulings for plaintiffs in this matter may affect AIG's ability to continue retaining and compensating Cahill to the same degree that Cahill and its partners have become accustomed—which from 2002 through 2007 earned Mr. Kavaler's household nearly ███████.

Moreover, Judge Preska has noted that "through my husband, I might be thought to have an indirect financial interest in the profits of the law firm of Cahill Gordon & Reindel."  Ex. L.  To the extent Judge Preska might reasonably be considered to have *any* financial interest in Cahill's profits, Mr. Kavaler has a direct one.  And, as a significant proportion of Cahill's profits derive directly from payments by AIG, Mr. Kavaler

certainly has a substantial interest—whether "financial" or otherwise—in the outcome of this action against AIG.  Not only could the resolution of this case adversely affect AIG, but also its ability to continue providing Cahill and Mr. Kavaler the sizeable revenue stream that it now provides.  Accordingly, Mr. Kavaler and his household have an interest that could be substantially affected by the resolution of this matter, thereby requiring recusal under Section 455(b).

### 4.    Judge Preska Should Exercise Her Discretion to Recuse

Recognizing the critical need to maintain the public's perception of an independent judiciary, judges in this District and throughout the country routinely exercise their discretion to recuse themselves in cases where the threat of an appearance of partiality is far less severe than that evident here.  Indeed, there are numerous examples where judges in this District have opted to disqualify themselves in order to uphold the principles embodied in Section 455, even when those jurists have not been convinced that the technical requirements of the statute were satisfied.

Such an approach is especially appropriate in the present case.  The allegations of wrongdoing against AIG have become a focal point for leaders in government and the public at large who will seek to hold those who contributed to the global economic crisis accountable for their actions.  The American public has an interest in the conduct of this action against AIG and will likely closely scrutinize the judiciary's role in that process. In an action destined to be litigated in the public eye, it is particularly important to maintain an appearance of the utmost impartiality.

Judge Cedarbaum's conduct in this regard is instructive.  In *Canino v. Barclays Bank, PLC,* 1998 WL 7219 (S.D.N.Y. 1998)—a case of significantly lesser public importance than this one—Judge Cedarbaum recused herself as a matter of discretion and prudence after hearing arguments on a summary judgment motion involving an employee's claim against Barclays, his former employer, for allegedly interfering with his rights to pension benefits.  Days after Judge Cedarbaum had ruled from the bench, granting summary judgment on some, but not all, of the plaintiff's claims, she recused herself from the action upon learning that her husband's law firm had been retained by Barclays in an unrelated matter:

> On September 25, 1997, Judge Cedarbaum recused herself from this action. That morning, her law clerk called Jonathan Rich, Defendant's counsel, and informed him that because Judge Cedarbaum's husband's law firm had been retained by Barclays on an unrelated matter, Judge Cedarbaum was immediately recusing herself from this action. Affidavit of Jonathan P. Rich, counsel for Barclays, dated November 5, 1997, at ¶ 6. Rich's affidavit is the only evidence of the basis for Judge Cedarbaum's recusal.

> *Id.* at *3.

Here, Mr. Kavaler personally represents AIG in a securities class action currently on appeal in this Circuit, and his firm represents AIG in numerous other matters, extending well beyond the field of litigation.  There is, moreover, significant evidence detailing ▆▆▆▆▆▆▆▆▆ proceeds attributable to AIG received directly by Mr. Kavaler and his household.  Accordingly, the facts of this case present a far more compelling scenario for recusal than in *Canino*.  Under these circumstances, recusal is the proper course.

Moreover, numerous other highly-qualified judges in this District whose immediate family members do not represent AIG are undoubtedly available to preside over this case. *Microsoft Corp. v. United States* is instructive. *See* 530 U.S. 1301 (2000). In that case, Chief Justice Rehnquist declined to recuse himself from hearing the action, despite the fact that his son concurrently represented the defendant in another matter. *Id.* at 1301. As Justice Rehnquist explained, in the Supreme Court, "unlike the situation in a District Court or a Court of Appeals[,] there is no way to replace a recused Justice. Not only is the Court deprived of the participation of one of its nine Members, but the even number of those remaining creates a risk of affirmance of a lower court decision by an equally divided court." *Id.* Such is not this Court's dilemma. Given the availability of other judges to preside over this matter, Judge Preska's exercise of discretion to recuse herself will cause no prejudice, and can only enhance the public's confidence in an independent and impartial judiciary.

## VI.  CONCLUSION

For the reasons stated above, it is respectfully submitted that Judge Preska should disqualify herself from presiding over these cases.


Counsel for OTPP and PGGM:

**BERNSTEIN LITOWITZ BERGER &**
    **GROSSMANN LLP**


     /s/ John P. Coffey
John P. Coffey (JC-3832)
Gerald H. Silk (GS-4565)

Counsel for Michigan:

**BERNSTEIN LIEBHARD &**
    **LIFSHITZ, LLP**


     /s/ Francis P. Karam
Sandy A. Liebhard (liebhard@bernlieb.com)
Francis P. Karam (karam@bernlieb.com)

23

Noam Mandel (NM-0203)
1285 Avenue of the Americas, 38th Floor
New York, NY  10019
sean@blbglaw.com
jerry@blbglaw.com
noam@blbglaw.com
(212) 554-1400
(212) 554-1444 (fax)

**SCHIFFRIN BARROWAY TOPAZ &
    KESSLER, LLP**

Sean M. Handler (shandler@stbklaw.com)
Darren J. Check (dcheck@stbklaw.com)
Naumon A. Amjed (namjed@sbtklaw.com)
280 King of Prussia Road
Radnor, PA  19087
(610) 667-7706
(610) 667-7056 (fax)

Christian Siebott (siebott@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY  10016
(212) 779-1414
(212) 779-3218 (fax)

**BARRACK, RODOS & BACINE**

Leonard Barrack (lbarrack@barrack.com)
Jeffrey Golan (jgolan@barrack.com)
1350 Broadway, Suite 1001
New York, NY  10018
(212) 688-0782
(212) 688-0783 (fax)