UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | **Master File No.:** 08-CV-4772-LTS  ECF Case |
| This Document Relates To: All Actions | **JURY TRIAL DEMANDED** |

CONSOLIDATED CLASS ACTION COMPLAINT

**BARRACK**, **RODOS** & **BACINE**
Leonard Barrack
Jeffrey W. Golan *(pro hoc vice)*
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838

 **and**

A. Arnold Gershon (AG - 3809)
Regina M. Calcaterra (RC- 3858)
1350 Broadway
**Suite 1001**
New York, New York 10018
Tel.: (212) 688-0782
Fax: (212) 688-0783

**THE MILLER LAW FIRM, P.C.**
**E. Powell Miller** *(pro hac vice)*
**Marc** L. Newman (*pro hac vice*)
**David H. Fink**
**Jayson E. Blake**
**Brian E. Etzel**
**Miller Building**
950 West University Drive, **Suite 300**
**Rochester**, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852



*Attorneys for Lead Plaintiff State of Michigan **Retirement** Systems,*
*and Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .......................................................................................... 2

JURISDICTION AND VENUE ..................................................................................... 14

PARTIES ........................................................................................................................ 15

    I.       Plaintiffs ........................................................................................... 15

           A.     Lead Plaintiff ........................................................................ 15

           B.     Other Plaintiffs .................................................................... 15

    II.      Defendants ........................................................................................ 17

           A.     AIG ....................................................................................... 17

           B.     The Executive Defendants .................................................. 17

           C.     The Underwriter Defendants................................................ 19

           D.     The Director Defendants...................................................... 22

           E.     PricewaterhouseCoopers LLP .............................................. 26

CLASS ACTION ALLEGATIONS ............................................................................... 27

BACKGROUND FACTS ............................................................................................... 30

    I.       AIG and the Establishment of AIGFP ............................................ 30

    II.      AIGFP Starts Writing Credit Default Swap Contracts ...................... 31

    III.     AIGFP's Decision to Stop Writing Credit Default Swaps................... 39

    IV.    AIG's Exposure to the Unhedged Risks of AIGFP's Credit Default Swaps ....... 42

    V.      AIG Loosens Controls on AIGFP After Greenberg's Departure........................ 47

    VI.    AIGFP Ignores Valuation Impact as the Subprime Mortgage Crisis Begins
           to Manifest .......................................................................................... 52

VII.     AIG Is Placed on Notice of Valuation Issues Concerning the CDS Portfolio Through Goldman Sachs' Collateral Demands .................................................. 57

VIII.    AIG Is Placed on Notice of Further Valuation Issues Stemming from Exclusion of Joseph St. Denis from Valuation Process and His Subsequent Resignation .......................................................................................... 59

IX.     PwC Informs AIG of a Potential Material Weakness in Controls at AIGFP....... 63

X.      AIG Falsely Reassures Investors at the December 5, 2007 Investor Meeting..... 64

XI.     AIG Admits Certain Misstatements Concerning Its Valuation of the CDS Portfolio ...................................................................................................... 67

XII.     OTS Letter of March 10, 2008 Advising of Material Weaknesses Due to Lack of Access to AIGFP ...................................................................... 72

XIII.    AIG Reports its First Quarter 2008 Results, Raises Additional Capital and Becomes the Subject of an SEC and DOJ Investigation...................................... 73

XIV.    The Full Extent and Risks of AIG's Exposure to the Subprime Market in the CDS Portfolio and through its Securities Lending Program Are Revealed When The Government Is Forced to Provide an $85 Billion Bailout to AIG ..... 76

XV.     Further Disclosures Made After the Government Bailout Confirm the Falsity of Defendants' Class Period Statements ................................................ 79

AIG'S FALSE PORTRAYAL OF ITS FINANCIAL CONDITION AND RISK EXPOSURES.................................................................................................98

I.       2005 Financial Results.......................................................................................98

II.      2006 Interim Financial Results .......................................................................108

III.     2006 Financial Results....................................................................................114

IV.     First Quarter 2007 Financial Results and May 31, 2007 Investor Meeting....... 119

V.      Second Quarter 2007 Financial Results........................................................... 121

VI.     Third Quarter 2007 Financial Results and December 5, 2007 Investor Meeting ..........................................................................................................134

VII      February 11, 2008 Form 8-K and 2007 Year-End Results .................................153

VIII.    First Quarter 2008 Financial Results and the May 12, 2008 Offering...............168

IX.     May 20, 2008 Investor Conference ................................................................. 177

X.      Disclosure of Government Investigations and Ouster of Defendant Sullivan .... 178

XI.     AIG's Second Quarter 2008 Financial Results .................................................. 178

DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES ............................................. 184

AIG USES FALSE AND MISLEADING STATEMENTS TO RAISE CAPITAL BY
ISSUING SECURITIES DURING THE CLASS PERIOD ...................................................... 198

FACTS RELEVANT TO THE SCIENTER OF THE SECTION 10(b) DEFENDANTS .......... 200

I.      Additional Facts Establishing the Section 10(b) Defendants' Scienter ............. 208

II.     Defendants' Motive to Perpetrate Fraud ........................................................... 214

LOSS CAUSATION/ECONOMIC LOSS ................................................................................ 219

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE ............................................................................................................................... 228

CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ............................................ 231

    FIRST CLAIM FOR RELIEF For Violations of Section 10(b) of the Exchange Act
    and Rule 10b-5 against AIG and the Section 10(b) Defendants ..................................... 231

    SECOND CLAIM FOR RELIEF For Violations of Section 20(a) of the Exchange
    Act against the Executive Defendants ............................................................................. 234

ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO THE SECURITIES
ACT ........................................................................................................................................... 238

    THIRD CLAIM FOR RELIEF For Violations of Section 11 of the Securities Act
    against Defendants AIG, the Signing Executive Defendants and the Director
    Defendants ....................................................................................................................... 259

    FOURTH CLAIM FOR RELIEF For Violations of Section 11 of the Securities Act
    against the Underwriter Defendants ................................................................................. 261

    FIFTH CLAIM FOR RELIEF For Violations of Section 11 of the Securities Act
    against Defendant PwC ..................................................................................................... 266

    SIXTH CLAIM FOR RELIEF For Violations of Section 12(a)(2) of the Securities
    Act against the Underwriter Defendants .......................................................................... 280

SEVENTH CLAIM FOR RELIEF For Violations of Section 15 of the Securities Act against the Executive Defendants ............................................................................282

JURY TRIAL DEMAND ............................................................................................284

Lead Plaintiff, The State Treasurer of Michigan, as custodian of the Michigan Public School Employees Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System ("the State of Michigan Retirement Systems," hereafter referred to as "Lead Plaintiff" or "SMRS"), by its undersigned counsel, brings this action for violations of the federal securities laws on behalf of itself and all other similarly situated persons or entities (the "Class," as defined in ¶ 72 herein), who purchased or otherwise acquired publicly traded securities issued by American International Group, Inc. ("AIG" or the "Company") from March 16, 2006 through September 16, 2008 (the "Class Period").  The allegations in this Complaint are based on Lead Plaintiff's personal knowledge as to itself, personal knowledge of other named Plaintiffs as to themselves, and on information and belief, including the investigation of counsel, as to all other matters.  The investigation of counsel is predicated upon, among other things, review and analysis of public filings by AIG with the United States Securities and Exchange Commission ("SEC") including, among other things, Forms 10-K, 10-Q, 8-K and S-3, Shelf Registration Statements, Registration Statements, Prospectuses and amendments and supplements thereto, press releases, AIG conference call transcripts and presentation materials, media reports about the Company, publicly available data relating to the prices and trading volumes of AIG securities, reports issued by securities analysts who followed AIG, complaints filed in actions against the Company, testimony, statements and documents submitted to Congressional committees, and interviews with former employees and others with personal knowledge of information pertinent to this Complaint.  Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      AIG was one of the most storied and distinguished companies in the United States and the world prior to and throughout the Class Period.  Its roots stretch back to 1919, with the founding of American Asiatic Underwriters in Shanghai by Cornelius Vander Starr.  Under the guidance of Starr and his successor, Maurice "Hank" Greenberg, who became the Company's CEO in 1968, and took it public in 1969, AIG grew to be recognized as the world's leading international insurance and financial services organization.

2.      In its SEC filings, AIG described itself as "the leading international insurance organization with operations in more than 130 countries and jurisdictions.  AIG companies serve commercial, institutional, and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer.  In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world."

3.      Commensurate with its rising importance in the U.S. economic and financial market, its stock started trading on the New York Stock Exchange ("NYSE") in 1984 and, on April 8, 2004, AIG became one of the thirty component companies of the Dow Jones Industrial Average.  By the end of 2005, AIG and its subsidiaries employed more than 97,000 people around the world; it wrote more than $41.87 billion in net premiums; and it had more than 65 million customers worldwide.

4.      Among the roughly 100,000 persons employed by AIG by the end of 2005 were approximately 400 employed at a subsidiary called American International Group Financial Products Corp. ("AIGFP"), which is headquartered in London, England and Wilton, Connecticut. As more fully described below, AIGFP was established in 1987 as a joint venture between AIG

and three former employees of the now-defunct Drexel Burnham Lambert investment banking firm.   Finding new and different ways to exploit the use and development of financial derivatives, which are essentially contracts used to mitigate the risk of economic loss arising from changes in the value of the underlying assets, AIGFP signed its first significant deal in July 1987, a $1 billion interest rate swap with the Italian government, which was 10 times larger than the typical Wall Street swap deals at the time.   The deal brought more than $3 million to the joint venture.   Within its first six months, AIGFP had brought in $60 million in revenues.   By 1990, it had offices in London and Tokyo, as well as its New York City headquarters (which were thereafter moved to Wilton, Connecticut).

5.      In 1993, after a dispute between Greenberg and the other founders of the AIGFP joint venture, AIG terminated the joint venture and established AIGFP as an operating subsidiary of the Company.   By 1995, AIGFP had grown into a 125-person operation with annual profits well above $100 million.   From 1995 to 1998, its profits more than doubled, from $140 million to $323 million, and its revenues rose from $289 million to $550 million.

6.      From its inception to 1998, AIGFP's deals were finely calibrated through hedging strategies so that the firm would not risk large losses on any transaction.   In 1998, however, AIGFP was approached by JP Morgan with a different type of deal – a credit default swap ("CDS").   For a fee, AIGFP would essentially insure a company's corporate debt in case of default.   After working the deal concept through their models, AIGFP determined that the risk was so remote "that the fees were almost free money."   From 1998 until mid-March 2005, AIGFP had entered into approximately 200 CDS contracts.   Most of these contracts insured corporate debt.

7.     In March 2005, Greenberg was replaced as AIG's Chief Executive Officer and Chairman by defendant Martin Sullivan, following government investigations into business transactions unrelated to the CDS business.  AIGFP underwent several management changes after it became an operating subsidiary of AIG.  In 1994, defendant Joseph Cassano was elevated from a back office position within AIGFP to become its Chief Operating Officer.  In early 2002, he was named its Chief Executive Officer.  By then, AIGFP was a $1 billion operation with 225 employees working on a multitude of derivatives deals for clients, involving hundreds of billions of dollars in obligations.  However, in early 2002, with the collapse of Enron, which had systematically abused derivatives as part of its fraudulent corporate accounting, certain derivatives became the focus of regulatory scrutiny and fell out of favor.

8.     Around 2004, AIG began writing credit default swaps on collateralized debt obligations ("CDOs") backed by securities that included mortgage bonds.  Known as "multi-sector CDOs," these complex instruments often packaged together 100 or more securities, each of which was backed by pools of mortgages, auto loans or credit card receivables.  After Greenberg's departure, the number of CDS contracts written by AIGFP increased dramatically.  During the nine month period from March through December 2005, AIGFP wrote about 220 CDS contracts, more than the entire amount of CDS deals written during the period from 1998 through mid-March 2005.  Many of these CDS contracts were written to insure multi-sector CDOs.  Since the major portion of multi-sector CDOs were backed by mortgages, the dramatic increase in CDS contracts written by AIG had the effect of vastly increasing the Company's exposure to the U.S. residential mortgage market, including subprime mortgages.  By the end of 2005, AIGFP became concerned that underwriting standards for subprime loans had deteriorated, and a decision was made to stop writing CDS contracts on multi-sector CDOs.  By then,

however, AIG was insuring about $80 billion of multi-sector CDOs, most of which were backed by subprime mortgages. Even though AIG was plainly aware of the downward turn of the mortgage market, it did not undertake to hedge the CDS portfolio because doing so would have undercut the profitability of the business.

9.     Paradoxically, while AIG ramped up its writing of CDS contracts during 2005 with the CDS portfolio becoming increasingly concentrated on U.S. residential mortgage loans, AIG's oversight of AIGFP and the CDS business became significantly diminished. With the transition from Greenberg to Sullivan as CEO, many risk controls were weakened or eliminated. Moreover, even within AIGFP, Cassano and a handful of others kept a tight rein on the origination, valuation and reporting functions relating to the CDS portfolio within the AIGFP group to the deliberate exclusion of key risk management and accounting personnel at AIGFP and its parent, AIG.

10.     AIGFP was not the only unit of the Company that increased AIG's exposure to the U.S. residential housing market and subprime mortgages. Another unit, AIG Investments, also greatly increased such exposure through its investments in residential mortgage-backed securities ("RMBS") and similar securities. Much of the RMBS investments occurred in connection with AIG's securities lending program, through which AIG would lend securities to banks and brokers in exchange for cash collateral that AIG would then invest. Contrary to traditional securities lending businesses that would invest their cash collateral in fixed income investments such as Treasury bonds or short-term corporate debt, AIG, in late 2005, set a target for investing up to 75 percent of the cash collateral received from borrowers in RMBS. This was done simply as an effort to boost the return on AIG's investment portfolio. Thus, at the same time that AIGFP had recognized the significant deterioration in underwriting standards in the

U.S. residential mortgage market and stopped writing credit default swaps in this area, AIG Investments made a concerted effort to **increase** its holdings in this same area.

11.     AIG's CDS portfolio and its investments in RMBS were like ticking time bombs. Although AIG claimed that the CDS portfolio was well-insulated against the risk of loss because a catastrophic level of defaults would need to be realized before it was required to pay the "counterparties" it was insuring, the CDS portfolio posed other significant risks.  Because a credit default swap is a form of guarantee, the contracts contained provisions establishing conditions that would require AIG to "post collateral" as an assurance that it would be able to perform its obligation in the event of a default.  Generally, AIG could be required to post collateral if its own credit rating was downgraded or if the underlying CDOs were subject to ratings downgrades or experienced a decline in value.  Thus, apart from the risk of making payments arising from defaults, the CDS portfolio subjected AIG to the risk of being required to make tens of billions of dollars in collateral postings if the underlying CDOs declined in value due to a downturn in the U.S. residential housing market.

12.     AIG's securities lending investments in RMBS also carried great risk.  In a declining housing market, the RMBS investments would also decline in value and become less liquid than traditional securities lending investments such as Treasury bonds.  The securities lending division was obligated to repay or roll over most of its loans every 30 days, but much of the RMBS investments matured in two to five years.  Thus, if a sufficient number of borrowers demanded the return of their cash collateral without a sufficient injection of new borrowers and new cash collateral into the program, AIG could be forced to sell its RMBS investments at depressed prices or would need to raise funds elsewhere.  Its options in this regard were limited since most of the funds invested by AIG Investments were needed for statutory and other capital

requirements of the Company's insurance subsidiaries.  As a result, both the securities lending business and the CDS portfolio, with its collateral posting requirements, posed a great risk that AIG would need to raise enormous amounts of cash, placing the Company in a liquidity vise.

13.     None of these risks appeared to matter much based on AIG's reported financial results for much of the Class Period.  In its year-end 2005 financial statements, AIG reported total net income of $10.48 billion after an arduous restatement process.  By year-end 2006, AIG's reported total net income had risen to $14.05 billion, a 34% increase.  And, for the first three quarters of 2007, the Company continued to report impressive earnings, with total net income of $4.39 billion, $4.28 billion and $3.08 billion, respectively, for the quarters.

14.     However, lurking behind AIG's success were the hundreds of billions of dollars of exposure to the U.S. residential mortgage market, including tens of billions of dollars of exposure to subprime debt that would bring the Company down.  While the risks inherent in these exposures were continually downplayed by AIG and AIGFP executives throughout the Class Period, they ultimately led to a massive liquidity crisis that would have forced AIG into bankruptcy proceedings were it not for the $85 billion Government bailout of AIG announced before the opening of the market on September 17, 2008.

15.     Throughout much of the Class Period, AIG's public disclosures scarcely mentioned credit default swaps or securities lending.  For example, in AIG's 2005 and 2006 Forms 10-K, AIG did little more than provide a generalized description of its "credit derivatives transactions."   It did not use the term "credit default swap" in this description and, more importantly, did not describe the types of CDOs being insured or the fact that a significant portion of the CDOs exposed the Company to subprime debt.  Similarly, AIG's references to the securities lending business did little more than provide account balances of collateral invested

and amounts payable, together with a bland description that invested collateral consisted mostly of "floating rate debt securities."

16.     As the U.S. residential housing and mortgage markets spiraled sharply downward in 2007, AIG was forced to respond to investors' concerns about its impact on AIG's businesses. AIG's response was to wage an all-out campaign to convince investors that the Company would not suffer any adverse effects.  For example, on an August 9, 2007 second quarter conference call with analysts, AIG executives represented that the risk undertaken "is very modest and remote, and has been structured and managed effectively" and "[w]e see no dollar loss associated with any of [the CDS] business."  Cassano declared in reference to the Company's CDS portfolio that "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions."  Thus, AIG executives misled investors into believing that the principal risk arising from the CDS portfolio was the risk that AIG would have to make payments on its CDS contracts due to defaults in the underlying CDOs. Defendants utterly failed to apprise the investing public of the fact that AIG was facing the obligation to post billions of dollars of collateral as the ratings and values of the CDOs plummeted.  Indeed, far from acknowledging the liquidity squeeze that such collateral postings could pose for AIG, Sullivan affirmatively declared that the Company was "a very safe haven in stormy times."

17.     Similar assurances concerning AIG's CDS portfolio were provided at an investor meeting on December 5, 2007, where Sullivan stated that the possibility that the credit default swaps would sustain a loss was "close to zero."  Sullivan added that AIG's valuation models had proven to be "very reliable" and provided AIG "with a very high level of comfort."  Cassano stated that "we are highly confident that we will have no realized losses on these portfolios" and

8

that it is "very difficult to see how there can be any losses in these portfolios."  Sullivan also touted AIG's "financial strength," stating that the capital base of the Company "will allow us to absorb volatility."  Cassano stated unequivocally that AIG had more than enough capital "to withstand this aberrant period."  Again, these assurances were made without any reference to the many billions of dollars of collateral postings that could be required from AIG as the value of the CDOs being insured by the Company continued to decline.  Indeed, although AIG disclosed in connection with the release of its third quarter 2007 financial results the bare fact that it had received collateral calls from counterparties (without disclosing the identity of the counterparties or the amounts demanded), defendant Cassano flatly declared that "we have been husbanding our liquidity all through this trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in."  At the December 5, 2007 investor meeting, he effectively derided collateral calls from counterparties as frivolous "drive by[s]."

18.    Compounding this campaign to obscure the true risks facing the Company were outright falsehoods disseminated by defendants concerning the state of AIG's internal controls and the valuation of its CDS portfolio.  Since 2005, AIG had represented that it was in the process of strengthening its internal controls and remediating internal control weaknesses identified in connection with the various government investigations of AIG and its accounting restatements undertaken during the first half of the decade.  However, defendants failed to disclose that AIG suffered from an internal control weakness directly pertaining to its valuation of the CDS portfolio.  As belatedly disclosed by AIG, controls over the valuation of the CDS portfolio "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates on a timely basis."

19.     The internal control weakness was largely the product of Cassano's making and the failure of AIG to exercise responsible oversight of AIGFP.  Cassano operated AIGFP in a manner that insulated it from scrutiny and control by AIG risk management and accounting functions.  According to minutes of AIG's audit committee that were provided to a congressional committee investigating AIG, there was a "lack of timely elevation of key data to the AIG level" and AIG "designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting function."  This is exemplified by the statements to Congress of Joseph St. Denis, a former AIGFP vice president of accounting policy from June 2006 until his resignation on October 1, 2007.  St. Denis stated that he had become concerned that the valuation model of at least one of AIG's CDS counterparties was at variance with AIG's own model.  St. Denis also testified that he became concerned that he was being deliberately excluded from the CDS valuation process and was eventually told by Cassano that "I have deliberately excluded you from the valuation of the Super Seniors [CDS] because I was concerned that you would pollute the process."  Ultimately, St. Denis resigned his position and told AIG's outside auditor, PricewaterhouseCoopers ("PwC") what had transpired.

20.     AIG's internal control weaknesses allowed defendant Cassano and his colleagues who controlled that Company's risk management and valuation processes to change the way AIGFP valued its CDS portfolio in order to conceal the extent to which deteriorating conditions in the real estate market had caused impairments in the value of AIGFP's CDS portfolio.  At the December 5, 2007 investor meeting, AIG stated that the market valuation loss on the CDS portfolio was $1.4 to $1.5 billion, which unbeknownst to the investors and analysts at the conference, was calculated by AIGFP using manipulated valuation models.  Moreover, AIG's senior management, including defendants Martin Sullivan, the Company's CEO, and Steven

Bensinger, the Company's CFO, provided this loss estimate notwithstanding being advised by PwC about a week earlier of AIGFP's internal control weakness in its valuation of the portfolio. In a Form 8-K filing two months later, on February 11, 2008, AIG acknowledged that the proper estimate of loss on the portfolio was actually $5.96 billion and that the previous estimate of loss was based on, among other things, a beneficial "negative basis adjustment" that did not comport with generally accepted accounting principles ("GAAP").  AIG also disclosed that it had been advised by PwC that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the CDS portfolio."  Just two weeks later, in connection with its release of fourth quarter and year end 2007 results, AIG disclosed that the market valuation loss of the CDS portfolio had mushroomed to $11.5 billion.

21.     While these disclosures were clearly significant, they still did not reveal the true extent of the risks facing AIG.  Even in the face of mounting losses AIG continued to maintain that it had more than sufficient capital to ride out the storm.  As AIG announced in early May 2008 plans to raise additional capital, it simultaneously declared a 10 percent increase in its dividend, with Sullivan describing the increase as "a reflection of … management's long term view of the strength of the company's business, earnings, and capital generating power." Sullivan further described the plans for raising additional capital as an effort to "fortify [AIG's] fortress balance sheet."

22.     Faced with mounting collateral calls on its credit default swaps, and demands by borrowers in the securities lending program for the return of their cash collateral, AIG's capital position and liquidity became critically stressed by September 2008.  In early-September 2008, AIG executives acknowledged internally that notwithstanding the $20 billion in capital raised in

May 2008, AIG would be forced to seek significant additional funding.  With defendant Sullivan having been ousted in June 2008 by the Board of Directors from his positions as Chairman and CEO, AIG's new CEO, Robert J. Willumstad, told Jamie Dimon, CEO of JP Morgan, in early September 2008:  "The holes we'll have to fill are so big, we need to raise capital."

23.     On Thursday, September 11, 2008, AIG executives brought in bankers from JP Morgan and a Blackstone consulting group, who determined that AIG would need at least $40 billion.  However, on Sunday morning, September 14, AIG's outside advisers discovered that the Company's securities lending business needed a separate injection of as much as $20 billion.  As a result, an offer of a $20 billion lending facility that the New York State Insurance Superintendent, Eric Dinallo, had considered establishing for the benefit of AIG became moot since it was becoming clear the Company needed at least $60 billion of financing.

24.     Things rapidly continued to spiral downward.  On September 15, AIG informed Superintendent Dinallo that it needed as much as $70 billion to avoid failing.  Mr. Dinallo responded that the State would not act unless there was a plan in place to provide the rest of what AIG needed to survive.  The same day, personnel from JP Morgan and Goldman Sachs met at the office of the Federal Reserve and, together with Morgan Stanley personnel, evaluated AIG's liquidity needs and the viability of a private-sector solution.  They reached an updated conclusion:  AIG needed about $80 billion.  By late afternoon on Monday, September 15, it was clear that private investors were not going to come to AIG's rescue, since many questions still loomed over the true value of the Company's assets available for collateral and the cash that would be needed to keep the Company afloat.

25.     The fate of AIG was sealed.  The rating agencies downgraded the Company's credit rating by up to three notches and the choice facing this once high-flying company was

stark:  either accept an $85 billion bailout being offered by the U.S. Government or declare bankruptcy.   The AIG board approved the bailout offer, which was announced before the opening of the next trading day, September 17, 2008.

26.     Speaking on March 16, 2009, President Barack Obama stated: "This is a corporation that finds itself in financial distress due to recklessness and greed."   Ben S. Bernanke, Chairman of the Federal Reserve, appearing on "60 Minutes" on Sunday, March 15, 2009, said:  "Of all the events and all of the things we've done in the last 18 months, the single one that makes me the angriest, that gives me the most angst, is the intervention with AIG… Here was a company that made all kinds of unconscionable bets.  Then, when those bets went wrong, they had a – we had a situation where the failure of that company would have brought down the financial system."   And Lawrence Summers, Chairman of the White House National Economic Council, appearing on Sunday, March 15, 2009, on ABC's *This Week*, said:  "There are a lot of terrible things that have happened in the last 18 months, but what's happened at AIG is the most outrageous."

27.     Not only was AIG brought down by "unconscionable bets" that went terribly wrong, the purchasers of the Company's stock and debt securities during the Class Period suffered tens of billions of dollars of losses, at the least, based on false and materially misleading statements that AIG, certain of its executives, directors, underwriters and outside auditor made concerning the Company's financial results, business operations and condition.  Defendants' failure to disclose the true state of AIG's financial condition and risk exposures throughout the Class Period artificially inflated the price of AIG stock, which reached as high as $72.54 per share on June 5, 2007.  In wake of the disclosures about AIG from February 2008 through the

U.S. Government bailout that ends the Class Period, tens of billions of dollars in shareholder and bondholder value has been lost, inflicting substantial damage to Plaintiffs and the Class.

28.     This lawsuit seeks compensation for those investors.

**The Claims Asserted in the Complaint**

29.     Lead Plaintiff asserts two sets of claims in this Complaint.  The first asserts a series of fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against those defendants, including AIG and certain of its executives, who made materially false and misleading statements that caused the prices of AIG securities to be artificially inflated over the course of the Class Period.

30.     The second asserts a series of strict liability and negligence claims under the Securities Act of 1933 ("Securities Act") against those defendants who are statutorily liable under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements in, and misleading omissions from, the offering documents for AIG's public offerings during the Class Period (the "Offering Materials").  The offerings are identified in ¶¶ 591 - 592 herein.  In all, during the Class Period, AIG made more than seventy public offerings of stock, notes and other securities, raising in excess of $10 billion from its note offerings, plus approximately $7.45 billion from an offering of common stock and $5.4 billion from an offering of Equity Units on May 12, 2008, which was just months before the U.S. Government would rescue AIG from filing for protection under the U.S. bankruptcy laws out of concern for the overall U.S. and world economies.

## JURISDICTION AND VENUE

31.     The claims on behalf of the Class (defined in ¶ 72 below) arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o), and under Sections 10(b)

and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.  This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

32.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

33.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

**PARTIES**

**I.      Plaintiffs**

**A.      Lead Plaintiff**

34.     Lead Plaintiff SMRS is based in Lansing, Michigan and invests on behalf of Michigan Public School Employees, State Employees, State Police, and Michigan Judges. SMRS has total assets of approximately $42 billion under investment for its beneficiaries, making it one of the largest pension systems in the nation.  There are approximately 580,000 participants and beneficiaries in the four retirement systems.  SMRS purchased AIG securities, including common stock and bonds issued during the Class Period, as set forth in Exhibit 1 hereto and in ¶ 581 below, and suffered substantial damage as a result.

**B.      Other Plaintiffs**

35.     Plaintiff Maine Public Employees Retirement System ("MainePERS") administers retirement programs that cover, among others, Maine public employees, public

15

school teachers, and employees of approximately 267 municipalities and other public entities in Maine. As of June 30, 2008, MainePERS managed assets of approximately $10.5 billion and serviced over 94,480 members including active employees and retirees. MainePERS purchased shares of AIG during the Class Period, including shares in the common stock offering of May 12, 2008, as set forth in Exhibit 1 and in ¶ 582 below, and suffered substantial damages as a result.

36.     Plaintiff Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees Represented by Local 85 of the Amalgamated Transit Union ("ATU 85") represents the hourly operating employees, hourly non-operating employees, first line supervisors, maintenance and secretaries of the Port Authority of Allegheny County. ATU 85 has approximately 2,200 members, as well as 2,600 retirees. ATU 85 purchased publicly-issued securities of AIG during the Class Period, including common stock on the open market and equity units in the May 12, 2008 offering, as set forth in Exhibit 1 and in ¶ 583 below, and suffered substantial damages as a result.

37.     Plaintiff Epstein Real Estate Advisory ("Epstein"), a private investor, purchased publicly-issued securities of AIG during the Class Period, including common stock and the following notes in three offerings under the AIG-FP Medium Term Note series: (a) Medium-Term Notes, Series AIG-FP, CMS Curve Notes issued May 31, 2007; (b) Medium-Term Notes, Series AIG-FP, CMS Curve Notes issued June 1, 2007; and (c) Medium-Term Notes, Series AIG-FP, CMS Curve Notes issued July 20, 2007, as set forth in Exhibit 1 and in ¶ 584 below, and suffered substantial damages as a result.

38.     Plaintiffs Lynette J. Yee, Michael Conte and Roger Wilson, individual investors, purchased publicly-issued securities of AIG during the Class Period, including 7.7% Series A-5

16

Junior Subordinated Debentures issued December 11, 2007, as set forth in Exhibit 1 and in ¶ 585 below, and suffered substantial damages as a result.

39.     Plaintiff Randy Lewis Decker, an individual investor, purchased publicly-issued securities of AIG during the Class Period, including 6.45% Series A-4 Junior Subordinated Debentures issued May 31, 2007, as set forth in Exhibit 1 and in ¶ 586 below, and suffered substantial damages as a result.

## II.     Defendants

### A.     AIG

40.     Defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  AIG is a holding company which, through its subsidiaries, is engaged in a range of insurance and financial services activities in the United States and abroad.  Throughout the Class Period, AIG common stock was traded on the NYSE under the ticker symbol "AIG" and was one of the thirty stocks within the Dow Jones Industrial Average.  As of September 16, 2008, AIG had approximately 2.69 billion common shares of stock outstanding, and approximately $50 billion worth of debt securities outstanding.

### B.     The Executive Defendants

41.     Defendant Martin J. Sullivan ("Sullivan") served as the President and Chief Executive Officer of AIG from the beginning of the Class Period through his resignation on June 15, 2008.  Upon his resignation, AIG paid a $47 million severance package to Sullivan.

42.     Defendant Steven J. Bensinger ("Bensinger") served as the Executive Vice President and Chief Financial Officer of AIG at all times relevant to the Class Period.  On May 8, 2008, AIG announced that Bensinger had been appointed Vice Chairman-Financial Services

of AIG.  Bensinger continued to serve as CFO of AIG until October 17, 2008, when AIG named his successor.

43.     Defendant Joseph Cassano ("Cassano") served as President of AIGFP from the beginning of the Class Period until the Company announced his resignation on February 29, 2008.  Cassano was retained by the Company to serve as a consultant through the end of 2008 and was paid $1 million per month for his services, until his contract was terminated with the Government bailout.  As reported in *The Wall Street Journal* on April 28, 2009, the U.S. Department of Justice ("DOJ") and SEC are both investigating whether civil and/or criminal charges should be brought against defendant Cassano, along with defendants Andrew Forster ("Forster") and Thomas Peter Athan ("Athan").

44.     Defendant Forster was employed as the Executive Vice President of Asset Trading & Credit Products ("Assets/Credit") of AIGFP during the Class Period.  Forster was responsible for running AIGFP's global credit division, which contracted to sell the CDS contracts at issue herein.  As reported in *The Wall Street Journal* on April 28, 2009, the DOJ and SEC are both investigating whether civil and/or criminal charges should be brought against defendant Forster, along with defendants Cassano and Athan.

45.     Defendant Alan Frost ("Frost") served as a marketing executive and an Executive Vice President of AIGFP during the Class Period.  Defendant Frost, who reported directly to defendant Cassano, headed AIGFP's business and marketing efforts in the United States, serving as AIGFP's principal liaison with Wall Street investment banks and other dealers in structured securities.

46.     Defendant David L. Herzog ("Herzog") served as the Senior Vice President and Comptroller and the Principal Accounting Officer of AIG from June 2005 until October 2008, when he replaced Bensinger as Chief Financial Officer of AIG.

47.     Defendant Robert Lewis ("Lewis") served as AIG's Senior Vice President and Chief Risk Officer at all times relevant to the Class Period.  Lewis signed off on each of the CDS contracts at issue herein.

48.     Defendant Athan has been employed as a Managing Director by AIGFP and by AIG Financial Securities Corp., in Wilton, Connecticut, from April 2007 to the present.  Prior to his employment at AIGFP, from July 1997 to March 2007, Athan was a Managing Director, Head of Structured Products & Principal Finance, at Société Générale, a counterparty on many CDS contracts with AIGFP.  Prior to that, Athan worked in derivative product sales at Lehman Brothers, Inc. ("Lehman Brothers") in 1996 and part of 1997, and as a portfolio manager at MBIA between 1991 and 1996.  As reported in *The Wall Street Journal* on April 28, 2009, the DOJ and SEC are both investigating whether civil and/or criminal charges should be brought against defendant Athan, along with defendants Cassano and Forster.

49.     Defendants Sullivan, Bensinger, Cassano, Forster, Frost, Herzog, Lewis and Athan are referred to collectively herein as the "Executive Defendants."

50.     Defendants Sullivan, Bensinger, Cassano, Forster, Herzog and Lewis are referred to collectively herein as the "Section 10(b) Defendants."

## C.     The Underwriter Defendants

51.     As underwriters of Offerings, as specified in ¶¶ 591 - 592 herein, the following Defendants were responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials:

a.       AG Edwards & Sons, Inc. ("AG Edwards");

b.       ABN AMRO Bank N.V. ("ABN");

c.       ANZ Securities ("ANZ");

d.       Banc of America Securities LLC ("BoA");

e.       Banca IMI S.p.A. ("Banca IMI");

f.       Barclays Bank PLC and its investment banking division, Barclays Capital, (together "Barclays");

g.       Bear Stearns & Co. Inc. ("Bear Stearns");

h.       BMO Capital Markets ("BMO");

i.       BNP Paribas Bank ("BNP");

j.       Calyon, the corporate and investment banking arm of the Crédit Agricole group;

k.       Citigroup Global Markets Inc. and Citigroup Global Markets Limited (together "Citigroup");

l.       Credit Suisse Securities (USA) LLC and Credit Suisse Securities (Europe) Limited, a wholly owned subsidiary of Credit Suisse Investment Holdings (UK) and an indirect wholly owned subsidiary of Credit Suisse Group, (together "Credit Suisse");

m.       Daiwa Securities America Inc. ("Daiwa America") and Daiwa Securities SMBC Europe Ltd ("Daiwa Europe");

n.       Deutsche Bank Securities Inc. and its parent, Deutsche Bank AG (together "Deutsche Bank");

o.       Dowling & Partners Securities, LLC ("Dowling");

p.       Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("Fox-Pitt");

q.       Goldman Sachs & Co. ("Goldman Sachs" or "Goldman");

r.       Greenwich Capital Markets, Inc. ("Greenwich");

s.       HSBC Securities (USA) LLC and HSBC Bank plc, companies within the HSBC Group (together "HSBC");

t.      Incapital LLC ("Incapital");

u.      JP Morgan Securities Inc. and JP Morgan Securities Ltd. (together "JP Morgan");

v.      Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette");

w.      KeyBanc Capital Markets Inc. ("KeyBanc");

x.      Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch");

y.      Mitsubishi UFJ Securities International plc ("Mitsubishi");

z.      Mizuho Securities USA Inc ("Mizuho");

aa.     Morgan Stanley & Co. Incorporated and Morgan Stanley Inc. (together "Morgan Stanley");

bb.     National Australia Capital Markets, LLC ("NAB Capital");

cc.     Nomura Securities International, Inc. ("Nomura");

dd.     The Royal Bank of Canada Europe Limited, RBC Dain Rauscher and RBC Capital Markets, all part of the Royal Bank of Canada (together "RBC");

ee.     The Royal Bank of Scotland ("RBS");

ff.     Scotia Capital (USA) Inc. ("Scotia");

gg.     SG Americas Securities LLC ("SG Americas"), a division of Société Générale, and Société Générale ("Société Générale");

hh.     UBS Securities LLC ("UBS");

ii.     Wachovia Capital Markets LLC ("Wachovia"); and

jj.     Wells Fargo Securities, LLC ("Wells Fargo").

52.     The defendants named in paragraph 51 (a) – (jj) are referred to collectively herein as the "Underwriter Defendants."

53.     Lehman Brothers was an underwriter of Offerings as specified in ¶¶ 591 - 592 herein.  As an underwriter of Offerings, Lehman Brothers was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference

21

into the Offering Materials.  Lehman Brothers filed for protection under the U.S. Bankruptcy Code on September 14, 2008.  For this reason, it is not being named as a defendant in this Complaint, but the Offerings for which it served as an Underwriter are identified herein.

### D. The Director Defendants

54.     Stephen F. Bollenbach has been a member of the Board of Directors from January 2008 to the present.  In September of 2008, defendant Bollenbach was appointed Lead Director. As Lead Director, he serves as an *ex-officio* member of each committee of the Board of Directors of which he is not currently a member.  He is currently the Chairman of the Regulatory, Compliance and Public Policy Committee and is a member of the Compensation and Management Resource Committee and has been a member of the Audit Committee since January 2008.  Defendant Bollenbach signed the 2008 Shelf Registration Statement at issue herein. Defendant Bollenbach also signed AIG's annual report for 2007, which was filed on Form 10-K with the SEC.

55.     Pei-yuan Chia was a member of the Board of Directors from 1996 to 2006. Defendant Chia served on the Audit Committee and the Compensation Committee in 2005. Defendant Chia signed the 2003 Shelf Registration Statement at issue herein and AIG's annual report for 2005, which was filed on Form 10-K with the SEC.

56.     Marshall A. Cohen was a member of the Board of Directors from 1992 to 2008. During his tenure, he served as the Chairman of the Compensation and Management Resources Committee, a member of the Nominating and Corporate Governance Committee, and a member of the Regulatory, Legal and Compliance Committee of the Board of Directors.  Defendant Cohen signed the 2003, 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Form 10-K with the SEC.

22

57.     Martin S. Feldstein has been a member of the Board of Directors from 1987 to the present.  He is a member of the Finance and Risk Management Committee and the Regulatory, Compliance and Public Policy Committee.  In 2005, defendant Feldstein was a member of the Compensation Committee.   Defendant Feldstein signed the 2003, 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

58.     Ellen V. Futter was a member of the Board of Directors from 1999 until her resignation in July 2008.  Defendant Futter served as a member of the Regulatory, Legal and Compliance Committee and of the Nominating and Corporate Governance Committee of the Board of Directors.  Defendant Futter signed the 2003, 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

59.     Stephen L. Hammerman was a member of the Board of Directors from 2005 until his resignation in February 2008.  Upon his appointment to the Board, defendant Hammerman served as a member of the Regulatory, Legal and Compliance Committee and the Social Responsibility Committee of the Board of Directors.  Defendant Hammerman signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

60.     Richard C. Holbrooke was a member of the Board of Directors from 2001 until his resignation in July 2008.  He served as the Chairman of the Public Policy and Social Responsibility Committee, and a member of the Finance Committee and the Compensation Committee of the Board of Directors.  Defendant Holbrooke signed the 2003, 2007 and 2008

Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

61.     Fred H. Langhammer was a member of the Board of Directors from 2006 until his resignation in October 2008.   He served on the Compensation and Management Resources Committee and the Finance Committee of the Board of Directors.   Defendant Langhammer signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2006 and 2007, which were filed on Forms 10-K with the SEC.

62.     George L. Miles, Jr. has been a member of the Board of Directors from 2005 to the present.  He is the Chairman of the Nominating and Corporate Governance Committee and is a member of the Audit Committee.   He was appointed to the Audit and Nominating and Corporate Governance Committees in 2005 when he became a member of the Board of Directors.   He was also named to the newly-formed Special Committee of the Board on Indemnification.   Previously, defendant Miles served as a member of the Public Policy and Social Responsibility Committee.  Defendant Miles signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

63.     Morris W. Offit has been a member of the Board of Directors from 2005 to the present.  He is currently the Chairman of the Finance and Risk Management Committee and also serves as a member of the Audit Committee.  He was appointed to the Audit Committee in 2005 when he became a member of the Board and served as Chairman of the Audit Committee until November 2006.   In 2005, he also served as a member of the Nominating and Corporate Governance Committee.   Defendant Offit was also named to the newly-formed Special Committee of the Board on Indemnification.   Defendant Offit signed the 2007 and 2008 Shelf

Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

64.     James F. Orr III has been a member of the Board of Directors from 2006 to the present.   He is currently the Chairman of the Compensation and Management Resources Committee and also serves as member of the Nominating and Corporate Governance Committee. Defendant Orr signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

65.     Virginia M. Rometty has been a member of the Board of Directors from 2006 through the present.   She has served as a member of the Compensation and Management Resources since 2007 and is also a member of the Nominating and Corporate Governance Committee.  Defendant Rometty signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2006 and 2007, which were filed on Forms 10-K with the SEC.  On March 25, 2009, defendant Rometty notified AIG that she will not seek re-election to the Board at AIG's 2009 Annual Meeting of Shareholders.

66.     Michael H. Sutton has been a member of the Board of Directors from 2005 to the present.  He has been a member of the Audit Committee since 2005 and has served as Chairman since November 2006.   Additionally, defendant Sutton is a member of the Regulatory, Compliance and Public Policy Committee.  Defendant Sutton signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.  On March 25, 2009, defendant Sutton notified AIG that he will not seek re-election to the Board at AIG's 2009 Annual Meeting of Shareholders.

67.     Edmund S.W. Tse has been a member of the Board of Directors from 1996 to the present.  Defendant Tse also currently serves as Senior Vice Chairman for the Life Insurance

Division of AIG.  Defendant Tse signed the 2003, 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Form 10-K with the SEC.   On March 19, 2009, defendant Tse notified AIG that he was retiring as Senior Vice Chairman effective at the AIG 2009 Annual Meeting of Shareholders and would not seek re-election to the Board.

68.     Robert B. Willumstad has been a member of the Board of Directors from 1996 to the present.  In 2006, defendant Willumstad became Chairman of the Board of Directors.  In his capacity as Chairman, defendant Willumstad served as an *ex officio* member of each of the standing committees of the Board.  He also served as AIG's Chief Executive Officer from June 15, 2008 until September 2008.   Defendant Willumstad signed the 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Forms 10-K with the SEC.

69.     Frank G. Zarb was a member of the Board of Directors from 2001 through 2008. During his tenure, defendant Zarb served on the Audit Committee.  Defendant Zarb served as the Interim Chairman through October 31, 2006.  As Interim Chairman, defendant Zarb served as an *ex officio* member of all standing committees of the Board.  Defendant Zarb signed the 2003, 2007 and 2008 Shelf Registration Statements at issue herein and AIG's annual reports for 2005, 2006 and 2007, which were filed on Form 10-K with the SEC.

70.     The defendants named in paragraphs 54 - 69 are referred to collectively as the "Director Defendants."

### E.     PricewaterhouseCoopers LLP

71.     Defendant PwC at all relevant times served as an Independent Registered Public Accounting Firm for AIG.  PwC audited the Company's financial statements for more than two

decades, including for the years ended December 31, 2005, 2006 and 2007, which financial statements were approved by PwC and included in AIG's annual reports for those years, as filed on Forms 10-K with the SEC.

## CLASS ACTION ALLEGATIONS

72.     Lead Plaintiff and the other named plaintiffs (together "Plaintiffs") bring this action on their own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedures on behalf of all persons or entities (a) who purchased AIG common stock or other securities that traded on a U.S. public exchange during the Class Period or (b) who purchased or acquired securities in or traceable to a public offering by AIG during the Class Period, and who suffered damages as a result (the "Class").

73.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Executive Defendants; (iii) any person who was an executive officer and/or director of AIG during the Class Period; (iv) any entity that served as an underwriter for any of AIG's offerings during the Class Period; (v) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

74.     The members of the Class, purchasers of AIG securities during the Class Period, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number in the tens of thousands, if not higher.  As of April 30, 2008, AIG reported that it had 2.49 billion shares of common stock issued and outstanding, and thereafter issued an additional 196 million shares of common stock in an offering of May 12, 2008.  As of January

30, 2009, AIG reported that it had 2.69 billion shares of common stock issued and outstanding. Moreover, as identified in ¶¶ 591 - 592, AIG issued over $20 billion of notes and other debt securities in registered public offerings during the Class Period and, as of September 16, 2008, had approximately $50 billion of notes and debt securities outstanding.

75.     Lead Plaintiff's claims, and the claims of the other named Plaintiffs, are typical of the claims of members of the Class.  Plaintiffs and all members of the Class sustained damages as a result of the conduct complained of herein.

76.     Plaintiffs will fairly and adequately protect the interest of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Plaintiffs seek to represent.

77.     A class action is superior to the other methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.   Among the questions of law and fact common to the Class are:

a.     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     Whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period, contained

misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

       c.     Whether the market prices of AIG securities during the Class Period were artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

       d.     With respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether the Section 10(b) Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

       e.     With respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Executive Defendants are controlling persons of the Company;

       f.     With respect to Plaintiffs' claims pursuant to the Securities Act, whether the Offering Materials for the offerings made during the Class Period contained untrue statements of material fact or material omissions; and

       g.     Whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

79.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

80.     The names and addresses of the record owners of AIG shares and debt securities purchased during the Class Period are obtainable from information in the possession of the Company and/or its transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## BACKGROUND FACTS

**I.     AIG and the Establishment of AIGFP**

81.     AIG traces its roots to an insurance agency founded in Shanghai, China in 1919. The Company moved its headquarters to New York in 1949.  By 1962 the Company had shifted its focus from personal insurance lines to corporate insurance.  Under the leadership of Hank Greenberg, who took over as Chairman in 1968, AIG became a publicly held company in 1969 and grew into one of the world's largest insurance and financial services companies.

82.     In 1987, Howard Sosin, a Stanford trained PhD who worked with Michael Milken at Drexel Burnham Lambert, convinced Greenberg to enter into a joint venture to find innovative ways to extract profits from financial transactions and to enable institutions to protect themselves against various types of financial risk.  Among the financial instruments Sosin and his colleagues used were contracts called "swaps," in which one party paid the other party a fee to take on the risk of a business transaction.  For example, a company that had sales in foreign countries might wish to eliminate the risk of fluctuations in currency values by engaging in an exchange rate swap, which would guarantee it a constant value for the currency received as a result of foreign sales transactions.  This joint venture was called AIG Financial Services.

83.     Sosin and his colleagues used sophisticated mathematical models to analyze various types of financial transactions to search out opportunities to generate profits, and used various hedging techniques to eliminate or reduce AIGFP's risk.  The senior management of AIGFP was involved in scrutinizing each transaction.

84.     These methods proved to be hugely successful, and AIGFP's business grew rapidly, both in terms of numbers of employees and profits generated.  Ultimately, however, tensions between Greenberg and Sosin caused the partnership to break up, and in 1993,

following Sosin's departure, AIGFP became a division of AIG.  According to legal proceedings stemming from the dissolution of the partnership, AIGFP made more than $1 billion in profits between 1987 and 1992.

85.     After Sosin's departure, a number of his former colleagues continued to manage the Financial Products business for AIG, but with more control by Greenberg and the holding company.  Led by a mathematician named Tom Savage, AIGFP expanded the business of taking on risk in financial transactions entered into by AIG's clients (called "counterparties") in exchange for premiums.

## II.     AIGFP Starts Writing Credit Default Swap Contracts

86.     In 1998, JP Morgan approached AIGFP about writing a type of financial insurance on a structured debt offering it was putting together.  The concept they proposed was that, in the event that the collateral underlying debt securities it was offering failed to perform as expected and did not generate sufficient cash to allow the securities to meet their interest payment obligations, AIGFP would, in effect, buy the securities from the holders at the initial offering price, thereby taking on the risk that the securities would not perform.  This was an early iteration of what came to be known as a "credit default swap."

87.     Sosin had established a committee to vet every single transaction undertaken by AIGFP.  It met at the end of each day.  Savage told *The Washington Post* that he continued to apply "academic rigor" to each deal after he succeeded Sosin as head of AIGFP.

88.     Savage retired from AIGFP in 2001, and was replaced with the former Chief Operating Officer of AIGFP, Joseph Cassano.  Cassano lacked the quantitative background of his predecessors.  According to Greenberg and former employees of AIGFP interviewed by *The*

*New Republic*, when Cassano took over, officials at the corporate parent with quantitative backgrounds scrutinized each deal exhaustively.

89.     In the first part of this decade, AIG was rocked by a series of accounting scandals, including a transaction involving PNC Financial Services Group in which the PNC entity transferred underperforming assets to a special purpose entity set up by AIGFP to eliminate losses to PNC.  The SEC and the DOJ brought separate civil and criminal actions, which resulted in AIG paying an $80 million fine and forfeiting nearly $40 million in fees earned on the transaction, plus interest.  A second scandal involved a questionable transaction with a re-insurer that resulted in AIG's booking $500 million in insurance premiums.  Following an investigation by the New York Attorney General, AIG restated its financial statements for each of the years 2000 through 2004, and Greenberg was forced to retire in March 2005.  In connection with the restatement, the Company disclosed that it had inadequate internal controls and that the resulting errors had overstated income by approximately $3.9 billion.

90.     The Company's 2005 10-K, filed on March 16, 2006, admits that, with respect to the Company's accounting, "In many cases … transactions or entries [entered into by the Company] appear to have had the purpose of achieving an accounting result that would enhance measures believed to be important to the financial community and may have involved documentation that did not accurately reflect the true nature of the arrangements."

91.     Within a few days after Greenberg's announced departure in March 2005, Fitch's, followed soon thereafter by Moody's and Standard & Poor's, lowered their ratings of AIG from its previous AAA status.

92.     Many of the financial products that AIGFP serviced, such as, for example, municipal bonds, were rated by the same rating agencies that rated AIG, such as Moody's and

Standard & Poor's.  When these rated securities were "wrapped" in insurance from AIG, and thereby guaranteed against defaulting, the rating agencies viewed the securities as taking on the same degree of risk as the insurer.  So, securities insured by an AAA insurer would themselves be given an AAA rating.  For this reason, AIG's loss of its AAA rating was a blow to AIGFP, which relied on the holding company's rating to attract "swap" business.

93.     One source of "swap" business that was still available to AIGFP despite its ratings downgrade was credit default swaps on securitized consumer debt, particularly high risk consumer debt like subprime mortgages.  *Time* magazine, based on an interview with former CEO Greenberg, reported that "once the company lost its top credit rating, AIGFP should have stopped writing swaps and hedged, or reinsured, its existing ones.  But Cassano's unit doubled down after the spring of 2005, writing more and more subprime-linked swaps as the ratings plunged, which made the possible need for collateral enormous in the event its debt was downgraded. The downgrades occurred in 2008.  'Of course they were going to run out of money,'" Greenberg stated.

94.     Credit default swaps are contracts that function much like insurance policies for debt securities instruments.  In exchange for premiums paid over a period of time by a counterparty, the party writing the credit default swap is obligated to pay the counterparty the par value of the referenced debt instrument in the event that instrument defaults.  While some credit default swaps may function like "put" options, permitting the counterparty to force the issuer of the swap to purchase the referenced security in the event it defaults, it is not necessary for either counterparty to a credit default swap contract to own the securities that are being "insured" by the swap.  Rather, the referenced securities may be owned by a third party, who may or may not have any relationship with either of the counterparties.  As originally conceived, credit default

swaps were written on securities owned by the counterparty, which used the credit default swap as a way of "hedging," that is, reducing or offsetting the risk in owning the securities. Later, however, AIG began writing credit default swaps on securities that were not owned by the counterparty, but are merely referenced by the swap contract. Such arrangements are called "naked" credit default swaps, and they function as a form of side bet on the performance of the referenced security.

95.     Because it is not necessary for a counterparty to own the CDO on which it purchases a credit default swap, multiple credit default swaps could be, and were, written to insure against the default of the same underlying "referenced" CDO. As *Time* magazine explained in an article published on March 19, 2009, entitled "How AIG Became Too Big to Fail":

> Although a CDS is, in its simplest form, an insurance policy, AIG was selling something far more exotic. Say you buy a house and insure it. The insurer doesn't offer the same policy on your house to everyone else in the neighborhood; if it did and your house went up in flames, the insurer could get wiped out. In its CDS contracts, though, AIG wrote multiple insurance policies covering the same underlying package of increasingly toxic assets. In essence, it was underwriting systemic risk. This is the opposite of what insurance companies are supposed to do: diversify risk across the universe of policyholders. "One thing about the insurance model: it relies on diversification as its means to exist," says a top exec at an AIG competitor. "If an insurance company plays in a field where they underwrite systemic risk, that's a totally different experience." Is it ever. Insurance companies can handle catastrophic risk but not systemic risk. That's why you can buy hurricane insurance from private companies but not terrorism insurance. Only a government can take on that risk. At its most basic, AIG took on colossal risks that it could not afford.

96.     According to testimony by the New York State Insurance Superintendent Eric Dinallo before the House Oversight Committee on October 7, 2008, it is estimated that the total corporate bonds outstanding in the world is about $6 trillion. By December 2007**,** the total amount of credit default swaps referencing this debt was approximately $62.2 trillion, or ten

times the underlying debt.  In Dinallo's words, "Ninety percent of it is written on just going to the track and putting a bet on whether Ford is going to fail or not."

97.     Despite the inherently risky nature of credit default swaps, they are unregulated by either state or federal government.   In 2000, Congress passed the Commodity Futures Modernization Act, which, among other things, pre-empted state gaming laws from regulating credit default swaps and exempted them from the definition of a "security" under SEC regulations.  While a number of state insurance regulators have sought to bring them under their jurisdiction, these efforts have been unsuccessful.  The March 19, 2009 *Time* article quotes Fed Chairman Benjamin Bernanke as saying:  "AIG exploited a huge gap in the regulatory system. … **This was a hedge fund, basically, that was attached to a large and stable insurance company**."[1]

98.     The type of securities that were referenced by the credit default swaps written by AIGFP were most often CDOs.  The collateral backing a CDO consists of asset-backed securities that are purchased by a CDO "manager," the nature of which varied during the time period relevant to this Complaint from large money managers to small entrepreneurs.  The manager would purchase the pool of securities with funds supplied by an underwriter, which was typically a large investment bank or commercial bank.  The underwriter obtained the funds it provided to the manager by structuring the CDO in layers, called tranches (described below) and selling securities backed by a particular tranche of the CDO.

99.     One common type of ABS used to form CDOs was mortgage-backed securities ("MBSs"), most often, RMBSs, which are securities backed by pools of residential mortgages, often from diverse geographic areas.  CDOs can be backed by other types of securities also, and

---

[1]     As used in this Complaint, bold-faced print within quotes denotes added emphasis.

when the flow of new subprime mortgages was insufficient to generate new RMBSs to package together into new CDOs, managers sometimes used securities issued by other CDOs as backing for new CDOs.  This type of CDO is sometimes called a "CDO squared" or "synthetic" CDO.

100.    CDOs are sold to investors in different layers, called "tranches."  The lowest tranche is often called the equity portion of the CDO, and the highest, or most senior, tranche is sometimes called the "super senior" tranche.  The risk that any of the securities in the pool of securities comprising the collateral for the CDO will default is allocated among the various tranches so that the lowest tranche bears the entire risk of default for a certain percentage of the collateral in the pool.  In other words, only the lowest tranche is affected by any defaults in the securities making up the CDO collateral until the percentage of securities in default reaches a defined level.  Once the amount of collateral in default exceeds that percentage, the next lowest tranche bears the risk of the next defaults, again up to a defined percentage of the pool, and so on.  By allocating the risk among the tranches in this manner, each tranche has its own risk profile, with each more senior tranche being less risky than those subordinated to it.  Each tranche is purportedly designed to pay an interest rate commensurate with the level of risk assigned to it, which permits each tranche to be rated independently from the other tranches.  Thus, an investor in a CDO may choose from among differently rated securities issued by the CDO, each paying an interest rate purportedly commensurate with the level of risk that the investor will be taking on.

101.    By allocating risk along a hierarchy of securities purchasers, the CDO is designed as a kind of financial alchemy, creating high quality, highly rated securities out of lower rated collateral.

102.     According to AIG's former CEO Greenberg, between the time AIGFP began writing credit default swaps in 1998 and the time he left AIG in March of 2005, AIGFP had written a total of about $200 billion in credit default swaps, which were housed in approximately 200 CDS contracts.  Most of these CDS contracts were based on underlying corporate debt. Between March 2005 and December 2005, AIGFP wrote approximately another 220 CDS contracts.  As of the end of 2005, among the roughly 420 CDS contracts, AIGFP had written approximately $80 billion of credit default swaps relating to CDOs comprised of pools of securities backed by subprime mortgages.

103.     The upsurge in AIG's credit default swap business in 2005 was, in large part, due to the rapid expansion of the housing market and the increased demand for mortgage financing, which was spurred by interest rates that had fallen to the lowest point in more than 40 years.  The innovation of structured financial products like CDOs, where highly rated and seemingly low risk financial products that paid relatively high interest rates were created from poorer quality, higher risk collateral, generated massive amounts of capital available in the financial markets, and financial institutions saw mortgage lending as an opportune way of taking advantage of this available capital.  Mortgage originators had a powerful incentive to relax underwriting standards, which enabled them to take advantage of the greater availability of capital and the high demand caused by rapidly increasing housing prices.

104.     Traditionally, most mortgage loans had conformed to a set of standards developed over time by the mortgage industry to protect the lenders against defaults by the mortgagors. These standards included such things as a 20% down payment by the purchaser, verified income, a maximum debt-to-income level, proof of the mortgagor's creditworthiness, and so forth. Subprime loans – loans that were non-conforming to these standards – were rare.  Subprime

loans included loans where the financial condition of the borrowers either did not conform or could not be verified, and the terms of the loans – such as adjustable rate mortgages ("ARMs") or interest only loans – could create additional risks. Because subprime loans lack the built-in protections for the lenders, they are considered higher risk than conforming loans, and historically have had a higher default rate.

105. By 2001, however, as home price inflation gathered steam, more and more subprime loans began to be offered. Some $190 billion in subprime mortgages were originated in 2001. By 2006, this number had jumped to $600 billion.

106. Credit default swaps written by AIG were an integral and essential component of the inflationary spiral in the housing market. By providing credit default swaps that were "credit enhancements" to the super senior tranches of the CDOs, AIG enabled these securities to receive high investment grade ratings from the ratings agencies, which allowed the investment and commercial banks that underwrote these securities to market them to investors as safe, secure investments. The securitization business was growing rapidly and generating billions of dollars in revenues, and the banks made available to mortgage originators increasing amounts of the funds generated from the securitization business to enable them to continue to generate mortgages to be used as collateral for new securitizations. Because, however, the number of qualified borrowers was finite, increasing the flow of new mortgages could only be accomplished by lowering underwriting standards and by employing questionable marketing practices, such as offering mortgage products at seductively low initial rates that reset to higher rates after a period ranging from a few months to a few years. Thus, the easy accessibility of mortgage funds was a major contributing factor to the creation of the so-called "housing bubble"

– the uncontrolled inflation of housing prices, which, in turn, increased the demand for additional mortgage funds.

### III.    AIGFP's Decision to Stop Writing Credit Default Swaps

107.    According to *The Washington Post*, and based on that publication's interviews with former AIG executives, during the spring of 2005 some AIGFP executives had begun to question the surge in volume in its credit default business.  Included among these were Cassano, who had been instrumental in the decision to involve AIGFP in the business of writing credit default swaps in the late 1990's.  However, that uneasiness did not stop Cassano and others at AIGFP from writing more CDS contracts in nine months than had been written during the entire period from 1998 to March 2005.

108.    By late 2005, there were signs that the subprime lending was out of control. Executives at an AIG division in the mortgage lending business called American General Financial Services ("American General") had become alarmed by the rapidly growing use of subprime mortgages in the industry and decided to stop approving subprime loans.  According to *The New Republic*, and based upon its interviews with AIG executives, "word spread from American General to AIGFP that the subprime business was a minefield."

109.    In the fall of 2005, Frost, the AIGFP executive who was in charge of marketing credit default swaps and who served as a liaison with Wall Street investment banks, was given a promotion.  Tapped to take his place was Eugene Park, who ran AIGFP's North American corporate credit derivative portfolio.  After examining AIGFP's credit default swap portfolio, and determining the extent to which it was based upon subprime mortgages, Park declined the position.  According to *The Washington Post*, which interviewed Park and other AIGFP personnel in connection with a series it ran in late December 2008 on AIG's collapse, Park had

examined the annual report of a company involved in the subprime business and, as related by Park's colleagues, Park told them he "was stunned" by what he found.  Park concluded that the subprime loans underlying many CDOs formed too large a part of the packaged debt, increasing the risk to unacceptable levels.  He further concluded that the underwriting process had been so shoddy that the subprime loans could default at any time, regardless of geographic area.  Thus, one of the factors cited by AIG as ameliorating risk – that the CDOs were "diversified" or "multi-sector" CDOs insofar as they pooled loans from different geographic areas – was a myth.  According to *The Washington Post*, Park concluded that if the housing market fell, the subprime loans would collapse like a house of cards.

110.    After a series of meetings and conversations with colleagues over the course of several weeks, Cassano directed executives of AIGFP to look more deeply into the subprime market and the risks it posed to AIG.

111.    On the basis of the analysis of the subprime market and AIG's subprime exposure, senior executives at AIGFP realized that the model they were using to manage the risk involved with their credit default swaps was not adequate to deal with the subprime mortgage debt underlying the insured CDOs.  In the words of Gary Gorton, the outside consultant used by AIGFP to construct the model, they realized that "the model was not going to be able to handle declining underwriting standards."   Cassano decided in December 2005 to stop writing new credit default swaps for CDOs backed by subprime mortgage debt.

112.    According to Confidential Witness ("CW") 4, who was an AIGFP executive in 2005 with knowledge of the decision to stop writing multi-sector CDO-based credit default swaps, AIGFP's analysis in late 2005 supported the conclusion that it is not possible to create super senior tranche(s) "off a collateral pool which is almost perfectly correlated so if things

went bad, they're going to go bad in a big way. And you can't create a high grade exposure through securitization when the collateral has a huge correlation."   According to CW 4, the analysis presented to AIGFP's management was that this correlation was 1:1.  He further noted that the composition of the underlying collateral in January 2004, for example, was extremely different from the collateral for deals done in the latter part of 2005.  Whereas in earlier multi-sector CDO deals there were many different types of uncorrelated assets, such as AAA credit cards, AAA student loans, AAA commercial MBS and prime mortgage collateral, the CDOs became "almost entirely all subprime" as time went by in 2005. CW 4 confirmed that by the end of 2005, of the 45 "high grade" and 59 "mezzanine" deals that AIG has admitted includes subprime exposure, most of them were written in the period after mid-March 2005.  Moreover, he recalled that so-called "no document" loans had become the norm by the end of 2005, and estimated that 40% to 50% of the collateral for multi-sector CDOs insured through the CDS program was comprised of no document loans by that time.  He stated that these considerations were the basis for the decision to exit the multi-sector CDO credit default swap business.

113.    According to CW 4, their review led them to conclude that "in order to continue writing CDS contracts on subprime debt, the attachment points [i.e., the percentage of default in the collateral before AIG's payment obligation attached], which would have been in the 30 [percent] range, would have needed to be in the range of 55 [percent], which makes it impossible to create a transaction after that date."

114.    According to CW 4, once AIGFP decided to exit the multi-sector CDS business, because of its many longstanding relationships with investment banks that "had a lot of deals in the pipeline," AIGFP simply told these clients that they were putting the business "on hold" and that AIGFP was reviewing the business.   Thereafter, its position on transactions that were

presented was that it was just impossible to get them done, which was a way for AIGFP "to bow out of it without having to say that they were 100% out of the business."

115.    AIG did not disclose its decision to stop writing these risky contracts to the public until August 2007, by which time the market was very concerned about the impact subprime mortgage-backed debt was having on large financial institutions and was clamoring for information about the composition of these institutions' asset portfolios.  As explained below, however, AIG failed to disclose significant facts about the reasons AIGFP decided to exit the business of writing CDS contracts based on multi-sector CDOs, and thereby misled the market about the actual risks that the subprime-backed CDOs, for which AIGFP had written CDS contracts, posed to AIG's financial condition.

## IV.    AIG's Exposure to the Unhedged Risks of AIGFP's Credit Default Swaps

116.    Despite AIGFP's decision to stop writing new credit default swaps, it did not attempt to extricate itself from the credit default swap contracts it had already written, which remained on its books and imposed continuing obligations on AIG for the length of the contracts.

117.    The par value, or "notional" amount of the CDOs insured by the credit default swaps written by AIGFP was important because, if any of these CDOs defaulted – meaning the CDO could no longer meet its obligations to pay interest to holders of the securities – under the terms of the credit default swap AIG could be obligated to pay up to the full notional amount of the defaulted CDO, in effect purchasing the CDO at full value.

118.    But the risk of default (*i.e.*, credit risk) is only one type of risk created by credit default swaps on subprime-backed CDOs.  In addition, AIG faced at least two other significant risks arising from these credit default swaps:  valuation risk and collateral risk.

119.     Valuation risk is the risk that the value of the CDO securities will decline.  This can occur even though the collateral underlying the CDO securities has not defaulted due to concern in the market about the possibility of such a default.  The percentage of collateral in the pool that must default before any loss is borne by the super senior tranche of a CDO is called the "attachment point" for that tranche.  The higher the amount of default in the pool, and the closer that default level gets to the attachment point, the more the market will discount the value of the super senior tranche due to the increasing possibility of the super senior tranche defaulting.

120.     As discussed in more detail below, except where credit default swaps are used to hedge other transactions, which was not the case with the credit default swaps written by AIGFP, GAAP requires a writer of a credit default swap to carry the value of the credit default swaps on its balance sheet at "fair value."  This means that AIG was required by GAAP to reassess the value of its credit default swaps on a regular basis and, when their value changed materially, that change had to be reflected by an adjustment on AIG's balance sheet and income statement.  The fair value of the credit default swaps written on CDOs was determined by the value of the CDOs themselves.  This is because of the possibility that AIG would have to swap positions with the holder of the CDO in the event of default – *i.e.*, AIG would have to pay the holder the notional amount of the CDO and, in exchange, be entitled to receive the cash flow generated by the CDO.  Therefore, AIG was required to value the credit default swap as though it represented a contingent interest in the CDO itself.  Thus, any decline in the fair value of the CDO represented a decline in the value of AIG's contingent interest, and AIG was required to record this adjustment as a charge against income on its financial statements.

121.     Collateral risk is the risk that AIG would have to post collateral in connection with a credit default swap.  Because a credit default swap contract is a form of guarantee, which,

under certain conditions can require the swap issuer to pay the counterparty up to the notional amount of the CDO, the swap contracts often contained provisions requiring the swap issuer to post collateral as an assurance that the issuer of the swap will be able to perform its obligation in the event of a default.  Because of AIG's stellar debt rating, however, and unlike many other financial institutions, it could write a virtually unlimited number of credit default swaps – and issue similar types of financial instruments – without having to post collateral.  Indeed, AIGFP's phenomenal growth from a fledgling operation when it was founded in 1987 to a multi-billion dollar operation by the middle of this decade was due, in large measure, to AIGFP's ability to draw on the AAA credit rating of the AIG holding company and thus avoid the expense and liquidity constraints faced by less highly rated competitors.  Nevertheless, many of AIGFP's credit default swap contracts contained a provision requiring AIGFP to post collateral if AIG's credit rating fell, or if certain other events occurred that might call into question AIGFP's ability to perform its obligations.

122.   Indeed, as AIG and AIGFP senior executives were aware, the model utilized by AIGFP to assess the amount of risk involved with particular credit default swaps utilized data relevant to predicting the likelihood of default, but it was not equipped to handle the risks associated with potential downgrades of AIG, downgrades in the ratings of counterparties, or declines in CDO valuations or ratings, any and all of which were contingencies that could be used by CDS counterparties to require AIG to post collateral on their CDS contracts.  Additionally, according to CW 4, an unusual feature of many of the CDS contracts written by AIGFP was that the counterparty bank was designated as the calculation agent for determining the valuation of the referenced CDO for purposes of determining when collateral had to be posted.  Thus, according to CW 4, the banks were the presumptive prevailing party as to the

valuation of the CDOs.  CW 4 stated that "it's their [i.e., the counterparties'] decision on how they mark it and that's how collateral is posted."  He added that this process is "very biased in favor of the banks."  Notably, however, that particular feature of the Company's CDS contracts was never made known to investors – even when AIG and AIGFP executives spoke of receiving collateral calls from CDS counterparties, and later, when AIGFP executives criticized the use of the Government bailout money to post collateral on AIGFP's multi-sector CDOs.

123.    Even though AIG ceased writing new credit default swaps on CDOs backed by subprime mortgages by the end of 2005, approximately half of the credit default swaps of this type previously written contained provisions permitting the manager of the CDO to substitute new collateral for RMBSs in which the underlying mortgages had been paid down or refinanced.  This enabled the manager to ensure a sufficient level of cash flow to service the securities backed by the CDO.  As underwriting standards in the home mortgage origination industry continued to decline during 2006 and 2007, and mortgage companies increasingly promoted risky, but seductive, types of mortgages such as ARMs, many of the CDOs insured by credit default swaps with AIGFP became more risky over time than they were when the credit default swap was written.

124.    Although it is possible for a financial institution to hedge the risk involved in writing credit default swaps, AIG did not hedge the risks created by those that it wrote on subprime-backed CDOs.  At a May 2007 investor conference, defendant Forster, the AIGFP executive who headed the global credit trading business, told investors that AIGFP did not have to hedge its credit default swap portfolio because of the "conservatism" in the way it constructed the portfolio.  That meant that while AIGFP was generating millions in profits from its credit default swap business, AIG was potentially exposed to losing the full notional amount of the

multi-sector CDOs it was insuring – approximately $80 billion, of which at least $63 billion was backed by subprime mortgage debt.

125.    CW 1, an executive who formerly headed the CDO business at a major Wall Street investment bank and two of the largest commercial banks in the United States, told Lead Plaintiff's investigators that he conducted five credit default swap deals for CDOs with AIGFP over the years, working directly with Alan Frost and Adam Budnick in AIGFP's Connecticut office and Andrew Forster in AIGFP's London office.

126.    CW 1 stated that AIGFP could have protected itself by hedging its credit default swaps, but did not do so because "their [AIGFP management's] bonuses were highly dependent on revenue out of that book of business" and if they had incurred the added cost of hedging "it wouldn't have been much of a business."  This was confirmed by CW 4, who stated that "if you had to hedge the business it would not be an economically viable line of business."  According to CW 1, the decision not to hedge the CDS portfolio was not due to "conservatism" – as defendant Forster stated - but because "they were being greedy."  In short, AIGFP's top management, including defendants Cassano, Frost and Forster, put the Company at greater risk in order to increase their own compensation.

127.    CW 1 confirmed that as time went by the CDS contracts written on multi-sector CDOs became almost 100% residential risk, and that they contained all or almost all subprime debt.  Contrary to AIG's public pronouncements that it only insured CDOs of the highest quality, CW 1 noted that AIGFP actually tended to prefer CDOs known as "mezzanine deals" as opposed to "high grade" CDOs.  The "mezzanine" CDOs were comprised of lower quality collateral with higher "attachment points," whereas the "high grade" CDOs contained higher quality collateral but with lower attachment points.  Because the notional amounts of mezzanine deals were

smaller, AIGFP could write more of them than the high grade CDOs, and thereby generate more revenue.

## V.     AIG Loosens Controls on AIGFP After Greenberg's Departure

128.    From its earliest history, AIGFP was both physically and culturally separated from the rest of AIG.  Apart from moving from New York City to establish AIGFP's U.S. headquarters in Wilton, Connecticut, AIGFP also opened its principal headquarters in London – putting that much more distance between AIG and AIGFP.

129.    While Greenberg was in charge of AIG, he insisted on close supervision of AIGFP by AIG's senior management.  After Greenberg retired as CEO, however, the holding company's control over AIGFP weakened substantially, and it did not monitor or evaluate effectively the level of risk that AIGFP had taken on.  Greenberg told the U.S. House of Representatives Committee on Government Oversight that it is his understanding that "the risk controls my team and I put in place were weakened or eliminated after my retirement.  For example, it is my understanding that the weekly meetings we used to conduct to review all AIG's investments and risks were eliminated.  These meetings kept the CEO abreast of AIGFP's credit exposure."  This is corroborated by a September 28, 2008 article in *Portfolio* magazine, entitled "AIG's House of Cards," which states that "Martin Sullivan 'had eliminated a twice-a-month meeting to assess the work of the [AIGFP] unit, according to a person formerly close to the company.  He wasn't really interested in the business,' this person said."  The *Portfolio* article quotes Randall K.C. Kau, a former senior executive at AIGFP, as stating:  "Within A.I.G., F.P. had a cult status."  Kau continued:  "Under Hank [Greenberg], F.P. was always on its toes. … [Greenberg] didn't have a derivatives background, but he was always vigilant about reading the reports."  *The New Republic* quotes a former AIG official as saying that Greenberg's successor,

defendant Sullivan, "didn't have the ability to figure out what was going on there [at AIGFP]." Sullivan, who took over the helm of AIG following Greenberg's resignation in the midst of multiple governmental investigations and related litigation, did not consider AIGFP a priority according to the former AIG official.  Similarly, according to *The New Republic*, AIG's Chief Financial Officer, defendant Bensinger, was completely preoccupied by the on-going restatement of four years worth of AIG's financial statements.  As *The New York Times* reported, based upon interviews with current and former AIG employees, Cassano ran AIGFP "with almost complete autonomy, and with an iron hand."  CW 4 similarly described Cassano as "a complete control freak" who "very much liked to be in control of everything."

130.    As the head of AIGFP, Cassano reported to William N. Dooley, a senior vice president of AIG.  According to interviews conducted by *The New Republic*, however, former colleagues report that Cassano rebuffed Dooley at every turn, often aggressively.

131.    AIG's outside auditors, PwC, reported to defendant Sullivan and others in November 2007, approximately a week before a December 5, 2007 investor meeting, that there were significant deficiencies, and possibly a material weakness in AIG's risk management and internal controls with respect to AIGFP's CDS portfolio.  According to the audit committee minutes from a later March 11, 2008 meeting, PwC found that this was due to a "lack of timely elevation of key data to the AIG level and the fact that AIGFP had designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting function."  Lead Plaintiff's investigation has confirmed PwC's findings from a number of sources, as indicated below, who stated that Cassano operated AIGFP in a manner to insulate it from scrutiny and control by AIG's risk management and accounting functions.  As a result, not only were AIGFP's valuation and risk management processes faulty, AIG was

incapable of verifying the information provided by AIGFP.  As a result, AIG's financial statements and public disclosures did not accurately reveal the true value of the assets acquired by AIGFP and the type or amount of risk that AIGFP had taken on.

132.   AIGFP operates in a number of business groups, including a Commodity Trading Group, a Foreign Exchange Trading Group, a Foreign Exchange Prime Brokerage Group, an Equity Trading Group, a Fixed Income Trading Group, a Transaction Development (private equity) Group, and a Corporate Marketing Group.  The credit default swap business was run out of both the London and Wilton, Connecticut offices by a group called the Assets/Credit Group. This business was headed by Cassano, who, along with Forster, supervised the London Asset/Credit Group operations, and the U.S. Asset/Credit Group operations were headed by Adam Budnick, Frost, and Athan, who were headquartered in Wilton.  Frost and Athan, along with Cassano, recently have been reported to be subjects of a criminal investigation by the DOJ.

133.   In the wake of the accounting fraud investigations during the first half of this decade, AIG implemented rigorous procedures and systems of internal controls, particularly in the area of risk management, which gave the Company's central risk management function clear access to, and understanding of, any risk management issues as they arose.  AIG boasted of these procedures and systems in its public statements and reports, and, for the most part, this was confirmed by the former employees interviewed by Lead Counsel's investigators.  There was, however, one notable exception to this.  The exception to this is the Asset/Credit Group, which was headed by Cassano in the London office.

134.   According to another of the confidential witnesses interviewed by Lead Counsel's investigators, CW 2, a former AIGFP vice president who was involved in AIGFP's management information system during the Class Period, AIG used a standard, company-wide, Windows-

based management information system nicknamed "JAVAH," an acronym for "Just Another Value and Hedge."  Information regarding the Company's positions and exposures was input into this system, and it provided the basis for any information transmitted to AIG's risk management, accounting and other departments to make business decisions pertaining to AIGFP. According to CW 2, who has worked at other large firms in the finance industry, many of AIG's processes were "so much more comprehensive and rigorous" than those used at other firms.  CW 2 described a nightly trading review process of the firm's trading positions.  In addition, there was a transaction review committee that reviewed each and every transaction that the firm conducted, and there were weekly conference calls that, in his words, "painstakingly monitored every aspect of risk."  He described the risk management process at AIG generally as being "rigorously transparent, top-notched and belt-and-suspenders in everything they do, except that none of this applied to the Asset/Credit [credit default swap] business, as it was handled completely differently."  According to CW 2, the Assets/Credit Group within AIGFP did not utilize JAVAH, but instead, Cassano maintained information regarding the credit default swaps separate from AIG's other information systems on a spreadsheet, which was managed out of the London office.  The risk management and accounting functions at AIG did not have access to this spreadsheet.

135.    According to CW 2, Cassano presided over weekly marketing and trading meetings, which were attended by executives in all of AIGFP's businesses, where the performance of each of AIGFP's businesses was reviewed, and pertinent risk management issues were also discussed.  For example, common risk metrics such as VaR ("value at risk") for each of the business units within AIGFP were discussed and analyzed at great length.  Again, however, the credit default swap business was an exception, as risk management issues

pertaining to this business were not covered at these weekly meetings.  The only risk discussions relating to the Asset/Credit business were "market driven" considerations, but, according to CW 2, the Asset/Credit business was "definitely treated differently and wasn't as transparent as the other businesses."

136.    CW 3, another former AIGFP executive vice president during the Class Period, stated that, although corporate management relied heavily on VaR analysis, unlike the other groups within AIGFP, he was not aware of the Asset/Credit Group ever providing a VaR analysis to corporate management with respect to the CDS portfolio.  CW 3 further described a "total lack of communication between [AIG]FP" and AIG.  He told Lead Plaintiff's investigators that "I was there [several] years and never met anyone from AIG, so if I were looking from the outside, I would wonder why AIG didn't have a better handle on what was going on at FP."

137.    Both CW 2 and CW 3 stated that it was their impression that Pierre Micottis, the head of global risk management at AIGFP, was intentionally excluded from adequately performing the risk management function with respect to the Asset/Credit Group.  CW 3 stated that he heard this from "many of his colleagues."   CW 4 confirmed this, stating:  "He definitely wasn't involved in that business which is odd because he's the head risk guy."   CW 4 further stated that Michael Hieb and Ravi Bhagavatula, two other senior personnel involved with overall risk management for AIGFP, similarly were not involved in reviewing the CDS business and attendant risks.

138.    According to CW 3, the persons assigned to valuation and collateral issues on AIGFP's credit default swap portfolio were generally junior level people with little responsibility.  If there were significant discrepancies on issues such as the need to post collateral or amount of collateral, these issues were handled by senior business people, such as Adam

Budnick or Alan Frost, who would contact the counterparty directly.  CW 3 described the credit default swap business as "purposely isolated in London" and "never subject to [the] rigorous process" that he described for the rest of AIG.  Moreover, according to CW 3, it would be impossible to understand effectively the total risk exposure of AIGFP without having an accurate understanding of the independent risk attributable to the London business.  Thus, in effect, despite AIG's impressive internal controls for **most** of its businesses, the absence of effective controls over the credit default swap business meant that a huge area of potential exposure was uncontrolled, and the risks were opaque to AIG's corporate financial management.

139.    A much publicized resignation letter written by an AIGFP executive vice president, Jason ("Jake") DeSantis, to AIG in March, 2009, which appeared in the op-ed section of *The New York Times* on March 24, 2009, further corroborates the information provided by plaintiffs' confidential sources, and various public statements, that the credit default swap business was isolated from AIGFP's other businesses and closely managed by Cassano and a few other senior executives.  DeSantis, who served as head of business development for AIGFP's commodities trading business, confirmed that not more than a "handful" of AIGFP's employees were involved with the credit default swap business.

## VI.    AIGFP Ignores Valuation Impact as the Subprime Mortgage Crisis Begins to Manifest

140.    By the start of 2006, the torrid rise in housing prices had begun to slow.  As may be seen from the data in the tables below from the National Association of Realtors' monthly statistical reports on home sales activity, home sales price growth had slowed nationwide by February 2006 and by early summer was in decline in most parts of the country.  The number of houses sold began declining year over year by February 2006, and this trend accelerated over the next two years.

**Median Home Prices (Year-over-Year Changes)**

| 2006 | YOY | Northeast YOY | Mid West YOY | South YOY | West YOY |
|---|---|---|---|---|---|
| Jan-06 | NA | NA | NA | NA | NA |
| Feb-06 | 15.30% | 12.40% | 3.90% | 11.70% | 21.60% |
| Mar-06 | 7.40% | 3.10% | 3.20% | 5.90% | 8.30% |
| Apr-06 | 3.70% | 5.60% | -2.40% | 4.00% | 4.50% |
| May-06 | 5.50% | 4.10% | 0.00% | 6.10% | 4.20% |
| Jun-06 | 0.00% | 4.00% | -1.70% | -1.60% | -0.60% |
| Jul-06 | 0.90% | -2.10% | -1.10% | 3.80% | -0.60% |
| Aug-06 | -2.20% | -3.90% | -3.40% | -2.60% | 0.30% |
| Sep-06 | -1.80% | -4.40% | -2.90% | -1.10% | -2.30% |
| Oct-06 | -4.40% | -4.50% | -3.50% | -7.50% | 0.00% |
| Nov-06 | -3.10% | -2.20% | -3.50% | -3.20% | -0.80% |
| Dec-06 | 0.00% | 3.70% | -2.90% | 0.00% | 1.50% |
| 2007 | US YOY | Northeast YOY | Mid West YOY | South YOY | West YOY |
| Jan-07 | -3.10% | -1.20% | -3.50% | -1.70% | -4.60% |
| Feb-07 | -2.30% | -5.10% | -2.00% | -3.50% | 1.20% |
| Mar-07 | -0.30% | -0.70% | 0.20% | - 0.40% | -2.90% |
| Apr-07 | -0.80% | -0.60% | 1.90% | -0.30% | -2.10% |
| May-07 | -2.50% | 1.50% | -3.30% | -4.40% | -0.50% |
| Jun-07 | 0.00% | 1.30% | -2.50% | 0.10% | 1.80% |
| Jul-07 | -0.70% | 6.40% | -1.80% | -3.60% | 0.90% |
| Aug-07 | 0.20% | 3.60% | 3.50% | -0.90% | -3.80% |
| Sep-07 | -4.80% | 0.20% | -1.40% | -5.60% | -7.80% |
| Oct-07 | -5.50% | 1.20% | -3.70% | -6.90% | -7.60% |
| Nov-07 | -4.00% | -3.30% | -2.10% | -3.30% | -6.80% |
| Dec-07 | -6.00% | -8.90% | -3.90% | -4.10% | -11.10% |
| 2008 | US YOY | Northeast YOY | Mid West YOY | South YOY | West YOY |
| Jan-08 | -5.30% | 2.40% | -7.90% | -6.40% | -7.90% |
| Feb-08 | -8.40% | 0.60% | -8.00% | -8.60% | -13.20% |

| Mar-08 | -8.00% | 4.10% | -6.20% | -6.80% | -15.00% |
| Apr-08 | -8.40% | -7.60% | -4.50% | -5.60% | -15.50% |
| May-08 | -6.60% | -2.50% | -1.90% | -4.30% | -16.40% |
| Jun-08 | -6.20% | -9.60% | 1.50% | -2.00% | -17.80% |
| Jul-08 | -7.10% | -4.70% | 0.90% | -3.30% | -21.80% |

(Source: National Association of Realtors)

141.   The bursting of the housing bubble directly caused an increase in subprime mortgage defaults.   In many instances, borrowers who could not afford to make mortgage payments over the term of the mortgage had purchased the mortgaged property on speculation based on the assumption that the market value of the property would continue to increase, enabling the purchaser to turn it for a profit.   Many mortgage originators had offered "no document" loans, evidencing a significant lowering of underwriting standards.   Many had also offered ARMs and interest only loans to entice borrowers to take on large amounts of mortgage debt, which initially had low "teaser" rates that reset to higher rates after a few years.   Because these home buyers assumed that the value of their homes would continue to increase, they believed that their equity in the homes would automatically increase, which would enable them to either sell the homes before the rates reset or to refinance at lower rates based upon better loan-to-value ratios.

142.   An August 23, 2006 *Barron's* article, titled "The No-Money Down Disaster," provided the following statistics:

- 32.6% of new mortgages and home-equity loans in 2005 were interest only, up from 0.6% in 2000;

- 43% of first-time home buyers in 2005 put no money down;

- 15.2% of 2005 buyers owe at least 10% more than their home is worth;

- 10% of all home owners with mortgages had no equity in their homes as of August of 2006; and

- $2.7 trillion dollars in loans would adjust to higher rates in 2006 and 2007.

143.     By early fall 2006, it was evident that the real estate bubble was bursting and, as a result, default rates for subprime mortgages were increasing.  During the first half of 2006, the California subprime originator Acoustic Home Loans was driven out of business.  Several other subprime originators closed their doors in early 2007, including Secured Funding Corp. (a California subprime lender focused on home equity loans with $1.3 billion in originations in 2005), which closed on January 8, 2007; Bay Capital ($800 million in originations during 2005), which closed on January 12, 2007; Lenders Direct Capital Corp., which ended its wholesale operations on February 8, 2007; and Maribella Mortgage LLC of Minnesota ($900 million in subprime originations in 2005), which closed on March 9, 2007.

144.     As a consequence of the decline in the real estate market, a number of subprime mortgage originators filed bankruptcy petitions at the end of 2006 and in early 2007, including Ownit Mortgage Solutions, Inc. (Chapter 11 petition filed December 28, 2006); ResMAE Mortgage Corp. (Chapter 11 petition filed on or about February 12, 2007); Mortgage Lender's Network USA, Inc. (Chapter 11 petition filed on February 4, 2007); and People's Choice Home Loan, Inc. (Chapter 11 petition filed on March 20, 2007).

145.     CW 1 stated that by mid to late 2006, AIGFP and the "Street" knew that there were going to be problems with respect to the ABS CDOs containing subprime mortgages, even though AIGFP had shut down the CDS product by 2006.

146.     In January 2006, a group of sixteen of the largest investment banks created an index to track the value of credit default swaps issued on securities backed by subprime mortgage loans.  This index, called the ABX Index, is administered by Markit Group, a London-

based company that specializes in credit derivative pricing.  The ABX has a number of sub-indices, each one tracking a different basket of swaps with similar ratings and underlying risk profiles.  In February 2007, the same group of investment banks launched a companion index, called the TABX, to track mezzanine subprime CDOs.  By mid-February 2007, in response to the reported rise of default rates on subprime mortgages and the announced bankruptcy of several subprime mortgage originators, the ABX indices had declined, and the mezzanine ABS indices had declined by 15% or more.  On February 22, 2007, *Bloomberg* quoted an asset manager as stating that the ABX BBB values were "going to zero."  By July 2007, the ABX had declined even further.  While the decline in the mezzanine portions of the ABX was more precipitous than the higher rated portions, all of the sub-indices were trending downward, and the portions tracking high grade credit default swaps fell significantly.  The TABX similarly fell significantly over this time period.  By the end of the first quarter of 2007, the TABX index for mezzanine super senior CDOs had declined to approximately 85%.  By the end of the second quarter of 2007, the TABX index for senior CDO tranches had fallen by about 40%.

147.   Despite the decline in indices reflecting the actual market values of subprime-based super senior CDOs, which were the same type of CDO tranches in AIG's investment portfolio and referenced by AIGFP's credit default swap portfolio, AIG failed to mark its CDO and CDS portfolios down to the current market value, as required by GAAP, and at least during the period from February 2007 to the end of February 2008, AIG reported inflated assets and income in its publicly filed financial statements.

148.   In April 2007, it was widely reported that two hedge funds operated by Bear Stearns had experienced losses in CDO investments, which losses triggered margin calls.  In June 2007, it was again widely reported that these hedge funds could not meet their margin calls

and had collapsed.  Certain of the CDO assets of the hedge funds were seized by creditors and sold at deep discounts, and in some cases collateral auctions were cancelled after it became apparent that there were no buyers for the CDOs.

## VII.   AIG Is Faced Directly with Valuation Deficiencies Concerning the CDS Portfolio Through Goldman Sachs' Collateral Demands

149.    Throughout the first half of 2007, AIG ignored evidence in the market indicating a probable decline in the value of CDOs backed by subprime debt and failed to record any valuation adjustments for its credit default swaps written on its multi-sector CDOs.  In particular, AIG ignored the declines in the ABX and TABX indices in the first half of 2007, which was direct evidence of the declining value of its CDS portfolio.

150.    Indeed, as the credit crunch was escalating, AIG adopted a strategy to allay investor fears by making a series of presentations to investors on the subject of AIG's exposure to the U.S. residential housing market, and particularly the subprime market.  One presentation was made during the second quarter 2007 investor call on August 8, 2007; another was made during the third quarter 2007 investor call on November 8, 2007; and a third presentation was made at a special investor meeting held on December 5, 2007.

151.    During each of these conferences, AIG conveyed the false impression that it was not susceptible to the infirmities experienced by other firms that held large amounts of RMBS.  For example, on the August 8 call, defendant Sullivan stated, "AIG is a very safe haven in stormy times."  In furtherance of this strategy, AIG senior executives focused the presentations on the purported strengths of AIG's CDS portfolio and investment portfolio, and sought to assure investors and analysts that whatever perceptions they had about AIG based on overall market conditions did not match the reality within the Company.

152.    Accordingly, during each presentation, AIG's senior executives stressed the remoteness of risk of the CDS portfolio and the strength of the underlying CDO assets.  For example, AIG made the following representations:

- AIGFP's CDS portfolio consisted of extremely risk remote, Super Senior credit protection on highly diversified pools of assets, noting that the Super Senior portion of the CDOs is the least likely to incur any losses.

- Every transaction was carefully structured and screened as to collateral, manager and structure to ensure that AIG received the maximum protection.

- The risk analysis and underwriting for each individual transaction was approved by the credit trading team, AIGFP credit officers and AIG's Credit Risk Committee.

- AIG had very favorable attachment points for its Super Senior tranche.

- AIG had strong risk management processes undertaken by experienced professionals.

- AIG's exposures to residential mortgages were understood and well-managed.

- AIG's exposure to sub-prime residential mortgages was relatively small.

- None of the AIGFP CDS contracts had experienced any significant collateral deterioration, and the risk of deterioration was "very remote."

- AIGFP stopped writing CDS contracts after 2005.  As a result, its CDS portfolio was not subjected to the more-risky mortgages in the 2006 and 2007 vintages.

- Based on the uniqueness of the CDS portfolio, AIG foresaw no dollar of loss associated with any of part of the CDS business, even under severe recessionary conditions.

- Based on the uniqueness of AIG's portfolio, the value of the CDOs it insured were not subject to being written down based on well-accepted indices.

153.    As described more fully below, these presentations were deceptive and materially misleading because, among other things, they were intended to detract investor attention away from AIG's collateral risk and valuation risk – risks that AIG was aware of were material and

substantial at the time of these presentations because, among other things, by the time these presentations were made, Goldman Sachs had made demands on AIG for substantial collateral payments and, moreover, indices for the very type of CDOs that were insured through the CDS contracts showed significant deterioration and diminished market prices.

154.    In August 2007, Goldman Sachs, a leading Wall Street investment bank, demanded that AIG post $1.5 billion in collateral due to the decline in value of the assets backing CDOs it had insured with credit default swaps.  AIG resisted this demand and was able to negotiate the collateral to be posted down to $450 million.  It did not, however, adjust its valuation of its CDS portfolio to reflect the obvious fact that it was not only Goldman's CDOs that were impaired due to the rise in defaults in underlying subprime mortgages.

155.    In October 2007, Goldman made a second collateral demand, this time for an additional $3 billion in collateral to support credit default swaps on Goldman's CDOs.  Again AIG resisted, and finally it agreed to post $1.5 billion in collateral.  Once again, AIG failed to adjust the value of the rest of its CDS portfolio, notwithstanding the similarities in the subprime mortgages underlying the Goldman CDOs to other CDOs AIG was insuring.  Goldman's collateral demand, however, was a red flag that, among other things, alerted PwC to the fact that AIG's valuation methods had been inadequate.

## VIII.   AIG Is Placed on Further Notice of Valuation Issues Stemming from the Exclusion of Joseph St. Denis from the Valuation Process and His Subsequent Resignation

156.    In response to concerns regarding the remediation of entity-wide material weaknesses at AIG, in June 2006, the Company hired Joseph St. Denis, a former Assistant Chief Accountant at the SEC Enforcement Division, to address certain accounting and reporting policies.

157.    The position of Vice President of Accounting Policy was created as part of an entity-wide effort to address material weaknesses previously cited by PwC, to provide AIG's Financial Services Division ("FSD") and Corporate Office of Accounting Policy ("OAP") with greater visibility and control over the operations and accounting policy practices of AIGFP, and to provide an on-site resource for AIGFP business people as they developed proposed transactions.

158.    Mr. St. Denis was Vice President of Accounting Policy at AIGFP from June 2006 through October 1, 2007, and also served as a member of AIGFP's Transaction Review Panel, which was responsible for evaluating and documenting the accounting for proposed transactions by customers of AIGFP.   During this entire period, Mr. St. Denis worked out of AIGFP's Wilton, Connecticut office.   As Vice President of Accounting Policy, Mr. St. Denis' responsibilities included documenting the accounting for AIGFP's proposed transactions, and building consensus around that proposed accounting with his accounting policy counterparts at FSD and OAP.   As part of this process, for material and/or unusual transactions, Mr. St. Denis was supposed to meet with the business people at AIGFP to understand the proposed transaction, draft a memorandum for the CFO of FSD, and ultimately share the revised draft with OAP and PwC, the company's auditors.

159.    Mr. St. Denis received two formal performance evaluations at AIGFP.   In December 2006, he was told that management thought he was a "fantastic hire" and they were "thrilled" to have him as an employee.   Mr. St. Denis was awarded a bonus that exceeded his guaranteed amount by $50,000, or 15%, and was told "this [was not] supposed to happen," but his outstanding performance had warranted it.   In his second formal performance evaluation, in June 2007, defendant Cassano told Mr. St. Denis he was "doing a great job" and that he "should

continue to work closely with [FSD] and OAP."  Cassano also told Mr. St. Denis that AIGFP's relationship with AIG was AIGFP's "most important asset" and Mr. St. Denis was "critical" to that relationship.

160.    In early September 2007, Mr. St. Denis learned that AIGFP had received a multi-billion dollar margin [collateral] call on certain super senior CDSs.  Mr. St. Denis became gravely concerned that the valuation model of at least one of AIGFP's counterparties indicated that AIGFP was in a material liability position, and he sought to participate in the process of valuing AIGFP's CDS portfolio.  However, during the final week of September 2007, in a meeting that included the newly hired CFO of AIGFP and an AIG quantitative risk expert, Cassano told Mr. St. Denis, "I have deliberately excluded you from the valuation of the Super Seniors because I was concerned that you would pollute the process."

161.    Mr. St. Denis later testified through a letter to Congress that he believed the "pollution" Cassano mentioned was in fact the transparency he sought to bring to AIGFP's accounting policy process.

162.    In fact, Mr. St. Denis resigned twice before actually leaving AIGFP.  He first resigned on Sunday, September 9, 2007, because on multiple occasions Cassano took actions designed to prevent Mr. St. Denis from performing the duties for which he was hired and his position required.  For instance, during a meeting in August 2007, that was also attended by AIGFP's general counsel, Douglas Poling, Cassano berated Mr. St. Denis for bringing up accounting problems to FSD, and told Mr. St. Denis that he worked for Cassano, not FSD and OAP.

163.    Upon his September 9 resignation, Mr. St. Denis was contacted by AIGFP Chief Administrative Officer William Kolbert, who told Mr. St. Denis that nobody at AIGFP or AIG

was trying to control or interfere with his communications with FSD and OAP.  However, on September 25, 2007, Cassano once again berated Mr. St. Denis for his close interactions with OAP, and Mr. St. Denis became convinced that he could no longer work at AIGFP and perform the functions for which he had been hired.

164.    On October 1, 2007, Mr. St. Denis called William Shirley, the General Counsel of AIGFP, and re-submitted his resignation, forfeiting his bonus.  Mr. St. Denis told Shirley that he had lost faith in the senior-most management of AIGFP and could not accept the risk to AIG and himself of being isolated from corporate accounting policy personnel, especially given the situation with the super senior CDS portfolio.

165.    Mr. St. Denis also relayed his concerns to AIG's Chief Auditor Michael Roemer, who contacted him to learn the reasons for his resignation.  Mr. St. Denis told Roemer that the proximate cause for his departure was Cassano's statement that he had deliberately excluded Mr. St. Denis from discussions regarding the valuation of super senior CDSs.  Roemer agreed that Mr. St. Denis he had been "painted into a corner" by Cassano, and had no choice but to resign. Roemer further relayed the information from Mr. St. Denis to the AIG Audit Committee.

166.    After his resignation, Mr. St. Denis was contacted as well by the PwC engagement partner to inquire as to the reasons for his departure.  Mr. St. Denis relayed the same concerns to the PwC engagement partner about Cassano's attempts to impede his communications with his counterparts from the parent organization.

167.    The circumstances surrounding Mr. St. Denis' resignation from AIGFP squarely placed AIG on notice regarding the problems at AIGFP, and specifically Cassano's decision to shut Mr. St. Denis and others out of the valuation process of the CDS portfolio.  His resignation further placed AIG's senior executives and Audit Committee on notice, if they did not already

know, that AIGFP's methodology for valuation of its super senior CDSs was problematic, and not subject to the types of internal controls that the Company was indicating to the public that existed at AIG and its affiliated companies.

168.    In his subsequent letter to Congress dated October 4, 2008, Mr. St. Denis wrote:

> I believe that certain statements made by Mr. Cassano and other AIG senior managers in the early stages of the SSCDS [super senior CDSs] crisis were ill-advised.  Specifically, statements made at the December 5, 2007 Investor Meeting that characterized margin calls from its SSCDS counterparties as lacking a legitimate basis, especially given the apparent state of AIGFP's valuation models, were statements that I would not have made or condoned.  I believed at the time of the Investor Meeting and continue to believe that full disclosure of margin calls by, and resulting collateral postings to, AIGFP's SSCDS counterparties was of critical importance.

## IX.    PwC Informs AIG of a Potential Material Weakness in Controls at AIGFP

169.    In or about the time of the Goldman collateral calls and Mr. St. Denis' resignation, PwC became concerned about "material misstatements or omissions in the disclosures" in AIG's Second Quarter 2007 Form 10-Q.

170.    As a result, defendants Bensinger and Sullivan began meeting regularly with PwC in the third quarter of 2007 to discuss concerns PwC had with regard to potential material weaknesses in internal controls, relating to, among other things, AIGFP's CDS portfolio.

171.    In one of these meetings, PwC learned that AIG intended to hold an investor meeting on December 5, 2007, and, as a result, met with senior management at AIG to warn them of significant deficiencies, and a possible material weakness, in the valuation process concerning the CDS portfolio.  Specifically, on November 29, 2007 (as later chronicled in minutes of an Audit Committee meeting of January 15, 2008), PwC warned AIG's CEO, defendant Sullivan, and CFO, defendant Bensinger, that AIG had deficiencies with respect to its

risk management of the CDS portfolio, and that it could rise to the level of a "material weakness."  As stated in the Audit Committee minutes of January 15, 2008:

> Mr. Ryan [of PwC] reported that in light of AIG's plans to hold the investor conference on December 5, PwC had raised their concerns with Mr. Sullivan and Mr. Bensinger on November 29, informing them that PwC believed that AIG could have a material weakness relating to the risk management of these areas.

172.    The Audit Committee minutes further relate that "[PwC] said that management and PwC had agreed to gather more information, and that numerous meetings and much analysis had taken place among PwC and Management, including Messrs. Sullivan, Bensinger, Lewis, Roemer, and Habayeb."

173.    This notification by PwC, and the "numerous meetings and much analysis" that resulted, further placed AIG on notice of the serious problems with respect to the valuation of AIGFP's CDS portfolio.

## X.    AIG Falsely Reassures Investors at the December 5, 2007 Investor Meeting

174.    On December 5, 2007, AIG held an investor meeting to discuss its exposures to the U.S. residential housing market.  During this meeting, AIG represented that the value of the CDS portfolio had declined by $1.05 billion to $1.15 billion since September 30, 2007.  Adding these losses to those previously disclosed in the third quarter Form 10-Q, AIG led shareholders to believe that the total decline in value of its CDS portfolio through November 30, 2007 was between $1.4 and $1.5 billion.  AIG later confirmed this disclosure in its Form 8-K filed with the SEC on December 7, 2007.

175.    During the investor meeting, defendant Sullivan told shareholders that the possibility that the CDS portfolio would sustain a loss was "close to zero" and that the Company's U.S. residential housing market exposure levels "are manageable given AIG's size,

financial strength and global diversification."  Sullivan concluded that the "bottom line" was that "AIG has accurately identified all areas of exposure to the U.S. residential housing market."

176.    Defendant Cassano also went to great lengths to assure investors of the soundness of AIGFP's valuation models for CDS.  Notwithstanding the issues that had been raised within AIG and AIGFP stemming from (a) Goldman's collateral demands, (b) the exclusion of Mr. St. Denis from the valuation process, which led to his resignation from AIGFP, and (c) PwC's warnings to AIG's senior executives a week before the investor meeting, including that there could exist a material weakness in internal controls regarding AIG's valuation of the CDS portfolio, Cassano asserted that "AIG is confident in [its] marks and the reasonableness of [its] valuation methods."  Sullivan also told investors that AIG had a "high degree of certainty in" the losses that AIG had "booked to date."

177.    Moreover, when asked about the collateral calls that had been received from counterparties on CDS contracts, Cassano stated: "[W]e have, from time to time, gotten collateral calls from people and then we say to them, 'Well, we don't agree with your numbers.' And they go, 'Oh.'  And they go away…  It's like a drive by in a way."  In fact, AIG had already made collateral payments to counterparties, knew that demands to post additional collateral were arising as a result of legitimate issues about valuation, knew about the CDS contract provision that designated the counterparties as the presumptive prevailing party in terms of setting marks for the underlying CDOs, and also knew that its counterparties would not just "go away."

178.    According to CW 3, discrepancies between AIGFP and its counterparties arose with regard to collateral because AIGFP's valuation models were based on theoretical default rates for the underlying CDOs, whereas the counterparties relied on actual market data. According to CW 1, even though the market for CDOs was not highly liquid, there was trading

among hedge funds and the large investment banks, and therefore, the banks had the ability to price the underlying CDOs based on market data.

179.    In addition, as stated by CW 4, a former executive within AIGFP during the Class Period who reviewed the CDS portfolio, AIGFP's valuation models were intended only to predict whether the level of defaults in the underlying collateral would rise to the point where AIGFP's obligation to make payments to the counterparties would be triggered.  They were not intended to predict whether or when the referenced CDOs would decline in value or whether the collateral posting triggers would be reached.  Thus, the models did not measure or predict important asset valuation and liquidity risks posed by the CDS portfolio.

180.    By insulating AIGFP's valuation process from meaningful review by AIG's corporate Enterprise Risk Management and accounting functions, as described in ¶¶ 19 - 20, 131 above, Cassano was able to manipulate the valuation process to conceal the dramatic decline in values of the CDS portfolio by the third quarter of 2007, as the accelerating rate of subprime defaults began to affect the values of an increasing number of CDOs.  This manipulation was subsequently exposed by PwC and admitted by the Company, in an SEC filing on February 11, 2008, which is described below.

181.    The presentations and statements made by defendants Sullivan, Cassano and others at the December 5, 2007 investor meeting had their intended positive effect on AIG's stock.  In the previous six months, AIG's stock had fallen approximately 23%.  But, as the Wall Street Journal's blog *MarketBeat* reported that same day:

> [AIG's] stock was the leading Dow component out of the gate, opening at $58 a share, up $2.55, or 4.6%, from Tuesday's $55.45 close.  **The rally was bolstered by statements from company executives during today's session that its exposure to housing is "manageable,"** and that it has no exposure to structured investment vehicles, which hold a big load of the odorous mass known as collateralized debt obligations.

**XI.    AIG Admits Certain Misstatements Concerning Its Valuation of the CDS Portfolio**

182.    It soon became apparent, however, that the December 2007 disclosures about the soundness of AIGFP's valuation models were far from the truth.  Indeed, on February 11, 2008, in a Form 8-K filed with the SEC, AIG disclosed that its CDS portfolio losses were understated and that material information previously supplied to the market was inaccurate.

183.    AIG reported in its February 11, 2008 8-K that its gross cumulative decline in valuation for its CDS portfolio was actually $5.96 billion -- **more than $4 billion greater than what it had reported to shareholders in December**.  The 8-K explained that in the figures provided during the December 5 investor meeting, AIG had reduced the $5.96 billion dollars in "gross" losses down to approximately $1.4 to $1.5 billion through the use of "cash flow diversion features" and "negative basis adjustments."

184.    According to the 8-K, this was the first time that the Company had utilized "cash flow diversion features" to lower the losses it would report to the public from its CDS portfolio. In fact, when previously calculating the value of its CDS portfolio as of September 30 and October 31, 2007, AIG specifically stated that it could not reliably estimate the value of the "cash flow diversion features," and thus did not utilize them in its calculations.  AIG further admitted that over half of the "cash flow diversion features" it used to reduce its reported CDS losses were improper.

185.    AIG also admitted in the February 11, 2008 8-K that the December 2007 disclosures were the first time AIG began to net its losses in the CDS portfolio by utilizing "negative basis adjustments" – which the Company claimed were intended to reflect the spread differential between the spreads implied from cash CDO prices and credit spreads implied from the pricing of CDSs on the CDOs.  Yet, as admitted in the 8-K filing, AIG did not have grounds

to utilize the $3.63 billion "negative basis adjustment," which it had used in its December disclosures – along with the use of "cash flow diversion features" – to drastically reduce its reported CDS losses.

186.    The calculation of losses in its CDS portfolio that AIG reported in December 2007, as well as in its third quarter 2007 Form 10-Q, were inaccurate in other ways as well.  As reported in the February 11, 2008 8-K, the CDS portfolio losses reported in AIG's third quarter 2007 Form 10-Q were calculated using a modified Binomial Expansion Technique ("BET") that incorporated "generic" valuation inputs, as opposed to observed market-based inputs, that AIG later adopted to calculate its losses, including "cash bond prices provided by the managers of the underlying CDO collateral pools, or, where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided."  As AIG admitted, this type of generic valuation methodology used to compute its losses in the third quarter 2007 10-Q, as well as during the December 5, 2007 investor meeting, resulted in dramatically lower loss calculations as compared to the market-based valuation that AIG later implemented, which was more typically used in the industry.  Significantly, the February 11, 2008 8-K indicated that use of the generic valuation methodology would have led to a 57% smaller reported gross loss through November 30 had AIG continued to rely on that highly inaccurate method.

187.    The February 11, 2008 Form 8-K also revealed for the first time that AIG had been advised by PwC that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the [CDS] portfolio."  Notably, even though PwC had warned AIG's senior executives of just this possibility on November 29, 2007, they nonetheless represented at the

December 5 investor meeting that AIG and AIGFP had the utmost confidence in its valuation

models.

188.    The disclosures made on February 11, 2008 had a marked impact on AIG's stock

price.  That day, AIG's stock closed at $44.74 per share, compared to the closing price of $49.89

on February 8, 2008, the prior trading day.   On February 12, 2008, *The Wall Street Journal*

reported on these developments:

> The finding by AIG's auditors PricewaterhouseCoopers LLP forced the big insurer to lower the value of insurance contracts it holds by an estimated $4.88 billion, before tax.  **Late last year, AIG went to great lengths to tell investors about the Company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller just above $1 billion for October and November**.

> Investors sold AIG's shares aggressively, sending them down $5.94, or 12%, to $44.74, a five-year low, and below its nadir during its accounting scandal.  The decline wiped out $15 billion in stock market value and was the biggest percentage drop for AIG's shares since the 1987 stock-market crash.  AIG's shares have lost a third of their value in the past year and are down 23% this year.  Bond-rating firm Fitch ratings announced yesterday that it is putting AIG's issuer default rating on "negative" watch.

189.    Unfortunately, the February 11 disclosures still did not reveal the full extent of the

losses that AIG would be required to incur on its CDS portfolio.  Over the next several months,

investors would slowly learn the true magnitude of the losses that AIG had suffered.

190.    On February 28, 2008, AIG filed its annual report on Form 10-K for 2007.  In the

10-K, AIG announced that the cumulative value of its CDS portfolio actually dropped by $11.5

billion, and reported that AIG had suffered its largest quarterly loss ever - $5.3 billion in the

fourth quarter of 2007.  AIG reiterated in the Form 10-K that it did not have a basis to apply the

$3.63 billion in "negative basis adjustments" that had been used in the presentations made at the

December 5, 2007 investor meeting, and reduced or eliminated these offsets from its loss

calculation.  On a conference call on February 29, 2008, defendant Bensinger admitted that "AIG

concluded that recording a negative basis adjustment at this time is not consistent with GAAP fair value requirements."

191.    AIG also revealed, for the first time, in its 2007 10-K that AIG's CDS portfolio included $6.5 billion in liquidity puts written on CDOs linked to the subprime mortgage market. These put agreements represented substantial near-term liabilities, as they allowed purchasers of the subprime CDOs to force AIG to buy them back at the original price, despite the fact that they had substantially declined in value, and would likely be exercised if it becomes apparent that a default on the underlying collateral will occur.  In this event, AIG would be required to take back the underlying assets in exchange for only the CDS price, which it had received when the credit quality of the assets was much higher.  The state of the market made it likely that many of these liquidity puts would be exercised in the short term.

192.    In addition to disclosing the existence of the liquidity puts, the 2007 Form 10-K also reported for the first time that AIG had actually repurchased $754 million of these securities in 2007, and that it had provided third-parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years.  However, while acknowledging the liquidity puts, these repurchases and the provision of liquidity facilities (presumably due to collateral demands by CDO counterparties), AIG did not disclose the identity of the counterparties that had made collateral demands, or the range of differences between AIG's valuations of CDS contracts and the counterparties' valuations of their CDS contracts.

193.    The 2007 Form 10-K further included a letter from PwC confirming that AIG's internal controls relating to the AIGFP CDS portfolio valuation process had a material weakness and were ineffective, and an acknowledgement by AIG that its internal controls and procedures were ineffective as of December 31, 2007.  Specifically with respect to the CDS portfolio

valuation process and AIG's oversight of that business line, AIG stated that it had "insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007."  As AIG further stated:

> As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information.  Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively.  As a result, controls over the AIGFP super senior default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements.

While disclosing a significant amount of information, these statements were still materially misleading because, among other reasons, they failed to disclose that the material weakness arose because key personnel at AIG and AIGFP had been deliberately excluded from the process of valuing the CDS portfolio, and further that AIG's most senior executives had been warned by PwC before the December 5 investor meeting that there were significant deficiencies, and possible material weaknesses, in its internal controls relating to the reporting functions for the CDS portfolio.

194.    Along with the filing of AIG's 2007 Form 10-K, defendant Sullivan reported on February 29, 2008 that defendant Cassano, who had headed up the AIGFP business, had resigned from AIG.  Notably, however, Sullivan failed to reveal at that time that AIG had agreed to retain Cassano as a consultant, at a salary of **$1 million per month**.

**XII.   OTS Letter of March 10, 2008 Advising of Material Weaknesses Due to Lack of Access to AIGFP**

195.    On March 3, 2008, the Office of Thrift Supervision ("OTS") met with AIG senior management and communicated significant supervisory problems over disclosures in AIG's Form 8-K filed December 7, 2007 and AIG's unsatisfactory handling of Enterprise Risk Management Relationships with AIGFP.

196.    On March 10, 2008, OTS downgraded AIG's CORE ratings and communicated its risk management failure in a letter to AIG's General Counsel.  OTS stated that the disclosures in the December 7, 2007 8-K and discussion with PwC and AIG management "raise supervisory concerns regarding the corporate oversight of key AIG subsidiaries."  Specifically, OTS was "concerned that the corporate oversight of AIG Financial Products (AIGFP), International Lease Finance Corporation (ILFC), and America General Finance, Inc. (AGF) lack critical elements of independence, transparency, and granularity."

197.    The OTS letter, which was presented to AIG's management in March 2008 but not made public until Congressional hearings into AIG in October 2008, continued to discuss AIG's material weaknesses:

> A material weakness exists within corporate management's oversight of AIGFP's super senior Credit Default Swap (CDS) valuation process and financial reporting.  Recent supervisory review work and discussions with PwC indicate that AIGFP was allowed to limit access of key risk control groups while material questions relating to the valuation of super senior CDS portfolio were mounting.  The control groups included Enterprise Risk Management (ERM), the Corporate Comptroller's Group, and the CFO of the Financial Services Division.

> The super senior CDS valuation reviewed by corporate management lacked the accuracy and granularity necessary to understand the impact of key valuation components on AIG's accounting and financial reporting disclosures.  Corporate management did not obtain sufficient information to completely assess the applicability of the negative basis adjustment, a critical component of the valuation method.  In view of this occurrence and the observed similarity in reporting by other key subsidiaries, we are concerned that risk metrics and

72

financial reporting provided to corporate management by AIGFP and other key subsidiaries may lack the independence, transparency, and granularity needed to provide effective risk management oversight. …

Risk management practices need improvement to ensure that management and the board are fully able to identify, monitor, and control all significant risks. …

…the significant negative impact to earnings from the super senior CDS portfolio valuation adjustment, combined with the portfolio's potential to significantly impact future earnings, are of increased supervisory concern.

## XIII.   AIG Reports its First Quarter 2008 Results, Raises Additional Capital and Becomes the Subject of an SEC and DOJ Investigation

198.   On May 8, 2008, after the market closed, AIG revealed that its losses were much greater than had previously been disclosed.  AIG announced a net loss for the quarter of $7.8 billion.  According to the press release, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) [CDS] portfolio."

199.   AIG also disclosed on May 8, 2008 that it had sustained "capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges … result[ing] primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary."

200.   AIG further announced on May 8, 2008 that it would seek to raise $12.5 billion in new capital.  In explaining the need for the new capital, defendant Sullivan stated: "The capital raise is a response to the events of the last two quarters and its effect on our capital position.  It will fortify the fortress balance sheet you expect us to maintain and provide us with increased

financial flexibility in these turbulent times.  It will also position us well for the future."  When specifically asked what the new capital would be used for, Sullivan stated:

> On the capital plan, obviously it's to use it for general purposes.  What we have said clearly is that we want to fortify the fortress balance sheet that we have.  Obviously from that standpoint, we want the ability to continue to grow while maintaining strength to withstand potentially short term market volatility that obviously the financial services sector is facing at the present moment.  So at the present time, it is for general proposes, fortify the fortress balance sheet, and to give us the ability to grow in certain areas and obviously withstand any potential short term volatility.

201.   After the Company announced its first quarter 2008 results and its intention to raise $12.5 billion in capital, Standard & Poor's downgraded AIG's credit rating from AA to AA-, and the price of AIG's common stock fell on May 9, 2008, from $44.15 to $40.28 per share, representing an 8.8% loss.  Yet, as shown in greater detail below, the full truth about AIG's exposure to the subprime market, through its CDS portfolio and securities lending program, and the impact those two business lines would have on AIG's liquidity, had still not been revealed to the investing public.

202.   On May 20, 2008, AIG announced it had raised over $20 billion in new capital, a substantial increase from its initial plan announced on May 8, 2008 to raise $12.5 billion.  The amount was raised through the sale of common stock and equity units through public offerings, and various debt securities in private placements.

203.   During an investor conference sponsored by Lehman Brothers on May 20, 2008, AIG further reinforced that the purpose of the capital raise was to fortify its balance sheet and use the capital to take advantage of opportunities in emerging markets.  Defendant Sullivan stated:

> So, why did AIG raise capital?  As you are aware we announced plans to raise capital through the issuance of common stock, convertible and higher-grade securities.  **This strategic decision by the Board and Management to raise**

**additional capital at this time reflects both confidence in AIG's strong balance sheet and the desire to position AIG with enhanced flexibility to take advantage of opportunities as conditions warrant.**

**We view the capital we are raising is allowing AIG to continue to invest in and support the growth of our businesses while maintaining AIG's opportunist start during the period likely continued volatility. In fact, we believe it was the most intelligent visibility to be proactive, reassure the market, fortify our fortress balance sheet, enable us to take advantage in a lot of the attractive emerging markets that we're in as well as obviously be well positioned for any continued volatility in the credit markets.**

204.   In response to a question about the purpose of the capital raise, defendant Sullivan stated:

> [W]hat we decided … was to be proactive, get out in front, reinforce our fortress balance sheet to make sure that we have the ability to continue to invest in the opportunities that we have around the world. And to absorb any market volatility that may still be out there.

205.   AIG did not disclose that it would use the capital to satisfy collateral calls which AIG knew were likely given that just days earlier – on May 8 and 9 – the debt rating agencies downgraded its debt rating and CDOs it had insured were placed on a negative ratings watch.

206.   On June 6, 2008, *The Wall Street Journal* reported that AIG was under investigation by the SEC, DOJ and U.S. Attorney's Office in Brooklyn, New York for overstating the value of its CDS portfolio. On June 13, 2008, *The Wall Street Journal* further reported that a key focus of AIG's regulators were the presentations of defendants Sullivan and Cassano at the December 5, 2007 investor meeting, which were characterized as trying to "assure investors that losses would be minimal."

207.   On Sunday, June 15, 2008, AIG's Board of Directors convened a special meeting and ousted defendant Sullivan from his position as CEO at AIG. He was replaced by defendant Willumstad. Two weeks later, on July 1, 2008, it was reported that Sullivan received a

severance payment of $15 million, a pro rata bonus of $4 million, and the continued vesting of outstanding equity and long-term cash awards valued at approximately $28 million.

## XIV.   The Full Extent and Risks of AIG's Exposure to the Subprime Market in the CDS Portfolio and Through its Securities Lending Program Are Revealed When The Government Is Forced to Provide an $85 Billion Bailout to AIG

208.   With defendant Sullivan no longer leading the Company, on August 6, 2008, AIG filed its Form 10-Q for the second quarter of 2008 that more fully revealed key issues in the Company's securities lending program, along with its CDS portfolio.   In the 10-Q, AIG announced unrealized market valuation losses on its CDS portfolio of $5.6 billion for the second quarter, and $14.7 billion for the first six months of 2008.   AIG also announced that it had incurred pre-tax realized capital losses of $6.08 billion arising primarily from other-than-temporary impairment charges on its investment portfolio, which resulted primarily from declines in fair market values of residential mortgage backed securities.   For the quarter, AIG reported a net loss of $5.36 billion or $2.06 per diluted share.

209.   The 10-Q noted in connection with AIG's securities lending program that the invested securities had substantial realized and unrealized losses and that the Company had agreed to deposit into the securities pool an amount equal to the investment losses realized on the sale of impaired assets up to $5 billion.   The 10-Q also revealed, **for the first time**, prior misstatements concerning the Company's securities lending program.   In earlier statements, the Company had represented that counterparties in the securities lending program were required to deposit 102 percent in cash collateral to borrow securities from AIG.   However, in the Second Quarter 2008 10-Q, AIG disclosed that the Company did not, in fact, always receive 102 percent of cash collateral on loaned securities, and that the parent company (AIG) had agreed to deposit

funds into the collateral pool to maintain the collateral received at 102 percent for the benefit of its insurance subsidiaries, as follows:

> AIG's securities lending program is a centrally managed program by AIG Investments for the benefit of certain of AIG's insurance companies and the Asset Management segment.  Securities are loaned to various financial institutions, primarily major banks and brokerage firms. Cash collateral generally ranging from 100 to 102 percent of the fair value of the loaned securities is received and is invested in fixed maturity securities to earn a net spread.  **To the extent that the collateral received is less than 102 percent, AIG has agreed with its insurance companies to deposit funds to the collateral pool for the benefit of the insurance company participants**.

210.    Further, in the second quarter 2008 10-Q, AIG commented on the continuing decline in the valuation of the CDS portfolio and the impairment charges realized in its investment portfolio.  The Company went so far as to say that the results of its operations with exposure to the U.S. residential mortgage market "will be highly dependent on future market conditions."  However, nowhere did the Company acknowledge that collateral calls on the CDS portfolio, and losses in the securities lending program (which had resulted from AIG Investments' decision in late 2005 to ramp up its investments in U.S. residential housing debt, including subprime debt), could and would lead to an imminent need for more than $80 billion in additional liquidity.

211.    On August 7, 2008, AIG held its 2008 second quarter earnings conference call. On the call, Mr. Willumstad acknowledged that AIG's risk concentration in the U.S. housing market had been too high: "[Y]ou see again in retrospect much of the problems that have come about have been a concentration of risk in the U.S. housing market both in the investment portfolio and the credit default swap book."

212.    In response to these disclosures, which more fully, but not entirely revealed the true state and uncertainty of the Company's securities lending program, as well as its CDS portfolio, AIG's stock fell on August 7, 2008 from $29.09 to $23.84, an 18% drop.

213.    In fact, by August 2008, AIG had received multi-billion dollar collateral calls from its CDS counterparties, and had posted billions in collateral.  Further ratings cuts of AIG and/or further deterioration in the U.S. residential housing market, including the subprime market, would trigger even larger collateral calls from counterparties on the CDS contracts and further payments resulting from the Company's securities lending program.

214.    The situation continued to deteriorate rapidly through August and into September 2008.  By the end of August, AIG was considering creating a separate entity to divest its subprime mortgage assets.  From July 1 to August 31, 2008, the continuing decline in value of the CDOs protected by AIGFP's CDS portfolio, together with ratings downgrades of such CDO securities, resulted in AIGFP posting additional collateral in an aggregate net amount of $5.9 billion.  And, by August 31, 2008, aggregate deposits by AIG to or for the benefit of the securities lending collateral pool totaled $3.3 billion.

215.    By September 8, 2008, AIG stock had fallen 45% since the beginning of the year, and between September 8 and September 12, it dropped an additional 48% to $6.32 per share.

216.    As more fully detailed below, on September 12, 2008, facing a severe liquidity crisis, AIG asked the Federal Reserve for a $40 billion bridge loan.  On September 12 and 13, AIG executives held emergency meetings with New York State Insurance Superintendent Eric Dinallo, with Federal Reserve officials calling into the meetings.

217.    On Monday, September 15, 2008, AIG's credit rating was downgraded two and three notches by Moody's, Standard & Poor's, and Fitch Rating.  As a consequence, AIG was

required to post an additional $14.5 billion in collateral, above and beyond its previous postings. Standard & Poor's explained that the downgrade was due to the following: "The primary source of the strain comes from credit default swaps covering multi-sector collateralized debt obligations with mortgage exposure as well as insurance company holdings of residential mortgage-backed securities."  AIG stock dropped from $12.14 to $4.76 per share.

218.    On September 16, 2008, with the collapse of AIG imminent, the Federal Reserve agreed to an $85 billion bailout of AIG, in exchange for a 79.9% equity stake.  AIG stock traded at $3.75 at the end of the day.  The bailout was announced publicly on September 17, 2008. Without this extraordinary action by the Federal Reserve, AIG would have been insolvent and would have been forced to file for protection under the bankruptcy laws.

219.    As *Time* magazine would later write in a March 19, 2009 article about AIG's securities lending program:

> Securities-lending is supposed to be a sort of Christmas club of high finance. Companies like insurers, which own tons of equities and Treasury bonds that they are holding long term, lend them out short term, often overnight, to borrowers who need the shares to fulfill other commitments. For instance, if hedge funds want to sell shares short, they borrow them, putting up cash collateral that includes a small spread to the lender. Typically, the owner of the shares takes that collateral and invests it in something with low risk and of short duration, like commercial paper. The lender is exposed to some risk, but it usually isn't catastrophic. However, AIG took the collateral and invested in longer-term, higher-risk mortgage- and asset-backed securities. "Crap," as a portfolio lending expert describes them. When those securities crashed in value, so did AIG.

## XV. Further Disclosures Made After the Government Bailout Confirm the Falsity of Defendants' Class Period Statements

220.    The disclosures that followed in the wake of the U.S. Government bailout underscore the grossly false and misleading impression that AIG conveyed concerning its financial condition and risk exposures during the Class Period.

221.    On September 18, 2008, *The Wall Street Journal* published an article, "Bad Bets and Cash Crunch Pushed Ailing AIG to Brink."  The article stated that the account of events contained therein was "based on interviews with Wall Street bankers and lawyers, AIG executives and government officials."  It reported that on Sunday, September 14, 2008, Treasury Secretary Henry Paulson told bankers considering financing for AIG that government officials "don't have a clear sense of how big the problem is."  By Tuesday, September 16, however, with no private financing forthcoming, federal officials decided that the risks of letting AIG declare bankruptcy would be more than the financial markets and the world economy could stand.

222.    As the article reported, by early September, AIG's then-CEO Willumstad had decided that AIG had to raise capital fast, and had told Jamie Dimon, CEO of JP Morgan.: "The holes we'll have to fill are so big, we need to raise capital."  On Thursday, September 12, AIG executives worked with bankers from JP Morgan and a Blackstone consulting group to determine how much money the Company would need, and by the next day, their estimate had doubled from $20 billion to $40 billion.  According to the article, on Sunday morning, September 14, "**AIG's advisers made a worrying discovery.  One of the insurer's regulated subsidiaries, its securities lending business, needed a separate injection of as much as $20 billion**."  The proposals that JP Morgan, J.C. Flowers, KKR and TPG had been considering, the article reported, had been based on the need for $40 billion in capital, and were therefore rendered moot by this discovery.  Similarly, an offer of a $20 billion lending facility that Superintendent Dinallo had considered establishing for the benefit of AIG was also now moot since "it was becoming clear the company now needed more than $60 billion."

223.    Further, according to the article, on Monday, September 15, AIG informed Superintendent Dinallo that it needed **as much as $70 billion to avoid failing.**  Mr. Dinallo

responded that the State would not act unless there was a plan in place to provide the rest of what AIG needed to survive.  The same day, personnel from JP Morgan and Goldman met at the office of the Federal Reserve and, together with Morgan Stanley personnel, evaluated AIG's liquidity needs and the viability of a private-sector solution.  They reached an updated conclusion: "**AIG needed about $80 billion**."  Based on these analyses, by late afternoon on Monday, September 15, "it became clear that Goldman and JP Morgan weren't going to come to AIG's rescue.  Big questions still loomed over the true value of the assets available for collateral and the cash ultimately needed."

224.    The fate of AIG was sealed.  Rating agency Standard & Poors downgraded the Company's credit rating by three notches, lowering its rating from AA- to A-, and maintained a "Watch Neg."  The other rating agencies lowered their ratings by similar amounts.  The U.S. Government delivered a three-page term sheet to AIG at 4:00 p.m. on Tuesday, September 16, which set forth a steep interest rate and the right to own almost 80% of the Company.  According to the article, "Mr. Willumstad was surprised [by the Government proposal] but not shocked," and as AIG's board was considering the offer, the head of the Federal Reserve Bank of New York ("FRBNY"), Timothy Geithner, during a call placed by Geithner and Treasury Secretary Paulson, told Willumstad that this was "the only proposal you're going to get," and that there was one other condition; "we'll replace you as CEO."  The AIG board approved the offer, which was announced publicly before the opening of the next trading day, September 17, 2008.

225.    Statements made on September 17, 2008 and thereafter make clear why the Government decided that a bailout of AIG was necessary.  As Edward M. Liddy, who replaced defendant Willumstad as Chairman and CEO of AIG, would testify to the U.S. House of Representatives   Financial   Services   Subcommittee   on   Capital   Markets,   Insurance   and

Government-sponsored Enterprises on March 18, 2009, "the U.S. Government determined that a collapse of AIG and the consequent blows to [its] counterparties and customers around the world posed too great a risk to the global economy, particularly in the context of the near or actual failure of other financial institutions."  As an Addendum to his testimony states: "Because of its size and substantial interconnection with financial markets and institutions around the world, the federal government and financial industry immediately recognized that an uncontrolled failure of AIG would have had severe ramifications.  In addition to being the world's largest insurer, AIG was providing more than $400 billion of credit protection to banks and other clients around the world through its credit default swap business.  AIG also provides credit support to municipal transit systems and is a major participant in foreign exchange and interest rate markets."

226.    As a result, on September 16, 2008, the U.S. Government extended a two-year emergency loan of $85 billion to AIG.  The facility carried a rate of LIBOR (the London Interbank Offered Rate, a widely used benchmark used to set short-term interest rates) plus 8.5%, a commitment fee of 2% on the loan principal and a fee on any undrawn portion of 8.5%. Additionally, the Government would be entitled to 79.9% ownership of the Company.

227.    The $85 billion emergency loan, however, was not enough.  As Mr. Liddy's Addendum summarized, on November 10, 2008, the original Government loan was restructured to include a $40 billion investment by the U.S. Treasury, through the Troubled Asset Relief Program ("TARP"), and a five-year FRBNY credit facility with a borrowing limit of up to $60 billion.  In addition, two financial entities, Maiden Lane II and Maiden Lane III, were created to acquire AIG's securities lending assets and AIG's multi-sector CDS assets, respectively.  The underlying source of value for Maiden Lane II was approximately $39.3 billion par value of RMBS in AIG's securities lending portfolio, and for Maiden Lane III it was approximately $62.1

billion par value of CDOs in the CDS portfolio.  The entities were funded primarily by the FRBNY, with a smaller capital contribution from AIG.  Under this agreement, the majority of any appreciation in the securities held by the entities would go to the Government.

228.    As AIG's mark to market losses continued throughout the fourth quarter of 2008, even the $125 billion pledged and/or utilized as of that time was not enough.  On March 2, 2009, AIG and the Government announced a "new set of tools to help AIG achieve a comprehensive restructuring over the next several years."  This "new set of tools" included exchanging the U.S. Treasury's cumulative preferred shares in AIG for preferred shares that more closely resemble common equity; a new five-year standby equity capital facility, which will allow AIG to raise up to $30 billion of capital by issuing non-cumulative preferred stock to the U.S. Treasury from time to time as needed; debt-for-equity swaps that allow AIG to tap the value of its insurance companies to repay a portion of the Government credit facility; elimination of the LIBOR floor on the credit facility, which will lower AIG's interest cost; and continued access to the credit facility, although with reduced borrowing capacity.

229.    By the time of Mr. Liddy's testimony of March 18, 2009, AIG had also disclosed – after significant negative press and subpoenas being issued by the office of the New York State Attorney General – the various counterparties who benefited from the Government bailout funds. In a press release of March 15, 2009, AIG disclosed that between September 16 and December 31, 2008, there were four categories of counterparties who either received payments from AIG or for whom AIG had posted collateral stemming from (a) AIGFP's CDS contracts, (b) AIG's securities lending program, and (c) AIGFP's guaranteed investment agreements ("GIA") held primarily by municipalities but also by other entities such as hospitals, universities, housing

agencies or similar issuers of bonds used to finance capital improvements.  The March 15, 2009

press release disclosed the following payments and collateral postings:

- A total of <u>$22.4 billion in additional collateral postings were made for the benefit of CDS counterparties</u>, which included Société Générale ($4.1 billion), Deutsche Bank ($2.6 billion), Goldman Sachs ($2.5 billion), an investment banking unit of Credit Agricole SA named Calyon ($1.1 billion), Barclays ($0.9 billion) and UBS ($0.8 billion).

- A total of <u>$27.1 billion in payments were made to CDS counterparties</u>, which included payments to Société Générale ($6.9 billion), Goldman Sachs ($5.6 million), Merrill Lynch ($3.1 billion), UBS ($2.5 billion), Deutsche Bank ($2.8 billion), Calyon ($1.2 billion), Bank of Montreal ($0.9 billion) and Barclays ($0.6 billion) and Bank of America ($0.5 billion).

- A total of <u>$9.5 billion in payments were made to municipalities and other entities that issue bonds for capital improvements</u>, which included payments to California ($1.0 billion), Virginia ($1.0 billion), Hawaii ($0.8 billion) and others.

- A total of <u>$43.7 billion in payments were made to AIG securities lending counterparties</u>, which included payments to Barclays ($7.0 billion), Deutsche Bank ($6.4 billion), BNP Paribas ($4.9 billion), Goldman Sachs ($4.8 billion), Bank of America $4.5 billion), HSBA ($3.3 billion), Citigroup ($2.3 billion), Dresdner Kleinwort ($2.2 billion), Merrill Lynch ($1.9 billion), UBS ($1.7 billion), and seven others.

230.    In all, as *The New York Times* reported on March 18, 2009, the largest recipients

of payments or collateral postings owed to them by AIGFP as counterparties on their CDS

contracts were Société Générale ($11.0 billion) (where defendant Athan had been employed

prior to joining AIG in 2007), Goldman ($8.1 million), Deutsche Bank ($5.4 billion), Merrill

Lynch ($4.9 billion), UBS ($3.3 billion); Calyon ($2.3 billion); Barclays ($1.5 billion);

Wachovia ($1.5 billion); Bank of Montreal ($1.1 billion); and Rabobank ($0.8 billion).

231.    Following articles at the time of the initial Government bailout of September 16,

2008, there were a number of other investigative articles concerning what had led to AIG's

demise, and the enormous losses suffered by its share and bond holders.  On September 28,

2008, Gretchen Morgenson, of *The New York Times*, published an article, "The Reckoning:

Behind Insurer's Crisis, Blind Eye to a Web of Risk."  Among other disclosures, the article identified Goldman as AIG's largest trading partner, citing six people "close to the insurer who requested anonymity because of confidentiality agreements."  Goldman was further described as a customer of AIG's credit insurance and as an intermediary for trades between AIG and other clients.  The article further highlighted the hundreds of millions of dollars paid to AIGFP executives and employees.  Since 2001, compensation ranged from $423 million to $616 million each year (for a unit that employed less than 400 people), for a total of $3.56 billion from 2001 through 2008.  Indeed, compensation expenses constituted 33% to 46% of AIGFP's total expenses on an annual basis.

232.   On October 7, 2008, *Fortune* magazine published an article by its editor at large, James Bandler, and others about AIG's former Chairman and CEO, Hank Greenberg.  According to the article, during Greenberg's tenure, AIG charged an average of $750,000 per deal, but only a handful of the CDS contracts were exposed to subprime mortgages.  From Greenberg's departure in March 2005 until the end of 2005, AIG insured more than 200 CDO-based CDS contracts, putting the total by the end of 2005 at approximately 420 deals.  As stated in the *Fortune* magazine article, according to AIG executives and Wall Street brokerage officials, the 420 deals, which included approximately $63 billion of deals that included subprime mortgages, brought in between $315 million and $400 million in revenue to AIG.

233.   On October 9, 2008, *The Wall Street Journal* published an article, "AIG Bailout Hit by New Cash Woes – Fed Moves to Widen Available Loans To Near $123 Billion."  The article stated: "The terms of the latest injection show how far AIG's problems extend beyond losses stemming from complex credit derivatives," referring to AIG's securities lending program.  As stated in the article, the program was "costing AIG dearly."

234.    On October 31, 2008, *The Wall Street Journal* published an extensive article, "Behind AIG's Fall, Risk Models Failed to Pass Real-World Test."  As reported, the account of AIG's "risk-management blunders" identified in the article was based on more than two dozen interviews with current and former AIG executives, AIG's trading partners and others with direct knowledge of the firm, as well as internal AIG documents, regulatory filings and congressional testimony.  It noted that two individuals with personal knowledge of events and the models used by AIG in determining which CDS contracts to issue, Professor Gary Gorton, who continued to be a paid AIG consultant, and defendant Sullivan, AIG's former Chairman and CEO, had refused to answer questions for the article.

235.    The article disclosed the startling fact that while AIG was relying on the models developed by Professor Gorton as the basis for issuing CDS contracts, **AIG executives knew that the models did not attempt to develop risk characteristics based on market forces and contract terms**.  As stated in the article: "AIG relied on those models to help figure out which swap deals were safe.  But AIG didn't anticipate how market forces and contract terms **not weighed by the models** would turn the swaps, over the short term, into huge financial liabilities. **AIG didn't assign Mr. Gorton to assess those threats, and knew that his models didn't consider them**."  AIG knew that the CDS contracts could expose the Company to three types of financial obligations: (1) if the underlying debt securities defaulted, AIG would have to pay AIG's counterparties, and essentially purchase the underlying CDOs at full price; (2) if the securities insured by the swaps declined in value, AIG would be required to post collateral; and (3) if AIG's own corporate debt rating was cut, it would also be required to post collateral.  In addition, as the article noted, if the value of the underlying CDOs declined, AIG would be obligated to account for the contracts on its books based on their diminished value, meaning that

AIG would have to take current period write-downs that would impact its reported earnings as well as its assets.  Thus, while Professor Gorton's models used historical data to focus on the likelihood of default, "**as AIG was aware, his models didn't attempt to measure the risk of future collateral calls or write-downs, which have devastated AIG's finances**."

236.   The October 31 article further disclosed that AIG did not apply effective models for valuing the swaps and for collateral risk until the second half of 2007, long after the swaps were sold.  It disclosed that Goldman "had pried from AIG $8 billion to $9 billion, covering virtually all of its exposure to AIG – most of it before the U.S. stepped in."  The article disclosed Goldman's initial collateral demand, for $1.5 billion, that was made in August 2007, and thereafter settled when AIG agreed to post $450 million to Goldman.  However, by late October 2007, "Goldman asked for even more collateral, $3 billion."  AIG disagreed, but thereafter posted another $1.5 billion as collateral.  These figures, and the identity of Goldman as the initial counterparty that sought posting of collateral by AIG in August and October 2007 was, thus, first revealed on October 31, 2008.

237.   The *Journal* article further noted the following: (a) in November 2007, collateral calls also came in from Merrill Lynch and Société Générale based on their CDS contracts with AIG; (b) by the end of 2007, at least four other banks that had CDS contracts with AIG – UBS, Barclays, Calyon and Royal Bank of Scotland PLC – had asked for money, "according to people familiar with collateral calls;" and (c) in 2008, Deutsche Bank, CIBC and Bank of Montreal also demanded collateral at various points, "a person familiar with AIG's finances says."

238.   On December 10, 2008, *The Wall Street Journal* published an article, "AIG Faces $10 Billion In Losses On Bad Bets," which highlighted another source of exposure that AIG had faced.  The *Journal* article began: "American International Group Inc. owes Wall Street's

biggest firms about $10 billion for **speculative trades** that have soured, according to people familiar with the matter ….”  It continued: “The details of the trades go beyond what AIG has explained to investors about the nature of its risk-taking operations, which led to the firm’s near-collapse in September.  **In the past, AIG has said that its trades involved helping financial institutions and counterparties insure their securities holdings.  The speculative trades, engineered by the insurer’s financial-products unit, represent the first sign that AIG may have been gambling with its own capital**.”  While an AIG spokesperson characterized the trades as “credit protection instruments” that had been disclosed and that amounted to less than $10 billion of AIG’s $71.6 billion exposure to derivative contracts in its CDS portfolio as of September 30, 2008, the *Journal* article stated that the $10 billion owed by AIG was “particularly challenging because the terms of the current $150 billion rescue package for AIG don’t cover those debts,” and the Federal Reserve “has no immediate plans to help AIG pay off the speculative trades.”  The article further reported that there were “no actual securities backing the speculative positions that the insurer is losing money on.”

239.    According to the article, some of AIG’s speculative bets were tied to a group of collateralized debt obligations named “Abacus,” created by Goldman Sachs.  As the article further explained: “The Abacus deals were investment portfolios designed to track the values of derivatives linked to billions of dollars of residential mortgage debt.  **In what amounted to a side bet on the value of those holdings, AIG agreed to pay Goldman if the mortgage debt declines in value and would receive money if it rose.”**  Thus, as noted in the article, AIG would lose two ways if the value of residential mortgage debt fell: it would lose, and need to post additional collateral, if the CDOs underlying its CDS portfolio fell in value; and it would lose in the Abacus deals if the value of the residential mortgage debt fell.  Of course, as is also now

known, AIG would also lose on the value of its investments from cash obtained through its securities lending program.

240.    *The Washington Post* thereafter published a three-part series of articles on December 29, 30 and 31, 2008. The articles were captioned: "The Beautiful Machine," which described the initial establishment of AIGFP and its entry into the CDS market (December 29); "A Crack in The System," which had a telling sub-title: "By 1998, AIG Financial Products had made hundreds of millions of dollars and had captured Wall Street's attention with its precise, finely balanced system for managing risk.  Then it subtly turned in a dangerous direction." (December 30); and "Downgrades And Downfall," which had a sub-title: "How could a single unit of AIG cause the giant company's near-ruin and become a fulcrum of the global financial crisis?  By straying from its own rules for managing risk and then failing to anticipate the consequences." (December 31, 2008).

241.    There were many significant disclosures in *The Washington Post* series.  One of the most startling was that, as noted above, in the fall of 2005, Eugene Park was asked to take over the responsibility for marketing AIGFP credit default swaps to Wall Street firms, that had previously been handled by defendant Frost.  According to the article, Park had been at AIGFP for six years and ran its North American corporate credit derivative portfolio.  Adding the CDS line of business to Park's responsibilities would have meant a significant increase in his annual compensation.  As the December 31, 2008 article in *The Washington Post* revealed, however, Park "wanted no part of it."  According to the *Post*: "He was worried about the subprime component of the CDO market.  He had examined the annual report of a company involved in the subprime business.  He was stunned, he told his colleagues at the time."

242.    As the article further reported, Park recognized at that point that subprime loans underlying many CDOs "formed too large a part of the packaged debt, increasing the risk to unacceptable levels."  The loans, he concluded, could default at any time, anywhere across the country because the underwriting processes had been so shoddy.  Moreover, as Mr. Park examined the issue and "spelled out his reasoning in meetings and conversations with colleagues over the next several weeks," he showed that the diversification aspect of the CDO line of business (which had been touted by AIG during the Class Period) "was a myth – if the housing market went bust, the subprimes would collapse, like a house of cards."

243.    Based on Mr. Park's insights and AIGFP's further analysis, as AIG would later reveal to the market starting in August 2007, AIGFP essentially stopped writing CDS contracts based on underlying CDOs in late 2005.  By that time, however, the Company had $80 billion worth of existing CDOs that included subprime mortgages as underlying assets.  Although an AIG spokesperson was cited in *The Washington Post* article as stating that about one-half of that had been issued before former CEO Greenberg left the Company in March 2005, Greenberg said in an interview in late 2008 that his research shows that only $7 billion in swaps were issued on CDOs with subprime assets during his tenure.[2]  As the article made clear: "Either way, the exposure would prove significant.  **If additional downgrades occurred, either in AIG's credit rating or in the CDO ratings, Financial Products would have to come up with tens of billions of dollars in collateral it did not have**."

---

[2]    In other portions of the three-part series, Greenberg is quoted as stating that during his tenure, AIG and AIGFP were prepared to hedge any transaction "if we thought there was going to be a potential problem."  A former AIG vice chairman, Edward Matthews, who also left AIG in or about March 2005, further stated: "What bothers us about this is we had a climate of risk management which seems to have evaporated after we left."

244.    There were similarly further revelations in the press about AIG's securities lending program.  On February 5, 2009, *The Wall Street Journal* printed an article entitled, "An AIG Unit's Quest to Juice Profit: Securities-Lending Business Made Risky Bets.  They Backfired on Insurer."  As the article stated, "a close look at the 2,000-employee AIG Investments unit shows how this part of the conglomerate made gambles that helped crippled the firm."  The article cited to a goal set in late 2005 by the head of AIG's asset management unit at the time, Win J. Neuger, who served as AIG's Chief Investment Officer until January 2009.  The goal, called "10-cubed," was to produce $1 billion more in annual profit from AIG Investments, a group that grew to include investment funds of AIG's global insurance subsidiaries and a third-party asset management business that managed money for pension funds and other institutions.

245.    To further the "10-cubed" goal, Neuger and AIG's Chief Credit Officer, Kevin McGinn, changed the guidelines for the Company's securities lending program, through which AIG would lend securities to banks and brokers in exchange for cash collateral, which AIG would then invest.  Contrary to traditional securities lending businesses that would invest their cash collateral in fixed-income investments, such as Treasury bonds or short-term corporate debt, in or about December 2005, Neuger and McGinn signed off on a proposal to invest 75 percent of the cash collateral in asset-backed securities, including securities that were backed by subprime mortgages and credit-card debt.  As stated in the article, following the new guidelines, "money managers at AIG Investments ramped up purchases of subprime-mortgage bonds in 2006 and 2007, as the securities-lending portfolio expanded to $94 billion in mid-2007."  While this served for a while to increase profits of AIG Investments (and the parent company, AIG), it also placed AIG and its investment unit in a precarious position, since the securities lending division was obligated to repay or roll over most of its loans every 30 days, but much of the subprime debt

investments matured in two to five years.  Indeed, as the prices of subprime-mortgage bonds "plummeted as loan delinquencies increased and credit markets froze," this created a hole for the Company from which it would never recover.

246.    The article further revealed a glaring internal control weakness concerning AIG senior management's oversight of the AIG Investments unit.  In a November 2007 note to AIG Investments' staff, Chief Credit Officer McGinn wrote: "**Senior management was clearly caught off guard by the size of [AIG Investments'] subprime, first-lien [residential mortgage-backed securities] portfolio** despite the portfolio's high ratings and credit quality." And, as the article further noted, the problem caused by this unit did not end with the Government bail-out in September 2008, because, in early October 2008, "many dealers returned the securities they had loaned from AIG, demanding their cash back, further straining AIG's finances."

247.    A series of articles and announcements made by the Company in March 2009 finally revealed the actual recipients of the Government bailout funds dedicated to payment of counterparties in AIG's CDS portfolio.  For months, AIG had refused to identify the counterparties that had received Government funds.  Eventually, however, on Sunday, March 15, 2009, the Company disclosed that $49.5 billion – almost 30% of the $170 billion in U.S. Government commitments to AIG by that time – had been funneled to financial institutions.

248.    Further, on April 28, 2009, *The Wall Street Journal* reported that the DOJ and SEC are both investigating whether civil and/or criminal charges should be brought against defendants Cassano, Forster and Athan.  According to the article, the DOJ and SEC "are focusing on at least three men, two of whom [Forster and Athan] are still at the company and are among those who received retention bonuses in March, said people familiar with the matter."

The report further stated that issues involved in the investigation include: (a) how AIG valued CDOs that underlay its CDS portfolio; (b) whether AIG executives made improper adjustments to the CDS valuation model "after receiving indications that the value should be lowered"; (c) defendant Cassano's statements at the December 5, 2007 investor meeting, including whether he should have disclosed at that time the value adjustment known as "negative basis," which was only disclosed in later filings made by AIG with the SEC; and (d) whether AIG executives failed to disclose to PwC in that same time frame "market indications that the credit default swaps' value should have been lower."

249.    In addition to press articles, a great deal of information about AIG's collapse – and the falsity of the statements that AIG, its officers, directors and underwriters made during the Class Period – was also disclosed through a series of Congressional hearings.  On October 7, 2008, the House of Representatives Committee on Oversight and Government Reform, chaired by Congressman Henry Waxman, held a full-day hearing.  Highlights of that hearing included the following:

       a.    Disclosure of the letter dated October 4, 2008, from **Joseph W. St. Denis**, who served as a Staff Accountant and an Assistant Chief Accountant in the Division of Enforcement of the SEC, and who later was employed as Vice President for Accounting Policy at AIGFP from June 2006 through October 1, 2007.  Among other things, the St. Denis letter revealed that in early September 2007, he learned that AIGFP had received a multi-billion dollar margin call on certain of its Super Senior Credit Default Swaps (referred to in the letter as "SSCDS").  As the letter states: "I was gravely concerned about this, as the mantra at AIGFP had always been (in my experience) that there could *never* be losses on the SSCDS.  I was questioning this mantra in light of the margin call, as were the professionals in FSD [AIG's Financial Services Division] and OAP [AIG's Corporate Office of Accounting Policy], in my belief."  When AIGFP attempted to value the CDS portfolio, AIGFP's chief executive, Joseph Cassano, informed Mr. St. Denis that he had been "**deliberately excluded**" from the valuation process because Cassano was concerned that Mr. St. Denis' efforts to bring transparency to the accounting policy process at AIGFP "**would pollute the process**."  The letter further recounts other actions taken by Defendant Cassano to prevent Mr. St. Denis from performing his duties and injecting transparency into the accounting process at AIGFP, and his eventual resignation from the Company.  As Mr. St. Denis wrote in his letter, he "could not continue in light

of what I perceived to be Mr. Cassano's efforts to isolate me from OAP and FSP personnel, and in light of Mr. Cassano's decision to exclude me from the valuation of the SSCDS portfolio."[3]

b.      Other written testimony provided to the Committee by former CEO Greenberg stated that when he was AIG's CEO, AIG management closely monitored AIGFP and its risk portfolio, subjecting AIGFP to numerous internal risk controls, including credit risk monitoring by several independent units of AIG, review of AIGFP transactions by outside auditor and consultants, and scrutiny by AIGFP's and AIG's boards of directors.  However, reports he had received indicated that the risk controls that Greenberg and his management team had put in place "were weakened or eliminated after my retirement," including, for example, the weekly meetings they had conducted to review all AIG's investments and risks.

c.      Lynn E. Turner, a former Chief Accountant of the SEC, also testified to the Committee.  During his testimony, Mr. Turner noted the admissions made in AIG's Form 10-K for the year ended December 31, 2007, that internal "controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective" and that AIG had dedicated "insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007."  Such disclosures, he stated, "immediately raises a question as to the values the company is reporting throughout its financial statements," and he specifically asked how the Company could expect to ensure that accurate, complete and transparent information was supplied to investors on a timely basis with these material weaknesses.  He further questioned the accuracy of the statement in AIG's Form 10-Q for the second quarter 2007 that in the event of a downgrade in AIG's credit rating, counterparties would be permitted to call for approximately **$847 million** of collateral, in light of the statement six months later in the 2007 Form 10-K that AIGFP had posted collateral based on exposures, calculated in respect of the super senior CDS portfolio, in an aggregate amount of **$5.3 billion**, and the further disclosure, made as of July 31, 2008, that AIGFP had posted collateral in an aggregate net amount of **$16.5 billion** and had unrealized market valuation losses of **$26.1 billion** recorded on the super senior CDS portfolio.

d.      Mr. Turner further noted that when making its disclosures of counterparty collateral payments, the Company did not disclose the identity of the counterparties that

---

[3]      Congressman Waxman, the Chair of the Committee, called Mr. St. Denis "a very reputable man," noting that he had been an Assistant Chief Accountant at the SEC Enforcement Division and had been hired by AIG to address material weaknesses cited by AIG's auditors and to provide greater visibility and control with respect to the operations and accounting policy process of AIGFP.  Lynn E. Turner, former Chief Accountant at the SEC, who also testified at the Hearing, stated:  "Mr. St. Denis worked for me at the SEC.  He worked for me when I was a partner in the accounting firm.  And his credibility is beyond reproach, and I'd seriously consider the comments that he has provided you."

had required the posting of collateral.  As Mr. Turner testified: "For example, if one of the counter parties was Goldman Sachs, a firm that has a reputation for excellence in valuation models, it might even further call into question the amounts reported by the company."  Among other things, he noted that with the amount of the Government bail-out in September 2008, "it would seem that in light of this, the company had failed to provide investors with a clear view of the magnitude of the potential demands for collateral."  As he further testified: "I don't think the company ever was honest with the investors about the magnitude of the potential impact of these things.  And I think that's what is grossly missing here."

  e. The Committee Hearing also brought to light the statements cited above that had been made by AIG's outside auditor, PwC, to the Company's senior executives on November 29, 2007, six days before the Company's December 5, 2007 investor meeting.

  f. Audit Committee minutes made public through the Hearing also show that PwC found that the "the process at AIG seemed to break down ... unlike other companies where there was a good dialogue and appropriate levels of management on the approach, alternatives considered and key decisions, at AIG, only AIGFP, the Financial Products Division, was involved in a December valuation process."  Indeed, in minutes of an Audit Committee meeting of January 15, 2008, the following statements show the concerns stated by PwC in advance of the December 5 investor meeting:

> Mr. Ryan ... expressed PwC's concern that this weakness may have resulted in a material disclosure error and that it could result in an income statement and/or disclosure error in the future if it was not addressed.  Mr. Ryan said that **PwC believes that Management's oversight of AIG Investments is insufficient, due to lack of access and unclear delineation of roles and responsibilities, and performance management and transparency are not where they should be**.

  g. Minutes from an Audit Committee meeting of February 7, 2008, revealed further deficiencies in AIG's internal controls over the AIGFP unit generally, and specifically stated PwC's views that the AIGFP valuation process was "insular."  PwC recommended that AIG's experts be "more entwined in the process."   The items identified as material weaknesses included that oversight of the valuation process for the CDS portfolio was not effective "and lacked the appropriate challenge and debate," and that even after PwC raised concerns over the process, the controls put in place by AIG's management "did not operate effectively."

  h. The minutes from a March 11, 2008 Audit Committee meeting also include significant other instances of internal control weaknesses at AIG and AIGFP, and specifically with respect to the valuation of the CDS portfolio, stated that there was **"a new material weakness in control over the super senior valuation process and oversight thereof and a new significant deficiency in control over access, roles and responsibilities of critical control functions**.  He said that **the new material weakness resulted from the large errors in connection with the models used by AIGFP, the**

**lack of timely elevation of key data on the negative basis and collateral issues to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of Enterprise Risk Management and the AIG Finance function in developing the approach.**"

> i.     The Hearing on October 7, 2008 also included statements made in a letter issued to AIG by the Office of Thrift Supervision on March 10, 2008.  The letter noted key internal control deficiencies, as noted in ¶¶ 195 - 198, above.

250.    On March 5, 2009, the United States Senate Committee on Banking, Housing and Urban Affairs held a Hearing entitled: "American International Group: Examining what went wrong, government intervention, and implications for future regulation."  Among the speakers at the Hearing were Scott M. Polakoff, Acting Director, Office of Thrift Supervision, and Eric Dinallo, Superintendent, New York State Insurance Department.   Superintendent Dinallo observed that AIG's actual insurance companies, which operated pursuant to the supervision of the New York State Insurance Department, had maintained adequate reserves, and appeared to have acted within prudent and reasonable standards for insurance companies.   However, the AIGFP unit was beyond the supervision of State insurance departments, and it was this unit that had essentially placed the entire Company in danger of bankruptcy.

251.    Acting Director Polakoff made a number of observations in his sworn testimony. Among other things, he testified that: (a) in 2005, OTS conducted several targeted, risk-focused reviews of various lines of business, including AIGFP, and made numerous recommendations to AIG senior management and the Board with respect to risk management oversight, financial reporting transparency and corporate governance; specific to AIGFP, the OTS "identified and reported to AIG's board weaknesses in AIGFP's documentation of complex structures transactions, in policies and procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement"; (b) in 2006, OTS noted only "nominal progress" on implementing corrective

measures on the weaknesses noted in the prior examination, and identified additional weaknesses requiring AIG's board to take corrective action, including the establishment of timely and accurate accounting and reconciliation processes, and enhancing and validating business line capital models; (c) during the summer of 2007, after a targeted review of AIGFP, OTS instructed the company to revisit its modeling assumptions in light of deteriorating sub-prime market conditions, and specifically questioned its valuation of CDS backed by subprime mortgages; and (d) in the last quarter of 2007, OTS increased the frequency of meetings with AIG's risk managers and PwC, and "due to the Agency's progressive concern with corporate oversight and risk management, in October 2007 we required AIG's Board to undertake a number of remediation efforts with respect to the identified material control weaknesses and deficiencies." In connection with the 2007 annual examination, the Organizational Structure component of the CORE rating was downgraded to reflect the identified weaknesses in the Company's control environment.

252.    Finally, at a Hearing on March 25, 2009, of the House Financial Services Committee, Ben Bernanke, the Chair of the Federal Reserve, testified concerning (a) the decision made by the U.S. Treasury Department and the Fed in September 2008 to provide support to AIG rather than allow it to file for protection under the U.S. bankruptcy laws, and (b) the Fed's on-going involvement with AIG.  Mr. Bernanke testified that as efforts to find a private-sector solution proved unsuccessful, AIG "faced severe liquidity pressures that threatened to force it imminently into bankruptcy."  Allowing that to occur "would have posed unacceptable risks for the global financial system and for our economy."  Mr. Bernanke testified as well that focusing on merely the direct effects of a default on AIG's counterparties "understates the risks to the financial system as a whole."

253.   Mr. Bernanke ended his testimony with a recommendation for future regulation of financial firms.   As he testified: "the AIG situation highlights the need for strong, effective consolidated supervision of all systemically important financial firms.   **AIG built up its concentrated exposure to the subprime mortgage market largely out of the sight of its functional regulators.   More effective supervision might have identified and blocked the extraordinarily reckless risk-taking at AIG-FP.**"

**AIG'S FALSE PORTRAYAL OF ITS**
**FINANCIAL CONDITION AND RISK EXPOSURES**

**I.   2005 Financial Results**

254.   On March 16, 2006, AIG filed with the SEC its Form 10-K for the year ended December 31, 2005 (the "2005 10-K") and issued a press release announcing its year-end financial results.   AIG reported net income for 2005 of $10.48 billion, or $3.99 per diluted share.

255.   Alluding to the recent financial restatements undertaken by AIG of its 2000-2004 financial results and the $1.15 billion after-tax charge incurred in 2005 resulting from settlements with various government regulators in connection with legal proceedings and investigations involving accounting, financial reporting and insurance brokerage practices of the Company, defendant Sullivan stated in the March 16, 2006 press release:

> AIG is financially strong, and our major business units remain focused on our strategic objectives.   Our tradition of entrepreneurship and innovation will enable AIG to continue to perform successfully, enter new markets, develop new products and meet our clients' needs.   There is every reason for us to be optimistic about our future.   AIG today is a better company for all that we have been through.

256.   Under the heading of "Controls and Procedures," the 2005 10-K noted that AIG management, in connection with the preparation of the 2004 10-K, had identified material weaknesses in internal control over financial reporting in five areas: control environment,

controls over the evaluation of risk transfer, controls over certain balance sheet reconciliations, controls over accounting for certain derivative transactions, and controls over income tax accounting.  The 2005 10-K represented that as of December 31, 2005, remediation had been completed in two of these areas, relating to control environment and evaluation of risk transfer.

257.   The 2005 10-K described the measures purportedly undertaken to remediate AIG's control environment, which, in the past, had not been effective in preventing management overrides of internal controls:

> AIG has taken several significant actions to improve its control environment, starting with the appointment of new senior management with a new tone and philosophy.  AIG's Chief Executive Officer and Chief Financial Officer, together with other senior executives, are committed to achieving transparency and clear communication with all stakeholders through effective corporate governance, a strong control environment, high ethical standards and financial reporting integrity.  To strengthen and enhance its overall financial reporting and internal control environment, AIG has increased resources for technical accounting, internal audit, enterprise risk management and compliance functions, hired additional staff with specialized financial and accounting expertise, and established stronger reporting lines within the financial reporting function.

> Among the specific actions taken by AIG to remediate this material weakness and to further strengthen overall controls over financial reporting were the following:

> AIG has established a Financial Disclosure Committee to assist the Chief Executive Officer and the Chief Financial Officer in fulfilling their responsibilities for oversight of the accuracy and timeliness of the disclosures made by AIG. …

> AIG has strengthened the position of Chief Risk Officer, responsible for enterprise-wide credit, market, and operational risk management and oversight of the corresponding functions at the business unit level and has empowered the Chief Risk Officer to work more closely with top executives at the corporate and major business unit levels to identify, assess, quantify, manage and mitigate risks to AIG.

> AIG has established an Operational Risk Management department, reporting to the Chief Risk Officer, to engage in expanded risk self-assessment processes for more effective identification and management of operational and reputational risks.

AIG has expanded the scope and activities of the corporate level Complex Structured Finance Transaction Committee, to review and approve transactions that could subject AIG to heightened legal, reputational, regulatory or other risk or enable a third party to achieve an accounting or financial reporting result inconsistent with applicable accounting principles, to include the review and approval of AIG's accounting and financial reporting of identified transactions, including related party transactions. Also, AIG's major business units have implemented their own committees and processes to enhance their ability to identify, analyze and present for approval complex structured finance transactions to AIG's corporate level committee.

258. While the 2005 10-K acknowledged that controls over accounting for certain derivative transactions had not been fully remediated, it essentially described the issue as limited to a failure "to maintain effective controls over the evaluation and documentation of whether certain derivative transactions qualified under GAAP for hedge accounting."

259. Without referring to "credit default swaps," the CDOs they insured, or their exposure to the U.S. residential mortgage market, the 2005 10-K nevertheless contained a discussion of AIGFP's "credit derivatives transactions." AIG represented that the risk of loss on such transactions was "remote, even in severe recessionary market scenarios." The Company's credit derivatives business was described in a financial statement footnote as follows:

AIGFP enters into credit derivative transactions in the ordinary course of its business. The majority of AIGFP's credit derivatives require AIGFP to provide credit protection on a designated portfolio of loans or debt securities. AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses." **The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.**

In certain cases, the credit risk associated with a designated portfolio is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies. Typically, there will be an equity layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer. In transactions that are rated, the risk

layer or tranche that is immediately junior to the threshold level above which AIGFP's payment obligation would generally arise is rated AAA by the rating agencies.  In transactions that are not rated, AIGFP applies the same risk criteria for setting the threshold level for its payment obligations.  Therefore the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions is often called the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that has been rated AAA by the credit rating agencies or if the transaction is not rated, equivalent thereto.  For example, in a transaction with an equity layer covering credit losses from zero to two percent of the total portfolio, a BBB-rated layer covering credit losses from two to four percent, an A-rated layer from four to six percent, an AA-rated layer from six to eight percent, and a AAA-rated layer from eight to 11 percent.  AIGFP would cover credit losses arising in respect of the portfolio that exceeded an 11 percent first loss threshold amount and thereby bear risk that is senior to the AAA-rated risk layer.

AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk.  AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion.  AIGFP has never had a payment obligation under these credit derivatives transactions where AIGFP is providing credit protection on the super senior risk.  **Furthermore, based on portfolio credit losses experienced as of December 31, 2005 under all such outstanding transactions, no transaction has experienced credit losses in an amount that has made the likelihood of AIGFP having to make a payment, in AIGFP's view, to be greater than remote, even in severe recessionary market scenarios.**  At December 31, 2005, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $387.2 billion.

260.    The 2005 10-K represented that derivative financial instruments were recorded on

AIG's financial statements at fair value:

Derivative transactions are entered into in the ordinary course of Capital Markets operations.  Therefore, income on interest rate, currency, equity, commodity, energy, and credit derivatives is recorded at fair value, determined by reference to the mark to market value of the derivative or their estimated fair value where market prices are not readily available.  The resulting aggregate unrealized gains or losses from the derivative are reflected in the income statement in the current year.  Where Capital Markets cannot verify significant model inputs to observable market data and verify the model value to market transactions, Capital Markets values the contract at the transaction price at inception and, consequently, records no initial gain or loss…

261.    Elsewhere, the 2005 10-K identified the bases for its fair value determinations as follows:

Fair Value Determinations of Certain Assets and Liabilities (Financial Services)

- *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.
- *Pricing data:* AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such prices are not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

262.    The 2005 10-K represented that AIGFP's credit derivatives transactions operated within strict guidelines established by AIG's Credit Risk Committee in order to carefully manage risk:

A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG. To help manage this risk, AIGFP's credit department operates within the guidelines set by the AIG Credit Risk Committee. This committee establishes the credit policy, sets limits for counterparties and provides limits for derivative transactions with counterparties having different credit ratings. In addition to credit ratings, this committee takes into account other factors, including the industry and country of the counterparty. Transactions which fall outside these pre-established guidelines require the specific approval of the AIG Credit Risk Committee…

263.    The 2005 10-K also included a discussion of AIG's credit ratings and the potential impact of such ratings on the Company's liquidity. The 2005 10-K noted that from March through June 2005, the major rating agencies (*e.g.* Standard & Poor's, Moody's Investors Service and Fitch Ratings) had downgraded their ratings of AIG's long-term senior debt. The Company reported that as a result of such downgrades, "AIG was required to post approximately $1.16 billion of collateral with counterparties to municipal guaranteed investment contracts and

financial derivatives transactions."  The Company further stated that downgrades of another notch by the rating agencies "would permit counterparties to call for approximately $962 million of additional collateral" and that further rating downgrades "could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity."

264.   The 2005 10-K included a financial statement footnote that, among other things, described AIG's securities lending program and its accounting treatment as follows:  "AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent.  Invested collateral consists primarily of floating rate debt securities.  Income earned on invested collateral, net of interest payable to the collateral provider, is recorded in net investment income."

265.   Defendants Sullivan and Bensinger certified the results reported in the 2005 10-K, as follows:

> 1.   I have reviewed this Annual Report on Form 10-K of American International Group, Inc.;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such  disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted   accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over  financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

266.    The statements made in the 2005 Form 10-K were materially false and misleading in at least the following respects:

(a)     Contrary to Defendants' representations, AIG's control environment was not remediated because there were additional, undisclosed material weaknesses relating to the Company's accounting for derivative transactions.   Similarly, Defendants' representations

regarding AIG managements' and credit committees' oversight of risks related to the CDS portfolio were false because AIG lacked oversight over AIGFP's risk management.   In particular, AIG lacked adequate internal controls over financial reporting and oversight relating to the fair value valuations of its super senior CDS portfolio.   ¶¶ 169 – 173, 187, 451 - 463. Indeed, far from strengthening internal controls, such controls were effectively weakened or overridden in regard to the valuation of the super senior CDS portfolio, and key segments of both AIG and AIGFP were effectively excluded from the valuation and risk management processes. As relayed by CW 2 and CW 3, financial reporting decisions concerning the CDS portfolio were made separately by defendants Cassano, Forster, and Frost, assisted by non-defendant Alan Budnick, and the valuation process relating to the CDS portfolio was deliberately conducted outside the purview of AIG's and AIGFP's risk management and financial and accounting functions.   ¶¶ 134 - 138.   As further testified to by Greenberg, the controls governing the CDS portfolio during the period from 1998 through mid-March 2005, when about 200 credit default swap contracts were written, were significantly weakened after that period, when the number of contracts more than doubled to 420 by the end of 2005.   ¶¶ 6 -8, 102.

(b)     Given the undisclosed material weakness concerning the valuation of its CDS portfolio, and the fact that AIG did not properly reassess and make necessary adjustments for the value of its CDS portfolio on a regular or timely basis, AIG's representation that credit derivatives were carried at "fair value" was false and misleading.

(c)     AIG's representations concerning its credit derivatives transactions were false and misleading because they failed to disclose that credit default swaps were written to insure CDOs, a significant portion of which exposed the Company to the U.S. residential housing and mortgage markets.   AIG further failed to disclose that AIGFP had stopped writing such CDS

contracts by the end of 2005 after an internal review concluded that the model used to assess potential CDS contracts was unreliable in light of, among other things, the deterioration in underwriting standards that was evident in the pools of mortgages underlying the 2005 multi-sector CDOs and the high correlation among the subprime debt included within the CDOs. Moreover, the models did not even attempt to factor in the risks of AIG's credit rating being downgraded or collateral calls that might arise from rating downgrades or declines in the valuations of the CDOs referenced by AIGFP's CDS portfolio.

(d)     The statement in the 2005 10-K that the likelihood of "any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios" was false and misleading because it focused almost exclusively on the risk of default of the referenced CDOs and failed to disclose other, more significant risk exposures associated with the CDS portfolio.  In particular, Defendants knew, but failed to disclose that downgrades or declines in the ratings or market value of the referenced CDO securities could require AIG to post substantial additional collateral, which could significantly strain the Company's liquidity, and that under the terms of the CDS contracts, the counterparties rather than AIGFP were often the calculating agents for determining when the value of the referenced CDOs had declined to the point that posting collateral would be required.  Moreover, Defendants knew that there was a significant likelihood that the referenced CDO securities would, in fact, be subject to ratings cuts and market valuation declines because AIG had already concluded that the U.S. residential housing market was contracting and that underwriting standards on mortgages underlying the CDO securities had greatly deteriorated.

(e)     The 2005 10-K's statement that "AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss

and has hedged outstanding transactions in this manner on occasion" was false and misleading because it failed to disclose that the vast majority of AIGFP's credit default swap transactions were unhedged, greatly increasing the risk associated with these contracts.  The statement was also false and misleading because it failed to disclose that AIGFP had determined to leave the CDS portfolio largely unhedged because hedging the portfolio would erode the profitability of the business and, thereby, diminish the compensation of defendants Cassano, Forster and Frost.

(f)    The 2005 10-K's discussion of possible additional collateral posting requirements in the event of downgrades of AIG's credit rating was false and misleading because it failed to disclose that counterparties to the credit default swap contracts would also be permitted to demand additional collateral in the event of ratings downgrades and/or declines in the valuations of the CDOs that were being insured through the CDS portfolio, and that the counterparties had the right to determine the value of the referenced CDOs for this purpose.  Moreover, Defendants knew or should have known that such downgrades and valuation declines were likely, given AIG's conclusion that the U.S. residential housing and mortgage markets were deteriorating.

(g)    AIG's discussion of its securities lending program was false and misleading because it failed to disclose that in late December 2005, AIG, in an attempt to boost income generated from securities lending, determined to invest 75% of all cash collateral received from borrowers in RMBS and other asset-backed securities.  Such investments carried far greater risk than investments in Treasury bonds or short-term debt normally undertaken by traditional securities lending businesses.  AIG failed to disclose that by expanding its investments in RMBS, as well as sharply increasing the number of credit default swaps written during 2005, the Company's risk concentration in the U.S. residential housing and mortgage markets greatly increased.

II.     **2006 Interim Financial Results**

267.    On May 10, 2006, AIG filed with the SEC a Form 10-Q for the quarter ended March 31, 2006 (the "2006 First Quarter 10-Q") and issued a press release announcing its first quarter financial results.  The Company reported net income for the first quarter of 2006 of $3.20 billion, or $1.22 per diluted share.

268.    On August 9, 2006, AIG filed with the SEC a Form 10-Q for the quarter ended June 30, 2006 (the "2006 Second Quarter 10-Q") and issued a press release announcing its second quarter financial results.  The Company reported net income for the second quarter of 2006 of $3.19 billion, or $1.21 per diluted share.  Commenting on the 2006 second quarter results, defendant Sullivan stated:  "AIG had a very good quarter.  Once again, our performance underscored the strength of AIG's widely diversified business portfolio, both domestically and overseas."

269.    On November 9, 2006, AIG filed with the SEC a Form 10-Q for the quarter ended September 30, 2006 (the "2006 Third Quarter 10-Q") and issued a press release announcing its second quarter financial results.  The Company reported net income for the third quarter of 2006 of $4.2 billion, or $1.61 per diluted share.  In the press release, defendant Sullivan referred to these results as a "very good quarter."

270.    Under the heading "Controls and Procedures," the 2006 Forms 10-Q for all three quarters referenced the 2005 10-K's identification of material weaknesses in internal controls, and all three represented that there had been "no change in AIG's internal control over financial reporting" during the particular quarter.

271.    The 10-Qs represented that derivative financial instruments were recorded on AIG's financial statements at fair value, as follows:

Derivative transactions are entered into in the ordinary course of Capital Markets operations. Income on derivatives is recorded at fair value, determined by reference to the mark to market value of the derivative or their estimated fair value where market prices are not readily available. The resulting aggregate unrealized gains or losses from the derivative are reflected in the income statement. Where Capital Markets cannot verify significant model inputs to observable market data and verify the model value to market transactions, Capital Markets values the contract at the transaction price at inception and, consequently, records no initial gain or loss…

272. Elsewhere, the 10-Qs identified the bases for the fair value determinations as follows:

Fair Value Determinations of Certain Assets and Liabilities (Financial Services - Capital Markets)

- *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.
- AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models. When such data is not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

273. The 10-Qs similarly all represented that risk exposure arising from the operations of AIGFP were subject to close oversight and management by senior management of its parent company, AIG:

The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations. AIG's senior management has established various oversight committees to monitor on an ongoing basis the various financial market, operational and credit risk attendant to the Capital Markets operations. The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.

AIG actively manages the exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities. In doing so, AIG must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.

274.     And the 10-Qs further represented, as had the 2005 10-K, that the credit derivatives transactions undertaken by AIGFP occurred within strict guidelines established by AIG's Credit Risk Committee to carefully manage risk:

> A counterparty may default on any obligation to AIG, including a derivative contract.  Credit risk is a consequence of extending credit and/or carrying trading and investment positions.  Credit risk exists for a derivative contract when that contract has a positive fair value to AIG.  To help manage this risk, AIGFP's credit department operates within the guidelines set by the AIG Credit Risk Committee.  This committee establishes the credit policy, sets limits for counterparties and provides limits for derivative transactions with counterparties having different credit ratings.  In addition to credit ratings, this committee takes into account other factors, including the industry and country of the counterparty. Transactions which fall outside these pre-established guidelines require the specific approval of the AIG Credit Risk Committee…

275.     Each of the 2006 10-Qs also reiterated the disclosure in the 2005 10-K concerning the rating downgrades of AIG in 2005 by the major rating agencies and that, as a result, AIG had been required to post $1.16 billion in collateral.  In the First Quarter 2006 10-Q, the Company represented that based on AIG's outstanding municipal guaranteed investment agreements and financial derivatives transactions as of April 30, 2006, the Company would be subject to collateral calls of approximately $896 million if AIG's ratings declined by another notch.  In the Second Quarter 2006 10-Q, the figure was $873 million as of July 31, 2006.  And in the Third Quarter 2006 10-Q, the figure was $1.1 billion as of October 31, 2006.  The Company stated in each 2006 10-Q that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity."

276.     Defendants Sullivan and Bensinger certified the results reported in the each of the 2006 Forms 10-Q, as follows:

> 1.     I have reviewed this Quarterly Report on Form 10-Q of American International Group, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such  disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted  accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over  financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design  or  operation  of  internal  control  over  financial  reporting  which  are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

277.    The statements made in the Forms 10-Q filed with the SEC for the first, second and third quarters of 2006 were materially false and misleading in at least the following respects:

(a)     Contrary to Defendants' representations, AIG's control environment was not remediated because there were additional, undisclosed material weaknesses relating to the Company's accounting for derivative transactions.   Similarly, Defendants' representations regarding AIG management's and credit committee's oversight of risks related to the super senior CDS portfolio were false because AIG lacked oversight over AIGFP's risk management. In particular, AIG lacked adequate internal controls over financial reporting and oversight relating to the fair value valuations of its super senior CDS portfolio.  ¶¶ 169-173, 187, 451 - 463.  Indeed, far from strengthening internal controls, such controls were effectively weakened or overridden in regard to the valuation of the super senior CDS portfolio, and key segments of both AIG and AIGFP were effectively excluded from the valuation and risk management processes.  As relayed by CW 2 and CW 3, financial reporting decisions concerning the CDS portfolio were made separately by defendants Cassano, Forster, and Frost, assisted by non-defendant Alan Budnick, and the valuation process relating to the CDS portfolio was deliberately conducted outside the purview of AIG's and AIGFP's risk management and financial and accounting functions.  ¶¶ 134 - 138.  As further testified to by Greenberg, the controls governing the CDS portfolio during the period from 1998 through mid-March 2005, when about 200 credit default swap contracts were written, were significantly weakened after that period, when the number of contracts more than doubled to 420 by the end of 2005.  ¶¶ 6 - 8, 102.

(b)      Given the undisclosed material weakness concerning the valuation of its CDS portfolio, and the fact that AIG did not properly reassess and make necessary adjustments for the value of its CDS portfolio on a regular or timely basis, AIG's representation that credit derivatives were carried at "fair value" was false and misleading.

(c)      AIG's representations concerning its credit derivatives transactions were false and misleading because they failed to disclose that credit default swaps were written to insure CDOs, a significant portion of which exposed the Company to the U.S. residential housing and mortgage market.  AIG further failed to disclose that AIGFP had stopped writing such CDS contracts by the end of 2005 after an internal review concluded that the model used to assess potential CDS contracts was unreliable in light of, among other things, the deterioration in underwriting standards that was evident in the pools of mortgages underlying the 2005 multi-sector CDOs.  Indeed, the models did not even attempt to factor in the risks of AIG's credit rating being downgraded or collateral calls that might arise from rating downgrades or declines in the valuations of the CDOs referenced by AIGFP's CDS portfolio.

(d)      The 2006 10-Qs' discussion of possible additional collateral posting requirements in the event of downgrades of AIG's credit rating was false and misleading because it failed to disclose that counterparties to the credit default swap contracts would also be permitted to demand additional collateral in the event of rating downgrades and/or declines in the valuations of the CDOs that were being insured through the CDS portfolio, and that the counterparties had the right to determine the value of the referenced CDOs for this purpose.  Moreover, Defendants knew or should have known that such downgrades and valuation declines were likely, given AIGFP's conclusion that the U.S. residential housing and mortgage markets were deteriorating.

III.     **2006 Financial Results**

278.     On March 1, 2007, AIG filed with the SEC its Form 10-K for the year ended December 31, 2006 (the "2006 10-K") and issued a press release announcing its year-end financial results.  AIG reported net income for 2006 of $14.05 billion, or $5.36 per diluted share, compared to $10.48 billion, or $3.99 per diluted share, for 2005.

279.     The March 1, 2007 press release quoted defendant Sullivan as stating:

> 2006 was a remarkable year beginning with the resolution of our significant regulatory challenges and ending with excellent financial results. . .  We also made significant progress throughout the year in improving our financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance.

280.     In AIG's earnings conference call with analysts, held on March 2, 2007, defendant Sullivan amplified on his comments concerning the Company's efforts to improve its financial controls, representing that only a single "material weakness" remained outstanding:

> During the year, we made further progress in our remediation efforts.  As detailed in the 2006 10-K, we have remediated the material weaknesses related to balance sheet reconciliations and derivatives accounting.  The one material weakness remaining relates to income tax accounting.  We are making good progress on this last issue and our goal is to complete remediation of this material weakness by year-end 2007.

281.     The 2006 10-K also represented that the material weaknesses relating to balance sheet reconciliations and accounting for certain derivative transactions had been remediated and that the material weakness in regard to income tax accounting was subject to further remedial efforts.  The 2006 10-K represented that the remediation was governed by a Steering Committee, under the direction of the Company's Chief Risk Officer and also including AIG's Chief Executive Officer, Chief Financial Officer and Comptroller, and that the status of the remediation of each material weakness was reviewed with the Audit Committee of the Board of Directors.

114

282.    Like the 2005 10-K, the 2006 10-K described AIG's credit derivatives transactions, while refraining from the use of the term "credit default swap" and avoiding any discussion of the CDOs they insured or the significant portion of them that exposed AIG to the U.S. residential housing and mortgage markets.  AIG again represented that the risk of loss on its "credit derivatives transactions" was "remote, even in severe recessionary market scenarios:"

> AIGFP enters into credit derivative transactions in the ordinary course of its business.  The majority of AIGFP's credit derivatives require AIGFP to provide credit protection on a designated portfolio of loans or debt securities.  AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses."  **The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.** …
>
> AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk.  AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion.  At December 31, 2006, the notional amount with respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $483.6 billion.

283.    The 2006 10-K represented that derivative financial instruments were recorded on AIG's financial statements at fair value:

> Derivative transactions are entered into in the ordinary course of AIGFP operations.  Derivatives are recorded at fair value, determined by reference to the mark to market value of the derivative or their estimated fair value where market prices are not readily available.  The resulting aggregate unrealized gains or losses from the derivatives are reflected in the consolidated income statement.  Where AIGFP cannot verify significant model inputs to observable market data and cannot verify the model value to market transactions, AIGFP values the contract at the transaction price at inception and, consequently, records no initial gain or loss…

284.    Elsewhere, the 2006 10-K identified the bases for AIG's fair value determinations as follows:

Fair Value Determinations of Certain Assets and Liabilities (Financial Services)

- *Valuation models:* utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.
- *Market price data:* AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third-party broker quotes for use in its models.  When such data is not available, AIG uses an internal methodology, which includes interpolation and extrapolation from verifiable prices from trades occurring on dates nearest to the dates of the transactions.

285.    The 2006 10-K made numerous references to AIG's corporate structures to address risk management policies and practices throughout the Company.  Under the heading of "Corporate Risk Management," the 2006 10-K represented:

AIG's major risks are addressed at the corporate level through the Enterprise Risk Management Department (ERM).  ERM is headed by AIG's Chief Risk Officer (CRO) and is responsible for assisting AIG's business leaders, executive management and the Board of Directors to identify, assess, quantify, manage and mitigate the risks incurred by AIG.  **An important goal of ERM is to ensure that once appropriate governance, authorities, procedures and policies have been established, aggregated risks do not result in inappropriate concentrations.**

The 2006 10-K further noted that senior management had established various oversight committees to monitor the risks attendant to its businesses.  These included, among others:

- The Credit Risk Committee (CRC) is responsible for (i) approving credit risk policies and procedures for use throughout AIG; (ii) delegating credit authority to business unit credit officers and select business unit managers; (iii) approving transaction requests and limits for corporate, sovereign and cross-border credit exposures that exceed the delegated authorities; (iv) establishing and maintaining AIG's risk rating process for corporate, financial and sovereign obligors; and (v) regular reviews of credit risk exposures in the portfolios of all credit-incurring business units; and.

- The Financial Risk Committee (FRC) oversees AIG's market risk exposures to interest rates, foreign exchange and equity prices and

provides strategic direction for AIG's asset-liability management. **The FRC meets monthly and acts as a central mechanism for AIG senior management to review comprehensive information on AIG's financial exposures and to exercise broad control over these exposures.**

286.     The 2006 10-K represented that AIG had "established a corporate-level Operational Risk Management Department (ORM) to oversee AIG's operational risk management practices" and that "[e]ach business [within AIG] is responsible for implementing the components of AIG's operational risk management program to ensure that effective operational risk management practices are utilized throughout AIG." This includes "developing and implementing policies, procedures, management oversight processes, and other governance related activities consistent with AIG's overall operational risk management policies."

287.     The 2006 10-K represented that risk exposure arising from the operations of AIGFP were subject to close oversight by the senior management of its parent company, AIG:

> The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations. AIG's senior management has established various oversight committees to monitor on an ongoing basis the various financial market, operational and credit risks attendant to the Capital Markets operations. The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.
>
> **AIG actively manages the exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities. In doing so, AIGFP must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.**

288.     The 2006 10-K represented that AIG's credit derivatives transactions were subject to oversight by AIG's Credit Risk Committee in order to carefully manage risk:

> A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG. To help manage this risk, AIGFP's credit department operates within the guidelines set by the CRC [*i.e.* AIG's Credit Risk Committee]. Transactions which fall outside these pre-established guidelines require the specific approval of the CRC…

AIGFP independently evaluates the counterparty credit quality by reference to ratings from rating agencies or, where such ratings are not available, by internal analysis consistent with the risk rating policies of the CRC. In addition, AIGFP's credit approval process involves pre-set counterparty and country exposure limits and, for particularly credit-intensive transactions, requires approval from the CRC. AIG estimates that the average credit rating of Capital Markets derivative counterparties, measured by reference to the fair value of its derivative portfolio as a whole, is equivalent to the AA rating category.

289.    The 2006 10-K also included a discussion of AIG's credit ratings and the potential impact of such ratings on the Company's liquidity. The 2006 10-K noted the downgrade of AIG's credit rating by the major rating agencies that occurred in 2005 and that as a result of such downgrades, AIG had been required to post approximately $1.16 billion of collateral with counterparties to municipal guaranteed investment contracts and financial derivatives transactions. The Company stated based on its outstanding municipal guaranteed investment contracts and derivatives transactions outstanding as of February 15, 2007, a further downgrade "would permit counterparties to call for approximately $864 million of collateral" and that further rating downgrades "could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

290.    The 2006 10-K included a financial statement footnote that, among other things, described AIG's securities lending program and its accounting treatment, as follows:

AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent. **Invested collateral consists primarily of floating rate bonds**. Interest earned on invested collateral, net of interest payable on the collateral provided is recorded as net investment income.

291.    Defendants Sullivan and Bensinger certified the results reported in the 2006 Form 10-K, using the same certification as set forth in the 2005 Form 10-K.

292.    The statements referred to above in the 2006 Form 10-K were materially false and misleading for the same reasons as set forth in ¶ 266 above.

293.    In addition, defendant Sullivan's statement in the March 1, 2007 press release that AIG had made "significant progress" in improving its control environment and in "providing grater transparency in our financial disclosures" was materially false and misleading because it failed to disclose that there was a material weakness in AIG's internal controls over the valuation of its CDS portfolio and because AIG's financial disclosures lacked sufficient transparency to enable readers of the Company's financial disclosures to discern AIG's exposure to the U.S. residential housing and mortgage markets, including the subprime market.

## IV.    First Quarter 2007 Financial Results and May 31, 2007 Investor Meeting

294.    On May 10, 2007, AIG filed with the SEC a Form 10-Q for the quarter ended March 31, 2007 (the "2007 First Quarter 10-Q") and issued a press release announcing its first quarter financial results.  The Company reported net income for the first quarter of 2007 of $4.13 billion, or $1.58 per diluted share, compared to $3.20 billion or $1.22 per diluted share in the first quarter of 2006.

295.    The 2007 First Quarter 10-Q represented that derivative financial instruments were recorded on AIG's financial statements at fair value:

> Unless subject to a scope exclusion, AIG carries all derivatives on the Consolidated Balance Sheet at fair value.  The changes in fair value of the derivative transactions of AIGFP are presented as a component of AIG's operating income…  However, in certain instances, when significant inputs into model valuations are not supported by observable market data, income is not recognized at inception …, and instead income is recognized over the life of the contract when those inputs become sufficiently observable.

296.    Elsewhere, the 2007 First Quarter 10-Q identified the bases for its fair value determinations, in language similar to that used in the 2006 Form 10-Qs.

297.    The 2007 First Quarter 10-Q also included a discussion of AIG's credit ratings and the potential impact of such ratings on the Company's liquidity.  The 2007 First Quarter 10-Q represented that, based on AIGFP's outstanding municipal GIAs and financial derivatives transactions as of April 30, 2007, a downgrade of AIG's long-term senior debt by the major rating agencies "would permit counterparties to call for approximately $902 million of collateral" and that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

298.    Under the heading "Controls and Procedures," the 2007 First Quarter 10-Q referenced the 2006 10-K's identification of a material weakness relating to internal control over income tax accounting.  The Company further represented that there had been "no change in AIG's internal control over financial reporting" during the first quarter of 2006.

299.    Defendants Sullivan and Bensinger certified the results reported in the 2007 First Quarter 10-Q, using the same form as had been used in the 2006 10-Qs.

300.    The statements made in the First Quarter 2007 10-Q and press release were materially false and misleading in the same respects as stated above with respect to the 2006 Forms 10-Q, as set forth in ¶ 277.

301.    On May 31, 2007, AIG made a special presentation to investors to provide an overview of AIGFP's business.  Defendant Forster led the discussion of AIGFP's credit default swap business.  Forster told investors that AIGFP conducted this business assuming "the worst recession I can imagine and … mak[ing] sure that I can withstand all of that."  Forster further assured investors:  "With the advent of the CDO market and the CDS market, it's actually fairly easy for us to hedge any of the risk that we perceive.  So if the portfolio, if it did start to deteriorate, it would be very easy for us to go out, buy an extra layer of protection to make sure

that we maintain the sort of super senior portfolio still.  I have to say, given the conservatism …
that we've built in these portfolios, we haven't had to do a huge amount of hedging over the
years."

302.    Forster's statements at the May 31, 2007 investor conference were materially
false and misleading because he knew but failed to disclose that AIGFP had made a deliberate
decision not to hedge the CDS portfolio because doing so would involve incurring costs that
would eat into the short-term profitability of the business.  As described by CW 1, a Wall Street
investment bank executive who transacted five credit default swap deals, working directly with
Forster, among others:  "[AIGFP management's] bonuses were highly dependent on revenue out
of that book of business" and if they had incurred the added cost of hedging "it wouldn't have
been much of a business."  Similarly, CW 4, a former AIGFP executive acknowledged that if the
CDS portfolio needed to be hedged, it would not be an economically viable line of business.
Moreover, by citing to "the worst recession [he] can imagine," Forster omitted to state that such
a recession, and its consequent impact on the value of the multi-sector CDOs that AIGFP insured
through its CDS portfolio, would very likely trigger billions of dollars of collateral calls that
would significantly impact AIG's capital position.

## V.    Second Quarter 2007 Financial Results

303.    On August 8, 2007, AIG filed with the SEC a Form 10-Q for the quarter ended
June 30, 2007 (the "2007 Second Quarter 10-Q") and issued a press release announcing its
second quarter financial results.  The Company reported net income for the first quarter of 2007
of $4.28 billion, or $1.64 per diluted share, compared to $3.19 billion or $1.21 per diluted share
in the second quarter of 2006.  Defendant Sullivan stated in the press release that "[o]verall, AIG
performed very well in the second quarter."   He further assured investors that "**[AIG]**

**continue[s] to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities**. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call."

304.    For the first time, AIG's public filings expressly referred to "credit default swaps" that insured "CDOs" that were "exposed" to "residential mortgage-backed securities," including "subprime collateral."   The 2007 Second Quarter 10-Q also discussed that the Company, in December 2005, had stopped writing credit default swaps on CDOs that contained subprime debt:

> Since 1998, AIGFP has written super senior (AAA+) protection through credit default swaps, a portion of which is exposed to CDOs of residential mortgage-backed securities and other asset-backed securities.   At June 30, 2007, the notional amount of this credit derivative portfolio was $465 billion, including $64 billion from transactions with mixed collateral that include U.S. subprime mortgages.   As of August 6, 2007, all of AIGFP's super senior exposures continued to have tranches below AIGFP's attachment point which have been explicitly rated AAA or would have been rated AAA had they been rated. AIGFP's portfolio of credit default swaps is carefully structured, undergoes regular monitoring, modeling and analysis and contains significant protection through collateral subordination.   In addition, in December 2005, AIGFP stopped committing to writing super senior protection for CDOs that included any subprime collateral.

305.    Under the heading "Outlook," the 2007 Second Quarter 10-Q included a discussion of the impact of the serious disruption of the U.S. residential mortgage market on various lines of AIG's business.   AIG represented the impact "is not expected to be material" on the Company's investments and its credit default swap portfolio:

> The U.S. residential mortgage market is experiencing serious disruption due to deterioration in the credit quality of loans originated to non-prime and subprime borrowers, evolving changes in the regulatory environment and a slower residential housing market.   AIG participates in the U.S. residential mortgage market in several ways:   American General Finance, Inc. (AGF) extends first and second-lien mortgage loans to buyers and owners of residential housing; United Guaranty Corporation (UGC) provides mortgage guaranty insurance for first and second-lien residential mortgages;   AIG insurance and financial services

subsidiaries invest in mortgage-backed securities and collateralized debt obligations (CDOs) in which the underlying collateral is composed in whole or in part of residential mortgage loans; and AIGFP provides credit protection through credit default swaps on certain senior tranches of such CDOs.  The operating results of AIG's consumer finance and mortgage guaranty operations in the United States have been and are likely to continue to be adversely affected by the factors referred to above.  The downward cycle in the U.S. housing market is not expected to improve until residential inventories return to a more normal level and the mortgage credit market stabilizes.  AIG expects that this downward cycle will continue to adversely affect UGC's operating results for the foreseeable future, although UGC is beginning to experience improved credit quality trends on new production.  **The effect of the downward cycle in the U.S. housing market on AIG's other operations, investment portfolio and overall consolidated financial position, is not expected to be material due to AIG's disciplined underwriting and active risk management, as well as the high credit ratings for assets collateralized by subprime and non-prime mortgages and the structural protections against loss afforded AIG by its senior position in the investments and exposures that it holds.**

306.    AIG provided for the first time in the 2007 Second Quarter 10-Q information concerning the extent of the Company's investments in RMBS and CDOs.  AIG represented that any changes in the valuation of such investments were expected to have only a "temporary" effect on shareholder equity:

As part of its strategy to diversify its investments, AIG invests in various types of securities, including residential mortgage-backed securities (RMBS) and CDOs. At June 30, 2007, AIG's investment portfolio included such securities with an amortized cost of $98.5 billion and an estimated fair value of $97.9 billion.  The gross unrealized gains and gross unrealized losses related to these investments were $134 million and $(747) million, respectively, at June 30, 2007.

AIG's insurance operations held investments in RMBS with an estimated fair value of $94 billion at June 30, 2007, or approximately 11 percent of AIG's total invested assets.  In addition, AIGFP held investments totaling $3.6 billion in CDOs which include some level of subprime exposure.   AIG's RMBS investments are predominantly in highly-rated tranches that contain substantial protection features through collateral subordination.   At June 30, 2007, approximately 91 percent of these investments were rated AAA and approximately 7 percent were rated AA by one or more of the principal rating agencies. AIG's investments rated BBB or below totaled approximately $400 million, or less than 1 percent of AIG's total invested assets at June 30, 2007.  As of August 6, 2007, none of AIG's RMBS with some level of subprime collateral had been downgraded as a result of recent rating agency actions, and a

small amount of AIG's RMBS investments with subprime collateral had been upgraded. AIG currently intends to hold these securities to full recovery and/or full payment of principal and interest, and therefore expects that any mark to market effect will result in only a temporary adjustment to shareholders' equity.

307. The 2007 Second Quarter 10-Q represented that "AIG carries all derivatives on the consolidated balance sheet at fair value" and identified the bases for its fair value determinations, as AIG had done in prior Form 10-Qs filed in 2006 and 2007.

308. The 2007 Second Quarter 10-Q also included a discussion of AIG's credit ratings and the potential impact of such ratings on the Company's liquidity. The 2007 Second Quarter 10-Q represented that, based on AIGFP's outstanding municipal GIAs and financial derivatives transactions as of July 31, 2007, a downgrade of AIG's long-term senior debt by the major ratings agencies "would permit counterparties to call for approximately $847 million of collateral" and that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

309. Under the heading "Controls and Procedures," the 2007 Second Quarter 10-Q referenced the 2006 10-K's identification of a material weakness relating to internal control over income tax accounting. The Company further represented that there had been "no change in AIG's internal control over financial reporting" during the second quarter of 2006.

310. Defendants Sullivan and Bensinger certified the results reported in the 2007 Second Quarter 10-Q, using the same certification as set forth in the 2006 Form 10-Qs.

311. On August 9, 2007, AIG held its earnings conference call with analysts for the second quarter of 2007. The call included a special presentation by AIG concerning the Company's exposure to the U.S. residential mortgage market. The presentation was given by defendant Lewis, AIG's Senior Vice President and Chief Risk Officer, followed by a Q & A

session with analysts in which Lewis was joined by other AIG executives, including defendants

Sullivan and Cassano.

312.    In his presentation, defendant Lewis stated, in pertinent part:

AIG is active in many segments of the residential mortgage market from lending, to mortgage insurance, to investments, to Super Senior portfolio protections. Certain segments of the market have experienced credit deterioration, which is affecting the current results in AIG's mortgage insurance business. AIG also holds residential mortgage-related securities and recognizes that the current market dislocation has caused quoted prices in many of them to decline. AIG views such declines as temporary as the robust cash flow characteristics, combined with reasonably short maturity structure of most of these securities will exert a very strong pull to par, even if the markets remain unstable. AIG views recent pricing as indicative of market turmoil unrelated to the fundamental characteristics of these securities.

**In addition, we believe that it would take declines in housing values to reach depression proportions, along with default frequencies never experienced, before our AAA and AA investments would be impaired. AIG does not need to liquidate any investment securities in a chaotic market due to its strong liquidity and cash flow as well as its superior financial strength.** I am confident in our people and our risk management processes. Our exposures to this market are prudent given the nature of our business and our financial strength. AIG has the financial wherewithal and expertise to take advantage of opportunities as they arise in the future.

**In all the areas where we're active, we have strong risk management processes undertaken by experienced professionals**. The risks we take are analyzed based upon our own independent analyses, modeling and monitoring. Risk tolerances and appetites are formulated and implemented within authorities allocated by senior management and ongoing review and analysis is undertaken both in the businesses as well as at the corporate enterprise risk management level. Although the market may continue to experience a period of adjustment and volatility, **our exposures are understood and well managed within an appropriate risk tolerance for a strong world leader in insurance and financial services**.

313.    Defendant Lewis discussed AIG's insurance investment portfolio and its

investments. According to the data presented by Lewis, AIG's investment portfolio, as of June

30, 2007, held approximately $94.6 billion in residential mortgage holdings, or about 11.4% of

total invested assets. Of this amount, approximately $28.7 billion consisted of subprime RMBS.

However, since nearly 97% of these investments were in AAA or AA tranches, defendant Lewis

represented that risk relating to AIG's exposure to subprime debt was minimal:

> [O]ur insurance companies invest in the residential mortgage market across most
> security types, including agency pass-through and collateralized mortgage
> obligation issuances, prime jumbo non-agency CMOs, Alt-A and sub-prime
> RMBS, and other housing-related paper.  Total insurance company holding
> aggregate approximately $94.6 billion at June 30, 2007 or about 11.4% of AIG's
> cash and invested assets…  The sizing of the different tranches vary somewhat
> depending on the nature of the collateral and rating agency models and analysis.
> As a general rule, AAA and AA securities can withstand very significant default
> losses within the collateral. …
>
> From a credit perspective, AIG views the AAA and AA RMBS market as a very
> safe asset class with minimal risk of ultimate loss. …
>
> The originator and servicers of the mortgage pools are generally those
> organizations with strong financial discipline…  In addition to the structural
> enhancements contained in our RMBS holdings, AIG receives additional comfort
> from a number of other key factors.  AIG's RMBS portfolio is highly diversified
> in terms of location, tenor and size as reflected in the thousands of underlying
> mortgages in the pool.
>
> The underlying collateral is closely monitored by AIG by the respective collateral
> managers as well as by the rating agencies….

314.    Defendant Lewis also sought to reassure investors that the risks arising from

AIG's super senior CDS portfolio were minimal and remote:

> AIGFP's exposure to the market is derived through two sources.  First, they write
> extremely risk remote, Super Senior or AAA+ credit protection on highly
> diversified pools of assets, some of which include residential mortgages.  Second,
> they are cash investors in highly rated securities where some portion of the
> underlying collateral, which may include collateral from many sectors, includes
> residential mortgages.
>
> While both of these activities involve significant notional exposure, the risk
> actually undertaken is very modest and remote and has been structured and
> managed effectively.  AIGFP has been running a successful business of writing
> Super Senior credit default swap or CDS protections since 1998.  As of June 30
> this year they had a total net CDS exposure across all asset classes of $465 billion.
> The Super Senior portion is the least likely to incur any losses in these deals since
> losses are allocated on a sequential basis from lowest to highest quality.  Before
> AIGFP would be at risk for its first dollar of loss, these structures would have to

experience exceptional losses that eroded all of the tranches below the Super Senior level, including a very significant AAA layer of protection. …

…   The balance of $79 billion relates to multi-sector CDOs that FP helped to structure.  These multi-sector CDOs consist of very diverse pools of reference securities, some of which are exposed to US sub-prime RMBS collateral.  Of this $79 billion, $15 billion has no US sub-prime RMBS exposure and $64 billion has some collateral that represents US sub-prime RMBS exposure. …

In all cases, every transaction AIGFP has conducted has been carefully structured and screened as to collateral, manager and structure to ensure that AIG continues to receive the maximum protection to its position. …

Given the diligence employed in selecting and structuring these deals, none of the AIGFP deals have experienced any significant collateral deterioration.  There are only three deals out of the entire 103 multi-sector CDO transactions that have experienced any negative rating actions on any tranches subordinate to AIGFP's position.  These three deals are rapidly amortizing and make up less than 0.5% of our CDO exposure totaling just $296 million.

…   **[W]e're talking about a very remote risk, which is defined and calculated not just by rating agency models but also by our own very rigorous internal models used on each deal AIGFP structures**. …

The determination of the attachment point for most senior layer, the Super Senior tranche, is based on the assumption that the exposure to the portfolio will occur during a severe recession until the maturity of the transaction.  A Super Senior tranche must show zero losses 99.85% of the time in this severe recession scenario.

…   [T]he risk analysis and underwriting for each individual transaction must be approved by the credit trading team, the AIGFP credit officers and then finally by AIG's Credit Risk Committee.  All of AIGFP's deals are subjected to an exceptional degree of due diligence both at the inception of the deal and on a daily basis going forward.  It is this due diligence that led FP to dramatically scale back their operations in this sector at the end of 2005 due to growing concerns about both the increasing percentages of US sub-prime RMBS exposure in the CDOs and the quality of some of the underlying collateral.  As a result, they withdrew from making any further commitments to providing Super Senior protection on any deals that has US sub-prime RMBS collateral as they felt the new production was of a significantly poor quality.

[A slide accompanying this portion of the presentation stated that "AIGFP stopped committing to writing "Super Senior" protection that included sub-prime collateral in December 2005, so the total exposure across all deals to the vintages of 2006 and 2007 totals just $31 million."]

315. Defendant Lewis concluded his prepared remarks by citing to AIG's enterprise

risk management process and its purported role in managing credit risk:

**AIG has a strong enterprise risk management process where risks to the mortgage market are identified, assessed, analyzed, monitored and managed at all levels of its organization**. All business units involved in the mortgage markets have credit function and carry out underwriting practices that utilize their own analysis and conclusions prior to inception of risk exposures, as well as on an ongoing basis. The foundation of AIG's decision-making process is based on this independent analysis. The fundamental analysis by the rating agencies is an important component of our analysis. However, their ratings do not drive our decisions. Decisions are made under credit authorities granted by AIG's corporate-level credit risk committee or CRC. The CRC also reviews and governs credit risk tolerances for the business units. AIG's corporate credit risk management department and the credit risk committee conduct regular reviews of the portfolios and provide independent assessments to senior management. AIG establishes prudent credit reserves for all its exposures through a process that includes recommendations from the business units and approval by AIG actuaries, controllers, and AIG's Chief Credit Officer.

In conclusion, I will repeat what I said earlier. As Chief Risk Officer of AIG, I'm confident in our people and our risk assessment processes. Our exposures to this market are prudent, given the nature of our businesses and our financial strength.

316. Before proceeding to the Q & A session, defendant Sullivan summarized the

presentation of defendant Lewis as follows:

Exposures to the residential mortgage-backed securities market within AIG's insurance investment portfolios are of a higher quality and enjoy a substantial protection through collateral subordination. AIG does not need to trade mortgage-related securities and does not depend on them for its liquidity needs. Temporary market disruptions may have some non-economic effect on AIG through unrealized losses, however the sound credit quality of the portfolios should result in collection of substantially all principal and interest under any reasonable scenario.

AIG's Financial Products portfolio, Super Senior credit default swaps is well structured, undergoes ongoing monitoring, modeling and analysis and enjoys significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction and we will continue to manage these risks carefully. However, in every period of uncertainty, there is also opportunity. Given the high quality of our investments and our superior financial strength, AIG is poised to take advantage of these

opportunities as they arise.  As I said, with all the uncertainty, recent volatility and on some occasions even panic in the market, hopefully we have demonstrated that with our superior financial strength, liquidity, and cash flow [why] we believe AIG is a very safe haven in stormy times and [why] I remain extremely confident about our future.

317.    Similarly, during the ensuing Q & A session, defendant Cassano stated unequivocally that there was no reasonable scenario under which losses stemming from AIG's CDS business could be foreseen.  Responding to a question from an analyst about the kind of economic conditions that would have to be realized before losses could occur, Cassano responded:

[S]ometimes I feel like it is hard to get this message across, but these [CDS] are very much hand picked.  We are very much involved in the process of developing the portfolios in which we are going to wrap and then picking the attachment points.  And people who have been willing to work with us in order to do that to create the value that they do in these underlyings.  And so the combination of the diversity, the combination of the underlying credit quality and then the stresses that we put it through to make sure that we can hit these marks, **it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions.**

318.    As noted above, in the Second Quarter 2007 Form 10-Q, the Company disclosed that AIGFP had stopped writing CDS contracts on subprime debt at the end of 2005.  Emphasizing this point as another reason for believing that the CDS portfolio would not result in losses to the Company, defendant Cassano stated during the conference call:

[O]ne of the key points to take away is definitely that we stopped this business at the end of 2005.  Most of the stresses that people are sort of really concerned about I think are very heavily concentrated in '06 and '07.  We have almost zero exposure to that, and again as Bob [Lewis] outlined in the slides, there is almost zero exposure, net exposure after our subordination to all of that collateral assuming it was all wiped out tomorrow with zero recovery.  We have an extremely small amount to that.  And I think that's -- again, it is not just the portfolio construction, it is the structure of the CDOs and then it is the vintage that we decided to invest in.

319.    Defendant Cassano concluded the conference call, telling analysts and investors that "we are quite comfortable that there is no issue with [the CDS] portfolios" and that:

> [I]n this presentation we broke out exactly what everything looked like in order to give everybody the full disclosure, but **we see no issues at all emerging and we see no dollar of loss associated with any of that business in any reasonable scenario that anyone can draw.  When I say a reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.**

320.    The statements made in the Second Quarter 2007 Form 10-Q, press release and conference call were materially false and misleading in at least the following respects:

(a)    As stated with greater specificity in ¶¶ 266,,277 above, they were false and misleading because AIG's control environment was not remediated, as represented in the 2006 Form 10-K, and because there were additional, undisclosed material weaknesses relating to the Company's valuation of its CDS portfolio.

(b)    Given the undisclosed material weakness concerning the valuation of its CDS portfolio, and the fact that AIG did not properly reassess and make necessary adjustments for the value of its CDS portfolio on a regular or timely basis, AIG's representation that credit derivatives were carried at "fair value" was false and misleading.

(c)    Although AIG disclosed that it had stopped writing credit default swaps on CDOs containing subprime collateral, AIG executives failed to disclose that the decision was based on the fact that the model used to assess potential CDS contracts had been deemed unreliable, among other reasons, in light of the deterioration of underwriting standards evident in the pools of mortgages underlying the 2005 multi-sector CDOs.  Moreover, given their knowledge about the inability of the model to adequately account for the deteriorated underwriting standards inherent in the 2005 vintage CDOs, it was further materially misleading for defendants Cassano and Lewis to cite to 2006 and 2007 vintages as much more severely deteriorated, and thereby use

the fact that AIGFP had stopped writing CDS business by the end of 2005 as a further basis for claiming that the risk exposure from the CDS portfolio was minimal.

(d) Defendant Cassano's statements that "we see no issues at all emerging and we see no dollar of loss associated with any of that [CDS] business in any reasonable scenario that anyone can draw" and "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those [CDS] transactions" were materially false and misleading, as were similar statements by other defendants referred to above.  First, Cassano knew that the model used by AIGFP to determine risks associated with credit default swaps for particular CDOs was not able to accurately predict such risks for CDOs constructed from pools of subprime mortgages because that is one of the primary reasons why AIGFP exited that business at the end of 2005.  Second, such statements focused almost exclusively on the risk of default of the referenced CDOs and failed to disclose other, more significant risk exposures associated with the CDS portfolio.  In particular, Defendants knew, but failed to disclose that downgrades or declines in the ratings or market value of the referenced CDO securities could require AIG to post substantial additional collateral and that the terms of the CDS contracts frequently provided that the counterparties were designated as the valuation agents – *i.e.*, the parties who determined the value of the CDOs for purposes of determining whether AIG was required to post collateral.  Since Defendants recognized by the second quarter of 2007 that "[t]he U.S. residential mortgage market is experiencing serious disruption," and that underwriting standards on mortgages underlying the CDO securities had greatly deteriorated by 2005, Defendants knew that there was a significant likelihood that the referenced CDO securities would, in fact, be subject to ratings cuts and market valuation declines.  As a result, defendants

knew, but failed to disclose, that AIG could be required to post tens of billions of dollars of additional collateral, straining the Company's liquidity.

(e)     The 2007 Second Quarter 10-Q's discussion of possible additional collateral posting requirements in the event of downgrades of AIG's credit rating was false and misleading because it failed to disclose that counterparties to the credit default swap contracts would also be permitted to demand additional collateral in the event of ratings downgrades and/or declines in the valuations of the CDOs that were being insured through the CDS portfolio and that the terms of the CDS contracts frequently provided that the counterparties were designated as the valuation agents – *i.e.*, the parties who determined the value of the CDOs for purposes of determining whether AIG was required to post collateral.  Moreover, Defendants knew or should have known that such downgrades and valuation declines were likely, given AIG's conclusion that the U.S. residential housing and mortgage markets were deteriorating.   For the same reasons, the statements of defendant Sullivan touting AIG's "superior financial strength, liquidity, and cash flow" as making the Company "a very safe haven in stormy times" as well as similar statements by other Defendants concerning AIG's purported financial strength were also false and misleading.

(f)     Based on their knowledge of the serious deterioration of the U.S. residential housing and mortgage markets, the likelihood that AIG would be required to post billions of dollars of additional collateral, and the deliberate exclusion of risk management, financial, and accounting functions from decisions concerning the valuation of the CDS portfolio, Defendants knew or should have know that the following statements on the August 8, 2007 investor conference call, among others, were false and misleading:  (i) "AIG views such declines as temporary" (Lewis); (ii) "In all the areas where we're active, we have strong risk management

processes undertaken by experienced professionals" (Lewis); (iii) "our exposures are understood and well managed within an appropriate risk tolerance for a strong world leader in insurance and financial services" (Lewis); (iv) "AIG has a strong enterprise risk management process where risks to the mortgage market are identified, assessed, analyzed, monitored and managed at all levels of its organization" (Lewis); (v) "the risk actually undertaken is very modest and remote and has been structured and managed effectively" (Lewis); (vi) "we're talking about a very remote risk" (Lewis); and (vii) "Temporary market disruptions may have some non-economic effect on AIG through unrealized losses" (Sullivan).

(g)     Defendant Lewis's statement that "[t]he originator and servicers of the mortgage pools are generally those organizations with strong financial discipline" was materially false and misleading because he knew that many of the originators of mortgages that were included in the pools of CDOs insured by the CDS portfolio had either gone bankrupt or were operating under a severely stressed financial condition due to shoddy underwriting standards employed by those firms.

(h)     Given the fact that AIGFP wrote approximately 220 CDS contracts from mid-March 2005 to the end of 2005, compared to having written just 200 CDS contracts from 1998 until mid-March 2005, and that AIGFP stopped writing CDS contracts based on CDOs with subprime exposure by the end of 2005, it was materially misleading for Lewis to state "AIGFP has been running a successful business of writing Super Senior credit default swap or CDS protections since 1998."

(i)     Defendant Lewis's statement that AIG "establishes prudent credit reserves for all of its exposures" was false and misleading because neither AIG nor AIGFP established any

reserves for their exposure on the CDS portfolio nor, for the most part, had AIGFP hedged its exposure on the CDS portfolio.

(j)     The statement in 2007 Second Quarter 10-Q that "[a]s part of its strategy to diversify its investments, AIG invests in various types of securities, including residential mortgage-backed securities (RMBS) and CDOs" was false and misleading.  Defendants failed to disclose that in late 2005, AIG elected to greatly expand its investment portfolio in RMBS and similar types of securities for the purpose of attempting to increase net income from investments. Defendants also failed to disclose that a major portion of its RMBS investments were made with the cash collateral received from borrowers in connection with AIG's securities lending program. Defendants further failed to disclose that AIG had established a target to invest up to 75 percent of the cash collateral received from borrowers in RMBS and that such investments (as opposed to investments in Treasury bonds and short-term corporate debt that are typical investments undertaken in traditional securities lending programs) greatly increased AIG's liquidity risk.

## VI.     Third Quarter 2007 Financial Results and December 5, 2007 Investor Meeting

321.    On November 7, 2007, AIG filed with the SEC its Form 10-Q for the quarter ended September 30, 2007 (the "2007 Third Quarter 10-Q") and issued a press release announcing its third quarter financial results.  The Company reported net income of $3.09 billion or $1.19 per diluted share.  In the press release, defendant Sullivan acknowledged that the U.S. residential mortgage and credit market conditions had adversely impacted results for the quarter, but nevertheless maintained that **"our active and strong risk management processes helped contain the exposure."**  AIG disclosed a relatively small operating loss of $352 million due to an "unrealized market valuation loss related to its super senior credit default swap portfolio." Moreover, the Company estimated that through October 2007, its CDS portfolio had incurred an

additional $550 million unrealized market valuation loss.  Significantly, however, AIG continued to maintain that there was no likelihood that actual losses would be realized on its CDS portfolio: "Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives."

322.    The 2007 Third Quarter 10-Q stated that the $352 million market valuation loss in its CDS portfolio "represented a decline in the fair value of [the] super senior credit derivatives." AIG also estimated that during the month of October 2007, the CDS portfolio had incurred an additional $550 million decline in fair value, even while acknowledging that fair value estimates had become difficult due to the limited availability of market observable data for these derivatives:

> The ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP.  Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of observable market data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since September 30, 2007 is approximately $550 million as of October 31, 2007. The fair value of these derivatives is expected to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates.  **AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.**

323.    Elsewhere in the 2007 Third Quarter 10-Q, AIG discussed its methodologies for valuing its CDS portfolio and disclosed, for the first time, that counterparties to the CDS transactions had made demands for AIG to post collateral as result of disagreements between the counterparties' estimates of the fair value and those of AIG:

> AIGFP values its super senior credit default swaps using internal methodologies that utilize available market observable information and incorporate management

estimates and judgments when information is not available.  It also employs the Binomial Expansion Technique (BET) model where appropriate to help estimate the fair value of these derivatives.  The BET model utilizes credit spreads for the collateral pool obtained from an independent source.  The model also utilizes diversity scores, weighted average lives, recovery rates and discount rates.  The BET model does not adequately quantify the benefit of certain structural mitigants, such as triggers that accelerate the amortization of the more senior tranches, that AIGFP believes are important to the appropriate valuation of its transactions.  AIG believes that the value of these mitigants could range from zero to $50 million, but is not able to reliably estimate their value at this time.  Therefore, AIG's estimate of the fair value of AIGFP's super senior credit default swaps as of September 30, 2007 does not attribute value to these features.

The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market.  These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes.  Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets **has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values**.

**As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates.**

324.    The 2007 Third Quarter 10-Q also included a discussion of AIG's investments in RMBS and CDOs.  AIG stated that such investments were made "[a]s part of its strategy to diversify its investments."  AIG stated that the estimated fair value of such securities in its insurance operations investment portfolio was $91 billion, or approximately 10% of AIG's total invested assets.  AIG represented that while some of its RMBS securities either had been downgraded or placed on watch for downgrade, the Company "currently intends to hold these securities to full recovery and/or full payment of principal and interest, and therefore expects that any mark to market effect will result in only a temporary adjustment to shareholders' equity."  The 2007 Third Quarter 10-Q further represented that "AIG's underwriting practices for

136

investing in RMBS, other asset-backed securities and CDOs takes into consideration the quality of the originator, the manager, the servicer, security credit ratings, underlying characteristics of the mortgages, borrower characteristics, and the level of credit enhancement in the transaction."

325.    The 2007 Third Quarter Form 10-Q also briefly noted AIG's securities lending operations, stating:  "At September 30, 2007, AIG's securities lending payables totaled $88.4 billion, $14.6 billion of which was one-day tenor, with the balance maturing within the next six months.  Collateral held for this program at September 30, 2007 included interest bearing cash equivalents with overnight maturities of $17.4 billion."

326.    The 2007 Third Quarter 10-Q also included a discussion of AIG's credit ratings and the potential impact of such ratings on the Company's liquidity.  The 2007 Third Quarter 10-Q represented that, based on AIGFP's outstanding municipal GIAs and financial derivatives transactions as of October 31, 2007, a downgrade of AIG's long-term senior debt by the major rating agencies "would permit counterparties to call for approximately $830 million of collateral" and that "additional downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity."

327.    Under the heading "Controls and Procedures," the 2007 Third Quarter 10-Q referenced the 2006 10-K's identification of a material weakness relating to internal control over income tax accounting.  The Company further represented that there had been "no change in AIG's internal control over financial reporting" during the third quarter of 2006.

328.    Defendants Sullivan and Bensinger certified the results reported in the 2007 Third Quarter 10-Q, using the same certification set forth in prior Forms 10-Q filed during 2006 and 2007.

329.   AIG's November 8, 2007 third quarter conference call with analysts, like the second quarter call, devoted considerable attention to the impact of the dislocation of the U.S. residential mortgage market on various lines of AIG's business.  Significant presentations were again made by defendants Sullivan, Lewis and Cassano, each of whom steadfastly maintained that AIG's CDS portfolio posed virtually no risk to the Company.  Defendant Sullivan stated, for example:

> The quarter's results also include a $352 million unrealized market valuation loss related to the AIG Financial Products' super senior credit default swap portfolio. The loss taken this quarter reflects a change in the fair value of these derivatives due to the significant widening of credit spreads on the underlying collateral. **However it does not reflect the change in our view:  AIG does not expect to pay any losses on this carefully structured and well-managed portfolio.**  All super senior transactions are written to a zero loss standard, underlying collateral assets are analyzed and modeled to determine appropriate risk attachment points, so that all transactions have significant subordination below AIGFP's attachment point.

330.   Similarly, defendant Lewis stated:

> AIGFP write[s] super senior protection through credit default swaps on CDO structures containing US residential mortgage backed securities.  But importantly, AIGFP stopped writing this business in late 2005, and therefore holds very low exposures to the troubled 2006 and 2007 vintages.  Although a valuation loss has been taken in the quarter to reflect credit spread widening of CDOs of ABS, **AIGFP does not expect to make any payments on its portfolio of super senior credit derivatives**. …

> AIGFP maintains a regular program where it closely monitors and models each transaction in the portfolio.  Despite recent rating action and dislocation in the marketplace, AIGFP's analysis indicates that except for a very modest amount that is AAA risk, their exposure remains super senior.  **We continue to believe strongly that AIGFP will not be required to make any payments on these derivatives.**

331.   Defendant Lewis also discussed AIG's insurance investment portfolios.  He noted that during the third quarter, AIG had recorded net unrealized depreciation of investments of $1.6 billion related to RMBS.  He represented that AIG's RMBS holdings were recorded at fair

value and stated that "we believe the structural protections in our RMBS holdings will result in full recovery on the vast majority of our holdings even in the severe housing downturn."

332.    In response to a question about differences in valuations between AIG and its counterparties, defendant Cassano represented that collateral calls resulting from such disputes posed no problems for the Company because "**we have been husbanding our liquidity all through this very trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in.**"

333.    At the December 5 investor meeting, and as later memorialized in its Form 8-K/A filed with the SEC on December 7, 2007 ("December 7 Form 8-K"), AIG represented that the value of its CDS portfolio had declined between $1.05 billion and $1.15 billion since September 30, 2007.  Taking the disclosure of these losses together with the $352 million loss reported for the third quarter of 2007, AIG led investors to believe that the total decline in value of the CDS portfolio through November was between $1.4 billion and $1.5 billion.

334.    With regard to investments in RMBS held in the investment portfolios of AIG's insurance operations, the December 7 Form 8-K represented that while a definitive estimate of the mark to market valuation was not yet available, unrealized losses in the portfolio were preliminarily estimated at $2.6 billion for the first two months of the fourth quarter.

335.    Defendant Sullivan began his presentation at the December 5 investor meeting by representing that AIG had foreseen the deterioration of the U.S. residential housing market in 2005, **and that appropriate corrective actions were undertaken at that time by AIG's business units**.  He emphasized that AIG had significant financial resources that provided the Company with the ability to "absorb volatility" and served as a platform for future growth:

> During 2005, AIG began to see mounting evidence that lending standards and pricing in the U.S. residential housing market were deteriorating at a significant

pace.  **Each of our businesses with exposure to that sector saw the same environment and took corrective action at that time, consistent with their individual business models**.  Due to the varying nature of these businesses, each responded in different ways. In some cases, we pulled out of the market. …

…  I am pleased to share with you that our five-year goal is to grow our adjusted earnings per share from 10% to 12% per year. …

…We are very focused on capital management and believe we will generate adjusted returns on equity of approximately 15% to 16% over the same five-year time period…  It is important to note that we are generating these kinds of returns with significant excess capital.  Over time, as that capital is redeployed, those returns could be higher, which is obviously what we would like to see.

**That said, in today's uncertain environment, we are fortunate to have a capital base as well as a diverse portfolio of leading businesses with tremendous earnings power that will allow us to absorb volatility and maintain the resources to grow and take advantage of opportunities that emerge from this uncertainty.**  I don't wake up in the morning worried I'm going to have to dilute the shareholders by issuing additional common equity or cutting our dividend. …

**AIG has significant financial resources and a very healthy balance sheet that will allow us to capitalize on attractive opportunity.**  AIG is one of the five largest companies in the world, as measured by tangible equity.  We operate with only modest financial leverage, and we have approximately $40 billion of cash and in short-term investments on the balance sheet as at September 30, 2007.

336.    Defendant Sullivan then addressed AIG's super senior CDS portfolio.  He again insisted that there was a near zero probability that the CDS portfolio would sustain an economic loss and that AIG had the financial strength to hold its RMBS investments until they recovered their value:

AIG does not rely on asset-backed commercial paper or the securitization markets responding and importantly, we have the ability to hold devalued investments to recovery.  That's very important…  AlGFP has very large notional amounts of exposure related to its Super Senior credit derivative portfolio.  **But because this business is carefully underwritten and structured with very high attachment points to the multiples of expected losses, we believe the probability that it will sustain an economic loss is close to zero.**

In addition, AIGFP stopped writing new business on CDOs with subprime RMBS collateral at the end of the 2005.  As a result of GAAP accounting requirements,

the business will likely continue to show some volatility [in] reported earnings even though it will be unlikely to sustain an economic loss.

AIG has approximately $93 billion of mostly AAA and agency RMBS investments, about 10% of its total investment portfolio, which makes up the vast bulk of the exposure to the U.S. residential housing market. We have very little exposures to subordinated tranches of RMBS or CDO resecuritizations of RMBS. Our exposures to move to more recent vintages are high grade and of short duration. **Due to our financial strength, we have the ability and intent to hold these securities to recovery, thereby minimizing liquidity-driven economic losses, even though further GAAP changes in valuation that affect net income in AOCI are possible.**

337.    Defendant Sullivan also sought to assuage the concerns of investors by emphasizing AIG's "rigorous due diligence" and its "risk management culture:"

We have a rigorous due diligence process. We are very focused on structure and stress -- On how stress-testing key variables affect those structures. We rely on our own credit analysis, not the monolines, and we evaluate all underlying collateral. **We have the financial wherewithal to hold to recovery**.

Now as you have heard before, we are very proud of our risk management culture and practices. The many years AIG has been a -- has had a centralized risk management function that oversees the market, credit and operational risk management units in each of our businesses as well as at the parent company. **We have our arms around what is happening through AIG and believe we have demonstrated this through timely and comprehensive disclosure and accuracy in our reporting**. Most importantly, the effectiveness of AIG's risk management efforts will come through in our results.

338.    Defendant Sullivan concluded his prepared remarks at the December 5 investor meeting by telling investors what they should view as the "bottom line" that should be taken from the presentations AIG was making:

First of all that AIG has accurately identified all areas of exposure to the U.S. residential housing market, **second, we are confident in our marks and the reasonableness of our valuation methods**. We cannot predict the future, but **we have … , a high degree of certainty in what we have booked to date**. Thirdly, **AIG's exposure levels are manageable, given our size, financial strength and global diversification.** Fourth, AIG is fortunate to have a diverse portfolio of leading businesses with tremendous earnings power.

339.     The next presentation at the December 5 investor meeting was made by defendant

Cassano.  Discussing AIG's CDS portfolio, Cassano stated unequivocally that "**we are highly**

**confident that we will have no realized losses on these portfolios during the life of these**

**portfolios**."   He emphasized this point repeatedly through his presentation: "our attachment

points are significantly high enough that it is very difficult to see how there can be any losses in

these portfolios. … So, our Super Senior risk reflects large notionals but poses remote risk …

And the structure would have to take losses that erode all of the tranches below the Super Senior

segment before we will be at risk for $1.00 of loss."

340.     Defendant Cassano also effectively told investors that AIG's reporting of the "fair

value" of its credit default swaps under GAAP was essentially irrelevant to how they should

view the portfolio and that "hysteria" and "misinformation" in the market had distorted

perceptions of the "economic realities" of the portfolio:

> The GAAP rules demand that we post the fair value for these transactions.  But --
> and you've heard this before, and you read it in the press and I know its common
> language now, but there is a major disconnect going on in the market between
> what the market is telling and what the market is doing versus the economic
> realities of our portfolio.  And one of our goals today is to set out for you the
> economic reality of our portfolios so you can cut through some of the popular
> press, some of the hysteria, some of the misinformation, I think, that is floating
> around in the market.

341.     Defendant Cassano reinforced this point again during the Q & A portion of the

December 5 investor meeting in the following exchange with Tom Cholnoky, an analyst from

Goldman:

> **Cholnoky**:  I just want to make sure I fully understand, I know this is kind of like
> second grade for me going through this.  But just so I understand, to the extent
> that you've now quarter to date had roughly a $1.1 billion or so of potential or
> mark-to-market --
>
> **Cassano:**  Or mark-to-model loss.

**Cholnoky:**  Mark-to-model, just to make sure, you don't actually expect these to actually generate economic loss for you.  This is an indication that, if you were to sell your portfolio today or sell these securities, you would have to recognize that loss.   But to the extent that you have the ability to ride out the duration of the contract, these would ultimately reverse these charges, just to understand that.  Is that correct?

**Cassano:**  That's absolutely correct.  Now let me just, what Tom is saying is absolutely correct.  We see the $1.1 billion, and we should add to it the $350 million from the third quarter of last year right, the end of the September numbers, so the approximately $1.5 billion as a mark that someone might make us pay to take on these liabilities in this aberrant market conditions.  But we don't have to sell, they're all synthetic, there's nothing that compels us to sell these trades.  **Our fundamental analysis says this is a money good asset.  We would not be doing the shareholders any benefit by exiting this right now and taking that loss**.  And over the average lives that you see us post for the maturity of these transactions, **these losses will come back and these are money good instruments that we have**.

342.   Asked about the collateral calls that AIG had received from counterparties, Cassano claimed the requests to post collateral were an indication that "the market's a little screwed up."   Cassano essentially dismissed at least some of the collateral calls as frivolous, stating:  "We have, from time to time, gotten collateral calls from people.  Then we say to them, 'Well, we don't agree with your numbers.'  And they go, 'Oh.'  **And they go away**.  And you say well what was that.  **It's like a drive by in a way**."  Thus, rather than acknowledge that AIG was overvaluing its CDS portfolio, Cassano claimed that the collateral calls arose either from frivolous claims or from valuation disputes due to the lack of "price transparency" in the market.

343.   Like Sullivan, Cassano also represented that AIG's purported financial strength enabled the Company to withstand what he described as an "aberrant period:"

Now the other part of your question … is how does your wherewithal to withstand this business under the way capital is allocated and all those things work out.  Clearly this is a time where it's a huge benefit to be part of the AIG family. …

… **I think it's these crises and these points in time that give us the wherewithal right now to stand here with you and say on the back of giants, on the back of everybody at AIG who has built the capital that AIG has, the**

**AIGFP unit is able to withstand this aberrant period.  And it's due to that that things would work out.  So we don't have any issues of our wherewithal here to sit through this business.**

344.     Similarly, defendant Bensinger asserted:

**AIG Financial Products has sufficient capital to run its business.**  When we look at the Super Senior business that Joe described., and he went through in great detail the rigorous and very conservative modeling that goes through to look at the expected and unexpected losses in that business, what I think we all should come away from is saying that, to an extremely high degree of confidence, there is no expected loss in that portfolio.  In fact it is underwritten so that there would be no loss at an extreme confidence level.

Now if we bring that over into AIG's capital assessments and capital modeling from an economic perspective, that's exactly what we're trying to do at the corporation as a whole is determine how much risk capital we need and how much we have against making sure, at an extremely high confidence level, that AIG has sufficient capital to meet its obligations.  And we have to stress the FP business far beyond that threshold before we see a first dollar of loss.  **So economically there is not a lot of capital exposed in that business compared to how AIG looks at things.**

So the other capital constraints that we have are of course the ratings agencies, as we look and we work with them…  And we will have sufficient capital up at FP to meet their requirements.  **Understand also that FP's transactions are guaranteed by AIG, Inc.  So their capital is really our capital and more importantly our capital is their capital.**

345.     AIG again emphasized at the December 5 investor meeting that at the end of 2005 it had stopped writing credit default swaps on CDOs with subprime exposure.  As stated by defendant Cassano, "[O]ne of the things that's helping us through was the decision we made in 2005 and the limited exposure that we have to the problematic vintages of '06 and '07."  In this regard, AIG sought to foster the notion that AIGFP had looked forward and seen that its internally developed models would be inadequate to model the behavior of CDOs written in 2006 and 2007.  Gary Gorton, the AIG consultant who helped to develop AIG's internal models, told investors at the December 5 investor meeting that "as my colleagues have emphasized, we

stopped writing this business in late 2005 based on fundamental analysis and based on concerns that the model was not going to be able to handle declining underwriting standards."

346.    Defendants also spent considerable time at the December 5 investor meeting emphasizing that their confidence in the performance of the CDS portfolio was based not only their modeling of the underlying CDOs, but on rigorous due diligence and fundamental analysis undertaken by AIGFP in structuring the transactions.  For example, in describing the multi-sector CDO transactions, defendant Forster stated:

> [W]e're … selecting and investigating the manager.  We questioning their abilities and resources to manage both the assets and also the CDO, which is very important.
>
> … [T]hey [the CDO managers] analyzed all of the collateral they have.  We ask them how they went about that.  We ask them how they stressed it, how they reviewed it, how they're going to do ongoing surveillance of it.  But then what we also do is do our own analysis in exactly the same processes.  And then, we compare and contrast the two to see if we're coming up with similar results and similar likes and dislikes of the underlying collateral.
>
> Again, all of this is with the aim of trying to create positively selected portfolios with very high diversity as Joe was outlining…
>
> And then finally once we've reviewed all of the assets, we work on the actual structure of the CDO itself to make sure that if there is any reinvestment that we have very tight limits on anything that they want to do …

347.    Forster acknowledged that AIG's modeling might not perfectly capture changes in the U.S. real estate market, but asserted that AIG's fundamental analysis served to identify more risks that might arise than modeling alone:  "[W]e have a fundamentally different approach of saying, yes we can use the model but the model will not capture everything…  We think if you combine the model with fundamental analysis and credit analysis deciding whether we think these are good assets before they're going in, that we capture an awful lot more risks that are in there.  And that's why we think we have a better transaction."

348.    The December 5 investor meeting also included a presentation by Kevin McGinn, AIG's Chief Credit Officer.  McGinn represented that AIGFP's credit default swap transactions were subject to strong oversight by the parent company through the activities of the Credit Risk Committee and that large transactions required approval at the highest levels of the Company:

> … I just want to confirm this about the relationship we [*i.e.* the Credit Review Committee] have with AIG Financial Products.  The Super Senior business of AIGFP is a business that we have been really involved with from the very inception of the business over ten years ago, initially through Bob [Lewis] when he was Chief Credit Officer of the corporation and since I took over in the middle of 1994.
>
> But essentially every single Super Senior transaction does come down to our Committee.  AIG Financial Products doesn't have credit authority really to approve that on its own.  We challenge Joe and his team on, we basically challenge his assumptions, we stress the book, we run some independent tests to make sure that all the assumptions that he's made are valid and we indeed approve those transactions.  Some of them are of a size that require the further sign off by either Bob [Lewis] or Steve [Bensinger] and in some cases, if they go into very high amounts, by Martin Sullivan himself.  So that's a very, very active process.

349.    AIG's December 5 investor meeting also included presentations concerning the Company's RMBS investments held by its insurance operations.  AIG represented that through October 31, 2007, the estimated aggregate mark-to-market loss in its RMBS portfolio was approximately $2.9 billion.  AIG also estimated an additional $1.7 billion to $1.8 billion decrease had occurred during the month of November.  The Company emphasized that its RMBS investments were not held as "trading positions" and that its underwriting therefore focused on ultimate collectability, not short-term market movements.

350.    AIG's Senior Vice President of Investments, Richard Scott, told investors:  "We do believe our RMBS portfolio is reasonably well positioned to withstand even a severe downturn in the U.S. housing market…  We believe our RMBS portfolio is a prudent and appropriate component of our overall diversified exposure."

351.     The statements made in the Third Quarter 2007 Form 10-Q, press release and conference call, and at the December 5 investor meeting and in the December 7 Form 8-K, were materially false and misleading in at least the following respects:

(a)      As AIG would later admit, the cumulative market valuation loss on the CDS portfolio **was materially understated by at least $4.3 billion**.  AIG and its executives failed to disclose that in arriving at their reported "loss" of approximately $1.5 billion, they had included for the first time the benefits of "cash flow diversion features" and "negative basis adjustments" in valuing the additional losses on the CDS portfolio for the month of November 2007.  These "benefits" were not previously included in AIG's estimate of market valuation losses on the CDS portfolio as of September 30, 2007 and for the month of October 2007, as presented in the Company's 2007 Third Quarter 10-Q.  Thus, when, for the first time, AIGFP acknowledged that it was required to report a substantial valuation adjustment on its CDS portfolio, Cassano and his inner circle, who controlled the risk management and valuation functions for the Asset/Credit business, manipulated the valuation model in order to minimize the amount of that valuation adjustment.  Whereas AIG and its executives presented the cumulative loss amount as of November 30, 2007, as $1.4 billion to $1.5 billion, in fact, the actual loss by that point was at least $5.96 billion.  As AIG would later admit, there was an insufficient basis for including the value of "negative basis adjustments" in its estimates of fair value.  The use of such negative basis adjustments in the loss estimate presented at the December 5 investor meeting resulted in understating the cumulative market valuation loss by at least $3.63 billion.

(b)      As AIG would also later admit, the calculations of the decline in value of the CDS portfolio for September and October 2007, as disclosed in the 2007 Third Quarter 10-Q, were calculated using a BET methodology that incorporated "generic" inputs such as "credit spreads

on asset-backed securities," rather than market-based inputs, including "cash bond prices provided by the managers of the underlying CDO collateral pools" that AIG later adopted. As later revealed, if the "generic" inputs had not been used to calculate the valuation loss as of November 30, the resulting reported loss would have been 57 percent greater in the Third Quarter 2007 Form 10-Q. As such, the description in the Third Quarter 2007 10-Q of how AIGFP valued its CDS portfolio according to the BET methodology failed to disclose the model's use of generic inputs that materially understated the market valuation loss of the CDS portfolio.

(c)     As stated with greater specificity in ¶ 277 above, Defendants' statements pertaining to the valuation of the CDS portfolio and AIG internal controls were false and misleading because AIG's control environment was not remediated, as represented in the 2006 Form 10-K, and because there were additional, undisclosed material weaknesses relating to the Company's accounting for derivative transactions. Indeed, on October 1, 2007, Joseph St. Denis, who had been hired to assist in formulating and implementing correct accounting policies for AIGFP, and had received two extremely positive performance evaluations, resigned his position based, in large measure, on his having been excluded deliberately by defendant Cassano from the CDS valuation process – a fact that was made known directly to AIGFP's Chief Risk Officer and AIG's General Counsel. Moreover, on November 29, 2007, just a week before the December 5 investor meeting, PwC had advised AIG's senior management, including defendants Sullivan and Bensinger, that there were significant deficiencies, and possibly a material weakness, in AIG's internal control over financial reporting and oversight relating to the fair value valuations of the CDS portfolio. Nevertheless, defendants Sullivan, Lewis, Bensinger and Cassano all represented, without any disclosure of PwC's warning, that they were confident in

AIG's valuation of the CDS portfolio.  For this reason, the following statements, among others, were materially false and misleading: (i) credit default swaps carried at "fair value" (2007 Third Quarter 10-Q); (ii) "we have our arms around what is happening through AIG and believe we have demonstrate this through timely and comprehensive disclosure and accuracy in our reporting" (Sullivan, December 5 investor meeting); (iii) "we are confident in our marks and the reasonableness of our valuation methods" (Sullivan, December 5 investor meeting); and (iv) "GAAP rules demand that we post the fair value for these transactions" (Cassano, December 5 investor meeting).

(d)     As set forth above, Defendants were aware that the deterioration of the U.S. residential housing and mortgage markets would result in continued and deepening market valuation losses in its CDS portfolio and that AIG was at risk for having to post tens of billions of dollars of additional collateral.  Defendants also knew that AIGFP had not established any reserves for the CDS portfolio and, for the most part, also did not hedge its credit default swap transactions.  Indeed, in late 2006 various AIGFP personnel had suggested hedging the CDS portfolio, but the strategy was rejected by defendants Cassano, Athan, Forster and Frost due to the adverse effect it would have on AIGFP's profitability and their own compensation. Moreover, by failing to disclose the extent of collateral calls already made on the Company and through repeated assurances regarding AIG's financial strength, capital position and liquidity, Defendants misled investors to believe that AIG had sufficient resources to meet any collateral calls and that the CDS portfolio posed no risks to the Company's liquidity.  For these reasons, the following statements, among others, were materially false and misleading: (i) a downgrade of AIG's credit rating "would permit counterparties to call for approximately $830 of additional collateral" (2007 Third Quarter 10-Q); (ii) "we have been husbanding our liquidity all through

this very trying period, and we have plenty of resources and more than enough resources to meet any collateral calls that might come in" (Cassano, November 8, 2007 conference call); (iii) "we are fortunate to have a capital base ... that will allow us to absorb volatility" (Sullivan, December 5 investor meeting); (iv) "AIG's exposure levels are manageable, given our size, financial strength and global diversification" (Sullivan, December 5 investor meeting); (v) "we don't have any issues of our wherewithal here to sit through this business" (Cassano, December 5 investor meeting); and (vi) "AIG Financial Products has sufficient capital to run its business ... importantly, our capital [AIG's] is their capital [AIGFP's]" (Bensinger, December 5 investor meeting).

(e)     Cassano's statement at the December investor meeting characterizing collateral demands made by counterparties as "drive by[s]" was also false and misleading.  As noted by Joseph St. Denis in his October 4, 2008 letter to Congress, Cassano's statements characterizing collateral calls "as lacking a legitimate basis, especially given the apparent state of AIGFP's valuation models, were statements that I would not have condoned.  I believed at the time of the investor meeting … that full disclosure of the margin calls, and resulting collateral postings … was of critical importance."  Indeed, Cassano knew, but failed to disclose, among other things, that (i) highly reputable investment banks, such as Goldman Sachs, were among the parties making collateral demands, (ii) AIG had, in fact, posted collateral in response to such demands, and (iii) the terms of the CDS contracts frequently provided that the counterparties were designated as the valuation agents – *i.e.*, the parties who determined the value of the CDOs for purposes of determining whether AIG was required to post collateral.

(f)     Although Defendants reiterated that AIG had stopped writing CDS contracts based on multi-sector CDOs by the end of 2005, they continued to conceal that the decision was

based on the facts that (i) the model used to assess potential CDS contracts had been deemed unreliable in light of the deterioration in underwriting standards that was evident in the pools of mortgages underlying the 2005 multi-sector CDOs, and (ii) the conclusion of AIGFP's senior management that there was a high correlation across pools of subprime mortgages that could not be eliminated by "multi-sector" diversification – thereby making it further materially misleading for Defendants to cite to 2006 and 2007 vintages of loans as much more severely deteriorated, and thereby use the fact that AIGFP had stopped writing CDS business as a further basis for claiming that the risk exposure from the CDS portfolio was minimal.  Thus, for example, the statements made at the December 5 investor meeting by defendant Cassano ("[O]ne of the things that's helping us through was the decision we made in 2005 and the limited exposure that we have to the problematic vintages of '06 and '07") and AIGFP consultant Gary Gorton (referring to "declining underwriting standards" rather than underwriting standards that AIGFP knew had declined during 2005) were materially misleading.

(g)     Defendants' repeated assurances that there was only a remote probability that AIG would be required to make payments on its CDS contracts were materially false and misleading because, as described above, they failed to disclose the considerable risk that the Company would be faced with billions of dollars of collateral calls.  Thus, the following statements, among others, created a misleading impression of the true risks arising from the CDS portfolio:  (i) "AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives" (AIG 2007 Third Quarter 10-Q); (ii) "AIG does not expect to pay any losses on this carefully structured and well-managed portfolio" (Sullivan, November 8 call); (iii) "AIGFP does not expect to make any payments on its portfolio of super senior credit derivatives" (Lewis, November 8 call); (iv) "we believe the probability that

it [the CDS business] will sustain an economic loss is close to zero" (Sullivan, December 5 investor meeting); (v) "we are highly confident that we will have no realized losses on these portfolios during the life of these portfolios" (Cassano, December 5 investor meeting); (vi) "it is very difficult to see how there can be any losses in these portfolios" (Cassano, December 5); (vii) "So the Super Senior risk reflects large notionals but poses remote risk" (Cassano, December 5); and (viii) "what I think we all should come away from is saying that, to an extremely high degree of confidence, there is no expected loss in that portfolio.  In fact it is underwritten so that there would be no loss at an extreme confidence level" (Bensinger, December 5).

(h)     The statements of defendant Forster and others concerning the "fundamental analysis" and due diligence undertaken by AIGFP in structuring its credit default swap transactions were false and misleading.  As described by CW 1, an executive who headed the CDO business of a major Wall Street investment bank, in all of the deals he did with AIGFP, AIGFP would only ask for "each of the underlying and offering documents."  He stated that AIGFP did not request any of the counterparties' own loan level valuation or analysis materials. Thus, contrary to the assertions of Forster and others, AIGFP did not perform a thorough or adequate review of the CDOs' underlying assets.

(i)     The representations in the 2007 Third Quarter 10-Q concerning AIG's securities lending program were false and misleading because it failed to disclose that the overwhelming majority of the cash collateral received from borrowers was invested in RMBS and other asset-backed securities, which greatly increased AIG's overall exposure to the U.S. residential housing and mortgage market and heightened the risks to the Company's liquidity.

(j)     The representation in the 2007 Third Quarter 10-Q that RMBS investments were made "[a]s part of [AIG's] strategy to diversify its investments" was false and misleading

because it failed to disclose that, in late 2005, AIG set a goal of investing 75 percent of the cash collateral received from borrowers through its securities lending program in RMBS and that such investments were not made for the purpose of diversification, but as an attempt to boost the income of the investment portfolio.

(k)    AIG's representation in the 2007 Third Quarter 10-Q that the Company "currently intends to hold these [RMBS] securities to full recovery and/or full payment of principal and interest, and therefore expects that any mark to market effect will result in only a temporary adjustment to shareholders' equity" was false and misleading because it failed to disclose that under adverse market conditions an increasing number of borrowers under AIG's securities lending program would demand the return of their cash collateral, forcing AIG to either sell its relatively illiquid RMBS investments at unacceptable prices or requiring AIG to raise cash from other sources.

(l)    Based on the foregoing, defendant Sullivan also lacked a reasonable basis to state at the December 5 investor meeting, and failed to disclose material facts undermining his statement, that AIG's five-year goal was to grow its adjusted earnings per share from 10% to 12% per year, that "we will generate adjusted returns on equity of approximately 15% to 16% over the same five-year time period," and that these kinds of returns would be generated "with significant excess capital," meaning that if the capital were redeployed, "those returns could be higher."

## VII.    February 11, 2008 Form 8-K and 2007 Year-End Results

352.    On February 11, 2008, AIG filed with the SEC a Form 8-K (the "February 11 Form 8-K"), acknowledging that its credit default swap portfolio losses were understated and that material information previously supplied to the market during the December 5 investor

meeting and in the December 7 Form 8-K required correction.  However, the 2007 Form 10-K still did not correct all prior misstatements or present in an accurate fashion the actual risks to AIG from its CDS portfolio or its securities lending program.

353.    The February 11 Form 8-K stated that AIG's cumulative loss on its CDS portfolio through November 30, 2007 was $5.96 billion, more than $4.3 billion greater than what had been reported to investors in December 2007.

354.    The February 11 Form 8-K effectively acknowledged that its valuation of the CDS portfolio, as provided to investors at the December 5 investor meeting and in the December 7 Form 8-K, was not calculated on the same basis as previous valuations.  In particular, in its December 2007 disclosures, AIG, had, for the first time, netted its losses in the CDS portfolio against "cash flow diversion features" and "negative basis adjustments."  Previously, in its 2007 Third Quarter 10-Q, AIG had told investors that its valuation of the CDS portfolio as of September 30, 2007 and October 31, 2007 did not include the benefit of certain "structural mitigants" because their value could not reliably be estimated.  However, AIG reported in February 11 Form 8-K that, subsequent to the filing of the 2007 Third Quarter 10-Q, based on the development of additional modeling, it was able to reliably estimate the value of these features.  As a result, when AIG, in the December 2007 disclosures, told investors that it had estimated a further decline in the CDS portfolio of $500 million to $600 million, such estimates included the benefits of the cash diversion features and negative basis adjustments.  As reported in the February 11 Form 8-K, the respective benefits of the cash flow diversion features and negative basis adjustment were $732 million and $3.63 billion.  Thus, if AIG had reported its November 30, 2007 valuation of the CDS portfolio on the same basis as the previously-reported

valuations as of September 30, 2007 and October 30, 2007, it would have reported a further decline in value of more than $4.3 billion.

355.    Significantly, AIG, in the February 11 Form 8-K, acknowledged that there was not an adequate basis for using negative basis adjustments and stated that it would not include any such adjustments when reporting the fair value of the CDS portfolio in its forthcoming Form 10-K for the year ended December 31, 2007.

356.    The February 11, 2007 8-K also reported that calculations of the decline in value of the CDS portfolio for September and October 2007, as disclosed in the 2007 Third Quarter 10-Q, were calculated using BET methodology that incorporated "generic" inputs such as "credit spreads on asset-backed securities," rather than market-based inputs, including "cash bond prices provided by the managers of the underlying CDO collateral pools" that AIG later adopted.  The February 11 Form 8-K acknowledged that if the "generic" inputs had not been used to calculate the valuation loss as of November 30, the resulting reported loss would have been 57 percent greater.

357.    Finally, as reported in the February 11 Form 8-K, AIG was advised by PwC that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio."

358.    Unbeknownst to investors, but not to defendants, the February 11 disclosures did not reveal the full extent of the losses that AIG would be required to incur on its CDS portfolio. Over the next several months, investors would slowly learn the staggering amount of losses that were withheld from the investing public and the resulting collateral calls that ultimately contributed to a severe liquidity crisis and U.S. Government bailout of the Company.

359.    On February 28, 2008, AIG filed with the SEC its Form 10-K for the year ended

December 31, 2007 (the "2007 10-K") and issued a press release announcing its fourth quarter

2007 and year-end financial results.  AIG reported a staggering $11.12 billion fourth quarter

decline in the value of its CDS portfolio, resulting in a fourth quarter net loss of nearly $5.3

billion, the Company's largest-ever quarterly loss.  For the year, the cumulative decline in the

value of the CDS portfolio was reported as almost $11.5 billion.  As a result, AIG's reported net

income for 2007 declined to $6.20 billion or $2.39 per diluted share, from $14.05 billion or

$5.36 per diluted share in 2006.

360.    Notwithstanding results that defendant Sullivan described in the press release as

"clearly unsatisfactory," AIG continued to maintain that the unrealized losses in the credit

default swap portfolio would ultimately be reversed and that any realized losses would be

minimal:

> AIG continues to believe that the unrealized market valuation losses on this super
> senior credit default swap portfolio are not indicative of the losses AIGFP may
> realize over time.  Under the terms of these credit derivatives, losses to AIG
> would result from the credit impairment of any bonds AIG would acquire in
> satisfying its swap obligations.  **Based upon its most current analyses, AIG
> believes that any credit impairment losses realized over time by AIGFP will
> not be material to AIG's consolidated financial condition, although it is
> possible that realized losses could be material to AIG's consolidated results
> of operations for an individual reporting period**.  Except to the extent of any
> such realized credit impairment losses, **AIG expects AIGFP's unrealized
> market valuation losses to reverse over the remaining life of the super senior
> credit default swap portfolio.**

361.    AIG also continued to maintain in its press release that it had the financial

wherewithal to ride out the upheaval in the market, and grow, even in the face of additional

unrealized losses.  The press release quoted defendant Sullivan as follows:

> During 2008, we expect the U.S. housing market to remain weak and credit
> market uncertainty will likely persist.  Continuing market deterioration would
> cause AIG to report additional unrealized market valuation losses and impairment

charges.  **However, with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current volatility while committing the resources to grow and take advantage of opportunities**.  We continue to invest in improvements in internal controls, processes, systems and overall effectiveness and will continue to assign the highest priority to remediation efforts over our material weakness in internal control and oversight over the fair value valuation of AIGFP's super senior credit default swap portfolio.  At the same time, we are looking to better leverage our significant scale, promote efficiency and improve margins.  **We are confident AIG is pursuing the right strategies, and has the global franchise and financial strength to meet our performance goals and build long-term shareholder value**.

362.   In connection with the release of AIG's year-end financial results, defendant Sullivan announced to the market that defendant Cassano, the head of AIGFP and architect of AIG's credit default swap portfolio, was resigning.  What he did not disclose in this regard, however, was that Cassano would remain a "consultant" to AIGFP and that he would be paid **$1 million per month** for his services.

363.   The 2007 10-K represented that AIG carried the CDS portfolio on its books at "fair value."  However, AIG noted that its valuation methodologies had "evolved in response to the deteriorating market conditions and the lack of sufficient observable information."  AIG described its valuation of the CDS portfolio through the use of a modified BET model.  In this regard AIG expressly disavowed the use of "negative basis adjustments," which it utilized in computing the numbers disclosed at the December 5, 2007, investor meeting, since "AIGFP was unable to reliably verify this negative basis due to the accelerating severe dislocation, illiquidity and lack of trading in the asset backed securities market."

364.   AIG also represented that both Enterprise Risk Management and AIGFP had conducted risk analyses of the CDS portfolio and had concluded that there "is currently no probable and reasonably estimable realized loss in this portfolio at December 31, 2007."  AIG further represented that based on its analyses and stress tests, "AIG believes that any losses

realized over time by AIGFP as a result of meeting its obligations under these derivatives **will not be material to AIG's consolidated financial condition**, although it is possible that such realized losses could be material to AIG's consolidated results of operations for an individual reporting period."

365.   The 2007 Form 10-K also included a letter from PwC confirming that AIG's internal controls, relating to the AIGFP super senior credit default swap portfolio valuation process, had a material weakness and were ineffective:

> Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO) **because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. …
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention of timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

366.   The 2007 Form 10-K further stated that AIG agreed with its auditor's assessment that the Company's disclosure controls and procedures were ineffective as of December 31, 2007.  The report concurred that AIG's controls over the AIGFP super senior credit default swap

portfolio valuation process and oversight thereof "were not adequate to prevent or detect misstatements in the accuracy of management's fair values estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements."

367.    The 2007 Form 10-K reported specifically on AIG's material weakness:

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified.  As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective. …

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting.  AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of AIG's financial statements for external purposes in accordance with GAAP. …

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective.  **AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007.  As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information.   Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively.**  As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof **were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis**, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements.  In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual, or interim consolidated financial statements that would not be prevented or detected on a timely basis.

368.   The 2007 10-K also disclosed that AIGFP had received collateral calls from counterparties with respect to certain credit default swaps and that "AIG is aware that valuation estimates made by certain of the counterparties with respect to certain super senior credit default swaps or the underlying reference securities for the purposes of determining the amount of collateral required to be posted by AIGFP in connection with such instruments, differ significantly from AIGFP's estimates."  However, the Company stated that:

> AIGFP has been able to successfully resolve some of the differences, including in certain cases entering into compromise collateral arrangements, some of which are for specified periods of time.  AIGFP is also in discussions with other counterparties to resolve such valuation differences.  As of February 26, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on exposures, calculated in respect of super senior default swaps, in an aggregate amount of approximately $5.3 billion. **Valuation estimates made by counterparties for collateral purposes were considered in the determination of the fair value estimates of AIGFP's super senior credit default swap portfolio**.

369.   For the first time, AIG acknowledged in the 2007 10-K that collateral calls by counterparties on credit default swaps could impair AIG's liquidity:

> Certain of the credit default swaps written by AIGFP contain collateral posting requirements.  The amount of collateral required to be posted for most of these transactions is determined based on the value of the security or loan referenced in the documentation for the credit default swap.  Continued declines in the values of these referenced securities or loans will increase the amount of collateral AIGFP must post which could impair AIG's liquidity.

370.   The 2007 10-K also stated that AIG could face additional collateral calls if its credit ratings were downgraded by the major rating agencies.  In this regard, AIG noted that in response to the Company's February 11 Form 8-K, the rating agencies had revised their ratings outlook to negative.  AIG stated that a ratings downgrade, based on the Company's outstanding municipal GIAs and financial derivatives as of February 14, 2008, "would permit counterparties

to call for approximately $1.39 billion of additional collateral" and that further downgrades "could have a substantial material effect on how AIG manages its liquidity."

371.    The 2007 Form 10-K also noted that approximately 23% of AIG's investments in certain securities, including structured securities, direct private equities, limited partnerships, hedge funds, mortgage loans, flight equipment, finance receivables and real estate, are "relatively illiquid."  AIG stated that the disruption of the credit markets had affected the liquidity of other AIG portfolios, including the RMBS portfolio.  AIG stated that if it "is required to post or return collateral in connection with its investment portfolio, derivative transactions or securities lending activities, then AIG may have difficulty selling these investments…   Although AIGFP has no current intent to do so, if AIGFP sells or closes out its derivative transactions prior to maturity, the effect could be significant to AIG's overall liquidity."

372.    Notwithstanding the discussion of possible effects of additional collateral calls on the Company's liquidity, AIG management represented in the 2007 10-K that it "believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, including the funding of increased dividends under AIG's current dividend policy."  Indeed, the 2007 10-K represented that "[a]s a result of market disruption in the credit markets, it has taken steps to enhance the liquidity of its portfolios" and had "created an interdisciplinary Liquidity Risk Committee to measure, monitor, control and aggregate liquidity risks across AIG."  While the responsibilities of the Liquidity Review Committee were described as "broad," the 2007 10-K noted that its initial focus was on portfolios with shorter-term contractual liabilities, such as securities lending in the United States.

373.    The 2007 10-K described AIG's securities lending program as follows:

AIG's securities lending program is a centrally managed program facilitated by AIG Investments primarily for the benefit of certain of AIG's Insurance

> companies.  Securities are loaned to various financial institutions, primarily major banks and brokerage firms.  **Cash collateral equal to 102 percent of the fair value of the loaned securities is received**.  The cash collateral is invested in highly-rated fixed income securities to earn a net spread.

AIG further reported that its liability to borrowers for collateral received was $82.0 billion and that the fair value of collateral reinvested was $75.7 billion.  Of the $75.7 billion of reinvested collateral, nearly $50 billion was listed as invested in mortgage-backed, asset-backed and collateralized securities.  AIG stated that as of December 31, 2007, its invested collateral had a net unrealized loss of $5.0 billion and a net realized loss of $1.0 billion, predominantly related to other-than-temporary impairments.  Elsewhere, the 2007 10-K represented:  "During 2007, AIG took steps to enhance the liquidity of its portfolios, including increasing the liquidity of the collateral invested in the securities lending program."

374.   With regard to AIG's investment portfolio, the 2007 10-K noted that for 2007, the portfolio had net realized capital losses of nearly $3.6 billion, including an other-than-temporary impairment charge of nearly $4.1 billion.  AIG stated that the impairment charge was principally the result of the "significant disruption in the U.S. residential mortgage and credit markets," primarily with respect to AIG's RMBS investments and other structured securities.  The 2007 10-K noted that AIG held $84.4 billion in RMBS, or approximately 10 percent of AIG's total invested assets.

375.   The 2007 10-K made numerous references to AIG's corporate structures to address risk management policies and practices throughout the Company.  Under the heading of "Corporate Risk Management," the 2007 10-K represented:

> AIG's major risks are addressed at the corporate level through the Enterprise Risk Management Department (ERM).  ERM is headed by AIG's Chief Risk Officer (CRO) and is responsible for assisting AIG's business leaders, executive management and the Board of Directors to identify, assess, quantify, manage and mitigate the risks incurred by AIG…  An important goal of ERM is to ensure that

once appropriate governance, authorities, procedures and policies have been established, aggregated risks do not result in inappropriate concentrations.

The 2007 10-K further noted that senior management had established various oversight committees to monitor the risks attendant to its businesses. These included, among others:

- The Financial Risk Committee (FRC) oversees AIG's market risk exposures to interest rates, foreign exchange and equity prices and provides strategic direction for AIG's asset-liability management. The FRC meets monthly and acts as a central mechanism for AIG senior management to review comprehensive information on AIG's financial exposures and to exercise broad control over these exposures.

- The Liquidity Risk Committee is responsible for liquidity policy and implementation at AIG Parent and exercises oversight and control of liquidity policies at each AIG entity.

- The Credit Risk Committee (CRC) is responsible for (i) approving credit risk policies and procedures for use throughout AIG; (ii) delegating credit authority to business unit credit officers and select business unit managers; (iii) approving transaction requests and limits for corporate, sovereign and cross-border credit exposures that exceed the delegated authorities; (iv) establishing and maintaining AIG's risk rating process for corporate, financial and sovereign obligors; and (v) regular reviews of credit risk exposures in the portfolios of all credit-incurring business units.

376.    The 2007 10-K represented that risk exposure arising from the operations of AIGFP were subject to close oversight and management by senior management of its parent company, AIG:

The senior management of AIG defines the policies and establishes general operating parameters for Capital Markets operations. AIG's senior management has established various oversight committees to monitor on an ongoing basis the various financial market, operational and credit risk attendant to the Capital Markets operations. The senior management of AIGFP reports the results of its operations to and reviews future strategies with AIG's senior management.

AIGFP actively manages the exposures to limit potential losses, while maximizing the rewards afforded by these business opportunities even though some products or derivatives may result in operating income volatility. In doing so, AIGFP must continually manage a variety of exposures including credit, market, liquidity, operational and legal risks.

377.    The 2007 10-K represented that AIG's credit derivatives transactions were subject to oversight by various standing committees in order to carefully manage risk:

> A counterparty may default on any obligation to AIG, including a derivative contract. Credit risk is a consequence of extending credit and/or carrying trading and investment positions. Credit risk exists for a derivative contract when that contract has a positive fair value to AIG. The maximum potential exposure will increase or decrease during the life of the derivative commitments as a function of maturity and market conditions. To help manage this risk, AIGFP's credit department operates within the guidelines set by the CRC [*i.e.* AIG's Credit Risk Committee]. Transactions which fall outside these pre-established guidelines require the specific approval of the CRC.

378.    Defendants Sullivan and Bensinger certified the results reported in the 2007 Form 10-K using the same certification as set forth in the 2005 and 2006 Forms 10-K.

379.    On February 29, 2008, AIG held its fourth quarter 2007 investor conference call. The call included presentations by Defendants Sullivan, Bensinger and Lewis, among others. Defendant Sullivan discussed the valuation of the credit default swap portfolio, claiming that the "mark we reported" is "clearly not representative of the risk AIGFP holds on the Super Senior credit default swap transactions" and is "not indicative of the losses AIGFP may realize over time." Defendant Sullivan again sought to reaffirm the growth potential and financial strength of AIG, stating: "[L]et me just say that **AIG is well positioned to grow shareholder value despite the current turbulent environment**. We have a diverse portfolio of global businesses with the scale and world-class expertise that extends throughout the organization. **We also have a strong capital base and we are not raising additional capital**."

380.    Defendant Bensinger asserted that AIG had subjected the CDS portfolio to "stress tests" and that "[u]nder this severe stress scenario, the realized loss would be approximately $990 million, in contrast to the unrealized market valuation loss of $11.25 billion."    Like

defendant Sullivan, defendant Bensinger asserted that the market valuation loss in the CDS portfolio was not an indicator of the risk to which AIG was exposed:

> AIG believes that its $11.25 billion best estimate of the unrealized market valuation loss represents fair value under GAAP. AIG also believes that the results of its fundamental credit analysis and stress testing provide confidence that any realized losses in the portfolio as I said will be materially below the GAAP fair value estimates.

> [I]n accordance with GAAP, AIG recognized a sizeable unrealized market valuation loss in 2007 consequent to the severe market disruption and credit deterioration, particularly of subprime mortgage backed collateral. This market valuation loss represents management's best estimate of the exit value of this portfolio into the current illiquid and distressed market. However, AIGFP underwrote its Super Senior credit derivative business to a zero loss standard, incorporating conservative stress scenarios at inception. Although there is likely to be continued volatility and perhaps further deterioration in the credit markets based upon AIG's analyses and stress tests, AIG does believe that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial position nor to its excess economic capital position, although as I stated, it could be material to an individual reporting period.

381.    During the Q & A portion of the investor call, one analyst remarked to defendant Sullivan: "[Y]ou just seemed so confident at that December Investor Day and it just makes me wonder what was PricewaterhouseCoopers thinking at the time to let you go into that Investor Day and be so confident." Sullivan replied simply that "obviously those numbers that were presented at December 5 were unaudited." **Sullivan thus continued to conceal that by the time of the December 5 investor meeting, he had already been warned by PwC that AIG might have a material weakness in its controls relating to the CDS portfolio valuation**.

382.    The statements made in the 2007 Form 10-K, press release of February 28, 2008 and conference call of February 29, 2008 were materially false and misleading in at least the following respects:

(a)    As described above, defendants knew that AIG faced a significant risk of being subject to tens of billions of dollars of additional collateral calls arising from it CDS portfolio.

Defendants also knew that the overwhelming portion of the cash collateral received from borrowers under AIG's securities lending program was invested in RMBS and other asset-backed securities, that such securities were becoming increasing illiquid, and that demands by borrowers for the return of their cash collateral would severely strain AIG's liquidity.  As a result, the following statements, among others, touting AIG's financial strength and capital position were materially false and misleading: (i) "with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current volatility" (Sullivan, February 28 press release); (ii) AIG has the "financial strength to meet our performance goals and build long-term shareholder value" (Sullivan, February 28 press release); (iii) "AIG is well-positioned to grow shareholder value despite the current turbulent environment" (Sullivan, February 29 investor call); and (iv) AIG has "a strong capital base and we are not raising additional capital" (Sullivan, February 29 investor call).  Indeed, less than three months later, AIG would announce equity offerings of $12.5 billion, which would have a severe impact on its earnings per share, among other metrics.

(b)      Defendants made statements that failed to disclose material facts concerning AIG's material weakness in the valuation of its CDS portfolio.  During the February 29 investor call, in response to a question about the figures provided at the December 5 investor meeting, Sullivan merely stated that those were unaudited, thereby continuing to conceal that (i) AIG's management, including defendant Sullivan directly, had been advised by that time by PwC that AIG had significant deficiencies, and might have a material weakness, in its controls relating to the CDS portfolio valuation, and (ii) a key member of the AIGFP accounting policy group, Joseph St. Denis, had resigned his position after being deliberately excluded from the valuation process.  AIG's description of the material weakness in the 2007 10-K was itself materially

misleading because it failed to disclose that key elements of AIG's and AIGFP's risk management, financial and accounting functions were deliberated excluded from the process of valuing the CDS portfolio.  Moreover, although Sullivan announced that Cassano was resigning, he failed to disclose that Cassano would remain as a "consultant" to AIGFP, and that he would be paid **$1 million per month** for his services.  Such disclosures about AIG's material weakness and the terms of Cassano's "resignation" would have been critical to investors' views of the veracity and trustworthiness of AIG's management.

(c)     All of the statements in the 2007 10-K, the February 28 press release and February 29 investor call asserting that realized losses on the CDS portfolio would not have a material effect on AIG's financial condition were false and misleading because, as described above, they created a misleading impression that the principal risk exposure arising from the CDS portfolio was the risk of making payments arising from credit losses (as opposed to liquidity issues arising from ratings downgrades and valuation declines of the referenced CDOs and concomitant requirement to post tens of billions of dollars of additional collateral) and, among other things, the terms of the CDS contracts frequently provided that the counterparties were designated as the valuation agents – *i.e.*, the parties who determined the value of the CDOs for purposes of determining whether AIG was required to post collateral..

(d)     The statements in the Form 10-K concerning the Company's ability to meet its "anticipated cash requirements, including the funding of increased dividends under AIG's current dividend policy," were false and misleading, given the demands that were likely to be made through CDS collateral calls and payments required by obligations undertaken in connection with the securities lending program.

(e)     AIG misrepresented its securities lending program in the 2007 10-K by asserting that "cash collateral equal to 102 percent of the fair value of the loaned securities is received." Defendants knew, but failed to disclose that AIG did not, in fact, always receive the full 102 percent of cash collateral on loaned securities.  Rather, AIG, as the parent company, had agreed to deposit funds into the collateral pool to maintain the collateral received at 102 percent.  By August 31, 2008, such deposits amounted to $3.3 billion.

## VIII.   First Quarter 2008 Financial Results and the May 12, 2008 Offering

383.    On May 8, 2008, AIG filed with the SEC its Form 10-Q for the quarter ended March 31, 2008 (the "2008 First Quarter 10-Q") and issued a press release announcing its first quarter financial results.  The first quarter 2008 results established a new record quarterly loss for AIG.  The Company reported a net loss for the quarter of $7.8 billion, largely stemming from a $9.11 billion net unrealized market valuation loss on the CDS portfolio.  Thus, the cumulative reported loss in the CDS portfolio now stood at more than $20 billion.

384.    AIG also disclosed that its investment portfolio had sustained net realized capital losses of $6.09 billion, primarily from other-than-temporary impairment charges resulting from declines in the market value of its RMBS holdings and other structured securities.

385.    Although defendant Sullivan had asserted little more than two months earlier that AIG was not seeking to raise additional capital, the May 8, 2008 press release announced that the Company was planning to raise $12.5 billion in new capital "to fortify its balance sheet and provide increased financial flexibility."   Nevertheless, similar to previous quarters, defendant Sullivan continued to assert that "AIG's results do not reflect the underlying strengths and potential of AIG … With the support of the newly added capital, we have every confidence in our ability to respond to today's market conditions and opportunities that may arise."

386.    In addition to its release of 2008 first quarter financial results, AIG also issued a press release on May 8, 2008 announcing that the Board of Directors had elected to increase AIG's dividend by 10% to $0.22 per share.

387.    On May 9, 2008, AIG held its 2008 first quarter investors conference call.  On the call, defendant Sullivan sought to explain the apparent paradox between the announced dividend increase, on the one hand, and AIG's plans for raising additional capital, on the other:

> We are being asked why we raised the dividend when we are also in a capital-raising mode.  The answer is that the dividend increase **is a reflection of both the Board's and management's long term view of the strength of the company's business, earnings, and capital generating power**.  The capital raise is a response to the events of the last two quarters and its effect on our capital position.  It will fortify the **fortress balance sheet** you expect us to maintain and provide us with increased financial flexibility in these turbulent times.  It will also position us well for the future.  The two are simply reflections of a positive long-term view and a prudent response to the current environment.

388.    During the call, defendant Sullivan also disclosed that the previous evening two major ratings agencies had downgraded AIG by a notch and had placed the Company on their watch lists.  Sullivan asserted, however, that "[a] one-notch downgrade of the holding company is very manageable for us and we do not believe that it will have a significant effect on our operations."  In the Q & A portion of the call, AIG disclosed that the ratings downgrade required additional collateral postings by AIG in the amount of $1.6 billion.

389.    Defendant Bensinger also participated in the conference call, making a presentation concerning, among other matters, AIG's risk exposure arising from its CDS portfolio.  As on previous conference calls, Bensinger asserted that the true risks in the CDS portfolio resulted from actual realized losses that might be sustained as a result of defaults on the referenced securities, rather than unrealized losses arising from the market valuation decline of the portfolio:

Although the fair value of the CDS under GAAP is our best estimate of the fair value of the underlying CDOs, **the substantial risk that AIGFP covers for the CDO investors is the risk of suffering actual realized losses, not the variance in fair value of the CDOs**. Therefore, AIG has undertaken fundamental credit stress tests to analyze the risk of actually suffering realized losses… Given the further rating agency downgrades in the underlying collateral securities occurring since year end and deploying the same static stress to the portfolio with new ratings, the number has increased to $1.25 billion [from $900 million]. …

However, through high attachment points and low exposure to the later vintage mortgages, AIGFP has structured its Super Senior credit default swap portfolio to withstand considerable stress.

390.    Bensinger further stated that a new methodology employed by AIG for predicting realized losses on its CDS portfolio showed losses ranging from $1.2 billion to $2.4 billion.  He also noted that AIG was aware that third parties seeking to estimate AIG's realized losses had used different methodologies that had predicted far greater losses.  However, Bensinger was dismissive of such predictions, stating:

AIG is aware that other market participants have used different assumptions and methodologies to estimate the potential losses on AIGFP's super senior credit derivative portfolio.  For example …, a third-party market based analysis provided to AIG in connection with the capital raising process estimates that potential realized losses are at between $9 and $11 billion.  AIG has reviewed this third-party analysis, but because of the disruption in the marketplace, we continue to believe that a market based analysis in not the best methodology to use as a predictor of AIG's potential realized losses, and we do not intend to update this analysis in future periods.

391.    During the Q & A portion of the conference, an analyst noted the disclosure in AIG's 2008 First Quarter 10-Q that as of April 30, 2008, AIGFP had posted collateral in the amount of $9.7 billion and asked about the source of funds for the collateral posting.  AIG's William Dooley, who assumed responsibility for AIGFP's day-to-day operations after the resignation of defendant Cassano, expressed comfort with AIG's liquidity position:

We started to build cash in FP last summer when we saw the markets starting to deteriorate.  So right now, we do have adequate cash.  Also, FP continues to have

normalized business in their book and they generate cash every day from their book.

The third thing is the capital markets.  We can raise money in the capital markets.  And as far as any other liquidity needs that we have, we do have assets that can be monetized.  **So overall, I am very comfortable with the liquidity position …**

392.    AIG's 2008 First Quarter 10-Q discussed various methods for analyzing potential credit impairment losses arising from its credit default swap portfolio.  AIG acknowledged that methodologies by third parties showed potential losses greatly exceeding the Company's estimates.  Nevertheless, AIG maintained that its own "credit-based" analysis was preferable to other "market-based" analyses:

> Under the terms of most of these credit derivatives, losses to AIG would generally result from the credit impairment of the referenced CDO bonds that AIG would acquire in satisfying its swap obligations.  Based upon its most current analyses, AIG believes that any credit impairment losses which may emerge over time at AIGFP will not be material to AIG's consolidated financial condition, but could be material to the manner in which AIG manages its liquidity.  In making this assessment, AIG uses a credit-based analysis to estimate potential realized credit impairment losses from AIGFP's super senior credit default swap portfolio.  This analysis makes various assumptions as to estimates of future stresses on the portfolio resulting from further downgrades by the rating agencies of the CDO collateral.  In addition, during the first quarter of 2008, AIG introduced another methodology called a roll rate analysis.  This methodology rolls forward current and estimated future delinquencies and defaults underlying mortgages in the CDO collateral pools to estimate potential losses in the CDOs.  Due to the dislocation in the market for CDO collateral, AIG does not use the market values of the underlying CDO collateral in estimating its potential realized credit impairment losses.  The use of factors derived from market-observable prices in models used to determine the estimates for future realized credit impairment losses would result in materially higher estimates of realized credit impairment losses.  AIG's credit-based analyses estimate potential realized credit impairment pre-tax losses at approximately \$1.2 billion to approximately \$2.4 billion…  AIG is aware that other market participants have used different assumptions and methodologies to estimate the potential realized credit impairment losses on AIGFP's super senior credit default swap portfolio, resulting in a significantly higher estimate than that resulting from AIG's credit-based analysis.  For example, a third-party analysis provided to AIG, that AIG understands uses credit and market value inputs, estimates the potential realized pre-tax losses on AIGFP's super senior credit default swap portfolio at between approximately \$9 billion and approximately \$11 billion.

393.     The 2008 First Quarter 10-Q also discussed AIG's fair value estimate of the CDS

portfolio.  AIG noted, *inter alia*:

> The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market, particularly during and since the fourth quarter of 2007.  These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values.
>
> AIGFP's valuation methodologies for the super senior credit default swap portfolio have evolved in response to the deteriorating market conditions and the lack of sufficient market observable information.  AIG has sought to calibrate the model to market information and to review the assumptions of the model on a regular basis.

394.     Nevertheless, AIG acknowledged that the material weakness in internal control

relating to the fair value valuation of the CDS portfolio had not been remediated:

> AIG is actively developing and implementing a remediation plan to address the material weakness in internal control relating to the fair value valuation of the AIGFP super senior credit default swap portfolio, and the oversight thereof … AIG is developing new systems and processes to reduce reliance on certain manual controls that have been established as compensating controls over valuation of this portfolio and in other areas, and is strengthening the resources required to remediate this weakness.

395.     The 2008 First Quarter 10-Q also discussed collateral calls that had been received

from counterparties to the CDS transactions as a result of declines in the values of the underlying

reference CDO securities:

> As of April 30, 2008, AIGFP had received collateral calls from counterparties in respect of certain super senior credit default swaps (including those entered into by counterparties for regulatory capital relief purposes and those in respect of corporate debt/CLOs).   At times, valuation estimates made by certain of the counterparties with respect to certain super senior credit default swaps or the

underlying reference CDO securities, for purposes of determining the amount of collateral required to be posted by AIGFP in connection with such instruments, have differed significantly from AIGFP's estimates.  In almost all cases, AIGFP has been able to successfully resolve the differences or otherwise reach an accommodation such that collateral posting levels are not currently the subject of ongoing negotiations, including in certain cases entering into compromise collateral arrangements, some of which are for specified periods of time. AIGFP is currently in active discussions with a small number of other counterparties to resolve such valuation differences.  As of April 30, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on exposures, calculated in respect of super senior credit default swaps, in an aggregate net amount of $9.7 billion.  Valuation estimates made by counterparties for collateral purposes were considered in the determination of the fair value estimates of AIGFP's super senior credit default swap portfolio.

396.    The 2008 First Quarter 10-Q also discussed AIG's requirement to post collateral in the event of a downgrade its credit ratings by the major ratings agencies.  The 2008 First Quarter 10-Q was filed before the downgrade of AIG's ratings that occurred immediately thereafter.  AIG represented that:

It is estimated that, as of the close of business on April 30, 2008, based on AIGFP's outstanding municipal GIAs and financial derivatives transactions at that date, a downgrade of AIG's long-term senior debt ratings to 'Aa3' by Moody's or 'AA–' by S&P would permit counterparties to call for approximately $1.8 billion of collateral, while a downgrade to 'A1' by Moody's or A+ by S&P would permit counterparties to call for approximately $9.8 billion of additional collateral.    Further downgrades could result in requirements for substantial additional collateral, which could have a material effect on how AIGFP manages its liquidity.  The actual amount of additional collateral that AIGFP would be required to post to counterparties in the event of such downgrades depends on market conditions, the fair value of the outstanding affected transactions and other factors prevailing at the time of the downgrade.  Additional obligations to post collateral would increase the demands on AIGFP's liquidity.

397.    With regard to AIG's overall liquidity, the 2008 First Quarter 10-Q represented that "[m]anagement believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, **including the funding of increased dividends under AIG's current dividend policy**."

398.    The 2008 First Quarter 10-Q disclosed that AIG had recognized a $4.1 billion other-than-temporary impairment charge in its investment portfolio, primarily stemming from loss on investments in RMBS and other structured securities.

399.    The 2008 First Quarter 10-Q made the following representations concerning AIG's securities lending program:

> AIG's securities lending program is a centrally managed program facilitated by AIG Investments primarily for the benefit of certain of AIG's insurance companies.  Securities are loaned to various financial institutions, primarily major banks and brokerage firms.  **Cash collateral generally equal to 102 percent of the fair value of the loaned securities is received**.  The cash collateral is invested in highly-rated fixed income securities to earn a net spread.

AIG further reported that its liability to borrowers for collateral received was $77.8 billion and that the fair value of collateral reinvested was $64.3 billion.  Of the $64.3 billion of reinvested collateral, nearly $41 billion was listed as invested in mortgage-backed, asset-backed and collateralized securities.  AIG stated that as of March 31, 2008, its invested collateral had a net unrealized loss of $9.4 billion and a net realized loss of $2.9 billion, predominantly related to other-than-temporary impairments.

400.    Defendants Sullivan and Bensinger certified the results reported in the 2008 First Quarter 10-Q as set forth in the certifications in prior Form 10-Qs filed in 2006 and 2007.

401.    The statements made in the First Quarter 2008 Form 10-Q, press release and conference call were materially false and misleading in at least the following respects:

(a)    Defendants continued to portray AIG's financial strength and liquidity in a materially misleading manner, as set forth in following statements, among others:  (i) liquidity is adequate to meet "anticipated cash requirements, including the funding of increased dividends under AIG's current dividend policy" (2008 First Quarter 10-Q); (ii) dividend increase is a reflection of "management's long-term view of the strength of the company's business, earnings,

and capital generating power" (Sullivan, May 9 investor call); (iii) capital raise will "fortify the fortress balance sheet" (Sullivan, May 9 investor call); and (iv) "I am very comfortable with the liquidity position [of AIGFP]" (Dooley, May 9 investor call).

(b)     The statement in the 2008 First Quarter 10-Q that "AIG believes that any credit impairment losses which may emerge over time at AIGFP will not be material to AIG's consolidated financial condition" and defendant Bensinger's statement that "the substantial risk that AIGFP covers for the CDO investors is the risk of suffering actual realized losses, not the variance in fair value of the CDOs," conveyed a false and misleading impression that the principal risks arising from the CDS portfolio were outright defaults (as opposed to collateral calls resulting from ratings downgrades or diminished valuations of the referenced CDOs).

(c)     The statement in the 2008 First Quarter 10-Q concerning AIG's securities lending program that cash collateral generally equal to 102 percent of the fair value of the loaned securities "is received," was materially false and misleading for the reasons stated at ¶¶ 372 - 373, 382, above, with respect to the same statement made in the 2007 Form 10-K.

402.    On May 12, 2008, AIG filed a Form 8-K disclosing that on May 8 and 9, 2008, the major rating agencies took actions regarding the credit ratings of AIG and its subsidiaries:

> • [S&P] downgraded the counterparty credit ratings and long-term debt ratings of AIG and certain AIG subsidiaries and placed these ratings as well as certain short-term debt ratings and the counterparty and financial strength ratings on AIG's core insurance operating subsidiaries on CreditWatch with negative implications;
>
> • [Moody's] placed the long-term debt ratings of AIG and certain subsidiaries and the financial strength ratings on certain AIG insurance operating subsidiaries on review for possible downgrade; and
>
> • [Fitch] downgraded the issuer default and senior debt ratings of AIG and certain subsidiaries and kept these ratings on Rating Watch Negative. All debt and financial strength ratings not previously on Rating Watch have been placed on Rating Watch Negative.

403.    Also, on May 9, 2008, Fitch placed several CDO classes that were insured by AIG CDS contracts on a negative rating watch.

404.    In an 8-K filed on May 16, 2008, AIG announced that it had closed the sale of 196,710,525 shares of its common stock, par value $2.50 per share, at a public offering price of $38.00 per share and 78,400,000 equity units, initially consisting of purchase contracts and junior subordinated debentures, at a public offering price of $75.00 per equity unit.

405.    In an 8-K filed on May 20, 2008, AIG announced that it had closed the sale of $4,000,000,000 of AIG's 8.175% Series A-6 Junior Subordinated Debentures offered pursuant to Rule 144A and Regulation S under the 1933 Act.

406.    In an 8-K filed on May 22, 2008, AIG announced that it had closed the sale of €750,000,000 of AIG's 8.000% Series A-7 Junior Subordinated Debentures and £900,000,000 of AIG's 8.625% Series A-8 Junior Subordinated Debentures, each offered pursuant to Rule 144A and Regulation S under the 1933 Act.

407.    In an 8-K filed on May 23, 2008, AIG announced that on May 21 and 22, 2008, the major rating agencies took actions regarding the credit ratings of AIG and its subsidiaries, as follows:

> • [Moody's] downgraded AIG's long-term debt rating from "Aa2" to "Aa3" and removed it from "under review" status.  The outlook on the long-term debt rating is negative.  Also, Moody's downgraded the financial strength ratings of many of AIG's insurance subsidiaries by one notch to either "Aa2" or "Aa3". The outlook on the financial strength ratings is stable. The Moody's ratings of certain other AIG subsidiaries remain on "under review" status.
>
> • [S&P] affirmed AIG's "AA-" long-term debt rating and removed it from CreditWatch Negative. The outlook on AIG's counterparty credit rating is negative.  Also, S&P maintained the "AA+" financial strength ratings on AIG's insurance subsidiaries.  The outlook on the financial strength ratings is negative.
>
> • [Fitch] affirmed AIG's "AA-" long-term debt rating and removed it from Rating Watch Negative.  The outlook on the long-term debt rating is negative. Also,

Fitch maintained the "AA+" financial strength ratings of AIG's insurance subsidiaries.  The outlook on the financial strength ratings is negative.

## IX.   May 20, 2008 Investor Conference

408.   At a May 20, 2008 conference sponsored by Lehman Brothers, defendant Sullivan, among other AIG representatives, made a presentation to investors and analysts. Sullivan again referred to AIG's "fortress balance sheet" and insisted that the new capital raise by AIG was largely to "take advantage of opportunities" and "support the growth of our businesses":

> I want to reinforce that our fundamental businesses are sound, [our] core insurance businesses continue to perform well and we remain confident that AIG has the financial strength and strategies in place to work through these conditions and continue to grow. …

> Regarding the risk of suffering actual realized losses, through high attachment points and low exposure to the length of vintage mortgages, AIGFP has structured its super senior credit default swap portfolio to withstand considerable stress. …

> This strategic decision by the Board and Management to raise additional capital at this time reflects both confidence in AIG's strong balance sheet and the desire to position AIG with enhanced flexibility to take advantage of opportunities as conditions warrant.

> We view the capital we are raising is allowing AIG to continue to invest in and support the growth of our businesses while maintaining AIG's opportunist start during the period likely continued volatility.  In fact, we believe it was the most intelligent visibility to be proactive, reassure the market, fortify our fortress balance sheet, enable us to take advantage in a lot of the attractive emerging markets that we're in as well as obviously be well positioned for any continued volatility in the credit markets. …

> But what we decided that time was to be proactive, get out in front, reinforce our fortress balance sheet to make sure that we have the ability to continue to invest in the opportunities that we have around the world.  And to absorb any market volatility that may still be out there.  So obviously, as you've seen from some of the releases from the rating agencies, had we not taken the proactive step, you might have seen another result.  But at least by getting out there in front, the downgrades so far from S&P and Fitch at the parent company level is one notch.

409.    These statements were materially false and misleading for the reasons set forth in ¶ 401(a) and (b) above.

## X.    Disclosure of Government Investigations and Ouster of Defendant Sullivan

410.    On June 6, 2008, *The Wall Street Journal* reported that AIG was under investigation by the SEC and by criminal prosecutors with the DOJ in Washington, D.C. and the U.S. Attorney's Office in Brooklyn, New York.  According to the article, the subject of the investigation was whether AIG had overstated the value of its CDS portfolio.  The following week, on June 13, 2008, *The Wall Street Journal* reported that "[o]ne current focus for the regulators is an elaborate presentation held on Dec. 5 at which both AIG Chief Executive Martin Sullivan and former financial-products chief Joseph Cassano tried to assure investors that losses would be minimal."

411.    On Sunday, June 15, 2008, AIG's board of directors convened a special meeting during which defendant Sullivan was removed from his positions with the Company, and Robert Willumstad was installed as the new CEO.

## XI.    AIG's Second Quarter 2008 Financial Results

412.    On August 6, 2008, AIG filed with the SEC its Form 10-Q for the quarter ended June 30, 2008 (the "2008 Second Quarter 10-Q") and issued a press release announcing its second quarter financial results.  While AIG's 2008 Second Quarter disclosures were generally more forthcoming in their belated acknowledgement that the Company had too high a concentration of risk exposure to the U.S. housing market, the Company nevertheless failed to disclose that it was facing an imminent liquidity crisis due to continuing significant collateral calls and demands by borrowers in the securities lending program for the return of their cash collateral.

413.    The Company reported a net loss for the quarter of $5.36 billion or $2.06 per diluted share.  Included in the second quarter net loss was a $5.56 billion net unrealized market valuation loss on the CDS portfolio, bringing the net cumulative valuation loss on this business to nearly $26 billion.  Also included in the second quarter net loss were other-than-temporary impairment charges in AIG's investment portfolio amounting to $6.08 billion, primarily resulting from declines in the value of AIG's holdings of RMBS and other structured securities.

414.    Commenting on second quarter 2008 results, defendant Willumstad, in his first quarterly financial report since replacing defendant Sullivan as AIG's Chairman and CEO, said:

> Our second quarter results were adversely affected by the severe conditions in the housing and credit markets and a very difficult investment environment.  These results do not reflect the earnings power and potential of AIG's businesses and it is clear that we have a lot of work to do to restore AIG's profitability to where it should be.
>
> We are conducting a comprehensive review of all AIG's businesses with the objectives of improving results, reducing AIG's risk profile and protecting our capital base.  We are examining every business, as well as the assumptions underlying how we do business in the markets where we have a presence.  We are considering all options.  Our goals are straightforward - to determine the optimal portfolio of businesses for AIG, sharpen our risk management and capital allocation processes, reduce expenses and continue to strengthen our accounting and reporting infrastructure.

415.    On August 7, 2008, AIG held its 2008 second quarter earnings conference call.  On the call, Willumstad acknowledged that AIG's risk concentration in the U.S. housing market had been too high:  "[Y]ou see again in retrospect much of the problems that have come about have been a **concentration of risk in the U.S. housing market both in the investment portfolio and the credit default swap book**."

416.    During the call, defendant Bensinger commented on the strength of AIG's capital position:  "[O]ur capital position is stronger today than it was as of the end of the first quarter.  Granted, we raised capital, but that was the prudent action to take in light of the volatile capital

markets we continue to face…  While we can't predict what the future holds in terms of capital market conditions and the effects of the ongoing U.S. housing market disruption, **based on what we know today, our capital position is sound.**"

417.    Defendant Bensinger also noted, in response to a question, that while "a large sum" of the $20 billion raised in May 2008 was left, having been allocated to the "domestic life and retirement clearance companies for capital purposes," "most of it I would say has been used for AIGFP purposes in terms of collateral."  Thus, Bensinger admitted that the May 2008 capital raise really had not been for the purpose of "strengthening [AIG's] fortress balance sheet" or to pursue growth in emerging markets, as AIG had stated at the time.

418.    As he had on previous calls, defendant Bensinger essentially told investors that they should discount the fair value market valuation estimate of the CDS portfolio because AIG's modeling showed that potential realized losses would be far less than market loss being reported under GAAP.  Bensinger stated that AIG was continuing to refine its methodologies to produce stress test scenarios of potential realized credit losses in the CDS portfolio and that the results of two stress test scenarios showed realized losses of $5 billion and $8.5 billion, respectively.  Bensinger stated that "these scenarios are conservative and provide comfort to AIG that the potential ultimate credit losses which may be incurred from the portfolio are substantially less than the $24.8 billion of fair valuation losses we have recorded to date."

419.    This theme was echoed in the 2008 Third Quarter 10-Q, where AIG contrasted its estimate of realized credit losses on the CDS portfolio with its estimate of the unrealized market valuation loss of the portfolio.  AIG essentially stated that the market valuation loss should be discounted because it was based, in part, on third-party prices on the underlying CDOs that "are

not necessarily reflective of the ultimate potential realized credit losses AIGFP could incur" and

"incorporate a significant amount of market-driven risk aversion":

> The potential realized credit losses illustrated in Scenarios A and B are lower than the fair value of AIGFP's super senior multi-sector CDO credit default swap portfolio, a net loss of $26.1 billion at June 30, 2008.  The net loss represents AIG's best estimate of the amount it would need to pay to a willing third party to assume the obligations under AIGFP's super senior multi-sector CDO credit default swap portfolio.  The fair value of AIGFP's super senior multi-sector CDO credit default swap portfolio is based upon fair value accounting principles, which rely on third-party prices for both the underlying collateral securities and the CDOs that AIGFP's super senior credit default swaps wrap.  These prices currently incorporate liquidity premiums, risk aversion elements and credit risk modeling, which in some instances may use more conservative assumptions than those used by AIG in its roll rate stress testing.  Due to the ongoing disruption in the U.S. residential mortgage market and credit markets and the downgrades of RMBS and CDOs by the rating agencies, the market continues to lack transparency around the pricing of these securities.  These prices are not necessarily reflective of the ultimate potential realized credit losses AIGFP could incur in the future related to the AIGFP super senior multi-sector CDO credit default swap portfolio, and AIG believes they incorporate a significant amount of market-driven risk aversion.

420.    The 2008 Second Quarter 10-Q noted that AIG and its counterparties continued to

have significant differences in their valuation of credit default swaps and the underlying

reference CDO securities.  AIG further noted that its efforts to resolve these differences had

resulted in its posting collateral in the aggregate net amount of **more than $16 billion**:

> As of July 31, 2008, AIGFP had received collateral calls from counterparties in respect of certain super senior credit default swaps (including those entered into by counterparties for regulatory capital relief purposes and those in respect of corporate debt/CLOs).  At times, valuation estimates made by certain of the counterparties with respect to certain super senior credit default swaps or the underlying reference CDO securities, for purposes of determining the amount of collateral required to be posted by AIGFP in connection with such instruments, have differed significantly from AIGFP's estimates.  AIG is unable to assess the effect, if any, that recent transactions involving sales of large portfolios of CDOs will have on collateral posting requirements.  In almost all cases, AIGFP has been able to successfully resolve the differences or otherwise reach an accommodation with respect to collateral posting levels, including in certain cases by entering into compromise collateral arrangements, some of which are for specified periods of time.  Due to the ongoing nature of these collateral calls, AIGFP may engage in

discussions with one or more counterparties in respect of these differences at any time. As of July 31, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on exposures, calculated in respect of super senior credit default swaps, in an aggregate net amount of $16.5 billion. Valuation estimates made by counterparties for collateral purposes were considered in the determination of the fair value estimates of AIGFP's super senior credit default swap portfolio.

421.    The 2008 Second Quarter 10-Q noted in connection with AIG's securities lending program that the invested securities had substantial realized and unrealized losses and that the Company had agreed to deposit into the securities pool an amount equal to the investment losses realized on the sale of impaired assets up to $5 billion. **AIG also disclosed for the first time that its insurance companies did not, in fact, always receive the full 102 percent of cash collateral on loaned securities, and that the parent company had agreed to deposit funds into the collateral pool to maintain the collateral received at 102 percent**:

AIG's securities lending program is a centrally managed program by AIG Investments for the benefit of certain of AIG's insurance companies and the Asset Management segment. Securities are loaned to various financial institutions, primarily major banks and brokerage firms. **Cash collateral generally ranging from 100 to 102 percent of the fair value of the loaned securities is received and is invested in fixed maturity securities to earn a net spread. To the extent that the collateral received is less than 102 percent, AIG has agreed with its insurance companies to deposit funds to the collateral pool for the benefit of the insurance company participants**.

AIG's liability to the borrower for collateral received was $75.1 billion and the fair value of the collateral reinvested was $59.5 billion as of June 30, 2008. In addition to the invested collateral, the securities on loan as well as all of the assets of the lending companies are generally available to satisfy the liability for collateral received. …

[T]he invested securities are carried at fair value with unrealized gains and losses recorded in accumulated other comprehensive income (loss), while net realized gains and losses are recorded in earnings. The net unrealized loss on the investments was $8.2 billion as of June 30, 2008. During the three- and six-month periods ended June 30, 2008, AIG recorded net realized losses of $3.8 billion and $6.7 billion respectively, on this portfolio, predominantly related to other-than-temporary investments.

AIG has agreed to deposit into the securities pool an amount equal to the investment losses realized by the pool in connection with sales of impaired securities, up to $5 billion.

422.   The statements made in the Second Quarter 2008 10-Q, press release and conference call were materially false and misleading in at least the following respects:

(a)   Defendant Bensinger's statement that "our capital position is sound" was false and misleading because it failed to disclose that as a result of continued collateral calls and demands from borrowers under the securities lending program for the return of their cash collateral, AIG faced an imminent liquidity crisis and had insufficient capital to meet such demands. Indeed, even as of August 2008, AIG continued to conceal, among other things, in relation to the CDS portfolio that (i) the decision to stop writing multi-sector CDO-based credit default swaps was based on the fact that the model used to assess potential CDS contracts had been deemed unreliable in light of the deterioration of underwriting standards evident in the pools of mortgages underlying the 2005 CDOs and AIGFP's conclusion that there was a very high degree of correlation in the subprime mortgage pools despite the geographic diversity in the multi-sector pools, which led AIGFP's management to conclude that if and when economic conditions caused subprime mortgages to begin to default, the defaults would be widespread and affect large portions of the subprime pools, and (ii) CDS contracts provided that AIGFP's counterparties were the presumptively prevailing party in terms of setting valuations for underlying multi-sector CDOs, and thereby setting the amounts that AIG was obligated to post as collateral.

(b)   The statement by defendant Bensinger during the second quarter conference call and in the 2008 Second Quarter Form 10-Q emphasizing that the reported market valuation loss of the CDS portfolio was not representative of actual losses that might be realized in the future

conveyed a false and misleading impression that the principal risk arising from the CDS portfolio were outright defaults (as opposed to collateral calls resulting from ratings downgrades or diminished valuations of the referenced CDOs).

<b>DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES</b>

423.    Defendants also caused AIG's financial statements, including the related footnote disclosures thereto, as of and for the years ended December 31, 2005, December 31, 2006 and December 31, 2007, and related Forms 10-K, (the "relevant annual financial statements"), as well as interim financial statements as of and for the quarterly periods ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008 and June 30, 2008, and related Forms 10-Q (the " relevant interim financial statements" and, collectively, the "relevant financial statements") not to present fairly, in conformity with GAAP and SEC rules, the Company's financial position and results of operations.

424.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.    GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP includes Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS"), FASB Interpretations ("FIN"), FASB Statements of Position ("FSP"), FASB Concept Statements ("FASCONS"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP").

425.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be

misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying the most recent annual financial statements. (17 C.F.R. § 210.10-01(a))

**Failure to Disclose The Reasonable Possibility That AIG Had Incurred Losses in its Super Senior CDS Portfolio**

**Relevant GAAP Requirements**

426.    AIG's super senior CDSs were derivative instruments but were not designated by the Company as hedges under FAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"). Thus, GAAP, specifically FAS 133, required the Company's super senior CDS portfolio to be reported at *fair value*, in the relevant financial statements with the changes in fair value recognized in net income during the period of the change. (FAS 133 ¶¶ 17, 18). Any declines in the fair value of the Company's super senior CDS portfolio would, therefore, reduce, among other things, net income and shareholders' equity in the period of the decline.

427.    Under GAAP, specifically FAS 133 and FAS 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), the fair value of the Company's super senior CDS portfolio at any point in time was, generally, the amount for which it could have been exchanged between willing parties, other than in a forced or liquidation sale. (FAS 133 ¶ 540, FAS 107 ¶ 5). Fair value was required to be determined based on quoted market prices in active markets or, in the absence of quoted market prices, fair value was required to be estimated based on the best information available in the circumstances. Those estimates were required to consider prices of similar financial instruments and the results of valuation techniques. Such valuation techniques were required to incorporate assumptions that market participants would use in their estimates,

including assumptions about risk and uncertainty.  An example of one such valuation technique would be the net present value of estimated future cash flows (inflows and outflows) using a discount rate commensurate with the risks involved. (FAS 133 ¶ 540; FAS 107 ¶¶ 11, 20-29)

428.   FAS 157, *Fair Value Measurements* ("FAS 157"), superseded the guidance provided by among other literature, FAS 133 and FAS 107, for defining and determining fair value. FAS 157, among other things, consolidated, clarified and enhanced the prior definitions of, and methods for determining, fair value.  For example, FAS 157 provided the following, in relevant part:

> [FAS 157] emphasizes that fair value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, [FAS 157] establishes a fair value hierarchy that distinguishes between (1) market participant assumptions developed based on market data obtained from sources independent of the reporting entity (observable inputs) and (2) the reporting entity's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs).  The notion of unobservable inputs is intended to allow for situations in which there is little, if any, market activity for the asset or liability at the measurement date.  In those situations, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions.  However, **the reporting entity must not ignore information about market participant assumptions that is reasonably available without undue cost and effort.**

> [FAS 157] clarifies that market participant assumptions include assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique.  A fair value measurement should include an adjustment for risk if market participants would include one in pricing the related asset or liability, even if the adjustment is difficult to determine.  Therefore, **a measurement (for example, a "mark-to-model" measurement) that does not include an adjustment for risk would not represent a fair value measurement if market participants would include one in pricing the related asset or liability**.  (FAS 157, Summary, Differences between This Statement and Current Practice).

429.   FAS 157 was effective, and adopted by the Company, as of January 1, 2008.

430.    FAS 5, *Accounting for Contingencies* ("FAS 5") requires disclosure of losses incurred and loss contingencies existing as of the date of the financial statements.  Specifically, FAS 5 provides the following, in relevant part:

> If no accrual is made for a loss contingency… or if an exposure to loss exists in excess of the amount accrued… **disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.** The disclosure shall indicate the nature of the contingency **and shall give an estimate of the possible range of loss or state that such an estimate cannot be made**… (FAS 5 ¶ 10)

431.    An impairment of the value of AIG's credit default swaps constituted a "loss" within the meaning of FAS 5.  Therefore, AIG was required to either record the amount of the impairment or, if the extent of the impairment could not be estimated, but it was nevertheless reasonably possible that a loss or an additional loss may have occurred, FAS 5 required AIG to disclose this loss contingency.

432.    As alleged in ¶¶ 146 - 147, by February 2007 at the latest, the Section 10(b) Defendants knew that the market prices of CDOs and RMBS containing subprime debt had declined substantially as a result of various factors, including the decline in housing values and increasing default rates for subprime mortgages.  Such indicators as the ABX and TABX indexes, which show the market value of credit default swaps on subprime-backed RMBSs and CDOs, continued to decline as the subprime crisis deepened throughout 2007.  AIG did not record any significant valuation adjustments to reflect the impairment of its subprime-based assets, however, until the third quarter of 2007.  But, as subsequently disclosed in AIG's 2007 10-K filed in February 2008, the third quarter 2007 valuation adjustments were substantially less than AIG should have recorded and were based on faulty models and methodology, which concealed the extent that these assets were impaired rather than truthfully and fully disclosing it.

433.    As the Section 10(b) Defendants knew, their valuation methodology was faulty in that they knowingly ignored such indicators of the value of their CDO and CDS portfolios as the declining ABX and TABX indexes, the inability of Merrill Lynch to sell CDOs repossessed from the collapsed Bear Stearns hedge funds in June 2007, the collateral calls they were receiving, and write-offs taken by their counterparties in the third quarter of 2007.  Under FAS 5, as well as FAS 133 and FAS 107, AIG was required to carry its CDO and CDS assets at fair value and to adjust its income to reflect any changes in the valuation of these assets.  In the absence of evidence sufficient to determine the fair value of these assets, AIG was required to disclose that losses in these portfolios were reasonably possible and to give a range of the possible losses if such a range could be determined.  Because AIG complied with neither of these alternatives, its financial statements for all three quarters of 2007 violated GAAP and were materially false and misleading in that they did not reflect the fair value of these assets.

**Failure to Disclose Risk Concentrations**

434.    FAS 107 requires disclosure of significant concentrations, or group concentrations, of credit risk.  The disclosure is required to provide (a) information about the characteristic that identifies the concentration, (b) the maximum amount of gross losses related to credit risk that would be incurred if the parties to the financial instruments comprising the concentration failed completely to perform, and (c) the related policy of requiring collateral or other security and of entering into master netting agreements to mitigate the credit risk. (FAS 107, as amended by FAS 133, ¶ 15A).  AIG's 2005 and 2006 financial statements failed to disclose that, due to the decision to invest 75 percent of its securities lending portfolio in residential mortgage-backed securities, including those with subprime collateral, and the rapid expansion of its multi-sector CDS portfolio, which was heavily exposed to subprime RMBS,

AIG had taken on a significant concentration of credit risk in the area of subprime mortgage-backed debt, which was not disclosed in violation of FAS 107.

**General Disclosure Requirements**

435.    One of the  fundamental principles of financial accounting provides, in relevant part:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.  (FASCON 1, ¶ 42).

436.    Additionally, reliability is a primary quality that makes accounting information useful for decision making.  To be reliable, information must have *representational faithfulness* as well as be verifiable and neutral.  (FASCON 2, ¶¶ 58-59, 62).

437.    FASCON 2, paragraph 79 states that the fundamental accounting principle of "completeness" requires that nothing material is left out of the information that may be necessary to ensure that the financial statements validly represent underlying events and conditions.

438.    Footnote disclosures in financial statements are an essential element of financial statements that are purportedly prepared in accordance with GAAP and serve, often, to satisfy the completeness assertion introduced above.  FASCON 5, ¶ 7, specifically states, in relevant part:

> Information disclosed in notes…amplifies or explains information recognized in the financial statements.  That sort of information is essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally accepted accounting principles.  (Footnote omitted).

439.    Additionally, APB No. 22, *Disclosure of Accounting Policies* ("APB 22"), states, in relevant part:

The Board concludes that information about the accounting policies adopted by a reporting entity is essential for financial statement users. When financial statements are issued purporting to present fairly financial position, cash flows, and results of operations in accordance with generally accepted accounting principles, a description of all significant accounting policies of the reporting entity should be included as an integral part of the financial statements. (APB 22, ¶ 8, as amended by FAS 95 [1987]).

## Guarantees

440.   With respect to the super senior CDS portfolio, the Company provided, in essence, credit protection (or guarantee) on the referenced CDO (*i.e.*, the Company assumed the credit risk held by the counterparties to its CDS portfolio). In most cases, in the event of a single instance of non-payment by the referenced CDO, the Company was required to purchase the referenced CDO at its par value. This portfolio also included liquidity puts written by the Company to acquire the referenced CDO at par value (prior to default).

441.   With respect to the accounting disclosure of such obligations, FIN 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* ("FIN 45"), requires disclosure of guarantees, or groups of similar guarantees, regardless of whether the likelihood of having to make payments is deemed remote. The disclosure is required to provide the following, in relevant part:

a.      The nature of the guarantee, including the approximate term of the guarantee, how the guarantee arose, and the events or circumstances that would require the guarantor to perform under the guarantee.

b.      The maximum potential amount of future payments (undiscounted) the guarantor could be required to make under the guarantee. That maximum potential amount of future payments shall not be reduced by the effect of any amounts that may possibly be recovered under recourse or collateralization provisions in the guarantee (which are addressed under (d) below). If the terms of the guarantee provide for no limitation to the maximum potential future payments under the guarantee, that fact shall be disclosed. If the guarantor is unable to develop an estimate of the maximum potential amount of future payments under its guarantee, the guarantor shall disclose the reasons why it cannot estimate the maximum potential amount…

190

c.      The current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee…

d.      The nature of (1) any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee and (2) any assets held either as collateral or by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee. The guarantor shall indicate, if estimable, the approximate extent to which the proceeds from liquidation of those assets would be expected to cover the maximum potential amount of future payments under the guarantee.  (FIN 45 ¶ 13).

442.    AIG's financial statements during the class period did not comply with FIN 45 because, as alleged herein, AIG failed to disclose the full amount of its obligations to post collateral under its credit default swaps.

443.    Moreover, as alleged above in ¶ 122, the terms of the CDS contracts written by AIGFP often designated the counterparty banks as the calculation agent for valuation of the referenced CDOs for purposes of determining whether and when AIG was required to post collateral and the amount to be posted.  Under FIN 45, AIG should have disclosed the existence of these provisions and their potential significant effect on the valuation of its CDS portfolio and its collateral posting obligations.  AIG failed to disclose the existence of these provisions or any information regarding them, in violation of FIN 45 and GAAP.

**Required MD&A Disclosures and Related Violations**

444.    SEC Regulation S-K requires Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") to provide information "…necessary to an understanding of [the registrant's] financial condition, changes in financial condition and results of operations." (17 C.F.R. § 229.303(a))   In December 2003, the SEC issued *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of*

191

*Financial Condition and Results of Operations* which provided that the MD&A requirements are intended to meet three principal objectives:

> to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

> to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

> to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

445.    Specific disclosures required in the MD&A include, but are not limited to, information related to the registrant's results of operations and liquidity.  Regulation S-K, in fact, speaks to the importance of such disclosures in a company's public filings and provides, specifically, certain guidance on what the SEC expects to see in such filings.  It requires the MD&A to include the following, in relevant part:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues…, the change in the relationship shall be disclosed. (17 C.F.R. § 229.303(a)(3)(ii))

> Identify known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.  If a material deficiency is identified, indicate the course of action that the registrant had taken or proposes to take to remedy the deficiency.  Also identify and separately describe internal and external sources of liquidity, and briefly discuss any material unused sources of liquid assets.  (17 C.F.R. § 229.303(a)(1))

446.    As noted above, AIG's multi-sector CDSs required the Company, in certain circumstances, to provide significant collateral in connection with its potential obligations under such instruments.  Such collateral requirements could potentially impact, and did impact in a material way, the Company's liquidity position.  As such, and as indicated above, such impacts

on the Company's liquidity should have been disclosed in the Company's MD&A section of its public filings during the relevant timeframe, as required by Regulation S-K.

447.    As discussed above, the statements made concerning the possible need to post collateral were materially misleading and false.  AIG stated repeatedly that its potential exposure to collateral postings in the event of a lowering in its debt ratings was relatively small, citing to a maximum of $830 billion in the third quarter of 2007 and a maximum of $1.39 billion as of December 31, 2007.  Such statements failed to disclose, however, that other factors, such as a lowering of the ratings of its counterparties or a decline in the value or ratings of the CDO tranches referenced by its credit default swaps, could result in substantially greater collateral calls.

448.    Indeed, in August 2007 Goldman demanded that AIG post $1.5 billion in collateral, more than the maximum amount that AIG said it could be required to post, for CDS referencing CDOs held by Goldman.  In October 2007, Goldman demanded that AIG post an additional $3 billion in collateral relating to other CDOs.  Although AIG was able to negotiate the amount it was actually required to post down to $1.5 billion, this was approximately 50% more than the amount it previously disclosed as the maximum it could be required to post.  By August 6, 2008, AIG had posted at least $10 billion in collateral on its CDO credit default swap portfolio, and between September 16, 2008 and December 31, 2008, as AIG's credit standing spiraled downward, it was required to post an additional $22.4 billion in collateral, and make payments of $27.1 billion on the CDS portfolio, the possibility of which the AIG defendants had never previously disclosed, in violation of their obligation under Regulation S-K.

449.    Under GAAP and the specific SEC regulations cited herein, among others, AIG had an obligation to discuss and describe the potential unfavorable impact of various economic

and industry factors on not only the carrying value of its investment portfolio but the risks to which the Company was subject as part of its super senior CDS portfolio products.

450.    Ultimately, these shortcomings were highlighted by former SEC chief accountant, Lynn E. Turner, in testimony to the U.S. Congress on October 7, 2008.  Mr. Turner provided the following, in relevant part, related to disclosure and, specifically, to AIG:

> Trust and confidence in markets and any company begins with, and ends with, transparency. Transparency that **ensures investors can fully understand and assess the risks** and rewards of investing in a company. Yet **time and time again AIG had failed to provide the requisite transparency to investors**.

**Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting**

451.    Throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting despite, in some instances, certifications and other statements by certain Defendants asserting the adequacy of such.

452.    The SEC defines "disclosure controls and procedures" as:

> …controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the [Securities Exchange Act] is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure information required to be disclosed by an issuer in the reports that it files or submits under the [Securities Exchange Act] is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. (17 C.F.R. § 240.13a-15(e), 240.15d-15(e)).

453.    The SEC defines "internal control over financial reporting" as a process "to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with [GAAP]**…" (17 C.F.R. § 240.13a-15(f), 240.15d-15(f).

454.     The Securities Exchange Act requires the Company to maintain effective disclosure control and procedures, and internal control over financial reporting.  The Company's management, including its principal executive and financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end, (b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end and (c) any changes in internal control over financial reporting that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting during each fiscal quarter.  (17 C.F.R. § 240.13a-15, 240.15d-15).  SEC Regulation S-K requires the Company's principal executive and financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations.  (17 C.F.R. § 229.307, 229.308).

455.     Further, in connection with the Sarbanes Oxley Act of 2002, the tenets of which have now been incorporated into Regulation S-K, management of public companies is required to report, at least annually, on the effectiveness of the company's system of internal controls. The ultimate goal of this process is for company management to express an opinion on the effectiveness of the company's internal control over financial reporting; because a company's internal control cannot be considered effective if one or more material weaknesses exist.

456.     The Company's disclosure controls and procedures, and internal control over financial reporting, were not effective throughout the Class Period as the Section 10(b) Defendants, possibly among others, caused the Company to issue the relevant financial statements which were, for the violations noted above and elsewhere herein, not in conformity with GAAP and SEC rules.  Specifically, the Company's disclosure controls and procedures, and internal control over financial reporting, were ineffective regarding the valuation and disclosure of the super senior CDS and investment portfolio.

457.    In May 2005, AIG filed its 2004 Form 10-K which disclosed that the Company had inadequate controls and had overstated previously reported net income by $3.9 billion, requiring the restatement of its 2000 through 2004 financial statements.  AIG then filed an amended 2004 Form 10-K in March 2006 which included **additional** restatement adjustments as a result of previously undetected errors.  The restatements followed investigations by the SEC, DOJ and New York Attorney General into questionable transactions.  In 2006 and 2007, the Company continued to record "out of period" adjustments indicating further errors in its previously issued financial statements.  Throughout the Class Period, AIG's relevant financial statements disclosed that the Company had ineffective disclosure controls and procedures, and internal control over financial reporting for various issues.  However, as more fully described below, it was not until the 2007 10-K was filed on February 28, 2008 that the material weaknesses concerning financial reporting of the CDS portfolio and its valuation were disclosed.

458.    Indeed, in 2006, the Office of Thrift Supervision, which had regulatory authority over AIG, documented numerous accounting and internal control issues.  As Scott Polakoff, the acting director of the Office of Thrift Supervision, testified before the House Subcommittee on Capital Markets on March 18, 2009, after a detailed review in 2005, OTS made a comprehensive report to AIG's board in March 2006 in which "OTS identified and reported to AIG's board weaknesses in AIGFP's documentation of complex structured transactions, in policies and procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement."  Further, according to Polakoff, "After a 2007 targeted review of AIGFP, OTS instructed the company to revisit its modeling assumptions in light of deteriorating market conditions.  In the summer of

2007, after continued market deterioration, OTS questioned AIG about the valuation of CDS backed by subprime mortgages."

459.    As described above, the AIGFP Asset/Credit Group made all valuation decisions itself and deliberately excluded from these processes AIG's corporate accounting and risk management representatives, particularly Joseph St. Denis, whose job function specifically required him to monitor, supervise, and report on this process to corporate management.  Thus, the Section 10(b) Defendants knew that AIG's internal control system was not functioning and that relevant valuation and risk management information was not properly being "accumulated and communicated to the issuer's management."

460.    Prior to the 2007 annual financial statements, however, the relevant financial statements omitted disclosure of any of the foregoing, including the ineffectiveness of controls surrounding the issues most pertinent to the allegations herein (*i.e.*, the valuation and disclosure of the super senior CDS and investment portfolios).

461.    In its 2007 Form 10-K, the Company noted the following, in relevant part, in connection with reporting on its assessments of the effectiveness of its system of internal controls:

> As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective.  AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007.  As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information.  Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively.  As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's

December 31, 2007 consolidated financial statements.  In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

462.     AIG's failure to maintain adequate internal controls and the Section 10(b) Defendants' misrepresentations as to the adequacy of AIG's internal controls in the Company's 2005 and 2006 10-Ks violated SEC rules.

463.     As such, throughout the Class Period, the Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting.  The ineffectiveness of these controls impacted the Company's financial statements throughout the Class Period but was not (a) recorded by the Company in the way of reductions in the fair value of the portfolios discussed above and hereinafter or (b) adequately disclosed such that all associated risks inherent to, and increasing within, these portfolios were apparent to users of the relevant financial statements.

### AIG USES FALSE AND MISLEADING STATEMENTS TO RAISE CAPITAL BY ISSUING SECURITIES DURING THE CLASS PERIOD

464.     During the Class Period, AIG raised over $27 billion in capital through the issuance of equity and debt securities in registered public Offerings, set forth in ¶¶ 591 - 592 below (the "Offerings"), utilizing a shelf registration process.  [In addition to the registered public Offerings, AIG also raised tens of billions of dollars throughout the Class Period in sales of unregistered securities, including through Rule 144A offerings, Regulation S offerings, and private placements.]

465.     The Offerings, among other things, coincided with a drastic rise in the Company's long-term borrowing level during the Class Period.  As reported in the 2005 Form 10-K, the issuance of which marks the start of the Class Period, long-term borrowing as of December 31,

2005 stood at approximately $105 billion.  From there, it rose to approximately $140 billion as of December 31, 2006, and $167 billion as of December 31, 2007.

466.    Through public Offerings from October 13, 2006 through December 7, 2007, AIG issued and sold debt securities with a face amount of over $8.5 billion in the form of medium-term notes designated as Series G and Series MP and junior subordinated debentures designated as Series A-1, A-2, and A-3, as set forth in more detail below at ¶¶ 591 - 592.

467.    Through additional public Offerings of preferred stock designated as Series A-4 and A-5 junior subordinated debentures, AIG raised another $1.85 billion in June and December 2007 issuances.

468.    AIG also raised an additional $3.6 billion in capital "to provide loans to AIGFP or certain AIGFP subsidiaries" through Offerings of debt securities designated as Series AIG-FP-1 through AIG-FP-17 and AIG-FP-19 through AIG-FP-57, which were offered on a continuous basis from November 17, 2006 through April 10, 2008, and an Offering of preferred securities, designated as Series AIG-FP-18  medium-term notes on December 18, 2007, as identified in ¶¶ 591 - 592 below.  As set forth above, on May 8, 2008, AIG announced its intention to raise $12.5 billion in capital.  AIG stated that the purpose of raising additional capital was to "fortify its balance sheet" and "enable us to take advantage in a lot of the attractive emerging markets."

469.    As a result of the defendants' positive assurances to the market of "confidence in AIG's strong balance sheet" and its plans for the use of capital, AIG announced on May 22, 2008, that it had raised an additional $20 billion upon completion of its capital raising program, which, according to AIG, exceeded the original targeted amount of $12.5 billion "due to strong demand."  The $20 billion capital raise included the public offering and sale of 196,710,525 shares of AIG common stock for a total of $7.47 billion, as well as the public offering and sale of

78.4 million equity units for $5.88 billion.  [Also included in this $20 billion capital raise are proceeds from the sale in May 2008 of fixed income securities totaling $6.9 billion in three series: 8.175% Series A-6 junior subordinated debentures ($4 billion); 8.0% Series A-7 junior subordinated debentures ($1.16 billion); and 8.625% Series A-8 junior subordinated debentures ($1.75 billion).  These securities were not offered in registered public offerings.]

470.    The total $13.35 billion in capital raised through the May 12, 2008 public Offerings was intended, according to defendant Sullivan, to "fortify [AIG's] balance sheet and provide increased financial flexibility."  However, AIG knew that it would be required to use this capital to satisfy collateral demands that counterparties were likely to make as a result of the negative bond rating it received on May 8, 2008 and negative rating to CDOs it insured on May 9, 2008.  Indeed, during the August 7, 2008 second quarter earnings call, in response to a question about AIG's use of the $20 billion of capital that had been raised, defendant Bensinger revealed that "most of [the $20 billion] I would say has been used for AIGFP purposes in terms of collateral."  And just four months after the May 2008 offerings, AIG was looking at an $80 billion deficit, and would have been required to institute bankruptcy proceedings were it not for the bail-out proposed by the U.S. Government on September 16, 2008.

**FACTS RELEVANT TO THE SCIENTER OF THE SECTION 10(b) DEFENDANTS**

471.    As set forth more fully above, the Section 10(b) Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that AIG's publicly reported financial results issued during the Class Period, as well as statements concerning the Company's exposure to collateral calls stemming from its CDS portfolio and securities lending program in its SEC filings and press releases and at analyst conferences, were materially false and misleading.

472.     These Defendants knew, but did not disclose to the market, that AIG faced an enormous unhedged concentration of risk involving hundreds of billions of dollars of investments in the U.S. housing and subprime debt markets across many of its units, most particularly, AIGFP and AIG's securities lending program.   Moreover, even after these Defendants became aware in mid to late 2006 that losses related to ABS and CDOs backed by subprime loans were all but inevitable, AIGFP made an advertent decision not to try to hedge its risk or restructure its CDS portfolio, in order to keep the income from these existing deals flowing into the Company and, in particular, to the AIGFP executives via the lucrative compensation arrangement they had in place with AIG.

473.     Among other things, the following facts establish a strong inference of scienter of the AIGFP executives identified as Section 10(b) Defendants (Cassano, Frost, Forster and Athan): (1) the magnitude of the AIGFP's exposure to losses and/or collateral calls in its CDS portfolio; (2) the decision made within AIGFP to stop writing CDS contracts based on multi-sector CDOs by the end of 2005, which AIG concealed from the public until August 2007 (¶¶ 115, 243); (3) the analyses presented by Eugene Park in the latter half of 2005, which recognized that (i) underwriting practices and standards for subprime mortgages had deteriorated significantly in 2005 (thereby making the Company's statements touting its relative lack of exposure within the CDS portfolio to 2006 and 2007 "vintages" highly misleading), (ii) the correlation factor, described above, meant that once certain CDOs began to lose value, there was no reasonable basis to believe that others, with similar subprime exposure, would not also lose value, and (iii) the Company faced enormous exposure to collateral calls and losses in its CDS portfolio (¶¶ 177 - 179); (4) AIGFP was aware of demands for collateral calls from counterparties to certain super senior CDSs dating back to at least August 2007, as well as the

magnitude of the potential demands for collateral posting, and that the CDS contracts provided for the counterparties to be the presumptive prevailing party entitled to set the valuation marks for the underlying CDOs (¶¶ 149 – 155, 177); (5) the resignation of Joseph St. Denis in 2007 as a result of being deliberately excluded from the valuation of AIGFP's liabilities because defendant Cassano believed St. Denis would "pollute the process;" (¶¶ 160 – 162, 249); (6) even though AIGFP was not writing new CDS contracts after 2005, managers of the CDOs underlying existing CDS contracts were still able to substitute collateral of 2006-2007 vintages with pre-2005 vintages (¶ 123), and the 2005 vintage included subprime mortgages that carried far higher risks than their credit rating would have suggested (¶¶ 251(f), 320); (7) AIGFP's preference for "mezzanine" deals, which were typically smaller but were based on greater percentages of subprime debt; and (8) AIGFP's valuation of its CDO portfolio varied from AIGFP's counterparties, some of which had strong reputations for reliability in valuations, and that AIGFP's formulas consistently produced higher valuations.

474.   The AIGFP Section 10(b) Defendants were also responsible for the issuance of false "fair value" and loss figures in the presentation concerning the CDS portfolio at the December 5, 2007 investor meeting.  This fact is corroborated by, among other things, PwC's statement that "As of December 31, 2007, controls over AIGFP's super senior CDS portfolio valuation process ... were not effective ... **with respect to the processes and models introduced in the fourth quarter of 2007**."  This is a clear reference to the "adjustments" that defendants Cassano and Forster, among others, made, for the first time, in order to minimize the losses that AIG would have to disclose at the investor meeting.  As such, this is powerful evidence of their scienter.

475.   Among other things, the following facts establish a strong inference of scienter of the AIG executives identified as Section 10(b) Defendants (Sullivan, Bensinger, Herzog and Lewis): (1) the magnitude of AIG's and AIGFP's exposure to losses and/or collateral calls in their CDS portfolio and securities lending program; (2) knowledge of the decision made within AIGFP to stop writing CDS contracts based on multi-sector CDOs by the end of 2005, which AIG concealed from the public until August 2007 (¶¶ 115, 243); (3) knowledge that there would have been analyses of the CDS portfolio in the latter half of 2005, and that the Company faced enormous exposure to collateral calls and losses in its CDS portfolio (¶¶ 177 - 179); (4) AIG was aware of demands for collateral calls from counterparties to certain super senior CDSs dating back to at least August 2007, as well as the magnitude of the potential demands for collateral posting and that the CDS contracts provided for the counterparties to be the presumptive prevailing party entitled to set the valuation marks for the underlying CDOs (¶¶ 149 – 155, 177); (5) PwC informed AIG at least by November 29, 2007 that the Company had significant deficiencies and could have a material weakness in internal controls over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior CDS portfolio, yet the Company's presentation to investors on December 5, 2007 presented the Company's position as secure and did not disclose the potential for a material weakness in its valuation models and processes (¶¶ 131, 171); (6) the resignation of Joseph St. Denis in 2007 as a result of being deliberately excluded from the valuation of AIGFP's liabilities because defendant Cassano believed St. Denis would "pollute the process;" (¶¶ 160 – 162, 249); (7) the receipt of the OTS Letter on March 10, 2008 detailing a material weakness within AIG's management and oversight of AIGFP's super senior CDS valuation process and financial reporting (¶¶ 195 - 197); (8) acknowledgement by PwC to AIG's audit committee in March 2008 that the Company's risk

control groups did not have "appropriate access" to AIGFP (¶ 131); (9) even though AIG was not writing new CDS contracts after 2005, managers of the CDOs underlying existing CDS contracts were still able to substitute collateral of 2006-2007 vintages with pre-2005 vintages (¶ 123) and the 2005 vintage included subprime mortgages that carried far higher risks than their credit rating would have suggested (¶¶ 251(f), 320); (10) AIGFP's valuation of its CDO portfolio varied from AIGFP's counterparties, some of which had strong reputations for reliability in valuations, and that AIGFP's formulas consistently produced higher valuations; (11) the Company's significant exposure to the U.S. residential mortgage market in the investment portfolios created through its securities lending program; (12) AIG had "made up" the difference if participants in the securities lending program put up less than 102% of the value of the securities, which was not made public until issuance of the Second Quarter 2008 Form 10-Q; (13) AIG Investments ramped up its investments in asset-backed securities, including RMBS that included subprime debt, in furtherance of the "10-cubed" goal established in or about December 2005 (¶¶ 244 - 245); and (14) the inadequate internal controls that had contributed to the Company's previous restatement and disclosure deficiencies and, as the Company was aware, had not been cured.

476.    The AIG executives identified as Section 10(b) Defendants were further aware, or recklessly disregarded, that the Company's risk management, corporate oversight, and financial reporting processes were ineffective and subject to increasing deterioration after being told repeatedly by the OTS as early as March 2006 that these weaknesses existed and needed to be remediated.   In testimony to the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises on March 18, 2009, Scott M. Polakoff, Acting Director of the OTS, explained that, through protracted reviews and examinations of AIG and its subsidiaries during the Class Period, the OTS directed numerous criticisms and corrective

actions to the Executive Defendants and the Board, which criticisms displayed an increasing level of severity with respect to AIG's risk management and corporate oversight, among other areas.

477.    For instance, in 2005, after conducting several targeted, risk-focused reviews of various lines of AIG's business, including AIGFP, the OTS identified numerous weaknesses and made recommendations to AIG's executives and Board members regarding AIG's risk management oversight, financial reporting transparency, and corporate governance, which were communicated in a report to the AIG Board in March 2006.  In his testimony before the House Subcommittee, Mr. Polakoff explained: "With respect to AIGFP, OTS identified and reported to AIG's board weaknesses in AIGFP's documentation of complex structured transactions, in policies and procedures regarding accounting, in stress testing, in communication of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement."

478.    In 2007, in the midst of deterioration in the U.S. mortgage finance markets, the OTS increased its scrutiny of AIGFP, including the valuation of CDS backed by subprime mortgages, and instructed AIG to "revisit its modeling assumptions in light of deteriorating sub-prime market condition."  Mr. Polakoff explained in his testimony to the House Subcommittee:

> In the summer of 2007, after continued market deterioration, OTS questioned AIG about the valuation of CDS backed by subprime mortgages.  In the last quarter of 2007, OTS increased the frequency of meetings with AIG's risk managers and PwC.  Due to the Agency's progressive concern with corporate oversight and risk management, in October 2007 we required AIG's Board to
>
> • Monitor remediation efforts with respect to certain material control weaknesses and deficiencies;
>
> • Ensure implementation of a long-term approach to solving organizational weaknesses and increasing resources dedicated to solving identified deficiencies;

- Monitor the continued improvement of corporate control group ability to identify and monitor risk;

- Complete the holding company level risk assessment, risk metrics, and reporting initiatives and fully develop risk reporting;

- Increase involvement in the oversight of the firm's overall risk appetite and profile and be fully informed as to AIG Catastrophic Risk exposures, on a full-spectrum (credit, market, insurance, and operational) basis; and

- Ensure the prompt, thorough, and accountable development of the Global Compliance program, a critical risk control function where organizational structure impediments have delayed program enhancements.

479.    In connection with this 2007 review, Mr. Polakoff testified that the OTS further emphasized to AIG management and Board members that the Company should give the "highest priority to the financial reporting process remediation and the related long-term solution to financial reporting weaknesses."   The OTS's ongoing review and recommendations to AIG culminated in the March 2008 Supervisory Letter, which downgraded AIG's examination rating and detailed the Company's risk management failures.

480.    The Section 10(b) Defendants were further aware, or recklessly disregarded, that the "Assets/Credit" group within AIGFP, within which the CDS business was written, was maintained separately from all other operations of the AIGFP unit, and that while there were risk management, accounting, and technology systems groups that supported the entire organization, defendant Cassano excluded such personnel from involvement with the CDS line of business. Indeed, former employees have confirmed that the lack of internal controls and risk management systems with respect to the Assets/Credit group made it possible for defendant Cassano and other AIGFP personnel, including defendants Forster, Frost, and Athan, to control the flow of information pertaining to AIGFP's super senior CDS portfolio and unilaterally make risk management and valuation decisions (¶¶ 131 - 139).

481.    The Section 10(b) Defendants were also aware, or recklessly disregarded, that AIGFP did not request potential counterparties to provide underlying loan detail, such as "loan level evaluation or analysis materials" regarding the mortgages or other instruments that made up the CDOs they insured.  According to CW 1, who interacted directly with AIGFP personnel, including defendants Frost and Forster, while working at various banks that obtained CDS coverage from AIGFP during the Class Period, AIGFP personnel "never asked for this data." CW 1 observed that this was extremely atypical in his experience representing counterparties in other CDS deals.

482.    The Section 10(b) Defendants were also aware, or recklessly disregarded, that even though the assets underlying high grade CDOs were of higher quality, a majority of AIGFP's multi-sector CDSs with subprime exposure were written on mezzanine CDOs, whose underlying collateral contained up to 100% of subprime risk exposure.  According to CW 1, AIGFP had "notional limits," and since the mezzanine deals tended to be smaller than the high grade deals, AIGFP could write more of the mezzanine deals.  While the mezzanine deals carried higher attachment points than the high grade deals, Defendants recklessly ignored the fact that these CDOs would fall in value much faster – since they included overall lesser credit-worthy loans – and would result in even faster collateral calls and balance sheet losses.

483.    The Section 10(b) Defendants were further aware, or recklessly disregarded, that the financial model created by Professor Gorton, and utilized by AIGFP in determining whether to issue CDS contacts, did not analyze the impact of the potential for AIG rating downgrades and/or market valuations that might require collateral calls to be paid on CDS contracts.   Indeed, former employees have confirmed that this model did not take into account certain crucial data, such as collateral trigger points, because that information was not provided to Professor Gorton,

nor was it within the parameters of the model he was instructed to create. According to CW 4, defendants Frost and Forster were responsible for overseeing the modeling process, but failed to provide Professor Gorton with "data such as loan level variables," instructing him instead to "just use summary level statistics on the collateral" (¶¶ 111, 235, 245).

## I.   Additional Facts Establishing the Section 10(b) Defendants' Scienter

484.    In addition to the specific facts set forth above, each of the Section 10(b) Defendants' scienter is also established by the additional facts set forth below:

**Defendant Sullivan:**

485.    From March 2005 to June 15, 2008, Sullivan served as the President and Chief Executive Officer of AIG. In that capacity, he assisted in the preparation of the false statements described herein and repeated the contents therein to the market. Sullivan signed each of AIG's Forms 10-K and 10-Q for the fiscal periods from March 16, 2006 through March 31, 2008, the 2007 Registration Statement, and the 2008 Registration Statement. Sullivan also spoke on the Company's calls with analysts on numerous occasions throughout the Class Period, including on March 17, 2006, May 11, 2006, August 10, 2006, November 10, 2006, March 2, 2007, May 11, 2007, August 9, 2007, November 8, 2007, December 5, 2007, February 29, 2008, and May 9, 2008. Sullivan also signed false certifications on AIG's 2005, 2006, and 2007 Forms 10-K and the interim period Forms 10-Q from the 1Q06 through the 1Q08, attesting to the accuracy of the financial information contained therein and that AIG had designed, established and maintained an effective set of internal controls.

486.    PwC specifically warned Sullivan, prior to the December 5, 2007 investor meeting, that the Company had significant deficiencies and might have a material weakness in terms of its CDS valuation processes, but Sullivan nevertheless stated that AIG had "a high

degree of certainty in" the losses AIG had booked to date, and that the Company's U.S. residential housing market exposure levels "are manageable given AIG's size, financial strength and global diversification." Sullivan further represented that AIGFP's models "have proven to be very reliable" and provide AIG "with a very high level of comfort."

487.   Defendant Sullivan also knew, or was reckless in not knowing, that the extensive risk that AIG took on through the CDSs written when Sullivan took over as CEO were entirely or substantially unhedged. Indeed, certain employees within AIGFP had encouraged senior management at AIGFP (including defendant Cassano), as well as senior management at AIG (including defendant Sullivan), to use the ABX indices launched in 2006 and 2007 and to hedge against the risk that the underlying securities would not be repaid as expected, but they declined to do so, as Cassano did not want to pay to hedge and Sullivan did not force him to do so.

488.   Also indicative of defendant Sullivan's recklessness is the fact that, as CEO, he eliminated the weekly meetings that had been instituted during Greenberg's tenure as CEO to review AIG's investments and risks, and, in particular, to assess the work of the AIGFP unit. According to Greenberg, these meetings were instituted to keep "the CEO abreast of AIGFP's credit exposure." As reported in the *Portfolio* magazine September 28, 2008 article, "AIG's House of Cards," defendant Sullivan "rarely questioned or sought to rein in the [AIGFP] unit, and, according to a person formerly close to AIG, Sullivan eliminated the weekly meetings because he 'wasn't really interested in the AIGFP business.'"

**Defendant Bensinger:**

489.   Throughout the Class Period, Bensinger served as the Executive Vice President and Chief Financial Officer of AIG and, in that capacity, assisted in the preparation of the false financial statements described herein and repeated the contents therein to the market.

Specifically, Bensinger signed the Company's Forms 10-K for the years 2005, 2006, and 2007, Forms 10-Q for the quarters ended March 31, 2006 through June 30, 2008, the 2007 Registration Statement, and the 2008 Registration Statement.  Bensinger also spoke on the Company's calls with analysts on numerous occasions throughout the Class Period, including on March 17, 2006, May 11, 2006, August 10, 2006, November 10, 2006, March 2, 2007, May 11, 2007, November 8, 2007, December 5, 2007, February 29, 2008, May 9, 2008, and August 7, 2008.  Bensinger also signed false certifications on AIG's Forms 10-K and Forms 10-Q during the period from March 16, 2008 through May 8, 2008, attesting to the accuracy of the financial information contained therein and that AIG had designed, established and maintained an effective set of internal controls.

490.    PwC specifically informed Bensinger on November 29, 2007 that the Company had significant deficiencies and might have a material weakness in terms of its CDS valuation processes.  Nevertheless, during the December 5, 2007 investor meeting, Bensinger stated, "what I think we should all come away from is saying that, to an extremely high degree of confidence, there is no expected loss in [the super senior CDS] portfolio.  In fact it is underwritten so that there would be no loss at an extreme confidence level."

**Defendant Herzog:**

491.    Defendant Herzog served as the Senior Vice President and Comptroller and the Principal Accounting Officer of AIG from June 2005 until October 2008, when he replaced defendant Bensinger as Chief Financial Officer of AIG.  As a result, throughout the Class Period, Herzog assisted in the preparation of the false financial statements described herein and repeated the contents therein to the market.  Specifically, Herzog signed the Company's Forms 10-K for the years 2005, 2006 and 2007, Forms 10-Q for the quarters ended March 31, 2006 through June

30, 2008, the 2007 Registration Statement and the 2008 Registration Statement.  Herzog also spoke on the Company's calls with analysts throughout the Class Period, including on May 9, 2008 and August 7, 2008.

**Defendant Lewis:**

492.    Throughout the Class Period, Lewis served as AIG's Senior Vice President and Chief Risk Officer.  Lewis also spoke on the Company's calls with investors and analysts on numerous occasions throughout the Class Period, including on August 9, 2007, when he stated that the risk "actually undertaken [through the CDS portfolio] is very modest and remote, and has been structured and managed effectively."  He further described the risk to AIG from the AIGFP CDS portfolio as a "very remote risk, which is defined and calculated not just by rating agency models, but also by our own very rigorous internal models used on each deal AIG-FP structures."  Moreover, according to former employees, defendant Lewis was "directly involved in the approval process of every CDS transaction."

**Defendant Cassano:**

493.    Defendant Cassano served as President of AIGFP from before the start of the Class Period until the Company announced his resignation on February 29, 2008.  However, unbeknownst to the public, Cassano was retained by the Company to serve as a consultant through the end of 2008 and was paid $1 million per month for his services.  Moreover, as reported in *The Wall Street Journal* on April 28, 2009, the DOJ and SEC are both investigating whether civil and/or criminal charges should be brought against defendant Cassano, along with defendants Forster and Athan.

494.    Through his service as President of AIGFP, and based on the control that he personally exercised over its Assets/Credit group, which issued the CDS contracts at issue,

Cassano was or had the ability to become aware of all studies involving the CDS portfolio, including but not limited to the analyses conducted by Eugene Park that led to the decision to stop writing CDSs based on the U.S. residential mortgage market by the end of 2005.

495.    Cassano was further aware of his exclusion of others within AIGFP and AIG, including but not limited to Joseph St. Denis and other accounting, risk management, and technical support personnel within AIGFP, from the valuation process concerning the CDS portfolio.  He was further aware of the use of the negative basis adjustment utilized in the statements made in November and December 2007 concerning the CDS valuation, which were designed to lower the losses that would be reported on the CDS portfolio, as well as the identity of the counterparties, and the amounts by which they demanded the posting of collateral on their CDS contracts.

496.    Moreover, as relayed by CW 2, Cassano intentionally excluded discussion of specific risk metrics or risk analyses relating to AIGFP's Assets/Credit unit during weekly marketing and trading calls that he led, which were also attended by other AIGFP personnel including defendants Frost and Forster, during which common risk metrics within AIGFP's other business segments were "discussed and analyzed at great length."

497.    Defendant Cassano knew, or should have known, that once AIG lost its AAA credit rating in 2005, the potential for extensive collateral calls was enormous, including in the event the Company's debt was again downgraded.  In a March 19, 2009 *Time Magazine* article titled, "How AIG Became Too Big to Fail," Greenberg opined that AIGFP should have stopped writing CDS and hedged, or reinsured, its existing CDS when it lost its AAA rating.  If they did not, "[o]f course they were going to run out of money."  Rather than hedging, however, as *Time*

magazine reported, "Cassano's unit doubled down after the spring of 2005, writing more and more subprime-linked swaps as the ratings plunged."

498.    As CW 2 further confirmed, information about performance and risk analysis regarding the Assets/Credit group and "CDS positions" was not housed in the standard analytics risk management systems used by all other AIGFP business segments, but was instead kept in a spreadsheet that was managed out of London, because "Mr. Cassano preferred to keep that business separate."  The analytics systems contained information pertaining to the performance, "positions and/or exposure" of all other AIGFP business segments, including "any information that was provided to risk management, accounting and/or any other group that required information based on the business activities of AIGFP."

499.    Cassano also spoke on the Company's calls with analysts and presentations to investors on numerous occasions throughout the Class Period, including on March 17, 2006, August 9, 2007, November 7, 2007, and December 5, 2007.  Among other statements, Cassano stated on August 9, 2007 that "it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions."  He further said at that time: "we see no issues at all emerging.  We see no dollar loss associated with any of that [CDS] business."  Yet, Cassano knew that certain factors, including AIG's credit rating weakness and a weakening of pricing of the CDOs underlying the CDS portfolio, had not even been put into the model through which AIGFP had decided whether to write or reject a CDS contract.

**Defendant Forster:**

500.    Defendant Forster has been employed as the Executive Vice President of Asset Trading & Credit Products of AIGFP from before the start of the Class Period to the present.

Forster was responsible for running AIGFP's global credit division, which contracted to sell many of the CDS contracts at issue herein.  Moreover, as reported in *The Wall Street Journal* on April 28, 2009, the DOJ and SEC are both investigating whether civil and/or criminal charges should be brought against defendant Forster, along with defendants Cassano and Athan.

501.    As noted above, Forster was within the small group of AIGFP personnel – which consisted of Cassano and Forster in London, and Frost, Alan Budnick and Athan in Wilton, Connecticut – who controlled the flow of information pertaining to the CDS portfolio.  Through that capacity, defendant Forster also knew that AIGFP did not request potential counterparties to provide underlying loan detail, which information was crucial to evaluating the risk associated with potential CDS transactions.

502.    Forster also spoke on the Company's calls with analysts on numerous occasions throughout the Class Period, including on November 8, 2007 and December 5, 2007.  For example, speaking about the CDS portfolio as AIGFP's global head of credit trading, Forster said at a May 31, 2007 presentation to investors in New York: "Given the conservatism that we've built in these portfolios, we haven't had to do a huge amount of hedging over the years." Forster also stated that if the CDS portfolio "did start to deteriorate, it would be very easy for us to go out, buy an extra layer of protection to make sure that we maintain the sort of super senior portfolio still."

## II.    Defendants' Motive to Perpetrate Fraud

503.    AIG's executive compensation arrangements provided the Section 10(b) Defendants, and especially those at AIGFP, was a powerful motive and opportunity to perpetrate the fraudulent scheme alleged herein.  As Henry Waxman, Chairman of the House Committee on Oversight and Government Reform, stated at the October 7, 2008 hearing: "Executives grew rich

by taking on excessive risk" and AIG "collapsed when risks turned bad" and "executives are walking away with millions of dollars while taxpayers are stuck with billions of dollars in costs."

504.    The AIG executives' compensation came from three sources: salary, discretionary bonuses, and participation in two "performance-based" compensation plans: the Senior Partners Plan, which recognized the Company's performance over a 3-year period and provided cash payments to the Company's top 70 executives, and the Partners Plan, through which AIG provided annual cash payments to its top 700 executives (together, the "Plans"). According to the terms of the Plans, the amount of compensation to be paid to the executives was dependant on AIG's meeting certain financial goals and objectives, thereby providing a powerful incentive to AIG's executives to boost the Company's reported financial results. Thus, as the Company's reported income climbed, so did the payments made to AIG's executives.

505.    The compensation received by defendant Sullivan under these Plans was particularly astounding. For instance, in 2005, the year in which he became President and CEO, defendant Sullivan received a $2.7 million payout under the Plan (bringing his total compensation that year to $13.8 million), upon AIG's recording of $10.5 billion in net income. In 2006, in his first full year as CEO, Sullivan received a $5.7 million payment under the Plan, in addition to a $9 million discretionary bonus he also received (for total compensation of $23.5 million), upon AIG's recording of $14 billion in net income that year.

506.    Then, as AIGFP's losses mounted at the end of 2007, defendant Sullivan urged the Board's compensation committee during a March 11, 2008 meeting to deviate from the terms of the Plans as written and to calculate executive payouts under the Plans "as if no AIG Financial Products Corp. unrealized market valuation losses had occurred in 2007." The compensation committee agreed to exclude from the bonus calculations AIGFP's reported unrealized market

valuation losses, which totaled approximately $5 billion in the fourth quarter of 2007 alone.  As a result, even though the Company's reported net income fell 55% in 2007 to $6.2 billion, defendant Sullivan still received total compensation that year valued at approximately $13.9 million, including a $5.6 million performance-based payout under the Plan.

507.    AIG's Board also approved what can only be described as a very generous severance package for defendant Sullivan upon his departure as CEO on July 1, 2008.  Despite the record drop in the value of AIG's stock and the massive losses that investors suffered, the Board-approved $47 million severance package included a $15 million golden parachute payment, a pro rata payment of $4 million under the Senior Partners Plan for the time he spent working in 2008, and the continued vesting of outstanding equity and long-term cash awards valued at approximately $28 million.

508.    The monies paid out by AIG to members of the AIGFP unit are even more startling.  AIGFP employees, including most prominently defendant Cassano, received massive incentive-based, payouts during the Class Period that were linked directly to the amount of income generated by AIGFP in a particular year, including income derived from sales of CDS contracts and the premiums paid to the Company on those contracts.  Specifically, for every dollar of current income that AIGFP recognized, AIG would place $0.30 directly into a "bonus pool" for AIGFP executives, to be divvied up and paid out at year end.  Astoundingly, however, while the bonuses paid to employees at AIGFP were contingent on the income received from the derivatives they created and sold, those bonuses weren't tied in any way to the performance of those products.  In fact, pursuant to the compensation arrangement between AIG and AIGFP, excluded from the bonus calculation were **"certain GAAP accruals," including, most notably, mark-to-market adjustments on derivative positions.**

509.     As a result, while the compensation paid to AIGFP employees grew as the unit sold more and more CDS products, it was not impacted to any significant degree by the massive losses AIG began to record at the end of 2007, due primarily to AIGFP's CDS portfolio.  Thus, even after this portfolio declined in value by $11.12 billion in 2007, AIG recorded $481 million in compensation expense with respect to AIGFP that year.  Then, in early 2008, with the collapse of the Company and the AIGFP unit looming, AIG set up a special bonus pool for AIGFP employees to encourage them to remain with the Company.  AIG agreed to pay approximately $450 million in bonuses for fiscal 2008 to AIGFP employees in a series of installments, even though the AIGFP unit would go on to record a $17.2 billion loss for the year.  Pursuant to the deal AIG struck with AIGFP, employees were guaranteed, for 2008 and 2009, the same level of incentive-based compensation that they received in 2007 (except for senior executives, whose compensation would be reduced by 25%), regardless of how AIGFP actually performed.  The only requirements were that the employees could not quit and could not be fired for cause.  In its 2007 10-K, AIG explained, "In light of the unrealized market valuation loss related to the AIGFP super senior credit default swap portfolio, to retain and motivate the affected AIGFP employees, a special incentive plan relating to 2007 was established. Under this plan, certain AIGFP employees were granted cash awards vesting over two years and payable in 2013. The expense related to these awards will be recognized ratably over the vesting period, beginning in 2008."

510.     With approximately 400 employees at AIGFP, the bonuses each of the employees received were massive.  In fact, from 2001 to 2008, compensation at AIGFP ranged from $423 million to $616 million each year, for a total of $3.56 billion, meaning that on average each person in the unit made more than $1 million a year.  The compensation received by AIGFP's employees ranged from 33 percent to 46 percent of the unit's revenue on a year-to-year basis.

According to AIG's 2007 10-K, "the most significant component of Capital Markets operating expenses is compensation, which was approximately $423 million, $544 million and $481 million in 2007, 2006 and 2005, respectively."

511.   Defendant Cassano received a large portion of these payouts.  In 2006, he made $43.6 million in salary and bonuses, and in 2007, he received compensation of $24.2 million, notwithstanding the $11.12 billion loss in the value of the CDS portfolio that Cassano oversaw. Moreover, even after defendant Sullivan announced on February 29, 2008 that Cassano would step down effective March 31, 2008, he still continued to receive $1 million per month on a consulting contract that was only revealed much later during a congressional investigation, and he was allowed to retain up to $34 million in unvested bonuses that had been awarded during his time with AIGFP.  Notably, the consulting contract was not cancelled until September 2008, in connection with the U.S. Government bailout.  In all, from 2000 to 2008, defendant Cassano received a total of $280 million in cash compensation from AIG, most of which came from the bonus program.

512.   The compensation program for AIGFP executives differed in significant ways from the compensation program that AIG had established for the corporate company's own executives.  As described in *Fallen Giant: The Amazing Story of Hank Greenberg and the History of AIG*, by Ron Shelp, because of a problem that is particularly acute in a field like insurance, where the ultimate risk of policy claims may come a significant time after an insurance policy is sold, Greenberg, while at AIG, had rewarded AIG's top producers with interests in two outside companies called C.V. Starr and Starr International (SICO), which owned significant blocks of AIG stock.  These acted as long-term incentive and highly contingent forms of deferred compensation, since the "real payoff" would come from

appreciation in the companies' holdings of AIG stock.  Indeed, the actual ownership of interests in the two entities did not vest until an executive reached the age of 65, and anyone who departed AIG before then would forfeit his or her interest, "leaving more money in the pot for those who stayed."

513.    Unlike that arrangement, AIG's compensation program with respect to AIGFP provided AIGFP executives – including defendants Cassano, Frost, Forster and Athan – with the unusual incentive, at least in comparison with executives throughout the rest of AIG, of higher and higher annual cash bonuses based solely on the annual income reported by the unit, without accounting for any losses suffered, no matter how large.  Therefore, even after it became apparent in mid to late 2006 that the value of ABS and CDOs backed by subprime loans was deteriorating, AIGFP decided *not* to try to hedge its risk relating to the CDS portfolio, or to sell or even re-insure some of that risk.  Instead, AIGFP personnel sought to maintain those deals and thereby keep the income they generated rolling in, since those revenues formed the basis of the massive payments made to the AIGFP executives.

## LOSS CAUSATION/ECONOMIC LOSS

514.    During the Class Period, as alleged herein, the Section 10(b) Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the value of AIG's securities and operated as a fraud on Class Period purchasers of AIG securities by misrepresenting, *inter alia*, (1) the value of and risks inherent in the CDS portfolio; (2) the Company's risk management practices; (3) the actual practices employed by the securities lending program, including that AIG ramped up its investing of cash collateral from the securities lending program in RMBS, including RMBS with subprime debt, and would "make up" the difference if a counterparty provided less than 102% of the value of the securities being

lent; and (4) the Company's financial condition and performance. Later, however, as shown herein, when the truth concerning the CDS portfolio, risk management practices, securities lending program and financial performance entered the market and became apparent to investors, the prices of AIG's securities materially declined as the artificial inflation dissipated.

515. As a result of their purchase of AIG securities during the Class Period at artificially inflated prices Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, when subsequent disclosures slowly removed the inflation from such securities.

516. The false and misleading statements and material omissions caused AIG's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high closing price of $72.65 per share. However, as a direct and proximate result of the various corrective disclosures set forth herein, which, over time, revealed the truth about the false and misleading statements and disclosed facts that had been previously concealed by the Section 10(b) Defendants' wrongful conduct, by the end of the Class Period, the common stock had lost nearly all of its value, closing on September 17, 2008 – the next trading day after the end of the Class Period – at $2.05 per share.

517. Throughout the Class Period, as partial corrective disclosures were made to the market, the market prices of AIG's securities declined with relevant news. On the other hand, when Defendants made statements that painted the Company's CDS portfolio and securities lending program in a false light, the market reacted positively, which allowed the Company's stock either to remain at its then-current trading levels or even increase in price.

518. For example, as set forth above, on August 8, 2007, AIG issued its Form 10-Q for 2Q07 and held a conference call on August 9, 2007 with analysts, during which it attempted to

calm investor concerns about its subprime related exposure and emphasized the strength of its CDS portfolio.  Among other statements made at that time, defendant Cassano stated on August 9, 2007 that "it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions."  He further said at that time: "we see no issues at all emerging.  We see no dollar loss associated with any of that [CDS] business."

519.   The market responded favorably to AIG's representations.  On August 9, 2007, analysts with Fox-Pitt Kelton Cochran Caronia Waller stated that "The bottom line is that market fears have been overdone compared to the fundamentals, in our view."  Further, "assuming 100% losses in subprime RMBS securities rated below AAA, AIG would experience only $0.99 per share losses, or 2% of book value."  Fox-Pitt Kelton noted that, "The primary concern so far has been subprime residential mortgage-based securities (RMBS) deals from 2005 and 2006 vintage RMBS, particularly triple-B deals and second lien transactions, and collateralized debt obligations (CDOs) of mezzanine RMBS (typically triple-B rated subprime securities) from 2005 and 2006 that include these exposures.  AIG has virtually no exposure to these areas and for a company of AIG's size, the subprime MBS market's impact on its investment portfolio is almost not worth discussing, in our opinion."

520.   Another analyst, J. Paul Newsome of A.G. Edwards, similarly stated that "[d]uring the conference call, management spent a great deal of time reviewing its subprime mortgage exposures.  To be succinct, AIG believes that it has little in aggregate exposure to subprime defaults.  We believe this disclosure should satisfy most investors' concerns about the company's exposure."

521.  As a result of these reassurances from AIG and the Section 10(b) Defendants, the market price of AIG's stock remained within the range of $64 to $66 per share before and after the second quarter 2007 results were announced.

522.  On November 7, 2007, after the close of the market, AIG filed its third quarter 2007 Form 10-Q, and held an investor conference the following day.  In the Form 10-Q, the Company stated that AIG continued to believe that it is "highly unlikely" that AIGFP would ever actually have to make payments under its CDS contracts.  However, the Company also reported $352 million in unrealized losses from its CDS portfolio, and revealed that there were disagreements over valuation with some of its counterparties.  The disclosures did not state how much collateral AIG has been forced to post, and further represented that when AIG had disputed counterparties' valuations, most of the counterparties did not challenge AIG's valuation.

523.  As noted above, the statements made by AIG actually painted the condition of its CDS portfolio in a false light because, among other reasons, the relatively modest losses reported by AIG for the third quarter and through October were calculated using an inadequate and improper valuation model, and AIG lacked adequate internal controls over its financial reporting and could not be reasonably sure of its valuations and the risks posed by the CDS portfolio. Nevertheless, even with AIG's unjustified positivity concerning the Company's CDS portfolio, the market reacted negatively to the disclosure of certain losses in the portfolio, and its common stock fell from the November 6, 2007 closing price of $62.05 to a closing price on November 7, 2007, of $57.90 per share, a loss of $4.15 per share, or 6.69%.

524.  Yet, analysts' opinions still continued to be influenced by AIG's false portrayal of its subprime exposure and the attendant risks of that exposure to AIG.  For example, an analyst from Credit Suisse stated that "There were no significant sales or major changes in the rating

composition of AIG's subprime RMBS, CDO and credit default swaps during the third quarter."
Similarly, on November 8, 2007, an analyst from JP Morgan noted that the risk from subprime
exposure was manageable, and concluded that "management's statement that the chance of
incurring claims on these derivatives 'is highly unlikely' is encouraging."

525.    On December 4, 2007, AIG stock closed at $55.65 per share.  On December 5,
2007, as previously stated, AIG held an investor meeting.  Among other things, AIG stated at the
meeting that it continued to believe it was "highly unlikely" that AIGFP would be required to
make any payments with respect to its CDS portfolio, and AIG further estimated the decline in
the fair value of the CDS portfolio since October 31, 2007, as $500 million to $600 million, as of
November 30, 2007, for an aggregate of approximately $1.05 billion to $1.15 billion since
September 30, 2007.  As shown above, these representations were materially false and
misleading because, among other reasons, the losses on the CDS portfolio in October and
November were actually at least $4 billion more than AIG had represented; AIG had used, but
not disclosed, "cash flow diversion features" and a "negative basis adjustment" to value the
portfolio; and PwC had already identified a significant deficiency, and possibly a material
weakness, in AIG's internal controls over financial reporting related to the fair value of the CDS
portfolio.

526.    The market reacted positively to this meeting.  On December 5, 2007, AIG's
stock price closed at $58.15 per share (a $2.50 per share increase from the day before), and
closed on December 6, 2007, at $61.35 per share (another $3.20 per share increase).  In total,
over the two days, AIG's stock price gained $5.70 per share, or 10.2% from the close on
December 4, 2007.

527.    Analysts also reacted positively to the December 5 investor meeting.  In a December 6, 2007 report, analysts at Fox-Pitt noted, "The company reiterated its belief that actual losses [from the CDO book] would be zero ….  We believe concerns about the mortgage exposure have been overdone."

528.    As noted above, AIG later admitted certain misstatements that had been made in connection with the announcements of its third quarter 2007 results and at the December 5, 2007 investor meeting.  The admissions were made in a Form 8-K filed on February 11, 2008, and the Form 10-K for the year ended December 31, 2007, filed on February 29, 2008.

529.    Among other things, on February 11, 2008, AIG admitted that its prior statements about losses incurred in the CDS portfolio as of September 30, 2007 and November 30, 2007, had been based on improper valuation methods that understated the losses by more than $4 billion, and it further admitted to a material weakness in its internal controls over financial reporting and oversight related to the valuation of the super senior credit default swap portfolio.

530.    The market reacted immediately and negatively to this news.  On February 11, 2008, AIG's common stock dropped from $50.68 to $44.74 per share, reflecting a loss of 11.7%, or $5.94 per share – at the time, the largest loss in AIG's stock price in 20 years.  Fox-Pitt Kelton noted: "Because of a change in methodology, the company now estimates its mark at the end of November to be $5.23 billion compared to the previous estimate of $1.60 billion pre-tax.  The change is due to the assumption that the difference between the cash markets and CDS markets can no longer be estimated and therefore is assumed to be zero."  Further, "the stock has been hit hard by this news."

531.    AIG's Form 10-K filed on February 28, 2008, included additional disclosures which demonstrated that the Company's prior statements regarding losses on its credit default

swap portfolio were false and misleading, and that the cumulative value of its credit default swap portfolio had dropped by $11.5 billion.  It further disclosed for the first time, as noted above, that the Company's CDS portfolio included $6.5 billion in liquidity puts written on CDOs linked to the subprime mortgage market, which allowed purchasers of the subprime CDOs to force AIG to buy them back at the original price, despite the fact they had declined in value.  AIG further disclosed that pursuant to the terms of the liquidity puts, it had repurchased $754 million of these securities, and had provided third parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years, and included further disclosures relating to its internal control weaknesses.

532.     With these disclosures, on February 28, 2008, the market price of AIG common stock dropped from $52.25 to $50.15 per share, a loss of $2.10 per share, or approximately 4.02%.  The next day, after the February 29, 2008 conference, AIG's stock fell another $3.29 per share, a loss of 6.56%.

533.     The disclosures made with the announcements of the Company's first and second quarter 2008 results, as well as the initiation of an SEC investigation, caused further declines in the price of AIG's stock.  On May 8, 2008, AIG issued its Form 10-Q for the first quarter 2008 in which AIG increased its estimate of unrealized losses on its CDS portfolio in 2008 to $9.1 billion as of March 31, 2008, for a total loss of $20.6 billion over 2007 and 2008.  It further disclosed that it had posted an aggregate of $9.7 billion of collateral over the past two years, and that it would seek to raise $12.5 billion through equity offerings.  As a result of this announcement, AIG's common stock fell from $44.15 on May 8 to $38.37 per share on May 12, 2008, a drop of $5.78 per share, or 13%.

534.    On June 6, 2008, with the announcement that the SEC was commencing an investigation of AIG and statements made concerning its CDS portfolio, its stock price fell from $36.41 on June 5, 2008 to $33.93 per share on June 6, 2008, a 6.8% decline.

535.    After the close of the market on August 6, 2008, AIG announced its second quarter 2008 results, including, as noted above, the first disclosure that AIG had "made up" the difference between the 102% of the cash collateral required by the securities lending program if the counterparties had put in only 100% of the cash collateral.  The Company announced unrealized market valuation losses of $5.6 billion for the Second Quarter 2008 and market valuation losses of $14.7 billion for the first six months on AIGFP's CDS portfolio. As noted above, the Company further admitted – candidly, for the first time – that it had invested too heavily in the U.S. residential mortgage market.  As a result of these disclosures, on August 7, 2008, AIG's common shares fell from $29.09 to $23.84 per share, a loss of $5.25 per share, or 18%.  Yet, the Company still had not disclosed that due to known weaknesses in the CDS portfolio and the actual condition and practices of the AIG Investments personnel running the securities lending business, far greater collateral calls and demands of re-payments – in the tens of billions of dollars – could and would be facing the Company imminently.

536.    On September 15, 2008, rating agencies, including Moody's, S&P and Fitch Rating, downgraded AIG's credit ratings to below 'AA' levels.  Fitch explained that it had downgraded AIG due to the fact that the Company's ability to raise cash was "extremely limited" because of its plummeting stock price, widening yields on its debt and difficult capital market conditions.  As a result of these and other disclosures, on September 15, 2008, the price of AIG's common shares fell from $7.12 to $4.76 per share, a loss of $2.36 per share or 33%.

537. Prices of AIG's debt securities also fell with the disclosures on or about September 15, 2008. For example, the 4.95% Medium-Term Notes due March 20, 2012 dropped on September 15, 2008 from $91.24 to $44.92, a loss of 51%. Further, the price of the equity units issued pursuant to the May 12, 2008 Shelf Registration Statement fell on September 15, 2008 from $28.75 to $14.07, a 51% loss. Similarly, the 5.45% Medium-Term Notes due May 18, 2017 fell on September 15, 2008 from $65.00 to $43.87, a loss of 32%.

538. Finally, after the close of the market on September 16, 2008, the last day of the Class Period, AIG issued a press release announcing an $85-billion U.S. Government bail-out of AIG. Specifically, among other things, AIG announced that it had entered into a revolving credit facility with the FRBNY, and that under the terms of the credit facility, which was secured by all of the assets of AIG and its material subsidiaries, AIG could borrow up to $85 billion from the FRBNY in exchange for a 79.9% interest the Government would have in AIG.

539. With this disclosure, AIG's common stock fell from $3.75 to $2.05 per share from September 16 to September 17, 2008, a 46% decline. The market prices of AIG debt securities declined by similar amounts. For example, the 5.85% Medium Term Notes due January 16, 2018 fell from $47 to $32.85, a 30% loss. The price of the Equity Units issued pursuant to the May 12, 2008 Shelf Registration Statement fell from $14.07 to $9.70, a 31% loss. And the 5.45% Medium-Term Notes due May 18, 2017 lost an additional 32% on September 16, 2008, falling from $43.87 to $30.00.

540. The price declines directly and proximately resulting from the above discussed disclosures were not caused by market conditions, industry news, randomness, or by AIG-related information unrelated to the alleged fraud. Each of the above referenced disclosures partially

corrected the false and misleading information previously provided to the market for which the Plaintiffs, on behalf of themselves and the Class, seek to be compensated.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

541.    At all relevant times, the market for AIG's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's stock.  Through the Class Period:

(a)    AIG's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    AIG met the requirements of a seasoned issuer to file registration statements under Form S-3; in addition, as a regulated issuer, AIG filed periodic public reports with the SEC and the NYSE;

(c)    AIG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and through periodic analyst conference calls and presentations; securities analysts and the business press followed and published research reports regarding AIG that were publicly available to investors;

(d)    The market price of AIG stock reacted promptly to the dissemination of public information regarding the Company;

(e)    The average daily trading volume for AIG stock during the Class Period was approximately 21.5 million shares traded; and

(f)     The Company's market capitalization was approximately $172.8 billion on May 10, 2006 (when AIG announced its financial results for the first quarter of 2006), $188.3 billion on May 11, 2007 (when AIG announced its financial results for the first quarter of 2007), and $100.3 billion on May 9, 2008 (when AIG announced its results for the first quarter of 2008).

542.    At all relevant times, the markets for certain AIG preferred stock and debt securities that traded on a public exchange were also efficient markets that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information, to the extent pertinent to such securities, in the prices of the securities.  Through the Class Period:

(a)     Certain of AIG's preferred stock and debt securities, including 5.75% Series A-2 Junior Subordinated Debentures, 4.85% Series A-3 Junior Subordinated Debentures, 6.45% Series A-4 Junior Subordinated Debentures and 7.70% Series A-5 Junior Subordinated Debentures, met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     AIG met the requirements of a seasoned issuer to file registration statements under Form S-3 and, in fact, during the Class Period its debt securities were issued pursuant to Form S-3 shelf registration statements and supplements thereto, as identified in ¶¶ 591 - 592; in addition, as a regulated issuer, AIG filed periodic public reports with the SEC and the NYSE;

(c)     AIG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services, and through periodic analyst conference calls and presentations; securities analysts and the business press followed and published research reports regarding AIG that were publicly available to investors;

(d)   The market prices of AIG preferred stock and debt securities reacted promptly to the dissemination of public information regarding the Company to the extent pertinent to these types of securities, including, most particularly, the marked declines in the prices of the preferred stock and many of the debt securities in the period from September 11 to September 17, 2008, when it appeared the Company might have filed for protection under the bankruptcy laws;

(e)   The average daily trading volumes for AIG preferred stock and debt securities were sufficient to establish an efficient market; and

(f)   During the Class Period, there was more than $50 billion worth of AIG debt securities trading in the market.

543.   As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the markets for AIG securities were artificially inflated.   Under such circumstances, the presumption of reliance available under the fraud on the market theory applies.

544.   Plaintiffs and the other Class members relied on the integrity of the market prices for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of AIG securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

545.    Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased AIG securities at inflated prices.

546.    Plaintiffs are also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants' statements concerning AIG's CDS portfolio and securities lending program failed to disclose material facts.

### CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

#### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 against AIG and the Section 10(b) Defendants

547.    Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1 - 546 as if fully set forth herein.

548.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against AIG and Section 10(b) Defendants Sullivan, Bensinger, Cassano, Forster, Herzog, and Lewis.

549.    During the Class Period, the Defendants named in this claim, individually, and in concert, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices, made, or substantially participated in, the creation of untrue statements of material fact and/or omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

550.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Plaintiffs and members of the Class to purchase AIG's securities at artificially inflated prices.

551.    Defendants presented a misleading impression of AIG's finances and prospects by failing to inform the market of the true risk of loss, including the need to post collateral, associated with AIG's CDS portfolio and by making other false statements and material omissions.  As a result, this caused and maintained artificial inflation in the prices of AIG's publicly traded securities throughout the Class Period and until the truth was fully disclosed.

552.    Defendant AIG and the Section 10(b) Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or making direct statements to the investing public on conference calls and at investor meetings detailed herein.

553.    During the Class Period, the Section 10(b) Defendants occupied executive-level positions at the Company and were privy to material non-public information concerning AIG and AIGFP.  Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

554.    By making the misleading statements contained herein, the Section 10(b) Defendants knew or recklessly disregarded that they would artificially inflate the price of the Company's securities.  Because of their respective positions with AIG or AIGFP, the Section 10(b) Defendants had and used their influence and control to further the scheme alleged herein.

The Section 10(b) Defendants had broad responsibilities including communicating with the financial markets and providing the markets with financial results and accurate information concerning its business operations, risk concentrations, exposures to losses and collateral calls, and other potential drains on the Company's liquidity.

555.    As described herein, the Section 10(b) Defendants knowingly, intentionally or recklessly made materially false statements and omissions.

556.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

557.    In ignorance of the materially false and misleading nature of Defendants' statements and/or in reliance upon the integrity of the market price for AIG securities, Plaintiffs and the other members of the Class purchased AIG securities at artificially inflated prices during the Class Period.  But for the fraud alleged herein, Plaintiffs and other Class members would not have purchased the securities at artificially inflated prices.

558.    The market prices for AIG securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described herein.

559.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of AIG securities at artificially inflated prices and the subsequent declines in the price of those securities when the truth was disclosed.

560.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged to be materially false and misleading.

561.    By virtue of the foregoing, AIG and the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to

Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violation.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 20(a) of the Exchange Act against the Executive Defendants

562.    Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1 - 561 as if set forth fully herein.

563.    This claim is brought pursuant to Section 20(a) of the Exchange Act against each of the Executive Defendants.  This claim is brought on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired AIG securities during the Class Period.

564.    As alleged herein, AIG is liable to Plaintiffs and the members of the Class who purchased AIG securities based on the materially false and misleading statements and omissions as set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 of promulgated thereunder.

565.    Throughout the Class Period, the Executive Defendants were controlling persons of AIG within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the fraud alleged herein.

566.    Defendants named in this claim exercised control over AIG and/or AIGFP during the Class Period through the key roles they played in the Company's management and their direct involvement in its day to day operations, including its financial reporting and accounting functions, and therefore caused the Company to engage in the illegal conduct and practices complained of herein.

567.    As senior executive officers of the Company or AIGFP, the Executive Defendants had a duty to disseminate accurate and truthful information regarding AIG's financial statements

and to correct any previously issued statements that had become untrue so that the market price of AIG securities would be based upon truthful and accurate information.

568.    Given their individual and collective responsibilities for managing AIG and/or AIGFP throughout the Class Period, the Executive Defendants were regularly presented to the market as the individuals responsible for AIG's and AIGFP's day-to-day business and operations, as well as the Company's and AIGFP's strategic direction.   The Executive Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, the Company, including AIGFP.

569.    Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein.   With respect to Section 10(b) Defendants Sullivan, Bensinger, Cassano, Forster, Herzog, and Lewis, as set forth more fully in ¶¶ 471 – 472, 475 - 513 above, each of these Defendants acted with scienter in that they knew or recklessly disregarded that AIG's publicly reported financial results issued during the Class Period, as well as statements concerning the Company's exposure to collateral calls stemming from its CDS portfolio and securities lending program in its SEC filings and press releases and at analyst conferences, were materially false and misleading.

570.    Defendants Frost and Athan also culpably participated in the fraud in that they knew or should have known that AIGFP, an entity that each of these Defendants controlled, and thereby, AIG, was engaging in fraudulent conduct.   Defendant Frost, who was AIGFP's chief marketing executive during the Class Period, served as the Assets/Credit group's liaison with Wall Street dealers.   According to former employees, Frost was "in charge of AIGFP's relationships with the big money center banks and investment banks," who acted as

counterparties to the CDS transactions.  In that capacity, Frost was primarily responsible for reviewing and evaluating potential CDS deals on behalf of AIGFP, and was therefore in a position to gather and review the underlying data regarding the mortgages or other instruments, including the ratings, the attachments points, and other statistics for the transactions.  According to CW 1, however, Frost often failed to request critical, loan level information from counterparties to the CDS deals that would have allowed AIGFP to properly price and evaluate the risks associated with the CDS transactions.  When he was questioned about the surge in volume of CDS contracts that AIGFP was writing in 2005, Frost said: "Dealers know we can close and close quickly.  That's why we're the go-to."

571.   Defendant Frost was also aware that the CDS portfolio was substantially unhedged, and, therefore, exposed to substantial risk and the potential for massive losses.  In fact, Frost was one of the AIGFP executives that specifically rejected hedging as a way to reduce risk within that portfolio, although various AIGFP personnel had advocated for such a strategy. This was because Frost's compensation was highly dependent on revenue from the CDS deals, and hedging would have reduced AIGFP's profitability, and, ultimately, his compensation. Defendant Frost, along with defendant Forster, was also responsible for providing Professor Gorton with the data inputs to use in his risk modeling, but failed to provide crucial information, such as collateral trigger points or loan level variables, so that the model did not take into account the substantial risk of future collateral calls or write-downs, which have crippled AIG's business.  Moreover, as set forth above, defendant Frost, along with defendants Athan and Cassano, have recently been reported to be subjects of a criminal investigation by the DOJ.

572.   Defendant Athan also culpably participated in the fraud alleged herein.  Prior to his employment as a Managing Director of AIGFP and by AIG Financial Securities Corp., Athan

was a Managing Director, Head of Structured Products & Principal Finance, at Société Générale, a counterparty on many CDS contracts with AIGFP.  According to CW 4, while at Société Générale, Athan was an "important and big customer of Alan Frost's as Société Générale was a big buyer of super senior credit default swap protection from AIGFP."

573.    Moreover, as described above, while at AIGFP, defendant Athan was within the small group of AIGFP personnel who controlled the flow of information pertaining to the CDS portfolio.  According to CW 4, he was "the guy assigned to deal with collateral calls and was the guy in the middle of collateral calls with Goldman and everybody else arguing with them about what the right valuation of the swaps are."  Thus, Athan knew or should have known, among other things, that AIG failed to disclose the extent of collateral calls already made or that could be made with respect to the CDS portfolio and further misled investors to believe that AIG had sufficient resources to meet any such collateral calls.  Furthermore, defendant Athan, along with defendants Cassano, Forster and Frost, specifically rejected hedging the CDS portfolio, although various AIGFP personnel had advocated for such a strategy, due to the adverse effect hedging would have on AIGFP's profitability, and, ultimately, his and other AIGFP executives' compensation.

574.    As a result of the false and misleading statements and omissions alleged herein, the market prices of AIG securities were artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance iavailable under the "fraud on the market" theory applies, as set forth in detail above.  Plaintiffs and the members of the Class relied upon either the integrity of the market or upon the statements and reports of AIG, or both, in purchasing AIG securities at artificially inflated prices.

575.     This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

576.     By virtue of the foregoing, each of the Executive Defendants is liable to Plaintiffs and other members of the Class, each of whom has been damaged as a result of AIG's underlying violations.

## ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

577.     The facts relevant to claims under the Securities Act are, as set forth below, that AIG's registration statements and prospectuses filed with the SEC with respect to the Offerings contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

578.     In the allegations and claims set out in this part of the Complaint (Third through Seventh Claims for Relief), Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act.  The Securities Act claims are asserted against the Company, the Executive Defendants who signed Registration Statements, the Director Defendants, the Underwriter Defendants, and PwC.  Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in AIG's registration statements and prospectuses, including AIG's materially false and misleading financial statements incorporated therein, for the Offerings.  Additionally, Section 12(a)(2) claims are asserted against the Underwriter Defendants on behalf of Class members who purchased securities in the Offerings.

579. Plaintiffs also assert control person liability under Section 15 of the Securities Act against various principals of AIG, including certain of its executives and AIG's directors at the times of the Offerings.

580. The Securities Act claims are not based on any knowing or reckless misconduct on behalf of the Defendants – i.e., they do not allege, and do not sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims under the Securities Act.

581. Lead Plaintiff purchased the following securities in the Offerings for those securities and in the aftermarket: (a) 6.25% Series A-1 Junior Subordinated Debentures issued March 6, 2007; (b) 5.60% Medium-Term Notes issued October 18, 2006; (c) 5.45% Medium-Term Notes issued May 18, 2007; and (d) 5.85% Medium Term Notes issued December 7, 2007. Lead Plaintiff purchased Floating Rate Medium-Term Notes issued March 20, 2007 in the Offering for those securities. The 6.25% notes, 5.60% notes, floating rate notes, and 5.45% notes were issued pursuant to the 2003 Registration Statement (as defined below). The 5.85% notes were issued pursuant to the 2007 Registration Statement (as defined below).

582. Plaintiff Maine PERS purchased AIG common stock in the May 12, 2008 Offering.

583. Plaintiff ATU 85 purchased AIG equity units in the May 12, 2008 Offering.

584. Plaintiff Epstein purchased notes in three Offerings under the AIG-FP Medium Term Note series: (a) Medium-Term Notes, Series AIG-FP-14, CMS Curve Notes issued May 31, 2007; (b) Medium-Term Notes, Series AIG-FP-16, CMS Curve Notes issued June 1, 2007; and (c) Medium-Term Notes, Series AIG-FP-22, CMS Curve Notes issued July 20, 2007.

585.     Plaintiffs Lynette J. Yee, Michael Conte and Roger Wilson purchased 7.7% Series A-5 Junior Subordinated Debentures issued December 11, 2007 in the Offering for those securities.

586.     Plaintiff Randy Lewis Decker purchased 6.45% Series A-4 Junior Subordinated Debentures issued May 31, 2007 in the Offering for those securities.

587.     During the Class Period, AIG raised over $27 billion in capital through the issuance of equity and debt securities in various registered public Offerings.  The Offerings were conducted pursuant to one or more of three shelf registration statements, which AIG filed with the SEC on Form S-3 and/or Form S-3MEF, including: (i) the registration statement filed on Form S-3 with the SEC on June 12, 2003 ("2003 Registration Statement"); (ii) the registration statement filed on Form S-3 with the SEC on June 12, 2007 ("2007 Registration Statement"); and (iii) the registration statement filed on Form S-3MEF with the SEC on May 12, 2008 ("2008 Registration Statement").

588.     The registration statements included one or more prospectuses, which described the general terms that applied to the registered securities and the general manner in which they were to be offered.  For each Offering, the specific terms of the securities being offered and the specific manner in which AIG offered the securities were included in a prospectus supplement or pricing supplement that became part of the respective prospectus and shelf registration statement pursuant to which that Offering was conducted.  Specifically, AIG issued the following prospectuses, prospectus supplements, and pricing supplements in connection with the Offerings traceable to the 2003 and 2007 Registration Statements, each of which were filed with the SEC:

    a.     With respect to the public Offerings made pursuant to the 2003 Registration Statement, AIG issued: (i) two prospectuses dated July 24, 2006, (ii) a prospectus supplement dated October 12, 2006, (iii) a prospectus supplement dated March 6,

2007, (iv) two prospectus supplements dated March 8, 2007, (v) a prospectus supplement dated May 31, 2007, and (vi) 42 pricing supplements; and

b.      With respect to the Offerings made pursuant to the 2007 Registration Statement, AIG issued: (i) two prospectuses dated July 13, 2007, (ii) a prospectus supplement dated July 13, 2007, (iii) a prospectus supplement dated December 11, 2007, (iv) two prospectus supplements dated May 12, 2008, and (v) 47 pricing supplements.

589.    The 2003 Registration Statement was signed by, among others, defendants Cohen, Feldstein, Futter, Holbrooke, Sullivan, Tse and Zarb.   The 2007 and 2008 Registration Statements were signed by defendants Sullivan, Bensinger, Herzog, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Miles, Offit, Orr, Rometty, Sutton, Tse, Willumstad and Zarb. Defendant Bollenbach signed the 2008 Registration Statement only.

590.    As identified in ¶¶ 591 – 592 below, the Underwriter Defendants acted as the underwriters for these Offerings, whether described in the Offering Documents as "principal underwriters," "managing underwriters," "co-managers", "underwriters," "joint bookrunning managers," "agents," "joint lead managers" or similar terms.  Therefore, each of the Underwriter Defendants was an "underwriter," as described in Section 2(11) of the Securities Act, of the Offerings for which they are identified in ¶¶ 591 - 592 below by the terms stated above.

591.    AIG issued the following securities in Offerings during the Class Period, which form the basis of the claims brought herein pursuant to the Securities Act:

**Offerings Pursuant to June 12, 2003 Shelf Registration Statement, July 24, 2006 Prospectus, and October 12, 2006 Prospectus Supplement**

5.60% Medium-Term Notes, Series G due October 18, 2016, $750 million face amount, issued October 18, 2006, Pricing Supplement No. G-1 dated October 13, 2006 (CUSIP No. 02687QBC1)
    Form 424B2 filed October 17, 2006
    Principal Underwriters: Lehman Brothers, Morgan Stanley, Wachovia, Citigroup, Credit Suisse, Deutsche Bank, and HSBC

5.375% Medium-Term Notes, Series MP, Matched Investment Program due October 18, 2011, $600 million face amount, issued October 18, 2006, Pricing Supplement No. MP-1 dated October 13, 2006 (CUSIP No. 02687QBE7)

Form 424B2 filed October 17, 2006

Principal Underwriters: Lehman Brothers, Morgan Stanley, Wachovia, Citigroup, Credit Suisse, Deutsche Bank, and HSBC

Floating Rate Medium-Term Notes, Series MP, Matched Investment Program due October 18, 2011, $400 million face amount, issued October 18, 2006, Pricing Supplement No. MP-2 dated October 13, 2006 (CUSIP No. 02687QBD9)

Form 424B2 filed October 17, 2006

Principal Underwriters: Lehman Brothers, Morgan Stanley, Wachovia, Citigroup, Credit Suisse, Deutsche Bank, and HSBC

6.25% Series A-1 Junior Subordinated Debentures Due March 15, 2037, $1 billion face amount, issued March 13, 2007 (CUSIP No. 026874BE6)

Form 424B2 filed March 8, 2007

Joint Bookrunning Managers: Citigroup, Deutsche Bank, JP Morgan, BoA, Lehman Brothers; Co-Managers: Merrill Lynch, Morgan Stanley, Scotia Capital, and Wachovia

£750,000,000 of 5.75% Series A-2 Junior Subordinated Debentures, issued March 15, 2007, scheduled maturity date: March 15, 2037, final maturity date: March 15, 2067, total principal amount $387,136,737 (ISIN: XS0291641420; GBP 026874BF3)

Form 424B2 filed March 9, 2007

Joint Bookrunning Managers: Barclays, Citigroup, Deutsche Bank, HSBC, and JP Morgan; Co-Managers: RBC, RBS, and UBS

€1,000,000,000 4.875% Series A-3 Junior Subordinated Debentures in denominations that are even multiples of €50,000, issued March 15, 2007, scheduled maturity date: March 15, 2037, final maturity date: March 15, 2067, total principal amount $755,401,118 (ISIN: XS0291642154)

Form 424B2 filed March 9, 2007

Joint Bookrunning Managers: ABN, Citigroup, Credit Suisse, Deutsche Bank, and JP Morgan; Co-Managers: Banca IMI S.p.A., BNP, Calyon, and Société Générale

4.95% Medium-Term Notes, Series MP, Matched Investment Program, Due March 20, 2011, $600 million face amount, issued March 20, 2007, Pricing Supplement No. MP-3 dated March 13, 2007 (CUSIP No. 02687QBL1)

Form 424B2 filed March 14, 2007

Agents: Goldman Sachs, Greenwich, Daiwa Europe, Mitsubishi, and Mizuho

Floating Rate Medium-Term Notes, Series MP, Matched Investment Program, Due March 20, 2012, $300 million face amount, issued March 20, 2007, Pricing Supplement No. MP-4 dated March 13, 2007 (CUSIP No. 02687QBK3)

Form 424B2 filed March 14, 2007

Agents: Goldman Sachs, Greenwich, Daiwa Europe, Mitsubishi, and Mizuho

5.450% Medium-Term Notes, Series MP, Matched Investment Program, Due May 18, 2017, issued May 18 and May 31, 2007 (aggregate principal amount $1.25 billion) (CUSIP No.: 02687QBW7)
- $850 million principal amount, Pricing Supplement No. MP-5 dated May 15, 2007
    424B2 filed May 17, 2007
    Agents: Barclays, Morgan Stanley, Wachovia, ANZ, BMO, KeyBanc, and NAB Capital
- $200 million principal amount, Pricing Supplement No. MP-6 dated May 25, 2007
    Form 424B2 filed May 29, 2007
    Agent: Morgan Stanley
Offered pursuant to July 13, 2007 Prospectus:
- $200 million principal amount, Pricing Supplement No. MP-7 dated Oct. 4, 2007
    Form 424B2 filed Oct. 5, 2007
    Agent: Wachovia

6.45% Series A-4 Junior Subordinated Debentures Due June 15, 2077, $750 million face amount, issued May 31, 2007 (CUSIP 026874800) (preferred securities)
    Form 424B2 filed June 4, 2007
    Joint Bookrunning Managers: Citigroup, Merrill Lynch, Morgan Stanley, UBS, Wachovia; Joint Lead Managers: AG Edwards, RBC, BoA, Bear Stearns, Lehman Brothers, and Wells Fargo; Additional Underwriters: Credit Suisse, Deutsche Bank, HSBC, and Keefe Bruyette

**Offerings Pursuant to June 22, 2007 Shelf Registration Statement, July 13, 2007 Prospectus, and July 13, 2007 Prospectus Supplement**

5.85% Medium-Term Notes, Series G, Due January 16, 2018, $2.5 billion face amount, issued December 7, 2007, Pricing Supplement No. G-2 dated December 7, 2007 (CUSIP No.: 02687QDG0)
    Form 424B2 filed December 10, 2007
    Agents: BoA, Credit Suisse, Lehman Brothers, Daiwa America, Key Banc, Mitsubishi, Mizuho, Scotia Capital, and SG America

7.70% Series A-5 Junior Subordinated Debentures due December 18, 2062, $1 billion face amount, issued December 11, 2007 (CUSIP No. 026874859) (preferred securities)
    Form 424B2 filed Dec. 13, 2007
    Joint Bookrunning Managers: Citigroup, Merrill Lynch, Morgan Stanley, UBS, and Wachovia; Joint Lead Managers: BoA, Bear Stearns, RBC, Lehman Brothers, and Wells Fargo; Additional Underwriters: HSBC, KeyBanc, Credit Suisse, Deutsche Bank, and Keefe Bruyette

**Offerings on May 12, 2008 Pursuant to May 12, 2008 Shelf Registration Statement and Prior Registration Statements for Equity Units and Common Stock**

72 million Equity units, consisting of preferred shares, Series B-1 due 2/15/2041, Series B-2 due 5/1/2041, and Series B-3 due 8/1/2041, Prospectus Supplement May 12, 2008 (CUSIP No.:

026874115) (public offering price of $75 per unit, $5.4 billion face amount) (6.4 million additional units sold through over-allotment option for total sale of $5.88 billion)

      Form 424B2 filed May 14, 2008

      <u>Joint Bookrunning Managers</u>: Citigroup and JP Morgan; <u>Joint Lead Managers</u>: BoA, Merrill Lynch, Morgan Stanley, UBS, Wachovia; <u>Co-Managers</u>: Dowling, Fox-Pitt, and Keefe Bruyette

171 million shares of Common Stock, par value $2.50, Prospectus Supplement May 12, 2008 (CUSIP No.: 026874107) (public offering price of $38 per share, $6,499,999,978 face amount) (25.6 million additional shares sold through over-allotment option for total sale of $7.47 billion)

      Form 424B2 filed May 14, 2008

      <u>Joint Bookrunning Managers</u>: Citigroup and JP Morgan; <u>Joint Lead Managers</u>: Credit Suisse, Deutsche Bank, Lehman Brothers, Merrill Lynch, Wachovia; <u>Co-Managers</u>: Dowling, Fox-Pitt, and Keefe Bruyette

      592.    In addition, during the Class Period, and pursuant to the 2003 and 2007 Shelf Registration Statements, AIG made offerings of notes designated as AIG-FP-1 through AIG-FP-57, the stated purpose of which was to provide working capital for AIGFP.  The AIG-FP offerings, which also form the basis for the Securities Act claims alleged herein, were as follows:

**Offerings Pursuant to June 12, 2003 Shelf Registration Statement, July 24, 2006 <u>Prospectus, and October 12, 2006 Prospectus Supplement</u>**

Medium-Term Notes, Series AIG-FP, Floating Rate Libor Notes due November 27, 2046, $20 million face amount, issued November 21, 2006, Pricing Supplement No. AIG-FP-1 dated November 14, 2006 (CUSIP No.: 02687 QBF4)

      Form 424B3 filed November 16, 2006

      <u>Agent</u>: Bear Stearns

Floating Rate Libor Notes due December 5, 2046, $51,551,000 total aggregate principal amount (CUSIP No. 02687QBG2)

- $28,050,000 issued Dec. 5, 2006, Pricing Supplement No. AIG-FP-2 dated Nov. 28, 2006

      Form 424B2 filed November 30, 2006

      <u>Agents</u>: Citigroup and BoA

- $23,501,000 issued Dec. 21, 2006 in reopening of offering, Pricing Supplement No. AIG-FP-3 dated December 15, 2006

      Form 424B2 filed December 19, 2006

      <u>Agent</u>: UBS

Medium-Term Notes, Series AIG-FP, US Dollar Zero Coupon Callable Notes due January 18, 2047, par amount $10 million, $135,329,000 principal amount, issued January 18, 2007, Pricing Supplement No. AIG-FP-4 dated January 12, 2007 (CUSIP No. 02687QBH0)

      Form 424B2 filed January 12, 2007

<u>Agent</u>: Merrill Lynch

CMS Curve Accrual Notes Due March 23, 2022, issued March 23, 2007, $15 million total
aggregate principal amount (CUSIP No. 02687 QBJ 6)
- $10 million principal amount, Pricing Supplement No. AIG-FP-5 dated March 6, 2007
    Form 424B2 filed March 8, 2007
    <u>Agent</u>: Morgan Stanley
- Additional $5 million, Pricing Supplement No. AIG-FP-5A dated June 4, 2007
    Form 424B3 filed June 5, 2007
    <u>Agent</u>: Morgan Stanley

Medium-Term Notes, Series AIG-FP, CMS Curve Accrual Notes Due April 18, 2022, $10
million principal amount, issued April 18, 2007, Pricing Supplement No. AIG-FP-6 dated March
30, 2007 (CUSIP No.: 02687QBM9)
    Form 424B2 filed March 30, 2007
    <u>Agent</u>: Morgan Stanley

Medium-Term Notes, Series AIG-FP, CMS Curve Accrual Notes due May 4, 2022, issue date
May 4, 2007, $49 million total aggregate principal amount (CUSIP No.:02687QBN7)
- $20 million principal amount, Pricing Supp. No. AIG-FP-7 dated April 19, 2007
    Form 424B2 filed April 23, 2007
    <u>Agent</u>: Morgan Stanley
- Additional $17 million, Pricing Supplement No. AIG-FP-7A dated April 20, 2007
    Form 424B2 filed April 24, 2007
    <u>Agent</u>: Morgan Stanley
- Additional $7 million, Pricing Supplement No. AIG-FP-7B dated April 23, 2007
    Form 424B2 filed April 25, 2007
    <u>Agent</u>: Morgan Stanley
- Additional $5 million, Pricing Supp. No. AIG-FP-7C dated April 24, 2007 (amended 6/4/07)
    Form 424B3 filed April 26, 2007
    <u>Agent</u>: Morgan Stanley

Medium-Term Notes, Series AIG-FP, CMS Spread Range Notes Due April 27, 2022, issued
April 27, 2007, $11,211,000 total aggregate principal amount (CUSIP No.: 02687QBP2)
- $10 million principal amount, Pricing Supplement No. AIG-FP-8 dated April 19, 2007
    Form 424B2 filed April 23, 2007
    <u>Agent</u>: Deutsche Bank
- Additional $1,211,000, Pricing Supplement No. AIG-FP-8A dated April 20, 2007
    Form 424B2 filed April 24, 2007
    <u>Agent</u>: Deutsche Bank

Medium-Term Notes, Series AIG-FP, CMS Spread Range Notes Due April 27, 2022, $6 million
principal amount, issued April 27, 2007, Pricing Supplement No. AIG-FP-9 dated April 19, 2007
(CUSIP No.: 02687QBQ0)
    Form 424B2 filed April 23, 2007
    <u>Agent</u>: Deutsche Bank

Medium-Term Notes, Series AIG-FP, Floating Rate CMT Notes Due May 8, 2008, $25 million principal amount, issued May 8, 2007, Pricing Supplement No. AIG-FP-10 dated April 26, 2007 (CUSIP No.: 02687QBR8)
>    424B2 filed May 1, 2007
>    <u>Agent</u>: Lehman Brothers

Medium-Term Notes, Series AIG-FP, 6.50% Callable Increasing, Principal Notes Due May 16, 2052, $25 million principal amount, issued May 16, 2007, Pricing Supplement No. AIG-FP-11 dated April 30, 2007 (CUSIP No.: 02687QBS6)
>    Form 424B2 filed May 2, 2007
>    <u>Agent</u>: Deutsche Bank

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due May 23, 2022, $10 million principal amount, issued May 23, 2007, Pricing Supplement No. AIG-FP-12 dated May 15, 2007 (CUSIP No. 02687QBT4)
>    Form 424B2 filed May 17, 2007
>    <u>Agent</u>: Lehman Brothers

Medium-Term Notes, Series AIG-FP, CMS Curve Accrual Notes Due May 18, 2022, $10 million principal amount, issued May 18, 2007, Pricing Supplement No. AIG-FP-13 dated May 15, 2007 (CUSIP No. 02687QBU1)
>    Form 424B2 filed May 17, 2007
>    <u>Agent</u>: Lehman Brothers

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due May 31, 2022, issued May 31, 2007, $7 million total aggregate principal amount (CUSIP No. 02687QBV9)
-   $5 million principal amount, Pricing Supplement No. AIG-FP-14 dated May 17, 2007
>    Form 424B2 filed May 21, 2007
>    <u>Agent</u>: Merrill Lynch
-   Additional $2 million Pricing Supplement No. AIG-FP-14A dated May 29, 2007
>    Form 424B2 filed May 29, 2007 (amended 5/31/2007)
>    <u>Agent</u>: Merrill Lynch

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due June 1, 2047, issued June 1, 2007, total $ $39,055,000 principal amount (CUSIP No. 02687QBX5)
-   $13.1 million principal amount, Pricing Supplement No. AIG-FP-15 dated May 21, 2007
>    Form 424B2 filed May 22, 202007
>    <u>Agent</u>: Deutsche Bank
-   Additional $25,955,000, Pricing Supplement No. AIG-FP-15A dated May 24, 2007
>    Form 424B2 filed May 25, 2007
>    <u>Agents</u>: Deutsche Bank, UBS, Morgan Stanley, Merrill Lynch, and JP Morgan

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due June 1, 2027, $6 million total aggregate principal amount, issued June 1, 2007 (CUSIP No. 02687QBY3)
-   $5 million principal amount, Pricing Supplement No. AIG-FP-16 dated May 21, 2007

Form 424B2 filed May 23, 2007
Agent: Nomura
- Additional $1 million, Pricing Supplement No. AIG-FP-16A dated May 31, 2007
Form 424B2 filed June 1, 2007
Agent: Nomura

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due June 20, 2017, $10 million principal amount, issued June 20, 2007, Pricing Supplement No. AIG-FP-17 dated May 30, 2007 (CUSIP No. 02687QBZ0)
Form 424B2 filed June 1, 2007
Agent: Deutsche Bank

Medium-Term Notes, Series AIG-FP, Nikkei 225® Index Market Index Target-Term Securities® Due January 5, 2011 (The "Mitts® Securities"), 1,210,000 Units, $10 Principal Amount Per Unit (no interest paid), $12.1 million principal amount, Pricing Supplement No. AIG-FP-18 dated June 28, 2007 (CUSIP 026874883) (preferred securities)
Form 424B2 filed July 2, 2007
Agent: Merrill Lynch

Medium-Term Notes, Series AIG-FP, CMS Inverse Floater Notes Due June 14, 2012, $50 million principal amount, issued June 14, 2007, Pricing Supplement No. AIG-FP-19 dated June 5, 2007 (CUSIP No. 02687QCA4)
Form 424B2 filed June 7, 2007
Agent: Lehman Brothers

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due June 29, 2017, $5 million principal amount, issued June 29, 2007, Pricing Supplement No. AIG-FP-20 dated June 7, 2007 (CUSIP No. 02687QCB2)
Form 424B2 filed June 13, 2007
Agent: BoA

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due June 27, 2022, $10 million total aggregate principal amount, issued June 27, 2007 (CUSIP No. 02687QCC0)
- $5 million principal amount, Pricing Supplement No. AIG-FP-21 dated June 12, 2007
Form 424B2 filed June 12, 2007
Agent: Lehman Brothers
- Additional $4 million, Pricing Supplement No. AIG-FP-21A dated June 14, 2007
Form 424B2 filed June 18, 2007
Agent: Lehman Brothers
- Additional $1 million, Pricing Supplement No. AIG-FP-21B dated June 26, 2007
Form 424B2 filed June 27, 2007
Agent: Lehman Brothers

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due July 20, 2027, $25,170,000 total principal amount, issued July 20, 2007 (CUSIP No. 02687QCD8)
- $5 million principal amount, Pricing Supplement No. AIG-FP-22 dated June 28, 2007

Form 424B2 filed July 2, 2007
- Additional $200,000 principal, Pricing Supp. No. AIG-FP-22A dated June 29, 2007
    Form 424B2 filed July 2, 2007
    <u>Agent</u>: Nomura
- Additional $1.5 million, Pricing Supp. No. AIG-FP-22B dated July 2, 2007
    Form 424B2 filed July 3, 2007
    <u>Agent</u>: Nomura
- Additional $500,000, Pricing Supp. No. AIG-FP-22C dated July 2, 2007 (amended 7/6/07)
    Form 424B2 filed July 3, 2007
    <u>Agent</u>: Nomura
- Additional $500,000, Pricing Supp. No. AIG-FP-22D dated July 3, 2007 (amended 7/6/07)
    Form 424B2 filed July 6, 2007
    <u>Agent</u>: Nomura
- Additional $500,000, Pricing Supp. No. AIG-FP-22E dated July 5, 2007 (amended 7/6/07)
    Form 424B2 filed July 6, 2007
    <u>Agent</u>: Nomura
- Additional $500,000, Pricing Supplement No. AIG-FP-22F dated July 5, 2007
    Form 424B2 filed July 9, 2007
    <u>Agent</u>: Nomura
- Additional $1 million, Pricing Supplement No. AIG-FP-22G dated July 6, 2007
    Form 424B2 filed July 9, 2007
    <u>Agent</u>: Nomura
- Additional $700,000, Pricing Supplement No. AIG-FP-22H dated July 10, 2007
    Form 424B2 filed July 10, 2007
    <u>Agent</u>: Nomura
Offered pursuant to July 13, 2007 prospectus and prospectus supplement:
- Additional $14,770,000, Pricing Supplement No. AIG-FP-22I dated July 10, 2007
    Form 424B2 filed July 19, 2007
    <u>Agent</u>: Nomura


Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due July 27, 2017, $5.7 million total principal amount, issued July 27, 2007 (CUSIP No. 02687QCE6)
- $ 5 million principal amount, Pricing Supplement No. AIG-FP-23 dated July 6, 2007
    Form 424B filed July 9, 2007
    <u>Agent</u>: BoA
Offered pursuant to July 13, 2007 prospectus and prospectus supplement:
- Additional $700,000, Pricing Supplement No. AIG-FP-23A dated July 20, 2007
    Form 424B2 filed July 23, 2007
    <u>Agent</u>: BoA


Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due August 1, 2022, $10 million principal amount, issued August 1, 2007, Pricing Supplement No. AIG-FP-24 dated July 10, 2007 (CUSIP No. 02687QCF3)
    Form 424B2 filed July 11, 2007
    <u>Agent</u>: Morgan Stanley

**Offerings Pursuant to June 22, 2007 Shelf Registration Statement, July 13, 2007 Prospectus, and July 13, 2007 Prospectus Supplement**

Medium-Term Notes, Series AIG-FP, US Dollar Zero Coupon Accreting Notes Due July 2, 2019, $20 million principal amount, issued July 24, 2007, Pricing Supplement No. AIG-FP-25 dated July 19, 2007 (CUSIP No.: 02687QCG1)
>       Form 424B2 filed July 23, 2007
>       Agent: Credit Suisse

Medium-Term Notes, Series AIG-FP, US Dollar Zero Coupon Accreting Notes Due June 1, 2018, $34,235,000 principal amount, issued June 24, 2007, Pricing Supplement No. AIG-FP-26 dated July 19, 2007 (CUSIP No.: 02687QCH9)
>       Form 424B2 filed July 23, 2007
>       Agent: Deutsche Bank

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due August 20, 2027, $20 million total principal amount, issued August 20, 2007 (CUSIP No. 02687QCJ5)
- $5 million principal amount, Pricing Supplement No. AIG-FP-27 dated July 20, 2007
>       Form 424B2 filed August 8, 2007
>       Agent: Nomura
- Additional $6.5 million, Pricing Supplement No. AIG-FP-27A dated August 6, 2007
>       Form 424B2 filed August 8, 2007
>       Agent: Nomura
- Additional $8 million, Pricing Supplement No. AIG-FP-27B dated August 16, 2007
>       Form 424B2 filed August 17, 2007
>       Agent: Nomura
- Additional $500,000, Pricing Supplement No. AIG-FP-27C dated August 17, 2007
>       Form 424B2 filed August 21, 2007
>       Agent: Nomura

Medium-Term Notes, Series AIG-FP, Floating Rate CMT Notes Due August 7, 2008, $40 million principal amount, issued August 7, 2007, Pricing Supplement No. AIG-FP-28 dated July 26, 2007 (CUSIP No.: 02687QCK2)
>       Form 424B2 filed July 27, 2007
>       Agent: Lehman Brothers

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due September 28, 2022, $4,317,000 total principal amount, issued Sept. 28, 2007, Pricing Supplement No. AIG-FP-29 dated Sept. 27, 2007 (CUSIP No. 02687QCL0)
>       Form 424B2 filed Sept. 28, 2007
>       Agent: BoA

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due September 28, 2022, $10 million total principal amount, issued Sept. 28, 2007, Pricing Supplement No. AIG-FP-30 dated Sept. 25, 2007 (CUSIP No. 02687QCM8)

Form 424B2 filed Sept. 27, 2007
<u>Agent</u>: Wachovia

Medium-Term Notes, Series AIG-FP, Principal Protected Notes Linked to a Basket of Latin American Currencies Due May 7, 2009, 7,500,000 Units US $10 Principal Amount Per Unit, $750 million principal amount, issued November 20, 2007, Pricing Supplement No. AIG-FP-31 dated Nov. 6, 2007 (CUSIP No. 026874875)
Form 424B2 filed November 8, 2007
<u>Agent</u>: Merrill Lynch

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due Oct. 10, 2017, $25 million total principal amount, issued Oct. 10, 2007, Pricing Supplement No. AIG-FP-32 dated Sept. 25, 2007 (CUSIP No. 02687QCN6)
Form 424B2 filed Sept. 27, 2007
<u>Agent</u>: Lehman Brothers

Medium-Term Notes, Series AIG-FP, CMS Range Notes Due Oct. 26, 2017, $1.557 million total principal amount, issued Oct. 26, 2007, Pricing Supplement No. AIG-FP-33 dated Oct. 25, 2007 (CUSIP No. 02687QCQ9)
Form 424B2 filed Oct. 11, 2007
<u>Agent</u>: BoA

Medium-Term Notes, Series AIG-FP, US Dollar Zero Coupon Accreting Notes Due October 15, 2037, $200 million principal amount, issued Oct. 15, 2007, Pricing Supplement No. AIG-FP-34 dated Oct. 2, 2007 (CUSIP No.: 02687QCR7)
Form 424B2 filed Oct. 3, 2007
<u>Agent</u>: Nomura

Medium-Term Notes, Series AIG-FP, Callable CMT Inverse Floating Rate Notes Due October 31, 2012, 6,323 Units, US $1,000 Principal Amount Per Unit, $6.323 million principal amount, Pricing Supplement No. AIG-FP-35 dated Oct. 29, 2007 (CUSIP No. 02687QCS5)
Form 424B2 filed Oct.31, 2007
<u>Agent</u>: Merrill Lynch

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due Oct. 15, 2022, $14.339 million total principal amount, issued Oct. 15, 2007 (CUSIP No 02687QCT3)
-  $10 million principal amount, Pricing Supplement No. AIG-FP-36 dated Oct. 2, 2007
Form 424B2 filed Oct. 4, 2007
<u>Agent</u>: Citigroup
-  Additional $4,339,000, Pricing Supplement No. AIG-FP-36A dated Oct. 10, 2007
Form 424B2 filed Oct. 11, 2007
<u>Agent</u>: Citigroup

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due Nov. 6, 2017, $10 million total principal amount, issued Nov. 6, 2007, Pricing Supplement No. AIG-FP-37 dated Oct. 5, 2007 (CUSIP No. 02687QCU0)

Form 424B2 filed Oct. 26, 2007
Agent: BoA

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due Oct. 24, 2022, $10 million total principal amount, issued Oct. 24, 2007, Pricing Supplement No. AIG-FP-38 dated Oct. 9, 2007 (CUSIP No. 02687QCV8)
Form 424B2 filed Oct. 11, 2007
Agent: Morgan Stanley

Medium-Term Notes, Series AIG-FP, US Dollar Zero Coupon Accreting Notes Due October 11, 2011, $ 16.405 million principal amount, issued Oct. 11, 2007, Pricing Supplement No. AIG-FP-39 dated Oct. 2, 2007 (CUSIP No.: 02687QCW6)
Form 424B2 filed Oct. 11, 2007
Agent: Lehman Brothers

Medium-Term Notes, Series AIG-FP, Municipal Index Linked Range Accrual Notes Due November 1, 2022, Principal Amount $25 million, issued November 1, 2007, Pricing Supplement No. AIG-FP-40 dated Oct. 30, 2007(CUSIP No. 02687QCX4)
Form 424B2 filed November 1, 2007
Agent: Deustche Bank Securities Inc.

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due Oct. 24, 2022, $5 million total principal amount, issued Oct. 24, 2007, Pricing Supplement No. AIG-FP-41 dated Oct. 19, 2007 (CUSIP No. 02687QCY2)
Form 424B2 filed Oct. 11, 2007
Agent: Merrill Lynch

Medium-Term Notes, Series AIG-FP, Step Up Callable Notes Due Nov. 16, 2022, $15 million total principal amount, issued Nov. 16, 2007, Pricing Supplement No. AIG-FP-42 dated Oct. 22, 2007 (CUSIP No. 02687QCZ9)
Form 424B2 filed Oct. 23, 2007
Agent: Morgan Stanley

Medium-Term Notes, Series AIG-FP, Principal Protected Currency Linked Notes Due March 8, 2010, 3,236,000 Units US $10 Principal Amount Per Unit, $323.6 million principal amount, issued November 29, 2007, Pricing Supplement No. AIG-FP-43 dated Nov. 6, 2007 (CUSIP No. 026874867)
Form 424B2 filed December 5, 2007
Agent: Merrill Lynch

Medium-Term Notes, Series AIG-FP, Municipal Index Linked Range Accrual Notes Due November 20, 2017, Principal Amount $10 million, issued November 20, 2007, Pricing Supplement No. AIG-FP-44 dated Nov. 1, 2007 (CUSIP No. 02687QDB1)
Form 424B2 filed November 5, 2007
Agent: Lehman Brothers

251

Medium-Term Notes, Series AIG-FP, Callable CMS Curve Notes Due December 14, 2022, Principal Amount $15 million, issued December 11, 2007, Pricing Supplement No. AIG-FP-45 (CUSPI No. 02687QCP1)
> Form 424B2 filed December 12, 2007
> <u>Agent</u>: Citigroup

Medium-Term Notes, Series AIG-FP Floating Rate LIBOR Notes Due November 27, 2047, $67.471 million total principal amount (CUSIP No. 02687QDC9)
- $35,433,000 Principal Amount, Pricing Supplement No. AIG-FP-46 dated Nov. 20, 2007
> Form 424B2 filed November 21, 2007
> <u>Agents</u>: UBS, Morgan Stanley Inc., JP Morgan
- Additional $32,038,000, Pricing Supplement No. AIG-FP-46A dated Dec. 7, 2007
> Form 424B2 filed Dec. 11, 2007
> <u>Agents</u>: UBS and Deutsche Bank

Medium-Term Notes, Series AIG-FP, Principal Protected WTI Crude Oil Linked Notes Due January 8, 2013, issued December 31, 2007, $2.5 million principal amount, Pricing Supplement No. AIG-FP-47 dated December 31, 2007 (CUSIP No. 02687QDD7)
> 424B2 filed January 2, 2008
> <u>Agent</u>: Wachovia

Medium-Term Notes, Series AIG-FP, Principal-Protected Notes Linked to the USD/EUR Exchange Rate Due July 8, 2009, $4 million principal amount, issued January 2, 2008, Pricing Supplement No. AIG-FP-48 dated January 2, 2008 (CUSIP No. 02687QDE5)
> 424B2 filed January 4, 2008
> <u>Agent</u>: Wachovia

Medium-Term Notes, Series AIG-FP, Municipal Index Linked Range Accrual Notes Due January 8, 2009, $5 million principal amount, issued December 12, 2007, Pricing Supplement No. AIG-FP-49 (CUSIP No. 02687QDF2)
> Form 424B2 filed December 14, 2007
> <u>Agent</u>: Lehman Brothers

Medium-Term Notes, Series AIG-FP, Principal Protected Notes Linked to the Performance of a Basket of Asian Currencies Due February 4, 2009, 13 million units, US$10 principal amount per unit, $1.3 billion principal amount, issued Jan. 18, 2008 and amended Feb. 13, 2008, Pricing Supplement No. AIG-FP-50 (CUSIP No. 026874842)
> Form 424B2 filed January 22, 2008
> <u>Agent</u>: Merrill Lynch

Medium-Term Notes, Series AIG-FP, Callable CMS Curve Notes Due December 31, 2027, $5 million principal amount, issued December 14, 2007, Pricing Supplement No. AIG-FP-51 (CUSIP No. 02687QDH8)
> Form 424B2 filed December 18, 2007
> <u>Agent</u>: Merrill Lynch

Medium-Term Notes, Series AIG-FP, CMS Spread Range Notes Due February 8, 2023, $1.625 million total aggregate principal amount, issued January 5, 2008 (CUSIP No. 02687QDJ4)
- $1,125,000 Principal Amount, Pricing Supplement No. AIG-FP-52 dated January 25, 2008
     424B2filed January 28, 2008
     Agent: Wachovia
- Additional $500,000, Pricing Supplement No. AIG-FP-52A dated February 6, 2008
     424B2 filed Feb. 7, 2008
     Agent: Wachovia

Medium-Term Notes, Series AIG-FP, LIBOR Range Notes Due January 9, 2023, $2 million principal amount, issued December 18, 2007, Pricing Supplement No. AIG-FP-53 (CUSIP No. 02687QDK1)
     Form 424B2 filed December 19, 2007
     Agent: Incapital

Medium-Term Notes, Series AIG-FP, Principal Protected Notes Linked to the Performance of a Basket of Currencies Due Feb. 4, 2010, $5.5 million principal amount, issued January 29, 2008, Pricing Supplement No. AIG-FP-54 dated January 29, 2008 (CUSIP No. 02687QDL9)
     424B2 filed January 31, 2008
     Agent: Wachovia

Medium-Term Notes, Series AIG-FP, CMS Callable Leveraged CMS Spread Notes Due Feb. 22, 2023, $6 million total principal amount, issued February 5, 2008 (CUSIP No. 02687QDM7)
- $5 million principal amount, Pricing Supplement No. AIG-FP-55 dated February 5, 2008
     Form 424B2 filed Feb. 5, 2008
     Agent: Nomura
- Additional $1,000,000, Pricing Supplement No. AIG-FP-55A dated March 3, 2008
     Form 424B2 filed March 4, 2008
     Agent: Nomura

Medium-Term Notes, Series AIG-FP, Principal Protected Notes Linked to the Performance of a Basket of Asian Currencies Due June 8, 2009, US $10 Principal Amount Per Unit, issued Feb. 8, 2008, $48.5 million total principal amount, Pricing Supplement No. AIG-FP-56 dated February 8, 2008 (CUSIP No. 026874834)
     Form 424B2 filed Feb. 8, 2008
     Agent: Merrill Lynch

Medium-Term Notes, Series AIG-FP, CMS Curve Notes Due Feb. 28, 2028, $8.5 million total principal amount, issued February 4, 2008 (CUSIP No.: 02687QDN5)
- $5 million principal amount, Pricing Supplement No. AIG-FP-57 dated February 4, 2008
     Form 424B2 filed February 5, 2008
     Agent: Nomura
- Additional $3.5 million, Pricing Supplement No. AIG-FP-57A dated March 3, 2008
     Form 424B2 filed March 5, 2008
     Agent: Nomura

593.    For purposes of liability under the Securities Act, the "effective date" of each of the Registration Statements is the date of the relevant Offering.

594.    The Registration Statements each expressly incorporate by reference AIG Forms 10-K, 10-Q, 8-K and Proxy Statements that were filed with the SEC prior to the date of each of the Offerings conducted pursuant to the Registration Statements.  Accordingly, on the date of each of the Offerings set forth above, the Registration Statements incorporated by reference Forms 10-K, 10-Q, and 8-K which contained untrue statements of material fact and material omissions.  Specifically, the SEC filings incorporated by reference, including their financial statements and the footnotes thereto, contained untrue statements of material fact and material omissions in the following respects, among others: (a) they failed to disclose, until the Second Quarter 2007 10-Q, the decision to stop writing CDS contracts on multi-sector CDOs, and even thereafter, failed to disclose the reasons for that decision, as set forth in ¶ 112; (b) they failed to disclose the decision made by AIG Investments in late 2005 to change the mix of investments for the securities lending program to contain 75 percent in RMBS and other ABS, as set forth in ¶ 245, and failed to disclose (and materially misrepresented), until the 2007 10-K, the concentration of investments in RMBS and other ABS that was made through the securities lending program; (c) they failed to disclose that the CDS contracts frequently provided that AIGFP's CDS counterparties were the presumptive prevailing party in setting the value of the multi-sector CDOs underlying AIGFP's CDS contracts, as set forth in ¶ 122; (d) they misrepresented, until the Second Quarter 2008 10-Q, the actual cash collateral payment requirement for the securities lending program, as set forth in ¶ 209; and (e) they failed, until the 2007 10-K, to adequately set forth AIG's concentration of credit risk in the U.S. residential housing and mortgage market, including the subprime market, as set forth in ¶ 434.

595.   The relevant shelf registration statement, prospectus, prospectus supplement and/or pricing supplement (including any documents incorporated by reference) as to each of the Offerings are referred to collectively as the "Offering Materials."  The Offering Materials further incorporated by reference documents, including AIG's financial statements, and Form 10-Q, 10-K and 8-K filings that were filed with the SEC prior to the date of each of the Offerings, which referenced documents contained untrue statements of material fact and material omissions. Accordingly, as to each Offering, the Offering Materials contained untrue statements of material fact and material omissions in violation of the Securities Act.

596.   The incorporated documents included the following:

For Offerings dated October 13, 2006:  2005 Form 10-K; 1Q06 and 2Q06 Forms 10-Q; and accompanying Forms 8-K

For Offerings between November 10, 2006 and February 28, 2007: 2005 Form 10-K; 1Q06, 2Q06 and 3Q06 Forms 10-Q; and accompanying Forms 8-K

For Offerings between March 1, 2007 and May 9, 2007: 2005 Form 10-K; 1Q06, 2Q06 and 3Q06 Forms 10-Q; and accompanying Forms 8-K

For Offerings between May 10, 2007 and August 7, 2007: 2006 Form 10-K; 1Q07 Form 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between August 8, 2007 and November 8, 2007: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07; Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between November 9, 2007 and December 6, 2007: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between December 7, 2007 and February 10, 2008: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; accompanying Forms 8-K; proxy statement filed April 6, 2007;

For Offerings between February 11, 2008 and February 27, 2008: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K;

For Offerings between February 28, 2008 and May 8, 2008: 2006 and 2007 Forms 10-K; 1Q07 Form 10-Q; proxy statements dated April 6, 2007 and April 4, 2008; and accompanying Forms 8-K

For Offerings dated May 12, 2008: 2006 and 2007 Forms 10-K; 1Q08 Form 10-Q; proxy statements dated April 6, 2007 and April 8, 2008; and accompanying Form 8-K.

597.    The Offering Materials further failed to disclose the material fact that many of the underwriters of securities and notes issued by AIG during the Class Period were also counterparties of AIG with respect to its CDS portfolio and securities lending program, and therefore, that significant portions of the sums raised through the Offerings by the Underwriters would or could be used to post collateral for the benefit of the Underwriters, or to make payments to the Underwriters, including but not limited to the following: Société Générale, Deutsche Bank, Goldman Sachs, Calyon, Barclays, UBS, Merrill Lynch, BMO, Bank of America, BNP Paribas, HSBC and Citigroup.

598.    PwC audited AIG's financial statements included in the Company's 2005, 2006, and 2007 10-Ks.

599.    AIG's 2005 10-K reported the Company's financial results for the years ended December 31, 2005 and 2004.  PwC audited AIG's financial statements included in the 2005 10-K and issued its unqualified auditor's report thereon on March 16, 2006 (the "PwC 2005 Audit Report").  In the PwC 2005 Audit Report, PwC stated, in pertinent part, that it conducted its audits "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that, in its opinion:

> [T]he consolidated financial statements … present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedules

… present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

600.   The PwC 2005 Audit Report was incorporated by reference into AIG's July 24, 2006 Prospectus and October 12, 2006 Prospectus Supplement, pursuant to which most of the Offerings from October 2006 through August 2007 were conducted, with the consent of PwC. Specifically, under the caption "Experts" in the July 24, 2006 Prospectus, AIG stated that the financial statements set forth in the 2005 Form 10-K were incorporated in that prospectus "in reliance on" PwC's unqualified auditor's report.

601.   AIG's 2006 10-K reported the Company's financial results for the year ended December 31, 2006.  PwC audited AIG's financial statements included in the 2006 10-K and issued its unqualified auditor's report thereon on March 1, 2007 (the "PwC 2006 Audit Report"). In the PwC 2006 Audit Report, PwC stated, in pertinent part, that it conducted its audits "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," and that, in its opinion:

> [T]he consolidated financial statements … present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedules … present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

602.   The PwC 2006 Audit Report was expressly incorporated into the 2007 Registration Statement with the consent of PwC.  Specifically, under the caption "Experts" in the 2007 Registration Statement, AIG stated that the financial statements set forth in the 2006 10-K were "incorporated in reliance on" PwC's unqualified auditor's report.  Further, PwC's "Consent

of Independent Registered Public Accounting Firm," dated June 22, 2007, was included as Exhibit 23.1 to the 2007 Registration Statement.

603.    PwC's 2006 Audit Report was also incorporated by reference into AIG's July 13, 2007 Prospectus and Prospectus Supplement, pursuant to which most of the Offerings from July 2007 through February 2008 were conducted, with the consent of PwC.  Specifically, the July 13, 2007 Prospectus stated that the financial statements set forth in the 2006 10-K were incorporated in that prospectus "in reliance on" PwC's unqualified auditor's report.

604.    AIG's 2007 10-K reported the Company's financial results for the year ended December 31, 2007.  PwC audited AIG's financial statements included in the 2007 10-K and issued its unqualified auditor's report thereon on February 28, 2008 (the "PwC 2007 Audit Report").  In the PwC 2007 Audit Report, PwC stated, in pertinent part, that it conducted its audits "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that, in its opinion:

> [T]he consolidated financial statements … present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedules … present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

605.    The PwC 2007 Audit Report was expressly incorporated into the 2008 Registration Statement with the consent of PwC.  Specifically, under the caption "Explanatory Note And Incorporation By Reference" in the 2008 Registration Statement, AIG stated that all amendments, supplements and exhibits to the 2007 Registration Statement, which included the 2007 10-K and the 2007 Audit Report, were incorporated by reference into the 2008 Registration

Statement. Further, PwC's "Consent of Independent Registered Public Accounting Firm," dated May 12, 2008, was included as Exhibit 23.1 to the 2008 Registration Statement.

606. The financial statements, including the footnotes thereto, included and/or incorporated by reference within the Offering Materials were materially false and misleading, and thus, the Offering Documents were materially false and misleading. Among other reasons, those financial statements, as issued to the SEC and the investing public, were materially false and misleading because they were in violation of GAAP. As a result, AIG's financial statements for the years ending December 31, 2005, 2006, 2007, including the footnotes thereto, all of which are incorporated by reference into the Offering Documents, are "presumed to be misleading or inaccurate." Regulation S-X, SEC Rule 4-01(a), 17 C.F.R. § 210.4-01(a)(1).

## THIRD CLAIM FOR RELIEF

### For Violations of Section 11 of the Securities Act against Defendants AIG, the Signing Executive Defendants and the Director Defendants

607. Plaintiffs repeat and reallege the allegations above in ¶¶ 577 - 606 as they pertain to the Securities Act. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim does not sound in fraud, and Plaintiffs do not incorporate herein any allegations of fraud in connection with this count.

608. This claim is brought pursuant to Section 11 of the Securities Act, on behalf of Lead Plaintiff, other named Plaintiffs, and other members of the Class against AIG, the Director Defendants, and defendants Sullivan, Bensinger and Herzog (the "Signing Executive Defendants").

609. This claim is asserted on behalf of all Class members who purchased or acquired AIG securities in or traceable to the equity and debt offerings identified in ¶¶ 591 - 592 herein.

610.    The first claim brought under Section 11 with respect to the Offerings was filed on October 9, 2008, which was within three years of the Offerings and one year of discovery of the claim.

611.    The Registration Statements at issue herein contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading as set forth above.

612.    The 2003 Registration Statement was signed by, among others, defendants Cohen, Feldstein, Futter, Holbrooke, Sullivan, Tse, and Zarb.

613.    The 2007 and 2008 Registration Statements were signed by defendants Sullivan, Bensinger, Herzog, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Miles, Offit, Orr, Rometty, Sutton, Tse, Willumstad, and Zarb.   Defendant Bollenbach also signed the 2008 Registration Statement.

614.    Defendant AIG is the issuer of the securities pursuant or traceable to the Registration Statements.   As issuer of the securities, AIG is strictly liable to Plaintiffs and to members of the class who acquired AIG securities pursuant or traceable to the Registration Statements for the materially untrue statements and omissions and alleged herein.

615.    The Signing Executive Defendants and the Director Defendants signed the Registration Statements for the Offerings.   These Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Registration Statements were true, did not omit any material fact, and were not materially misleading.   As such, they are liable to Plaintiffs and to members of the Class who acquired AIG securities pursuant or traceable to the Registration Statements for the materially untrue statements and omissions and alleged herein.

616.     Plaintiffs and other members of the Class purchased AIG equity and debt securities in or traceable to the Offerings.  The Offerings were conducted pursuant to the 2003, 2007 and 2008 Registration Statements, and amendments and supplements thereto.

617.     The Registration Statements, at the time they became effective, contained untrue statements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements.

618.     Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Registration Statements.

619.     Plaintiffs have sustained damages as a result of the misstatements and omissions of the Registration Statements, for which they are entitled to compensation.

620.     Plaintiffs brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

### FOURTH CLAIM FOR RELIEF

#### For Violations of Section 11 of the Securities Act
#### against the Underwriter Defendants

621.     Plaintiffs repeat and reallege the allegations above in ¶¶ 577 - 606 as they pertain to the Securities Act.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim does not sound in fraud, and Plaintiffs do not incorporate herein any allegations of fraud in connection with this count.

622.     This claim is brought pursuant to Section 11 of the Securities Act, on behalf of Lead Plaintiff, other named Plaintiffs, and other members of the Class against the Underwriter Defendants.

623. This claim is asserted on behalf of all Class members who purchased or acquired AIG securities in or traceable to the equity and debt offerings identified in ¶¶ 591 - 592 herein.

624. The Underwriter Defendants served as the underwriters of the Offerings and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of equity and debt securities to the investing public pursuant to the registration statements.

625. Due to their role as underwriters of the equity and debt securities in the Offerings, the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statements and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein. The Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Registration Statements were true, did not omit any material fact, and were not materially misleading.

626. The allegations contained herein relating to AIG's materially untrue statements are replete with examples of the failure of the Underwriter Defendants to perform a reasonable investigation and due diligence in connection with the Offerings.

627. As alleged herein, AIG failed to disclose adequately its true exposure to losses and/or collateral calls resulting from AIGFP's CDS contracts and AIG's securities lending program, and further failed to identify material weaknesses and other deficiencies concerning its valuation process for the CDS contracts. The Underwriter Defendants were or should have been aware of these problems and, given the significance of the Company's exposure to losses and/or collateral calls in the CDS portfolio and securities lending program, in the course of their due

diligence, the Underwriter Defendants should have required management to record and reflect such exposure sufficiently in AIG's financial statements and other disclosures.

628.     The Underwriter Defendants further failed to perform a reasonable investigation in connection with their duty to understand fully AIG's and AIGFP's policies with respect to the proper valuation of the CDS portfolio.  Despite this requirement, the Underwriter Defendants failed to investigate that AIG was, throughout the Class Period, allowing a very small group of persons within AIGFP to provide valuation figures for the CDS portfolio, including the outright exclusion of other personnel – such as Mr. St. Denis and others – from the process, and that the CDS contracts frequently provided that the counterparties were designated as the valuation agents.

629.     Had the Underwriter Defendants performed due diligence with respect to AIG's true exposure in its CDS and securities lending portfolios, they would have uncovered the untrue statements in the Offering Documents and SEC filings incorporated in the Offering Documents.

630.     In performing their due diligence procedures and investigations, the Underwriter Defendants further ignored risk factors that were present and ultimately led to AIG's downfall. Such "red flags," which the Underwriter Defendants had a duty to investigate, but instead ignored, included the following:

> ▪   A significant portion of management's compensation was represented by bonuses, stock options, and other incentives, including but not limited to (a) hundreds of millions of dollars paid to AIGFP executives based on the "bonus pool" described in ¶¶ 508 - 510, above, and (b) the compensation paid to AIG executives based on the Company's reported revenue and income;
>
> ▪   The practice by management of committing to analysts, creditors, and other third parties to achieve the "three 15s" that AIG's management demanded – 15% revenue growth, 15% profit growth, and 15% return on equity, as chronicled in *Fallen Giant*;
>
> ▪   Exclusion of others outside a select group of AIGFP executives from the

process of determining valuations for the CDS portfolio;

- Inadequate monitoring of significant controls;

- Management's failure to correct known reportable conditions on a timely basis; and

- Significant pressure to obtain additional capital, including the need for funds for operations of AIG and AIGFP, as well as collateral calls, as seen, among other things, through the massive debt financings in which the Underwriter Defendants themselves played a critical role, including those that were devoted in large part, *i.e.*, AIG-FP 1 through AIG-FP 57, to providing additional funds for AIGFP's operations.

631.    Further, each of the Underwriter Defendants knew of, or but for their negligence would have recognized, the conflicted position that many of the Underwriters had as a result of their own dealings with AIG and AIGFP including, but not limited to, their own participation as counterparties on CDS contracts and/or their own participation in AIG's securities lending program.   Thus, for example, during the period from September 16 to December 31, 2008, as described above, many of the Underwriter Defendants that were significant counterparties to AIG received hundreds of millions and/or billions of dollars in counterparty payments, and received the benefit of hundreds of millions and/or billions of dollars being posted as collateral, after the Government bailout.   Indeed, even before the Government bailout, as of July 31, 2008, AIGFP had posted collateral (or had received collateral, where offsetting exposures on other transactions resulted in the counterparty posting to AIGFP) based on CDS valuations and exposures in an aggregate net amount of $16.5 billion.   Thus, effectively, at least certain of the Underwriter Defendants were raising money for AIG and AIGFP through public offerings, and funds from those same offerings were then provided as payments to or collateral for the Underwriters as counterparties on CDS contracts and/or AIG's securities lending program.

632.    Given the conflicts, each Underwriter Defendant that had CDS contracts with AIGFP and/or participated in AIG's securities lending program had a duty to ensure that the other Underwriter Defendants conducted their own due diligence and investigations separate and apart from these conflicted Underwriter Defendants, and had a duty to satisfy themselves that the Registration Statements for the Offerings did not contain untrue statements or fail to include material information.   Each also had a duty to disclose to potential investors their own participation in AIGFP's CDS contracts and/or AIG's securities lending program.

633.    Further, the other Underwriter Defendants were or should have been aware of the many deals that certain of the Underwriter Defendants had with AIG.   For example, based on Plaintiffs' investigation, in or about 2007, AIGFP and Goldman were in the process of creating a Credit Derivative Products Company ("CDPC").   As a result, each of the other Underwriter Defendants had a duty to conduct its own due diligence and investigation, separate and apart from the conflicted Underwriter Defendants, and to view whatever due diligence the conflicted Underwriter Defendants conducted with the appropriate degree of skepticism.   And each of the Underwriter Defendants had a duty to disclose the conflicted positions they had with AIG and/or AIGFP to the other Underwriter Defendants, and to purchasers of the Offerings.

634.    Plaintiffs and other members of the Class purchased AIG equity and debt securities in or traceable to the Offerings.   The Offerings were conducted pursuant to the 2003, 2007 and 2008 Registration Statements, and amendments and supplements thereto.

635.    The Registration Statements, at the time they became effective, contained untrue statements and omitted facts necessary to make the facts stated therein not misleading.   The facts misstated and omitted would have been material to a reasonable person reviewing the registration statements.

636.    Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Registration Statements.

637.    Plaintiffs have sustained damages as a result of the misstatements and omissions of the Registration Statements, for which they are entitled to compensation.

638.    Plaintiffs brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

### FIFTH CLAIM FOR RELIEF

#### For Violations of Section 11 of the Securities Act
#### against Defendant PwC

639.    Plaintiffs repeat and reallege the allegations above in ¶¶ 577 - 606 as they pertain to the Securities Act.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim does not sound in fraud, and Plaintiffs do not incorporate herein any allegations of fraud in connection with this count.

640.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs, other named Plaintiffs and other members of the Class against Defendant PwC.

641.    This claim is asserted on behalf of all Class members who purchased or acquired AIG securities in or traceable to the equity and debt offerings identified in ¶¶ 591 - 592 herein.

642.    The Registration Statements at issue herein contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading as set forth above.

643.    Defendant PwC issued audit opinions for AIG's 2005, 2006 and 2007 10-Ks, which were incorporated by reference in the Registration Statements and Offering Materials with

PwC's consent.  As such, PwC expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to the Registrations Statements at issue herein.

**Summary of SEC Audit Requirements and PwC Audit Opinions**

644.    SEC Regulations require that annual financial statements of public companies be audited by an accredited, independent, external accounting firm. Throughout the relevant timeframe, PwC was the Company's external auditor.  As such, PwC had or, at the least, should have had access to documents and analyses pertaining to AIG's CDS, investment and securities lending portfolios and the valuation thereof, reports on internal control, and AIG's management, including the Audit Committee and the Board of Directors.   The combination of this information and access, coupled with PwC's responsibility – as an external auditor registered with the Public Company Accounting Oversight Board (the "PCAOB") – to perform an integrated audit of the Company's financial statements and internal controls in compliance with Generally Accepted Auditing Standards ("GAAS") and the PCAOB's adoption and expansion of those standards, put PwC in a unique position to identify, and to cause the Company to remedy, the omission of both (a) the recognition of incurred losses from required fair value adjustments and (b) required disclosures in the Company's financial statements and SEC filings discussed herein.

645.    Yet, despite the significance of those omissions and the Company's violations of both GAAP and SEC rules, including the specific failures of the Company to disclose the severity of its exposures to credit risk and/or to make adjustments to the carrying value of its investments and other assets or disclose the reasonable possibility that such assets had been impaired in connection with such risks, PwC concluded, for each of years ended December 31, 2005, 2006, and 2007, that the Company's financial statements:

> … present[ed] fairly, in all material respects, the financial position of American International Group and its subsidiaries (AIG) at December 31, XXXX and

XXXX, and the results of their operations and their cash flows for each of the three years in the period ended December 31, XXXX in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related financial statements.  (2005, 2006, 2007 Forms 10-K)

646.    In doing so, PwC failed to satisfy its obligations as an external auditor under GAAS and the standards of the PCAOB in the conduct of its audits of the relevant financial statements, especially in light of internal control deficiencies identified by management and concurred upon by PwC in its audit opinions for those financial statements.

**GAAS and its Applicability to PwC's Audits**

647.    GAAS, as adopted and supplemented by PCAOB standards, represent the guidelines by which an audit must be planned and performed.

648.    PwC was required to plan and conduct its audits, and report on the financial statements and footnotes of AIG, in accordance with GAAS, as well as PCAOB standards.  In order to satisfy the obligations of an external auditor under GAAS and the PCAOB standards, an accountant is required to exercise what is referred to as "due professional care" in the conduct of his/her audits and to exercise "professional skepticism."

649.    In light of the significance of the risk of loss retained by the Company, PwC failed to exercise the required level of due professional care when performing its audits of the relevant annual financial statements, by failing to ensure that the Company (a) made adequate disclosures regarding the internal control weaknesses and risks of loss to which it was subject in connection with its portfolios, in particular, the multi-sector super senior credit default swap portfolio, the CDO and other ABS investment portfolio, and the portfolio of investment assets relating to the securities lending business (as was required by GAAP and SEC rules), and (b)

disclosed the reasonable possibility of loss that it was not able to quantify.  This failure is particularly apparent given the types of internal control weaknesses that the Company clearly had, but neither the Company nor PwC identified in the 2005 and 2006 Forms 10-K.  In fact, the Company did not identify these material internal control weaknesses until forced to confront them as a result of, among other things, the St. Denis resignation, the discovery of improper valuation adjustments utilized by AIGFP in connection with the December 5 investor meeting, and collateral calls from AIGFP's counterparties on its CDS contracts that evidenced significantly larger impairments than AIGFP had been willing to acknowledge.

**Internal Control Deficiencies at the Company and PwC's Knowledge Thereof**

650.    As discussed previously, management of public companies are required to report, at least annually, on the effectiveness of their companies' systems of internal controls.  Section 404 of the Sarbanes Oxley Act requires a company's independent auditor, registered with the PCAOB, to attest to and opine upon management's disclosures regarding the effectiveness of the internal control processes through which transactions were originated for eventual inclusion in the financial statements, as well as to ensure that management had sufficiently tested and appropriately attested to the operational effectiveness of the company's internal controls.

651.    Because a company's internal controls cannot be considered effective if one or more material weaknesses exist, to form a basis for expressing an opinion, the auditor must plan and perform the audit to obtain competent evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment of its internal controls. (PCAOB Auditing Standard No. ("AS") 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statement* ("AS 2").4).  The PCAOB has concluded, however, that a material weakness in

internal control over financial reporting may exist even when the auditor concludes that the financial statements are not materially misstated.  (AS 2.193; AS 5, *An Audit of Internal Control Over Financial Reporting that is Integrated with An Audit of Financial Statements* ("AS 5").3)

652.    A material weakness is defined by GAAS as:

…a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.  (AU 325.15)

653.    Similarly, AS 2 defined a material weakness as a significant (internal control) deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

654.    Beginning in 2004, PwC was subject to AS 2, the standard introduced and adopted by the PCAOB describing the auditor's obligation not only to audit the subject company's financial statements and footnotes, but to opine on the assessment of internal controls by management required by the Sarbanes Oxley Act of 2002.

655.    In connection with its audits of the Company's financial statements for the years ended December 31, 2005 and December 31, 2006, PwC became aware of, concurred with, and noted in its audit opinions, various internal control deficiencies that existed at the Company and had been identified by management.  PwC's audit opinion, included in the 2005 Form 10-K, provided the following, in fact, in relevant part:

…[W]e have audited management's assessment, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A, that AIG did not maintain effective internal control over financial reporting as of December 31, 2005 because of the effect of the material weaknesses relating to (1) controls over certain balance sheet reconciliations, (2) **controls over the**

**accounting for certain derivative transactions**, and (3) controls over income tax accounting, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). (2005 Form 10-K)

656.     Regarding the second of these material weaknesses, PwC's audit opinion further stated, in relevant part:

> *Controls over the accounting for certain derivative transactions*: AIG did not maintain effective controls over the evaluation and documentation of whether certain derivative transactions qualified under GAAP for hedge accounting. **As a result, net investment income, realized capital gains (losses), other revenues, accumulated other comprehensive income (loss) and other related balance sheet accounts were misstated under GAAP**. …
>
> In our opinion, management's assessment that AIG did not maintain effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO.  Also, in our opinion, because of the effects of the material weaknesses described above on the achievement of the objectives of the control criteria, AIG has not maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. (2005 Form 10-K).

657.     The Company's 2005 Form 10-K disclosed that "[t]hroughout 2005 and continuing in 2006, AIG [had] been actively engaged in the implementation of remediation efforts to address the five material weaknesses in existence at December 31, 2004 and disclosed in its 2004 Form 10-K. …  As a result of its assessment of the effectiveness of internal control over financial reporting, AIG management determined that as of December 31, 2005, …three [of the five] material weaknesses, relating to the controls over certain balance sheet reconciliations, **controls over the accounting for certain derivative transactions** and controls over income tax accounting, **had not been remediated**." (2005 Form 10-K).

658.     The Company's 2005 Form 10-K noted further that certain related control deficiencies had been identified in 2004 and that the items surrounding derivative instruments

identified and addressed here for 2005 were found in the process of management's attempts to remediate the then-existing internal control deficiencies.

659.   Because PwC audited AIG during the years covered by the 2005 restatement and having found material weaknesses in internal controls that resulted in AIG having materially misstated its financial statements, PwC was aware of a pattern of pervasive and material internal control deficiencies – deemed to be material weaknesses – that should have significantly impacted its audits for the relevant timeframe.

660.   This included PwC's obligations in connection with, and in its audit performed on, AIG's financial statements as of and for the year ended December 31, 2006.  For that audit, PwC had the same responsibilities, under GAAS and AS 2, to opine on management's assessment of the effectiveness of internal control at the Company.  In connection with that assessment, however, management noted only one material weakness, and it did not relate to the measurement, valuation, or accounting for investment or hedge-related activities (including derivatives).  Instead, the sole remaining material weakness identified by management, and referenced and concurred upon by PwC in its audit opinion for 2006, related to controls over income tax accounting.

661.   Despite AIG's disclosures of a material weakness in maintaining effective controls over income tax reporting, PwC did not conclude that AIG's 2006 financial statements had been materially misstated as a result of this material weakness, nor did it identify other internal control deficiencies separate from management that were addressed in the audit opinion. It is apparent, therefore, that none of what the Company identified in internal control deficiencies, and communicated in its public filings as material weaknesses, related in any way to the deficiencies surrounding the accounting for derivatives identified in 2004 or 2005 or,

similarly, to any of the issues that ultimately rendered the Company's financial statements in violation of GAAP during the relevant timeframe – as discussed extensively herein – despite the fact that AIG had not adequately remedied these issues. PwC's conclusions in that regard, however, were erroneous and were the result of its failure to use due care and professional skepticism in the conduct of its audits.

**PwC's Obligations under GAAS to Understand and Assess Internal Controls**

662. For purposes of planning and performing its audits of AIG for 2005, 2006 and 2007, PwC had a professional obligation, in accordance with GAAS and PCAOB standards and, specifically, AU 311, *Planning and Supervision* ("AU 311"), to understand AIG's business in the proper context. Included in such an understanding should have been the following procedures, among others:

- performing specific audit procedures to obtain an understanding of AIG and its business environment, including internal controls, and to be able to assess the risks of material misstatement in the financial statements and related footnotes,

- considering matters affecting the industry in which AIG operated, such as economic conditions, government regulations, accounting practices common to the industry and financial trends and ratios pertaining to the Company, including obtaining an understanding of risks inherent to AIG's effective guarantee of the credit risk held by counterparties to its CDS super senior CDS and the risks inherent in the Company's *own* investment in CDOs,

- evaluating the reasonableness of estimates, such as the valuation of asset accounts, contra-asset accounts, and contracts, and/or

- considering PwC's experience with AIG and its industry, inquiring with AIG personnel, and reviewing of AICPA Accounting and Auditing Guides.

663. Further, in addition to the Sarbanes Oxley Act of 2002 (addressed in the standards adopted and promulgated by the PCAOB, including AS 2), GAAS requires the auditor to

understand a subject company's system of internal controls when performing an audit. See AU

319, *Consideration of Internal Control in a Financial Statement Audit* ("AU 319").

664.    AU 328, *Auditing Fair Value Measurements and Disclosures* ("AU 328"),

prescribes, specifically, that an auditor consider the following items when obtaining an

understanding of a company's process for arriving at fair value measurements and disclosures,

the subject of these allegations:

- Controls over the process used to determine fair value measurements, including, for example, controls over data and the segregation of duties between those committing the entity to the underlying transactions and those responsible for undertaking the valuations.

- The expertise and experience of those persons determining the fair value measurements.

- The role that information technology has in the process.

- The types of accounts or transactions requiring fair value measurements or disclosures (for example, whether the accounts arise from the recording of routine and recurring transactions or whether they arise from non-routine or unusual transactions).

- The significant management assumptions used in determining fair value.

- The documentation supporting management's assumptions.

- The process used to develop and apply management assumptions, including whether management used available market information to develop the assumptions.

- The process used to monitor changes in management's assumptions.

- The controls over the consistency, timeliness, and reliability of the data used in valuation models. (AU 328.12)

665.    PwC was also required to increase the extent of auditing procedures when a high

risk of fraud or error was present. In fact, AS 2 noted, specifically, the following:

In an audit of internal control over financial reporting, the auditor's evaluation of controls is interrelated with the auditor's evaluation of controls in a financial

statement audit, as required by AU sec. 316, *Consideration of Fraud in a Financial Statement Audit* ["AU 316"]. Often, controls identified and evaluated by the auditor during the audit of internal control over financial reporting also address or mitigate fraud risks, which the auditor is required to consider in a financial statement audit. If the auditor identifies deficiencies in controls designed to prevent and detect fraud during the audit of internal control over financial reporting, the auditor should alter the nature, timing, or extent of procedures to be performed during the financial statement audit to be responsive to such deficiencies, as provided in paragraphs .44 and .45 of [AU 316].

666.    AU 316, as referenced by AS 2, was especially pertinent with respect to PwC's audits of AIG because particular deficiencies in the Company's system of internal controls, as identified in connection with the issuance of the 2005 Form 10-K (which included PwC's audit opinion thereupon), led the Company to restate prior period financial statements that had been issued in error.  Such knowledge should have contributed not only to PwC's consideration of the system of internal controls under both GAAS and the Sarbanes Oxley Act of 2002, including the need to alter audit procedures accordingly to ensure that risks relating to the material misstatement of the financial statements and related footnotes had been mitigated, but to PwC's consideration of the potential for fraud to to occur in light of those control deficiencies.

667.    PwC, therefore, in light of the 2004 and 2005 internal control findings with respect to the valuation of derivatives, alongside other changing and compounding market conditions, was required – under GAAS and the PCAOB standards – to ensure, before issuing an unqualified audit opinion in 2005 and 2006, particularly, that AIG's internal controls surrounding the measurement, valuation, accounting, and disclosure for its significant investment portfolios were adequate.  In connection therewith, PwC was also obligated to ensure, before signing an unqualified opinion, that the Company had disclosed the very real possibility of the impact of a declining real estate market, the risk of collateral calls, and the susceptibility of the

Company's assets to required fair value determinations in the event of a market meltdown, the signs of which had already begun to appear in 2006.

668.    If PwC had adequately assessed AIG's internal controls with regard to its valuation of its CDS portfolio, it would have learned that AIGFP excluded AIG's Enterprise Risk Management and accounting functions from the valuation process, as described above, and therefore an essential aspect of AIG's internal controls was overridden by AIGFP's senior management.

669.    Further, PwC failed to understand the business of AIG and AIGFP well enough to understand the Company's exposure to subprime-based assets and CDSs and the Company's potential need to post collateral.

670.    Additionally, had PwC conducted its 2005 and 2006 audits in compliance with GAAS, it would have been aware of the reasons why AIGFP had stopped writing credit default swaps at the close of 2005 and the on-going risks posed by that portfolio and would have required further disclosure of those risks.

671.    Further, had PwC conducted its 2005 and 2006 audits in compliance with GAAS it would have been aware of AIG's decision to increase the securities lending program investments in RMBS to 75 percent at the end of 2005 and the risks posed by that decision, and would have required appropriate disclosure.

672.    Further, had PwC conducted its 2005 and 2006 audits in compliance with GAAS it would have been aware of the investments made of cash collateral from the securities lending program in subprime-based securities and required disclosure of that risk concentration in the 2006 10-K, especially given the decline in the market by that time, the fact that these instruments

had two to five year maturities, and the fact that AIGFP and American General had seen the decline by the end of 2005.

**AS 5 and PwC's 2007 Audit**

673.    Beginning with its 2007 audit, PwC was required to follow guidance set forth in AS 5, as issued by the PCAOB, which amended AS 2.

674.    AS 5 dedicates an entire subsection to the auditor's responsibility to identify and address significant company accounts and *disclosures*.  Therein, the PCAOB places particular emphasis on the importance of disclosures alongside the notional amounts in the financial statements.  Specifically, AS 5.29 provides the following:

> To identify significant accounts and disclosures and their relevant assertions, the auditor should evaluate the qualitative and quantitative risk factors related to the financial statement line items and disclosures. Risk factors relevant to the identification of significant accounts and disclosures and their relevant assertions include—
>
> - Size and composition of the account;
> - **Susceptibility to misstatement due to errors or fraud**;
> - Volume of activity, complexity, and homogeneity of the individual transactions processed through the account or reflected in the disclosure;
> - **Nature of the account or disclosure**;
> - Accounting and reporting complexities associated with the account or disclosure;
> - **Exposure to losses in the account**;
> - **Possibility of significant contingent liabilities arising from the activities reflected in the account or disclosure**;
> - Existence of related party transactions in the account; and
> - **Changes from the prior period in account or disclosure characteristics.**

675.    In fact, in 2007, management had again identified a material weakness in its Report on Internal Control Over Financial Reporting relating to the fair value valuation of certain

of its assets – in this instance, the AIGFP super senior CDS portfolio. As discussed elsewhere herein, the Company's 2007 Form 10-K stated, in relevant part:

> As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective. AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. (2007 Form 10-K)

676.    PwC's audit opinion, included in the Company's 2007 Form 10-K, stated that management had identified the foregoing significant internal control deficiency as a material weakness and reflected its assessment thereof in the following manner, in relevant part:

> …[I]n our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date. (2007 Form 10-K)

677.    Nevertheless, however, and as noted above, despite finding this material weakness, PwC, in violation of GAAS, did not require AIG to disclose appropriately the inherent risks in its CDS portfolio as required in view of facts it knew or should have known if it had properly conducted its audit, including (a) those related to deficiencies in the Company's internal

controls, (b) the magnitude of the inherent risks in the Company's credit default swaps, as well as its investment portfolio, and (c) those related to macroeconomic trends such as a declining real estate market in the United States and abroad throughout the relevant timeframe.

678.    The known facts regarding AIG's revenue-generating products and the composition of its portfolios, create a strong inference that PwC was negligent in performing its audits relative to its obligations under GAAS and PCAOB standards.  By issuing clean audit opinions despite the internal control deficiencies that it and the Company had identified and delineated, PwC acted negligently, at the least, in failing to perform its audits in accordance with the foregoing standards.

679.    Plaintiffs and other members of the Class purchased AIG equity and debt securities in or traceable to the Offerings.  The Offerings were conducted pursuant to the 2003, 2007 and 2008 Registration Statements, and amendments and supplements thereto.  The Offerings at issue herein incorporated by reference AIG's financial statements for the years ended December 31, 2005, 2006 and/or 2007, to which PwC consented in the Offering Materials.

680.    The Registration Statements, at the time they became effective, contained untrue statements and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the registration statements.

681.    Plaintiffs did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Registration Statements.

682.    Plaintiffs have sustained damages as a result of the misstatements and omissions of the Registration Statements, for which they are entitled to compensation.

683.     Plaintiffs brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

### SIXTH CLAIM FOR RELIEF

**For Violations of Section 12(a)(2) of the Securities Act
against the Underwriter Defendants**

684.     Plaintiffs repeat and reallege the allegations above in ¶¶ 577 to 606 as they pertain to the Securities Act.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim does not sound in fraud, and Plaintiffs do not incorporate herein any allegations of fraud in connection with this Count.

685.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Lead Plaintiff, other named Plaintiffs, and other members of the Class against the Underwriter Defendants.

686.     This claim is asserted on behalf of all members of the Class who purchased or acquired equity or debt securities in the Offerings identified in ¶¶ 591 - 592 herein.

687.     By means of the Offering Memoranda, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Underwriter Defendants, through public offerings, offered and sold the equity and debt securities to Plaintiffs and other members of the Class.  As previously set forth herein, the Offering Memoranda negligently included untrue statements of material facts and negligently omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

688.     In connection with and in furtherance of the Offerings, the Offering Memoranda were widely distributed and, thus, the Offerings were public offerings.  The Offering Memoranda also were prospectuses for purposes of the Securities Act.

689.     The Underwriter Defendants identified in ¶ 51 (a) - (jj) are sellers for particular Offerings within the meaning of the Securities Act because they: (a) transferred title to Plaintiffs and other purchasers of the equity and debt securities; (b) transferred title to the equity and debt securities to other underwriters and/or broker-dealers that sold the equity and debt securities as agents for the Underwriter Defendants; and (c) solicited the purchase of the equity and debt securities by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interest of AIG, including but not limited to commissions on their own sales of the equity and debt securities and separate commissions on the sale of the equity and debt securities by non-underwriter broker-dealers.

690.     The Underwriter Defendants actively solicited the sale of the equity and debt securities by, among other means, participating in the drafting of prospectuses and pricing supplements, in furtherance of the equity and debt securities.

691.     The equity and debt securities consisted of new issues of securities.

692.     Plaintiffs and other Class members purchased the equity and debt securities based on the Offering Memoranda, or in the immediate wake of the Offering and traceable thereto.

693.     Plaintiffs did not know of the omissions and misstatements described above when they purchased the equity and debt securities.

694.     Plaintiffs brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the equity and debt securities offerings.

695.   By virtue of the foregoing, the Underwriter Defendants have violated Section 12(a)(2) of the Securities Act.

## SEVENTH CLAIM FOR RELIEF

### For Violations of Section 15 of the Securities Act
### against the Executive Defendants

696.   Plaintiffs repeat and reallege the allegations above in ¶¶ 577 to 620 as they pertain to the Securities Act.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim does not sound in fraud, and Plaintiffs do not incorporate herein any allegations of fraud in connection with this Count.

697.   This claim is brought pursuant to Section 15 of the Securities Act, on behalf of Lead Plaintiff, other named Plaintiffs, and other members of the Class against the Executive Defendants.

698.   This claim is asserted on behalf of all Class members who purchased or acquired AIG securities in or traceable to the equity and debt offerings identified in ¶¶ 591 - 592 herein.

699.   The Executive Defendants, at the time of the registration statements and prospectuses alleged to be false and misleading, conducted and participated, directly and indirectly, in the operation and management of AIG and AIGFP.

700.   Because of their positions of control and authority at AIG and AIGFP and as senior officers of AIG and AIGFP, the Executive Defendants were able to, and did, control the contents of the registration statements and prospectuses that contained materially false and misleading information.

701.     Therefore, the Executive Defendants were controlling persons of Defendant AIG within the meaning of Section 15 of the Securities Act., and are liable for AIG's violations of Section 11 of the Securities Act, as alleged in the Third Claim for Relief, above.

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiffs and the members of the Class compensatory damages;

C.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such other relief as this Court may deem just and proper.

JURY TRIAL DEMAND

**Plaintiffs hereby demand** a trial by jury **in this action for all issues so triable.**

Dated:  May 19, 2009

**BARRACK, RODOS & BACINE**
Leonard Barrack
Jeffrey W. Golan *(pro hac vice)*
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838

        -and-

A. Arnold Gershon (AG - 3809)
Regina M. Calcaterra (RC- 3858)
1350 Broadway
Suite 1001
New York, New York 10018
Tel.: (212) 688-0782
Fax: (212) 688-0783

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller *(pro hac vice)*
Marc L. Newman *(pro hac vice)*
David H. Fink
Jayson E. Blake
Brian E. Etzel
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*