UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | Master File No.:<br>08-CV-4772-LTS<br><br>**ELECTRONICALLY FILED** |
| This Document Relates To:  All Actions | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**BARRACK, RODOS & BACINE**
Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
David H. Fink
Jayson E. Blake
Brian E. Etzel
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

and

A. Arnold Gershon (AG – 3809)
Regina M. Calcaterra (RC- 3858)
1350 Broadway
Suite 1001
New York, New York 10018
Tel.:  (212) 688-0782
Fax:  (212) 688-0783

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

THE CLAIMS ASSERTED BY PLAINTIFFS AND THEIR RESPONSE TO THE
MOTIONS TO DISMISS ................................................................................ 11

STATEMENT OF THE CASE ................................................................................ 14

I.    Background Facts ................................................................................ 15

      A.    AIGFP and Credit Default Swaps ........................................................ 15

      B.    AIGFP's Decision to Discontinue Writing Credit Default Swaps ......................... 17

      C.    AIG's Securities Lending Business Further Increases the Company's Exposure
            to the U.S. Residential Mortgage Market ................................................ 19

      D.    AIG's Relaxation of Controls Over AIGFP ............................................... 20

II.   AIG's False Portrayal of Its Financial Condition and Risk Exposures ......................... 22

      A.    March 2006 - May 2007:  Defendants' False and Misleading Statements ........... 22

      B.    May 2007 - February 2008:  Defendants' False and Misleading Statements ....... 26

            1.    The Emergence and Manifestation of the Subprime Mortgage Crisis ...... 26

            2.    Defendants' False and Misleading Statements ......................... 27

            3.    AIG's February 2008 Partial Corrective Disclosures ............... 36

      C.    March 2008 - September 2008: Defendants' False and Misleading Statements .. 40

ARGUMENT ................................................................................ 44

POINT ONE – THE COMPLAINT ASSERTS VIABLE EXCHANGE ACT CLAIMS ........... 44

I.    The Complaint Adequately Alleges Defendants' False and Misleading Statements
      Throughout the Class Period ................................................................ 45

      A.    False and Misleading Statements in the Period from March 2006 through
            May 2007 ................................................................ 45

1.  AIG Failed to Disclose the Existence of its Extensive Portfolio of Credit Default Swaps Referencing Subprime-Backed CDOs .................. 45

    a.  Statements About AIG's Credit Derivatives Portfolio Were Misleading Because They Failed to Disclose Material Facts About the Subprime Exposure of the CDS Portfolio .................. 46

    b.  Defendants Were Required by GAAP to Disclose the Concentration of Risk in Subprime Mortgage-Backed Securities 52

2.  AIG Failed to Disclose and Misrepresented its Exposure for Posting Collateral .................................................................................. 55

3.  AIG Made Misleading Disclosures Regarding Its Ability to Hedge Its Credit Derivatives Portfolio .................................................... 58

4.  AIG Failed to Disclose a Material Weakness in Internal Controls ........... 59

5.  AIG's Description of Its Securities Lending Program Was Materially Misleading ................................................................................. 65

6.  Defendants Continued to Make False and Misleading Statements Throughout 2006 and into 2007 as Risks from Subprime Mortgage-Backed Investments Began to Materialize ................................. 67

7.  AIG's False Representations in the 2006 10-K that It Recorded Its "Multi-Sector" Credit Default Swaps at Fair Value ................................ 69

B.  False and Misleading Statements During the Period From May 2007 through February 2008 ................................................................................. 73

    1.  False Statements from May through August 2007 .................................. 73

    2.  Third and Fourth Quarter 2007 False Statements ..................................... 84

    3.  False and Misleading Statements in the February 2008 Disclosures ........ 93

C.  False and Misleading Statements from March to September 2008 ..................... 97

II.  The Complaint Pleads Cogent and Compelling Facts that Give Rise to a Strong Inference of Scienter on Behalf of Each of the Section 10(b) Defendants .................... 101

A.  The Applicable Legal Standards ........................................................................ 102

B.  Overview of Scienter Allegations ...................................................................... 104

ii

C.  The Complaint Contains Detailed Allegations that the AIGFP Section 10(b) Defendants Engaged in Intentional Misconduct or Conscious Misbehavior ...... 110

   1.  The Company's Undisclosed Decision to Exit the CDS Business ......... 110

   2.  Defendants Were Aware of Collateral Calls from Goldman Sachs and Other Counterparties and the Potential for Future Collateral Calls ........ 116

   3.  The AIGFP Section 10(b) Defendants' Purposeful Under-Reporting of the Loss of Value in the CDS Portfolio Evidences Their Scienter ......... 119

   4.  The Deliberate Exclusion of St. Denis from the CDS Valuation Process, and his Subsequent Resignation, Supports a Strong Inference of Scienter ............................................................................................ 123

   5.  The Exclusion of Risk Management and Accounting Functions from the Operations of the Assets/Credit Group Supports a Strong Inference of Scienter .............................................................................. 128

   6.  The Significance of the CDS Portfolio to AIGFP's Business, as Well as Cassano's and Forster's Decision-Making Authority and Access to Information, Supports a Strong Inference of Scienter ........................... 130

   7.  The AIGFP Section 10(b) Defendants Knew that the Substantial Risks Associated With the CDS Portfolio Were Unhedged ............................ 132

D.  The AIGFP Section 10(b) Defendants Also Had a Substantial Motive and Opportunity to Commit Fraud .......................................................................... 133

E.  The Complaint Pleads Numerous Facts That Support a Strong Inference of the AIG Section 10(b) Defendants' Scienter ...................................................... 137

   1.  Facts Known to the AIG Section 10(b) Defendants by the Beginning of the Class Period ................................................................................ 138

   2.  Other Events That Transpired During the Class Period Further Indicate That the AIG Section 10(b) Defendants Acted Recklessly ................... 143

F.  Defendants' Suggestions of Innocent or Honest Conduct in the Wake of a Global Financial Crisis Are Implausible and Do Not Negate Scienter ............. 158

G.  The Statements by the OTS Do Not Negate Scienter ......................................... 164

H.  The Absence of Stock Sales Does Not Negate Scienter ..................................... 166

III.    Defendants Improperly Seek To Truncate the Class Period As Defined in the Complaint.................................................................................................. 169

IV.    Count II of the Complaint States a Viable Claim for Control Person Liability under Section 20(a) of the Exchange Act Against the Executive Defendants............... 177

V.     Plaintiffs Sufficiently Plead Loss Causation.................................................. 186

        A.    Plaintiffs Plead a Series of Corrective Disclosures That Led to Market Declines........................................................................................ 186

        B.    Defendants' Argument that Plaintiffs' Losses Were Caused by the Overall Economic Recession, Rather than the Fraud Pled in the Complaint, Is Wrong As a Matter of Fact and Improper Because Loss Causation Is a Matter of Proof at Trial ............................................................................. 191

POINT TWO - THE COMPLAINT ASSERTS VIABLE SECURITIES ACT CLAIMS......... 195

I.     Background Facts Relating to Plaintiffs' Securities Act Claims .................................... 195

II.    Legal Standards Governing the Securities Act Claims.................................... 197

        A.    The Causes of Action ......................................................................... 197

        B.    Plaintiffs' Securities Act Claims Should Not Be Subjected to a Heightened Pleading Standard ............................................................... 200

III.   Plaintiffs Adequately Allege Primary Securities Act Violations.................................... 203

        A.    AIG's SEC Filings Contained Materially False and Misleading Statements and Omissions, Thereby Making the Offering Materials Defective.................. 203

        B.    The Offering Materials Were Deficient Because They Failed to Disclose that Many of the Underwriter Defendants Were AIG's Counterparties on the CDS Portfolio and Participants in its Securities Lending Program............................ 204

        C.    AIG's Audited Financial Statements and the Notes Thereto, Which Were Incorporated by Reference in the Offering Materials, Subject PwC to Liability Under Section 11 ................................................................... 210

        D.    Plaintiffs Have Standing to Pursue All Securities Act Claims Pursuant to Sections 11 and 12(a)(2) ...................................................................... 215

        E.    Plaintiffs' Securities Act Claims Were Timely Filed ......................................... 222

IV.    Plaintiffs Have Adequately Stated a Section 15 Claim ................................................. 229

CONCLUSION ............................................................................................................................. 232

# TABLE OF AUTHORITIES

**Page**

CASES

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ............................................................................................ 136

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)....................................................................................................... 44

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).......................................................................................... 157

*Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................. 103, 131

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................................... 148

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................... 44, 176

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ....................................................................................... 130

*Bharucha v. Reuters Holdings PLC*,
    No. 90-3838, 1993 WL 657863 (E.D.N.Y. Oct. 29, 1993)........................................... 172

*Breard v. Sachnoff & Weaver, Ltd.*,
    941 F.2d 142 (2d Cir. 1991)......................................................................................... 171

*Caiola v. Citibank, N.A., New York*,
    295 F.3d 312 (2d Cir. 2002)............................................................................... 45, 46, 97

*Castillo v. Dean Witter Discover & Co.*,
    No. 97 Civ. 1272 (RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) ......................... 210

*Catton v. Defense Technology Systems, Inc.*,
    457 F. Supp. 2d 374 (S.D.N.Y. 2006).......................................................................... 181

*Chemical Bank v. Arthur Anderson & Co.*,
    726 F.2d 930 (2d Cir. 1984).......................................................................................... 45

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)......................................................................................... 157

*Ciresi v. Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991)................................................................ 91

*Commercial Union Assurance Co., plc v. Milken*,
    17 F.3d 608 (2d Cir 1994).......................................................................... 221

*Coronel v. Quanta Capital Holdings Ltd.*,
    No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...................... passim

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*,
    99 Civ. A. 12046 (WHP), 2001 WL 300733 (S.D.N.Y. March 28, 2001) ............... passim

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)......................................................... 104

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) ............................................................. 140

*Danis v. USN Commc'ns, Inc.*,
    121 F. Supp. 2d 1183 (N.D. Ill. 2000) ........................................................ 214

*Darquea v. Jarden Corp.*,
    No. 06 CV 0722 (CLB), 2007 WL 1610146 (S.D.N.Y. May 21, 2007).......................... 85

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982)......................................................................... 72

*Degulis v. LXR Biotechnology, Inc.*,
    No. 95 Civ. 4204 (RWS), 1997 WL 20832 (S.D.N.Y. Jan. 21, 1997) ......................... 203

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004)........................................................ 161

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)...................................................................... 200

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)...................................................................... 163

*Dorchester Investors v. Peak Trends Trust*,
    No. 99 Civ. 4696(LMM), 2003 WL 223466 (S.D.N.Y. Feb. 3, 2003).......................... 231

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................. 177

*Eastwood Enterprises, LLC v. Farha*,
      No. 8:07-cv-01940- T-33EAJ, 2009 U.S. Dist. LEXIS 88945
      (M.D. Fla. Sept. 28, 2009) ................................................................. 108

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
      553 F.3d 187 (2d Cir. 2009).............................................................. 157

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
      551 F. Supp. 2d 210 (S.D.N.Y. 2008) ............................................... 182

*Fezzani v. Bear, Stearns & Co. Inc.*,
      592 F. Supp. 2d 410 (S.D.N.Y. 2008) .................................................. 77

*Fisher v. Kanas*,
      487 F. Supp. 2d 270 (E.D.N.Y. 2007) .................................................. 72

*Fleming Companies, Inc. Sec. & Der. Litig.*,
      No. CIV. A 503-MD-1530-TJW, MDL-1530,
      2004 WL 5278716 (E.D. Tex. Jun. 16, 2004).................................... 219

*Florida State Bd. of Admin. v. Green Tree Financial Corp.*,
      270 F.3d 645 (8th Cir. 2001) ...................................................... 136, 166

*Fouad v. Isilon Sys.*,
      No. C07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)........... 108-109

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
      479 F. Supp. 2d 349 (S.D.N.Y. 2007)............................................... 145

*Friedlander v. Barnes*,
      104 F.R.D. 417 (S.D.N.Y. 1984) ...................................................... 172

*Ganino v. Citizens Utils. Co.*,
      228 F.3d 154 (2d Cir. 2000)................................................. 103, 169, 210

*State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*,
      No. 08-3185, 2009 WL 1796534 (2d Cir. June 25, 2009)............................ 103

*Glazer v. Formica Corp.*,
      964 F.2d 149 (2d Cir. 1992)................................................................ 57

*Goldman v. Belden*,
      754 F.2d 1059 (2d Cir. 1985).................................................. 200, 208, 209

*Greenapple v. Detroit Edison Co.*,
      618 F.2d 198 (2d  Cir. 1980)............................................................. 199

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ............................................................................................... 199

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................... 136, 153

*Hayes v. Gross*,
    982 F.2d 104 (3d Cir. 1992) .................................................................................. 86

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ................................................................................... 198, 199

*Hershfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991) ..................................................................... 91

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ............................................................... 200

*Hunt v. Alliance North American Govt. Inc. Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998) ............................................................... 58, 75, 81

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991) ............................................................................... 199

*In re Adelphia Commc'ns Corp.*,
    No. 03-1529, 2005 WL 1278544 (S.D.N.Y. 2005) ................................. 227, 228

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ) ............................................................ 227

*In re Allied Capital Corp. Sec. Litig.*,
    No. 02 Civ 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. April 25, 2003) .......... 72, 91, 145

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..................................................... 103, 186

*In re AM Int'l, Inc. Sec. Litig.*,
    108 F.R.D. 190 (S.D.N.Y. 1985) ....................................................................... 171

*In re AMF Bowling Sec. Litig.*,
    No. 99 Civ 3023(DC), 2002 WL 1033826 (S.D.N.Y. May 21, 2002) ............. 172

*In re Ashanti Goldfields Sec. Litig.*,
    184 F. Supp. 2d 247 (E.D.N.Y. 2002) ...................................................... 48, 49

*In re Authentidate Holding Corp.*,
    No. 05 Civ. 5323 (LTS) (DFE), 2006 WL 2034644 (S.D.N.Y. July 14, 2006) ..... 183, 220

*In re Authentidate Holding Corp.*,
    No. 05 Civ. 5323 (LTS) (DFE), 2009 WL 755360 (S.D.N.Y. Mar. 23, 2009) ............. 183

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................................... 48, 49

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008).......................................................... 77, 147, 194

*In re Bayer AG Sec. Litig.*,
    No. 03 Civ. 1546 (WHP), 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) .................... 155

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................................... 109

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ............................................................................. 190

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).......................................................................... 167

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008).......................................................................... 103

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996).............................................................................. 90

*In re Carter-Wallace, Inc., Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000).......................................................................................... 162

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ................................................................. 212, 214

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................. passim

*In re Daou Systems, Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .................................................................................... 166

*In re DDi Sec. Litig.*,
    No. 03-7063, 2005 WL 3090882 (C.D. Cal. Jul. 21, 2005)........................................... 216

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   No. 98 Civ. 4318 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000)................................ 225

*In re Elan Corp.*,
   No. 02 Civ. 865 (RMB), 2004 WL 1305845 (S.D.N.Y. May 18, 2004) ....................... 230

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006)........................................................................... 167

*In re Friedman's Inc. Sec. Litig.*,
   385 F. Supp. 2d 1345 (N.D. Ga. 2005) ........................................................................ 221

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   No. 07 Civ. 10588(RWS), 2009 WL 2432373 (S.D.N.Y. Aug. 7, 2009)........................ 81

*In re Glenayre Technologies, Inc. Sec. Litig.*,
   No. 96 Civ. 8252 (HB), 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) .......................... 167

*In re Global Crossing Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................................... 217

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)..................................................................... 44, 214

*In re Global Crossing Ltd. Sec. Litig.*,
   471 F. Supp. 2d 338 (S.D.N.Y. 2006).................................................................... 178, 183

*In re Global Crossing, Ltd. Sec. Litig.*,
   No. 02 Civ. 910 (GEL), 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005).......................... 231

*In re Global Crossing Ltd. Sec. Litig.*,
   No. 02 Civ. 910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)................... 178, 230

*In re Guilford Mills Inc. Sec. Litig.*,
   No. 98 CIV. 7739, 1999 WL 33248953 (S.D.N.Y. July 21, 1999) ............................... 167

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)......................................................................................... 100

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008)........................................................... 120, 189, 194

*In re Initial Public Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................... 183, 184, 230

*In re Interpublic Sec. Litig.*,
  No. 02-6527, 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003)................................. 171, 172

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. C 02-1486 (CW), 2005 WL 43463 (N.D. Cal. 2005) ............................................ 203

*In re JP Morgan Chase Sec. Litig.*,
  No. 02 Civ. 1282 (SHS), 2007 WL 950132 (S.D.N.Y. March 29, 2007)................. 64, 156

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................. 109, 168

*In re Kidder Peabody Sec. Litig.*,
  10 F. Supp. 2d 398 (S.D.N.Y. 1998)............................................................................ 186

*In re LaBranche Sec. Litig.*,
  405 F. Supp. 2d 333 (S.D.N.Y. 2005)......................................................................... 186

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009)......................................................................... 171, 172

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................... 157, 186

*In re Majesco Sec. Litig.*,
  No. Civ. A05 CV-3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006).................... 157, 214

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................... passim

*In re Merck & Co., Inc. Sec., Deriv. and ERISA Litig.*,
  543 F.3d 150 (3d Cir. 2008)......................................................................................... 51

*In re Metawave Comm'n Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003).................................................................. 182

*In re Metropolitan Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) ........................................................... 211, 213

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) .............................................................................. 221

*In re MoneyGram Intern., Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009)..................................................................... passim

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) .......................................................................... passim

*In re Morgan Stanley and Van Kampen Mutual Fund Sec. Lit.*,
    No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. April 18, 2006) ...................... 203

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    No. 02 Civ. 6153 (BSJ), 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ............................. 46

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................................ 134

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................................... 85, 91, 144

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ........................................................... 110, 113, 148

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .................................................................... 93, 126

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) .......................................................................... passim

*In re Parmalat Sec. Litig.*,
    414 F. Supp. 2d 428 (S.D.N.Y. 2006) .......................................................................... 230

*In re Parmalat Sec. Litig.*,
    474 F. Supp. 2d 547 (S.D.N.Y. 2007) .......................................................................... 183

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008) ............................................................................ 93

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) .......................................................................... 113

*In re PMA Capital Corp. Sec. Litig.*,
    No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ................................... 100, 218

*In re Prestige Brands Holding, Inc.*,
    No. 05-06924, 2006 WL 2147719 (S.D.N.Y. July 10, 2006) ........................................ 199

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ....................................................................... 80, 81, 91

*In re PXRE Group, Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)......................................................... passim

*In re Quintel Entertainment Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 2008)................................................. 108, 181, 226

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) ............................................................ 117

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................... passim

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 RWS, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ....................... 84, 102

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)............................................................ 137

*In re Saxon Sec. Litig.*,
    No. 82-3103, 1984 WL 2399 (S.D.N.Y. Feb. 23, 1984).................................... 216

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................ 103, 104

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................................... passim

*In re Sotheby's Holdings, Inc.*,
    No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...................... 137

*In re Spiegel, Inc. Sec. Litig.*,
    No. 02 C 8946, 2005 WL 1838449 (N.D. Ill. July 29, 2005) ............................... 93

*In re Stellant, Inc. Sec. Litig.*,
    326 F. Supp. 2d 970 (D. Minn. 2004)............................................................ 54

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).................................................................. 70, 71

*In re Suprema Specialties Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).................................................................... 202

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................................................... 155

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ........................................................................ 212

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ....................................................... 200

*In re Unisys Corp. Sec. Litig.*,
    No. Civ. A. 00-1849, 2000 WL 1367951 (E.D. Pa. Sept. 21, 2000) ............. 169

*In re Veeco Instruments, Inc., Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .............................................. 103, 140, 148

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................. passim

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) .................................................................. 86, 100

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007), *aff'd*, 588 F.3d 1130 (10th Cir. 2009) .......... 194

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................... 171, 199

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................................................. passim

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) .................................................. 207, 210

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) ........................................... 110, 200, 213

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2004 WL 555697 (S.D.N.Y. March 19, 2004) .................. 218

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288 (DLC), 2005 WL 335201 (S.D.N.Y. Feb. 14, 2005) ......... 229

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288 (DLC), 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ......... 231

*In re WorldSpace Sec. Litig.*,
    No. 07 Civ. 2252 (RMB), 2008 WL 2856519 (S.D.N.Y. July 21, 2008) .............. 201, 202

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001) .................................................................... 130, 131

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................... 134

*Klein v. Boyd*,
    No. CIV. A. 95-5410, 1996 WL 675550 (E.D. Pa. Nov. 18, 1996) ............................... 176

*Koppel v. 4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999)....................................................................................... 93

*Kurzweil v. Philip Morris Companies, Inc.*,
    No. 94 Civ. 2373 (MBM), 1997 WL 167043 (S.D.N.Y. April 9, 1997) .......................... 51

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................... 97, 182, 190

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)..................................................................................... 225

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................... passim

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)....................................................................... 187

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979)..................................................................................... 205

*Marcus v. Frome*,
    275 F. Supp. 2d 496 (S.D.N.Y. 2003)....................................................................... 148

*Markowski v. S.E.C.*,
    34 F.3d 99 (2d Cir. 1994) ........................................................................................ 148

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ......................................................................... 174

*Mayle v. Felix*,
    545 U.S. 644 (2005)................................................................................................ 228

*McCoy v. Goldberg*,
    748 F. Supp. 146 (S.D.N.Y. 1990)............................................................................. 75

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992)...................................................................................... 200

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)............................................... 200, 221, 226

*Nathan Gordon Trust v. Northgate Exploration, Ltd.*,
    148 F.R.D. 105 (S.D.N.Y. 1993) .................................................................... 172

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008)............................................................. 187

*Nelson v. Stahl*,
    173 F. Supp. 2d 153 (S.D.N.Y. 200l ) .......................................................... 225

*Nolte v. Capital One Financial Corp.*,
    390 F.3d 311 (4th Cir. 2004) .................................................................... 48, 49

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................. passim

*P. Stolz Family Partnership L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)........................................................................ 80

*Pinter v. Dahl*,
    486 U.S. 622 (1988)........................................................................ 199, 221

*Pollio v. MF Global Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)........................................................ 100

*Power & Telephone Supply Co. v. SunTrust Banks, Inc.*,
    447 F.3d 923 (6th Cir. 2006) .................................................................... 54

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000)..................................................................... 205

*Primavera Familienstiftung v. Askin*,
    No. 95 Civ. 8905 (RWS), 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996)................ 117, 162

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)........................................................................ 44

*Roeder v. Alpha Industries, Inc.*,
    814 F.2d 22 (1st Cir. 1987).................................................................... 58

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................201

*Ross v. Warner*,
    No. 77 Civ. 243, 1980 WL 1474 (S.D.N.Y. Dec. 11, 1980)...........................199

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)...............................................................157

*Rubin v. MF Global Ltd.*,
    No. 08 Civ. 2233 (VM), 2009 WL 2058590 (S.D.N.Y. July 16, 2009) ...........97

*Ruskin v. TIG Holdings, Inc.*,
    No. 98 Civ. 1068(LLS), 2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000) .................81, 101

*S.E.C. v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963).......................................................................205

*S.E.C. v. Dci Telecommc'ns., Inc.*,
    122 F. Supp. 2d 495 (S.D.N.Y. 2000)...................................................156

*S.E.C. v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997).......................................................207

*Sedona Corp. v. Ladenthal Thalmann & Co.*,
    No. 03-Civ-3120 (LTS) (THK), 2006 WL 2034663 (S.D.N.Y. July 19, 2006) ...........184

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..............................................................203

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..............................................................163

*Siegel v. Converters Transp., Inc.*,
    714 F.2d 213 (2d Cir. 1983)..............................................................227

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ...........205

*Silva Run Worldwide Ltd. V. Gaming Lottery Corp.*,
    No. 96 Civ. 3231 (RPP),1998 WL 167330 (S.D.N.Y. April 8, 1998)...........181-82

*Sirota v. Solitron Devices, Inc.*,
    673 F.2d 566 (2d Cir. 1982)..............................................................171

*Sonnenberg v. Prospect Park Financial Corp.*,
    No. CIV. 91-435 (DRD), 1991 WL 329755 (D.N.J. Aug. 20, 1991) .............................. 67

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009)................................................................................ 104, 154

*Steinberg v. Ericsson LM Telephone Co.*,
    No. 07 Civ. 9615 (RPP), 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)........................ 149

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ....................................................................... 153

*Stumpf v. Garvey*,
    No. 03-CV-1352-PB, 2005 WL 2127674 (D.N.H. Sept. 2, 2005)................................. 195

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................ 109, 184, 188

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)...................................................................................... 110

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ..................................................................................... 102, 134

*Touche Ross & Co. v. S.E.C.*,
    609 F.2d 570 (2d Cir. 1979)...................................................................................... 211

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)................................................................................................. 206

*Tsirekidze v. Syntax-Brillian Corp.*,
    No. CV-07-02204-PHX-FJM, 2009 WL 275405 (D. Ariz. Jan. 30, 2009) ................... 203

*United Paperworkers Intern. Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993).................................................................................... 174

*United Resources 1988-I Drilling & Completion Program*,
    91 Civ. 8703 (RPP), 1993 WL 17464, (S.D.N.Y. Jan. 21, 19939)............................... 225

*United States  v. Skilling*,
    554 F.3d 529 (5th Cir. 2009) .................................................................................... 100

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)............................................................................................ 46, 75

*White v. H&R Block, Inc.*,
    No. 02 Civ. 8965 (MBM , 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ..................... 170

*William H. McGee & Co. v. M/V Ming Plenty*,
    164 F.R.D. 601 (S.D.N.Y. 1995) ................................................................ 229

*Wilson v. Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989)................................................................... 222

## STATUTES & RULES

15 U.S.C. § 7262(b) ...................................................................................... 68

15 U.S.C. § 77k ................................................................................... 198, 212

15 U.S.C. § 77l ......................................................................................... 199

15 U.S.C. § 77m ................................................................................. 223, 224

15 U.S.C. § 77o ........................................................................................ 229

15 U.S.C. § 77z-2 ....................................................................................... 80

15 U.S.C. § 78t ........................................................................................ 177

17 C.F.R. § 210.4-01 ............................................................................. 52, 212

17 C.F.R. § 229.508 ................................................................................... 206

17 C.F.R. § 240.10b-5 ................................................................................. 46

70 Fed. Reg. 44722-01 (2005) .................................................................... 214

Fed. R. Civ. P. 8 .................................................................................. 201, 203

Fed. R. Civ. P. 9(b) ................................................................................... 200

Fed. R. Civ. P. 15(c) ............................................................................ 227, 229

## OTHER AUTHORITIES

Shelf Registration, S.E.C. Exchange Act Release No. 6499,
1983 WL 408321 (Dec. 31, 1998) ................................................................ 218

Lead Plaintiff, The State Treasurer of Michigan, as custodian of the Michigan Public School Employees' Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System ("the State of Michigan Retirement Systems," hereafter referred to as "Lead Plaintiff" or "SMRS"), respectfully submits this memorandum of law in opposition to the motions of defendants to dismiss the Consolidated Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

As Federal Reserve Chairman Ben S. Bernanke has stated, American International Group, Inc. ("AIG" or the "Company") "made all kinds of unconscionable bets." ¶ 26.[1]  These unconscionable bets took the form of decisions by AIG management to chase some additional profits through transactions unrelated to the Company's core insurance operations, which exposed AIG to hundreds of billions of dollars of subprime debt in connection with its credit default swap (sometimes referred to as "CDS") and securities lending businesses.  The catastrophic damage wrought by these unconscionable bets has been painfully apparent ever since the U.S. Government was forced to step in to rescue the Company from total collapse on the night of September 16, 2008.

This lawsuit raises the question of what responsibility AIG, its officers and directors, outside auditor and underwriters have to the investors of AIG, who are among the many groups that have suffered from the wreckage caused by the defendants' actions.  Defendants' answer to this question is that they have no responsibility whatsoever.  They assert that AIG's demise was caused by an unprecedented collapse of the financial markets that no one predicted and that, accordingly, they are not responsible for losses that were unforeseen.

---

[1]      "¶ ____" refer to paragraph numbers in the Complaint.

There is no question that participants in the capital markets subject themselves to risk, and that the federal securities laws do not operate to guarantee the losses of investments gone bad. But AIG and the other defendants have it wrong when they assert that the Complaint seeks to hold them responsible for unforeseen losses. The Complaint does not charge defendants with failing to predict that losses would occur. Rather, at its core, the Complaint charges that AIG and its management failed to uphold their legal obligations to provide investors with truthful and accurate information by concealing and misrepresenting the extent of risk to which AIG was being subjected by management's unconscionable bets. Thus, investors were deprived of the ability to assess for themselves whether they wanted to assume the risks of the bets placed by AIG management.

Lead Plaintiff and the other named plaintiffs in the Complaint (collectively, "plaintiffs") seek to recover for investors who purchased AIG securities on a U.S. public exchange during the period from March 16, 2006 through September 16, 2008 (the "Class Period") or who acquired AIG securities traceable to a public offering by AIG during the Class Period. ¶ 72. While defendants' misconduct evolved during the Class Period as both conditions within AIG and in the market changed, the basic elements of their misconduct included the following:

- Failing to disclose the concentration of assets exposed to subprime mortgages arising from AIG's credit default swap and securities lending businesses;

- Repeated misleading declarations that the subprime mortgage crisis would not unduly impact AIG's business and, in particular, that the Company would not see a single dollar in losses on its credit default swap transactions;

- Misleading investors into believing that the principal risk of AIG's credit default swaps was the possibility of defaults on the securities being insured by them, while failing to disclose the far more serious and greater risk that they could expose the Company to tens of billions of dollars in collateral calls for the benefit of its CDS counterparties;

- Failing to disclose, until February 2008, a material weakness in internal controls relating to AIG's oversight and valuation of the CDS portfolio. A principal cause of this internal control weakness was the deliberate exclusion of key accounting and risk management personnel from the valuation process by the management of the unit that ran the credit default swap business, AIG Financial Products Corp. ("AIGFP"). Indeed, a vice president of accounting who was specifically hired to serve as a "watch-dog" raised concerns about the propriety of the CDS valuation and, in response, was expressly told by the president of AIGFP, defendant Joseph Cassano, that he had been deliberately excluded from CDS valuation decisions out of concern that he would "pollute the process";

- Knowingly understating the losses on its CDS portfolio through, at least, February 2008. This includes management's representation of a "high degree of certainty" at a December 5, 2007 investor conference that losses on the CDS portfolio through November 2007 were in the range of $1.4 to $1.5 billion, despite having been warned just days earlier by AIG's outside auditor that the Company could have a material weakness in its internal controls relating to the valuation of the portfolio. In fact, the loss reported on December 5 was based on "adjustments" that were improper under Generally Accepted Accounting Principles ("GAAP"), resulting in an understatement of the loss by more than $4.3 billion;

- Failing to disclose that the cash collateral received from borrowers under its securities lending program was being invested in securities exposed to subprime debt, in contrast to the highly secure and liquid investments that AIG had utilized through 2005 for its securities lending businesses; and

- Repeated declarations of AIG's purported financial strength and "fortress balance sheet," while the Company was scrambling to raise additional capital in order to meet collateral calls.

As demonstrated herein, there is no basis for giving defendants a free pass for misrepresenting the Company's business, financial condition and risk exposures. The Complaint's allegations are based on statements made by AIG and its management and their knowledge of facts that rendered such statements inaccurate or materially incomplete. Many of the statements were contained or incorporated in public offering documents and, as such, properly subject AIG, its underwriters, auditor, directors and certain controlling executives to liability for materially false and misleading statements in those documents.

The Class Period can be divided roughly into three segments corresponding to the types of false and misleading statements that defendants were making and to events that were transpiring in the market:  March 2006 – May 2007; May 2007 – February 2008; and March – September 2008.    Nevertheless, the Complaint pleads a continuing course of false and misleading representations concerning AIG's credit default swap and securities lending businesses, beginning as early as March 2006, when AIG released its 2005 financial results, and ending with the government bailout in September 2008.

**March 2006 - May 2007**

The first segment runs from the beginning of the Class Period (when AIG filed its 2005 Form 10-K with the SEC) through May 10, 2007 (when AIG filed its first quarter 2007 Form 10-Q).  At the beginning of the Class Period, AIG was seeking to rebuild a reputation that had been badly tarnished by recent accounting scandals, government investigations and heavy fines.  In March 2005, AIG ousted its long-time Chairman and CEO, Maurice "Hank" Greenberg.  His replacement, defendant Martin Sullivan, promised greater "transparency" in AIG's financial disclosures and a strengthening of AIG's internal controls.  But as these promises were being made, the business unit that issued the disastrous credit default swaps, AIGFP, was engaged in a frenzy of CDS transactions.  Following Greenberg's departure through the end of 2005, approximately 220 CDS contracts were written, ***more than the entire number of contracts*** issued by AIGFP in the seven years since it began writing credit default swaps in 1998.

As explained below, the credit default swaps at issue in this case, which were a sub-set of AIGFP's overall portfolio of credit default swaps, operated in essence as insurance on complex financial instruments known as collateralized debt obligations ("CDOs"), which packaged together large numbers of asset-backed securities ("ABS").  Significantly, by 2005, when AIGFP

went on its spree of writing CDS contracts, the CDOs being insured by these contracts were comprised almost entirely of assets backed by subprime mortgages.  AIGFP's credit default swap transactions following Greenberg's departure in 2005 vastly increased AIG's exposure to risky subprime debt so that by year-end, the Company was insuring about $80 billion of these CDOs, which included $64 billion in subprime debt.  During 2005, AIGFP took note of a significant deterioration in the quality of the subprime loans being originated.  AIGFP observed that during 2005 the underwriting standards on subprime mortgages had become so shoddy that the internal models AIGFP used to predict the behavior of these mortgages under economically-stressed conditions were no longer adequate.  AIG essentially concluded that the lack of "diversity" in the collateral pools, combined with the increasingly lax underwriting standards in the subprime industry, made the risk of insuring CDOs too high.  As a result, it made a decision at the end of 2005 to discontinue writing credit default swaps on CDOs containing subprime debt.  This action, however, did nothing to diminish the risks already incurred because AIG did nothing to divest itself of the credit default swaps remaining on its books, nor did it undertake to hedge any of the transactions.

Even as the recent accounting scandals were prompting AIG to strengthen internal controls over other aspects of its business, the frenzy of CDS activity during 2005 was actually a reflection of the fact that controls over AIGFP *had been relaxed*.  After assuming the leadership of AIG, defendant Sullivan discontinued regular meetings with AIGFP management that had been the practice during Greenberg's tenure.  According to published reports based on interviews with AIG employees, Sullivan "wasn't really interested in the business."  As a result, there was little corporate oversight of AIGFP's credit default swap business and those efforts that were made were actively rebuffed by AIGFP's management.  This resulted in the exclusion of key risk

5

management and accounting personnel from AIGFP decision-making regarding the CDS business.

At the same time, AIG's securities lending business greatly expanded the Company's exposure to subprime debt. In a securities lending operation, a lender, such as AIG, will lend securities to borrowers (who may use them to cover trading positions) in exchange for cash collateral. The cash collateral had historically been invested by AIG in conservative and highly liquid securities. Paradoxically, however, at about the same time that AIGFP determined that it was no longer safe to incur any further subprime exposure, AIG Investments, the division of AIG that ran its securities lending program, decided to increase its subprime exposure. In an attempt to increase the short-term profitability of AIG Investments, the decision was made to invest up to 75% of the cash collateral received from borrowers in residential mortgage-backed securities ("RMBS"), which included substantial numbers of securities backed by subprime mortgages. This marked a significant departure from AIG's prior practice.

The relaxation of controls over AIGFP and the vast expansion of AIG's exposure to subprime debt stood at odds with the message of a company that was seeking to boost investor confidence and put its troubled past behind it. Instead of acknowledging additional areas where internal controls needed strengthening and that a company in the risk management business was making highly speculative bets, AIG, during the first phase of the Class Period, misled investors by concealing the Company's subprime exposure, while continuing to provide assurances that it was moving toward greater "transparency" in its disclosures and a full remediation of its accounting systems. Thus, AIG's SEC filings in this first phase of the Class Period acknowledged that it engaged in "credit derivatives transactions," but little else. The Company steadfastly avoided use of the term "credit default swap" or telling investors that the Company

was insuring "collateralized debt obligations," many of which were comprised almost entirely of "subprime" mortgages. At the same time, it proclaimed that the risk of a "payment obligation" arising on its "credit derivatives transactions" was "remote, even under severe recessionary market scenarios." Nowhere did AIG disclose that it could be forced to post tens of billions of dollars of collateral if the value of the CDOs being insured by the credit default swaps declined. Indeed, AIG was expressly aware that valuation declines were likely to occur because its decision to discontinue writing credit default swaps on subprime debt at the end of 2005 was based on its conclusion at that time that the U.S. residential housing market was contracting and that the quality of subprime loans had greatly deteriorated.

**May 2007 - February 2008**

The next phase of the Class Period runs from May 31, 2007, the date the Company held an investor conference concerning AIGFP, through February 28, 2008, when AIG filed its 2007 Form 10-K. By the start of this period, the crisis in the subprime mortgage market was beginning to emerge publicly. The intense interest concerning its impact on financial institutions created pressure on AIG to provide more information concerning its subprime exposure. As a result, the Company, for the first time, began to provide information concerning the subprime exposure in its CDS portfolio and its investments. However, along with these disclosures, AIG waged an intensive campaign to convince investors that it was "a very safe haven in stormy times" and would suffer no ill effects from its subprime exposure.

For example, in a series of investor conferences held in May, August, November and December of 2007, AIG executives repeatedly assured investors that the Company would not realize a single dollar in losses arising from its CDS contracts. In so doing, it misled investors into believing that the primary risk in the CDS portfolio was the "remote" possibility of a default

on the underlying CDOs being insured by AIG, while essentially ignoring a much more serious risk - the obligation to post collateral.  The subprime exposure of the CDS portfolio created a very substantial risk that the value of the portfolio would plummet, as the underlying CDOs lost value.  Hand-in-hand with the declines in the value of the CDS portfolio and underlying CDOs was the likelihood that AIG would be forced to post tens of billions of dollars in collateral to assure its counterparties of the Company's ability to perform on its CDS contracts.  These risks were more than just hypothetical concerns; indeed, they were being realized during this period. By August, AIG's counterparties, including Goldman Sachs, began to make collateral calls and disputed the Company's valuations of the underlying CDOs.  AIG did not publicly disclose the collateral calls until November, and even then did not disclose the amount of collateral demanded by its CDS counterparties or the amount that AIG had been required to post. Moreover, even as AIG was disclosing the bare fact that counterparties had made collateral calls, AIGFP's president, defendant Cassano, effectively derided them as mostly illegitimate "drive bys," while falsely assuring investors that AIG had the financial strength and liquidity to meet any subsequent collateral calls that might be made.

Even more significantly, AIG vastly overstated the value of the CDS portfolio and concealed that it had a material weakness in its internal controls in regard to the portfolio's valuation.  For the first two quarters of 2007, AIG did not take any write-downs in the valuation of the CDS portfolio, even though there were numerous indicators in the market – such as the marked decline in indices tracking the valuation of CDOs – that should have put the Company on notice that its credit default swaps were overvalued.  In the third quarter of 2007, AIG finally wrote down the value of the CDS portfolio, but only by a modest $352 million.  By this time, however, a vice president of accounting policy at AIGFP, Joseph St. Denis, who had been hired

8

for the specific purpose of providing greater corporate oversight of AIGFP's accounting policies, had already resigned after being rebuffed by defendant Cassano in his attempts to raise questions concerning the propriety of the portfolio's valuation. Cassano told St. Denis that he had been "***deliberately excluded***" from the CDS valuation process due to Cassano's concerns that St. Denis would "***pollute the process***." St. Denis discussed his concerns with AIG's corporate accounting management and with the Company's outside auditor, PricewaterhouseCoopers LLP ("PwC"). Thereafter, on November 29, 2007, PwC warned AIG's senior management that the Company could have a material weakness in its internal controls relating to the CDS portfolio valuation.

In spite of this warning, AIG management proceeded to hold an investor meeting just days later, on December 5, where the Company announced that the losses on the CDS portfolio had increased somewhat to $1.4 - $1.5 billion. This amount, however, was vastly and deliberately understated. By February 11, 2008, with PwC's audit of the Company's year-end financial results underway, AIG was forced to publicly acknowledge that it had under-reported the losses in the CDS portfolio *by more than $4.3 billion*, that its previous valuation of the CDS portfolio had included the benefit of certain "adjustments" that failed to comply with GAAP, and that PwC had advised the Company of material weaknesses in its internal controls concerning the CDS portfolio valuation.[2] On February 28, 2008, AIG released its year-end financial results,

---

[2]    As noted in the Complaint, AIG is the subject of an ongoing criminal investigation by the Department of Justice ("DOJ"). Since the filing of the Complaint, an article in *The Wall Street Journal* reported on September 11, 2009 that federal prosecutors are preparing to impanel a grand jury to consider indictments of Cassano and other employees. According to the article, the DOJ's investigation centers on whether Cassano and others misled investors by "overstating the value of mortgage-related contracts." The article further cited the existence of *tape recorded conversations* in which Cassano and others purportedly discussed the impact of the deteriorating mortgage market on the CDS portfolio in terms that appear to contradict what was being told to investors. *See* "Prosecutors Are Poised to Impanel AIG Grand Jury," *The Wall Street Journal*,

reporting a whopping $11.5 billion cumulative loss on the value of the CDS portfolio.  AIG also disclosed for the first time that it had posted $5.3 billion in collateral arising from declines in the valuation of the securities insured by the credit default swaps.  AIG nevertheless insisted that its poor financial results were not indicative of the true financial strength and potential of the Company.

**March 2008 - September 2008**

While AIG's February 2008 announcements constituted significant partial corrective disclosures, defendants nevertheless labored to conceal the Company's true financial condition. As the crisis in the housing and mortgage markets deepened and intensified, AIG continued to mislead investors by proclaiming that it had more than ample resources to weather the storm and position itself for future growth.  Even though AIG raised approximately $20 billion in capital during May 2008, the injection of new capital was characterized by management as a means to increase "financial flexibility" and "support the growth of [AIG's] business," rather than the frantic effort to raise money to meet collateral calls that it really was.  Several times, AIG's CEO, defendant Martin Sullivan, referred to the Company's balance sheet as a "fortress."

By the end of the Class Period, this fiction could no longer be maintained.  As the crisis in the U.S. residential housing and mortgage markets grew even more acute, AIG became subject to tens of billions of dollars of additional collateral calls from counterparties.  The value of AIG's investments in RMBS also declined sharply and the liquidity of such investments became increasingly impaired.  When borrowers in AIG's securities lending program demanded the return of their cash collateral, the Company was unable to generate sufficient cash to meet their

---

Sept. 11, 2009.  A copy of this article is attached as Exhibit 1 to the Declaration of Jeffrey W. Golan in Support of Lead Plaintiff's Memorandum of Law in Opposition to Motions to Dismiss the Consolidated Class Action Complaint ("Golan Decl.").

demands.  AIG became caught in a liquidity vise, unable to meet the twin demands of its CDS counterparties and securities lending borrowers.  Bankruptcy was averted only when the U.S. government stepped in with an emergency $85 billion bailout package on the night of September 16, 2008.

Plaintiffs are not alleging that the transactions that resulted in AIG's downfall were the product of "evil geniuses" who "knowingly" set out to bring the Company and the global financial system to ruin.  But if the management of AIG did not set out to destroy the Company, it nonetheless utterly failed to provide investors with an accurate and a transparent view of AIG's exposure to the U.S. residential mortgage market and the risks associated with such exposure. Instead, as detailed further below, the subprime exposure of AIG's CDS portfolio and securities lending investments remained hidden for much of the Class Period.  When the press of events forced the Company to provide more information about the nature of these businesses, AIG changed tactics and went into an aggressive mode to falsely reassure investors.  It repeatedly stated that the risk of even a single dollar in losses was "remote."  It overstated the value of the CDS portfolio.  It concealed a material weakness in its internal controls.  And it assured investors that the Company had the financial strength and liquidity to "ride out the storm," even as it was scrambling to raise additional capital so that it could meet the incoming wave of collateral calls.

### THE CLAIMS ASSERTED BY PLAINTIFFS AND
### THEIR RESPONSE TO THE MOTIONS TO DISMISS

Plaintiffs assert two sets of claims in the Complaint.  The first asserts a series of fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against those defendants who made materially false and misleading statements with scienter and that caused the prices of AIG securities to be artificially inflated over the course of the Class Period.  ¶ 29.  The defendants on the Exchange Act claims are AIG, four senior executives of

AIG (Sullivan, the Chief Executive Officer and President for much of the Class Period; Bensinger, the Chief Financial Officer; Herzog, the Chief Accounting Officer; and Lewis, the Chief Risk Officer (collectively, the "AIG Section 10(b) Defendants")), two senior executives of AIGFP (Cassano, the President of the unit, and Forster, Executive Vice President of Asset Trading & Credit Products (the "Assets/Credit Group") at AIGFP (together, the "AIGFP Section 10(b) Defendants," and together with AIG and the AIG Section 10(b) Defendants, the "Section 10(b) Defendants")); and Frost, who headed the U.S. Assets/Credit Group operations and is sued only as a control person under Section 20(a) of the Exchange Act.

The second set asserts strict liability and negligence claims under the Securities Act of 1933 ("Securities Act") against those defendants who are statutorily liable under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements in, and misleading omissions from, the offering documents for AIG's public offerings during the Class Period (the "Offering Materials").   ¶ 30.   Plaintiffs expressly disclaim any incorporation of allegations pertaining to fraud into these claims, and designed the Complaint to reflect that the Securities Act claims are separate and distinct from the fraud claims asserted against the Section 10(b) Defendants.  *See, e.g.,* ¶¶ 580, 607, 621, 639, 684, 696.  Through the offerings, which are identified in the Complaint at ¶¶ 591-592, AIG raised in excess of $10 billion from its note offerings, plus approximately $7.45 billion from an offering of common stock and $5.4 billion from an offering of Equity Units on May 12, 2008. ¶ 30. The defendants on the Securities Act claims are AIG, the AIG directors who signed the registration statements (the "Director Defendants"), AIG's outside auditor, PwC, the underwriters of the stock and bond offerings (the "Underwriter Defendants"), and certain AIG executives sued in their capacities as control persons.

Each of the defendants has moved to dismiss the Complaint. The Section 10(b) Defendants primarily attack the Complaint on the grounds that it does not adequately allege materially false or misleading statements or omissions, and that it does not support a strong inference of scienter against these defendants. Certain of the individual defendants also challenge the allegation that they were control persons of AIG for purposes of Section 20(a) liability under the Exchange Act.

The Underwriter Defendants, PwC and the Director Defendants primarily challenge the Securities Act claims against them on the grounds that the offering documents (which incorporated by reference Forms 10-K, 10-Q and 8-K filed with the SEC) were not materially false or misleading at the time they became effective; that there was no duty to disclose certain information that plaintiffs assert was necessary to make statements in the offering documents not materially misleading; and various other defendant-specific arguments. The Section 10(b) Defendants incorporate many of these arguments into their motions to dismiss, particularly with respect to their arguments that the Complaint fails to plead actionable misstatements or omissions. Finally, certain defendants raise standing and statute of limitations arguments as additional grounds for seeking a dismissal of claims relating to certain of the offerings.

In this brief, plaintiffs respond to the arguments of the defendants in the following manner. First, we present a Statement of the Case to provide an accurate description of what the Complaint alleges and the factual basis for plaintiffs' allegations. Second, plaintiffs demonstrate that the false and misleading statements and omissions asserted in the Complaint are actionable under the Exchange Act, and that such statements and omissions were made with scienter by the Section 10(b) Defendants. In this section, we respond to arguments made by the Section 10(b) Defendants as well as arguments made by other defendants (primarily PwC and the Underwriter

Defendants) that challenge whether actionable misstatements have been pled. We further respond to arguments raised by certain defendants on the control person claims against them under Section 20(a), as well as a loss causation argument raised by AIG and certain of the other defendants.

Third, we provide the Court with the background of the claims being made under the Securities Act, which seek compensation for AIG investors who purchased securities issued during the Class Period pursuant to three Shelf Registration Statements. We note that the SEC filings incorporated by reference into the Offering Materials contained materially false and misleading statements and omissions, referring back to the discussion of those SEC filings in the section relating to the Section 10(b) claims, and we further address the specific arguments presented by the Underwriter Defendants, PwC, the Director Defendants and other defendants who have challenged the Securities Act claims. In this section, we also respond to control person arguments asserted by certain of AIG's and AIGFP's former executives.

Finally, we conclude this brief by requesting that all of the motions to dismiss should be denied in their entirety, so that this case can proceed to discovery.

## STATEMENT OF THE CASE[3]

In moving to dismiss the Complaint, AIG and the other named defendants have asserted, as their overarching theme, that plaintiffs' claims are classic "fraud-by-hindsight" allegations. They portray the Complaint as seeking to hold them responsible for lacking clairvoyance that a "tsunami" would overtake the financial markets in September 2008, bringing down AIG and

---

[3]    The Statement of the Case is based on facts alleged in the Complaint. In moving to dismiss, certain of the defendants have sought to rely upon a variety of documents not properly before the Court, including numerous reports, statements and remarks that are not referenced or relied upon in the Complaint. For this reason, concurrently with the filing of this opposition brief, Lead Plaintiff is submitting its motion to strike certain of the exhibits submitted by defendants in support of their motions to dismiss.

other institutions with it.  They contend that if they had known that AIG's credit default swaps were "ticking time bombs" as alleged in the Complaint, they would have acted to defuse them, thereby avoiding the enormous losses they themselves incurred, along with AIG's shareholders and employees.  They argue that the misconduct alleged in the Complaint, at most, constitutes acts of corporate mismanagement for which no redress is available under the federal securities laws.

These arguments would indeed be compelling if they were based on an accurate depiction of what the Complaint alleges.  But the Complaint is not based on a hindsight view of events. Nor does it seek to hold defendants responsible for failing to predict the future or making bad business decisions.  Contrary to the defendants' characterization of the Complaint, plaintiffs do not contend that defendants "knew" that AIG's exposure to subprime mortgages would ultimately cause its collapse.  Rather, plaintiffs contend that AIG effectively misled investors and deprived them of the ability to make informed investment decisions by concealing material adverse information about, among other matters, the Company's credit default swaps, securities lending business, risk exposures and internal controls.  As this section of Lead Plaintiff's brief will demonstrate, the Complaint identifies *contemporaneous facts* showing defendants' statements during the Class Period were materially false and misleading.

## I.    Background Facts

### A.    AIGFP and Credit Default Swaps

At the beginning of the Class Period, AIG stood as one of the world's largest insurance and financial services companies.  It employed nearly 100,000 people, wrote more than $40 billion in net premiums, and had more than 65 million customers worldwide.  ¶ 3.  By the end of the Class Period, AIG was on the brink of bankruptcy, a fate that was averted only by an

emergency $85 billion U.S. government bailout.  ¶ 25.  AIG's descent from a financial colossus to a ward of the state resulted from the Company's exposure to hundreds of billions of dollars of debt securities linked to the U.S. residential mortgage market.  ¶ 14.  When defaults started piling up on the subprime mortgages that underpinned much of this debt, the fortunes of AIG went into a tailspin.

The business unit whose transactions resulted in much of the wreckage at the Company, AIGFP, was a relatively small entity that employed about 400 individuals at the end of 2005.  ¶ 4.  AIGFP was formed to extract profits from financial institutions through the use and development of financial derivative products designed to insulate institutions against various types of financial risk.  These included "swap" agreements in which AIGFP was paid a fee to assume the risk of various types of business transactions.  ¶¶ 4, 82.  In 1998, AIGFP began writing a form of swap agreement known as a credit default swap.  Credit default swaps are contracts that function much like insurance policies on debt securities.  In essence, AIGFP, in exchange for premiums paid by a "counterparty" over a period of time, obligated itself to pay the counterparty the par value of the referenced debt instrument in the event of a default on that instrument.  ¶ 94.  Around 2004, AIGFP began writing credit default swaps on so-called "multi-sector CDOs."  These complex debt instruments often packaged together 100 or more securities.  Initially, such multi-sector CDOs were backed by pools of mortgages, auto loans and credit card receivables, but over time, they were backed almost exclusively by subprime mortgages.  ¶ 8.

From 1998 through March 2005, AIGFP entered into approximately 200 CDS contracts.  However, after the departure of Greenberg as AIG's chairman and CEO, the pace of CDS contracts written by AIGFP greatly accelerated, with more than 220 CDS contracts written from March 2005 through the end of the year.  Most of the CDS contracts issued during 2005 were

written for multi-sector CDOs.   By this time, the greatest portion of the multi-sector CDOs

contained mortgage securities that included large amounts of subprime debt.   As a result, AIG's

exposure to subprime debt was vastly increased.   ¶ 8.   By the end of 2005, AIG was saddled with

credit default swaps insuring $80 billion of multi-sector CDOs that, for the most part, were

comprised of subprime debt.   ¶ 102.

**B.      AIGFP's Decision to Discontinue Writing Credit Default Swaps**

As 2005 drew to a close, AIGFP knew there were serious risks in continuing to write

credit default swaps on multi-sector CDOs.   During 2005, there were disturbing signs that the

underwriting standards for subprime mortgages had significantly deteriorated.   Another division

of AIG that was in the mortgage lending business, American General Financial Services, became

so concerned about the state of the industry that it stopped approving subprime loans.   According

to an article in *The New Republic* based on interviews with AIG executives, "word spread from

American General to AIGFP that the subprime business was a minefield."   ¶ 108.

In the fall of 2005, Eugene Park, who ran AIGFP's corporate credit derivative portfolio,

was asked to accept a promotion and take charge of the marketing of credit default swaps to Wall

Street investment banks.   Before agreeing to assume this position, Park undertook to review

AIGFP's credit default swap business.   Park was "stunned" by what he found.   As described by

the *Washington Post* based on interviews it conducted of AIGFP employees, and as related to

Lead Plaintiff's investigators by a confidential witness, Park concluded that the underwriting

practices associated with subprime loans had become so shoddy that they could default at any

time, regardless of the geographic area in which the loan was being made.   He determined that

these subprime loans formed too large a portion of the CDOs being insured by credit default

swaps, raising the risks to unacceptable levels.   Whereas earlier CDOs were deemed "multi-

17

sector" because they included different types of assets, such as AAA credit card debt, AAA student loans and AAA prime mortgage collateral, the CDO deals being put together during 2005 were almost entirely comprised of subprime mortgages. *See* ¶¶ 109-113. Given the large percentage of subprime mortgages that came to comprise the CDOs and the diminished underwriting standards used in originating them, AIG concluded that its model for managing risk, developed by outside consultant Gary Gorton, was no longer adequate. Based on the review conducted by Park and others, AIGFP determined by the end of 2005 that it would discontinue writing credit default swaps on CDOs backed by subprime mortgages. ¶¶ 110-11, 114.

This decision did nothing to ameliorate the risks posed by the CDS contracts already written. AIG did not seek to divest itself of its CDS portfolio, so the contracts remained on the Company's books and imposed continuing obligations for the duration of the contracts. Nor did AIG undertake to hedge against any potential losses arising from the CDS portfolio. According to witnesses interviewed by Lead Plaintiff's investigators, hedging against the CDS contracts would have eroded their profitability. Since the bonuses of AIGFP management were highly dependent on the CDS business, the failure to hedge against the contracts was largely the product of management's desire to increase its compensation. ¶¶ 125-26.

The risks presented by continuing to hold the unhedged CDS portfolio were threefold. First, in the event that any of the CDOs insured by AIG defaulted, AIG was obligated to pay the par value (also referred to as the "notional" amount) of the CDO, effectively purchasing the CDO at full value. [4] Second, even absent default, concern in the market about the possibility of default could cause the value of the credit default swaps to decline. AIG was required by GAAP

---

[4]    The term "notional amount," when used in reference to a credit derivative, refers to the face amount of the credit instrument referenced by the derivative. Thus, the notional amount of a credit derivative represents the amount of the maximum potential exposure to the seller of the derivative in the event of a default.

to carry the CDS portfolio on its books at "fair value." If the referenced CDOs declined in value due to concerns about the risk of default, the value of the CDS portfolio would also decline. Finally, the CDS portfolio presented a risk that AIG would have to post significant collateral. Because a credit default swap is a form of guarantee, the contracts contained provisions establishing conditions that would require AIG to "post collateral" as an assurance that it would be able to meet its obligation in the event of a default. Generally, AIG would be required to post collateral if its own credit rating was downgraded *or* if the underlying CDOs were subject to ratings downgrades or experienced a decline in value. Thus, apart from the risk of making payments arising from defaults, AIG was subject to the risk of being required to post tens of billions of dollars of collateral if the underlying CDOs declined in value due to a downturn in the U.S. residential housing market. ¶¶ 11, 117-21.

C.     **AIG's Securities Lending Business Further Increases the Company's Exposure to the U.S. Residential Mortgage Market**

Paradoxically, at about the same time that AIGFP deemed subprime mortgages too risky to warrant the continued writing of credit default swaps, another division of the Company, AIG Investments, determined to ***increase*** its exposure to subprime debt. AIG Investments managed the investment funds of AIG's global insurance subsidiaries. In connection with its investment management activities, AIG Investments also oversaw the Company's securities lending business, through which AIG would lend securities to banks and brokerage firms in exchange for cash collateral. In late 2005, AIG Investments adopted a goal of seeking to generate an additional $1 billion in annual profit. In furtherance of this goal, the management of AIG Investments signed off on a proposal to change the way in which it invested the cash collateral received from securities lending borrowers. Rather than investing the cash collateral in safe and highly liquid as AIG had largely done previously, AIG Investments determined to invest up to 75

percent of the cash collateral in asset-backed securities, including securities backed by subprime mortgages and credit card debt. By mid-2007, the securities lending portfolio was valued at $94 billion, consisting principally of RMBS, including subprime debt. ¶¶ 244-45. Thus, at the same time that AIGFP recognized the significant deterioration in underwriting standards in the U.S. residential mortgage market and stopped writing credit default swaps on CDOs exposed to subprime mortgages, AIG Investments made a concerted effort to increase its exposure to the same types of financial instruments.

Under the securities lending program, the cash collateral received from borrowers was supposed to equal 102 percent of the value of the securities being loaned. However, although not publicly acknowledged by AIG, the Company often accepted less than 102 percent. Instead, AIG itself deposited funds into the collateral pool to maintain the collateral received at 102 percent. ¶ 209.

### D.    AIG's Relaxation of Controls Over AIGFP

In the wake of accounting scandals, government investigations and the resignation of Greenberg, AIG entered 2006 seeking to rebuild its tarnished reputation. Greenberg's successor, defendant Martin Sullivan, repeatedly emphasized AIG's purported commitment to greater "transparency" in its financial disclosures. In a March 16, 2006 press release announcing AIG's 2005 financial results, Sullivan alluded to AIG's prior financial restatements and a recent settlement with various government regulators, declaring that "AIG today is a better company for all that we have been through." ¶ 255. In its 2005 Form 10-K, filed on the same day, AIG stated that the Company had "taken several significant actions to improve its control environment, starting with the appointment of new senior management with a new tone and philosophy" and that the Company's CEO and CFO "are committed to achieving transparency and clear

20

communication with all stakeholders." ¶ 257. A year later, Sullivan, in connection with the announcement of AIG's 2006 financial results, cited the "significant progress made throughout the year in improving our financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance." ¶ 279.

The effort to remediate certain identified weaknesses in its internal controls did not extend to AIGFP and its credit default swap business. Indeed, AIG's controls over AIGFP were *loosened* following Greenberg's departure from the Company. While he was in charge of AIG, Greenberg insisted on close supervision of AIGFP by AIG's senior management. However, Sullivan, according to published news reports, "wasn't really interested in the business." He eliminated twice-a-month meetings that Greenberg held to assess AIGFP's businesses. ¶ 129. The President of AIGFP, defendant Joseph Cassano, actively rebuffed efforts by the management of the parent company to exercise supervisory control. ¶¶ 129-30. As a former executive vice president at AIGFP noted, "I was there [several] years and never met anyone from AIG." ¶ 136.

The insular nature of AIGFP's operations was particularly characteristic of the operations of the Assets/Credit Group, headed by defendants Cassano and Forster, which ran the credit default swap business out of the Company's London office. ¶ 132. While most information concerning the operations of AIGFP was maintained on a company-wide management information system, information concerning the credit default swap business was separately maintained by Cassano on a spreadsheet in London. The accounting and risk management functions at AIG did not have access to this spreadsheet. ¶ 134. Indeed, the head of risk management at AIGFP, Pierre Micottis, was ***excluded*** from performing risk management functions for the Assets/Credit Group. ¶ 137. Moreover, while Cassano presided over weekly marketing and trading meetings that reviewed each of AIGFP's businesses and the risk

21

management issues associated with them, discussion of the credit default swap business was largely absent from these meetings. According to a former AIGFP vice president with responsibility for management information systems, the Assets/Credit business "was definitely treated differently and wasn't as transparent as the other businesses." ¶ 135. A former AIGFP executive vice president stated that the credit default swap business was purposely isolated in London so that it would not be subject to the same scrutiny that other business received from AIG. ¶ 138. Thus, it should have come as no surprise to AIG management when PwC reported finding a material weakness in AIG's and AIGFP's internal controls concerning the valuation of the CDS portfolio due to a "lack of timely elevation of key data to the AIG level and the fact that AIGFP designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting function." ¶ 131.

## II.    AIG's False Portrayal of Its Financial Condition and Risk Exposures

### A.    March 2006 - May 2007:  Defendants' False and Misleading Statements

In AIG's annual 2005 and 2006 SEC filings, as well as its quarterly filings for 2006, the term "credit default swap" scarcely appears. Instead, AIG discussed its "credit derivatives transactions" in vague, general terms, stating that its "credit derivatives" provided "credit protection on a designated portfolio of loans or debt securities." This generic description encompassed a variety of types of derivatives, including various types of credit default swaps. Nowhere did AIG discuss the fact that it had written credit default swaps on CDOs or the exposure to subprime mortgages that resulted from them. At the same time, AIG assured investors that the risk of loss on its "credit derivatives transactions" was "remote, even in severe recessionary market scenarios." For example, in its 2005 Form 10-K, filed on March 16, 2006, AIG discussed its credit derivatives transactions as follows:

AIGFP enters into credit derivative transactions in the ordinary course of its business. The majority of AIGFP's credit derivatives require AIGFP to provide credit protection on a designated portfolio of loans or debt securities. AIGFP provides such credit protection on a "second loss" basis, under which AIGFP's payment obligations arise only after credit losses in the designated portfolio exceed a specified threshold amount or level of "first losses." *The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote, even in severe recessionary market scenarios.*

In certain cases, the credit risk associated with a designated portfolio is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies. Typically, there will be an equity layer covering the first credit losses in respect of the portfolio up to a specified percentage of the total portfolio, and then successive layers that are rated, generally a BBB-rated layer, an A-rated layer, an AA-rated layer, and an AAA-rated layer. In transactions that are rated, the risk layer or tranche that is immediately junior to the threshold level above which AIGFP's payment obligation would generally arise is rated AAA by the rating agencies. In transactions that are not rated, AIGFP applies the same risk criteria for setting the threshold level for its payment obligations. Therefore the risk layer assumed by AIGFP with respect to the designated portfolio in these transactions is often called the "super senior" risk layer, defined as the layer of credit risk senior to a risk layer that has been rated AAA by the credit rating agencies or if the transaction is not rated, equivalent thereto. For example, in a transaction with an equity layer covering credit losses from zero to two percent of the total portfolio, a BBB-rated layer covering credit losses from two to four percent, an A-rated layer from four to six percent, an AA-rated layer from six to eight percent, and a AAA-rated layer from eight to 11 percent. AIGFP would cover credit losses arising in respect of the portfolio that exceeded an 11 percent first loss threshold amount and thereby bear risk that is senior to the AAA-rated risk layer.

AIGFP continually monitors the underlying portfolios to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk. *AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion.* AIGFP has never had a payment obligation under these credit derivatives transactions where AIGFP is providing credit protection on the super senior risk. Furthermore, based on portfolio credit losses experienced as of December 31, 2005 under all such outstanding transactions, no transaction has experienced credit losses in an amount that has made the likelihood of AIGFP having to make a payment, in AIGFP's view, to be greater than remote, even in severe recessionary market scenarios. At December 31, 2005, the notional amount with

respect to the Capital Markets credit derivative portfolio (including the super senior transactions) was $387.2 billion.  ¶ 259.[5]

AIG's description of its "credit derivatives transactions" was totally lacking in the "transparency" promised by defendant Sullivan.  Absent from this description was any mention of the credit default swaps written to insure CDOs, including $80 billion of so-called "multi-sector" CDOs that contained significant subprime exposure.  AIG also did not disclose that it had stopped writing credit default swaps on CDOs that contained subprime debt as a result of the internal review conducted by Park and others at the end of 2005.

AIG's statements that there was only a "remote" likelihood that AIG would experience losses on its credit derivatives transactions, "even in severe recessionary market scenarios," was also highly misleading.  AIG failed to disclose, for example, that apart from the risk of loss arising from defaults, the Company was also exposed to the risk of having to post billions of dollars of collateral if the referenced CDOs experienced ratings downgrades or declined in value.  Indeed, elsewhere in the 2005 Form 10-K, AIG implied that the only circumstance in which the Company could be required to post collateral was if AIG's corporate bond rating was downgraded.  ¶¶ 263, 266(f).  However, AIG knew that there was a significant likelihood that collateral postings would be required because it had already concluded that the U.S. residential mortgage market was contracting and that underwriting standards on the subprime mortgages underlying the CDOs had greatly deteriorated.  AIG's description of its "credit derivatives transactions" was also highly misleading in its assertion of the "ability to opportunistically economically hedge" such transactions, since the Company had already determined to leave the

---

[5]    As used herein, bold-face and/or italicized print within quoted statements of defendants denotes added emphasis.

CDS portfolio largely unhedged so as to avoid eroding the profitability of the transactions. ¶ 266 (c), (d) and (e).

The 2005 10-K also described "significant actions" that had purportedly been undertaken to improve AIG's control environment. These included: "the appointment of new senior management with a new tone and philosophy;" "increased resources for technical accounting, internal audit, enterprise risk management and compliance functions;" the establishment of a Financial Disclosure Committee charged with assisting the CEO and CFO "in fulfilling their responsibilities for the oversight of the accuracy and timeliness of the disclosures made by AIG;" strengthening the position of Chief Risk Officer "to work more closely with top executives at the corporate and major business unit levels to identify, assess, quantify, manage and mitigate risks to AIG;" establishing an Operational Risk Management department "to engage in expanded risk self-assessment processes for more effective identification and management of operational and reputational risks;" and "expand[ing] the scope and activities of the corporate level Complex Structure Finance Transaction Committee, to review and approve transactions that could subject AIG to heightened legal, reputational, regulatory or other risk." ¶ 257. In addition, the 2005 10-K identified material weaknesses in internal control over financial reporting in five areas, stating that remediation had been completed in two of them.

These representations were materially false and misleading. Far from strengthening internal controls, such controls were effectively weakened or overridden in regard to the oversight, structuring, marketing and valuation of the CDS portfolio. As described above and in the Complaint, key personnel at both AIG and AIGFP were excluded from the valuation and risk management processes. ¶¶ 134-138. Instead, decisions relating to the CDS portfolio, including its valuation, were largely left to Cassano and a small number of other individuals at AIGFP.

25

Indeed, notwithstanding the explosive growth in the number of CDS contracts with subprime exposure written after Greenberg's departure in 2005, oversight of AIGFP by AIG was significantly relaxed.

The 2005 10-K contained a passing reference to AIG's securities lending program in a financial statement footnote: "AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent.  Invested collateral consists primarily of floating rate debt securities.  Income earned on invested collateral, net of interest payable to the collateral provider, is recorded as net investment income."  ¶ 264.  The footnote thus concealed from investors the decision made by AIG in late 2005 to increase investment income by investing 75% of the cash collateral from borrowers in RMBS and other ABS, and the significant concentration of risk in the U.S. residential housing and mortgage markets arising therefrom.  ¶ 266 (g).[6]

**B.      May 2007 - February 2008:  Defendants' False and Misleading Statements**

**1.      The Emergence and Manifestation of the Subprime Mortgage Crisis**

By the beginning of 2006, the U.S. residential housing market had peaked and was beginning to cool.  Through the first several months of the year, the increase in home sales prices slowed.  Then, from mid-2006 onward, home sales prices began to decline by accelerating amounts.  ¶ 140.  By early fall 2006, it was evident that the real estate bubble was bursting and, as a result, default rates for subprime mortgages were increasing.  By early 2007, numerous subprime mortgage originators either went out of business or filed for bankruptcy.  ¶¶ 143-44. Another barometer of the subprime mortgage market's woes was the precipitous declines of indices, such as the ABX and TABX, that were created during 2006 and 2007 to track the value

---

[6]      AIG's 2006 10-K, 2006 Forms 10-Q and first quarter 2007 Form 10-Q made materially false and misleading representations similar to those in the 2005 10-K.  *See* ¶¶ 267-300.

of various types of CDOs.  For example, the TABX index for mezzanine super senior CDOs declined by 15% during the first quarter of 2007, and by 40% through the first half of the year.  ¶ 146.  By the spring of 2007, the liquidity of CDOs was evaporating.  Two hedge funds operated by Bear Stearns collapsed amid losses on CDO investments.  When creditors seized the assets of these hedge funds, the CDOs were either sold at deep discounts or could not be sold at all.  ¶ 148.

## 2.     Defendants' False and Misleading Statements

As the subprime mortgage crisis deepened in 2007, investors clamored for information concerning its impact on financial institutions.  AIG began to respond to investor concerns during the second quarter of 2007.  But rather than being forthcoming about the risks posed by the Company's exposure to subprime debt, AIG's response was to wage an all-out campaign to convince investors that it was different from those companies vulnerable to the subprime mortgage crisis, calling AIG "a very safe haven in stormy times," and confidently asserting that it would not suffer any adverse effects.  For example, on May 31, 2007, AIG made a special presentation to investors to provide an overview of AIGFP's business.  Defendant Andrew Forster, an executive vice president at AIGFP, led the discussion on the credit default swap business.  Forster told investors that AIGFP conducted this business assuming "the worst recession I can imagine and … mak[ing] sure that I can withstand all of that."  Forster further assured investors: "With the advent of the CDO market and the CDS market, it's actually fairly easy for us to hedge any of the risk that we perceive.  So if the portfolio, if it did start to deteriorate, it would be very easy for us to go out, buy an extra layer of protection to make sure that we maintain the sort of super senior portfolio still.  I have to say, given the conservatism … that we've built in these portfolios, we haven't had to do a huge amount of hedging over the

years." ¶ 301. Forster thus portrayed the likelihood of loss arising from the CDS business as extremely remote, while concealing the tens of billions of dollars of collateral calls to which AIG could become subject as a result of declining values and ratings cuts in the underlying CDOs. Forster also concealed that AIGFP had made a calculated decision not to hedge the CDS transactions because doing so would erode the profitability of the business and reduce the enormous compensation paid to AIGFP management. ¶ 302.

On August 8, 2007, AIG announced its second quarter 2007 financial results, issuing a press release and filing its second quarter 2007 Form 10-Q. In the face of the crisis gripping the financial markets, defendant Sullivan assured investors that *"[AIG] continue[s] to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities."* ¶ 303. In its second quarter 10-Q, AIG, for the first time, expressly referred to "credit default swaps" that insured "CDOs" that were "exposed" to "residential mortgage-backed securities," including "subprime collateral." ¶ 304. AIG also provided for the first time information concerning the extent of the Company's investments in RMBS and CDOs. ¶ 306. Yet notwithstanding these disclosures, AIG maintained that the effects of "serious disruption" of the U.S. residential mortgage market were not expected to be material to AIG's overall financial position. ¶ 306.

This point was made even more forcefully during a conference call AIG held with investors on August 9, 2007 that included a special presentation concerning the Company's exposure to the U.S. residential mortgage market. The presentation was made by defendant Robert Lewis, AIG's senior vice president and chief risk officer, followed by a Q & A session in which Lewis was joined by other AIG executives, including defendants Sullivan and Cassano. With regard to the CDS portfolio, Lewis told investors that while AIG had "significant notional

exposure, ***the risk actually undertaken is very modest and remote and has been structured and managed effectively*** ... ***[W]e're talking about a very remote risk***, which is defined and calculated not just by rating agency models but also by our own very rigorous internal models used on each deal AIGFP structures …." ¶ 314.  He asserted: "As Chief Risk Officer of AIG, I'm confident in our people and our risk assessment processes.  Our exposures to this market are prudent, given the nature of our businesses and our financial strength."  ¶ 315.  Defendant Sullivan echoed Lewis's remarks, asserting that the CDS portfolio "is well structured, undergoes ongoing monitoring, modeling and analysis and enjoys significant protection from collateral subordination. … As I said, with all the uncertainty, recent volatility and on some occasions even panic in the market, hopefully we have demonstrated that with our superior financial strength, liquidity and cash flow we believe ***AIG is a very safe haven in stormy times and I remain extremely confident about our future***."  ¶ 316.  Defendant Cassano was even more blunt in discussing the likelihood that AIG would be adversely affected by its credit default swap transactions:  "***[I]t is hard for us, without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions. … [W]e see no issues at all emerging and we see no dollar of loss associated with any of that business in any reasonable scenario that anyone can draw.  When I say a reasonable, I mean a severe recession scenario that you can draw out for the life of those securities***."  ¶¶ 317, 319.

A similar refrain was heard from AIG when the Company announced its third quarter 2007 financial results on November 7, 2007.  In AIG's press release, defendant Sullivan acknowledged that the U.S. residential mortgage and credit market conditions had adversely impacted results for the quarter, but nevertheless maintained that "***our active and strong risk management processes helped contain the exposure***."  AIG disclosed a relatively small write-

down of $352 million due to an "unrealized market valuation loss related to its super senior credit default swap portfolio" and estimated that an additional $550 million loss had been incurred through October 2007.  Significantly, however, AIG continued to maintain that there was no likelihood that actual losses would be realized on its CDS portfolio:  "Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives."  ¶ 322.    Similar statements were made on AIG's November 8, 2007 third quarter conference call with analysts.  ¶¶ 329-30.

AIG's third quarter 2007 Form 10-Q made a veiled reference to differences that had arisen between the Company and its CDS counterparties as to the valuation of the credit default swaps and the extent of collateral that AIG was required to post as a result of valuation declines: "As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates."  ¶ 323.  When asked about collateral calls during AIG's third quarter conference call, defendant Cassano dismissed any concern about this reference, assuring investors that they posed no problem for the Company because "we have been husbanding our liquidity all through this very trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in."  ¶ 332.

These and other similar statements made by defendants were materially false and misleading.  AIG's valuation of the CDS portfolio did not reflect its "fair value" and was materially overstated.  ¶¶ 320 (b), 351 (a) and (b), 432-33.    AIG failed to disclose that its internal controls pertaining to the valuation of the CDS portfolio suffered from material

weaknesses.  ¶¶ 320(b), 351(c).  Defendants' repeated assertions that no losses would arise from AIGFP's credit default swap transactions were highly misleading because they knew, but failed to disclose, that declines in the market value or ratings downgrades of the underlying CDOs could require AIG to post *tens of billions of dollars* of collateral, straining the Company's liquidity.  ¶¶ 320(d), 351(d), (g).  Defendants' statements regarding AIG's risk management processes and monitoring of the CDS portfolio failed to disclose that the risk management, financial and accounting functions were deliberately excluded from decisions concerning the CDS portfolio, including its valuation.  ¶¶ 320 (f), 351 (c).

While defendants endeavored to salve investor concerns about the subprime crisis, they were well aware that the risks they avoided mentioning, *i.e.* collateral calls and declines in the valuation of the CDS portfolio to a far greater extent than what had been publicly disclosed, were being realized.  In August 2007, for example, Goldman Sachs demanded that AIG post $1.5 billion in collateral due to the decline in value of the assets backing the CDOs it had insured with credit default swaps.  AIG resisted this demand and negotiated an agreement to post $450 million in collateral.  By October, however, with valuations continuing to decline, Goldman made a second collateral demand for an additional $3 billion.  Again, AIG resisted, but ultimately agreed to post an additional $1.5 billion in collateral.  ¶¶ 154-155.  Neither the identity of Goldman Sachs as the counterparty making the demand, the size of the demands or the size of the collateral postings were disclosed to the market.  Moreover, given the similarities in the subprime mortgages underlying the Goldman CDOs to other CDOs AIG was insuring, the Goldman collateral demand was a red flag that significant adjustments needed to be made in the valuation of AIG's CDS portfolio.  Not only did AIG fail to make such adjustments, but the management of AIGFP also actively squelched efforts to consider Goldman's valuations and

those of other CDS counterparties in making its own valuation of the CDS portfolio. The valuations made by AIG's counterparties were particularly relevant because the credit default swap agreements frequently designated the counterparty bank as the "calculation agent," making the bank the presumptive prevailing party as to the value of the CDOs for the purposes of determining whether AIG was required to post collateral. ¶¶ 121, 319(d).

AIGFP's deliberate exclusion of relevant personnel and information from the CDS valuation process came to light through the post-Class Period congressional testimony of Joseph St. Denis, a former vice president of accounting policy at AIGFP from June 2006 through October 1, 2007. St. Denis, who had previously served as a former assistant chief accountant at the SEC Enforcement Division, was appointed to his position at AIGFP as part of the Company's effort to address material weaknesses previously cited by PwC in 2005. In his role at AIGFP, St. Denis was to provide AIG's Financial Services Division ("FSD") and Corporate Office of Accounting Policy ("OAP") with greater visibility and control over the operations and accounting policy practices of AIGFP, and to serve as an on-site resource for AIGFP business people as they developed proposed transactions. He also served on AIGFP's Transaction Review Board, which was responsible for evaluating and documenting the accounting for proposed transactions by customers of AIGFP. As part of his job, St. Denis was responsible for documenting the accounting for AIGFP's proposed transactions and building a consensus for the proposed accounting with his colleagues at FSD and OAP. ¶¶ 156-58.

In August 2007, Cassano berated St. Denis for raising accounting issues with FSD, rather than keeping them within AIGFP. Then, in early September 2007, St. Denis learned that AIGFP had received a multi-billion dollar "margin call" (*i.e.*, a collateral call) on certain of its credit default swaps. St. Denis stated that "I was gravely concerned about this, as the mantra at AIGFP

had always been (in my experience) that there could *never* be losses on the [credit default swaps]. I was questioning this mantra, in light of the margin call, as were the professionals in FSD and OAP." ¶¶ 160, 249(a). St. Denis sought to participate in AIGFP's valuation of the CDS portfolio. However, during the final week of September 2007, in a meeting that included the newly hired CFO of AIGFP, Cassano told St. Denis, "***I have deliberately excluded you from the valuation of the [CDS portfolio] because I was concerned that you would pollute the process***." ¶ 160.

On October 1, 2007, St. Denis tendered his resignation to AIGFP's general counsel, William Shirley. He told Shirley that he had lost faith in the senior-most management of AIGFP and could not accept the risk to AIG and himself of being isolated from corporate accounting policy personnel, especially given the situation concerning the valuation of the CDS portfolio. He also relayed his concerns to AIG's Chief Auditor Michael Roemer, who had contacted him to learn the reasons for his resignation. St. Denis told Roemer that the reason he resigned was Cassano's statement that he had deliberately been excluded from discussions regarding the valuation of the CDS portfolio. Roemer agreed that St. Denis had been "painted into a corner" by Cassano, and had no choice but to resign. Roemer brought his conversation with St. Denis to the attention of AIG's Audit Committee. Thereafter, St. Denis was contacted by the PwC engagement partner and he reiterated that Cassano had sought to impede his communications with his colleagues in the parent organization. ¶¶ 164-166.

PwC also became aware in late November that AIG planned to hold an investor meeting on December 5, 2007. PwC met with defendants Bensinger and Sullivan because of the upcoming investor meeting and warned them that AIG could have material weaknesses in its

internal controls relating to, among other matters, the CDS portfolio.  Minutes of a January 15, 2008 meeting of AIG's Audit Committee reflect that:

> *Mr. Ryan [of PwC] reported that in light of AIG's plans to hold the investor conference on December 5, PwC raised their concerns with Mr. Sullivan and Mr. Bensinger on November 29, informing them that PwC believed that AIG could have a material weakness relating to the risk management of these areas.* ¶ 171.

Notwithstanding the concerns expressed by PwC, AIG proceeded with the December 5, 2007 investor meeting, offering an updated valuation of the CDS portfolio that vastly understated the losses that had been incurred, along with continued assurances of the Company's financial strength to "absorb volatility" created by the subprime mortgage crisis.  At the December 5 meeting, and as later set forth in a Form 8-K filing on December 7, 2007, AIG represented that the value of the CDS portfolio had declined by $1.05 billion to $1.15 billion since September 30, 2007.  Taking the disclosure of these losses together with the $352 million loss reported for the third quarter of 2007, AIG led investors to believe that the total decline in value of the CDS portfolio through November 2007 was between $1.4 billion and $1.5 billion.  ¶ 333.  Moreover, despite PwC's warning that AIG could have a material weakness in its valuation of the CDS portfolio, defendant Sullivan declared that "we are confident in our marks and the reasonableness of our valuation methods. … [W]e have … a high degree of certainty in what we have booked to date."  ¶ 338.  Elsewhere in his presentation, Sullivan asserted that ""[w]e have our arms around what is happening through AIG and believe we have demonstrated this through timely and comprehensive disclosure and accuracy in our reporting."  ¶ 337.  As AIG would disclose two months later, the reported loss on the CDS portfolio was understated by at least $4.3 billion – meaning that the loss by that time was actually *four times* the amount presented at the December 5 investor meeting.  ¶ 351(a).

At the December 5 investor meeting, defendants once again repeated their "mantra" that no losses would be sustained on AIGFP's credit default swap transactions. Defendant Sullivan, for example, asserted that "we believe the probability that it [*i.e.*, the CDS portfolio] will sustain an economic loss is close to zero." ¶ 336. Similarly, defendant Cassano declared that "we are highly confident that we will have no realized losses on these portfolios during the life of these portfolios." ¶ 339. And defendant Bensinger stated "what I think we all should come away from is saying that, to an extremely high confidence level, there is no expected loss in that portfolio." ¶ 344.

Defendants also used the December 5 investor meeting to drive home the point that AIG's capital base was more than sufficient to allow AIG to effectively "ride out the storm." Defendant Sullivan stated, for example, that "[d]ue to our financial strength, we have the ability and intent to hold these securities to recovery, thereby minimizing liquidity-driven economic losses." ¶ 336. Defendant Cassano added that "it's these crises and these points in time that give us the wherewithal right now to stand here with you and say on the back of giants, on the back of everybody at AIG who has built the capital that AIG has, the AIGFP unit is able to withstand this aberrant period. … So we don't have any issues of our wherewithal here to sit through this business." ¶ 343. Defendant Bensinger stated flatly, "AIG Financial Products has sufficient capital to run its business. … Understand also that FP's transactions are guaranteed by AIG, Inc. So their capital is really our capital and more importantly our capital is their capital." ¶ 344.

The subject of collateral calls was also addressed at the December 5 conference. Defendant Cassano claimed that the requests were an indication that "the market's a little screwed up." He essentially dismissed the collateral calls as frivolous, stating: "We have, from time to time, gotten collateral calls from people. Then we say to them, 'Well, we don't agree

with your numbers.'  And they go, 'Oh.'  **And they go away**.  And you say well what was that.

**It's like a drive by in a way**."  ¶ 342.  In his letter to Congress, St. Denis was particularly pointed

in his criticism of these remarks:

> I believe that certain statements made by Mr. Cassano and other AIG senior
> managers in the early stages of the SSCDS [super senior CDS] crisis were ill-
> advised.  Specifically, statements made at the December 5, 2007 Investor Meeting
> that characterized margin calls from its SSCDS counterparties as lacking a
> legitimate basis, especially given the apparent state of AIGFP's valuation models,
> were statements that I would not have made or condoned.  *I believed at the time
> of the Investor Meeting and continue to believe that full disclosure of margin
> calls by, and resulting collateral postings to, AIGFP's SSCDS counterparties
> was of critical importance*.  ¶ 168.

### 3.    AIG's February 2008 Partial Corrective Disclosures

On February 11, 2008, AIG filed with the SEC a Form 8-K acknowledging that losses on

its credit default swap portfolio had been wildly understated and that material information

previously supplied to the market required correction.  AIG disclosed that the cumulative loss on

its CDS portfolio through November 30, 2007 was $5.96 billion, over $4.3 billion more than

reported at the December 5, 2007 investor conference.  A significant portion of AIG's

understatement of losses resulted from the Company's improper use of a $3.63 billion "negative

basis adjustment," which AIG stated would not be included in its valuation of the CDS portfolio

as set forth in the financial statements of its forthcoming Form 10-K for the year ended

December 31, 2007.   (On a February 29, 2008 conference call, defendant Bensinger

acknowledged that recording a negative basis adjustment "is not consistent with GAAP fair

value requirements." ¶ 190.)  Another portion of the understatement was based on a "Binomial

Expansion Technique" methodology, which AIG acknowledged relied on "generic" inputs,

instead of the market-based inputs, including "cash bond prices provided by the managers of the

underlying CDO collateral pools."  The Form 8-K revealed that the loss on the CDS portfolio

reported during the December 5 investor meeting *would have been 57 percent greater* if the generic inputs had not been used. Finally, AIG's Form 8-K disclosed that the Company had been advised by PwC that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio." ¶¶ 352-57.

This disclosure sent AIG's stock price tumbling. On February 11, 2008, AIG's common stock dropped from $50.68 to $44.74 per share, a loss of $5.94 or 11.7%. At the time, this represented the largest one-day decline in AIG's stock price in 20 years. ¶ 530.

On February 28, 2008, AIG filed its 2007 Form 10-K and issued a press release announcing its fourth quarter and year-end financial results. AIG reported a staggering $11.2 billion fourth quarter decline in the value of its CDS portfolio, resulting in a fourth quarter net loss of nearly $5.3 billion, the Company's largest-ever quarterly loss. For the year, the cumulative decline in the value of the CDS portfolio was reported as almost $11.5 billion. As a result, AIG's reported net income for 2007 declined to $6.20 billion or $2.39 per diluted share, from $14.05 billion or $5.36 per diluted share in 2006. ¶ 359. On AIG's conference call with analysts, defendant Sullivan announced the resignation of defendant Cassano. He did not disclose, however, that Cassano would remain as a paid "consultant" to AIGFP at the rate of *$1 million per month*. ¶ 362.

The 2007 Form 10-K included PwC's opinion that internal controls relating to the process for valuing the CDS portfolio had a material weakness and were ineffective. ¶ 365. It also included the concurrence of AIG management with PwC's assessment, acknowledging, among other things, that AIG had not adequately assessed the relevance of all third party information in its valuation of the CDS portfolio and that oversight and monitoring of the

valuation process, including the timely sharing of information at appropriate levels of the organization, had not been effective. ¶ 367. AIG stated that the estimated $11.5 billion loss in its CDS portfolio now included consideration of "[v]aluation estimates made by counterparties for collateral purposes." ¶ 368. AIG disclosed that it had posted collateral in the amount of $5.3 billion arising from declines in the value of the securities insured by the credit default swaps. For the first time, AIG acknowledged that collateral calls by CDS counterparties could impair the Company's liquidity. ¶¶ 368-369.

Notwithstanding these disclosures, AIG continued to insist that it had more than ample capacity to weather the upheaval in the market and position itself for future growth. Its February 28, 2008 press release asserted that "with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current market volatility while committing the resources to grow and take advantage of opportunities." Similarly, defendant Sullivan declared in an investor conference call held on February 29, 2008 that "AIG is well positioned to grow shareholder value despite the current turbulent environment. … We also have a strong capital base and are not raising additional capital." ¶ 379. In addition, AIG's 2007 Form 10-K represented that the Company had sufficient liquidity to meet its anticipated cash requirements. ¶ 372. It also represented that during 2007, AIG had taken steps to increase the liquidity of its investment portfolio, including the liquidity of collateral invested in the securities lending program. ¶ 373.

AIG also downplayed the significance of the $11.5 billion in "unrealized" losses incurred in the CDS portfolio. The Company's press release represented, for example, that "AIG continues to believe that the unrealized market valuation losses on this super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time." ¶ 360. Indeed, on

AIG's conference call with analysts, defendant Bensinger effectively told investors that the Company's GAAP valuation of the CDS portfolio should be disregarded:

> [I]n accordance with GAAP, AIG recognized a sizeable unrealized market valuation loss in 2007 consequent to the severe market disruption and credit deterioration, particularly of subprime mortgage backed collateral. This market valuation loss represents management's best estimate of the exit value of this portfolio into the current illiquid and distressed market. However, AIGFP underwrote its Super Senior credit derivative business to a zero loss standard, incorporating conservative stress scenarios at inception. Although there is likely to be continued volatility and perhaps further deterioration in the credit markets based upon AIG's analyses and stress tests, AIG does believe that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial position nor to its excess economic capital position. ¶ 380.

AIG thus continued to convey a misleading impression that the principal risk exposure arising from the CDS portfolio was the risk of credit losses arising from the underlying CDOs it insured, while downplaying the significant risks faced by the Company arising from continued valuation declines and concomitant collateral posting requirements amounting to tens of billions of dollars.

The 2007 Form 10-K also disclosed more information about AIG securities lending program, but nevertheless continued to misrepresent it. The 2007 10-K now disclosed that nearly $50 billion out of $75 billion of the cash collateral received from borrowers was invested in mortgage-backed, asset-backed or collateralized securities. However, the 2007 10-K also represented that AIG received from borrowers "[c]ash collateral equal to 102 percent of the fair value of the loaned securities." ¶ 373. As AIG later disclosed in its second quarter 2008 Form 10-Q, the Company did not, in fact, always receive the full 102 percent of cash collateral on loaned securities. When borrowers put up less than 102 percent in collateral, AIG itself deposited funds into the collateral pool to maintain the collateral received at 102 percent. ¶ 421.

AIG's disclosures in connection with the release of its 2007 financial results caused a further decline in the Company's stock value. On February 28, 2008, the market price of AIG

stock dropped from $52.25 to $50.15 per share, a loss of $2.10 per share or about 4%. The next day, after the February 29 conference call, AIG stock fell another $3.29 per share, a loss of over 6.5%. ¶ 532.

      C.      **March 2008 - September 2008: Defendants' False and Misleading Statements**

On May 8, 2008, AIG announced its first quarter 2008 financial results, which established a new record quarterly loss for the Company. AIG reported a net loss for the quarter of $7.8 billion, which included a $9.1 billion net unrealized market valuation loss on the CDS portfolio. The cumulative reported loss in the CDS portfolio then stood at more than $20 billion. ¶ 383. AIG disclosed that its collateral postings on the CDS portfolio had increased to $9.7 billion. ¶ 395. Defendant Sullivan asserted that these results "do not reflect the underlying strengths and potential of AIG." ¶ 385.

Notwithstanding Sullivan's declaration scarcely more than two months earlier that AIG was not seeking to raise additional capital, AIG now disclosed that it was planning to raise $12.5 billion in new capital "to fortify its balance sheet and provide increased financial flexibility." At the same time, AIG attempted to convince the market that it still remained a "safe haven" by announcing that the Board of Directors had elected *to increase AIG's dividend* by 10% to $0.22 per share. ¶¶ 385-386. During AIG's May 9, 2008 investor conference call, Sullivan sought to explain the apparent paradox between the announced dividend increase, on the one hand, and raising additional capital, on the other:

> We are being asked why we raised the dividend when we are also in a capital-raising mode. The answer is that the dividend increase ***is a reflection of both the Board's and management's long term view of the strength of the company's business, earnings, and capital generating power***. The capital raise is a response to the events of the last two quarters and its effect on our capital position. It will fortify the ***fortress balance sheet*** you expect us to maintain and provide us with increased financial flexibility in these turbulent times. It will also position us well

40

for the future.  The two are simply reflections of a positive long-term view and a prudent response to the current environment.  ¶ 387.

During the investor call, AIG was asked about the source of funds for the $9.7 billion in collateral it had posted.  In response, AIG's William Dooley, who assumed responsibility for AIGFP's day-to-day operations following the resignation of Cassano, expressed comfort with AIG's liquidity position, stating:  "We started to build cash in FP last summer when we saw the markets starting to deteriorate. … I am very comfortable with the liquidity position …."  AIG's first quarter 2008 Form 10-Q reinforced this view, stating with regard to AIG's overall liquidity that "[m]anagment believes that AIG's liquid assets, cash provided by operations and access to the capital markets will enable it to meet its anticipated cash requirements, including the funding of increased dividends under AIG's current dividend policy."  ¶ 397.  AIG thus continued to portray its financial strength in a materially misleading manner, failing to disclose the liquidity crisis that was overtaking the Company.

From May 12-20, 2008, AIG completed several offerings of common stock and debt, raising $20 billion in new capital.  ¶¶ 404-406, 417.  On May 20, 2008, defendant Sullivan addressed a conference sponsored by Lehman Brothers.  Sullivan again referred to AIG's "fortress balance sheet" and insisted that the additional capital raised by the Company was largely to "take advantage of opportunities" and "support the growth of our business."  ¶ 408.  AIG did not disclose that it would use the capital to satisfy collateral calls, which AIG knew were likely given that just days earlier, on May 8 and 9, credit rating agencies had downgraded AIG's debt rating and CDOs it had insured were placed on a negative ratings watch.  ¶ 205.  On June 6, 2008, *The Wall Street Journal* reported that AIG was under investigation by the SEC and criminal prosecutors with the DOJ in Washington, D.C. and the U.S. Attorney's Office in Brooklyn, New York.  According to the article, the subject of the investigation was whether AIG

had overstated the value of the CDS portfolio.  One week later, *The Wall Street Journal* reported that "one current focus for regulators is an elaborate presentation held on Dec. 5 at which both [Sullivan and Cassano] tried to assure investors that losses would be minimal."  ¶ 410.[7]  Two days later, on Sunday, June 15, 2008, AIG's board of directors convened a special meeting, during which defendant Sullivan was removed from his positions with the Company, and Robert Willumstad was installed as the new CEO.  ¶ 411.

With defendant Sullivan no longer leading the Company, AIG, on August 6, 2008 announced its financial results for the second quarter of 2008.  AIG reported a net loss for the quarter of $5.36 billion, which included a $5.56 billion net unrealized market valuation loss on the CDS portfolio.  The cumulative valuation loss on the CDS portfolio climbed to nearly $26 billion.  ¶ 413.  Aggregate collateral postings escalated to more than $16 billion.  ¶ 420. Willumstad acknowledged belatedly that AIG's concentration of risk to the U.S. residential housing market had been too high.  ¶ 415.  AIG nevertheless failed to disclose that it was facing an imminent liquidity crisis due to continuing collateral calls and demands by borrowers in the securities lending program for the return of their cash collateral.  Defendant Bensinger, for example, asserted during AIG's August 7, 2008 investor conference call that "based on what we know today, our capital position is sound."  ¶ 416.[8]  In response to these disclosures, which more

---

[7]    Ten months later, on April 28, 2009, *The Wall Street Journal* reported that the SEC and DOJ were investigating whether civil and/or criminal charges should be brought against defendants Cassano and Forster, among others.  According to the article, the investigation focused on AIG's valuation of the CDS portfolio and Cassano's statements at the December 5 investor meeting.  ¶ 248.

[8]    The falsity of this statement about the soundness of AIG's balance sheet, among others, has now been confirmed by defendant Willumstad, who joined the AIG board in January 2006 and became its CEO upon the termination of defendant Sullivan.  In a recent speech, Willumstad tellingly stated: "I thought I knew the company well, but after three weeks of digging and turning over rocks, I realized how fragile AIG's balance sheet was."  *See* "AIG Ex-CEO Breaks Down the Final Days," *TheStreet.com* (Golan Decl., Ex. 2).

fully, but not entirely, revealed the true state and uncertainty of the Company's securities lending program, as well as its CDS portfolio, AIG's stock fell on August 7, 2008 from $29.09 to $23.84, an 18% drop.  ¶ 212.

AIG's financial condition continued to deteriorate rapidly through August and into September 2008.  From July 1 to August 31, 2008, the continuing decline in value of the CDOs protected by AIGFP's CDS portfolio, together with ratings downgrades of such CDO securities, resulted in AIGFP posting additional collateral in an aggregate net amount of $5.9 billion.  And, by August 31, 2008, AIG had made aggregate deposits to or for the benefit of the securities lending collateral pool totaling $3.3 billion.  ¶ 214.  By September 8, 2008, AIG stock had fallen 45% since the beginning of the year, and between September 8 and September 12, it dropped an additional 48% to $6.32 per share.  ¶ 215.

On September 12, 2008, facing a severe liquidity crisis, AIG asked the Federal Reserve for a $40 billion bridge loan.  On September 12 and 13, AIG executives held emergency meetings with New York State Insurance Superintendent Eric Dinallo, with Federal Reserve officials calling into the meetings.  ¶ 216.  On Monday, September 15, 2008, AIG's credit rating was downgraded two and three notches by Moody's, Standard & Poor's, and Fitch Rating.  As a consequence, AIG was required to post an additional $14.5 billion in collateral, above and beyond its previous postings.  Standard & Poor's explained that the downgrade was due to the following: "The primary source of the strain comes from credit default swaps covering multi-sector collateralized debt obligations with mortgage exposure as well as insurance company holdings of residential mortgage-backed securities."  AIG stock dropped from $12.14 to $4.76 per share.  ¶ 217.  On September 16, 2008, with the collapse of AIG imminent, the Federal Reserve agreed to an emergency $85 billion bailout of AIG, in exchange for a 79.9% equity

stake.  AIG stock fell to $3.75 by the end of the day.  The bailout was announced publicly on

September 17, 2008.  Without this extraordinary action by the Federal Reserve, AIG would have

been insolvent and would have been forced to file for protection under the bankruptcy laws.  ¶

218.

## ARGUMENT

### POINT ONE – THE COMPLAINT ASSERTS
### VIABLE EXCHANGE ACT CLAIMS

Plaintiffs assert claims based on materially false and misleading statements and

omissions under Sections 10(b) and 20(a) of the Exchange Act.  The Supreme Court has

recognized that "Congress' aim in enacting the 1934 Act was not confined solely to

compensating defrauded investors.  Congress intended to deter fraud and manipulative practices

in the securities markets, and to ensure full disclosure of information material to investment

decisions."  *Randall v. Loftsgaarden*, 478 U.S. 647, 664 (1986); *see also Basic Inc. v. Levinson*,

485 U.S. 224, 230-31 (1988) (stating that "a private cause of action exists for a violation of §

10(b) and Rule 10b-5, and constitutes an essential tool for enforcement of the 1934 Act's

requirements").

The specific purpose of Section 10(b) was "to substitute a philosophy of full disclosure

for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the

securities industry."  *In re Global Crossing, Ltd. Sec. Litig*., 322 F. Supp. 2d 319, 328 (S.D.N.Y.

2004) (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151 (1972)).  The

Second Circuit has made clear:

> The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in
> securities transactions - to make sure that buyers of securities get what they think
> they are getting and that sellers of securities are not tricked into parting with
> something for a price  known to the buyer to be inadequate or for a consideration
> known to the buyer not to be  what it purports to be.

*Chemical Bank v. Arthur Anderson & Co.,* 726 F.2d 930, 943 (2d Cir. 1984).

To state a claim under Section 10(b), a "plaintiff must allege 'that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused [the plaintiff's] injury.'"  *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 321 (2d Cir. 2002) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir. 1993)).  The particular elements of plaintiffs' Section 10(b) and Section 20(a) claims are discussed at length below.

I.    **The Complaint Adequately Alleges Defendants' False and Misleading Statements Throughout the Class Period**

    A.    **False and Misleading Statements in the Period from March 2006 through May 2007**

        1.    **AIG Failed to Disclose the Existence of its Extensive Portfolio of Credit Default Swaps Referencing Subprime-Backed CDOs**

AIG's 2005 10-K did not discuss or even mention its portfolio of more than $80 billion in "multi-sector" CDSs that insured CDOs backed mostly by securitized subprime mortgages.  This portfolio was included in the broad category of "credit derivatives," which was shown on AIG's 2005 balance sheet as having a "notional amount" totaling $387.2 billion.  AIG argues that it was not required to disclose the existence of this subprime-referencing CDS portfolio because it was under no obligation to "disaggregate" it from the broader category of credit derivatives.  This argument misstates the issue.  The issue is not whether AIG was required to "disaggregate" its CDS portfolio on its balance sheet, but whether the existence and characteristics of this portfolio were material information required to be disclosed under the federal securities laws.

> a.    **Statements About AIG's Credit Derivatives Portfolio Were Misleading Because They Failed to Disclose Material Facts About the Subprime Exposure of the CDS Portfolio**

SEC Rule 10b-5(b) prohibits "mak[ing] any untrue statement of material fact or … *omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading*."  17 C.F.R. § 240.10b-5 (emphasis added).  "Under this provision, even though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading."  *In re Par Pharm., Inc. Sec. Litig.,* 733 F. Supp. 668, 675 (S.D.N.Y. 1990); *accord Caiola*, 295 F.3d at 331 (the "lack of an independent duty [to disclose] is not … a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues."); *see also Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1098 n.7 (1991) (when a company chooses to speak, "there can be no question that the statement [it] d[oes] make carrie[s] with it no option to deceive").  "A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement."  *In re Par,* 733 F. Supp. at 677.  As the court stated in *In re Marsh & Mclennan Companies, Inc. Sec. Litig.,* 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (citations omitted):

> Of course, specific statutes and regulations create affirmative duties to disclose information, but another duty arises more generally. "When a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate." … In other words, corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements.

*Accord In re Morgan Stanley Tech. Fund Sec. Litig.*, Nos. 02 Civ. 6153 (BSJ), 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009) ("a duty to disclose may arise when additional information is needed to make another statement, whether required or voluntarily made, not misleading").

AIG, which during the Class Period was the world's largest insurance and financial services conglomerate, was in the business of acquiring and managing risk.  A large portion of the business of its AIGFP division was in the complex and arcane area of credit derivatives.   As alleged in the Complaint, the 2005 10-K contained a lengthy description of AIGFP's "credit derivatives transactions," including, *inter alia*, a description of how AIGFP purportedly constructed these transactions *to minimize risk*.  ¶ 259.  For example, the 10-K describes how, in some cases, credit risk is "tranched," that the different tranches are separately rated, and that AIG insures only the most senior tranches.  The 10-K then represents that these "super senior" credit derivatives are constructed such that the risk of loss on such transactions would be "remote [or "greater than remote"], even in severe recessionary market scenarios," a statement that defendants repeated constantly during the Class Period:

> The threshold amount of credit losses that must be realized before AIGFP has any payment obligation is *negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each transaction is remote*, even in severe recessionary market scenarios.  ¶ 259.

While defendants contend that this statement is forward-looking and is entitled to the protections provided to forward-looking statements under the federal securities laws, read in context, it is clear that the statement was not intended to be a mere prediction.  Rather, imbedded in this statement is a representation that defendants applied a particular standard – *i.e.*, that the risk of loss would be remote even under a severe recessionary scenario – in constructing these portfolios.  The Complaint recites in great detail, however, that the AIGFP defendants concluded by late 2005 that they did not have a basis to determine that a portion of AIGFP's credit derivatives portfolio, the so-called "multi-sector CDSs," which were essentially insuring securitized subprime mortgages, actually met this extremely high standard.  The Complaint specifically pleads evidence showing that the AIGFP defendants concluded by late 2005 that the

model developed by AIG consultant, Gary Gorton, *could not predict* how the multi-sector CDOs would perform in severely stressed conditions. Specifically, AIGFP concluded that by the second half of 2005, underwriting standards for subprime mortgages had greatly deteriorated. In addition, AIGFP believed that the subprime market was highly "correlated," meaning that an event that could trigger increased defaults in subprime mortgages, such as a decline in housing prices, would be likely to be widespread across geographic regions and not confined to individual homebuyers. For these reasons, the AIGFP defendants made the decision to stop writing "multi-sector" CDSs by the end of 2005, despite the fact that this had been a highly profitable business. *See* ¶¶ 109-113. Thus, AIG's description of its credit derivative portfolio in the 2005 10-K was materially misleading because it failed to disclose that a significant segment of this portfolio – approximately $80 billion of the misnamed "multi-sector" CDSs – insured CDOs that were backed mostly by securitized subprime mortgages. AIG's description was also misleading because it failed to disclose that the Company could no longer adequately assess the risks of, or determine that these CDSs met the high standard applicable to, the credit derivatives portfolio and that, accordingly, it had decided to exit this profitable line of business.

AIG relies upon cases in which courts rejected claims arising from the failure to separately disclose items included within broader categories in financial statements, and argues that they compel the conclusion that it had no obligation to disclose the size of, or risks arising from, its subprime-related credit default swaps. *See Nolte v. Capital One Financial Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) (alleged failure to specify the size of its subprime portfolio); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (alleged failure to break out contingent commission costs in insurance company's acquisition costs); and *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002) (alleged failure to

disclose specific details of its hedging contracts). These cases are easily distinguished. Unlike here, where the Complaint alleges a duty to disclose the omitted information arising from specific incomplete and misleading statements made by defendants, as well as arising from GAAP requirements, in none of those cases did the complaints similarly allege facts supporting a duty to disclose the omitted information.[9]

The Underwriter Defendants argue that "[p]laintiffs can identify no statement that was rendered misleading because AIG, while making disclosures about its CDS business, had never disclosed the particular types of underlying obligations on which it wrote CDSs before the

---

[9]       Moreover, the reasoning of *Nolte* is unsound and should not be followed. The *Nolte* court based its decision on a single sentence from a ***request for comments*** by the Office of the Comptroller of the Currency, the Federal Reserve System, the F.D.I.C. and the Office of Thrift Supervision on a proposed regulation – ***which was apparently never adopted*** – the purpose of which was to require banks that made subprime consumer loans to file periodic reports about their subprime lending activities. The Fourth Circuit took from this Comment Request the proposition that "subprime lenders are discouraged from publicly reporting the size of their subprime portfolios …." 390 F.3d at 317. Contrary to the Fourth Circuit's reading of the Comment Request, however, the agencies were not seeking to "discourage" disclosure of banks' subprime lending activities. On the contrary, they were seeking authority to ***require*** that such information be provided to them on a regular basis. They were, in that connection, also attempting to standardize the definitions of such terms as "subprime" to avoid confusion. Importantly, the proposal to maintain the confidentiality of the reported information was a ***temporary*** measure until such terms could be standardized. The Comment Request states in this regard that "[t]he agencies are initially proposing confidential treatment for the proposed new schedule. However, after experience has been gained with the data, *e.g.*, after six or eight quarters, the agencies will reevaluate whether this treatment should be retained." Thus, the one sentence from the report on which the Fourth Circuit based its decision was taken out of context and cited for a proposition that is, in fact, the opposite of the overall meaning of the Comment Request. A copy of the Comment Request cited in *Nolte* is attached as Exhibit 3 to the Golan Decl.

In *Axis Capital*, the court found that the basic fact alleged to be omitted, that contingent commissions were included in acquisition costs, was clear from the face of the complaint: "[T]he complaint taken as a whole makes perfectly clear that many insurance companies paid such commissions in order to secure business from the brokers. It seems inarguable then that the commissions were indeed a cost of business." 456 F. Supp. 2d at 590. And in *Ashanti Goldfields*, the plaintiffs did not dispute that there was no requirement that the defendant make the disclosures claimed to be omitted, nor did they allege that defendants' description of its hedging activity was inaccurate. 184 F. Supp. 2d at 266.

Second Quarter 2007 10-Q." Underwriters Mem. at 8. This argument begs the question. By omitting any mention, much less description, of the underlying subprime debt that comprised most of the "multi-sector" CDOs insured by the CDSs, and by failing to acknowledge that AIG had stopped writing CDSs on "multi-sector" CDOs because it could not adequately model the risk inherent in this particular type of derivative instrument, defendants created a false impression that the risk inherent in each of the types of derivatives in AIG's credit derivative portfolio met the "remote, even in severe recessionary market" standard, which, as plaintiffs have alleged, was false, at least as to the "multi-sector" CDS portion of the portfolio.

AIG and the Underwriter Defendants further argue that AIG was not required to disclose the fact that it stopped writing "multi-sector" CDSs because it had no affirmative duty under SEC regulations to disclose "normal business decisions," and because this decision actually mitigated the risk to members of the class, all of whom purchased AIG securities after the decision was made. *See* AIG Mem. at 47, n.28; Underwriters Mem. at 9-10. Plaintiffs do not contend that AIG had an independent duty to disclose this decision, absent AIG's materially misleading description of its credit derivatives portfolio and the risk management standards applied to these instruments. But the fact that the AIGFP defendants made the decision to stop writing multi-sector CDSs, even though that business had been highly profitable, once Eugene Park convinced them of the unacceptably high risk to which these CDSs exposed the Company, shows that these defendants *did not* have a genuine belief that the multi-sector CDSs met the description of the level of risk in the credit derivatives portfolio.

Moreover, it is clear from the context of the actions taken by AIG and AIGFP that the decision to stop writing the then-profitable multi-sector CDS contracts was anything but a normal business decision. The Company decided to stop writing them because it realized a

serious flaw in its model.  Significantly, AIG did not just conclude that writing *future* swaps was risky.  It determined that *those it had already written during 2005* were riskier than they appeared due to the increasing concentration of subprime assets in the "multi-sector" CDOs and the diminished underwriting standards on the subprime mortgages underlying them.  Yet AIG continued, in both its public filings and statements to tout the supposed "diversification" of its portfolio, the "super-senior" nature of its CDSs, and the supposed superiority of its model, when it had already determined its model was defective and that if the subprime market continued to decline, its CDS portfolio would not be able to handle the liquidity, valuation or credit risk inherent in the portfolio.

Thus, defendants were required to qualify their statements regarding this level of risk and to explain that those statements did ***not*** apply to the recently discontinued business of writing multi-sector CDSs.  *See In re Merck & Co., Inc. Sec., Deriv. and ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008), *cert granted*, 77 U.S.L.W. 3641 (U.S. May 26, 2009) (No. 08-905) (defendant can be liable under the federal securities laws for statements made without a genuine belief or reasonable basis); *accord In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) ("Those who choose to speak, however, must speak honestly-not in half-truths, in bad faith, or without a reasonable basis for their statements."); *Kurzweil v. Philip Morris Companies, Inc.*, No. 94 Civ. 2373 (MBM), 1997 WL 167043 at *8 (S.D.N.Y. April 9, 1997). The fact that AIG did not make matters worse by continuing to write these risky swaps does not negate the massive losses suffered by members of the class when the liquidity, valuation and credit risks from insuring subprime-backed credit instruments came to fruition.

b.    **Defendants Were Required by GAAP to Disclose the
Concentration of Risk in Subprime Mortgage-Backed
Securities**

AIG was also required to disclose the CDS portfolio and its attendant risk under GAAP.

"Under the regulations of the Securities and Exchange Commission, filings that do not comply

with GAAP 'will be presumed to be misleading and inaccurate.'  17 C.F.R. § 210.4-01(a)(1)."

*Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 981 (W.D. Wis. 2003).   Among other

authoritative pronouncements requiring disclosure of concentrations of risk, ¶ 15A of FAS No.

107, *Disclosures About Fair Values of Financial Instruments,* requires disclosure of significant

concentrations of credit risk arising from financial instruments including, *inter alia*, "information

about the (shared) … economic characteristic that defines the concentration" and the loss in

value to the financial instruments that could be expected to occur if the credit risk materialized.

¶ 15A of FAS 107 states, in relevant part:

> Except as indicated in paragraph 15B [containing limited exceptions for pension
> plans and certain other irrelevant exceptions], an entity shall disclose all
> significant concentrations of credit risk arising from ***all*** financial instruments,
> whether from an individual counterparty or groups of counterparties…. (Emphasis
> in original.)

There is no dispute that, as of December 31, 2005, AIG had written approximately $80

billion of credit default swaps on the so-called "multi-sector" CDOs, which included about $64

billion of exposure to securities backed by subprime mortgage assets.  Nowhere, however, in

AIG's 2005 10-K is this concentration of credit risk disclosed.  This portfolio of highly risky

subprime-related financial instruments constituted a concentration of credit risk in the residential

real estate market, and subprime mortgages in particular, which was required to be disclosed by

FAS 107 at that time, but was not disclosed until August 2007.

Defendants do not attempt to argue that AIG had no concentration of credit risk in the subprime real estate market arising from its "multi-sector" CDS portfolio.  Instead, AIG and PwC attempt to defend the Company's failure to disclose this credit risk concentration by arguing that FAS 107 only requires disclosure of "a material, direct credit risk – the risk that a counterparty will default on its obligation to a party."  AIG Mem. at 48, citing FAS 107 ¶ 15A; *see also* PwC Mem. at 20.  In other words, these defendants assert that FAS 107 applied only to the holders of the CDOs, who faced the risk the securities in the collateral pool would default.  Yet, they do not cite any language in FAS 107 either stating or implying that the scope of this pronouncement is limited to the risk of default by a counterparty to a derivative transaction, and neither the language of the pronouncement nor its intent supports this argument.  On the contrary, ¶ 15A emphasizes that disclosure is required of significant concentrations of credit risk "arising from *all* financial instruments."  There can be no doubt that a concentration of credit risk "arose" from AIG's "multi-sector" CDSs.  As admitted by defendant Willumstad, soon after replacing defendant Sullivan as the Company's President and CEO: "[Y]ou see again in retrospect much of the problems that have come about have been a *concentration of risk in the U.S. housing market both in the investment portfolio and the credit default swap book*."  ¶ 415.

Moreover, the limitation that defendants read into ¶ 15A of FAS 107 makes no sense in the case of credit default swaps because the whole purpose of a credit default swap is to *transfer* the credit risk of the holder of the CDOs to the issuer of the swap – in this case AIG.  Thus, by entering into credit default swaps, AIG acquired the credit risk previously held by its counterparties that the subprime mortgage-backed securities referenced by the CDS would default.  While defendants now claim that AIG had only "market risk," in its financial disclosures during the Class Period, AIG repeatedly acknowledged that it took on "credit risk" as

a result of entering into "derivative transactions."  For example, AIG's 2005 10-K states: "AIGFP enters into credit derivative transactions in the ordinary course of its business ….  In certain cases, **the credit risk associated with a designated portfolio** is tranched into different layers of risk, which are then analyzed and rated by the credit rating agencies ….  **[T]he risk layer assumed by AIGFP** with respect to the designated portfolio in these [credit derivatives] transactions is often called the 'super senior' risk layer, defined as **the layer of credit risk** senior to a risk layer that has been rated AAA by the credit rating agencies."  *See* ¶ 259.[10]

Thus, even if the language of ¶ 15A did not, by its terms, include credit default swaps, the argument that concentrations of credit risk arising from credit default swaps did not have to be disclosed is an elevation of form over substance, which is contrary to basic GAAP principles. *See In re Stellant, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 981 (D. Minn. 2004) ("GAAP … requires that transactions 'be accounted for in accordance with their substance rather than their form.'") (citing relevant GAAP pronouncements).  The argument that there was no credit risk to AIG to which FAS 107 applied is therefore completely without merit.[11]

---

[10]    Market risk refers to the risk that the value of an asset will change due to economic conditions. *See Power & Telephone Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 928 (6th Cir. 2006).  In this case, among the market risks to which the CDSs were exposed was the risk of a decline in their fair value due to economic conditions.  While there is no doubt that the CDSs were subject to market risk, and they did lose a substantial portion of their market value during the Class Period, they were also subject to credit risk, **as admitted by AIG**, and therefore within the scope of the disclosure requirement of FAS 107.  Moreover, the market valuation declines were themselves a product of credit risk as increasing concern with the prospect of defaults by the CDOs having subprime exposure drove down the value of the credit default swaps they insured.

[11]    PwC also argues that paragraph B6 of a September 2008 FASB staff position pronouncement, FSP 133-1, states "expressly that FAS 107 applies only to buyers of financial instruments."  PwC Mem. at 20 n.9.  PwC is wrong.  Nowhere does FSP 133-1 state, either expressly or otherwise, that FAS 107 applies only to buyers of financial instruments.  The only reference to FAS 107 in the cited paragraph B6 is the following sentence: "[T]he Board decided not to address in this project disclosures by buyers of credit derivatives because (a) the relevant risks to buyers such as counterparty risk and concentration risk, are inherent in all derivatives

2.     **AIG Failed to Disclose and Misrepresented its Exposure for Posting Collateral**

AIG's 2005 10-K, in its description of "credit derivatives transactions," disclosed only one type of risk: namely, the "remote" risk that a default event on the insured CDO tranches could trigger a "payment obligation" by the Company.  AIG thus conveyed a highly misleading impression that the risk of incurring a "payment obligation" was the primary risk associated with its derivatives transactions.  In fact, there was a very real risk that AIG could be required to "post collateral" for the benefit of its counterparties.  As described above, the circumstances under which AIG could be required to post collateral were threefold:  (i) a downgrade in the credit ratings of AIG; (ii) a downgrade in the ratings of the CDOs referenced by the credit default swaps; or (iii) a decline in the valuation of the referenced CDOs.  ¶¶ 121-22.  AIG's 2005 10-K

and financial instruments, not just credit derivatives, and (b) FASB Statement No. 107, *Disclosures About Fair Value of Financial Instruments*, currently requires disclosures relating to these risks for all financial instruments."  This explanatory note simply means that, while the FASB deemed it necessary to impose extensive new disclosure requirements on sellers of credit default swaps to bolster the existing requirements found in FAS 107, it was not necessary to impose similar requirements on buyers of credit default swaps.  This is because buyers of credit default swaps do not increase credit risk by entering into such transactions – in fact the purpose of these transactions is to *reduce* credit risk to the buyer.  Buyers may face a risk that the swaps will not be effective because of the characteristics of the sellers, particularly if the swaps they enter into are concentrated with a limited number of sellers of credit protection (the counterparty and concentration risk referred to in paragraph B6 of FSP 133-1).  To the extent buyers of credit default swaps face such concentration or counterparty risks, or other credit risk such as from holding subprime mortgage-backed assets, FAS 107 already requires credit default swap buyers to disclose these risks.  But nothing in FSP 133-1 states or implies that the requirements of FAS 107 are limited to buyers of credit default swaps.

In addition, relying on the statement made by AIG in its 2005 10-K that "[c]redit risk exists for a derivative contract when that contract has a *positive fair value to AIG,*" s*ee* PwC Mem, at 20, n.10 (emphasis added by PwC), PwC argues that because AIG carried its credit default swaps at zero value on its balance sheet, there could be no credit risk arising from those contracts.  Regardless of whether AIG carried its credit default swaps as assets on its balance sheet, there can be no question that they subjected the Company to credit risk, and if that risk was realized – i.e., if the counterparty experienced a default – AIG would have to record a liability and a charge to income.  Indeed, AIG has admitted that its credit default swaps resulted in actual credit losses to the Company.  *See, e.g.*, ¶ 229 (AIG states in press release that it made payments to CDS counterparties of $27.1 billion between Sept. 16 and Dec. 31, 2008).

did not make any mention of these collateral posting requirements.   But by the time the Company filed its 2005 10-K in March 2006, AIG was already facing a heightened risk that the conditions requiring it to post collateral would be realized.   AIG had, of course, concluded by the end of 2005 that underwriting standards on the subprime mortgages that comprised the CDOs it insured during 2005 had deteriorated significantly to the point where its own internal models could no longer predict how the mortgages would perform.   Given the decline in underwriting standards, there was a reasonable likelihood that the ratings and/or valuations of the CDOs would decline, requiring AIG to post collateral.

The misleading impression created by AIG's failure to disclose the collateral posting risk in its discussion of credit derivatives transactions was compounded by other misleading disclosures elsewhere in the 2005 10-K.   The 2005 10-K included a discussion of AIG's credit ratings and their potential to impact the Company's liquidity.   AIG stated in the 2005 10-K that, as a result of its credit ratings downgrade by the major ratings agencies, it "was required to post approximately $1.16 billion in collateral with counterparties to municipal guaranteed investment contracts and financial derivatives transactions."   ¶ 263.[12]   The 10-K stated further that "downgrades" of another notch by the rating agencies "would permit counterparties to call for approximately $962 million of additional collateral" and that further rating downgrades "could result in requirements for substantial additional collateral, which could have a material effect on how AIG manages its liquidity."   These statements were materially misleading because they implied that the only circumstance when AIG would be required to post collateral was a downgrade of AIG's own ratings and failed to disclose that AIG could also be required to post collateral in connection with its credit default swaps if the referenced CDOs were downgraded or

[12]      These ratings downgrades were associated with AIG's previous accounting restatements and the departure of Greenberg from the Company.   ¶ 91.

declined in value.  Moreover, AIG failed to disclose the important fact that the counterparties were typically designated as the calculation agent for purposes of determining the amount of collateral that was required.  ¶ 122.

AIG responds by arguing that the Company "had an obligation to disclose only 'known' risks….  Plaintiffs do not cite a single collateral call on the multi-sector CDS portfolio before August of 2007, and the securities laws do not require clairvoyance."  AIG Mem. at 51.  This argument is specious because it conflates risk with loss.  While the securities laws do not require disclosing *losses* before they occur, the securities laws do require disclosing known *risks* before they become losses, particularly when the failure to do so renders statements made materially misleading.  *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.").  Here, AIG had already concluded that the subprime mortgage market had significantly deteriorated and was therefore well aware that conditions were ripe for realization of the triggering events that would require the Company to post collateral.  Moreover, AIG's argument ignores the fact that, while AIG *did* make disclosures in, *inter alia*, the 2005 10-K regarding the amount of collateral it would be required to post in the event of a particular triggering event, *i.e.*, a downgrade of its ratings, its disclosures were materially incomplete because they failed to address the much more extensive collateral postings that would be required as a result of other triggering events, such as a decline in value or downgrade in ratings of the referenced CDO tranches.  ¶ 266(f).  *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("When a corporation does make a disclosure -- whether it be voluntary or

required -- there is a duty to make it complete and accurate.") (quoting *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)).

### 3.    AIG Made Misleading Disclosures Regarding Its Ability to Hedge Its Credit Derivatives Portfolio

The 2005 10-K states that "AIGFP maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss and has hedged outstanding transactions in this manner on occasion." The Complaint alleges that this statement is misleading because it omits to state that the reason why AIGFP did not hedge its subprime-based CDSs is ***not*** because these were low risk transactions that did not require hedging, but rather because they were so risky that they could not be hedged economically without eliminating much of the profit from these transactions, which profit was an important basis of the AIGFP defendants' compensation. ¶¶ 126, 302. Thus, the AIGFP defendants put their own compensation above the interests of the Company and its shareholders.

AIG alleges that, at most, the Complaint's allegations in this regard point to corporate mismanagement, not securities fraud. However, AIG clearly misled investors by telling them that the Company had the "ability" to hedge the transactions, while knowing full well that there was no intention to ever do so. The Second Circuit, in *Hunt v. Alliance North American Govt. Inc. Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998), upheld allegations very similar to those alleged here. In *Hunt*, a mutual fund stated in a prospectus that hedging devices were available to lower risk on certain investments. The Second Circuit upheld a claim that these statements were false or misleading because, like here, the defendants failed to disclose that the cost of hedging would make it prohibitively expensive to use them:

> A reader of these passages and others reasonably could have understood them to mean that these hedging techniques were available (even if they were not foolproof) and that the Fund would attempt to hedge against currency risk by

> using these techniques. By alleging that the Fund managers knew (or recklessly
> disregarded) that these hedging techniques were not available (because they were
> too costly), *see* Proposed Amended Complaint ¶¶ 55, 61, plaintiffs stated an
> actionable claim for misrepresentation.

*Id*.  As in *Hunt*, defendants' statement that AIGFP had the "ability" to hedge while failing to

disclose the prohibitive cost of hedging the CDS transactions also states an actionable claim.

### 4.    AIG Failed to Disclose a Material Weakness in Internal Controls

The 2005 10-K described a number of measures undertaken by AIG to strengthen its

control environment and remediate material weaknesses in internal controls identified in

connection with the Company's accounting restatement.    The Complaint alleges that the

description of these activities was misleading and materially incomplete because it failed to

disclose existing material weaknesses in internal controls relating to AIG's oversight of the CDS

portfolio, including its valuation.    ¶ 266.    Defendants contend that this allegation fails because

the weaknesses in the CDS portfolio valuation identified by PwC in late 2007 and subsequently

admitted by the Company in a filing on Form 8-K with the SEC in February 2008 purportedly

arose only in late 2007 as the Company devised a new valuation model for its CDS portfolio.

However, a review of the facts alleged in the Complaint demonstrates that the material weakness

that supposedly arose only in the fourth quarter of 2007 was actually a manifestation of precisely

the same sort of deficiencies that had been identified from at least the beginning of the Class

Period.    As such, the Complaint pleads facts from which a reasonable inference can be drawn

that the material weakness in connection with the CDS portfolio oversight and valuation existed

from at least as early as 2005.

As described in the Complaint, AIG was rocked by a series of accounting scandals in the

early part of this decade, resulting in a massive $3.9 billion accounting restatement, large fines

levied by regulators, and Greenberg's forced resignation.    ¶¶ 89-90.    AIG disclosed in its 2005

10-K that PwC concluded that these problems were the result of a number of weaknesses in internal controls at the Company, including, notably, a pervasive deficiency in the "control environment" that had failed to prevent management overrides of internal controls. *See* ¶¶ 255-258. As part of the effort to "remediate" these issues, in addition to replacing the Company's senior management, the Company created a number of committees and positions, including a Financial Disclosure Committee, Operational Risk Management department, and a strengthening of the position of Chief Risk Officer. ¶ 257. In addition, the Company created the position of Vice President of Accounting Policy to provide AIG's FSD and OAP with greater visibility and control over the operations and accounting policy practices of AIGFP, and to provide an on-site resource for AIGFP business people as they developed proposed transactions. ¶ 157. Despite the "remediation" efforts, in 2006 and 2007, AIG recorded additional out-of-period adjustments, and the Office of Thrift Supervision ("OTS") documented numerous accounting and internal control issues and reported them to AIG's Board in March 2006. ¶ 251. Moreover, as described above, while AIG attempted to strengthen internal control weaknesses in certain areas, it actually relaxed internal controls over AIGFP by cutting back on oversight over AIGFP by defendant Sullivan, AIG's CEO, as demonstrated by Sullivan eliminating regular meeting to keep him abreast of AIGFP's credit exposure. ¶ 129.

In June 2006, as part of the Company's on-going remediation effort, the Company hired Joseph St. Denis, a former Assistant Chief Accountant at the SEC Enforcement Division, to fill the position of Vice President of Accounting Policy. ¶¶ 156, 158. St. Denis was, in effect, the "eyes and ears" of the parent Company at the AIGFP division. His participation in the valuation of credit default swaps was intended to provide transparency and accountability and was a vital "internal control" that had been previously lacking. However, as described above and in the

Complaint, St. Denis was deliberately excluded from participating in this process by defendant Cassano. While the hiring of St. Denis as Vice President of Accounting Policy may have been an effort to implement new internal controls, his *exclusion* by Cassano represented a deliberate overriding of these controls. Thus, the same internal control issue that St. Denis' hiring was intended to fix continued to exist. In fact, what triggered the investigation leading to the discovery of the internal control deficiency was St. Denis' discussion of the circumstances of his resignation with AIG's Chief Auditor, Michael Roemer, who brought these circumstances to the attention of AIG's audit committee. ¶ 165.

By November 29, 2007, PwC had advised AIG's board of directors of a possible material weakness in connection with its CDS portfolio and that they were raising these concerns "in light of AIG's plans to hold the investor conference on December 5." Despite this warning, AIG proceeded to inform investors that the Company would record valuation adjustments on its CDS portfolio of only $1.4 to $1.5 billion through November 30, 2007. As the Company subsequently revealed in an 8-K filing in February 2008, this figure was derived by manipulating the valuation model by using novel, and unsupportable, inputs and processes, which enabled the Company to under-report its valuation adjustments by approximately $4.3 billion for that period.

The fact that PwC may only have identified the material weakness in internal controls at the end of 2007 when, as a result of the world-wide financial crisis, AIG's process for valuing credit instruments came under closer scrutiny, does not mean that the internal control deficiency did not exist before then. As explained by PwC in its opinion letter published in AIG's 2007 10-K: "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that *there is a reasonable possibility* that *a material misstatement* of the annual or interim financial statements *will not be prevented or detected* on a timely basis."

¶ 365.  Because, by definition, a material weakness tends to prevent detection of misstatements in financial statements, a material weakness typically exists well before it is detected.

In its 2007 10-K, AIG described the internal control deficiencies as follows:

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective.  AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007.  As a result, *AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information*.  Also, *controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively*.  As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements.  In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual, or interim consolidated financial statements that would not be prevented or detected on a timely basis.  ¶ 367.

Thus, as disclosed by AIG, the internal control deficiency had two important aspects: the failure to "assess" relevant third party information, such as evidence of value from counterparties and publicly available indices; and the absence of oversight and monitoring, including sharing of information at "appropriate levels of the organization," such as the exclusion of St. Denis and other members of the corporate risk management function from the decision making process, and maintaining data regarding the CDS portfolio in a separate database isolated from the corporate-wide management information system.  Here, the material weakness concerned the *process* used by AIGFP for valuing of the CDS portfolio.   In other words, while the unsupported "adjustments" that AIGFP used to manipulate the valuation model in the fourth quarter of 2007 may not have been used prior to that period, the material weakness was not simply the use of these improper methods.  The material weakness consisted of the fact that defendant Cassano

and his coterie had the ability to use these manipulative methodologies and insulate them from review by AIG's accounting and risk management functions.  In effect, the material weaknesses identified in connection with the CDS portfolio represented a continuing pattern of management overrides of internal controls that had been evident from at least as early as 2005.

PwC argues that because the Complaint does not allege a decline in the value of the CDS portfolio before August 2007 there could have been no risk of material misstatement, and therefore no material weakness in internal controls, before then.  *See* PwC Mem. at 18-19.  But the fact that this material weakness in the valuation *process* went undetected until the *actual values* of the credit default swaps began to drop precipitously does not mean that the *valuation process* was adequately controlled and transparent to AIG's corporate accounting and risk management functions prior to that time.  Again, PwC conflates the risk of a negative outcome with the actual occurrence of that outcome.  As noted above, a material weakness creates a "reasonable possibility that a material misstatement … will not be prevented or detected on a timely basis…." – i.e., a ***risk*** of a material misstatement.  There is no requirement that a material misstatement must have actually occurred for there to be a material weakness.  Otherwise, the requirement established by Sarbanes-Oxley that management and auditors review internal controls for material weaknesses would not be designed to prevent misstatements, but would be a perpetual exercise in closing the proverbial barn door after the horse has escaped.  And, in any event, plaintiffs allege, citing numerous facts in support, that as of the time the 2006 10-K was issued in March 2007, AIG was required to disclose, in a footnote to the financial statements, that there was a reasonable possibility that the value of the CDS portfolio had materially declined.

AIG argues that its failure to disclose the material weakness in its internal controls while describing its risk management and internal control functions in positive terms amounts to non-actionable "puffery," relying on *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282 (SHS), 2007 WL 950132, at \*12 (S.D.N.Y. March 29, 2007).  AIG Mem. at 50.  In *JP Morgan Chase*, the court dismissed as "puffery" allegations that actions such as serving as an underwriter for a large WorldCom debt issue before WorldCom declared bankruptcy demonstrated the falsity of what the court described as "generalizations regarding integrity, fiscal discipline and risk management."  2007 WL 950132, at \*12.  There are many facts distinguishing this case from *JP Morgan Chase* that AIG ignores.  Most significantly, AIG **admitted** to having material weaknesses in its internal controls, both in 2005 and again in 2007.[13]  The alleged failure of JP Morgan Chase to criticize its own internal processes in the *JP Morgan Chase* case is categorically different from the failure to disclose a material weakness in this case or the misrepresentation that previously admitted material weaknesses had been remediated.  Here, moreover, the facts supporting the allegations of material weakness are not merely bad business decisions.  The Complaint contains specific allegations regarding how defendant Cassano and his cohorts thwarted attempts to remediate the admitted internal control weaknesses with respect to AIGFP by isolating AIGFP from the parent Company's scrutiny and excluding risk management personnel, including St. Denis, from overseeing AIGFP's valuation processes, and excluding Pierre Micottis (the head of risk management at AIGFP) from all of his oversight responsibilities with respect to the CDS portfolio.  Thus, the facts alleged here are not only far more specific

---

[13]    A "material weakness" is a defined term under generally accepted auditing standards ("GAAS") and SEC rules.  *See* AU 2, Securities Exchange Act Release No. 34-49544, ¶ 10, approved by Securities Exchange Act Release No. 34-49884.

than in *JP Morgan Chase*, they are based upon admissions by the Company, extensive former employee information, and findings by the Company's auditors.

        5.      **AIG's Description of Its Securities Lending Program Was Materially Misleading**

The 2005 10-K contained the following general description of AIG's securities lending program in a financial statement footnote:

> AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent. Invested collateral consists primarily of floating rate debt securities. Income earned on invested collateral, net of interest payable to the collateral provider, is recorded in net investment income. ¶ 264.

As alleged in the Complaint, this description was materially misleading because it failed to disclose that, unlike the industry norm for securities lending programs, which dictated conservative, short term investments of collateral received from parties to whom securities were loaned, by the end of 2005, AIG had instituted a policy of investing up to 75% of all cash collateral received in RMBS and other ABS, which exposed this portfolio to subprime mortgage risk. ¶ 266(g). As *Time* magazine described it, securities lending is considered by the market to be like "the Christmas Club," meaning it is a safe, conservative way of realizing incremental returns. *See* ¶ 219 (quoting from *Time*, March 19, 2009).[14] AIG, however, invested up to 75%

---

[14]      The Underwriter Defendants posit that investors would have recognized from AIG's statements in the 2005 10-K and 2006 10-K that the cash collateral from AIG's securities lending program was invested in RMBS and ABS, and included subprime debt. *See* Underwriters Mem. at 16 & n.23. However, a statement that the collateral was invested "primarily" in "floating rate securities" (2005 10-K) and "floating rate bonds" (2006 10-K) is a far cry from a disclosure that collateral was being invested in RMBS, including subprime debt. Indeed, these statements created the opposite impression – that AIG invested the collateral in short-term conservative investments. ¶¶ 15, 266(g). The literature confirms that floating rate notes "carry little interest rate risk" and have "a duration close to zero, and its price shows very low sensitivity to changes in market rates." http://www.mojolaw.com/info/is41. Further, "Floating rate bonds are considered a fairly safe investment, since they offer some protection against interest rate risk. When interest rates rise, floating rate bond prices remain fairly stable since they will reflect the

of these borrowed funds in risky investments designed to produce high returns as long as real estate prices continued to rise and default rates for subprime mortgages stayed low.

AIG was aware, however, that these investments had a high risk of loss if and when real estate prices stopped rising. For that reason, at least two separate AIG businesses – the American General Financial Services mortgage lending business and the AIGFP credit default swap business – decided in 2005 to withdraw from highly profitable businesses that involved subprime mortgage debt because this market sector presented unacceptably high risks. ¶¶ 108, 109-114. Even more importantly in the context of securities lending, AIG was aware that RMBS investments were less liquid than ordinary securities lending investments such as Treasury securities or corporate debt, and that a downturn in real estate and subprime mortgage markets could significantly impair their liquidity. Liquidity is important to a securities lending program to ensure that sufficient funds are available when borrowers seek a return of their cash collateral. Thus, it was materially misleading for AIG to fail to disclose that it was investing up to 75% of the cash collateral in securities that were far less liquid than what AIG had utilized before.

AIG and the Underwriter Defendants assert that its securities lending disclosures were not misleading because investors could ascertain any shortfall in the value of securities lending collateral from an examination of AIG's balance sheet. AIG Mem. at 46; Underwriters Mem. at 16-17. For its part, PwC reiterates its argument, made in connection with the discussion of AIG's credit derivatives disclosures, that FAS 107 did not require disclosure of the decision to

---

new interest rate as soon as the reset date comes around." *Id*. Another source provides that the prices of floating rate bonds remain relatively stable because "neither a capital gain nor a capital loss occurs as market interest rates go up or down." http://www.businessdictionary.com/definition/floating-rate-bond.html. Thus, contrary to the Underwriter Defendants' argument, the statements in the 2005 and 2006 10-K's hardly disclosed the Company's true investments, and in any event, this is a question that cannot be resolved in defendants' favor on a motion to dismiss.

pour 75% of invested collateral into RMBS.  PwC Mem. at 23.  These arguments are beside the point.  By failing to disclose that the cash collateral was being invested in RMBS, AIG failed to apprise investors that significant liquidity risk could arise in the securities lending program.  Both the federal securities laws and GAAP require disclosure of significant **risks** prior to the time those risks materialize into **losses**, so investors can make informed decisions as to what risks they are willing to take.[15]  *See Sonnenberg v. Prospect Park Financial Corp*., No. CIV. 91-435 (DRD), 1991 WL 329755, at *9 n.5 (D.N.J. Aug. 20, 1991) ("The purpose of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear.").

6.      **Defendants Continued to Make False and Misleading Statements Throughout 2006 and into 2007 as Risks from Subprime Mortgage-Backed Investments Began to Materialize**

As the overheated residential real estate market began to cool down and eventually decline in 2006, causing a predictable increase in defaults among subprime mortgagors, the market became increasingly conscious of the risks posed by subprime mortgage-backed securities.  ¶¶ 140-146.  Not only were published statistics available that showed housing price trends, *see, e.g.*, ¶ 140, well respected national publications such as *Barron's* sounded the alarm about the impending subprime collapse.  ¶ 142.  Thus, knowing the extent of subprime-backed assets on the balance sheets of financial institutions became increasingly important to investors in such institutions, and AIG's concealment of its exposure to this market sector through credit

---

[15]      As demonstrated above, FAS 107 certainly required disclosure of AIG's concentration of credit risk arising from its subprime exposure in the CDS portfolio.  To the extent that AIG further increased its overall subprime exposure through RMBS investments in the securities lending program, FAS 107 would be no less applicable.

default swaps and direct investments in subprime mortgage-backed securities was an increasingly material fact to its investors.

While these events were unfolding, AIG's subprime exposure was actually increasing as a result of AIG's implementation of its new policy of investing up to 75% of its securities lending collateral in RMBS.  Nevertheless, AIG's quarterly and annual reports for the interim quarters and full year 2006 contained many of the same false and misleading statements as were contained in the 2005 10-K.  For example, the various press releases and SEC filings issued in connection with AIG's quarterly and annual financial results during 2006 and for the first quarter of 2007:

- Falsely reported that internal control deficiencies had been remediated, while failing to disclose material weaknesses in the valuation and risk management functions at AIGFP (¶¶ 280-81, 292);[16]

- Misrepresented the nature and effectiveness of internal controls and risk management with respect to credit, market and liquidity risks, falsely implying that all businesses within AIG, including AIGFP, operated under strict controls and guidelines established by the corporate parent (¶¶ 273-74; 285-87);

- Failed to disclose and misrepresented AIG's obligations to post collateral for its credit derivative contracts through statements similar to those contained in the 2005 10-K, which were false and misleading for the same reasons as discussed above (¶¶ 282, 289, 292);

- Omitted from discussions regarding AIG's credit derivatives portfolio and securities lending activities any disclosure of the concentration of credit risk in subprime

---

[16]    Under Section 404(b) of The Sarbanes-Oxley Act of 2002, as part of its 2006 audit, PwC was required to "attest to, and report on, the assessment made by the management of the issuer" regarding the effectiveness of AIG's controls.  15 U.S.C. § 7262(b).  Because AIG failed to note the existence of the internal control weaknesses discussed herein, PwC's attestation of AIG management's assessment of internal controls was false as of the time it was made.  For this reason, as well as for the reasons discussed below in connection with the valuation of the CDS portfolio, PwC's argument that it made no false statements in connection with the public offerings pursuant to the July 2007 Shelf Registration Statement is wrong.  For the same reasons this case is distinguishable from *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009), and other cases cited on page 14 of PwC's brief in which the complaints did not adequately allege statements that were untrue as of the time of the registration statement.

mortgage-backed securities due to its credit default swap and securities lending investment portfolios, which had become increasingly invested in residential mortgage-backed securities, including subprime debt (¶¶ 282, 290, 292); and

- Falsely stated in the footnotes to the financial statements in the 2006 10-K that the collateral from AIG's securities lending operation was invested primarily in "floating rate bonds," ¶ 290, when, in fact, AIG had decided in December 2005 to invest up to 75% of the securities lending collateral in RMBS, which had the effect of nearly doubling the Company's exposure to subprime mortgage debt, ¶ 266(g).

### 7.    AIG's False Representations in the 2006 10-K that It Recorded Its "Multi-Sector" Credit Default Swaps at Fair Value

Defendants do not contest that, under relevant accounting rules, AIG was required to evaluate its derivative portfolios, including the credit default swaps, on a periodic basis to determine if they were carried on AIG's books at "fair value" and, to the extent they were not, to record any decrease (or increase) in value.  Fair value, under the accounting rules, is to be determined on the basis of actual market prices of identical derivatives to the extent they are available, and to the extent they are not, on the basis of comparable or analogous derivatives.  To the extent there are insufficient market transactions in comparable derivatives, fair value is to be determined by the use of a model that estimates the price at which the derivative would trade.  In short, derivatives such as credit default swaps were required under GAAP to be "marked to market" or, in the absence of an adequate market, "marked to model."  ¶¶ 426-429.

Like any debt security, the fair value of a CDO tranche insured by a credit default swap – and thus the fair value of the CDS – will typically decline long before it is in default.  As with any debt security, the *risk* of potential default of a CDO is an important determinant of the fair value of the CDO and any CDS referencing the CDO.  If, for example, a CDS insures a super senior CDO tranche with an attachment point of 15%, meaning that the default rate in the underlying collateral would have to reach 15% before the super senior tranche would experience any credit loss, the fair value of that CDO is likely to decline as the default rate in the collateral

pool increases. Regardless of whether the level of credit loss in the collateral pool ever reaches the attachment point, the closer the default rate gets to the 15% attachment point, the more the fair value will decline because of the increased risk that the 15% level will be reached. So, with respect to whether defendants timely wrote down the value of AIG's CDS portfolio, the relevant inquiry is not whether defendants knew or foresaw that the insured CDOs would at some point experience credit losses, but rather whether defendants knew, or recklessly disregarded, facts likely to have affected the fair value of these CDOs.

AIG's 10-Qs and 10-Ks generally described fair value accounting and represented that AIG applied these procedures to a wide variety of derivatives and that changes in the value of its derivatives were reflected in AIG's income statement. *See* ¶¶ 260, 271, 283, 295. By no later than February 2007, however, the value of the credit default swaps AIG had written on "multi-sector" CDOs had declined substantially. AIG did not file its 2006 10-K until March 1, 2007. By the time the 10-K was filed, the deterioration in the housing and mortgage markets, and effect on securitized subprime debt, was so significant that the financial statements in the 10-K were materially false and misleading because they failed to disclose in a subsequent event footnote the reasonably possible decline in the value of AIG's CDS portfolio. GAAP requires adequate disclosure of material matters and requires that information reported or disclosed in financial statements be useful, relevant, reliable, and complete. FASCON 2, ¶¶ 79-80; FASCON 1, ¶¶ 9, 34. *See also In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 198 (1st Cir. 2005).

Moreover, as alleged in ¶ 430 of the Complaint, FAS 5 provides, in relevant part:

> If no accrual is made for a loss contingency … or if an exposure to loss exists in excess of the amount accrued … ***disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.*** The disclosure shall indicate the nature of the contingency ***and shall give an estimate of the possible range of loss or state that such an estimate cannot be made***… (FAS 5 ¶ 10)

70

Thus, regardless of whether AIGFP could determine the full extent to which it had experienced losses in its CDS portfolio, there was an abundance of evidence indicating *at least* a "reasonable possibility" that by at least February 2007 the fair value of its CDSs had been negatively impacted by declines in the value of the underlying collateral. *See, e.g.*, ¶ 140 (declining trends in housing prices), ¶ 143 (increase in subprime default rates and closing of subprime lenders), ¶ 144 (numerous subprime lenders file bankruptcy). A confidential witness who formerly headed the CDO business at a major Wall Street investment bank and at two of the largest commercial banks in the United States, and who worked directly with the senior management of AIGFP in both Connecticut and London on the issuance of CDS contracts, stated that both the "Street" and AIGFP executives were aware that these problems would affect "multi-sector" CDOs containing subprime mortgages. ¶¶ 125, 145. In addition, as alleged in the Complaint, in January 2006 a consortium of sixteen large investment banks created the ABX index to track the value of CDSs written on securities backed by subprime mortgage debt, ¶ 146, and in February 2007 the same group of investment banks launched a companion index, called the TABX, to track mezzanine subprime CDOs. *Id.*

PwC argues that it cannot be liable for registration statements or prospectuses that incorporated AIG's 2006 financial statements because plaintiffs do not allege with particularity the amount by which particular line items in the 2006 financials were overstated. PwC Mem. at 13. However, AIG was obligated under FAS 5 to disclose the reasonable possibility that it had suffered a loss of value in the CDS portfolio, even if that loss could not yet be quantified. Indeed, by definition, the obligation to disclose the reasonable possibility of a loss imposed by FAS 5 arises when the amount of the loss is not quantifiable. *Stone & Webster*, 414 F.3d at 198 ("[I]f there is only a 'reasonable possibility' of a loss instead of a 'probable' loss, disclosure

instead of accrual is appropriate."). Accordingly, it is not necessary, as PwC contends, for plaintiffs to plead with particularity *the amount* by which the fair value of the CDS portfolio was overvalued. For this reason, the cases cited by PwC in which claims were rejected for failure to quantify the extent to which particular line items were misstated are inapposite. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982); *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812 (GEL), 2003 WL 1964184, **4-5 (S.D.N.Y. April 25, 2003). Significantly, neither AIG nor PwC addresses the allegation that AIG failed to make the disclosure required under FAS 5, thereby apparently conceding the point.[17]

AIG asserts that it was justified in ignoring declines in the ABX and TABX indexes in determining whether its CDS portfolio was carried at fair value because, first, its CDSs were written to insure "multi-sector" CDO tranches, which, according to AIG, is unlike the ABX insofar as the ABX tracked "mostly" subprime CDO tranches, and second, these indexes were not reliable indicators of the value of specific credit default swaps. AIG Mem. at 35. Both of these arguments are unavailing. As pointed out above, AIG's description of its subprime-backed CDS portfolio as "multi-sector" was a misnomer. As AIGFP ramped up its CDS production in the second half of 2005, the content of the collateral for the CDO tranches it insured became increasingly comprised of subprime mortgage debt, and by the time AIG stopped writing CDSs on "multi-sector" CDOs, they were comprised "almost entirely" of subprime mortgage debt. ¶¶ 112, 127. Indeed, by the end of 2005, of the nearly $80 billion in "multi-sector" CDSs written by AIGFP, $64 billion represented subprime mortgage debt-related obligations (*see* ¶ 124), a whopping 80% of the "multi-sector" portfolio.

---

[17] Having failed to address plaintiffs' FAS 5 allegation in their opening briefs, defendants have waived the right, for purposes of their motions to dismiss, to refute plaintiffs' reliance on that provision. *Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007).

In addition, even if the ABX and TABX indices did not provide an exact measurement of the loss in AIG's portfolio, AIG cannot deny that a decline in the ABX and TABX indexes was an indication of a "reasonable possibility" that AIG's CDS portfolio had also lost value because, as AIG itself points out, defendant Cassano admitted at a December 5, 2007 investor meeting that "[t]he [ABX is] information … about changes in value and it informs some of the management information that we need to use when creating our valuations for accounting purposes." *See* AIG Mem. at 35, n.21.  While AIGFP's use of this information did not begin until the third quarter of 2007 at the earliest, and was therefore untimely, AIG cannot deny that it had access to this information by February 2007.  Moreover, the facts alleged in the Complaint regarding AIGFP's internal control deficiencies compel the conclusion that the failure to use this and other available information was not due to the unreliability of the information, but rather the desire on the part of AIGFP's senior management to conceal the potential losses faced by the "multi-sector" CDS portfolio.  The Complaint, therefore, provides a more than adequate basis for alleging that AIG's representation that it carried its credit derivatives at "fair value" was false or misleading.

**B.    False and Misleading Statements During the Period From May 2007 through February 2008**

**1.    False Statements from May through August 2007**

May 31, 2007 Investor Conference

In a May 31, 2007 investor conference, defendants attempted to provide reassurances to a market that was increasingly concerned about the exposure of financial institutions to the mounting subprime crisis.  At this conference, defendant Forster made a presentation on AIGFP's credit default swap business.  While he gave no indication of the size of this portfolio, defendant Forster assured investors that they need not be concerned about any risk with this

portfolio because it was designed to withstand "the worst recession I can imagine." ¶ 301. Forster further assured investors that "[w]ith the advent of the CDO market and the CDS market, it's actually fairly easy for us to hedge any of the risk that we perceive. So if the portfolio, if it did start to deteriorate, it would be very easy for us to go out, buy an extra layer of protection to make sure that we maintain the sort of super senior portfolio still. I have to say, given the conservatism … that we've built in these portfolios, we haven't had to do a huge amount of hedging over the years." *Id.* As explained above, Forster had no reasonable basis for asserting that the CDS portfolio had been designed to withstand a severe recession when AIGFP exited that business for the very reason that it concluded that this portfolio could not meet the high standards that it purported to set. And as further explained above, Forster's statement that "it's actually fairly easy for us to hedge" the risk posed by the "multi-sector" CDS portfolio was materially misleading because AIGFP, in fact, could not economically hedge these instruments and had no intention of doing so.

Forster attempts to defend his statement that the CDS portfolio was designed to withstand a severe recession by asserting that he "was speaking about AIGFP's system for evaluating potential *future* CDS transactions." Forster Mem. at 9 (emphasis added). This explanation is simply not credible, however, because AIGFP had stopped writing these credit default swaps a year and a half earlier. As to his remark about hedging, his rejoinder totally misses the point. Forster contends that since he disclosed the fact that "we haven't had to do a huge amount of hedging over the years," investors would understand that this is because it was not economical to do so. *Id.* at 10. But Forster's statement in the May 31 conference that hedging would be "fairly easy" to do, along with his assurances that there was virtually no possibility of losses in this portfolio, suggests just the opposite – that AIGFP could have economically hedged its CDS

portfolio, but did not do so because it decided it was unnecessary.  Importantly, plaintiffs do not

base their claim upon defendants' business decision not to hedge this portfolio, however flawed

that decision may have been.[18]  The claim is based on the fact that defendants misled investors in

their explanation of the reason for that business decision, which is unquestionably actionable

under Section 10(b).  *See Hunt v. Alliance North American Govt. Inc. Trust,* 159 F.3d at 728.[19]

Second Quarter 2007 Disclosures

By the time AIG released its financial results for the second quarter of 2007 on August 8,

2007, concern in the market about the risks to subprime-backed securities was extremely high.

---

[18]    Forster seizes on a single phrase in ¶ 302 of the Complaint to argue that plaintiffs are, in essence, charging him with failing to foresee the magnitude of the economic downturn.  Forster Mem. at 11-12.  That is a misreading of the Complaint.  The point of ¶ 302 is not that defendants should have predicted the future, but rather that their descriptions of the degree of risk currently existing in the CDS portfolio were highly misleading because they failed to describe the most immediate and dangerous risk, of which they were clearly aware – *viz.*, that a decline in the value of the CDO tranches insured by the CDSs would result in collateral calls and, in the severe recessionary scenario that Foster himself postulated, the amount of collateral AIGFP would have to post could be extremely large.

In addition, Forster contends that the Section 10(b) claim against him is based, in part, on a failure to disclose details of AIGFP's compensation scheme.  Forster Mem. at 12, citing ¶ 302.  That is incorrect.  Plaintiffs do not contend that defendants were required to disclose all of the facts alleged in the Complaint in support of their claims.  The misstatements and omissions at issue in this action are clearly specified as such in the Complaint.

[19]    Forster cites *McCoy v. Goldberg*, 748 F. Supp. 146, 150 (S.D.N.Y. 1990), for the proposition that his description of the CDS portfolio as "conservative" is not actionable.  Forster Mem. at 11.  This reliance is misplaced.  *McCoy* was an action by a client against her stockbroker.  The court held that the broker's representations that a proposed investment program was "conservative" were not made "in connection with the purchase of a security," and thus not actionable in the context in which they were made, because the representations "did not pertain to the value or quality of specific securities purchased by plaintiff, but were related to defendants' attempt to gain plaintiff's business."  *Id.*  The context in which Forster used the term "conservative," however, brings it squarely within the holding of *Virginia Bankshares*, 501 U.S. at 1093, where the Supreme Court held that "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  Here, investors would have understood the factual basis of Forster's statement to be that this portfolio was designed to avoid losses even in severe recessionary times, which, for the reasons explained above, was false.

75

In June 2007, the financial markets were stunned when two Bear Stearns hedge funds collapsed as a result of their inability to meet margin calls. Creditors seized, and attempted to auction off CDO assets held by the hedge funds. It was widely reported that although the hedge fund's creditors were able to sell some of the CDOs at deep discounts, in some cases collateral auctions were cancelled after it became apparent that there were no buyers for the CDOs. In addition, the ABX and TABX indexes continued to decline during the first half of 2007. ¶¶ 148-49.

Due to what AIG described as this "serious disruption" in the residential mortgage market, AIG felt compelled to address its subprime exposure in its 10-Q and in the analyst conference call held on August 9, 2007. AIG made some disclosure of certain previously undisclosed material facts, such as revealing that it had written credit default swaps on subprime-backed CDOs, that its subprime-based CDS exposure amounted to about $64 billion, and that it had stopped writing these swaps at the end of 2005. In addition, AIG disclosed that it had direct investments in RMBS and that a portion of these was also exposed to subprime mortgages. But instead of providing a complete and accurate account of the risks that these investments and derivatives posed, defendants provided investors with half-truths that were designed to, and did, give them a false sense of comfort about the risks – or lack thereof – inherent in these portfolios. The numerous false and misleading statements defendants made in connection with the release of second quarter 2007 financial results are set forth in the Complaint (*see* ¶ 320), but a few examples will illustrate how defendants' statements were half-truths, calculated to deceive rather than inform.

On August 9, 2007, AIG held an investor conference to reassure investors that the "serious disruption" in the residential mortgage market would not adversely affect AIG. In speaking specifically about its "multi-sector" CDS business and direct investments in RMBS,

defendants reassured investors by repeating a familiar theme: "While both of these activities involve significant notional exposure, the risk actually undertaken is very modest and remote and has been structured and managed effectively. AIGFP has been running a successful business of writing Super Senior credit default swap or CDS protections since 1998." ¶ 314. This theme was repeated several times during this call by different spokespersons. Notably, defendant Cassano told participants that "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions," ¶ 317, and "we see no issues at all emerging and we see no dollar of loss associated with any of that [CDS] business in any reasonable scenario that anyone can draw. When I say a reasonable, I mean a severe recession scenario that you can draw out for the life of those securities." ¶ 319.[20] Similarly, in that same conference defendant Lewis, AIG's chief risk officer, assured investors that AIG's risk from its "multi-sector" CDSs was "extremely remote." ¶ 314. He added: [W]e're talking about a very remote risk, which is defined and calculated not just by rating agency models but also by our own very rigorous internal models used on each deal AIGFP structures." *Id.*

---

[20]     Relying on *Fezzani v. Bear, Stearns & Co. Inc.*, 592 F. Supp. 2d 410, 429 (S.D.N.Y. 2008), AIG argues that the Complaint fails to state with particularity "how" the alleged false statements were false or misleading. *See* AIG Mem. at 52. *Fezzani* involved an alleged scheme by a now-defunct broker dealer, A.R. Baron & Co., to bilk its customers out of millions of dollars. *See* 592 F. Supp 2d at 416. Seeking deep pockets from which to recover, plaintiffs sued various brokers and traders that had done business with Baron and accused them of "prop[ping] up" Baron to enable it to commit fraud. *Id.* In dismissing claims against two traders who were alleged to have participated in pre-IPO financing of one of Baron's propped-up companies and then to have sold shares at artificially inflated prices, the court found that the complaint failed to specify "how these actions were false or misleading." *Id.* at 429. *Fezzani* is easily distinguished from this case where each of the individual defendants was an executive of AIG or AIGFP, and the Complaint alleges specific false and misleading statements made for the purpose of artificially inflating AIG's stock price, identifies the persons making the statements, and explains why they were false and/or misleading. This clearly satisfies the requirements for pleading fraud articulated in *Fezzani*. *Id.*

Defendants now contend that these statements were intended to mean "that AIG would not ultimately experience <u>credit</u> losses in connection with AIGFP's multi-sector CDS portfolio." AIG Mem. at 52 (emphasis in original); *see also* Lewis Mem at 9.  Defendants argue, in effect, that they were only trying to reassure investors that AIGFP would not have ***credit*** losses in its CDS portfolio, rather than ***other*** kinds of losses or strains on its liquidity arising from this portfolio.  But this explanation only serves to demonstrate that these statements were, at best, materially misleading half-truths, which required complete disclosure.  *See WorldCom,* 294 F. Supp. 2d at 428.  As explained above, AIG had consistently misrepresented the conditions under which AIGFP would be required to post collateral on its CDSs and the amount of collateral postings to which it could be subject, and it had failed to adjust the fair value of its CDS and CDOs in response to deteriorating economic conditions (or even note the reasonable possibility that the portfolio had lost value).  By boasting of the remoteness of any possible credit losses, while ignoring the risk that AIG would need to post collateral and adjust the value of its CDS portfolio, defendants sought to create, and succeeded in creating, a false sense of security for investors.  In fact, numerous analysts wrote immediately after this call that AIG had virtually no subprime exposure.  ¶¶ 519-520.  As such, these statements were materially misleading within the meaning of Section 10(b) and Rule 10b-5.  *In re Marsh,* 501 F. Supp. 2d at 469; *In re Par,* 733 F. Supp. at 677.[21]

---

[21]    AIG argues that plaintiffs have failed to plead "particularized facts showing that at the beginning of the credit crisis, AIG anticipated significant valuation losses on the multi-sector CDSs or the advent of significant collateral calls…."  AIG Mem. at 53.  This is a variation on defendants' oft-repeated, but ill-founded, "fraud by hindsight" mantra.  Defendants' disclosure obligations do not depend on what they "anticipated."  The Second Circuit has observed that while defendants "need not be clairvoyant," they are responsible for revealing material facts "reasonably available to them."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Thus, as explained above, by March 1, 2007, when the 2006 10-K was filed, and thereafter, AIG was required to disclose the "reasonable possibility" of valuation losses, even if the amount of the

Moreover, even viewing AIG's assurances as relating solely to credit losses, defendants had no basis for such optimism.[22]   As explained above, contrary to Lewis' assurances about "very rigorous internal models used on each deal AIGFP structures," AIGFP's decision to exit the subprime-backed CDS business at the end of 2005 was based upon its conclusion that it lacked the ability to model credit risk for asset-backed securities that during 2005 had become largely or entirely comprised of subprime mortgage debt and, because of the high degree of correlation in the subprime market, if that market became severely stressed, default rates would become unacceptably high.   ¶¶ 109-112.   Thus, defendants had no basis for their blanket

loss could not be quantified.   This is an objective standard, not dependent on defendants' subjective belief or anticipation.   Here, the Complaint alleges ample objective evidence that the fair value of the CDS portfolio had materially declined, even if the amount of the decline was not quantifiable.   As to collateral calls, as also explained above, the obligation to disclose the possibility of collateral calls resulting from a decline in the value of the CDOs insured by credit default swaps arose from the statements made by AIG and other defendants in SEC filings and on conference calls that limited the discussion of risk to the risk of credit losses arising from defaults and on other statements in AIG's SEC filings that mentioned only a downgrade of AIG's credit ratings as a possible trigger of collateral calls.   Collateral calls were certainly a known risk at the time defendants made their statements and defendants did not need to "anticipate" that collateral calls would occur in order to discuss this known risk.

[22]     Defendant Lewis attempts to defend his false statement that AIG established "prudent credit reserves for all its exposures," ¶ 315, by arguing that "the complaint contains nothing showing that GAAP required (or even permitted) AIG to establish credit reserves in connection with its credit default swaps."   Lewis Mem. at 11, n.32.   He adds that this failure could not have been imprudent, in any event, because "meaningful credit losses have not been suffered to this day."   *Id.*   Assuming, *arguendo*, that GAAP did not permit AIG to establish reserves for its CDSs, that does not make Lewis's statement that AIG had established "prudent credit reserves for *all* its exposures" true; in fact, it would demonstrate that the statement *could not be true*. Moreover, the assertion that AIG has not experienced significant credit losses is contrary to AIG's own announcement on March 15, 2009 that, over and above the tens of billions of dollars AIG had posted as collateral, AIG had made payments, as of that date, of $27.1 billion to counterparties to purchase the securities underlying the CDS contracts.   *See* ¶ 229 and March 15, 2009 press release cited therein and attached as Exhibit 4 to the Golan Decl.

assurances when faced with the type of severely stressed market conditions that they were afraid

might occur when they decided to stop writing these CDSs.[23]

AIG contends that all of the statements with which plaintiffs take issue during this period

are in the nature of projections, and thus subject to the "bespeaks caution" doctrine.[24]  But the

"bespeaks caution" doctrine is no help to AIG.  Cautionary language is "examined in the context

of the representations to determine whether the language warns of the specific contingency that

lies at the heart of the alleged misrepresentation."  *P. Stolz Family Partnership L.P. v. Daum*,

355 F.3d 92, 97 (2d Cir. 2004).  *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.

Supp. 68, 72 (S.D.N.Y. 1996) ("The bespeaks caution doctrine involves an examination of

statements in the context in which they were made.").  Cautionary language does not foreclose

---

[23]     AIG also argues that because it disclosed in August 2007 that it had $94.6 billion in RMBS investments as of June 30, 2007, which included approximately $28.7 billion of subprime exposure, and because a close examination of the June 30, 2007 balance sheet reveals a shortfall of more than $1 billion in the securities lending collateral, investors should have been able to discern that AIG had invested its securities lending collateral in subprime-backed RMBSs.  *See* AIG Mem. at 53, n.30.  The logic of this argument is faulty.  As the Complaint alleges, AIG failed to disclose that, in a sharp break from its prior practice, it invested up to 75% of its securities lending collateral in RMBSs, including subprime-backed assets.  Defendants gave no indication that the $94.6 billion in RMBS investments that AIG disclosed were primarily through its securities lending program.  Thus, there was no way for a reader of AIG's financial statements to make the connection between a shortfall in the securities lending collateral and the fact that the shortfall was due to the disruption of the residential housing market and resulting credit crisis, or to anticipate that this crisis might cause AIG to have severe liquidity constraints due to further securities lending collateral shortfalls.  There was also no way for investors to anticipate that AIG's build-up of subprime exposure would continue, due to the decision to invest the majority of securities lending collateral in RMBSs.

[24]     On February 17, 2006, a final judgment was entered against AIG in the Southern District of New York for antifraud violations in connection with AIG's 2005 accounting restatement.  *SEC v. AIG*, 06 Civ. 1000 (S.D.N.Y. Feb. 17, 2006); *see also* AIG Mem. at 43-44, n.26.  Therefore, AIG is not entitled to the protections offered by the Safe Harbor provision of the PSLRA, which provides greater protection than the judicially fashioned "bespeaks caution" doctrine, but does not shelter forward-looking statements made by issuers that, within the three years prior to dates of such forward-looking statements, have been the subject of a judicial decree or order that prohibits future violations of the antifraud provisions of the securities laws.  15 U.S.C. § 77z-2(b)(1)(A)(ii).

liability if it "warn[s] investors of a different contingency than that which plaintiffs allege was misrepresented." *Hunt*, 159 F.3d at 728. In other words, the cautionary language "must relate directly to that by which plaintiffs claim to have been misled." *Id.* at 729. *See also In re Prudential*, 930 F. Supp. at 72 (cautionary language must "precisely address the substance of the specific statement or omission that is challenged").

Here, defendants cannot claim to have adequately disclosed the risks associated with the CDS portfolio because AIG's SEC filings from the 2005 10-K to the first quarter 2007 Form 10-Q did not even disclose its existence, much less the serious risks of valuation declines and collateral calls associated with it. ¶¶ 259, 266(c)-(d), 277(c), 282, 292. *See In re Giant Interactive Group, Inc. Sec. Litig.*, No. 07 Civ. 10588(RWS), 2009 WL 2432373, at *7 (S.D.N.Y. Aug. 7, 2009) (a registration statement that disclosed the effect of gold farming generally, but did not use the term "gold farming" specifically, did not adequately bespeak caution about the extent and impact of gold-farming). Indeed, AIG itself acknowledges that it "warned of risks without specifically mentioning the multi-sector CDSs or its securities lending business." AIG Mem. at 45. It is well-settled, however, that generic, boilerplate warnings, such as those appearing in AIG's SEC filings and those made at the outset of the August 9, 2007 conference call, "do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. A. 12046 (WHP), 2001 WL 300733, at * 8 (S.D.N.Y. March 28, 2001). And, of course, "[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068(LLS), 2000 WL 1154278, at *7 (S.D.N.Y. Aug. 14, 2000).

AIG points to a number of risk disclosures, but none of them warned against the specific risks that plaintiffs allege were undisclosed. *See* AIG Mem. at 45-46. For example, AIG cites a risk disclosure from the 2006 Form 10-K in regard to liquidity, which stated that "AIG's liquidity could be impaired by an inability to access the capital markets or by unforeseen outflows of cash." This "warning" is nothing more than a truism, applicable to *any* company. It fails to mention the specific liquidity risks that AIG faced in connection with the CDS portfolio as a result of possible collateral calls or in connection with the securities lending business as a result of the decision to invest most of the cash collateral received from borrowers in RMBS. Similarly, AIG stated, in regard to its investment portfolio, that "[t]he concentration of AIG's investment portfolios in any particular industry, group of related industries or geographic sector could have an adverse effect on the investment portfolios and consequently on AIG's results of operations and financial position." This statement, however, did nothing to warn investors that AIG *had already decided* to concentrate the investment of cash collateral received through securities lending in RMBS and the specific risks posed by such concentration. Thus, AIG's purported "warnings" were so generalized that they failed to apprise investors of the "hard facts" that defendants knew to be true and which undermined the accuracy of the statements at issue in this case. As such, they cannot shelter defendants' false and misleading statements. *Credit Suisse,* 2001 WL 300733 at *8.

Similarly, the statements made during AIG's August 9, 2007 conference call were unaccompanied by any meaningful cautionary statements. AIG notes that at the start of the call, investors were told that the remarks could contain "projections" and that they should consult the risk factors contained in AIG's public filings. AIG further cites the "caution" in its second quarter 2007 Form 10-Q that its "projections and statements are not historical facts but instead

represent only AIG's belief regarding future events, many of which, by their nature, are inherently uncertain and outside AIG's control." AIG Mem. at 54-55. Again, these generic warnings did nothing to address the specific risks that plaintiffs allege were undisclosed. Thus, for example, when investors were told that the risk of loss in its subprime-backed CDS and RMBS portfolios "is very modest and remote and has been structured and managed effectively," there was no accompanying warning that this assessment might not turn out to be true because AIG's models could not provide reasonable assurance that losses would not occur under stressed market conditions, such as were occurring by the third quarter of 2007. Nor were investors warned that the risk of a credit loss was just one type of risk to which AIG was exposed by these financial instruments and that there was also a significant liquidity risk arising from them.

Similarly, Cassano's statements that "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions," and "we see no issues at all emerging and we see no dollar of loss associated with any of that [CDS] business in any reasonable scenario that anyone can draw" are not protected by the bespeaks caution defense. Instead of accompanying these statements by the type of "hard facts" that would be critical to understanding the risks posed by the "multi-sector" CDS – such as the fact that AIGFP decided to exit the multi-sector CDS business in 2005 because it recognized that it was *unable to determine* the extent of losses in such a stressed environment as was now appearing, and the fact that obligations to post collateral could cause AIG a severe liquidity strain if the value of the insured CDO tranches declined – Cassano flatly denied that there was any imaginable scenario that could result in a loss for AIG. Under these circumstances, the boilerplate warnings accompanying these statements were ineffective. *Credit Suisse*, 2001 WL 300733 at * 8; *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS, 2005 WL

225288, at * 18 (S.D.N.Y. Feb. 1, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine.").

### 2. Third and Fourth Quarter 2007 False Statements

As the deterioration of the housing and subprime markets intensified during the third and fourth quarters of 2007, AIG continued to mislead investors about its impact on the Company. AIG, among other false and misleading representations:

- Under-reported the market valuation loss of the CDS portfolio;

- Failed to disclose a material weakness in internal controls relating to the CDS portfolio valuation;

- Continued to insist that no losses would be realized on the CDS portfolio;

- Insisted that AIG's subprime exposure had been contained by an active and strong risk management process; and

- Failed to disclose the liquidity risk to the Company arising from collateral calls.

By the time AIG issued its third quarter 2007 financial results, it had already received a $1.5 billion collateral call from Goldman Sachs, a clear indication from the market that the value of its CDS portfolio had substantially declined. Also by that time, St. Denis had resigned after being told by defendant Cassano that he had been "deliberately excluded" from decision-making about the CDS portfolio because Cassano was concerned that he would "pollute the process."

Third Quarter 2007 Disclosures

AIG argues that, like the statements made in the second quarter discussed above, it cannot be liable for these false statements because they were forward-looking and accompanied by cautionary language. Again, this argument fails. For example, in response to plaintiffs' allegation that AIG's reported $352 million market valuation loss on the CDS portfolio was

understated, the Company points to statements made in its third quarter 2007 10-Q noting that the value of the CDS portfolio could "fluctuate" in response to changing market conditions and that its estimates of the portfolio's value at future dates could be materially different. *See* AIG Mem. at 56. Notwithstanding these purported warnings, the bespeaks caution doctrine is inapplicable. When AIG told investors that the loss on the CDS portfolio was $352 million, the figure represented the Company's then-*present* estimate of the loss. The bespeaks caution doctrine does not apply to statements of present or historical fact, which is what a financial statement purports to be. *See Darquea v. Jarden Corp.*, No. 06 CV 0722 (CLB), 2007 WL 1610146, at *7 (S.D.N.Y. May 21, 2007) (quoting *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004)); *accord In re Nortel Networks Corp. Sec. Litig.,* 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).

Even if the bespeaks caution doctrine were somehow applicable to AIG's reported financial results, which it is not, the purported warnings omitted material facts and were themselves misleading. There is no question that the value of the CDS portfolio could fluctuate in response to market conditions. But plaintiffs have alleged that the CDS portfolio valuation was understated due to an undisclosed, material weakness in internal controls relating to the CDS valuation process. The internal weakness manifested itself through the deliberate exclusion of accounting and risk management personnel from the valuation process and by the failure to consider third-party valuations. By the time AIG issued its third quarter 2007 financial statements, St. Denis had already resigned in protest of his treatment by Cassano and Goldman Sachs had made a $1.5 billion collateral call. Thus, any cautionary language about the possible fluctuation of the value of the CDS portfolio in response to market conditions was rendered meaningless by AIG's failure to disclose its internal control weakness.

AIG also defends its failure to take timely mark-downs of the value of its CDS portfolio on the ground that the models used to value these instruments were "new and evolving," and that this was an inherently difficult task in an illiquid market under fair accounting rules.  AIG Mem. at 57.  Even if this were true, this does not mean, as AIG suggests, that it had a reasonable basis for its valuation of its CDS portfolio.[25]  To accept this argument, the Court would have to overlook the material weakness in AIGFP's internal controls that allowed it to exclude AIG's risk management and accounting functions from the valuation process and to fail to utilize third party valuations.  Furthermore, the Court would have to accept the proposition that it was merely a coincidence that when AIG did report additional writedowns of the CDS portfolio in December 2007, it **under-reported** losses by 75%.  And it would have to further attribute to coincidence the fact that most of the under-reporting of losses was due to the fact that AIGFP employed a "negative basis adjustment" that failed to comply with GAAP.  ¶ 190.  Thus, notwithstanding any warning that AIGFP's valuation methodology was "new and evolving," investors did not know that the reported valuation was the product of deliberate manipulation.[26]

---

[25]     It must be noted that there is no factual basis properly before the Court to support the assertion that the models AIGFP used to value its CDS portfolio were "new and evolving."  In fact, as PwC admits in its brief, there was never a liquid market for credit default swaps, *see* PwC Mem. at 5, and therefore their value always had to be determined by model rather than on the basis of market trading.

[26]     AIG's contention that its valuation of the CDS portfolio was a matter of opinion that is inactionable under the securities laws also rings hollow.  AIG Mem. at 57.  As AIG acknowledges, statements of opinion are actionable if the speaker lacked a genuine belief as to their veracity.  Even if AIG's valuation could properly be construed as a matter of opinion, as recited above, the Complaint provides a more than ample basis for concluding that defendants lacked a genuine belief as to the propriety of the valuation.  Thus, as a matter of law, AIG's argument should be rejected.  As cases involving the establishment of under-stated loan loss reserves make clear, even though they are set up for future contingencies, they are still statements of present fact for which the speaker can be liable under the federal securities laws. *See, e.g., In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996) (allegations of misstatements regarding adequacy of company's loan loss reserves stated securities claims); *Hayes v. Gross*, 982 F.2d 104, 106-07 (3d Cir. 1992) (same).

AIG defends Cassano's statement during the November 8, 2007 third quarter earnings call reassuring investors that AIG had "more than enough resources to meet any of the collateral calls that might come in," ¶ 332, by arguing that it could not have anticipated the extent of the amount of collateral it would have to post in September 2008.  AIG Mem. at 58.  Again, the argument is based on the false premise that plaintiffs seek to hold defendants liable for failing to predict the future.  Plaintiffs do not allege here, or anywhere, that defendants are liable for failing to predict the amount of collateral it would have to post in the future.  Liability here arises from defendants' failure to make complete and accurate disclosures regarding the circumstances under which AIGFP could be required to post collateral.  As explained above, such disclosures were required because of the limited and misleading disclosures in AIG's SEC filings about the risk that AIGFP could be required to post collateral if AIG's debt ratings declined,[27] which omitted to disclose the risk that AIGFP could be required to post far greater amounts of collateral under other conditions, such as, for example, a decline in the fair value or ratings of the CDOs it insured.  *See In re Par,* 733 F. Supp. at 677; *In re Marsh,* 501 F. Supp. 2d at 469.  These undisclosed facts would have been of critical importance to investors who, by November 2007, were aware that AIG had begun to experience a decline in the fair value of its CDSs and who were undoubtedly concerned about the risk and consequences of further such declines.  Plaintiffs allege that the market was stunned by the extent of the collateral call obligations experienced by AIG in 2008, and their drain on the Company's liquidity, not because defendants failed to predict these events, but because the market had not been informed in a clear, non-misleading manner, of the risk that these collateral calls could result from, among other things, a decline in value of

---

[27]    *See, e.g.,* ¶ 326 (quoting AIG third quarter 2007 Form 10-Q as stating that a downgrade of AIG's long-term senior debt by the major rating agencies "would permit counterparties to call for approximately $830 million of collateral").

the subprime-backed CDOs insured by AIGFP's credit default swaps, which was far more likely to occur, at least initially, than a decline in AIG's ratings.

December 5, 2007 Investor Meeting

For similar reasons, AIG fails in its attempt to defend Cassano's characterization during the December 5, 2007 investor meeting of the collateral calls AIG had received as "drive-by[s]." Again, plaintiffs' claim is not that Cassano or any other defendant should have predicted the amount of collateral AIG would have to post. Cassano's cavalier remark, made at a time when AIGFP had already received collateral calls from institutions such as Goldman Sachs, Merrill Lynch and Société Générale (¶¶ 236-237), further demonstrates his lack of candor in attempting to minimize the risk to AIG's liquidity arising from its obligations to post collateral, which AIG consistently misrepresented in its SEC filings and other public statements. As noted by Joseph St. Denis in his October 4, 2008 letter to Congress, Cassano's statements characterizing collateral calls "as lacking a legitimate basis, especially given the apparent state of AIGFP's valuation models, were statements that I would not have condoned. I believed at the time of the investor meeting … that full disclosure of the margin calls, and resulting collateral postings … was of critical importance."[28]

AIG argues that "[p]laintiffs have not pleaded that the collateral calls were so substantial at the time of the December 5 meeting that AIG knew they would threaten AIG's trillion dollar balance sheet." AIG Mem. at 62. Similarly, defendant Bensinger argues "there is no allegation

---

[28]  AIG argues that Cassano's statement that AIGFP and its counterparties were engaged in negotiations to "try and find the middle ground" somehow constitutes adequate disclosure of the risk that it would have to post further collateral. AIG Mem. at 62. It does not. The circumstances under which AIGFP was subject to collateral calls on its CDSs cannot be gleaned from this statement. Thus, investors could not adequately gauge the risk that such potential collateral calls posed to AIG's liquidity, either from this statement by itself or when considered in conjunction with the other public statements made by defendants regarding AIGFP's collateral posting obligations.

that *as of December 2007*, when Bensinger spoke at the investor meeting, AIG did not in fact have sufficient capital to cover AIG's then-anticipated collateral requirements."  Bensinger Mem. at 13.  But AIG and Bensinger fail to apprehend that their obligation to provide complete and accurate disclosures concerning AIG's collateral posting requirements did not depend on whether collateral calls had, by December 2007, threatened AIG's balance sheet.[29]  The obligation arose from the fact that AIG had consistently misled the market about the circumstances under which collateral calls ***could be*** required.  By minimizing the possibility of significant collateral posting requirements, the statements made at the December 5 investor meeting reinforced the previous misleading statements.  For example, AIG falsely assured investors in the December 5 conference that, even though the subprime crisis had caused it to write down the value of its CDSs, the write-down that was announced posed no threat to AIG's liquidity because AIGFP had "the ability and intent to hold these securities to recovery, thereby minimizing liquidity-driven economic losses."  ¶ 336.  This comment, like similar statements before it, was highly misleading because it failed to acknowledge the liquidity threat posed by the need to post collateral that could be triggered by further declines in the value of the insured CDO securities, and that this was an independent risk, apart from whether AIG might eventually have to make actual payments to the counterparties in the event of defaults on the CDS contracts. Moreover, even if the market had understood that collateral calls could be triggered by a decline in the value of the insured CDO tranches, investors would not have been able to accurately gauge

---

[29]    AIG's reference to its "trillion dollar balance sheet" is highly disingenuous.  As AIG knows well, its insurance companies were subject to regulatory capital requirements.  As such, regardless of the size of its balance sheet, the Company was not free to deploy its capital in any way it wished.  Indeed, the statutory restrictions on its deployment of capital exacerbated the liquidity squeeze that resulted in the near collapse of AIG at the end of the Class Period.

the likelihood of such collateral calls because defendants misrepresented the extent of valuation

losses that AIGFP's portfolio had incurred at the time of this conference.[30]

As noted, AIG, at the December 5 investor meeting, reported a fair value loss on the CDS

portfolio in the range of $1.4 - $1.5 billion, before ultimately being forced to acknowledge two

months later that the loss was actually $5.96 billion.  AIG now defends the false valuation it

provided at the meeting on the ground that Cassano cautioned investors that there were

disagreements among market participants as to these values and that they were "in flux."  AIG

Mem. at 60.  In a similar vein, AIG argues that defendants warned that the losses it reported on

December 5 would change by year end.  *Id.* at 63.  While the market was in a state of rapid

deterioration, this was not the reason why the valuation loss reported by AIG was false.  As AIG

subsequently admitted (but now ignores), the valuation losses AIG reported were false because

the valuation methods AIGFP used did not comply with GAAP, and the use of these methods

was the result of the material weakness in AIG's internal controls, about which PwC had

previously warned AIG just days before the meeting.  *See* ¶¶ 184-190.  Thus, this was a false

statement or present fact.  But even if it could be considered a forward-looking statement, "[t]he

cautionary language 'must precisely address the substance of the specific statement or omission

---

[30]     AIG relies on *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1210-11 (S.D.N.Y. 1996), to argue that it was not required to disclose details of its collateral calls or the terms of its CDS contracts.  *Canandaigua* is easily distinguished.  In that case, the court rejected the plaintiffs' contention that Item 303 of SEC Regulation S-K established an affirmative duty on the part of the defendant company to disclose details of its promotional strategy in the MD&A portion of its 10-K.  944 F. Supp. at 1209.  The court held that the requirement in Item 303 of disclosing known trends did not require disclosing management's strategy.  Here, plaintiffs do not charge defendants with merely failing to disclose their strategy, but rather of misrepresenting facts concerning known risks that AIG would have to post large, and potentially crippling, amounts of collateral.

that is challenged.'" *In re Nortel*, 238 F. Supp. 2d at 628 (quoting *In re Prudential* 930 F. Supp. at 72). Thus, the "bespeaks caution" defense is unavailing to defendants here.[31]

Finally, AIG describes defendants' statements during the December 5 conference regarding AIG's financial strength as inactionable statements of optimism that proved to be false only with the benefit of hindsight.[32] *See* AIG Mem. at 62, citing *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), and *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1257 (S.D.N.Y. 1991). Unlike in cases such as *Ciresi* and *Hershfang*, where the plaintiffs' claims were based on unsupported conclusory allegations, *see Ciresi*, 782 F. Supp. at 821; *Hershfang*, 767 F. Supp. at 1257, defendants' declarations of AIG's financial strength at the December 5 investor meeting, when viewed in the context in which they were made, were much more than conclusory expressions of optimism. Here, investors and analysts had been told repeatedly by AIG that it

---

[31]     AIG's citation of *In re Allied*, 2003 WL 1964184, at *1 (AIG Mem. at 57) lends no support to its position. In that case, the plaintiffs' allegation that Allied Capital overvalued certain illiquid securities was a mere opinion that had not been proven or admitted. *Id.* at *4. Here, by contrast, AIG has admitted to providing false information to investors in the December 5 investor meeting and that its valuation method did not conform to GAAP. Furthermore, in *Allied Capital*, the plaintiffs failed to allege the magnitude of the alleged overstatement of value, *id.* at *5, whereas here, the amount of the understatement of loss is pled with particularity.

AIG also maintains that Cassano and others disclosed the valuation methodology used, and therefore it cannot have deceived investors. AIG Mem. at 61. But even AIG acknowledges that "the details of any particular adjustments" were not disclosed. *Id.* At most, Cassano, without using the term "negative basis adjustment," mentioned during the investor meeting that AIG "take[s] into account the difference between the cash price for the underlying reference obligation and the pricing of the synthetic credit derivative." *Id.* Cassano did not explain how AIG took this information "into account," and it would not be possible even for an accountant to determine from his remarks that AIG did so in a way that did not conform to GAAP.

[32]     Similarly, defendant Bensinger argues that his statements during investor calls were not false when made, arguing that what ultimately happened to AIG cannot be used as evidence of the falsity of prior statements and that fraud-by-hindsight pleading is routinely dismissed. Bensinger Mem. at 13. Defendant Bensinger further argues that his use of cautionary language and the context of his statements negate any inference of fraud. But, for the reasons set forth herein, including the fact that defendant Bensinger provided a loss estimate at the December 5, 2007 investor meeting just days after being advised by PwC about AIGFP's internal control weakness, the statements, when viewed in context, were false and misleading when made.

might have to post, at most, modest amounts of collateral (in the range of about $1 billion) if it experienced a ratings downgrade.   Investors were also told that collateral calls by CDS counterparties were illegitimate "drive-bys" that "go away" when questioned by AIG. Defendants' lack of candor concerning AIG's potential obligation to meet tens of billions of dollars in collateral calls deprived investors of precisely the information that would have been needed to objectively assess their expression of AIG's purported financial strength.   Indeed, the statements at the December 5 conference must be viewed in the context of compelling evidence that AIGFP was purposefully *manipulating valuation models to under-report fair value losses*, and in fact, disclosed unsupported valuation adjustments even after being warned by its outside accountants of a possible material weakness in this area.    In this context, defendants' representations that they had a high degree of certainty in the value of the CDS portfolio and that AIG had the financial wherewithal to "ride out the storm" were more than simply inactionable expressions of optimism.

The Complaint also challenges defendant Forster's statement at the December 5 Investor Meeting that, in writing credit default swaps on CDO tranches, AIGFP applied the same level of analysis to the underlying collateral as did the managers of the CDOs.  According to a transcript of the conference, Forster stated:

> … [T]hey *[the CDO managers] analyzed all of the collateral they have*.  We ask them how they went about that.  We ask them how they stressed it, how they reviewed it, how they're going to do ongoing surveillance of it.  But then *what we also do is do our own analysis in exactly the same processes*.  And then, we compare and contrast the two to see if we're coming up with similar results and similar likes and dislikes of the underlying collateral.  ¶ 346 (emphasis added).

In response to evidence from a confidential witness that AIGFP did not, in fact, obtain or analyze loan-level valuation materials or analysis (¶ 351(h)), Forster now argues that his statements at the conference do "not remotely suggest that AIGFP took steps to review the counterparty's internal

lower(sic)-level valuation materials," but rather, relied primarily on credit ratings.   Forster Mem. at 14.   Forster's attempt to spin this statement's meaning is implausible, but, in any event, requires a determination of fact that is inappropriate for resolution on a motion to dismiss. *In re Spiegel, Inc. Sec. Litig.*, No. 02 C 8946, 2005 WL 1838449, at *6 (N.D. Ill. July 29, 2005); *see Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).[33]

### 3.    False and Misleading Statements in the February 2008 Disclosures

The Complaint alleges in detail that, despite being forced to make a number of corrective disclosures in February 2008, the Section 10(b) Defendants continued to make false and misleading statements to cover up their previous lies and to continue to prevent investors from understanding the extent of the Company's exposure to the financial crisis that was growing worse with each day.   While AIG attempts to reduce plaintiffs' claims to the allegation that "AIG continued to express unsupported optimism about its financial condition," AIG Mem. at 64, the Complaint sets forth specific false and misleading statements, most of which AIG does not attempt to counter.   For example, the Complaint alleges that during the February 29 investor call, an analyst confronted Sullivan regarding the fact that he and other AIG executives provided grossly understated loss estimates for the CDS portfolio at the December 5 investor meeting. Sullivan's response was that the false numbers disclosed at the December 5 meeting were "unaudited."   ¶ 381.   This was a further act of dissembling by Sullivan, intended to create the false impression that AIG had not had the benefit of a review of its valuation process by its

---

[33]    Forster also incorrectly argues that he can only be liable for his statements at the May 31, 2007 and December 5, 2007 investor conferences.   That is not so.   Under the group pleading doctrine, plaintiffs may "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) (quoting *In re Oxford Health Plans, Inc.* 187 F.R.D. 133, 142 (S.D.N.Y. 1999)).   Forster certainly meets this criterion.

outside auditors at the time of the December 5 conference.  In fact, however, as Sullivan knew, PwC specifically warned AIG prior to that investor meeting – and **because it knew that the meeting was scheduled** – of a possible material weakness in internal controls relating to the value of these instruments.   Nevertheless, AIG and Sullivan not only went ahead with the meeting, but proceeded to provide investors with false information that had been the subject of PwC's warning.

While AIG eventually disclosed PwC's findings – and its concurrence in those findings – of a material weakness in connection with the valuation of the CDS portfolio, the vague description of the material weakness in the 2007 10-K concealed highly material aspects of what PwC and AIG's board had learned, such as the deliberate exclusion of St. Denis from the valuation process.  Similarly, although AIG disclosed Cassano's "resignation" at the time it announced its 2007 financial results, it failed to disclose that Cassano had been retained as a "consultant" by the Company at a fee of **$1 million per month**.  Thus AIG's disclosures during this period failed to provide information that was highly material and necessary for investors to have an informed understanding of the integrity and veracity of AIG's management, and the reliability of the statements made throughout the Class Period.[34]

Once again, AIG argues that the false and misleading statements plaintiffs attack are forward-looking and were purportedly accompanied by meaningful cautionary warnings.  *See* AIG Mem. at 64.  As explained above, however, the statements at issue are not forward looking

---

[34]    AIG argues that it had no duty to disclose the resignation of St. Denis. AIG Mem. at 64, n.35.  It is clear, however, that the circumstances of his resignation, together with the false representation at the December 5 investor meeting of the fair valuation loss of the CDS portfolio, notwithstanding PwC's warning, would have been highly material to the market's assessment of management's integrity.  The is particularly true in light of AIG's prior representations that internal controls had been strengthened to prevent the very sort of management overrides that occurred here.

and the warnings AIG cites were highly generalized cautions that applied to all market participants. Because these warnings failed to point out specific facts that were likely to cause the risks AIG warned of to occur, they are ineffective in sheltering AIG or any of the Section 10(b) Defendants from liability. *Credit Suisse*, 2001 WL 300733 at *8.

For example, in the 2007 10-K, February 28, 2008 press release and February 29, 2008 investor call, defendants repeatedly reassured investors that the CDS portfolio would not experience losses that would have a material effect on AIG's financial condition, ¶ 382(c), and explained that this was because "AIGFP underwrote its Super Senior credit derivative business to a zero loss standard, incorporating conservative stress scenarios at inception." ¶ 380. Defendant Bensinger stated that AIG had subjected the CDS portfolio to "stress tests" and that "[u]nder his severe stress scenario, the realized loss would be approximately $990 million, in contrast to the unrealized market valuation loss of $11.25 billion," and that the market valuation loss in the CDS portfolio was not an indicator of the risk to which AIG was exposed. *Id.* Defendant Bensinger argues that his statement regarding potential losses on the February 29, 2008 investor call was protected because the call contained forward-looking statements. Bensinger Mem. at 14. Again, these statements were not merely forward-looking statements of optimism, but included statements of purported historical fact regarding the standards used to underwrite the portfolio, which were false. In fact, as stated previously, AIGFP made the decision to exit this business because the opposite was true, *i.e.,* the inability of AIGFP's risk model to deal with the degraded subprime underwriting standards meant that the business did not conform to the "zero loss standard" to which AIG aspired for such investments. [35]

---

[35] Defendant Bensinger also argues that plaintiffs conflate realized losses on the CDS portfolio with unrealized mark to market valuation losses. Bensinger Mem. at 13. As explained above, the statements of Bensinger and others were false and misleading because the confidence

AIG also falsely represented in its 2007 10-K that in its securities lending activities it received "cash collateral equal to 102 percent of the fair value of the loaned securities." This gave the impression that the Company was carefully executing its securities lending program by protecting itself with an over-securitized position. Plaintiffs allege that this statement was false because, in fact, AIG did not always receive 102 percent but, in some instances, AIG agreed to make up the shortfall in order to maintain 102 percent of the collateral in the collateral pool. By August 31, 2008, AIG had deposited $3.3 billion of its own funds in the collateral pool. ¶ 382(e).

AIG and other defendants now argue that AIG's admission in the 10-Q for the second quarter of 2008 that it did not always receive 102 percent cash collateral and sometimes had to make up missing collateral from its own assets cannot be used to conclude that its statement in the 2007 10-K about how much collateral it required was false. AIG thus asks the Court to conclude that as the financial crisis deepened in 2008, it changed its policy to require *less* collateral than it did at the end of 2007, and that it adopted this change, which required it to post more than $3 billion, at a time when its liquidity was already strained. There is no rational reason for it to have made this decision, and this argument is not credible. Nor is it a reasonable inference to draw from the facts alleged in the Complaint. Indeed, AIG did not merely correct its prior false statement. It also disclosed that, as a result, it had been required to make up the shortfall by "deposit[ing] funds to the collateral pool for the benefit of the insurance company participants." ¶ 421. This certainly gives rise to a plausible inference that AIG in fact received less than 102 percent.

---

that defendants expressed in the performance of the CDS portfolio related solely to the question of whether the portfolio would experience credit losses. These statements thus ignored the high probability that additional collateral postings, which AIG had already experienced, would threaten AIG's liquidity, and that further valuation losses would severely impact AIG's balance sheet.

Citing *Rubin v. MF Global Ltd.*, No. 08 Civ. 2233 (VM), 2009 WL 2058590, at *7 (S.D.N.Y. July 16, 2009), the Underwriter Defendants contend that AIG's qualification that it "generally" accepted certain amounts of collateral somehow precludes plaintiffs from establishing a claim based on AIG's statements. However, the false statement plaintiffs are complaining about is contained in the 2007 Form 10-K where AIG made no such qualification. AIG plainly stated in the 2007 10-K that "Cash collateral **equal to 102 percent** of the fair value of the loan securities **is received**." That was false, and materially so, as shown by AIG's admission in the second quarter 2008 10-Q filed in August 2008 that that it "generally" received **between 100 and 102 percent** of the value. ¶ 209. Thus, AIG's qualification using the word "generally" was not included until AIG's curative statements.[36]

C.    **False and Misleading Statements from March to September 2008**

Although the February 2008 filing of AIG's 2007 10-K disclosed substantial losses, collateral postings, liquidity puts and other drains on AIG's liquidity, defendants continued to make false and misleading statements that prevented the market from becoming aware of the full extent to which AIG's financial condition had been weakened by its ill-considered investments in subprime mortgage-related financial instruments.

---

[36]    The Underwriter Defendants' further argument that AIG's decision to disclose in the 2007 10-K that it received collateral worth 102% of the value of its securities on loan is not a basis for concluding that similar detail was legally required earlier, *see* Underwriters Mem. at 18, is a red herring. By placing this statement in its annual report, AIG implicitly acknowledged its materiality. And, of course, once a party chooses to make statements, one "has a duty to be both accurate and complete." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (quoting *Caiola, N.A.*, 295 F.3d at 331). By stating the amount of collateral it received under the securities lending program as "equal to" 102%, AIG undertook an obligation "to speak truthfully and to make such additional disclosures as … necessary to avoid rendering the statements made misleading." *In re Par Pharm., Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990).

On May 8, 2008, AIG announced large losses for the first quarter, ended March 31, 2008, and that it would seek to raise $12.5 billion in new capital "to fortify its balance sheet and provide increased financial flexibility." ¶ 385. On May 20, 2008, AIG disclosed that, instead of the $12.5 billion capital increase announced twelve days earlier, it had raised more than $20 billion through the sale of stock and equity units through public offerings and various debt securities through private placements. In connection with these offerings, defendant Sullivan stated at a Lehman Brothers sponsored investor conference on May 20 that the reason for raising capital at that time was the Company's "desire to position AIG with enhanced flexibility to take advantage of opportunities as conditions warrant." ¶ 203. In response to a question, Sullivan stated:

> [W]hat we decided … was to be proactive, get out in front, reinforce our **fortress balance sheet** to make sure that we have the ability to continue to invest in the opportunities that we have around the world. And to absorb any market volatility that may still be out there.

¶ 204. In truth, the reason for raising capital at this point was hardly to be "proactive" or to take advantage of "opportunities" for investment. This additional capital was a transfusion to replace the capital hemorrhaging from the Company as a result of AIGFP's collateral postings, which resulted from the continued deterioration of the CDO market and the decision by the major rating agencies, announced on May 8 and 9, to lower AIG's debt ratings and to place a number of the CDO tranches it insured on credit watch. ¶¶ 205, 417.[37]

---

[37]     Defendant Sullivan's representation that AIG had a "fortress" balance sheet has been further shown to be false through a recent admission of defendant Willumstad, who took over as the Company's CEO following Sullivan's termination on June 15, 2008. Indeed, it shows that material information about the Company's financial condition had still not been disclosed by the summer of 2008. Commenting on what he found when he took over as CEO from Sullivan, Willumstad – who had served on AIG's board since January 2006 – stated: "I thought I knew the company well, but after three weeks of digging and turning over rocks, I realized how **fragile** AIG's balance sheet was." Golan Decl., Ex. 2 (emphasis added). That the new CEO, who had

AIG ignores these allegations, and focuses instead on attacking other statements that it dismissively characterizes as "optimistic forward-looking statements." *See* AIG Mem. at 66. AIG again mischaracterizes the nature of the claims asserted against it by arguing that "Plaintiffs plead nothing to suggest that AIG could have anticipated (and then disclosed) the unprecedented events of September 2008." *Id.* at 67. It bears repeating that plaintiffs' claims are **not** based upon the contention that defendants should have either anticipated or disclosed the events of September 2008. In short, AIG is attacking a straw man.

Defendants' repeated assertions that the Company's then-current financial condition was sufficient to "absorb the current volatility," "meet our performance goals and build long-term shareholder value," "grow shareholder value despite the current turbulent environment," and its assurances that AIG has "a strong capital base and we are not raising additional capital," ¶ 382(a), misrepresented the ***then-existing state*** of AIG's financial condition. Similarly, defendant Bensinger argues that his statements during the May 9, 2008 call regarding potential losses and valuation were not materially false when made and when viewed in context. Bensinger Mem. at 16. Regardless of whether defendants believed that the CDS portfolio would not experience ***credit*** losses, by February 2008 defendants knew that the CDS portfolio had experienced, and was continuing to experience, collateral calls as the value of the insured CDOs steadily dropped,

---

been on the Board since January 2006, had to spend three weeks "digging and turning over rocks" to realize the true and dire state of affairs at AIG speaks volumes about the massive fraud perpetrated on AIG investors.

As noted above, to further falsely reassure the market of AIG's strong capital position, AIG announced on May 8, 2008 that its Board had voted a 10% ***increase*** in its dividend. ¶ 386. This followed Sullivan's pattern of seeking to reassure investors by reference to the Company's dividend policy. *See* ¶¶ 335 (statement at December 5, 2007 investor meeting that dividend would not be cut), 372 (statement in 2007 10-K that Company anticipated increasing the dividend) & 387 (Sullivan statement at May 9, 2008 conference that the dividend increase was "a reflection of both the Board's and management's long term view of the strength of the company's business, earnings, and capital generating power").

and that the securities lending collateral investments were deeply in the red. Indeed, the $20 billion in new capital that AIG raised in May 2008 was far less than it needed to save the Company from collapse a mere four months later.[38]

It is well-settled that statements such as these, that are implicit representations of an existing state of facts, will subject a defendant to liability if the defendant knows the factual representations are not true. *See United States v. Skilling,* 554 F.3d 529, 554 (5th Cir. 2009) (statements by Enron executive describing certain of the company's businesses as "uniquely strong franchises with sustainable high earnings power" and a "stable, high-growth business" were material and could be the basis for criminal securities fraud liability); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 n.11 (3d Cir. 1996); *In re PMA Capital Corp. Sec. Litig*., No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005). Even if deemed forward-looking, such statements are actionable if, as here, the speaker does not have a reasonable basis to believe them. *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

AIG argues further that these statements were "preceded by meaningful cautionary warnings," and therefore cannot be the basis of liability under the bespeaks caution doctrine. For

---

[38]     Defendant Bensinger argues that subsequent use for collateral purposes by AIGFP of capital raised in May 2008 does not demonstrate falsity of statements made earlier about the reasons AIG was raising capital because there was no promise or guarantee that AIG was not going to use it for those purposes. Bensinger Mem. at 18. He cites *Pollio v. MF Global Ltd.*, 608 F. Supp. 2d 564, 575 (S.D.N.Y. 2009), to argue that there is nothing fraudulent about changing course in the face of the unexpected and defendants cannot be held liable for inability to have "greater clairvoyance." Again, this case is not about the failure to predict, but rather the failure to provide investors with meaningful disclosures about AIG's exposure to subprime debt and its liquidity risks. Moreover, in *Pollio*, the plaintiff did not allege any specific facts indicating defendants' awareness that the company's 2009 projections were inaccurate or that it faced a "liquidity crunch." *Id.* at 574-75. Here, however, the Complaint sets forth in detail specific statements such as defendant Bensinger's admission that, contrary to the stated purpose of "strengthening [AIG's] fortress balance sheet" or to pursue growth in emerging markets "most of it [the $20 billion raised in May 2008] I would say has been used for AIGFP purposes in terms of collateral." ¶ 417. There is certainly a strong inference that AIG knew in May 2008 that the primarily reason for its capital raise was to meet collateral calls.

example, AIG cites as an example of "meaningful cautionary statements" the statement made at the outset of its August 7, 2008 Earnings Call that "[i]t is possible that AIG's actual results and financial condition may differ, possibly materially, from the anticipated results and financial conditions indicated in these projections and statements," and referring to, without describing, the risk factors discussed in the 2007 10-K and first quarter 2008 10-Q.  AIG Mem. at 67; *see also* Bensinger Mem. at 16.  As noted above, the generic, unfocused "warnings" included in these documents are insufficient to avoid liability.  *Credit Suisse*, 2001 WL 300733, at * 8; *Ruskin,* 2000 WL 1154278, at *7.  Thus, defendants' argument based on the "bespeaks caution" doctrine is wholly unsupported, and must be rejected.

Based on the foregoing, it is clear that the Complaint pleads actionable false and misleading statements and omissions that are material and that provide a basis for plaintiffs to assert their Section 10(b) claims in this case.  As shown below, the Complaint further pleads sufficient facts that give rise to a strong inference of scienter on the part of each Section 10(b) Defendant, and that loss causation has similarly been adequately pled.

## II.    The Complaint Pleads Cogent and Compelling Facts that Give Rise to a Strong Inference of Scienter on Behalf of Each of the Section 10(b) Defendants

In page after page of argument, each of the Section 10(b) Defendants argues that the Complaint fails to adequately allege that they acted with "scienter" in connection with the fraud at AIG.  As set forth below, the Complaint details numerous material facts that these defendants knew or recklessly disregarded in making false and misleading statements to investors and amply describes the motives and opportunities of defendants for engaging in such deceptive conduct. As such, the Complaint easily satisfies the applicable standards for pleading scienter and affords defendants no basis for seeking dismissal on that ground.

### A.    The Applicable Legal Standards

The PSLRA requires that a securities fraud complaint allege scienter by pleading facts sufficient to show a strong inference of either fraudulent intent or conscious recklessness. *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).  In evaluating whether a plaintiff has adequately pled scienter under the PSLRA, the Supreme Court has held that courts must "accept all factual allegations in the complaint as true," and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007).  The Supreme Court further emphasized that "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences.'"  *Id.* at 2510 (citation omitted); *see also In re Regeneron*, 2005 WL 225288, at *24 ("Although the inference of scienter must be reasonable and strong, it need not be irrefutable.").  Rather, the inference of scienter need only be *at least as compelling* as any plausible opposing inference that can be drawn from the facts alleged in the complaint. *Tellabs*, 127 S.Ct at 2509-10.  Accordingly, on a motion to dismiss, it is a defendant's burden to demonstrate the allegations give rise to an inference of nonculpable conduct that is *stronger* than the inference of scienter.  *Id.* at 2504-05.

In *Tellabs*, the Supreme Court cautioned that a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and determine whether the allegations "accepted as true and taken collectively, would [allow] a reasonable person [to] deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 127 S.Ct at 2511.  Thus, in determining whether the Complaint alleges facts giving rise to a strong inference of scienter, the Court may "take into account" only those "plausible opposing inferences" – *i.e.*,

plausible nonculpable explanations for the defendant's conduct – that may be "rationally drawn *from the facts alleged*." *Id.* at 2504, 2509 (emphasis added).

In the Second Circuit, a plaintiff may establish the requisite strong inference of scienter either by (i) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" *or* by (ii) "alleging facts showing Defendants had both motive and opportunity to commit fraud." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 167 (S.D.N.Y. 2008); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000), *State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, No. 08-3185, 2009 WL 1796534, at *2 (2d Cir. June 25, 2009).[39]  Under the first of these methods, courts have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, ignored obvious signs of fraud, or knew of facts or had access to information contradicting their public statements.  *Novak*, 216 F.3d at 308. *Accord In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y.2006) (scienter requirement satisfied where plaintiff identified specific facts constituting strong circumstantial evidence of recklessness and alleged that defendants knew of or recklessly ignored a series of accounting improprieties).  With respect to the second method, courts have found sufficient motive allegations "showing concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged, and the means and likely prospect of achieving the concrete benefits by the means

---

[39]    Although complaints alleging violations of Rule 10b-5 must comply with the particularity requirement of Rule 9(b), the Second Circuit has noted that the requisite intent of the alleged perpetrator of the fraud need not be alleged with "great specificity."  *Ganino*, 228 F.3d at 169; *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("we do not require the pleading of detailed evidentiary matter in securities litigation"); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 455-56 (S.D.N.Y. 2005); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004).

alleged." *Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 469 (S.D.N.Y. 2001); *accord In re Scholastic Corp. Sec. Litig*., 252 F.3d at 74.

Accordingly, as the Second Circuit has explained, a strong inference of the requisite state of mind is adequately pled by alleging that a defendant (1) deliberately engaged in "illegal behavior," (2) "knew facts *or had access to information suggesting that their public statements were not accurate*," (3) "failed to check information they had a duty to monitor," *or* (4) "benefitted in a concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 311 (emphasis added) (citations omitted); *see also South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109-10 (2d Cir. July 14, 2009).

## B.    Overview of Scienter Allegations

As set forth in detail below, the Complaint pleads numerous facts to support plaintiffs' allegations that the Section 10(b) Defendants acted with scienter in making the false and misleading statements and material omissions described above. *See generally* ¶¶ 471-513. While plaintiffs discuss many of these facts individually below, they intersect in large measure and when viewed as a whole, as they should be viewed under *Tellabs*, they clearly satisfy the PSLRA's requirements for pleading scienter as to each of the Section 10(b) Defendants.[40]

The scienter allegations begin with facts that each of the Section 10(b) Defendants either knew or had access to information that contradicted their public statements. First, upon the resignation of Greenberg from his positions as CEO and Chairman in March 2005, defendant Sullivan and his AIG management team allowed AIG's oversight of AIGFP – and especially

---

[40]    To recap, the Section 10(b) Defendants consist of AIG; the AIGFP Section 10(b) Defendants (Joseph Cassano, head of the AIGFP unit, and Andrew Forster, Executive Vice President of Asset Trading & Credit Products in AIGFP); and the AIG Section 10(b) Defendants (Martin Sullivan, the AIG CEO and President, Steven Bensinger, the CFO, David L. Herzog, the Chief Accounting Officer, and Robert Lewis, the Chief Credit Officer).

AIGFP's Asset Trading & Credit Products Group ("Assets/Credit Group") – to become significantly weakened, even as AIG was touting in its 2005 and 2006 Annual Reports and elsewhere that it was "curing" previously identified internal control weaknesses.  Second, during this period of weakened, and materially misrepresented, internal controls over AIGFP, between March 2005 and the end of that year, again without any disclosure, AIGFP significantly ramped up its CDS business, writing more CDS contracts in that nine month period than it had written in the entire seven year period from 1998 to March 2005.  Third, not only did AIGFP ramp up its production of CDSs, but it completely changed the character of its so-called "multi-sector" CDSs into contracts insuring nearly all subprime-based CDOs, leaving the Company with $64 billion of subprime exposure in its $79 billion "multi-sector" CDS portfolio by the end of 2005.  None of that was disclosed until much, much later.

Fourth, by the end of 2005, AIGFP insiders had learned that the Gorton model upon which the CDS contracts had been written could not adequately assess the credit risks associated with AIG's subprime-based CDOs, in addition to its previously-known inability to model any potential valuation or liquidity risks of the CDS contracts.  Based on this analysis, AIGFP executives decided to stop writing "multi-sector" CDS contracts, a decision that was clearly made known to AIG's senior management at the time but not disclosed to the public until more than 18 months later.  Yet, even after being made aware of this decision – and with clear access to the underlying analysis that prompted the change – AIG's senior executives continued to allow defendant Cassano and others within his Asset/Credit Group to control the CDS portfolio, including its valuation reflected in financial reports issued by AIG, and further allowed them to maintain the CDS portfolio on AIGFP's books without seeking to hedge the known risks of the $64 billion of subprime exposure in that portfolio.  Moreover, notwithstanding the decisions

within AIGFP and the American General mortgage division to cease writing new CDS contracts and mortgages based on the subprime market, at the start of 2006, AIG ramped up its investments in the U.S. housing market, including subprime-based debt instruments, further concentrating the Company's concentration of risk in this highly risky sector.

Fifth, on October 1, 2007, Joseph St. Denis, a former Assistant Chief Accountant in the SEC Enforcement Division hired by AIG for the specific purpose of ensuring that AIGFP's accounting for complex transactions was in line with AIG's overall accounting practices and GAAP, resigned his position at AIGFP in protest after being deliberately excluded by defendant Cassano from the process of valuing the CDS portfolio. This was at a time when AIG had already received at least one collateral call, of $1.5 billion, from Goldman Sachs, and when it was clear that AIGFP's valuation of its CDS portfolio differed significantly from the valuations of AIGFP's credit default swap counterparties. After submitting his resignation, St. Denis met with AIG's chief internal auditor, AIGFP's general counsel, and the engagement partner of AIG's outside auditor, PwC, and told them the reasons he had resigned. These concerns were also relayed to the Audit Committee. Thereafter, on November 29, 2007, just six days before AIG and AIGFP executives were scheduled to hold an investor meeting, PwC advised defendants Sullivan and Bensinger, as it had advised AIG's audit committee, that based on St. Denis' observations and other matters uncovered in an abbreviated investigation, AIG had a significant deficiency, and possibly a material weakness, in its internal control processes with respect to the CDS portfolio and its valuation, among other areas within AIGFP.

Against this backdrop, the Section 10(b) Defendants' proclivity to lie to and mislead the investing public with respect to the Company's exposure to the subprime market, and the grave credit, collateral and liquidity risks facing the Company as a result of that exposure is nowhere

more clearly shown than during their December 5, 2007 investor meeting. The meeting was attended by, *inter alia*, Section 10(b) Defendants Sullivan, Bensinger, Cassano, Lewis and Forster. Notwithstanding PwC's warning to AIG's management just six days earlier, Sullivan assured investors that AIG had a "high degree of certainty" with the financial figures provided during the meeting. Bensinger assured investors that "to an extremely high degree of confidence, there is no expected loss in [the CDS] portfolio." And Cassano provided investors with valuation loss figures for the CDS portfolio that understated its fair value loss by 75% (representing that the loss on the portfolio was, at that point, between $1.4 and $1.5 billion when, in fact, the loss was at least *$4.3 billion more* than that amount). Cassano further noted that while AIGFP had received several collateral calls from CDS counterparties, the collateral calls received to that point were akin to "drive bys" and that when AIGFP disputed the collateral calls, the CDS counterparties would simply "go away."

It was only after PwC was conducting its 2007 year-end audit, and required the Company to use appropriate valuation techniques and disclose the material weakness in the Company's internal controls over its valuation and reporting of the CDS portfolio, that AIG, in February 2008, publicly acknowledged the internal control material weaknesses and that the losses on its CDS portfolio had been massively understated due to the use of improper accounting adjustments. And even then and thereafter, as shown in greater detail below, the Section 10(b) Defendants continued to knowingly or recklessly misrepresent the Company's financial strength, and the grave dangers that further collateral calls on its CDS portfolio and demands for repayment by its securities lending partners posed for the Company. Indeed, it was not until the Government's emergency $85 billion bailout in September 2008 that the truth about AIG's financial status was revealed, at long last, to the investing public.

Not surprisingly, the SEC, DOJ and U.S. Attorney's Office are investigating the truthfulness of AIG's public statements during the Class Period. ¶¶ 206, 410. On June 6, 2008, the initial announcement of those investigations resulted in a significant drop in the market price of AIG's stock. ¶ 534. And now, just 15 months after those investigations were announced, *The Wall Street Journal* has reported that the DOJ is about to impanel a grand jury to examine the statements made by Cassano and possibly others at that December 5, 2007 investor meeting. *See* Golan Decl., Ex. 1. *The Wall Street Journal* further reported that there are certain 2007 *tape recordings* that include discussions by Cassano's group about the impact of the deteriorating mortgage market on AIG's credit default swaps, which the Government's criminal prosecutors will seek to contrast with the reassuring statements that Cassano and others made at the December 5 investor meeting. The article states that PwC could be called to testify about, among other things, the way in which it came to determine that there was a material weakness in the internal controls used by Cassano's group to value the swaps, and that St. Denis could also be a material witness in the case against Cassano and others.[41]

---

[41]    Courts have found that the existence of government investigations support an inference of scienter. In *Eastwood Enterprises, LLC v. Farha*, No. 8:07-cv-01940- T-33EAJ, 2009 U.S. Dist. LEXIS 88945 (M.D. Fla. Sept. 28, 2009), plaintiffs brought Exchange Act claims against WellCare Health Plans, Inc., and three individual defendants who served as WellCare's CEO, CFO and General Counsel, after federal and state agents conducted a raid of the company's headquarters. *Id.* at 2-3. The court found the complaint pled actionable misrepresentations and sufficiently alleged each of the defendants' scienter. Among other factors indicating the defendants' scienter, the court stated, "the investigations into WellCare by various government agencies only serve to bolster the inference of scienter at this stage of this action. Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, i.e., that the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored." *Id.* at 10 (citations omitted). Other courts have similarly held that government investigations can support an inference of scienter. *See, e.g., In re Quintel Entertainment Sec. Litig.,* 72 F. Supp. 2d 283, 295 (S.D.N.Y. 1999). In addition, Sullivan's termination in the midst of the government investigations, as well as Cassano's forced resignation just a few months prior, further supports a strong inference of scienter. *See Fouad v.*

As set forth more fully below, the manner in which Cassano, Sullivan, Bensinger and the other Section 10(b) Defendants approached and acted (or remained silent while false and misleading statements were being made) at the December 5 investor meeting is highly indicative of their intentional misconduct and/or recklessness with respect to their statements, and those made in AIG's SEC filings, throughout the Class Period. Thus, there should be no serious dispute about whether plaintiffs have adequately alleged the Section 10(b) Defendants' scienter, as we demonstrate in more detail, and specifically for each defendant, below.

As for AIG's scienter, that is based on the knowledge of its executives and other employees. As courts in this District have repeatedly held, "[a] corporate defendant's scienter is necessarily derived from its employees." *In re Marsh*, 501 F. Supp. 2d at 481 (citing *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)). Courts in this district have "readily attributed the scienter of management-level employees to corporate defendants," *In re Marsh*, 501 F. Supp. 2d at 481 (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442-43 (S.D.N.Y. 2005) and *In re JP Morgan Chase Sec. Litig.,* 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005)), and have repeatedly emphasized that there is no requirement "that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *JP Morgan Chase*, 363 F. Supp. 2d at 627; *see also In re BISYS*, 397 F. Supp. 2d at 443, 449; *In re Marsh*, 501 F. Supp. 2d at 481 ("Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement … is unduly limiting."). Imposing such a requirement would unduly foreclose "liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement." *In re Marsh*, 501 F. Supp. 2d at 481

*Isilon Sys.,* No. C07-1764, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (replacement of CEO and CFO during internal investigation supported strong inference of scienter).

("Imposing this limitation at the pleading stage would doom the long-recognized concept of primary entity liability to irrelevancy, effectively limiting the liability of corporate defendants to secondary liability under Section 20(a).").  Additionally, the Second Circuit has recently held that a plaintiff may raise the required inference of scienter with regard to a corporate defendant based only on the corporation's collective knowledge, without evidence of any particular employee's scienter.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (a plaintiff may plead scienter against a corporation "without being able to name the individuals who concocted and disseminated the fraud"); *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 303 (S.D.N.Y. 2009).; *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005); *In re Marsh*, 501 F. Supp. 2d at 481.

### C. The Complaint Contains Detailed Allegations that the AIGFP Section 10(b) Defendants Engaged in Intentional Misconduct or Conscious Misbehavior

#### 1. The Company's Undisclosed Decision to Exit the CDS Business at the End of 2005

Evidence of the AIGFP Section 10(b) Defendants' scienter begins with the decision they made in December 2005 – but did not disclose until August 2007 – to stop writing new CDS contracts based on multi-sector CDOs that included U.S. subprime mortgage collateral because of the *severe risks* associated with that business line, notwithstanding that the CDS business had been highly profitable for both the Executive Defendants and the Company.[42]  ¶¶ 112, 115, 243.

The Complaint alleges particular facts showing that by the beginning of the Class Period, based on their own internal analyses, the AIGFP Section 10(b) Defendants were well aware that the quality of the U.S. residential housing and subprime mortgage markets – which formed the basis of the collateral underlying AIGFP's super senior CDS portfolio – was rapidly

---

[42]    In fact, nearly all of the revenue that the Company received from the CDS business was income, other than the portion that was placed in the bonus pool for AIGFP employees.  ¶ 508.

deteriorating.  For example, in late 2005, executives at an AIG division in the mortgage lending business decided to stop approving subprime loans after they had become concerned by the rapidly growing use of subprime mortgages in the industry.  According to an article in *The New Republic*, and based upon its interviews with AIG executives, "word spread from American General to AIGFP that the subprime business *was a minefield*."  ¶ 108 (emphasis added).

At around the same time, Eugene Park, who had been running AIGFP's North American corporate credit derivative portfolio, analyzed the subprime markets and provided the following warnings to Cassano, Forster, and other AIGFP executives: (i) underwriting practices and standards for subprime mortgages had deteriorated significantly in 2005; (ii) because the CDOs that AIGFP insured were comprised almost entirely of subprime loans, the risks attendant to those securities had increased to unacceptable levels; and (iii) the subprime collateral underlying the CDOs was also highly correlated, such that if certain CDOs began to lose value, there was no reasonable basis to believe that other CDOs in AIGFP's CDS portfolio, with similar subprime exposure, would not also lose value.  *Id*.  Through a further analysis, the AIGFP Section 10(b) Defendants became acutely aware of the severe risks posed by the multi-sector CDO-based CDS contracts that AIGFP had accumulated.  For instance, these defendants discovered, if they did not already know, that the model created by Gary Gorton, AIGFP's outside consultant, which AIGFP purportedly used to determine whether to issue CDS contacts based on the amount of risk involved, could not adequately predict losses in light of the fact that, from approximately mid-March 2005 forward, the CDOs underlying the CDSs became almost entirely subprime and, therefore, almost perfectly correlated.  ¶¶ 111-13; 266(c).

Moreover, as the Section AIGFP 10(b) Defendants also discovered, if they did not already know, the Gorton model was intended *only* to predict the likelihood of defaults in the

underlying collateral that could require AIGFP to make payments to counterparties. ¶ 179. Accordingly, it had not been used to analyze, and could not analyze, the impact of potential *collateral posting* trigger points and the effects they could have on the Company's liquidity, which posed a far more significant risk exposure than the risk of default. ¶¶ 122, 179. This was a gaping hole in the model because, as the AIGFP Section 10(b) Defendants knew, many of the CDS contracts contained a provision requiring AIG to post collateral if the Company's credit rating fell or if the underlying CDOs either declined in value or had their ratings downgraded. ¶ 122.[43] This was of particular importance because many of AIGFP's CDS contracts designated the *counterparties* as the valuation agents for determining when AIGFP was required to post collateral as a result of a decline in the value of the underlying CDOs. ¶¶ 122, 320(e).

In addition, as the AIGFP Section 10(b) Defendants were aware, unlike AIGFP, whose valuation model used *theoretical default rates* for the underlying CDOs, the counterparties relied on *actual market data*, including trading from hedge funds and large investment banks that traded CDOs. ¶ 178. As a result, AIGFP's valuations produced consistently higher valuations than its counterparties, thereby exposing the Company to significant asset valuation and liquidity risks that it could not model and was not equipped to handle. ¶¶ 178, 473.[44]

---

[43]    Former employees have explained that defendant Forster, along with Section 20(a) defendant Frost, who were primarily responsible for overseeing the modeling process, specifically told Professor Gorton that the model should *not* take into account this crucial data regarding collateral trigger points and other loan level variables. ¶¶ 122, 235, 245.

[44]    In its brief, AIG argues that plaintiffs fail to plead the nature and magnitude of any undisclosed risks identified in internal analyses of the CDS portfolio from late 2005 or the understood impact of those risks or how they contradicted AIG's public statements. AIG Mem. at 34 n.19. AIG is mistaken. First, plaintiffs have pled that the risks inherent in the credit default swaps that AIG was writing were substantial enough that the Company stopped writing so-called "multi-sector" CDSs altogether once those risks were analyzed. Second, plaintiffs have clearly pled that the tens of billions of dollars of potential collateral calls impacted AIG's valuation and liquidity risks, both of which were minimized by the Section 10(b) Defendants.

Defendants cite to the decision to exit the multi-sector CDS business in 2005 as an exercise of business judgment, which they claim reduced AIGFP's exposure to the more risky 2006 and 2007 vintage CDSs. They also assert that this decision fails to show a fraudulent intent to "cover up or misstate risks" arising from earlier written CDSs in a "different market environment." AIG Mem. at 34; Cassano Mem. at 25; Forster Mem. at 6. These arguments are based on a fundamental misunderstanding of the plaintiffs' allegations. According to plaintiffs' confidential sources, the underlying basis for the decision to stop writing multi-sector CDS

As for the source of the allegations in the Complaint, while plaintiffs may rely on specifically identified "reports or statements" containing information that contradicts defendants' public statements, they "may also rely on confidential sources to satisfy the pleading requirements of the PSLRA and Rule 9(b)." *In re NovaGold*, 629 F. Supp. 2d at 298. In this Circuit as elsewhere, reliance on confidential witnesses is appropriate at the pleading stage if those witnesses are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Moreover, "[w]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 313 ("our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter"). *See also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478-79 (S.D.N.Y. 2004) (interpreting *Novak* as endorsing a broad approach to the PSLRA's particularity requirement, which does not require plaintiffs to identify confidential witnesses in securities fraud complaints).

Here, the confidential witnesses cited in the Complaint readily meet this standard. CW 1 is an executive who formerly headed the CDO business at a major Wall Street investment bank and two of the largest commercial banks in the United States, and who conducted five credit default swap deals for CDOs with AIGFP over the years, working directly with Defendants Forster and Frost, among others (¶ 125); CW 2 is a former AIGFP vice president who was involved in AIGFP's management information system during the Class Period (¶ 134); CW 3 was an AIGFP executive vice president during the Class Period (¶ 136); and CW 4 was an AIGFP executive in 2005 with knowledge of the decision to stop writing multi-sector CDO-based credit default swaps and the analyses that were conducted at that time (¶ 112). Thus, the information they provided may be used to satisfy the pleading requirements of the PSLRA and Rule 9(b). *Novak, supra; In re NovaGold, supra; see also In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 526 (S.D.N.Y. 2009) (Judge Sullivan ruling that court would consider allegations based on information provided by confidential sources without discounting those allegations due to the anonymity of the information's source); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 392-93 (S.D.N.Y. 2007) (Judge Scheindlin finding that allegations based on confidential witness information provided an adequate basis for believing the falsity of the defendants' statements).

contracts, which, notably, was never disclosed to investors, was that the underlying risk was correlated, rather than diverse, and, therefore, for modeling purposes, the entire basis for the Gorton model was inapplicable to these types of investments.  Nor did the model attempt to estimate the risk that the underlying CDOs could decline in value, notwithstanding that such declines would have triggered AIGFP's obligations to post collateral to counterparties.  However, even after Cassano and his colleagues decided to exit the CDS business because they could not sufficiently model subprime-based CDOs, they continued to keep the existing CDSs on their books, in an unhedged position, so that they could continue to recognize income on them on a year-to-year basis.[45]  In fact, in *August 2007*, when AIG finally disclosed its decision to exit the business, its credit default swaps insured about $80 billion worth of CDOs, most of which were comprised of subprime mortgages as underlying assets.[46]

Even when the defendants finally disclosed in August 2007 that they had discontinued writing multi-sector CDS contracts, they sought to alleviate any investor concern by touting their "super senior" status and pointing to the 2006 and 2007 vintage CDOs as being much more severely at risk.  As alleged in detail in the Complaint, however, defendants knew that even the 2005 vintage CDSs imposed severe, yet undisclosed, risks to the Company for the length of those contracts.  One of the major risks was collateral risk.  *See, e.g.,* ¶¶ 121-122.  Consequently,

---

[45]    AIG argues that these allegations are "implausible and unsupported" because plaintiffs do not explain why Defendants did not "defuse" the "ticking time bomb" (plaintiffs' phrase) represented by the "multi-sector" CDS portfolio.  AIG Mem. at 34.  On the contrary, the Complaint makes clear that the reason defendants did not take steps to "defuse" the risks presented by this portfolio is that the cost of hedging them would eliminate the profits, and resulting compensation, from the CDS business.  ¶ 126.  These allegations present a plausible explanation for the AIGFP Section 10(b) Defendants' conduct, however deplorable it may be.

[46]    Cassano's argument that AIGFP told their counterparties in December 2005 that AIGFP was going to stop writing CDSs is irrelevant.  Cassano Mem. at 25, n.22.  AIG did not impart *to its investors* that it issued CDSs on subprime CDOs, much less the decision to exit the business, until August 2007.  Cassano's argument is also contradicted by a confidential witness who stated counterparties were not expressly told that AIGFP was going to stop writing CDSs.  ¶ 114.

as Cassano and Forster knew, a decline in the market for securities tied to subprime mortgages alone could cause AIG to pay billions of dollars in collateral and suffer billions of dollars of unrealized losses on the CDS contracts it retained in its portfolio.  It could also cause AIG to suffer substantial realized losses if and when the CDOs defaulted and AIG's CDS counterparties demanded that AIG pay the full notional amount of the multi-sector CDS portfolio.

Furthermore, defendants' argument that the CDS portfolio was not risky *because* a large percentage of it consisted of pre-2006 vintage CDSs, as opposed to the weaker 2006 and 2007 vintage CDSs, is to no avail.  *See, e.g.,* AIG Mem. at 33-34; Forster Mem. at 6.  As the AIGFP Section 10(b) Defendants knew, the 2005 vintage CDSs that AIGFP carried on its books were far riskier than had been disclosed.   First, as defendants have repeatedly acknowledged, the underwriting standards for subprime mortgages had greatly deteriorated by the end of 2005, but from March through December of that year, AIGFP had already written about 220 CDS contracts, more than the entire amount of CDS deals written during the period from 1998 through mid-March 2005, many of which insured securitized subprime mortgages.  ¶ 8.  There were also known risks that were specific to AIGFP's CDS portfolio of 2005 vintage CDSs.  For instance, according to CW 4, the AIGFP Section 10(b) Defendants discovered that as of late 2005, many mortgage originators had offered "no document" – and therefore highly risky – loans, and estimated that approximately 40% to 50% of the collateral for the CDOs that AIGFP was insuring through the CDS portfolio were comprised of such loans.  ¶¶ 112, 141.  CW1 confirmed that AIGFP's portfolio of 2005-vintage CDS also insured many "mezzanine-grade" CDOs, meaning that these CDSs insured a large percentage of low quality collateral.  ¶ 127.  Moreover, many of the mortgages underwritten at that time also offered ARMs and interest only loans with

low "teaser" rates that reset to higher rates after a few years, thus increasing the risk of default once the rates were re-set at much higher percentages.  ¶ 142.

These risks were known to the AIGFP Section 10(b) Defendants, but were not disclosed or were purposely misrepresented.

> **2.      Defendants Were Aware of Collateral Calls from Goldman Sachs and Other Counterparties and the Potential for Future Collateral Calls**

By the latter half of August 2007, the AIGFP Section 10(b) Defendants had concrete evidence, by way of a collateral call from a credit default swap counterparty, that the value of the CDS portfolio should be adjusted to reflect the fact that the underlying CDOs were impaired due to the rise in subprime mortgage defaults.  Indeed, in August 2007, Goldman Sachs demanded that AIGFP post $1.5 billion in collateral due to the decline in value of the assets backing the CDOs it had insured.  In response, AIGFP agreed to post $450 million.  Then, in October 2007, Goldman Sachs made a second collateral demand for an additional $3 billion in collateral. AIGFP again resisted payment of the full demand, thereafter agreeing to post $1.5 billion in collateral.  Due to the similarities between the subprime mortgages underlying the Goldman Sachs CDOs that AIGFP was insuring and the subprime mortgages underlying AIGFP's other CDS deals, these collateral calls provided *direct evidence* that a significant adjustment to the value of the CDS portfolio needed to be made.  ¶¶ 154-55.

Cassano argues that AIGFP's awareness of the existence and amounts of Goldman's collateral calls and the fact that many of the CDS counterparties were the designated agents entitled to set the valuation marks for the underlying CDOs provide only circumstantial evidence that Cassano knew that the "CDS portfolio could crumble at any time."  Cassano Mem. at 22-23;

*see also* AIG Mem. at 38-39.[47]  He also argues that disclosure of the collateral calls refutes any

inference of scienter.  Cassano Mem. at 22-23.  However, the fact that these collateral demands

were made and, contrary to defendants' assertions, not adequately disclosed and

mischaracterized to investors so as to minimize them, is highly indicative of scienter.

For instance, in AIG's Form 10-Q for the third quarter of 2007 (the quarter in which the

first collateral call was received), to which Cassano refers in his brief at 23, AIG stated:  "As of

October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with

respect to the fair value of certain AIGFP super senior credit default swaps and the collateral

required in connection with such instruments differ significantly from AIGFP's estimates."  AIG

added:  "AIG continues to believe that it is highly unlikely that AIGFP will be required to make

payments with respect to these derivatives."  ¶¶ 321, 323.  These statements fail to set forth that

by that time, notwithstanding the differences referred to by AIG, it had posted nearly half a

billion dollars in collateral to Goldman Sachs during the quarter and another $1.5 billion in

collateral in October 2007.

Moreover, when asked outright about the valuation differences between AIGFP and its

counterparties during the third quarter 2007 earnings call on November 8, 2007, Cassano

purposefully downplayed this issue, stating only that AIGFP had looked at the collateral calls it

had received "and said we don't agree with the market."  He also represented that these collateral

---

[47]    In support of a similar argument, AIG cites *Primavera Familienstiftung v. Askin*, 1996
WL 494904, at *21 (S.D.N.Y. Aug. 30, 1996) (the fact that defendants' portfolio of both exotic
bullish derivative tranches and exotic bearish derivative tranches that would provide security
against interest rate fluctuations failed when interest rates rose did not support an inference of
fraudulent intent) and *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009)
(plaintiffs failed to allege that defendants acted with scienter in not taking impairment charge on
investment in company earlier than it did because defendants did not know of such company's
misrepresentations regarding ability to meet margin calls).  As shown here, however, unlike
those cases, here defendants had concrete evidence of the risks to its liquidity, but made a
conscious decision not to disclose them and not to hedge against the losses that could result.

calls posed no problems for the Company because "we have been husbanding our liquidity all through this very trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in." ¶ 332. Cassano thus failed to acknowledge the extent of the collateral postings AIGFP had made and how much of a threat future collateral postings actually posed in light of, among other things, the valuation discrepancies.

Then again, during the December 5, 2007 investor meeting, to which Cassano also refers in his brief at 23, when asked outright about the collateral calls AIGFP had received, Cassano stated that these demands were an indication that "the market's a little screwed up" and further provided: "[W]e have, from time to time, gotten collateral calls from people and then we say to them, 'Well, we don't agree with your numbers.' And they go, 'Oh.' *And they go away*. … *It's like a drive by in a way*." ¶ 342. But at this point, AIGFP had also received collateral calls from Merrill Lynch and Société Générale, in addition to Goldman Sachs. ¶ 237. Characterizing these collateral calls as "drive bys" that would simply "go away" during the December 5 conference was, therefore, an utter misrepresentation, as AIGFP had also just received collateral demands from two other financial institutions who were significant counterparties on the CDS deals.[48]

Thus, while acknowledging that collateral demands were made, and that AIGFP's valuations differed from that of its counterparties, Cassano and AIG consistently made statements disparaging the counterparties' demands, essentially dismissing them as frivolous, even though they knew the extent of the risks that they posed and the likelihood that AIG would receive many more collateral calls from other CDS counterparties.

---

[48] By the end of 2007, AIG had also received collateral calls from UBS, Barclays, Calyon and Royal Bank. ¶ 237. These were hardly entities that would simply "go away" if AIG disputed their collateral calls, especially when AIGFP's contracts designated the counterparties as the presumptive valuation agents, as many of them did. ¶ 122.

>        3.      **The AIGFP Section 10(b) Defendants' Purposeful Under-Reporting of
>                the Loss of Value in the CDS Portfolio Evidences Their Scienter**

At the same time that Cassano was referring to the counterparties' demands as "drive bys," he and Forster were also manipulating the model used to value AIGFP's CDS portfolio through the use of improper accounting tricks to prevent having to disclose just how underwater it had become.  Indeed, by the end of 2007, the deterioration in the real estate and subprime mortgage market had escalated to such high levels that substantial impairments in the values of the CDSs had occurred.  However, the AIGFP Section 10(b) Defendants manipulated the way AIGFP valued its CDSs to fraudulently understate the reported losses.  For instance, at the December 5 investor meeting, in which both Cassano and Forster participated, it was reported that the total decline in the value of AIGFP's CDS portfolio through November 30, 2007 was only between $1.4 and $1.5 billion.  ¶¶ 174, 183, 474.  As AIG later disclosed in its February 11, 2008 8-K, however, the valuation loss that should have been reported on December 5 was actually ***$5.96 billion***.  ¶  353.

This dramatic under-reporting of the loss was the product of several improper accounting "adjustments."  As the defendants have admitted, by the fourth quarter of 2007, they had become concerned with the effect the worsening market conditions would have on AIG and, in particular, AIGFP and the CDS portfolio.  Cassano and Forster – who, together with their inner circle, controlled the risk management and valuation functions for the Assets/Credit Group and exercised nearly full discretion in valuing the CDS portfolio – also knew that they faced the prospect of being forced to report significant losses on the CDS portfolio at the impending December 5, 2007 investor conference.  As a result, they sought to soften the blow by resorting to various adjustments that, as later acknowledged in the February 11, 2008 8-K, AIG had not previously used and were lacking in an adequate basis.

For example, the February 11 8-K disclosed that the estimated losses reported during the December 5 meeting had included, ***for the first time***, a $3.63 billion "negative basis adjustment." Defendant Bensinger later admitted that this adjustment did not comply with GAAP.  ¶ 190. This improper "adjustment" was thus responsible for more than 75% of the under-reporting of the market valuation loss on the CDS portfolio.  Juxtaposed against the "high degree of certainty in what we have booked to date" expressed by defendant Sullivan  at the December 5 meeting, AIG's resort to an enormous and improper accounting maneuver is highly indicative that defendants acted with fraudulent intent when they manipulated the model used to value the CDS portfolio and reported a materially false loss estimate.  *See In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 475-76 (S.D.N.Y. 2008) (finding it particularly "troublesome" and strong evidence of scienter that the company deviated from its internal policy in order to accelerate revenue recognition).

Defendants defend the use of what AIG describes as "flawed models" to arrive at these loss estimates on the basis that there was an extraordinary crisis that required the defendants to exercise judgment and create models to value complex instruments.  *See, e.g.*, AIG Mem. at 36. Cassano also points to the complex facts and sophisticated fair value accounting standards that left room for judgments and estimations.  Cassano Mem. at 24.  Defendants further attempt to downplay the significance of the manipulated loss figures by touting the adequacy of the defendants' associated disclosures.  For instance, AIG asserts that it warned investors, in the fall of 2007, about the challenges in valuing the CDS portfolio given the lack of "comparable transactions" or "market observable information," which necessitated the increased reliance on management estimates and judgments.  AIG Mem. at 36.  Defendants also cite to the Company's "voluntary" disclosures in the February 11, 2008 8-K, prior to the release of the audited year-end

financial results, as evidence of non-culpable conduct, *see* AIG Mem. at 36, and the disclosures made during the December 5 meeting regarding the use of negative basis adjustments. Cassano Mem. at 23. Again, each of these arguments is based on a self-serving mischaracterization of the Complaint.

This lawsuit is about the defendants' woefully inadequate disclosures, and in certain circumstances, purposeful misrepresentations, regarding AIGFP's and AIG's massive concentration of risk in the U.S. residential housing and mortgage markets and the effects of that risk on the Company and its shareholders, as well as the serious, undisclosed internal control weaknesses that plagued the Company relating directly to the valuation of the CDS portfolio. The manipulation of the valuation model in the fourth quarter of 2007 to significantly minimize AIG's reported losses is one of the clearest examples of how the defendants' disclosures were at odds with what they knew internally to be true. Specifically, the internal control deficiency with respect to the valuation of the CDS portfolio – which, by that time, had been communicated directly to certain of the Executive Defendants by PwC – and the lack of oversight over the Assets/Credit Group allowed the AIGFP Section 10(b) Defendants to report materially false financial results that concealed the dramatic decline in the value of the CDS portfolio by the third quarter of 2007. PwC's conclusions, as later disclosed in AIG's February 11, 2008 8-K, fully support this point: "[PwC has] concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio." ¶¶ 187, 474. The innocent explanations that defendants offer in return, such as the purported difficulties in applying fair value accounting, simply do not hold water. Cassano can hardly argue that the fair value principles were difficult to apply when *he deliberately excluded* St. Denis from the process,

notwithstanding that St. Denis was hired specifically to act as on-site resource for AIGFP business people in implementing consistent and GAAP compliant accounting.  ¶ 157; *see also* Point One, Section II.C.4 below.  Nor can he and the other Section 10(b) Defendants be lauded for ultimately disclosing the weakness in AIG's internal controls inasmuch as PwC, which was conducting its own investigation of the matter after having conferred with St. Denis, was poised to disclose it anyhow.

Cassano also argues that he disclosed the negative basis adjustment during the December 5, 2007 meeting and, therefore, could not have acted with scienter.  Cassano Mem. at 23. However, while Cassano stated briefly that AIG took "into account" the difference between the price of the underlying CDO and the pricing of the credit derivative, the adjustments made to the valuation model were never disclosed.  Cassano did not explain how AIG took this information "into account," and even AIG acknowledges that the details of particular adjustments were not disclosed, making it impossible to discern from his remarks that AIG had utilized an accounting device that violated GAAP.

In fact, the SEC continued to raise questions about AIG's valuation of its CDS portfolio and even directed AIG then to provide better disclosures relating to the portfolio's valuation as late as *September 2008*.  For example, in a September 5, 2008 letter to defendant Willumstad, the SEC stated:

> We believe that your disclosure of the contractual terms, methodology, inputs and assumptions could be improved so that an average investor can better understand how you establish the fair value of your CDS.  While we acknowledge that the valuation of these instruments may be complex, we do not believe that such complexities obviate the need to provide readable and understandable disclosure. In addition, where differences exist in your valuations of different types of CDS, we believe that your disclosure should be presented on a disaggregated basis.

*See* Golan Decl., Ex. 5, at 2.  This letter makes clear that even at the end of the Class Period, AIG still had not sufficiently corrected its disclosures regarding the valuation of the CDS portfolio, including, among other things, the process it used to determine the fair value of the CDSs.  The letter also makes clear that even if the applicable accounting rules were difficult to understand and apply to a set of complex facts, this did not give the AIGFP Section 10(b) Defendants a free ride to manipulate the valuation of the CDS portfolio or provide inadequate disclosures about the valuation process.[49]

### 4. The Deliberate Exclusion of St. Denis from the CDS Valuation Process, and his Subsequent Resignation, Supports a Strong Inference of Scienter

The deliberate exclusion of Joseph St. Denis, by defendant Cassano, from the valuation process of the super senior CDS portfolio, and St. Denis' subsequent resignation from AIGFP, also provides strong circumstantial evidence of scienter.  As explained above, St. Denis was hired specifically to document the accounting for AIGFP's proposed transactions, particularly material and/or unusual transactions, in light of the material weaknesses previously cited by PwC, in order to provide AIG with greater visibility and control over the operations and

---

[49]    AIG also defends its valuation of the CDS portfolio on the basis of the difficulties that purportedly arose due to the lack of observable market data.  AIG Mem. at 35.  As discussed in Point One, Section I.A.7, however, there was information in the market, such as the ABX and TABX indices that defendants could have utilized to determine at the very least that there was a reasonable possibility of a significant decline in the valuation of the portfolio.  AIG attempts to discredit plaintiffs' allegations relating to the ABX and TABX indices by asserting that plaintiffs fail to plead which Defendants received or reviewed reports with information about these indices or how those reports contradicted AIG's public statements.  AIG Mem. at 36.  AIG cites *Novak*, 216 F.3d at 308 and *In re PXRE*, 600 F. Supp. 2d at 535-36, in this regard.  This argument mischaracterizes plaintiffs' allegations, however.  Plaintiffs have alleged that this information was available and defendants knew it was available, but they made a conscious decision not to take it into account when valuing the CDS portfolio.  In any event, unlike in *Novak* and *PXRE*, the Complaint's allegations concerning the indices are not premised on internal, non-public reports that conflicted with their public statements.  Here, the ABX and TABX were publicly available, and defendants admitted to having access to them.

accounting policy practices of AIGFP, and to provide an on-site resource for AIGFP business people as they developed proposed transactions. ¶ 157.[50]  However, as St. Denis testified to Congress in October 2008, when he approached Cassano about becoming more involved with the CDS valuation process in light of Goldman Sachs' collateral call and his concerns that the valuation models of AIG's CDS counterparties were at variance with AIG's own model, Cassano told St. Denis that he *deliberately excluded* him from the valuation of the super senior CDSs because he was concerned that St. Denis would "pollute the process." ¶ 160.

AIG and Cassano argue that the resignation of St. Denis in October 2007 does not support a strong inference of scienter. AIG Mem. at 41-42; Cassano Mem. at 26-27. They assert that St. Denis was not an expert in the valuation of derivatives and, because he left AIGFP at the same time it was beginning to build new models to estimate valuation losses, he had "no specific knowledge of the valuation process or of AIG's accounting for the multi-sector CDSs." AIG Mem. at 42. They further argue that the Complaint does not allege that St Denis communicated any specific concerns about the valuation process to AIG's accountants, any of the Individual Defendants, or PwC. AIG Mem. at 42. These arguments are meritless.

The fact is that a highly trained accountant – a former Assistant Chief Accountant at the SEC Enforcement Division who was supposed to bring transparency and uniformity to AIGFP's accounting – identified a major red flag regarding the precise subject matter that is at the heart of this litigation. Indeed, what could signify Cassano's intent to conceal from AIG's investors the true valuation of AIGFP's CDS portfolio more than *deliberately excluding* a trained accountant

---

[50]     St. Denis reported initially to AIGFP's CFO, Mark Balfan, then, starting in January 2007, to William Kolbert, Executive Vice President and Chief Administrative Officer of AIGFP. *See* Ex. 75 to Allerhand Decl., at 3. From September 10, 2007 to his resignation the next month, St. Denis reported to Mr. Balfan's successor as CFO. *Id.* St. Denis also reported to the leaders of the Marketing and Transaction Development groups at AIGFP, and to the senior financial managers of accounting oversight bodies within AIG. *Id.*

from the valuation process that he and his hand-picked confederates controlled?  That St. Denis left AIG in October 2007 is of no moment.  Even though he may have left before AIG developed new valuation models, St. Denis was nevertheless witness to actions by Cassano that demonstrate that Cassano was, in large measure, the very cause of the internal control weakness later found by PwC.  In fact, the timing of St. Denis' exclusion strongly *supports* an inference of scienter on behalf of these defendants.  Cassano purposefully excluded St. Denis from the valuation process the month after AIGFP received a $1.5 billion collateral call from Goldman Sachs and, as described above, just before Cassano and Forster availed themselves of improper accounting "adjustments" to manipulate the valuation of the CDS portfolio.

AIG and Cassano's final attempt to discredit St. Denis' statements by alleging that he never communicated his concerns to anyone at AIG or PwC is incorrect and unpersuasive.  In *In re PXRE,* 600 F. Supp. 2d at 537, which these defendants cite in support of their argument, plaintiffs relied on confidential witnesses who stated that the defendant company's chief actuary quit his job prior to the time he had to sign an actuarial opinion out of fear that the company's erroneous loss estimates would damage his professional reputation.  *Id.*  However, there was "no allegation in the [complaint] that these concerns, communicated from [the chief actuary to the confidential informant], were ever brought to the attention of the individual defendants, *or anyone else at PXRE.*"  *Id.* (emphasis added).

The facts here are quite to the contrary.  As alleged in the Complaint and as set forth in Exhibit 75 to the Allerhand Decl., St. Denis communicated his concerns *to AIG and AIGFP senior management and to PwC.*  For instance, when St. Denis first became concerned in December 2006 with errors in hedge accounting relating one of AIGFP's investments, he communicated those concerns to Doug Poling of FSD and Mark Balfan of OAP, two of AIGFP's

125

senior managers.  Ex. 75 at 5-6.  Although these errors were genuine and appear to have been later corrected, when Cassano learned that St. Denis had uncovered these problems, he verbally "berated" and "shouted obscenities" at St. Denis, and he specifically told St. Denis that St. Denis worked for Cassano, not FSD or OAP.  *Id.* at 6.  Then, in September 2007, St. Denis and Cassano had another meeting during which Cassano assured St. Denis that he would have unfettered access to AIG and FSD.  This did not materialize, however, and after St. Denis participated in a conference call with OAP, Cassano told St. Denis that he had specifically excluded him from the valuation of the CDSs because of concerns that he would "pollute the process."

But, importantly, it was not only AIGFP personnel that St. Denis spoke to about the problems with AIGFP's accounting and the internal control deficiencies at the Company. Indeed, after St. Denis resigned in October 2007, he spoke to *AIG's Chief Auditor*, Michael Roemer, about his concerns with the valuation of AIGFP's CDS portfolio and the reasons for his resignation.  Mr. Roemer informed St. Denis that he would personally report those concerns to AIG's Audit Committee.  *Id.* at 8.  St. Denis also spoke directly to the PwC engagement partner on AIGFP regarding, among other things, Cassano's efforts to impede St. Denis' interaction with his counterparts at AIG.  *Id.* at 9.  And, of course, more recently, he testified to Congress, and many of his statements are being investigated by federal prosecutors, who, according to media reports, are preparing to impanel a grand jury, after an 18-month investigation by the DOJ and SEC, to consider an indictment of Cassano.

This case is similar to *In re Oxford Health Plans, Inc. Securities Litigation*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999), where a recently hired chief information officer told the chairman of the company's board, who was also an individual defendant, that the company's "planned

computer conversion could not be done reliably."  Defendants also knew "that the computer system was missing critical applications and could not handle any new functions" and that the company's "internal controls and accounting practices were deficient."  *Id.*  In light of those allegations, the court held that the defendants either knew or should have known that the company's financial statements were not in compliance with GAAP and were not reliable evidence of the company's continuing growth and profitability, although the defendants had represented otherwise to the investing public.  *Id.*

Similarly, here, St. Denis directly communicated his concerns to AIG and AIGFP executives (who then reported that information to AIG's Audit Committee) and to PwC regarding the valuation of the CDS portfolio, as well as the severe internal control deficiencies that specifically allowed Cassano and others at AIGFP to deliberately exclude him from the valuation process and to keep that process separate and out of the reach of AIG supervision. This is compelling evidence of scienter, particularly in light of the fact that St. Denis was hired specifically to provide greater visibility and control over the accounting practices of AIGFP.  In these circumstances, Cassano's deliberate exclusion of St. Denis from the valuation process, which was one of the factors that led to his subsequent resignation, also fully supports that the AIGFP Section 10(b) Defendants – and especially Cassano himself – acted with scienter.[51]

---

[51]    As will be discussed in greater depth below, the fact that others within AIG – including the AIG Section 10(b) Defendants – allowed Cassano to continue to dominate the CDS valuation process, even after they learned of St. Denis' resignation and the reasons for it, is significant evidence of the AIG Section 10(b) Defendants' scienter.  As was made known to AIGFP's chief auditor as well as AIG's outside auditor, PwC, St. Denis resigned from his positions at AIGFP because he was not provided with enough access to do his job, and because he was concerned that (a) the Company was overvaluing the CDS portfolio and (b) its internal controls with respect to the valuation of the CDS portfolio were deficient.  Each of these concerns turned out to be true and form the basis of this action.  These facts, when considered together with the other facts alleged, suggest a strong inference of scienter on the part of all of the Section 10(b) Defendants.

5.      **The Exclusion of Risk Management and Accounting Functions from the Operations of the Assets/Credit Group Supports a Strong Inference of Scienter**

The Assets/Credit Group, headed by defendant Forster as Executive Vice President and defendant Cassano as President, was the AIGFP unit in charge of selling the CDSs at issue in this litigation.  As plaintiffs' confidential witnesses and various public sources have confirmed, the CDS business was deliberately sealed off from the Company as well as from AIGFP's other businesses by Cassano and a few other senior executives, including Forster.  For example, the Assets/Credit Group did not utilize the same accounting, technology, risk management, and information systems that the other AIGFP units utilized.  According to CW 2, Cassano maintained critical information about the CDS deals and the Assets/Credit Group's performance and risk on a spreadsheet, managed out of the London office, to which no one outside of Cassano's tight-knit group of executives had access.  ¶¶ 134, 498.  By contrast, all of AIGFP's other business segments maintained information pertaining to their performance, "positions and/or exposure" in AIGFP's standard analytics management information system, which confidential sources have confirmed was intended to house information that could be easily transmitted to AIG's risk management, accounting, and other departments.  ¶ 498.

Other risk management functions that supported the rest of AIGFP and AIG were also excluded from the Assets/Credit Group.  CW 2 and CW 3 have stated that Pierre Micottis, AIGFP's head of global risk management, and at least two other senior personnel involved with overall risk management for AIGFP, were intentionally excluded from reviewing the CDS business and adequately performing the risk management function with respect to the Assets/Credit Group.  ¶ 137.  CW 3 also confirmed that, unlike other groups within AIGFP, the Assets/Credit Group did not provide a value at risk, or VaR, analysis regarding the CDS

portfolio to corporate management.  ¶ 136.  CW 2 further provided that while the performance of each of AIGFP's businesses was reviewed and pertinent risk management issues discussed during weekly marketing and trading meetings that Cassano ran and all AIGFP executives attended, risk management issues pertaining to the CDS business in particular were not covered at these weekly meetings.  ¶ 135.  Courts have found these types of by-passing of a company's internal controls to be highly probative of scienter.  *See*, *e.g.*, *In re MoneyGram Intern., Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 974 (D. Minn. 2009) (violation of internal controls permitted inference that defendants had access to valuation information contradicting their public financial statements).

Cassano does not dispute that he kept information regarding the Assets/Credit Group separate and seemingly out of the reach of the Company's risk management and accounting functions.  Instead, he argues that the use of a different database does not indicate that AIG lacked oversight of the information housed in that system and defends his refusal to discuss any risk metrics or risk analyses regarding the CDS portfolio at the weekly meetings on the basis that plaintiffs fail to show how this caused any of his public statements to be misleading.  Cassano Mem. at 23-24.  These arguments confuse the issues.  As the Complaint alleges, the Company's internal controls were deficient with respect to the Assets/Credit Group and the valuation of the CDS portfolio.  This allowed the AIGFP Section 10(b) Defendants to purposely seal off the these functions from the other units of the Company by, for example, denying the head of AIGFP's risk management group access to certain information regarding the CDS portfolio.  ¶ 134.

On the one hand, these allegations provide significant evidence that the AIGFP Section 10(b) Defendants attempted to insulate AIGFP's valuation process from meaningful review by either AIGFP's or AIG's risk management or accounting functions.  On the other hand, they

provide powerful evidence that the AIG Section 10(b) Defendants, who publicly proclaimed the effectiveness of AIG's risk management systems and that internal controls were in perfect working order, internally allowed a culture to flourish where management could easily override such systems with respect to the Assets/Credit Group. This allowed the AIGFP Section 10(b) Defendants to unilaterally make risk management and valuation decisions that affected the entire Company, and even manipulate the valuation process in an attempt to conceal the substantial decline in the value of the CDS portfolio in 2007 and 2008. This is of particular importance because, as the Section 10(b) Defendants knew, the Assets/Credit Group had taken on hundreds of billions of dollars of exposure to the U.S. residential mortgage market, including tens of billions of dollars relating to subprime debt, which created enormous undisclosed risk. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (scienter satisfied where defendants knew of internal corporate mismanagement, but failed to disclose, and made false and misleading statements concerning, its impact on the company).

6.    **The Significance of the CDS Portfolio to AIGFP's Business, as Well as Cassano's and Forster's Decision-Making Authority and Access to Information, Supports a Strong Inference of Scienter**

As the head of AIGFP, who was said to run the unit "with almost complete autonomy and with an iron hand," ¶ 129, and as one of its top executives in charge of the Assets/Credit Group, Cassano and Forster should be charged with knowledge of the risks surrounding the Company's CDS portfolio, which provided a significant amount of the revenue that AIGFP and, in turn, these defendants, earned. Indeed, in instances very similar to the case at bar, courts have held that it would be "absurd to suggest" that corporate insiders were not aware of certain information, particularly when that information was crucial to their business. *See, e.g., Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (facts that support misleading

nature of statements were "prominent enough" that it was "absurd to suggest" that top management were unaware of them); *Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) ("Knowledge of market conditions that substantially affect these core operations and the financial reporting of them may be imputed to key officers within the company."); *In re Countrywide Fin. Corp. Sec. Litig.,* 588 F. Supp. 2d 1132, 1189-90 (C.D. Cal. 2008) (insiders certainly had knowledge of Countrywide's core mortgage-related operations); *In re Xerox*, 165 F. Supp. 2d at 223 (scienter adequately alleged because company's problems "jeopardized the success of the company's most significant initiative at that time").

Forster, who co-headed AIGFP's Assets/Credit Group in London and was responsible for running AIGFP's global credit division, which contracted with counterparties to sell CDS contracts, argues that his position at AIGFP alone is not enough to impute scienter.  Forster Mem. at 5.  However, as the *Countrywide* court held, "[i]n some circumstances it is appropriate to use a defendant's position and responsibilities within the company to support a strong inference of scienter  … [such as] when the alleged misrepresentations relate to a company's 'core operations.'"  *In re Countrywide*, 588 F. Supp. 2d at 1189.  This is precisely one of those situations.  As the executive responsible for heading the Assets/Credit Group, defendant Forster actively participated in all aspects of AIGFP's CDS business.  As confidential witnesses with first-hand knowledge have confirmed, defendant Forster was intimately involved with the origination, valuation and reporting functions relating to the CDS portfolio.  For example, through his oversight of the development of the financial model that AIGFP utilized to determine whether to issue CDS contacts, Forster was aware that this model did not analyze the impact of potential ratings downgrades of AIG and/or market valuations that might require collateral calls to be posted on CDS contracts.  ¶ 483.  Moreover, as one of the AIGFP executives responsible

for interacting with the various banks that obtained CDS coverage from AIGFP, defendant Forster also knew that AIGFP did not request these potential counterparties to provide underlying loan detail, which information was crucial to evaluating the risk associated with potential CDS transactions.  ¶ 481.  Furthermore, Forster held himself out on analyst calls and during investor conferences as deeply knowledgeable about the CDS business.  For instance, during the May 31, 2007 investor presentation, defendant Forster led the discussion of AIGFP's credit default swap business, where he stated that the conservatism built into CDS portfolio insulated it from any viable risk of losses.  ¶ 301.  Having made such representations publicly, it is disingenuous for Forster to deny now that he knew the undisclosed risks in this portfolio.

Accordingly, and as detailed above, Cassano's and Forster's positions, responsibilities, decision-making power, and access to information, among others things, give rise to a strong inference that they knew, but failed to disclose, that the CDS portfolio was a highly risky, substantially unhedged business line, which, left unchecked, had the potential to, and ultimately did, cause the Company's stockholders enormous losses.

### 7.    The AIGFP Section 10(b) Defendants Knew that the Substantial Risks Associated With the CDS Portfolio Were Unhedged

As the AIGFP Section 10(b) Defendants knew, in addition to collateral risk, the CDSs that AIGFP maintained on its books also created billions of dollars of credit risk (the risk of default) and valuation risk (the risk that the value of the CDO securities would decline).  However, even after deciding to stop writing multi-sector CDO contracts at the end of 2005, precisely because AIGFP's model had proven unable to accurately assess these other risks (and because even the foundation of the supposed remote lack of credit risk - the assumption that the underlying CDOs were uncorrelated - had proven to be false), the AIGFP Section 10(b) Defendants maintained the CDS portfolio in an unhedged position.

In fact, the AIGFP Section 10(b) Defendants made a conscious decision *not* to hedge the multi-sector CDS exposure because such hedging would have greatly eroded the profitability of the CDS business, and greatly reduced their own massive compensation based on the profits they recognized. ¶ 472. As described by CW 1, a Wall Street investment bank executive who transacted five credit default swap deals with AIGFP, working directly with defendant Forster, among others: "[AIGFP management's] bonuses were highly dependent on revenue out of that book of business" and if they had incurred the added cost of hedging "it wouldn't have been much of a business." ¶ 302. CW 4, a former AIGFP executive, similarly acknowledged that if the CDS portfolio needed to be hedged, it would not be an economically viable line of business. Hiding this motive, however, at a May 2007 investor conference, defendant Forster stated that although it would have been easy for AIGFP to hedge its risk, it did not do so because of the "conservatism" built into the CDS portfolio and that the Company would be safe from the risks inherent in the CDS portfolio even in "the worst recession [he] can imagine." *Id.*

In making this highly misleading statement, Forster evidenced his own intent to misrepresent the risks inherent in the CDS portfolio and, specifically, the fact that even absent being required to make payments for the credit risk, a decrease in the value of the underlying CDOs could subject AIG to billions of dollars of collateral calls and diminished valuations that would significantly impact AIG's capital, liquidity and balance sheet positions.

### D.    The AIGFP Section 10(b) Defendants Also Had a Substantial Motive and Opportunity to Commit Fraud

In addition to the allegations detailing the AIGFP Section 10(b) Defendants' intentional misconduct and/or recklessness, the Complaint also sets forth a compelling argument that these defendants had a substantial motive and opportunity to commit fraud. As the Supreme Court emphasized in *Tellabs*, "personal financial gain may weigh heavily in favor of a scienter

inference."  127 S. Ct. at 2511; *see also Novak*, 216 F.3d at 307-08 (plaintiffs may plead scienter by showing that the defendant benefitted in some "concrete and personal way from the purported fraud").

Here, the AIGFP Section 10(b) Defendants, motivated by greed, put the entire Company at risk for the sake of their own enormous compensation.  They received a "concrete and personal" benefit in the form of tens and hundreds of millions of dollars in lucrative bonuses and salaries that were linked directly to the amount of income AIGFP generated, including, of course, the revenues received from the CDS contracts that ultimately led to the Company's collapse.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  While plaintiffs recognize that ordinarily compensation packages *alone* are not indicative of scienter, it is beyond dispute that the compensation packages in this case, for AIGFP executives, were extraordinary.  Specifically, for every dollar of "distributable income" that AIGFP recognized, AIG would place $0.30 directly into a "bonus pool" for AIGFP executives, which was divided up and paid out at year end.  ¶ 508.  Cassano took home $43.6 million in 2006, and in 2007, notwithstanding the $11.12 billion loss in the value of the CDS portfolio that Cassano oversaw, received $24.2 million in compensation.  ¶ 511.  Notably, these massive payouts were not tied in any way to the performance of those products or the losses AIGFP suffered when the CDS business collapsed.  Rather, they were based on the income AIGFP created – *unaffected by the losses* that income stream might cause down the road.  Therefore, these defendants made money by creating, selling, and receiving premiums from counterparties to the CDS contracts, without regard to the quality of their underlying assets. *See In re New Century,* 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008) (a motive to defraud "based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter") (citation omitted).  This arrangement also

provided a powerful motive to the AIGFP Section 10(b) Defendants not to hedge the CDS portfolio, even after Park's analysis detailed the significant risks associated with CDOs backed by subprime mortgages, because such hedging would have cut substantially into the massive personal profits that these defendants were earning. ¶ 302.[52]

Notwithstanding these allegations, defendant Cassano (of all people) argues that the Complaint fails to plead a cogent motive-based incentive to commit fraud. Cassano Mem. at 19-27. As explained above, however, the concrete and personal benefits that Cassano received, and others like Forster who received bonuses that Cassano set for them, provided them with a motive that was quite unlike the universal-type motives "generally possessed" by most corporate directors and officers to, for example, maintain a high stock price or sustain the appearance of corporate profitability. *Id.* at 19. Indeed, the massive payouts these defendants received were not tied to AIG's actual performance – they were not dependent either on AIG's stock price or financial results. Rather, here, the motive was highly personal – Cassano and Forster made millions of dollars from the revenue AIGFP generated on the CDS portfolio, without regard to the impact their actions would ultimately have on AIG and its shareholders. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 184-85 (S.D.N.Y. 2003) (finding plaintiffs adequately alleged motive because CEO was given a "concrete and personal benefit" where he had been given a bonus worth more than two and one half times his normal salary, for boosting

---

[52]    AIG asserts that the AIGFP personnel's compensation consisted of deferred compensation, and that those deferred compensation accounts were wiped out by the losses from the multi-sector CDOs. AIG Mem. 31. Even if the amounts accrued under AIGFP's deferred compensation plans were reversed in 2008, and assuming AIGFP personnel knew during the Class Period that that compensation would be reversed if losses were recognized by AIGFP, instead of negating a finding of motive, this provides evidence that the AIGFP Section 10(b) Defendants had even an even stronger incentive to hide the losses that AIGFP was experiencing on the CDS portfolio. Moreover, there has been no indication that Cassano, for example, has been required to repay AIG for any of the salary or bonuses he obtained in 2006, 2007 or any other year during his tenure with AIG. Thus, AIG's argument in this regard must be rejected.

corporation's earnings before interest, taxes, depreciation and amortization by more than 30%); *see also Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (magnitude of compensation package that was impacted by an overstatement of earnings provided an unusual, heightened showing of motive to commit fraud).[53]

Indeed, in the wake of the February 2008 disclosures about the improper manipulation of the value of the CDS portfolio during the latter half of 2007, Cassano was forced to resign. ¶ 43. Although he was thereafter provided by defendant Sullivan with an undisclosed $1 million per month "consulting" payment, his forced termination by AIG – like Sullivan's own forced termination by the AIG Board in June 2008 - is a further indicator of Cassano's scienter. *Cf. In re Scottish Re*, 524 F. Supp. 2d at 394 n.176 (defendants' resignations, although not sufficient in and of themselves to indicate scienter, lent further support to the inference of scienter); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008). Moreover, the apparent success of the CDS business was essential not only to Cassano's career, but also to the continued viability of the entire AIG conglomerate. When AIGFP, along with the securities lending program, collapsed, it nearly took the entire Company down with it. This also provided a powerful motive for the AIGFP Section 10(b) Defendants, as well as the AIG Section 10(b) Defendants, to commit fraud.

---

[53] For this reason, AIG's reliance on *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) is misplaced. AIG Mem. at 30. There, the court held that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." Here, rather than relying on generic allegations of seeking to maintain a high stock price, plaintiffs allege that the AIGFP Section 10(b) defendants received their extraordinary compensation based on the transactions that are at the very heart of the deceptive conduct alleged in this action.

Taken as a whole, the allegations relating to Cassano's and Forster's motive and opportunity, as well as their knowledge and recklessness, are much more compelling than any competing inferences, and therefore raise a strong inference of scienter.

**E.     The Complaint Pleads Numerous Facts That Support a Strong Inference of the AIG Section 10(b) Defendants' Scienter**

The Complaint also alleges a strong inference of scienter as to the AIG Section 10(b) Defendants - Sullivan (CEO), Bensinger (CFO), Herzog (Chief Accounting Officer) and Lewis (Chief Risk Officer) - based on substantial circumstantial evidence establishing their conscious misbehavior or reckless disregard for the truth. [54]

As set forth below, based on confidential witness testimony and information derived from other public sources, the Complaint sets forth a compelling argument that the AIG Section 10(b) Defendants either knew or recklessly disregarded that AIG's publicly reported financial results were false, that its internal controls were deficient, and that the serious risks associated with AIG's exposure to the subprime mortgage market through the CDS portfolio and the securities lending program were not adequately disclosed to investors. *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 508-09 (W.D. Pa. 2002) ("When plaintiffs allege the existence of specific facts that should put defendants on notice of errors … a refusal to react to these 'red flags' can support a strong inference of scienter"); *see also In re Sotheby's Holdings, Inc.,* No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *6 (S.D.N.Y. Aug. 31, 2000) (plaintiffs may set forth "specific reports,

---

[54]     The Second Circuit has stated that "recklessness" is difficult to identify with much "precision and consistency," but is adequately alleged when plaintiffs establish, for example, defendants' "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Under such circumstances, "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*

information or other indicia of fraud that rendered the defendants' conduct highly unreasonable").[55]

1.     **Facts Known to the AIG Section 10(b) Defendants by the Beginning of the Class Period**

By the start of the Class Period, the AIG Section 10(b) Defendants knew that the CDS business was highly lucrative and had helped boost the Company's profits to record levels, but at the same time exposed the Company to tens of billions of dollars in potential losses. Accordingly, as these defendants also knew, the Company stopped writing new multi-sector CDS contracts in late 2005 due to, among other reasons, declining underwriting standards for subprime mortgages, but retained the previously-written credit default swaps on its books, which imposed continuing obligations and risks on the Company. However, neither these continuing risks, nor even the decision to exit the business in the first place, was disclosed to investors at this time.

The AIG Section 10(b) Defendants also knew by the beginning of the Class Period that, at about the same time AIGFP had decided to stop writing CDSs written on CDOs backed by subprime mortgages, AIG made a conscious decision to ramp up its investing of the cash

---

[55]     Contrary to defendants' assertions, Plaintiffs are not pleading scienter based on the AIG Section 10(b) Defendants' positions alone or based on their signing of SEC filings that contained misstatements. The cases cited by defendants in support of this proposition, s*ee, e.g.*, Sullivan Mem. at 6; Bensinger Mem. at 11-12; Herzog Mem. at 5-6, are inapposite. In those cases, unlike here, the plaintiffs' allegations with respect to certain individual defendants, regarding their signing of allegedly misleading SEC filings or their "access" to corporate information based on their positions, amounted to nothing more than alleging scienter based on corporate status alone. As discussed below, here, notwithstanding their executive positions or their signing of SEC filings containing misrepresentations, the Complaint sufficiently creates a strong inference of scienter as to each of the AIG Section 10(b) Defendants by alleging knowledge of internal control failures, and other information that contradicted their public statements. *See In re New Century,* 588 F. Supp. 2d at 1228 n.21 (management acted with scienter based on allegations that multiple data sources indicated that loan quality was problematic, loan quality was crucial to the company's core operations, and internal control problems were known but not disclosed).

collateral received through the securities lending program in long-term, high-risk RMBS, including RMBS with subprime debt, unlike its past practice of investing such collateral in low-risk, highly liquid securities.  ¶¶ 244-245.  Moreover, notwithstanding that the AIG Section 10(b) Defendants signed a 10-K that represented the Company "received" cash collateral "equal to" 102% of the fair value of the loaned securities, and clearly had access to information that would verify or contradict that statement, it is clear that the Company did not, in fact, always received cash collateral equal to that amount, as shown by the admission in the second quarter 2008 10-Q. Instead, when the collateral received was less than 102%, AIG would make up the difference by depositing funds into the collateral pool to maintain the collateral received at 102%.  ¶¶ 209, 373, 421.  Even though the AIG Section 10(b) Defendants had access to this information from the time each of the contracts were written, this fact was not disclosed to investors until August 6, 2008.

The AIG Section 10(b) Defendants also knew by the beginning of the Class Period that the internal controls put in place by former CEO Greenberg were *weakened and/or eliminated* under defendant Sullivan's watch, including during the period from March 2005 through the end of that year, *when AIGFP wrote more CDS contracts than it had written in the entire period from 1998 to March 2005*.  ¶ 107.  For example, according to plaintiffs' confidential witnesses and other public sources of information, after Sullivan became CEO, (i) the weekly meetings implemented by Greenberg to review AIGFP's credit exposure and assess the work of the AIGFP unit were eliminated (¶¶ 129, 488), (ii) the Assets/Credit Group was not required to utilize the standard, company-wide, information management system that housed information to be transmitted to AIG's risk management, accounting and other departments as a basis for them to make business decisions pertaining to AIGFP (¶ 134); and (iii) the risk management,

accounting, and technology systems groups that supported the entire organization were otherwise excluded from involvement in the CDS line of business, thereby making it possible for defendants Cassano, Forster, and Frost to control the flow of information and unilaterally make risk management and valuation decisions regarding the CDS portfolio (¶ 480).

As courts in this circuit have held, "a failure to maintain sufficient internal controls to avoid fraud is … indicative of scienter." *In re Veeco,* 235 F.R.D. at 232. In *Veeco*, plaintiffs argued – similar to plaintiffs' argument here - that the officer "defendants recklessly ignored red flags regarding [the company's] internal accounting controls," which "created and fostered an environment that permitted defendants to conceal accounting improprieties and false financial reporting." *Id.* at 232. Also like plaintiffs here, the *Veeco* plaintiffs further alleged that the defendants either had knowledge of or recklessly ignored a series of accounting improprieties that violated GAAP within a particular division, but had repeatedly assured investors that the division was increasingly profitable despite knowledge of those improprieties. *Id.* at 231-32. These allegations constituted strong circumstantial evidence of the *Veeco* defendants' recklessness, or conscious misbehavior, with respect to the company's false financial statements. *Id.* at 233; *see also In re Scottish Re*, 524 F. Supp. 2d at 393-95 (circumstantial evidence that company's reporting systems were in poor condition and that the individual in charge of maintaining financial reporting systems was dismissed in connection with this failure sufficiently supported inference of scienter); *In re New Century*, 588 F. Supp. 2d at 1216, 1228 n.21 (allegations that senior management knew of internal control problems when making misrepresentations as to loan quality, internal controls, and various financial statements was evidence of scienter); *Crowell v. Ionics, Inc.,* 343 F. Supp. 2d 1, 20 (D. Mass. 2004) (allegations that a company failed to maintain adequate internal controls can add to the strength of an

inference of scienter).[56]  The Section 10(b) Defendants' failure to maintain sufficient internal controls is even more egregious here, as these defendants were aware of AIG's recent problems with the SEC relative to earlier internal control problems and affirmatively misrepresented that they were "curing" the identified problems.

The thrust of the AIG Section 10(b) Defendants' argument against a finding of scienter on their part is that, unbeknownst to them, Cassano and others at AIGFP circumvented the Company's internal controls and actively concealed information about the so-called "multi-sector" credit default swaps, so these defendants had no way to know that the CDS portfolio was materially overvalued and much riskier than was being disclosed to investors.  To say that the AIG Section 10(b) Defendants' attempt to distance themselves from Cassano comes with ill-grace would be an understatement.  As described above, at the outset of the Class Period, Sullivan and the executive management of AIG actually *loosened* controls over AIGFP and its credit default swap business, thus creating the very conditions that gave rise to the improper valuation of the CDS portfolio.  Even more significantly, as discussed below, knowing that AIG had scheduled an investor conference, PwC warned the AIG Section 10(b) Defendants point blank that there could be a material weakness in internal controls relating to the CDS portfolio valuation.  But even after being warned by PwC about relying on AIGFP's valuation of the CDS portfolio, they proceeded, days later, to ignore that warning and publicly state during the December 5, 2007 investor meeting their total confidence in AIGFP's valuation of that portfolio which vastly understated its losses and was manipulated in violation of GAAP.  Thus, the

---

[56]    Sullivan's and Bensinger's attestations that the financial information contained in AIG's 2005 10-K (as well as in AIG's 2006 10-K and the interim period Forms 10-Q from the first quarter of 2006 through the third quarter of 2007) was accurate, and that the internal controls that AIG designed, established, and maintained were effective, is also probative of their scienter in light of the contradictory information they knew at the time.  *See In re MoneyGram Intern.,* 626 F. Supp. 2d at 981 (D. Minn. 2009) (false SOX certifications can be probative of scienter).

argument that the AIG Section 10(b) Defendants were somehow "caught unaware" is belied by the fact that when "made aware," they nevertheless made false statements in knowing or reckless disregard of the truth.

Furthermore, AIG's significant and unchecked exposure to the U.S. residential housing and subprime mortgage markets through the securities lending program undermines the AIG Section 10(b) Defendants' argument that if Cassano and the other AIGFP executives had not concealed the extent of AIGFP's exposure to the U.S. residential housing market, these defendants would have acted to curtail or, at the least, accurately and publicly describe that exposure.   The AIG Section 10(b) Defendants did not act to curtail or even contain the Company's exposure to RMBS, including those backed by subprime mortgages, through the securities lending program (and, in fact, increased the amount of investments in such securities after 2005).  Therefore, it is implausible to suggest that they would have done so with respect to the CDS portfolio absent Cassano's deception.  And, given the misrepresentations and material omissions in statements they made about AIG's securities lending program (for which AIGFP had no responsibility), their "blame Cassano" defense is unpersuasive.

The AIG Section 10(b) Defendants attempt to defend the cordoning off of the Assets/Credit Group and the valuation process from the Company's information systems and risk management functions by asserting that the CDS business was qualitatively different, and therefore, did not fit with the overall system in place at AIG is futile.  Defendant Lewis argues, for example, that the lack of involvement by risk management professionals in the valuation of the CDS portfolio was "altogether commonplace" given the different functions of each.  Lewis Mem. at 12.  This is an amazing argument given that AIG and the AIG Section 10(b) Defendants expressly represented that there was proper oversight over AIGFP, and the fact that the failure to

properly oversee the so-called multi-sector CDSs nearly brought down the entire conglomerate of AIG and was the primary factor necessitating the massive bailout aimed at preventing catastrophic damage to the world's financial system. It is hard to imagine what purpose the risk management function was meant to serve if not to provide some oversight of the CDS valuation process and the adequacy of the risk disclosures being disseminated to the Company's investors. Indeed, Lewis' assertion is incomprehensible in light of the fact that PwC expressly informed AIG's audit committee in March 2008 that the internal control weakness in the CDS portfolio valuation arose due to, among reasons, "the fact that AIGFP had designed a valuation process that did not allow the involvement of *Enterprise Risk Management* and the AIG Finance function in developing the approach." ¶ 249 (emphasis added).

### 2. Other Events That Transpired During the Class Period Further Indicate That the AIG Section 10(b) Defendants Acted Recklessly

There is no question that AIG's senior management was aware of AIGFP's exposure to subprime mortgage-backed debt, the mounting default rates in the subprime market sector and the effect of those defaults on financial instruments backed by subprime debt. Beginning with the May 31, 2007 investor conference, which was attended by Sullivan and other senior members of AIG's management, the Company devoted an increasing amount of time to subprime issues and their potential effect on the Company. For example, the May 31, 2007 conference featured lengthy presentations about AIG's subprime lending business and AIGFP's credit derivatives business.[57] By the time the Company held its investor conference on August 9, 2007 to discuss its results for the second quarter of 2007, the Company's subprime exposure as a result of its credit derivatives business became a focus of the conference. ¶¶ 311-317.

---

[57] *See* Ex. 24 to Allerhand Decl.

In addition to the information set forth above that the AIG Section 10(b) Defendants knew from the start of the Class Period going forward, these defendants were exposed to numerous events in the market that served as red flags from outside sources regarding the risks associated with AIG's exposure to the U.S. residential housing and subprime mortgage markets. For example, in June 2007, Merrill Lynch was unable to sell CDOs that had been repossessed from the collapsed Bear Stearns hedge funds. Then, in the third quarter of 2007, many of AIGFP's CDS counterparties recorded write-downs on the same types of CDOs that AIG was insuring, ¶ 433, and AIGFP began to receive demands to post collateral from counterparties to its credit default swaps due to a decline in the value of insured CDO tranches. ¶¶ 154-155.

AIG argues that it need not have considered the valuations of counterparties to the CDSs that made collateral calls. AIG Mem. at 37. However, the fact that AIG's valuations of CDS contracts consistently produced ***higher results*** than their counterparties' valuations was yet another red flag warning these defendants that the CDS portfolio was overvalued. In fact, one of St. Denis' main concerns before his resignation, as he told Cassano and, thereafter, AIG's own Chief Auditor, was that Goldman Sachs' valuation model was inconsistent with AIG's. ¶ 20.

That AIGFP began receiving collateral demands as early as August 2007 from CDS counterparties and that potential future demands were likely and could reach into the tens of billions of dollars, as described in more detail above, was a fact that was known to these defendants or was readily accessible to them. *See In re Nortel,* 238 F. Supp. 2d at 631 (plaintiffs adequately alleged scienter by showing that defendants had "ready access" to facts that contradicted their public statements); *see also In re MoneyGram*, 626 F. Supp. 2d at 982

(allegations that company did not downgrade securities in its investment portfolio when outside sources downgraded similar securities were sufficient to plead scienter).[58]

Defendant Lewis attacks plaintiffs' assertion that the AIG Section 10(b) Defendants were placed on notice of valuation issues concerning the CDS portfolio as a result of Goldman Sachs' collateral demands in August and October 2007 by arguing that the Complaint does not explain why such collateral postings (which he argues were "small" in relation to AIG's total notional CDS exposure of $527 billion) indicated a likelihood that more postings would follow. Lewis Mem. at 11-12. Mr. Lewis is dead wrong. First, there is no question that the approximately $2 billion in collateral posted for the benefit of Goldman Sachs (which was negotiated down from a total demand of $4.5 billion), out of a nearly *$80 billion* multi-sector CDO exposure ($64 billion of which was subprime) was highly significant. This is particularly so because the demand came from a substantial issuer – Goldman Sachs – which was held in high regard throughout the industry for its valuation acumen. Goldman's demands – followed by demands from several other CDS counterparties in the following months - was a red flag staring these defendants in the face that more demands were likely, given the similarities in the subprime mortgages underlying the Goldman CDOs to other CDOs that AIG was insuring, and further that such collateral calls could be enormous. Yet, AIG refused to adjust the value of the rest of the CDS portfolio.[59]

---

[58]    Unlike the cases to which AIG cites in this regard, *see In re Allied*, 2003 WL 1964184, at *4 (investors failed to allege that investment company overvalued securities in its portfolio without explaining how values were excessive and without making any showing that company varied from publicly announced valuation standards) and *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007) (discussing whether net asset value of collateralized mortgage obligations was determination of fact or was based upon advisor's judgment), plaintiffs here illustrate that defendants ignored the red flag that, in the absence of additional reliable data, other valuation models contradicted AIG's inflated assessment.

[59]    Mr. Lewis also argues that Plaintiffs fail to allege that the collateral calls were brought to his attention. Lewis Mem. at 12. This contention is disingenuous. Lewis was present when

In addition to the collateral demands, by October to November 2007, the AIG Section 10(b) Defendants either knew or had access to information concerning St. Denis' resignation and that fact that he had been deliberately excluded from the CDS valuation process by Cassano. Certain defendants cast doubt on whether and when they knew about the events involving Mr. St. Denis. First, it is hard to believe that the Company's top executives, including the executive who was in charge of the Company's risk management, did not know that the person *hired specifically to address the entity-wide material weaknesses PwC had previously identified* was deliberately excluded from the valuation process by Cassano and was ultimately forced to resign. Moreover, even if the AIG Section 10(b) Defendants truthfully did not know about the events that transpired with respect to St. Denis (even though St. Denis described these events in detail to AIG's Chief Auditor), this is a clear sign that the internal controls were completely broken and that these defendants were severely reckless in failing to learn such information. And further, given the information that St. Denis provided to AIG's Chief Auditor and outside auditor, PwC, and the warning that PwC thereafter gave to AIG's audit committee and senior management, the fact that *any* of the AIG Section 10(b) Defendants allowed Cassano to control the valuation process for the CDS portfolio, in advance of the December 5 investor meeting, and present valuation figures to investors at that conference, certainly qualifies as the type of "egregious refusal to see the obvious, or to investigate the doubtful" that comprises reckless behavior. *See Novak*, 216 F.3d at 308.

Remarkably, one of defendant Sullivan's arguments in support of his contention that the Complaint does not establish his scienter is that plaintiffs do not allege that he failed to check

---

Cassano disparaged the collateral calls received as of the time of the December 5, 2007 investor meeting as "drive bys." If Lewis did not know what Cassano was referring to, he clearly had an obligation – *as the Company's Chief Risk Officer* – to find out, and he clearly had access to information about the collateral calls.

information that he had a duty to monitor. Sullivan Mem. at 7-8. Sullivan, however, was clearly aware that the impact on AIG of the "serious disruption" in the market (as described in AIG's Second Quarter 2007 10-Q) was of keen interest to investors, and he spoke at length on numerous occasions to express his "confidence" in the CDS portfolio valuation and in the fact that the CDS transactions would not adversely impact AIG's financial condition. Sullivan's argument that he should be now absolved for remarks he made so frequently and emphatically is, in effect, an assertion that as CEO of a large, sprawling company, he can never have any liability for his statements because he had no direct responsibility for functions that were exercised by his subordinates. Clearly, however, by undertaking to speak directly on a subject that was of intense interest to the market, Sullivan had an obligation to ensure that his remarks were truthful, accurate and not misleading. Moreover, as explained above, the person that AIG hired *specifically to monitor* the CDS valuation process and to report relevant valuation and risk management information to AIG corporate management was ***deliberately excluded*** from the valuation process. Even if Sullivan had no direct "line responsibility" to monitor AIGFP's valuation, the exclusion and subsequent resignation of St. Denis was a red flag that should have put him on alert that AIGFP's valuation process was inadequate, AIG's oversight of that process was lacking, and AIGFP's valuations were likely incorrect.

For these reasons, *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008), which Sullivan cites on page 8 of his brief, is inapposite. There, plaintiffs failed to allege *any communication or report received by the individual defendants or any other indicia of fraud* that should have raised a red flag about the company's subsidiary's accounting. Here, however, after the events involving St. Denis occurred and the Goldman collateral calls were received, the AIG Section 10(b) Defendants were clearly on notice that the CDS valuation

process was highly problematic and, therefore, they had a duty to ensure that the information being disclosed to investors in SEC filings and during investor meetings about the valuation of the CDS portfolio was accurate.[60]  *See Novak*, 216 F.3d at 308; *accord In re Veeco*, 235 F.R.D. at 232 (S.D.N.Y. 2006); *In re NovaGold*, 629 F. Supp. 2d at 298-99.   Under similar circumstances to this case, the court in *In re New Century*, 588 F. Supp. 2d  at 1230, held that the complaint there was "sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different."

Despite these facts, defendant Lewis goes to great lengths to defend statements he made during the August 9 and November 8, 2007 calls, when he boasted about the Company's "strong risk management processes," stated that its "exposures are understood and well managed within an appropriate risk tolerance," and reassured investors that the risks arising from AIG's CDS portfolio were "remote," among other things.  ¶¶ 313, 314.  Lewis argues that his focus during these calls – and, in fact, generally – was on credit risk, not collateral or valuation risk.  Lewis

---

[60]    The other cases to which Sullivan cites in this regard do not support his position. (Sullivan Mem. at 7-8).  For instance, in *Markowski v. S.E.C.*, 34 F.3d 99, 104 (2d Cir. 1994), in affirming an SEC order that sustained disciplinary sanctions by the NASD against an officer of a brokerage firm, the Second Circuit stated that although the officer was responsible for compliance by the firm, he could rely "upon the reasonable delegation of particular functions to others," *unless* he has "knowledge or reason to know of non-compliance by the person to whom the function is delegated."  In that case (which was not a §10(b) case and does not deal with scienter), similar to the present action, the officer "knew (or certainly should have known)" that the NASD's demands were not being met.  *Id*.  *See also Marcus v. Frome*, 275 F. Supp. 2d 496, 502 (S.D.N.Y. 2003) (complaint did not even allege that defendants had access to the relevant information) (Sullivan Mem. at 7-8); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007) (in securities fraud action by corporation alleging that investors defrauded it into selling multiple series of its convertible preferred securities to entities they controlled, plaintiffs made only generalized allegation that investors had engaged in death spiral financing) (Sullivan Mem. at 8, n.10).

Mem. at 9.[61]  But this argument does not help his cause.  Plaintiffs are asserting that the AIG

Section 10(b) Defendants – and particularly defendant Lewis as AIG's Chief Risk Officer -

should have known at this point that credit risk was not the most pressing issue.  Lewis, like the

other Section 10(b) Defendants, knew of the internal control deficiencies with respect to the

Assets/Credit Group and the CDS valuation process, including the deliberate exclusion of risk

management, financial, and accounting functions from decisions concerning the valuation of the

CDS portfolio (as exemplified by the deliberate exclusion of St. Denis).  He, like other

defendants, also knew of the serious deterioration in the U.S. residential housing and mortgage

markets and the likelihood that AIG would be required to post billions of dollars of collateral –

in addition to the collateral provided to Goldman Sachs.  By admittedly failing to disclose

valuation and liquidity risks, which ultimately turned out to cause the Company's collapse, but

instead focusing almost entirely on the risk of default, Lewis and the other Section 10(b)

Defendants either intentionally or recklessly misled the market as to the risks posed to AIG by

the subprime mortgage crisis.[62]

---

[61]    Plaintiffs note, however, that at the December 5, 2007 investor meeting, Lewis
specifically told investors that AIG looks at a variety of "risk categories," including credit risk,
market risk, insurance risk, operational risk management, and liquidity risk management.

[62]    Lewis also argues that he was not specifically provided with "an internal report
identifying the problems to come" or "a memorandum outlining future difficulties."  Lewis
Mem. at 10-11.  Surely it was not necessary for defendant Lewis – the Company's Chief Risk
Officer – to be handed a memorandum detailing the risks of valuation declines and collateral
calls in order for this Court to infer his scienter.  The information that was available to him at the
same time he made contrary public statements about, among other things, the Company's strong
financial strength, capital position, liquidity, and risk management processes, and in failing to
disclose the considerable risks that the Company faced, sufficiently demonstrates his
recklessness.  The cases he cites in this regard do not hold to the contrary.  *See Coronel,* 2009
WL 174656, at *27  (complaint's factual allegations about reserves boiled down to claim that
Quanta announced loss estimates, and then revised the estimates upward later on) and *Steinberg
v. Ericsson LM Telephone Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at **13-15
(S.D.N.Y. Dec. 10, 2008) (complaint failed to identify any adverse information that the
defendants knew, other than stating generically, that it was contained in various internal

Further proof that AIGFP's methodology for valuing its CDS portfolio was problematic and, contrary to the Company's public representations, not subject to the types of internal controls that existed elsewhere at AIG and its affiliated companies, came in the form of a specific warning from PwC that AIG had significant deficiencies, and a possible material weakness, in its risk management, including with respect to AIGFP's CDS portfolio. ¶ 171. According to minutes of AIG's January 15, 2008 Audit Committee Meeting, PwC, on November 29, 2007, had expressed concerns to Sullivan and Bensinger that AIG's enterprise risk management and certain AIG senior finance officials were denied access into certain business units, including AIGFP and that this "weakness may have resulted in a material disclosure error and that it could result in an income statement and/or disclosure error in the future if it was not addressed." ¶ 249(f). PwC also informed Sullivan and Bensinger, among others, that the Company's "oversight of AIG Investments [was] insufficient, due to lack of access and unclear delineation of roles and responsibilities, and performance management and transparency [were] not where they should be." *Id.* This warning of a deficiency and possible material weakness came after a series of meetings between PwC and AIG management, including defendants Bensinger, Sullivan, and Lewis, in the third quarter of 2007, that PwC initiated in the wake of the Goldman collateral calls and St. Denis resignation, and out of a concern that there were "material misstatements or omissions in the disclosures" in AIG's second quarter 10-Q. ¶ 169-172. [63]

---

documents, conversations, and connections with other officers and employees, discussed at meetings) (Lewis Mem. at 8).

[63]    Defendants argue that PwC's identification of a possible material weakness concerned risk management generally, not *specifically* AIGFP or the CDS portfolio, and further that the issues raised in the November 29 meeting were not the same as the material weakness that PwC ultimately identified. Bensinger Mem. at 10; AIG Mem. at 41. The facts clearly imply the opposite. PwC was put on notice by St. Denis' resignation. This started their investigation, and there is no reason to think that they were talking about a problem other than the one they

PwC purposefully informed AIG about this issue in advance of the December 5 investor meeting, where PwC anticipated that AIG would likely discuss the CDS business. Notwithstanding PwC's warnings, however, during that conference, Company representatives touted AIG's valuation processes and provided assurances about the CDS portfolio. For instance, Sullivan stated that AIG accurately identified all areas of exposure to the U.S. residential housing market, that such exposure was "manageable," that AIG had a "high degree of certainty in" the losses that it had "booked to date," and that AIG's valuation models had proven to be "*very reliable*" and provided AIG "with a *very high level of comfort*."[64]  That Sullivan could claim to have a high level of comfort in the loss figures, given PwC's warnings and other information available to him – especially concerning the inadequacies of the Gorton model – is shocking.  This fact alone gives rise to an exceptionally strong inference of his and his fellow AIG Section 10(b) Defendants' scienter.  As the court held in *In re Scottish Re*, "[t]his is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements," rather, "plaintiffs have cited contemporaneous circumstances" of which defendants were aware that "support a strong and cogent inference of scienter."  524 F. Supp. 2d at 394.

Defendants argue that knowledge of a *possible* material weakness is not by itself enough to establish scienter.  The point, however, is that even after the AIG Section 10(b) Defendants were warned that the valuation of the CDS portfolio could be unreliable, they specifically stated at the December 5 investor meeting that it was very reliable.  Sullivan stated flat out that AIG's

---

ultimately identified.  Certainly, this warning, in addition to the collateral calls and resignation of St. Denis, among other things, should have raised a red flag about the CDS valuation process.

[64]     Sullivan defends this and other statements that he made at the December 5 meeting on the bases that he used cautionary language and that the misstatements were not actionable for other reasons.  Sullivan Mem. at 16-17.  Plaintiffs address these arguments in Section I.B.2 above.

valuation models had proven to be "*very reliable*" and provided AIG "*with a very high level of comfort*." ¶ 17. At the same meeting, Lewis touted AIG's risk management processes and enterprise risk managements' ability to share information across the corporation and further described the Company's distaste for "undue concentrations of risk" that could affect its capital position; and Bensinger stated, among other things, that AIGFP was sufficiently capitalized, touted the "rigorous and very conservative modeling" involved with that business, and stated that there is no expected loss associated with the CDS portfolio. ¶¶ 17, 175. These assurances were made without regard to the fact that, as PwC had just warned, internal control weakness existed directly pertaining to AIG's valuation of the CDS portfolio and without reference to the many billions of dollars of collateral postings that AIG could be required to make as the value of the CDOs it insured continued to decline.[65] *See id.* The strong inference of recklessness is unquestionably more compelling than any competing inference rationally drawn from these facts.

Indeed, just a couple months later, PwC confirmed that there was in fact a material weakness in internal control over the valuation process for the CDS portfolio as of December 31, 2007. According to the minutes of AIG's February 7, 2008 Audit Committee meeting, PwC stated the valuation process was "insular" and that oversight of that process was not effective "and lacked the appropriate challenge and debate." ¶¶ 187, 249(f)(g). PwC recommended that AIG's experts be "more entwined in the process" (prior to this, AIGFP had been permitted to

---

[65]      Lewis argues that plaintiffs fail to allege that he received the warning from PwC or was told about it prior to the December 5 meeting. Lewis Mem. at 12-13 n.36. Yet, again, as the Company's Chief Risk Officer, and as a participant at the December 5 meeting, Lewis had a duty to inform himself about the risk disclosures that would be made at the conference, and to ensure that they were true and accurate. In this regard, Lewis clearly failed, as he sat by quietly while Cassano, among other things, presented materially false loss figures, and characterized the grave risks to AIG stemming from collateral calls as frivolous demands that "go away" as soon as AIGFP disputes them, and while Sullivan expressed his "comfort" in the figures provided by Cassano. And, as noted above, Lewis himself made statements during that meeting that were highly misleading.

determine their own valuation of the CDS portfolio without input from AIG's experts).  ¶ 249(g).

According to the minutes, PwC also expressed concern that only AIGFP was involved in the

"December valuation process," and noted that even after it raised concerns over the CDS

valuation process, the controls put in place by AIG's management "did not operate effectively."

*Id.*  Among the things that Sullivan, Bensinger, and PwC discussed as needing remediation was

that "AIGFP's culture need[ed] to change."[66]  AIG disclosed this material weakness on February

11, 2008, at which time it also revised upward to $5.96 billion the previously reported $1.4 to

$1.5 billion loss estimate associated with the CDS portfolio **– *four times the amount stated at***

***the December 5 investor meeting***.  ¶¶ 174, 183.

     A material weakness in a company's internal controls can be compelling evidence that a

defendant acted recklessly in issuing financial results that were false or misleading.  *See, e.g.,*

*Hall*, 580 F. Supp. 2d at 233 (admitted material weaknesses in company's internal controls was

probative of scienter).  Here, plaintiffs have alleged that the AIG Section 10(b) Defendants failed

to put in place and maintain adequate internal controls over AIGFP (and the Assets/Credit Group

in particular).  This internal control failure – which admittedly rose to the level of a material

---

[66]    In fact, however, these internal control weaknesses with respect to AIGFP and the valuation of the CDS portfolio were not remediated, and on March 11, 2008, PwC informed AIG's Audit Committee that there was a new material weakness in control over the CDS valuation process and oversight thereof resulting from "the large errors in connection with the models used by AIGFP, the lack of timely elevation of key data on the negative basis and collateral issues to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of Enterprise Risk Management and the AIG Finance function in developing the approach," and a new significant deficiency in internal control over "access, roles and responsibilities of critical control functions."  ¶ 249(h).  AIG's failure to remediate the previously identified material weaknesses provide further evidence of scienter.  *See Stocke v. Shuffle Master, Inc.* 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (investors demonstrated strong inference of scienter by alleging that company issued press release and public reports stating that weaknesses in internal accounting controls, which required two write-downs, would be examined and corrected, and that such remedial measures would remain a priority, but corporation failed to implement remediation plan and subsequent public reports acknowledged that internal control deficiencies still existed).

weakness - is highly indicative of their scienter, particularly in light of plaintiffs' particularized allegations that they did not honestly or reasonably believe that such internal controls were working properly, but represented to the contrary when speaking to investors.  *See In re New Century*, 588 F. Supp. 2d at 1230.

The AIG Section 10(b) Defendants seek to counter this compelling inference of scienter by arguing that they timely disclosed the existence of the material weakness and timely corrected their false statements during the December 5, 2007 investor meeting resulting from the improper application of the $3.63 billion in "negative basis adjustments" in subsequent SEC filings and/or conference calls.  Thus, for example, they point to the fact that during a February 29, 2008 conference call, defendant Bensinger admitted that AIG had concluded that the recording of the negative basis adjustment was "not consistent with GAAP fair value requirements" (¶ 190) and argue that this was a highly complex accounting issue that AIG executives could determine only after hearing from PwC on the topic.  *See, e.g.,* AIG Mem. at 37; Bensinger Mem. at 10 - 11.

Yet, this argument entirely overlooks that these same AIG executives were aware that PwC had told them, *before* the December 5, 2007 investor meeting, that there were deficiencies and possible material weaknesses concerning their oversight of AIGFP.[67]  Thus, their purported "actions" taken after the December 5, 2007 investor meeting in no way negate their recklessness, at the least, in making false and misleading statements at the December 5 meeting, and in allowing Cassano to make other highly misleading statements.  Making such statements and failing to act in the face of "obvious signs of fraud" by Cassano and others, represented "an extreme departure from the standards of ordinary care."  *South Cherry Street*, 573 F.3d at 109. Moreover, the AIG Section 10(b) Defendants' knowledge of the internal control weaknesses

---

[67]    It also overlooks that their belated acknowledgement of deficiencies was undertaken only in the face of an impending disclosure of internal control weaknesses by PwC.

clearly did not start with PwC's finding of a material weakness as of December 31, 2007 – the

end of their audit year – or even with PwC's warning of significant deficiencies and a possible

material weakness in November 2007.  Rather, from the beginning of the Class Period, the AIG

Section 10(b) Defendants knew that they had allowed various internal controls put in place by

former CEO Greenberg to be weakened or suspended and permitted – throughout the Class

Period – the cordoning off of the CDS valuation process by Cassano and Forster, and a few other

AIGFP executives.  Yet, from early 2006 through 2007, the AIG Section 10(b) Defendants

consistently touted their internal controls, and even reported "curing" earlier-disclosed

weaknesses in the 2005 and 2006 Forms 10-K.  ¶¶ 256, 280.[68]

In this regard, courts have held that violations of GAAP standards constitute effective

evidence of scienter.  *See Novak*, 216 F.3d at 309 (allegations of GAAP violations are sufficient

---

[68]    Lewis and Herzog also argue that the Complaint relies on "group pleading" to establish
their scienter.  Lewis Mem. at 12-13, 15; Herzog Mem. at 6.  Based on this same argument,
Lewis contends that the statements made by other defendants during the December 5, 2007
meeting fail to raise an inference of scienter as to him.  However, as Lewis admits, he was
present during the December 5 meeting and even spoke to investors during that call.  He was
therefore aware of not only the statements he was making, but also the statements the other
defendants and AIG representatives were making, which he knew were false or misleading based
on his awareness of the information and red flags discussed above.  Instead of correcting those
misstatements or disclosing additional information that would have made them not misleading,
Lewis stood silent and, therefore, his acquiescence to those statements can be assumed, at least
with respect to the statements having to do with the risk arising from AIG's exposure to the U.S.
residential and subprime mortgage markets – which were precisely within his area of
responsibility within AIG as its Chief Risk Officer – including the statements having to do with
collateral calls, such as Cassano's improper characterization of them as "drive bys."  *See In re
Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30,
2004).  Moreover, with respect to Herzog, he was the Principal Accounting Officer during the
Class Period and, in that capacity, he signed the Company's Forms 10-K and Forms 10-Q during
the Class Period, as well as the 2007 and 2008 Registration Statements.  The Complaint
adequately alleges that by the time AIG filed in 2006 Form 10-K, there was at least a reasonable
possibility that the value of the CDS portfolio had declined.  This was precisely within Herzog's
admitted area of oversight.  Certainly, even if he was not expressly aware of this, all of the
information necessary to make that determination was accessible to Herzog, as AIG's Principal
Accounting Officer.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 300-301
(S.D.N.Y. 2008).

to give rise to a strong inference of scienter when coupled with evidence of corresponding fraudulent intent); *In re Scottish Re*, 524 F. Supp. 2d at 394 (allegations of a GAAP violation "may shift [the balance of the inferences to be drawn] significantly in favor of scienter"); *S.E.C. v. DCI Telecommc'ns., Inc*., 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000) (evidence of GAAP violation supports an inference of scienter).   Here, the Complaint specifically alleges significant GAAP violations.   For example, as described above, by February 2007 at the latest, the Section 10(b) Defendants knew that the market prices of CDOs containing subprime debt had declined substantially because of, among other things, the decline in housing values and the increase in subprime mortgage default rates.   As a result, FAS 5, FAS 133 and FAS 107 required them to record the resulting change in AIGFP's CDSs portfolio's fair value, estimate a range of possible losses on this portfolio, or, at the least, disclose that there was a reasonable possibility that the portfolio had declined materially in value.   They failed to do either.   ¶¶ 120, 426-433.   These violations, considered together with plaintiffs' other allegations, indicate scienter.

Defendants further argue that the absence of a restatement of AIG's financial statements and the fact that AIG's financial statements were audited by an independent auditor negates a finding of scienter regarding the falsity of the financial statements.   AIG Mem. at 33; Sullivan Mem. at 11-12.   AIG and Sullivan cite *In re JP Morgan*, 2007 WL 950132, in support of this argument.   There, the court found that because, among other reasons, the SEC had not found that JP Morgan's SEC filings improperly omitted related-party disclosures and JP Morgan did not have to restate its financial statements due to its failure to comply with SFAS 57, "reasonable accountants could differ as to whether SFAS 57 applied" to the transaction at issue, and that this was contrary to a claim of recklessness.   2007 WL 950132, at *13.   This decision – with its particularized facts and circumstances – does not help defendants' argument.

There is no requirement that financial statements be restated to plead a violation of Section 10(b). Indeed, numerous courts have upheld securities fraud claims involving GAAP violations where there was no restatement of a Company's audited financials or where the company's outside auditor issued clean audit opinions throughout the class period. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (denying motion to dismiss Section 10(b) claim even though there was no restatement and defendant's auditor issued a clean audit opinion); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) (same); *In re Majesco Sec. Litig.*, No. Civ. A. 05 CV-3557 (PGS), 2006 WL 2846281 (D.N.J. Sept. 29, 2006) (same); *Aldridge v. A.T. Cross Corp.*, 284 F. 3d 72, 72 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA."); *In re MoneyGram*, 626 F. Supp. 2d at 974; *In re New Century*, 588 F. Supp. 2d at 1231 (fact that auditor issued clean audit opinions did not preclude strong inference of scienter). Moreover, the fact that AIG did not restate its financials during the Class Period is not evidence that its SEC filings were not false and misleading. Indeed, as described above, the SEC even sent a letter to AIG on September 5, 2008 – just two weeks before the end of the Class Period – advising AIG that it *still* needed to provide better disclosures to investors on the precise issues raised in this litigation.[69]

The AIG Section 10(b) Defendants also violated GAAP and SEC rules by failing to maintain effective disclosure controls and procedures; by failing to disclose that they did not

---

[69]    The cases cited by defendants in support of their argument that GAAP violations or accounting irregularities are insufficient to demonstrate scienter are inapplicable because in those cases, unlike here, the plaintiffs either failed to allege that GAAP was violated or failed to set forth any other corresponding evidence of scienter. *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) (shareholders did not adequately plead that bank knowingly or recklessly failed to comply with GAAP); *Coronel*, 2009 WL 174656, at **26-31; *Chill v. General Elec. Co.*, 101 F.3d 263, 271 (2d Cir. 1996).

maintain such controls and procedures; and by failing to maintain internal controls over financial reporting – particularly with respect to the valuation and disclosure of the CDS and investment portfolios. ¶¶ 456-463.[70] Indeed, the Company's inadequate internal controls and disclosure deficiencies had contributed to the Company's previous restatement. As the Section 10(b) Defendants were aware, these issues had not been cured.[71]

### F. Defendants' Suggestions of Innocent or Honest Conduct in the Wake of a Global Financial Crisis Are Implausible and Do Not Negate Scienter

As the foregoing discussion makes clear, the Complaint's allegations of scienter are not based on a hindsight view of events. Instead, they are based on facts that defendants knew or recklessly disregarded when they made their false and misleading statements to investors. The Section 10(b) Defendants' efforts to posture themselves as innocent "victims" of a financial crisis that was not foreseen fails because, as discussed above, the Complaint's allegations are based on a failure to disclose *known risks*, rather than a failure to predict that losses would ultimately occur. Thus, the Section 10(b) Defendants *knew* that underwriting standards on subprime mortgages dramatically declined during 2005; *knew* that the Gorton model could not adequately predict the behavior of the so-called "multi-sector" CDOs; *knew* that AIG had a significant concentration of risk arising from subprime exposure in the CDS portfolio and

---

[70]   As set forth in the Complaint, AIG also violated GAAP and SEC rules by failing to disclose (i) in AIG's 2005 and 2006 financial statements, the significant concentration of credit risk in AIG's securities lending and CDS portfolios; (ii) the extent of AIG's obligations to post collateral to counterparties under its CDSs; (iii) that the CDS contracts often designated the counterparty banks as the calculation agent for valuation of the referenced CDOs; and (iv) the impacts of potential collateral calls and other economic and industry factors on the Company's liquidity and the risks the Company faced with respect to the CDS portfolio. ¶¶ 434, 440-50.

[71]   AIG asserts that the internal control weaknesses arising out of its earlier restatement had nothing to do with the valuation of the CDS portfolio. AIG Mem. at 40. However, as noted above, the accounting improprieties that were the subject of the restatement arose due to management overrides of internal controls, the same type of misconduct that caused the fair value decline in the CDS portfolio to be under-reported.

securities lending business; *knew* that AIG had a material weakness in internal controls relating to the CDS portfolio valuation; and *knew* that AIG faced significant liquidity risk due to collateral calls from counterparties to the credit default swaps and demands for the return of cash collateral that had been placed in investments of limited liquidity in the securities lending program.

These and other facts that were known to the Section 10(b) Defendants present a cogent and compelling argument that these defendants knew or recklessly disregarded that the *risks* the Company was taking on were not adequately disclosed to investors. Moreover, they belie any assertion that these defendants were simply innocent victims of "bad luck" who bear no responsibility to investors on whose behalf they purported to act. To the contrary, the purposeful misconduct in which these defendants engaged – *e.g.* deliberately excluding St. Denis and providing a false valuation of the CDS portfolio to investors after being expressly warned of a possible material weakness in the valuation process – present a picture of individuals who engaged in an extensive charade to portray AIG as a company that had successfully insulated itself against risks faced by lesser peers in the financial services industry. It is this failure to disclose the true state of AIG's own financial condition and risk exposures, which thereby artificially inflated the price of AIG stock, that is the subject of this action – not whether AIG should have predicted a global financial crisis.

*In re New Century,* 588 F. Supp. 2d at 1230, is directly on point. There, despite increasing interest rates and an overall market downturn, the court found that the inference of deliberate recklessness as to false statements regarding loan quality and underwriting standards was at least as compelling as the inference that the defendants were taken by surprise by these general industry events. *Id.* The *New Century* court noted that the "allegations are sufficient to

159

infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different – the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching." *Id.*

Also directly on point is *In re MoneyGram*, 626 F. Supp. 2d at 982-83. In *MoneyGram*, defendants urged the court not to impose liability for their failure to "presage the nation's worst economic meltdown in decades." Like the defendants here, they argued that the scope of the market failure was unforeseeable, particularly as it related to the defendants' portfolio of ABS (which were primarily A-rated or higher, and largely collateralized by mortgages with earlier vintages that were deemed less susceptible to the market downturn). *Id.* Also like the defendants here, they argued that as 2007 progressed and the full extent of the market decline became apparent, they "proactively disclosed" material information about the content of the portfolio and its risk exposure when that information became available, and increased the company's recognition of unrealized losses. They additionally asserted that they valued the portfolio and made disclosures in good faith, as evidenced by the absence of insider trading allegations and financial restatements. *Id.*

The court, however, found the plaintiffs' inference of scienter to be more compelling. The plaintiffs alleged that the defendants knew, or were reckless in not knowing, the extent of the market turmoil's effect on its investment portfolio, but that they "failed to make adequate and accurate disclosures for fear of the market's reaction." *Id.* at 983. Specifically, by at least January 2007, external "red flags" about the subprime mortgage market were so apparent that defendants knew or should have known that the company's ABS were substantially impaired and could not be reliably priced. *Id.* Then, as the market continued to fall, the *MoneyGram* defendants "selectively and misleadingly" released information specific to the portfolio's

subprime exposure – just like the defendants here.  These selective disclosures caused investors to believe that the market decline had a minimal effect on the portfolio, and that it did not threaten the company's liquidity.  *Id.*  At the same time, because of liquidity concerns, the company was exploring bankruptcy and comprehensive recapitalization.  *Id.*  For similar reasons, the Court should reject defendants' contention that they were victims of an unforeseen financial meltdown.[72]

At its core, defendants' argument about the global financial crisis is nothing more than a self-serving attempt to avoid liability for their concealment and misrepresentation of AIG's financial condition and risk exposures.  Whether or not AIG executives could have foreseen this crisis, they consistently sought to assure investors that their risk management functions and conservatism would insulate AIG "even in severe recessionary market scenarios."  *See DeMarco v. Robertson Stephens Inc.,* 318 F. Supp. 2d 110, 123 (S.D.N.Y. 2004) (rejecting defendants' argument that plaintiffs' loss was due to the general market downturn in the telecommunications stock because plaintiffs' theory of the case is that defendants deliberately participated in inflating the telecommunications stock bubble by disseminating misrepresentations).  The enormous losses that led to AIG's near collapse experienced through the CDS portfolio and what defendants call the "run-on-the-bank" in the securities lending program may have been precipitated by the liquidity crisis that overtook all financial institutions in September 2008.

---

[72]    Other courts have reached similar results.  *See In re Countrywide*, 588 F. Supp. 2d at 1173-74 (noting, in response to defendants' argument that the unprecedented liquidity crisis caused all or most of Countrywide's decline, that Countrywide's shares declined as its deteriorating underwriting standards came to light, though Countrywide held itself out as situated differently than other subprime lenders and made continued misrepresentations and omissions, concurrently with corrective disclosures); *In re Scottish Re*, 524 F. Supp. 2d at 394 (dismissing defendants' argument that plaintiffs were attempting to plead fraud based on circumstances that were unforeseen at the time by defendants made their statements).

That they occurred at all, however, was the result of the high-stakes bets defendants were making in light of the known risks, none of which were disclosed to investors.

The cases defendants cite in this regard do not change this result. For instance, in *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000), the court held that the plaintiffs attempted to plead fraud by hindsight by alleging that a drug manufacturer should have known that its advertisements touting the safety of a particular drug were false because, at the time the advertisements ran, the available information did not demonstrate a statistically significant link between the drug and any illness. However, in *Carter-Wallace*, defendants acted properly in immediately recommending that patients withdraw from a particular drug after receiving adverse reports about it. *Id.* Here, after receiving information that was significant enough to cause AIGFP to stop writing new CDS deals, the Section 10(b) Defendants acted with conscious misbehavior and/or recklessness by, among other things, failing to disclose the extent of AIG's continuing involvement in the U.S. residential housing and subprime mortgage markets, and the level of risks to which it was exposed. When they learned, in late 2005, of adverse facts regarding the exposure of their CDS portfolio to the risky subprime mortgage market, as well as the deficiencies in the models they used to value and measure the associated risk, they stopped writing new CDS deals without informing the market about the decision or its rationale until much later. Nor did they attempt to extricate from their books the $80 billion worth of existing CDOs that included subprime mortgages and that imposed continuing obligations on the Company.

AIG's reliance on *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905 (RWS), 1996 WL 494904, at *21 (S.D.N.Y. Aug. 30, 1996), is similarly misplaced. In *Primavera*, the court found that no inference of scienter could be drawn where plaintiffs failed to allege that

defendants knew objective facts or circumstances regarding the price of collateralized mortgage obligations ("CMO") prior to the collapse of the CMO market.  *Id.*  Here, in sharp contrast, the Defendants knew by late 2005 that AIGFP's primary tool for assessing the CDS portfolio – the Gorton model – was not reliable, and could not adequately model highly-correlated subprime mortgages, or provide useful information pertaining to the collateral and valuation risks inherent in such a portfolio.  They also came to know, by mid-2007, that the valuation methods utilized by the CDS counterparties consistently provided lower valuations than AIG's valuation methods.  Yet, they failed to disclose the circumstances surrounding the decision to stop writing subprime-based CDS contracts at that time, and thereafter minimized the continuing risk exposures to AIG stemming from the CDS portfolio.[73]

---

[73]     AIG's reliance on *In re PXRE*, is also woefully misplaced.  There, plaintiffs alleged that defendants had engaged in a scheme to understate the losses of a reinsurance company that resulted from the series of hurricanes.  The court found that plaintiffs' pleading of scienter was inadequate because they failed to allege that defendants had knowledge of specific contradictory information or that such information was available at the same time that defendants made the alleged misrepresentations.  600 F. Supp. 2d at 536.  Here, of course, the Complaint cites a wealth of adverse information that defendants knew or was available to them when they made the statements at issue.

This case is similarly distinguishable from *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978), where the court found the complaint was an example of alleging fraud by hindsight because it relied upon disclosures in later annual reports regarding risky and speculative loans made by the defendant financial corporation to allege that they should have been made such disclosures in earlier reports.  AIG Mem. at 32-33.  Specifically, the *Denny* court found that the complaint failed to allege "transactions about which defendants in fact had such perceptions or were reckless in not having them."  *Id.* at 470.  Unlike *Denny*, here plaintiffs adequately allege facts demonstrating that defendants learned of adverse facts regarding the Company's exposure to the subprime mortgage market in late 2005, well before such facts were made public in AIG's SEC filings, and continuing throughout the Class Period.

Furthermore, in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), the court did not reject the inference of scienter merely because the corporation's losses followed the deterioration of the real estate market, as Cassano contends.  *See* Cassano Mem. at 21.  Instead, the court found the plaintiff's allegations relating to concealment and misrepresentation of the corporation's loan portfolio and loan loss reserves to be insufficient to find an inference of scienter because such allegations were "so broad and conclusory as to be meaningless."  *Id.* at 1129.  Here, in contrast, the pages and pages of allegations, including those based on former AIG

### G.      The Statements by the OTS Do Not Negate Scienter

The AIG Section 10(b) Defendants also attempt to use the oversight of the Company by the Office of Thrift Supervision as a shield against their own scienter. Their argument fails. The OTS – a savings-and-loan regulator – became responsible for supervising AIG when the Company bought a small savings and loan company about a decade ago. As recently set forth in a report by the U.S. Government Accountability Office, the OTS lacked the needed expertise to oversee the AIGFP units and the risks associated with its multi-billion CDS portfolio. Moreover, while the defendants attempt to blame the OTS and other governmental regulators for the losses incurred, what the regulators knew and when they knew it is irrelevant because they did not sign the Company's filings or certifications to the Registration Statements or make the disclosures on AIG's behalf that contained the misleading statements. Indeed, what the OTS regulators seem to have focused upon is the same thing that Defendant Lewis and the other AIG Section 10(b) Defendants wanted the public to focus on – AIG's potential "credit risk," which the defendants represented was "remote" even under severe recessionary scenarios, rather than the true liquidity and valuation risks that were facing AIG.

Defendants point to certain statements made by the OTS in its July 13, 2007 report that they claim dispute any inference of scienter. *See*, *e.g.*, Sullivan Mem. at 12-13; Bensinger Mem. at 9. However, it is apparent that the OTS did not realize the severity of the Company's liquidity problems *because of the way AIG presented information to them*. Thus, it appears that AIG misled the OTS in the same manner as it misled analysts and investors – by focusing its attention

---

employees, executives and counterparties, show precisely how AIG and AIGFP executives – at the time – knew or recklessly disregarded material information that made their statements with respect to the CDS portfolio, securities lending program and internal controls materially false and misleading, right up until the Government was forced to extend the $85 billion emergency bail-out that kept AIG afloat.

on payment obligation risk, while neglecting the much more severe liquidity and balance sheet concerns posed by the collateral and valuation risks inherent in both the CDS portfolio and securities lending program.  As former OTS acting chief Polakoff admitted in his prepared statement to the House, AIG "repeatedly reported and disclosed that its payment obligations would arise only after credit losses in the designated portfolio exceeded a specified threshold amount or level of 'first losses.'"  Ex. 14 to Allerhand Decl., at 5.  Indeed, even today, in his brief, defendant Lewis – AIG's Chief Risk Officer – continues to maintain that *he* was focusing on the CDS portfolio's payment obligation risk.  Thus, both in their public statements and, apparently, during their discussions with the OTS, AIG executives downplayed altogether the much larger collateral and valuation risks posed by the CDS portfolio while focusing the public's and the OTS's attention on the "remote" payment risk.  As a result, the report issued in July 2007 by the OTS, *which specifically noted that the agency would be taking a more detailed look at AIG's subprime exposure during its 2008 review*, does not undercut the strong inference of scienter from the totality of facts pled in the Complaint.

Finally, defendants argue that, because the OTS sent its March 2008 Supervisory Letter detailing the Company's risk management failures after AIG disclosed a material weakness in February 2008, the March 2008 letter cannot support an inference of scienter.  Sullivan Mem. at 13, n.14; Bensinger Mem. at 9, n.3.  As the testimony of Polakoff makes clear, however, the OTS had throughout the Class Period documented many accounting and internal control issues.  Moreover, it provided recommendations to AIG that went unheeded.  For instance, after a detailed 2005 review, the OTS prepared a comprehensive report that it provided to AIG in March 2006.  The report identified "weaknesses in AIGFP's documentation of complex structured transactions, in policies and procedures regarding accounting, in stress testing, in communication

of risk tolerances, and in the company's outline of lines of authority, credit risk management and measurement." ¶ 457. Polakoff also testified that in 2007, after continued review of AIG and increased scrutiny of AIGFP, the OTS "instructed the company to revisit its modeling assumptions in light of deteriorating market conditions." *Id.* According to Polakoff, in 2007, the OTS again "questioned AIG about the valuation of CDS backed by subprime mortgages," in light of the continued market deterioration, and expressed a "progressive concern with corporate oversight and risk management." *Id.* ¶ 479. Thus, before PwC informed defendants Sullivan, Bensinger and others at AIG that a material weakness could exist with respect to AIG's oversight of AIGFP and the CDS valuation process, and before Cassano was allowed to exclude St. Denis from the CDS valuation process, the OTS had informed the Company that its risk management practices with respect to AIGFP and the valuation of the CDS portfolio were in need of improvement.

### H.    The Absence of Stock Sales Does Not Negate Scienter

Defendants' argument that the absence of insider stock sales negates scienter is unpersuasive. *See* AIG Mem. at 29; Cassano Mem. at 20; Herzog Mem. at 8; Lewis Mem. at 16; Bensinger Mem. at 6; Sullivan Mem. at 19; Forster Mem. at 7. As courts have held, a plaintiff need not allege sales of stock by insiders in order to establish scienter, or even to show motive and opportunity to commit fraud. *See, e.g., In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (the PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter"); *Florida State Bd. of Admin*, 270 F.3d at 662-63 (circumstantial allegations established motive and opportunity even though plaintiff did not allege that executive defendants sold stock during class period). Moreover, unlike the cases that defendants cite in

this regard, where the motive and opportunity allegations were confined to insider trading,[74] as described in Section II.D above, the motive allegations in this case do not rely on stock sales. Rather, they are based on the massive payouts made to AIGFP executives based on the unusual compensation structure that they had set up for their own benefit.

AIG further argues that the fact that it repurchased more than 88 million shares of its own stock during the Class Period negates a finding of scienter. AIG Mem. at 30. AIG's claim that it repurchased common stock is nowhere in the Complaint and should not be considered by this Court. But even if these facts were to be considered, they do not negate a finding of scienter – rather, they provide even further evidence of scienter. It is well-recognized that stock repurchases using corporate funds are sometimes used to prop up the price of a company's stock, rather than reflecting management's belief that purchasing such stock is the best investment for the company. *See In re Guilford Mills Inc. Sec. Litig.*, No. 98 CIV. 7739, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (buying back stock did not in and of itself refute the strong inference of scienter raised by plaintiffs' other allegations). Indeed, stock repurchases can give rise to an inference that company insiders are "manipulating the market price of [the company's] stock to reduce the gradual corrective disclosures' effect on the market price." *In re Countrywide*, 588 F. Supp. 2d at 1187, n.67. Here, the stock repurchases that AIG cites occurred from March 1, 2007 through February 15, 2008. Thus, they coincided with growing investor

---

[74]    *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 266, 291-92 (S.D.N.Y. 2006) (motive allegations inadequate to show scienter because stock sales were not unusual and other insiders had not sold any stock); *In re Glenayre Technologies, Inc. Sec. Litig.*, No. 96 Civ. 8252 (HB), 1998 WL 915907, at **4-5 (S.D.N.Y. Dec. 30, 1998) (insider sales were not unusual given defendants' consistent past trading history, low percentage of stocks traded relative to the amount owned, and absence of trading by other corporate officers); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (consistent pattern of stock sales undertaken primarily to make payments required for exercise of stock options or to pay taxes was not unusual or suspicious).

concerns about AIG's exposure to the subprime market. They also coincided to the disclosure of certain losses in the CDS portfolio, including AIG's February 11, 2008 disclosures, which revealed improper valuation methods that had understated its previously reported losses, and which also disclosed a material weakness in AIG's internal controls. ¶¶ 518, 523, 529. Thus, far from negating scienter, a fair conclusion from AIG's management and Board's decision to buy back stock was that they were seeking a way to maintain the price of AIG stock, in the face of potential investor unrest.[75]

Indeed, at the same time it was buying back stock, AIG was also raising tens of billions of dollars through offerings. These offerings failed to disclose material information to investors, and not only funded, in part, AIG's stock repurchases, but also raised money to meet growing need to pay the collateral demands of CDS counterparties and participants in AIG's securities lending program. ¶¶ 468-470. As discussed above, AIG sold tens of billions of dollars of debt securities in a series of registered public offerings and private placements during the Class Period, although they misrepresented what this funding was primarily being used for – to meet collateral demands from CDS counterparties. Thus, these facts do not negate an inference of scienter. Rather, when viewed holistically, as required by *Tellabs*, they provide further evidence of the AIG Section 10(b) Defendants' motive to artificially inflate the price of AIG stock. *See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007) (insider buying by a corporation is not inconsistent with scienter where the parties acquiring the stock may have believed that the scheme could remain hidden indefinitely).

---

[75]    This is quite unlike the situation in *JP Morgan Chase*, which AIG cites on page 30 of its brief, where the court found it implausible that JP Morgan, while attempting to defraud its own shareholders, extended billions in credit to Enron in return for tens of millions of dollars in fees, even though it knew that Enron was on the brink of financial collapse. 363 F. Supp. 2d at 621.

For these reasons, the facts pled in the Complaint clearly establish a strong inference of scienter on the part of each of the Section 10(b) Defendants, and defendants' arguments to the contrary are without merit.

## III.   Defendants Improperly Seek To Truncate the Class Period As Defined in the Complaint

Defendants set forth a number of arguments for truncating the Class Period based primarily on the Complaint's alleged failure to plead reasonable reliance either at the beginning or the end of the Class Period.  Their arguments should be rejected.

AIG argues that plaintiffs cannot show reasonable reliance on any of the alleged misstatements from March 2006 through July 2007.  It claims that the information that should have caused AIG to know that it would suffer losses was in the public domain and should therefore have put plaintiffs on notice.  AIG Mem. at 67-68.  A "truth-on-the-market" defense, such as the one being asserted by AIG, is available, however, "only where defendants can demonstrate that the information has 'credibly' entered the market through 'transmitt[al] to the public with the degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.'"  *In re Unisys Corp. Sec. Litig.*, No. Civ. A. 00-1849, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000).  As the Second Circuit has noted, "[t]he truth-on-the-market defense is ***intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.***" *Ganino v. Citizens Utilities Co.*, 228 F.3d at 167 (emphasis added).

AIG's argument also overlooks crucial information that was known to AIG insiders, but not disclosed to the public.  For instance, none of AIG's disclosures during and even before this time period ever reported the extent of AIG's exposure to the U.S. residential housing and subprime mortgage markets through the CDS portfolio and securities lending program.  Nor had

AIG disclosed that AIGFP stopped writing CDS contracts in late 2005, or that it had done so because the Gorton model was unreliable.  The Section 10(b) Defendants also knew, but failed to disclose, that AIG lacked oversight of AIGFP's risk management and, importantly, lacked adequate internal controls over financial reporting and oversight relating to the CDS portfolio, including its valuation.  Nor had they disclosed that the CDS contracts permitted the counterparties to demand collateral in the event of ratings downgrades or declines in the valuations of the insured CDOs.  In light of all of the material facts that defendants failed to disclose, there can be no finding at this stage of the litigation that any information that was in the public domain entered the market with sufficient intensity and credibility so as to neutralize the misleading impression created by defendants.[76]

Defendants further argue that plaintiffs cannot assert Section 10(b) claims for their purchases of AIG stock after February 28, 2008.  They claim that plaintiffs cannot, as a matter of law, invoke the presumption of reliance afforded by the fraud-on-the-market theory for those purchases.  AIG Mem. at 69; Cassano Mem. at 28.  In essence, these defendants argue that the Class Period must end when the Company issued its Form 10-K for the year ended December 31, 2007, because, in that filing, AIG disclosed a significant increase in the write-down of its CDS portfolio, a shortfall in the Company's securities lending program, the amount of collateral posted by December 31, 2007 to CDS counterparties, and a material weakness in its CDS valuation process.  This argument is also meritless.

---

[76]     The cases to which defendants cite do not change this result.  *See White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (all of the information plaintiffs claimed was concealed by defendants was publicly available) and *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 375 (S.D.N.Y. 2003) (all of the information alleged to have been concealed was specifically disclosed in public reports).

In securities class actions, it is well-established that a class period ends only when new information indisputably "cures the market" of the security's artificially-inflated price. *See*, *e.g.*, *In re Interpublic Sec. Litig.*, No. 02-6527, 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003). As courts in this Circuit have explicitly recognized, whether a purportedly corrective disclosure "cures" the market for purposes of ending the class period is a fact-intensive question; it is not properly decided on a motion to dismiss, but rather by a finder of fact after appropriate discovery. *See*, *e.g.*, Transcript of Oral Argument, at pg. 4, lines 8-23; pg. 9, lines 1-7, and pgs. 14-15, *The Ohio Public Employees Ret. Sys., et al. v. Federal Home Loan Mortgage Corp., et al.*, ("*Freddie Mac*"), No. 03-CV-4261 (S.D.N.Y. March 31, 2006) (Docket # 88) (attached as Exhibit 6 to Golan Decl.) (holding that court did not have the power to change a class period without resolving issues concerning the merits of the litigation, which is the province of a jury); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 307 (S.D.N.Y. 2003) (even at class certification stage, "a class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market"); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982) (it is "improper for a district court to resolve substantial questions of fact going to the merits when deciding the scope or time limits of a class"); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 n.3 (2d Cir. 1991) (issue of whether subsequent disclosure "cured" prior omission is a question of fact that should not be resolved on the pleadings); *accord In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) (whether or not a disclosure "actually cured a prior misrepresentation is a sensitive issue to rule on at [class certification] stage … because it comes so close to assessing the ultimate merits in the case"). Moreover, it is defendants' burden to demonstrate "as a matter of law" that their allegedly-curing disclosure in fact cured the market. *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 192-93 (S.D.N.Y. 1985);

*see also In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023(DC), 2002 WL 1033826, at *2 (S.D.N.Y. May 21, 2002) (class period should be shortened "[o]nly if a release to the market clearly and unequivocally revealed the inaccuracies of the prospectus"); *Friedlander v. Barnes*, 104 F.R.D. 417, 420-22 (S.D.N.Y. 1984) (defendants' proposed changes to the class period will only be accepted where "no substantial question exists as to the curative effect of the press release"); *In re LDK.*, 255 F.R.D. at 529 (reliance is not "unreasonable, as a matter of law, unless there is no substantial doubt as to the curative effect of the announcement").

For these reasons, courts have routinely rejected efforts by defendants to shorten class periods, whether at the pleading or class certification stage.  *See, e.g.*, Transcript of Oral Argument at 15, *Freddie Mac*, 03 CV 4261, Ex. 6 to the Golan Decl. (noting that courts are "required to choose the maximum class period and let the jury determine if it was something less"); *In re Refco,* 503 F. Supp. 2d at 656-67 (rejecting defendants' attempt to shorten proposed class period at motion to dismiss stage on the basis that the market was on notice that company's financial statements were unreliable); *In re Interpublic*, 2003 WL 22509414, at *5 (same); *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y.1993) (declining to rule, at class certification stage, on the "factual issue of whether there had been a proper curative disclosure"); *Bharucha v. Reuters Holdings PLC*, No. 90-3838, 1993 WL 657863 at *3 (E.D.N.Y. Oct. 29, 1993) ("This court will not inquire into the merits of this case by determining which statements [and actions by the defendants] actually opened the door to litigation and which slammed the door shut.").

To the extent the Court is inclined, however, to delve into the merits and determine now when the Class Period should end, it should reject defendants' argument.  The statements in AIG's 2007 Form 10-K, along with the accompanying press release filed on February 28, 2008

and during a February 29, 2008 call with investors, as more fully shown above, were only partial disclosures, and thus did not dissipate the effects of the prior misstatements. And, they were accompanied by other misleading statements that were evidently intended to allay the concerns that AIG investors might have as to the Company's overall financial health and its prospects.

For example, while the 10-K reported a large unrealized loss as of December 31, 2007 in the CDS portfolio, it also stated that the losses resulting from the CDS portfolio's valuation decline would ultimately "reverse," and that "any losses realized over time by AIGFP as a result of meeting its obligations under these derivatives *[would] not be material to AIG's consolidated financial condition*." ¶¶ 360, 364. AIG further represented that, based on risk analyses conducted by AIG's enterprise risk management team and AIGFP, there was no "probable and reasonably estimable realized loss" in the CDS portfolio. ¶ 364. These statements did not merely mask the scope of AIG's risk exposures and potential losses going forward. They also gave the false impression that the principal risks arising from the CDS portfolio were from AIG's obligations to make payments on the instruments, and *not* to liquidity concerns resulting from collateral calls, ratings downgrades, or valuation declines of the referenced CDOs. ¶ 382. This, however, was not the case – as investors would only later come to learn.

The 2007 10-K also downplayed the losses AIG had incurred from invested collateral from its securities lending program. For instance, AIG stated that "during 2007, AIG took steps to enhance the liquidity of its portfolios, including increasing the liquidity of the collateral invested in the securities lending program." ¶ 373. It failed to disclose, however, that at the end of 2005, AIG had made a decision to invest up to 75% of the securities lending cash collateral in RMBS, which could not easily be liquidated to meet repayment demands of borrowers. AIG also misrepresented in the 2007 10-K that AIG received cash collateral equal to 102% of the fair

value of the loaned securities.  In fact, as later admitted in the Second Quarter 2008 10-Q, AIG

did *not* always receive that amount.  Rather, AIG had agreed to deposit its own funds into the

collateral pool to maintain the collateral received at 102%.  ¶ 382.  Additionally, while the 2007

10-K disclosed that AIGFP had received collateral calls from counterparties with respect to

certain CDSs, and that additional collateral calls were possible, AIG also represented that its

"liquid assets, cash provided by operations and access to the capital markets [would] enable it to

meet its anticipated cash requirements, including the funding of increased dividends under AIG's

current dividend policy."  ¶ 372.  Plaintiffs assert with specificity, as shown above, that such re-

assuring statements were materially false and misleading at the time they were made.

Thus, instead of "curing" the market of defendants' prior misrepresentations, the

February 2008 disclosures were themselves false and misleading.  As a result, this Court should

not rule, especially at this stage of the litigation, that as a matter of law no purchaser of AIG

securities after February 28, 2008 can have a claim under Section 10(b) of the Exchange Act.

*See, e.g., United Paperworkers Intern. Union v. Int'l Paper Co.*, 985 F.2d 1190, 1200-01 (2d Cir.

1993) (disclosures in annual report failed to cure materially misleading representations and

omissions in company's proxy statement); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*,

927 F. Supp. 1297, 1306-09 (C.D. Cal. 1996) (defendants' disclosure in Form 10-K insufficient

to counteract the allegedly misleading financial statements and public announcements).

Indeed, there were numerous false statements made after February 28, 2008, as well as

additional partial disclosures that triggered significant further declines in AIG's stock price.  For

example, on May 8, 2008, AIG increased its estimate of unrealized losses on its CDS portfolio to

$9.1 billion as of March 31, 2008, for a total loss of $20.6 billion over 2007 and 2008, and

further disclosed that it had posted an aggregate of $9.7 billion of collateral over the past two

years.  ¶ 533.  On June 6, 2008, AIG reported that it was under investigation by the SEC and by criminal prosecutors with the DOJ and the U.S. Attorney's Office regarding its valuation of the CDS portfolio.  ¶ 534.  On August 6, 2008, AIG disclosed that, with respect to its securities lending program, the cash collateral received from counterparties was less than 102% of the fair value of the loaned securities, and AIG "made up" the difference between what was received and the 102% cash collateral required by the securities lending program.  ¶ 535.  On September 15, 2008, several major rating agencies downgraded AIG's rating to below 'AA' levels, citing, among other things, AIG's inability to raise cash.  ¶¶ 536-37.  As shown in the following section, each of these resulted in significant stock price declines, lending further support to plaintiffs' allegation that the artificial inflation in the prices of AIG stock and other securities were not dissipated by the February 11 and 28, 2008 disclosures.

Then, after the close of the market on September 16, 2008, the last day of the Class Period, the Company announced the $85 billion U.S. Government bailout, which included a revolving credit facility secured by all of the assets of AIG and its material subsidiaries, in exchange for a 79.9% equity stake in the Company.  ¶¶ 218, 538.  This disclosure caused a 46% decline in the price of AIG's common stock, which dropped from $3.75 on September 16 to $2.05 on September 17, 2008.  ¶ 539.  The market prices of AIG's debt securities fell by similar amounts.  For example, its 5.85% Medium Term Notes due January 16, 2018 fell 30% from $47.00 to $32.85; its Equity Units issued pursuant to the May 12, 2008 Shelf Registration Statement fell 31% from $14.07 to $9.70; and its 5.45% Medium Term Notes due May 18, 2017 fell 32% from $43.87 to $30.00.  *Id.*  The September 16, 2008 disclosure and the market's reaction to it demonstrates that even if the prior disclosures to which defendants point in their motions had credibly entered the market, they certainly had not "dissipated the effects of the

false and misleading statements," as is required by the Supreme Court in *Basic*, 485 U.S. at 249, to rebut the presumption of reliance.

Finally, defendant Cassano argues that because he "resigned" as the head of AIGFP as of March 31, 2008, although he remained as a secret consultant to AIG ***at a salary of $1 million per month***, plaintiffs' allegations against him should be dismissed to the extent that they relate to purchases of securities made after that date. This argument is wrong as a matter of fact, as a matter of procedure, and as a matter of law.

The statements Cassano made while he was employed by AIGFP continued to inflate the prices of AIG's securities throughout the Class Period, and they were never fully cured until at least the announcement of the Government bailout, which ends the Class Period. Therefore, Cassano's early departure as a full-time employee does not sever his liability to the Class.

Under the Exchange Act, officers are liable for misstatements they make during the course of their employment, regardless of whether the effects of these statements occur after their termination. *See Klein v. Boyd*, No. Civ. A. 95-5410, 1996 WL 675550, at *2 (E.D. Pa. Nov. 18, 1996). In *Klein*, the defendant was removed from his position as secretary and treasurer of Mercer Securities, Inc. in July of 1993. *Id*. at *1. A month later, in August 1993, the company offered new Class B securities which the plaintiffs purchased. *Id*. at *2. The defendant in *Klein* argued that because the company did not offer the Class B securities until after his termination, he was not liable to the purchasers of them. *Id*. at *2. The court disagreed. It held that because the plaintiffs relied on the misrepresentations and omissions that the defendant made prior to his termination in purchasing Class B stock, he was still liable for the impact of these statements, even though this impact occurred after he was terminated, and even though the purchased securities were of a different class than the one offered while the defendant was

employed with the company.  *Id*.  The court held "[t]he law … does not require that the misrepresentations and omissions be in reference to the specific securities purchased by plaintiffs or the marketing thereof" to hold the defendant liable as a control person with respect to those securities.  *Id*. at *2.

As in *Klein*, Cassano is liable for his Class Period omissions and misstatements that impacted investors even after he lost his officer position with AIG.  As explained above, none of the supposed "curative" disclosures made after Cassano's termination revealed the true state of the Company's CDS portfolio or the multiple and significant risks that it posed to AIG and its shareholders.  ¶ 212.  Thus, false statements attributed to Cassano caused shareholders to incur losses well after February 2008.  *See, e.g.*, ¶¶ 363, 364, 368.[77]

## IV.  Count II of the Complaint States a Viable Claim for Control Person Liability under Section 20(a) of the Exchange Act Against the Executive Defendants

Section 20(a) provides liability for "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable …."  15 U.S.C. § 78t(a).

---

[77]    Cassano argues, citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), that no recovery may be provided for shares sold before or purchased after corrective disclosure because plaintiffs suffered no injury or could not have reasonably relied on defendants' alleged misrepresentations to their detriment.  This analysis is inapplicable here because the limited corrective disclosures made by AIG were incomplete and insufficient to educate investors about the extent of the problems at AIG.  And, as noted above, even the "announcement" of Cassano's termination was materially misleading, since it concealed that he was still employed by AIG as a "consultant" at a salary of $1 million per month.  This fact, which was exposed only after the end of the Class Period, also calls into question whether Cassano was, as he claims, actually outside the management circle responsible for AIG's post February 28, 2008 statements.  Having been paid $1 million per month from March to September 2008, it is a reasonable inference that Cassano was still within the highest management circles at AIG and, therefore, liable for false and misleading statements that AIG continued to make.

It is well-established that the liberal pleading standards of Rule 8 apply to allegations of "control" under § 20(a).  *See In re Global Crossing Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 352 (S.D.N.Y. 2006) (because Rule 8(a) applies to allegations of control under § 20(a), "even if the facts alleged do not, by themselves, permit an inference of control, 'dismissal is improper as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster'") (quoting *In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005)); *In re WorldCom,* 294 F. Supp. 2d at 415-16.  To establish control, a plaintiff needs only show some indirect means of discipline or influence.  *In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009); *see also In re Marsh*, 501 F. Supp. 2d at 494 (control is adequately alleged with allegations that give the defendant fair notice of the claim and the grounds on which the control allegations rest) (citing *In re WorldCom*, 294 F. Supp. 2d at 415-16).

Here, the Complaint alleges that the Executive Defendants "exercised control over AIG and/or AIGFP during the Class Period through the key roles they played in the Company's management and their direct involvement in its day to day operations, including its financial reporting and accounting functions, and therefore caused the Company to engage in the illegal conduct and practices complained of herein."  ¶ 566.  The Complaint also alleges that, as senior executives of AIG and AIGFP, each of the Executive Defendants "were regularly presented to the market as the individuals responsible for AIG's and AIGFP's day-to-day business and operations, as well as the Company's and AIGFP's strategic direction," and "accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, the Company, including AIGFP."  ¶ 568.  The Complaint further alleges that these defendants were also responsible for disseminating

accurate and truthful information to the market regarding AIG's financial statements and for correcting any previously issued statements that had become untrue. ¶ 567.

Moreover, the Complaint contains numerous, detailed allegations regarding the high-ranking positions that these defendants held within AIG and AIGFP, which gave them the power and authority to cause AIG to engage in the alleged § 10(b) violations, as well as the actual control that these defendants exercised over the transactions at issue in this case, including:

- Defendants Sullivan and Bensinger were AIG's highest ranking officers, serving as AIG's President and Chief Executive Officer, and Executive Vice President and Chief Financial Officer, respectively. They were responsible for, among other things, attesting to the accuracy of each of the financial statements disseminated during their tenure and certifying that AIG had designed, established and maintained an effective set of internal controls. ¶¶ 485, 489, 491.[78]

- Throughout the Class Period, defendant Herzog served as AIG's Senior Vice President, Comptroller and Principal Accounting Officer.[79] He then replaced defendant Bensinger as AIG's Chief Financial Officer when Bensinger left the Company in October 2008. ¶ 491.

- As Senior Vice President and Chief Risk Officer of AIG, defendant Lewis was "directly involved in the approval process of every CDS transaction" and was responsible for calculating the risk on each CDS deal AIGFP structured. ¶ 492.

- As President of AIGFP and head of the Assets/Credit Group, defendant Cassano ran AIGFP "with almost complete autonomy, and with an iron hand." He was in charge of the CDS business and further "controlled [AIGFP's] risk management and valuation processes." ¶¶ 129, 132.

---

[78] Specifically, Sullivan signed certifications on AIG's 2005, 2006, and 2007 Forms 10-K and the interim period Forms 10-Q from the 1Q06 through the 1Q08. ¶ 485. Bensinger signed certifications on all of AIG's Forms 10-K and Forms 10-Q during the period from March 16, 2008 through May 8, 2008. ¶ 489. Sullivan also signed each of AIG's Forms 10-K and 10-Q for the fiscal periods from March 16, 2006 through March 31, 2008 and the 2007 and 2008 Registration Statements. Bensinger signed the Company's Forms 10-K for the years 2005, 2006, and 2007, Forms 10-Q for the quarters ended March 31, 2006 through June 30, 2008, and the 2007 and 2008 Registration Statements. ¶¶ 485, 489.

[79] In that capacity, defendant Herzog signed numerous of the Company's financial statements that are alleged to have contained actionable misrepresentations, including the Company's Forms 10-K for the years 2005, 2006 and 2007, Forms 10-Q for the quarters ended March 31, 2006 through June 30, 2008, and the 2007 and 2008 Registration Statements. ¶ 491.

- Defendant Forster was the Executive Vice President of the Assets/Credit Group during the Class Period. In that capacity, he was responsible for supervising the Group's operations and for running AIGFP's global credit division, which contracted to sell the CDS contracts at issue. ¶ 44; *see also* below.

- Defendant Frost was an Executive Vice President of AIGFP and reported directly to defendant Cassano. Frost was based in the Connecticut office and served as the Company's principal liaison with the Wall Street investment banks that were counterparties to the CDS contracts. According to Lead Plaintiff's confidential sources, Frost and Forster "control[led] the flow of information pertaining to AIGFP's super senior CDS portfolio and unilaterally [made] risk management and valuation decisions" on behalf of the Company. ¶¶ 132; 480.

Of the seven Executive Defendants named as control persons, only defendants Forster and Frost seriously dispute that they exercised "control" over AIG. They are incorrect. As the head of AIGFP's global credit trading operations, Forster oversaw the CDS portfolio. He was directly involved in and had substantial knowledge of all of AIGFP's CDS transactions. He also served as a conduit of information from AIGFP to AIG regarding the valuation and financial reporting of the CDS portfolio and thus *had the ability to control the public disclosures that AIG ultimately made about this line of business*. Indeed, defendant Forster held himself out as the principal person in charge of AIGFP's CDS business line during AIG calls with analysts and presentations to investors, when, as plaintiffs allege, he made false and misleading statements.[80] As a result, Forster served as one of the main sources of the misleading information that was

---

[80]    For instance, during a May 31, 2007 investor presentation, which was one in a series of investor presentations on the subject of AIG's exposure to the U.S. residential housing market and subprime mortgage market, Forster discussed the CDS business and stated, among other things, that because of the "conservatism" built in the CDS portfolio, AIG did not have to do a "huge amount of hedging," and if the CDS portfolio "did start to deteriorate, it would be very easy for us to go out, buy an extra layer of protection to make sure that we maintain the sort of super senior portfolio." ¶ 502. Forster also discussed the CDS portfolio during AIG's third quarter 2007 conference call held on November 8, 2007 and during AIG's December 5, 2007 meeting with investors, where he again stressed the remoteness of risk associated with the CDS portfolio and the strength of the assets underlying the CDOs, as well as the rigorous process by which AIGFP scrutinized the underlying loan detail before it entered into a CDS deal. ¶¶ 17, 175.

ultimately reported to the market.  ¶ 502.  Plaintiffs' control allegations as to Forster are therefore more than sufficient.  *See Catton v. Defense Technology Systems, Inc.*, 457 F. Supp. 2d 374, 385 (S.D.N.Y. 2006).

Defendant Frost also acted as a controlling person for purposes of § 20(a) liability. During the Class Period, Frost, who reported directly to defendant Cassano, headed AIGFP's business efforts in the United States, serving as AIGFP's principal liaison with Wall Street investment banks and other dealers in structured securities.  ¶ 570.  Defendant Frost had previously served as a marketing executive of AIGFP, where he was responsible for reviewing and evaluating potential CDS deals on behalf of AIGFP, including during the period from March through December 2005 when AIGFP wrote over 220 CDS contracts.  Thus, defendant Frost was not only intimately involved in the CDS business and the risk management, valuation, and financial reporting decisions concerning AIGFP's CDS portfolio, but he, like Forster, controlled the flow of information to AIG from AIGFP regarding the CDS portfolio and *thereby controlled the public disclosures that AIG ultimately made about the CDS business*.  ¶¶ 266(a), 480.[81]  *See In re Quintel Entertainment Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 298 (S.D.N.Y. 2008).  Since defendant Frost had the ability to control the content of the public disclosures regarding AIGFP's CDS business, he had "power or influence" over AIG, which suffices to establish control at this stage.  *See Silva Run Worldwide Ltd. V. Gaming Lottery Corp.*, No. 96 Civ. 3231 (RPP), 1998

---

[81]    Frost argues that because his marketing duties ended before the beginning of the Class Period, he had no control relationship at the time the primary violations occurred.  However, Frost received a promotion in early 2006, pursuant to which he reported directly to Cassano.  Not only did he bring to this position all of the knowledge he gained as the person responsible for actually writing the CDS deals in 2005 or earlier but, according to confidential witnesses, defendant Frost was also responsible for handling significant discrepancies with CDS counterparties on issues such as the need to post collateral or the amount of collateral to be posted.  ¶¶ 138, 480.  He was, therefore, in a key position of control over AIGFP relating directly to the valuation of the CDS portfolio.

WL 167330, at *13 (S.D.N.Y. April 8, 1998); *see also In re WorldCom,* 294 F. Supp. 2d at 415-

16 (for purposes of pleading the control element of a § 20(a) claim, "[a] short, plain statement

that gives the defendant fair notice of the claim that the defendant was a control person and the

ground on which it rests its assertion that a defendant was a control person is all that is

required"); *In re Metawave Commc'n Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D.

Wash. 2003) ("At the motion to dismiss stage, general allegations concerning an individual

defendant's title and responsibilities are sufficient to establish control.").[82]

Accordingly, the element of "control" has been adequately pled as to each of the

Executive Defendants for purposes of § 20(a).

Defendants further argue that even if control is adequately alleged the Complaint fails to

set forth sufficient particularized allegations of their "culpable participation" in the fraud.  In this

context, plaintiffs recognize that some courts in this Circuit apply the PSLRA's heightened

pleading requirements to the "element" of culpable participation.  *See, e.g.*, *Edison Fund v.

Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008); *Lapin v. Goldman

Sachs Group, Inc.*, 506 F. Supp. 2d 221, 244-245 (S.D.N.Y. 2006).  However, a separate and

more compelling line of cases in this Circuit holds that culpable participation is an affirmative

defense under § 20(a) and, therefore, need not be pled with specificity, if at all.  *See In re*

---

[82]    Frost cites to case law suggesting that it is insufficient for a plaintiff to plead "a bare
allegation of officer status."  Frost Mem. at 7, n.6.  Here, however, plaintiffs have done much
more than simply recite the individual defendants' positions.  With respect to Frost, plaintiffs
have asserted how failures to disclose key facts about the CDS portfolio, which Frost and a few
other AIGFP executives created and maintained, caused many statements within AIG's filings
with the SEC to be materially false and misleading.

Frost also asserts that he only had some responsibility for marketing the CDS portfolio until late
2005, which was prior to the start of the Class Period.  Frost Mem. at 8-9.  As Plaintiffs explain
herein, however, Frost was involved in the CDS business even after he changed positions –
subsequent to which he reported directly to Cassano - and further took to his new position all of
the knowledge he had gained by marketing the CDSs in 2005 and prior.

*Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 554 (S.D.N.Y. 2007); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003); *In re WorldCom,* 294 F. Supp. 2d at 414-16. As those cases demonstrate, for various reasons, including the words of § 20(a) itself, while a defendant can seek to prove, as an affirmative defense, that she did not culpably participate in a fraud, the controlling person provision in the Exchange Act does not require a plaintiff to plead such culpable participation.

Even if culpable participation must be pled affirmatively in a complaint, as this Court stated in *In re Authentidate Holding Corp.*, No. 05 CIV 5323 (LTS) (DFE), 2006 WL 2034644, *7 (S.D.N.Y. July 14, 2006) and 2009 WL 755360, *2 (S.D.N.Y. Mar. 23, 2009), the Complaint here clearly alleges that element with respect to each of the Executive Defendants. First, all Executive Defendants except defendant Frost are Section 10(b) Defendants. With respect to these Executive Defendants, courts in this District have recognized that the pleading requirements for "culpable participation" are clearly satisfied by allegations that satisfy pleading requirements for scienter. *See, e.g., In re Global Crossing*, 471 F. Supp. 2d at 351. Accordingly, plaintiffs' allegations establishing a strong inference of the Section 10(b) Defendants' scienter, as discussed above in Section II, satisfy the pleading requirements for culpable participation as to those defendants. Thus, the controlling person allegations against the Executive Defendants who are also are Section 10(b) Defendants are clearly sufficient.

Moreover, even courts that have required an affirmative pleading of culpable participation allow that pleading to be made pursuant to the notice pleading requirements of Rule 8, rather than the particularity standard of Rule 9(b). *In re Vivendi*, 381 F. Supp. at 189-90 (after considering the pleading requirements for culpable participation, court concluded that "a § 20(a) claim needs to be pled only in accordance with Rule 8(a)") (citing *Suez Equity Investors,*

*L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)); *see also In re IPO*, 241 F. Supp. 2d at 395-96 (culpable participation is a less demanding standard than scienter). Thus, even if this Court were to decide that culpable participation allegations must be pled, and that there are Section 10(b) Defendants against whom scienter has not been sufficiently pled, there are still viable grounds on which to assert § 20(a) control person claims against them.

Finally, with respect to defendant Frost, who is the only Executive Defendant not named as a Section 10(b) Defendant, the Complaint also sufficiently pleads that he was, "in some meaningful sense," a culpable participant in the fraud. *See In re Refco,* 503 F. Supp. 2d at 661 (allegations of motive to commit fraud or allegations of recklessness suffice to support an allegation of culpable participation); *Sedona Corp. v. Ladenthal Thalmann & Co.*, No. 03-Civ-3120 (LTS) (THK), 2006 WL 2034663 (S.D.N.Y. July 19, 2006) (finding control person liability adequately pled against certain defendants regardless of whether scienter was alleged).

First, defendant Frost's substantial financial incentive establishes his culpable participation. He, like the other AIGFP executive defendants, received massive annual cash bonuses. These bonuses were based solely on the annual income reported by AIGFP, without accounting for any losses suffered. ¶ 513. Accordingly, while he was aware that the CDS portfolio was substantially unhedged and, therefore, exposed to substantial risk and the potential for massive losses, he decided, along with the other AIGFP executives, not to hedge the risk relating to that portfolio, or sell or re-insure a portion of that risk. This continued even after it became apparent that the value of CDOs backed by subprime loans was deteriorating. ¶ 513. Such hedging would have had an adverse effect on AIGFP's profitability and, as a result, on Frost's compensation, thereby providing him with the same motive to overstate the value of the CDS portfolio, and minimize its inherent and growing collateral and balance sheet risks, as

defendants Cassano and Forster.   ¶ 351(d); *see also In re Refco*, 503 F. Supp. 2d at 663 (S.D.N.Y. 2007) (allegations of motive based on fact that defendants stood to profit "personally and directly" from fraud were sufficient to show culpable participation).

Defendant Frost's culpable participation is also demonstrated by the fact that he, like the other AIGFP executive defendants, took advantage of the lack of internal controls and risk management systems with respect to the Assets/Credit Group in order to unilaterally make risk management and valuation decisions, and ultimately control the flow of information pertaining to the CDS portfolio.   For instance, one of defendant Frost's primary responsibilities was to review and evaluate potential CDS deals on behalf of AIGFP.   He often failed, however, to request critical, loan-level information from counterparties, even though he knew that, without such information, AIGFP could not properly price or evaluate the risks associated with the transactions.   ¶ 570.   Additionally, Frost knew that the financial model created by Professor Gorton, and utilized by AIGFP in determining whether to issue CDS contacts, did not analyze the impact of the potential for AIG rating downgrades or market valuations that might trigger collateral calls.   Frost, along with defendant Forster, was responsible for overseeing this process, but failed to provide Professor Gorton with "data such as loan level variables," instructing him instead to "just use summary level statistics on the collateral."   ¶ 483.

Accordingly, Frost knew, or was reckless in not knowing, that the information he and his AIGFP colleagues were providing to AIG regarding the CDS portfolio was false, and that this false information would ultimately be communicated to investors.   In that regard, even though he himself did not make any actionable public statements, defendant Frost was a culpable participant in the fraud.   In similar contexts, courts in this District have held that when "a subsidiary provides false or misleading financial information to a parent, knowing that the

information will be communicated to investors, it can be held liable for the statements made by the parent." *In re Alstom SA*, 406 F. Supp. 2d 433, 464 (S.D.N.Y. 2005) (citing *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998)) (noting that the subsidiary should be held liable for parent's statements since it was the entity where the actual fraud had occurred and the source of the misleading financial information communicated to investors by the parent). The same principle applies here to Frost, as well as Cassano and Forster.

These allegations are sufficient to show that Frost, along with each of the other Executive Defendants, culpably participated in the fraud. *See In re Pfizer,* 584 F. Supp. 2d at (allegations that individuals "participated directly in the day-to-day management of Pfizer and made strategic decisions" were sufficient to plead culpable participation); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364-65 (S.D.N.Y. 2005).

## V.  **Plaintiffs Sufficiently Plead Loss Causation**

### A.  **Plaintiffs Plead a Series of Corrective Disclosures That Led to Market Declines**

In order to plead loss causation, "[a]ll that is required at this stage is a showing by plaintiffs that Defendants' misstatements concealed something from the market, and that its disclosure negatively affected the value of the security." *In re Moody's*, 599 F. Supp. 2d at 512 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). Here, plaintiffs have clearly met their burden of pleading loss causation by citing to a series of public reports correcting prior false and misleading statements that resulted in significant drops in the price of AIG's stock. *See* ¶¶ 528-540.

The Second Circuit has held that in order to plead loss causation, a plaintiff must allege that (1) a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security, and (2) the loss was a foreseeable consequence of

the misrepresentation or omission. *Lentell*, 396 F.3d at 174. There are generally two methods to plead loss causation: (1) that a corrective disclosure of a previously concealed truth caused a decline in the stock price; *or* (2) that materialization of a concealed risk in the form of unfavorable developments caused the stock price to drop. *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006). As the court stated in *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008), with respect to the second method: "[W]here some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled."

Plaintiffs meet both prongs for pleading loss causation. First, as shown in detail above, plaintiffs satisfy the misstatement prong by pleading that the Section 10(b) Defendants misrepresented: (1) the value of, and risks inherent in, the CDS portfolio; (2) the Company's risk management practices; (3) the actual practices employed by the securities lending program; and (4) the Company's financial condition and performance. ¶ 514. Later, when the truth came out with respect to these subjects, the prices of AIG's securities materially declined as the artificial inflation dissipated. ¶ 514. The Complaint further alleges that as a result of their purchases of AIG securities at artificially inflated prices, plaintiffs suffered economic loss when subsequent disclosures removed the inflation from such securities. ¶ 515.

The Complaint alleges that the false and misleading statements and material omissions caused AIG's common stock to trade at artificially inflated levels, reaching a high closing price of $72.65 per share (¶ 516), and as AIG's corrective disclosures revealed the truth, the common stock lost nearly all of its value, closing on September 17, 2008 at $2.05 per share. *Id.* As more fully described below, the correction of the Section 10(b) Defendants' fraudulent statements and omissions was the cause of the actual loss suffered. *See Lentell*, 396 F.3d at 173.

The Complaint also satisfies the "foreseeability" prong for pleading loss causation. In order to show that a loss was a foreseeable consequence, a plaintiff must allege that the risk "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor." *Lentell*, 396 F.3d at 174 (emphasis in original). Here, plaintiffs allege that it was foreseeable that as a result of the false statements and omissions from AIG and the other Section 10(b) Defendants, the market prices of AIG's stock would continue to trade at artificially inflated levels. Thus, for example, even after AIG reported its second quarter 2007 results, its stock continued to trade in the range of $64 to $66 per share (¶ 521), and after the investor meeting on December 5, 2007, AIG's stock price *increased* to $58.15 per share, which was a $2.50 per share increase from the day before (¶ 526).

It was certainly foreseeable that losses would have occurred had the concealed risks in the CDS portfolio, risk management practices, securities lending program, and internal controls been disclosed accurately and fully to investors at those times. *See Suez Equity*, 250 F.3d at 97 ("it would have been foreseeable to defendants that facts concealed ... would have indicated [the executive's] inability to run the Group, and would have forecast its (eventually fatal) liquidity problems"). In particular, it was foreseeable that the prices of AIG's securities would have materially declined had AIG reported: (i) the significant amount of collateral AIG would be forced to post (¶ 525); (ii) that the valuation adjustments disclosed during the December 5 investor meeting were derived from improper valuation methods that understated the loss on the portfolio by more than $4.3 billion (¶ 529); and (iii) that it had a material weakness in its internal controls over financial reporting and oversight related to the CDS portfolio, including its valuation (¶ 529).

As AIG acknowledges, plaintiffs plead a series of partial corrective disclosures. AIG Mem. at 71, citing ¶¶ 517-539. Indeed, as the court found in *In re IMAX*, 587 F. Supp. 2d at 485, in language equally applicable here, truth can be "revealed not in a neat and tidy single disclosure," but, rather, in a series of disclosures that revealed AIG's fraud and led to plaintiffs' losses. Here, that series of disclosures is pled in ¶¶ 530-539 of the Complaint, where plaintiffs also allege the correlation between defendants' corrective disclosures and immediate and significant drops in AIG's stock price.

AIG argues that plaintiffs' allegations are simply "nonactionable 'bad news.'" AIG Mem. at 70, 72. As the court held in *In re Moody's*, this argument is also "untenable [here,] given the drops in the stock price" pled in the Complaint. 599 F. Supp. 2d at 512. In any event, however, it is clear that the Complaint alleges a significant number of corrective disclosures, which led to stock price declines that were *directly related* to the previously misrepresented or concealed material information. For example, the Complaint pleads the following corrective disclosures and the consequent price drop from these disclosures:

- February 11, 2008: AIG admitted in a Form 8-K that its prior statements about losses incurred in the CDS portfolio *had been understated by more than $4.3 billion*, its prior use of "negative basis adjustments" *had been improper* under GAAP, and it further admitted to a material weakness in its internal controls over financial reporting of the CDS portfolio. ¶¶ 182-189, 352-357, 528-529. The market reacted immediately and negatively to this news. On February 11, 2008, AIG's common stock dropped from $50.68 to $44.74 per share, reflecting a loss of 11.7%, or $5.94 per share. ¶ 530; *see also* ¶ 188 (citing article in *The Wall Street Journal* on February 12, 2008, which stated, *inter alia*: "Late last year, AIG went to great lengths to tell investors about the Company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller just above $1 billion for October and November.").

- February 28, 2008: AIG's 2007 Form 10-K included additional disclosures that indicated that the Company's prior statements regarding losses on its CDS portfolio were false and misleading, and that the cumulative value of its CDS portfolio had dropped by $11.5 billion. ¶¶ 189-194, 358-382, 528, 531-532. AIG further disclosed, for the first time, that it had repurchased $754 million of these securities, and had provided third parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional

CDOs over the next three years.  *Id.*  As a result, the market price of AIG common stock dropped from $52.25 to $50.15 per share, a loss of $2.10 per share, or approximately 4.02%. ¶ 532.  The next day, after the February 29, 2008 conference, AIG's stock fell another $3.29 per share, a loss of 6.56%.  *Id.*[83]

- <u>May 8, 2008</u>:  AIG issued its Form 10-Q for the first quarter 2008 in which it increased its estimate of unrealized losses on its CDS portfolio in 2008 to $9.1 billion as of March 31, 2008, disclosed that it had posted an aggregate of $9.7 billion of collateral over the past two years, and stated, contrary to Sullivan's statement in February 2008, that AIG would seek to raise $12.5 billion through equity offerings. ¶¶ 198-201, 383-403, 533.  As a result of this announcement, AIG's common stock price fell from $44.15 on May 8 to $38.37 per share on May 12, 2008, a drop of $5.78 per share, or 13%. ¶ 533.

- <u>June 6, 2008</u>:  With the announcement that the DOJ and SEC were commencing investigations of AIG and statements made concerning its CDS portfolio, AIG's stock price fell from $36.41 on June 5, 2008 to $33.93 per share on June 6, 2008, a 6.8% decline. ¶¶ 206-207, 410-411, 534.[84]

- <u>August 6-7, 2008</u>:  AIG announced its second quarter 2008 results, including the first disclosure that AIG had "made up" the difference between the 102% of the cash collateral required by the securities lending program if the counterparties had put in only 100% of the cash collateral. ¶¶ 208-213, 412-422, 535.  The Company also announced unrealized market valuation losses of $5.6 billion for the second quarter 2008 and market valuation losses of $14.7 billion for the first six months on its CDS portfolio. ¶¶ 208, 413, 535.  The new CEO, Willumstad, bluntly acknowledged that AIG's risk concentration in the U.S. housing market had been too high: "[Y]ou see again in retrospect much of the problems that have come about have been a concentration of risk in the U.S. housing market both in the investment portfolio and the credit default swap book."  As a result of these disclosures, on August 7, 2008, AIG's common shares fell from $29.09 to $23.84 per share, a loss of $5.25 per share, or 18%.  *Id.* at ¶¶212, 535.

---

[83]      While acknowledging the liquidity puts, the repurchases and the provision of liquidity facilities (presumably due to collateral demands by CDO counterparties), AIG did not disclose the identity of the counterparties that had made collateral demands, or the range of differences between AIG's valuations of CDS contracts and the counterparties' valuations of their CDS contracts. ¶ 192.

[84]      Courts commonly treat announcements of government investigations into the subject matter of the fraud as corrective disclosures.  *Lapin*, 506 F. Supp. 2d at 243 ("[T]he announcement by the regulators in April 2002 could establish that … it was finally revealed to the market that Goldman's research reports were not objective and independent as touted and that they were heavily manipulated by investment banking pressures."); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (plaintiffs sufficiently alleged loss causation where defendants announced that the SEC was conducting an informal inquiry to determine whether there had been violations of securities laws).

- <u>September 15, 2008</u>:  Based on their reviews of AIG's actual operating and capital positions, the rating agencies downgraded AIG's credit ratings to below "AA" levels.  ¶¶ 217, 536-537.  As a result of these and other disclosures, on September 15, 2008, the price of AIG's common shares fell from $7.12 to $4.76 per share, a loss of $2.36 per share or 33%.  ¶¶ 217, 536.

- <u>September 16, 2008</u>:  After the close of the market, the last day of the Class Period, AIG issued a press release announcing the terms of the $85-billion Government bailout of AIG.  ¶¶ 218-219, 538-539.  This announcement finally revealed that the Company's prior representations that its balance sheet was sound (a "fortress") had been highly misleading, and that, in fact, the Company was not able to survive without this massive outside cash infusion.  With this disclosure, AIG's common stock fell from $3.75 to $2.05 per share from September 16 to September 17, 2008, a 46% decline.  ¶¶ 218, 539.

Thus, the market declines were not simply the result of "bad news" (although, clearly, there was much "bad news" that investors did not expect due to prior misrepresentations) but, rather, corrective disclosures that led to the declines in AIG's stock price.[85]

> **B.**    **Defendants' Argument that Plaintiffs' Losses Were Caused by the Overall Economic Recession, Rather than the Fraud Pled in the Complaint, Is Wrong As a Matter of Fact and Improper Because Loss Causation Is a Matter of Proof at Trial**

To dispute loss causation, AIG attempts to blame plaintiffs' losses on "the deepest economic recession since the Great Depression."  AIG Mem. at 70.  In so doing, however, AIG mischaracterizes plaintiffs' claims.  The crux of plaintiffs' allegations is that even though AIG was plainly aware of the downward turn of the housing and mortgage markets, AIG executives

---

[85]    In addition, the disclosure during a conference call on August 9, 2007 of the fact that the CDS portfolio was exposed to subprime mortgage debt caused a 3.3% decline in the price of AIG's stock, although the price of the stock continued to be substantially inflated due to the fact that this disclosure was coupled with false and misleading statements about the portfolio and the risks it posed to AIG.  As one analyst stated "[d]uring the conference call, management spent a great deal of time reviewing its subprime mortgage exposures.  To be succinct, AIG believes that it has little in aggregate exposure to subprime defaults.  We believe this disclosure should satisfy most investors' concerns about the company's exposure."  ¶ 521.  As a result, the market price of AIG's stock remained within the range of $64 to $66 per share before and after the second quarter 2007 results were announced.  ¶ 522.

continually downplayed AIG's risk of exposure to subprime debt and attempted to persuade investors it was in much better condition than other companies involved in the subprime market.

AIG also attempts to argue that because the broader financial market fell during the latter portion of the Class Period, plaintiffs have failed to adequately plead loss causation. AIG Mem. at 71. However, the very chart that AIG uses to support its point, in fact, shows that on the days of AIG's most revealing disclosures, AIG's stock fell by far greater amounts and percentages than the broader financial market.

AIG uses the XLF Financial Select Sector SPDR fund as its purported representative sample of the broader market.[86] However, AIG stock actually fell at a pace much greater than the index proposed by AIG. Overall, from February 11, 2008 until September 17, 2008, AIG's stock fell by $42.69 per share, from $44.74 to $2.05, suffering a whopping loss of 95%. During this same period, the XLF index proposed by defendants fell from $26.52 to $18.55, for a loss of only 30%. And on days of the curative disclosures asserted in the Complaint, the prices of AIG stock fell by far greater amounts and percentages than the XLF index. For instance, on February 11, 2008, while AIG stock suffered an 11.7% loss, the XLF fund fell by only 2.21%. On May 8, 2008, AIG stock fell by 13%, while the XLF fund actually *increased* by 1.18%. And, on September 15, 2008, as AIG stock plummeted by 33%, the XLF fund only fell by 3.29%. (Source of data: *http://finance.yahoo.com/.*) Thus, even without the benefit of discovery and expert testimony, it is plain from a simple examination of AIG's stock price compared to the index defendants selected for this purpose, AIG's stock dropped disproportionately to the

---

[86]    It must be noted that AIG's entire argument in this regard, including its selection of a baseline index against which to compare the movements of AIG's stock, is improper on a motion to dismiss, as explained below. Rather, it is a subject of expert testimony. Nonetheless, as demonstrated herein, even using AIG's proposed index, the movements in AIG stock show significant correlation, over and above the index, to disclosures relating to the false statements asserted in this case.

financial industry sector, and thus AIG's stock drop was not solely caused by a broader market downturn. Indeed, it is more likely that the steep decline in AIG's stock caused the entire index to decline.

In any event, the question of loss causation in these circumstances is not appropriate to resolve at this stage, but should be reserved for trial. In *In re Moody's*, 599 F. Supp. 2d at 513-14, defendants similarly disputed loss causation on the basis that the plaintiffs' losses were due to a market wide downturn in the credit-ratings industry at the time of the alleged corrective disclosures. *Id.* The court held, however, "[i]f there was such a downturn, one would expect the stock prices for Moody's competitors to fall along with that of Moody's, but the stock prices revealed the opposite." *Id.* The *Moody's* court found that, given the competitors' stock did not fall as far or even rose during the relevant period, it could not conclude that there was an industry-wide downturn, and the question of loss causation due to an intervening event was to be resolved at trial. *Id.* at 513-14.

Moreover, while AIG quotes at length from *Lentell v. Merrill Lynch* in support of the argument that plaintiffs' losses are due to the economic downturn (*see* AIG Mem. at 72), it omits a critical part of that court's holding on loss causation – namely, that this issue raises questions of fact not appropriately decided at the motion to dismiss stage. As the *Lentell* court stated:

> [I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, *the chain of causation ... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss*.

396 F.3d at 174 (emphasis added). Thus, as the Second Circuit held, the chain of causation in this case should be determined at trial, not in ruling on a Rule 12(b)(6) motion, and any "disentangling" of the effect of the economic recession from AIG's fraudulent statements, as AIG suggests must be done (AIG Mem. at 70), should be done through expert testimony, after

discovery, and at trial. This is because loss causation, as the *Lentell* court further stated, "is a fact-based inquiry." *Id*. at 174. As a result, in cases such as this, an expert witness is often required where the defendant claims a "marketwide phenomenon" to be the cause of the losses incurred by plaintiffs. *Id*.; *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1264 (N.D. Okla. 2007), *aff'd*, 588 F.3d 1130 (10th Cir. 2009) ("So where there is both an industry-wide debacle … accompanied by an abundant flow of bad news, unrelated to the fraud, … the non-fraud 'contributing forces must be isolated and removed. This is often done, as it was here, with the help of an expert witness.'").

For this reason, courts routinely deny motions to dismiss premised on alternative causes for stock price declines. *See, e.g., In re IMAX*, 587 F. Supp. 2d at 486 ("To survive a motion to dismiss, a plaintiff need only provide 'some indication of the loss and the causal connection [he or she] has in mind.' … Accordingly, the defendants will be entitled to interpose their defense of intervening facts, such as the fact of the failed merger and acquisition discussions, at trial."); *Nathel v. Siegal*, 592 F. Supp. 2d at 467 ("The existence of intervening events that break the chain of causation, such as a general fall in the price of stocks in a certain sector, is a 'matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'"). Similarly, in its ruling on the dismissal motions filed in *In re Countrywide*, the court rejected defendants' claims that losses resulted solely from an intervening "unprecedented" downturn in the credit and mortgage markets, holding, "[t]he issue at present is *whether* the alleged securities violations caused a loss. Not *how much* of the loss the alleged violations proximately caused." 588 F.

Supp. 2d at 1173-74. Thus, AIG's arguments that the economic downturn in the residential housing market purportedly caused plaintiffs' losses are premature and improper at this stage.[87]

Accordingly, plaintiffs have adequately alleged the loss causation elements of their Exchange Act claims, and therefore, these claims should be upheld in their entirety.

**POINT TWO - THE COMPLAINT ASSERTS
VIABLE SECURITIES ACT CLAIMS**

**I.    Background Facts Relating to Plaintiffs' Securities Act Claims**

The Securities Act creates causes of action for materially false statements or omissions made in connection with the sale of securities against an issuing company, underwriters of offerings, executives and directors who sign registration statements, and experts, such as outside auditors, who with their consent are named as having prepared or certified any part of a registration statement.  Here, the Complaint asserts a series of strict liability and negligence claims under the Securities Act against each of the defendants for the dissemination of offering materials that contained misleading statements and omissions.[88]  These claims arise from 101

---

[87]    The court in *Stumpf v. Garvey*, No. 03-CV-1352-PB, 2005 WL 2127674, at *12 (D.N.H. Sept. 2, 2005), similarly rejected the defendants' argument in that case that the complaint should be dismissed based on lack of loss causation.  There, the plaintiffs were purchasers of stock in TyCom, a provider of internet bandwidth.  Plaintiffs alleged that the defendants falsely represented the supply and demand for undersea bandwidth, and that when defendants finally disclosed the demand for bandwidth could not keep pace with supply, the price of the stock fell. Defendants moved to dismiss on the ground, *inter alia*, that the entire market for telecommunications stocks reacted negatively to the revelation and, therefore, that plaintiffs had not adequately alleged loss causation.  *Id.*  The court rejected this argument, finding that (a) the complaint was sufficient to establish that the drop in TyCom's stock price was causally related to defendants' prior alleged misrepresentations (*id.* at *13), and (b) even if the entire market for telecommunications stocks fell, its collapse was arguably not an intervening event but, rather, the proximate result of defendants' misrepresentations of the demand for and supply of bandwidth capacity (*id.* at *12, n.15).

[88]    Specifically, plaintiffs assert (i) a Section 11 claim against AIG and its directors and executives who signed the registration statements, alleging that AIG is strictly liable for issuing securities pursuant to registration statements that contained materially untrue statements and omissions, and that the individual defendants are liable because they signed the registration

public offerings made by AIG during the Class Period, ¶¶ 591-592, pursuant to three Shelf Registration Statements, dated June 12, 2003 (the "2003 Shelf Registration Statement"), June 27, 2007 (the "2007 Shelf Registration Statement") and May 12, 2008 (the "2008 Registration Statement") (collectively, the "Registration Statements"), and supplemented by final offering documents for each specific offering. These registration statements incorporated by reference the Company's 10-Ks, 10-Qs and 8-Ks that contained misleading statements and omissions, ¶¶ 595-596, as well as AIG's audited financial statements. ¶¶ 599-606. AIG obtained over $27 billion from these offerings, including $3.6 billion specifically designated for AIGFP, and $12.5 billion from a May 2008 offering. ¶¶ 464, 468.

The offerings that give rise to the Securities Act claims include: (1) offerings from October 13, 2006 to July 10, 2007, pursuant to the 2003 Registration Statement; (2) offerings from July 19, 2007 to February 8, 2008, pursuant to the 2007 Registration Statement; and (3) offerings on May 12, 2008, pursuant to the 2008 Registration Statement. ¶¶ 591-592. The Offering Materials incorporated documents, as follows:

> For Offerings dated October 13, 2006: 2005 Form 10-K; 1Q06 and 2Q06 Forms 10-Q; and accompanying Forms 8-K
>
> For Offerings between November 10, 2006 and February 28, 2007: 2005 Form 10-K; 1Q06, 2Q06 and 3Q06 Forms 10-Q; and accompanying Forms 8-K

---

statements without making a reasonable investigation or having reasonable grounds to believe that the registration statements were not misleading (Claim for Relief Three); (ii) a Section 11 claim against the Underwriter Defendants for serving as underwriters on offerings that were issued pursuant to registration statements which included false or misleading material statements or omissions without performing a reasonable investigation (Claim for Relief Four); (iii) a Section 11 claim against PwC for issuing audit opinions for AIG's 2005 and 2006 10-Ks that were incorporated by reference, with PwC's consent, in the registration statements and supplements; (iv) a Section 12(a)(2) claim against the Underwriter Defendants for soliciting and selling securities that were issued pursuant to offering memoranda that contained untrue statements of material fact and negligently omitted to state material facts; and (v) a Section 15 claim against certain executives based on their positions as control persons of AIG and AIGFP.

For Offerings between March 1, 2007 and May 9, 2007: 2005 Form 10-K; 1Q06, 2Q06 and 3Q06 Forms 10-Q; and accompanying Forms 8-K

For Offerings between May 10, 2007 and August 7, 2007: 2006 Form 10-K; 1Q07 Form 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between August 8, 2007 and November 8, 2007: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07; Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between November 9, 2007 and December 6, 2007: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K

For Offerings between December 7, 2007 and February 10, 2008: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; accompanying Forms 8-K; proxy statement filed April 6, 2007;

For Offerings between February 11, 2008 and February 27, 2008: 2006 Form 10-K; 1Q07, 2Q07 and 3Q07 Forms 10-Q; proxy statement dated April 6, 2007; and accompanying Forms 8-K;

For Offerings between February 28, 2008 and May 8, 2008: 2006 and 2007 Forms 10-K; 1Q07 Form 10-Q; proxy statements dated April 6, 2007 and April 4, 2008; and accompanying Forms 8-K

For Offerings dated May 12, 2008: 2006 and 2007 Forms 10-K; 1Q08 Form 10-Q; proxy statements dated April 6, 2007 and April 8, 2008; and accompanying Form 8-K.  ¶ 596.

## II.    <u>Legal Standards Governing the Securities Act Claims</u>

### A.    **The Causes of Action**

To recap, the Complaint asserts Securities Act claims under Section 11 (against the Company, the Executive Defendants who signed Registration Statements, the Director Defendants, the Underwriter Defendants, and PwC); Section 12(a)(2) (against the Underwriter Defendants on behalf of class members who purchased securities in the Offerings); and Section 15 (against the Executive Defendants).  With respect to these claims, the Complaint specifically states:

> The facts relevant to claims under the Securities Act are … that AIG's registration statements and prospectuses filed with the SEC with respect to the Offerings contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. …

> The Securities Act claims are not based on any knowing or reckless misconduct on behalf of the Defendants – i.e., they do not allege, and do not sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims under the Securities Act.  ¶¶ 577, 580.

Pursuant to the Section 11 claim, plaintiffs allege that each of the defendants against whom this claim is asserted are statutorily liable for the materially inaccurate statements contained in AIG's registration statements and prospectuses, including AIG's materially false and misleading financial statements incorporated therein, for the each of the offerings set forth above.  15 U.S.C. § 77k.  Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities Act] by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

To establish a Section 11 claim, a complaint need only allege that: (1) the defendant is either a signer of the registration statement, a director of the issuer, an underwriter for the offering, or anyone who consented to be "named as having prepared or certified any part of the registration statement … [or] any report or valuation which is used in connection with the registration statement"; (2) the plaintiff acquired the registered securities; and (3) any part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements not misleading.  15 U.S.C. § 77k(a); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *12 (S.D.N.Y. Jan. 26, 2009).

Liability against the *issuer* under Section 11 "is virtually absolute, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 382. With respect to *underwriters*, their liability is tethered to their duty to conduct due diligence regarding the offering company. *See In re Prestige Brands Holding, Inc.,* No. 05-06924, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006) (citation omitted). As the court stated in *Ross v. Warner,* No. 77 Civ. 243, 1980 WL 1474, at *7 (S.D.N.Y. Dec. 11, 1980): "A claim under section 11 does not require proof of reliance, causation or scienter." Rather, to recover, the plaintiff "need only prove materiality." *Id.* Indeed, "[a]llegations that 'material facts have been omitted' from a registration statement or 'presented in such a way as to obscure or distort their significance' are sufficient to state a claim for violation of Section 11." *In re WorldCom,* 294 F. Supp. 2d at 407 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir. 1991)); *see also Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 209-10 (2d Cir. 1980) (absence of motive or intent does not absolve defendants of liability under Section 11).

Section 12(a)(2) of the Securities Act allows a purchaser of a security to bring a private action against a seller that "offers or sells a security … by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77l(a)(2). A defendant may be liable under Section 12(a)(2) for selling or soliciting the purchase of a security, either directly or indirectly. *Pinter v. Dahl,* 486 U.S. 622, 647 (1988). Underwriters are liable as sellers under Section 12(a)(2). *See, e.g., In re Scottish Re*, 524 F. Supp. 2d at 400; *In re WorldCom*, 219 F.R.D. at 283. Moreover, as with Section 11, Section 12 turn on status, not scienter; thus imposing liability without requiring proof of either fraud or reliance. *Gustafson v. Alloyd Co*., 513 U.S. 561, 582 (1995). Instead, a plaintiff need only show "some causal

connection between the alleged communication and the sale, even if not decisive." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992) (citation omitted).

Under the Securities Act generally, a plaintiff can establish a duty to disclose material information in one of two ways: through an explicit regulatory or statutory requirement; or when the omitted information is otherwise material.  "[A]ny inquiry into alleged material misstatements within a registration statement must focus not on whether 'particular statements, taken separately, were literally true, but whether defendants' representations, *taken together and in context*, would have misled a reasonable investor about the nature of the securities.'"  *In re WorldCom,* 352 F. Supp. 2d at 491 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)); *see also Hoffman v. UBS-AG,* 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993)).  Dismissal as a matter of law is proper only if the alleged omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *see also In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).

### B.      Plaintiffs' Securities Act Claims Should Not Be Subjected to a Heightened Pleading Standard

Defendants argue that plaintiffs' Section 11 and 12(a)(2) counts sound in fraud and, therefore, are deficient because they were not pled with the particularity required by Fed. R. Civ. P. 9(b).  *See, e.g,*. Outside Director Def. Mem. at 2-5; Tse Mem. at 2.  This argument is without merit.

First, as stated explicitly and as clearly as possible in the Complaint, the Securities Act claims are all premised *solely* on negligent or non-intentional conduct, and, therefore, are

governed by Fed. R. Civ. P. 8's pleading standard. *See In re Refco,* 503 F. Supp. 2d at 631-33 (Securities Act claims not subject to heightened requirements for pleading fraud where they disclaim fraud and expressly plead negligence) (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)); *In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 WL 2856519, at *4-5 (S.D.N.Y. July 21, 2008) (Securities Act claims were predicated on negligence and therefore subject only to notice pleading standard of Fed. R. Civ. P. 8(a)).  Indeed, plaintiffs made clear when first describing their claims, *see* ¶¶ 29-30, when introducing the Securities Act claims, *see* ¶¶ 577-580, and each time a new cause of action was asserted, *see* ¶¶ 607, 607, 621, 639, 684 & 696, the Securities Act claims are not premised *at all* on any allegations of fraud or fraudulent intent.  To the contrary, plaintiffs were careful to separate out allegations sounding in fraud from those sounding in negligence in the Complaint.  For example, the Complaint alleges that the Underwriter Defendants, the Director Defendants and PwC:

- Failed to perform a reasonable investigation (*e.g.,* ¶ 628);

- Did not possess reasonable grounds for believing that the statements contained in the Registration Statements were true (*e.g.,* ¶ 615);

- Failed to perform adequate due diligence in connection with the Offerings (*e.g.,* ¶ 626); and

- Acted negligently (*e.g.,* ¶ 678).

Moreover, plaintiffs explicitly did not incorporate by reference any of the scienter allegations contained in the separate heading entitled "Facts Relevant to the Scienter of the Section 10(b) Defendants."  ¶¶ 471-513.  To the contrary, plaintiffs alleged that (a) the statements contained in the offering documents were untrue or failed to contain information necessary to not make them misleading; (b) the defendants failed to disclose information that they would have discovered had they conducted a reasonable investigation, which rendered other

statements by defendants misleading (*e.g.*, ¶¶ 594, 625-629); (c) the Director Defendants signed registration statements that contained untrue statements, without making a reasonable investigation (¶ 615); and, (d) PwC consented to the inclusion in the registration statements of its audit opinions and the Company's audited financial statements that contained material misstatements or omissions (¶ 677).  Thus, short of filing two separate complaints, plaintiffs could not have exercised more care in separating the allegations of fraud from the non-fraud allegations.  Furthermore, many of the defendants in the Securities Act claims – the Underwriter Defendants, PwC and the Director Defendants – are not even named as defendants on the Exchange Act claims in the Complaint.  How, then, could plaintiffs be alleging fraud against them?

This type of careful pleading has been sustained in lieu of filing separate complaints or subjecting the negligence-based claims to heightened pleading requirements  For instance, in *In re WorldSpace Securities Litigation*, 2008 WL 2856519, at *4-5, the complaint alleged that defendants owed a "duty to make a reasonable and diligent investigation" and that the registration statement and prospectus were "negligently prepared."  *Id.* at *5.  The *WorldSpace* court consequently held that the plaintiffs' claims as to the defendants' intent were "carefully couched in the language of negligence," *id.* (citing *In re Refco*, 503 F. Supp. 2d at 632), and denied the motion to dismiss based upon the alleged failure to satisfy Rule 9(b).  Similar results have been reached in well-reasoned decisions in other circuits.  *See In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256, 271, 273 (3d Cir. 2006) (holding that Rule 9(b) is inapplicable where plaintiff "carefully segregated its allegations of negligence against the Officers and BDO from its allegations of fraud against those defendants" and "made it clear that its particular claims for relief under the Securities Act are not based on knowing or reckless misconduct");

*Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223 (1st Cir. 1996) (filing of two separate complaints – one for fraud claims and one for negligence claims – is not necessary if complaint separates fraud-based and negligence-based claims); *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 275405 (D. Ariz. Jan. 30, 2009); *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 (CW), 2005 WL 43463 (N.D. Cal. Jan. 6, 2005). Here, because plaintiffs pled their Section 11 and Section 12(a)(2) claims separately from claims under the Exchange Act, and allege only strict liability and negligence-based misconduct, Fed. R. Civ. P. 8 is the appropriate pleading standard.[89]

## III.    Plaintiffs Adequately Allege Primary Securities Act Violations

### A.    AIG's SEC Filings Contained Materially False and Misleading Statements and Omissions, Thereby Making the Offering Materials Defective

As shown in Point One, Section I above, AIG's SEC filings on Forms 10-K, 10-Q and 8-K included numerous materially false and misleading statements, including in the financial statements and notes thereto contained in its 2005, 2006 and 2007 Forms 10-K. As shown above, the Complaint identifies the false and misleading statements in AIG's SEC filings that were incorporated in the offering documents and explains in great detail why the statements were false and misleading. This establishes a clear predicate for plaintiffs' Section 11 and 12(a)(2)

---

[89]    In arguing against application of the Rule 8 standard to plaintiffs' Securities Act claims, the Director Defendants overreach by suggesting that Rule 9(b) applies, and that it adds a scienter requirement to plaintiffs' Section 11 and 12 claims. There can be no serious dispute that scienter is *not* an element of a *prima facie* Section 11 or Section 12 case. *See Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204 (RWS), 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) (plaintiffs need only allege a material misstatement or omission, finding that neither knowledge nor reason to know is an element in a *prima facie* case). The Director Defendants further cite to a footnote in *In re Morgan Stanley and Van Kampen Mutual Fund Sec. Lit.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, *6 n.12 (S.D.N.Y. April 18, 2006), for the proposition that when Section 11 and Section 12(a)(2) claims sound in fraud, plaintiffs must plead scienter. *See* Dir. Mem. at 8. However, their analysis is undercut by the very case they cite, as the court in *Morgan Stanley* recognized the well-settled law that, unlike claims under Rule 10b-5, claims under "the Securities Act [ ] do not require reliance *or scienter*." *Id.* at *6 (emphasis added).

claims. Having set forth its arguments demonstrating that the Complaint adequately alleges that the statements identified in AIG's SEC filings were false and misleading, Lead Plaintiff will not burden the Court with additional argument on this matter in the context of the Securities Act claims.[90]

> **B.    The Offering Materials Were Deficient Because They Failed to Disclose that Many of the Underwriter Defendants Were AIG's Counterparties on the CDS Portfolio and Participants in its Securities Lending Program**

As described above, AIG's liquidity crisis at the end of the Class Period arose when counterparties to the Company's CDS contracts demanded that AIG post collateral to back its CDS guarantees and when borrowers in AIG's securities lending program demanded the return of their cash collateral. AIG could not meet these "collateral calls" and would have collapsed were it not for the Government bailout. Based on information revealed *after* the Government bailout, it is now known that many of the Underwriter Defendants – the entities that were assisting AIG to raise over $27 billion during the Class Period, including $12.5 billion in the public offerings of May 12, 2008 – were also counterparties to AIG on its CDS contracts and participants in its securities lending program. These included Société Générale, Deutsche Bank,

---

[90]    The Underwriter Defendants appear to misconstrue ¶ 594 of the Complaint as representing, along with the items discussed in ¶ 597 (failure to disclose that many of the Underwriters were also counterparties of AIG with respect to its CDS portfolio and securities lending program) and ¶¶ 598-606 (pertaining to audited financial statements and PwC audit opinions and consents), the sum total of plaintiffs' allegations as to the manner in which the offering documents were false and misleading. *See* Underwriters Mem. at 2. However, by its terms, ¶ 594 states that the registration statements for each of the offerings "incorporated by reference Forms 10-K, 10-Q and 8-K which contained untrue statements of material fact and material omissions." It then articulates a non-exhaustive ("among others") list of the manners in which the incorporated documents contained untrue statements of material fact and material omissions. But, as noted above, there were many additional ways in which the incorporated documents were materially false or misleading. In any event, the substance of the Underwriter Defendants' arguments concerning the specific items in ¶ 594 is addressed in Point One, Section I above, which demonstrates that even these limited topics provide a basis for upholding plaintiffs' Section 11 and 12(a)(2) claims against the Underwriter Defendants.

Goldman Sachs, Calyon, Barclays, UBS, Merrill Lynch, BMO, Bank of America, BNP Paribas, HSBC and Citigroup. ¶ 597. Indeed, Bank of America, SG America (a division of Société Générale), Citigroup, Merrill Lynch, HSBC and UBS were underwriters of the offerings issued in December 2007 and/or May 2008, *after AIG had already received collateral calls on its CDS portfolio*. *See* ¶ 591 (last items). Thus, at least some of the Underwriter Defendants were the same companies that were making and benefiting from the collateral demands that created the undisclosed need to raise capital. *Id.*

The registration statements generally, including the registration statements for the December 2007 and May 2008 offerings, failed to disclose that many of the Underwriters (a) were counterparties to these significant transactions and (b) had made or were in positions to make collateral demands. They further failed to disclose that portions of the sums raised through the offerings would be used to post collateral for the benefit of AIG's counterparties, including the Underwriters. Under the law in this Circuit, AIG and the Underwriter Defendants had a clear duty to disclose this potential conflict of interest. Courts have found actionable a failure to fully disclose conflicts of interest and self-dealing. *See, e.g., S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 198 (1963) ("[S]uppression of information material to an evaluation of the disinterestedness of investment advice 'operated as a deceit on purchasers.'") (citation omitted); *Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir. 1979) (failure to disclose material conflicts of interest and/or self-dealing is actionable under the securities laws); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, **5-6 (N.D. Cal. Aug. 14, 2006); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) ("[investors'] knowledge that their broker-dealers have a conflict of interest … is material.").

This rule applies to underwriters. For example, SEC regulations require a registration statement and prospectus to name the principal underwriters, state the respective amounts underwritten, and "[i]dentify each such underwriter having a material relationship with the registrant *and state the nature of the relationship*." 17 C.F.R. § 229.508(a) (emphasis added). Here, the Underwriter Defendants were obligated to disclose facts concerning their material relationships with AIG and the nature of those relationships. As discussed above, given the extremely important business risk posed by actual and potential collateral calls from CDS counterparties and demands for the return of cash collateral from securities lending program participants, the fact that such demands had and might be received from underwriters of its offerings was material and should have been disclosed.

These conflicts of interest are material not only because these relationships were at the heart of AIG's collapse, but because the conflicts meant that the funds that the Underwriter Defendants were raising for AIG were intended to be *used to make payments to the Underwriters*. In other words, AIG hired the Underwriters to raise money – money that AIG needed to pay the Underwriters. The Underwriter Defendants were like the management of a casino, helping an indebted gambler to borrow the money that the gambler needed in order to pay off the house. Any third party considering a loan to such a gambler because of the casino's "good word" would be interested to know this background. In short, the failure to disclose the conflicts rendered the remainder of the registration statement misleading, since there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

The Underwriter Defendants' arguments to the contrary are wholly unpersuasive.  They argue, for example, that their disclosure that they might engage in transactions with AIG "in the ordinary course of business" was sufficient.  Underwriters Mem. at 25.  Similarly, they cite *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004), to argue that they have no obligation to disclose "ordinary banking arrangements and relationships."  Underwriters Mem. at 26-27.  But, here, there was nothing "ordinary" about the Underwriter Defendants' relationships with AIG.  In fact, the court in *WorldCom* recognizes a distinction between "ordinary" relationships, which need not be disclosed, and "relationships that undermine the independence of an underwriter's judgment about the quality of the investment."  *In re WorldCom*, 346 F. Supp. 2d at 689 (citing *S.E.C. v. Softpoint, Inc.*, 958 F. Supp. 846, 863 (S.D.N.Y. 1997)) (additional citations omitted).[91]  Because the CDS portfolio and securities lending program risks were so significant to AIG, the relationships between the Underwriters and AIG in this regard can hardly be said to be "ordinary."  At the very least, the relationships

---

[91]    In *WorldCom,* the underwriter defendants sought summary judgment on the basis that they had no duty to disclose, in WorldCom's registration statement for its bond offerings, certain private banking and lending relationships between WorldCom's CEO (Ebbers) and certain of the underwriter defendants.  346 F. Supp. 2d at 634.  Principally, to finance his private investments (including in a yacht building business, timber, motels, a trucking company and the largest working ranch in North America), Ebbers had borrowed substantial  amounts of money from certain of the underwriter defendants (or the private banking arms thereof), which loans were collateralized by his WorldCom stock.  *Id.* at 639.  The court held that a jury should decide whether the "relationships between Ebbers and the bankers were so significant, given Ebbers' prominent position within the registrant and his power to affect their selection as underwriters for a bond offering, that a description of that relationship was material and required to be disclosed." *Id.* at 689.  As noted above, this was a summary judgment decision.  Of course, here, a request for summary resolution of the materiality of the conflict at issue is even less appropriate on a motion to dismiss.  Moreover, the conflict in the present action is *more direct* than in *WorldCom*. Here, in the event of continued deterioration in the subprime market, AIG would be contractually obligated to many of the Underwriter Defendants to post billions of dollars in collateral based on CDS contracts and to repay the cash collateral the Underwriters had lodged with AIG to participate in its securities lending program, which obligations ran directly from AIG, the issuer, to the Underwriter Defendants.  This impacted their independence *directly* with respect to the issuer, rather than just the issuer's executives.

between AIG and the Underwriters are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman*, 754 F.2d at 1067.

Indeed, it was not until March 2009 – well after the offerings (and the Government bailout of AIG) took place – that the magnitude of AIG's potential indebtedness to the Underwriter Defendants became apparent. As stated in ¶ 229, in a press release of March 15, 2009, AIG disclosed that between September 16 and December 31, 2008, there were four categories of counterparties who either received payments from AIG or for whom AIG had posted collateral stemming from (a) AIGFP's CDS contracts, (b) AIG's securities lending program, and (c) AIGFP's guaranteed investment agreements ("GIA"). With regard to the CDS portfolio and securities lending program, the press release disclosed the following payments and collateral postings:

- A total of <u>$22.4 billion in additional collateral postings were made for the benefit of CDS counterparties</u>, which included Société Générale ($4.1 billion), Deutsche Bank ($2.6 billion), Goldman Sachs ($2.5 billion), an investment banking unit of Credit Agricole SA named Calyon ($1.1 billion), Barclays ($0.9 billion) and UBS ($0.8 billion);

- A total of <u>$27.1 billion in payments were made to CDS counterparties</u>, which included payments to Société Générale ($6.9 billion), Goldman Sachs ($5.6 million), Merrill Lynch ($3.1 billion), UBS ($2.5 billion), Deutsche Bank ($2.8 billion), Calyon ($1.2 billion), Bank of Montreal ($0.9 billion) and Barclays ($0.6 billion) and Bank of America ($0.5 billion); and

- A total of <u>$43.7 billion in payments were made to AIG securities lending counterparties</u>, which included payments to Barclays ($7.0 billion), Deutsche Bank ($6.4 billion), BNP Paribas ($4.9 billion), Goldman Sachs ($4.8 billion), Bank of America $4.5 billion), HSBA ($3.3 billion), Citigroup ($2.3 billion), Dresdner Kleinwort ($2.2 billion), Merrill Lynch ($1.9 billion), UBS ($1.7 billion), and seven others.

Under *WorldCom*, this enormous actual exposure of AIG to the Underwriter Defendants was required to be disclosed when the offerings were made or, at the least, it represents a materiality decision that must be left to the trier of fact.

Likewise, the Underwriter Defendants' arguments regarding the relationship between the funds raised through the offerings and the collateral obligations to the Underwriters are without merit. Plaintiffs need not show that the funds from the issues were *actually* used to pay the collateral calls, or that the Underwriter Defendants *actually* made decisions based upon the obligations. Rather, as noted above, plaintiffs need only show that there is a "substantial likelihood" that the disclosure of the relationship would have been viewed by a reasonable investor as having significantly altered the total mix of information made available to the investor. Clearly, given the magnitude of AIG's indebtedness to the Underwriter Defendants, dismissal of the conflict of interest allegations is improper because the omissions are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman,* 754 F.2d at 1067.

Though it is not necessary for plaintiffs to prove definitively at this stage, the Complaint demonstrates an exceptionally high probability that offering funds were used to pay the collateral demands. On May 8, 2008, AIG's bond rating was lowered. ¶ 201. On May 9, 2008, several CDO classes that were insured by AIG CDS contracts received a negative rating watch. ¶ 403. Both of these events independently likely triggered a right by AIG's counterparties to demand collateral postings. Between May 8 and May 20, 2008, the public offerings at issue, along with certain private offerings, raised $20 billion, ¶ 202, and on August 7, 2008, AIG admitted that substantially all the funds were used to pay collateral demands. ¶ 417. Since the rating downgrades, as well as valuation declines would have allowed further collateral demands to be

made, it is at least a fair inference that monies raised in the May 2008 offering (as well as monies raised in the December 2007 offerings) were used to satisfy counterparty demands. As *The New York Times* reported on March 18, 2009, the largest recipients of payments or collateral postings owed to them by AIGFP as counterparties on their CDS contracts were Société Générale ($11.0 billion), Goldman ($8.1 million), Deutsche Bank ($5.4 billion), Merrill Lynch ($4.9 billion), UBS ($3.3 billion); Calyon ($2.3 billion); Barclays ($1.5 billion); Wachovia ($1.5 billion), ¶ 230, all of whom were underwriters. ¶ 597.

The Underwriter Defendants' argument that the scope of the duty to disclose is too amorphous, because it does not fit within any sort of "formulaic approach" to materiality (*see* Underwriters Mem. at 29) is without merit. Indeed, courts in the Second Circuit have "consistently rejected a formulaic approach" when assessing materiality. *Ganino*, 228 F.3d at 162. Likewise, their argument that this Court cannot find an omission material without an act of Congress or a specific SEC regulation is meritless. The case that they cite, *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998), is a 10b-5 insider trading case, and does not govern an underwriter's duties under the Securities Act. Moreover, the Underwriter's own cited authority, *WorldCom*, specifically holds that "non-disclosure of an underwriter or issuer's conflicts of interest can constitute material omissions, *even where no regulation expressly compels the disclosure of such conflicts*." *In re WorldCom*, 346 F. Supp. 2d at 689 (emphasis added).

### C.   AIG's Audited Financial Statements and the Notes Thereto, Which Were Incorporated by Reference in the Offering Materials, Subject PwC to Liability Under Section 11

The role of an auditor goes "beyond 'routine services' rendered to a client. They serve the additional role of communicating to investors about corporations and their securities." *In re*

*Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1301 (E.D. Wash. 2007) (internal citations omitted). An auditor's breach of professional responsibility can "jeopardize the achievement of the objectives of the securities laws and can inflict great damage on public investors." *Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 581 (2d Cir. 1979). The Complaint alleges that PwC committed such breaches and, accordingly, asserts a claim against the firm under Section 11 of the Securities Act.

Plaintiffs' Section 11 claim against PwC is premised on false and misleading statements and omissions in AIG's 2005 and 2006 financial statements and footnotes thereto, which were incorporated by reference in the Offering Materials relating to the 2003 and 2007 Shelf Registration Statements. Specifically, AIG's financial statements: (i) failed to disclose and significantly misrepresented in the 2005 and 2006 10-Ks, the material weakness in its internal controls relating to AIG's oversight of AIGFP, the CDS portfolio and its valuation process; (ii) failed to disclose in the 2005 and 2006 10-Ks its significant concentration of risk arising from the Company's exposure to subprime debt; and (iii) failed to disclose in the 2006 10-K that there was a reasonable possibility that the fair value of its CDS portfolio had declined. Each of these failures forms an appropriate basis to assert a Section 11 claim against PwC.[92]

---

[92]    PwC argues that due to the nature of an auditor's opinion, it can be liable only for false and misleading statements contained in audited financial statements and footnotes thereto that were incorporated by reference, with PwC's consent, into the Offering Materials. *See* PwC Mem. at 12 (noting that PwC has no responsibility for unaudited financial statements, AIG press releases, statements made by Company management at investor conferences, and statements that appeared only in the MD&A section of the 10-Ks). Even under this standard plaintiffs have asserted a viable Section 11 claim against PwC. And, as we have also shown, as a corollary to PwC's argument, misstatements in other portions of the 10-K's, including in the MD&A discussions, and misstatements in other SEC filings made by AIG, such as Forms 10-Q and 8-K, which were *also* incorporated by reference in the Offering Materials, can also form the basis of plaintiffs' Securities Act claims against the other defendants, *e.g.*, AIG, the Director Defendants, Underwriter Defendants, and Section 15 control person defendants.

Section 11 establishes liability for auditors where a registration statement contains material misstatements or omissions and where the auditor "has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him."  15 U.S.C. § 77k(a)(4).  *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 310-11 (E.D.N.Y. 2002) ("By asserting that the … Registration Statement contained 'untrue statements of material fact' when it became effective, and that [the accountant] audit opinions appeared with its consent in the Statement, … Class Plaintiffs have stated a claim under Section 11.").  Here, PwC certified financial statements that did not adequately disclose material weaknesses in AIG's internal controls, the credit risk concentrations, and the reasonable possibility that the fair value of the CDS portfolio had declined as of December 31, 2006.  PwC's audit reports and the underlying financial statements for the years 2005 and 2006 were incorporated into AIG's registration statements for the offerings from October 13, 2006 through February 8, 2008, thereby exposing PwC to liability under Section 11 on those offerings.  *See*, *e.g.*, ¶¶ 599-603.

The materiality of an accountant's statement or omission can be established through violations of GAAP or GAAS.  The Complaint alleges that PwC violated both.  ¶¶ 426-443, 644-672.  Financial statements that violate GAAP are presumed misleading.  *See* 17 C.F.R. § 210.4-01(a)(1).  Moreover, since omission of a fact required by SEC regulations is a material omission, *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), omission of a disclosure required by GAAP is likewise material.  Thus, when an accountant certifies a financial statement that violates GAAP, that certification can render the accountant liable under Section 11.  *In re*

*WorldCom, Inc.* 352 F. Supp. 2d at 492.  In addition to GAAP, outside auditors are bound by

GAAS and related Public Company Accounting Oversight Board ("PCAOB") standards.  ¶ 643.

Failure to comply with GAAS can also render a registration statement inaccurate.  *See*, *e.g., In re*

*Metropolitan,* 532 F. Supp. 2d at 1294.

The Complaint contains specific references to GAAP and GAAS standards that were

violated.  For example, the Complaint alleges that the financial statements violated FAS 107 by

failing to disclose AIG's concentration of credit risk arising from its subprime exposure and FAS

5 for failing to disclose in AIG's 2006 10-K a reasonable possibility that the fair value of the

CDS portfolio had declined.  PwC is also alleged to have violated a number of GAAS standards

in connection with its failure to disclose a material weakness in internal controls relating to the

CDS portfolio valuation, including:  AU 311, *Planning and Supervision*, professional obligation

to understand a company's business in the proper context (¶ 662); AU 319, *Consideration of*

*Internal Control in a Financial Statement Audit*, professional obligation to understand a

company's system of internal controls (¶ 663):  and AU 328, *Auditing Fair Value Measurements*

*and Disclosures*, professional obligation to understand AIG's process for arriving at fair value

measurements and disclosures.  (¶ 664).

Despite the obligations imposed on PwC by GAAP and GAAS, PwC failed to find or, at

the least, failed to require AIG to disclose in the 2005 and 2006 10-Ks, material information that

was required to be included in the financial statements to prevent them from being false and

misleading.  Notwithstanding this failure, PwC claims that plaintiffs have not established a duty

on the part of PwC to disclose the omitted information.  PwC's argument is without merit.  First,

PwC's audit opinions stated affirmatively – and falsely – that their audits were conducted in

accordance with GAAS.  Plaintiffs allege, with factual support, those statements were false.  *See*

213

*generally* ¶¶ 644-678.  Indeed, as alleged and shown above, there were affirmative failures to follow GAAP and GAAS requirements that present a *prima facie* case that the omitted information was required to be disclosed.  Second, at this stage of these proceeding, plaintiffs need only plead that the omission was material and that PwC consented to the inclusion of the audited statements and footnotes thereto, and its audit reports in the Registration Statements.  *See In re CINAR*, 186 F. Supp. 2d at 310-11; *accord Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (GAAP and GAAS violations are ultimately established by expert testimony).  Moreover, any resolution of plaintiffs' allegations of GAAP and GAAS violation is inappropriate on a motion to dismiss.  *See In re Global Crossing*, 322 F. Supp. 2d at 339; *Danis*, 121 F. Supp. 2d at 1192; *In re Majesco*, 2006 WL 2846281, at *4 ("Whether any or all of the … statements were, in fact, misstatements in violation of GAAP or GAAS is an issue to be determined at a later date and not on a motion to dismiss.").

Plaintiffs are asserting that AIG's 2005 and 2006 financial statements and footnotes thereto, as well as PwC's accompanying unqualified audit reports, dated March 16, 2006 and March 1, 2007, respectively, attesting to the accuracy of AIG's financial statements, financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting, and the effectiveness of internal control over financial reporting, were materially misleading ***when filed***.  Importantly for purposes of the Section 11 claim, they were also materially misleading when AIG filed its post-effective amendment to the 2003 Registration Statement[93] on July 24, 2006 (which expressly incorporated AIG's 2005 10-K and, with PwC's

---

[93]    While the filing of a new prospectus does not always trigger a new effective date for auditors, a new effective date is established for auditors if a "post-effective amendment contain[ing] new audited financial statements or other information as to which the auditor is an expert and for which a new consent is required" is filed.  S.E.C. Release No. 33-8591, 70 Fed. Reg. 44722-01 (Aug. 3, 2005).  Moreover, plaintiffs are not alleging that PwC is liable for

consent, its March 16, 2006 audit report) and its 2007 Registration Statement on July 13, 2007

(which expressly incorporated AIG 2006 10-K and, with PwC's consent, its March 1, 2007 audit

report). Accordingly, because AIG's offerings from October 13, 2006 through February 8, 2008

were made pursuant to these two Registration Statements (which contained materially

misleading information), *see* ¶¶ 592-596, PwC is subjected to Section 11 liability for each of

those offerings.[94]  For these reasons, and as previously stated, plaintiffs' claims against PwC

should be upheld.

### D.    Plaintiffs Have Standing to Pursue All Securities Act Claims Pursuant to Sections 11 and 12(a)(2)

Plaintiffs satisfy the standing requirements of Sections 11 and 12 because (a) each of the

named plaintiffs purchased equity and debt offerings traceable to at least one of three defective

shelf registration statements in effect during the Class Period, and (b) on a collective basis, the

plaintiffs purchased equity and debt offerings pursuant to all of the shelf registration statements.

Defendants assert that plaintiffs have only identified a purchaser for 12 of the 101 securities

offered during the Class Period and, therefore, lack standing to pursue claims for the other 89

offerings for which no purchaser has been identified. However, for purposes of Section 11 and

12 standing, plaintiffs are not required to have purchased every security offered during the Class

Period where, as here, there were continuous or serial offerings pursuant to and traceable to the

defective shelf registration statements.

---

misstatements in SEC filings - other than the registration statements (or post-effective amendments thereto) and subsequent 10-Ks – such as those filings that AIG expressly incorporated by reference in the 2007 Registration Statement (i.e., certain 10-Qs, 8-Ks, and proxy statements or certain future SEC filings). PwC Mem. at 24-25.

[94]      PwC, of course, raises specific arguments that attempt to refute any contention that it was required to disclose the information that plaintiffs contend was omitted from AIG's financial statements and which rendered them misleading. These arguments are addressed by Lead Plaintiff in Point One, Section I, above.

Lead Plaintiff, SMRS, and the other seven named plaintiffs adequately allege that (1) they acquired securities traceable to each of the three shelf registration statements in effect during the Class Period, and (2) the registration statements share common components — the Forms 8-K, 10-K and 10-Q incorporated therein — that were materially false and misleading. Therefore, plaintiffs possess the requisite standing under Sections 11 and 12(a)(2) to pursue the claims of purchasers of *all* AIG shares, notes and other offerings made during the Class Period which all stem from the same Registration Statements.

Defendants' insistence that the Complaint must identify a purchaser for each of the 101 offerings shows a fundamental misunderstanding of the mechanics of shelf registration and ignores well-established law that a plaintiff with standing to pursue a Securities Act claim on behalf of purchasers of one security of a particular issuer may represent the interests of purchasers of other types of securities of the same issuer where the alleged harm stems from the same wrongful conduct. *See, e.g., In re Countrywide*, 588 F. Supp. 2d at 1165-66 (where the initial shelf registration statement contained an actionable statement or omission common to more than one offering under the shelf registration, "then purchasers in those issuances may be able to trace the same injury to the same registration statement"); *In re DDi Sec. Litig.*, No. 03-7063, 2005 WL 3090882, *6 (C.D. Cal. Jul. 21, 2005) (stock purchasers had standing to assert claims on behalf of note purchasers where the harm was traceable to the same wrongful conduct); *In re Saxon Sec. Litig.*, No. 82-3103, 1984 WL 2399, *7 (S.D.N.Y. Feb. 23, 1984) ("[d]ebentureholders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct.").

In order to have standing to bring a Section 11 claim, "plaintiffs must be able to trace their shares to an allegedly misleading registration statement." *In re Global Crossing Ltd. Sec.*

*Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003).[95]    As explained by Judge Pfaelzer in *Countrywide*, 588 F. Supp. 2d at 1164 (internal quotations omitted):

> Under § 11, if *any part* of the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact, then any person acquiring such security pursuant to the registration statement has standing to sue a variety of participants in the security's issuance…. Thus, standing is satisfied so long as the purchase can be traced to a registration statement containing, in any part, a false or misleading statement as of that part's effective date.

The shelf registration device allows the issuer to file a registration statement with the SEC and then issue delayed, continuous, or serial offerings until they reach the total issuance authorized by the shelf registration.  "Thus, the registration may be 'pulled down' from the shelf to issue securities as needed."  *Id.*  Therefore, continuous or serial offerings under the same initial registration form and base prospectuses qualify *as the same registration statement for Section 11 standing purposes*, so long as the registrations have in common misrepresentations or omissions that were actionable on the effective date.  *Id.* at 1166.  That each new issuance of securities during the Class Period required the filing of a prospectus *supplement* or pricing *supplement* does not change this result where, as here, the amendments were *de minimis* in nature (i.e., merely reflecting a new purchase date and price) and only served to incorporate by reference further SEC filings that also contained false and misleading statements.

Requiring plaintiffs to identify a purchaser for all 101 offerings not only goes beyond the minimum standing requirements under Sections 11 and 12, but such a requirement would prove impractical and result in a massive duplication of efforts in pursuing redundant claims, theories and proofs, all based on the same series of actionable statements.  The large number of offerings under the three shelf registrations at issue were part of a single, continuous offering designed to

---

[95]    Section 12 claims can be based on a prospectus, a much broader set of documents than the registration statement.

give AIG substantial "procedural flexibility" to vary "the structure and terms of securities on short notice" and to "time its offering to avail itself of the most advantageous market conditions." Shelf Registration, S.E.C. Exchange Act Release No. 6499, 1983 WL 408321, at *4 (Dec. 31, 1983). The shelf registrations were designed to make it easier and faster for AIG to raise capital — not to erect barriers for the purchasers of these securities to assert claims.

Beyond their failure to appreciate Section 11's application to the shelf registration device, defendants also ignore the well-settled law that a purchaser of one type of security has standing to pursue claims of purchasers of a different type of security issued pursuant to the same registration statement. In *In re PMA*, the standing of the plaintiffs was challenged because the complaint failed to identify an actual purchaser of one of the securities (the senior debentures) in question. 2005 WL 1806503, at *18. The court rejected the standing challenge, holding that the plaintiffs who purchased senior *notes* "offered pursuant to the same registration statement and allege the same incorrect statements and violations" had adequate standing to represent the purchasers of senior *debentures*. *Id*.

Similarly, in *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 555697, at *7, (S.D.N.Y. March 19, 2004), Judge Cote squarely rejected the argument that the named plaintiffs must include a purchaser for every security offered during the putative class period. There, two different debt instruments (foreign notes and domestic notes) were sold as part of the same registration statement. The standing of plaintiffs to pursue claims based on the foreign notes was contested because none of the named plaintiffs had purchased such an instrument. *Id*. at **6-7. However, because the foreign and domestic notes were offered pursuant to a single registration statement, a named plaintiff's purchase of the domestic notes was sufficient to confer standing to bring suit "on behalf of a class against any and all underwriters of that offering." *Id*. at *7.

*Fleming Companies, Inc. Sec. & Der. Litig.*, No. CIV. A 503-MD-1530-TJW, MDL-1530, 2004 WL 5278716, at **48-49 (E.D. Tex. Jun. 16, 2004), is also instructive.  There the plaintiff *stock* purchasers sought to assert claims on behalf of purchasers of *notes* issued pursuant to the same registration statements.  The court emphasized that the purpose of standing "is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases 'securities' as that term is defined by the Act issued pursuant to a particular registration statement."  *Id.* at *49.  Because both the stocks and the notes at issue were offered pursuant to the same registration statement, the court found that lead plaintiff possessed the requisite "personal stake in the outcome" to confer Article III standing.  *Id.* at **48-49.

Here, Lead Plaintiff, SMRS, purchased stock on the open market and also purchased five sets of AIG notes – four issued pursuant to the 2003 Shelf Registration Statement and amendments thereto, and one issued pursuant to the 2007 Shelf Registration Statement.  ¶ 581. The Complaint also names seven other plaintiffs that purchased securities in offerings during the Class Period traceable to the same series of shelf registration statements, as well as the 2008 Registration Statement for the May 12, 2008 offerings.  ¶¶ 582-586.  Among the other plaintiffs is one, Epstein Real Estate Advisory, that bought AIG notes in three of the fifty-nine series of the AIG-FP notes issued during the Class Period.  Thus, among the eight named plaintiffs, at least one has standing to bring Securities Act claims ***based on each of the three Shelf Registration Statements, which Statements cover all of the offerings made during the Class Period***.

As a result, the injury suffered by SMRS and the other plaintiffs with respect to the notes and other securities they purchased is no different than the injury suffered by purchasers of all other notes and securities issued pursuant to the same Shelf Registration Statements.  For each such purchaser, the cause of injury consists of the false and misleading statements that

accompanied the Shelf Registration Statements, including the SEC filings incorporated therein by reference.[96]

The Underwriter Defendants' reliance on this Court's holding in *In re Authentidate,* 2006 WL 2034644, is misplaced.  There, the complaint alleged that the class members acquired common stock traceable to a 2004 registration statement, but failed to identify a single class member who actually purchased stock traceable to that registration statement.  This Court held that "[b]ecause Plaintiffs *have not alleged that they themselves or other named Plaintiffs* have standing to bring a Section 11 claim" predicated on the registration statement at issue, they lacked standing.  *Id.* at *7 (emphasis added).

Here, however, there is no dispute that SMRS and the additional named plaintiffs purchased securities in or traceable to each of the shelf registration statements that provided the basis for all of the offerings made during the Class Period.  Thus, under this Court's ruling in

---

[96]    The Underwriter Defendants argue that SMRS did not suffer an actual loss with respect to its purchase of the 5.60% Medium-Term Notes, which was issued pursuant to the 2003 Shelf Registration Statement.  However, SMRS clearly suffered losses with respect to the other securities it purchased, including others purchased pursuant to the 2003 as well as the 2007 Registration Statements, and, as such, is capable of pursuing claims on behalf of itself and other purchasers of the notes that did suffer losses, just as it is capable of representing purchasers of securities of the other 89 offerings traceable to the same shelf registration statements.  Should the Court dismiss claims based on specific offerings not purchased by plaintiffs, leave to amend should be granted so that additional purchasers can be brought into the case.

The Underwriter Defendants further argue that because the alleged misrepresentations changed over time, the Court should require that there be a named plaintiff who purchased securities from each of the 101 offerings.  However, plaintiffs purchased AIG securities not only pursuant to all three Shelf Registration Statements but also in offerings made during the first segment of the Class Period (March 2006 to May 2007), during the second segment (May 31, 2007 through February 2008) and during the third segment (March to September 2008).  *See* Preliminary Statement, *supra*, at 4-11, and ¶¶ 581-586 (showing purchases in or traceable to offerings of October 18, 2006, March 6 and 26, 2007, May 18 and 31, 2007, June 1, 2007, July 20, 2007, December 7 and 11, 2007, and May 12, 2008.  As a result, it is clear the plaintiffs bought securities pursuant to Offering Materials that were based on the same alleged misstatements and omissions as purchasers of other offerings, and that they suffered the same types of injuries as purchasers of all of the offerings.

*Authentidate*, plaintiffs have standing to assert the Securities Act claims alleged in the Complaint.[97]  *See also In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 (D.N.J. 1998) (plaintiffs who purchased common stock who alleged an injury under section 11 had standing to bring claims for purchasers of notes traceable to the same offering.).

Finally, the Underwriter Defendants' argument (Underwriters Mem. at 35, n.37) that plaintiffs have failed to adequately plead a purchaser-seller relationship for the Section 12(a)(2) claim is misguided.  First, the Complaint affirmatively asserts that all of the plaintiffs purchased securities in offerings (and that SMRS also purchased some securities in the after-market).  *See* ¶¶ 581-586, 689-690.  Thus, there were direct purchases from the Underwriter Defendants. Second, in this Circuit, the law is that "[p]rivity between the buyer and seller is no longer required in a § 12[(a)](2) action."  *Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 616 (2d Cir 1994) (citation omitted).[98]  However, in the event that the Court requires that the

---

[97]     The Underwriter Defendants' reliance on *In re Friedman's Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1371 (N.D. Ga. 2005), is misplaced.  In *Friedman's*, there was one shelf registration statement filed in December 2001, and two offerings issued pursuant to the shelf registration, one in 2002 and one in 2003.  Only the 2002 prospectus contained allegedly false and misleading statements.  *There were no allegations that the 2003 prospectus contained any false or misleading statements.*  The plaintiffs purchased pursuant to the 2003 offering, but attempted to pursue claims against the underwriter for the 2002 offering, arguing that they could do so because both offerings were made under the same shelf registration statement.  However, since each offering was issued pursuant to a different prospectus, and only the 2002 prospectus contained allegedly false and misleading statements, the court ruled that plaintiff lacked standing.  *Friedman's* is easily distinguishable.  Here, at least one of the named plaintiffs purchased under each registration statement and each prospectus.  Further, unlike in *Friedman's*, the Complaint alleges false and misleading statements in *each* of the prospectuses.  ¶ 595.

[98]     "The Second Circuit has explained that 'the term seller includes a person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"  *In re Scottish Re*, 524 F. Supp. 2d at 399 (quoting *Commercial Union*, 17 F.3d at 616; *Pinter*, 486 U.S. at 647).  Thus, the term seller "applies not only to the seller who is in privity with the investor-plaintiff, but also with other persons, not in privity, who 'solicited the sales in question for financial gain.'"  *In re Scottish Re*, 524 F. Supp. 2d at 399 (quoting *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989)); *see also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999)

Complaint plead the existence of a purchaser-seller relationship for each of the 101 offerings, plaintiffs request leave to replead to add a plaintiff for each offering and, if required, each underwriter.

For these reasons, SMRS and the additional named plaintiffs are qualified to pursue relief for all purchasers in offerings made pursuant to the Shelf Registration Statements at issue.

### E.    Plaintiffs' Securities Act Claims Were Timely Filed

The Underwriter Defendants and PwC also seek to have the Securities Act claims with respect to *certain* of the AIG offerings made during the Class Period dismissed on statute of limitations grounds.  *See* Underwriters Mem. at 36-39; PwC Mem. at 34-35 & Ryan Decl., Ex. W.  The following background is relevant to these arguments.

After the Government bailout of AIG in mid-September, a series of cases were filed that alleged Securities Act claims.  The cases were:

> *Carroll, et al. v. American International Group, Inc., et al.*, No. 08-08659, filed October 9, 2008, asserting claims for purchasers of 7.70% Series A-5 notes issued December 11, 2007 (an offering that was pursuant to the 2007 Shelf Registration Statement);

> *Bernstein, et al v. American International Group, Inc., et al.*, No. 08-09162, filed October 27, 2008, asserting the same claims as in *Carroll*;

> *Fire and Police Pension Association of Colorado, et al. v. American International Group, Inc. et al*, No. 08-10586, filed December 4, 2008, asserting claims for purchasers of certain offerings between March 8, 2007 and May 12, 2008, including the Series A-5 notes cited in *Carroll* and *Bernstein* (offerings pursuant to the 2003, 2007, and 2008 Shelf Registration Statements); and

> *Epstein Real Estate Advisory, et al. v. Bank of America Corporation, et al.*, No. 09-00428, filed January 15, 2009, asserting claims for purchasers of AIG Medium-Term Notes, Series AIG-FP-1 through FP-59.

Defendants admit that these complaints serve to toll the statute of limitations period at least as to the defendants they name and the offerings they identify.  In this regard, PwC notes

---

(citing *Commercial Union* and stating that privity between a buyer and seller "is not an absolute prerequisite for 'seller' status under § 12").

that it was sued only in the *Colorado* complaint, and that the Lead Plaintiff's Complaint, which was filed on May 19, 2009 in accordance with this Court's Scheduling Order (also referred to herein as the "Consolidated Complaint"), asserts claims for purchasers of five offerings (three issued on October 13, 2006, and two issued on March 8, 2007) that were not included within either the *Colorado* or *Epstein* complaints.  *See* PwC Mem. at 34 & Ryan Decl., Ex. W, at 1-2. The Underwriter Defendants also claim that there are fifteen Underwriter Defendants that were not named in any of the earlier complaints.

Defendants base their arguments that the claims being asserted on behalf of purchasers of the newly-identified offerings in Lead Plaintiff's Complaint should be barred under the one-year "discovery" period that governs Sections 11 and 12(a)(2) claims.  *See* Underwriters Mem. at 36-39; PwC Mem. at 34-35 & Ryan Decl., Ex. W.[99]  PwC's and the Underwriter Defendants' primary argument for dismissal of claims against them relating to the newly-identified offerings and the additional Underwriter Defendants is that they were brought more than a year after AIG's disclosures of February 11 and 28, 2008 (which includes the issuance of the 2007 Form 10-K).[100]  Under this theory, defendants thus challenge only five of the offerings during the Class Period.

---

[99]    Section 13 of the Securities Act provides a one-year statute of limitation from the date a plaintiff had actual knowledge or inquiry notice of the claimed violation, and allows a three-year period to bring such claims.  15 U.S.C. § 77m.  Since Lead Plaintiff's Complaint was filed May 19, 2009, and the earliest offering referenced in the Complaint was on October 13, 2006, plaintiffs have clearly brought their claims within the three-year statute of repose.

[100]    These defendants make a further argument that because certain disclosures were made in August 2007, Securities Act claims alleging the falsity of statements made before that time should also be barred.  Given the many alleged misstatements and material omissions alleged after that date, this argument should be rejected out of hand.  In any event, as we show below, it would be inappropriate for this Court to dismiss any Securities Act claims pled in the Consolidated Complaint based on the defendants' argument that plaintiffs were on "notice inquiry" as of February 28, 2008.

Under case law in this District, the one-year discovery period "begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *In re WorldCom*, 294 F. Supp. 2d at 444; 15 U.S.C. §77m. Here, as alleged in the Complaint, it was not until September 17, 2008 – when the $85 billion Government bailout of AIG was announced – that defendants' prior misrepresentations were cured. And, while AIG made certain disclosures in its 2007 Form 10-K, which was issued February 28, 2008, even that document contained certain misrepresentations (including the misrepresentation that AIG required participants in its securities lending program to pay 102% of the value of the securities being lent), and did not cure what had been misrepresented in the earlier 2005 and 2006 Forms 10-K that had been incorporated by reference into the Offering Materials for Offerings prior to February 28, 2008. Based on this, plaintiffs reasonably and credibly allege, with respect to the Securities Act claims, that plaintiffs did not know, and in the exercise of reasonable diligence, could not have known, of the misstatements and omissions in the three Registration Statements and supplements, *see, e.g.,* ¶¶ 636, 693, and that they brought this action within one year after the discovery of those untrue statements and omissions. ¶¶ 638, 694.

Certainly there were significant disclosures made in the 8-K filed on February 11, 2008 and 2007 10-K filed on February 28, 2008, but elsewhere in their briefs, defendants take great pains to argue that these disclosures did not "correct" prior misrepresentations but, rather, simply provided investors with an updated status report of the Company's financial condition and internal controls as of November 30, 2007 (the 8-K) and December 31, 2007 (the 10-K). Thus, by their terms, these disclosures did *not* indicate (a) there had been material weaknesses in internal controls that had been concealed and misrepresented in the 2005 and 2006 10-Ks; (b) the

credit risk concentrations and guarantees that AIG had accumulated as of year-ends 2005 and 2006; or (c) the reasonable possibility that the fair value of the CDS portfolio had declined as of December 31, 2006.  They also failed to disclose, among other things, that AIG had made an advertent decision, by the end of 2005, to increase up to 75% its level of investment of cash collateral from its securities lending program in RMBS and ABS, including subprime debt. These were only things that could be ascertained after significant information was uncovered, much of which was revealed through other sources after the end of the Class Period (as summarized in the Complaint at ¶¶ 220-253).  Thus, a dismissal of the claims sought by PwC and the Underwriter Defendants is improper at this stage of the case.  *See, e.g., LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 156 (2d Cir. 2003) (the issue of whether a plaintiff was on inquiry notice is not normally disposed of on a Rule 12 motion); *Nelson v. Stahl*, 173 F. Supp. 2d 153, 166 (S.D.N.Y. 200l); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 10211, at *3 (S.D.N.Y. Jan. 6, 2000).[101]

Indeed, even in connection with the issuance of the 10-K on February 28, 2008, AIG and its executives continued to insist that its year-end financial results were not indicative of the Company's true financial strength and potential.  ¶¶ 359-361, 379, 380.  For example, in the press release accompanying the 10-K, AIG stated:

> AIG believes that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial condition. … AIG expects

---

[101]    As stated by the court in *Nivram Corp. v. Harcourt Brace Jovanovich, Inc*., "[i]nquiry notice exists only when '**uncontroverted evidence irrefutably demonstrates** when plaintiff discovered or should have discovered the fraudulent conduct.'"  840 F. Supp. 243, 249 (S.D.N.Y. 1993) (quoting *United Resources 1988-I Drilling & Completion Program*, 91 Civ. 8703 (RPP), 1993 WL 17464, at *5 (S.D.N.Y. Jan. 21, 1993)) (emphasis added) (citation omitted).  *See also In re Countrywide*, 588 F. Supp. 2d at 1159 (when a complaint "plausibly alleges the market was fooled, it is preposterous to argue at the pleadings stage that a 'reasonable investor' should have been on inquiry notice").  Indeed, defendants bear a heavy burden regarding this argument even at later stages of litigation.

> AIGFP's unrealized market valuation losses to reverse over the remaining life of
> the super senior credit default swap portfolio.  ¶ 360.

And during AIG's investor conference call on February 29, 2008, defendant Bensinger stated:

> Although there is likely to be continued volatility and perhaps further
> deterioration in the credit markets based upon AIG's analyses and stress tests,
> AIG does believe that any credit impairment losses realized over time by AIGFP
> will not be material to AIG's consolidated financial position.  ¶ 380.

As Judge Cote stated in a similar situation in *In re WorldCom*, 294 F. Supp. 2d at 445: "In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice 'because the warning signs are accompanied by reliable words of comfort from management.'" (citation omitted); *see also Milman*, 72 F. Supp. 2d at 229.  Moreover, defendant Sullivan, the Company's CEO, continued to tout AIG's "fortress balance sheet" during a May 9, 2008 investor call that took place just three days before the $12.5 billion offerings of stock and equity units to investors on May 12, 2008.  Tellingly, it took defendant Willumstad, who was named CEO of AIG after Sullivan was terminated on June 15, 2008 and who "thought he knew the company well," three weeks of "digging and turning over rocks [to realize] how fragile AIG's balance sheet was."  *See* Golan Decl., Ex. 2.  As alleged, AIG and the Underwriter Defendants further concealed that the $20 billion in capital that was raised during May 2008, including $12.5 billion from public investors, was for the purpose of meeting collateral calls, and that many of the Underwriter Defendants were primary beneficiaries of that fund-raising.

Thus, the earliest date on which plaintiffs could be deemed, as a matter of law, to have been put on notice of misstatements and omissions made in the Offering Materials was September 17, 2008, when AIG announced the terms of the $85 billion emergency Government bailout (¶¶ 218-219, 538-539), which is within one year prior to filing the Consolidated Complaint.

However, even assuming, *arguendo*, that plaintiffs had actual knowledge or were on inquiry notice as of February 28, 2008, as defendants contend, the Securities Act claims asserted in the Complaint filed on May 19, 2009 relate back to the Securities Act claims alleged in prior complaints, including the complaints in *Carroll, Bernstein, Colorado* and *Epstein*.  Fed. R. Civ. P. 15(c)(1)(B) provides that an amendment to a pleading relates back to the date of the original pleading when "[t]he amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading."  In *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) (citation omitted), the Second Circuit held that "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities," and the rule is "to be liberally construed, particularly where an amendment does not 'allege a new cause of action but merely ... make[s] defective allegations more definite and precise.'"

In determining whether a claim should relate back, the court's inquiry should focus on the notice given by the general fact situation set forth in the original pleading.  *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 528 (S.D.N.Y. 2005); *see also In re Adelphia Commc'ns Corp.*, No. 03-1529, 2005 WL 1278544, at *16 (S.D.N.Y. May 31, 2005) (relation back depends on "common core of operative facts").  Here, defendants (including PwC in the *Colorado* case, and most of the Underwriter Defendants in the four earlier cases) were clearly on notice of claims against them pursuant to the 2003, 2007 and 2008 Shelf Registration Statements, and offerings that were made pursuant to those Registration Statements.  All of those complaints were filed within a year of AIG's February 11 and 28, 2008 filings with the SEC.  Thus, while not all of the offerings at issue in the current Complaint were cited in the prior complaints, many of the

227

Offerings at issue here were included in prior complaints, and Securities Act claims based on the same course of conduct were asserted in those complaints.

As a result, plaintiffs' claims on behalf of purchasers of the five newly-identified offerings should be found to relate back to the previously filed complaints that contained allegations regarding offerings made pursuant to each of the 2003, 2007, and 2008 Registration Statements, *which are the same Shelf Registration Statements that form the basis of the claims based on the newly-identified offerings.*  ¶ 587.  As the court stated in *In re Adelphia*, 2005 WL 1278544, at *16, offerings made pursuant to the same registration statement are considered to be part of the same transaction or occurrence for relation back purposes.  As a result, there is a common core of operative facts that unite the Sections 11 and 12(a)(2) claims in the earlier complaints and in the Consolidated Complaint.  *See Mayle v. Felix,* 545 U.S. 644, 646 (2005).  Thus, plaintiffs' claims with respect to each of these offerings are timely filed.  ¶¶ 587, 591.[102]

Finally, the Underwriter Defendants argue that the fifteen newly-identified Underwriter Defendants cannot be added to the case through the filing of the Consolidated Complaint on May 19, 2009, since that is more than a year after February 28, 2008.  First, as shown above, the claims should not be dismissed since plaintiffs cannot be said to have been on inquiry notice, as a matter of law and at this stage of the proceedings, as of that date.  Second, certain of the Underwriters were named as defendants in prior complaints, although arguably they were

---

[102]     PwC argues that because it was sued only in the *Colorado* complaint, it cannot be sued here for claims based on issuance of the AIG-FP series of notes, which were the subject of the *Epstein* complaint against other defendants.  However, since the AIG-FP notes were issued pursuant to the same 2003 and 2007 Shelf Registration Statements that formed the basis of the Section 11 claim against PwC in *Colorado*, that complaint provided PwC with notice of potential claims relating to the AIG-FP notes, and therefore, even if the Court were to find the February 28, 2008 disclosures provided plaintiffs with inquiry notice (which plaintiffs contest), then claims on behalf of purchasers of AIG-FP notes would still relate back to the filing of the *Colorado* complaint as against PwC.

incorrectly identified.[103]  Fed. R. Civ. P. 15(c) allows a complaint to be amended to add or correct names of parties.  As the court stated in *William H. McGee & Co. v. M/V Ming Plenty*, 164 F.R.D. 601, 606 (S.D.N.Y. 1995), "[t]he misidentification of similarly named or related companies is the classic case for application of Rule 15(c) relation back."  Thus, the Complaint is timely for this reason at least as to the six defendants incorrectly identified in prior complaints.[104]

## IV.    Plaintiffs Have Adequately Stated a Section 15 Claim

Plaintiffs have asserted a Section 15 claim against the Executive Defendants.  ¶¶ 696-701.  Section 15 provides that:

> [e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o; *see also In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 335201, at *3 (S.D.N.Y. Feb. 14, 2005) ("The controlling person is held jointly and severally liable with the controlled person for whatever liability the controlled person ultimately faces.").

---

[103]    For instance, Barclay's was named in the *Colorado* complaint at ¶ 40 and *Epstein* complaint at ¶ 17; Citigroup Global Markets was named in the *Colorado* complaint at ¶ 48 and in the *Epstein* complaint at ¶ 12; Deutsche Bank was named in *Colorado* complaint at ¶ 56 and the *Epstein* complaint at ¶ 21; HSBC Bank was named in *Colorado* complaint at ¶ 67; JP Morgan Securities was named in *Colorado* complaint at ¶¶ 42 & 69; and Morgan Stanley Inc. was named in *Colorado* complaint at ¶ 81.

[104]    Calyon makes the additional argument that Plaintiffs failed to properly serve it at its Paris branch.  Underwriters Mem. at 1, n.2.  Plaintiffs effected service on Calyon's New York branch and believe that was proper.  In the event the Court concludes that service on Calyon's New York branch was not proper, Plaintiffs seek leave to re-serve Calyon at its Paris branch.

To state a *prima facie* claim for control person liability under Section 15, a plaintiff need only allege (i) a primary violation of the Securities Act by a controlled person, and (ii) direct or indirect control by the defendant of the primary violator.  *See In re Refco*, 503 F. Supp. 2d at 637; *In re Elan Corp.*, No. 02 Civ. 865 (RMB), 2004 WL 1305845, at *15 (S.D.N.Y. May 18, 2004).  "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity" under either Rule 9(b) or the PSLRA.  *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).  Instead, control allegations are subject only to Rule 8(a)'s notice pleading requirements, and accordingly survive motions to dismiss "as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster."  *In re Refco,* 503 F. Supp. 2d at 637 (quoting *In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005); *see also In re IPO*, 241 F. Supp. 2d at 352 (even "[n]aked allegations of control … will typically suffice to put a defendant on notice of the claims against her"); *In re Vivendi,* 381 F. Supp. 2d at 187.

As set forth above, there can be no dispute that primary violations of Sections 11 and 12(a)(2) have been pled, and therefore, defendants' motions to dismiss on this ground should be denied.  In addition, as set forth above, the Complaint sufficiently alleges that each of the Executive Defendants exercised control over AIG.  *See* Point One, Section IV (detailing the Executive Defendants' "control" under Section 20(a)).  Indeed, the Complaint sets forth extensive specific allegations as to each of the Executive Defendants' control status. *See, e.g.,*¶¶ 483, 500-502, 570, 573, 699-701, 351(h), 501.  As courts have held, Section 15's "terms are interpreted in the same manner as those of Section 20(a)." *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005); *see also In re IPO*, 241 F. Supp. 2d at 393; *In re Refco,* 503 F. Supp. 2d at 639 (officers and directors who are

directly involved in day-to-day operations including financial reporting and accounting may be presumed to have exercised sufficient control). Each of the Executive Defendants is therefore liable for AIG's violations of Sections 11 and 12(a)(2) to the same extent as AIG.[105]

Finally, defendants Cassano, Sullivan, Herzog, Frost, and Bensinger seek dismissal of the Section 15 claim on the basis that plaintiffs are required to show, for purposes of Section 15, that these defendants were culpable participants in the primary violation. Culpable participation, however, is not an element of a Section 15 claim, and therefore need not be pled by plaintiffs as part of their *prima facie* case.[106] Even if culpable participation were required, however (which it is not), plaintiffs have easily satisfied this burden, as set forth in Point One, Section IV above (detailing each of the Executive Defendants' culpable participation under Section 20(a)).

---

[105]    Notably, only defendants Forster and Frost argue that the Complaint fails to plead their control person status. However, as set forth in detail in Point One, Section IV above, both of these defendants had control over the flow of information that led to material misstatements regarding the CDS portfolio in the Company's public disclosures and other misstatements in its SEC filings, which were incorporated by reference into the Offering Materials. Indeed, the allegations of control as to these defendants are entirely consistent with language that courts in this District have found to be sufficient for purposes of "control" under Section 15. *See, e.g., In re AOL*, 381 F. Supp. 2d at 234. To the extent that Frost and Forster are demanding more, that would require a level of factual analysis that goes far beyond what is required of plaintiffs at the pleading stage. *See id.*

[106]    *See In re Refco,* 503 F. Supp. 2d at 637 n.24; *In re Global Crossing,* 2005 WL 1907005, at *11; *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 638268, at *13 (S.D.N.Y. Mar. 21, 2005) ("there is little dispute that [Section 15] contains no scienter requirement"); *In re Vivendi.,* 381 F. Supp. 2d at 187-88; *Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696(LMM), 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003).

Moreover, in the context of Section 15, the requisite state of mind would only be negligence, since the statute provides for strict liability of the issuer and a negligence standard for other defendants. *In re WorldCom,* 2005 WL 638268, *16, n.20 ("Section 15 in conjunction with its affirmative defense … imposes a negligence standard only.").

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that the motions filed by defendants to dismiss the Complaint should be denied in their entirety. In the alternative, Lead Plaintiff respectfully requests leave to replead any claims that may be dismissed.

Respectfully submitted,

**BARRACK, RODOS & BACINE**

/s/ Jeffrey W. Golan
Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838

and

A. Arnold Gershon (AG – 3809)
Regina M. Calcaterra (RC- 3858)
1350 Broadway
Suite 1001
New York, New York 10018
Tel.: (212) 688-0782
Fax: (212) 688-0783

**THE MILLER LAW FIRM, P.C.**

/s/ E. Powell Miller
E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
David H. Fink
Jayson E. Blake
Brian E. Etzel
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*