UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | Master File No.: 08-CV-4772-LTS |

This Document Relates To:  All Actions

### DECLARATION OF JEFFREY W. GOLAN IN SUPPORT OF LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

JEFFREY W. GOLAN, under the penalty of perjury, declares and certifies as follows:

1.  I am a member of the law firm of Barrack, Rodos & Bacine, attorneys for Lead Plaintiff, The State Treasurer of Michigan, as custodian of the Michigan Public School Employees' Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System ("the State of Michigan Retirement Systems"). I have been admitted *pro hac vice* in this Action.

2.  I submit this declaration in support of Lead Plaintiff's Memorandum of Law in Opposition to Motions to Dismiss the Consolidated Class Action Complaint.

3.  Attached hereto as Exhibit 1 is a true and correct copy of a September 11, 2009 article from *The Wall Street Journal* entitled "Prosecutors Are Poised to Impanel AIG Grand Jury."

4.  Attached hereto as Exhibit 2 is a true and correct copy of a September 25, 2009 article from the *TheStreet.com* entitled "AIG Ex-CEO Breaks Down the Final Days."

5.  Attached hereto as Exhibit 3 is a true and correct copy of the Comment Request by the Office of the Comptroller of the Currency, the Federal Reserve System, the F.D.I.C. and the Office of Thrift Supervision cited in *Nolte v. Capital One Financial Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004).

6.  Attached hereto as Exhibit 4 is a true and correct copy of an AIG press release dated March 15, 2009.

7.  Attached hereto as Exhibit 5 is a true and correct copy of a September 5, 2008 letter to Robert B. Willumstad from Jim B. Rosenberg, Senior Assistant Chief Accountant of the Securities and Exchange Commission.

8.  Attached hereto as Exhibit 6 is a true and correct copy of the transcript from *The Ohio Public Employees Ret. Sys., et al. v. Federal Home Loan Mortgage Corp., et al.*, No. 03-CV-4261 (S.D.N.Y. March 31, 2006) (Docket # 88).

In accordance with 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on October 1, 2009.

_____
Jeffrey W. Golan

# EXHIBIT 1

# THE WALL STREET JOURNAL.

WSJ.com

SEPTEMBER 11, 2009

# Prosecutors Are Poised to Impanel AIG Grand Jury

*Ex-Executive Cassano Is Focus of Probe as Authorities Weigh Criminality vs. Poor Decisions*

By AMIR EFRATI and SUSAN PULLIAM

Federal prosecutors, capping an 18-month investigation, are preparing to impanel a grand jury in Brooklyn, N.Y., to consider an indictment of a former senior American International Group Inc. executive, according to people familiar with the matter.

The Justice Department and the Securities and Exchange Commission have been investigating whether Joseph Cassano, whose AIG Financial Products unit nearly brought down the insurer a year ago, committed securities fraud in allegedly misleading investors by overstating the value of mortgage-related contracts and failing to disclose material facts about them to AIG's outside auditor, the people said.

**Cracking Down** | Some of the probes being pursued by the Justice Department

| Company | AIG | BEAR STEARNS | Credit Suisse | LEHMAN BROTHERS | UBS |
|---|---|---|---|---|---|
| Investigation | Whether executives intentionally overstated the value of credit-default swaps | Whether two former hedge-fund managers misled investors when their fund was in peril | Whether former brokers lied about how investors' money was placed into auction-rate securities | Whether it misled investors about asset values; firm's health | Whether the bank improperly valued its mortgage securities |
| Status | Charges expected | Charges filed; Ralph Cioffi and Matthew Tannin face trial this month | Charges filed; defendants convicted of securities fraud | Ongoing; no charges imminent | No charges imminent |

Source: WSJ research

The planned grand jury in the AIG case also could weigh charges against other employees. The possible case against Mr. Cassano and others could rely partly on tape recordings of 2007 phone calls involving AIG Financial Products employees who discussed the value of derivatives trades known as credit-default swaps, these people said.

Spokesmen for the Justice Department's fraud section in Washington, the SEC and the U.S. attorney's office in Brooklyn, which are handling the case, declined to comment.

Mr. Cassano has denied wrongdoing. His lawyer, F. Joseph Warin, has said AIG was fully aware of Mr. Cassano's activities, and his client has been cooperating with the inquiry. AIG declined to comment.

Any indictments of AIG employees would represent just the second major criminal corporate-fraud case stemming from the two-year-old credit crisis. That so few criminal cases have come to fruition illustrates the complicated legal road that prosecutors face in trying to find criminal wrongdoing at companies whipsawed by extraordinary events.

AIG has become a symbol of much of what the public has found wrong with Wall Street in the crisis: big bets on subprime mortgages using unregulated derivatives, failures that caused widespread financial pain, and multiple government bailouts with uncertainty over whether taxpayers would ever see their money returned. AIG also became a target of criticism because it paid $165 million in bonuses to Financial Products employees this year, long after a government bailout of the company.

Financial-industry executives said poor business decisions, rather than criminal acts, fueled the financial crisis. Most of the probes of executives at large financial firms focus on behavior after the crisis began. Investigators are looking to see whether individuals made false public statements to investors about the firms' financial condition, engaged in insider trading or

Print Powered By [ FormatDynamics ]

# THE WALL STREET JOURNAL.

WSJ.com

tinkered improperly with the firms' accounting.

In another criminal case, prosecutors are investigating whether executives at Lehman Brothers Holdings Inc. misled investors about the firm's financial picture before it filed for bankruptcy protection a year ago, among other things. But people familiar with the probe said any potential case against individuals at Lehman could be complicated by the fact that representatives of the Federal Reserve and SEC had been stationed at Lehman's headquarters, with access to its books and records, since the collapse of Bear Stearns Cos. in March 2008.

Authorities who had been investigating whether Wall Street firms, including Merrill Lynch & Co. and UBS AG, overvalued mortgage-related holdings before taking huge write-downs have ceded these cases to regulators at the SEC, an agency that brings only civil cases. The Merrill matter has been put on hold at the SEC amid a judicial challenge to a settlement in another Merrill-related case involving whether Bank of America Corp. misled investors about Merrill bonuses after agreeing to take over the securities firm last year. Bank of America neither admitted nor denied the allegations as part of the pact. The SEC declined to comment. Bank of America and UBS declined to comment.

For the Justice Department, the difficulty in these cases has been the higher criminal bar of proving the firms intended to defraud investors, people familiar with the cases said. Financial-industry representatives and defense lawyers said executives were dealing with an unprecedented catastrophe, and they had no intent to mislead investors, even if statements turned out to be wrong.

"There's not a lot of 'there there,'" said Carey Dunne, a former New York state prosecutor who is now a defense lawyer at Davis Polk & Wardwell LLP and isn't involved in the Lehman or AIG investigations. Typically, "you'd see damning internal emails and whistle-blowers coming out of the woodwork," he said. "We haven't seen much of that."

*Tales of the Tape*

In the AIG matter, the swaps at issue led to billions of dollars in write-downs for the insurer after PricewaterhouseCoopers LLP, its auditor, said the process AIG used to value them was flawed.

Pricewaterhouse could be called to testify about, among other things, the way in which it came to determine there was a material weakness in the internal controls used by Mr. Cassano's group to value the swaps, the people familiar with the matter said.



Bloomberg News

AIG has become a symbol of much of what the public has found wrong with Wall Street in the crisis: big bets on subprime mortgages, failures that caused widespread financial pain, and multiple government bailouts. Above, the American International Building, home of AIG, in New York.

The 2007 tape recordings include discussions by Mr. Cassano's group about the impact of the deteriorating mortgage market on AIG's credit-default swaps, the people said. Prosecutors could try to contrast these calls with reassuring statements Mr. Cassano and other executives made publicly around the same time, telling investors at a conference that any possible losses would be limited, these people said.

If the case is filed, these people said, one potential

Print Powered By [FormatDynamics]

# THE WALL STREET JOURNAL.

## WSJ.com

witness could be Joseph St. Denis, a former internal auditor at AIG, who told a congressional committee last year that Mr. Cassano said he had "deliberately excluded" Mr. St. Denis from evaluating the credit-default swaps "because I was concerned that you would pollute the process." A lawyer for Mr. St. Denis declined to comment.

