UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE AMERICAN
INTERNATIONAL GROUP, INC.
2008 SECURITIES LITIGATION

                                    MASTER FILE
                                    No.  08 Civ. 4772 (LTS)

This Document Relates To:
All Actions


-------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

BARRACK, RODOS & BACINE
 By: Leonard Barrack, Esq.
      Jeffrey W. Golan, Esq. (pro hac vice)
      M. Richard Komins, Esq.
      Robert A. Hoffman, Esq.
      Lisa M. Lamb, Esq.
      Julie B. Palley, Esq.
3300 Two Commerce Square, 2001 Market Street
Philadelphia, Pennsylvania 19103

      A. Arnold Gershon, Esq.
      Regina M. Calcaterra, Esq.
1350 Broadway, Suite 1001
New York, New York 10018

THE MILLER LAW FIRM, P.C.
 By: E. Powell Miller, Esq. (pro hac vice)
      Marc L. Newman, Esq. (pro hac vice)
      David H. Fink, Esq.
      Jayson E. Blake, Esq.
      Brian E. Etzel, Esq.
950 West University Drive, Suite 300
Rochester, Michigan 48307

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

WEIL, GOTSHAL & MANGES LLP
By: Joseph S. Allerhand, Esq.
    Robert F. Carangelo, Esq.
    Paul Dutka, Esq.
    Stacy Nettleton, Esq.
767 Fifth Avenue
New York, New York 10153

*Attorneys for Defendant*
*American International Group, Inc.*

MAYER BROWN LLP
By: Richard A. Spehr, Esq.
    Joseph De Simone, Esq.
    S. Christopher Provenzano, Esq.
    Bradford Jealous, III, Esq.
1675 Broadway
New York, New York 10019

*Attorneys for Defendant Steven J. Bensinger*

AKIN GUMP STRAUSS HAUER & FELD LLP
By: James A. Diehl, Esq.
    David M. Murphy, Esq.
    Richard B. Zabel, Esq.
One Bryant Park
New York, New York 10036

WACHTELL, LIPTON, ROSEN & KATZ
By: David M. Murphy, Esq.
    Meredith L. Turner, Esq.
51 West 52nd Street
New York, New York 10019

*Attorneys for Defendant Martin Sullivan*

WILKIE FARR & GALLAGHER LLP
 By: Michael R. Young, Esq.
     Antonio Yanez, Jr., Esq.
     Mei Lin Kwan-Gett, Esq.
     Brian R. Faerstein, Esq.
787 Seventh Avenue
New York, New York 10019

*Attorneys for Defendant Robert E. Lewis*

WEIL, GOTSHAL & MANGES, LLP
 By: Joseph S. Allerhand, Esq.
767 Fifth Avenue
New York, New York 10153

*Attorneys for the Defendant David L. Herzog*

MILBANK, TWEED, HADLEY & McCLOY LLP
 By: Andrew E. Tomback, Esq.
     Dorothy Heyl, Esq.
     Tamieka Spencer Bruce, Esq.
1 Chase Manhattan Plaza
New York, New York 10005

*Attorneys for Defendant Alan Frost*

LATHAM & WATKINS LLP
 By: Richard D. Owens, Esq.
     David M. Brodsky, Esq.
     Lillian E. Gutwein, Esq.
885 Third Avenue
New York, New York 10022

*Attorneys for Defendant Andrew Forster*

GIBSON DUNN & CRUTCHER LLP
 By: Lee G. Dunst, Esq.
     Jim Walden, Esq.
     Georgia K. Winston, Esq.
     Julie I. Smith, Esq.
200 Park Avenue, 48th Floor
New York, New York 10166

*Attorneys for Defendant Joseph Cassano*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 By: Richard A. Rosen, Esq.
     Brad S. Karp, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064

     Charles E. Davidow, Esq.
2001 K Street, NW
Washington, D.C. 20006-1047

*Attorneys for the Underwriter Defendants*

CRAVATH, SWAINE & MOORE LLP
 By: Thomas G. Rafferty, Esq.
     Antony L. Ryan, Esq.
     Samira Shah, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

*Attorneys for Defendant PricewaterhouseCoopers LLP*

WEIL, GOTSHAL & MANGES, LLP
 By: Joseph S. Allerhand, Esq.
     Robert F. Carangelo, Esq.
     Stacy Nettleton, Esq.
767 Fifth Avenue
New York, New York 101534

*Attorneys for Defendant Edmund S.W. Tse*

SIMPSON THACHER & BARTLETT LLP
 By: James G. Gamble, Esq.
425 Lexington Avenue
New York, New York 10017-3954

*Attorneys for the Outside Director Defendants*


LAURA TAYLOR SWAIN, United States District Judge

Lead Plaintiff State of Michigan Retirement Systems, as custodian of the

Michigan Public School Employees Retirement System, the State Employees Retirement System,

the Michigan State Police Retirement System, and the Michigan Judges Retirement System

("Lead Plaintiff"), brings this action on behalf of a putative class of investors ("Plaintiffs") who

purchased or otherwise acquired publicly traded securities issued by American International

Group, Inc. ("AIG" or the "Company"), between March 16, 2006, and September 16, 2008 (the

"Class Period").  Plaintiffs principally allege that Defendants violated the federal securities laws

by materially misstating the extent to which AIG had accumulated exposure to the subprime

mortgage market through its securities lending program and its credit default swap ("CDS")

portfolio.  That exposure, which placed the Company at risk in ways that Defendants allegedly

declined to disclose, ultimately led to a liquidity crisis that required an unprecedented bailout by

the United States Government.

Plaintiffs assert claims under the federal securities laws against AIG and various

current or former AIG executives, directors, accountants, and underwriters (collectively,

"Defendants").[1]  Specifically, in the Consolidated Class Action Complaint ("CCAC" or

"Complaint"), Plaintiffs assert the following claims: (i) against AIG and the "Section 10(b)

Defendants" (defined below) for alleged violations of Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5 "); (ii) against the "Executive Defendants"

---

[1]     On July 16, 2009, the Court severed the claims against defendant Thomas Athan. Lead Plaintiff and Athan entered into a tolling agreement on July 27, 2009.  (See docket entry nos. 109, 115, 116.)

(defined below) for alleged violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1 ("Section 20(a)"); (iii) against AIG, the "Signing Executive Defendants" and the "Director Defendants" (defined below) for alleged violations of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k ("Section 11 "); (iv) against the "Underwriter Defendants" (defined below) for alleged violations of Section 11; (v) against PricewaterhouseCoopers LLP ("PwC") for alleged violations of Section 11; (vi) against the Underwriter Defendants for alleged violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)") ; and (vii) against the Executive Defendants for alleged violations of Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15").  The Court has jurisdiction of the claims pursuant to 28 U.S.C. § 1331.

Plaintiffs group the defendants in the following manner in the Complaint, and the Court uses the same nomenclature for the purposes of this opinion: Sullivan, Bensinger, Cassano, Forster, Herzog and Lewis are named as the "Section 10(b) Defendants."  (CCAC ¶ 50.)  All of the Section 10(b) Defendants occupied executive-level positions at the Company and were privy to material non-public information concerning AIG and AIGFP.  (CCAC ¶ 553.)  Moreover, Plaintiffs allege, all of the Section 10(b) Defendants "prepared, approved, signed, and/or disseminated" the documents and statements that contain the material misstatements and omissions upon which Plaintiffs' 10(b) claims are predicated.  (CCAC ¶ 552.)

The Section 10(b) Defendants and Frost are named as the "Executive Defendants."  (CCAC ¶ 49.)  Plaintiffs allege that all of the Executive Defendants exercised control over AIG and/or AIGFP during the Class Period through the key management roles they played and their direct involvement in the Company's day-to-day operations, including its

financial reporting and accounting functions.  (CCAC ¶ 566.)  Sullivan, Bensinger and Herzog

are named as the "Signing Executive Defendants."  (CCAC ¶ 608.)  Tse and the "Outside

Director Defendants" are named as the "Director Defendants."  (CCAC ¶ 70.)

        The following twelve defendants or groups of defendants, comprising all of the

served defendants,[2] have moved to dismiss the claims asserted against them:

(i)      AIG, a holding company which, through its subsidiaries, engages in a wide range of

       insurance and financial service activities in the United States and abroad (CCAC ¶ 40);

(ii)     Martin J. Sullivan, President and Chief Executive Officer of AIG from the beginning of

       the Class Period through his resignation on June 15, 2008, who signed the Company's

       Registration Statements and Forms 10-Q and 10-K throughout the Class Period, and

       made many of the statements Plaintiffs allege to have been false or misleading (CCAC ¶¶

       41, 485);

(iii)    Steven J. Bensinger, Executive Vice President and Chief Financial Officer of AIG

       throughout the Class Period, who signed the Company's Registration Statements and

       Forms 10-Q and 10-K throughout the Class Period, participated in the preparation of the

       allegedly false press releases and public filings at issue, and participated in the investor

       conference calls at issue as well (CCAC ¶¶ 42, 489);

(iv)    Joseph Cassano, who was President of AIG Financial Products ("AIGFP"), the division

---

[2]      Plaintiffs have named two additional underwriters as defendants, Banca I.M.I.
S.p.A. and Daiwa Securities SMBC Europe Ltd. Plaintiffs have not effected
service of process on these defendants and they have not appeared in this action.
More than 120 days have passed since the filing of the Complaint.  Accordingly,
the claims asserted against these two defendants are dismissed without prejudice
pursuant to Federal Rule of Civil Procedure 4(m).  Fed. R. Civ. P. 4(m).

