UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | Master File No.: 08-CV-4772-LTS **ELECTRONICALLY FILED** |
| This Document Relates To:  All Actions | |

### LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF THE SECURITIES ACT DEFENDANTS FOR JUDGMENT ON THE PLEADINGS

**BARRACK, RODOS & BACINE**
Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
Jayson E. Blake
Courtney Ciullo
Casey A. Fry
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

and

A. Arnold Gershon (AG – 3809)
Regina M. Calcaterra (RC -- 3858)
1350 Broadway
Suite 1001
New York, New York 10018
Tel.:  (212) 688-0782
Fax:  (212) 688-0783

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................4

   I.   The Rule 12(c) Motion is Procedurally Improper ........................................................ 4

   II.   Moving Defendants Misapply the *Fait* Decision to the Facts of This Case .................................... 7

   III.   The Specific Accounting and Auditing Issues on Which the CCAC
       Bases PwC's Liability Are Not Subject to the *Fait* Standard ........................................... 10

      A.   The Failure to Disclose a Significant Concentration of Credit Risk....................................... 10

      B.   The Failure to Disclose Guarantees Under FIN 45................................................. 17

      C.   The Failure to State AIG's Derivatives at Fair Value............................................... 19

      D.   PwC is Liable for its Audit Opinion and SOX Certification .................................. 20

   IV.   The Motion Must Be Denied As to the Underwriter and Director Defendants Because
       They Did Not Issue Any Statements of Opinion ........................................................ 22

CONCLUSION ......................................................................................................................25

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                            <u>Page(s)</u>

*Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield,*
   No. 3:09-CV-1419 (JCH) 2010 WL 1882308, at *3 (D. Conn. May 10, 2010) ....................... 20

*Eisenberg v. Gagnon,*
   766 F.2d 770 (3d Cir. 1985) .................................................................................... 21

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) .................................................................................................. 8

*Fait v. Regions Financial Corp.,*
   655 F.3d 105 (2d Cir. 2011) ........................................................................... passim

*Glamorgan Coal Group v. Ratner's Group PLC,*
   1995 WL 406167 (S.D.N.Y. July 10, 1995) ............................................................. 6

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983) .................................................................................................. 8

*Herskowitz v. Nutri/System, Inc.,*
   857 F.2d 179 (3d Cir. 1988) .................................................................................... 21

*Ideal Steel Supply Corp. v. Anza,*
   652 F.3d 310 (2d Cir. 2011) ................................................................................. 1, 4

*In re American International Group, Inc. 2008 Securities Litigation,*
   741 F.Supp.2d 511 (S.D.N.Y. 2010) ................................................................. 20, 22

*In re Citigroup Bond Litigation,*
   No. 1:08-cv-09522-SHS (S.D.N.Y.) ....................................................................... 5

*In re Donald J. Trump Casino Litigation,*
   7 F.3d 357 (3d Cir. 1993) ....................................................................................... 21

*In re Lehman Bros. Securities & ERISA Litigation,*
   No. 08 Civ. 552, No. 08 Civ. 552 (LAK), 2011 WL 3211364
   (S.D.N.Y. July 27, 2011) ........................................................................................ 16

*In re Suprema Specialties, Inc. Securities Litigation,*
   438 F.3d 256 (3d Cir. 2006) ................................................................................... 22

*In re WorldCom, Inc. Sec. Litig.,*
   346 F.Supp.2d 628 (S.D.N.Y. 2004) ...................................................................... 10

Cases                                                                                                                          Page(s)

*In re WorldCom Securities Litigation,*
    352 F.Supp.2d 472 (S.D.N.Y. 2005)................................................................................ 21, 22

*McLean v. Alexander,*
    599 F.2d 1190 (3d Cir.1979)................................................................................................ 22

*Oshinsky v. New York City Housing Authority,*
    98 Civ. 5467 (AGS) 2000 WL 1225796 (S.D.N.Y. Aug. 28, 2000) ........................................ 20

*Sellers v. M.C. Floor Crafters, Inc.,*
    842 F.2d 639 (2d Cir. 1988)................................................................................................... 5

*Stack v. Lobo,*
    903 F.Supp. 1361 (N.D. Cal. 1995) ...................................................................................... 23

*TSC Industries v. Northway, Inc.,*
    426 U.S. 438 (1976)............................................................................................................. 14

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) ........................................................................................................... 21

Statutes

15 U.S.C.§ 77k................................................................................................ 3, 4, 7, 8, 10, 24

15 U.S.C.§ 77l(a)(2)................................................................................................. 4, 6, 7, 8

Rules

Fed. R. Civ. Pro. 12(c) .............................................................................................................. 1

Fed. R. Civ. Pro 56................................................................................................................... 5

## PRELIMINARY STATEMENT

Defendant PricewaterhouseCoopers, LLC ("PwC"), joined by the Underwriter and Outside Director Defendants (collectively, the "Securities Act Defendants" or "Moving Defendants"), have moved for judgment on the pleadings (the "Motion") – more than a year after the Court denied motions to dismiss filed by these defendants. The Motion seeks to extend the holding of *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), to the claims asserted against Moving Defendants in this case. But the *Fait* case addressed forward-looking estimates, and the pleading rules it established for such issues cannot logically be applied to the omissions and misstatements in this case, which are neither estimates nor forward-looking, but are matters of objective, existing fact.

