USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/6/12

**BR&B**

**Barrack, Rodos & Bacine**
A Professional Corporation
Attorneys At Law

Philadelphia
San Diego
New York
New Jersey

*Jeffrey W. Golan*
jgolan@barrack.com

June 16, 2011

Honorable Debra C. Freeman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Courtroom 17A
New York, NY 10007-1312



Re:   In re American Int'l Group, Inc. 2008 Sec. Litig.
      Master File No. 08, CV-4772 (LTS) (DCF)
      Defendants' Document Request No. 27

Dear Judge Freeman:

Pursuant to Rule 2(A) of Your Honor's Individual Practices, and Local Rule 37.2, I write on behalf of Lead Plaintiff State of Michigan Retirement Systems ("Lead Plaintiff") in the above-referenced matter in response to the letter from Robert F. Carangelo, Esq., on behalf of defendant American International Group, Inc. ("AIG"), dated June 9, 2011.

As we explained in my letter to Mr. Carangelo dated May 23, 2011, which he appended to his letter to the Court, Lead Plaintiff objects to disclosing the identities of the four confidential witnesses referenced in the Consolidated Class Action Complaint (the "Complaint") for a number of reasons. First, disclosure of these names will reveal privileged attorney work product; second, defendants cannot demonstrate substantial need or undue hardship; and third, protection of the confidentiality of persons who provide information used in drafting securities fraud complaints is necessary to maintain the deterrent effect of the federal securities laws.

Contrary to defendants' claim that "the great weight of authority" denies work product protection to confidential witnesses in securities class actions, at least five jurisdictions, including this one (twice), have found that work product protects the identity of confidential witnesses from disclosure because "if the identity of the interviewed witnesses is disclosed, opposing counsel can infer which witnesses counsel considers important, revealing mental impressions and trial strategy. Such evaluations, impressions, and strategy are at the heart of the work product rule." *In re MTI Technology Corp. Sec. Litig. II*, 2002 U.S. Dist Lexis 13015, at *7-8 (C.D. Cal. June 13, 2002); *see also In re Ashworth, Inc. Sec. Litig.*, 213 F.R.D. 385, 388-99 (S.D. Cal. 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 U.S. Dist. Lexis 5969, *4-5

*Barrack, Rodos & Bacine*

Honorable Debra C. Freeman
Page 2
June 16, 2011

(S.D.N.Y. Jan. 26, 2007); *In re St. Paul Travelers Sec. Litig. II*, 2007 U.S. Dist. LEXIS 34527, *5-7 (D. Minn. May 10, 2007); *In re SLM Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 16893, *1-3 (S.D.N.Y. Feb. 15, 2011); *Ross v. Abercrombie & Fitch Co.*, 2008 WL 821059, at *1 (S.D. Ohio Mar. 24, 2008). Lead Plaintiff believes that no appellate court has considered this issue directly. *See* Gideon Mark, *Confidential Witnesses in Securities Litigation*, 36 Iowa J. Corp. L. 551, 580 (Spring 2011). However, the Second Circuit, in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), upheld the ability of plaintiffs in securities class actions to rely on confidential witnesses, stating that the use of such witnesses to support allegations in a complaint was not grounds for dismissal as long as there was sufficient indicia of the reliability of their statements. Thus, the Second Circuit has implicitly recognized that securities litigation plaintiffs have a legitimate need to maintain the confidentiality of sources. Requiring plaintiffs to disclose those sources in the discovery phase of the case would effectively eviscerate *Novak*.

Defendants rely heavily on *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2008 U.S. Dist. Lexis 57542 (S.D.N.Y. July 30, 2008). As I explained in the May 23, 2011 letter to Mr. Carangelo, the decision in *Marsh* was based upon a "fact-specific determination as to whether disclosure was warranted" under standards of Rule 26(b)(3), and the facts here are very different from *Marsh*. In *Marsh*, the court found grounds for disclosure based upon the complaint's referencing 17 confidential witnesses and, even though plaintiffs listed 362 individuals with relevant knowledge in their initial disclosures, their list did not even include all of the confidential witnesses. *Id.* at *15-16. Judge Kram did not announce a general rule, however, and in fact noted that the situation in that case was "fundamentally different from one in which the defendant seeks to narrow an all-inclusive list of sources." *Id.* at *16. Here, there are only four confidential witnesses, far fewer than the 17 in *Marsh*; indeed, it is far fewer than the 16 confidential witnesses in in *SLM Corp., supra*, where Judge Pauley recently declined to find undue hardship and denied a request for disclosure of the confidential witnesses referred to in the complaint. 2011 U.S. Dist. LEXIS 16893 at *1, *2.

