UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re AMERICAN INTERNATIONAL GROUP,
INC. 2008 SECURITIES LITIGATION

This Document Relates To:  All Actions

Master File No. 08-CV-4772 (LTS)

ECF Case

**Evidentiary Hearing Requested**

**PRICEWATERHOUSECOOPERS LLP'S
MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant
PricewaterhouseCoopers LLP*

May 24, 2012

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................5

    The Claim Against PwC ......................................................................................5

    Securities Included in the Proposed Class ...........................................................5

    The Proposed Class Period ..................................................................................9

    AIG's Bonds Have Retained Their Value ...........................................................11

ARGUMENT ...........................................................................................................12

I.     A CLASS CANNOT BE CERTIFIED FOR THE 1933 ACT CLAIMS ON THE
       MAY 2008 EQUITY OFFERING OR THE EARLIER BOND OFFERINGS. ...............13

    A.    A Class Cannot Be Certified Against PwC Based on the May 2008
          Offering Because the Alleged Misrepresentations or Omissions in the
          Audited Financial Statements Were Cured in AIG's 2007 Form 10-K. ..............13

    B.    A Class Cannot Be Certified Based on the Bond Offerings Because Bond
          Purchasers' Claims Are Barred by Lack of Materiality and Loss Causation. .......16

    C.    A Class Cannot Be Certified Based on the Bond Offerings Because
          Plaintiffs Cannot Show Section 11(e) Damages for Many of the Bonds. ............22

II.    CLASS CERTIFICATION IS INAPPROPRIATE FOR THE 1933 ACT
      CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH COMMONALITY
      ACROSS ALL OF THE DIFFERENT SECURITIES OFFERINGS. ..............................23

III.   PLAINTIFFS' PROPOSED 1933 ACT CLASS IS OVERLY BROAD AS IT
      INCLUDES SIGNIFICANT CATEGORIES OF PURCHASERS WHOSE
      CLAIMS CANNOT BE MAINTAINED ON A CLASSWIDE BASIS. ..........................24

    A.    Plaintiffs With Section 11 Claims Based on Purchases of Common Stock
          Must Trace Their Stock to the May 2008 Offering and Should Therefore
          Be Excluded from the Class Because Individual Issues Predominate. .................24

    B.    Series AIG-FP Note Purchasers Should Be Excluded from the Class .................27

          1.    Individual issues predominate due to the unique nature of each
              series of AIG-FP notes. ......................................................................27

          2.    AIG-FP note purchasers cannot show damages due to the illiquid
              nature of the notes. .............................................................................29

**Page**

C.    Foreign Purchases Are Not Covered by the U.S. Securities Laws, and the Series A-2 and A-3 Junior Subordinated Debentures Should Be Excluded from the Class on This Ground. .............................................................................31

D.    Individualized Reliance Issues for Plaintiffs Who Purchased Bonds After the Registration Statements Became Stale Defeat the Predominance Showing Required for Class Certification. .............................................................31

E.    Named Plaintiffs Lack Standing and Typicality To Bring Claims for Bonds They Did Not Acquire. ............................................................................................35

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
No. 11-0221-cv, 2012 WL 1232700 (2d Cir. Apr. 13, 2012)................................................31

*Akerman v. Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987)................................................................................................21

*APA Excelsior III L.P. v. Premiere Techs., Inc.*,
476 F.3d 1261 (11th Cir. 2007) ....................................................................................31, 32

*Barnes v. Osofsky*,
373 F.2d 269 (2d Cir. 1967)................................................................................................24

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)..........................................................................................16, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011)...........................................................................................21, 31, 34

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004)..................................................................................................34

*In re Am. Int'l Grp. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ........................................................................................20

*In re AOL Time Warner Sec. Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................................................22

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................................33

*In re Crazy Eddie Sec. Litig.*,
792 F. Supp. 197 (E.D.N.Y. 1992) .....................................................................................27

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................................................33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
245 F.R.D. 147 (S.D.N.Y. 2007) ..................................................................................25, 26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)........................................................................................... passim

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003).................................................................................25

**Page(s)**

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009) ........................................................................19

*In re Initial Public Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ...............................................................................12

*In re Initial Public Offering Sec. Litig.*,
  227 F.R.D. 65 (S.D.N.Y. 2004 .................................................................25, 26, 27

*In re Livent, Inc. Noteholders Sec. Litig.*,
  211 F.R.D. 219 (S.D.N.Y. 2002) ........................................................................33

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................19

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) .................................................................21

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ........................................................................33

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ...............................................................................19

*Miller v. Thane Int'l, Inc.*,
  615 F.3d 1095 (9th Cir. 2010) ...........................................................................20

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010) ................................................................................31, 34

*N.J. Carpenters Health Fund v. RALI Series 2006-QO1 Trust*,
  No. 11-1683(HB), 2012 WL 1481519 (2d Cir. Apr. 30, 2012) ...............................23

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  No. 08 Civ. 8781, 2011 WL 2020260 (S.D.N.Y. May 19, 2011) ...........................22

*NECA–IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
  743 F. Supp. 2d 288 (S.D.N.Y. 2010) .................................................................30

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ..........................................................................19, 20

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................33

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ...............................................................................12

Page(s)

*UFCW Local 1776 v. Eli Lilly & Co.,*
620 F.3d 121 (2d Cir. 2010) ...................................................................................29

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011) ........................................................................... passim

*Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.,*
821 F. Supp. 212 (S.D.N.Y. 1993) ...........................................................................18

## Statutes & Rules

Securities Act § 11, 15 U.S.C. § 77k ........................................................... passim

Fed. R. Civ. P. 23(a) ...............................................................................................12

SEC Rule 158, 17 C.F.R. § 230.158 ........................................................................32

SEC Rule 424, 17 C.F.R. § 230.424 ........................................................................32

SEC Rule 430B, 17 C.F.R. § 230.430B ...................................................................32

SEC Release No. 33-6464, 48 Fed. Reg. 19,392 (Apr. 29, 1983) ..........................32, 34

SEC Release No. 33-6485, 48 Fed. Reg. 44,767 (Sept. 30, 1983) .............................32

H.R. Conf. Rep. No. 73-1838 (1934) .......................................................................32, 34

## Other Authorities

SEC, *Structured Notes with Principal Protection: Note the Terms of Your Investment*
(June 2, 2011), available at http://sec.gov/investor/alerts/structurednotes.htm .......................28

# TABLE OF REFERENCES[*]

**AIG SEC Filings**

AIG 2007 Form 10-K ("2007 10-K") ............................................. 5/24/12 Allerhand Decl. Ex. 40

AIG Prospectus Supplement dated May 12, 2008 ("2008 Common Stock
    Prospectus Supp.") ............................................................... 8/17/11 Ryan Decl. Ex. A

AIG Pricing Supplement dated May 17, 2007
    ("AIG-FP-14 Pricing Supp.") ............................................. 8/17/11 Ryan Decl. Ex. B

**Deposition Transcripts**

Deposition of Michael Epstein ........................................ 5/24/12 Allerhand Decl. Ex. 15

Deposition of Steven Feinstein (July 22, 2011) ............................ 5/24/12 Allerhand Decl. Ex. 16

Deposition of Paul Hayes ................................................. 5/24/12 Allerhand Decl. Ex. 17

Deposition of Richard Roll ........................................... 5/24/12 Allerhand Decl. Ex. 20

**Deposition Exhibits**

Defendants' Deposition Exhibits 61-62 ................................... 5/24/12 Allerhand Decl. Exs. 25-26

**Court Documents**

Consolidated Class Action Complaint ("Complaint") ............................................... Docket No. 95

Memorandum of Law in Support of Defendant PricewaterhouseCoopers LLP's
    Motion to Dismiss the Consolidated Class Action Complaint
    ("PwC Mot. Dism. Br.") ................................................................... Docket No. 162

Lead Plaintiff's Memorandum of Law in Opposition to Motions to Dismiss the
    Consolidated Class Action Complaint
    ("Plf. Mot. Dism. Br.") ...................................................................... Docket No. 192

Opinion and Order dated Sept. 27, 2010 ("Mtn. Dism. Opn.") .............................. Docket No. 223

Declaration of Professor Bradford Cornell in Support of PricewaterhouseCoopers
    LLP's Opposition to Lead Plaintiff's Motion for Class Certification
    ("Cornell Decl.") ......................................................... Docket No. 293 (also filed under seal)

---

[*] "5/24/12 Allerhand Decl." refers to the Declaration of Joseph S. Allerhand to be filed on May 24, 2012.  "8/17/11 Ryan Decl." refers to the Declaration of Antony L. Ryan filed on August 17, 2011 (Docket No. 292).

