UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | Master File No.: 08-CV-4772-LTS-DCF |
| | **ELECTRONICALLY FILED** |
| This Document Relates To:  All Actions | |

## LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO AIG'S MOTION TO EXCLUDE THE DECLARATIONS, TESTIMONY AND OPINIONS OF LEAD PLAINTIFF'S EXPERT, PROFESSOR STEVEN P. FEINSTEIN

**BARRACK, RODOS & BACINE**
Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
M. Richard Komins
Robert A. Hoffman
Chad A. Carder
Lisa M. Lamb
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

and

Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)
425 Park Avenue
Suite 3100
New York, New York 10022
Tel.:  (212) 688-0782
Fax:  (212) 688-0783

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
Jayson E. Blake
Casey A. Fry
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel:  (248) 841-2200
Fax:  (248) 652-2852

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................ 5

I.      Professor Feinstein Has Been Accepted As An Expert By Many Courts.............. 8

II.     Professor Feinstein's Opinions Concerning The Efficiency of the
Market For AIG Common Stock Are Based on Reliable Methodologies
and Should Not Be Excluded ................................................................. 9

      A.    Event Study Dates................................................................. 9

      B.    Market Volatility................................................................. 12

      C.    The Last Three Months of the Class Period............................... 14

III.     Professor Feinstein's Opinions Concerning The Efficiency
of the Market For AIG Bonds Are Based on Reliable Methodologies
and Should Not Be Excluded ................................................................. 15

      A.    Event Studies for the Eight Bonds .......................................... 15

      B.    The Other 60 Bonds ............................................................ 17

CONCLUSION ..................................................................................................... 20

**<u>TABLE OF AUTHORITIES</u>**

Page(s)

**<u>Cases</u>**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002).................................................................... 5

*Beach v. Healthways, Inc.*,
   No. 08-0569, 2010 WL 1408791 (M.D. Tenn. Apr. 2, 2010).................................... 8

*Bell v. Ascendant Solutions, Inc.*,
   No. Civ. A. 301CV0166N, 2004 WL 1490009 (N.D. Tex. July 1, 2004) .............................. 11

*Borawick v. Shay*,
   68 F.3d 597 (2d Cir. 1995)................................................................... 5

*Bricklayers & Trowel Trades Int'l. Pension Fund v. Credit Suisse First Boston*,
   Civil Action No. 02-12146-NMG, 2012 WL 118486 (D. Mass. Jan. 13, 2012) ..................... 10

*Buettgen v. Harless*,
   Civil Action No. 09-CV-791, 2011 WL 1938130 (N.D. Tex. May 19, 2011) ......................... 8

*City of Ann Arbor Employee' Retirement System v. Sonoco Products Co.*,
   827 F. Supp. 2d 559 (D.S.C. 2011)............................................................ 7

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993)................................................................. 5, 6, 16, 20

*Dekoven v. Plaza Assocs.*,
   599 F.3d 578 (7th Cir. 2010) ............................................................. 11

*In re Apollo Group, Inc. Sec. Litig.*,
   Master File No. CV 04-2147-PHX-JAT (D. Ariz.) ................................................ 8

*In re Apollo Group, Inc. Sec. Litig.*,
   527 F.Supp. 2d 957 (D. Ariz. 2007)...........................................................8

*In re Apollo Group, Inc. Sec. Litig.*,
   2010 WL 5927988 (9th Cir. June 23, 2010)................................................... 8

*In re Apollo Group, Inc. Sec. Litig.*,
   2012 WL 1378677 (D. Ariz. April 20, 2012)....................................................8

*In re Benjumen*,
   408 B.R. 9 (E.D.N.Y. 2009) .................................................................. 6

*In re Cooper Cos. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009)............................................................. 9

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................... 19

*In re Fed. Home Loan Mortg. Corp. Sec. Litig.*,
    Nos. 09 Civ. 832(MGC) and 09 MD 2072(MGC), 2012 WL 1028642
    (S.D.N.Y. Mar. 27, 2012) ............................................................................. 2, 10, 19

*In re Homestore.com, Inc.*,
    Master File No. CV 01–11115 RSWL (CWx), 2011 WL 291176
    (C.D. Cal. Jan. 25, 2011) ......................................................................................... 7

*In re Mills Corp. Sec. Litig.*,
    257 F.R.D. 101 (E.D. Va. 2009) ............................................................................. 9

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................................. 7

*In re Pfizer Inc. Sec. Litig.*,
    No. 04 Civ. 9866 (LTS)(JLC), No. 05 md 1688 (LTS), 2010 WL 1047618
    (S.D.N.Y. Mar. 22, 2010) ....................................................................................... 6

*In re Red Hat Sec. Litig.*,
    261 F.R.D. 83 (E.D.N.C. 2009) ............................................................................. 9

*In re Xerox Corp. Sec. Litig.*,
    Civ. A. No. 3:99CV02374 (AWT), 2009 WL 8556135 (D. Conn. Apr. 22, 2009) ............ 7

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000) ................................................................ 20

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ................................................................ 20

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ............................................................................. 6, 7

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
    No. 09-12830, 2012 WL 638517 (E.D. Mich. Feb. 28, 2012) ...................... 8, 10, 11

