UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION | Master File No.:<br>08-CV-4772-LTS-DCF |
| This Document Relates To:  All Actions | |

### MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR FINAL APPROVAL OF AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

**BARRACK, RODOS & BACINE**

Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)
Lisa M. Port
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel.:  (215) 963-0600

     and

A. Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)
425 Park Avenue, Suite 3100
New York, New York 10022
Tel.:  (212) 688-0782

**THE MILLER LAW FIRM, P.C.**

E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
Jayson E. Blake
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 7

I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE
     AND SHOULD BE GRANTED ................................................................................ 7

     A.   The Legal Standards Governing the Award of Attorneys' Fees .................................. 7

     B.   The Fee Award Should Be Based on the Percentage Method ...................................... 9

     C.   The Requested Fee is Reasonable as Measured by the Second Circuit's
          *Goldberger* Factors ........................................................................................ 10

          1.   Time and Labor Expended By Counsel ...................................................... 10

          2.   The Magnitude and Complexities of the Litigation ............................................ 13

          3.   The Risks of the Litigation ..................................................................... 13

          4.   The Quality of Representation ................................................................. 17

          5.   The Results Achieved Justify the Requested Fee ................................................. 18

          6.   Public Policy Considerations Support the Requested Fee ..................................... 19

     D.   The Requested Fee is Reasonable Under the Lodestar "Cross-Check".................... 21

II.  PLAINTIFFS' COUNSEL SHOULD BE REIMBURSED FOR EXPENSES
     REASONABLY INCURRED IN CONNECTION WITH THIS ACTION.................... 22

III. LEAD PLAINTIFF SHOULD BE AWARDED REASONABLE COSTS AND
     EXPENSES INCURRED IN CONNECTION WITH THIS ACTION........................... 24

CONCLUSION.................................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Batemen Eichler, Hill Richards, Inc. v. Berner,*
 472 U.S. 299 (1985) ................................................................................ 8

*Blum v. Stenson,*
 465 U.S. 886 (1984) ............................................................................... 21

*Boeing Co. v. Van Gemert,*
 444 U.S. 472 (1980) ................................................................................ 8

*Carlson v. Xerox Corp.,*
 596 F.Supp.2d 400 (D. Conn. 2009) ............................................... 18, 22

*City of Detroit v. Grinnell Corp.*
 495 F.2d 448 (2d Cir. 1974) .................................................................. 13

*Doglow v. Anderson,*
 43 F.R.D. 472 (E.D.N.Y. 1968) .............................................................. 8

*Fait v. Regions Financial Corp.,*
 655 F.3d 105 (2d Cir. 2011) .................................................................. 14

*Goldberger v. Integrated Resources, Inc.,*
 209 F.3d 43 (2d Cir. 2000); .............................................................. 8, 21

*Hicks v. Stanley,*
 No. 01 Civ. 10071(RJH),
 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............................ 19, 20, 25

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,*
 No. 03 MDL 1529 LMM,
 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ................................. 18, 22

*In re Bank of Am. Corp. Sec., Derivative,*
 *& Employee Ret. Income Sec. Act (ERISA) Litig.,*
 772 F.3d 125 (2d Cir. 2014) .................................................................. 25

*In re Cardinal Health Inc. Sec. Litigations,*
 528 F. Supp. 2d 752 (S.D. Ohio 2007) ................................................. 19

*In re Citigroup Inc. Bond Litig.,*
 988 F. Supp. 2d 371 (S.D.N.Y. 2013), *appeal dismissed* (Feb. 10, 2014) .............................. 18

*In re Comverse Tech. Inc. Sec. Litig.*,
   No. 06-CV-1825(NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)............................ 8, 19

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007)................................... 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02-cv-3400 (CV) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................. 8, 19, 23

*In re Global Crossing Sec. Litig.*,
   225 F.R.D.436 (S.D.N.Y. 2004) ....................................................................... 17, 21

*In re Lucent Tech., Inc., Sec. Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) ............................................................................ 19

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
   No. 04 CIV. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)........................... 16, 26

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) ............................................................................... 20

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................................. 9, 10

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ............................................................................ 18, 22

*In re Oxford Health Plans. Inc. Sec Litig.*,
   MDL 1222 (CLB), 2003 U.S. Dist. Lexis 26795 (S.D.N.Y. June 12, 2003)........................... 18

*In re Pfizer, Inc. Securities Litigation*,
   No. 04-cv-09866-LTS-HBP, 5-md-1688-LTS,
   2014 WL 3291230 (S.D.N.Y. July 8, 2014) ................................................................. 14

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ............................................................................... 14

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999)..................................................................... 9, 19, 22

*In re Twinlab Corp. Sec. Litig.*,
   187 F. Supp. 2d 80 (E.D.N.Y. 2002) ........................................................................... 8

*In re Union Carbide Corp. Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ............................................................................. 20

*In re UnitedHealth Group Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1094 (D. Minn. 2009) ................................................................. 22

*In re Veeco Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ..................... 9, 22, 26

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
   No. 09 CIV. 6351 RJS, 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) ........................ 22

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ........................ 8, 9, 20

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................. 8, 9, 20

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964) ................................................................. 8

*Kurzweil v. Philip Morris Cos., Inc.*,
   Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB),
   1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) ........................................ 19

*Maley v. Del Global Tech.. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................. 9, 10, 20, 22

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ................................................................. 8

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ................................................................. 21

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983) ................................................... 21

*Shaw v. Toshiba America Information Systems*, Inc.,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ........................................... 19

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ................... 23

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................. 9

## **Other Authorities**

S. Rep. No. 104-98 (1995) ................................................................. 25

"The Private Securities Reform Act of 1995,"
  H.R. Conf. Report No. 104-369,
  104th Cong., 1st Sess. (1995), 1995 WL 709276 ........................................................... 6, 24, 25

## **<u>Statutes</u>**

15 U.S.C. § 78u-4(a)(4) ............................................................................................................. 6, 24

Court-appointed Lead Counsel,[1] Barrack, Rodos & Bacine and The Miller Law Firm, P.C., respectfully submit this memorandum of law in support of the motion for an award of attorneys' fees and reimbursement of expenses ("Fee and Expense Application" or "Application"), on behalf of themselves and all counsel who assisted Lead Counsel (collectively "Plaintiffs' Counsel") in the prosecution of this Action. As detailed below, this Application is being submitted with the prior approval of Lead Plaintiff. For the reasons set forth herein, Lead Counsel respectfully request that the Fee and Expense Application be approved.

