UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE AIG 2008
SECURITIES LITIGATION

Case No: 08-CV-4772-LTS-DCF

## OBJECTION OF JEFF M. BROWN

David Stein
Samuel and Stein
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dstein@samuelandstein.com (DS-2119)

*Attorney for Jeff M. Brown*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ I

INTRODUCTION .................................................................................................................... 1

I.      Mr. Brown Is a Class Member........................................................................................... 2

II.     12.0% Is Not a Reasonable Percentage of $970 Million...................................................... 2

III.    Class Counsel Dramatically Inflates Its Lodestar with Wildly Exaggerated Hourly Rates Several
        Times the Market Rate of What Paying Clients Are Willing to Pay............................................ 5

A.      Class Counsel Attempts to Mislead This Court by Overstating Billing Rates and Failing to
        Fairly Identify Temporary Contract Attorneys.............................................................................. 6

B.      The Prevailing Market Rate for a Contract Attorney Doing Document Review Is Cost or
        Otherwise Under $100/Hour. ....................................................................................................... 9

C.      Courts Agree That Document Review and Digesting Depositions Does Not Merit the Full-
        Fare Rate of Full-Time Associates Doing More Substantive Work........................................... 11

D.      Class Counsel's Proposed Billing Rates for Contract Attorneys Are Unethical........................ 133

IV.     Citigroup Demonstrates That Further Investigation of Class Counsel's Billing Records Is
        Needed. ........................................................................................................................................ 14

V.      A Multiplier Above 1.5 Overcompensates Class Counsel for the Risks of the Case. ................. 17

VI.     Class Counsel's Fee Request Does Not Comply With the PSLRA............................................... 22

VII.    The Court Should Make No Inferences From a Low Number of Objectors............................. 24

CONCLUSION....................................................................................................................... 25

## INTRODUCTION

Mr. Brown objects to the Rule 23(h) request. Class counsel's fee request substantially exaggerates their lodestar billing rates beyond what the market bears and what courts in this district have awarded. Worse, at least one firm, The Miller Law Firm, has committed fraud on the court by falsely representing contract attorneys doing low-level document review and "litigation support" as employees of the firm with millions of dollars of lodestar. Because the scope of the fraud is unknown, and class members cannot fairly evaluate Miller's hours, this Court should deny fees to Miller entirely as a sanction for their unethical behavior. Meanwhile, Barrack, Rodos & Bacine fairly acknowledges that dozens of attorneys were "staff attorneys"—but bills their time at $325 to $400/hour when no paying client would agree to pay a staff attorney more than $25/hour. As a result, Barrack's $36.7M lodestar is exaggerated by nearly $15 million. We can assume that Miller's lodestar is exaggerated by at least that much, too. And if the firms are playing fast and loose with hourly rates, what else are they doing to exaggerate their lodestar? In *In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369, 391-93 (S.D.N.Y. 2013), a review of billing records revealed that a substantial percentage of the lodestar was billed for tasks *after* the case settled that no reasonable client would agree to pay for. This Court should require the same disclosure, which was absent from the parties Rule 23(h) petition.

A 12% award for a settlement of this size is excessive. Much larger settlements have resulted in smaller fee requests. The fee request should be reduced to a reasonable multiplier (not to exceed 1.5) of the actual lodestar reasonably incurred by Barrack to obtain the settlement. Miller should be precluded from any award as a sanction for their fraud upon the court. If the only consequence from trying to claim more than what class counsel is entitled to is that class counsel will get what they would have been entitled to if they had filed a fair petition in the first place, there is no

incentive to be forthright with a court in the original fee petition. In the absence of a sanction, every class counsel is playing with house money when they try to artificially inflate their fee request: "heads I win, tails don't count." *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir.1980).

## I.   Mr. Brown Is a Class Member.

As demonstrated in the documents attached as Exhibit 5, Mr. Brown is a class member with standing to object to the excessive fee request.

Mr. Brown joins and adopts the objection of any other objector to the extent it is not inconsistent with his own.  He objects to any provision of the settlement that purports to limit the rights of objectors to object or to appeal an adverse ruling.  Objection is made to any requirement or procedure to object that is not contained in the notice and/or that is not satisfied here.  Objector does not intend on attending the fairness hearing in person or through counsel and objects to the extent that requiring personal attendance at the fairness hearing would violate his due process rights and right to be heard on this objection.

## II.   12.0% Is Not a Reasonable Percentage of $970 Million.

Class counsel seeks 12% of $970 million plus over $4 million in expenses, a total of 12.5% of the $970 million fund. This is not a reasonable percentage. Securities litigation cases are, as the Second Circuit has recognized, generally relatively low risk because "virtually all cases are settled." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). The PSLRA precludes discovery before a plaintiff survives a motion to dismiss; thus, plaintiffs face little investment before most of the risk in bringing litigation has passed.

A reasonable percentage should be a sliding scale because of economies of scale. "It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998). "There is considerable merit to reducing the percentage as the size of the fund increases. In

many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* (quoting *In re First Fidelity Securities Litigation*, 750 F.Supp. 160, 164 n. 1 (D. N.J. 1990)). As a court in this district recently said about a 17.5% fee request in a $627 million settlement,

> The requested amount of attorneys' fees is high in relation to the Settlement Fund. Although fee recoveries over 15% of the settlement fund are not uncommon in PSLRA securities class actions, *see, e.g., In re Bristol-Meyers Squibb Co. Sec. Litig.*, No. 07 Civ. 5867 (PAC), Doc. No. 78, at 1 (Dec. 8, 2009) (awarding 17% of $125 million settlement fund), "'[t]o avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases,'" *In re Currency Conversion Fee Antitrust Litig.,* 263 F.R.D. 110, 129 (S.D.N.Y. 2009) (quoting *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 U.S. Dist. LEXIS 21429, 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004)). Indeed, in recent settlements of comparable magnitude, courts have awarded fees below eight percent of the settlement fund. *See In re Countrywide Fin. Corp. Sec. Litig.*, No. 07 Civ. 5295, 2011 U.S. Dist. LEXIS 126721, Doc. No. 1062, at 4 (CD. Cal. Mar. 4, 2011) (granting 7.7% of $601.5 million settlement fund); *In re Merrill Lynch & Co., Inc. Sec, Derivative & ERISA Litig*, No. 07 Civ. 9633 (JSR), 2009 WL 2407551, at *1 (S.D.N.Y. Aug. 4, 2009) (granting 7.8% of $475 million settlement fund).

