UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE AMERICAN INTERNATIONAL GROUP, INC. 2008 SECURITIES LITIGATION

---

This Document Relates To: All Actions

Master File No.:
08-CV-4772-LTS-DCF

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED CLASS
ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND LEAD COUNSEL'S
MOTION FOR FINAL APPROVAL OF AN AWARD OF ATTORNEYS'
<u>FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

**BARRACK, RODOS & BACINE**
Leonard Barrack
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)
Lisa M. Port
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600

and

A. Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)
425 Park Avenue, Suite 3100
New York, New York 10022
Tel.: (212) 688-0782

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (*pro hac vice*)
Marc L. Newman (*pro hac vice*)
Jayson E. Blake
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................... 1

II. THE SETTLEMENT SHOULD BE GRANTED FINAL APPROVAL
AS FAIR, REASONABLE AND ADEQUATE, AND THE SETTLEMENT
CLASS SHOULD BE FINALLY CERTIFIED ................................................. 3

III. THE PLAN OF ALLOCATION, AS REVISED, IS FAIR AND
REASONABLE, AND SHOULD BE GRANTED FINAL APPROVAL ........................ 9

IV. THE FEE AND EXPENSE APPLICATION IS FAIR AND
REASONABLE, AND SHOULD BE APPROVED IN ITS ENTIRETY ...................... 10

    A.    Mr. Brown Has Failed to Demonstrate His Standing to
        Object to the Fee Request ................................................................. 12

    B.    Mr. Brown's Objections to the Fee Application Are Without Merit ................... 13

        1.    The 12% Fee Request Is Fair and Reasonable ......................................... 15

        2.    Class Counsel Properly Calculated Their Lodestar ................................. 18

        3.    The Lodestar Cross-Check Confirms the Reasonableness
            of Lead Counsel's Fee Request .............................................. 30

V. CONCLUSION ................................................................................................ 34

i

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*Andrews v. Lawrence Livermore Nat'l Sec., LLC*,
  No. 11-cv-3930-CW, 2012 U.S. Dist. LEXIS 5571 (N.D. Cal. Jan. 18, 2012) ....................... 25

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
  643 F.3d 1165 (9th Cir. 2010)..................................................................................... 33

*Bd. Of Trustees of AFTRA Ret. Fund v. JP Morgan Chase Bank*,
  No. 09 Civ. 686 (SAS), 2012 WL 2064907 (S.D.N.Y. June 7, 2012) .................................... 18

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) .......................................................................................................... 8

*Boeing v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................................ 18

*Carlson v. Xerox Corp.*,
  596 F.Supp.2d 400 (D. Conn. 2009) ............................................................................ 17, 18

*Cen. States Se. & Sw. Areas Health & Welfare Fund v.*
  *Merck-Medco Managed Care, L.L.C.*,
  504 F.3d 229 (2d. Cir. 2007)....................................................................................... 8, 18

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)............................................................................................ 15

*Cobell v. Salazar*,
  No. 1:96CV01285 TFH, 2011 WL 10676927 (D.D.C. July 27, 2011).................................... 17

*Feder v. Elec. Data Sys. Corp.*,
  248 Fed App'x 579 (5th Cir. 2007)................................................................................ 13

*Garnet v. State Farm Mut. Auto. Ins. Co.*,
  No. 08-CV-1365-CW, 2010 U.S. Dist. LEXIS 49482 (N.D. Cal. Apr. 22, 2010).................... 13

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000).......................................................................................... 11, 19

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006),
  *aff'd*, 272 Fed App'x 9 (2d Cir. 2008) ............................................................................ 17

ii

*In re Apollo Group Inc. Sec. Litig.*,
  Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT,
  CV 04-2334-PHX-JAT, 2012 WL 1378677 (D. Az. Apr. 20, 2012) ....................................... 24

*In re AT&T Corp.*,
  455 F.3d 160 (3d Cir. 2006) ..................................................................................... 18

*In re Bank of America Sec. Litig.*,
  No. 09-MDL-2058 (S.D.N.Y.) .................................................................................... 17

*In re BankAmerica Corp. Sec. Litig.*,
  228 F.Supp.2d 1061 (E.D. Mo. 2002) ......................................................................... 17

*In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*,
  909 F.Supp.2d 259 (S.D.N.Y. 2012) ............................................................................. 5

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F.Supp.2d 752 (S.D. Ohio 2007) .......................................................................... 17

*In re Citigroup Inc. Bond Litig.*,
  988 F.Supp.2d 371 (S.D.N.Y. 2013) ............................................................... 16, 17, 27

*In re Citigroup Inc. Sec. Litig.*,
  965 F.Supp.2d 369 (S.D.N.Y. 2013) ............................................................... 16, 26, 27

*In re Crazy Eddie Sec. Litig.*,
  824 F. Supp. 320 (E.D.N.Y. 1993) .............................................................................. 13

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  586 F.Supp.2d 732 (S.D. Tex. 2008) ........................................................................... 25

*In re Gen. Elec. Co. Sec. Litig.*,
  998 F. Supp. 2d 145 (S.D.N.Y. 2014) .......................................................................... 33

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................... 1, 5, 10, 17

*In re Initial Pub. Offering Sec. Litig.*,
  No. 21 MC 92 SAS, 2011 WL 3792825 (S.D.N.Y. Aug. 25, 2011) ..................................... 9, 12

*In re Initial Pub. Offering Sec. Litig.*,
  671 F.Supp.2d 467 (S.D.N.Y. 2009) ...................................................................... 17, 19

*In re Merrill Lynch & Co., Inc., Sec., Deriv. & ERISA Litig.*,
  No. 07CV9633 JSR DFE, 2009 WL 2407551 (S.D.N.Y. Aug. 4, 2009) ................................. 17

*In re Monster WorldWide, Inc. Sec. Litig.*,
  No. 07-cv-02237 (JSR), 2008 WL 9019514 (S.D.N.Y. Nov. 25, 2008)................................. 18

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................... 4, 13, 15

*In re Nutella Mktg. & Sales Practices Litig.*,
  No. CIV. A. 11-1086 FLW, 2012 WL 6013276 (D.N.J. Nov. 20, 2012),
  *aff'd* 589 Fed. Appx. 53 (3d Cir. 2014) ....................................................................... 33

*In re Pfizer, Inc. Sec. Litig.*,
  04-cv-09866-LTS-HBP, 5-md-1688-LTS, 2014 WL 3291230 (S.D.N.Y. July 8, 2014) ......... 32

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ................................................................................. 25

*In re Tyco Int'l, Ltd.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) ............................................................................ 24

*In re Vioxx Prods. Liab. Litig.*,
  760 F.Supp.2d 640 (E.D. La. 2010) ........................................................................... 33

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003)......................................................................... 18

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
  No. 09 CIV. 6351 RJS, 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) ................................ 17

*In re WorldCom, Inc. Sec. Litig.*,
  Master File No. 02 Civ. 3288 (DLC),
  2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ........................................................ 5, 8, 25

*In re WorldCom, Inc. Sec. Litig.*,
  388 F.Supp.2d 319 (S.D.N.Y. 2005)........................................................................ 5, 29

*Klein v. O'Neal, Inc.*,
  705 F.Supp.2d 632 (N.D. Tex. 2010).......................................................................... 33

*Lola v. Skadden*,
  No. 13-cv-5008(RJS), 2014 WL 4626228 (S.D.N.Y. Sept. 16, 2014)................................ 24

*Maley v. Del Global Tech. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................... 13

*Morris v. Potter*,
  No. 06-cv-432-MSK, 2008 U.S. Dist. LEXIS 105409 (D. Colo. Dec. 22, 2008).................... 25

*Ohio Pub. Employees Ret. Sys. v. Freddie Mac.,*
  No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380 (S.D.N.Y. Oct. 26, 2006) .......................... 17

*Perdue v. Kenny A ex rel Winn,*
  559 U.S. 542 (2010) ................................................................................................. 33

*SEC v. Bank of America,*
  10 Civ. 215 (JSR), 2010 WL 624581 (S.D.N.Y. Feb. 22, 2010) ............................................. 17

*Takeda Chem. Indus. v. Mylan Labs., Inc.,*
  No. 03-cv-8253-DLC, 2007 U.S. Dist. LEXIS 19614 (S.D.N.Y. Mar. 21, 2007) ................... 25

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
  396 F.3d 96 (2d Cir. 2005) ......................................................................................... 5

## Articles

Lawrence Hurley and Jonathan Stempel,
  *U.S. Justices to Hear Halliburton Securities Class Action,*
  Reuters (Nov. 15, 2013) ............................................................................................ 32

M. Sinaiko and Seven S. Sparling,
  *Supreme Court To Address Standards For Class Certification In Securities*
  *Fraud Actions And Contours Of The "Fraud On The Market" Doctrine,*
  The Metropolitan Corporate Counsel (October 2012) ............................................. 31

Lead Plaintiff and Lead Counsel respectfully submit this reply memorandum of law in further support of:  (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for Final Approval of an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

## I.    INTRODUCTION

On August 4, 2014, after six years of intense litigation, the Parties in this complex securities case announced an agreement in principle to settle the Action for $970.5 million on behalf of a Settlement Class consisting of purchasers of AIG publicly-traded securities during the period from March 16, 2006 through September 16, 2008.  The Parties submitted formal settlement papers on September 12, 2014, and the Court granted preliminary approval to the Settlement on October 7, 2014.