In the only major criminal case filed against Wall Street executives in the wake of the credit crisis, two former managers of hedge funds at Bear Stearns were indicted last summer on charges they lied to investors as the funds were collapsing. They have pleaded not guilty. A trial is set for this month.

*A Surfeit of Cases*

Documents filed in Lehman's bankruptcy-court proceedings shed some light on the volume of Lehman-related documents and witnesses being examined by regulators and Anton Valukas, a lawyer at Jenner & Block LLP, the court-appointed examiner in the bankruptcy case.

Mr. Valukas has been preparing documents and sharing witness lists and information with the SEC relating to issues such as Lehman's valuation of real-estate and other assets -- the subject of an investigation by prosecutors in Manhattan -- and Lehman's finances heading into bankruptcy. Mr. Valukas declined to comment.

Prosecutors in Brooklyn and the SEC also are investigating whether former Lehman executives sold auction-rate securities to clients while knowing that the market for the short-term securities was drying up, people familiar with the matter said. Spokesmen for the Brooklyn U.S. attorney's office and the SEC declined to comment.

Some prosecutors acknowledge the hurdles they face. Benton Campbell, the U.S. attorney in Brooklyn, whose office brought the Bear Stearns case and who declined to comment about pending investigations, said prosecutors have been inundated with fraud cases recently.

Mr. Campbell said prosecutors are being particularly swamped with cases involving alleged Ponzi schemes and other fraud that have emerged amid the recession. These cases require immediate attention in order to prevent alleged suspects from fleeing or dissipating investors' money.

"We're having to deal with things that pop up, and Ponzi schemes and large mortgage fraud schemes have had an impact," said Mr. Campbell, whose office this week charged a Long Island, N.Y., money manager with running a 30-year Ponzi scheme. "We have limited resources."

**Write to** Amir Efrati at amir.efrati@wsj.com and Susan Pulliam at susan.pulliam@wsj.comPrinted in The Wall Street Journal, page C1

| Companies within this Article | | | |
|---|---|---|---|
| Bank of America Corp.(BAC) | 17.14 | -0.36 | 12:05a.m. |
| American International Group Inc. (AIG) | 46.95 | +0.24 | 12:04a.m. |
| UBS AG ADS(UBS) | 18.41 | -0.34 | 12:04a.m. |

Print Powered By FormatDynamics

# EXHIBIT 2



$2.95 stocks     $9.95 options     $14.95 spreads

# TheStreet.com

Try Jim Cramer's
Action Alerts PLUS

**Insurance**                                                    ► Return to Article

# AIG Ex-CEO Breaks Down the Final Days

## Lauren Tara LaCapra

09/25/09 - 01:39 PM EDT

*This article contains further comments made by ex-AIG CEO Robert Willumstad in a speech on Thursday. The first story on his appearance at Adelphi University can be read here. Updated to add share price.*

GARDEN CITY, N.Y. (TheStreet) -- Robert Willumstad described his brief tenure as the head of **American International Group** (AIG Quote) as bittersweet, and his two years on the firm's board as jumbled at its best.

The banking veteran spent 91 days at the helm of the troubled insurance giant, struggling to avoid a disaster as AIG teetered on the verge of collapse. During an appearance at Adelphi University on Thursday, Willumstad gave a tick-tock of AIG's final days from his point of view as a key player, as well as his outlook for the insurance giant's future.

Willumstad said that while he has turned down most interview offers, the Long Island native was finally speaking up at his alma mater because, "what has been written and recorded has distorted the facts." Thus, he offered an account of "what happened, according to yours truly."



**PHOTO GALLERY**
**AIG CEOS, PAST AND PRESENT**

## 'Welcome to AIG'

When Willumstad joined AIG's board in January 2006, the insurer was still reeling from previous difficulties. An accounting scandal had led to the contentious ouster of former Chairman and CEO Maurice "Hank" Greenberg, who had spent nearly half a century building AIG into the large international conglomerate that is now being unwound.

"My first board meeting, I had to vote on a multi-billion-dollar settlement," said Willumstad, referring to a $1.6 billion deal with the **Securities and Exchange Commission** to settle fraud charges. He also had to provide input and make decisions about complex issues that he only was starting to familiarize himself with.

"As someone said to me, 'Welcome to AIG,'" Willumstad said.

Nonetheless, the firm was posting record profits like much of the financial industry at the time because of high-risk, high-reward gambles on subprime debt.

While AIG was cautious enough to stop backing subprime products in 2005, it already had cannonballed into the market through vehicles called credit-default swaps. Those assets offered a hedge against big subprime bets made by major banks across the globe, including **Goldman Sachs** (GS Quote), **Merrill Lynch**, **Bank of America** (BAC Quote), **Citigroup** (C Quote), **Wells**

**Fargo**'s (WFC Quote) **Wachovia**, **Societe Generale**, **Deutsche Bank** (DB Quote), **Barclays** (BCS Quote) and **UBS** (UBS Quote).

In the first quarter of 2007, the board still felt that then-CEO Martin Sullivan was "doing a good job," said Willumstad. Soon, however, the subprime cancer began to appear with losses reported by Citigroup and Merrill. By the fourth quarter of 2007 it had spread to AIG.

As losses escalated, the board changed its mind about Sullivan's performance. Its members deemed Willumstad the best replacement, since he had served as president and chief operating officer of Citi, and held top positions at **Travelers** and **Chemical Bank**.

The white-haired, bespectacled banker initially demurred, not wanting to distract himself from a private-equity venture. Ultimately, his associates at Brysam Global Partners convinced Willumstad he ought to make AIG his priority instead, a decision that still seems to haunt him.

"I thought I knew the company well," Willumstad said, "but after three weeks of digging and turning over rocks, I realized how fragile AIG's balance sheet was."

## Height of Despair

Willumstad approached then-New York Fed Chairman Timothy Geithner for assistance early on, asking for access to the **Federal Reserve's** discount lending window in June 2008. Geithner said no, because it would not be in the best interest of the firm or the system.

"While I understood his concerns, I didn't agree with him," Willumstad said.

As problems continued to escalate, he approached Geithner with the same request on Sept. 9. "Tim said he'll get back to me -- by the way, I'm still waiting," Willumstad said with a laugh.

The market lost confidence in AIG with each day that passed and each crisis that unfolded, especially the government takeover of **Fannie Mae** (FNM Quote) and **Freddie Mac**(FRE Quote), which left preferred shareholders in the cold. Stock investors slashed its share price in half over the course of a month and it faced an increasing number of collateral calls from lenders. Credit ratings agencies like **Moody's** (MCO Quote), Fitch and **McGraw Hill**'s (MHP Quote) S&P were seriously considering downgrades.

They would eventually cut AIG's ratings a day before its collapse, but Willumstad managed to convince the agencies to hold off on a downgrade while he approached high-profile investors for assistance.

Willumstad scoffed at a deal proffered by Christopher Flowers, the vulture investor who invests in financial institutions. Terms were lucrative for Flowers' eponymous private-equity firm, but a hard pill to swallow for AIG, whose leader was still underestimating its problems.

Willumstad also turned to Warren Buffett, known as the "Oracle of Omaha" for making billions through time-tested, traditional methods. Buffett wouldn't invest in businesses he didn't understand, and credit-default swaps fell squarely in that category.

Instead, Willumstad called Buffett at home, offering up AIG's U.S. property and casualty division for $25 billion. Willumstad proposed e-mailing details, but Buffett doesn't use e-mail, and had no fax machine at home. Buffett drove to his **Berkshire Hathaway** (BRK-A Quote) office in downtown Omaha to review the documents for several hours.

"This is from the world's richest man -- no email and no fax machine," said Willumstad, gearing up for the letdown. "He called me later that evening to say the deal was too big for him to do."

On Sunday, Sept. 14, Willumstad headed to a meeting at the New York Fed, which was also scrambling to prevent **Lehman Brothers'** bankruptcy. "The place was crawling with bankers and lawyers," said Willumstad.