that managed the CDS portfolio that is at the center of this action, from the beginning of

the Class Period through his resignation on February 29, 2008 (CCAC ¶ 43);

(v)     Andrew Forster, Executive Vice President of the Asset Trading & Credit Products Group

of AIGFP during the Class Period, who was responsible for managing AIGFP's global

credit division (which contracted to sell the CDSs at issue) and who gave investor

presentations concerning the Company's management of the CDS portfolio (CCAC ¶¶

44, 124, 346);

(vi)    Alan Frost, Executive Vice President of AIGFP during the Class Period, who headed

AIGFP's business and marketing efforts in the United States (CCAC ¶ 45);

(vii)   David L. Herzog, Senior Vice President, Comptroller, and Principal Accounting Officer

of AIG throughout the Class Period, who signed the Company's Forms 10-Q and 10-K

throughout the Class Period and participated in the Company's calls with research

analysts throughout the Class Period (CCAC ¶¶ 46, 491);

(viii)  Robert Lewis, Senior Vice President and Chief Risk Officer throughout the Class Period,

who signed off on each of the CDS contracts and gave investor presentations concerning

the Company's exposure to the mortgage market (CCAC ¶¶ 47, 311, 329);

(ix)    34 financial institutions that served as underwriters of AIG offerings of notes, debentures,

and common stock during the Class Period (the "Underwriter Defendants") (CCAC ¶

51);[3]

---

[3]     Defendants contest the validity of Plaintiffs' service on defendant underwriter
Calyon, which has nevertheless filed a Rule 7.1 Corporate Disclosure Statement
(docket entry no. 145) and joined the Underwriter Defendants' motion to dismiss
(docket entry no. 174).  Plaintiffs' request for leave to re-serve Calyon is granted.

(x)     15 former and current outside directors (the "Outside Director Defendants") who signed various registration statements and annual reports filed with the U.S. Securities and Exchange Commission ("SEC") (CCAC ¶¶ 54-66, 68-69);

(xi)    Edmund S.W. Tse, a Board Member and Senior Vice Chairman for the Life Insurance Division of AIG throughout the Class Period (CCAC ¶ 67); and

(xii)   PricewaterhouseCoopers LLP, which served as an Independent Registered Public Accounting Firm for AIG and audited the Company's financial statements throughout the Class Period (CCAC ¶ 71).

Plaintiffs have moved to strike certain exhibits submitted by Defendants in support of their motions to dismiss.  The Court has reviewed thoroughly all of the parties' submissions, including multiple notices of supplemental authority.  For the reasons that follow, Defendants' motions to dismiss are denied.  In light of the resolution of the motions to dismiss, Plaintiffs' motion to strike is moot.

## I.  BACKGROUND

For the purposes of these motions, the Court takes as true the following facts drawn from the Consolidated Class Action Complaint, the documents incorporated by reference therein, and public filings of which the Court may take judicial notice.[4]  Plaintiffs' 284-page pleading details Plaintiffs' allegations as to the causes of AIG's liquidity crisis, as well as their allegations regarding attendant material misstatements and omissions on Defendants' part.  The Court assumes the parties' familiarity with the record and limits the following summary of

---

[4]     See Citadel Equity Fund Ltd. v. Aquila, Inc., 168 Fed. App'x 474, 476 (2d Cir. 2006) (SEC filings are amenable to judicial notice).

Plaintiffs' factual allegations to matters that are material to the Court's legal conclusions.

A.    *The Genesis of AIG's Exposure to the Subprime Mortgage Market*

AIG was founded as an insurance agency in Shanghai, China, in 1919.  The Company moved to New York in 1949 and, under the leadership of Maurice "Hank" Greenberg, became a publicly held company in 1969.  AIG eventually grew into one of the world's largest insurance and financial services companies.  (CCAC ¶ 81.)

Greenberg initiated AIG's foray into "swap" transactions in 1987 through a joint venture, called AIG Financial Services, which entered into contracts in which one party paid its counterparty a fee to assume the risk of a referenced transaction.  (CCAC ¶ 82.)  The joint venture was highly profitable and it became a division of AIG (AIGFP) in 1993.  (CCAC ¶¶ 83-85.)  In 1998, AIGFP, while led by Tom Savage, began entering into credit default swaps, in which AIGFP received regular premium payments in exchange for assuming the risk that an underlying debt security would not perform.  (CCAC ¶ 86.)   Savage rigorously analyzed each credit default swap transaction until he retired from AIGFP in 2001, at which time Cassano succeeded Savage as the President of AIGFP.  (CCAC ¶ 87.)  In the early years of Cassano's tenure, the division was scrutinized closely by AIG's management.  (CCAC ¶ 88.)

A series of accounting scandals that occurred at AIG between 2000 and 2004 (arising out of misconduct unrelated to AIGFP) led to SEC and Department of Justice ("DOJ") investigations of the Company; AIG's disclosure of internal control failures and recognition of a $3.9 billion overstatement of reported income; AIG's payment of an $80 million fine and restatement of years of financial statements; a downgrade of AIG's AAA credit rating; and, in 2005, Greenberg's forced retirement.  (CCAC ¶¶ 89-91).  Following Greenberg's departure,

AIG's senior management weakened or eliminated the risk controls that Greenberg had put in place to supervise AIGFP.  (CCAC ¶ 129.)  Sullivan, Greenberg's replacement as CEO, cancelled bi-weekly meetings with AIGFP and excepted AIGFP from AIG's rigorous company-wide control procedures.  (CCAC ¶¶ 129, 133.)

At approximately the same time that Greenberg retired, AIG's loss of its AAA rating curtailed AIGFP's ability to engage in certain types of investments.  The credit default swap market, however, remained available.  AIGFP decided to expand considerably its underwriting of credit default swaps, particularly those in which it sold protection on Collateralized Debt Obligations ("CDOs").  (CCAC ¶¶ 91-93.)

CDOs are structured products created by a manager that has purchased asset-backed securities, typically pools of residential mortgages (including subprime mortgages) bundled into Residential Mortgage Backed Securities ("RMBS"), which serve as the underlying collateral for the security.  The CDOs are divided into tranches such that the highest tranche (often referred to as the "Super Senior" tranche) suffers losses only after the collateral pool has been impaired to such an extent that all of the lower tranches have been wiped out.  In a financial alchemy that has been much maligned, the highest tranches of CDOs composed of subprime RMBS were assigned much higher credit ratings than the underlying collateral.  AIGFP only sold protection on the highest tranche.  (CCAC ¶¶ 92-102.)

AIGFP wrote approximately 220 new CDS contracts in 2005, which exceeded the total number of such contracts it had written in the previous seven years combined.  By the end of 2005, AIGFP had written, in the aggregate, approximately $80 billion of credit default swaps relating to CDOs comprised of pools of securities backed by subprime mortgages.  (CCAC ¶

102.)

Senior executives at AIGFP recognized signs in late 2005 that the Company's increased exposure to the subprime mortgage market carried greater risks than they had previously realized.  American General Financial Services, an AIG division in the mortgage lending business, "had become alarmed by the rapidly growing use of subprime mortgages" and "word spread from American General to AIGFP that the subprime business was a minefield." (CCAC ¶ 108.)  Eugene Park, who managed AIGFP's North American credit derivative portfolio, declined the opportunity to be placed in charge of marketing AIGFP's CDSs (which would have entailed a promotion) after concluding that the swaps were unacceptably risky. (CCAC ¶¶ 108-09.)  Most importantly, AIGFP executives realized that the model they were using to evaluate the risk involved with the CDSs (the "Gorton model," constructed by Professor Gary Gorton) "was not adequate to deal with the subprime mortgage debt underlying the insured CDOs."  (CCAC ¶¶ 111, 483.)  In fact, AIGFP executives Frost and Forster did not even provide Gorton with all the data he would have needed to develop a comprehensive model, even if it were possible to do so.  (CCAC ¶ 483.)

AIGFP decided at the end of 2005 to stop entering into new credit default swaps that provided protection on CDOs.  (CCAC ¶ 112.)  According to a confidential witness who was an AIGFP executive in 2005 with knowledge of this decision, the factors that led AIGFP to stop underwriting new CDSs – the declining quality of underwriting standards for subprime loans and the correlation between the types of collateral in the CDOs (which were supposed to be composed of diverse, non-correlated assets) – were already present in the majority of the CDSs that AIGFP had entered into in 2005.  (CCAC ¶ 112.)  AIGFP did not, however, extricate itself

from any of those contracts, nor did it hedge against the increased risk of those contracts. (CCAC ¶¶ 116, 124.)  Rather, defendants Forster, Frost and Cassano rejected suggestions from other AIGFP personnel that AIGFP should hedge the CDS portfolio.  (CCAC ¶ 351(d).)  Although AIG stated in its public filings that it had the ability to hedge its positions (CCAC ¶ 259), and defendant Forster stated at a May 2007 investor conference that hedging the CDS portfolio was unnecessary due to its conservative profile, AIG actually declined to hedge because it would not have been economically feasible to do so.  (CCAC ¶ 126.)

The CDS portfolio put the Company at risk in three ways.  Most obviously, AIG would have to make large payments in the event that a significant proportion of the underlying reference securities defaulted, a risk known as "credit risk."  Additionally, if AIG's credit rating were downgraded, or if the market value of the reference securities declined – due, for example, to a market perception that the mortgage-backed securities within the CDOs were increasingly likely to fall short of providing the expected cash flows because of increasing defaults on the underlying mortgages – AIG would be forced to post collateral to its counterparties to provide security that it could make good in the event of a default, a risk known as "collateral risk."  Morever, in such a scenario AIG would be required to mark-to-market the declining value of the CDS assets in its financial statements.  Such marking to market would cause it to recognize a loss on paper even before it experienced an actual economic loss, a risk known as "valuation risk."  (CCAC ¶¶ 117-22.)