In addition to lacking merit, the Motion is untimely. Discovery has been on-going following the Court's September 2010 denial of motions to dismiss filed by all defendants, which mounted comprehensive challenges to the sufficiency of the pleadings. Defendants have produced millions of pages of documents. Lead Plaintiff has deposed fourteen fact witnesses, and an additional 35 depositions (including depositions of witnesses affiliated with the Moving Defendants) are currently either scheduled or in the process of being scheduled. Under these circumstances, the law is clear in this Circuit that district courts must consider all evidentiary materials pertinent to a Rule 12(c) motion, which effectively converts such a motion to one for summary judgment. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011). The Motion, moreover, raises factual issues that can only be resolved on the basis of a full evidentiary record. At an appropriate time Moving Defendants may challenge the evidentiary support for the claims against them, but this case is now well past the point when the Court should revisit failed challenges to the sufficiency of the pleadings.

Moreover, Moving Defendants' attempt to apply the *Fait* decision to the claims in this case stretches the holding of *Fait* beyond all reasonable bounds. The issue addressed in *Fait* was the standard for pleading falsity of financial statement entries for goodwill and loan loss reserves. The court held that estimates of that type – based on predictions of future events – can only be false if the estimate was incorrect and the speaker did not believe the statement of opinion at the time it was expressed. *See Fait*, 655 F.3d at 110, 112. But the accounting statements and omissions on which the Moving Defendants' liability in this case is based do not involve quantifications or estimates and are not forward-looking. They are statements of existing fact that AIG was required, but failed, to disclose, thereby making false or misleading its 2005 and 2006 financial statements that were audited by PwC and incorporated into registration statements signed by the Outside Director Defendants for public offerings underwritten by the Underwriter Defendants.

One of the principal contentions on which Moving Defendants' Securities Act liability is predicated is that AIG's financial statements, which were contained in its 2005 and 2006 10-Ks, violated GAAP by failing to disclose an enormous concentration of credit exposure to subprime mortgage debt. This concentration was located primarily in AIG's "multi-sector" credit default swap ("CDS") portfolio, which totaled more than $79 billion at the time AIG decided to stop writing new CDSs at the end of 2005, of which $64 billion had some subprime component, Consolidated Class Action Complaint ("CCAC") ¶ 314, and in its securities lending investment portfolio, which by mid-2007 included ▮▮▮▮▮▮▮ in exposure to subprime mortgage-backed securities and another ▮▮▮▮▮▮ in exposure to Alt-A mortgage-backed securities.[1] In addition, the CCAC alleges that AIG's financial statements during the class period violated GAAP by

---

[1]   *See* document Bates numbered AIG-PSLRA14222300, attached as Exhibit 1 to the Declaration of Jeffrey W. Golan ("Golan Decl."), filed in support of this opposition brief.

failing to disclose the existence of billions of dollars of guarantees that AIG provided to its CDS counterparties in the form of collateral posting requirements.

Nothing in the *Fait* decision supports extending the standard applied in that case to the accounting issues in this case. *Fait* dealt with allegations that financial statements were false because the defendants ***recorded*** false forward-looking estimates. This case, on the other hand, alleges that AIG failed to ***disclose*** objective, existing facts that they were required to disclose under GAAP. Such an extension of *Fait* would radically alter the statutorily mandated elements of claims under Sections 11 and 12(a)(2) by making proof of the absence of an "honest belief" a requirement on most, if not all, negligence-based claims brought under those statutory sections, in direct contradiction to the language of the statute, which makes proof of a good faith belief an affirmative defense.   And while Moving Defendants point to provisions in the GAAP pronouncements relating to these accounting issues that discuss the need, in some circumstances, for valuation judgments, those provisions are not relevant here. The disclosures that AIG failed to make required, at most, arithmetic, not estimation.

Even if it were proper to apply the *Fait* standard to the facts of this case, which it is not, the Motion still should be denied.  The evidence demonstrates that ███████████████████

██████████████████████████████████████████████████

███████████████████████ Indeed, for PwC to feign an honest belief that AIG did ***not*** have a "significant concentration of credit risk" in subprime debt – a concentration that was at the heart of AIG's failure, requiring the largest bailout by the U.S. government ever – it would have had to have turned a blind eye to AIG's enormous subprime exposure.

Finally, although the Underwriter and Outside Director Defendants join in the Motion, the *Fait* decision has no relevance to them at all. Even if *Fait* were found to apply to the types of

judgments at issue in this case, neither the underwriters nor the outside directors had any part in rendering such judgments, which were made by AIG's management and audited by PwC. The claims against the underwriters and outside directors in this case arise from the express language of Sections 11 and 12(a)(2) of the Securities Act, which extend liability to such persons based solely upon their status. Having expressed no opinions, there is no issue as to their belief in their opinions, and *Fait* is inapplicable to them.

## ARGUMENT

### I.   The Rule 12(c) Motion is Procedurally Improper

This litigation is much too far advanced for the Court to revisit the sufficiency of the pleadings. As the Second Circuit recently held in *Ideal Steel Supply Corp.*, 652 F.3d at 326, where a court is presented with a Rule 12(c) motion at an advanced stage of the litigation, it must consider all "evidence . . . produced during discovery." In *Ideal*, shortly after the completion of discovery, defendants made a Rule 12(c) motion to dismiss the plaintiffs' RICO claims. The district court, without considering the evidence that had been obtained in discovery and offered in opposition to the motion, found that the complaint failed to adequately plead a RICO claim and dismissed the complaint. The Second Circuit held that the district court erred in failing to consider all documents and deposition testimony that could "fill the perceived gaps in the Complaint." *Id.* The Second Circuit further found that the district court was required to "assume[] the truth of the Complaint's allegations *and* of evidence in the record supporting those allegations...." *Id.* at 326 (emphasis added). Accordingly, the Second Circuit vacated the judgment of the district court and, since discovery had been completed, remanded for trial. *Id.* at 326.