Defendants acknowledge that the *Marsh* case on which they rely distinguished situations where the plaintiffs had provided initial disclosures that included the names of all of the confidential witnesses among the names in a list of persons with relevant knowledge. *See, e.g.*, *Veeco*, *MTI*, and *SLM Corp.*, where the courts found that defendants could use the names provided in the plaintiffs' initial disclosures to take discovery regarding the information provided by confidential sources. Defendants argue, however, that because the Lead Plaintiff did not provide initial disclosures in this case, the identities of the confidential witnesses must be


*Barrack, Rodos & Bacine*

Honorable Debra C. Freeman
Page 3
June 16, 2011

disclosed. What defendants fail to mention is that plaintiffs did not provide initial disclosures in this case because *defendants expressly agreed to waive Rule 26(a) initial disclosures in connection with the parties' discovery planning* following the Court's denial of the motions to dismiss the Complaint. See Joint Pre-Conference Statement, filed October 29, 2010, and Case Management Order No. 1, entered November 5, 2010. At the time defendants agreed to waive initial disclosures, they had had the Consolidated Class Action Complaint for more than 17 months. Defendants clearly had time to determine whether it was important to them to attempt to figure out the identities of the confidential witnesses. By waiving their right to initial disclosures, defendants also waived their right to claim prejudice from not being able to use plaintiffs' initial disclosures to narrow the scope of their discovery.

Defendants' argument that plaintiffs are not entitled to maintain the confidentiality of the identity of the confidential witnesses because plaintiffs "shared [their] work product in the CAC [the Complaint]" is misguided. The fact that the Complaint discloses some portion of the information plaintiffs obtained in witness interviews does not mean that other information obtained in those interviews, but that was not included in the Complaint, is no longer entitled to work product protection. Likewise, names of confidential witnesses, which were intentionally not disclosed in the Complaint, have not lost their status as protected work product. See *MTI*, 2002 U.S. Dist Lexis 13015, at *7-8 (disclosure of names of confidential witnesses would reveal counsel's mental impressions as to the significance of their statements). Moreover, defendants are not foreclosed from utilizing other means of narrowing the field of persons who may have information supporting plaintiffs' claims. See, e.g., *In re Initial Public Offering Sec. Litig.*, 220 F.R.D. 30, 35-36 (S.D.N.Y. 2003). While it may be true that that task has been made more difficult by defendants' waiver of initial disclosures, no one coerced them into that waiver.

*City of Livonia Employees' Retirement Sys. v. Boeing*, 2011 U.S. Dist. Lexis 22347 (N.D. Ill. Mar. 7, 2011), which defendants cite as providing "important public policy considerations favoring disclosure" of the identities of the confidential witnesses in this case, is clearly distinguishable. There the plaintiffs relied upon the statements of a single confidential witness to support their scienter allegations, and when the witness's subsequent deposition testimony contradicted those allegations, the court questioned the reliability of the allegations and raised the possibility that fraud may have been involved. In this case, defendants disclaim any belief that "fraud is at play." Carangelo letter at 4. Yet, they seek to have this Court strip away the work product protection from the confidential witnesses on the purely speculative ground that deposing these individuals could possibly turn up fraud.


Barrack, Rodos & Bacine

Honorable Debra C. Freeman
Page 4
June 16, 2011

But this case is a far cry from *City of Livonia*, and simply does not warrant such a fishing expedition. The collapse of AIG was central to the 2008 financial crisis, and one of the single most newsworthy events of that time. Numerous articles concerning AIG's collapse have been published in major newspapers and financial publications, and many of them are cited in the complaint. AIG's collapse has been the subject of public hearings by congressional committees and the Financial Crisis Inquiry Commission ("FCIC"). Accordingly, the Consolidated Class Action Complaint in this case, which was sustained in its entirety by Judge Swain, cites numerous sources to support its allegations. Indeed, since that time, even more has been written about AIG's collapse. *See, e.g.*, Boyd, Roddy, Fatal Risk: A Cautionary Tale of AIG's Corporate Suicide (John Wiley & Sons, Inc. 2011); Morgenson, Gretchen, and Louise Story, "Testy Conflict With Goldman Helped Push A.I.G. to Edge," *The New York Times* (Feb. 7, 2010).