Declaration of Richard A. Sesny Jr.
("Sesny Decl.") ............................................................ Docket No. 294 (also filed under seal)

Lead Plaintiff's Motion for Class Certification ("Plf. Mot.")................................. Docket No. 339

Memorandum in Support of Lead Plaintiff's Motion for
   Class Certification ("Plf. Br.").......................................................................... Docket No. 340

Declaration of Steven P. Feinstein, Ph.D., C.F.A. in Support of Lead Plaintiff's
   Motion for Class Certification ("Feinstein Decl.")................................... Docket No. 341, Ex. 8

Reply Declaration of Steven P. Feinstein, Ph.D., C.F.A. in
   Support of Lead Plaintiff's Motion for Class Certification
   ("Feinstein Reply Decl.").......................................................................Docket No. 341, Ex. 9

AIG's Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class
   Certification ("AIG's Br."). .......................................................... To Be Filed on May 24, 2012

Memorandum of Law in Support of the Underwriter Defendants' Opposition to
   Lead Plaintiff's Motion for Class Certification
   ("Underwriters' Br."). ................................................................... To Be Filed on May 24, 2012

Supplemental Declaration of Professor Bradford Cornell in Support of
   PricewaterhouseCoopers LLP's Opposition to Lead Plaintiff's Motion for
   Class Certification ("Supp. Cornell Decl.")...................To Be Filed Accompanying This Brief

PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum in opposition to Lead Plaintiff's motion to certify this case as a class action.

## PRELIMINARY STATEMENT

This case combines two distinct sets of claims:  (1) claims against American International Group, Inc. ("AIG") and certain former AIG executives based on Section 10(b) of the Securities Exchange Act of 1934, based on secondary-market purchases of AIG securities during the Class Period (Counts I and II), and (2) claims under the Securities Act of 1933, based on purchases in public offerings of AIG securities (Counts III to VII).  PwC, the Underwriter Defendants and the Director Defendants are sued only on the 1933 Act claims.

No class can be certified for Plaintiffs' claim against PwC for the simple reason that the evidence on this motion shows that Plaintiffs have no claim against PwC.  Plaintiffs have no claim with respect to AIG securities issued after the end of February 2008—which include the only common stock issued during the Class Period, in AIG's May 2008 equity offering—because all alleged misstatements and omissions Plaintiffs attribute to PwC had been cured by the end of February 2008, when AIG issued its 2007 Form 10-K.  Plaintiffs themselves concede this point.  Likewise, Plaintiffs have no claim with respect to securities issued before the end of February 2008 because the undisputed evidence demonstrates that neither materiality nor loss causation can be met on a classwide basis for these securities.  From the start of the proposed Class Period through February 2008, the only securities offered by AIG were bonds (albeit bonds that differed from one another in certain important respects).  As Plaintiffs' own expert observes, the prices of these bonds did not move in response to the February 2008 disclosures curing the prior alleged misstatements and omissions.  That is because the market perceived the risk of default on AIG's bonds as so remote, even after the February 2008 disclosures, that the information then disclosed was immaterial to bond purchasers.

Notably, there are no factual disputes on this motion relating to the 1933 Act claims.  As shown below, the event study conducted by Plaintiffs' expert, Professor Steven Feinstein, supports PwC's opposition to class certification on the bond claims under the 1933 Act.  With its opposition to Plaintiffs' original motion for class certification on August 17, 2011, PwC submitted the declaration of Professor Bradford Cornell, a recognized expert in corporate finance.  Dr. Cornell's declaration stands unrebutted.  After reviewing the responses of defendants' experts, Dr. Feinstein prepared a reply declaration dated December 16, 2011.  That declaration, while responding to certain points made by AIG's experts, does not contain a single criticism of Dr. Cornell.  (*See* Feinstein Reply Decl.)  Plaintiffs' other rebuttal expert, Professor Richard Roll, was not even asked to read Dr. Cornell's declaration.  (Roll Dep. Tr. at 64.)  Nor do Plaintiffs take issue with any of Dr. Cornell's opinions in their March 30, 2012 memorandum in support of their renewed motion for class certification.

Therefore, the undisputed evidence before the Court on this motion establishes that Plaintiffs cannot prevail on their claim against PwC for either the bond offerings or the May 2008 equity offering.  A class cannot be certified where the class members have no claim.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009).  Accordingly, the motion to certify a class against PwC (or any other 1933 Act Defendant based on the audited financial statements) should be denied.

*First*, Plaintiffs have no claim against PwC based on the May 2008 equity offering—and, thus, a class cannot be certified based on that offering—because the alleged misrepresentations or omissions in the prior years' audited financial statements were cured in AIG's 2007 Form 10-K issued on February 28, 2008.  In February 2008, AIG disclosed the full extent of its subprime exposure and, in a clear warning to investors, PwC, AIG's independent auditor, issued a "material weakness" opinion on AIG's internal control over the valuation of its

2

super-senior credit default swap ("SSCDS") portfolio.  By the end of February 2008, all of the

facts that Plaintiffs allege should have been included in AIG's previous securities filings had

already been disclosed.  Indeed, Plaintiffs have conceded, in their opposition to the motion to

dismiss (Plf. Mot. Dism. Br. at 211), that they have no claim against PwC following the issuance

of AIG's 2007 Form 10-K.  (*See infra* Part I.A.)

    *Second*, Plaintiffs have no 1933 Act claim based on AIG's bond offerings—and,

thus, a class cannot be certified based on those offerings—because bond purchasers' claims are

barred by lack of materiality and loss causation, as well as lack of Section 11 damages for many

of the bonds.  Plaintiffs' own expert establishes in his declaration that the disclosures up to and

through February 2008 generally had no statistically significant effect on the price of AIG bonds.

(Feinstein Decl. ¶¶ 325-326; Feinstein 7/22/11 Dep. Tr. at 272-73.)  Indeed, as of March 3, 2008,

most of the AIG bonds for which Plaintiffs' expert was able to obtain trading data were trading

*above* their offering price.  That is because the public disclosures by both AIG and PwC of

AIG's subprime exposure and the material weakness in AIG's internal controls were immaterial

to bond investors due to AIG's "equity cushion" (the market capitalization of AIG's common

stock, which would absorb any losses before the bonds were affected).  AIG's equity cushion

was so large, from the beginning of the Class Period through March 3, 2008, that default on the

bonds was highly unlikely.  The undisputed evidence on this motion establishes that the alleged

omissions in the 2005 and 2006 financial statements (the only ones on which PwC is sued here)

were immaterial to bond purchasers, and any loss by bondholders was caused by other factors.

Thus, Plaintiffs cannot establish materiality as to the bond offerings, and cannot overcome the

loss causation defense for PwC or any other 1933 Act Defendant based on the audited financial

statements.  The trading data submitted by Plaintiffs' expert also establishes a lack of Section 11

damages for many of the bonds.  (*See infra* Part I.B-C.)

Plaintiffs' motion to certify a class on their 1933 Act claims also should be denied because Plaintiffs do not meet the commonality requirement of Rule 23 under *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  Plaintiffs base their 1933 Act claims on 101 public offerings of securities.  The 1933 Act claims encompass billions of dollars' worth of disparate kinds of AIG securities, issued at times all throughout the Class Period, over the course of several years.  There is no way to resolve in a common inquiry the question whether the alleged misstatements or omissions in the registration statements were material to purchasers in each of the dozens of different securities offerings here.  Their claims therefore simply do not belong in the same class.  (*See infra* Part II.)

Even if Plaintiffs could overcome these barriers to class certification, Plaintiffs' proposed class is overly broad in at least five respects.  To meet the requirements of Rule 23(b), the class definition would have to be revised to exclude (1) purchasers of AIG common stock in the May 2008 offering, who cannot meet the "tracing" requirement of Section 11 on a classwide basis; (2) purchasers of the AIG-FP "structured notes", which raise unique issues unsuitable for class resolution; (3) individuals who made foreign purchases, including class members who bought the foreign currency denominated A-2 and A-3 notes; (4) purchasers who bought AIG bonds after issuance of a "twelve-month earnings statement" under Section 11, who cannot prove reliance on a classwide basis; and (5) purchasers of bonds whose claims none of the named plaintiffs have standing to assert.  (*See infra* Part III.)

These arguments preclude certification of a class against PwC, and the grounds set forth in Parts I.B-C, II and III apply equally to the other 1933 Act Defendants.

## STATEMENT OF FACTS

**The Claim Against PwC**

Plaintiffs' sole claim against PwC is under Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k, for alleged misstatements and omissions in registration statements for certain public offerings during the Class Period.  Plaintiffs base their Section 11 claim on securities AIG issued between October 18, 2006 and May 12, 2008, pursuant to one of three shelf registration statements:  (i) one filed June 12, 2003, with a prospectus creating an effective date of July 24, 2006; (ii) one filed June 12, 2007, with a prospectus creating an effective date of July 13, 2007; and (iii) one filed May 12, 2008.  (Compl. ¶¶ 587-588, 591-592.)

As this Court held on the motion to dismiss, "[u]nder Section 11, PwC can only be held liable for the allegedly false and misleading statements in the audited financial statements and annual reports on internal controls prepared by PwC that were included in the Company's Forms 10-K".  (Mtn. Dism. Opn. at 45.)  Plaintiffs concede that their "claim against PwC is premised on false and misleading statements and omissions in AIG's 2005 and 2006 financial statements and footnotes thereto".  (Plf. Mot. Dism. Br. at 211; *see also id.* at 195-96 n.88, 212-14.)  Notably, Plaintiffs allege *no* misrepresentation or omission attributable to PwC in the 2007 Form 10-K.  (*See id.* at 195-96 n.88, 211-15.)  Nor could they, as the 2007 Form 10-K disclosed each of the pieces of information that Plaintiffs allege that PwC should have caused AIG to disclose in its prior-year Forms 10-K.  (*See infra* Part I.A.)