## **Rules**

Fed. R. Evid. 702 ................................................................................................. 5, 7

Lead Plaintiff, the State Treasurer of Michigan, as custodian of the Michigan Public School Employees Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System (the "State of Michigan Retirement Systems," hereafter referred to as "Lead Plaintiff"), respectfully submits this memorandum in opposition to the motion filed by defendant American International Group, Inc. ("AIG") to exclude the declarations, testimony and opinions of Lead Plaintiff's expert, Professor Steven P. Feinstein, which were undertaken and submitted in support of Lead Plaintiff's motion for class certification.[1]

## PRELIMINARY STATEMENT

AIG's challenge to the admissibility of the declarations, testimony and opinions of Professor Feinstein (hereafter, the "Feinstein Evidence") is devoid of any legitimate grounds to support its request for exclusion.  The motion represents little more than a desperate effort to avoid the inevitable conclusion that Lead Plaintiff's motion for class certification rests on a solid evidentiary foundation and should be granted.  AIG raises no challenge to Professor Feinstein's qualifications to serve as an expert, nor could it.  Professor Feinstein is one of the most experienced and recognized experts in securities litigation on matters relating to market efficiency, loss causation and damages.  His opinions have been repeatedly accepted in numerous cases across the country, including in the *Apollo Group, Inc. Securities Litigation*, one of a handful of securities class actions tried since the enactment of the PSLRA and which resulted in a jury verdict for the plaintiffs.

---

[1]       References to AIG's Memorandum of Law in Support of Its Motion to Exclude the Declarations, Testimony and Opinions of Lead Plaintiff's Expert Dr. Steven P. Feinstein (Docket No. 364) shall be in the form "AIG Daubert Mem. at __."  References to the Memorandum in Support of Lead Plaintiff's Motion for Class Certification (Docket No. 340) shall be in the form "Lead Plaintiff's Class Mem. at __" and references to the Reply Memorandum in Support of Lead Plaintiff's Motion for Class Certification (Docket No. 384) shall be in the form "Lead Plaintiff's Class Reply Mem. at __."

Nor has AIG offered any credible basis for impugning the reliability of the analysis that Professor Feinstein performed to determine whether the AIG securities at issue traded efficiently. For example, with regard to AIG common stock, AIG criticizes Professor Feinstein's selection of "event dates" for his event study because all of the dates he chose to study occurred within the last year of the 2½ year Class Period.  Yet AIG's criticism is at odds with the very criteria for selecting event dates that it adopts from Judge Cederbaum in the *Freddie Mac* case; namely, that event dates are identified as those "on which ***unexpected,*** important news entered the market." *In re Fed. Home Loan Mortg. Corp. Sec. Litig. ("Freddie Mac")*, Nos. 09 Civ. 832(MGC) and 09 MD 2072(MGC), 2012 WL 1028642, at *4 (S.D.N.Y. Mar. 27, 2012).  With only one exception – AIG's second quarter 2007 earnings announcement – AIG does not identify a single Class Period date before those studied by Professor Feinstein on which important and ***unexpected*** news about AIG entered the market.  This is not surprising, since for much of the first half of the Class Period, AIG's earnings announcements were consistent with the market's expectations.  Moreover, as explained at length in the reply memorandum filed by Lead Plaintiff in further support of its motion for class certification, AIG's August 2007 disclosures contained a mix of "new" information concerning the Company's subprime exposures, tempered by statements providing false assurances to investors that its exposures were not a matter of concern.[2]  Thus, there is a substantial question as to whether those disclosures could have been expected to result in any price impact at all.  Regardless, AIG's identification of only one additional event date that it deemed worthy of study out of a 2½ year Class Period is hardly a basis for excluding Professor Feinstein's event study as unreliable.

---

[2]     *See* Lead Plaintiff's Class Reply Mem at 15-22.

AIG is on equally thin grounds in its other criticisms of Professor Feinstein's event study of AIG common stock.  For example, AIG contends that Professor Feinstein improperly accounted for the volatility in both AIG's stock and the financial markets during the Class Period.  This argument borders on the absurd because when AIG's expert, Dr. Vinita Juneja, modified Professor Feinstein's event study by using what she considered to be an appropriate volatility adjustment, she confirmed all of the event dates that Professor Feinstein found to be statistically significant and also found an additional event date – February 29, 2008 – where AIG's stock price reacted in a statistically significant manner.  Thus, the work of AIG's own expert lends further support to Professor Feinstein's conclusion that the market for AIG's stock was efficient.

AIG and its other experts, Dr. Mukesh Bajaj and Dr. Owen Lamont, also fail to offer any credible basis for excluding Professor Feinstein's opinions concerning the efficiency of AIG's stock trading during the last three months of the Class Period.  As explained in Lead Plaintiff's class reply memorandum, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████[3]  Moreover, as set forth in Lead Plaintiff's opening brief on the class motion, the three tests conducted by Dr. Bajaj that purport to show that AIG's stock traded inefficiently during the last three months of the Class Period are fundamentally flawed and fail to support Dr. Bajaj's conclusions.[4] Tellingly, AIG failed to offer any response at all to the detailed critique of Dr. Bajaj's tests in

---

[3]    *See* Lead Plaintiff's Class Reply Mem. at 33-36.