## **INTRODUCTION**

Lead Plaintiff, the State of Michigan Retirement Systems, as custodian of the Michigan Public School Employees' Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System ("SMRS" or "Lead Plaintiff") and Lead Counsel have succeeded in achieving a settlement that will resolve all claims asserted in this Action against the Defendants for a total recovery of $970.5 million, plus interest. The Settlement, which appears to be the largest recovery ever achieved in a securities class action where there was not also a criminal prosecution, SEC enforcement action, or a restatement of financial results (¶¶2, 76),[2] represents an outstanding recovery for the Settlement Class.[3] Lead Counsel respectfully submit that this result was obtained through the hard work, persistence and skill of Lead Counsel, who prosecuted this

---

[1] All capitalized terms not otherwise defined herein have the same meanings as set forth in Paragraph 1 of the Stipulation and Agreement of Settlement (the "Stipulation"), dated September 12, 2014.

[2] All references to ¶__ herein are to the Joint Declaration of Jeffrey W. Golan and E. Powell Miller in Support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Joint Declaration") that Lead Plaintiff is filing herewith. The Joint Declaration provides a detailed description of the nature of the claims asserted in the Complaint, the mediation process, the risks of continued litigation, a description of the services Plaintiffs' Counsel provided to the Class, and the role that Lead Plaintiff played in prosecuting this Action.

[3] Specifically, the Settlement includes payments from American International Group, Inc. ("AIG") in the amount of $960 million, and from PricewaterhouseCoopers LLP ("PwC") in the amount of $10.5 million.

case for more than six years on an entirely contingent basis.  As set forth more fully in the Joint Declaration, this was a highly complex securities class action that involved allegations regarding Defendants' materially false and misleading statements related to more than 70 different AIG securities and 101 public bond and stock offerings during the Class Period.  ¶¶12-17.  Due to the complexity of this Action, Lead Counsel worked closely with experts in various fields including market efficiency, loss causation, damages, accounting and auditing, and investment banking and securitization of mortgage loans.  ¶¶9, 148-150.

As set forth more fully in the Joint Declaration, the efforts of Lead Counsel in the prosecution of this Action have been substantial.  Over the course of more than six years, Lead Counsel diligently prosecuted this Action against each of the Defendants and, despite many significant obstacles, succeeded in achieving an outstanding recovery for the benefit of the Settlement Class.

On March 20, 2009, the Court appointed SMRS as Lead Plaintiff, approved SMRS's selection of Barrack, Rodos & Bacine and The Miller Law Firm, P.C. as Lead Counsel, and denied all competing motions for appointment as Lead Plaintiff and Lead Counsel.  Lead Plaintiff was ordered to file a consolidated complaint within sixty (60) days of the entry of the Order.  Prior to filing the Complaint, Lead Counsel undertook an exhaustive investigation of both public and non-public sources in order to gather information regarding the claims to be asserted in the Complaint.  Among other things, Lead Counsel consulted with experts in various fields relevant to the claims made in the Complaint. Lead Counsel further retained an investigator who identified and interviewed numerous confidential witnesses with first-hand knowledge of the subject matter of this Action, several of which were thereafter cited by a "CW" designation in the Complaint.  ¶9.

Lead Counsel drafted and filed a detailed 701 paragraph, 284 pages long Consolidated Complaint. ¶12; *see generally* ¶¶8-17.   As detailed in the Joint Declaration, the Complaint included a significant amount of information that was not part of the public record pertaining to AIG prior to the filing of the Complaint.   ¶17.   Thereafter, Lead Counsel successfully opposed Defendants' voluminous motions to dismiss and a related motion for reconsideration, which involved hundreds of pages of briefing.   ¶¶18-27.

Fact discovery began in November 2010.   ¶31.   The discovery process, including obtaining, reviewing and analyzing tens of millions of pages of documents produced by Defendants and certain non-parties, was an enormous task. ¶33.   Among other things, Lead Counsel: (i) conducted and participated in numerous conferences with defense counsel to establish search terms, custodians and time periods for which Defendants would produce various types of documents and to set protocols for the production of certain documents by AIG and PwC (¶33); (ii) successfully moved to compel the production of certain documents by PwC and AIG (¶33); (iii) served subpoenas on numerous third parties (*id*); (iv) reviewed and analyzed more than 36 million pages of documents produced by Defendants and third parties (¶¶34-37); (v) prepared for and took 45 fact witness depositions from July 2011 through June 2012 (¶¶38-39); and (vi) prepared and served comprehensive responses to Defendants' contention interrogatories (¶40).

In the midst of merits discovery, Lead Counsel was also engaged in discovery related to Lead Plaintiff's vigorously contested class certification motion, which was initially filed on April 1, 2011 and renewed on July 6, 2011.   ¶¶41-42.   After the renewed motion for class certification was filed, Defendants pursued class-related discovery and then filed their opposition to the motion on August 17, 2011, after which the Court terminated the motion without prejudice

3

pending the completion of class discovery.  In connection with the motion for class certification, Lead Plaintiff and Defendants retained a total of six experts, each of whom submitted a declaration either in support of or in opposition to class certification, and certain of the experts also submitted reply declarations.  Lead Counsel also prepared for and defended the depositions of each of the three experts retained by Lead Counsel as well as 11 non-expert class-related witnesses, and conducted the depositions of defendants' experts.  ¶¶44-46.   Lead Counsel, together with certain of Plaintiffs' Counsel worked with Plaintiffs to respond to and produce documents responsive to Defendants' requests for production of documents.   On March 30, 2012, Lead Plaintiff again filed its motion for class certification, supported by a revised brief and a new set of exhibits.  ¶¶42-43.  Then, Lead Counsel prepared for and participated in a three-day evidentiary hearing and oral argument concerning the motion for class certification and AIG's motion to preclude the declarations, testimony and opinions of Lead Plaintiff's expert.  ¶¶47-52.