*In re Wachovia Preferred Secs. & Bond/Notes Litig.*, 2011 U.S. Dist. LEXIS 155622, *9-*10 (S.D.N.Y. Dec. 30, 2011).

In Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 838 (2010), the author notes,

> "[F]ee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent, and by the time $500 million was reached, they plunged well below 15 percent, with ***most awards at that level under even 10 percent***." [*Id.* (emphasis added)]

Indeed, the law books are rife with several PSLRA settlements *smaller* than this one with fee awards far lower than 12%. *See, e.g., In re United Health Group Inc. PSLRA Lit.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) (7% of $925M); *In re Countrywide Fin. Corp. Sec. Liptig.*, No. 07-cv-05295, (C.D. Cal. Mar. 4, 2011) (7.7% of a $601.5M fund); *In re Lehman Brothers Sec. & ERISA Litig.*, No. 09-md-

2017 (S.D.N.Y. Jun. 29, 2012) (11.0% of a $516M fund); *In re Merrill Lynch & Co., Inc. Sec., Deriv. &*
*ERISA Litig.,* No. 07-cv-09633 (S.D.N.Y. 2009) (7.8% of a $475M fund); *In re Dynegy, Inc. Sec. Litig.,*
No. 02-cv-01571 (S.D. Tex. 2005) (8.7% of a $474M fund); *In re Raytheon Co. Sec. Litig.,* No. 99-cv-
12142 (D. Mass. 2004) (9% of $460M); *In re Waste Management Sec. Litig.* (S.D. Tex. Apr. 9, 2002) (less
than 8% of $457M). *See also In re Wachovia Preferred Secs. & Bond/Notes Litig.,* 2011 U.S. Dist. LEXIS
155622 (S.D.N.Y. Dec. 30, 2011) (12% of $627M); *Citigroup,* 965 F. Supp. 2d 369 (12% of $590M).
The sliding scale should be applied and this fee award should be nowhere near 12%.

> This very district recently decided a similar financial-crisis settlement on the books pending
against Bank of America, even involving the same defense counsel. *In re Bank of America Securities
Lit.,* No. 09-MDL-2058 (S.D.N.Y.). That settlement is more than twice as large ($2.425 billion
instead of $0.97 billion), yet the attorneys received a fee award of $150 million. To award $116.5
million for the first $970 million won for the class, and $33.5 million for the next $1,555 million
implies that the *Bank of America* class counsel is only getting a 2% percentage of the last three fifths
of their settlement. The 6% rate in that settlement would be more appropriate here.

> Or take *Cobell v. Salazar,* 679 F.3d 909 (D.C. Cir. 2012), where the attorneys won $1.512
billion of direct pecuniary relief for the class and another $1.9 billion for indirect relief. *Id.* at 914-15.
The attorneys were awarded $99 million in fees. *Id.* at 916 n. 5. *Cobell* not only involved 24 written
opinions and multiple appeals to the D.C. Circuit on unprecedented complex cutting-edge issues of
Indian law and sovereign immunity, but required Congressional legislation before the settlement
could be approved; the case lasted from 1996 to 2012, over twice as long as this case. In short the
*Cobell* attorneys won five times as much money, yet received less than what class counsel is asking
for here, and did so in a riskier, more complex, and longer case.

> Professor Coffee writes that for securities laws to operate most effectively, attorneys' fees
should be higher when class counsel recovers from third parties and from insider board members

and executives, and lower—in the ten percent range—when, as here, class counsel only recovers

from the corporation. John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence*

*and Its Implementation* 63 (2006). As Professor Coffee says, "If the plaintiff's attorney in securities

litigation is a bounty hunter, it is not too much to ask courts to set the bounties intelligently."

The correct percentage in this case should be 7% or less, subject to a lodestar crosscheck.

### III.    Class Counsel Dramatically Inflates Its Lodestar with Wildly Exaggerated Hourly Rates Several Times the Market Rate of What Paying Clients Are Willing to Pay.

Though the percentage of the fund method is the primary method for awarding fees,

lodestar is not

> irrelevant. "It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is `reasonable' under the circumstances." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir.2000) (citation omitted). Part of the reasonableness inquiry is a comparison of the lodestar to the fees awarded pursuant to the percentage of the fund method "[a]s a `cross-check.'" *Wal-Mart Stores*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 50). Moreover, as Lead Counsel's own expert recognizes, the lodestar cross-check is particularly important in so-called mega-fund settlements such as this one. (Miller Decl. ¶ 32.) The cross-check is crucial because "economies of scale could cause windfalls in common fund cases" with large funds, again such as this one. See *Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 52). For that same reason, "courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Id.* …
>
> "The lodestar figure should be based on market rates `in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Reiter*, 457 F.3d at 232 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The Court must determine "the rate a paying client would be willing to pay." *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008); *see generally McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 421-22 (2d Cir. 2010) (discussing use of Arbor Hill-based lodestar calculation as part of cross-check on common fund percentage award).

*Citigroup*, 965 F. Supp. 2d at 388, 393-94.

In a settlement of this size, the lodestar crosscheck is a much more important indicator of

fee fairness. Class counsel claims that they have a lodestar of $77 million. But this figure is

imaginary, and based upon the fiction that temporary contract attorneys doing trivial and relatively unskilled document review work that discerning paying clients refuse to pay a premium for has the same market rate of $300 to $400/hour that actual associates doing substantive work could bill. Plaintiffs have exaggerated their true lodestar by tens of millions of dollars through overstated hourly rates. If the Court retains an audit firm as a special master or court-appointed expert, as recommended by *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), it will likely find millions more of overbilling.