Beginning on November 6, 2014, a detailed Notice of the Settlement was mailed to potential members of the Settlement Class.  A week later, the Summary Notice was posted in *The Wall Street Journal* and on *PR Newswire*.  By December 22, 2014, when Lead Plaintiff and Lead Counsel filed briefs and supporting declarations in support of the Settlement, the proposed Plan of Allocation, and Lead Counsel's Fee and Expense Application, Notices and Proof of Claim forms had been mailed to more than 1.6 million potential Settlement Class members, and had also been posted on the websites of the two Lead Counsel firms and the Claims Administrator. Among other things, the Notice prominently informed Settlement Class members that any objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application were required to be filed with the Court by January 5, 2015.

In assessing six objections out of a comparably sized class, Judge Lynch, in *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 457-58 (S.D.N.Y. 2004), stated that the

"vanishingly small" number of objections "constitutes a ringing endorsement of the settlement by class members."  Here, by the deadline for objections (and continuing through today), there have been ***no objections*** filed by any Settlement Class member either to the Settlement or to the Plan of Allocation.[1]  As discussed more fully below, the overwhelmingly favorable response of the Settlement Class is a powerful factor, among others, in favor of this Court approving the Settlement and Plan of Allocation.  Indeed, even though the deadline for submitting claims is still more than two months away, there has been an extremely favorable response rate to the Settlement, with over 40,000 claims having been submitted through February 27, 2015.[2]

Moreover, notwithstanding that more than 1.6 million Notices were mailed to potential Settlement Class members, there was (and continues to be) ***just one lone objection*** that is limited to opposing the Fee and Expense Application.  Prior to the U.S. Government bailout of AIG, the Company was one of the most highly traded stocks on the New York Stock Exchange, and its stock, bonds and other publicly-traded securities were held by a vast number of the nation's many institutional investors, which purchased millions of dollars worth of AIG stock and other securities during the Class Period.  Yet, no objection was made by any institutional investor. Rather, the sole objection comes from a Florida-based attorney who claims (without providing

---

[1] On January 6, 2014, T. Patrick Duggan, on behalf of himself and his wife ("the Duggans"), sent a letter to the Court requesting that they be allowed to participate in the Settlement.  *See* ECF No. 480; *see also* Reply Joint Declaration of Jeffrey W. Golan and E. Powell Miller in Further Support of Lead Plaintiff's Motions for Final Approval of the Settlement and Plan of Allocation, and Lead Counsel's Fee and Expense Application ("Reply Joint Decl."), Exhibit 6.  The Duggans identified themselves as holders of AIG stock since 2002 who suffered losses when the price of AIG stock fell during and at the end of the Class Period.  They sought to be included within the Settlement Class so that they could participate in the distribution of the Settlement Funds.  However, their letter also made clear they had made no purchases of AIG stock or other AIG securities during the Class Period.  Accordingly, and as discussed more fully in Section II below, the Duggans are not members of the Settlement Class and their letter provides no reason for this Court to withhold approval of the Settlement.

As for the Notice of Motion to Sever Individual Claims filed with a supporting Memorandum and an "Expert Declaration" on February 23, 2015 (ECF Nos. 483-485), the Memorandum states expressly that the movants "do not 'object' to the class-wide settlement or otherwise wish to impede the rights of any other Class Members."  ECF No. 484 at 11.  Lead Plaintiff will therefore respond to the Motion separately.

[2] *See* Reply Joint Decl., Exhibit 8 (Supplemental Affidavit of Michael Joaquin ("Suppl. Joaquin Aff.")) at ¶ 5.

supporting documentation confirming his purchases) that he bought 80 shares of AIG stock in March, April and May 2008, paying a total of $3,568 for those shares.  As shown in Section IV below, the arguments made in the objection (which are, in large part, cribbed virtually word for word from an objection submitted by another fee objector in a different case), are without merit and should be rejected.  The facts that only one putative Settlement Class member has objected to the Fee and Expense Application and that objection is largely copied from an objection in a different case serve as a powerful factor in favor of this Court approving the Fee and Expense Application.

## II.   THE SETTLEMENT SHOULD BE GRANTED FINAL APPROVAL AS FAIR, REASONABLE AND ADEQUATE, AND THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

As noted in Lead Plaintiff's opening memorandum and the Joint Declaration submitted on December 22, 2014, the recovery achieved through the Settlement stands as the largest recovery in a securities class action in the absence of an SEC enforcement action, a criminal indictment, or a restatement of the issuing company's financial statements.  Joint Decl. ¶ 76.  It was achieved only after six years of intense litigation that included, among other things: an extensive investigation that allowed Lead Plaintiff to plead significant, new information in the Consolidated Complaint filed May 19, 2009; Lead Plaintiff's success in opposing all of the Defendants' motions to dismiss the Complaint; substantive review and analysis of more than 36 million pages of documents produced by Defendants and non-parties; the completion of extensive fact discovery, including 45 fact witness depositions and comprehensive answers to defendants' contention interrogatories detailing the evidence in support of Lead Plaintiff's claims; extensive class-related discovery, including expert reports and depositions; full briefing, a three-day evidentiary hearing and oral argument on Lead Plaintiff's motion for class

certification; and two years of settlement negotiations before a well-respected mediator.  Joint Decl. ¶¶ 29-40, 41-52, 63-71.  The Settlement was further reached only after proceedings in the case had been stayed pending the United States Supreme Court's consideration of the *Halliburton II* case, in which one of the Lead Counsel firms submitted an *amicus* brief that was cited favorably in the Court's decision upholding the fraud-on-the-market presumption.  *Id.* ¶¶ 65-69.  Moreover, as previously demonstrated, the Settlement was achieved in the face of very significant risks that went to the heart of Lead Plaintiff's case on liability, damages, and class certification.  *Id.* ¶¶ 83-98.

In the opening papers submitted on December 22, 2014, Lead Plaintiff and Lead Counsel posited many reasons and factors supporting their request that this Court grant final approval of the Settlement and certify the proposed Settlement Class.  None of those factors has been questioned by any Party, Settlement Class member, or anyone else, and Lead Plaintiff and Lead Counsel respectfully submit that each of those factors remains fully valid.  *See* Reply Joint Decl., ¶ 2.

In addition to the reasons and factors supporting approval of the Settlement and certification of the Settlement Class previously submitted, Lead Plaintiff and Lead Counsel respectfully submit that there are two further factors that also fully support this Court's final approval of the Settlement and final certification of the Settlement Class.

*First*, the reaction of the Settlement Class to the Settlement has been extraordinarily positive.  As noted previously, there has not been a single objection by a Settlement Class member to the Settlement.  In *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D.N.Y. 1998), Judge Sweet noted that a small number of objections (a term the court used after discussing at least eight submitted objections) to the aggregate settlement was a significant

4

factor favoring approval of the settlements.  Of particular importance was the fact that "none of the thousands of institutional Class members, who have the largest financial stake, have objected to the Proposed Settlements, nor have any of the class representatives objected."  *Id.* at 478-79. In *In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 337-38 (S.D.N.Y. 2005), Judge Cote found that the fact there were only seven objectors out of the entire class was a factor supporting approval of the settlements in that case.  In *In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.,* 909 F.Supp.2d 259, 266-67 (S.D.N.Y. 2012), the fact that there were only two objectors was seen as a significant factor favoring approval of the proposed settlement.  And in *In re Global Crossing*, the fact that only six class members objected was found to be a "ringing endorsement of the settlement by class members."  225 F.R.D. at 458.  *See also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 119  (2d Cir. 2005) ("the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry").

Against this backdrop, the fact that not a single Settlement Class member has objected to the sufficiency of the Settlement achieved in this case is extraordinary.  More than 1.6 million putative Settlement Class members were advised of the Settlement, the risks faced in the Action, the discovery undertaken, and the issues raised by Defendants in the context of the class proceedings, in other motion practice, and during the Parties' mediation efforts.  Based on the authorities cited above, the absence of ***any*** objection to the Settlement stands as a powerful factor in support of its approval.

Over and above the lack of objections, the affirmative support of the Settlement by Settlement Class members is also more apparent now than it was when Lead Plaintiff and Lead Counsel filed their initial papers on December 22, 2014, as seen through a comparison of the

number of Proof of Claim forms submitted then and the number that have now been submitted. As of December 16, 2014, the Claims Administrator had already received 12,923 Proof of Claim forms from putative Settlement Class members. *See* Joint Decl., Exhibit 1 at ¶ 13. As of February 27, 2015, the number of claim forms submitted by putative Settlement Class members has grown to over 40,000. Suppl. Joaquin Aff., at ¶ 5. And the deadline for submitting claim forms, when the majority of claims are likely to be filed, is still two months away. Reply Joint Decl. ¶ 5. This, too, fully supports approval of the Settlement.

*Second*, as Lead Counsel stated in the Joint Declaration, another factor favoring approval of the Settlement is that it was reached notwithstanding the fact that a number of investor funds (a) had earlier brought and settled their own claims against AIG and other Defendants, (b) had filed and still have pending their own individual lawsuits, and/or (c) entered into tolling agreements with AIG. Joint Decl. ¶ 82. Specifically, the Settlement was negotiated recognizing that certain large holders, particularly Starr International and certain of its affiliates, had already brought and resolved their claims against AIG arising from their purchases of AIG securities during the Class Period, and would be excluded from the Settlement Class. *Accord* Stipulation and Agreement of Settlement ("Stipulation"), ¶ 1(vv). The Settlement was also negotiated with the recognition that other entities that had either filed their own individual lawsuits that remain pending and/or entered into tolling agreements with AIG would likely exclude themselves from the Settlement Class. Joint Decl. ¶ 82.