The meeting was fruitless, not just for Lehman but also for AIG. Willumstad heard the same message from regulators that he had heard for several months: "There would be no public money for AIG."

When the markets opened on Monday, lending froze further while stocks encountered the most prolific crash since the Sept. 11, 2001, attacks. The **Dow Jones Industrial Average** fell more than 500 points in a single session. AIG lost more than 60% of its

market value.

"By then," said Willumstad, "nobody would lend AIG lunch money."

Willumstad called Geithner one last time from AIG's headquarters in Lower Manhattan. Willumstad informed the regulator that he'd be drawing down the last bit of AIG's credit line and preparing for a bankruptcy filing. Geithner told Willumstad to hold off, but he made the call to lenders anyhow.

Just as AIG was plumbing the depths of despair, regulators suddenly changed their tune, offering a bittersweet deal to keep the company alive.

In exchange for ample capital, AIG would have to bear a burdensome 11.5% interest rate and grant the federal government a huge equity stake. Willumstad began to review terms with other decision-makers, one of whom was Dick Beattie, a well-known financial-services lawyer at Simpson Thacher & Bartlett.

"You now work for the U.S. government," Beattie told Willumstad, though not for long.

Before the team got far along in its assessment, Willumstad received another call. Geithner informed the CEO that the deal was non-negotiable and that he'd be replaced.

"I turned to Beattie and said, 'I no longer work for the U.S. government,'" Willumstad recalled.

## On The Horizon

Willumstad was familiar with the ins and outs of boardroom politics, having served as a director at **MasterCard** (MA Quote) International, SC Johnson, Commercial International Bank of Egypt and Habitat for Humanity. But AIG was a different story.

As Willumstad noted in congressional testimony nearly a year ago, AIG was not just an insurer, but a global financial giant with $1 trillion in assets and more than 100,000 employees. It operated in more than 100 countries in a "diverse array of businesses operating under scores of different regulatory regimes," Willumstad told the House Committee on Oversight and Goverment Reform on Oct. 7, 2008.

Being thrust in charge of such a behemoth at the crux of an unprecedented crisis seems to have been beyond Willumstad's -- or perhaps anyone else's -- expertise. The market tumult was simply too much for the firm and its leader to bear.

"No one expected that -- not anyone on the board, not Alan Greenspan, nobody," the still-shell-shocked former executive said, referring to the former Federal Reserve chairman.

Willumstad heaps plenty of blame on everyone in the government -- from Greenspan's low-interest rate policy; to political bickering in Congress that gets in the way of comprehensive reform; to regulators' ad-hoc approach to the crisis as it unraveled, including what he calls the "ill-conceived" Troubled Asset Relief Program; to the lack of a solution for large companies that are inextricably linked into the financial system.

"The 'too big to fail' issue hasn't been solved," Willumstad said Thursday, later adding, "There is no national regulator for the insurance industry, but many insurers are national or international, like AIG."

But while Willumstad acknowledged that financial-services firms "bear the ultimate responsibility" for taking on too much risk, he deflected blame from "yours truly."

"As CEO for 91 days, I don't necessarily accept any personal responsibility for what happened," he asserted, adding that he "arguably" prevented AIG's outright bankruptcy by aggressive negotiations with ratings agencies and his "friends at the Fed."

Willumstad had nothing but kind words for the other men who shared his grief at the helm of AIG. He called Hank Greenberg a "very impressive entrepreneur" and said the new CEO, **MetLife** (MET Quote) veteran CEO Robert Benmosche is "quite a feisty guy" who "has as good a chance as anybody of righting the company."

Nonetheless, Willumstad maintained a gloomy outlook for the insurer itself.

Willumstad added further credence to the view that AIG's recently deflated stock run-up was based on nothing but air. The former top gun believes AIG's debts to the government are simply too massive to be pared back in any way that benefits shareholders. He also notes that Benmosche faces a huge challenge in retaining top talent to help trim AIG's operations and keep healthy businesses competitive. Because of compensation restrictions and political pressure, many of the insurer's most valuable assets are "walking out the door," Willumstad said.

Ironically, while Buffett couldn't swing the deal, the P&C division is one jewel of the core divisions AIG is holding onto. There aren't many more, said Willumstad. He doesn't predict AIG will be a viable entity apart from government support any time soon.

Uncle Sam has now extended more than $180 billion to keep the financial-services giant afloat, and Willumstad noted that AIG will have to be pared down significantly to pay back that massive debt.

"It owes the government more money than it has the ability to pay back," Willumstad asserted. "...What's likely to be left of AIG is a small portion of its former self."

Shares of AIG fell 4% to $43.15 in recent action.

-- *Written by Lauren Tara LaCapra in New York*

Visit TheStreet for more great features

## THESTREET PREMIUM SERVICES

From the action-oriented investing ideas of *Action Alerts PLUS* by Jim Cramer to the expert technical trading strategies of Helene Meisler's *Top Stocks*, TheStreet.com offers a range of premium services to help boost your portfolio's performance. View now.

## FREE NEWSLETTERS

Get an edge on the market with the help of free email newsletters like Jim Cramer's *Daily Booyah!*. Learn about the day's major market events, companies that sizzled or fizzled and lots more that can help you make more profitable investing decisions. Sign up.

## EXPERT ADVISORS ALERTS DELIVERED TO YOUR INBOX

*Action Alerts PLUS:* Cramer's personal portfolio, emails before he acts.
*RealMoney:* 70+ experts share their top investing ideas and analysis.
*Stocks Under $10:* Alerts identify undervalued stocks with profit potential.

**Sponsored Links**

**DON'T Pay for White Teeth**
Learn the trick discovered by a mom to turn yellow teeth white w/under $10.
MomsTeethStory.com

**30%-50% Return w/ Silver!**
Control $25k Silver w/ a $10k Investment! IRA-Eligible. $10k minimum.
DirectMetalsInvesting.com

**Free Alaska guide**
The ultimate Alaska wilderness deserves the ultimate guide.
www.hollandamerica.com

**Buy a link here**

## Brokerage Partners

© 1996-2009 TheStreet.com, Inc. All rights reserved.
TheStreet.com&apos;s enterprise databases running Oracle are professionally monitored and managed by Pythian Remote DBA.

Quotes delayed at least 20 minutes for all exchanges. Market Data provided by Interactive Data. Company fundamental data provided by Morningstar. Earnings and ratings provided by Zacks. Mutual fund data provided by Valueline. ETF data provided by Lipper. Terms & Conditions. Powered and implemented by Interactive Data Managed Solutions.

TheStreet.com Ratings updates stock ratings daily. However, if no rating change occurs, the data on this page does not update. The data does update after 90 days if no rating change occurs within that time period.

IDC calculates the Market Cap for the basic symbol to include common shares only. Year-to-date mutual fund returns are calculated on a monthly basis by Value Line and posted mid-month.

*Oil Data in Market Overview is Brent Crude Pricing

# EXHIBIT 3



67 FR 46250-01                                                                 Page 1
67 FR 46250-01, 2002 WL 1482510 (F.R.)
**(Cite as: 67 FR 46250)**

NOTICES

DEPARTMENT OF THE TREASURY

Office of the Comptroller of the Currency

FEDERAL RESERVE SYSTEM

FEDERAL DEPOSIT INSURANCE CORPORATION

DEPARTMENT OF THE TREASURY

Office of Thrift Supervision

Proposed Agency Information Collection Activities; Comment Request

Friday, July 12, 2002

**\*46250** AGENCIES: Office of the Comptroller of the Currency (OCC), Treasury; Board
of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Cor-
poration (FDIC); and Office of Thrift Supervision (OTS), Treasury.

ACTION: Joint notice and request for comment.