Despite the multitude of risks presented by the CDS portfolio, AIGFP did not subject these investments to strict control procedures.  Cassano presided over weekly meetings with AIGFP executives (including defendants Forster and Frost) where risk management issues

across AIGFP's businesses were discussed, yet he deliberately excluded key risk management personnel from reviewing the Asset/Credit Group (which engaged in the CDS transactions). (CCAC ¶ 133.)  Cassano also did not subject the CDS investments to the rigorous risk analysis process to which the other business units at AIGFP were routinely subjected (CCAC ¶¶ 136-38), and Forster and Frost made valuation and risk management decisions with respect to AIGFP while controlling the flow of relevant information within the Company (CCAC ¶ 480).

AIGFP's CDS portfolio was not the only major source of exposure to RMBS at AIG.  The Company's securities lending program, which was housed within AIG Investments (a separate division from AIGFP), was intended to earn additional return on long-term financial assets by lending securities to banks and brokerage firms in exchange for cash collateral.  In an ambitious effort to generate additional income, it became significantly exposed to the subprime mortgage markets as well: by year-end 2005, the program was investing up to 75% of all the collateral it received from borrowers in RMBS and other mortgage-backed securities.[5]  (CCAC ¶ 219, 244-45, 266(g).)  The securities lending program's exposure to RMBS was particularly risky given that the program was obligated to repay or roll over most of its loans every 30 days. Therefore, investing its collateral in this manner created the risk that a freeze in the RMBS market might quickly precipitate a liquidity crunch for AIG.  (CCAC ¶ 245.)

---

[5]      While Plaintiffs allege that AIG decided to invest "up to 75%" of all received collateral in RMBS and other mortgage-backed securities, the Underwriter Defendants point out that AIG's public filings indicate that the securities lending program actually invested only 60-66% of its collateral in that manner.  (See Underwriter Defendants' Mem. 15, n. 21.)  The distinction is immaterial for the purposes of this analysis.

*B.*     *The Fall of AIG*

In 2006, as has been widely documented, the previously soaring housing market faltered, leading to rising mortgage default rates, falling home values, failures of hedge funds that had long positions in the mortgage market, and bankruptcies of many subprime mortgage lenders.  These events continued throughout 2006 and 2007.  (CCAC ¶¶ 140-48.)  In light of growing investor concern regarding exposure to the subprime mortgage market, AIG, on August 8, 2007 (during the second quarter 2007 investor call), November 8, 2007 (during the third quarter 2007 investor call), and December 5, 2007 (during a special investor meeting) gave three investor presentations addressing its own exposure.  (CCAC ¶ 150.)  These presentations, along with the Company's public filings and press releases, are the focus of many of Plaintiffs' allegations of material misstatements and omissions.

Plaintiffs' securities law claims are based principally on the contention that AIG consistently misled the market by failing to disclose the valuation and collateral risk of the CDS portfolio (which ultimately caused the Company's liquidity crisis) while emphasizing instead what AIG characterized as the "extremely remote" nature of the portfolio's credit risk.  Plaintiffs also allege that AIG consistently trumpeted its risk controls and its careful structuring of its CDS portfolio despite its awareness that its risk controls were inadequate and its models were unable to evaluate the extent of the risk.  (CCAC ¶ 152.)  Plaintiffs allege as well that AIG failed to disclose the nature and extent of the risk to the Company presented by the securities lending program's aggressive foray into RMBS.  (CCAC ¶ 266(g).)

On top of the warnings mentioned above – the alarm sounded by American General Financial Services, Park's refusal to take a leadership role in the CDS business, and the

recognition of the inadequacy of the Gorton model – Plaintiffs contend that AIG received additional warnings regarding the inadequacy of the risk controls at AIGFP and the scope of the risk presented by the CDS portfolio over the course of 2007.  One of those warnings was the resignation of Joseph St. Denis, a former Assistant Chief Accountant at the SEC Enforcement Division, who had been hired by AIG in June 2006 for the position of Vice President of Accounting Policy.  The position was created as part of a company-wide effort to address accounting problems in light of the Company's scandals earlier in the decade.  St. Denis worked out of AIGFP's Connecticut office and was responsible for documenting the accounting of AIGFP's proposed transactions.  (CCAC ¶¶ 156-58.)   However, when St. Denis became concerned about the valuation of AIGFP's CDS portfolio, Cassano told him, "I deliberately excluded you from the valuation of the Super Seniors because I was concerned you would pollute the process."  (CCAC ¶ 160.)  Cassano's various obstructions of St. Denis' efforts to do his job and ensure that AIGFP properly accounted for its transactions led him to resign, which he first attempted to do on September 9, 2007, and finally did on October 1, 2007.  (CCAC ¶¶ 162-64.)  St. Denis informed the AIGFP General Counsel that he believed that his exclusion from the CDS portfolio placed AIG at great risk, and he relayed the same concern to both AIG's Chief Auditor and the PwC engagement partner.  (CCAC ¶¶ 164-66.)

AIG received another warning in August 2007, when Goldman Sachs, a counterparty to an AIGFP credit default swap, demanded $1.5 billion in collateral due to the declining value of the reference CDO.  After negotiation, AIGFP posted $450 million in collateral.  In October 2007, Goldman Sachs demanded an additional $3 billion in collateral, which AIGFP negotiated down to $1.5 billion.  (CCAC ¶ 154-55.)  These undisclosed collateral

demands put AIGFP on notice that at least some of its counterparties were using models that were indicating a steeper decline in CDO values than those used by AIGFP. This was particularly problematic for AIGFP because many of the CDS contracts designated AIGFP's counterparty as the "Valuation Agent" with primary authority to determine the value of the reference CDOs and whether AIGFP was required to post collateral. (CCAC ¶ 320(d).) These collateral demands also put AIG – but not AIG's investors – on notice that the CDS portfolio's collateral risk would have significant consequences for AIG's liquidity.

PwC provided another critical warning to AIG management regarding risk control problems with AIGFP's CDS portfolio in a meeting attended by defendants Sullivan and Bensinger on November 29, 2007. PwC, concerned about an upcoming investor meeting that was scheduled for December 5, 2007, in which AIG was expected to discuss its exposure to the subprime mortgage market, warned AIG of "significant deficiencies, and a possible material weakness, in the valuation process concerning the CDS portfolio." (CCAC ¶ 171.) The Audit Committee meeting minutes reflect that Sullivan, Bensinger, and Lewis were all actively involved in discussions with PwC on this issue. (CCAC ¶ 182.) Despite PwC's warning, AIG proceeded with the December 5, 2007, presentation and did not disclose PwC's expressed concerns.

Following the December 5, 2007, investor meeting, AIG's stock rose over 4%, a rally that one report in the financial news media attributed to "statements from company executives . . . that its exposure to housing is 'manageable,' and that it has no exposure to structured investment vehicles, which hold a big load of the odorous mass known as collateralized debt obligations." (CCAC ¶ 181.) However, on February 11, 2008, AIG disclosed,

in a Form 8-K filed with the SEC, that the CDS portfolio loss estimates supplied in the December 5, 2007, meeting were inaccurate, and that the gross cumulative decline of its CDS portfolio was actually more than $4 billion greater than previously disclosed.  (CCAC ¶¶ 182-83.)  In the February 11, 2008, Form 8-K, AIG attributed the multi-billion dollar inaccuracy to the use of accounting mechanisms (specially, "cash flow diversion features" and "negative basis adjustments") that were unreliable.  (CCAC ¶¶ 183-85.)  The February 11, 2008, 8-K also revealed that AIG had been advised by PwC that AIG had a material weakness in its internal controls related to the CDS portfolio.  (CCAC ¶ 187.)  In response to the announcement, an article in the financial news media reported that "[i]nvestors sold AIG's shares aggressively." (CCAC ¶ 188.)

AIG's 2007 Form 10-K, filed on February 28, 2008, disclosed even greater losses in the CDS portfolio ($11.5 billion) and, in a conference call on February 29, 2008, defendant Bensinger conceded that recording a negative basis adjustment was not consistent with the fair value requirements of GAAP ("Generally Accepted Accounting Principles").  (CCAC ¶ 190.) That same day, defendant Sullivan reported that Cassano had resigned from AIG, although he did not disclose that AIG had agreed to retain Cassano at a salary of $1 million per month.  (CCAC ¶ 194.)

On May 8, 2008, AIG announced its results for the first quarter, including a pre-tax charge of $9.11 billion for a "net unrealized market valuation loss" related to the CDS portfolio.  (CCAC ¶ 198.)  AIG contemporaneously announced its intention to raise $12.5 billion in new capital, and on May 20, 2008, it revealed that it in fact had raised $20 billion in new capital.  (CCAC ¶ 200.)

On June 6, 2008, it was reported that AIG was under investigation by the SEC and the DOJ and, on June 15, 2008, AIG's Board of Directors convened a special meeting and ousted Sullivan from his position as CEO. (CCAC ¶¶ 207-08.) The Company's second quarter results, announced on August 7, 2008, revealed another unrealized market valuation loss on the CDS portfolio of $5.6 billion, as well as $6.08 billion of losses arising from other investments in RMBS. In response to these disclosures, and statements from AIG's new CEO recognizing the Company's overexposure to the U.S. housing market, the Company's share price declined another 18%. (CCAC ¶¶ 210-12.)