In *In re Citigroup Action Litigation*, No. 1:08-cv-09522-SHS (S.D.N.Y.), pending in this Court, Judge Stein entered an order on November 23, 2011 denying a motion for judgment on the pleadings under circumstances virtually identical to those here. The Citigroup defendants, who are represented by the same law firm that represents the Underwriter Defendants in this case, similarly argued that the court should revisit the sufficiency of the pleadings based upon the *Fait* decision. Judge Stein ruled that, because the plaintiffs sought to present materials obtained in discovery in opposition to the motion, it "must be treated as one for summary judgment under Rule 56." November 23, 2011 Order at 1.[2] He further ruled that "it would be extremely inefficient to consider such a motion at this time" because the motion did not seek dismissal of all remaining claims in the litigation and therefore would not resolve the litigation. He therefore dismissed the motion with leave to renew it in connection with summary judgment motions to be filed after the close of discovery. *Id.* at 2.

As in *Ideal* and *Citigroup,* Moving Defendants' Rule 12(c) Motion cannot properly be considered by the Court at this stage of this litigation. This action is currently in the midst of active discovery and has been for nearly a year. To date, defendants have produced tens of millions of pages of documents, and depositions of witnesses have been ongoing for months. As a result of the discovery efforts, Lead Plaintiff has already uncovered substantial evidence supporting its claims. Under the mandate of *Ideal*, the Court would be required to consider all of the evidence uncovered by Lead Plaintiff during discovery and thereby turn the motion into a motion for summary judgment. In fact, this is what the Second Circuit found the district court had done in *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988), a case relied on by Moving Defendants. There, because the district court considered matters outside the

---

[2]   A copy of Judge Stein's order is attached as Exhibit 2 to the Golan Declaration.

pleadings, the Second Circuit not only deemed the defendants' motion to be a motion for summary judgment, it reversed the trial court's order granting the motion. Just as in *Sellers*, there are disputed factual issues in this case. If the Court is inclined to consider the Moving Defendants' motion on the merits, the Court should not only consider the evidence uncovered to date, but give Lead Plaintiff the opportunity to complete discovery on issues relevant to the Motion.[3]

Moving Defendants rely on *Glamorgan Coal Group v. Ratner's Group PLC*, 1995 WL 406167 (S.D.N.Y. July 10, 1995), in support of their argument that a motion for judgment on the pleadings is appropriate at this stage of the case, even though a motion to dismiss was previously denied, because there has been a recent change in the law. *Glamorgan* is distinguishable on a number of grounds. First, the procedural posture was markedly different from this case. In *Glamorgan*, the motion for judgment on the pleadings was filed by all of the defendants, only one of whom had previously moved to dismiss, and thus most of the defendants were not taking a second "bite at the apple." More importantly, unlike this case and unlike *Ideal*, *Glamorgan* involved a single factual issue, the resolution of which was evident from the face of the pleadings. The defendants in that case were an issuer of stock, certain of its officers, and its investment bankers, all of whom participated in the private placement of the stock. The defendants sought judgment on the pleadings on a claim asserted against them under Section 12(a)(2) of the Securities Act after the Supreme Court issued a decision establishing that Section

---

[3]     Case Management Order No. 3, entered on November 2, 2011, established an April 30, 2012 fact witness deposition cut-off in this case. Fourteen fact witness depositions have been taken by Lead Plaintiff to date, with four more depositions scheduled to take place through mid-January 2012. Counsel for Lead Plaintiff recently sent defendants' counsel a letter identifying 29 additional fact witnesses and the time periods in which Lead Plaintiff intends to take these depositions, which included witnesses identified with each of the Moving Defendants. The parties are in the process of setting a schedule for the remaining depositions.

12(a)(2) does not apply to private placements.  The motion for judgment on the pleadings raised a single issue – whether the stock was sold in a private placement – and the pleadings provided a complete answer.  In this case, however, as in *Ideal*, the 12(c) motion raises factual questions that have been, and currently are, the subject of extensive discovery.  As discussed below, these factual questions include, for example, whether, to the extent the accounting issues on which Lead Plaintiff's Securities Act claims are based actually involve "opinions" in the sense addressed in the *Fait* decision (which Lead Plaintiff disputes), PwC in fact honestly believed, and had a reasonable basis to believe, that AIG's financial statements were properly stated and that it conducted its audits of AIG in accordance with GAAS.

Moving Defendants' arguments are inappropriately raised at this time and should be reserved for the summary judgment stage of the litigation.  Respectfully, the Court should adopt the procedure followed by Judge Stein in the *Citigroup* Bond Litigation and deny the Motion.

## II.   Moving Defendants Misapply the *Fait* Decision to the Facts of This Case

In *Fait*, the Second Circuit held that financial statement assertions of the value of goodwill and loan loss reserves can only be false, within the meaning of Sections 11 and 12(a)(2) of the Securities Act, if the estimates are false and if person or entity making the assertions did not honestly believe them at the time they were made.  655 F.3d at 113.  Moving Defendants' argument rests heavily on an unwarranted extension of the *Fait* decision.  As Moving Defendants construe *Fait*, a court must dismiss all Securities Act claims that involve any application of judgment, no matter what type of judgment is involved, unless the plaintiff pleads that the defendant making the statement actually disbelieved that the statement was true.  But that is far too broad an interpretation of *Fait*.  Some degree of judgment could be said to be involved in most, if not all, disclosures required by the securities laws.  For example, whether a fact is

material could be presented as a matter of judgment. Similarly, whether the omission of a fact makes a statement misleading could be presented as a matter of judgment. However, such determinations are not dependent on the maker's judgment. Rather, such determinations are for the trier of fact to make based on objective facts, rather than a speaker's judgment. Moving Defendants' expansive reading of the *Fait* decision, if carried to its logical conclusion, would re-write the federal securities laws to require plaintiffs to plead and prove a defendant's subjective disbelief in any statement or omission that arguably concerned an exercise of judgment, and thereby effectively raise the standard of liability under Section 11 from a negligence standard to, at least, knowing misconduct.