Here, the statements of the four confidential witnesses cited in the Complaint provide only small pieces of the comprehensive story laid out in the Complaint, and many of the facts attributed to confidential witnesses in the Complaint are mere confirmatory of facts obtained from other sources as well. For example, in paragraph 112, the Complaint cites statements of a confidential witness explaining that AIGFP decided in late 2005 to discontinue writing new multi-sector credit default swaps because "[I]it is not possible to create super senior tranche(s) 'off a collateral pool which is almost perfectly correlated so if things went bad, they're going to go bad in a big way. And you can't create a high grade exposure through securitization when the collateral has a huge correlation.'" This merely confirms, however, the point made in an article in the *Washington Post* from December 2008, cited in paragraph 109 of the Complaint, in which the *Post* cited an AIG executive as stating that AIG's claimed diversification of the multi-sector credit default swap portfolio was a "myth;" if the housing market fell, "the subprime loans would collapse like a house of cards." In a similar vein, in a number of paragraphs, the Complaint cites statements from three of the four confidential witnesses to the effect that parent company personnel were deliberately excluded from risk management activities at AIGFP. *See* ¶¶ 137, 138, 266(a), 277(a), 463, 496, 498. In paragraph 131, the Complaint describes a publicly disclosed finding by PricewaterhouseCoopers ("PwC"), AIG's outside auditor, of a material weakness at AIG relating to this very fact: "According to the audit committee minutes from a later March 11, 2008 meeting, PwC found ... a lack of timely elevation of key data to the AIG level and the fact that AIG had designed a valuation process that did not allow the involvement of [AIG Corporate] Enterprise Risk Management and the AIG Accounting function." And in



*Barrack, Rodos & Bacine*

Honorable Debra C. Freeman
Page 5
June 16, 2011

paragraph 166, the Complaint quotes a letter to a congressional investigatory committee from a former AIG employee in the area of accounting policy complaining about the head of AIGFP's attempts to impede his communications with his counterparts from the parent organization.

Because, among other reasons, the information obtained from confidential witnesses for the most part simply confirms facts obtained from other sources, disclosure of the identities of the confidential witnesses is not warranted here. *In re St. Paul Travelers Sec. Litig. II*, 2007 U.S. Dist. LEXIS 34527, *5-7 (D. Minn. May 10, 2007) (compelled disclosure of the identities of confidential witnesses is not warranted where "there is an abundance of independent evidence that is not based on the confidential witnesses that can demonstrate the same information supplied by those witnesses and alleged in the complaint").[1]

---

[1] With respect to defendants' argument about Alan Frost, who is named as a defendant only in Lead Plaintiff's Section 20(a) control person claim, there has been an enormous amount of information that has come out publicly before and since the filing of the Complaint about the key roles that Frost played with respect to AIGFP's CDS portfolio. Defendant Cassano testified before the FCIC, in an interview that has now been made public, that Frost reported directly to him and was the person primarily responsible for marketing AIGFP's CDS contracts business to the investment banking community. Gene Park testified before the FCIC that Frost was in charge of the multi-sector CDS book and originated most of the CDS deals. The FCIC Final Report quotes an AIG executive who described Frost as "the golden goose for the entire Street." A timeline created by the FCIC from documents produced to the FCIC by AIG and Goldman: (a) quotes from an internal July 11, 2007 telephone call between Defendants Forster and Frost, in which they acknowledged that counterparties were marking down their CDO's, and Forster stated: "We're ... f---ed basically"; (b) cites a July 27, 2007 email from Andrew Davilman to Frost advising him that Goldman would be making a collateral call; and (c) quotes from an August 16, 2007 email from Frost to Forster in which Frost stated that AIGFP "might start to see some significant margin calls." An "AIG Risk Management" document prepared by the FCIC states that Frost was among the people at AIGFP who knew that the CDS contracts contained collateral posting requirements. Further, in written testimony provided by Defendant Forster to the FCIC, he stated that Frost and Gary Gorton, a consultant to AIGFP, originated most of the CDS deals. The article, "Testy Conflict With Goldman Helped Push A.I.G. to Edge," *The New York Times* (Feb. 7, 2010), described Frost's role, as follows:

> Alan Frost, a managing director in Mr. Cassano's unit, negotiated scores of mortgage deals around Wall Street that included a complicated sequence of events for when an insurance payment on a distressed asset came due. The terms, described by several A.I.G. trading partners, stated that A.I.G. would post payments under two or three circumstances: if mortgage bonds were downgraded, if they were deemed to have lost value, or if A.I.G. s own credit rating was downgraded. If all of those things happened, A.I.G. would have to make even larger payments.