**Securities Included in the Proposed Class**

Plaintiffs' proposed class includes purchasers of a wide variety of equity and debt securities, with divergent investment interests.  The securities can be divided into five distinct categories:  (1) common stock, (2) senior bonds, (3) structured notes, (4) junior subordinated debentures, and (5) equity units.  (Cornell Decl. ¶ 11.)  AIG's senior bonds, structured notes and

junior subordinated debentures are collectively referred to herein as "bonds".  The securities are summarized in an attached chart (Appendix A).

    **1.  Common stock.**  Purchasers of common stock (or equity) have claims on the profits a corporation produces.  By contrast, bondholders receive "fixed claims on the corporation".  (Cornell Decl. ¶ 21.)  Bondholders have priority in payments over shareholders.  (*Id.*)  Thus, shareholders bear greater exposure to changes in future cash flows.  (*Id.*)  Before the start of the Class Period, AIG had already issued large amounts of common stock, and had one of the largest market capitalizations of any corporation.  From 2006 through February 2008, the market value of AIG's common stock always exceeded $115 billion.  (*Id.* ¶ 40.)  In May 2008, AIG issued 196.6 million new shares of common stock at a price of $38 per share.  (Compl. ¶ 591.)  The May 2008 offering was AIG's only offering of common stock during the Class Period.

    **2.  Senior bonds.**  Between October 2006 and October 2007, AIG issued senior debt in the form of the Series G-1 and G-2 and Series MP-1 through MP-7 bonds.  (Compl. ¶ 591.)  The senior bonds have maturities ranging from 5 to 10 years, and include both fixed and floating rate notes.  (Cornell Decl. ¶¶ 24, 25.)  Senior bonds have priority in payment over both equity and junior subordinated debt.  Accordingly, such bonds appeal to investors interested in a steady rate of return and relatively little risk of loss of principal.  (*Id.* ¶ 31.)

    **3.  Structured notes.**  The Series AIG-FP notes (Series AIG-FP-1 through AIG-FP-57) are different types of senior notes issued by AIG during the Class Period.  (Cornell Decl. ¶ 53.)  Plaintiffs list 85 issuances of these notes (56 different securities, with 29 supplements) over a period spanning November 21, 2006 through March 3, 2008.  (Compl. ¶ 592.)  These notes are complex, highly customized financial instruments known as "structured notes", which combine a corporate bond with a derivative contract.  (Cornell Decl. ¶ 26.)  Unlike with regular

6

corporate bonds, the return on the Series AIG-FP notes is linked to macroeconomic variables, such as foreign currency exchange rates, commodity prices, or the slope of the interest rate yield curve. (*Id.* ¶¶ 26, 54.) For example, the Series AIG-FP notes bought by named plaintiff Epstein paid interest based on ███████████████████████████████████████ ████ (Epstein Dep. Tr. at 199-202.) While the Series AIG-FP notes differ substantially in their attributes, they are each linked to underlying macroeconomic variables unrelated to AIG's financial performance, and therefore have a very different risk profile from AIG's regular senior bonds. (Cornell Decl. ¶ 60.) The AIG-FP notes were issued in small amounts, with customized risk profiles suitable for highly sophisticated investors. (*Id.* ¶¶ 54, 57.) Due to the customized nature of the notes, there was a very limited, or no, secondary market for these notes. (*Id.* ¶ 58.)

    **4. Junior subordinated debentures.** AIG issued the Series A-1 to A-5 Junior Subordinated Debentures between March and December 2007. (Compl. ¶ 591.) The Series A-2 and A-3 debentures are denominated in foreign currencies, and there is no evidence that these debentures were traded during the Class Period on a U.S. exchange or by U.S. broker-dealers. (Cornell Decl. ¶ 29.) In priority of payment, the Series A debentures are subordinate to AIG's senior bonds—including the Series G, Series MP and Series AIG-FP notes—but come before the common stock. (*Id.* ¶ 28.)[1] The Series A debentures are all long-term notes, ranging in maturity from 30 to 40 years (with AIG having the right to extend to 55 to 80 years). (*Id.* ¶ 28 nn.19 & 21.) Unlike with the senior bonds, AIG has the right to defer interest payments on the Series A debentures for up to ten years. (*Id.* ¶ 28 n.20.) Because of their more junior position, the

---

    [1] Plaintiffs' expert, Dr. Feinstein, refers to the A-4 and A-5 debentures as preferred stock. Dr. Feinstein testified, however, that he "actually do[es]n't think it would matter much" whether they are referred to as junior bonds or preferred stock. (Feinstein 7/22/11 Dep. Tr. at 252.) He also testified that preferred stock "tends to behave very similar to a bond in the marketplace generally", and he found that the A-4 and A-5 debentures generally "moved in a more bond-like way as opposed to a more stock-like way". (*Id.* at 257, 258.)

Series A debentures generally have a higher rate of interest than the senior bonds.  Such debentures appeal to investors looking for a higher rate of return and willing to accept somewhat greater risk of loss of principal.  (*Id.* ¶ 31.)

       **5.  Equity units.**  As part of the May 12, 2008 offering, AIG issued so-called "equity units".  The equity units are hybrid securities composed of:  (1) a junior subordinated debenture, and (2) a forward contract on AIG common stock.  (Cornell Decl. ¶ 30.)  The forward contract obliges the investor to purchase from AIG at a fixed price of $25 a number of shares (to be determined based on the trading price of AIG's stock) on three dates in 2011.  (*Id.*)  The equity units are complex securities that require investors to assess the value of a mix of debentures and put and call options on AIG common stock.  (*Id.*)

* * *

       Plaintiffs' expert, Dr. Feinstein, agrees that the securities *within* each category have similar characteristics and would generally respond to a market event in a similar way.  (Feinstein 7/22/11 Dep. Tr. at 241-42.)  In his study of AIG securities during the Class Period, Dr. Feinstein found, however, that securities in *different* categories moved in relation to different factors.  (*Id.* at 244-45.)  For example, AIG's common stock price for the most part moved in similar ways to common stock of other insurance companies (*id.* at 238-39), whereas AIG's fixed-rate senior bonds reacted primarily to market interest rates, and therefore behaved similarly to other corporate bonds in the market (*id.* at 240-41, 243).

       Dr. Feinstein recognizes that "the nature of bond investing and trading is different from that of stocks" (Feinstein Decl. ¶ 297), and he "expected AIG senior bonds to move in different ways from AIG's common stock" (Feinstein 7/22/11 Dep. Tr. at 255).  Dr. Feinstein explains that the value of bonds—especially conventional corporate bonds, such as AIG's senior bonds—is "driven primarily by market interest rates and issuer credit quality" (Feinstein Decl.

8

¶ 341), meaning "the default probability on principal [] and interest payment[s] by AIG" (Feinstein 7/22/11 Dep. Tr. at 248).  That is quite different from common stock, which increases or decreases in value as expectations of future dividends and capital appreciation change. (Cornell Decl. ¶ 32.)

**The Proposed Class Period**

Plaintiffs seek to certify a single class, with a wide-ranging class period that runs from March 16, 2006 to September 16, 2008.  (Plf. Mot. at 1.)  The securities at issue for the 1933 Act claims were offered on various dates from October 18, 2006 to May 12, 2008.  (Compl. ¶¶ 591-592.)  But market conditions changed dramatically over the course of this Class Period, as did AIG's public disclosures.  Accordingly, the offerings fall into three distinct time periods.

1. **October 2006 to July 2007.**  During this period, AIG issued its 2005 and 2006 Forms 10-K, recording its SSCDS liability at an estimated fair value of approximately zero.  The likelihood that AIG would have to pay out on the SSCDSs was, at the time of those disclosures, remote.  The "subprime crisis" had not yet begun.  During this period, AIG issued most of the senior bonds (Series MP-1 to MP-6 and G-1) and junior subordinated debentures (Series A-1 to A-4) at issue, as well as about half of the Series AIG-FP structured notes, pursuant to the shelf registration statement effective in July 2006.

2. **August 2007 to February 2008.**  In the summer of 2007, concerns in the marketplace over subprime mortgages grew.  On August 8, 2007, in its Second Quarter 2007 Form 10-Q, AIG provided investors with extensive disclosures concerning AIG's subprime exposure.  (Compl. ¶¶ 304-306.)  In September 2007, in response to unprecedented deterioration in the residential mortgage markets, AIG recorded a fair-value loss of $352 million on its SSCDS derivatives.  AIG disclosed that loss in its Third Quarter 2007 Form 10-Q, filed on November 7, 2007.  (*Id.* ¶ 321.)  As market conditions changed, AIG developed new processes and models in

the fourth quarter of 2007 to estimate the fair value of its SSCDSs.  PwC became concerned about AIG's internal controls in this area, and ultimately, based on the work PwC performed in its year-end audit, PwC concluded that "a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of [December 31, 2007]".  (*Id.* ¶ 676 (quoting PwC's opinion).)

Before the markets opened on February 11, 2008, AIG filed a Form 8-K disclosing that AIG had significantly increased its estimate of the decline in fair value of AIGFP's SSCDS portfolio.  AIG also disclosed that PwC had advised AIG of the material weakness in valuation of the SSCDS portfolio.  (Compl. ¶¶ 182-188, 352-357.)  That same month, PwC completed its audit of AIG's 2007 financial statements.  In its 2007 Form 10-K, filed after the markets closed on February 28, 2008, AIG further explained the material weakness (*id.* ¶ 367) and disclosed a fair-value SSCDS liability as of year-end 2007 of $11.5 billion (*id.* ¶ 359).  PwC's "material weakness" opinion was included in the Form 10-K.  (*Id.* ¶ 365.)  AIG's financial statements further showed that the securities lending invested collateral had a fair value $6.3 billion below the corresponding payable.  (*Id.* ¶ 373.)