[4]    *See* Lead Plaintiff's Class Mem. at 33-38.

3

either its opposition brief to the class motion or in the instant motion.  There are thus no grounds for excluding the Feinstein Evidence based on any of the work performed by Dr. Bajaj.

AIG's attempt to exclude the Feinstein Evidence insofar as it relates to AIG's bonds should also be rejected.  With regard to the bonds for which Professor Feinstein was able to obtain sufficient pricing data to perform an event study,[5] AIG argues that the lack of statistically significant price movements in the bonds until the very end of the Class Period demonstrates that Professor Feinstein's conclusion that these bonds traded efficiently is unsupported.  This argument ignores the fact that the values of AIG's debt securities were supported by an "equity cushion" that insulated them from all but the most extreme news concerning the Company.  Inasmuch as AIG's expert, Dr. Juneja, and PwC's expert, Professor Bradford Cornell, both ██████████████████████████████████ there is no basis for AIG's assertion that the lack of statistically significant price movements before the end of the Class Period shows that these bonds traded inefficiently.[6]  Moreover, Professor Feinstein also demonstrated – ████████████ ██████████████ – that for the portions of the Class Period during which these bonds traded, there were highly significant relationships between the movements in AIG's bond prices and market interest rates, another indicator that valuation relevant information was rapidly incorporated into the prices of the eight bonds.[7]

---

[5]        As noted previously, Professor Feinstein conducted event studies on six bonds that were issued during the Class Period, as well as one other bond that was issued before the beginning of the Class Period.  In its motion, AIG refers to eight "bonds" on which Professor Feinstein conducted event studies.  In so doing, AIG is referring to the event studies conducted for the six identified bonds issued during the Class Period and event studies on two series of preferred shares (also referred to as junior subordinated debentures) issued during the Class Period.  (AIG's discussion omits reference to the event study on the bond issued before the start of the Class Period.)  Lead Plaintiff clarified this in Lead Plaintiff's Class Reply Mem. at 12 & n.9.  However, for ease of reference here, Lead Plaintiff will also refer to the six bonds and two series of preferred shares issued during the Class Period as the "eight bonds."

[6]        See Lead Plaintiff's Class Mem. at 55-56; Lead Plaintiff's Class Reply Mem. at 38-42.

[7]        Lead Plaintiff's Class Mem. at 56; Lead Plaintiff's Class Reply Mem. at 39, 41.

There are 60 other bonds and structured notes at issue for which Professor Feinstein was unable to obtain sufficient pricing data that would allow him to conduct an event study.  Many of these bonds were issued in relatively small offerings (*e.g.*, in the range of $10 million) and were relatively thinly-traded during the Class Period.  Given the inability to perform event studies with respect to these bonds, AIG contends that Professor Feinstein's conclusion that these bonds traded efficiently is unsupported.  Professor Feinstein, however, provided evidence that the prices of AIG's more frequently traded securities conveyed the market's consensus regarding AIG's financial condition and risk of default to purchasers of the 60 other bonds, and further that when those bonds traded, they did, in fact, incorporate new information of a type that would be expected to impact their value (*i.e.*, when information entered the market in mid-September raising concerns about AIG's credit-worthiness and risk of default).[8]  As such, Professor Feinstein's opinions concerning the 60 other bonds are well-supported and there is no basis for excluding them.

As further demonstrated herein, AIG's motion to exclude the Feinstein Evidence should be denied.

## ARGUMENT

The *Daubert* standard, incorporated in Rule 702 of the Federal Rules of Evidence,[9] governs the admissibility of expert testimony.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  As emphasized by the Second Circuit, *Daubert* "loosen[ed] the strictures on scientific evidence… [and] reinforce[d] the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).  Put another way, the Federal

---

[8]      *See* Lead Plaintiff's Class Reply Mem. at 42-45.

[9]      *See* Fed. R. Evid. 702 Advisory Committee Notes on the 2000 Amendment.

Rules of Evidence have "liberal admissibility standards" that "recognize[] that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 265, 267.

Under *Daubert*, the court serves a "gatekeeping" function: it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 579-80, 597*; see also In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866 (LTS)(JLC), No. 05 md 1688 (LTS), 2010 WL 1047618, at *2 (S.D.N.Y. Mar. 22, 2010). The Second Circuit has stated that the court, as gatekeeper, must determine whether the following three requirements for admissibility are met: (1) the witness must be "qualified as an expert to testify as to a particular matter"; (2) the expert's opinion must be "based upon reliable data and methodology"; and (3) "the expert's testimony (as to a particular matter) [must] assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotes and cites omitted). The gatekeeper role, however, "is not intended to serve as a replacement for the adversary system." *In re Benjumen*, 408 B.R. 9, 21 (E.D.N.Y. 2009) (internal quotes and cites omitted). Indeed, the Supreme Court recognizes the role of the adversary system in testing expert opinion evidence:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. … These conventional devices, rather than wholesale exclusion … are the appropriate safeguards where the basis of scientific testimony meets the standard of Rule 702.