The settlement negotiation process was also long and arduous.  The parties did not enter into the mediation until July 2012 – after the completion of fact witness discovery.  Thereafter, several mediation sessions resulted in no agreements being reached, and the mediation efforts were also interrupted by the Supreme Court's granting of certiorari to hear the appeal from the Fifth Circuit Court of Appeal's decision in the *Halliburton II* case.  In all, the parties entered into the Settlement only after engaging in two years of negotiations under the auspices of former U.S. District Court Judge Layn Phillips, one of the most experienced mediators in securities class actions.  ¶¶63-71.

The Settlement amount represents an outstanding result for the Settlement Class, particularly when viewed against the numerous and significant risks that Lead Plaintiff faced going forward in this litigation.  ¶¶83-98.  As set forth in greater detail in the Joint Declaration,

throughout the litigation, including in their responses to Lead Plaintiff's motions for class certification, Defendants raised a series of defenses that, if successful, could well have undercut Lead Plaintiff's ability to have the class fully certified, to defeat motions for summary judgment and/or obtain a meaningful (if any) recovery on behalf the Class. *Id.* For instance, Defendants attacked, *inter alia,* the claims that Lead Plaintiff asserted on behalf of purchasers of AIG securities during the early part of the class period (from March 2006 through July 2007) and during the later part of the Class Period (from March 2008 through September 16, 2008). ¶¶84-86. Defendants further raised challenges to the breadth and scope of the class that Lead Plaintiff sought to have certified, arguing that the AIG non-stock securities had virtually no price impact until the end of the Class Period, and that 60 of the 68 non-stock securities had so little pricing data that Lead Plaintiff's expert could not even run event studies for those securities. ¶¶89-91.

Moreover, Lead Plaintiff faced considerable risks in establishing liability and damages. Defendants raised a series of issues concerning the damages that Lead Plaintiff might have asserted at trial, including that the declines in the price of AIG stock through the last three months of the Class Period mirrored declines in the stock prices of other companies in the financial sector, and that such declines were merely the result of the realization of risks that were already known in the market stemming from AIG's previously disclosed exposure to the U.S. residential real estate market, including its known exposure to the subprime market. ¶¶93-94. Defendants further argued, in connection with Lead Plaintiff's claims relating to the common stock portion of the case, that the declines in the prices of AIG stock on the alleged curative disclosure dates were not attributable to any alleged misrepresentations or omissions. Defendants also raised significant damages and loss causation defenses with respect to Plaintiffs'

offering claims.  ¶¶96-97.  Any of the above arguments, if credited by the Court or a jury, could have materially limited or eliminated the Settlement Class's recovery.

It was in the face of these risks (and others) that Lead Counsel achieved for the benefit of the Settlement Class the $970.5 million Settlement now pending before the Court.  As compensation for their efforts expended to achieve this outstanding result for the Settlement Class, Lead Counsel is applying for a fee constituting 12% of the Settlement Fund, and reimbursement of litigation expenses in the amount of $4,352,327.04[4]  ¶¶116, 145.  In view of the substantial risks, the complexity of the case, the difficulties in achieving the Settlement, the quality of the legal work performed, and the amount of time and effort expended by Lead Counsel and Plaintiffs' Counsel, the Fee and Expense Application is fair and reasonable under the applicable standards in this Circuit and District and is well within the range of awards made in contingent fee matters in comparable securities class actions.

The Fee and Expense Application has also been reviewed and approved by Lead Plaintiff, an institutional investor with a significant financial stake in the outcome of the Action, and the paradigm of a class fiduciary that Congress envisioned when it enacted the PSLRA.[5]  ¶¶143-144; Declaration of Robert Brackenbury in Support of Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and

---

[4] Pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel are also seeking reimbursement of SMRS's reasonable costs and expenses incurred directly in connection with its service as Lead Plaintiff in this Action and representation of the Class in the amount of $80,927.34. ¶¶154-156.

[5] As the Court is aware, Congress enacted the PSLRA in large part to encourage sophisticated institutional investors to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."  See "The Private Securities Reform Act of 1995," H.R. Conf. Report No. 104-369, 104th Cong., 1st Sess. (1995), 1995 WL 709276, at *32.  Congress believed that institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request.

Reimbursement of Expenses of Lead Plaintiff ("Brackenbury Dec."), Exhibit 2 to Joint Declaration, ¶¶14-16.

In accordance with the Court's Preliminary Approval Order,[6] a printed Notice, in the form approved by the Court, advising Settlement Class Members of the pendency of the Action and the proposed Settlement, the date of the Settlement Fairness Hearing, and Lead Counsel's Fees and Expense Application, was mailed to 1,663,594 potential Settlement Class Members beginning on November 6, 2014.   A Summary Notice was published in *The Wall Street Journal* and *PR Newswire* on November 13, 2014.   ¶82 n.3.   The Notice advised Settlement Class Members of the proposed Settlement, the proposed Plan of Allocation, and the request for an award of attorneys' fees and reimbursement of litigation expenses.   The Notice further advised Settlement Class Members of their right to object or seek exclusion from the Settlement Class, and explained that any Settlement Class Member wishing to exercise these rights needed to do so by January 5, 2015.  *Id.*

Lead Counsel respectfully submit that, given the risks attendant in this Action and the substantial benefit conferred on the Settlement Class by the Settlement, the Fee and Expense Application is fair and reasonable, comports with applicable precedent, and should be approved.