A.    **Class Counsel Attempts to Mislead This Court by Overstating Billing Rates and Failing to Fairly Identify Temporary Contract Attorneys.**

In the *Citigroup* case, Daniel Fisher, a senior editor at *Forbes* magazine who graduated Yale Law School's one-year program for journalists, interviewed a contract attorney who reported that the document review was work that a paralegal without a law degree could have done. *Citigroup Plaintiff Lawyers Fire Back at Fee Objectors*, Forbes.com (Jan. 24, 2013). Paying clients do not agree to pay law firms fully marked up rates for temporary contract attorneys. On information and belief, AIG paid between $25 to $50/hour for temporary contract attorneys in this case. The Court should require defense counsel to disclose this amount and the class should not face a lodestar rate for contract attorneys greater than what the defendants paid. The best indicator of the market rate in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis. *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008).

Any contract attorneys should be marked down to the same rate that AIG is paying, presumptively $25/hour. "The lodestar figure should be based on ***market rates*** in line with those [rates] prevailing in the community for ***similar services*** by lawyers of reasonably comparable skill, experience, and reputation." *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006)

(emphasis added). Simply put, "Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). *Accord, e.g., Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1100 (2d Cir. 1977); *Tucker v. City of New York*, 704 F. Supp. 2d 347, 356 n.7 (S.D.N.Y. 2010); *In re KeySpan Corp. Sec. Litig.*, CV 2001-5852 (ARR) (MDG), 2005 U.S. Dist. LEXIS 29068, at *53-*54 (E.D.N.Y. Aug. 25, 2005) (rejecting use of $275/hour attorneys to do document review). As Scott Rickman, the associate general counsel of Del Monte Corp., has publicly stated, "it doesn't make sense to pay $150 or $250 an hour at some of the larger firms to do the document review—it just seems like overkill." Zusha Ellison, *GCs Embrace Outsourced Work*, The Recorder (Jan. 25, 2008). And if it's routine for in-house counsel to announce that it doesn't make sense to pay $150/hour for document review, they surely would not agree to $300 to $400/hour—especially when the review is being performed by $25/hour temporary attorneys.

If so, class counsel's fee request is substantially exaggerated. Barrack Rodos claims a lodestar of $15.94 million for 42,837.5 hours of staff attorney time, nearly half of their $36.8M total lodestar. The correct lodestar figure should be $1.07M. (In *Citigroup*, this court reduced the lodestar rate of contract attorneys to $200/hour. This was error, given that the undisputed evidence of market rate in that case was that the defendants were paying $25/hour for similar work. But even using this figure, Barrack Rodos is exaggerating their lodestar by over $7M, approximately one fifth of their total claimed lodestar.)

Miller Law Firm does not disclose which of its attorneys were temporary contract attorneys: they refer to all of the timekeepers on the case as "associates" or "counsel," and even purport to show firm biographies for these attorneys. But they have deceived the Court. Searches on Google and on the LinkedIn.com website for Miller Law Firm timekeepers show that many of these attorneys never considered themselves employees of Miller Law Firm; still others list their position with Miller Law Firm on their resume as "Contract Attorney" and acknowledge that their role was

"litigation support." *See, e.g.*, Johnson Resume (attached as Exhibit 1); Meklir Intellius Report (attached as Exhibit 3). Searches on LinkedIn.com for several other attorneys listed as associates show that they call themselves "contract attorneys"—or claim to have been working as solo practitioners during the pendency of this case without any indication they had worked for Miller. One had even been suspended from the practice of law for ten months. *See* Tunney Disciplinary Report (attached as Exhibit 2). It is likely that Miller Law Firm's lodestar is exaggerated by even more than the $14.9 million that Barrack Rodos exaggerated their lodestar. At a minimum, Miller should be required to provide accurate accounting of their timekeeper status the way Barrack Rodos did. But given the attempt to deceive the Court, this Court should go further, and preclude any award to Miller Law Firm entirely.

If the only consequence from trying to claim more than what class counsel is entitled to is that class counsel will get what they would have been entitled to if they had filed a fair petition in the first place, there is no incentive to be forthright with a court in the original fee petition. On the rare occasions they get caught, they're no worse off; if no objector investigates, they receive a windfall. "Heads I win, tails don't count." In the absence of a sanction, every class counsel is playing with house money when they try to artificially inflate their fee request. If "the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful." *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980); *Toussie v. County of Suffolk*, No. 01-CV-6716(JS)(ARL), 2012 U.S. Dist. LEXIS 127143, at *15 (E.D.N.Y. Sept. 6, 2012) (failure to exclude excessive or redundant hours from fee request is grounds for sanctions). Public policy and the law demands that there be material consequences for the original false assertion that lodestar is $77 million and that dozens of

temporary contract attorneys were "associates" or "counsel." That Miller Law Firm engaged in these shenanigans in this district after the extensive national publicity in the *Citigroup* case for the billing abuses in that PSLRA shows that merely reducing fees to a reasonable level is insufficient deterrent to induce class counsel to be honest with the Court. There is precedent for this approach. One of the first cases to discuss the issue rejected an award of fees entirely for contract attorneys on the grounds that lead counsel had failed to disclose the arrangement—as has happened here with Miller Law Firm. *In re Fine Paper Antitrust Litig.*, 98 F.R.D. 48, 188-90 (E.D. Pa. 1983), *aff'd in relevant part*, 751 F.2d 562, 598 (3d Cir. 1984). And the Ninth Circuit recently affirmed a district court that zeroed out a firm award because it had misled the Court about its arrangements with representative plaintiffs and their conflicts of interest. *Rodriguez v. Disner*, 688 F.3d 645 (9th Cir. 2012).