Based on the exclusion of the Starr entities from the Settlement Class and the likely exclusion requests by investor funds that had already commenced their own cases or entered into tolling agreements, the Parties and the Mediator negotiated the Settlement with the awareness that the Settlement Class would most likely consist of approximately 80% of AIG's shareholders

as of the end of the Class Period, which would leave the Settlement to be distributed to far fewer than the totality of impacted AIG shareholders.  *Id.*

Having now completed the exclusion request process, the Parties have identified in Exhibit A to the proposed Final Judgment and Order all of the individuals and entities that requested and continue to wish to be excluded from the Settlement Class in accordance with the Notice.  The list identifies 113 persons and entities that submitted such exclusion requests.  Of these:  (a) 35 are individuals with what appears to be relatively small, if any, purchases of AIG stock during the Class Period;[3] (b) one is an institutional fund that purchased certain AIG non-stock securities issued during the Class Period; and (c) 77 are funds (including groups of funds) that had previously been identified as having filed their own, individual cases and/or entered into tolling agreements with AIG.  A compilation of the individuals and funds that submitted exclusion requests and copies of such requests are being submitted to the Court in accordance with paragraph 15 of the Order entered October 7, 2014.

Based on the exclusion requests submitted in accordance with the Notice, the factor identified in paragraph 82 of the Joint Declaration has, in fact, held true, as nearly all of the funds that had previously been identified as having filed their own, individual cases and/or entered into tolling agreements with AIG have excluded themselves from the Settlement Class.  Accordingly, the exclusion in the Stipulation and Agreement of Settlement of Starr International and its affiliates from the Settlement Class, as well as level of the exclusion requests by funds that had been expected to seek exclusion from the Settlement Class, stands as a further reason for approval of the Settlement.

---

[3] Indeed, of the 35 individuals who submitted exclusion requests, 7 stated in their requests that they did not purchase AIG Securities during the Class Period and only 9 provided information from which the Claims Administrator could determine that they had purchased AIG Securities during the Class Period and suffered a loss from their transactions.  Hence, it is not clear that the remaining 19 individuals who sent in exclusion requests are actually members of the Settlement Class.  *See* Suppl. Joaquin Aff. at ¶ 7.

Finally, as noted above, the letter submitted by the Duggans provides no basis for this Court to withhold approval of the Settlement. The Duggans' letter, attached as Exhibit 6 to the Reply Joint Decl., while raising an understandable desire on their part to participate in the distribution of the Settlement Funds, misapprehends the scope of claims that could have been asserted under the federal securities laws based on the facts alleged in this case. Stated simply, the claims were based on alleged false and misleading statements and omissions beginning with the issuance of AIG's 2005 Form 10-K on March 16, 2006 and continuing until the announcement of the Government bailout of AIG after the close of the market on September 16, 2008. The Duggans represented that they purchased AIG stock in 2002 and held it throughout the Class Period. However, their letter also made clear that they made <u>no</u> purchases of AIG stock or any other AIG securities during the Class Period.

The law is clear that since the Duggans did not purchase stock during the Class Period, they could not have brought claims under the federal securities laws and, therefore, cannot be members of the Settlement Class. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 755-56 (1975) (in order to seek damages under the Securities Exchange Act of 1934, one must be a purchaser or a seller, and not merely a holder of a security); *see also In re WorldCom, Inc. Sec. Litig.*, Master File No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) ("merely holding securities is not actionable under federal securities law") (*citing Blue Chip Stamps* and prior decision in *WorldCom* at 366 F.Supp.2d 310, 319 (S.D.N.Y. 2004)). Since they are not Settlement Class members, the Duggans lack standing to object to the Settlement. *See Cen. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 504 F.3d 229, 244 (2d. Cir. 2007) ("Because CareFirst is not a class member, it does not have an affected interest in the class Plaintiffs' claims against Medco so as to be able to assert its

objections on behalf of its plans."); *In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 SAS, 2011 WL 3792825, at *1 (S.D.N.Y. Aug. 25, 2011) (same).  And, in any case, the Duggans are seeking to be ***included*** in the Settlement so that they can participate in the distribution of Settlement proceeds.  Their request is not in any sense an objection to the sufficiency of the recovery achieved; rather, it is in effect an endorsement of the Settlement.

For these reasons, and those submitted on December 22, 2014, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable and adequate, and should be approved, and that the Settlement Class should be finally certified.

## III.   THE PLAN OF ALLOCATION, AS REVISED, IS FAIR AND REASONABLE, AND SHOULD BE GRANTED FINAL APPROVAL

Lead Plaintiff and Lead Counsel further respectfully submit that the Plan of Allocation, with the revised Exhibit A pertaining to certain AIG FP issuances approved for notice purposes by this Court on January 6, 2015, should also be granted final approval.  As with the Settlement, not a single Settlement Class member (nor anyone else) has objected to the Plan of Allocation.

As summarized in Lead Plaintiff's submissions of December 22, 2014, the Plan of Allocation was proposed after extensive consultation with and input from Lead Plaintiff's loss causation and damages expert, upon consideration of the relative maximum damages that might have been incurred by purchasers of AIG stock and by purchasers of the other AIG Securities at issue in this Action, and after analysis by Lead Plaintiff and Lead Counsel of the relative strengths and weaknesses of the claims that were asserted on behalf of purchasers of AIG stock at different points during the Class Period.  Lead Plaintiff and Lead Counsel described the proposed Plan of Allocation at length in the Notice, and further refined the proposed Plan, as it

relates to purchasers of certain AIG FP series, after receiving an inquiry from a Settlement Class member.  [ECF No. 473].[4]

For the reasons set forth in the submissions of December 22 and 30, 2014, Lead Plaintiff and Lead Counsel believe that the Plan of Allocation, as revised, represents the best method of allocating the proceeds of the Settlement in a manner that fairly treats all Settlement Class members who submit valid proof of claim forms.  Reply Joint Decl. ¶¶ 8, 15.  Lead Plaintiff and Lead Counsel further submit that the Plan fully satisfies the requirement that a plan of allocation represent an appropriate and a reasonable way to allocate a settlement fund.  *See, e.g., In re Global Crossing,* 225 F.R.D. at 462 ("when formulated by competent and experienced class counsel," a plan of allocation "need have only a reasonable, rational basis") (internal citations omitted).  Accordingly, Lead Plaintiff and Lead Counsel respectfully submit that the Plan of Allocation, as revised, should be approved.

## IV. THE FEE AND EXPENSE APPLICATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED IN ITS ENTIRETY

In the Notice, potential Settlement Class members were advised that Lead Counsel would seek a fee of up to 12% of the $970.5 million recovered for the benefit of the Settlement Class members, plus reimbursement of expenses incurred by Plaintiffs' Counsel and the Lead Plaintiff

---

[4]  The Court granted the Motion to Amend by Order entered January 6, 2015, after which Lead Counsel and the Claims Administrator acted in strict accordance with the Order to notify potential Settlement Class members of the revision to Exhibit A to the Notice.  The Claims Administrator: (a) posted on the website it maintains for the Settlement a specific notification to Settlement Class member purchasers of AIG FP Securities of the modified Exhibit A, alerting them to the changes made in the October 9, 2008 price column for the twenty-one AIG FP Securities at issue; (b) included the modified Exhibit A in the Notice made available through its Settlement website; and (c) printed an alert on the outside of envelopes containing the packet for the Notice and Proof of Claim form advising purchasers of AIG FP Securities of the modified Exhibit A that was accessible through the websites of Lead Counsel and the Claims Administrator.  *See* Suppl. Joaquin Aff. at ¶ 9.  Lead Counsel placed the revised Exhibit A on their respective websites, with a prominent alert stating: "**ATTENTION PURCHASERS OF SERIES AIG FP SECURITIES:** Exhibit A to the Notice of Class Action, Proposed Settlement, Motion for Attorneys' Fees and Expenses, and Settlement Hearing has been revised by Court Order" and included a copy of the revised Exhibit A on their firm website pages for the Settlement.  *See* Reply Joint Decl. ¶ 12.  Accordingly, the Settlement Class was duly notified not only of the proposed Plan of Allocation in the Notice issued in accordance with the Order entered October 7, 2014, but also of the proposed revision to the Plan in accordance with the Order entered January 6, 2015.  *Id.* ¶ 14.

of no more than $6 million.  *See* Notice ¶ 17.  In the Joint Declaration and Lead Counsel's memorandum in support of the Fee and Expense Application, Lead Counsel identified the fee and expense reimbursement being sought and undertook an extensive examination of each of the factors set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), showing how each of them supports the Fee and Expense Application.  *See* Joint Decl. ¶¶ 121-144; Lead Counsel's Mem. at 10-21.

In response to the Notice, the Fee and Expense Application, and Lead Counsel's supporting papers, just one person, Jeff M. Brown, who claims to be a member of the Settlement Class, filed an objection to the Fee and Expense Application.  The objection challenges only the fee sought by Lead Counsel.  It does not challenge the reimbursement sought for litigation expenses incurred by Lead Counsel and the Assisting Counsel.  Nor does it challenge the reimbursement sought on behalf of the Lead Plaintiff for its costs and expenses incurred in connection with its service as Lead Plaintiff in this Action and representation of the Class.  Thus, there are no objections by any putative Settlement Class members to any of the reimbursement requests made in the Fee and Expense Application.