SUMMARY: In accordance with the requirements of the Paperwork Reduction Act of
1995 (44 U.S.C. chapter 35), the OCC, the Board, the FDIC, and the OTS (the "agen-
cies") may not conduct or sponsor, and the respondent is not required to respond
to, an information collection unless it displays a currently valid Office of Man-
agement and Budget (OMB) control number. The Federal Financial Institutions Exam-
ination Council (FFIEC), of which the agencies are members, has approved the agen-
cies' publication for public comment of proposed revisions to the Consolidated Re-
ports of Condition and Income (Call Report) for banks and the Thrift Financial Re-
port (TFR) for savings associations, which are currently approved collections of
information. At the end of the comment period, the comments and recommendations
received will be analyzed to determine the extent to which the FFIEC should modify
the proposed revisions prior to giving its final approval. The agencies will then
submit the revisions to OMB for review and approval.

DATES: Comments must be submitted on or before September 10, 2002.

ADDRESSES: Interested parties are invited to submit written comments to any or all
of the agencies. All comments, which should refer to the OMB control number(s),
will be shared among the agencies.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                Page 2
67 FR 46250-01, 2002 WL 1482510 (F.R.)
**(Cite as: 67 FR 46250)**

OCC: Written comments should be submitted to the Communications Division, Office of the Comptroller of the Currency, 250 E Street, SW., Public Information Room, Mailstop 1-5, Attention: 1557-0081, Washington, DC 20219. Due to temporary disruptions in the OCC's mail service, commenters are encouraged to submit comments by fax or electronic mail. Comments may be sent by fax to (202) 874-4448, or by electronic mail to regs.comments@occ.treas.gov. Comments will be available for inspection and photocopying at the OCC's Public Information Room, 250 E Street, SW., Washington, DC 20219. Call (202) 874-5043 to make appointments for inspection of comments.

Board: Written comments, which should refer to "Consolidated Reports of Condition and Income, 7100-0036," may be mailed to Ms. Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW., Washington, DC 20551. Due to temporary disruptions in the Board's mail service, commenters are encouraged to submit comments by electronic mail to regs.comments@federalreserve.gov. Comments addressed to Ms. Johnson also may be delivered to the Board's mailroom between 8:45 a.m. and 5:15 p.m. weekdays, and to the security control room outside of those hours. Both the mailroom and the security control room are accessible from the Eccles Building courtyard entrance on 20th Street between Constitution Avenue and C Street, NW. Comments received may be inspected in room M-P-500 between 9 a.m. and 5 p.m. on weekdays pursuant to sections 261.12 and 261.14 of the Board's Rules Regarding Availability of Information, 12 CFR 261.12 and 261.14.

FDIC: Written comments should be addressed to Robert E. Feldman, Executive Secretary, Attention: Comments/Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, NW., Washington, DC 20429. All comments should refer to "Consolidated Reports of Condition and Income, 3064- 0052." Due to temporary disruptions in the FDIC's mail service, commenters are encouraged to submit comments by fax or electronic mail [Fax number: (202) 898- 3838; Internet address: comments@fdic.gov]. Comments also may be hand-delivered to the guard station at the rear of the 550 17th Street Building (located on F Street) on business days between 7 a.m. and 5 p.m. Comments may be inspected and photocopied in the FDIC Public Information Center, Room 100, 801 17th Street, NW., Washington, DC, between 9 a.m. and 4:30 p.m. on business days.

OTS: Submit comments by mail to: Information Collection Comments, Chief Counsel's Office, Office of Thrift Supervision, 1700 G Street, NW., Washington, DC 20552; by hand delivery to the Guard's Desk, east lobby entrance 1700 G Street, NW., Washington, DC 20552, on business days between 9 a.m. and 4 p.m.; by facsimile transmission: (202) 906-6518; or by electronic mail to: infocollection.comments@ots.treas.gov. All comments should refer to "TFR Revisions, OMB No. 1550-0023," and include your name and phone number. Comments submitted to OTS and the related TFR schedules will be posted on the OTS Internet site at: http://www.ots.treas.gov. In addition, interested persons may inspect comments at the Public Reference Room, 1700 G Street, NW., Washington, DC 20552, by appoint-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                    Page 3

67 FR 46250-01, 2002 WL 1482510 (F.R.)

**(Cite as: 67 FR 46250)**

ment.  To make an appointment, call 202-906- 5922.  Appointments will be scheduled
on business days between 10 a.m. and 4 p.m.

  Acopy of the comments may also be submitted to the OMB desk officer for the
agencies: Joseph F. Lackey, Jr., Office of Information and Regulatory Affairs, Of-
fice of Management and Budget, New Executive Office Building, Room 10235, Washing-
ton, DC 20503 or electronic mail to jlackeyj@omb.eop.gov.

FOR FURTHER INFORMATION CONTACT: Sample copies of the proposed new schedule for
the Call Report for March 31, 2003, can be obtained at the FFIEC's web site
(www.ffiec.gov) or may be requested from the agency clearance officers listed be-
low for the OCC, the Board, and the FDIC.  Sample copies of the proposed new
schedule for the TFR for March 31, 2003, can be obtained at the OTS' web site
(www.ots.treas.gov) or may be requested from the agency clearance officer listed
below for the OTS.

  OCC: Jessie Dunaway, OCC Clearance Officer, or Camille Dixon, (202) 874-5090,
Legislative and Regulatory Activities Division, Office of the Comptroller of the
Currency, 250 E Street, SW., Washington, DC 20219.

  Board: Mary M. West, Board Clearance Officer, (202) 452-3829, Division of Re-
search and Statistics, Board of Governors of the Federal Reserve System, 20th and
C Streets, NW., Washington, DC 20551.  Telecommunications Device for the Deaf
(TDD) users may call (202) 263-4869.

  FDIC: Tamara R. Manly, Management Analyst, (202) 898-7453, Legal Division, Fed-
eral Deposit Insurance Corporation, 550 17th Street NW., Washington, DC 20429.

  OTS: William Magrini, Senior Project Manager, Supervision Policy, at (202)
906-5744 or by electronic mail **46251** william.magrini@ots.treas.gov, or Marilyn
K. Burton, OTS Paperwork Clearance Officer, at (202) 906-6467 or by electronic
mail marilyn.burton@ots.treas.gov, Office of Thrift Supervision, 1700 G Street,
NW., Washington, DC 20552.

SUPPLEMENTARY INFORMATION: Request for OMB approval to extend, with revisions, the
following currently approved collections of information for banks and savings as-
sociations.

  The agencies estimate that only approximately 130 banks and savings associations
(banking institutions) have significant subprime lending programs and would have
to complete the entire proposed subprime lending schedule.  The agencies further
estimate that each of these institutions would need approximately 1 to 1.5 hours
to complete this schedule.  In addition, other banking institutions with any
subprime lending programs would have to complete only a single item on the sched-
ule.  Although the agencies do not have an estimate of the number of such banking
institutions, they believe that this item would add only a negligible amount of
burden.  The following burden estimates include the proposed revisions.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01
67 FR 46250-01, 2002 WL 1482510 (F.R.)
(Cite as: 67 FR 46250)

1.  Report Title: Consolidated Reports of Condition and Income (Call Report).

Form Number: FFIEC 031 (for banks with domestic and foreign offices) and FFIEC 041 (for banks with domestic offices only).

Frequency of Response: Quarterly.

Affected Public: Business or other for-profit.

For OCC:

OMB Number: 1557-0081.

Estimated Number of Respondents: 2,200 national banks.

Estimated Time per Response: 42.05 burden hours.

Estimated Total Annual Burden: 370,076 burden hours.

For Board:

OMB Number: 7100-0036.

Estimated Number of Respondents: 978 state member banks.

Estimated Time per Response: 48.25 burden hours.

Estimated Total Annual Burden: 188,754 burden hours.

For FDIC:

OMB Number: 3064-0052.

Estimated Number of Respondents: 5,480 insured state nonmember banks.

Estimated Time per Response: 32.66 burden hours.

Estimated Total Annual Burden: 715,993 burden hours.

The estimated time per response is an average, which varies by agency because of differences in the composition of the banks under each agency's supervision (e.g., size distribution of institutions, types of activities in which they are engaged, and number of banks with foreign offices).  The time per response for a bank is estimated to range from 15 to 550 hours, depending on individual circumstances.