The CDOs protected by AIGFP's CDS portfolio continued to decline in value throughout August and into September, requiring AIG to post billions of dollars of additional collateral to its CDS counterparties. On September 15, 2008, AIG's credit rating was downgraded multiple levels by all three major rating agencies. Standard & Poor's attributed the downgrade primarily to AIG's exposure to the mortgage market. The downgrades required AIG to post an additional $14.5 billion of collateral and brought the Company to the brink of collapse. (CCAC ¶¶ 214-18.) On September 16, 2008, the federal government agreed to an $85 billion bailout of AIG in exchange for a 79.9% equity stake in the Company ("the September 2008 Government Bailout"). AIG stock, which had traded at a high of $72.65 per share during the Class Period, closed at $3.75, an 87% fall in six weeks. (CCAC ¶¶ 212, 218, 516.)

C.   *Alleged Material Misstatements and Omissions*

Plaintiffs contend that Defendants began to mislead the market materially with regard to the riskiness of the Company's CDS portfolio and its exposure to RMBS in the Company's 2005 Form 10-K; that Defendants continued to mislead the market through various

public filings and investor conferences throughout the Class Period; and that the material

misstatements and omissions were not cured until the announcement of the September 2008

Government Bailout at the close of the Class Period.  Plaintiffs identify dozens of allegedly

actionable misstatements and omissions, the significance of many of which Defendants

vigorously contest. The Court need not determine the significance of each alleged material

misstatement and omission.  The sampling of allegations included below, however, is sufficient

to support the legal analysis that follows.

> 1.      *AIG's 2005 10-K*

AIGFP entered into a much larger volume of CDS contracts in 2005 than it had in

previous years and, in the bulk of those CDS contracts, the Company assumed the credit risk of a

CDO.  These CDOs were collateralized by portfolios of miscellaneous financial assets, most

commonly residential mortgage-backed securities.  AIG's dramatic expansion into the CDS

market in 2005 thus had the effect of greatly increasing the Company's exposure to the

residential mortgage market, particularly the subprime mortgage market.  These investments

exposed the Company to valuation risk and collateral risk as well as credit risk.  The Company's

2005 Form 10-K, however, did not disclose that the Company's burgeoning CDS portfolio could

require AIG to post large sums of collateral in the event that the underlying CDOs declined in

value or were downgraded.  (CCAC ¶ 266(f).)  Rather, AIG's disclosures regarding its potential

obligations to post collateral were limited to the possibility that a downgrade of AIG could

trigger collateral posting obligations.

The 2005 Form 10-K also contained allegedly misleading disclosures regarding

AIGFP's ability to hedge the risk of the CDS portfolio. Whereas the filing states that "AIGFP

maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss," two confidential witnesses with direct knowledge of AIGFP's credit default swap transactions allege that AIGFP in fact could not economically hedge the CDS portfolio.[6]  (CCAC ¶¶ 125-26.)

AIG's disclosures in the Form 2005 10-K were misleading with respect to the Company's controls as well.  The filing contained extensive discussion of the manner in which the Company had strengthened its controls in light of the accounting scandals of previous years (CCAC ¶¶ 255-58), but did not disclose that at the same time the Company had taken specific measures to weaken AIG management's control over AIGFP.  (CCAC ¶ 129.)

With respect to the securities lending business, in the 2005 Form 10-K, AIG stated that

> AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent.  Invested collateral consists primarily of floating rate debt securities.

(CCAC ¶ 264.)  The anodyne reference to "floating rate debt securities" was misleading because it concealed the fact that, rather than invest the collateral primarily in low-risk instruments, AIG had decided by the end of 2005 to invest up to 75% of the collateral in RMBS. (CCAC ¶ 266(g).)

2.     *AIG's 2006 Disclosures*

Plaintiffs allege that AIG repeated many of the false and misleading statements that were published in the 2005 Form 10-K in the Company's 2006 quarterly reports, 2006 annual report, 2006 quarterly and annual earnings press releases, and 2006 quarterly and annual

---

[6]     Forster made a similar misstatement on behalf of AIG at the May 31, 2007, investor conference.  (CCAC ¶ 302.)

earnings conference calls.  (CCAC ¶ 277.)  In AIG's 2006 Form 10-K, AIG misrepresented the effectiveness of its internal controls and risk management and falsely implied that AIGFP operated under strict risk controls established and monitored by AIG.  (CCAC ¶¶ 285-88.)  AIG's 2006 Form 10-K failed to disclose the valuation risk and collateral risk presented by the CDS portfolio (CCAC ¶¶ 282, 289), and it also failed to disclose the increasing concentration in credit risk in subprime mortgage-backed securities created by the CDS portfolio and the securities lending business (CCAC ¶¶ 282, 290).

　　　　　　　3. 　　AIG's 2007 Disclosures

AIG held a special investor conference on May 31, 2007, at which Forster presented an overview of AIGFP's CDS portfolio.  He assured investors that AIGFP could handle "the worst recession I can imagine"; that "it's actually fairly easy for us to hedge any of the risks that we perceive"; and that "given the conservatism . . . that we've built in these portfolios, we haven't had to do a huge amount of hedging over the years."  (CCAC ¶ 301.) Forster failed to disclose, however, that AIGFP had elected not to hedge its CDS investments because it would not have been economically feasible to do so.  (CCAC ¶ 302.)  Moreover, Forster's bravado regarding the CDS portfolio's ability to withstand "the worst recession I can imagine" contradicted the Company's (undisclosed) recognition that its models were actually incapable of evaluating the risk presented by the CDS portfolio.

On August 8, 2007, AIG announced its financial results for the second quarter of the year and, on the following day, AIG held an investor conference at which it repeated many of the misstatements and omissions previously alleged.  (See generally, CCAC ¶¶ 311-320.)  Lewis emphasized the "strong risk management processes" in all areas related to the Company's

exposure to the mortgage market and he referred to the Company's exposure to that market as "prudent" and "understood and well managed."  (CCAC ¶ 312.)  He discussed the credit risk presented by the portfolio as a "very remote risk" and insisted that "risks to the mortgage market are identified, assessed, analyzed, monitored and managed at all levels of [the Company's] organization," without disclosing the true extent of the valuation and collateral risk posed by the CDS portfolio.  (CCAC ¶¶ 314-15.)  Sullivan and Cassano made similar remarks; Cassano went so far as to say, "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions."  (CCAC ¶¶ 316, 317.)

In the face of increasing concern in the marketplace regarding exposure to the subprime mortgage market, as well as AIG's disclosure in the 2007 Third Quarter Form 10-Q of a $352 million market valuation loss in the CDS portfolio, AIG held another investor conference call on December 5, 2007.  Sullivan stated that the Company had forecast the problems in the residential housing market in 2005 but he did not disclose that the Company, despite that forecast, had failed to take the natural step of hedging or paring back its existing CDS portfolio in any way.  Nor did Sullivan, or any of the other AIG executives who participated in the conference call (which includes all of the Section 10(b) Defendants), disclose that the Company actually increased its exposure to RMBS through the securities lending program at the end of 2005.  (CCAC ¶¶ 335-36.)  With respect to the Company's estimates of the losses incurred in the CDS portfolio, Sullivan stated that AIG was "confident in [its] marks and the reasonableness of our valuation methods."  (CCAC ¶ 338.)

Cassano gave a presentation at the December 5 investor conference as well, in which he also insisted that "we are highly confident that we will have no realized losses on these portfolios during the life of these portfolios."  (CCAC ¶ 339.)  None of the Section 10(b) Defendants disclosed the extent of the valuation or collateral risk presented by the CDS portfolio.[7]  (CCAC ¶¶ 171-182.)  Rather, Cassano characterized the response to the Company's GAAP-required markdown of the portfolio as "hysteria" disconnected from "economic reality" and dismissed the collateral demands AIG had received from CDS counterparties as "like a drive by in a way," suggesting that AIGFP had an ability to avoid collateral calls.  (CCAC ¶¶ 340-42.)

Bensinger spoke at the conference as well, trumpeting AIG's management of AIGFP risk and insisting that "there is not a lot of capital exposed in that business."  (CCAC ¶ 344.)  Forster described in detail the creation of the portfolio, stating that AIGFP conducted thorough due diligence on the managers of each CDO underlying a swap in which AIGFP sold protection.  (CCAC ¶¶ 346, 481.)  Forster's statement is contradicted by the confidential allegation of an executive who headed the CDO business of a major Wall Street investment bank that in each swap transaction between AIGFP and the bank, AIGFP, particularly Frost and Forster, merely requested the underlying and offering documents and did not request access to the counterparties' own valuation or analytical materials relating to the investment.  (CCAC ¶¶ 351(h), 481.)

---

[7]     Similarly, in the Third Quarter Form 10-Q, AIG warned that it could be obliged to post $830 million of collateral if the Company was downgraded but it did not disclose the much greater collateral risk presented by the possibility of downgrades or declines in value of the CDOs on which it had sold protection. (CCAC ¶ 326.)

AIG led investors to believe at the December 5, 2007, investor meeting – and through its Form 8-K/A filed with the SEC two days later – that the total value of its CDS portfolio had declined between $1.4 and $1.5 billion through November 2007.  (CCAC ¶ 333.) A few months later, when AIG subsequently recognized that this figure under-reported losses by over $4 billion (triggering an 11.7% single-day drop in the stock price), it conceded that it had arrived at this figure by using improper accounting techniques.  (CCAC ¶¶ 183-86, 530.)  AIG presented its highly-erroneous estimates on the December 5, 2007, investor call with great confidence (as exemplified by Sullivan's statements quoted above) despite the fact that PwC had warned Sullivan, Bensinger, and AIG of the possibility that the Company had a material weakness relating to the valuation of the CDS portfolio.  (CCAC ¶ 187.)