Contrary to the Moving Defendants' view of the law post-*Fait*, the Second Circuit could not legitimately have intended to eliminate all negligence-based claims under Section 11, whether against auditors or any other category of defendants, as this would conflict with binding Supreme Court precedent. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability [under Section 11] against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence."); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976) ("[E]xperts such as accountants who have prepared portions of a registration statement are accorded a 'due diligence' defense.")

Moreover, the Second Circuit was quite explicit in *Fait* about the scope of its holding: "This case requires us to consider whether certain statements concerning **goodwill and loan loss reserves** in a registration statement of Defendant–Appellee Regions Financial Corporation give rise to liability under sections 11 and 12 of the Securities Act of 1933." *Fait*, 655 F.3d at 106 (emphasis added). Goodwill and loan loss reserves belong to that category of accounting issues that not only involve disclosure but also involve estimating values to be recorded on the

8

company's books.  Goodwill and loan loss reserve estimates are necessarily forward-looking.  As the court observed in *Fait,* goodwill is defined under GAAP as "an asset representing the *future economic benefits* arising from other assets acquired in a business combination that are not individually identified and separately recognized."  *Id.* at 110 (quoting FAS 141 ¶3j) (emphasis added).  The court similarly described loan loss reserves as "reflect[ing] management's opinion or judgment about what, if any, portion of amounts due on the loans *ultimately might not be collectible*."  *Id.* at 113 (emphasis added).  Because the future cannot be known, forward-looking judgments are especially vulnerable to second guessing, and the *Fait* approach is designed to immunize such forward-looking judgments from hindsight attacks.

Thus, as a close reading of *Fait* makes clear, the requirement that a plaintiff plead and prove a speaker's subjective disbelief in a statement of opinion applies only to types of accounting decisions and similar matters that (a) involve recording of quantitative determinations, (b) involving the exercise of professional or skilled judgment, (c) with regard to future events.

As discussed in the following sections, Moving Defendants' motion would extend the subjective disbelief standard applied in *Fait* to areas that are not forward-looking and do not involve applying professional judgment to make quantitative estimates.  Such an unprecedented and unwarranted expansion of *Fait* would have serious ramifications.  Not only would Moving Defendants' reading of *Fait* impose an extraordinarily high pleading burden, given that a plaintiff ordinarily does not have access to an auditor's or other defendant's internal documents before filing a complaint, such a pleading burden is contrary to the express provisions of Section 11 of the Securities Act.  The wording of Section 11 clearly provides that an auditor or other person who "expertises" a portion of a registration statement may assert his or her good faith

9

belief in the truth of his or her opinion as an *affirmative defense.* The Securities Act thereby places the burdens of pleading and proof squarely on the expert – *not* on the plaintiff – to show that he or she had a reasonable, good faith belief in the truth of his or her opinion. *See* 15 U.S.C.§ 77k(b)(3)(B), which provides:

> (b) Notwithstanding the provisions of subsection (a) no person, other than the issuer, shall be liable as provided therein *who shall sustain the burden of proof* –
>
> \*                    \*                    \*
>
> (3) that ... (B) as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert, (i) *he had*, after reasonable investigation, *reasonable ground to believe, and did believe*, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading;…. (Emphasis added.)

As Judge Cote made clear in the *WorldCom* class action, to prove that a Section 11 defendant conducted a "reasonable investigation," the defendant must demonstrate having conducted a "searching inquiry." *In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d 628, 678 (S.D.N.Y. 2004).

In this case, the principal accounting issues do not involve predictive, quantified estimates like the assessments of goodwill and loan loss reserves at issue in *Fait*. The accounting issues here primarily involve required disclosures. To the extent these disclosures involve the value of assets or liabilities, they involve non-judgmental, objective, arithmetic computations. Therefore, applying the *Fait* standard to the issues in this case would be an illogical and unwarranted extension of that decision.

### III.    The Specific Accounting and Auditing Issues on Which the CCAC Bases PwC's Liability Are Not Subject to the *Fait* Standard

### A.    The Failure to Disclose a Significant Concentration of Credit Risk

Moving Defendants do not contest that FAS 107 requires companies to disclose "significant concentrations" of credit risk. They argue, however, that the determination of a "significant concentration" of credit risk is a matter of opinion, and thus an auditor who incorrectly fails to require such a disclosure is afforded the same extremely high level of protection that *Fait* affords to determinations of goodwill and loan loss reserves. The type of disclosure required under FAS 107, however, is completely different from disclosure of goodwill and loan loss reserves, which involve expert quantification and are based upon future events. AIG's exposure to credit risk was a known, or knowable, objective fact, based principally upon (a) what it paid for the subprime mortgage-backed bonds it purchased, particularly in its securities lending portfolio, and (b) the par, or "notional" amount of the subprime mortgage-backed bonds that were referenced by its credit default swaps.

Moving Defendants argue that a claim under FAS 107 is subject to the *Fait* standard for two reasons. First, they point to the provision in FAS 107 stating that, once a significant credit risk is identified, the financial statements must disclose the "maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur" if the counterparties "completely failed to perform."[4] Latching on to the term "gross fair value," and taking it out of context, Moving Defendants argue that the use of this concept in FAS 107 automatically makes the risk concentration determination a matter of opinion. Second, Moving Defendants argue that the determination of whether a risk concentration is "significant" is a matter of opinion.