And the recently published Fatal Risk includes pages and pages about Frost's actions with respect to the CDS portfolio and AIGFP's dealings with counterparties on those contracts. For defendants to insinuate that the only information available about Frost came from the confidential witnesses is ludicrous.


Barrack, Rodos & Bacine

Honorable Debra C. Freeman
Page 6
June 16, 2011

      There are further weighty policy reasons why courts should maintain the confidentiality of confidential witnesses in securities fraud cases. The Private Securities Litigation Reform Act places an extraordinarily high pleading burden on plaintiffs in cases brought under the federal securities laws, requiring them to plead with particularity the factual basis of the claims asserted, including pleading with particularity facts giving rise to a strong inference of scienter. *See* 15 U.S.C. §§ 78u-4(b)(1) - (2). Because plaintiffs in federal securities fraud actions are not permitted to conduct discovery until the complaint has survived a motion to dismiss, plaintiffs typically have to find knowledgeable former employees and persuade them to voluntarily provide information.[2] Under such circumstances, maintaining witness confidentiality is of paramount importance. Without the ability to provide interviewed witnesses with assurances that their identity will be kept confidential, to the extent permissible under law, such persons may be hesitant to provide information, and the burden imposed by the strict pleading requirements of the PSLRA would rise substantially. Many meritorious cases might not survive. As the court observed in *In re Cigna Corp. Sec. Litig.*, 2006 U.S. Dist Lexis 3864, *10 (E.D. Pa. Jan. 31, 2006): "[R]equiring specific identification of confidential sources from among the universe of individuals with relevant knowledge in a securities fraud case would chill informants from providing critical information which may end up being in the public eye." *Accord Novak*, 216 F.3d at 314 ("Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them.").

      The fact that the confidential witnesses in this case are no longer employed by AIG does not lessen the need for confidentiality. "[F]ormer employees acting as informers could face serious consequences if their identities were revealed by plaintiff's counsel." *MTI*, 2002 U.S. Dist Lexis 13015, at *17. In an analogous context, the Fifth Circuit cautioned that former

---

[2] A recent study from the Association of Certified Fraud Examiners determined that frauds are more likely to come to light through whistleblower tips than through internal audits, internal controls, external audits, or any other means. *See* Ass'n of Certified Fraud Examiners, 2008 Report to the Nation on Occupational Fraud and Abuse 18 (2008), available at http://www.acfe.com/documents/2008-rttn.pdf. The need for maintaining confidentiality of persons exposing fraud has long been recognized in related contexts. *See Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) ("it needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept"); *Wirtz v. Cont'l Fin. & Loan Co. of W. End*, 326 F.2d 561, 563-64 (5th Cir. 1964) ("[T]he most effective protection from retaliation is the anonymity of the informer."); *Mitchell v. Roma*, 265 F.2d 633, 637 (3d Cir. 1959) ("[t]he statutory prohibition against retaliation provides little comfort to an employee faced with the possibility of subtle pressures by an employer, which pressures may be so difficult to prove when seeking to enforce the prohibition").



Barrack, Rodos & Bacine

Honorable Debra C. Freeman
Page 7
June 16, 2011

employees face specific retaliation for acting as whistleblowers because they could find it difficult to find a new job, they could be stigmatized by their current bosses for disclosing the previous malfeasance of their former employers, and they will likely be precluded from applying for a job in the future at the company where they blew the whistle. *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 306 (5th Cir. 1972).

For the foregoing reasons, Lead Plaintiff respectfully submits that defendants are not entitled to disclosure of the identities of the confidential witnesses, and requests that the Court deny defendants' request for an order compelling such disclosure.

Respectfully submitted,

Jeffrey W. Golan

Via telecopy

cc: All counsel of record (via email)