During this second portion of the Class Period, AIG issued the MP-7 senior bonds in October 2007; the G-2 senior bonds and the A-5 junior subordinated debentures in December 2007; and around half of the AIG-FP structured notes, on a variety of offering dates through March 3, 2008.  (Compl. ¶¶ 591-592.)  These securities were issued pursuant to the shelf registration statement effective in July 2007.

**3.  March 2008 to September 2008.**  Over the course of 2008, market conditions continued to worsen, and AIG's fair-value losses on its SSCDS portfolio and its securities lending program grew each quarter.  (Compl. ¶ 383-384, 399, 413, 421.)  In September 2008, a credit crisis overcame Wall Street, driving AIG to the verge of collapse.  On September 15,

2008—the same day Lehman Brothers filed for bankruptcy in the largest filing in U.S. history—the major ratings agencies downgraded AIG's credit rating.  (*Id.* ¶ 217.)  One day later the Federal Reserve agreed to lend money to AIG to sustain the company.  (*Id.* ¶ 218.)

During this final portion of the Class Period, AIG's only securities offering was on May 12, 2008, when AIG issued common stock and equity units.  This offering was pursuant to the May 2008 registration statement, which incorporated the 2007 Form 10-K.  Purchasers in the May 2008 offering were therefore on notice of the prior disclosures by AIG and PwC.

**AIG's Bonds Have Retained Their Value**

The financial crisis had a devastating effect on AIG's equity securities.  The price of AIG's common stock began to decline in 2007, and the price of both the common stock and the equity units (which were issued in May 2008) plummeted in September 2008, when the company almost collapsed.  While it has since recovered somewhat, the price of AIG's equity securities today remains below the price in the May 2008 equity offering.

AIG's bonds are a different story.  As of March 3, 2008, following the filing of AIG's 2007 Form 10-K, most of the AIG bonds for which Plaintiffs' expert was able to obtain trading data were still trading *above* their offering price.  (Cornell Decl. ¶ 36.)  The bonds retain their value today.  AIG has not missed an interest or principal payment on a single bond. (Cornell Supp. Decl. ¶ 5.)  Indeed, AIG has redeemed many of the bonds at issue in this case at par (with accrued interest), thereby making investors whole.  (*Id.* ¶¶ 3-4.)  While the price of those bonds that traded in the secondary market declined significantly in September 2008 as investors feared AIG would go bankrupt, the price of AIG bonds has since recovered, and most trade at or near par today.  (*Id.* ¶ 6.)  Investors who held onto the bonds have suffered no loss.

**ARGUMENT**

To maintain this case as a class action, Plaintiffs bear the burden of establishing the four requirements of Rule 23(a):  numerosity, commonality, typicality and adequacy.  Fed. R. Civ. P. 23(a).  Plaintiffs also carry the burden of satisfying the predominance and superiority factors of Rule 23(b)(3).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ."  *Wal-Mart Stores*, 131 S. Ct. at 2551.  The court is to undertake a "rigorous analysis" in determining whether the Rule 23 criteria have been met.  *Id.*  The court also has "an 'obligation' to resolve factual disputes relevant to the Rule 23 requirements".  *Flag Telecom*, 574 F.3d at 38 (citation omitted).  Failure to establish any Rule 23 element by preponderance of the evidence precludes class certification.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Cases over the past several years have dramatically altered the standard for certifying a class.  First, the Second Circuit overruled its prior case law and held that district courts must resolve factual disputes and make findings on Rule 23 motions.  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 40-41 (2d Cir. 2006) (*IPO II*).  The Second Circuit held that the proponent of class certification bears the burden of proof by preponderance of the evidence.  *Teamsters*, 546 F.3d at 202.  The Second Circuit also made clear that district courts' obligation to resolve factual disputes is "not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement".  *Flag Telecom*, 574 F.3d at 38 (quoting *IPO II*, 471 F.3d at 41).  And most recently, in *Wal-Mart*, the Supreme Court held that the movant "must be prepared to prove" that the requirements of Rule 23 are met "*in fact*".  131 S. Ct. at 2551 (emphasis in original).

As set forth below, under these rigorous legal standards, Plaintiffs cannot satisfy the requirements of Rule 23 with respect to their 1933 Act claims.

## I. A CLASS CANNOT BE CERTIFIED FOR THE 1933 ACT CLAIMS ON THE MAY 2008 EQUITY OFFERING OR THE EARLIER BOND OFFERINGS.

Plaintiffs allege a narrow set of misrepresentations or omissions by PwC. All of these alleged misrepresentations or omissions were cured by the end of February 2008. (*See infra* Part I.A.) Yet, prices for AIG bonds (the only securities subject to Plaintiffs' 1933 Act claims issued before May 2008) did not move in response to these disclosures because the bonds were "cushioned" by AIG's then ample market capitalization. This fact demonstrates that:

(1)     no prior alleged misstatement or omission was material to bond purchasers;

(2)     any loss to bond purchasers was caused not by disclosure of the risks, but by changed market conditions (the subprime and credit crises) later in 2008; and

(3)     bond purchasers suffered no damages.

For these reasons, a class cannot be certified for 1933 Act claims by bond purchasers against any 1933 Act Defendant based on AIG's audited financial statements. (*See infra* Parts I.B-C.)

### A. A Class Cannot Be Certified Against PwC Based on the May 2008 Offering Because the Alleged Misrepresentations or Omissions in the Audited Financial Statements Were Cured in AIG's 2007 Form 10-K.

As an initial matter, a class cannot be certified for 1933 Act claims based on the May 2008 offering. Plaintiffs concede that their claim against PwC is based solely on the audited financial statements in AIG's 2005 and 2006 Forms 10-K. (Plf. Mot. Dism. Br. at 211-15.) Plaintiffs explain that "AIG's offerings from October 13, 2006 through February 8, 2008 were made pursuant to" the 2003 and 2007 registration statements, which incorporated AIG's 2005 and 2006 Forms 10-K. (*Id.* at 214-15.) Accordingly, Plaintiffs concede that their claim against PwC is limited to the "offerings from October 13, 2006 through February 8, 2008" (*id.* at

13

212, 215), and Plaintiffs have no claim against PwC for the May 2008 equity offering, which was made pursuant to the 2008 registration statement, which incorporated the 2007 Form 10-K.

Plaintiffs' claim against PwC arises from three narrow categories of omissions in the 2005 and 2006 financial statements:

> "AIG's financial statements: (i) failed to disclose and significantly misrepresented in the 2005 and 2006 10-Ks, the material weakness in its internal controls relating to AIG's oversight of AIGFP, the CDS portfolio and its valuation process; (ii) failed to disclose in the 2005 and 2006 10-Ks its significant concentration of risk arising from the Company's exposure to subprime debt; and (iii) failed to disclose in the 2006 10-K that there was a reasonable possibility that the fair value of its CDS portfolio had declined." (*Id.* at 211.)

Nor could Plaintiffs assert any misrepresentation or omission attributable to PwC in AIG's 2007 Form 10-K because the alleged prior omissions were cured in that Form 10-K (if not by earlier disclosures). The 2007 Form 10-K contained abundant information specifically about each of the three risks that Plaintiffs allege were omitted from the 2005 and 2006 financial statements:

> **(i)   "[T]he material weakness in [AIG's] internal controls relating to AIG's oversight of AIGFP, the CDS portfolio and its valuation process" (Plf. Mot. Dism. Br at 211)**

Here, PwC's opinion on AIG's internal control over financial reporting expressly cured any alleged omission in prior-year Forms 10-K. PwC stated in the 2007 Form 10-K:

> "[I]n our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, . . . because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date." (2007 10-K at 129.)

PwC's opinion referred to Management's Report on Internal Control Over Financial Reporting (*see id.*), which included further detail on the material weakness, and concluded that "controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis". (*Id.* at 202.)

14

     (ii)     **"[AIG's] significant concentration of risk arising from the Company's exposure to subprime debt" (Plf. Mot. Dism. Br. at 211)**

AIG began to provide comprehensive disclosures of its subprime exposures in its Second Quarter 2007 Form 10-Q.  (Compl. ¶¶ 304-306.)  The 2007 Form 10-K included even more information.  The financial statements disclosed that AIG had an "unrealized market valuation loss" on its SSCDS portfolio of $11.472 billion, and that "[a]pproximately $61.4 billion, in notional amount, of the multi-sector CDO pools includes some exposure to U.S. subprime mortgages".  (2007 10-K at 164.)  AIG also provided full disclosure of its subprime exposure outside AIGFP, including the securities lending program.  (*Id.* at 104.)  AIG provided a detailed breakdown of the "fair value" of $84.8 billion in RMBS investments outside AIGFP, by year of vintage and by credit rating, and separately a detailed breakdown of the "fair value" of $21.2 billion in "subprime RMBS investments".  (*Id.* at 105.)