*Daubert*, 509 U.S. at 596; *see also Pfizer*, 20102010 WL 1047618, at *2 ("Nor should district courts prejudge the weight of conflicting evidence or substitute the judgment of the court for that of the jury.").[10]

---

[10]     Because the instant motion to exclude comes to the Court not during a full-scale inquiry on the merits, but at the class certification stage, the proper role for the *Daubert* inquiry at this stage remains limited by Rule 23. Therefore, "the Court may only examine the expert reports as far as they bear on the Rule 23 determination" and the

The focus of a court's evaluation of proposed expert testimony "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. As a result, the "rejection of expert testimony is the exception, rather than the rule." *See* Fed. R. Evid. 702, Notes of Advisory Committee on 2000 Amendments. Indeed, courts presiding over securities cases have repeatedly rejected efforts to use *Daubert* to exclude expert opinions, where, as here, the expert has utilized a reliable event study methodology and the expert's opinion will assist the Court in its role as the trier of fact. *See, e.g., City of Ann Arbor Employee' Retirement System v. Sonoco Products Co.*, 827 F. Supp. 2d 559, 570-71 (D.S.C. 2011); *In re Homestore.com, Inc.*, Master File No. CV 01–11115 RSWL (CWx), 2011 WL 291176, at *7-8 (C.D. Cal. Jan. 25, 2011); *In re Xerox Corp. Sec. Litig.*, Civ. A. No. 3:99CV02374 (AWT), 2009 WL 8556135, at *1 (D. Conn. Apr. 22, 2009).

As set forth in greater detail below, Professor Feinstein's thorough analyses and well-founded opinions regarding market efficiency satisfy the Second Circuit's requirements for admissibility since (1) he is qualified as an expert; (2) his opinions are based on reliable methodology; and (3) his opinions will assist the trier of fact. *See Nimely*, 414 F.3d at 397. Professor Feinstein describes clearly and justifies cogently his statistical methods and conclusions, including with respect to the market efficiency of AIG's common stock and bonds, as well as its other securities. Further, Professor Feinstein details his methodology, and has done so in a way that has allowed Defendants' experts to test that methodology. Finally, Professor Feinstein has responded to the arguments of AIG and its experts in a scientifically-supportable and thorough manner. As such there is no basis for excluding the Feinstein Evidence.

---

Court's "*Daubert* inquiry is limited to whether or not the [experts'] [r]eports are admissible to establish the requirements of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009) (internal quotes and cites omitted).

## I.      Professor Feinstein Has Been Accepted As An Expert By Many Courts

Professor Feinstein, an Associate Professor of Finance at Babson College who earned his doctorate from Yale University, is one of the foremost experts in securities litigation on matters relating to market efficiency, loss causation and damages.[11]  Professor Feinstein provided expert trial testimony in *In re Apollo Group, Inc. Sec. Litig.*, Master File No. CV 04-2147-PHX-JAT (D. Ariz.), one of the few securities class actions that have been tried since the enactment of the PSLRA.  Professor Feinstein's testimony on loss causation and damages, which was provided after the district court denied defendants' motion *in limine* to exclude it,[12] became the basis for a jury verdict in favor of plaintiffs.  Although the district court set aside the jury verdict on a post-trial motion for judgment as a matter of law, its decision was reversed by the Court of Appeals for the Ninth Circuit, which expressly found that "[t]he jury could have reasonably credited the expert [Professor Feinstein] who testified that the fraud revealed by multiple disclosures accounted for $5.55 of the drop in stock price."[13]

Professor Feinstein's opinions concerning market efficiency have been accepted by numerous courts on motions for class certification, including:

- *Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-12830, 2012 WL 638517 (E.D. Mich. Feb. 28, 2012);

- *Buettgen v. Harless*, Civil Action No. 09-CV-791, 2011 WL 1938130 (N.D. Tex. May 19, 2011);

- *Beach v. Healthways, Inc.*, No. 08-0569, 2010 WL 1408791 (M.D. Tenn. Apr. 2, 2010);

---

[11]      Professor Feinstein's credentials are summarized in Declaration of Steven P. Feinstein, Ph.D., C.F.A., ("Feinstein Decl."), attached as Exhibit 8 to the Declaration of Jeffrey W. Golan in Support of Plaintiff's Motion for Class Certification ("Golan Decl.") (Docket No. 341) at ¶¶ 5-14 and Exhibit-2.

[12]      *See In re Apollo Group, Inc. Sec. Litig.*, 527 F.Supp 2d. 957, 964 (D. Ariz. 2007).

[13]      *In re Apollo Group, Inc. Sec. Litig.*, 2010 WL 5927988 (9ᵗʰ Cir. June 23, 2010).  The parties ultimately agreed to resolve the case for $145 million in satisfaction of the judgment.  *See* 2012 WL 1378677 (D. Ariz. April 20, 2012).

- *In re Red Hat Sec. Litig.*, 261 F.R.D. 83 (E.D.N.C. 2009);

- *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101 (E.D. Va. 2009); and

- *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628 (C.D. Cal. 2009).

The broad acceptance of Professor Feinstein's opinions demonstrates not only his qualifications, but also that the methodologies he employed in reaching them have been well within the mainstream of accepted practice.