<u>**ARGUMENT**</u>

## I.     THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE GRANTED

### A.  The Legal Standards Governing the Award of Attorneys' Fees

It is well-established that attorneys who represent a class and achieve a benefit for the class members are entitled to be compensated for their services.   The Supreme Court has

---

[6] On October 7, 2014, the Court preliminarily approved the Settlement, set a hearing for March 20, 2015 to determine the fairness, reasonableness, and adequacy of the Settlement, Lead Plaintiff's Plan of Allocation and Lead Counsel's Fee and Expense Application, and directed that Notice of the Fairness Hearing be given to the Class.

recognized that "a lawyer who recovers a common fund for the benefit of persons other than ... his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392-93 (1970). The Second Circuit and district courts within this Circuit have consistently recognized these teachings. *See, e.g., Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 84 (E.D.N.Y. 2002); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) ("When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to a reasonable fee - set by the court - to be taken from the fund.") (internal quotation omitted).

Awards of attorneys' fees from a common fund serve the dual purpose of encouraging representatives to seek redress for damages caused to an entire class of persons, as well as discouraging future misconduct of similar nature. *Doglow v. Anderson,* 43 F.R.D. 472, 481-84 (E.D.N.Y. 1968); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* No. 02-cv-3400 (CV) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010) ("awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature") (internal citations omitted). The Supreme Court has emphasized that private securities actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Batemen Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432 (1964)).

Moreover, since the passage of the PSLRA, courts have given great weight to fee awards negotiated between fully informed lead plaintiffs and their counsel. *See, e.g., In re Comverse Tech. Inc. Sec. Litig.,* No. 06-CV-1825(NGG), 2010 WL 2653354, at *2-3 (E.D.N.Y. June 24,

2010) ("the Second Circuit directs district courts to give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable.") (internal quotations omitted); *In re Veeco Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("Since passage of the PSLRA, courts-including this Court have found that in a PSLRA case, a fee request which has been approved and endorsed by a properly-appointed lead plaintiff is 'presumptively reasonable,' especially where the lead plaintiff is a sophisticated institutional investor.") (quoting *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *8 (S.D.N.Y. July 27, 2007)); *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *1-9 (S.D.N.Y. Nov. 12, 2004) (applying presumption of reasonableness where lead plaintiff conscientiously supervised the work of lead counsel and endorsed the fee request).

## B.  The Fee Award Should Be Based on the Percentage Method

The Second Circuit and district courts within this Circuit have recognized that in the case of a common fund, the "trend in this Circuit" is to award a fee to class counsel on a percentage-of-recovery basis.  *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A.,* 396 F.3d 96, 121 (2d Cir. 2005) (citation omitted); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 136 (S.D.N.Y. 2008); *In re WorldCom,* 388 F. Supp. 2d at 355 (noting the "practical and policy advantages of the percentage method, as well as the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions"); *Maley v. Del Global Tech.. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("[T]he trend within this Circuit is to use the percentage of recovery method to calculate fee awards to class counsel" in common fund cases.); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397

(S.D.N.Y. 1999) ("Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a groundswell of support for *mandating* a percentage-of-the-fund approach in the common fund cases.") (internal citations omitted).

The PSLRA also implicitly supports the use of the percentage of the fund method. *See* 15 U.S.C. § 78u-4(a)(6) (directing courts to ensure that the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class … not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); *see also In re Merrill Lynch Tyco Research*, 249 F.R.D. at 136 (use of the percentage method "comports with the statutory language" of the PSLRA); *Maley,* 186 F. Supp. 2d at 370 (noting that in amending the PSLRA, Congress "indicated a preference for the use of the percentage method").

### C. The Requested Fee is Reasonable as Measured by the Second Circuit's *Goldberger* Factors

In determining a reasonable fee, the Second Circuit has set forth the six factors that courts should consider when determining the reasonableness of a request for attorneys' fees in a common fund action:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (2d Cir. 2000) (internal quotations omitted).   Each of these factors supports the fee requested here.

### 1.  Time and Labor Expended By Counsel

The efforts expended by Lead Counsel in the prosecution of this Action have been substantial.  The Joint Declaration sets forth the many tasks undertaken by Lead Counsel and Plaintiffs' Counsel, the time and labor expended, and the favorable results achieved as a result of

those efforts.   For example, Lead Counsel undertook an exhaustive investigation of both public and non-public sources in order to gather information regarding the claims to be asserted in the Complaint, and through that process gathered a wealth of new information that was included in the Complaint.   ¶¶9, 17.   During the pre-complaint investigation, counsel also hired and consulted with an expert in the fields of investment banking and securitization of mortgage loans, and an expert in accounting and auditing matters, and retained an investigator whose personnel identified and interviewed numerous confidential witnesses with first-hand knowledge of the subject-matter of this Action, several of which were thereafter cited by a "CW" designation in the Complaint. ¶9.   Thereafter, Lead Counsel successfully opposed Defendants' voluminous motions to dismiss, involving hundreds of pages of briefing and exhibits, and a related motion for reconsideration.   ¶¶18-27.

Moreover, formal discovery in this Action, which spanned more than two years, was an enormous undertaking.   Among other things, Lead Counsel: (i) conducted and participated in numerous conferences with defense counsel to establish search terms, custodians and time periods for which defendants would produce various types of documents and to set protocols for the production of certain documents by AIG and PwC (¶33); (ii) successfully moved to compel the production of certain documents by PwC and AIG (¶33); (iii) served subpoenas to numerous third parties (*id*); (iv) reviewed and analyzed more than 36 million pages of documents produced by Defendants and third parties (¶¶34-37);  (v) prepared for and took 45 fact witness depositions from July 2011 through June 2012 (¶¶38-39); and (vi) prepared and served comprehensive responses to defendants' contention interrogatories (¶40).

Lead Counsel also filed detailed papers in support of Lead Plaintiff's vigorously contested class certification motion and conducted and responded to extensive class-related

discovery. ¶¶41-52.   In connection with the class certification motion, Lead Counsel and Defendants retained a total of six experts, each of whom submitted a declaration in support of class certification.  Lead Counsel took or defended each of these expert's depositions, as well as 11 other non-expert class-related witnesses.  ¶¶44-46.  In addition, Lead Counsel, together with certain Plaintiffs' Counsel, worked with Plaintiffs to respond to and produce documents responsive to Defendants' requests for production of documents.  ¶¶44-46.  Finally, Lead Counsel prepared for and participated in a three-day evidentiary hearing and oral argument in connection with the motion for class certification and AIG's motion to preclude the declarations, testimony and opinions of Lead Plaintiff's expert.  ¶¶47-52.