**B.      The Prevailing Market Rate for a Contract Attorney Doing Document Review Is Cost or Otherwise Under $100/Hour.**

This is not an argument that class counsel cannot ever make a large profit on a temporary timekeeper's time. Class counsel may collect a lodestar rate for temporary attorneys. But the lodestar rate is an approximation of what ***paying clients pay***. *Blum v. Stenson*, 465 U.S. 886, 895 (1984) ("calculated according to the prevailing market rates in the relevant community"). The "prevailing market rate" is that which is "comparable to what 'is traditional with attorneys compensated by a fee-paying client.'" *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989). *Missouri v. Jenkins* held that it was permissible to bill paralegals above cost—but only because that "appears to be the practice in most communities today." *Id.* at 289. ***But***, "[i]f it is the practice in the relevant market … to bill the work of paralegals only at cost, that is all that [the law] requires." *Id.* at 288. The "fee awarded would be too high if the court accepted separate billing for paralegal hours in a market where that was not the custom." *Id.* at 287.

What is true for paralegals under binding Supreme Court precedent is true for document-

review contract attorneys. Brown's argument is that "the practice in the relevant market" is that paying clients do not pay $200/hour markups when law firms hire contract attorneys to do document review. Therefore the lodestar rates are not $200/hour, much less $400/hour.

This is because "the established rates represent the opportunity cost of what the firm turned away in order to take the litigation." *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995) (*quoting Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24 (D.C. Cir. 1984)). But a firm that hires project attorneys only because of the press and volume of a particular litigation has no opportunity cost: if class counsel were not litigating this case, the contract attorneys would not have been paid a dime by class counsel, and they would not have been billed to any paying clients. This is why it is appropriate to reduce the lodestar rate because of "the zero opportunity cost to [attorney] by taking the case." *Trimper v. City of Norfolk*, 58 F.3d 68, 76 (4th Cir. 1995).

And paying clients pay much less for project attorneys than for full-time law-firm attorneys for document review, even when the temporary "lawyers are experienced, highly qualified attorneys." Nicole Bradick, *Freelance Law: Providing Solutions to Modern Day Practice Dilemmas*, 27 Maine Bar J. 23, 24 (2012); *accord* Vincent R. Johnson & Virginia Coyle, *On the Transformation of the Legal Profession: The Advent of Temporary Lawyering*, 66 Notre Dame L. Rev. 359, 388 (1990) ("firms are reluctant to make a profit on services performed by temporary lawyers"); Heather Timmons, *Outsourcing to India Draws Western Lawyers*, N.Y. Times B1 (Aug. 4, 2010) (clients "don't need a $500-an-hour associate to do things like document review and basic due diligence"); Julie Kay, *Contract Lawyers: Cheaper by the Hour*, NAT'L L.J. (Jan. 12, 2009); Mike Dolan and John Thickett, *Department: Technology: Document Review: Unbundling and Offshoring*, 71 Tex. B. J. 730, 731 (Oct. 2008); Jonathan H. Lewis, *Finding The Right Temporary Staffing Partner*, The Metropolitan Corp. Counsel, Vol. 14, No. 5 (May 2006) ("Bill rates for contract attorneys are far lower than for permanent workers. In the largest law firms, a junior associate's hourly bill rate can range between $200-350. In contrast, the

hourly bill rate of an experienced temporary document review attorney typically averages between $60 and $75.").

In short, the evidence unanimously points to a lodestar market rate for document review in the last few years, whether performed by law-firm attorneys or contract attorneys, of well under $100/hour. While class counsel may be able to point to a handful of cases that sign off on higher lodestars, not a single one of those cases actually considered evidence of what ***paying clients pay in the marketplace for those services in 2008 to 2014***. The class should not be paying more for temporary document-review attorneys than AIG did.

## C.   Courts Agree That Document Review and Digesting Depositions Does Not Merit the Full-Fare Rate of Full-Time Associates Doing More Substantive Work.

Recent cases recognize that document review and contract-attorney work does not merit full-scale rates. "It is not appropriate to use the current market rate for all of an associate's time worked on a case when the attorney was a contract attorney, and not an associate, for some of that time." *Wachtel v. Health Net, Inc.*, 2007 U.S. Dist. LEXIS 44225, at *25 n.22 (D.N.J. June 19, 2007). *Tampa Bay Water v. HDR Eng'g, Inc.*, 2012 U.S. Dist. LEXIS 157631 (M.D. Fla. Nov. 2, 2012) (contract attorney lodestar of $85/hour, less than half of regular associates); *Apple, Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS 160668 (N.D. Cal. Nov. 7, 2012) ($125/hour for contract attorneys vs. $500/hour for associates); *In re Warner Chilcott Ltd. Secs. Litig.*, 06 Civ. 11515 (WHP), 2009 U.S. Dist. LEXIS 58843, at *11 (S.D.N.Y. July 10, 2009) (class counsel "used project attorneys to perform a significant portion of the document review at a reduced rate"); *SEC v. Kirkland*, 2008 U.S. Dist. LEXIS 123308, at *5 (M.D. Fla. June 30, 2008) ("H&K anticipated using a senior associate whose rate was $245.00 per hour, a mid-level associate whose rate was $210.00 per hour, and contract attorneys at the rate of $125.00 per hour if extensive document review was required.").