As we show below, the objection to the fee request provides no justification for this Court not approving the fee request in its entirety.  Not only has Mr. Brown failed to demonstrate that he is a member of the Settlement Class, but the arguments raised by Mr. Brown in support of his objection are without merit and often contradicted by the very cases cited in his submission.  Indeed, large portions of his objection were cribbed virtually word for word from an objection made to a fee request in a *different case* involving very different circumstances by a different objector. Tellingly, however, Mr. Brown omits critical portions of that objection which actually

supports the reasonableness of the fee request in this Action.  We discuss these and other points below.

**A.      Mr. Brown Has Failed to Demonstrate His Standing to Object to the Fee Request**

Mr. Brown attached to his objection a copy of a proof of claim that he apparently filled out in handwritten form in support of his contention that he is a member of the Settlement Class. The proof of claim identifies purchases of AIG stock on three different occasions: 19 shares purchased on March 11, 2008 for $823.00; 26 shares purchased on April 23, 2008 for $1,161.00; and 35 shares purchased on May 24, 2008 for $1,584.00.  It also identifies a sale of 80 shares on November 20, 2008 for $123.00.   However, Mr. Brown did not attach any documentation as proof of these transactions.  The handwritten version of Mr. Brown's proof of claim does not appear to have been submitted to the Claims Administrator.  *See* Suppl. Joaquin Aff., at ¶ 6. Instead, on January 5, 2015, Mr. Brown submitted a claim form through the claims administrator's online claims filing service.  *Id.* ¶ 6, Ex. 1.  The online version identifies the same purchase and sale transactions as the handwritten version submitted to the Court.  The online version of the proof of claim form asks claimants to indicate (yes/no) if they have proof of their transactions.  Mr. Brown checked "no" for each of the transactions he listed.  Thus, in both the objection submitted to the Court and in the proof of claim submitted to the Claims Administrator, Mr. Brown has failed to provide any proof that he is, in fact, a member of the Settlement Class.  As such, his objection may be disregarded on this basis alone. *See In re Initial Pub. Offering Sec. Litig.*, 2011 WL 3792825, at *2 (finding objector's documentation

insufficient to establish membership in the class by a preponderance of the evidence); *Feder v. Elec. Data Sys. Corp.,* 248 Fed App'x 579, 581 (5th Cir. 2007).[5]

**B.      Mr. Brown's Objections to the Fee Application Are Without Merit**

Mr. Brown's objection to the fee request, the only such objection from a Settlement Class that includes many large and sophisticated institutional investors,[6] is fundamentally flawed and built on a number of false premises.  For example, Mr. Brown contends that the request of Lead Counsel for a fee award of 12% of the Settlement Fund is "excessive," yet some of the very cases upon which he relies in support of this proposition, *e.g., In re NASDAQ*, 187 F.R.D. 465, resulted in fee awards equal to or greater than the percentage award being requested here.  Mr. Brown also asserts that the fee request of Lead Counsel is based on "wildly exaggerated hourly rates" because, he contends, Lead Counsel utilized "contract attorneys" who, he claims, performed "trivial and relatively unskilled document review work" that could have been "performed by non-professionals."   As shown herein, Mr. Brown's bald assertions are completely unsupported and fail to recognize, among other things, the complexity of the documents that attorneys were required to review, the training they received in order to review them, the close supervision under which document review work was performed, and the need to utilize legal experience and training to determine whether documents impacted the legal theories

---

[5] Indeed, at least one of the purchase transactions listed by Mr. Brown is questionable on its face.  Mr. Brown claims to have purchased 35 shares of AIG stock on May 24, 2008 for $1,584.00, an average of approximately $45.26 per share.  However, May 24, 2008, a Saturday, was not a trading date for AIG stock.  Moreover, from May 13, 2008 through the end of the month, AIG stock never traded above $40 per share.

[6] Contrary to Mr. Brown's assertion (Obj. at 24-25), the fact that just one objection to the fee request has been made after issuance of over 1.6 million Notices is a powerful indication that the Fee and Expense Application is fair and reasonable.  "[A] single objection out of a sizeable class, after notice, … demonstrates the reasonableness and fairness of Class Counsels' request" for fees.  *Garnet v. State Farm Mut. Auto. Ins. Co.,* No. 08-CV-1365-CW, 2010 U.S. Dist. LEXIS 49482, *5 (N.D. Cal. Apr. 22, 2010) (awarding fees of 30% of the common fund).  *See also, e.g., Maley v. Del Global Tech. Corp.,* 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) ("this overwhelmingly positive response by the Class attests to the approval of the Class with respect to the Settlement and the fee and expense application."); *In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320, 327 (E.D.N.Y. 1993) (rejecting the objection of a single purported class member and awarding fees of 33.8%).

being pursued in the case and were appropriate for use at depositions.  Mr. Brown further asserts that Lead Counsel is not entitled to a fee award that would represent a multiple of their lodestar because, he erroneously believes, once the case survived defendants' motions to dismiss, a settlement was virtually assured.  This argument represents a total failure to apprehend the substantial and meaningful risks that Lead Counsel faced in this case, as well as the fact that the Settlement ultimately reached here is of a historic magnitude whose outcome was hardly assured merely by defeating the motions to dismiss.  As discussed further below, these and other arguments against the fee application are meritless and should be rejected.

As an initial matter, Lead Counsel would be remiss in failing to point out that many of the arguments and long passages in Mr. Brown's objection are cribbed, either entirely or virtually word for word, from an objection presented by another objector to a fee application in a different case.  Specifically, long passages of Mr. Brown's objection are copied virtually verbatim from an objection submitted by Theodore H. Frank in the *Citigroup Stock* securities class action that was pending before Judge Stein in 2012 (the "*Citigroup* Objection").  Mr. Frank's *Citigroup* Objection is attached as Exhibit 9 to the Reply Joint Declaration; Mr. Brown's objection is attached as Exhibit 7.  They demonstrate a stunning case of plagiarism involving page after page of the present objection.[7]

It is telling that while Mr. Brown "borrows" extensively from the objection submitted in the *Citigroup Stock* case, he left out from his objection the most salient point of the *Citigroup Stock* Objection.  Specifically, in the *Citigroup Stock* Objection, which was submitted to oppose a 16.5% fee request where the majority of the time incurred by the attorneys was performed after

---

[7]   For instance, pages 17-21 of the Brown objection are virtually identical to pages 14-18 of the *Citigroup* Objection; pages 22-24 of the Brown's objection are nearly identical to pages 6-8 of the *Citigroup* Objection; and a portion of  pages 22-23 of the Brown objection are very similar to pages 22-23 of the *Citigroup* Objection.  Reply Joint Decl. ¶ 18; *see also* Exhibits 7 and 9 at the cited pages.

the case had already settled, Mr. Frank presented an analysis through which he concluded that the mean and the median fee awards in case settlements of $500 million to $1 billion are 12.9%. *See Citigroup* Objection, at 8-9.  Excluding the *IPO* case from that analysis, Mr. Frank found that the mean fee award is 12.79% and the median is 12%.  *Id.*  But, while copying long stretches of the *Citigroup* Objection leading up to these findings, Mr. Brown left these findings out of his objection, presumably because Lead Counsel's fee request here is for 12% -- which is at or below the mean and median fee in the study cited by Mr. Frank in the *Citigroup* Objection.  Mr. Brown's selective cut and paste from the *Citigroup* Objection demonstrates that he has failed to consider the propriety of the fee request here in light of all of the relevant facts and circumstances *of this case*.  As such and as further detailed below, the objection should be rejected.

### 1.    The 12% Fee Request Is Fair and Reasonable

Much of the authority cited by Mr. Brown in opposition to the fee application actually confirms that the requested fee is fair and reasonable.  For example, at pages 2-3 of his objection, Mr. Brown relies on *In re NASDAQ Market-Makers Antitrust Litig.* for the proposition that as settlement amounts increase, fee percentages should decline.  Regardless of the merits of this proposition, there is no doubt that *NASDAQ* fully supports Lead Counsel's fee request here.

In *NASDAQ*, Judge Sweet was called upon to award a fee based on aggregate payments by defendants which, including interest, totaled approximately $1.027 billion before deductions for fees and expenses.  *See* 187 F.R.D. at 472-73.  After first finding that the settlement satisfied the factors generally considered in determining the fairness of a proposed settlement, as set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), Judge Sweet considered plaintiffs' counsel's fee request, examining (1) the amount of work done, (2) the risk incurred,

(3) the difficulty or complexity of the case, (4) the benefit to the class, and (5) the benefit to the public.  187 F.R.D. at 487-88.  After considering each of these factors, Judge Sweet ruled that a fee of 14% was fair and reasonable.  *Id.* at 488.

Here, Lead Counsel is seeking a smaller percentage fee (12%) based on a comparable, yet slightly smaller, recovery.  In *NASDAQ*, the $1.027 billion recovery was $56.5 million more than the present Settlement of $970.5 million.  Yet here, Lead Counsel is seeking a smaller percentage fee award.  Thus, under Mr. Brown's own cited authority, a 12% fee here would constitute an even more reasonable fee than the fee that Judge Sweet awarded in *NASDAQ*.  And notably, the 14% fee awarded in *NASDAQ* equated to a 3.97 multiple of plaintiffs' counsel's lodestar, *see id.* at 488-89, whereas the multiple that Lead Counsel seek through the 12% fee request here is only a 1.5 multiple of the lodestar incurred by Plaintiffs' Counsel in this Action.