2.  Report Title: Thrift Financial Report (TFR).

Form Number: OTS 1313 (for savings associations).

Frequency of Response: Quarterly.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                                    Page 5
67 FR 46250-01, 2002 WL 1482510 (F.R.)
(Cite as: 67 FR 46250)

Affected public: Business or other for profit.

For OTS:

OMB Number: 1550-0023.

Estimated Number of Respondents: 1,000 savings associations.

Estimated Time per Response: 33.8 burden hours.

Estimated Total Annual Burden: 135,200 burden hours.

General Description of Reports

 These information collections are mandatory: 12 U.S.C. 161 (for national banks),
12 U.S.C. 324 (for state member banks), 12 U.S.C. 1817 (for insured state nonmem-
ber commercial and savings banks), and 12 U.S.C. 1464 (for savings associations).
Except for the items covered in this proposal and a limited number of other items,
these information collections are not given confidential treatment.  Small busi-
nesses (i.e., small banks and savings associations) are affected.

Abstract

 Banks file Call Reports and savings associations file the TFR with the agencies
each quarter for the agencies' use in monitoring the condition, performance, and
risk profile of reporting individual banking institutions and the industry as a
whole.  In addition, Call Reports and TFRs provide the most current statistical
data available for evaluating banking institutions' corporate applications such as
those for mergers, for identifying areas of focus for both on-site and off-site
examinations, and for monetary and other public policy purposes.  Call Reports and
TFRs also are used to calculate all banking institutions' deposit insurance and
Financing Corporation assessments, national banks' semiannual assessment fees, and
OTS' assessments on savings associations.

Current Action

I. Overview

 The agencies are requesting comment on a proposed revision to the Call Report and
the TFR that will enable the agencies to better plan their examinations of banking
institutions and to monitor off-site the extent of, changes in, and performance of
subprime lending programs at banking institutions.  Subprime lending refers to
loans to borrowers who have weakened credit histories.  The characteristics of a
subprime borrower typically include a history of paying debts late, personal bank-
ruptcy filings, or a high debt service-to-income ratio.  These borrowers, there-
fore, pose a higher risk of default than do traditional borrowers at banking in-
stitutions.  A subprime lending program is the regular or targeted acquisition,
through origination or purchase, of loans to subprime borrowers that will be held

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                                                    Page 6
67 FR 46250-01, 2002 WL 1482510 (F.R.)
(Cite as: 67 FR 46250)

in portfolio or accumulated for resale.

 In May 2000, the OCC, the Board, and the FDIC [FN1] and, in August 2000, the OTS
[FN2] proposed to collect information on subprime lending in the Call Report and
TFR to make possible the early detection and proper supervision of subprime lend-
ing through off-site monitoring procedures.  Banks involved in subprime lending
would have reported quarter-end data for eight categories of subprime loans as
well as past due and nonaccrual information and year-to-date charge-offs and re-
coveries for two broader categories of subprime loans.  The agencies recognized
that the quality and validity of the proposed Call Report and TFR information de-
pended on a workable definition of subprime lending, which was still in the pro-
cess of development at that time.  The definition of subprime included in the 2000
proposals was based on the definition of the term in the agencies' March 1999
guidance on subprime lending.  The agencies also asked for comment on whether in-
formation should be collected based on loan portfolios or programs that possess
subprime characteristics or individual loans with these characteristics.

 FN1 65 FR 34801, May 31, 2000.

 FN2 65 FR 48049, August 4, 2000.

 The comments received in 2000 on the proposed collections of information on
subprime lending in the Call Report and TFR were generally unfavorable, particu-
larly with respect to the agencies' then proposed definition. Furthermore, the
commenters overwhelmingly stated that if the agencies did collect subprime lending
information, the information should only be collected from banks with subprime
lending programs.  In addition, the commenters suggested that future requests for
comment on a subprime information collection for the Call Report and TFR should be
*46252  addressed in a separate proposal dealing only with the subprime informa-
tion collection issues.

 Over the last two years, the agencies have conducted examinations that have con-
firmed the agencies' contentions that subprime lending programs continue to pose
an increased risk to those institutions involved and to the deposit insurance
funds.  A disproportionate number of the banking institutions on the FDIC's "prob-
lem institution" list during the past two years have been engaged in subprime
lending programs and the volume of loans in these programs has exceeded 25 percent
of the institutions' Tier 1 capital. [FN3] The exact number of institutions in-
volved in subprime lending programs is not known with certainty.  However, the
agencies estimate that approximately 130 banking institutions currently have sig-
nificant exposures in the subprime lending business.

 FN3 In general, Tier 1 capital is the sum of a banking institution's common
stockholders' equity (as defined in the agencies' regulatory capital standards),
noncumulative perpetual preferred stock, and minority interests in consolidated
subsidiaries, less goodwill and other intangible assets (other than limited

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                          Page 7
67 FR 46250-01, 2002 WL 1482510 (F.R.)
**(Cite as: 67 FR 46250)**

amounts of servicing assets and purchased credit card relationships) and less dis-
allowed deferred tax assets and disallowed credit-enhancing interest-only strips.
For banks, see Schedule RC-R of the Call Report to calculate Tier 1 capital.  For
savings associations, see Schedule CCR of the TFR to calculate Tier 1 capital.

  The actual extent of banking institutions' involvement in subprime lending pro-
grams is not fully known because there is no regular periodic reporting of this
activity to the banking agencies.  The estimates that have been made come from ex-
amination data, but the quality and timeliness of the subprime lending data de-
rived from examination reports is constrained by the lack of standard industry-
wide definitions of the terms "subprime" and "program" and by the length of the
examination cycle.  The issue of timeliness is particularly troublesome from a
safety and soundness perspective because subprime lending programs tend to be a
volume-oriented business that encourages rapid portfolio growth.  Consequently,
there is no reliable way to regularly monitor individual institutions' subprime
lending programs between examinations.

*II. Current Proposal*

  This proposal addresses solely the agencies' planned collection of information on
subprime consumer lending programs each quarter in the Call Report and TFR begin-
ning March 31, 2003.  The agencies continue to believe that a need exists to col-
lect information on subprime lending programs.  This information would be the
agencies' sole source of off-site data on subprime lending programs.  One purpose
for which the agencies intend to use these data is to enhance the examination
planning process.  In addition, the data would provide the agencies with a timely
and regular source of information from institutions with subprime consumer lending
programs that can be used to monitor the extent of banking institutions' involve-
ment in such programs, including the level of growth in this activity, and the
performance of subprime portfolios.

Definitions

  Subsequent to the 2000 proposals, the agencies issued Expanded Guidance for
Subprime Lending Programs on January 31, 2001.  This guidance contains definitions
that describe the characteristics of the terms "program" and "subprime." Examiners
have been using these characteristics during the examination process to determine
which institutions have subprime lending programs that, in the aggregate, are
greater than or equal to 25 percent of an institution's Tier 1 capital.  The agen-
cies propose to use the characteristics described in the Expanded Guidance in the
proposed subprime lending program information collection in the Call Report and
TFR.  These two terms would be defined as follows for purposes of the proposed new
schedule:

  The term "program" refers to the process of acquiring on a regular or targeted
basis, through either origination or purchase, loans to subprime borrowers that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                     Page 8
67 FR 46250-01, 2002 WL 1482510 (F.R.)
**(Cite as: 67 FR 46250)**

are to be held in the institution's own portfolio or accumulated and packaged for
sale.  The average credit risk profile of such programs or portfolios will likely
display significantly higher delinquency and/or loss rates than prime portfolios.

 Subprime programs include loan products that attract a disproportionate number of
borrowers with weakened credit histories, including payday loan and credit repair
products.  A subprime program also may include cases where an institution regu-
larly purchases loans, such as indirect auto paper, of which disproportionate
amounts qualify as loans to subprime borrowers.  In addition, an institution
should include any program determined to be a subprime lending program by its
primary federal regulator.  If a reporting institution has a question as to wheth-
er it has a subprime lending program, it should contact its primary federal regu-
lator.