### 4.    *AIG's 2008 Disclosures*

AIG hosted a conference call on February 29, 2008, discussing the financial results reported for the fourth quarter of 2007 in the Company's 2007 Form 10-K.  Sullivan, Bensinger, and Lewis all made presentations during the call.  (CCAC ¶ 379.)  Sullivan and Bensinger both insisted that investors should focus on the credit risk of the CDS portfolio and downplayed the impact of valuation risk.  (CCAC ¶ 380.)  Bensinger proclaimed that "AIG does believe that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial position nor to its excess economic capital position" because "AIGFP underwrote its Super Senior credit derivative business to a zero loss standard, incorporating conservative stress scenarios at inception."  (CCAC ¶ 380.)  Sullivan, when asked how he could have appeared so confident in a figure that proved to be so drastically wrong during the Company's presentation of its loss estimates on the December 5, 2007, investor call, merely

claimed that the figures presented were "unaudited," without disclosing that in fact his expressed confidence contradicted PwC's explicit warning given a week earlier regarding the potential material weakness.  (CCAC ¶ 381.)

On May 8, 2008, AIG announced its first quarter financial results along with its intention to raise $12.5 billion in new capital.  In a press release, AIG pronounced that it was undertaking the capital raising effort "to fortify [AIG's] balance sheet and provide increased financial flexibility."  (CCAC ¶ 385.)  During a May 20, 2008, investor conference, Sullivan stated that the decision to raise capital "reflects both confidence in AIG's strong balance sheet and the desire to position AIG with enhanced flexibility to take advantage of opportunities as conditions warrant."  (CCAC ¶ 203.)  While emphasizing AIG's commitment to being "proactive," its "opportunist start during the period," and its "invest[ing] in . . . the growth of our business" (CCAC ¶ 203), Sullivan did not disclose that, in fact, the decision by the major ratings agencies on May 8 and 9 to lower AIG's credit ratings and to place a number of the CDO tranches it insured on credit watch precipitated multi-billion dollar collateral calls that would swallow up most of the raised capital.  (CCAC ¶¶ 205, 417.)

In June 2008, Sullivan was forced out as CEO and replaced by Robert B. Willumstad, who had served on the Company's Board of Directors since 1996 and is named as a Director Defendant in this action.  (CCAC ¶ 68.)  Speaking of his assumption of the CEO position in June 2008, Willumstad later stated that "I thought I knew the company well, but after three weeks of digging and turning over rocks, I realized how fragile AIG's balance sheet was." (Golan Decl., Ex. 2.)

II.   Discussion

*A.       Legal Standards: Motions to Dismiss, Rules 9(b) and 12(b)(6), and the PSLRA*

In deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do."  Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citation omitted).  Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). This Twombly standard applies to all civil actions.  Id. at 1953.

Securities fraud claims are also subject to additional pleading requirements. Plaintiffs' Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Produce 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  See In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir. 2001).  Rule 9(b) requires that allegations of fraud be stated with particularity.  Fed. R. Civ. P. 9(b).  Additionally, under the PSLRA, in an action for money damages requiring proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.A. § 78u-4(b)(2) (West 2009).  Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal

quotation marks and citation omitted); Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85,

88 (2d Cir. 1999).

A court considering a motion to dismiss "is normally required to look only to the

allegations on the face of the complaint." Roth, 489 F.3d at 509.  However, "[i]n certain

circumstances, the court may permissibly consider documents other than the complaint in ruling

on a motion under Rule 12(b)(6)." Id.  Courts "may consider any written instrument attached to

the complaint, statements or documents incorporated into the complaint by reference, legally

required public disclosure documents filed with the SEC, and documents possessed by or known

to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  "If . . . allegations of securities fraud conflict with

the plain language of the publicly filed disclosure documents, the disclosure documents control,

and the court need not accept the allegations as true." In re Optionable Sec. Litig., 577 F. Supp.

2d 681, 692 (S.D.N.Y. 2008).  The Court may also consider matters that are subject to judicial

notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

B.    *Plaintiffs' Rule 10b-5 Claims Asserted Against AIG and the Section 10(b)*
      *Defendants*

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder, a plaintiff must allege that "the defendant, in connection with the

purchase or sale of securities, made a materially false statement or omitted a material fact, with

scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff."

Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (citation omitted).  For the reasons that

follow, the Court concludes that Plaintiffs have adequately pleaded this claim with respect to

AIG and the Section 10(b) Defendants.

*1.      Material False Statements and Omissions*

Rule 10b-5 provides: "It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5 (2007).  "A statement is material only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re International Business Machines Corporate Sec. Litig. 163 F.3d 102, 106-07 (2d Cir. 1998) (citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)).  Although "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact," In re Optionable Sec. Litig., 577 F. Supp. 2d at 692, once a corporation does speak, its communication creates "a duty to disclose all facts necessary to ensure the completeness and accuracy of [the corporation's] public statements," Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 469 (2d Cir. 2006).

Plaintiffs need not plead misstatements and omissions on the part of each of the Section 10(b) Defendants separately.  Rather, the group pleading doctrine allows Plaintiffs to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (citation omitted).  The Section 10(b) Defendants – Sullivan, Bensinger, Cassano, Forster, Herzog and Lewis – are all alleged to have had "direct involvement in the everyday business of the company" and Plaintiffs are therefore entitled to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other

group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."[8] In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotation marks omitted).  However, the group pleading doctrine is "extremely limited in scope," and "[o]ne such limitation is that it applies only to group-published documents, such as SEC filings and press releases."  Goldin Associates, L.L.C, v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688, 2003 WL 22218643, at *5 (S.D.N.Y. Sept. 25, 2003) (citations omitted). Furthermore, the doctrine does not permit plaintiffs to presume the state of mind of the defendants at the time the alleged misstatements were made.  See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made." (citation omitted)).

Plaintiffs' allegations, as set forth above, are adequate to plead material misstatements and omissions on the part of AIG and the Section 10(b) Defendants throughout the Class Period.  Plaintiffs' Complaint alleges with particularity that AIG and the Section 10(b) Defendants, through AIG's SEC filings, press releases, and investor conferences, beginning with the Company's 2005 Form 10-K and continuing through the Company's capital raising in May 2008, materially misled the market in the following ways: (i) failing to disclose the scope of AIGFP's expansive underwriting of CDSs in 2005; (ii) failing to disclose that up to 75% of the cash collateral of the securities lending program was invested in RMBS; (iii) falsely stating that

---

[8]     The statements of the Section 10(b) Defendants in their capacity as agents of AIG are all attributable to AIG as well.

the Company engaged in extensive due diligence before entering into swap contracts; (iv) repeatedly emphasizing the strength of the Company's risk controls when addressing investor concerns related to exposure to the subprime mortgage market, without disclosing that the CDS portfolio at AIGFP was in fact not subject to either the risk control processes that governed other divisions of the Company or the risk control processes that previously had been in place at AIGFP; (v) repeatedly pronouncing confidence in the Company's assessment of the risks presented by the CDS portfolio, despite knowledge that the Company's models were incapable of evaluating the risks presented; (vi) stating that the Company had the ability to hedge its CDS portfolio when in fact it was not economically feasible to do so; (vii) leading investors to believe that the primary risk presented by the CDS portfolio was credit risk, when in fact the CDS portfolio entailed tremendous collateral risk and valuation risk; (viii) expressing confidence at the December 5, 2007, investor conference in their estimates related to losses in the CDS portfolio despite a warning from PwC that the Company may have a material weakness in assessing that portfolio; and (ix) leading investors to believe that the Company was raising capital in May 2008 to take advantage of opportunities in the marketplace when, in fact, the capital was necessary to meet billions of dollars' worth of collateral obligations triggered by recent downgrades of the Company's credit rating and the credit ratings of CDOs on which AIG had sold protection.  Each of these allegations of misstatements and omissions plausibly and with particularity frames a claim of concealment of either a significant decision taken by the Company to expose itself to risk or a significant weakness in the Company's risk controls that "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  See In re International Business Machines Corporate Sec. Litig.,

163 F.3d at 106-07 (2d Cir. 1998); Hunt v. Alliance North American Government Income Trust, Inc., 159 F.3d 723, 728 (2d Cir. 1998) (allegations of a defendant's representations that hedging techniques are available and will be used, when made with the knowledge that such techniques are not in fact economically feasible and therefore will not be used, are sufficient to plead materially misleading statements); Sonnenberg v. Prospect Park Financial Corp., No. Civ. 91-435, 1991 WL 329755, at *9 n.5 (D.N.J. Aug. 20, 1991) ("The purpose of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear.").

AIG and the Section 10(b) Defendants contend that many of the Company's statements cited above are not actionable because they were forward-looking statements that were accompanied by sufficient cautionary language identifying various risks of investment in AIG securities.  Forward-looking statements are protected under the "bespeaks caution" doctrine where they are accompanied by meaningful cautionary language.  In re Sina Corp. Sec. Litig., No. 05 Civ. 2154, 2006 WL 2742048, at *9 (S.D.N.Y. Sept. 26, 2006).  However, generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.  In re Regeneron Pharm. Inc. Sec. Litig., No. 03 Civ. 3111, 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005).  Moreover, statements of opinion and predictions may be actionable if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.  In re International Business Machines Corporate Sec. Litig. 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

In Credit Suisse First Boston Corp. v. ARM Financial Group, Inc., the plaintiff

investors alleged that the defendant issuer failed to disclose that the short-term funding contracts

upon which it relied could be redeemed on as little as seven days notice, creating a tremendous

liquidity risk that ultimately materialized, leading the issuer to suffer large losses and a

corresponding collapse of its stock price.  No. 99 Civ. 12046, 2001 WL 300733, at *1-2

(S.D.N.Y. Mar. 28, 2001).  The defendant sought shelter in the disclosure in its Form 10-K that

the funding contracts are "are designed and have historically been held by customers as long term

cash investments, even though under most contracts customers have the option to liquidate their

holdings with written notice of thirty days or less."  Id. at *9.  Judge Pauley held that this

disclosure was inadequate:

> [W]arnings of specific risks like those in the ARM Prospectus do
> not shelter defendants from liability if they fail to disclose hard facts
> critical to appreciating the magnitude of the risks described . . . .  As
> aptly put by Judge Pollack in the context of the bespeaks caution
> doctrine, disclosures of risk provide "no protection to someone who
> warns his hiking companion to walk slowly because there might be
> a ditch ahead when he knows with near certainty that the Grand
> Canyon lies one foot away."