These arguments fail for a number of reasons. The "fair value" argument is a red herring. Lead Plaintiff has not asserted a claim in this case that AIG disclosed, or that PwC audited, an

---

[4] See ¶ 15A.b. of FAS 107, a copy of which is attached as Exhibit H to the Declaration of Antony Ryan (the "Ryan Declaration"), submitted by Moving Defendants in support of the Motion.

improper estimation of the loss AIG would incur based upon "gross fair value" of the subprime assets purchased by its securities lending unit or referenced by its credit default swaps. On the contrary, the CCAC alleges that AIG completely failed to disclose this credit risk concentration in its 2005 and 2006 10-Ks. *See* CCAC ¶ 434. Because AIG did not disclose this significant concentration, it never addressed the second requirement in the 2005 or 2006 10-Ks – *i.e.,* it did not disclose *any* amount of loss it would incur if all of these assets defaulted. So, regardless of whether calculating the maximum loss AIG would incur in the event of a default of its entire subprime mortgage debt-related risk would have involved forward-looking "fair value" estimates for these assets – which it would not – Lead Plaintiff cannot be required to allege that Moving Defendants disbelieved such estimates when neither AIG nor the Moving Defendants ever publicly made them in the first place.

Moreover, determining the amount of credit loss that AIG would incur if all of its subprime mortgage-backed bonds were to default did not require estimation; it simply required arithmetic. FAS 107 does not require an estimate of future losses likely to be incurred. Rather, to determine the maximum *possible risk* of loss from a category of bonds, such as the subprime mortgage-backed securities in the securities lending portfolio, AIG would merely have to compute the amount paid for the bonds and subtract any amortization of principal. [5] The "fair value" of the bonds, in the sense of their market value, would not enter into the calculation. Similarly, determining the *maximum amount* that AIG could be required to pay under credit default swap contracts also would not require an estimate, but merely would involve determining an objective fact by an arithmetic computation[6] based upon the terms of the contracts.[7]

---

[5]    *See* ¶¶ 10-11 of the Declaration of Harris L. Devor, CPA, attached to the Golan Decl. as Exh. 11.

[6]    *Id.*, ¶¶ 8-9, 11.

Moving Defendants argue that FAS 107 requires an entity preparing financial statements, and an auditor auditing them, to determine whether a risk concentration is "significant," and that such a determination is a matter of judgment. From this, Moving Defendants argue that this claim should be dismissed against PwC because the CCAC does not allege that PwC disbelieved any judgment it may have made in not ensuring such a disclosure was made before issuing unqualified audit opinions on AIG's 2005 and 2006 financial statements. But determining whether a concentration of risk is "significant" can only be a matter of judgment if an issuer or an auditor actually first determines the total amount of credit risk in a particular area, such as exposure to subprime mortgage debt, and then makes a reasoned evaluation of whether that amount is significant. Here, Lead Plaintiff's review of PwC's audit work papers has uncovered ███████████████████████████████████████

████████████████████████████ . ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ .

---

[7]    In footnote 8 to AIG's 2007 financial statements, on page 164 of its 2007 Form 10-K, (Golan Decl., Exh. 3) AIG broke down its credit default swap portfolio into categories by the underlying reference obligations, including corporate loans, prime residential mortgages, corporate debt and collateralized loan obligations, and multi-sector collateralized debt obligations; and AIG provided the notional amount of the CDSs in each category. The footnote discloses AIG's credit loss exposure on these CDSs as follows: "While the credit default swaps written on corporate debt obligations are cash settled, the majority of the credit default swaps written on CDOs and CLOs require physical settlement. Under a physical settlement arrangement, AIGFP would be required to *purchase the referenced super senior note obligation at par* in the event of a non-payment on that security." Thus, AIG's credit exposure on the multi-sector CDSs would be the par value of the referenced security, *not* the "fair value," in the sense of current market value. Thus, determining the maximum amount it would have to pay in the event of default of all CDOs with subprime mortgage-backed collateral would simply require totaling the par value of those CDOs.

In any event, even if the determination of whether a risk concentration is "significant" may be considered a matter of opinion, it is entirely different from the type of opinions at issue in *Fait*, which concerned quantified estimates based on uncertain future events. As used in FAS 107, the concept of "significance" is akin to materiality. Whether an omitted fact is material – or, in this case, significant – is, under well-settled legal and accounting standards, an objective question for the trier of fact to determine based on a "reasonable person" standard. *See TSC Industries v. Northway, Inc.,* 426 U.S. 438, 446, (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor.")

But in this case, no rational auditor, indeed no rational person, could honestly believe that AIG's risk concentration in the subprime mortgage market was insignificant. As the CCAC describes in extensive detail, AIG's concentration of risk exposure to subprime mortgage-backed assets was what necessitated the largest government bailout of a single company in history, totaling $85 billion, in September 2008.

There is, moreover, an abundance of evidence in the record in this case that AIG itself considered its exposure to the subprime mortgage market to be highly significant beginning at least as of the end of 2005. To cite just a few examples:[8]



---

[8]      Emphasis in the quotations in this section has been added. References to exhibit numbers (e.g., "Exh. [x]") are to exhibits attached to the Golan Declaration. Because certain of the documents cited herein were produced pursuant to the Confidentiality Order entered in this case, Lead Plaintiff is filing certain portions of this section under seal.