     (iii)     **The "reasonable possibility" of future declines in the "fair value of [AIG's] CDS portfolio" (Plf. Mot. Dism. Br. at 211)**

In addition to the $11.5 billion in fair-value losses on its SSCDS portfolio as of December 31, 2007, AIG specifically disclosed the risk of future decline in value:

> "The ongoing disruption in the U.S. residential mortgage and credit markets and the recent downgrades of residential mortgage-backed securities and CDO securities by rating agencies continue to adversely affect the fair value of the super senior credit default swap portfolio written by AIGFP. . . . The fair value of these derivatives is expected to continue to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates."  (2007 10-K at 33.)

Furthermore, PwC warned that, as a result of the material weakness in internal control over financial reporting, "there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis".  (*Id.* at 129.)

* * *

Investors who chose to purchase after AIG's and PwC's disclosures in February 2008 did so in the face of extensive warnings that specifically addressed the risks about which Plaintiffs now claim to have been misled—the consequences for AIG of continued declines in the residential mortgage and credit markets. These plaintiffs knowingly accepted those risks, and have no claim under the 1933 Act. *See DeMaria v. Andersen*, 318 F.3d 170, 182 (2d Cir. 2003). Lead Plaintiff State of Michigan Retirement System ("SMRS") illustrates this point.

(Defs. Dep. Exs. 61-62; Hayes Dep. Tr. at 115-17, 123-29, 199-201.) Purchasers in the May 2008 offering should therefore be excluded from the class.[2]

**B.     A Class Cannot Be Certified Based on the Bond Offerings Because Bond Purchasers' Claims Are Barred by Lack of Materiality and Loss Causation.**

Other than the May 2008 equity offering, Plaintiffs' 1933 Act claims all relate to bond offerings. No class can be certified on these claims because the lack of movement in the bond price in response to the disclosures through February 2008 curing the prior alleged misstatements and omissions shows that neither materiality nor loss causation can be met on a classwide basis.

Both sides' experts agree that AIG bond prices did not react to any disclosures made through February 2008. Plaintiffs' expert testified that both the junior subordinated

---

[2] For the same reason, purchasers of two supplemental offerings of Series AIG-FP structured notes after February 28, 2008—AIG-FP-55A, offered on March 4, 2008, and AIG-FP-57A, offered on March 5, 2008 (Compl. ¶ 592)—also should be excluded from the 1933 Act class. It is noteworthy that both of these offerings were offered on the same terms as the earlier-issued AIG-FP-55 and AIG-FP-57 notes—further evidence of the fact, discussed in detail below, that the February 2008 disclosures were immaterial to bond investors.

debentures and the senior bonds "generally did not exhibit statistically significant price movements on the event dates prior to those tested in September of 2008". (Feinstein 7/22/11 Dep. Tr. at 272-73; *see also* Feinstein Decl. ¶¶ 325-326.) Likewise, PwC's expert, Dr. Cornell, concludes that "[t]he prices of [AIG's senior bonds, structured notes and debentures] did not change in a statistically significant way on the disclosures of any of the alleged misstatements and omissions through the February 28, 2008 filing of AIG's 2007 Form 10-K". (Cornell Decl. ¶ 13(a).) Plaintiffs and their experts do not challenge Dr. Cornell's conclusions.

The reason that AIG's bond prices did not decline in price in response to the February 2008 disclosures is clear. As Dr. Feinstein explains, from the beginning of the Class Period through the end of February 2008, there was a "value buffer" (or "equity cushion") that protected the bonds from price movement in response to events that caused price movement for the stock. (*See* Feinstein Decl. ¶¶ 168, 220-222, 325-326.) While the equity cushion was in place, negative news about AIG would not be expected to affect—and, in fact, did not affect— the price of AIG bonds, as it affected the price of AIG common stock. (*See* Feinstein 7/22/11 Dep. Tr. at 255.) A Bear Stearns bond analyst report illustrates the typical reaction of bondholders to the dramatic disclosures in the February 11, 2008 Form 8-K. The analyst wrote that the news was "disappointing", but "not very material" to bondholders "in the context of AIG's capital base (i.e., $115 billion of equity as of 9/30)". (Cornell Decl. ¶ 44.) So long as the risk of default on AIG's bonds remained sufficiently low, "negative news about AIG would be expected, under normal market conditions, to have little or no effect on the price of AIG bonds". (*Id.* ¶ 33.)

Dr. Feinstein conducted an "event study", in which he analyzed eight of the bonds at issue on the 1933 Act claims: five senior bonds and three junior subordinated debentures. He concluded that none of those eight bonds moved in a statistically significant way on November 8,

2007 (upon filing of the Third Quarter 2007 Form 10-Q filing); only one of eight did so on February 11, 2008 (upon filing of the Form 8-K); and again only one (a different one) of eight did so on February 29, 2008 (upon filing of the 2007 Form 10-K).  (Feinstein Decl. Exs. 11, 13, 24-29; *see* Cornell Decl. ¶ 47.)  As securities of the same seniority would be expected to move in a similar way (Feinstein 7/22/11 Dep. Tr. at 244-45), these declines (on different dates) in one of AIG's bonds (but not the others) may well have been caused by "factors (like low market liquidity in conjunction with the arrival of sell orders) unrelated to the alleged disclosure". (Cornell Decl. ¶ 48.)[3]  And once bond prices are considered over two trading days, once the market had the chance to absorb the information, *see Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212, 219-20 (S.D.N.Y. 1993), neither of these individual declines was statistically significant.  (Cornell Decl. ¶ 50.)  Accordingly, Dr. Feinstein concludes that the results of his event study "are consistent with the expectation that, prior to September 2008, the negative news would generally not be of a sufficient magnitude to cause statistically significant price movements in the bonds".  (Feinstein Decl. ¶ 328; *see also* Feinstein 7/22/11 Dep. Tr. at 272-73.)

The lack of a statistically significant price impact on the bonds of the February 2008 disclosures is fatal to Plaintiffs' motion for certification of a 1933 Act class.  "[C]ourts may resolve contested factual issues where necessary to decide on class certification, and when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue."  *Flag*

---

[3] For example, one of the statistically significant declines that Dr. Feinstein found was for the Series MP-1 bond on February 29, 2008.  (*See* Feinstein Decl. Ex. 25.)  This finding was based on extremely thin trading—only two transactions on that day.  (Cornell Decl. ¶ 49.)  Moreover, the Series G-1 bond, which has the same seniority, *increased* in price that day, which Dr. Feinstein acknowledges was "somewhat unexpected" (Feinstein 7/22/11 Dep. Tr. at 269), and which Dr. Cornell concludes is evidence that the decline in the price of the Series MP-1 was likely caused by illiquidity (not the disclosures in the 2007 Form 10-K) (Cornell Decl. ¶ 49).

*Telecom*, 574 F.3d at 39 (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir.

2008)).  This is the appropriate time to resolve these issues.  The materiality, loss causation and

damages issues here were not raised on Defendants' motions to dismiss; nor could they have

been, as they depend on the trading data submitted by Plaintiffs' expert on this motion.  Unlike

on the Rule 12(b)(6) motions, the Court now has "an 'obligation' to resolve factual disputes

relevant to the Rule 23 requirements".  *Flag Telecom*, 574 F.3d at 38; *see also In re Moody's*

*Corp. Sec. Litig.*, 274 F.R.D. 480, 489 n. 4 (S.D.N.Y. 2011).

   Plaintiffs must show that a statement or omission in a registration statement was

"material" to bond purchasers.  *See* 15 U.S.C. § 77k(a).  Because of the significant structural

differences between debt and equity, the information considered significant by the reasonable

bond investor will differ from that considered significant by the reasonable equity investor—

particularly when the bonds are protected by a substantial equity cushion.  For example, in the

context of market efficiency, one court remarked:

> "The price of bonds reacts differently to unexpected new information than does
> the price of stocks.  Information that may be material to a stock price, such as the
> announcement of a dividend, may not be material for a bond investor whose fixed
> return would not be affected."  *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D.
> 616, 635 (N.D. Ala. 2009).

   In this case, Plaintiffs cannot show that an alleged misstatement or omission was

material to bond purchasers.  Because the price of the bonds did not change in response to the

disclosures in February 2008 curing the prior alleged misstatements and omissions, Plaintiffs

cannot show that the 2005 and 2006 Forms 10-K contained a misrepresentation or omission that

was material to bondholders.  *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he

materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock.").[4]

The lack of movement in bond prices at the time of disclosures curing the alleged misstatements or omissions demonstrates that Plaintiffs cannot show any misstatement or omission material to bondholders.  For all AIG bond purchases through at least March 3, 2008, the equity cushion remained large enough that bond purchasers simply did not care about the alleged misstatements or omissions contained in the 2005 or 2006 Forms 10-K.  Disclosure of the allegedly misstated or concealed information would not have changed investors' perception of the risk of default on the bonds at the time of purchase.  Plaintiffs' claims are doomed to fail as a matter of law, and this Court cannot certify a class without a meritorious claim.  *See Flag Telecom*, 574 F.3d at 39.

In addition, class certification of the 1933 Act claims on AIG bonds should be denied because individual issues will predominate under Rule 23(b)(3).  A plaintiff can establish predominance only if his claim is "subject to generalized proof" and "applicable to the class as a whole".  *In re Am. Int'l Grp. Sec. Litig.*, 265 F.R.D. 157, 172 (S.D.N.Y. 2010).  Here, Plaintiffs cannot show materiality "applicable to the class as a whole".  Without movements in bond prices in response to the disclosures curing the alleged misstatements and omissions, Plaintiffs cannot show that any statement or omission attributable to PwC was material to the bond market, and hence to bond purchasers as a whole.  Any bond purchaser attempting to pursue an idiosyncratic claim would necessarily rely on evidence and legal arguments separate from those applicable to the class as a whole.