## II.   Professor Feinstein's Opinions Concerning The Efficiency of the Market For AIG Common Stock Are Based on Reliable Methodologies and Should Not Be Excluded

AIG challenges Professor Feinstein's opinions concerning the efficiency of the market for AIG common stock on three grounds.   First, AIG contends that Professor Feinstein's selection of event dates for his event study was improper.   Second, it contends that Professor Feinstein failed to properly account for the changes in volatility with which AIG's stock traded during the Class Period.   Finally, it contends that Professor Feinstein "ignored" evidence that AIG's stock traded inefficiently during the last three months of the Class Period.   As demonstrated below, each of these arguments is without merit and should be rejected.

### A.   Event Study Dates

AIG criticizes Professor Feinstein's selection of event dates for his event study because he did not select any dates to study before November 8, 2007, when AIG issued its third quarter 2007 financial results.[14]   This criticism, however, is completely at odds with the very standard for choosing event dates that AIG adopts from the decision of Judge Cederbaum in the *Freddie Mac* litigation.   As Judge Cederbaum observed:

> An event study examines the extent to which stock prices react to the release of new, material information (an "event").   For the purpose of showing market

---

[14]   *See* AIG Daubert Mem. at 8-11.

efficiency, days on which **unexpected**, important news entered the market are identified.

*Freddie Mac*, 2012 WL 1028642 at *4 (emphasis added); *see also id.* ("[i]n an efficient market, stock prices should show statistically significant abnormal returns on days in which **unexpected**, material information is released into the market") (emphasis added).  This is precisely what Professor Feinstein did; that is, he selected event dates when news was disclosed that appeared to be related to the alleged fraud and which appeared to be at least partially corrective of the alleged misrepresentations and omissions.[15]  While AIG makes much of the fact that the first event date studied by Professor Feinstein occurred 400 days into the Class Period, AIG itself, with only a single exception discussed below, did not cite *any* dates within these 400 days when the Company released *unexpected* information into the market.  Thus, AIG is hard-pressed to identify any event dates that satisfy its own criteria for choosing them.  Conversely, to the extent that AIG contends that Professor Feinstein should have studied event dates from earlier in the Class Period when AIG's earnings releases were not unexpected, the argument defies logic.  As the court in *Wilkof v. Caraco Pharm. Labs.* recently observed, "[i]t would make little sense that the release of a statement essentially stating 'everything is fine' would be correlated to a change in stock prices."  2012 WL 638517, at 14 (certifying class over defendants' objections that Professor Feinstein had "cherry-picked" event dates).[16]

---

[15]    *See* Feinstein Decl., ¶¶101-04 (describing the basis for his selection of event dates and the disclosures made on each of the event dates he selected); *see also* ███████████████████████████████████████████████████

[16]    The cases cited by AIG in support of its contention that Professor Feinstein's selection of event dates was improper are unavailing.  *See* AIG Daubert Mem. at 9 n.32.  In *Bricklayers & Trowel Trades Int'l. Pension Fund v. Credit Suisse First Boston*, Civil Action No. 02-12146-NMG, 2012 WL 118486, at *5 (D. Mass. Jan. 13, 2012), the court determined that plaintiffs' expert (Dr. Hakala) purposefully selected dates for study that were "unusually volatile days."  Moreover, "[i]f the stock price increased sharply, he attributed it to the defendants (even if no [Credit Suisse] reports were released that day).  If the stock price decreased sharply, he called it a corrective disclosure (even if the news released was positive)."  *Id.*  Here, Professor Feinstein did not choose event dates on the basis of their volatility.  Instead, and unlike plaintiffs' expert in *Bricklayers*, he studied event dates where news was released that appeared to relate to Plaintiffs' allegations and which the Complaint identified as partially corrective

Other than the nine event dates that Professor Feinstein studied, the **only** other specific date that AIG and its expert, Dr. Juneja, contend should have been studied is August 9, 2007. But, as set forth in greater detail in Lead Plaintiff's Class Reply Mem. at 18-20, while the August 2007 disclosures were the first time the Company provided details of its subprime exposures, those disclosures were accompanied by numerous statements by Defendants assuring investors (falsely, Plaintiffs contend) that AIG's subprime exposures were being well-managed and were not a cause for concern.  Thus, as Professor Feinstein explained, ██████████████

████████████████████████████████████████████████████

██████████████████████████████████████[17]  Indeed, analyst commentary in the wake of the August 2007 disclosures was rife with statements concluding that "investors should rest easy," "we are not concerned with AIG's [subprime] exposure" and similar sentiments.  Thus, the August 2007 disclosures were precisely the type of "everything is fine" disclosures that the court in *Wilkof* said made "little sense" to study.  Accordingly, there was good reason for Professor Feinstein to omit the date from his event study, and his determination in that regard provides no basis for excluding his opinions.[18]

---

disclosures.  Similarly, unlike Professor Feinstein's selection of event dates here, plaintiffs' expert (Professor Pettit) in *Bell v. Ascendant Solutions, Inc.*, No. Civ. A. 301CV0166N, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004), selected a date based on a news article that "did not mention Ascendant at all and does not appear to implicate Ascendant's business model directly."  Finally, *Dekoven v. Plaza Assocs.*, 599 F.3d 578 (7th Cir. 2010), was a case brought under the Fair Debt Collection Practices Act that simply has no applicability to the event study at issue here.