The negotiations leading up to the Settlement also required extensive time and effort on the part of Lead Counsel.  Indeed, Lead Counsel engaged in  negotiations over a two-year period under the auspices of Judge Phillips (retired).   Throughout this process, Lead Counsel participated in four separate mediation sessions, some of which lasted for two days, prepared several extensive submissions for use in the mediation, prepared and made in-person *ex parte* presentations to Judge Phillips and engaged in briefing and argument before Judge Phillips. ¶¶63-71.  Additionally, Lead Counsel negotiated and drafted various documents related to the Settlement, including the Stipulation, the proposed Preliminary Approval Order, and the Notice to Settlement Class Members.

The number of hours spent by Lead Counsel also attests to the extensive effort put forth. Lead Counsel spent a total of more than 159,000 hours over a period of six years in the prosecution of this action.  ¶127.  Collectively, Plaintiffs' Counsel spent over 165,500 hours in the prosecution and investigation of this action. The cumulative lodestar of Plaintiffs' counsel is $77,474,172.40, of which $74,400,223.75 (96%) was incurred by Lead Counsel.  *Id.*  Lead

Counsel supervised every aspect of the prosecution of this Action and allocated work assignments among Plaintiffs' Counsel in order to avoid duplication and ensure effective and efficient prosecution of the Action.   ¶126.   Accordingly, the time and labor expended by Plaintiffs' Counsel in prosecuting this highly complex Action, supports the requested fee.

### 2.   The Magnitude and Complexities of the Litigation

The magnitude and complexities of the Action also favor approval of the fee request. The 284-page Complaint details the claims that Defendants violated the federal securities laws by making materially false and misleading statements concerning AIG's financial results, business operations, and condition, including its exposure to risky subprime mortgage debt, causing the prices of AIG securities to be artificially inflated over the course of the Class Period.  The Action involved more than 70 different AIG securities and 101 public bond and stock offerings during the Class Period.  ¶¶12-17.  Moreover, the Action was brought against numerous defendants, including AIG, senior executives of AIG and its subsidiary AIG Financial Products ("AIGFP"), AIG's outside directors, AIG's auditor, PwC, and the underwriters of the 101 public bond and stock offerings.  *Id.*  To litigate this case, Lead Counsel had to become deeply knowledgeable about complex financial products including credit default swaps, which required extensive consultation with experts. Moreover, Lead Counsel had to gain a deep understanding about securities lending in general and specifically as it relates to residential mortgage-back securities.

Both the magnitude and complexity of the Action support approval of the fee requested.

### 3.   The Risks of the Litigation

As the Second Circuit recognized in *City of Detroit v. Grinnell Corp.*, "despite the most vigorous and competent of efforts, success is never guaranteed."  495 F.2d 448, 471 (2d Cir. 1974).  Federal courts have long recognized that securities class action litigation "is notably

difficult and notoriously uncertain." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999). High quality legal work and an aggressive pursuit of a case provide no assurance that plaintiffs' counsel will prevail on summary judgment, at trial, or achieve a satisfactory settlement or even any settlement at all. This is confirmed by the substantial risks that Lead Counsel assumed in commencing and prosecuting this Action.

Although the Complaint had survived Defendants' motions to dismiss,[7] Lead Plaintiff's motion for class certification remained pending at the time of the Settlement and summary judgment motions had yet to be filed by the parties. Lead Plaintiff faced numerous risks that could have prevented Lead Plaintiff from achieving any recovery on behalf of the Settlement Class, or at least a recovery of the magnitude of the amount achieved through the Settlement, including the possibility of the Court finding in favor of Defendants at summary judgment on the basis of liability and/or loss causation. Indeed, on July 8, 2014, this Court issued a summary judgment opinion in *In re Pfizer, Inc. Securities Litigation*, No. 04-cv-09866-LTS-HBP, 5-md-1688-LTS, 2014 WL 3291230 (S.D.N.Y. July 8, 2014), in which the Court entered judgment in favor of defendants and against the plaintiff on loss causation grounds.

Lead Counsel faced the risk that that either the class would not be certified in its entirety or, if certified, that this Court or a reasonable jury could conclude that certain of the alleged

---

[7] On September 27, 2010, the Court issued an Opinion and Order denying Defendants' motions to dismiss. The Court held that the Complaint adequately alleged material misstatements and omissions concerning AIG's credit default swap portfolio as well as its securities lending program. The Court upheld Lead Plaintiff's claims under sections 10(b) and 20(a) of the Exchange Act, as well as each of claims brought under sections 11, 12(a)(2) and 15 of the Securities Act for the stock, corporate units, notes and bonds issued by AIG during the Class Period. ¶19.

On October 12, 2011, PwC, the Underwriter Defendants, and the Director Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure based on the then-recent Second Circuit decision in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), seeking dismissal of certain claims relating to the alleged false and misleading statements made in AIG's financial statements. The motion was subsequently joined by AIG and the Executive Defendants. On April 26, 2013, the Court issued a Memorandum Opinion and Order ("April 26, 2013 Order") granting the motion and dismissing all claims against PwC and Lead Plaintiff's Securities Act claims against AIG, its outside directors, the Underwriter Defendants and certain of the Individual Defendants to the extent those claims were based on statements of opinion. ¶¶54-56.

misrepresentations were not material.  For example, as set forth in the Joint Declaration, Defendants made numerous arguments with respect to the claims of AIG stock purchasers in various portions of the Class Period, all of which posed potential issues for class certification and the merits portion of the case.  ¶¶83-88, 93.  Defendants argued that with respect to AIG stock purchasers during the early part of the Class Period (from March 2006 through July 2007), the alleged misrepresentations were not material and there was no price impact because there was not a statistically significant price movement after the disclosures made by the Company in August 2007, when AIG first presented the details of its CDS portfolio and securities lending portfolio to the market.  ¶85.  Defendants also argued that Lead Plaintiff could not assert viable claims on behalf of purchasers of stock after the close of the market on February 28, 2008, when AIG issued its Form 10-K, because the statements in the Form 10-K allegedly cured the alleged misrepresentations or omissions in the prior years' audited financial statements.   ¶86. Defendants also made a series of arguments with the respect to the claims of common stock purchasers from August 2007 through February 2008, including that AIG's valuations of loan loss reserves were "judgments" that were not susceptible to claims by the Lead Plaintiff and that AIG had already disclosed significant information and details about the Company's CDS portfolio and how AIG was seeking to value it.  ¶87.