Even when document review is performed by full-time law-firm attorneys, many courts

refuse to permit full lodestar rates to be charged, given that large-scale document review can be performed by non-professionals. *Planned Parenthood of Cent. N.J. v. Attorney Gen. of N.J.*, 297 F.3d 253, 266 (3d Cir. 2002) (remanding an award because appeals court was "unable to make a determination" whether plaintiff's attorney had improperly "billed hours for. . . such tasks as document review"); *United States v. Metropolitan Dist. Com.*, 847 F.2d 12, 19 (1st Cir. 1988) (approving lower rate for document review); *FB-Stark, LLC v. White*, 2012 U.S. Dist. LEXIS 137892, at *4-*5 n.1 (D. Ariz. Sept. 26, 2012) (perusing documents is task for paralegal); *Microsoft Corp. v. Computer Care Ctr., Inc.*, 06-CV-1429 (SLT), 2008 U.S. Dist. LEXIS 112080, at *47 (E.D.N.Y. Apr. 8, 2008) (rejecting use of $385/hour associate for work a more junior attorney could have performed); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2001 U.S. Dist. LEXIS 8418, at *29-*30 (S.D.N.Y. Jun. 21, 2001) ($375/hour for "document review" unacceptable); *Weinberger v. Great N. Nekoosa Corp.*, 801 F. Supp. 804, 814 (D. Me. 1992) (disallowing hours for digesting depositions and reviewing documents). *See also Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1100 (2d Cir. 1977) (inappropriate to use high-billing-rate attorneys for lower-skilled tasks); *Tucker v. City of New York*, 704 F. Supp. 2d 347, 356 n.7 (S.D.N.Y. 2010) (same); *Kahlil v. Original Old Homestead Rest., Inc.*, 657 F. Supp. 2d 470, 477 (S.D.N.Y. 2009) (same); *Simmons v. New York City Transit Auth.*, 2008 U.S. Dist. LEXIS 54870, 2008 WL 2795138, *2 (E.D.N.Y. July 17, 2008) (same); *Staples, Inc. v. W.J.R. Assocs.*, 2007 U.S. Dist. LEXIS 65211, 2007 WL 2572175, *8 (E.D.N.Y. Sept. 4, 2007) (same); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003) ("In this case, UBS decided -- as is its right -- to have a senior associate at a top New York City law firm conduct the privilege review at a cost of $410 per hour. But the job could just as easily have been done (while perhaps not as well) by a first-year associate or contract attorney at a far lower rate."); *Mautner v. Hirsch*, 831 F. Supp. 1058, 1076 (S.D.N.Y. 1993) (reducing lodestar for using senior attorneys when junior attorneys and paralegals were available), *rev'd in part on other grounds*, 32 F.3d 37 (2d Cir. 1994); *Loughner v. Univ. of Pittsburgh*,

260 F.3d 173, 180 (3d Cir. 2001); *New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Co.*, 72 F.3d 830, 835 (10th Cir. 1996); *ACLU of Fla., Inc. v. Dixie County Fla.*, 2012 U.S. Dist. LEXIS 40513, at *3 (N.D. Fla. Mar. 23, 2012).

Courts agree that contract attorneys should not have the same rates as full-time associates. *In re WorldCom Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 2591402, at *21 n.48 (S.D.N.Y. Nov. 12, 2004), the court approved the use of contract attorneys **because** they were "more efficient" than "highly compensated counsel." *See also In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) (reducing contract-attorney rates to 40% of partner rates and paralegal rates to $100/hour). Many bankruptcy courts also do not permit law firms to bill for contract attorneys as if they are regular associates. *In re Worldwide Direct, Inc.*, 316 B.R. 637, 652 (Bankr. D. Del. 2004) (firm to be compensated for contract attorneys only at invoice cost); *id.* at 647 (use of temporary attorneys is laudable only to "the extent that these cost-savings are passed on to clients and the debtors' estate"); *see also In re Ferguson*, 445 B.R. 744 (Bankr. N.D. Tex. 2011) (contract attorneys billing at attorney rates may not be compensated from debtor's estate as if they are law-firm attorneys without a separate application).

**D.     Class Counsel's Proposed Billing Rates for Contract Attorneys Are Unethical.**

The ABA Standing Committee on Ethics has ruled that "In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." Furthermore, "The analysis is no different for other outsourced legal services, except that the overhead costs associated with the provision of such services may be minimal or nonexistent if and to the extent that the outsourced work is performed off-site without the need for infrastructural support. If that is true, the outsourced services should be billed at cost, plus a reasonable allocation of the cost of

supervising those services if not otherwise covered by the fees being charged for legal services."
ABA Formal Opinion 08-451. There is no evidence how much overhead can be attributed to the
temporary attorneys; for a 36-million-page document review, the review was almost certainly
conducted offsite, and the supervision performed by attorneys who are already being billed
separately. *See also generally, e.g.,* Lester Brickman, *Lawyer Barons* 378-87 (Cambridge U. Press 2011); *id.*
at 501-06. This is a separate reason that the contract attorneys should not be billed at more than
$25/hour.

## IV.   *Citigroup* Demonstrates That Further Investigation of Class Counsel's Billing Records Is Needed.

Class counsel in *Citigroup* similarly hid the identity of their contract attorneys, resulting in a
substantial fee reduction. When the district court there also required disclosure of billing records,
objectors found that over sixteen thousand hours were pointlessly billed *after* the case had settled,
965 F. Supp. 2d at 391-92, and that lodestar was otherwise exaggerated by 10% because of "waste
and inefficiency." *Id.* at 392-93. Class counsel that exaggerate their billing rates and fails to disclose
the identity of temporary contract attorneys have presumptively exaggerated their billed hours as
well. But class counsel have not disclosed their billing records, meaning that class members have
been "handicapped in objecting because the details of class counsel's hours" have not been
disclosed, as Rule 23(h) requires. *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014). These
hourly billing records should be made available to the class, or at least to a neutral expert appointed
by the Court. *Cf. Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014).

In assessing the reasonableness of class counsel's Rule 23(h) fee request, "a court is to act as
a fiduciary who must serve as a guardian of the rights of absent class members." *Central States
Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d
229, 249-50 (2d Cir. 2007) (quotations omitted). "As a fiduciary for the class, the district court must

act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is. Included in that fiduciary obligation is the duty to ensure that the class is **afforded the opportunity to represent its own best interests**." *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988, 994-95 (9th Cir. 2011) (emphasis added and internal quotations omitted).

The district court may allow objectors discovery to defend such interests:

> Allowing class members an opportunity thoroughly to examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported is essential for the protection of the rights of class members. It also ensures that the district court, acting as a fiduciary for the class, is presented with adequate, and **adequately-tested**, information to evaluate the reasonableness of a proposed fee.