Other fee awards in comparable cases similarly support the reasonableness of Lead Counsel's percentage fee request.  In *In re Citigroup Inc. Bond Litig.*, 988 F.Supp.2d 371 (S.D.N.Y. 2013), Judge Stein awarded a 16% fee to counsel based on a $730 million settlement, notwithstanding "an empirical study of class action settlements reached during the years 2006 and 2007 concluding that the median percentage awarded in settlements between $500 million and $1 billion was 12.9%."  *Id.* at 375.  In the *Citigroup Bond* decision, Judge Stein cited specifically to three other cases he viewed as comparable:  (1) *In re Citigroup Inc. Sec. Litig.*, 965 F.Supp.2d 369 (S.D.N.Y. 2013) ("*Citigroup Stock*"), a case brought on behalf of purchasers of Citigroup stock rather than bonds in which Judge Stein had earlier awarded in 2013 a fee of 12% to counsel based on a $590 million recovery, notwithstanding serious deficiencies in the fee application in that case;[8] (2) *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 CIV.

---

[8] Despite making a fee award identical to the 12% request here, Mr. Brown relies heavily on the *Citigroup Stock* case to take issue with Lead Counsel's lodestar calculation.  As demonstrated in Section IV.B.2, the *Citigroup* Stock

6351 RJS, 2012 WL 2589230, at *1, *3 (S.D.N.Y. Jan. 3, 2012), in which the court awarded a fee of 12% of a $627 million recovery, notwithstanding that the case had not proceeded beyond the motion to dismiss stage, the parties had not entered into any formal discovery, and the resulting multiple was approximately 2.3 times lodestar; and (3) *Carlson v. Xerox Corp.*, 596 F.Supp.2d 400, 403 (D. Conn. 2009) (awarding a fee of 16% on a $750 million recovery). Notably, in dollar terms, the 16% fees awarded in both the *Citigroup Bond* case (16% of $730 million) and the *Xerox* case (16% of $750 million) **exceed** the fee that Lead Counsel are seeking here, even though the recovery for the Settlement Class here is $240.5 million and $220.5 million more than plaintiffs' counsel recovered in the *Citigroup Bond* and the *Xerox* cases, respectively.[9]   Thus, Mr. Brown's characterization of the 12% fee request here as excessive is undercut by many awards in similarly sized securities class actions, which show, to the contrary, that the fee request is exceptionally reasonable.[10]

---

case provides no support to Mr. Brown's objection because the factual circumstances of the fee request in the that case are not remotely comparable to those present here.

[9] *See also In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467, 516 (S.D.N.Y. 2009) (Scheindlin, J.) (33% fee on $586 million recovery); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna,. J.), *aff'd*, 272 Fed App'x 9 (2d Cir. 2008) (21.4% fee on $455 million recovery); *Ohio Pub. Employees Ret. Sys. v. Freddie Mac.*, No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380, at *4 (S.D.N.Y. Oct. 26, 2006) (Sprizzo, J.) (20% fee on $410 million recovery); *In re Global Crossing*, 225 F.R.D. at 469 (Lynch, J.) (18% fee on combined $408 million recovery); *In re Cardinal Health Inc. Sec. Litig.*, 528 F.Supp.2d 752 (S.D. Ohio 2007) (18% fee on $600 million recovery); and *In re BankAmerica Corp. Sec. Litig.*, 228 F.Supp.2d 1061 (E.D. Mo. 2002) (18% fee on $490 million settlement).

[10] Other cases cited by Mr. Brown are easily distinguishable. For instance, *In re Merrill Lynch & Co., Inc., Sec., Deriv. & ERISA Litig.*, No. 07CV9633 JSR DFE, 2009 WL 2407551, at *2 (S.D.N.Y. Aug. 4, 2009), settled while motions to dismiss the complaint were pending, but even there the court awarded a 7.8% fee that constituted a lodestar multiple of 2.26. In *In re Bank of America Sec. Litig.*, No. 09-MDL-2058 (S.D.N.Y.), plaintiffs had an advantage of having an SEC enforcement action that yielded a payment from Bank of America to the Government, in contrast to the situation here where there was no such SEC enforcement action. *See SEC v. Bank of America*, 10 Civ. 215 (JSR), 2010 WL 624581 (S.D.N.Y. Feb. 22, 2010). As for the *Cobell* case, an action against the United States Government relating to management of a trust for Indian lands that Mr. Brown cites for a $99 million fee award in that case, Mr. Brown neglects to mention that there was an agreement that plaintiffs' counsel entered into with the United States that counsel would not seek a fee of more than $99 million and the United States would not oppose a fee of less than $50 million, and that plaintiffs' counsel would be allowed to subsequently seek another $10 million fee award. *See Cobell v. Salazar*, No. 1:96CV01285 TFH, 2011 WL 10676927, at *5 (D.D.C. July 27, 2011). In fact, plaintiffs' counsel ended up seeking a fee of 14.75% (see Plaintiffs' Reply to Defendants' Response

Mr. Brown further argues that the fee should be based on the "net" amount obtained for the Settlement Class, rather than on the basis of the recovery achieved through the Settlement. *See* Obj. at 22-24.  However, well settled precedent provides that attorneys who create a common fund are entitled to an award of fees and expenses <u>from that fund</u>.  *See Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); *Cen. States*, 504 F.3d at 249 (affirming district court's award of "30% of the settlement fund"); *Bd. Of Trustees of AFTRA Ret. Fund v. JP Morgan Chase Bank,* No. 09 Civ. 686 (SAS), 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding "25% of the [$150 million] Settlement Amount, or $37.5 million"); *In re Monster WorldWide, Inc. Sec. Litig.*, No. 07-cv-02237 (JSR), 2008 WL 9019514, at *1 (S.D.N.Y. Nov. 25, 2008) ("a fee award of 25% of the <u>gross</u> Settlement Fund is consistent with awards made in similar cases") (emphasis added).

Courts have repeatedly rejected the contention that fees must be calculated on a "net" basis.  *See, e.g., Carlson v. Xerox*, 596 F.Supp.2d at 411 (rejecting objection contending that "attorneys' fees should be paid out of the 'net fund' (i.e. after payment of expenses) as opposed to the 'gross fund'"); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp.2d 503, 525 n.34 (E.D.N.Y. 2003) (rejecting an objection asserting that fees should be "calculated on the net recovery to the Class, excluding costs and expenses"); *In re AT&T Corp.,* 455 F.3d 160, 172 n.8 (3d Cir. 2006) (rejecting objection that attorneys' fees must be calculated based on the net settlement amount).  The rationale is that otherwise Class Counsel would not be made whole for the significant time and expenses advanced.

## 2.    Class Counsel Properly Calculated Their Lodestar

In addition to challenging the propriety of the 12% fee request submitted by Lead Counsel, Mr. Brown further asserts that Lead Counsel inflated their lodestar by utilizing "wildly

---

to Petition for Class Counsel's Fees, filed March 7, 2015, at 17), arguing that "the clear sailing amount of $99.9 million is so low it would be an anomaly."

exaggerated hourly rates" for work performed by lawyers at the Lead Counsel firms who were originally hired specifically to work on this case, which he claims undercuts Lead Counsel's fee request.  We strongly contest Mr. Brown's claims, as shown below.  At the outset, Lead Counsel note that to the extent this argument has any relevance at all, it is relevant only to the extent the Court performs a lodestar "crosscheck" of the percentage fee award being requested.  As demonstrated above, the 12% fee award requested by Lead Counsel is well within the range of fee awards in comparable cases.  In such circumstances, courts have generally found an exhaustive examination of lodestar to be unnecessary.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d at 506 ("Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable."); *Goldberger v. Integrated Resources,* 209 F.3d at 50 (where a fee is based on a percentage-of-the-recovery, counsel's lodestar need not be "exhaustively scrutinized").

In any event, Mr. Brown's assertions are baseless.  Hypothesizing that the attorneys, whom Mr. Brown characterizes as "contract attorneys," only performed "trivial and relatively unskilled document review work" (Obj. at 6) and postulating that "large-scale document review can be performed by non-professionals" (Obj. at 12), Mr. Brown argues that Lead Counsel should have billed these attorneys as expense items, rather than based on the legal work they performed in the case, and accordingly that the lodestar presented by Lead Counsel was massively inflated.  In making this argument, Mr. Brown wrongfully presumes that the work of the attorneys at the Lead Counsel firms was limited to first-level "relevance reviews" and "privilege reviews" of the type normally conducted by the party *producing* discovery in order to identify documents that are potentially responsive to a document request.  However, the

19

attorneys working at the Lead Counsel firms did *not* spend time engaging in such review. Rather, they engaged in a far more substantive and complex review of the tens of millions of pages of documents produced by Defendants.  Mr. Brown also fails to recognize that the e-discovery platform utilized by Lead Counsel automated all "objective" coding of documents prior to the commencement of any attorney review.  Reply Joint Decl. ¶ 22.  As a result, no attorney time was spent to input dates of documents, authors or recipients of documents, subject lines, and similar information.  *Id.*

To the contrary, the attorneys at the Lead Counsel firms were required to carefully review and analyze documents and other information (including telephone call records and transcripts) that were exceptionally complex, much of which related to a host of complicated derivative financial transactions and the accounting for these transactions.  In order for the attorneys to effectively understand the significance of any documents and other information produced, Lead Counsel performed extensive training for the attorneys about the facts and theories of the case and closely interacted with and supervised them on a regular basis.   This allowed Lead Counsel to routinely advise the teams of developments in the case.  Equally important, the reviewing attorneys were able to bring significant information to the attention of Lead Counsel as it was being identified.  This required the attorneys working on the case to utilize their legal experience, judgment and training to fully understand the documents and determine their significance, how they impacted the legal theories being pursued in the case, and whether any of the evidence was appropriate for use at depositions or otherwise. *Id.* ¶ 23.