 The term "subprime" refers to the credit characteristics of individual borrowers.
Subprime borrowers typically have weakened credit histories that include payment
delinquencies, and possibly more severe problems such as charge-offs, judgments,
and bankruptcies.  The borrowers may also display reduced repayment capacity as
measured by credit scores, debt-to-income ratios, or other criteria that may en-
compass borrowers with incomplete credit histories.  Subprime loans are loans to
borrowers displaying one or more of these characteristics at the time of origina-
tion or purchase. Such loans have a higher risk of default than loans to prime
borrowers.  Generally, subprime borrowers will display a range of credit risk
characteristics that may include one or more of the following:

 - Two or more 30-day delinquencies in the last 12 months, or one or more 60- day
delinquencies in the last 24 months;

 - Judgment, foreclosure, repossession, or charge-off in the prior 24 months;

 - Bankruptcy in the last 5 years;

 - Relatively high default probability as evidenced by, for example, a credit bur-
eau risk score (FICO) of 660 or below (depending on the product/collateral), or
other bureau or proprietary scores with an equivalent default probability likeli-
hood; and/or

 - Debt service-to-income ratio of 50% or greater, or otherwise limited ability to
cover family living expenses after deducting total monthly debt-service require-
ments from monthly income.

 This list is illustrative rather than exhaustive and does not define specific
parameters for all subprime borrowers.  Institutions that have identified borrow-
ers as "subprime" based on their own internal rating systems should be reported as
such.

 For purposes of reporting on the proposed schedule, subprime lending does not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                                    Page 9
67 FR 46250-01, 2002 WL 1482510 (F.R.)
(Cite as: 67 FR 46250)

refer to individual subprime loans originated and managed, in the ordinary course
of business, as occasional exceptions to prime risk selection standards.  Addi-
tionally, this definition generally does not apply to the following:

- Prime loans that develop credit problems after acquisition.

- Loans initially extended in subprime programs that are later upgraded, because
of their performance, to programs targeted to prime borrowers.

- Community development loans as defined in the Community Reinvestment Act regu-
lations that may have some higher risk characteristics, but are otherwise mitig-
ated by guarantees from government programs, **46253  private credit enhancements,
or other appropriate risk mitigation techniques.

- Institutions that extend credit to subprime borrowers as part of their standard
community lending process or make loans to subprime borrowers as an occasional ex-
ception.

Scope of Schedule

  Subprime lending, by the nature of the definition, is concentrated in the con-
sumer-lending arena.  Thus, the proposed schedule covers only information on con-
sumer loans.  Furthermore, the agencies are proposing that only banking institu-
tions that are programmatic lenders of subprime consumer loans should complete
some or all of this schedule.  Banking institutions that do not have any subprime
consumer lending programs will not be required to provide any information on this
schedule.

  All banking institutions that have any subprime consumer lending programs would
be required to report the total dollar amount outstanding of loans in those pro-
grams as of the quarter-end report date in Part I, item 1. However, only those
banking institutions where the total dollar amount outstanding is greater than or
equal to 25 percent of the reporting institution's Tier 1 capital as of the report
date would be required to complete the detailed items in Parts II, III, and IV of
the schedule discussed below.  Once an institution reaches the 25 percent of Tier
1 capital threshold, it must continue to complete Parts II, III, and IV of the
schedule until it fails to meet the Tier 1 capital threshold for two consecutive
quarter-end report dates or for the remainder of the calendar year, whichever is
longer.

Detailed Items

  The proposed detailed items in Parts II, III, and IV of the schedule would allow
the agencies to perform off-site monitoring of the performance of banking institu-
tions with significant exposures to subprime lending.  Because these parts of the
schedule would be completed only by banking institutions with subprime lending
programs of at least 25 percent of Tier 1 capital, the schedule would minimize the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

information collected from banking institutions with small volumes of loans in
subprime lending programs.

Part II collects a breakdown of the total dollar amount of loans in subprime con-
sumer lending programs as of the report date into the following consumer loan cat-
egories: open-end and closed-end loans secured by 1-4 family residential proper-
ties (with first and junior lien closed-end loans reported separately), credit
card loans, loans extended under other revolving credit plans, and other consumer
loans.  The sum of the amounts outstanding by loan category must equal the total
dollar amount reported in Part I.

Part III requires the same breakout of past due and nonaccrual loans as required
in Schedule RC-N of the Call Report and Schedule PD of the TFR (i.e., loans past
due 30-89 days and still accruing, loans past due 90 days or more and still accru-
ing, and nonaccrual loans) for each category of loans reported in Part II of this
schedule.  However, loans extended under revolving credit plans other than credit
cards and other consumer loans are combined rather than reported separately.

Part IV requires the separate reporting of charge-offs and recoveries as in
Schedule RI-B of the Call Report and Schedule VA of the TFR for the same loan cat-
egories as in Part III.

*III.  Confidentiality*

The agencies are proposing that the information reported in this schedule be ac-
corded confidential treatment on an individual institution basis.  The information
requested will provide the agencies with sensitive business data that is needed to
aid examiners and supervisory analysts in better evaluating the risk profiles and
performance of banking institutions with concentrations of subprime lending pro-
grams.  This information also will be used to plan the detail and timing of exam-
inations and to provide the agencies with a timely and regular source of informa-
tion on subprime lending programs, which is not currently available.

The agencies believe that confidential treatment initially should be accorded
this information collection because, notwithstanding the Examiner Guidance on
Subprime Lending, there is no standard industry-wide approach to the definitions
of either "subprime" or "program," which means that the meanings of these terms
are institution-specific.  Thus, the reported information will not be entirely
comparable from one institution to the next, leading to potential misinterpreta-
tion of the data by the public.

The proposal will not result in the collection of data on all loans to subprime
borrowers, but only on subprime lending programs.  This outcome occurs because of
the supervisory and examination, rather than statistical, focus of the proposed
schedule.  Moreover, because the focus is also on programs rather than individual
loans, attempts to aggregate the reported data across institutions will not
provide users with statistics on the overall volume of subprime loans held by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                                              Page 11
67 FR 46250-01, 2002 WL 1482510 (F.R.)
**(Cite as: 67 FR 46250)**

banking institutions.  For this same reason, the reported data will not reveal
whether an individual institution does or does not have loans to subprime borrow-
ers, nor will it reveal the entire amount of the institution's loans to subprime
borrowers.  As a consequence, care must be taken in interpreting the reported data
to avoid reaching improper conclusions.

 Furthermore, different institutions may reach different conclusions as to whether
one or more of their consumer lending programs are subprime programs and, accord-
ingly, whether their subprime lending programs aggregate 25 percent or more of
their Tier 1 capital.  The agencies therefore believe that some period of time is
needed to ensure that banking institutions understand the proposed definitions and
how they may apply to their various lending programs. This will also enable exam-
iners to determine whether institutions are properly applying these definitions
and correctly reporting the data.

 The agencies also have some concern, due to the sensitive nature of these data,
that the release of the subprime lending information before banking institutions
and the agencies have adequate experience with it could inhibit the collection of
accurate and complete data in the future.  Until any potential problems with the
newly reported data have been addressed, the agencies believe there is a risk that
the data will be misinterpreted and that their release at this time could cause
potential harm to an institution or an increased risk to deposit insurance funds.
The agencies are initially proposing confidential treatment for the proposed new
schedule.  However, after experience has been gained with the data, e.g., after
six or eight quarters, the agencies will reevaluate whether this treatment should
be retained.

*IV. Request for Comment*

 Public comment is requested on all aspects of this proposal.  In addition, com-
ments are invited on:

 (a) Whether the proposed revisions to the Call Report and TFR collections of in-
formation are necessary for the proper performance of the agencies' functions, in-
cluding whether the information has practical utility;

 (b) The accuracy of the agencies' estimates of the burden of the information col-
lections as they are proposed to be revised, including the validity of the method-
ology and assumptions used; **\*46254**

 (c) Ways to enhance the quality, utility, and clarity of the information to be
collected;

 (d) Ways to minimize the burden of information collections on respondents, in-
cluding through the use of automated collection techniques or other forms of in-
formation technology; and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 FR 46250-01                                                    Page 12
67 FR 46250-01, 2002 WL 1482510 (F.R.)
(Cite as: 67 FR 46250)

(e) Estimates of capital or start up costs and costs of operation, maintenance, and purchase of services to provide information.