Id. at *8.  Similarly, Plaintiffs here have adequately pleaded that the various general disclosures

cited by AIG and the Section 10(b) Defendants were insufficient to fulfill Defendants' disclosure

obligations under the federal securities laws in light of the undisclosed "hard facts critical to

appreciating the magnitude of the risks described," such as, to name but a few, the known

weaknesses of AIGFP's models; the deliberate weakening of AIGFP's risk controls; the scope of

the exposure to RMBS at AIGFP and the securities lending program; and the valuation and

collateral risk presented by the CDS portfolio that rendered misleading AIG's frequent placement

of emphasis on the "remote" credit risk.  These "hard facts" warrant the inference that the

Section 10(b) Defendants could not have reasonably believed the alleged misstatements and, accordingly, they are not protected as forward-looking statements.  In re International Business Machines Corporate Sec. Litig., 163 F.3d at 107.  In the context of this motion to dismiss, in which the Court must draw all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have adequately stated a claim notwithstanding the cautionary language.  See Iowa Public Employees' Retirement System v. MF Global, Ltd., No. 09-3919-cv, 2010 WL 3547602, at *4 (2d Cir. Sept. 14, 2010) (bespeaks caution doctrine does not apply to omissions of present facts).

> 2.     *Scienter*

A plaintiff's allegations must "give rise to a strong inference of fraudulent intent" to adequately plead scienter; "fraud by hindsight" is an inadequate basis for a securities fraud claim.  Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999).  Scienter can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citation and internal quotation marks omitted).   In evaluating whether the pleadings suggest a strong inference of scienter, the "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  Tellabs, Inc., 551 U.S. at 326.  In order to survive Defendants' motions to dismiss, the inference of scienter that can be drawn from Plaintiffs' Complaint must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  Tellabs, Inc., 551 U.S. at 314.

In <u>Novak</u>, the Second Circuit identified four types of allegations that may be sufficient to allege scienter:  "[D]efendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor"  <u>Novak</u>, 216 F.3d at 311 (citations omitted).  Plaintiffs rely principally on the third of the four <u>Novak</u> rubrics, alleging that AIG and the Section 10(b) Defendants knew facts or had access to information suggesting that their public statements were not accurate.  <u>Novak</u>, 216 F.3d at 311.  To plead scienter based on conscious misbehavior or recklessness, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  <u>Ronconi v. Larkin</u>, 253 F.3d 423, 432 (9th Cir. 2001).  "Plaintiffs can plead conscious misbehavior or recklessness by alleging defendants' knowledge of facts or access to information contradicting their public statements."  <u>In re Bayer AG Sec. Litig.</u>, No. 03 Civ. 15462004, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) (citing <u>Novak</u>, 216 F.3d at 308).  "In cases in which scienter is pled in part by alleging that the defendant knew facts or had access to information suggesting that their public statements were not accurate, the scienter analysis is closely aligned with the analysis as to misleading statements."  <u>In re Alstom SA</u>, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) (internal citation and quotation marks omitted).

As set forth above, all of the Section 10(b) Defendants were allegedly privy to material non-public information concerning AIG and AIGFP, and all of the Section 10(b) Defendants allegedly "prepared, approved, signed, and/or disseminated" the documents and statements that contain the material misstatements and omissions upon which Plaintiffs' 10(b)

claims are predicated.  Plaintiffs' factual allegations, pleaded amply and with particularity,

support an inference that is "at least as compelling as any opposing inference" that AIG and the

Section 10(b) Defendants knew facts or had access to information suggesting that their public

misstatements were not accurate.

    According to the Complaint, AIG and the Section 10(b) Defendants knew,

beginning in 2005, that the Company had acquired billions of dollars' worth of exposure to

RMBS through the CDS portfolio, and knew that, while their model could not properly evaluate

the extent of the related risk, the portfolio carried considerable valuation risk and collateral risk

as well as credit risk.  Moreover, AIG and the Section 10(b) Defendants knew that risk controls

had been weakened at AIGFP.  AIG and the Section 10(b) Defendants deliberately declined,

nonetheless, to disclose these risks to the marketplace, and they similarly declined to disclose the

risk presented by the Company's aggressive expansion into RMBS through the securities lending

program.  As the investment community became increasingly alarmed by the subprime mortgage

crisis, AIG and the Section 10(b) Defendants continued to proclaim – through their public filings,

conference calls with the investment community, and press releases – their confidence that the

CDS portfolio only presented "remote risk" and that the Company's controls were adequate to

evaluate that risk.  AIG and the Section 10(b) Defendants did so despite various internal

indicators to the contrary, including the Company's recognition of the weakness of the Gorton

model; the resignation of St. Denis; PwC's warning of a potential material weakness; and the

multi-billion dollar collateral calls received from AIGFP's CDS counterparties.

    Construing the allegations in the Complaint in the light most favorable to

Plaintiffs, the Court concludes that Plaintiffs have satisfied their burden of alleging facts giving

rise to a strong inference of fraudulent intent.  See In re New Century, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (allegation that defendants certified financial statements despite knowledge of internal control problems states a claim for deliberately reckless misstatements); In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 631 (allegations that "[d]efendants either had actual knowledge of or ready access to facts that contradicted their public statements" adequately plead scienter).  No opposing inference is more compelling.  Accordingly, Plaintiffs' allegations are sufficient to satisfy their pleading obligation with regard to scienter.

### 3.    Loss Causation

The PSRLA requires that in order to sustain a securities fraud claim, a plaintiff must plead loss causation, which is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003); 15 U.S.C. § 78u-4(b)(4).  An allegation that plaintiffs purchased securities at an artificially inflated price, absent any allegation that defendants' misrepresentations caused plaintiffs' economic loss, is insufficient to plead loss causation.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 340-46 (2005).  Loss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline.  Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), aff'd, 216 F. App'x 14 (2d Cir. 2007).  With respect to the latter, "where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled."  Nathel v. Siegal, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008).

Plaintiffs have adequately pleaded a causal link between the alleged misconduct

and the economic harm they ultimately suffered.  The Complaint is replete with allegations that

AIG's stock price fell in response to AIG's corrective disclosures of previously undisclosed

information.  For instance, the Complaint alleges that, upon the disclosure in February 2008 that

the previously provided estimates of AIG's losses from its CDS portfolio were based on

improper accounting techniques and understated the actual losses by billions of dollars, AIG's

stock price fell over 11% in a single day of trading.  Additionally, the Complaint adequately

pleads that many of the principal risks concealed by AIG and the Section 10(b) Defendants'

material misstatements and omissions – such as the threat posed to the Company's liquidity by

the CDS portfolio's collateral risk – subsequently materialized to Plaintiffs' detriment.

    AIG and the Section 10(b) Defendants contend that the decline in AIG's stock

price is attributable to the decline experienced in the stock market generally, and in the financial

services sector specifically, during the severe economic recession that took hold during the Class

Period.  However, the sharp drops of AIG's stock price in response to certain corrective

disclosures, and the relationship between the risks allegedly concealed and the risks that

subsequently materialized, are sufficient to overcome this argument at the pleading stage.

Although Defendants may ultimately demonstrate that some or all of Plaintiffs' losses are

attributable to forces other than AIG and the Section 10(b) Defendants' material misstatements

and omissions, "[t]he existence of intervening events that break the chain of causation, such as a

general fall in the price of stocks in a certain sector, is a 'matter of proof at trial and not to be

decided on a Rule 12(b)(6) motion to dismiss.'"  Nathel v. Siegal, 592 F. Supp. 2d 452, 467

(S.D.N.Y. 2008) (quoting Emergent Capital, 343 F.3d at 197). ____

C.     *Plaintiffs' Claims for Control Person Liability under Section 20(a)*

Plaintiffs assert control person liability claims under Section 20(a) of the

Exchange Act against the Executive Defendants – Sullivan, Bensinger, Cassano, Forster, Herzog,

Lewis and Frost.  While a party cannot be held liable for both a primary violation and as a control

person, alternative theories of liability are permissible at the pleading stage.  Police and Fire

Retirement System of the City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 241 (S.D.N.Y.

2009).  "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show:

(1) a primary violation by a controlled person; (2) control of the primary violator by the

defendant; and (3) 'that the controlling person was in some meaningful sense a culpable

participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)

(quoting SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).  As demonstrated

above, Plaintiffs have stated a claim under Rule 10b-5 with respect to AIG and the Section 10(b)

Defendants' primary participation in AIG's material misrepresentations and omissions. Plaintiffs

have thereby satisfied the first element.