Moreover, internal AIG documents obtained in discovery have revealed that



Therefore, even if there is an element of judgment involved in making a determination of the significance of a risk concentration, and even if the Court were inclined to extend the holding of *Fait* to encompass such matters, there is no conceivable way a rational auditor who had conducted a GAAS audit could form an honest opinion that AIG's risk concentration in subprime mortgage-backed debt was insignificant. Indeed, ██████████████████████████████ ██████████████████████████████

Notably, AIG belatedly did make some disclosure of its concentration of subprime mortgage-related credit risk beginning in mid-2007, and AIG identified in its 2007 10-K what portion of that risk was comprised of subprime debt. These disclosures represent an overdue concession that this risk concentration was significant. While PwC may contend that AIG's risk concentration in subprime mortgage-backed debt took on more significance in 2007 because the market became more concerned about subprime debt, this excuse holds no water. As the evidence cited above shows, ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████.[9]  As alleged in the CCAC, if PwC had performed a

---

[9]  In *In re Lehman Bros. Securities & ERISA Litigation*, No. 08 Civ. 552, No. 08 Civ. 552 (LAK), 2011 WL 3211364 at *19 (S.D.N.Y. July 27, 2011), cited by defendants in their brief at 16-17, Judge Kaplan found that a single email from an unnamed employee expressing concern about the build-up of Alt-A mortgage and commercial mortgage-backed debt exposure was sufficient to deem a risk concentration in those asset types "significant" for purposes of FAS 107, and thus to state a claim for failing to disclose this risk concentration. Similarly, he found

GAAS audit, it would have known that despite the concerns about subprime debt that prompted the Financial Products unit of AIG to stop taking on new subprime debt exposure at the end of 2005, the AIG securities lending unit continued to increase its exposure to subprime mortgage-related debt, thereby increasing the Company's risk concentration in this area. *See* CCAC ¶¶ 670-71.

### B.   The Failure to Disclose Guarantees Under FIN 45

The CCAC also alleges that AIG's 2005 and 2006 financial statements were false and misleading for failing to comply with disclosure requirements contained in FIN 45, which deals with accounting for guarantees. FIN 45 required AIG to disclose the "maximum potential amount of future payments" that could result under the collateral posting provisions[10] in AIG's credit default swap contracts, which functioned as guarantees of AIG's performance under the contracts. Moving Defendants argue that this claim must be dismissed under *Fait* because, they contend, the determination of the maximum potential amount of future payments is, in essence, a fair value type determination and is "inherently subjective." Again, Moving Defendants are wrong. While FIN 45 does contain a provision relating to the recording of certain types of guarantees at "fair value," these requirements are separate and independent from the disclosure requirements in FIN 45.

---

that a presentation to Lehman's executive committee that identified risks inherent in over-concentration in global commercial real estate was sufficient to state a claim for failing to disclose such a significant concentration under FAS 107. *Id.* at *20. The evidence cited above is far stronger than the evidence supporting the claims in *Lehman*, weighing heavily in favor of upholding the claims for violating FAS 107 in this case as well.

[10]   Specifically, paragraph 13b of FIN 45 requires the reporting entity to disclose, *inter alia*, "[t]he maximum potential amount of future payments (undiscounted) the guarantor could be required to make under the guarantee." *See* copy of FIN 45 attached as Exhibit L to the Ryan Declaration.

Although Moving Defendants attempt to blur the distinction between the fair value requirements and the disclosure requirements in FIN 45, the determination of the maximum potential amount of future payments possibly due under the guarantees has nothing to do with a fair value determination. The "maximum potential amount of future payments" under a CDS contract is based on the terms of the contract, whereas the "fair value" of the security referenced by a CDS is a market measure that depends upon facts external to the contract and expected future events. The CCAC does not assert any claim relating to the failure to **record** properly guarantees at fair value in AIG's 2005 and 2006 year-end financial statements. Rather, the CCAC alleges a failure by PwC to require AIG to **disclose** the maximum potential amount of future payments under guarantees in the form of collateral posting provisions of the CDS contracts. For CDSs written by AIG, the collateral posting requirements were set forth in appendices to the contracts. Generally speaking the maximum amount of the payments under the guarantee, *i.e.*, the amount of collateral that AIG could be required to provide, was the notional amount of the swap contract.[11] Thus, the aggregate maximum amount was not an estimate, but was an objective fact determinable through arithmetic computation from the terms of the contracts.[12]

In sum, even if AIG were required to make fair value estimates under FIN 45, whether or not it properly made such estimates is not at issue here. The CCAC does not allege that Moving Defendants made or audited such false estimates, and therefore Lead Plaintiff had no burden to plead Moving Defendants' disbelief in any such estimates. What is at issue with respect to

---

[11]

[12]    *See* ¶¶ 13-15 of the Devor Declaration, Exh. 11 to Golan Decl.

AIG's guarantees is simply the failure to disclose an objective, arithmetically calculable number, to which the *Fait* test does not apply.

### C.     The Failure to State AIG's Derivatives at Fair Value.

Moving Defendants further argue that *Fait* requires dismissal of the claims asserting violations of FAS 5, FAS 133, FAS 107 and FAS 157 relating to AIG's failure to report its credit default swap portfolio at fair value during the first three quarters of 2007, or alternatively to disclose the "reasonable possibility" that the value of the credit default swap portfolio was impaired, must be dismissed. Moving Defendants argue that these claims fail because the CCAC does not adequately allege Moving Defendants' disbelief in their statements regarding the value of the credit default swaps.