---

[4] That is so even in a relatively inefficient market, such as that for AIG bonds.  *See Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010) ("[E]ven an inefficient market price is objective and contemporaneous with events, changing in response to news, including statements by the principals."  (internal quotations and citations omitted)).

Plaintiffs' motion for class certification also must be denied because the lack of movement in the price of AIG's bonds demonstrates that PwC can rebut the presumption of loss causation.  Section 11 provides that a defendant is entitled to judgment if he can prove by a preponderance of the evidence that any decline in value was caused by a factor other than "such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading".  15 U.S.C. § 77k(e).  Although the Section 11 defendant bears the "heavy burden" of disproving loss causation, this burden "is not insurmountable".  *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).  Notably, the Second Circuit has held that a defendant may rebut the presumption of loss causation with evidence of "the market's failure to react in any discernible way" to curative disclosures.  *Id.* at 340-41.

Here, PwC has met its burden of disproving loss causation.  Both sides' experts agree that the price of AIG bonds did not react to the disclosures in February 2008 curing the prior alleged misstatements and omissions.  Loss causation is therefore rebutted.  *See In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 602 (S.D.N.Y. 2010).  A class cannot be certified where a Section 11 defendant makes out its affirmative defense of absence of loss causation.[5]  *See Flag Telecom*, 574 F.3d at 41 (refusing to include "in and out" traders in a Section 11 class).  That is the case here with respect to the 1933 Act claims by purchasers of AIG's bonds.

---

[5] In *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011), the Supreme Court held in a Section 10(b) claim that plaintiffs need not prove loss causation to avail themselves of the rebuttable presumption of reliance granted by the "fraud on the market" theory.  *Id.* at 2186. This decision has no bearing on the 1933 Act claims here, as Section 11 creates a conclusive presumption of reliance until issuance of a "twelve-month earnings statement".  (*See infra* Part III.D.)  PwC raises loss causation not to rebut a presumption of reliance, but rather to show that, as a matter of law, Plaintiffs cannot recover on their Section 11 claim if the facts presented in Plaintiffs' own expert's declaration are taken as true.

C.   **A Class Cannot Be Certified Based on the Bond Offerings Because Plaintiffs Cannot Show Section 11(e) Damages for Many of the Bonds.**

Likewise, Plaintiffs cannot show damages for most of the AIG bonds at issue. Section 11(e) damages are based on the price paid for the security, "not exceeding the price at which the security was offered to the public". 15 U.S.C. § 77k(e). Thus, the offering price serves to "cap" damages. For example, in *In re AOL Time Warner Securities Litigation*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004), the plaintiffs could not show damages where the bonds "traded above their offering prices". *See also N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ. 8781 (HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011) (dismissing claims for offerings sold at a profit).

Here, the trading data make clear that Plaintiffs cannot show damages for most of the AIG bonds for which Plaintiffs' expert, Dr. Feinstein, was able to obtain trading data. On Monday, March 3, 2008 (the first trading day after February 29, 2008), the A-5, G-1, G-2, MP-1, MP-3, MP-5, MP-6 and MP-7 bonds all traded above their offering prices. (Cornell Decl. Ex. 4.) Thus, those bonds were trading above their offering prices *after* the alleged misstatements and omissions had been fully disclosed (in the February 11, 2008 Form 8-K and February 28, 2008 Form 10-K) and the market had a chance to absorb the new information.[6] Thus, using Plaintiffs' expert's trading data, Plaintiffs cannot show Section 11 damages, and a class cannot be certified on those bonds.

---

[6] As PwC's expert, Dr. Cornell explains, "when markets are illiquid or less than highly efficient", as was the case with respect to AIG's bonds, "securities prices often take time to reflect new information fully and accurately". (Cornell Decl. ¶ 50.) But the result would be largely the same based on trading data from February 29, 2008: the A-5, G-1, G-2, MP-1 and MP-3 bonds all traded above their offering price on that date or the next date on which there were trades. (*See* Feinstein Decl. Ex. 9, at 162; Ex. 17, at 29; Ex. 21, at 70; Ex. 18, at 43; Ex. 19, at 54.)

II.   **CLASS CERTIFICATION IS INAPPROPRIATE FOR THE 1933 ACT CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH COMMONALITY ACROSS ALL OF THE DIFFERENT SECURITIES OFFERINGS.**

PwC incorporates by reference the arguments in the Underwriters' Brief (pp. 3-14) that class certification is inappropriate because the purported class, including purchasers of dozens of different securities over a class period covering more than two and half years, does not meet the commonality requirement of Rule 23(a)(2) or the predominance requirement of Rule 23(b)(3).  *See Wal-Mart Stores*, 131 S. Ct. at 2551-53; *N.J. Carpenters Health Fund v. RALI Series 2006-QO1 Trust*, No. 11-1683, 2012 WL 1481519 (2d Cir. Apr. 30, 2012).  The alleged misstatements and omissions in registration statements upon which Plaintiffs base their Section 11 claims, as well as the underlying market conditions, changed significantly over the period from March 16, 2006, to September 16, 2008.  Further, because of the different characteristics of the securities that AIG issued, they were sold to different types of investors, and each type of investor assessed information about AIG's financial condition differently.  Therefore, the inquiry into whether material information was omitted is not subject to common proof.  In addition, PwC's defense of "reasonable investigation" is not subject to common proof.  Section 11(b) requires that the defense be measured at the effective date of the registration statement, which, for PwC, means that the defense must be assessed as of five separate dates for different offerings during the Class Period.  (*See* PwC Mot. Dism. Br. at 9, 23-25.)

III.    **PLAINTIFFS' PROPOSED 1933 ACT CLASS IS OVERLY BROAD AS IT INCLUDES SIGNIFICANT CATEGORIES OF PURCHASERS WHOSE CLAIMS CANNOT BE MAINTAINED ON A CLASSWIDE BASIS.**

Even if a 1933 Act class could be maintained despite the conclusive objections to certification set forth in Parts I and II above, Plaintiffs' proposed class would have to be dramatically cut down in scope.  The proposed class is overly broad in at least five respects:

(1)    it includes shareholders for whom individual issues predominate because they must trace their purchases of common stock to the May 2008 secondary offering;

(2)    it includes purchasers of dozens of types of AIG-FP structured notes that are fundamentally different in kind from the remaining AIG bonds (and from one another), and for which class members cannot establish damages;

(3)    it includes individuals who made foreign purchases, including purchases of the A-2 and A-3 notes, which are not covered by U.S. securities laws;

(4)    it includes aftermarket purchasers who bought bonds after AIG issued an earnings statement covering at least 12 months after the offering, and for whom individual issues predominate because they must prove actual reliance; and

(5)    it includes purchasers of bonds for which no named plaintiff has standing.

These issues must be resolved before certifying any 1933 Act class, so as to prevent notice of a class action from being sent to individuals who do not properly belong in the class.

A.    **Plaintiffs With Section 11 Claims Based on Purchases of Common Stock Must Trace Their Stock to the May 2008 Offering and Should Therefore Be Excluded from the Class Because Individual Issues Predominate.**

The only AIG common stock offering during the Class Period was in May 2008. Plaintiffs with Section 11 claims based on common stock must therefore demonstrate that their shares were acquired in or are traceable to that offering, and should be excluded from the class because that tracing exercise would require a fact-intensive examination of individual issues.

To have standing to assert a Section 11 claim, plaintiffs must "'trace' their shares to the allegedly defective registration statement".  *See DeMaria*, 318 F.3d at 176 (citing *Barnes v. Osofsky*, 373 F.2d 269, 271 (2d Cir. 1967)).  While a Rule 10b-5 claim covers all purchases

during a class period, plaintiffs may sue under Section 11 only "'so long as the security was indeed issued under *that* registration statement and not another'".  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003) (emphasis in original).  For bonds, that requirement is met because each series of bonds has its own CUSIP number.  For common stock, however, tracing is extremely complicated when stock was issued before or after the offering at issue.  In this case, AIG had issued common stock in the past, and the May 2008 registration statement was for a so-called "secondary offering".  Thus, to have standing under Section 11, purchasers of AIG common stock must be able to trace their shares to the May 2008 offering.