[17] ████████████████████████████████████████████████████████████

████████████████████████████████████

[18] As it did in its opposition to the class motion, AIG asserts again here that Professor Feinstein should have studied the August 9, 2007 event date because "Lead Plaintiff characterizes these disclosures as at least 'partially' corrective."  AIG Daubert Mem. at 10-11 (footnote omitted).  Notwithstanding the number of times AIG makes this assertion, it is simply not true.  In the Loss Causation section, the Complaint states:  "Throughout the Class Period, as partial corrective disclosures were made to the market, the market price of AIG's securities declined with relevant news.  ***On the other hand, when Defendants made statements that painted the Company's CDS portfolio and securities lending program in a false light, the market reacted positively, which allowed the Company's stock either to remain at its then-current trading levels or even increase in price.***"  ¶ 517 (emphasis added).  In the very

AIG is also incorrect when it asserts that Professor Feinstein did not compare news dates to non-news dates.[19]  The regression component of the event study analysis measures typical security price movements on all non-event dates and describes how the security's price typically behaves on such dates.  The "t-test" component of the event study then compares the observed residual returns on the selected news event dates to the range of price movement on non-event dates to determine whether there is a statistically significant difference.  Thus, the event study effectively compares event dates to all non-event dates.[20]  AIG's observation that the methodology employed by Professor Feinstein here does not precisely match the methodologies he used in other cases is also of no consequence.[21]  There is no standard template that can be applied to appropriate event selection in all event studies designed to evaluate market efficiency.  Rather, event selection criteria is influenced by, among other things, the duration of the Class Period, the number of events during the Class Period, the number of partial curative disclosures that can be tested, and the timing of events within the Class Period.  Given that AIG's expert identified only one other specific event date for study, AIG's criticism of Professor Feinstein's selection criteria fails to warrant the exclusion of his opinions.

## B.   Market Volatility

AIG next argues that the Professor Feinstein's opinions with regard to AIG's common stock must be excluded because he not take into account an increase in market volatility leading up to the end of the Class Period.[22]  Specifically, AIG's criticism is that Professor Feinstein used

---

next paragraph, the August 2007 disclosures are then expressly cited as an "example" of the Company presenting itself in a false light.  ¶ 518.

[19]   *See* AIG Daubert Mem. at 11.

[20]   *See* Feinstein Decl., ¶¶ 105-119 (describing method for isolating impact of company-specific information).

[21]   *See* AIG Daubert Mem. at 11 n.40.

[22]   *See* AIG Daubert Mem. at 12-13.

the entire Class Period to estimate the average AIG common stock residual returns and residual return volatility, as opposed to AIG's expert, Dr. Juneja, who utilized a "rolling regression," by which she compared the price movements on each of the event dates with the average return for AIG's common stock over the respective prior year.[23]  This criticism, however, has absolutely no bearing on Professor Feinstein's opinions concerning market efficiency.   When Dr. Juneja modified Professor Feinstein's event study by applying her rolling regression analysis, not only did she confirm Professor Feinstein's findings with respect to the seven event dates on which he found that AIG's common stock price had declined by statistically significant amounts (including all five of the event dates during the last five months of the Class Period), she also found AIG's residual stock movements to be statistically significant on one additional event date that had been selected by Professor Feinstein, February 29, 2008.[24]   Thus, Dr. Juneja's modification, if anything, only serves to strengthen the case for market efficiency.   AIG's argument that the results of Professor Feinstein's regression analysis for AIG common stock is somehow "distorted and misleading" is absurd given that Dr. Juneja produced virtually identical results through her own analysis.[25]

---

[23] ████████████████████████

[24] ████████████████████████

[25]       AIG's observations with regard to "homoscedasticity" or constant volatility are also not well-founded.  *See* AIG Daubert Mem. at 12 n.43. ███████████████████████████████████████

C.        The Last Three Months of the Class Period

Finally, with regard to AIG common stock, AIG argues that Professor Feinstein "ignored" proof of inefficiency in the market for AIG's common stock at the end of the Class Period.[26]  This argument is especially bizarre given the extensive criticism by Professor Feinstein (as well as by Plaintiffs' other expert, Professor Roll) of the three tests performed by AIG's expert, Dr. Bajaj, that purport to show that AIG's stock traded inefficiently during the last three months of the Class Period.  Far from "ignoring" Dr. Bajaj's purported "proof" of inefficiency, Professor Feinstein carefully reviewed Dr. Bajaj's analysis ████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████[27] █████████████████████████████████████████████████████ ███████████████████[28]

Plaintiffs anticipated AIG's argument in this regard when Plaintiffs filed the class motion, devoting a significant portion of the memorandum in support of the motion to demonstrate the flaws in the three tests performed by Dr. Bajaj.  *AIG, in turn, chose not to offer any substantive response at all to this criticism in its opposition to Lead Plaintiff's class motion, and has continued to remain silent with respect to the criticism in making its Daubert arguments*.[29]  Simply put, AIG's refusal to address the well-founded criticism of Dr. Bajaj's

---

[26]        AIG Daubert Mem. at 16-19.