Lead Counsel also faced the risk that the Court would determine that certain of the alleged misstatements were not material.  In this regard, Defendants argued that none of the alleged misrepresentations and omissions asserted in connection with Lead Plaintiff's claims for offerings made from March 2006 to February 2008 was material.  ¶¶89-91.  There was also the risk that damages would be reduced or that Lead Counsel would be unable to prove loss causation.  ¶¶93-97.  For example, on class certification, Defendants argued that all material

information about the Company had been disclosed by no later than February 28, 2008, and that neither Lead Plaintiff nor any members of the Settlement Class had damages based on purchases of AIG common stock or any other AIG security after that date or arising out of the declines in the prices of AIG common stock and other securities from February 29, 2008 through the end of the Class Period.  Because the damages associated with the declines in prices of AIG common stock after February 29, 2008 would have formed the bulk of Lead Plaintiff's damages in this Action, Lead Plaintiff faced the risk that the damages would be significantly reduced by either the Court or a jury.  ¶¶93-95, 97.

Moreover, Defendants pointed to the lack of statistically significant price movements in the prices of AIG's non-stock securities after the Company issued its Form 8-K on February 11, 2008 and its Form 10-K on February 28, 2008 to argue that Plaintiffs would be unable to show any damages arising from claimed misrepresentations or omissions in the offering documents of the bonds, debentures and notes issued from the start of the Class Period through February 2008.  Defendants further argued that almost all of the decline in the prices of AIG's non-stock securities came at the very end of the Class Period, and that those declines did not result from any alleged misrepresentations and omissions in earlier offering documents.   ¶¶96-97.

Despite these risks and uncertainties, Lead Counsel prosecuted this Action for six years on an entirely contingent nature, without receiving any reimbursement, knowing that they may never be compensated for the substantial time and expenses spent prosecuting the Action.  ¶128.  "In numerous class actions, including complex securities cases, plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009).  Despite these risks, Lead

Counsel worked tirelessly for six years "facing the real and heightened risk that they would receive nothing for their efforts." *Id.* Accordingly, this factor weighs in favor of granting Lead Counsel's Application.

### 4. The Quality of Representation

The fourth criterion for evaluating the fee request is the quality of the representation. To determine the "quality of the representation," courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit. *See In re Global Crossing Sec. Litig.*, 225 F.R.D.436, 467 (S.D.N.Y. 2004). Here, Lead Counsel succeeded in obtaining a $970.5 million recovery for the benefit of the Settlement Class, which, if approved, would be one of the largest recoveries in a securities class action stemming from the 2008 financial crisis, and would rank among the fifteen largest securities class action settlements in history. ¶75.

This result was obtained through Lead Counsel's hard work, persistence and skill in a highly complex case that presented very significant litigation risks. Lead Counsel achieved the Settlement without the benefit of an accounting restatement by AIG and notwithstanding that the SEC decided not to seek an enforcement action against AIG or any of the other defendants in the Action. ¶131. Indeed, this Settlement represents the largest recovery ever in a securities class action in the absence of criminal indictments, an SEC enforcement action, or a restatement of a company's financial statements. ¶76. Lead Counsel's prosecution of the case developed evidence far beyond what the SEC had called upon AIG to produce to the Government, and as further explained above, Lead Counsel independently developed substantial evidence to support Lead Plaintiff's claims and convince defendants to settle. The fact that Lead Counsel achieved this result through its independent efforts further demonstrates that the quality of representation here was outstanding. ¶131.

17

Courts also recognize that the quality of the opposition faced by plaintiffs' counsel should be considered in assessing counsel's performance. *See, e.g., In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,* No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsel's work") (internal citations omitted). Here, as is known to the Court and as identified in the Joint Declaration, Defendants were represented by some of the most prestigious and experienced securities defense firms nationwide, which vigorously and ably defended the Action on behalf of their respective clients for more than six years. Even against this formidable opposition, Lead Counsel presented a case that was sufficiently strong to allow the Lead Plaintiff and Lead Counsel to negotiate the outstanding recoveries reflected in the proposed Settlement. ¶134.

### 5.  The Results Achieved Justify the Requested Fee

The fee request of 12% of the Settlement Fund, which equates to a multiple of just 1.5 times Plaintiffs' Counsel's collective lodestar in the case, is well within the percentage range that courts in this Circuit and elsewhere have awarded in comparable cases. *See, e.g., In re Adelphia*, 2006 WL 3378705, at *3 (awarding attorneys' fees constituting 21.4% of $455 million settlement fund); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371 (S.D.N.Y. 2013), *appeal dismissed* (Feb. 10, 2014) (awarding attorneys' fees constituting 16% of $730 million settlement amount); *In re Oxford Health Plans. Inc. Sec Litig.,* MDL 1222 (CLB), 2003 U.S. Dist. Lexis 26795 (S.D.N.Y. June 12, 2003) (awarding attorneys' fees constituting 28% of $300 million settlement amount); *Carlson v. Xerox Corp.,* 596 F.Supp.2d 400, 414 (D. Conn. 2009) (awarding 16% of $750 million settlement); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465,

489 (S.D.N.Y. 1998) (awarding 14% of the $1.027 billion recovery); *In re Comverse Tech.*, 2010 WL 2653354, at *2-3 (awarding 25% of $225 million settlement); *In re Sumitomo*, 74 F. Supp. 2d at 399-40 (awarding attorneys' fees constituting 27.5% of the $116.6 million settlement amount); *Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) (awarding attorneys' fees constituting 30% of $124 million settlement fund)*; see also In re Lucent Tech., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 442-43 (D.N.J. 2004) (awarding 17% of $517 million settlement); *Shaw v. Toshiba America Information Systems*, Inc., 91 F. Supp. 2d 942, 981 (E.D. Tex. 2000) (court approved a fee of $147.5 million, constituting over 14% of the value of that settlement, which consisted of $597.5 million in cash and other benefits for a total settlement conservatively valued at $1 billion); *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) (awarding 18% of $600 million settlement).