*Id.* at 994 (emphasis added); *see also Bowling v. Pfizer, Inc.*, 159 F.R.D. 492, 498 (S.D. Ohio 1994) (granting objectors' motion for discovery regarding attorneys' fees); *In re Master Key Antitrust Litigation*, MDL No. 45, 1977 U.S. Dist. LEXIS 12948, *3 (D. Conn. 1977) (noting that it had continued "the hearing for a month to allow objectors an opportunity to engage in discovery to test the fee petitions").

*Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) *abrogated on other grounds, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), anticipates the need for the limited discovery that Brown seeks. The Second Circuit first noted in *Malchman* that "[o]n first impression, the district court's denial of discovery appears in conflict with" an earlier opinion requiring scrutiny of the issue on which objectors wanted discovery. 761 F.2d at 898. But *Malchman* affirmed the denial of discovery *only* because defendants had conducted discovery "at length" on the issues where the objectors wished discovery. *Id.* at 898-99. In *Malchman*, objectors were seeking to re-litigate the *underlying merits* with information that had *already* been produced. *Malchman*, 761 F.2d 893 at 898 (finding discovery unnecessary regarding class representative adequacy because "defendants had deposed the named plaintiffs at length" and discovery regarding settlement negotiations unnecessary because of

transcripts before state court referree). Here, by contrast, there has been no discovery or testing of the claims made in the fee request because the settlement agreement proscribes it.

While the Second Circuit does not require a district court to "convert settlement hearings into mini-trials on the merits," *Malchman*, 761 F.2d at 897, Brown is not seeking discovery regarding the underlying merits (Rule 23(e)). Instead, Brown is requesting information that has not yet been produced relating to the Rule 23(h) fee request. Whether objector discovery should be granted depends on whether the record is sufficiently developed. *See Wal-Mart*, 396 F.3d at 120; *Malchman*, 761 F.2d at 897-898; Fed. R. Civ. P. 23, 2003 Advisory Committee Notes, ¶ 69 ("One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion...."). Here, the record regarding the underlying merits (Rule 23(e)) may arguably be sufficient because *both* plaintiffs and defendants discovered such information through the course of the litigation. On the other hand, because defendants are contractually precluded (by the Settlement) from challenging class counsel's Rule 23(h) request, the record regarding fees consists merely of class counsel's self-serving declarations, and the summary billing records that class counsel is putting its own spin on.

"Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stages," there is no one here to protect the class members' interests by testing plaintiffs' submissions. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). Indeed, if objectors cannot seek discovery to develop the record regarding such submissions, no one will, and the fairness hearing becomes mere pretense. *Cf. In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 743-44 (3d Cir. 2001) ("[T]he contribution a particular class member's attorney [can make], by providing an adversarial context in which the district court could evaluate the fairness of attorneys' fees, [is] substantial.") (quoting *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999)). Many of class counsel's submissions in connection with their fee request will remain untested

without the requested discovery if the Court accepts class counsel's representations about the meaning of the billing records and their false identifications of temporary contract attorneys doing "litigation support" as attorneys doing substantive work.

Rule 23(h) contemplates as much. The Advisory Committee Notes instruct that the court may permit "objector discovery relevant to the objections." Fed. R. Civ. P. 23, 2003 Advisory Committee Notes, ¶ 69; *see also* 5 Moore's Federal Practice § 23.124[4] (Matthew Bender 3d ed. 2009) (objectors should receive "an adequate opportunity to review all of the materials that may have been submitted in support of the motion and, in an appropriate case, conduct discovery concerning the fees request").

## V.     A Multiplier Above 1.5 Overcompensates Class Counsel for the Risks of the Case.

Because the lodestar figure is wildly inflated, the proposed multiplier is actually likely to be nearly 3 rather than the 1.5 the parties claim once reasonable hourly rates are provided. This Court should not respond to reducing the lodestar by increasing the multiplier above 1.5.

The fee briefing fails to identify a unique feature of PSLRA litigation: the discovery stay. Discovery does not begin until a motion to dismiss is denied. But (1) discovery is the most time-consuming and expensive aspect of pre-trial litigation; and (2) the motion to dismiss is the riskiest part of a PSLRA case. Once a PSLRA plaintiff survives the motion to dismiss, 82% of cases settle. *See* 2011 Cornerstone Securities Class Action Settlements Report (attached as Exhibit 4).

An analogy from a different type of risk strategy is apropos. In blackjack, a card counter can make money because she varies her bets as she keeps track of the cards that have been played. If the remaining playable deck is filled with low cards, she knows her odds are worse, and she bets less money or leaves the table; but if the remaining playable deck is filled with high cards and aces, she know that the odds are in her favor and should make larger bets. Similarly, any hedge-fund manager will describe her portfolio of risky investments, and tell you that she invests more money on the

investments that are most likely to pay off. *Cf. generally* J.L. Kelly, Jr., *A New Interpretation of Information Rate,* 35 Bell System Tech. J. 917 (1956) (mathematical formulation of this optimization principle, the "Kelly criterion").

Thanks to the discovery stay, it is easy for PSLRA attorneys to act like hedge-fund managers or like card-counters in blackjack. The motion to dismiss is risky, but the plaintiffs' attorneys can devote relatively small bets and investments to the early part of the case. If they lose the motion to dismiss, the loss is pretty small. But once they survive the motion to dismiss, the odds are better than 4:1 in their favor on average, and they can load up the lodestar with as much discovery as the other side will tolerate. The discovery doesn't even have to be useful, because no court second-guesses the decision to devote hours of superfluous temporary attorneys to millions of pages of documents that have nearly no chance of being relevant. Moreover, plaintiffs' attorneys can pick and choose which cases to put resources into, and will naturally choose the cases that are more likely to have a large settlement—just like a blackjack player will double down on an 11, but not on a 12. Thus, it is very rare for PSLRA attorneys to devote tens of thousands of hours to a case—especially a multi-billion dollar alleged damages case where even a nuisance settlement will be large—and be unable to settle. If class counsel is required to disclose how much lodestar was spent before the motion to dismiss was denied and how much lodestar was spent after the motion to dismiss was denied, the Court will see a stark difference: most of the hours in the case will have been devoted well after most of the risk of not settling had passed.