This process of daily on-site interaction between Lead Counsel and the reviewing attorneys effectively assisted Lead Counsel to understand key evidence, and to best utilize the evidence to effectively and cohesively support the theories being pursued in the case.  In many

instances, the attorneys engaged in document review work undertook more specialized analysis relating to the unique claims and defenses associated with particular defendants or groups of defendants, including, *inter alia*, the Underwriter Defendants, PwC, AIGFP executives, AIG Investment executives, AIG board members, and AIG senior executives. *Id*. ¶ 24. They prepared internal memorandum to analyze and explain various transactions, they extensively assisted in the preparation of depositions, and second-chaired several of the depositions. *Id.*

Indeed, as indicated in the firm biographies that Lead Counsel submitted as Exhibit 4 and 5 to the Joint Declaration, many of the attorneys hired to work on the AIG case were very experienced attorneys who provided services to the litigation effort in addition to document reviews. As examples, at BR&B, Teresa Ahonkhai, a 2002 graduate of Temple University Law School who had eight years of experience before joining BR&B, assisted in the preparation for, and second chaired, depositions of the two PwC audit partners, and further assisted in deposition preparations for two other fact witnesses, including AIG's former board chairman. *Id.* ¶ 25. Frank Delfi, a 2002 graduate of Fordham University Law School who worked at another plaintiff's securities firm for six years before joining BR&B, conducted specialized reviews of underwriter documents, and assisted in preparing the attorneys taking depositions of Underwriter Defendant witnesses as well as securities lending witnesses. *Id.* ¶ 26. Richard Fein, a 1994 graduate of Brooklyn Law School, had worked for three years, among other positions, as general counsel for the National Society of Accountants, and assisted the litigation by conducting specialized reviews of the millions of pages of documents produced by PwC in the case. *Id.* ¶ 27. And Robert Meyers, a 1987 graduate of American University Law School, had worked, among other positions, for five years as a trial counsel at the New York Stock Exchange, and assisted in the litigation effort by making specialized document reviews, assisting in the

preparation for Underwriter Defendant depositions, and reviewing prior testimony relevant to PwC witnesses. *Id.* ¶ 28.

The attorneys hired to assist in the AIG case prosecution by the Miller firm similarly included experienced attorneys who were able to provide not only document review and analysis, but many other types of litigation support services.  One of the attorneys highlighted in the objection, Lowell Johnson, is not only a trained attorney who graduated *magna cum laude* from Cooley Law School, but is also a Certified Public Accountant (CPA) and obtained his Master's of Business degree (MBA) prior to working for many years as a chief financial officer (CFO). See Objection, Exhibit 1; *see also* Reply Joint Decl. ¶ 32.  In addition to providing document review and analysis, Mr. Johnson also assisted in evaluating the many complex accounting and auditing issues involved in the case, and prepared internal memoranda about several of the derivative transactions at issue.  Reply Joint Decl. ¶ 32.  Mr. Johnson also was instrumental in preparing Lead Counsel for several depositions in the case.  *Id.*

Other attorneys hired by the Miller firm to assist in the case were similarly experienced and able to provide other "higher level" attorney work for the case.  For instance, Louisa Andress, in addition to her training as an attorney, was well-versed in collateralized debt obligations and credit default swaps before being hired by the Miller firm.  Ms. Andress held Series 7 and 63 licenses, various insurance licenses, and worked for several international financial services firms for more than ten years as an investment advisor.  In addition to her document review and analysis on this case, Ms. Andress also assisted in preparing for fact witness depositions, including drafting deposition outlines and lines of questioning, and identifying potential documents for use as exhibits.  Reply Joint Decl. ¶ 30. Ms. Andress is also fluent in French, which proved to be exceptionally useful since one of AIGFP's subsidiaries was

a bank in France, and AIG had produced a number of documents that were written in French, as well as audio recordings that were in French. *Id.*  Mr. Christopher Aguwa was hired by the Miller firm with an economics degree from The University of Michigan and a law degree from Howard University.  Prior to his work on this case, Mr. Aguwa had experience in financial crisis and mortgage-backed securities litigation.  Accordingly, he was able to provide more focused document review and analysis work on the issues of the case dealing with MBS, and he also provided legal research on certain issues related to the class motion. *Id.* ¶ 31.[11]

The prior experience and types of assistance provided by each of the Associate Staff Attorneys at BR&B and the counsel attorneys at the Miller firm were the basis for the various billing rates included in the Joint Declaration. *Id.* ¶¶ 29, 35.

Further, contrary to the objection's unfounded speculation that the attorneys brought in to assist in the prosecution of this case "almost certainly conducted [the document review] offsite" (Obj. at 14), the fact is all document work was undertaken at the offices of BR&B and the Miller firm.   The reviewing attorneys, among other legal services they provided under Lead Counsel partners' close supervision, used the firms' computer stations and had the same access to – and utilized – the entire range of support staff used by the firms' partners and associates, including secretaries, paralegals, and other office services.  Reply Joint Decl. ¶ 21.  Thus, notwithstanding

---

[11] In support of his contention that attorneys who reviewed documents performed "unskilled" work, Mr. Brown refers to Lauren Crummel (f/k/a Lauren Meklir), an attorney who apparently referred to herself as a "contract attorney" at the Miller Law Firm.  *See* Obj. at 8 and Ex. 3.  Regardless of the term that she used to describe her employment, Ms. Crummel was a direct hire of the Miller firm who worked there in a full-time capacity from November 2010 through July 2013.  She initially worked on the AIG case, but then worked on other matters for more than a year after the close of fact discovery in AIG.  In addition to reviewing documents in this case, she also assisted in preparing for several depositions and second-chaired one of the Defendant depositions.  Ms. Meklir left the firm in July 2013 to take an associate position with another firm.  *Id.* ¶ 33.  The objection also cites to the fact that the Miller firm employed Stephen Tunney to perform legal services in this case, and that Mr. Tunney's license to practice was suspended in late May 2012.  *See* Obj. at 8 and Ex. 2.  By late May 2012, however, the Lead Counsel firms had by and large ceased employing associate staff attorneys and others who had been brought in specifically to assist in the prosecution of the case because fact witness discovery was drawing to a close.  Reply Joint Decl. ¶ 34.  [The last fact witness deposition took place on June 6-7, 2012.  *See* Joint Decl. ¶ 39 (chart)].  And, in any case, the Miller firm severed all ties with Mr. Tunney when he was notified of his suspension.  Reply Joint Decl. ¶ 34.

Mr. Brown's attempt to denigrate their work by incorrectly asserting that they performed only "trivial and relatively unskilled document review work," the reviewing attorneys were integral members of the team that prosecuted this Action and performed substantive work under the close supervision of partners at the Lead Counsel firms that directly benefitted the Settlement Class in numerous ways. *Id.* ¶¶ 20-24, 36.[12]

Moreover, case after case has ruled that plaintiffs' firms are entitled to utilize temporary attorneys for large document cases and bill them at rates similar to the rates that we presented in our papers. Contrary to Mr. Brown's argument, Lead Counsel are not aware of any court that has held that staff attorney or contract attorney time should be treated as an expense for the purposes of a class action fee application. Rather, courts have ruled uniformly that staff attorneys' and contract attorneys' time is properly included in counsel's lodestar, and should not be treated as an expense. *See, e.g., In re Apollo Group Inc. Sec. Litig.,* Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT, CV 04-2334-PHX-JAT, 2012 WL 1378677 (D. Az. Apr. 20, 2012) (refusing to reduce the lodestar and award of attorneys' fees despite the fact that plaintiffs' counsel utilized contract attorneys); *In re Tyco Int'l, Ltd.,* 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("An attorney, regardless of whether she is an associate . . . or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney. *It is therefore appropriate to bill a contract attorney's time at market rates and count these time*

---

[12] A recent decision in this District makes clear that an attorney hired to work as a "contract attorney" provides meaningful legal services, and may not be characterized as an unskilled document reviewer. In *Lola v. Skadden,* No. 13-cv-5008(RJS), 2014 WL 4626228 (S.D.N.Y. Sept. 16, 2014), a former contract attorney brought an action against a law firm and legal staffing company alleging that defendants had failed to pay him and other contract attorneys overtime for hours worked in excess of 40 hours a week. The contract attorney's responsibilities consisted of (a) looking at documents to see what search terms, if any, appeared in the documents, (b) marking those documents into the categories predetermined by the law firm's attorneys leading the case, and (c) at times redacting documents based on specific established protocols. The court dismissed the complaint, finding that the contract attorney was exempt from the overtime provision of the FLSA as a licensed attorney engaged in the practice of law, and further finding that the tasks the contract attorney performed were akin to "drafting contracts, pleadings, and memorandum of law." *Id.* at *11. Here, as shown above, the work performed by the attorneys at hired to assist Lead Counsel was much more substantive than the first-level document review at issue in *Lola.*

*charges toward the lodestar.*") (emphasis added); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
586 F.Supp.2d 732, 783-84 (S.D. Tex. 2008) (the work of "contract attorneys" is properly billed
as a fee rather than a cost); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264-65 (E.D. Va.
2009) ("[T]he Court has absolutely no trouble finding that the contract attorneys should be billed
at market versus cost.  They are part of the team brought in to benefit the class.  Their
contributions are of a similar nature to the attorneys who are in the firms retained by plaintiffs,
and they should be compensated in that manner."); *Takeda Chem. Indus. v. Mylan Labs., Inc.,*
No. 03-cv-8253-DLC, 2007 U.S. Dist. LEXIS 19614, *25 (S.D.N.Y. Mar. 21, 2007) (denying
objection and noting that "[i]n complex litigation, contract attorneys are routinely used by well-
established law firms who supervise their work"); *Morris v. Potter*, No. 06-cv-432-MSK, 2008
U.S. Dist. LEXIS 105409, *19-20 (D. Colo. Dec. 22, 2008) (rejecting an objection to fees
asserting that "the associates were, in fact, contract attorneys"); and *Andrews v. Lawrence
Livermore Nat'l Sec., LLC*, No. 11-cv-3930-CW, 2012 U.S. Dist. LEXIS 5571, *8 (N.D. Cal.
Jan. 18, 2012) (rejecting the contention that "an attorney's status as a contract attorney, as
opposed to his or her employment as an associate" was relevant to the determination of
reasonable hourly rates).