Comments submitted in response to this Notice will be shared among the agencies and will be summarized or included in the agencies' requests for OMB approval. All comments will become a matter of public record. Written comments should address the accuracy of the burden estimates and ways to minimize burden as well as other relevant aspects of the information collection request.

Dated: July 3, 2002.

Mark J. Tenhundfeld,

Assistant Director, Legislative and Regulatory Activities Division, Office of the Comptroller of the Currency.

Board of Governors of the Federal Reserve System, July 5, 2002.

Robert deV. Frierson,

Secretary of the Board.

Dated at Washington, DC, this 8th day of July, 2002.

Federal Deposit Insurance Corporation

Valerie Best,

Assistant Executive Secretary.

Deborah Dakin,

Deputy Chief Counsel, Regulations and Legislation Division, Office of Thrift Supervision.

[FR Doc. 02-17590 Filed 7-11-02; 8:45 am]

BILLING CODE 4810-33-P, 6210-01-P, 6714-01-P, 6720-01-P

67 FR 46250-01, 2002 WL 1482510 (F.R.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

# News



Contact:    Teri Watson (Investment Community)
            (212) 770-7074

            Nick Ashooh (News Media)
            (212) 770-3523

## AIG DISCLOSES COUNTERPARTIES TO

## CDS, GIA AND SECURITIES LENDING TRANSACTIONS

NEW YORK, March 15, 2009 – American International Group, Inc. (AIG) recognizes the importance of upholding a high degree of transparency with respect to the use of public funds. As a result, after close consultation with the Federal Reserve, AIG is disclosing information identifying certain credit default swap counterparties, municipal counterparties and securities lending counterparties. Before disclosing this information, AIG consulted with the Federal Reserve about the potential public benefit of counterparty disclosure and the potential that such disclosure would cause competitive harm to AIG or its counterparties.

Severe valuation losses on the super senior multi-sector credit default swap portfolio of AIG Financial Products Corp. (AIGFP) triggered collateral provisions in the swap contracts, creating a liquidity crisis for AIG in September 2008. The Federal Reserve Bank of New York (FRBNY) provided an emergency $85 billion loan to AIG to meet short-term cash needs. The aid received by AIG helped avoid severe financial disruptions by providing liquidity to important financial institutions and municipalities.

Using funds from the emergency loan, financial counterparties listed on Attachment A (all attachments are posted online at http://www.aig.com/Related-Resources_385_136430.html ) received a total of $22.4 billion in collateral relating to CDS transactions from AIGFP between September 16, 2008 and December 31, 2008. This amount represents funds provided to such counterparties after the date on which AIG began receiving government assistance. The counterparties received additional collateral from AIG prior to September 16, 2008.

On November 10, 2008, AIG and the FRBNY established Maiden Lane III, a financing entity, to purchase the securities underlying certain CDS contracts from the counterparties to such contracts, allowing the cancellation of the contracts. Attachment B lists payments made by Maiden Lane III to such counterparties.

Municipalities in the states listed on Attachment C received a total of $12.1 billion from AIGFP between September 16, 2008 and December 31, 2008 in satisfaction of Guaranteed Investment Agreement (GIA) obligations. GIAs are structured investments with a guaranteed rate of return. Municipalities typically use GIAs to invest the proceeds from bond issuances until the funds are needed.

Public aid was also used to satisfy obligations to financial counterparties related to AIG's securities lending operations. Securities lending counterparties listed on Attachment D received $43.7 billion from September 18, 2008 to December 31, 2008.

*--more--*

**American International Group, Inc.**
70 Pine Street, New York, NY 10270

**AIG Discloses Counterparties…**
March 15, 2008
Page two

AIG has used the balance of the public aid it received during that time period for other purposes, including the funding of Maiden Lane II and III, debt repayment and capital support for some of its businesses.

AIG Chairman and Chief Executive Officer Edward M. Liddy said that the counterparty and collateral information show that billions in government assistance flowed to dozens of financial counterparties and municipalities during a time of acute stress in the economy.

Mr. Liddy emphasized that AIG's disclosure of the counterparties does not change AIG's commitment to maintaining the confidentiality of its business transactions. "Our decision to disclose these transactions was made following conversations with the counterparties and the recognition of the extraordinary nature of these transactions," Mr. Liddy said.

#    #    #

American International Group, Inc., a world leader in insurance and financial services, is the leading international insurance organization with operations in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world. AIG's common stock is listed on the New York Stock Exchange, as well as the stock exchanges in Ireland and Tokyo.

#    #    #



**AIG** Attachment A - Collateral Postings Under AIGFP CDS †

## Use of Direct Support to AIG from 9/16/08-12/31/08

### AIGFP Related Uses: $52.0 bn

Equity in Maiden Lane III, $5.0

Maturing Debt & Other, $12.5

GIAs Held by Municipalities, $12.1

Collateral Postings, $22.4

| Counterparty | Amount Posted ($ bn) |
|---|---|
| Societe Generale | $4.1 |
| Deutsche Bank | 2.6 |
| Goldman Sachs | 2.5 |
| Merrill Lynch | 1.8 |
| Calyon | 1.1 |
| Barclays | 0.9 |
| UBS | 0.8 |
| DZ Bank | 0.7 |
| Wachovia | 0.7 |
| Rabobank | 0.5 |
| KFW | 0.5 |
| JPMorgan | 0.4 |
| Banco Santander | 0.3 |
| Danske | 0.2 |
| Reconstruction Finance Corp | 0.2 |
| HSBC Bank | 0.2 |
| Morgan Stanley | 0.2 |
| Bank of America | 0.2 |
| Bank of Montreal | 0.2 |
| Royal Bank of Scotland | 0.2 |
| **Top 20 CDS Total** | **$18.3** |
| Other | 4.1 |
| **Total Collateral Postings** | **$22.4** |

† The collateral amounts reflected in Schedule A represent funds provided by AIG to the counterparties indicated after September 16, 2008, the date on which AIG began receiving government assistance. The counterparties received additional collateral from AIG prior to this date, and AIG's SEC report relating to ML III reflects the aggregate amount of collateral that counterparties were entitled to retain pursuant to the terms of the ML III transaction.

# AIG Attachment B – Maiden Lane III Payments to AIGFP CDS Counterparties

| Institution (Counterparty may differ) | Maiden Lane III Payments Made to Counterparties | Maiden Lane III Payments Made to AIGFP |
|---|---|---|
| Deutsche Bank | $2.8 | |
| Landesbank Baden-Wuerttemberg | 0.1 | |
| Wachovia | 0.8 | |
| Calyon | 1.2 | |
| Rabobank | 0.3 | |
| Goldman Sachs | 5.6 | |
| Société Générale | 6.9 | |
| Merrill Lynch | 3.1 | |
| Bank of America | 0.5 | |
| The Royal Bank of Scotland | 0.5 | |
| HSBC Bank USA | 0.0* | |
| Deutsche Zentral-Genossenschaftsbank | 1.0 | |
| Dresdner Bank AG | 0.4 | |
| UBS | 2.5 | |
| Barclays | 0.6 | |
| Bank of Montreal | 0.9 | |
| Other payments to AIGFP under Shortfall Agreement | | $2.5 |
| **Total** | **$27.1** | **$2.5** |

\* Amount rounds to zero

**AIG** Attachment C – Payments Under
Guaranteed Investment Agreements

## Use of Direct Support to AIG from 9/16/08-12/31/08

### AIGFP Related Uses: $52.0 bn



Collateral Postings, $22.4

Equity in Maiden Lane III, $5.0

GIAs Held by Municipalities, $12.1

Maturing Debt & Other, $12.5



| State | Amount ($ bn) |
|---|---|
| California | $1.02 |
| Virginia | 1.01 |
| Hawaii | 0.77 |
| Ohio | 0.49 |
| Georgia | 0.41 |
| Colorado | 0.36 |
| Illinois | 0.35 |
| Massachusetts | 0.34 |
| Kentucky | 0.29 |
| Oregon | 0.27 |
| Delaware | 0.26 |
| New York | 0.21 |
| New Jersey | 0.21 |
| Mississippi | 0.18 |
| Washington | 0.17 |
| Pennsylvania | 0.15 |
| Florida | 0.15 |
| Rhode Island | 0.14 |
| Arizona | 0.12 |
| Texas | 0.10 |
| **Top 20 Total** | **$7.00** |
| Other | 5.10 |
| **Total GIAs** | **$12.10** |