With respect to the second element, "determination of § 20(a) liability requires an

individualized determination of a defendant's control of the primary violator."  Boguslavsky, 159

F.3d at 720.  At the pleading stage, allegations of a Section 20(a) defendant's control need not be

set forth with particularity.  Sgalambo v. McKenzie, No. 09 Civ. 10087, 2010 WL 3119349, at

*8, 16 (S.D.N.Y. Aug. 6, 2010) (allegations that defendants were senior officers and board

members and possessed the power to cause the direction of the company's management and

policies suffice to satisfy the second element of pleading control person liability).  A plaintiff

must only show some indirect means of discipline or influence to plead control.  In re Moody's

Sec. Litig., 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009).

        Of the seven named Executive Defendants, only Frost and Forster dispute that Plaintiffs have pleaded this element adequately.  Frost, Executive Vice President of AIGFP during the Class Period, headed AIGFP's business and marketing efforts in the United States and, along with Forster and other defendants, allegedly "control[led] the flow of information pertaining to AIGFP's super senior CDS portfolio and unilaterally [made] risk management and valuation decisions" on behalf of the Company.  (CCAC ¶¶ 480.)  Frost also allegedly had control over key decisions regarding the financial reporting on the CDS portfolio, which is an essential element of the alleged primary violations.  (CCAC ¶ 266(a).)  Forster, as Executive Vice President of the Asset Trading & Credit Products Group of AIGFP during the Class Period, was responsible for managing AIGFP's global credit division, which contracted to sell the CDSs.  (CCAC ¶ 41.)  Forster also gave investor presentations concerning the Company's management of the CDS portfolio.  (CCAC ¶¶ 124, 301.)  He thereby both managed the operations of the CDS portfolio and held himself out to investors as an authority on the CDS portfolio during the Company's conference calls.  These factual allegations are sufficient to satisfy the control element under the pleading standard of Rule 8(a) as to Frost and Forster.

        With respect to the third element of control person liability under Section 20(a), the pleading requirements for "culpable participation" are satisfied by the same allegations that satisfy the scienter pleading requirements.  In re AOL Time Warner, Inc. Sec. and ERISA Litig., 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004) ("allegations of scienter necessarily satisfy the [culpable participation] requirement").  The Section 10(b) Defendants therefore assert essentially the same arguments in opposition to Plaintiffs' allegations of Section 20(a) culpable conduct that

they assert in opposition to Plaintiffs' allegations of Rule 10b-5 scienter, and those arguments are unavailing for substantially the reasons explained above in connection with the Section 10(b) claims.  The Court now turns to the allegations of culpable conduct on the part of Frost, the only Executive Defendant who is not also a Section 10(b) Defendant.

"In order to plead that a defendant culpably participated in an alleged fraud, plaintiffs must adequately allege that the defendant acted at least with recklessness, in the sense required by Section 10(b) of the Exchange Act and Rule 10b-5."  In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 307-08 (S.D.N.Y. 2008).  Plaintiffs' allegations that Frost (i) rejected suggestions to hedge the CDS portfolio despite being aware of its risks, many of which were not publicly disclosed; (ii) declined to provide Professor Gorton with data necessary to develop a comprehensive model to evaluate the risks of the CDS portfolio; and (iii) made unilateral decisions regarding risk management and valuation of the CDS portfolio without subjecting it to AIG's risk controls, are sufficient to plead plausibly that Frost acted with the recklessness required to satisfy the culpable participation element.  Accordingly, Plaintiffs have stated a claim for control person liability under Section 20(a) of the Exchange Act against each of the Executive Defendants.  See Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 307 (control person allegations evaluated under the standard set forth in Federal Rule of Civil Procedure 8(a)).

D.     *Plaintiffs' Securities Act Claims*

Section 11 of the Securities Act of 1933 provides a private right of action for any investor who purchases securities pursuant to a registration statement that, at the time the registration statement became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading." 15 U.S.C. § 77k (West 2009).  With respect to any sale of a security pursuant to a misleading registration statement, Section 11 extends potential liability to issuing companies, executives and directors, underwriters, and accountants who provide their consent to being named as having prepared or certified any part of the registration statement or any report used in connection with the registration statement.  Id.  Section 12(a)(2) expands the potential liability of underwriters beyond that provided in Section 11 (whose scope is curtailed by the requirement that the material misstatement or omission occur in the registration statement) by providing a private right of action for any investor who purchases securities based on *any* prospectus or oral communication that includes a material misstatement or omission.  15 U.S.C. § 77l(a)(2).  Section 15 of the Securities Act further extends liability to any defendant that controlled a primary violator of Section 11.  15 U.S.C. § 77o.  "The test for whether a statement is materially misleading under Section 12(a)(2) is identical to that under Section 10(b) and Section 11: whether representations, viewed as a whole, would have misled a reasonable investor."  Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004).

Plaintiffs purchased AIG securities during the Class Period that were offered pursuant to AIG's 2003, 2007, and 2008 shelf registration statements.  (CCAC ¶ 616.).  AIG used these shelf registration statements in 101 separate offerings during the Class Period and Plaintiffs assert claims premised on all 101 offerings.  For each offering, the shelf registration statements were supplemented by a prospectus and either a prospectus supplement or a pricing supplement, and the offering materials always incorporated by reference the Company's Forms 10-Q, 10-K, and 8-K.  (CCAC ¶¶ 587-96.)  Plaintiffs assert claims against AIG, the Signing Executive Defendants, and the Director Defendants under Sections 11 and 15, against the Underwriter

Defendants under Sections 11 and 12(a)(2), and against PwC under Section 11, based on their allegations that these registration statements and the documents incorporated therein, as well as additional offering memoranda (in the case of the Underwriter Defendants), contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading.

Defendants contend that Plaintiffs' Section 11 claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  However, Rule 9(b) is only applicable to Section 11 claims "insofar as the claims are premised on allegations of fraud."  In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 631 (S.D.N.Y. 2007) (quoting Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)); see also In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010) (Section 11 of the Securities Act, unlike Section 10(b) of the Exchange Act, does not require that the defendant acted with scienter).  Plaintiffs go to great lengths in the Complaint to separate the allegations of fraud that underlie their Exchange Act claims from the allegations of negligence and non-intentional conduct that underlie their Securities Act claims, which is a permissible pleading tactic that spares the Court (and the parties) the burden of proceeding on separate complaints.  Accordingly, the Court determines whether Plaintiffs' Securities Act claims survive the motions to dismiss under the notice pleading standard of Federal Rule of Civil Procedure 8(a), as elucidated in Twombly and Iqbal.

1.      *Plaintiffs' Standing to Assert Claims under the Securities Act*

Plaintiffs allege that they purchased securities in offerings pursuant to each of the shelf registration statements at issue herein.   (CCAC ¶¶ 581-86.)  These shelf registration statements each expressly incorporate by reference AIG's Forms 10-K, 10-Q, and 8-K, which

include many of the alleged material misstatements and omissions set forth above.  (CCAC ¶ 594.)  Plaintiffs contend that these purchases confer standing upon them to assert claims based on all 101 offerings made by AIG pursuant to the same three shelf registration statements during the Class Period, even offerings in which they admittedly did not purchase securities.

Although the question of whether this is a sufficient basis for standing is undecided in this Circuit, district courts, including a district court in this Circuit, have held that where, as here, "a plaintiff alleges untrue statements in the shelf registration statement or the documents incorporated therein . . . then that plaintiff has standing to raise claims on behalf of all purchasers from the shelf."  In re Citigroup Bond Litig., No. 08 Civ. 9522, 2010 WL 2772439, at *14 (S.D.N.Y. July 12, 2010).  This conclusion was premised on allegations that purchasers in each of the different offerings made pursuant to the same misleading shelf registration statement can trace their injury to the same alleged underlying conduct on the part of the defendants.  It is therefore appropriate to accord standing to a plaintiff to represent purchasers from those offerings "because they have all suffered from the same alleged injury."  Id.  In that case, all of the relevant claims were premised on statements or alleged omissions in company reports that had been incorporated by reference in each of the registration statements at issue.

This Court recently held that the fact that a plaintiff purchased securities in one securities offering does not confer standing on that plaintiff to assert claims on behalf of purchasers of different securities offerings in which the alleged material misstatements and omissions occurred not in the elements of the registration statements that were common to all the offerings but rather appeared in the prospectus supplements unique to each particular offering.  In re Morgan Stanley Mortgage Pass-Through Certificates Litig., No. 09 Civ. 2137, 2010 WL

3239430, at *5 (S.D.N.Y. Aug. 17, 2010).  Here, Plaintiffs do not rely on the information

furnished in the prospectus and pricing supplements unique to each of the 101 offerings but

rather on the alleged material misstatements and omissions located in the common elements of

the three different registration statements: the Company's Forms 10-K, 10-Q, and 8-K

incorporated therein.  Plaintiffs therefore can trace the injury of the purchasers in each of the 101

offerings to the same underlying conduct on the part of the defendants.  Accordingly, the Court

concludes here that Plaintiffs have standing to assert claims premised upon all 101 offerings

alleged in the Complaint.[9]

> ### 2.    The Timeliness of Plaintiffs' Securities Act Claims

Section 13 of the Securities Act provides that

> No action shall be maintained to enforce any liability created under
> [Section 11 or 12(a)(2)] unless brought within one year after the
> discovery of the untrue statement or the omission, or after such
> discovery should have been made by the exercise of reasonable
> diligence . . . .  In no event shall any such action be brought to
> enforce a liability created under [Section 11] of this title more than
> three years after the security was bona fide offered to the public, or
> under [Section 12(a)(2)] of this title more than three years after the
> sale.