This argument completely fails. Moving Defendants concede that the only claims in the CCAC relating to the disclosures of the fair value of AIG's multi-sector CDS portfolio relate to the interim financial statements published in AIG's Form 10-Qs for the first three quarters of 2007. Def's. Br. at 13. *See* CCAC ¶¶ 430 – 433; 146 - 147.[13] With respect to PwC, no claim is asserted against it relating to those interim financial statements because PwC did not audit them and, accordingly, never expressed any opinion on them as a whole or on any matters contained in them. As this Court observed in its opinion denying PwC's motion to dismiss in this case,

---

[13]     Although the CCAC contains several references to AIG's failure to record its credit default swaps at fair value, these are in the context of allegations of a material weakness in the Company's internal controls. *See, e.g.*, CCAC ¶¶ 20, 266(b), 277(a), 277(b), 320(b), 351(a), 351(b). The CCAC does not assert a claim against PwC based on the reported values of the credit default swap portfolio per se; rather, the claim asserted is that PwC falsely represented that AIG's internal controls were sufficient. *See, e.g.*, CCAC ¶¶ 432. The CCAC further alleges that AIG admitted, and PwC specifically found and disclosed in its opinion on the 2007 financials published in February 2008 in the 2007 10-K, that AIG had a material weakness in its internal controls, which resulted in an inability to properly value its CDS portfolio. *See, e.g.*, CCAC ¶¶ 187, 193, 357.

"Under Section 11, PwC can only be held liable for alleged false and misleading statements in the audited financial statements and annual reports on internal controls prepared by PwC that were included in the Company's forms 10-K." *In re American International Group, Inc. 2008 Securities Litigation*, 741 F.Supp.2d 511, 540 (S.D.N.Y. 2010). PwC therefore lacks standing to challenge claims based solely on these statements, and to the extent that PwC seeks judgment on the pleadings as to disclosures contained in AIG's interim financial statements, its motion is moot. *See Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield*, No. 3:09-CV-1419 (JCH) 2010 WL 1882308, at *3 (D. Conn. May 10, 2010) (moving defendant lacked standing to move to dismiss claims not asserted against it); *Oshinsky v. New York City Housing Authority*, 98 Civ. 5467 (AGS) 2000 WL 1225796, at *7 (S.D.N.Y. Aug. 28, 2000) (motion to dismiss moot as to claims not asserted against moving defendants).[14]

### D.    PwC is Liable for its Audit Opinion and SOX Certification

PwC argues that the *Fait* decision provides it with immunity from Section 11 liability as to its opinions on AIG's annual financial statements and its Sarbanes-Oxley ("SOX") certifications regarding AIG's internal controls because the CCAC does not adequately allege its lack of belief in the truth of those opinions. But as *Fait* makes clear, an auditor's liability for its overall opinions regarding GAAS and SOX issues is derivative of its determinations on the various audit issues that the plaintiff challenges. *See Fait*, 655 F.3d at 113 (dismissing claims regarding SOX opinions and audit opinions because "Plaintiff's remaining allegations related to SOX, GAAP, and GAAS are essentially derivative of his primary allegations regarding goodwill and loan loss reserves."). Although in *Fait* the Second Circuit dismissed claims regarding the

---

[14]    As discussed below, the claims asserted against the other Moving Defendants do not assert that those defendants expressed any opinion whatsoever, and therefore, the *Fait* pleading standard does not apply to them.

outside auditor's audit and SOX opinions because it found the allegations regarding goodwill and loan loss reserves to be inadequate, in this case, the reverse is true. Here, because PwC's arguments fail to undermine Lead Plaintiff's primary allegations regarding, *inter alia*, AIG's failure to disclose concentrations of credit risk and guarantees, PwC cannot escape liability for its audit opinions that are based in part upon its faulty audit procedures relating to those issues.

In any event, the critical question left unaddressed by *Fait* is what sort of allegations satisfy the subjective disbelief prong of the standard applied there. Fortunately, there is a well-developed body of law dating from well before the *Fait* decision that addresses that question. Courts have emphasized that whether an auditor subjectively believes his opinion involves an inquiry into the genuineness of the claimed belief, which in turn involves whether it was reasonable for the auditor to claim to have a subjective belief in his or her opinion in light of the evidence. *See, e.g., In re Donald J. Trump Casino Litigation,* 7 F.3d 357, 372 (3d Cir. 1993) (noting that, in *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991), the Supreme Court upheld a finding of liability for a statement of opinion "because the minority shareholders reasonably understood [the opinion] to rest on a factual basis"); *Herskowitz v. Nutri/System, Inc.,* 857 F.2d 179, 185 (3d Cir. 1988) (the dual "without a genuine belief" and "without a reasonable basis" test "is intended to identify deviations from the appropriate standard of care in expressions of opinions by professionals 'with greater access to information or having a special relationship to investors making use of the information....'") (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985). Thus, courts have upheld claims that auditors lacked a genuine belief in their audit opinions based upon allegations that the auditors failed to conduct an audit in accordance with GAAS, coupled with allegations of "red flags" suggesting improper accounting entries that would have been apparent if the auditors had complied with GAAS. *See In re WorldCom*

*Securities Litigation,* 352 F.Supp.2d 472, 496 (S.D.N.Y. 2005) (citing *McLean v. Alexander,* 599

F.2d 1190, 1198 (3d Cir.1979); *In re Suprema Specialties, Inc. Securities Litigation,* 438 F.3d

256, 279 (3d Cir. 2006) (reversing an order granting a motion to dismiss and finding that the red

flags confronting an auditor did not support the district court's conclusion that "it can not [sic] be

said that BDO did not have an honest belief that the statements made by it were true.").