The leading case on the tracing requirement as applied to issuances of common stock is *In re Initial Public Offering Securities Litigation*, 227 F.R.D. 65 (S.D.N.Y. 2004) (*IPO I*), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006).  The *IPO I* court held that a plaintiff may establish tracing in one of two ways:  "through proof of a direct chain of title from the original offering to the ultimate owner . . . or through proof that the owner bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement".  *Id.* at 117-18.  While the second means of establishing tracing (where applicable) is susceptible to common proof, the first necessitates "individualized inquiry".  *Id.* at 118.  In the context of initial public offerings (where no shares are in the market before the offering), "generalized proof" of tracing "is possible if plaintiffs' section 11 class periods are limited to exclude all purchases made after untraceable securities entered the market".  *Id.* at 118-19.  Thus, the *IPO I* court cut off the class period for Section 11 claims at the date when shares later entered the market from another source.  *Id.*; *accord In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245

F.R.D. 147, 173 (S.D.N.Y. 2007), *aff'd in relevant part*, 574 F.3d 29 (2d Cir. 2009).[7]

This case involves a secondary offering. Before the May 2008 offering of 196.6 million new shares (Compl. ¶ 591), AIG had outstanding approximately 2.5 billion shares of common stock (2008 Common Stock Prospectus Supp. at S-6). Accordingly, there is no way to tell on a classwide basis whether shares purchased in the aftermarket after the May 2008 offering were ones already in the market, or ones newly issued. To establish tracing, any plaintiff who purchased AIG common stock in the aftermarket must establish a "direct chain of title" to the May 2008 offering. Such tracing would necessarily require individualized inquiry and "would fragment the class action into myriad mini-trials on the subject of tracing". *IPO I*, 227 F.R.D. at 118.

The same tracing requirement applies equally to those who purchased stock from underwriters in the secondary offering. As the *IPO I* court stated, "the presence of identical shares that were traded before an offering and remain in the market after the offering forecloses the possibility of a section 11 class". 227 F.R.D. at 118 n.396. That is precisely the situation here. As Dr. Cornell explains, the Depository Trust Company ("DTC") holds securities in "fungible bulk". The DTC regards brokers as the holders, in "street name", of all of their customers' securities, and records ownership transfers only as between brokers, on a net basis. (Cornell Decl. ¶ 67.) As a result of this "netting", stock purchasers do not receive shares from a particular seller. (*Id.* ¶ 69.)

Accordingly, those who purchased AIG common stock in the May 2008 offering may have received old shares sold by other investors on the day of the offering. Or they may

---

[7] On appeal, the Second Circuit noted that "[n]either party disputes 'that shares that are bought on the market after unregistered shares have entered the market cannot be traced back to the IPO'". *Flag Telecom*, 574 F.3d at 42 n.8 (quoting *Flag Telecom*, 245 F.R.D. at 173).

have received old shares already in the underwriter's account at the DTC when the new shares were credited to that account. There is no way to distinguish the new shares from the old. (*Id.*) For example, named plaintiff MainePERS purchased shares from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so MainePERS cannot trace. As the *IPO I* court summed up, "[t]he modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market." 227 F.R.D. at 118; *accord In re Crazy Eddie Sec. Litig.*, 792 F. Supp. 197, 202 (E.D.N.Y. 1992).

Plaintiffs' experts do not dispute any aspect of Dr. Cornell's account of electronic clearing and delivery of stock. Nor do Plaintiffs in their brief address the impossibility of tracing shares on a classwide basis to the May 2008 secondary offering.

This is not to say that purchasers of AIG common stock cannot bring Section 11 claims on an individual basis,[8] or that they cannot bring a 10b-5 claim on a classwide basis. It does mean, however, that they must be excluded from the proposed Section 11 class because, for their claims, individual issues of tracing would predominate.

**B.      Series AIG-FP Note Purchasers Should Be Excluded from the Class.**

**1.      Individual issues predominate due to the unique nature of each series of AIG-FP notes.**

The AIG-FP notes contain complex derivatives on macroeconomic risks entirely unrelated to AIG's business or AIG's creditworthiness. As AIG disclosed, "AIGFP's notes and bonds include structured debt instruments whose payment terms are linked to one or more

---

[8] For example, an investor may be able to trace his or her shares by presenting individualized proof showing that stock purchased in the secondary offering was registered directly in the investor's name, rather than in street name. (Cornell Decl. ¶ 63 n.81.)

financial or other indices (such as an equity index or commodity index or another measure that is

not considered to be clearly and closely related to the debt instrument)." (2007 10-K, at 91.)

Dr. Cornell explains that the AIG-FP notes are what are known as "structured notes", which "are

customized to offer exposure to specific economic variables". (Cornell Decl. ¶ 55.) Similarly,

the SEC has advised that structured notes reflect "the combination of a zero-coupon bond . . .

with an option or other derivative product", and has warned investors that they should

understand the "unique risks" they would "take on as a result of being exposed to the underlying

asset, index or benchmark". SEC, *Structured Notes with Principal Protection: Note the Terms*

*of Your Investment* (June 2, 2011), available at http://sec.gov/investor/alerts/structurednotes.htm.

For example, Michael Epstein, the only named plaintiff who purchased AIG-FP notes, testified

that ████████████████████████████████████████████████████████████████

█████████████████████████████████████ (Epstein Dep. Tr. at 199-202.)

As a result of the macroeconomic derivatives embedded in the AIG-FP notes,

investors are predominantly concerned with factors entirely unrelated to AIG's credit. (Cornell

Decl. ¶ 60.) Plaintiffs emphasize that investors in the AIG-FP notes shared with investors in

AIG's conventional bonds an interest in AIG's risk of default. (Plf. Br. at 52 n.32.) Plaintiffs

and their experts do not contest, however, that investors in the AIG-FP notes were primarily

concerned with the macroeconomic derivatives embedded in the AIG-FP notes. AIG's

disclosures highlighted those risks. For example, the pricing supplement for CMS curve notes

purchased by Mr. Epstein states: "Investing in the Notes involves a number of significant risks

not associated with similar investments in a conventional debt security, including, but not limited

to, fluctuations in the 30-year Constant Maturity Swap (CMS) Rate and 10-year CMS rate, and

other events that are difficult to predict and beyond AIG's control." (AIG-FP-14 Pricing Supp.

at P-3.) Structured notes of this kind are suitable only for highly sophisticated investors.

(Cornell Decl. ¶ 54.)  It is unsurprising, then, that named plaintiff Epstein ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████  (Epstein Dep. Tr. at 23-24, 206, 216-17, 219-20.)

Purchasers of AIG-FP notes do not belong in the same class as purchasers of conventional AIG bonds.  Information material to particular AIG-FP notes in many cases would be immaterial to conventional AIG bonds, let alone other AIG-FP note series.  The AIG-FP notes also raise questions of suitability for particular investors that cannot be adjudicated on a classwide basis.  In short, the unique nature of the AIG-FP notes would cause individual issues to predominate.  *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010).

Nor can the lack of predominance of common issues with respect to the AIG-FP notes be remedied by creating a separate class of AIG-FP note purchasers.  The 56 different series of AIG-FP notes differ substantially among themselves in terms of the underlying macroeconomic risks (such as foreign-currency exchange rates, commodity prices or the shape of the interest-rate curve).  (Cornell Decl. ¶ 61.)  And the specific terms of each note series affect value in a way that would require a separate assessment for each note series.  (*Id.*)  Given the customized nature of the notes, purchasers of any of the 56 individual series of AIG-FP notes likely would not meet the numerosity requirement of Rule 23(a).  Thus, the AIG-FP note purchasers are not suited for this or any other class.

### 2. AIG-FP note purchasers cannot show damages due to the illiquid nature of the notes.

A further reason why AIG-FP note purchasers should not be included in a Section 11 class is that the notes were illiquid, and did not trade in an active secondary market.  Section 11(e) provides that, when a plaintiff has not disposed of a security, damages are the

amount paid (capped at the offering price) less the "value" of the security at the time of suit.  15

U.S.C. § 77k(e).  "Value" does not equal price—and value does not equal price when there is no

market in which to trade a security.  *NECA–IBEW Health & Welfare Fund v. Goldman, Sachs &

Co.*, 743 F. Supp. 2d 288, 291-92 (S.D.N.Y. 2010).  Where, as here, a purchaser "made an

investment that it knew might not be liquid, it may not allege an injury based upon the

hypothetical price of the [security] on a secondary market at the time of suit".  *Id.* at 292.

AIG disclosed to investors in the AIG-FP notes:  "There may be little or no

secondary market for the notes. . . .  Even if a secondary market for the notes develops, it may

not provide significant liquidity or result in trading of notes at prices advantageous to you."

(*See, e.g.*, AIG-FP-14 Pricing Supp. at P-4.)  And that is what happened.  There was little or no

secondary market for the Series AIG-FP notes.  Plaintiffs' expert acknowledges that he has no

evidence of aftermarket trading on most of the AIG-FP notes because no transactions are

reported on the TRACE system.  (Feinstein Decl. ¶ 347.)  Indeed, 23 of 56 AIG-FP notes have

no TRACE data available at all.  (Cornell Decl. ¶ 58.)  And even those notes that do show

extremely limited trading—on average, on only 8% of the trading days between their issuance

and the end of the Class Period.  (*Id.*)  Thus, when named plaintiff Epstein tried to sell his AIG-

FP notes, he "couldn't sell them", even when he got in contact with a specialist broker, because

there was no secondary market for such customized notes.  (Epstein Dep. Tr. at 100-105.)

The "value" for Section 11 purposes of an illiquid security such as the AIG-FP

notes is unimpaired unless the plaintiff can show an "actual failure to receive payments due".

*NECA–IBEW*, 743 F. Supp. 2d at 292.  Here, noteholders have received all payments due.  Every

scheduled interest and principal payment has been made.  (Cornell Supp. Decl. ¶ 5.)  Indeed, all

three of the AIG-FP notes purchased by named plaintiff Epstein have been redeemed at par.

(*Id.* ¶ 3.)  Because purchasers of AIG-FP notes cannot show damages for their illiquid

investments, they should be excluded from any Section 11 class.