[27]        ███████████████████████████████████

[28]

[29]        In fact, AIG blatantly misrepresents Plaintiffs' position by suggesting that Plaintiffs have somehow conceded that put-call parity violations occurred and that there was evidence of serial correlation during the last three months of the Class Period.  AIG Daubert Mem. at 19 & n.71.  Nothing could be further from the truth, as

three tests by both Professor Feinstein and Professor Roll, whose report AIG does not seek to exclude, renders baseless its assertion that Professor Feinstein somehow "ignored" Dr. Bajaj's findings.  To the contrary, Professor Feinstein carefully reviewed Dr. Bajaj's work, ███████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████[30]   Accordingly, there is similarly no basis for excluding the Feinstein Evidence on account of the flawed tests conducted by Dr. Bajaj.[31]

### III. Professor Feinstein's Opinions Concerning The Efficiency of the Market For AIG Bonds Are Based on Reliable Methodologies and Should Not Be Excluded

#### A. Event Studies for the Eight Bonds

Professor Feinstein had sufficient pricing data to conduct event studies on six bonds and two series of preferred shares that were issued during the Class Period.  Professor Feinstein used the same event dates for these studies as he had used in connection with his event study on the common stock, recognizing, however, that AIG bonds were not likely to have responded in a statistically significant manner on most of the event dates because such bonds would not react to disclosures except when they have a direct impact on the Company's credit-worthiness and risk of default.[32]

---

even a cursory examination of Lead Plaintiff's opening class memorandum reveals no such admissions.   *See* Lead Plaintiff's Class Mem. at 34, 38.

[30]   ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[31]      As noted in Lead Plaintiff's Class Reply Mem. at 33-37, apart from the fact the Dr. Bajaj's tests fail to demonstrate inefficiency, they are also inappropriate here because they reflect an underlying premise that in an efficient market, the price of a security should reflect the "correct" price, a view is inconsistent with the application of the fraud-on-the-market presumption by the courts.

[32]      Feinstein Decl., ¶¶ 218-222, 309-311.

AIG cites the lack of statistically significant price movements on pre-September 2008 event dates as evidence that Professor Feinstein's opinions concerning the efficiency of trading for the either bonds is unreliable.[33]  Plaintiffs anticipated this criticism and have responded to it several times, including in Lead Plaintiff's Class Mem. at 55-56 and in Lead Plaintiff's Class Reply Mem. at 41-42, each time citing extensively from the Feinstein Evidence and to the testimony of both Dr. Juneja and Professor Cornell.  In the interest of efficiency, Lead Plaintiff will not repeat that analysis here, but will make several brief points about AIG's argument in the context of its *Daubert* motion.

First, AIG's argument ignores Professor Feinstein's detailed analysis regarding the equity cushion and the multitude of authority cited by Plaintiffs and Professor Feinstein to support the existence of the equity cushion and the fact that debt securities such as the bonds at issue here are structurally different from equity securities such as AIG's common stock, and are thus inherently less volatile.[34]  Accordingly, the fact that the bonds generally did not react until the news in September 2008 raised concerns about AIG's credit-worthiness and risk of default is not surprising.

Second, Professor Feinstein's event studies on the eight AIG bonds demonstrates a clear cause and effect relationship between their prices and unexpected material disclosures,



[33]     AIG Daubert Mem. at 13-16.

[34]     Lead Plaintiff's Class Mem. at 46-48

[35]     Lead Plaintiff's Class Mem. at 54-57; Lead Plaintiff's Class Reply Mem. at 41.



Third, Professor Feinstein's event studies showed highly significant relationships between the day-to-day movements in bond prices and market interest rates. This demonstrated that investors monitored valuation-relevant information and that such information was incorporated rapidly into bond prices.[38]

Fourth, Professor Feinstein established with respect to the eight bonds that the first four *Cammer* factors were indicative of a finding of efficiency.[40]

For all of these reasons, there is no basis for excluding the Feinstein Evidence insofar as it relates to the event studies he performed on the eight bonds.

## B.      The Other 60 Bonds

AIG argues that Professor Feinstein has ignored the most important *Cammer* factor, empirical evidence that the price of a security reacted to new, material information, with respect to the 60 bonds for which Professor Feinstein was not able to obtain consistent pricing data.[41] This argument is simply a rehash of AIG's flawed contention raised in opposition to Lead

---

[36]      Lead Plaintiff's Class Mem. at 55-56

[37]      Lead Plaintiff's Class Mem. at 56

[38]      *See* Lead Plaintiff's Class Reply Mem. at 39-40 (pertaining to preferred shares) & 41 (pertaining to six identified bonds).

[39]      *Id*. at 38, 41.

[40]      *Id.*

[41]      AIG Daubert Mem. at 2, 5-8.

Plaintiff's class certification motion that because consistent pricing and trading data was unavailable for these bonds, the markets for them were necessarily inefficient. As Lead Plaintiff set forth more fully in its briefing in support of class certification, AIG's argument in this regard is flawed for a variety of reasons.