Under the percentage of recovery approach, the fee Lead Counsel seeks is fair and reasonable in litigation of this kind and consistent with the decisions of courts in this Circuit.

### 6. Public Policy Considerations Support the Requested Fee

Public policy considerations also weigh in favor of approval of the Settlement.  Private lawsuits such as this Action serve to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices.  *See Hicks v. Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices."); *In re Flag Telecom Holdings,* 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the

value of their efforts, taking into account the enormous risks they undertook.").   As a practical matter, such lawsuits can be maintained only if competent counsel can be obtained to prosecute them.  This will occur if courts award reasonable and adequate compensation for their services where successful results are achieved.  As Judge Cote stated in *In re WorldCom*:

> In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.

388 F. Supp. 2d at 359; *see also Hicks,* 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration [in a securities class action] should be both fair and rewarding."); *In re Union Carbide Corp. Sec. Litig.,* 724 F. Supp. 160, 169 (S.D.N.Y. 1989) ("A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken").

Here, where many of the Settlement Class members are individual investors, a class action was the most efficient manner in which to prosecute their claims and this Action was likely their only hope of obtaining compensation for the losses they suffered as a result of the alleged misconduct that took place at AIG.  In this circumstance, "public policy supports an award sufficient to encourage counsel to act on behalf of such investors."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 175 (S.D.N.Y. 2007).  Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud."  *Maley*, 186 F. Supp. 2d at 374.

Finally, the fact that a sophisticated, well-qualified Lead Plaintiff has approved this Application is particularly appropriate to consider when judging the public policy of approving the fee award.  As Judge Cote stated in *In re WorldCom,* 2004 WL 2591402, at *1-9, there is a

presumption of reasonableness where a lead plaintiff has conscientiously supervised the work of lead counsel and endorsed the fee request.

### D.  The Requested Fee is Reasonable Under the Lodestar "Cross-Check"

The Court may also consider whether the requested fee determined under the percentage approach is consistent with an award that would result under the lodestar/multiplier approach. The lodestar/multiplier method involves calculating the product of the number of hours worked and counsel's respective hourly rates, *i.e.,* the "lodestar," and adjusting the lodestar for contingency, risk and other factors by applying a "multiplier" to the lodestar.  *Goldberger,* 209 F.3d at 47.[8]

The Second Circuit encourages the practice of performing this lodestar cross-check on the reasonableness of a fee award based on the percentage of recovery approach.  When doing so, the hours documented "need not be exhaustively scrutinized." *Goldberger,* 209 F.3d at 50. *See also In re Global Crossing*, 225 F.R.D. at 468 ("where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case.") (internal citations and quotations omitted).

As set forth in the Joint Declaration, Plaintiffs' Counsel have collectively expended a total of 166,218.24 hours[9] in the investigation, prosecution and settlement of this Action, for a

---

[8] In computing the lodestar, the hourly billing rate to be applied is the "market rate," *i.e.*, the hourly rate that is normally charged in the community where counsel practices. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 895 (1984). In addition, the Supreme Court and the Second Circuit have held that the use of current rates is proper since such rates more adequately compensate for inflation and loss of use of funds. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two to three years of fee application).

[9] Lead Counsel have excluded from their hours and lodestar calculations all time spent working on their application for an award of attorneys' fees and reimbursement of litigation expenses, and have not included any time for work incurred after November 30, 2014.  ¶129.  And, of course, the Application, this brief and the accompanying declarations do not take into account the many hours that Lead Counsel expect to incur leading up to

total lodestar of $77,487,172.40.[10]  ¶125.  The requested 12% fee, which amounts to $116.46 million, yields a multiplier of 1.5.  *Id.*  This multiplier is well below the range of multipliers commonly awarded in securities class actions.  *See Maley,* 186 F. Supp. 2d at 369 (4.65 multiplier was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Sumitomo*, 74 F. Supp. 2d at 399 (approving a multiplier of 2.5 and noting that multiples of between 3 and 4.5 have been common in federal securities cases).

The 1.5 multiplier is, in fact, relatively modest when compared to the multipliers approved by courts in fees awarded in this Circuit and nationwide in cases involving settlements of significant magnitude, such as this one. *See, e.g., In re UnitedHealth Group Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) (6.5 multiplier awarded in $600 million settlement); *In re Adelphia*, 2006 WL 3378705, at *3 (2.89 multiplier awarded in $455 million settlement); *Carlson v. Xerox Corp.,* 596 F.Supp.2d 400, 414 (D. Conn. 2009) (1.56 multiplier awarded in $750 million settlement);  *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 CIV. 6351 RJS, 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012) (2.3 multiplier awarded in $627 million settlement); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (3.97 multiplier awarded in $1.027 billion settlement).

Thus, the "cross-check" confirms the reasonableness of the percentage sought here.

## II.   PLAINTIFFS' COUNSEL SHOULD BE REIMBURSED FOR EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS ACTION

"It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class."  *In re Veeco*, 2007 WL 4115808, at

---

and for the final settlement hearing as well as the considerable time and efforts that will be expended in the settlement claims process, should be Settlement be approved.

[10] The vast majority of the total lodestar in the Action – 96% – was incurred by Lead Counsel.  ¶124.  Each of the additional Plaintiffs' Counsel performed work at the direction and under the supervision of Lead Counsel.  ¶¶124-125 & Exhibits 3 and 3A-3F.

*10; *In re Flag Telecom Holdings,* 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class."); *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004).