Furthermore, since most of the class counsel's precedent, the Supreme Court has spoken out against the use of multipliers; the law has a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A.,* 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent

counsel." *Id.* at 1673. "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant." *Id. Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but has equal application to "reasonable" fee awards in class actions made under Fed. R. Civ. P. 23(h). *See, e.g., Gonzalez v. S. Wine & Spirits of Am., Inc.*, No. 11-cv-5849, 2012 U.S. Dist. LEXIS 46401, at *12-*16 (C.D. Cal. Mar. 29, 2012) (citing *Kenny A* and denying enhancement multiplier of 1.5); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check). Any argument that *Kenny A* is inapplicable here would have this Court believe that the word "reasonable" in the PSLRA and Rule 23(h) means something different than the word "reasonable" in 42 U.S.C. § 1988.

The plaintiffs do not provide the "specific evidence" that a 1.5 multiplier is necessary to create the adequate incentive. It plainly is not. We know that a multiplier is unnecessary to attract class counsel here, because we know that when district courts put class counsel status up for competitive bid, they can increase class recovery to over 90% of the common fund. *E.g., In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000); *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp 1190 (N.D. Ill. 1996) (winning bid agreed to sliding scale with $3.5 million cap in case that eventually settled for over $40 million). While it is unclear whether the PSLRA permits auction mechanisms in selecting lead counsel, there is no reason not to bind class counsel to the results that the marketplace would have produced. Imagine a world where class counsel spends fivw times as many hours on cases where the motion to dismiss is denied than on cases where the court does not deny the motion to dismiss. (That 5:1 ratio is almost certainly a conservative estimate.) Thus, while only 56.6% of cases may settle, a law firm can readily allocate hours so that it spends only a quarter of its hours on losing cases. As a result, a law firm that received a 1.5 multiplier in every case that it settled would average above lodestar:

Table 1

| Category | % of cases | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.5 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss | 38.9% | 67.2% | 1.5 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100% | 1.1 average |

Table 2

| Category | % of cases | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.76 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss – pre-ruling hours | 38.9% | 13.4% | 1.76 |
| Settled after motion to dismiss – post-ruling hours | | 53.7% | 1.22 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100%* | 1.00 average |

In comparison, a 1.76 multiplier for hours spent before the motion to dismiss is decided and a 1.22 multiplier for hours spent after the motion to dismiss is decided is more than sufficient to incentivize class counsel to engage in securities litigation and ensure that they average above lodestar rates, as demonstrated by Table 2 above. *See generally In Matter of Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (Posner, J.) (endorsing this approach to calculate multiplier).

If class counsel disputes these numbers, they should open their books to the last few years of their resolved securities litigation, and we can have a firm-specific empirical basis for calculating the multiplier that will compensate counsel for risk. Given that the 5:1 ratio estimate is conservative, and that this model also conservatively assumes that class counsel doesn't know which cases that survive

motions to dismiss are most likely to settle before summary judgment, I would think that opening the books to how much lodestar is devoted to losing cases would show that even lower multipliers than 1.76 and 1.22 for pre- and post-motion-to-dismiss hours would be sufficient to attract competent class counsel.

As the Second Circuit has previously stated, a high multiplier in securities litigation is inappropriate, because "virtually all cases are settled" and the risk is corresponding low. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). Though class counsel relies heavily on *Goldberger* in their brief, they unsurprisingly neglect to quote the following passage of direct relevance to this request:

> But the principal analytical flaw in counsel's argument lies in their assumption that there is a substantial contingency risk in every common fund case. We harbor some doubt that this assumption is justified in cases such as this. At least one empirical study has concluded that "there appears to be no appreciable risk of non-recovery" in securities class actions, because "virtually all cases are settled." Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. Rev. 497, 578 (1991). Anecdotal evidence tends to confirm this conclusion. Indeed, Mr. Weiss and his partner William S. Lerach of the Milberg firm have stated that losses in these cases are "few and far between," and that they achieve "a significant settlement although not always a big legal fee, in 90% of the cases we file." *In re Quantum Health Resources, Inc. Sec. Litig.*, 962 F. Supp. 1254, 1258 (C.D. Cal. 1997) (internal quotation marks and citations omitted). Of course, we are not suggesting that compensation for risk is never permitted, merely that it is not - under either the percentage or lodestar methods - an appropriate starting assumption. Even where there is some contingency risk but recovery remains virtually certain, we question whether a fully informed group of plaintiffs able to negotiate collectively would routinely agree to pay their lawyers a fee of 25% of a multi-million dollar settlement.

*Id.*; *accord In re KeySpan Corp. Sec. Litig.*, CV 2001-5852 (ARR) (MDG), 2005 WL 3093399, 2005 U.S. Dist. LEXIS 29068, at *17-*19 (E.D.N.Y. Aug. 25, 2005) (noting that even after PSLRA, "the settlement rate of cases between 1998 and 2001 ranged between 73.6% to 78.6% and less than 1% of cases were tried").

*Goldberger* expressed concern that "attorneys in [securities] cases are routinely

---

overcompensated for such things as contingency risk." 209 F.3d at 57. The Second Circuit recently reiterated this concept in mega-fund cases. *McDaniel v. County of Schenectady*, 595 F.3d 411, 425, 426 (2d Cir. 2010) (describing the "danger of 'routine overcompensation' for risk that has troubled this court in the context of 'mega-fund' class actions" and holding that "an award of no lodestar multiplier at all is within the district court's discretion."). *See also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) (1.6 multiplier to megafund award, citing *Goldberger*'s caution with megafunds and general refusal to award up to 2.03 multipliers).