Judge Cote made this point explicitly in *In re WorldCom,* 2004 WL 2591402.  In
discussing an objection of a putative class member who asserted, among other things, that no
multiplier was appropriate for document review work done by contract attorneys, Judge Cote
wrote that the "extensive use of contract attorneys was justified by the need to review over ten
million pages of documents and was a far more efficient way of proceeding than giving the task
to more highly compensated counsel."  *Id.* at *21 & n.48.  In that case, after the objection was
filed, BR&B and its co-lead counsel in *WorldCom* provided the Court with time records,

identifying the precise number of hours spent on the case, hourly rates, and lodestar figures for each of the attorneys (partners, associates, of counsel, and staff attorneys) who had worked on the *WorldCom* case, in a format similar to the attorney information provided to this Court in Exhibits 3a (for BR&B) and 3b (for the Miller firm) to the Joint Declaration.  After reviewing that information, Judge Cote not only ruled that the time and lodestar of contract attorneys were appropriately included in the plaintiffs' firms' overall lodestar calculations, but also that given the nature of the lodestar cross-check being undertaken, no special master of the type that Mr. Brown seeks here should be appointed to review the plaintiffs' firms' time records.  *Id.* at *21.

Mr. Brown's reliance on the decision in the *Citigroup Stock* case is ill-founded since the case actually underscores the appropriate use by Lead Counsel of attorneys hired to assist in the prosecution of the Action and the billing rates presented for those attorneys.  In *Citigroup Stock*, in sharp contrast to this case, the lead counsel had massively "bulked up" its lodestar figures ***after the parties reached a settlement in principle*** by having its contract attorneys expend thousands of hours on document review and discovery-related tasks.  *See* 965 F.Supp.2d at 391; *see also id.* at 392 (referring to "the ballooning of contract-attorney hours at issue").  Specifically, on May 8, 2012, the parties had accepted a mediator's proposal to settle the case (*id.* at 377), but it was also in May 2012 that the lead counsel had engaged a "supplemental team" of newly hired attorneys.  *Id.* at 391 & n.4.  In sharp contrast, in this Action, Lead Counsel employed staff and other attorneys to assist in the prosecution of the case commencing with the start of document productions in or about December 2010.  The document review work was completed in May 2012, as the last deposition was taken on June 6-7, 2012.  *See* Joint Decl. ¶ 39 (chart).  Moreover, settlement discussions did not commence until more than a month after the end of fact discovery, and the agreements in principle with AIG and PwC were not reached until

two years later, on July 15, 2014 and August 1, 2014, respectively.  Clearly, the use of staff attorneys and others brought in to assist in the prosecution of this Action does not implicate any of the concerns that Judge Stein noted in the *Citigroup Stock* case.

But even in the context of the *Citigroup Stock* case, Judge Stein set an hourly rate of the contract attorneys hired by lead counsel at $200 per hour – eight times the amount that Mr. Brown argues in his objection should be utilized (Obj. at 6) – and still awarded a fee of 12% of the settlement amount, which equated to a 2.8 multiple of the lodestar re-calculated by the Court. *See* 965 F.Supp.2d at 398-99 & 401.  And just a few months later, in setting the fee in the *Citigroup Bond* case, Judge Stein determined that the staff attorneys employed by the lead counsel in that case, who accounted for roughly 73% of the total lodestar billed in the case, even if lowered to $300 per hour, would still lead to an overall multiple of 1.59, which Judge Stein found to be appropriate for the 16% fee he awarded.  988 F. Supp.2d at 378.[13]  Under any analysis applicable here, a 12% fee and the resulting multiple are extremely reasonable.

Finally, in his challenge of the fee request, and specifically the billing rates for the lawyers characterized as "contract attorneys," Mr. Brown asserts that Lead Counsel's billing rates are "unethical."  Obj. at 13-17.  In calling Lead Counsel "unethical" – a most serious charge for a lawyer who plagiarized without attribution from an objection submitted by a different person in a different case – Mr. Brown cites to a passage attributed to the ABA Standing Committee on Ethics, as follows:  "In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of

---

[13] Even if the Court were to utilize a billing rate of $300 per hour for the Associate Staff Attorneys at BR&B and the "counsel" attorneys at the Miller firm, as Judge Stein utilized in the *Citigroup Bond* case, Plaintiffs' Counsel's adjusted lodestar would be approximately $72.23 million, and the requested fee would be a 1.61 multiple of the adjusted lodestar.  And if the Court were to utilize a billing rate of $200 per hour as Judge Stein utilized in the *Citigroup Stock* case, Plaintiffs' Counsel's adjusted lodestar would be approximately $66.05 million, and the requested fee would be a 1.76 multiple of the adjusted lodestar.  Reply Joint Decl. ¶ 36.  Both would be reasonable lodestar multiples and well within the ranges approved in similarly sized securities and other class actions.  *Id.*

associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." He continues: "The analysis is no different for other outsourced legal services, …" Obj. at 13.

Mr. Brown's contention underscores his complete misunderstanding of Lead Counsel's billing of attorneys hired to work on the AIG case. First, there ***was an agreement*** with Lead Counsel's client in this matter, the State of Michigan Retirement Systems, the Court-appointed Lead Plaintiff, and the fee application was explicitly approved by SMRS after it evaluated the work that Lead Counsel performed, the result achieved for the Settlement Class, the time and expenses incurred in the case, the firms' billing rates for all attorneys and other support staff who worked on the case, and the other information submitted in support of the Fee and Expense Application. *See* Joint Decl. ¶¶ 143-144 & Exhibit 2 (Declaration of Robert Brackenbury) at ¶ 14.

Second, contrary to Mr. Brown's assertion, the hiring of attorneys to perform document reviews and other tasks did not constitute the use of "outsourced" legal services. While Mr. Brown speculates without any basis that document reviews were "almost certainly conducted offsite" (Obj. at 14), the ***fact*** is that none of the work of the attorneys hired to work on the AIG case was either outsourced or done off-site. As described above, all of the work was done in the offices of BR&B and the Miller firm, on the firms' computer systems, using the database that we employed through a third-party vendor selected after an extensive RFP process (Joint Dec. ¶ 151), and using the firms' secretarial services and other support systems. Reply Joint Decl. ¶ 21. And, as further noted above, Lead Counsel regularly interacted with and oversaw all of the attorneys working at their firms, often on a daily basis, to ensure that all attorneys working on the case understood the myriad complex issues involved, and so that Lead Counsel understood

28

documents and issues, and their significance, as they were being discovered.  This regular interplay among the teams of lawyers and Lead Counsel aided Lead Counsel in efficiently understanding the complex issues, and effectively and coherently utilize this information in this case.  *Id.* ¶¶ 22-24.

As for Mr. Brown's suggestion that this Court should retain a special master to review Lead Counsel's time records, similar suggestions have been considered and rejected for very good reasons by other Judges in this District.  *See, e.g., In re WorldCom*, 2004 WL 2591402, at *21 (finding "no need to retain an independent guardian to undertake a further review of Lead Counsel's time records," which the Court found would "reduce the amount of money available to distribute to the class" and "would be redundant of the work already performed by Lead Plaintiff").  Indeed, this Court's appointed Lead Plaintiff has already conducted the types of reviews upon which this Court can and should rely in evaluating the Fee and Expense Application.  As noted in the Joint Declaration and Brackenbury Declaration, Lead Plaintiff actively oversaw the prosecution of this case, including closely monitoring the Lead Counsel firms.  Lead Counsel provided case status reports and updates to SMRS on a periodic basis throughout the course of the litigation, which included Lead Counsel's time, lodestar and expenses incurred at the times of the reports, and thereafter provided SMRS with the attorney time, hourly rates and lodestar information contained in Exhibits 3A through 3F of the Joint Declaration, in advance of Lead Plaintiff's approval of the Fee and Expense Application.  After reviewing the fee submission, SMRS approved it.  Given the Lead Plaintiff's careful review of these materials, as well as its comprehensive oversight of the litigation and settlement of this Action, Lead Counsel respectfully submit that no special master should or needs to be appointed.

### 3.     The Lodestar Cross-Check Confirms the Reasonableness of Lead Counsel's Fee Request

In Lead Counsel's submissions on December 22, 2014, Lead Counsel sought to demonstrate that each of the factors generally considered by courts in this Circuit justify the 12% fee request sought in the Fee and Expense Application.  *See generally* Joint Decl. ¶¶ 110-144, discussing, *inter alia*, (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the Settlement; and (6) public policy considerations.  After considering these factors and obtaining prior approval from SMRS for the Application, Lead Counsel sought a fee that equates to a multiple of 1.5 times the collective lodestar of Plaintiffs' Counsel as of November 30, 2014.