 **Attachment D – Payments to AIG Securities Lending Counterparties**

**Use of Direct Support to AIG from 9/16/08-12/31/08**

($ billions)

| Institution | Payments to Counterparties by U.S. Securities Lending |
|---|---|
| Barclays | $7.0 |
| Deutsche Bank | 6.4 |
| BNP Paribas | 4.9 |
| Goldman Sachs | 4.8 |
| Bank of America | 4.5 |
| HSBC | 3.3 |
| Citigroup | 2.3 |
| Dresdner Kleinwort | 2.2 |
| Merrill Lynch | 1.9 |
| UBS | 1.7 |
| ING | 1.5 |
| Morgan Stanley | 1.0 |
| Societe Generale | 0.9 |
| AIG International Inc. | 0.6 |
| Credit Suisse | 0.4 |
| Paloma Securities | 0.2 |
| Citadel | 0.2 |
| **Total** | **$43.7** |

# EXHIBIT 5

Mail Stop 6010
Via Facsimile and U.S. Mail

September 5, 2008

Mr. Robert B. Willumstad
Chief Executive Officer
American International Group, Inc.
70 Pine Street
New York, New York 10270

> **Re:**  **American International Group, Inc.**
> **Form 10-K for Fiscal Year Ended December 31, 2007**
> **Form 10-Q for Fiscal Quarter Ended June 30, 2008**
> **File No. 1-8787**

Dear Mr. Willumstad:

We have reviewed your August 8, 2008 and August 12, 2008 responses to our June 25, 2008 letter and have the following comments. In our comments, we ask you to provide us with information so we may better understand your disclosure. Where a comment requests you to revise disclosure, the information you provide should show us what the revised disclosure will look like and identify the filing in which you intend to first include it. If you do not believe that revised disclosure is necessary, explain the reason in your response. After reviewing the information provided, we may raise additional comments and/or request that you amend your filing.

Form 10-Q for the Fiscal Quarter Ended June 30, 2008

Note 3 – Fair Value Measurements, page 13

1. Please refer to your tabular disclosure on page 17.  Please explain the basis for the counterparty netting adjustments shown in the table.  Please tell us whether any portion of the counterparty netting adjustments are related to your super senior credit default swap portfolio, and explain how the adjustments are consistent with the requirements of SFAS 157 or other applicable literature.

Mr. Robert B. Willumstad
American International Group, Inc.
September 5, 2008
Page 2

Management's Discussion and Analysis of Financial Condition and Results of Operations

Critical Accounting Estimates

AIGFP's Super Senior Credit Default Swap Portfolio, page 49

2.  You disclose that the unrealized market valuation losses on your super senior credit default swap portfolio represents the amount you would need to pay a willing, able and knowledgeable third-party to assume the obligations.  Please revise your disclosure to discuss how you determined the principal or most advantageous market in accordance with SFAS 157, and disclose who you believe the market participants would be.

You disclose that you value your credit default swaps written on the most senior risk layers (super senior) of designated pools of debt securities or loans using internal valuation models, third-party prices and market indices.  We believe that your disclosure of the contractual terms, methodology, inputs and assumptions could be improved so that an average investor can better understand how you establish the fair value of your CDS.  While we acknowledge that the valuation of these instruments may be complex, we do not believe such complexities obviate the need to provide readable and understandable disclosure.  In addition, where differences exist in your valuations of different types of CDS, we believe that your disclosure should be presented on a disaggregated basis. We issue the following comments to address these matters.

3.  You have provided extensive disclosure regarding the valuation of CDS relating to multi-sector CDOs, but appear to have provided only limited disclosures regarding the valuation of CDS relating to corporate debt/CLOs.  Please revise to provide disclosure of the contractual terms, methodology, inputs and assumptions regarding the valuation of your CDS relating to corporate debt/CLOs.

4.  You disclose that your modified version of the Binomial Expansion Technique (BET) model to value your credit default swap portfolio written on super senior tranches of CDOs of asset-backed securities.  Please clarify how the output of the modified BET model translates into the amount that you would need to pay a willing, able and knowledgeable third-party to assume the obligations.

5.  Please revise to disclose how the BET model calculates the probabilistic measure of expected loss for your credit default swaps.  Explain each significant step in the valuation process.

6.  Please refer to prior comment two of our letter dated June 25, 2008.  Please revise your disclosure to provide a summary that quantifies the CDO pool pricing assumptions for each period presented, and explains any significant changes between periods.

Mr. Robert B. Willumstad
American International Group, Inc.
September 5, 2008
Page 3

7. You disclose that the most significant assumption in your CDS valuation is the pricing of securities within the CDO collateral pools, which you state are "obtained in most cases from the CDO collateral managers, to the extent available." Please expand your disclosure to include the following information:

- Describe the relative significance and effect on the valuation of each pricing methodology used.
- Describe more specifically the third party pricing services and in-house valuation models used by collateral managers.
- Describe more specifically your analysis and testing that verifies the accuracy and completeness of pricing information provided by collateral managers.
- Quantify the impact of the time lag in prices provided by the collateral managers. Describe how and to what extent this time lag affects your fair value estimate.
- Describe more specifically the methods and assumptions used to determine pricing for individual securities when the collateral manager has been unable to provide this information.
- Explain the relative significance of the Monte Carlo simulation process to the overall valuation process. If the Monte Carlo simulation process has a material effect on the valuation, describe the process in more detail.

8. You state that AIG considers all available information in addition to the results of the BET model and that for each individual super senior bond, you compare the BET-driven valuation to the highest third party prices and use the lower value if they do not approximate each other. Please expand your disclosure to describe more specifically the nature and sources of these third party prices and provide a breakdown of your fair valuation that quantifies the third party and BET-driven components for each period presented.

9. You disclose that other inputs to the BET model include diversity scores, weighted average lives, recovery rates and discount rates. Please disclose how each of these inputs are obtained, along with any key underlying assumptions.

10. We acknowledge the new disclosure in your second quarter Form 10-Q. However, we believe that investors would benefit from an expanded description and quantification of the key assumptions underlying your roll rate analysis. Please provide this information, much of which appears on pages 10-14 of your August 8, 2008 response letter.

11. You state that the roll rate and loss severity assumptions were based on several sources, including the research of a well known investment bank and rating agency roll rate models and assumptions. Please include in your revised

Mr. Robert B. Willumstad
American International Group, Inc.
September 5, 2008
Page 4

    disclosure a more detailed explanation of the specific factors and sources that you considered in selecting each key assumption. For each of your key assumptions, quantify the impact of changes in key assumptions underlying the estimates at March 31, 2008 and June 30, 2008 (i.e. both scenarios).

12. You provide sensitivity disclosure for your SFAS 157 compliant fair valuation but not for your estimate of the potential realized credit losses for AIGFP's super senior multi-sector credit default swap portfolio. Please discuss and quantify the sensitivity of this estimate to reasonably likely changes in key assumptions.

*   *   *   *

    Please respond to the comments within 10 business days or tell us when you will provide us with a response.  Your letter should key your responses to our comments.  Detailed cover letters greatly facilitate our review.  Please furnish your letter on EDGAR under the form type label CORRESP.

    You may contact Frank Wyman, Staff Accountant, at 202-551-3660 or Carlton Tartar, Accounting Branch Chief, at 202-551-3387, if you have questions regarding these comments.  In this regard, do not hesitate to contact me, at 202-551-3679.

                        Sincerely,

                        Jim B. Rosenberg
                        Senior Assistant Chief Accountant