15 U.S.C.A. § 77m (West 2009).  A plaintiff in a Section 11 or Section 12(a)(2) case is required

to plead the time and circumstances of its discovery of the material misstatement or omission

---

[9]    None of the decisions cited by the Underwriter Defendants on this point is directly
apposite.  None of those decisions denied standing to a plaintiff who had
purchased securities pursuant to a misleading registration statement and sought to
assert a claim based on another offering made pursuant to that same registration
statement.  See Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y.
2008); In re Authentidate Holding Corp. Litig., No. 05 Civ. 5232, 2006 WL
2034644, at *3 (S.D.N.Y. July 16, 2006); In re Friedman's Inc. Sec. Litig., 385 F.
Supp. 2d 1345, 1371 (N.D. Ga. 2005).

upon which its claim is based.  In re Chaus Sec. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).

Plaintiffs allege that they did not know of the material misstatements and the omissions in the

Registration Statements until the September 17, 2008, announcement of the September 2008

Government Bailout.  (CCAC ¶¶ 636-68, 692-94.)  The Complaint was filed within one year of

that date, on May 19, 2009.  (Docket entry no. 95.)  All of the securities offerings at issue in

Plaintiffs' Section 11 claims, and all of the sales at issue in Plaintiffs' Section 12(a)(2) claims,

occurred within three years of that filing date.  (CCAC ¶ 591.)

         Defendants contend that AIG's earlier disclosures, such as those contained in the

Company's February 11, 2008, Form 8-K and February 28, 2008, Form 10-K, put Plaintiffs on

inquiry notice of the misleading nature of the registration statements, requiring Plaintiffs to assert

their claims within a year of those dates.  However, "[i]nquiry notice exists only when

uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have

discovered" the misconduct.  Nivram Corp. v. Harcourt Brace Jovanovick, Inc., 840 F. Supp.

243, 249 (S.D.N.Y. 1993).  Although "[w]here . . . the facts needed for determination of when a

reasonable investor of ordinary intelligence would have been aware of the existence of

[actionable misconduct] can be gleaned from the complaint and papers . . . integral to the

complaint, resolution of the issue on a motion to dismiss is appropriate," LC Capital Partners, LP

v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003), Plaintiffs' allegations of

continuing misstatements and omissions throughout the Class Period (construed in the light most

favorable to Plaintiffs) support the inference that Plaintiffs were not on inquiry notice until the

September 2008 Government Bailout.  The Court therefore denies the Defendants' motions

insofar as they seek dismissal on statute of limitations grounds.

   3.  *Plaintiffs' Section 11 and Section 15 Claims against AIG and the Signing Executive Defendants*

   The alleged material misstatements and omissions in the documents incorporated by reference in the registration statements that were pleaded with respect to AIG and the Signing Executive Defendants (Sullivan, Bensinger, and Herzog) in the Exchange Act context suffice to state a claim against these defendants under Section 11.[10]  Similarly, the allegations that suffice for the purposes of control person liability under Section 20(a) of the Exchange Act similarly suffice to plead control person liability under Section 15 of the Securities Act.  See In re Global Crossing Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005) (applying a single analysis in determining control person liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act).  Accordingly, Plaintiffs have adequately pleaded these claims with respect to AIG and the Signing Executive Defendants.

   4.  *Plaintiffs' Section 11 Claims against the Director Defendants*

   The sixteen Director Defendants (Tse and the fifteen Outside Director Defendants) do not dispute that, as directors of the Company who signed the registration statements, they can be held liable for material misstatements and omissions in the registration statements and documents incorporated by reference therein.  Their arguments for dismissal of the Complaint are the same as those advanced by AIG and the Signing Executive Defendants:

---

[10] The Signing Executive Defendants' only contention to the contrary relies upon their argument, rejected above, that the heightened pleading standard of Rule 9(b) should apply to these claims.  (See Sullivan Mem. 4 (docket entry no. 159); Bensinger Mem. 18 (docket entry no. 173); Herzog Mem. 10 (docket entry no. 179).)

they contend that the registration statements did not contain material misstatements and omissions; that Plaintiffs lack standing to assert certain claims, and that other claims are time-barred; and that the Rule 9(b) heightened pleading standard should apply to the Section 11 claims.  These arguments have been rejected above and, accordingly, the Director Defendants' motions to dismiss the Complaint are denied.

However, Section 11 only imposes liability on directors who either signed the registration statement on which the claims are premised or served at the time the registration statement was filed.[11]  The potential liability of defendants Bollenbach, Chia, Rometty, to whom Section 11 only applies to claims premised on one or two of the registration statements at issue, is therefore narrower than that of the other Director Defendants who signed all three of the registration statements.[12]

> 5. *Plaintiffs' Section 11 and Section 12(a)(2) Claims against the Underwriter Defendants*

The Underwriter Defendants contend that none of the alleged material misstatements could have misled a reasonable investor and that there was no disclosure obligation as to any of the alleged material omissions.  However, when viewed as a whole and in the light most favorable to Plaintiffs, the allegations regarding the shortcomings of the public filings incorporated by reference in the registration statements and offering materials are

---

[11]     Section 11(a)(3) also imposed liability on "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner."  15 U.S.C.A. § 77k (West 2009).

[12]     Plaintiffs do not contest this point.  (See Director Def.'s Mem. 5, n.2 (docket entry no. 168); Pl.'s Opp. (docket entry no. 192).)

adequate to state a claim under Sections 11 and 12(a)(2), for substantially the reasons stated with

respect to the Court's analysis of these documents in the context of Plaintiffs' Exchange Act

claims.[13]  Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004).  The Underwriter

Defendants' standing and statute of limitations arguments also fail for the reasons stated above.

Accordingly, the Underwriter Defendants' motion to dismiss the Complaint is denied.

### 6.      Plaintiffs' Section 11 Claim against PwC

Under Section 11, PwC can only be held liable for the allegedly false and

misleading statements in the audited financial statements and annual reports on internal controls

prepared by PwC that were included in the Company's Forms 10-K.  15 U.S.C. § 77k(a)(4); see

Herman & MacLean v. Huddleston, 459 U.S. 375, 386 n.22 (1983) (accountants cannot be held

liable for parts of a registration statement that they are not named as having prepared or

certified).  Accountants may ordinarily avoid liability under Section 11 if they conduct audits that

comply with GAAS (Generally Accepted Accounting Standards) and identify any failures to

conform with GAAP (Generally Accepted Accounting Principles) on the part of the audited

company.  See In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 492-93 (S.D.N.Y. 2005)

---

[13]      In light of this conclusion, the Court need not address whether Plaintiffs have stated a claim against the Underwriter Defendants under the Securities Act for their alleged failure to disclose adequately that some of the Underwriter Defendants were counterparties of AIG with respect to its CDS portfolio and securities lending program and that proceeds from the offerings at issue may have been used for those Underwriter Defendants' benefit (CCAC ¶ 597).  See In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004) ("Information regarding relationships that undermine the independence of an underwriter's judgment about the quality of the investment can be material to an investor. As a consequence, non-disclosure of an underwriter or issuer's conflicts of interest can constitute material omissions, even where no regulation expressly compels the disclosure of such conflicts.").

According to federal regulations, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).

Plaintiffs allege that PwC's audited financial statements were not prepared in accordance with GAAP and that PwC did not conduct its audit in accordance with GAAS. (CCAC ¶¶ 434, 442-443, 646.)  Specifically, Plaintiffs allege that PwC had certain obligations to assess the adequacy of AIG's internal controls.  (CCAC ¶ 667.)  Plaintiffs also allege that PwC had certain obligations to disclose the scope of AIG's potential collateral obligations pursuant to FIN 45, which sets forth disclosure requirements for gaurantees.  (CCAC ¶ 442.)  PwC's alleged failure to meet these obligations resulted in its signing unqualified opinions (included in the Comany's 2005 and 2006 Forms 10-K) that did not disclose adequately the risks posed by the CDS portfolio, the securities lending program, and the concentration of exposure to the subprime mortgage market, in violation of various accounting standards, including FAS 107 and 133. (CCAC ¶¶ 677-71.)  Plaintiffs further allege that the Company's 2007 Form 10-K, while identifying a material weakness, also did not adequately disclose the extent of risks presented by the CDS portfolio.  (CCAC ¶ 677.)

PwC contends that Plaintiffs' allegations do not show that there were GAAP or GAAS violations.  PwC disputes Plaintiffs' interpretation of the relevant accounting standards, including standards governing the reporting of derivatives at fair value and disclosure of concentrations of credit risk, and argues that none of these standards imposed obligations on PwC with which it failed to comply.  However, where a plaintiff has made well-pleaded

allegations that an accountant blessed financial statements that violated certain identified GAAP principles and were "fundamentally misleading to investors," it is inappropriate to dispose of the claims at the motion to dismiss stage. In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 338-40 (S.D.N.Y. 2004). Rather, because "[e]ventual evidence on industry practice or expert testimony are likely to shed light on this question," the determination of whether AIG's accounting treatment of its CDS portfolio and its exposure to the subprime mortgage market comported with GAAP in the audited financial statements included in its Forms 10-K "cannot be determined in advance of the development of the record." Id. at 339. Accordingly, PwC's motion to dismiss the Complaint is denied.

## CONCLUSION

Plaintiffs' claims asserted against Banca I.M.I. S.p.A. and Daiwa Securities SMBC Europe Ltd. are dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). Plaintiffs' request for leave to re-serve defendant Calyon is granted. Defendants' motions to dismiss the Complaint are denied in all respects. This Opinion and Order resolves docket entry nos. 153, 156, 158, 160, 163, 165, 171, 174, 175, 178, 181, 184, 186 and 190. The Court will issue a separate order setting a pretrial conference.

SO ORDERED.

Dated: New York, New York
     September 27, 2010

LAURA TAYLOR SWAIN
United States District Judge