Here, the Court has already denied PwC's motion to dismiss the claim that it did not

conduct its audits in accordance with GAAS. *See AIG,* 741 F.Supp.2d at 541. Specifically, Lead

Plaintiff alleged in the CCAC that despite previously finding material weaknesses in AIG's

internal controls, PwC gave clean audit opinions on AIG's 2005 and 2006 financial statements,

only to admit in connection with its 2007 audit that AIG had not remediated these weaknesses

and they had surfaced in connection with the valuation of the Company's credit default swap

portfolio. Moreover, as demonstrated above, if PwC had conducted a GAAS audit, there is no

question that it would have been aware of the existence of AIG's enormous exposure, both on

and off its balance sheet, to subprime mortgage debt. Thus, the allegations in the CCAC are

sufficient to support a claim that PwC did not have a genuine belief in the truth of its audit and

SOX opinions regarding AIG's 2005 and 2006 financial statements.

## IV.  The Motion Must Be Denied As to the Underwriter and Director Defendants Because They Did Not Issue Any Statements of Opinion

The Underwriter Defendants and the Director Defendants, against whom only Securities

Act claims are asserted in the CCAC, join in the motion for judgment on the pleadings. Even if

the arguments in the Motion were persuasive as to the claims against PwC, which they are not,

those arguments do not provide any basis for dismissal of the claims against the other Securities

Act Defendants. Moving Defendants incorrectly contend that, to state a Securities Act claim

against defendants other than PwC for the accounting issues alleged in the CCAC, *Fait* requires

Lead Plaintiff to "prove that the Securities Act Defendants falsely represented their belief in those opinions at the time the disclosures were made." Df. Br. at 22. Not only does *Fait* not require that, it would make no sense to impose such a requirement on parties who never publicly stated any opinions "at the time the disclosures were made," but rather are statutorily liable solely by virtue of their status as underwriters or directors.

The court in *Fait* made it clear that the standard it announced applies only to a person expressing a belief or opinion: "[W]hen a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion *alleged to have been communicated by a defendant*, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." 655 F.3d at 110 (emphasis added*); see also id.* at 111 ("Requiring plaintiffs to allege *a speaker's* disbelief in, and the falsity of, the opinions or beliefs expressed ensures that their allegations concern the factual components of those statements.") (emphasis added).

Here, unlike the claims against PwC, whose audit opinions were included in the Registration Statements for the public offerings during the Class Period and therefore is deemed under Section 11 to have "expertised" portions of the Registration Statements, neither the Outside Director Defendants nor the Underwriter Defendants are alleged to have made any of the false statements in the Registration Statements upon which the Securities Act claims are based or in the 10-Ks and 10-Qs incorporated by reference therein. *See Stack v. Lobo*, 903 F.Supp. 1361, 1376 (N.D. Cal. 1995) ("an outside director does not become liable for the contents of a group published document merely by signing it"). As *Fait* makes clear, to the extent financial statement items are statements of opinion, they are the opinions of management. *See* 655 F.3d at 109 ("[L]oan loss reserves 'reflect *management's* opinion as to the likelihood of future loan

losses and their magnitude.'") (quoting from district court opinion, emphasis added); *id.* at 110
("Estimates of goodwill depend on ***management's*** determination of the "fair value" of the assets
acquired and liabilities assumed, which are not matters of objective fact.") (Emphasis added.)
Indeed, the Outside Director Defendants and the Underwriter Defendants are not alleged to have
made any statements whatsoever, much less any statements of opinion, in either the Registration
Statements or the SEC filings incorporated therein.

The Section 11 claim against the Outside Director Defendants is predicated on subsection
(a)(2) of Section 11, which lists among the persons who shall be liable for false or misleading
statements in a registration statement "every person who was a director of … the issuer at the
time of the filing of the part of the registration statement with respect to which his liability is
asserted." The Section 11 claim against the Underwriter Defendants is predicated on subsection
(a)(5) of Section 11, which makes liable "every underwriter with respect to such security;" and
the Section 12(a)(2) claim against the Underwriter Defendants is predicated on the language of
that section that makes liable "[a]ny person who…offers or sells a security…by means of a
prospectus…which includes an untrue statement of material fact or omits to state a material fact
necessary in order to make the statements, in the light of the circumstances under which they
were made, not misleading…." Section 11(b)(3) expressly permits persons against whom claims
are made under Section 11(a) to assert ***an affirmative defense*** that they believed the statements
in the Registration Statement to be true, and Section 12(a)(2) contains a similar provision
permitting the affirmative defense that a defendant did not know, and in the exercise of
reasonable care could not have known, of such untrue statements or omissions.

Applying the *Fait* standard to the outside directors and underwriters in this case would
expand the scope of that decision to persons who expressed no opinions in a registration

statement or prospectus. Moreover, in direct contradiction to the language of Sections 11 and 12 of the Securities Act, applying PwC's arguments to outside directors and underwriters would shift to the plaintiff the burden of pleading and proving defendants' disbelief in the truth of their false statements, a burden that the statute expressly places on those defendants.

Therefore, the Motion must be denied out of hand as to the Underwriter Defendants and the Director Defendants.

## CONCLUSION

For all of the foregoing reasons, the Motion for Judgment on the Pleadings must be denied.

Dated:  December 2, 2011

**BARRACK, RODOS & BACINE**

Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
M. Richard Komins
Robert A. Hoffman
Lisa M. Lamb
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838

            and

A. Arnold Gershon (AG – 3809)
Regina M. Calcaterra (RC- 3858)
425 Park Avenue, Suite 3100
New York, New York 10022
Tel.: (212) 688-0782
Fax: (212) 688-0783

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
Jayson E. Blake
Courtney Ciullo
Casey A. Fry
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*

25