> ### C. Foreign Purchases Are Not Covered by the U.S. Securities Laws, and the Series A-2 and A-3 Junior Subordinated Debentures Should Be Excluded from the Class on This Ground.

PwC incorporates by reference the argument in the Underwriters' Brief

(pp. 16-18) that there is no evidence of any purchase of the A-2 and A-3 Junior Subordinated

Debentures in the United States during the Class Period.  Accordingly, purchasers of those notes

should be excluded from the class.  *See Morrison v. National Australia Bank Ltd.*, 130 S. Ct.

2869 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, No. 11-0221-cv, 2012 WL

1232700 (2d Cir. Apr. 13, 2012).

> ### D. Individualized Reliance Issues for Plaintiffs Who Purchased Bonds After the Registration Statements Became Stale Defeat the Predominance Showing Required for Class Certification.

The requirement for each investor to prove individual reliance is an "insuperable

barrier to class certification" under Rule 23(b)(3).  *Wal-Mart*, 131 S. Ct. at 2552 n.6; *see also*

*Halliburton*, 131 S. Ct. at 2185.  That barrier does not exist if reliance can be presumed, either

because of the fraud-on-the-market presumption of reliance that sometimes applies in Rule 10b-5

cases, *see Wal-Mart*, 131 S. Ct. at 2552 n.6, or because reliance is conclusively presumed for

some Section 11 claims.  But where the substantive cause of action requires proof of individual

reliance, a Rule 23(b)(3) class cannot be certified.

Under Section 11, reliance is "conclusively presumed" for purchases in or shortly

after the offering.  *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1271 (11th

Cir. 2007).  A Section 11 plaintiff is required to prove reliance, however, "[i]f such person

acquired the security after the issuer has made generally available to its security holders an

earning statement covering a period of at least twelve months beginning after the effective date

of the registration statement".  15 U.S.C. § 77k(a).  The "effective date of the registration statement" (for the reliance requirement only) includes the filing of a prospectus supplement or pricing supplement for shelf offerings.  SEC Rule 158, 17 C.F.R. § 230.158(c).[9]  The earnings statement can be composed of a combination of Forms 10-K and 10-Q covering at least twelve months.  SEC Rule 158, 17 C.F.R. § 230.158(a).[10]

The reason for requiring reliance following a twelve-month earnings statement is that by then the information in the original offering will have grown stale.  As stated by Congress and the SEC, "in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated on that statement rather than upon the information disclosed upon registration".  SEC Release No. 33-6464, 48 Fed. Reg. 19,392, 19,393 (Apr. 29, 1983) (quoting H.R. Conf. Rep. No. 73-1838, at 41 (1934)); *see also APA Excelsior*, 476 F.3d at 1275 ("after a year or so the statements made in the registration would have become outmoded and wholly discounted by a host of other factors").

---

[9] Each of the offerings at issue involved the filing of a prospectus or pricing supplement under Rule 424(b), 17 C.F.R. § 230.424(b), which is the "effective date" "[f]or purposes of the last paragraph of Section 11(a) only", 17 C.F.R. § 230.158(c)(3).  For purposes of the whether there was a material misstatement or omission for claims against an auditor relating to a shelf registration, the "effective date" is the date of the auditor's consent.  *See* SEC Rule 430B, 17 C.F.R. § 230.430B(f)(5).

[10] By way of example, for AIG's A-1 note offering on March 15, 2007, AIG's 2007 Form 10-K covered the second through fourth quarters of 2007, and AIG's First Quarter 2008 Form 10-Q covered the first quarter of 2008 (through March 31, 2008, more than one year following the "effective date").  Together, the two SEC filings compose the twelve-month "earnings statement" that triggers the reliance requirement for purchases after the filing of the Form 10-Q on May 8, 2008.  *See* 17 C.F.R. § 230.158(a); SEC Release No. 33-6485, 48 Fed. Reg. 44,767, 44,767-68 (Sept. 30, 1983).

As the following chart shows, AIG's filing of its 2007 Form 10-K was the first trigger for the reliance requirement with respect to certain bonds:

| "Effective Date" of Registration Statement | "Earnings Statement" Triggering Requirement of Reliance | Reliance Required for Purchases After This Date |
| --- | --- | --- |
| 10/1/06 to 12/31/06 | 2007 Form 10-K | February 28, 2008 |
| 1/1/07 to 3/31/07 | 1Q 2008 Form 10-Q + 2007 Form 10-K | May 8, 2008 |
| 4/1/07 to 6/30/07 | 2Q 2008 Form 10-Q + 2007 Form 10-K | August 6, 2008 |

As Plaintiffs end their proposed class with purchases on September 16, 2008 (Plf. Mot. at 1), the Section 11 reliance requirement is not triggered in this case for securities offered after June 2007.

For those plaintiffs required to establish reliance for their Section 11 claim, individual questions would predominate, making class certification improper. Similarly, in a Rule 10b-5 claim, where the plaintiff does not satisfy the requirements for the fraud-on-the-market presumption of reliance, the lack of predominance precludes class certification under Rule 23(b)(3). *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 223-24 (S.D.N.Y. 2002). The same is true where, as here, the conclusive presumption of reliance for a Section 11 claim expires after issuance of the twelve-month earnings statement.

A district court in this Circuit, *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267, 293-94 (S.D.N.Y. 2003), held that Forms 10-K and 10-Q filed after the registration statement qualify as twelve-month "earnings statements" under Section 11(a) only if they are not alleged themselves to contain material misrepresentations or omissions.[11] On appeal, the Second

---

[11] Two district courts outside this Circuit have followed the district court in *WorldCom*, and are wrongly decided for the same reasons. *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 621-23 (C.D. Cal. 2009); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 697 (S.D. Tex. 2006). One court in this Circuit has cited to *WorldCom*'s holding that a report violating SEC rules does not qualify as an "earnings statement" for the purposes of Section 11—but not in the context of assessing whether an alleged material representation or omission contained in a report disqualified it from being considered an earnings statement. *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 114-15 (S.D.N.Y. 2011).

33

Circuit noted that this is an open legal question, but affirmed on other grounds and therefore did not need to reach the issue. *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 85 n.14 (2d Cir. 2004).[12]

The district court decision in *WorldCom* is wrongly decided. *First*, it is contrary to the text of the statute, which requires reliance following issuance of an "earnings statement", without inquiry into the contents of that earnings statement. 15 U.S.C. § 77k(a). *Second*, it is contrary to the statutory purpose of the reliance requirement, which is that the original disclosure has become stale, not that it has been corrected. H.R. Conf. Rep. No. 73-1838, at 41. *Third*, examining the earnings statement to determine whether it cured the original misstatement is contrary to the purpose of Rule 158, which is "to provide clarity and certainty" for the reliance trigger. SEC Release No. 33-6464, 48 Fed. Reg. at 19,394. Moreover, the *WorldCom* rule should not apply to the claim against PwC here, where Plaintiffs do not assert any material misrepresentation or omission attributable to PwC in the 2007 Form 10-K.

Once the twelve-month earnings statement was issued (as shown in the chart above), individualized reliance is required for a Section 11 claim. Neither the Supreme Court nor the Second Circuit has ever held that a Section 11 claim (as opposed to a 10b-5 claim) can depend on the fraud-on-the-market presumption to establish reliance on a classwide basis. The 1933 Act establishes reliance as a requirement for purchases following a twelve-month earnings statement. 15 U.S.C. § 77k(a). To apply the fraud-on-the-market presumption—a presumption developed in the context of Rule 10b-5, which has no statutory text for its elements, and the contours of which have therefore been shaped by the courts, *see Morrison*, 130 S. Ct. at 2881

---

[12] The Second Circuit affirmed on the district court's finding that common issues would predominate, even if some plaintiffs had to prove actual reliance. *Hevesi*, 366 F.3d at 85. *Wal-Mart* has overruled that aspect of *Hevesi*. In *Wal-Mart*, the Supreme Court made clear that, in the absence of a fraud-on-the-market presumption, the need to prove reliance is "an insuperable barrier to class certification". 131 S. Ct. at 2552 n.6; *see also Halliburton*, 131 S. Ct. at 2185.

CONTAINS CONFIDENTIAL MATERIAL
FILED UNDER SEAL

n.5—would contravene the statute.  Nor would that presumption apply here in any event, where

the market for AIG bonds was not sufficiently efficient to qualify for the fraud-on-the-market

presumption.  (*See* AIG Br. at 27-31.)  Accordingly, any Section 11 class should exclude

purchasers of AIG bonds following a twelve-month earnings statement.  This is a further reason

to cut off the Class Period with the filing of the 2007 Form 10-K on February 28, 2008.

> **E.    Named Plaintiffs Lack Standing and Typicality To Bring Claims for Bonds
> They Did Not Acquire.**

PwC incorporates by reference the arguments in the Underwriters' Brief

(p. 15-16) that named plaintiffs lack standing to bring claims for bonds that they did not acquire,

and their claims are not typical of those of purchasers of other bonds.

## CONCLUSION

For the foregoing reasons, PwC respectfully requests that this Court deny

Plaintiffs' motion for class certification.

Dated:  May 24, 2012

CRAVATH, SWAINE & MOORE LLP

by _____
/with consent
MLA

Thomas G. Rafferty
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant
PricewaterhouseCoopers LLP*