First, AIG's argument disregards the fact that Professor Feinstein analyzed the market for these AIG bonds in terms of the other indicia of market efficiency set forth in *Cammer*, as well as several additional factors discussed in other cases, and found that the factors weighed in favor of a finding of market efficiency.[42]

Second, as was noted by Plaintiffs in their opening memorandum in support of class certification, Professor Cornell █████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████[43]

Third, and directly contrary to AIG's contention that Professor Feinstein somehow "ignored" the cause and effect factor of *Cammer* with respect to these AIG bonds, Plaintiffs have repeatedly stressed Professor Feinstein's analysis and conclusions that show the next time many of these bonds traded after the news of AIG's downgrade on September 15, 2008, they did so at markedly lower prices.[44] Indeed, AIG's argument wholly ignores the fact that █████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[42]   *See* Lead Plaintiff's Class Mem. at 46-57; Lead Plaintiff's Class Reply Mem. at 42-45; Feinstein Decl., ¶¶ 337-353; ████████████████████████████████

[43]   Plaintiff Class Mem. at 52 n.32 ██████████████████████████████████████████
██████████████████████

[44]   *See* Lead Plaintiff's Class Reply Mem. at 43 ████████████████████████████████
████████████ Lead Plaintiff's Class Mem. at 52 n.32 ████████████

███████████████████████████████████████████████████████
████████████████████████████████████████████████[45]

Fourth, AIG's bluster that extrapolation here is both "improper" and "untenable" is plainly incorrect given that it ignores (1) the fact that, as noted directly above, many of the *Cammer* factors applicable to an assessment of market efficiency for the bonds are applicable to *all* of AIG's bonds; (2) the evidence that the prices of AIG's more frequently traded securities would convey the market's consensus regarding AIG's financial condition and risk of default to purchasers of the other bonds and notes;[46] (3) the academic research that a market may be considered efficient when the security prices at any point in time "fully reflect" all available information;[47] and (4) authority such as the decision in *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, where the court included bond purchasers within a certified class of purchasers of Enron stock and bonds, notwithstanding that certain of the bonds had limited trading data and that the plaintiff's expert had used an exemplar bond as a proxy for the others. 529 F. Supp. 2d 644, 745-68 (S.D. Tex. 2006).

Like many of AIG's arguments in opposition to class certification, AIG relies on very little aside from broad generalizations that ignore the record and much of the Feinstein Evidence to support its contention that the Feinstein Evidence should be excluded. While AIG once again relies in this regard on the decision in *Freddie Mac*, the facts and expert analysis in that case are so clearly distinguishable from the circumstances here as to render it meaningless.[48]   AIG's

---

[45]     Lead Plaintiff's Reply Class Mem. at 43 ████████████████████████ *see also* Plaintiff Class Mem. at 52 n.32 ████████
████████████████████████████████████████████

[46]     Lead Plaintiff's Class Reply Mem. at 45 █████████████████████

[47]     *Id.* █████████████████████

[48]     *See* Lead Plaintiff's Class Reply Mem. at 44 n.94.

reliance on *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268 (S.D.N.Y. 2000), and *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005), is similarly misplaced.[49]

For the reasons set forth above, AIG's claim that Professor Feinstein's methodology is somehow "nonexistent" in regard to the 60 other bonds is clearly without merit and should be rejected.

## CONCLUSION

AIG's *Daubert* motion appears to have been filed simply because AIG does not agree with the conclusions reached by Professor Feinstein, without regard to the substantial underlying support for Professor Feinstein's opinions contained in the Feinstein Evidence and the high standard set in *Daubert* to exclude the reports, testimony and opinions of an opposing side's expert. For all of the foregoing reasons, supplemented by the reasons set forth in the opening brief and reply brief that Lead Plaintiff submitted in support of its motion for class certification, Lead Plaintiff respectfully submits that AIG's motion to exclude the declarations, testimony and opinions of Professor Feinstein should be denied in its entirety.

---

[49]    *Johnson* is a patent case where the court found large sections of the expert analysis to be irrelevant and further that the expert's ultimate conclusions were "preposterous" because of the expert's severely flawed damages calculation that could have had no basis in "common sense." 103 F. Supp. 2d at 280-87. Similarly, the court in *Loeffel Steel* found the expert's conclusion to be "demonstrably false," finding that the expert was not qualified and that his methodology was "under-inclusive." 387 F. Supp. 2d 812-17. Moreover, neither case involved an assessment under *Daubert* performed at the class certification stage.

Dated:  June 29, 2012                          Respectfully submitted,

**BARRACK, RODOS & BACINE**                    **THE MILLER LAW FIRM, P.C.**


/s/ Jeffrey W. Golan                           /s/ E. Powell Miller
Leonard Barrack                                E. Powell Miller (*pro hac vice*)
Jeffrey W. Golan (*pro hac vice*)              Marc L. Newman (*pro hac vice*)
M. Richard Komins                              Jayson E. Blake
Robert A. Hoffman                              Casey A. Fry
Chad A. Carder                                 Miller Building
Lisa M. Lamb                                   950 West University Drive, Suite 300
3300 Two Commerce Square                       Rochester, MI 48307
2001 Market Street                             Tel.: (248) 841-2200
Philadelphia, PA  19103
Tel.:  (215) 963-0600

        and

A. Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)
425 Park Avenue, Suite 3100
New York, New York 10022
Tel.:  (212) 688-0782

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*