As set forth in the Joint Declaration, Plaintiffs' Counsel incurred $4,352,327.04 in litigation expenses on behalf of the Class in the prosecution of this Action.  ¶¶145-153.  Such expenses were essential to the successful prosecution and resolution of this Action and have been approved by Lead Plaintiff.  Lead Counsel maintained strict control over these expenses.  Other expenses were incurred by Lead Counsel, which firms established a litigation fund for the Action, from which major case expenses were paid.  These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the respective firms' expenses. ¶147.

Lead Counsel have incurred considerable expenses for experts and consultants they retained.  These include: a market efficiency, loss causation and damages expert; a second market efficiency witness who responded specifically to one of AIG's experts; an accounting and auditing expert; and other experts with whom Lead Counsel consulted, including experts on risk management and internal controls, credit default swaps and valuation of CDS portfolios, due diligence standards and underwriting investigations, economic capital modeling and other issues critical to the Action.  ¶¶148-150.  The total incurred for services of experts exceeded $1.1 million. *Id.*

Another significant part of the litigation expenses, over $2.3 million, was necessary to maintain a reliable, interactive system for Lead Counsel's electronic document discovery. Defendants and third parties produced over 36 million pages of documents in this Action either in electronic format or through the production of documents that were converted to electronic

format.  Thus, it was necessary for Lead Counsel to retain the services of a specialist firm to host a secure, Internet-based electronic document database that could be used to search, review, code and organize the relevant documents.  ¶151.

Other costs for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.   ¶152.  These expenses include, among others, travel, long distance telephone and facsimile charges, postage and delivery expenses, computerized research, court reporters for depositions, filing fees and photocopying.

The Notice informed the Settlement Class Members that Lead Counsel would apply for reimbursement of litigation expenses not to exceed $6 million and that the costs and expenses of the Lead Plaintiff could be sought within that amount.  ¶157.  Plaintiffs Counsels' request for reimbursement of $4,352,327.04 and the PSLRA award sought by Lead Plaintiff in the amount of $80,927.34, discussed more fully below, is well below the amount set forth in the Notice.  Lead Counsel respectfully submit that all of the foregoing reimbursement requests are appropriate, fair and reasonable, and respectfully seek the Court's approval of the reimbursement of these expenses out of the Settlement Fund.

## III.   LEAD PLAINTIFF SHOULD BE AWARDED REASONABLE COSTS AND EXPENSES INCURRED IN CONNECTION WITH THIS ACTION

Lead Plaintiff is also seeking reimbursement of litigation costs and expenses in the amount of $80,927.34, which were incurred in connection with the prosecution of this Action.  ¶¶154-156; Brackenbury Dec. ¶18.  The PSLRA permits "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. § 78u-4(a)(4).  Congress, in fact, intended to grant courts discretion to approve awards in appropriate cases.  *See* H.R. Conf. Rep.

No. 104-369, at 35 (1995) ("[L]ead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and [the committee] grants the courts discretion to award fees accordingly."); S. Rep. No. 104-98 at 10 (1995) ("[T]he Committee grants courts discretion to award the lead plaintiff reimbursement for 'reasonable costs and expenses (including lost wages) directly relating to the representation of the class'."). Courts in the Second Circuit "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks*, 2005 WL 2757792, at *10; *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132-33 (2d Cir. 2014) (affirming the award of PSLRA expense and costs to lead plaintiffs totaling $453,000).

As set forth in the Joint Declaration and Brackenbury Declaration, Lead Plaintiff has actively and effectively fulfilled its obligations as the Lead Plaintiff and as a representative of the Class, complying with all of the many demands placed upon SMRS and its personnel during the litigation and settlement of this Action. ¶¶154-156; Brackenbury Dec. ¶¶8-12, 17. Lead Plaintiff has devoted significant time and resources to this Action. Among other things, Lead Plaintiff: (i) reviewed case filings, case status reports, and other case-related materials; (ii) prepared for and attended the hearing for appointment of Lead Plaintiff; (iii) participated in discovery, including searching for and producing approximately 7,900 pages of documents maintained by SMRS that were responsive to Defendants' document requests; (iv) prepared for and testified in depositions; (v) attended hearings and depositions; and (vi) participated in the mediation sessions and actively

consulted with Lead Counsel with respect to the final negotiations leading up to the Settlement. Brackenbury Dec. ¶¶8-12.

The efforts of Lead Plaintiff are precisely the type that Courts find support reimbursement to the class representatives.  *See, e.g., In re Marsh & McLennan*, 2009 WL 5178546, at *21 (noting that the similar efforts of the lead plaintiff are "precisely the types of activities that support awarding reimbursement of expenses to class representatives"); *In re Veeco,* 2007 WL 4115808, at *12 (granting lead plaintiff reasonable costs and expenses, including lost wages, directly relating to its representation of the class).

The Notice states that Lead Counsel's overall request of litigation expenses will include a request for an award to Lead Plaintiff for reimbursement of its reasonable costs and expenses. As such, Lead Counsel respectfully request that the Court award Lead Plaintiff $80,927.34 as reimbursement of its costs and expenses, including lost wages.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Lead Counsel, supported by the Lead Plaintiff, respectfully request that this Court:  (i) grant in its entirety Lead Counsel's petition for an award

of attorneys' fees and reimbursement of expenses; and (ii)  grant in its entirety Lead Plaintiff's

request for reimbursement of its costs and expenses.

Dated:  December 22, 2014                                    Respectfully submitted,

**BARRACK, RODOS & BACINE**                    **THE MILLER LAW FIRM, P.C.**

/s/ Jeffrey W. Golan                                    /s/ E. Powell Miller
Leonard Barrack                                            E. Powell Miller (*pro hac vice*)
Jeffrey W. Golan (*pro hac vice*)              Marc L. Newman (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)            Jayson E. Blake
Lisa M. Port                                                    Miller Building
Julie B. Palley                                               950 West University Drive, Suite 300
3300 Two Commerce Square                        Rochester, MI 48307
2001 Market Street                                         Tel.: (248) 841-2200
Philadelphia, PA  19103
Tel.:  (215) 963-0600

         and

A. Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)
425 Park Avenue, Suite 3100
New York, New York 10022
Tel.:  (212) 688-0782

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*