Given the lodestar exaggeration, the real requested multiplier is nearly 3. This is wrong. As *In re Twinlab Corp. Sec. Litig.* noted before *Kenny A* was decided, "post-*Goldberger* courts . . . have generally refused multipliers as high as 2.03." 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2002) (applying 1.3 multiplier); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 WL 313474, 2007 U.S. Dist. LEXIS 9450, at *75-*77 (S.D.N.Y. Jan. 31, 2007) ("an award that equates to a multiplier of 2.43 of the lodestar is excessive"); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 143 (S.D.N.Y. 2008) ("counsel's fee request must be reduced in order to provide a fair and reasonable fee that translates to a multiplier that is not markedly greater than twice counsels' lodestar and an aggregate hourly wage that is less than $1,000.").

## VI.    Class Counsel's Fee Request Does Not Comply With the PSLRA.

A PSLRA fee request under the Securities Act of 1934 must adhere to the limitations of 15 U.S.C. § 78u-4(a)(6): "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." Yet class counsel's briefs supporting their fee request fail to mention the statute; the correct numerator; the correct denominator; or the correct percentage.

Instead, class counsel asks for a percentage of the settlement *fund*, but the fund includes

millions of dollars of money that will not be "actually paid to the class"—not least the request of over $4 million in expenses, which class counsel improperly exclude from the *numerator* of the percentage, while simultaneously including the figure in the *denominator* of their calculation.[1] The effect is to reward class counsel with a commission on the payments to themselves for expenses. The class is only entitled to the "Net Settlement Fund": the $907 million "Settlement Fund less any taxes, attorneys' fees, expert fees, Notice and Administration Costs, Litigation Expenses, or other costs and expenses approved by the Court." The calculation of class counsel and their experts thus similarly improperly inflate the fee award and deflate the "reasonable percentage" they purport to claim by including undisclosed notice and settlement administration costs, again rewarding class counsel with a commission on amounts paid to third parties. *Redman*, 768 F.3d 622.

By the plain language of the statute, this is wrong. "In order to determine a reasonable fee for the services of counsel, it is necessary to understand what counsel has actually accomplished for their clients, the class members. This can only be done when the expenses paid by the class are deducted from the gross settlement. The amount that remains, the adjusted gross settlement, represents what counsel has been able to achieve for the benefit of the class." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, 2004 U.S. Dist. LEXIS 8608 at *20-*21 (S.D.N.Y. May 14, 2004); *accord In re Initial Public Offering Securities Litig.*, 671 F. Supp. 2d 467, 514 (S.D.N.Y. 2009): *Abrams v. Van Kampen Funds, Inc.*, 2006 U.S. Dist. LEXIS 2129 at *17-*18 (N.D. Ill. Jan. 18, 2006); *contra Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

We do not know what the Net Settlement Fund is. It was not disclosed in the notice; it is not in the fee petition; it is not in the expert reports; if it is in any of the other supporting documents, it is not readily apparent. Moreover, class counsel seeks fees without once mentioning the relevant

---

[1] (A fraction, of course, is the "numerator" over the "denominator." *Cf., e.g., Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 3 (D.C. Cir. 2011).)

statute. It would be perhaps too harsh to preclude counsel from any recovery for failing to carry their burden in their motion for fees, but new briefing and a fair opportunity to respond is required.

## VII.    The Court Should Make No Inferences From a Low Number of Objectors.

*Grinnell* asks courts to consider the class's reaction to the settlement. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). But a court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007); *accord Redman, supra*. Class counsel may have exaggerated their fee request by tens of millions of dollars, but that is spread across over billions of share purchases. A class member would have to have a million shares purchased in the class period to be willing to spend $10,000 on an attorney to challenge the fee request—and would have to have the background experience that Brown's counsel has to see through the misleading fee request to know that there were grounds to do so. (This is especially true here where the fee request was not filed until December 21, requiring any objections to be researched over the Christmas season.) If Miller Law Firm had clearly disclosed to AIG shareholders that they were being charged $400/hour for

"litigation support" by temporary contract attorneys that paying clients normally pay $25/hour for, there surely would have been more objections. Such "informational barriers to class opposition" artificially reduce the number of objections. *In re GM Pick-Up Trucks*, 55 F.3d 768, 812 (3d Cir. 1995).

## CONCLUSION

The requested percentage is not reasonable. The purported lodestar is inflated by tens of millions of dollars by overstating "prevailing market rates" for temporary contract attorneys doing document review. Class counsel's original submissions to the Court were misleading at best and intentionally deceptive at worst. It would be within the Court's rights to reduce the fee award to $30 million, including zeroing out the Miller Law Firm's share. Even the 6% figure the S.D.N.Y. used for the superior settlement in *Bank of America* would grant class counsel a tremendous windfall greater than class counsel's reasonably calculated lodestar, but any amount above the 6% figure would be especially unfair to the class, which should not be punished by the failure of the class representative to adequately supervise class counsel the way a paying client would.

Dated: Januarty 5, 2015.

/s/David Stein
David Stein
Samuel and Stein
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dstein@samuelandstein.com (DS-2119)

*Attorney for Jeff M. Brown*

For the foregoing reasons, I object to this settlement.

DATED: January 5, 2015

Jeff M. Brown
750 South Dixie Highway
Boca Raton, Florida 92342
(608) 395-0000

**Certificate of Service**

I hereby certify that on January 5, 2015, I caused one true and correct copy of

the foregoing Objection to be served via ECF and First Class Mail postage prepaid

upon the following parties:

WEIL, GOTSHAL & MANGES LLP
Joseph S. Allerhand
Robert F. Carangelo
Stacy Nettleton
767 Fifth Avenue
New York, NY 10153

BARRACK, RODOS & BACINE
Jeffrey W. Golan
Robert A. Hoffman
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

THE MILLER LAW FIRM, P.C.
E. Powell Miller
Marc L. Newman
950 West University Drive, Suite 300
Rochester, MI 48307

Dated: January 5, 2015                    _/s/ David Stein_____
                                          David Stein