As shown above, the hourly rates that Lead Counsel presented for their attorneys – partners, associates, counsel, and staff attorneys – were proper and appropriate given the work experiences and expertise of the attorneys involved and the work they performed in this case.

Mr. Brown next argues, in essence, that because virtually all cases that pass the motion to dismiss stage settle, by the time Lead Counsel began its discovery efforts in the case – which was when staff attorneys and others were employed to assist in the prosecution of the case – all of the risk in the case had passed, so no multiple should be awarded.  Mr. Brown asserts that it is "very rare for PSLRA attorneys to devote tens of thousands of hours to a case – especially a multi-billion dollar alleged damages case where even a nuisance settlement will be large – and be unable to settle."  Obj. at 18.  He continues that in such a case, "most of the hours in the case will have been devoted well after most of the risk of not settling had passed."  *Id.*

This argument fails on numerous grounds.  The $970.5 million that Lead Plaintiff and Lead Counsel recovered for the benefit of the Settlement Class is hardly a "nuisance settlement."

To the contrary, it appears to be the largest recovery ever achieved in a PSLRA case in the absence of an SEC enforcement action, a criminal indictment, or a restatement of the company's financial statements.  Joint Decl. ¶ 76.  While the objector may have been fine with a "nuisance" settlement, Lead Plaintiff and Lead Counsel certainly were not going to accept anything other than a very significant amount as a settlement in this case and devoted substantial resources to achieve that goal.

Moreover, to assert that the case had no risks after motions to dismiss were decided evidences a gross misunderstanding of the securities litigation process generally and the prosecution of this case in particular.  The objection disregards the many significant risks that Lead Counsel described in the Joint Declaration pertaining to certification of the class, liability issues, and loss causation and damages issues.  *Id.* ¶¶ 83-98.  For example, it disregards that while the motion for class certification was originally pending, the Supreme Court accepted certiorari in *Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*, No. 11-1085, which many commentators predicted could have a substantial impact on "the relative leverage of parties in [securities fraud class actions] and the ability of plaintiffs to obtain monetary settlements."  *See, e.g.*, M. Sinaiko and Seven S. Sparling, *Supreme Court To Address Standards For Class Certification In Securities Fraud Actions And Contours Of The "Fraud On The Market" Doctrine*, The Metropolitan Corporate Counsel (October 2012).  It disregards that the parties conducted two earlier mediation sessions – one in the summer of 2012, and another in the fall of 2013 – that did not result in a settlement.  And it disregards that prior to any settlement being reached, the Supreme Court accepted certiorari in *Halliburton II*, which many commentators predicted would be the death knell of securities fraud class actions.  *See, e.g.*, Lawrence Hurley and Jonathan Stempel, *U.S. Justices to Hear Halliburton Securities Class Action,* Reuters (Nov.

15, 2013) ("The U.S. Supreme Court, which in recent years has ruled for business in a string of high-profile cases, agreed on Friday to hear a case that could herald a dramatic decline in securities class action litigation," quoting a law school professor who said "Overruling 'Basic' would scale back securities class actions tremendously," and quoting an *amicus* counsel on the petition for certiorari as stating, "It's simply unlikely that the Supreme Court took this case with an eye to leaving 'Basic' in place"). To say there was no risk in the case after the motion to dismiss stage is to ignore the reality of the many obstacles that Lead Plaintiff, Lead Counsel and the Class faced before achieving this large and historic settlement.[14]

Perhaps one reason that the argument Mr. Brown presses in this regard ignores the facts of this case is that the argument is cribbed, virtually word for word, from the *Citigroup* Objection. For instance, Mr. Brown's entire discussion analogizing plaintiffs' law firms to card counters playing blackjack and to hedge-fund managers is taken **word for word** from the *Citigroup* Objection filed December 7, 2012. *Compare* Reply Joint Decl., Ex. 7 (Brown Objection) at 17-18 with Ex. 9 (*Citigroup* Objection) at 14-15. However, there are two major differences. First, while the *Citigroup* Objection cites to an extensive declaration that Mr. Frank had submitted in support of his objection for the proposition that once a PSLRA case survives the motion to dismiss, 82% of cases settle, Mr. Brown cites to a 2011 Cornerstone Securities Class Action Settlement Report (Exhibit 4 to the Brown Obj.) for the same proposition. The Cornerstone Report, however, **says nothing whatsoever** about the percentage of cases that settle after surviving a motion to dismiss. Second, as noted above, Mr. Brown's objection **omits** the information included in the *Citigroup* Objection that showed that for settlements during the years

---

[14] Mr. Brown's objection also ignores the decision of this Court in *In re Pfizer, Inc. Sec. Litig.*, 04-cv-09866-LTS-HBP, 5-md-1688-LTS, 2014 WL 3291230 (S.D.N.Y. July 8, 2014), where judgment was entered for defendants on loss causation grounds after all fact and expert discovery was completed and after consideration and re-consideration of summary judgment motions.

2006 and 2007 of $500 million to $1 billion, the mean and median fee percentages are 12.9%. Mr. Brown's unsupported assertions, glaring omissions, and cribbed objections should not be countenanced.  *See, e.g., In re Nutella Mktg. & Sales Practices Litig.,* No. CIV. A. 11-1086 FLW, 2012 WL 6013276, at \*2 (D.N.J. Nov. 20, 2012), *aff'd* 589 Fed. Appx. 53 (3d Cir. 2014) (finding that opposition briefs "contain large portions of text copied and pasted" from another brief, and affirming the imposition of an appeal bond); and *In re Gen. Elec. Co. Sec. Litig.,* 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (rejecting papers of objector "as if he had simply copied and pasted his objection papers from another proceeding").[15]

Finally, Mr. Brown's argument that there should be a presumption that a fee award equal to lodestar is sufficient is based on *Perdue v. Kenny A ex rel Winn*, 559 U.S. 542, 130 (2010), a decision in a prevailing party/statutory fee-shifting case.  However, the *Perdue* decision is not applicable for a common fund case such as this one.  *See Antoninetti v. Chipotle Mexican Grill, Inc.,* 643 F.3d 1165, 1176 (9th Cir. 2010) (noting *Perdue's* application to fee-shifting cases); *In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 661 n. 25 (E.D. La. 2010) ("*Perdue* has little bearing on the use of lodestar as a cross-check of a … fee awarded as a percentage of a common fund"); *Klein v. O'Neal, Inc.,* 705 F.Supp.2d 632 (N.D. Tex. 2010) (objector's reliance on *Perdue* "misplaced" because *Perdue* did not involve a common fund).  Moreover, such an alleged "presumption" goes against scores of district and appellate court decisions that have held that multiples as high as 6 times lodestar may be appropriate, based on the court's evaluation of counsel's work in the case, the result achieved, a lead plaintiff's approval of the requested fee,

---

[15] In *Gen. Elec.,* Judge Cote imposed an appeal bond against a *pro se* objector, in part, because he had been "represented in the matter" by attorney Christopher Bandas, who the court noted is a "known vexatious appellant," although Mr. Bandas never formally appeared in the action.  *See* 988 F.Supp.2d at 156.  Similarly here, although Mr. Bandas is not included as counsel or co-counsel on the Brown Objection, and has never appeared in this Action, his email address was added for some reason to the ECF service list in this Action between January 5 and January 6. *Compare* ECF No. 479 with ECF No. 476 (adding Mr. Bandas' email address as a secondary email for counsel for Mr. Brown).

and other factors cited in Lead Counsel's initial memorandum in support of the Fee and Expense Application.

For all of these reasons, Lead Counsel – supported by Lead Plaintiff – respectfully submit that the Fee and Expense Application is fully justified and should be awarded in its entirety, and that the objection to the fee request should be dismissed and rejected.

## V.    CONCLUSION

For all of the foregoing reasons, as well as the reasons stated in Lead Plaintiff's and Lead Counsel's memoranda submitted on December 22, 2014, the motion filed on December 30, 2014, the Joint Declaration and the Reply Joint Declaration, Lead Plaintiffs and Lead Counsel respectfully request that the Court: grant final approval of the Settlement; grant final certification to the Settlement Class; grant final approval of the Plan of Allocation as revised; and grant the Fee and Expense Application in its entirety.

Dated:  March 6, 2014

Respectfully submitted,

**BARRACK, RODOS & BACINE**                          **THE MILLER LAW FIRM, P.C.**

/s/ Jeffrey W. Golan                                     /s/ E. Powell Miller
Leonard Barrack                                          E. Powell Miller (*pro hac vice*)
Jeffrey W. Golan (*pro hac vice*)                        Marc L. Newman (*pro hac vice*)
Robert A. Hoffman (*pro hac vice*)                       Jayson E. Blake
Lisa M. Port                                             Miller Building
Julie B. Palley                                          950 West University Drive, Suite 300
3300 Two Commerce Square                                 Rochester, MI 48307
2001 Market Street                                       Tel.: (248) 841-2200
Philadelphia, PA  19103
Tel.:  (215) 963-0600

            and

A. Arnold Gershon (AG – 3809)
Michael A. Toomey (MT – 6688)

425 Park Avenue, Suite 3100
New York, New York 10022
Tel.:  (212) 688-0782

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,*
*and Lead Counsel for the Putative Class*